****EXECUTIONS SCHEDULED FOR APRIL 17, 20, 24, and 27, 2017****

**FILED**
U.S. DISTRICT COURT
EASTERN DISTRICT ARKANSAS

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF ARKANSAS**

MAR 2 7 2017

JAMES W. McCORMACK, CLERK
By: _Rochelle_
                                    DEP CLERK

| | |
|---|---|
| JASON McGEHEE, STACEY JOHNSON, BRUCE WARD, TERRICK NOONER, JACK JONES, MARCEL WILLIAMS, KENNETH WILLIAMS, DON DAVIS, and LEDELL LEE, ) ) ) ) ) ) | |
| Plaintiffs, ) ) | |
| v. ) ) | Case Number____ ____ ___ 4:17-cv-00179-KGB |
| ASA HUTCHINSON, Governor of the State of Arkansas, in his official capacity, and WENDY KELLEY, Director, Arkansas Department of Correction, in her official capacity, ) ) ) ) ) ) | This case assigned to District Judge _Baker_ and to Magistrate Judge _Deere_ |
| Defendants. ) | |

## COMPLAINT

1. Plaintiffs are nine inmates currently on death row in Arkansas. The Governor has set

   eight of their execution dates for a ten-day period at the end of April, with two

   executions to occur back-to-back on four separate nights. The executions are

   scheduled as follows, at a time not yet disclosed to inmates or their counsel:

   - Don Davis and Bruce Ward on April 17, 2017;

   - Stacey Johnson and Ledell Lee on April 20, 2017;

   - Marcel Williams and Jack Jones on April 24, 2017; and

   - Jason McGehee and Kenneth Williams on April 27, 2017.

The order of executions on each date is unknown.

2. Plaintiffs bring this action under 42 U.S.C. § 1983 for (1) violations and threatened violations of their right to be free from cruel and unusual punishment under the Eighth and Fourteenth Amendments to the United States Constitution; (2) violations and threatened violations of their right to counsel during the pre-execution period, as guaranteed by 18 U.S.C. § 3599; and (3) violations of their right to access the courts and to § 3599 counsel during the executions themselves. Plaintiffs seek equitable, injunctive, and declaratory relief.

**Jurisdiction and Venue**

3. Jurisdiction over this matter arises under 28 U.S.C. §§ 1331 (federal question) and 1343(a)(3) (civil rights violations and equitable relief under an act of Congress). This Court also has jurisdiction to enforce its orders appointing counsel under 18 U.S.C. § 3599.

4. Venue is appropriate in the Eastern District of Arkansas under 28 U.S.C. § 1391(b).

**Parties**

5. Plaintiffs are all citizens of the United States and of Arkansas. They are all death-sentenced inmates currently incarcerated at the Varner facility of the Arkansas Department of Correction ("ADC"), which is in the Eastern District of Arkansas and under Defendants' supervision and control. With the exception of Nooner, Plaintiffs all have pending execution dates as set out in Paragraph 1.

2

6. Defendant Wendy Kelley is the Director of the ADC. She or her designee is statutorily responsible for "order[ing] the dispensation and administration of the drug or drugs . . . for the purpose of carrying out the lethal-injection procedure." Ark. Code Ann. § 5-4-617(b). Kelley is statutorily responsible for conducting "an execution for a sentence of death" or for designating "some assistant or assistants" to do so. Ark. Code Ann. § 16-90-502(b), (d). Kelley alone is responsible for "develop[ing] logistical procedures necessary to carry out the sentence of death." Ark. Code Ann. § 5-4-617(g).

7. Defendant Asa Hutchinson is the Governor of Arkansas. He is the final executive authority in the state. As Governor, Hutchinson is statutorily responsible for setting execution dates by warrant. Ark. Code Ann. § 16-90-507(a). The Governor also has the power to suspend execution of a judgment of death. Ark Const. art. 6, § 18; Ark. Code Ann. § 16-90-506(c)(1).

## Facts

### A. Arkansas's lethal-injection protocol.

8. Arkansas statute provides two options for execution by lethal injection: "(1) a barbiturate; or (2) Midazolam, followed by vecuronium bromide, followed by potassium chloride." Ark. Code Ann. § 5-4-617(c).

9. Kelley has adopted a written and largely undisclosed lethal-injection protocol for executions using midazolam ("midazolam protocol").

3

10. The entirety of Plaintiffs' knowledge about the midazolam protocol is encompassed in a public document known as "Attachment C." Attachment C describes the procedure for mixing the execution drugs and for injecting them into Plaintiffs. This document is attached to this Complaint as Exhibit 1.

11. Attachment C calls for the drugs to be administered in the following manner. First, the executioner will inject 500 mg of midazolam, which is intended to—but which, as described further below, will not—render the condemned inmate insensate to the pain caused by the subsequent drugs. Second, five minutes after the midazolam has been injected, the executioner will inject 100 mg of vecuronium bromide, which is intended to paralyze the condemned inmate. Third, the executioner will inject 240 mEq of potassium chloride, which is intended to stop the condemned inmate's heart and to cause his death.

12. Between injection of the midazolam and injection of the vecuronium bromide, Attachment C calls for the ADC's Deputy Director, or his designee, to "confirm the condemned inmate is unconscious by using all necessary and medically-appropriate methods." If the condemned inmate remains conscious, the executioner will inject another 500 mg midazolam. Attachment C is silent on what happens if the condemned inmate remains conscious after that.

13. Attachment C calls for IV lines to be set up by an unknown number of people called the "IV team." Members of the IV team are to have at least two years of professional

4

experience in one of the following disciplines: emergency medical technician–intermediate; emergency medical technician–paramedic; nurse; physician assistant; or physician. The Deputy Director or his designee, who is the person directly in charge in the execution chamber, is not required to have these qualifications, though she must be "healthcare trained, educated, and/or experienced in matters related to the establishment and monitoring of IVs, the mixing and administration of the chemicals, and assessing the presence or absence of consciousness." If there is a problem with the IV lines, unknown "trained, educated and experienced person(s) necessary to establish a primary IV line as a peripheral line or as a central venous line will be summoned to facilitate an IV infusion site."

14. Plaintiffs have sought additional information about the lethal-injection procedure. See Exhibit 2. Kelley's counsel responded to these requests in a letter dated March 15, 2017, attached as Exhibit 3, as follows:

    a. Kelley refuses to disclose execution protocols besides Attachment C.

    b. Kelley has no documents establishing whether the IV team members will remain the same during the eight executions that Kelley intends to carry out from April 17, 2017, to April 27, 2017.

    c. Kelley has no documents other than Attachment C explaining what she considers to be "necessary and medically-appropriate methods" for

determining whether a condemned inmate is unconscious after the injection
of midazolam.

d.  Kelley has no documents other than Attachment C concerning plans for
suspending the execution should there be a problem with the IV lines.

e.  Kelley has no documents establishing a contingency plan for stopping the
execution if the condemned inmate appears to be conscious after the
midazolam is administered.

**B. Botched midazolam executions.**

15. Since 2014, there have been at least four botched executions across the United States
using midazolam.

a.  On January 16, 2014, Ohio executed Dennis McGuire using a combination of
10 mg midazolam and 40 mg hydromorphone. The execution took twenty-
five minutes and "was accompanied by movement and gasping, snorting and
choking sounds." Erica Goode, *After a Prolonged Execution in Ohio, Questions
over 'Cruel and Unusual'*, N.Y. TIMES, Jan. 17, 2014, *available at*
http://nyti.ms/2glQUyI.

b.  On April 29, 2014, Oklahoma executed Clayton Lockett using 100 mg
midazolam followed by a paralytic and potassium chloride. Lockett awoke
during administration of the second and third drugs. Though the execution
was halted, Lockett died forty minutes after the execution began. *See Glossip*

6

*v. Gross*, 135 S. Ct. 2726, 2782 (2015) (Sotomayor, J., dissenting). This execution was scheduled to be a double execution, with Lockett followed by Charles Warner. After the botch, the Oklahoma Department of Public Safety concluded that executions should be spaced at least seven days apart. *See* Exhibit 4.

c.  On July 23, 2014, Arizona subjected Joseph Wood to an execution in which he was injected with 750 mg midazolam and 750 mg hydromorphone. Wood "gasped and snorted for nearly two hours" before he finally died. *Glossip*, 135 S. Ct. at 2791; *see also* Mark Berman, *Arizona Execution Lasts Nearly Two Hours; Lawyer Says Joseph Wood Was 'Gasping and Struggling to Breathe,'* WASH. POST, July 23, 2014, http://wapo.st/2nsiJrk. Wood's attorneys convened a hearing during the execution. See Exhibit 5.

d.  Most recently, on December 8, 2016, Alabama executed Ronald Bert Smith using 500 mg of midazolam followed by 600 mg of rocuronium bromide followed by 240 mEq potassium chloride. This protocol is effectively the same as the one Arkansas intends to use. During the execution, which took thirty-four minutes, Smith "was apparently struggling for breath as he heaved and coughed for about 13 minutes." Mark Berman & Robert Barnes, *After Divided Supreme Court Allows Alabama Execution, Inmate Heaves and Coughs During Lethal Injection*, WASH. POST, Dec. 9, 2016, *available at* http://wapo.st/2hnRs7p.

According to Spencer Hahn, an attorney for Smith present at the execution, two minutes after the midazolam began flowing, Smith began having "regular asthmatic-sounding barking coughs every ten seconds or so." Exhibit 6 ¶7. "He also lifted his head and looked around, moved his arms, clenched his left hand, and moved his lips in what appeared to be an attempt to say something. [His] eyes never closed, and he moved and coughed regularly throughout approximately the next fifteen minutes." *Id.* Smith was awake after the first consciousness check, "as he was still moving his head, hands and arms, coughing, and attempting to speak." *Id.* ¶8. After the second consciousness check, Smith's "eyes remained open" (despite a guard's attempt to push his left eye closed), and Smith "moved his right arm." *Id.* ¶10–11. "Shortly thereafter, they must have administered the paralytic, as [Smith's] breathing became very shallow and he stopped moving. His eyes remained open, with the left eye opening further as his breathing became imperceptible." *Id.* ¶11.

16. In light of midazolam's obvious impropriety as an execution drug, state corrections departments have abandoned it. Kentucky abandoned it in 2014. Arizona has recently agreed that it will never again use midazolam in an execution. Florida has eliminated midazolam from its most recent execution protocol.

## C. Kelley's drug supply.

**17.** Arkansas statute allows Kelley to choose the quality of the drugs she will use in

executions. The drugs may be "approved by the United States Food and Drug

Administration [("FDA")] and made by a manufacturer approved by the [FDA]" or

they may be "obtained by a compounding pharmacy that has been accredited by a

national organization that accredits compounding pharmacies." Ark. Code Ann. § 5-

4-617(d).

**18.** Compounded drugs are much riskier than FDA-approved drugs. FDA-approved

drugs come with manufacturer-provided labels; compounded drugs do not. Kelley

has previously provided (redacted) labels for the midazolam and the vecuronium

bromide. She has refused to provide labels for the potassium chloride.

**19.** Kelley obtained the ADC's supply of midazolam sometime in the summer of 2015.

Its expiration date is April 2017. Kelley obtained the vecuronium bromide in July

2016. Its expiration date is March 1, 2018. Kelley obtained the potassium chloride in

March 2017. Its expiration date is August 2018.

**20.** Kelley has previously tested some of the ADC's execution drugs to ensure their

purity and potency. She tested the current supply of midazolam in November 2015

and provided Plaintiffs with a redacted report showing the midazolam was

sufficiently potent at that time. See Exhibit 7. She tested the vecuronium bromide in

9

July 2016 but has not provided any record of the results. Plaintiffs do not know

whether she has tested the potassium chloride.

**D.  Hutchinson's execution schedule.**

21.  In Arkansas, the Governor sets execution dates after receiving a letter from the

Attorney General asking him to do so. On Friday, February 24, 2017, the Attorney

General sent letters requesting execution dates for all Plaintiffs but Nooner. On

Monday, February 27, Hutchinson ordered the execution schedule set out in

Paragraph 1.

22.  Hutchinson has admitted in press interviews that he scheduled the executions so as

to exhaust the State's supply of midazolam before it expires. *See* Matthew Haag &

Richard Fausset, *Arkansas Rushes to Execute 8 Men in the Space of 10 Days*, N.Y. TIMES,

Mar. 3, 2017, *available at* http://nyti.ms/2ln3kc4.

23.  Since the return of the death penalty in *Gregg v. Georgia*, 428 U.S. 153 (1976), no state

has carried out executions in such a compressed time frame. No state has attempted

as many as eight executions in even a month since 1997.

24.  No state has conducted a double execution since 2000. The last time a double

execution was attempted, in 2014, the result was the botched Lockett execution,

discussed in Paragraph 15b. The Lockett execution spurred an investigation in

which the Oklahoma Department of Public Safety recommended that "executions

should not be scheduled within seven calendar days of each other" and that there be

sufficient time between executions for a review in which "all involved personnel [may] voice their opinions, concerns and/or recommendations in order for continuous improvement to the process." *See* Exhibit 4 at 28.

**E. Kelley's policies governing the execution.**

25. Historically, Kelley's predecessors in office have permitted multiple attorneys to view executions.

26. Despite Kelley's refusal to share any execution policies besides Attachment C, Plaintiffs' counsel have sought additional information about whether each Plaintiff's attorneys will be able to witness their client's execution and whether they will have access to a phone during the execution. *See* Exhibit 8.

27. Kelley's counsel has informed Plaintiffs' counsel that if a Plaintiff has more than one attorney, only one attorney will be allowed to witness the execution. *See* Exhibit 9.

28. Kelley's counsel has informed Plaintiffs' counsel that a Plaintiff's attorney will not have access to a telephone during the execution if she chooses to view the execution. *See* Exhibit 10.

29. Kelley's predecessor provided Plaintiffs a more complete version of the ADC's execution procedures, AD 08-28, which became effective on May 22, 2008. Exhibit 11. AD 08-28 places no restrictions on attorney viewing or phone access during the execution. Because Kelley has not provided later versions of the procedures, it is unknown when the viewing and telephone policies changed.

**30.** Kelley's policies prevent any witness, including the attorneys, from viewing and hearing the complete execution process. The policies do not permit witnesses to view the execution until the IV lines have been affixed to the prisoner and the drugs are ready to flow. Members of the execution team have discretion to pull the curtain during drug flow in the event of a problem. Audio to the witness room is shut down after the inmate's last words.

**CLAIM I (ON BEHALF OF ALL PLAINTIFFS BUT NOONER): THE COMPRESSED EXECUTION SCHEDULE RESULTS IN DENIAL OF PLAINTIFFS' RIGHT TO COUNSEL PURSUANT TO 18 U.S.C. § 3599.**

**31.** The previous paragraphs of this complaint are incorporated by reference as if fully stated herein.

**32.** The execution of eight of the Plaintiffs in a period of ten days denies each of them the effective representation of counsel, which was guaranteed to them when they were appointed counsel by the federal courts under 18 U.S.C. § 3359. Unambiguously, this federal statute provides that death-sentenced inmates are entitled to appointment of counsel. The statute recognizes that counsel is authorized to represent Plaintiffs in various stages of capital litigation including "applications for stays of execution and other appropriate motions and procedures, and shall also represent the defendant in such competency proceedings and proceedings for executive or other clemency as may be available to the defendant."

33. Each Plaintiff set to be executed has been appointed counsel under this statute. The current execution schedule, in a serial fashion and with only two months' notice for the setting of all eight execution dates, denies each of them the effective representation of counsel in each of the areas guaranteed by § 3599, including, but not limited to, effective and meaningful representation during executive clemency proceedings, effective and meaningful representation in competency proceedings, effective and meaningful representation concerning stays of executions, and effective and meaningful representation in other motions and proceedings concerning execution of their sentence of death. *See Harbison v. Bell*, 556 U.S. 180, 190 (2009).

34. The current schedule places an inordinate burden on counsel, who represent multiple clients with execution dates. Consequently, it has a deleterious effect on the adequacy of the legal representation counsel is able to provide. The effect of the compressed execution schedule amounts to denial of counsel contemplated by § 3599. This denial can easily be remedied by spreading the execution dates out over a more reasonable time period.

35. Counsel must prioritize any client who is facing an execution date. However, an execution date does not dispel deadlines in counsel's other pending cases. The burden of an execution date upon a pre-existing caseload is expected. The undue

13

burden of *multiple* execution dates upon counsel's caseload is rare and extremely difficult. This burden erodes effectiveness of representation.

**36.** Each Plaintiff has been appointed counsel by either the United States District Court for the Eastern or Western District of Arkansas under 18 U.S.C. §3599. 21 U.S.C. § 848(q) was recodified in 2006 as 18 U.S.C. § 3599. The provisions in § 848 remain the same. *See Harbison*, 556 U.S. at 190.

**37.** On March 7, 2000, Jack Jones moved for appointment of counsel under 21 U.S.C. § 848 and *McFarland v. Scott*, 512 U.S. 849 (1994). Motion, No. 4:00mc0008-JMM, E.D. Ark., ECF Doc. 1. This motion was granted on April 1, 2000, and counsel was appointed. Order, ECF Doc. 2. Jeff Rosenzweig represents Jones.

**38.** On July 27, 2001, Don Davis moved for appointment of counsel. Motion, No. 5:01-cv-05188, W.D. Ark., ECF Doc. 1. This motion was granted on August 2, 2001, and Al Schay was appointed. Order, ECF Doc. 2. On May 13, 2004, Deborah Sallings was appointed as pro bono counsel without compensation. Order, ECF Doc. 34. After Al Schay's death in January 2016, on March 20, 2017, the Court entered an order appointing the Capital Habeas Unit of the Federal Public Defender for the Eastern District of Arkansas to represent Davis under 18 U.S.C. § 3599. Order, ECF Doc. 45.

**39.** On September 17, 2002, Jason McGehee moved for appointment of counsel. Motion, No. 4:02-mc-00015-SWW, E.D. Ark., ECF Doc. 1. On the same day, an order was

14

entered appointing Al Schay and the Federal Public Defender's Office for the Eastern District of Arkansas. Order, ECF Doc. 2.

40. On February 25, 2002, Al Schay moved to be appointed to represent Marcel Williams. Motion, Case No. 4:02mc00005SMR, E.D. Ark., ECF Doc. 1. This motion was granted on March 18, 2002. Order, ECF Doc. 5. On November 12, 2002, Schay moved that the Federal Public Defender's Office for the Eastern District of Arkansas be appointed as co-counsel. Motion, ECF Doc. 6. This request was granted on December 2, 2002. Order, ECF Doc. 7.

41. On July 12, 2004, Kent Gipson and William C. Odle moved to be appointed to represent Ledell Lee "pursuant to U.S.C. § 848(q)(B) and 18 U.S.C. § 3006(A)." Motion, No. 5:01cv00377 JH, E.D. Ark., ECF Doc. 26 at 1. On July 28, 2004, this motion was granted. ECF Doc. 27. Subsequently, Gary Brotherton was substituted for Odle. On May 24, 2016, Gipson sought to withdraw. ECF Doc. 148. This motion was denied on July 18, 2016. ECF Doc. 155. On August 16, 2016, Lee Short was permitted to substitute for Brotherton, as Brotherton had been suspended from the Missouri Bar because of mental illness. ECF Doc. 157.

42. On May 23, 2006, Stacey Johnson moved for appointment of counsel under 21 U.S.C. § 848 and *McFarland v. Scott*, 512 U.S. 849 (1994). Motion, No. 4:06mc00017GH, E.D. Ark., ECF Doc. 1. This motion was granted on June 6, 2006, and Jeff Rosenzweig was appointed. Order, ECF Doc. 2.

**43.** On April 9, 2007, Kenneth Williams moved for appointment of counsel under 21

U.S.C. § 848 and *McFarland v. Scott*, 512 U.S. 849 (1994). Motion, No. 4:07mc00008,

E.D. Ark., ECF Doc. 1. This motion was granted on April 12, 2007, and Jeff

Rosenzweig was appointed. Order, ECF Doc. 2.

**44.** On August 26, 2015, Jennifer Merrigan was appointed to represent Bruce Ward

along with the Federal Public Defender's Office for the Eastern District of Arkansas.

Order, No. 5:03-cv-00201-BSM, E.D. Ark., ECF Doc. 170. The Federal Public

Defender had been appointed on June 10, 2003. Order, ECF Doc. 5. On December 14,

2015, the Court granted a motion to permit Joseph Perkovich to substitute for Joe

Luby. Order, ECF Doc. 174. Merrigan and Perkovich represented two other clients

who were executed in other states earlier this year, thus reducing the time they have

had to devote to Ward's case and requiring them to rely on the work of the CHU.

**45.** Undersigned attorney Jeff Rosenzweig represents Stacey Johnson, Jack Jones, and

Kenneth Williams individually with effectively no co-counsel. Dale Adams was also

appointed to represent Jones, but Adams's recent involvement has been limited to

correspondence with Jones and the ADC on some of Jones's medical issues. Gerald

Coleman was appointed to represent Johnson. Coleman has performed essentially

no work on the case. Rosenzweig is also co-counsel for Jason McGehee.

**46.** Undersigned attorneys from the Federal Public Defender's Capital Habeas Unit

(CHU) for the Eastern District of Arkansas represent Marcel Williams and Jason

McGehee. The CHU is also co-counsel for Bruce Ward and Don Davis. Of note,

Bruce Ward and Don Davis are scheduled to be executed on the same day during

the first round of executions.

47. Undersigned attorney Lee Short represents Ledell Lee. Short only came into the case

after Lee's longtime attorney Gipson unsuccessfully sought to withdraw. Short has

been provided only seven months to become knowledgeable about Lee's case, to

create a working relationship with Lee, and to begin investigation for potential

litigation and clemency issues. Gipson, who is technically still appointed, has been

unable to provide guidance.

48. The scheduling of eight executions in ten days unduly strains the resources of the

CHU office, of Jeff Rosenzweig, and of Lee Short; requires an inordinate amount of

counsel's time; and significantly decreases the quality of representation afforded

Plaintiffs.

49. There is a small community of counsel qualified to represent an inmate under

warrant of death. The complexity of a capital case, including the voluminous record,

prevents last-minute entry of alternate counsel to alleviate the burden of multiple

execution dates on current counsel.

50. This hardship is further exacerbated by the fact that these executions were

announced and set on February 27, 2017, giving all counsel less than sixty days to

prepare for these executions, consult with their clients, apply for clemency, and

litigate important constitutional claims on an exceptionally short and altogether inadequate timetable.

51. There is no more serious undertaking than representing a client facing a death sentence. This undertaking is most serious when the client is under a death warrant. Multiple death-penalty attorneys will attest to the enormous responsibility placed on capital counsel once execution warrants are set. *See* Exhibit 12 (Declaration of Brian Mendelsohn); Exhibit 13 (Declaration of Robert Edward Lee, Jr.); Exhibit 14 (Declaration of Dale A. Baich). Those responsibilities include the following:

a. Counsel must litigate issues not legally available until an execution is imminent, such as challenges to competency to be executed. *See, e.g., Panetti v. Quarterman,* 551 U.S. 930, 942–48 (2007) (claims regarding competency to be executed not ripe until after an execution date has been scheduled).

b. Counsel must pursue executive clemency, which, in Arkansas, is not available to an inmate until his execution date is set. This pursuit includes extensive investigation and preparation of the petition.

c. Counsel must pursue challenges that seek to ensure that any execution process is fair and that do not ripen until the execution process is set in place. *See Ohio Adult Parole Authority v. Woodard,* 523 U.S. 272 (1998).

   d. Counsel must frequently consult with the client, must communicate with the client's family and friends, and must make arrangements with the client in the event he is executed.

   e. Counsel must determine whether issues disposed of in earlier proceedings may be revisited due to subsequent developments in the law.

52. Rosenzweig and the CHU attorneys will potentially be required to challenge the execution process up until moments before, or even during, the execution itself. Then they will have to continue challenging that process for another client just minutes after watching another client die.

53. Congress recognized that taking on these substantial obligations takes significant time. The legal proceedings in death-penalty cases are notoriously lengthy and complex. Establishing a detailed understanding of these proceedings is a time-consuming task and a basic prerequisite to competent performance. Competent representation of inmates under an execution warrant takes substantial time.

54. Competent representation of a client under an execution warrant also takes substantial emotional resources. Competent representation in capital cases requires establishing a relationship of trust with the client. In the context of this relationship, the client will often share the most sensitive details of his life. No matter how professional the relationship between a death-sentenced client and his counsel, having a client executed is a uniquely taxing professional experience.

19

55. The scheduled pace of executions is preventing and will prevent Plaintiffs' counsel
from performing competently as contemplated by Congress when it enacted § 3599.
It is professionally and emotionally impossible to pursue all avenues of litigation
and defense available to each Plaintiff currently scheduled for execution due to (1)
the setting of executions with such short notice, which drastically compresses the
amount of time available to prepare clemency petitions and litigation and (2) the
setting of eight executions to occur over a span of just ten days when certain
Plaintiffs are represented by the same counsel.

56. It will be professionally and emotionally impossible for counsel to fully, adequately,
and competently represent a client by witnessing his execution and raising
challenges (if warranted) while also preparing for the execution of another client
either on the same night or within a matter of days—time after time after time.

57. Even if competent representation of a single client were possible in the expedited
timeframe in which these executions were set, the physical and psychological toll of
litigating under warrant and losing one or more clients prevents competent
representation of subsequent clients. Additionally, the impending prospect of losing
additional clients detracts and distracts from the ability to fully focus on critical
matters that may arise in the days and moments leading up to—and during—
executions of Plaintiffs that are scheduled on the first date.

**58.** Undersigned counsel also have other pre-existing cases and responsibilities, including other clients whose cases must still be litigated. The burden imposed by multiple death warrants will prevent adequate and competent advocacy in those cases, potentially giving rise to more issues—including ineffective assistance of counsel—to be litigated in the future.

**Denial of Counsel in Clemency Proceedings**

**59.** The right to effective and meaningful counsel in state clemency proceedings is guaranteed by 18 U.S.C. § 3599. *Harbison v. Bell*, 556 U.S. 180 (2009). A clemency application alone is a substantial undertaking, requiring a "complete and persuasive" presentation, "utilizing all appropriate resources in support (e.g., relevant outside organizations, the trial judge, prominent citizens), and discussing explicitly why the clemency-dispenser should act favorably notwithstanding the repeated affirmation of the client's conviction and sentence by the judicial system." ABA Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases ("ABA Guidelines"), Guideline 10.15.2: Duties of Clemency Counsel (Feb. 2003).

**60.** Preparing for the clemency process requires a thorough examination of all prior phases of the case and independent investigation to tailor the clemency presentation to the client and case. Counsel must also ensure that consideration of the client's clemency application is substantively and procedurally just.

61. Generally, if executions are spaced apart by a period of weeks or months, as they have been in the past, counsel is afforded time necessary to give complete focus to the client in most imminent danger of execution—including the clemency process (if the client desires)—before shifting focus to the next client.

62. Stacey Johnson, Ledell Lee, Marcel Williams, Jason McGehee, and Kenneth Williams are all seeking executing clemency. Jeff Rosenzweig is therefore responsible for preparing two clemency applications (for Stacey Johnson and Kenneth Williams) and preparing for two clemency hearings (and securing witnesses, paperwork, etc.) within a span of less than two weeks on very short notice. The CHU likewise is responsible for preparing two clemency applications (for Marcel Williams and Jason McGehee) and preparing for two day-long clemency hearings (and securing witnesses, paperwork, etc.) within a span of less than a week on very short notice.

63. Plaintiffs were given seventeen days at most to file their clemency applications. Some were given only eight days. Johnson and Lee had ten days; Marcel Williams had fifteen days; McGehee and Kenneth Williams had seventeen. Even seventeen days is an insufficient amount of time, especially considering counsel's other professional obligations that are ongoing during this time, including competing clemency applications and other obligations to these clients themselves.

**Denial of Counsel for "Appropriate Motions and Procedures"**

**64.** The current compressed time period leaves absolutely no time for a critical

assessment or debriefing period after each execution. Those assessments will

generally include an autopsy report, review of practices and procedures, gathering

feedback from participants, checking qualifications of those involved, etc. This is a

vitally important step in the process and an important safeguard against

unconstitutional practices.

**65.** The compressed schedule leaves no time for this critical assessment period after the

initial execution and no time for an assessment period after the subsequent

executions until the last one is performed. Counsel rely on these assessments to

determine whether Defendants' actual practices (as opposed to the written protocol,

which is far from exhaustive) are in line with what is required by state law and the

United States Constitution. This compressed schedule prevents counsel from

presenting meaningfully "any appropriate motion" or initiating any meaningful

"procedure" concerning the executions as they happen over the ten-day period.

**Denial of Counsel for "Applications for Stays of Execution"**

**66.** Under the ABA Guidelines, the paramount duty of counsel in a capital case is to

seek a stay of execution. Guideline 10.15.1(B). This duty is reflected in § 3599 which

23

mandates that counsel pursue "applications for stays of execution and other appropriate motions and procedures."

67. The execution of eight inmates in a period of ten days denies each of them the effective representation of counsel guaranteed by 18 U.S.C. § 3359. *Harbison v. Bell*, 556 U.S. 180, 190 (2009).

68. It is an impossible task for counsel to effectively litigate on behalf of each client during overlapping periods of time, or to litigate on behalf of one client and then gear up within minutes or hours to zealously advocate for the next client on the assembly line of death.

69. Stays of executions are often litigated until the final moments before an execution takes place and may even be litigated during an execution if an issue arises.

70. Counsel will be required to visit with each client numerous times during the period leading up to the client's execution, especially in the days just before and the day of the scheduled execution. This entails travel to and from Grady, Arkansas, from counsel's offices in Little Rock, as well as time spent going through security and with the client himself. Counsel will likely make daily trips to and from Grady during the critical time period, beginning just before the first scheduled executions (over Easter weekend) and throughout the following weeks as additional clients are scheduled for execution. At the same time, counsel must also be litigating vigorously on behalf of each client, coordinating with each client's family and

friends, and making practical arrangements attendant to an execution. It is simply not possible for counsel to perform effectively in these circumstances.

71. Furthermore, the current schedule places counsel in violation of both state and federal ethical guidelines.

72. Arkansas Rule of Professional Conduct 1.3 mandates that counsel "shall act with reasonable diligence and promptness in representing a client." Comment 2 to this Rule states that a "lawyer's work load must be controlled so that each matter can be handled competently." The scheduling of executions for three or four clients represented by a single counsel or office within a ten-day period presumptively violates this state ethical duty.

73. Guideline 10.3 of the ABA Guidelines states that counsel should limit their caseloads so as to provide "each client with high quality legal representation in accordance with" the ABA Guidelines.

74. Because counsel in these circumstances must be familiar with complex and nuanced issues that arise in litigation for stays of executions and the clemency process, as well as with the extensive record of the case and with the client himself, counsel cannot unload a case onto new counsel at the last minute. That in itself would violate counsel's ethical obligations to the client.

**CLAIM II (ON BEHALF OF ALL PLAINTIFFS BUT NOONER): EXECUTIONS IN THE CURRENT COMPRESSED TIMEFRAME VIOLATE THE EIGHTH AMENDMENT.**

75. The previous paragraphs of this complaint are incorporated by reference as if fully stated herein.

76. Governor Hutchinson has scheduled eight men to be executed over the span of ten days, commencing on Easter Monday, April 17, 2017, with two men to be executed on each of four nights as set out in Paragraph 1. This compressed schedule poses an unnecessary and objectively intolerable risk of substantial harm that is sure or very likely to occur. The compressed schedule is also contrary to evolving standards of human decency.

77. Because the death penalty is the most serious penalty available to a state, and because of its unique irrevocability, the procedures for such penalty must be implemented in a reasoned, deliberate, and ultimately constitutional manner.

78. Any execution imposes an extraordinary amount of stress on corrections officers and others involved in the elaborate process.

79. The stress is multiplied when multiple executions are scheduled for the same day, or when executions are scheduled without a reasonable period for rest, recovery, and assessment, including participants' self-assessment of their well-being and willingness to participate in additional executions.

80. As former corrections officials attest, the stress placed on corrections officers during a ten-day string of executions will heighten physical and mental fatigue, will prevent any meaningful post-execution review of death-chamber procedures, and

will accordingly increase the risk that the condemned inmate will suffer during the execution. "[I]t would essentially be professional malpractice for only department of corrections official to attempt to stage eight executions as currently scheduled in Arkansas." Exhibit 15 at 6 (Declaration of Jennie Lancaster).

81. Execution teams are generally made up largely of staff from the department of corrections. Corrections officers are not hired executioners. They are tasked with the protection of inmates in the custody of the department of corrections. Killing people is certainly outside their regular course of duty and is an extraordinary task.

82. The intricacies of an execution go far beyond what happens during the final hour. Each step in the process requires focus and attention to detail. Just one mistake at any point can have disastrous consequences.

83. The people who will make up the execution team(s) for Plaintiffs' scheduled executions will be called upon to take part in the killing of an otherwise healthy human being, under intense scrutiny and pressure, in a process that they have little to no prior experience with, using a drug that has not been used before for executions in this State. And then they are going to be asked to do it again. And then come back to work and do it again. And again. And again. And again. And again. And finally again for the eighth time. With little to no rest in between.

84. Once the execution or double-execution process is over, the veil of secrecy enshrouding that process prevents the participants from seeking solace from their

friends, church groups, or even co-workers. The State has indicated in

communications with the press that counseling will be made available to all staff

members involved. Given the current schedule, however, staff members will have

no meaningful opportunity to receive any necessary or desired counseling between

executions, particularly those executions scheduled for the same day. The

availability of such counseling is necessary to ensure a healthy and appropriate

mindset and level of focus and professionalism required for each execution.

85. Physical, emotional, and mental fatigue of those involved in this execution schedule

substantially increases the risk that a critical detail will be overlooked, that a mistake

will be made, and that Plaintiffs will unconstitutionally suffer the consequences.

86. Defendants' obligations do not cease once an execution has been performed. For

instance, procedures must be followed for appropriate handling and medical review

of the body. Each Plaintiff's property must be accounted for and distributed to a

designated person or persons. Each Plaintiff has a family and friends who will be

impacted by these executions, and Defendants have a responsibility to ensure that

appropriate outreach is made to those people. All of this activity will presumably be

ongoing at the same time other executions are being prepared for and carried out.

87. Preparation for each individual execution requires individual attention to each

Plaintiff. Each Plaintiff must be medically evaluated and have their vein viability

checked. Each Plaintiff is to be provided access to a spiritual adviser. Each Plaintiff

must be counseled on an individual basis about what to expect during their executions. Traditionally, each Plaintiff would receive a last meal of their choosing before their execution. In the days leading up to the execution, Plaintiffs will be transported to the death house. Provisions must be made to house multiple death-row inmates in a different facility to await their executions. Visits from family members, legal counsel, and spiritual advisers are to be accommodated. A detailed log is to be made of each Plaintiffs' activities while they await execution. The drugs to be used in each execution must be measured, mixed, put in syringes, and transported to the death house. Equipment must be inventoried and inspected. All of these things, and more, are required of the numerous people involved in the preparation for each execution, before the actual execution even begins. All of these actions are significant in ensuring that the human dignity of each condemned man is retained in our civilized society in accordance with the Constitution.

88. In light of the complex and coordinated nature of executions, and the intense scrutiny under which they are performed, the increased stress of even two executions in quick succession poses an objectively intolerable risk of substantial harm. That risk is compounded by the prospect of doing eight executions in quick succession.

89. If Defendants proceed with this schedule, they are doing so in deliberate indifference to Plaintiffs' constitutional rights. Defendants are on notice that

29

multiple executions, especially those using midazolam, are stressful and likely to result in objectively intolerable pain suffered by Plaintiffs. The one state—Oklahoma—to even attempt a double execution using midazolam as the first drug in a three-drug protocol was unable to complete both executions as scheduled.

90. After the botched execution of Clayton Lockett in Oklahoma, an investigation of Oklahoma's execution practices (which were substantially similar to what Arkansas has planned) found that intravenous lines in Lockett's case had been mishandled in part because of the "extra stress" from the state's scheduling of two executions on the same day. After the bungling of Lockett's execution, the second execution scheduled for that same day did not occur. The report resulting from the Lockett investigation recommended that executions not be scheduled within seven calendar days of each other in deference to manpower and facility concerns. *See* Exhibit 4. Those same concerns are heightened in this case, with not one but four double-header midazolam executions scheduled over a ten-day period in a state that has not performed an execution in over eleven years.

91. The Missouri Supreme Court recently adopted a rule limiting the number of executions to be carried out in a one-month period. The rule, effective January 1, 2016, reads that "[t]he department of corrections shall not be required to execute more than one warrant of execution per month." Mo. S. Ct. R. 30.30(f).

92. In tacit recognition of the unnecessary stress and risk involved in multiple or mass executions and in recognition of our society's evolved standards of decency, no state (apart from Oklahoma's failed attempt in 2014, which in itself is a cautionary tale) has conducted multiple executions in one day in seventeen years. And no state in modern history has attempted to execute so many men in such a short time period.

93. Arkansas has not executed anyone since November 29, 2005, and has not carried out a dual execution since September 8, 1999. Defendant Kelley has not presided over an execution. It is unknown whether any member of the team or teams that will execute Plaintiffs has ever participated in an execution. Unless participants are being recruited from out of state, certainly none of the participants will have taken part in an execution involving midazolam. The collective institutional memory as to the intricate process involved in an execution by lethal injection is minimal to non-existent in the ADC. And there is no viable protocol for execution by assembly line.

94. In this situation, it is vitally important that there be a period of time after an execution for quality assessment and debriefing. All persons involved in the intricate and complex procedure of lethal injection, which requires coordinated movements and action by multiple teams of people, must be assessed after any execution—but certainly after the first execution a state performs in over eleven years. Other states engage in a comprehensive post-execution assessment to identify problems, discuss improvements, and make necessary modifications to the lethal-

injection process. *See, e.g.*, Ohio Execution Procedures § VI.I.10–12, *available at* http://bit.ly/2n9PeKs.

95. The compressed schedule, with two executions scheduled for April 17, 2017, and two more every three or four days thereafter until April 27, leaves no time for this critical assessment period after the initial execution and no time for an assessment period after the subsequent executions until the last one is performed. Indeed, the preparation for all eight executions is presumably happening on an overlapping basis, without any regard for the individualized challenges posed by each unique Plaintiff. If the current schedule proceeds, no meaningful assessment will be possible until all eight executions have been performed. The State will have no time to determine how to correct errors that occur during earlier executions.

96. Defendants have indicated through the media that they believe this schedule is no less onerous than spreading executions out over the course of months. No rationale for that belief has been given, which is especially problematic given Defendant Kelley and Defendant Hutchinson's lack of experience overseeing executions. Plaintiffs' request for communications between the ADC and the Governor's office on the workability of the execution schedule was denied. *See* Exhs. 2–3.

97. There is no justifiable rationale to hold multiple executions on the same day. Nor is there a justifiable rationale to hold eight executions within ten days. The expiration

of a drug that Defendants have already shown they can obtain is not a valid reason for rushing these executions.

98. Under the current schedule, the additional stress on execution participants—with its attendant increase in the potential for error—creates a substantial risk that Plaintiffs will be subject to unnecessary pain and suffering during their executions.

99. Ultimately, the schedule set out in Paragraph 1 pushes the contemplated executions outside the bounds of evolving (and evolved) standards of decency. Our country does not participate in mass executions. Execution schedules such as the one Defendants contemplate do not respect the innate human dignity of the condemned, who are to suffer the ultimate punishment at the hands of the State in the name of the State's citizens.

100.    To the extent that pleading an alternative is necessary for this claim, the alternative is simple: the ADC can easily choose a different schedule. The ADC must give adequate notice and time to prepare for each execution. It must ensure that executions are appropriately spaced so as not to overburden or overtax necessary resources and personnel. And it must ensure that each execution is given sufficient attention to detail on an individualized basis.

**CLAIM III (ON BEHALF OF ALL PLAINTIFFS): USE OF MIDAZOLAM AS THE FIRST DRUG IN A THREE-DRUG PROTOCOL VIOLATES THE EIGHTH AMENDMENT'S PROHIBITION AGAINST CRUEL AND UNUSUAL PUNISHMENT.**

101.    The previous paragraphs of this complaint are incorporated by reference as if fully stated herein.

102.    Use of midazolam as the first drug in Arkansas's three-drug protocol poses an objectively intolerable risk of substantial harm that is sure or very likely to occur. Alternative execution methods that would avoid this risk are feasible and readily available to Kelley. Accordingly, the execution protocol Kelley intends to use in Plaintiffs' executions would cause cruel and unusual punishment proscribed by the Eighth Amendment.

### A. Midazolam cannot anesthetize Plaintiffs to the suffering the second and third drugs cause.

103.    Pharmacological experts and anesthesiologists familiar with midazolam have determined that its inclusion in a three-drug execution protocol is all but certain to cause Plaintiffs excruciating suffering. *See* Exhibit 16 (Declaration of Craig Stevens, Ph.D.); Exhibit 17 (Declaration of Joel Zivot, MD). The reasons for that conclusion are as follows:

104.    The second drug in the midazolam protocol, vecuronium bromide, paralyzes the recipient's diaphragm and prevents breathing. Exhibit 17 ¶12. Administered by itself, it leaves the recipient unable to communicate and feeling as if he has been buried alive. Researchers have determined that vecuronium bromide should not be used alone because it causes serious psychic trauma. Exhibit 16 at 19–20.

105.    The third drug in the midazolam protocol, potassium chloride, stops the heart. Administered by itself, it would cause the recipient to experience an excruciating burning pain. Exhibit 16 at 20–21; Exhibit 17 ¶13.

106.    Unless the prisoner is placed under general anesthesia, he will feel the physical and psychological suffering caused by the second and third drugs in the midazolam protocol. Exhibit 16 at 21. Anesthesia occurs on a spectrum; a level of sedation lower than general anesthesia in a lethal injection is insufficient. *Id.* at 9–11.

107.    Midazolam is a benzodiazepine, a class of drug that also includes Valium and Xanax. Unlike barbiturates, which are typically used in lethal injections and which can render general anesthesia, midazolam has no independent depressive effect. Rather, it binds with a neurotransmitter called "GABA" to produce sedation. Because GABA is present in limited quantities in the brain, midazolam's sedative properties are also limited. *Id.* at 4–8. Scientists refer to this as the drug's "ceiling effect." *Id.* at 8; Exhibit 17 ¶21.

108.    Midazolam's ceiling effect prevents it from producing general anesthesia. Thus, it cannot render Plaintiffs insensate to the pain and suffering caused by the vecuronium bromide and the potassium chloride. 500 mg midazolam will sedate Plaintiffs, but it will not anesthetize them to pain. Exhibit 16 at 34. The executioner could pump Plaintiffs with a limitless amount of midazolam, but they would still be aroused by the harrowing effects of the second and third drugs.

35

**109.**  The second drug in the protocol has the additional effect of preventing Plaintiffs

from communicating any distress caused by the third drug. Were there no paralytic,

the arousal and pain caused by the potassium chloride would be obvious to any

observer. *Id.* at 33. With the paralytic, the observer is prevented from seeing

something that is scientifically verifiable to pharmacological experts: midazolam is

incapable of anesthetizing the prisoners to the agonizing pain caused by the third

drug.

**B. There are multiple alternative execution methods that are feasible, readily
available, and that would significantly reduce Plaintiffs' suffering.**

**110.**  The State could execute Plaintiffs by a lethal injection of FDA-approved,

manufactured pentobarbital. Pentobarbital is a barbiturate and would adequately

anesthetize Plaintiffs to the pain the second and third drugs otherwise would cause.

At least one other state (Missouri) has obtained FDA-approved, manufactured

pentobarbital in the recent past. *See* Exhibit 18. Additionally, Arkansas has passed

laws to shield drug suppliers from public view, Ark. Code Ann. § 5-4-617(i)(2), thus

facilitating its ability to acquire drugs, as exhibited by its recent purchases of

vecuronium bromide and potassium chloride.

**111.**  A two-drug cocktail of midazolam and potassium chloride would reduce a

significant quantum of suffering inherent in the three-drug protocol. Though

Plaintiffs would still feel the effects of the potassium chloride, they would not

experience the psychological trauma and sensation of being buried alive that the

36

vecuronium bromide causes. The vecuronium bromide serves only to inflict gratuitous torment, which the Constitution forbids. A two-drug cocktail will effect Plaintiffs' deaths while removing a significant and unnecessary element of suffering. This method is obviously available and feasible.

112.     Execution by firing squad would be a more humane and reliable means of death than the torturous chemical procedure Defendants now use. Properly performed— and proper performance is a simple matter for trained marksmen—execution by firing squad will cause a painless and nearly instantaneous death. *See* Exhibit 19 (Declaration of Dr. Jonathan I. Groner). The State has all the personnel and implements necessary to carry out an execution by firing squad. And such a method is plainly feasible, as evidenced by Utah's use of a firing squad in 2010. Utah has a detailed protocol for firing squad executions, which it would be easy for Arkansas to either adopt or adapt. Exhibit 19.

113.     An injection of compounded pentobarbital, implemented with appropriate safeguards, would significantly reduce the risk of Plaintiffs' suffering. Like FDA-approved, manufactured pentobarbital, compounded pentobarbital would adequately anesthetize Plaintiffs to the pain caused by the second and third drugs. Compounded drugs come with additional risks, but with easily implemented safeguards—for example, acquisition from a reputable pharmacy and adequate testing of the drug—this method would significantly reduce the suffering the

midazolam protocol is sure to cause. Compounded drugs are available to the State—

indeed, Texas and Georgia, states that have carried out numerous executions in

recent years, have done so with compounded pentobarbital.

114.    Execution using a massive overdose of sevoflurane as the sole lethal agent would

significantly reduce the pain and suffering inherent in the midazolam protocol.

Sevoflurane is a gas that has the same mechanism of action as barbiturate drugs and,

like barbiturates, is sufficient to cause death on its own. Exhibit 16 at 34–35. The gas

is available to the ADC for use in executions from Piramal Critical of Bethlehem, PA.

Exhibit 21 (Declaration of Joseph Cummings). The equipment required for

administration is also available from online vendors, and medical expertise is not

required to operate it. Exhibit 16 at 35.

115.    Execution by nitrogen hypoxia would significantly reduce the pain and suffering

inherent in the midazolam protocol. Hypoxia is a process favored by right-to-die

proponents in which a gas displaces a person's oxygen supply, thereby causing

rapid unconsciousness and a painless death within minutes. Oklahoma has recently

adopted hypoxia as a feasible execution method. Exhibit 22. Louisiana has also

studied it. Exhibit 23. These states have concluded that the supplies needed for

nitrogen hypoxia are widely available for purchase.

**C. In the alternative, the State's unwillingness to even consider more humane execution methods dispenses with the need for Plaintiffs to plead and prove alternative execution methods to show an Eighth Amendment violation.**

116.    In October 2016, the Committees of the Arkansas House and Senate Judiciary met jointly to consider a possible study of nitrogen hypoxia as an alternative execution method. The legislator sponsoring the study pitched it as a way to explore more humane execution methods. Cory Cox, the Attorney General's legislative director, told the Joint Committees they should not adopt hypoxia because the current midazolam protocol is preferable. Rep. Laurie Rushing told the Joint Committees, in comments quoted by the *Arkansas Democrat-Gazette*, that Plaintiffs and others on death row "need to be punished instead of wasting taxpayer money," "even if it's in the least humane way." *See* John Moritz, *Execution by Gas Gets Panel Flak*, ARK. DEM.-GAZ., Oct. 11, 2016, at A1 (attached as Exhibit 24). The Joint Committees elected not to study hypoxia after these comments.

117.    In March 2017, Rep. Jimmy Gazaway filed a bill "to establish a more humane method of execution" and to sanction hypoxia as an execution method. The bill was withdrawn three days later, for reasons unknown.

118.    The State has shown that it is unwilling to even consider an execution method that is more humane than the midazolam protocol. Typically a prisoner is required to plead and prove a feasible and readily available alternative execution method to successfully challenge the current method. However, if such an effort would be

futile, and if the State has exhibited that it would rather use "the least humane"

execution method instead of "wasting taxpayer money," the prisoner need not show

that an alternative exists. The State's insistence on a gratuitously painful execution

method is sufficient to show an Eighth Amendment violation.

**CLAIM IV (ON BEHALF OF ALL PLAINTIFFS): THE EXECUTION PROTOCOL (OR LACK THEREOF) VIOLATES THE EIGHTH AMENDMENT'S PROHIBITION AGAINST CRUEL AND UNUSUAL PUNISHMENT.**

119.    The previous paragraphs of this complaint are incorporated by reference as if

fully stated herein.

120.    Choice of drugs aside, the current lethal-injection protocol carries unacceptable

risks of severe pain in violation of the Eighth Amendment. Defendants have failed to

employ available safeguards that would avoid much of the risk inherent in lethal

injection. Defendants should adopt procedures and safeguards that will

substantially mitigate the grave risks of suffering lethal injection entails.

### A. The protocol (or absence of protocol) carries objectively intolerable risks of suffering.

121.    The avoidable risks incumbent in the Defendants' plan to execute the Plaintiffs

include the following:

### i.    Risks caused by improper training, lack of adequate personnel, or lack of adequate protocol.

122.    <u>Lack of Sufficient Training, Education, and Expertise</u>. The ADC lethal injection

protocol sets vague and improperly low or non-existent professional criteria for

40

execution team members responsible for setting IV lines, mixing and verifying

drugs, and injecting drugs. The protocol does not require a physician to supervise

and monitor the administration of any of the three drugs. No member of the

execution team is required to be qualified by professional training and education to

administer anesthesia, nor must they be licensed to do so under Arkansas law or

regulations. While the protocol requires that the IV team have some kind of training

and experience, it has no requirement that the training and experience be recent.

There is no requirement in the protocol that the executioners (who actually inject the

lethal chemicals) be medically trained.

123.   Cursory "Consciousness" Check. It is essential that Plaintiffs achieve general

anesthesia before they are injected with the second or third drugs. There is a

continuum of sedation, the deepest being general anesthesia. Only general

anesthesia is sufficient to prevent the experiencing of painful stimulus. As set forth

in Claim Three, midazolam is unsuitable to achieve general anesthesia, and the

consciousness check is futile. Exhibit 16 at 21. Assuming the drug were capable of

inducing general anesthesia, the execution protocol fails to provide necessary

guidance to assess for general anesthesia.

124.   Attachment C provides that, after the injection of midazolam, the Deputy

Director or designee "will confirm the condemned inmate is unconscious by using

all necessary and medically-appropriate methods." Exhibit 1 at 5. The term

41

"unconscious" is not a term of art. Exhibit 17 ¶20. A sleeping person is

"unconscious," but she would wake when injected with vecuronium bromide,

which causes air hunger, or potassium chloride, "the chemical equivalent of burning

alive." *Glossip*, 135 S. Ct. at 2795. It is possible for a person to exhibit no movement,

suppressed reflexes, and no responsiveness to verbal or physical stimuli and still not

have reached the surgical plane of anesthesia. Exhibit 17 ¶20. Thus, there is a

substantial risk that plaintiff will be judged "unconscious" by the Deputy Director

or designee but will immediately regain awareness and experience pain upon the

injection of vecuronium bromide or potassium chloride. *Id.* ¶22.

125.   Plaintiffs requested additional documents regarding how the execution team

would determine if the Plaintiffs are "unconscious." The ADC responded that they

have "no additional records, beyond Attachment C, which are responsive to [the]

request." Exhibit 3. Failure to provide guidance to execution-team members on how

to assess for a sufficient level of anesthesia creates a substantial risk that Plaintiffs

will be aware and sensate to the painful effects of the second and third drugs.

Exhibit 17. ¶¶20–22.

126.   Even if the ADC provided sufficient guidance regarding the appropriate plane of

anesthesia, the protocol fails to require personnel with sufficient training and

education to assess anesthetic depth. The protocol provides that the person who

"assess[es] the presence or absence of consciousness" will have two years of

42

professional training and certification as an Emergency Medical Technician (EMT),

Nurse, Physician's Assistant, or Physician. Exhibit 1 at 6. In all but rare cases, an

EMT, nurse, or physician's assistant lacks sufficient experience to assess anesthetic

depth. Even a physician, if not an anesthesiologist, lacks the training and experience

to assess anesthetic depth during general anesthesia for surgical procedures.

Assessing sedation depth is a complicated process that requires simultaneous

consideration of numerous sources of information, including but not limited to

movement, changes in blood pressure and respiratory rate, brain waves and

electrical activity, initiation of skin moisture, and enlarged pupils. To verify a

surgical plane of anesthesia, a person must have extensive training and clinical

experience in monitoring anesthetic depth. Exhibit 17 at 22.

127.    Even if midazolam were capable of inducing general anesthesia, and even were

the personnel qualified to assess for onset and maintenance of general anesthesia,

the protocol fails to provide necessary equipment to monitor anesthetic depth.

Equipment exists for medical professionals to monitor physiological signs of

anesthetic depth, such as brain activity. *Id.* ¶21. The protocol fails to require this

equipment be used and fails to require qualified personnel to operate and interpret

the equipment.

128.    Lack of Resuscitation Plan/Equipment. As explained in Paragraph 15 and in

Claim Three, it is all but certain that the midazolam will not anesthetize the

Plaintiffs and that they will still be able to move, vocalize, and feel pain after the

injection of the sedative. Plaintiffs requested that the ADC provide "all policies,

documents, correspondence, or records of any kind in the Department's possession

that concern the Department's contingency plan, including any plan for stopping the

execution, should the prisoner appear to be conscious after administration of the

backup syringes, or should the prisoner show movement at any point during the

execution." Exhibit 2. In failing to turn over the documents requested, the ADC

responded as follows: "[T]he ADC has determined that there are no additional

records, beyond Attachment C, which are responsive to your request. In so

responding the ADC notes that your request seeks records related to a hypothetical

fact situation not specifically referenced in Attachment C. Nonetheless, the response

is the same. There are no records responsive to this inquiry, beyond Attachment C."

Exhibit 3.

129.    Attachment C itself fails to create any contingency plan for the very real

likelihood that the midazolam will fail to render the inmate insensate to pain, or the

very real likelihood that the inmate will show signs of consciousness after he feels

the suffocating effects of the vecuronium bromide or the intense pain of the

potassium chloride. The protocol fails to provide for this contingency and have at

the ready personnel, equipment, and medication to reverse the effects of a tortuous,

botched execution attempt. For example, in Arizona, Joseph Wood gasped for air for almost two hours after he was injected with midazolam. *See* Exhibit 5.

130.    Due to the massive dosage of midazolam, the inmate could suffer reduced oxygen to the brain because of a collapsed airway or the inability to sense and clear his own airway. Exhibit 17 ¶24. The reduction in oxygen could create sub-lethal brain damage. In the event that the prisoner is conscious and suffering through these events, the ADC is deliberately indifferent to his suffering by failing to have on hand a readily available antidote for midazolam. The effect of the midazolam can be reversed with the administration of flumazenil. *Id*. At least one state, Ohio, has opted to secure flumazenil to reverse the effects of the midazolam in the event it is not successful at anesthetizing the prisoner. *See* Andrew Welsh Huggins, *Ohio Is Looking for an Antidote for Lethal Injections, Just in Case,* Toronto Star, Jan. 13, 2017, *available at* http://on.thestar.com/2nsy5fn.

131.    If the inmate moves after injection with vecuronium bromide, the ADC should reverse the effect of that drug. The effects of vecuronium bromide can be reversed with the drug sugammadex. Exhibit 17 ¶23.

132.    In the event a Plaintiff moves after the burning effects of the potassium chloride are felt, that too can be reversed with successive injections of insulin, D-50 (dextrose and water), and calcium chloride. *Id.* ¶25.

        **ii.    Risks inherent in the administration of drugs.**

45

133.   <u>IV Setting</u>. The execution protocol fails to require that the person setting the IV lines has sufficient training and education. The protocol provides that the person who sets the IV will have two years of professional training and certification as an EMT, nurse, physician's assistant, or physician. Exhibit 1 at 6. However, the protocol fails to require that this training be recent or that the certification be current. Two years of training or certification in the requisite disciplines, at some point unknown, does not equate to capability of establishing venous access in an execution chamber.

134.   Failure to provide for sufficient safeguards regarding establishment of venous access creates a risk of painful execution through repeated attempts at venous access, infusion of the injection site, or perforations in the vein. If the injection site becomes infiltrated, the chemical flows into the tissue rather than the vein and does not enter the circulatory system. Exhibit 17 ¶17. Moreover, the protocol places no time limits or limits on attempts to secure venous access by sticking needles into Plaintiffs, a safeguard that at least one state, Kentucky, has previously adopted by requiring the execution cease if the executioners fail to locate a vein after an hour.

135.   If venous access is not achieved through the arms, the protocol provides that other "possible infusion sites" will be evaluated. If peripheral venous access is not established, the protocol calls for gaining central access. A central line involves the placement of an intravenous tube directly into the large vein in the neck, the chest, or the groin. This is a complicated medical procedure. When a central line is placed,

the vein is not visible to the eye. In a clinical setting, a central line would be placed with the assistance of an ultrasound machine. An EMT or nurse does not have the requisite training and experience to place a central line. A physician's assistant would not set a central line without the supervision of a physician. The lethal-injection protocol allows for the placement of a "blind" central line by unqualified persons. Worse still, without equipment to verify the placement of the central line, it is likely that the person placing the line will not be aware it is misplaced. A misplaced central line can cause the lung to collapse, which can lead to a painful death by suffocation and cardiovascular collapse. *Id.* ¶18.

136.   <u>Drug Pushing</u>. The lethal chemicals are administered by two executioners in a chemical room, which is separated from the execution chamber by a one-way mirror. There is a hole in the wall through which IV tubing travels between the body of the condemned and the chemical room. The protocol provides that the gurney shall be positioned so that the executioners can see the face of the condemned inmate. Exhibit 1 at 1. However, the distance between the inmate and the chemical room prevents the executioners from seeing the veins of the condemned in order to regulate proper flow of chemicals.

137.   The lethal-injection protocol provides that two syringes containing 250 mg of midazolam be injected into the vein of the condemned inmate. This is about 1/3 a standard measuring cup of liquid. With such a high volume of liquid and such a

large syringe, if the plunger of the syringe is pushed too quickly, the vein will burst, causing pain and infiltration of the site. In order to prevent bursting the veins of the condemned, the person pushing the plunger on the syringe should be able to see the vein to regulate proper rate of flow. The distance between the executioner and the condemned creates an unnecessary risk of pain. Exhibit 17 ¶19.

138.    Even if the executioner were able to see the vein of the condemned from their distant chamber, they lack the proper qualifications to monitor subtle changes in vein appearance and adjust administration of the chemicals accordingly.

139.    Precipitation. Because of the large dose of midazolam called for in the protocol, there is also a substantial risk that the drug will precipitate when mixed with the saline present in the intravenous line or the blood in the inmate's vein. Precipitation is caused when a strong acid is mixed with a weak acid or base. Midazolam has a pH of 2.5-3.5. Normal saline has a pH of 5-6. When the two substances are mixed either in the line or the vein of the inmate, it is likely that a salt will be formed which can obstruct the line and cause pain in the vein. The midazolam precipitate is pharmacologically inactive and will lower the amount of midazolam delivery in a completely unpredictable fashion. Id. ¶10.

140.    Paradoxical Effects. Another risk associated with the large dose of midazolam used in the lethal injection protocol is that the drug will have the opposite effect and cause hyper-reactivity, agitation, and movement. The protocol, which calls for the

48

administration of *more* midazolam if unconsciousness is not achieved, will only make the agitation worse. *Id.* ¶11.

### iii.   Risks inherent in the composition of pharmaceuticals.

141.   <u>Expired or Expiring Drugs</u>. The ADC will use midazolam with the expiration date of April 2017. Assuming midazolam could render general anesthesia at all, use of midazolam close to the expiration date creates a substantial risk that it will have reduced efficacy and thus subject Plaintiffs to intolerable pain upon injection of the second and third drugs. *Id.* ¶14.

142.   <u>Recalled Drugs</u>. Certain midazolam injection drugs are subject to recall due to "failed impurities/degradations." Due to Defendants' refusal to disclose the source of the midazolam, Plaintiffs are unable to determine whether this recall affects the expiring drugs in the ADC's possession.

143.   <u>Drug Storage</u>. The execution protocol fails to create adequate safeguards against degraded or impure midazolam by not specifying the conditions under which the execution drugs are to be stored. Improper storage can speed the degradation of pharmaceuticals. The label on the midazolam Defendants intend to inject into Plaintiffs requires the product be stored at a temperature of between 68 and 77 degrees Fahrenheit. See Exhibit 25.

144.   <u>Drug Inspection</u>. The protocol fails to require that a qualified person (such as a physician or pharmacist), or *any* person, inspect the lethal chemicals for particulate

matter or discoloration prior to administration of the drug. When a solution that is

supposed to be clear turns cloudy, it indicates one of a number of serious problems

that render the drug unusable and dangerous. One reason for a drug appearing

cloudy is suspended particulate matter. Injection of a substance with particulates

can cause extreme pain if the particulate lodges in a small blood vessel. On March 2,

2015, Georgia halted the execution of Kelly Gissendaner because the drugs had

become cloudy. *See Gissendaner v. Bryson*, 2015 WL 10710264 (N.D. Ga Aug 10, 2015).

Arkansas's lethal-injection protocol contains no similar safeguards.

145.   Drug Preparation. The execution protocol requires the Deputy Director or

designee to mix or reconstitute the chemicals and to prepare the syringes and then

transport the chemicals in a box to the Cummins Unit. Exhibit 1 at 1. The

preparation of drugs in advance, at a distant location, creates a risk that they will

become mislabeled, contaminated, and at an increased risk of falling out of solution

as a precipitate. Drugs sold in sterile injectable form are designed to be placed into a

syringe and injected immediately. Defendants' plan to execute two inmates on a

single night means that the drugs used in the second execution will have been stored

in the syringes for two to three additional hours and are even more likely to become

contaminated or fall out of solution. The protocol's requirement that the drugs be

transferred to syringes at a distant location hours before the execution creates an

unnecessary risk of substantial harm to the plaintiffs. Exhibit 17 ¶16.

146.    In sum, Plaintiffs' executions under the current protocol (or lack thereof) are all but certain to cause unnecessary pain. There is a substantial risk that Defendants' failures to provide sufficient guidance and safeguards in their lethal-injection protocol will cause Plaintiffs to needlessly suffer in their last hours of life. There is also a significant risk that the execution will fail and that Plaintiffs will suffer irreversible brain damage. Plaintiffs have a fundamental right under the Eighth Amendment to be free from cruel and unusual punishment.

**B. Alternatives are available that would eliminate the substantial risks of harm inherent in the protocol (or lack of protocol).**

147.    The alternatives to the ADC's defective protocol are easily stated. Defendants can and should adopt sufficient safeguards, as detailed below, in order to avoid the substantial risks detailed above. Those safeguards include the following:

**i. Safeguards to prevent risks caused by improper training, lack of adequate personnel, or lack of adequate protocol.**

148.    <u>Medical Training</u>. Defendants can and should require that persons with current and appropriate pharmacy and medical training and experience perform the critical functions of drug inspection, drug mixing, IV setting, level-of-anesthesia determination, and injection of lethal chemicals. Medical doctors can and do participate in executions throughout the country. *See* Ty Alper, *The Truth About Physician Participation in Lethal Injection Executions*, 88 N.C. L. Rev. 11 (2009).

**149.** <u>Anesthesia Determination by Qualified Individual Using Medically Accepted</u>

<u>Methods</u>. The Defendants can and should require that the second and third drugs

not be administered until it is determined that the Plaintiffs have reached a surgical

plane of anesthesia, which renders them insensate to pain and unaware of their

surroundings. This can be accomplished by using a person with the training and

experience to make such a determination, such as an anesthesiologist or a Certified

Registered Nurse Anesthetist. Defendants can and should make proper equipment,

such as a BIS machine, available for this purpose. Defendants can and should

require Plaintiffs to be continually assessed for signs of awareness during the lethal

injection.

**150.** <u>Provision of Life-Saving Equipment and Antidotes</u>. Defendants can and should

have available equipment, personnel, and medication necessary to revive Plaintiffs

in the likely event that the execution fails and the inmate remains conscious.

Defendants should have on hand antidotes for the midazolam, vecuronium

bromide, and potassium chloride. These include flumazenil, sugammadex, insulin,

D-50, and calcium chloride. Exhibit 17 ¶¶23–25.

**ii.  Safeguards to prevent risks inherent in administration of drugs.**

**151.** <u>Provision for Proper IV Insertion</u>. Defendants can and should make available

sufficient safeguards to mitigate the risk that the IV will be improperly inserted or

infiltrate the vein. First, Defendants can and should secure the assistance of medical

professionals with recent experience and current credentials qualifying them to place IVs in the Plaintiffs. Second, Defendants can and should provide sufficient catheters of various lengths and gauges to accommodate the physiological differences between each Plaintiff. Defendants can and should make available the equipment necessary to place a central vein, such as an ultrasound machine, a central line kit, and an x-ray machine. *Id.* ¶¶17–18.

152.   <u>Time Limit on Vein Attempt</u>. Defendants can and should place a reasonable time-limit in which they will discontinue the execution if they are unable to obtain venous access. At least one other state (Kentucky) has limited the endeavor to one hour.

153.   <u>Executioner Positioning and Qualifications</u>. The executioners pushing the drugs should be positioned so as to have an adequate view of the Plaintiffs' veins and should have adequate training in intravenous drug administration. *Id.* ¶19.

154.   <u>Drug Pushing</u>. The executioners pushing the drugs should administer the drug at a slow rate and monitor the IV line to avoid precipitation and vein compromise. *Id.*

**iii.   Safeguards to prevent risks inherent in drug composition.**

155.   <u>Use of Fresh Drugs</u>. Defendants can and should use drugs that are not within days of expiration.

156.   <u>Disclosure of Drug Manufacturer</u>. Defendants can and should disclose the

manufacturer of the execution drugs to allow Plaintiffs and the Court to determine

whether there are recalls affecting the product.

157.   <u>Requirement of Proper Drug Storage</u>. Defendants can and should require that the

lethal-injection chemicals be stored in accordance with the requirements of the label.

158.   <u>Drug Inspection</u>. Defendants can and should require that a qualified person

inspect the lethal-injection chemicals before they are transferred to syringes and

again before they are placed in the chemical room at the Cummins Unit.

159.   <u>Drug Testing</u>. Defendants can and should test their drugs for potency. Because

degradation is a continuum, recent testing for drug potency is a necessary

safeguard. The midazolam was tested November 2015 and its potency was at 99.2

percent. Exhibit 7. Given that 16 months have passed and the drug is near the date at

which it can longer be safely used, Defendants can and should retest the drug. In

addition, the vecuronium bromide and potassium chloride should be tested for

impurities, and sub- or super-potency. Testing is an appropriate safeguard against

the use of counterfeit, mislabeled, super-potent, or sub-potent drugs.

**<u>CLAIM V (ON BEHALF OF ALL PLAINTIFFS BUT NOONER</u>): THE COMBINED EFFECT OF
MIDAZOLAM EXECUTIONS OCCURRING WITHOUT ADEQUATE SAFEGUARDS AND ON A
COMPRESSED SCHEDULE VIOLATES THE EIGHTH AMENDMENT.**

160.   If neither the schedule, nor the use of midazolam, nor the lack of adequate

protocol constitutes an independent constitutional violation, they substantiate a

constitutional violation in combination.

161.   The lack of institutional knowledge occasioned by an eleven-year gap in

executions in Arkansas calls for prudence and caution in restarting the machinery of

death—not a rushed, mass execution.

162.   The complexity of lethal-injection procedures—from extraction and delivery of

the drugs through examination of the body—requires minute attention to detail and

intricate coordination under an intense amount of pressure. That pressure is

increased by the rushed schedule, which also prevents the inexperienced

Defendants from performing necessary reviews and debriefs of involved parties

subsequent to each execution.

163.   Certainly no one at the ADC has performed an execution using midazolam,

which has a history of causing botched executions across the country. The ADC has

confirmed there is no contingency plan in place when something goes foreseeably

wrong with the execution. Neither are there other appropriate and necessary

safeguards in place. Taking into consideration the complexity of the procedure for

each Plaintiff, the added pressure of eight executions in ten days, the lack of time

necessary for review, and the lack of experience of those involved at the highest

levels—combined with the use of a drug that is insufficient for its intended purpose

and that has caused botched executions in the past—there is a substantial and objectively intolerable risk of suffering and harm to Plaintiffs.

164.   For all the reasons set out above, the protocol, and specific schedule that Defendants intend to use to execute Plaintiffs constitutes cruel and unusual punishment under the Eighth Amendment. It is cruel in that it will subject Plaintiffs to the torturous effects of vecuronium bromide and potassium chloride without adequate anesthetization and without adequate safeguards in place in the event things go wrong, as is probable based on the lack of institutional knowledge combined with the rushed nature of the scheduling. It is also unusual in that no state in this country in modern history has attempted this many executions in the timeframe Defendants contemplate and with the other complicating factors discussed herein.

165.   Should an alternative be required, numerous alternatives to the planned execution procedure and schedule are known and available, as already set out in Claims Two, Three, and Four above.

**CLAIM VI (ON BEHALF OF ALL PLAINTIFFS): KELLEY'S POLICIES DURING THE EXECUTIONS VIOLATE PLAINTIFFS' RIGHT OF ACCESS TO THE COURTS.**

166.   The previous paragraphs of this complaint are incorporated by reference as if fully stated herein.

167.   Plaintiffs have a right to access the courts under the First Amendment and Due Process Clause. This right guarantees them the ability, through counsel, to contact a

judge during the execution should it appear the execution is being carried out in a way that violates the Eighth Amendment.

168.    The history of botched midazolam executions in this country, and the additional risk engendered by Hutchinson's compressed execution schedule, heightens the possibility that Plaintiffs' attorneys will need to access the courts during the executions to protect their clients' rights.

169.    Kelley's policy absolutely prevents each Plaintiff's attorney from contacting a judge if the attorney elects to watch the execution. Counsel has a choice: decline to view the execution and have access to a phone, or view the execution and have no access to a phone. Kelley's counsel has made clear that a witnessing attorney will not be allowed to leave the viewing room and will not be allowed to contact the courts, or co-counsel located elsewhere, even if the execution lasts hours. Exhibit 10.

170.    Other corrections departments allow attorneys to contact the courts during prolonged executions and thus to advocate for their clients' rights. During the two-hour-long execution of Joseph Wood, discussed in Paragraph 15c above, three attorneys attended the viewing. Two were permitted to leave the viewing area during the execution and to access a phone. An attorney was then able to convene a thirty-minute hearing with a judge. *See* Exhibit 5.

171.    Arizona now explicitly allows a witnessing attorney immediate access to a cell phone: "While the attorney witness is in the witness room, a member of the Witness

Escort Team shall hold one mobile phone designated by the attorney, to be made available to the attorney in exigent circumstances." Ariz. Execution Procedures § 1.5.1.3, *available a*. The attorney is required to leave the witness room while using the phone. Ohio likewise provides that "at all times after counsel enters the witness room, counsel shall have free access to the phone near the entrance door of the Death House." Ohio Execution Procedures § VI.G.2, *available at* http://bit.ly/2n9PeKs.

172.   To ensure adequate access to the courts, it is necessary to have at least two attorneys present at the viewing—one who can access a phone, and one who can continue to monitor the execution should phone access be necessary.

173.   By preventing witnessing counsel adequate phone access—indeed, any phone access—during the execution, Kelley's policy violates Plaintiffs' right of access to the courts.

**CLAIM VII (ON BEHALF OF ALL PLAINTIFFS): KELLEY'S POLICIES DURING THE EXECUTIONS VIOLATE THE RIGHT TO COUNSEL UNDER 18 U.S.C. § 3599**

174.   The previous paragraphs of this complaint are incorporated by reference as if fully stated herein.

175.   Under 18 U.S.C. § 3599, indigent persons sentenced to death are entitled to "the appointment of one or more attorneys." As explained in Claim One, each Plaintiff has been appointed an attorney or attorneys under this provision.

176.   Attorneys appointed under § 3599 are authorized to represent the death-sentenced person "throughout every subsequent stage of available judicial

58

proceedings, including . . . all available post-conviction process, together with applications for stays of execution and other appropriate motions and procedures."

177.    "Available judicial proceedings" and "appropriate motions and procedures" include motions that counsel may find necessary to make during the execution to advocate for her client's right to be free from cruel and unusual punishment. Counsel for condemned inmates in other states have been forced to file such motions during prolonged executions.

178.    Kelley's policies arbitrarily deprive Plaintiffs of the right to have multiple attorneys witness the execution. Section 3599 envisions the appointment of multiple counsel for death-sentenced persons, up to and including the execution itself. To adequately protect the Plaintiffs' rights, it is necessary to have at least two attorneys present: one who can respond to any problems that arise, and one who can continue making a record of the execution. Kelley has no legitimate penological reason for restricting access to only one attorney—a policy the ADC has never before followed. Indeed, as recently reported in the media, Kelley is having difficulty finding sufficient witnesses to the executions, thus space for an additional attorney or attorneys should not be a concern to the ADC. *See* Jeannie Roberts, *State Hunting for Volunteers to Witness April's 8 Executions*, ARK. DEM.-GAZ., Mar. 22, 2017, at A1. (attached as Exhibit 26).

59

179.   Kelley's policies prevent the one attorney who is allowed to view the execution from effectively representing his clients by depriving him of any access to a phone (and thus to the courts or co-counsel).

180.   Kelley's policies prevent the one attorney who is allowed to view the execution from protecting her client's rights by obstructing her from seeing and hearing the full execution process. Without a complete view of the execution from the time the inmate enters the chamber, the attorney has no way of knowing whether the execution is violating her client's Eighth Amendment rights. For example, during the attempted 2009 execution of Romell Broom in Ohio, the executioners repeatedly pierced Broom with needles for two hours as they unsuccessfully tried to find a vein. Under Kelley's policies, Plaintiffs' attorneys could not raise such a problem with the courts—indeed, they could not even learn of it. Likewise, Kelley's policy of shutting off the chamber audio would prevent Plaintiffs' attorneys from hearing any audible reaction Plaintiffs have to the drugs. Plaintiffs' right to counsel requires that their attorneys have a complete visual and audio access to the execution from the time Plaintiffs enter the chamber to the time they are pronounced dead.

181.   By arbitrarily limiting Plaintiffs to one attorney in the witnessing room, and by preventing even that attorney from perceiving the entire execution and from contacting the courts in the event of a problem, Kelley's policies infringe upon the right to counsel guaranteed by 18 U.S.C. § 3599.

## Conclusion and Prayer for Relief

182.    For all of the above reasons, Plaintiffs respectfully request this Court to:

- Rule and declare that the compressed execution schedule violates Plaintiffs' right to counsel;

- Rule and declare that the current execution schedule is unconstitutional;

- Rule and declare that Arkansas's three-drug protocol is unconstitutional due to both the use of midazolam and the failure to have appropriate safeguards in place;

- Rule and declare that the use of midazolam, in combination with the lack of safeguards in the protocol, in combination with the expedited execution schedule, is unconstitutional;

- Rule and declare that Defendants must allow counsel for Plaintiffs to be able to witness the executions—including the ability to hear and see the entirety of the process until death is confirmed;

- Rule and declare that Defendants must provide ready access to a telephone during the execution that will allow Plaintiffs' attorneys to reach persons responsible for overseeing the execution and any appropriate governmental or judicial authority;

- Rule and declare that Defendants must permit multiple defense team members to witness the execution if Plaintiffs have multiple attorneys;

61

- Rule and declare that Defendants must give notice of at least 120 days prior to the scheduling of any execution in order for counsel to be able to adequately and competently represent the client scheduled to be executed;

- Rule and declare that Defendants must schedule executions so as not to overburden assigned counsel with more than one client under a death warrant at any time;

- Grant a preliminary and permanent injunction enjoining[1] Defendants from making any attempt to execute any Plaintiff unless access to counsel is guaranteed throughout the execution process;

- Order Defendants to disclose[2] to Plaintiffs and Plaintiffs' counsel the lethal injection protocol (in full) that will be used during Plaintiffs' execution at least 25 days in advance of each execution;

- Order Defendants to submit any proposed changes to the execution protocol to the Court immediately upon making them;

---

[1] In accordance with Local Rule 7.2(e), Plaintiffs will file a motion for a preliminary injunction to enjoin Defendants from proceeding with Plaintiffs' executions under the current protocol and according to the current schedule.

[2] Plaintiffs anticipate filing a motion for expedited discovery detailing the information sought from Defendants and the expedited schedule requested. As will be set out in that motion, Plaintiffs will agree to entry of a protective order covering information to be kept confidential according to the statute in order to expedite disclosure of necessary information.

- Order Defendants to disclose to Plaintiffs and Plaintiffs' counsel as soon as possible complete information about the drugs that will be used to kill them, including, but not limited to: what they are, when they were purchased, from whom they were purchased, testing that has been done to them, and their National Drug Code identifying number; and

- Grant a preliminary and permanent injunction enjoining Defendants from executing Plaintiffs with inadequate anesthesia and execution procedures that violate their right to be free from cruel and unusual punishment under the Eighth Amendment;

- Grant a preliminary and permanent injunction enjoining Defendants from executing Plaintiffs on a schedule that effectively violates their statutory right to counsel and violates their right to be free from cruel and unusual punishment under the Eighth Amendment;

- Stay the eight executions currently scheduled for April 17, 20, 24, and 27, 2017, until all issues raised in this complaint are resolved; and

- Grant any further relief the Court deems proper.

Respectfully submitted,

Jeff Rosenzweig, ABN 77115
jrosenzweig@att.net
300 Spring St., Ste. 310
Little Rock, AR 72201
(501) 372-5247

*Counsel for Stacey Johnson,*
*Jack Jones and Kenneth Williams*

Scott Braden, ABN 2007123
John C. Williams, ABN 2013233
Federal Public Defender Office
scott_braden@fd.org
john_c_williams@fd.org
1401 W. Capitol Ave., Ste. 490
Little Rock, AR 72201
(501) 324-6114

*Counsel for Don Davis, Jason McGehee,*
*Terrick Nooner, Bruce Ward,*
*and Marcel Williams*

Lee Short, ABN 2010136
Short Law Firm
leedshort@gmail.com
425 W. Broadway St. A
North Little Rock, AR 72114
(501) 766-2207

*Counsel for Ledell Lee*

Deborah R. Sallings, ABN 80127
deborahsallings@gmail.com
35715 Sample Road
Roland, AR 72135

*Counsel for Don Davis*

Jennifer Merrigan, MO Bar No. 56733
Joseph Perkovich, NY Bar No. 4481776
j.merrigan@phillipsblack.org
j.perkovich@phillipsblack.org
Phillips Black
P.O. Box 2171
New York, NY 10008
(212) 400-1660

*Counsel for Bruce Ward*

## INDEX TO EXHIBITS

Exhibit 1      Arkansas Midazolam Protocol

Exhibit 2      Letter to DePriest re Protocol

Exhibit 3      DePriest FOIA Response Letter to John C. Williams

Exhibit 4      Lockett Report

Exhibit 5      Wood v Ryan Execution Hearing

Exhibit 6      Spencer Hahn

Exhibit 7      Midazolam Testing Results

Exhibit 8      Letter to Kelley re Viewing

Exhibit 9      DePriest Letter re Viewing and Phone Access

Exhibit 10     DePriest Email re Phone Access

Exhibit 11     AD 08-28

Exhibit 12     Brian Mendelsohn

Exhibit 13     Robb Lee

Exhibit 14     Dale Baich

Exhibit 15     Jennie Lancaster

Exhibit 16     Craig Stevens

Exhibit 17     Joel Zivot

Exhibit 18     Missouri Buys Nembutal

Exhibit 19     Jonathan Groner

Exhibit 20     Utah Firing Squad Protocol

Exhibit 21     Joe Cummings

Exhibit 22     Oklahoma Nitrogen Study

Exhibit 23     Louisiana Nitrogen Study

Exhibit 24     Hypoxia Article

Exhibit 25     Midazolam Insert

Exhibit 26     State Hunting for Volunteers

## **LETHAL INJECTION PROCEDURE (Attachment C)**

**SECTION I.  General**

1.      The Deputy Director, or designee, is responsible for assuring that the chemicals for lethal injection, the gurney, straps, and other necessary items, are available for use on the scheduled date of execution.   The Deputy Director, or the designee, shall be healthcare trained, educated, and/or experienced in matters related to the establishment and monitoring of IVs, the mixing and administration of the chemicals, and assessing the presence or absence of consciousness.

2.      When the chemicals have been received, the Deputy Director, or the designee, shall verify as to type and concentration, and thereafter supervise any necessary mixing or reconstituting of the chemicals in such a manner as will meet the injection requirements (see Chart A) and in accordance with manufacturer's instructions. The mixed or reconstituted chemicals shall be transferred to an appropriate syringe(s) and thereafter placed in a designated Injection Drug Box. The box will be secured and conveyed to the Cummins Unit.

3.      The Deputy Director, or designee, shall maintain physical custody of the Injection Drug Box and physically convey the box directly to the execution chamber for use. If not used, the Deputy Director, or designee, shall secure the Drug Box until used or destroyed.

4.      Orientation of the executioner(s) to the Department's *Lethal Injection Procedure*, if needed, will be conducted prior to the day of the execution and provided by the Director and/or designee(s).

5.      On the evening of the execution, the executioner(s) shall, under the supervision of the Director, or designee, enter the injection room prior to the scheduled time of the execution and shall immediately inventory the Injection Drug Box to ensure that all chemicals are accounted for and that the infusion device(s) are in readiness.

6.      The execution gurney will be positioned in the death chamber so that the Deputy Director, or designee, and the executioner(s) can directly observe the condemned inmate's face and IV infusion site(s).

Revised 08/06/2015

Exhibit 1 Page 1

**SECTION II.  IV Set-Up Procedure**

1.   The Deputy Director, or designee, shall have an intravenous infusion device placed in each arm, or other standard anatomical venous point of entry, of the condemned inmate and a solution of N.S. (Normal Saline) available for an infusion medium. The individual(s) engaged in this activity will be referred to as the IV Team and shall be qualified as set forth in Section V.

2.   An IV administration set shall be inserted into the outlet of the bag of N.S. IV solution.  Two (2) IV bags will be set up in this manner.

3.   The administration set tubing for each set-up will be connected to the receiving port of the three-way control devices; one left arm/side, the other for the right arm/side.

4.   IV extension tubing will be connected to the discharge ports on the right/left three-way control devices and shall be thereafter connected to the applicable right and left IV insertion site(s).  Extension tubing will be of sufficient length to accommodate the distance from control device to IV insertion site(s).

5.   The tubing shall be cleared of air and made ready for use.

6.   Intravenous catheters shall be initiated through standard procedure for such devices. Once the infusion of the IV solution has been assured, the IV devices shall be secured as appropriate.

7.   At this point, the administration sets shall be running at a slow rate of flow (KVO), and ready for the insertion of syringes containing the chemicals.  The Deputy Director, or designee, shall maintain observation of IV infusion(s) to ensure that the rate of flow is uninterrupted.  NO FURTHER ACTION shall be taken until the prearranged signal to start the injection of chemicals is given by the Warden.

8.   In the event that a patent intravenous infusion site cannot be established, the IV Team shall be directed by the Deputy Director, or designee, to evaluate other possible infusion sites. All effort will be made to establish two (2) unrelated intravenous infusion sites.  If one (1) patent infusion site is established, and a second site proves to be a futile effort, the Deputy Director, or designee, may direct the IV Team to suspend further action to establish a second site and proceed with one site. In the case that no patent infusion site is established after reasonable attempts as determined by the IV Team, the Deputy Director, or designee, will direct the IV Team to suspend further action and thereafter summon trained, educated, and experienced person(s) necessary to establish a primary IV line as a peripheral line or as a central venous line.

EVERY EFFORT WILL BE EXTENDED TO THE CONDEMNED INMATE TO ENSURE THAT NO UNNECESSARY PAIN OR SUFFERING IS INFLICTED BY THE IV PROCEDURE.  STANDARD PRACTICE OF USING A LOCAL ANESTHETIC (1% LIDOCAINE) WILL BE ACCOMMODATED AS NECESSARY.

Revised 08/06/2015

Exhibit 1 Page 2

**SECTION III.  Preparation of Chemicals**

1.     The Deputy Director, or the designee(s), and a member of the IV Team shall prepare the designated chemicals and syringes for a total of one (1) complete set of chemicals. One (1) complete set of syringes is used in the implementation of the death sentence and an additional complete set of the necessary chemicals shall be obtained and kept available.  The specific chemical contained in each syringe will be identified with the following information as set forth in the chemical charts:

    a.     Assigned number

    b.     Chemical name

    c.     Chemical amount

    d.     Designated color

2.     The quantities of chemicals prepared and administered shall not be changed in any manner without prior documented approval of the director.

3.      All prepared chemicals shall be utilized or properly disposed of in a timely manner after the time designated for the execution to occur.

4.     The chemical amounts as set forth in the Chemical Chart are designated for the execution of persons weighing 500 pound or less. The chemical amounts shall be reviewed and may be revised as necessary for an offender exceeding this body weight.

5.     CHEMICAL CHART

    a.     **CHART A**: Three (3) Drug Protocol with Midazolam, Vecuronium Bromide and Potassium Chloride

| CHEMICAL CHART | |
|---|---|
| **Syringe No.** | **Label** |
| 1A | 250 mg midazolam, **GREEN** |
| 2A | 250 mg midazolam, **GREEN** |
| 3A | 60 ml saline, **BLACK** |
| 4A | 50 mg vecuronium bromide, **YELLOW** |
| 5A | 50 mg vecuronium bromide, **YELLOW** |
| 6A | 60 ml saline, **BLACK** |
| 7A | 120 mEq potassium chloride, **RED** |
| 8A | 120 mEq potassium chloride, **RED** |
| 9A | 60 ml saline, **BLACK** |

(1)    Syringes 1A and 2A shall each have a dose of 250 milligrams midazolam for a total dose of 500 milligrams. Each syringe containing midazolam shall have a **GREEN** label which contains the name of the chemical, the chemical amount and the designated syringe number.

(2)    Syringes 4A and 5A shall each have a dose of 50 milligrams vecuronium bromide for a total dose of 100 milligrams. Each syringe containing the selected bromide shall have a **YELLOW** label which contains the name of the chemical, the chemical amount and the designated syringe number.

(3)    Syringes 7A and 8A shall each contain 120 milliequivalents potassium chloride for a total dose of 240 milliequivalents. Each syringe containing potassium chloride shall have a **RED** label which contains the name of the chemical, the chemical amount and the designated syringe number.

(4)    Syringes 3A, 6A, and 9A shall each contain 60 milliliters of saline solution. Each syringe shall have a **BLACK** label which contains the name of the solution, amount of solution, and the designated syringe number.

## SECTION IV.  Injection Procedure

1.    The three-way control device facilitates the movement of infusion fluid from saline bag or infusion fluid with the chemicals from the syringes. A valve serves to direct which fluid source is entering the IV set up.

2.    When the signal to commence is given by the Warden, the executioner(s) shall administer the chemicals in the order they appear in chart A under the direction of the Deputy Director, or designee, as follows:

    a.    Syringe 1A shall be inserted into the designated chemical receiving port of the three-way control device.

    b.    The flow of IV solution will be interrupted by moving the three-way valve assembly to allow the infusion of chemical from Syringe 1A.

    c.    The contents of Syringe 1A shall commence with a steady even flow of the chemical and continue until the full dose of the chemical has been administered.  Only the force necessary to activate the syringe plunger will be used.

    d.    When the contents of Syringe 1A have been injected, the three-way valve assembly will be moved so as to shut off the chemical receiving port and resume infusion of IV solution.

e.   Syringe 1A will be replaced by Syringe 2A and the procedure described in subparagraphs a-d for Syringe 1A will be repeated. This process will be repeated for all subsequent syringes.

f.   Following the administration of syringe numbers 1A, 2A, and 3A, and after at least five (5) minutes have elapsed since commencing the administration of syringe 1A, the Deputy Director, or designee, will confirm the condemned inmate is unconscious by using all necessary and medically-appropriate methods. The Deputy Director, or designee, shall also confirm that the IV line(s) remains affixed and functioning properly.

g.   Once the Deputy Director, or designee, determines that the condemned inmate is unconscious, the remaining chemicals will be administered in the order they appear in Chart A.

h.   In the unlikely event that the Deputy Director, or designee, determines that the condemned inmate remains conscious following the administration of the chemicals in syringe numbers 1A, 2A, and 3A, the back-up syringes of the first chemical (Syringe 1B and 2B) and saline (Syringe 3B), shall be administered via the secondary or alternative IV line.

   (1)   Following the administration of syringe numbers 1B, 2B, and 3B, and after at least five (5) minutes have elapsed since commencing the administration of syringe 1B, the Deputy Director, or designee, will confirm the condemned inmate is unconscious by using all necessary and medically-appropriate methods. The Deputy Director, or designee, shall also confirm that the IV line(s) remains affixed and functioning properly.

   (2)   Once the Deputy Director, or designee, determines that the condemned inmate is unconscious, the remaining chemicals will be administered via the secondary or alternative IV line in the order they appear in Chart A.

i.   Throughout the chemical infusion process, the Deputy Director, or designee, will closely monitor the infusion site for evidence of infiltrate, vein collapse, or other challenge to the patency of the infusion site.

   (1)   Should a problem be suspected, the Deputy Director, or designee, will direct reduction of chemical flow rate or redirect chemical to the secondary or alternative site.

   (2)   In the use of a singular infusion site pursuant to Section II (8), if the infusion site is suspected to be compromised, chemical flow rate will be reduced. If problem persists, the:

Revised 08/06/2015

Exhibit 1 Page 5

       (a)     injection procedure will cease;

       (b)     curtain to death chamber will close; and

       (c)     the IV Team summoned, and the infusion site problem corrected.

    (3)    If all efforts to re-establish patent infusion site fail, the Deputy Director, or designee, will direct the IV Team to suspend further action and trained, educated, and experienced person(s) necessary to establish a primary IV line as a peripheral line or as a central venous line will be summoned to facilitate an IV infusion site.

    (4)    When the infusion compromise is corrected, the IV Team and the summoned person(s) will be excused, the curtain reopened, and the lethal injection procedure continued.

**Section V.  IV Team Qualifications**

Each member of the IV team shall have at least two (2) years of professional experience and certification or licensure in at least one of the following fields:

    1.    Emergency Medical Technician-Intermediate, or

    2.    Emergency Medical Technician-Paramedic, or

    3.    Nurse, or

    4.    Physician Assistant, or

    5.    Physician.



# FEDERAL PUBLIC DEFENDER ORGANIZATION

## EASTERN DISTRICT OF ARKANSAS

**CAPITAL HABEAS UNIT**

Jennifer Horan
FEDERAL DEFENDER

CAPITAL HABEAS CHIEF
Scott Braden

ASSISTANT DEFENDERS
Julie Vandiver
John Williams
Jamie Giani

RESEARCH LAWYER
Jason Kearney

INVESTIGATORS
Dana Harrison
Joseph Cummings
Tonya Willingham

ADMINISTRATIVE OFFICER
Debbie Williams

COMPUTER SYSTEMS ADMINISTRATOR
Sharon Robinson

OPERATIONS ADMINISTRATOR
Jeri Robinson

ADMINISTRATIVE ASSISTANT
Dana Liner

MAILING ADDRESS
1401 West Capitol
Suite 490
Little Rock, Arkansas
72201

PHONE NUMBER
501-324-6114

FAX NUMBER
501-324-5630

March 10, 2017

Jim DePriest, General Counsel
Arkansas Department of Correction
PO Box 8707
Pine Bluff, AR 71611

RE:     **Freedom of Information Act Request**

Dear Mr. DePriest:

My office represents three of the death-row inmates scheduled for execution in April. The Department has previously provided us with its Lethal Injection Procedure dated August 6, 2015 (attached). I have several FOIA requests concerning practices covered by this document, plus some additional requests.

First, Section IV.2.f of the Procedure says that, after the first three syringes have been administered and five minutes have elapsed, someone "will confirm the condemned inmate is unconscious by using all necessary and medically-appropriate methods." Please provide all policies, documents, correspondence, or records of any kind in the Department's possession that further define what the Department considers to be "necessary and medically-appropriate methods."

Second, Section IV.2.h of the Procedure provides that if the prisoner remains conscious after administration of the first three syringes, backup syringes will be administered. Please provide all policies, documents, correspondence, or records of any kind in the Department's possession that concern the Department's contingency plan, including any plan for stopping the execution, should the prisoner appear to be conscious after administration of the backup syringes, or should the prisoner show movement at any point during the execution.

Third, Section V of the Protocol discusses the IV team. Please provide all policies, documents, correspondence, or records of any kind in the Department's possession that further describe the training and qualifications of the IV team or teams. Such documents include, but are not limited to, training materials and training

Exhibit 2 Page 1

schedules for the upcoming executions; documents establishing the credentials of each person who will be an IV team member; and documents exhibiting whether the composition of the IV team will change from execution to execution.

Fourth, Part II.8 of the Procedure establishes certain conditions in which the Deputy Director or his designee "will direct the IV Team to suspend further action and thereafter summon trained, educated, and experienced person(s) necessary to establish a primary IV line as a peripheral line or as a central venous line." Please provide all policies, documents, correspondence, or records of any kind in the Department's possession concerning the qualifications of the person(s) described in this passage and their availability for assistance during the upcoming executions.

Fifth, Part I.1 of the Procedure states that the "Deputy Director, or the designee, shall be healthcare trained, educated, and/or experienced in matters related to the establishment and monitoring of IVs, the mixing and administration of the chemicals, and assessing the presence or absence of consciousness." The Procedure does not indicate whether the Deputy Director or designee must have the same qualifications as the IV team. Please provide any record in the Department's possession exhibiting the requisite credentials of the Deputy Director. Please also provide any record in the Department's possession exhibiting the requisite credentials of each person who will serve as designee.

Sixth, please provide all records in the Department's possession concerning the current execution schedule. This request encompasses, but is not limited to, correspondence between the Department and other state offices concerning the setting of the schedule; correspondence concerning the effect of the execution schedule on Department employees and contractors; correspondence concerning the Department's ability to successfully conduct eight executions on this timetable; and internal Department documents concerning these topics.

Finally, please confirm that the Lethal Injection Procedure has not changed since August 6, 2015. If the Procedure has changed, please send me the new version. Also, I would note that the Procedure appears to be an incomplete version of the Department's execution protocols (as it is labeled "Attachment C"). Please send me the Department's complete execution procedures (including any additional attachments).

Should the Department find it necessary to redact any portion of the requested documents, please indicate the specific FOIA exemption claimed to justify the redaction. Should the Department find no responsive documents to one or all of these requests, please specify that in your reply.

Thank you for your attention to this matter.

2

Exhibit 2 Page 2

Sincerely,

John C. Williams

Attachment



**Arkansas Department of Correction**

Arkansas Department of Correction
Legal Division
P.O. Box 8707
Pine Bluff, Arkansas 71611-8707
Phone: (870) 267-6371
Fax: (870) 267-6373
www.arkansas.gov/adc

March 15, 2017

John C. Williams
Assistant Defender
1401 West Capitol, Suite 490
Little Rock, AR 72201

RE: FOIA Request

Dear Mr. Williams:

On Friday evening, March 10, 2017, the Arkansas Department of Correction received your e-mail with an attached Freedom of Information Act (FOIA) request. The ADC acknowledged the receipt of that request on Monday, March 13. This is the ADC's response to that request.

We are responding to the separate paragraphs of your request in the order presented, using the same designations. Your request makes specific reference to a document entitled "Lethal Injection Procedure (Attachment C)", a copy of which you attached to your request. As a preliminary matter, the ADC confirms that this document remains unchanged from the version attached to your request which appears to date from August 6, 2015.

Your "First" request seeks records related to that portion of the lethal injection procedure concerning the determination that the inmate is unconscious. In response, the ADC has determined that there are no additional records, beyond Attachment C, which are responsive to your request.

Your "Second" request relates to the same issue. In response, the ADC has determined that there are no additional records, beyond Attachment C, which are responsive to your request. In so responding the ADC notes that your request seeks records related to a hypothetical fact situation not specifically referenced in

Attachment C. Nonetheless, the response is the same. There are no records responsive to this inquiry, beyond Attachment C.

Your "Third" request seeks three types of records. Each type is related to the IV team described in Attachment C. First you seek records which further describe the training and qualifications of IV team members. In response, there are no additional records which are responsive to the "qualifications" portion of this category of records. With respect to the "training schedules" portion of this request, to the extent that such records exist, the ADC has determined that such records are exempt from FOIA disclosure pursuant to the Arkansas Method of Execution Act, Ark. Code Ann. § 5-4-617, in general, and more specifically, section 5-4-617(i), which exempts from disclosure the implementation of the procedures listed in section 5-4-617 (g).

Next, under your "Third" request you seek records establishing the credentials of each member of the IV team. To the extent that such records exist, the ADC has determined that such records are exempt from FOIA disclosure pursuant to section 617(i), which excludes from disclosure, inter alia, the identity of entities and persons who participate in the execution process or administer the lethal injection. Finally, under your "Third" request you seek records regarding whether the composition of the IV team will change from execution to execution. There are no responsive records. If such records did exist, they would be exempt from disclosure pursuant to section 617(i).

Your "Fourth" request relates to potential suspension of the execution procedure. There are no records, beyond Attachment C, which are responsive to your "Fourth" request.

Your "Fifth" request seeks records related to the "Deputy Director, or designee" as described in Attachment C and the qualifications of that person. You inquire whether that person must have the same qualifications as those listed for members of the IV team. The Deputy Director and designee are healthcare trained; however, you are correct that Attachment C does not require they meet the credentials of the IV team. You then request the credentials of the Deputy Director and any person who may serve as designee. To the extent that such records exist, the ADC has determined that such records are exempt from FOIA disclosure pursuant to section 617(i), which excludes from disclosure the identity of entities and persons who participate in the execution process or administer the lethal injection.

Exhibit 3 Page 2

Your "Sixth" request seeks records related the execution schedule and logistics. Although it is likely that some records potentially responsive to this requests exist, the ADC has determined that any such records are exempt from FOIA disclosure pursuant to section 5-4-617 (g).

Finally, you ask that the ADC confirm that the Lethal Injection Procedure has not changed since August 6, 2015. As noted at the outset of this response, the procedure has not changed. Noting the existence of Attachment C, you next ask for a complete version of "the Department's execution protocols." The ADC has determined that the remainder of any records which might fit the description you provide are exempt from FOIA disclosure pursuant to the Arkansas Method of Execution Act and its specific provisions described in more detail above. To the extent your inquiry here might be interpreted to include records related to visitation privileges, including those pertaining to legal counsel, those will be disclosed in more detail in response to the separate inquiry which the ADC received from your office.

Sincerely,

James B. DePriest
Chief Legal Counsel,
Arkansas Department of Correction

Exhibit 3 Page 3

# OKLAHOMA DEPARTMENT OF PUBLIC SAFETY

# The Execution of Clayton D. Lockett

## Case Number 14-018051

Executive Summary

Exhibit 4 Page 1

## Table of Contents

I.    **BACKGROUND** ................................................................................................ 1

II.   **INVESTIGATION** ............................................................................................ 2

    A.   Autopsy of Clayton D. Lockett ................................................................. 3

    B.   Tour of the Oklahoma State Penitentiary ................................................. 3

    C.   Collection of Evidence .............................................................................. 5

    D.   Review of Surveillance and Camcorder Video .......................................... 5

    E.   Documentation Provided by Oklahoma Department of Corrections ........... 6

    F.   Interviews ................................................................................................. 7

III.  **FINDINGS** ...................................................................................................... 8

    A.   Timeline ................................................................................................... 8

    B.   Autopsy Results for Clayton D. Lockett ................................................. 13

    C.   DOC Execution Protocols ....................................................................... 14

    D.   IV Insertion, Viability and Administration of Execution Drugs ............... 14

    E.   Toxicology Results of Femoral Blood Sample: Clayton D. Lockett ......... 19

    F.   Toxicology Results of Execution Supplies: Clayton D. Lockett ............... 19

    G.   Toxicology Results of Execution Drugs: Charles Warner ....................... 20

    H.   Execution Protocol Training of Execution Team ..................................... 20

    I.   Contingency Planning for Executions ..................................................... 22

    J.   Cessation of Execution Protocols .......................................................... 22

    K.   Two Executions Scheduled on the Same Day ........................................ 23

    L.   Maintenance of Daily Logs ..................................................................... 23

    M.   Use of Midazolam, Vecuronium Bromide and Potassium Chloride ......... 24

    N.   Historical Incident Reports and Medical Records ................................... 24

    O.   Lockett's Movements and Sounds after Drug Administration ................. 25

Exhibit 4 Page 2

**IV. RECOMMENDATIONS** ....................................................................................... **26**

A.  Observation of IV Insertion Point(s) and Infusion ................................................ 26

B.  Training and Maintenance of Execution Log for Condemned Offenders ............... 26

C.  Additional Execution Supplies ............................................................................. 27

D.  Contingency Plans in Protocols/Policy ................................................................ 27

E.  Formal and Continuing Training Program for Execution Personnel ...................... 28

F.  Formal After-Action Review of the Execution Processes ..................................... 28

G.  Defined Execution Terminology ........................................................................... 28

H.  Completion of One Execution per Seven Calendar Days ..................................... 28

I.  Updated Methods of Communication ................................................................... 28

J.  Disposition of Executed Offender's Property ....................................................... 29

K.  Execution Witness Briefing .................................................................................. 29

Exhibit 4 Page 3

## I.   BACKGROUND

The State of Oklahoma, through the Office of the Attorney General (OAG), filed an *Application for Execution Date* for Clayton Derrell Lockett on January 13, 2014. Lockett had been convicted of first degree murder for a 1999 case in Noble County and sentenced to death. On January 22, the Oklahoma Court of Criminal Appeals ordered the execution to be set for March 20. Motions were later filed on behalf of Lockett and another offender sentenced to death, Charles Warner, that challenged Oklahoma's execution-secrecy law and execution protocol. On March 18, the Court of Criminal Appeals vacated Lockett's execution date and it was reset for April 22. This order also rescheduled Warner's execution from March 27 to April 29.

On April 9, the Court of Criminal Appeals denied an application for stay made by both offenders. On April 21, the Oklahoma Supreme Court issued a stay of execution for Lockett and Warner. In response, Governor Mary Fallin issued Executive Order 2014-08, which granted a stay of Lockett's execution and rescheduled it for April 29, based on the Supreme Court not having constitutional authority to issue a stay. On April 23, the Supreme Court dissolved their stay. Between April 23 and April 29, an application for extraordinary relief was denied by the courts, as was another request for a stay.

On the morning of April 29, Oklahoma Department of Corrections (DOC) personnel began procedures to prepare for Lockett's and Warner's executions at the Oklahoma State Penitentiary (OSP) in McAlester, Oklahoma. Lockett's execution was scheduled to begin at 6:00 p.m. Lockett was removed from his cell that morning and taken to the Institutional Health Care Center (IHCC), located on prison grounds, for self-inflicted lacerations to the inside of his arms and his pre-execution medical examination. Lockett remained at IHCC until later that afternoon, when he was returned to H-Unit to await his execution.

Lockett was taken to the execution chamber, placed onto the table, and after failed attempts in other locations, an intravenous (IV) line was started in Lockett's right groin area. On the order of Warden Anita Trammell, the administration of execution drugs began. Several minutes into the process, it was determined there was a problem with the IV patency. The execution was stopped and Lockett later died in the execution chamber.

Exhibit 4 Page 4

On April 30, Governor Fallin issued Executive Order 2014-11, which appointed Secretary of Safety and Security and Department of Public Safety (DPS) Commissioner Michael Thompson to conduct an independent review of the events leading up to and during Lockett's execution. This order stated the review should include:

1. An inquiry into the cause of death by a forensic pathologist;
2. An inquiry into whether DOC correctly followed their current protocol for executions;
3. Recommendations to improve the execution protocol used by DOC. The order further directed that the Office of the Chief Medical Examiner (OCME) authorize the Southwestern Institute of Forensics Science (SWIFS) in Dallas, Texas to perform the autopsy, additional examination, and all other related testing of Lockett's remains.

In order to effectuate the examination, OCME was directed to transport Lockett's remains to and from SWIFS. OCME was also ordered to appropriately maintain Lockett's remains until they were released to his family. Commissioner Thompson assembled a team of DPS investigators to conduct this investigation and report its findings. This executive summary, along with its attachments and supporting documentation, are the result of the investigation conducted by this team.

## II. INVESTIGATION

This investigation was conducted by a team of six investigators assigned full-time to the case. Nine investigators and a criminal intelligence analyst were also utilized part-time to assist with the case. All investigators were sworn, law enforcement members of the Oklahoma Highway Patrol (OHP) Division of DPS. A medical expert was also consulted during the investigation to assist the investigators in understanding the various technical aspects related to the medical procedures that were performed during the execution. The expert was a current, American Board of Surgery certified physician with more than 35 years of experience in the medical field. The remainder of this section outlines the methodology utilized by the team to complete this investigation.

2

Exhibit 4 Page 5

### A. Autopsy of Clayton D. Lockett

On April 29, at 7:50 p.m., DOC released Lockett's body to the OCME designated transport contractor, Ray Francisco's Embalming Service, who transported the body to OCME in Tulsa, Oklahoma. On the morning of April 30, OCME pathologists began an external examination of the body. A portion of the superficial veins of the right and left arms were explored, photographed and removed. Personnel also obtained a blood sample from the left femoral artery/vein. Around 11:30 a.m., pathologists were notified to stop the examination pursuant to the aforementioned Executive Order. They had not started a posterior body inspection or internal examination. OCME staff sealed the body and evidence in a body bag and placed it in storage. Later that day, Lockett's body and evidence were transported by Ray Francisco's Embalming Service to SWIFS and the transport was monitored by a member of the investigation team.

On May 1, the autopsy of Lockett's body was conducted by Dr. Joni McClain and other SWIFS staff. A member of the investigation team observed the autopsy and evidence processing procedures. Dr. McClain completed the external and internal examinations of the body utilizing SWIFS normal procedures and protocols. After the autopsy was complete, Lockett's body was released to Ray Francisco's Embalming Service and transported back to OCME in Tulsa.

During this investigation, the investigation team met with the SWIFS pathologists and staff to gain a better understanding of their autopsy process and its findings. The results of the autopsy and the toxicology tests that were completed are summarized in the *Findings* section of this report.

### B. Tour of the Oklahoma State Penitentiary

On May 5, the investigation team met with Warden Trammell and several OSP staff members to prepare for a tour of H-Unit and IHCC. The team was escorted through H-Unit where they viewed the holding cells, shower, execution chamber, executioners' room and medical room. The team also collected evidence during the tour. The team was then escorted to IHCC and viewed the area where Lockett was treated for his self-inflicted wounds and the cell where he was held, until being returned to H-Unit. After the tour, the team met with Warden Trammell and her staff to collect additional evidence and

Exhibit 4 Page 6

retrieve documents requested for the investigation. Several measurements and photographs were taken during the tour to document the execution facilities, which were later used to construct Diagram II.1.

# OSP EXECUTION FACILITY

## Executioners' Room

At the time of execution the following individuals were in the Executioners' Room:
Three Executioners
Paramedic
One DOC Employee

At the time of execution the following individuals were in the Execution Chamber:
Warden
Physician
Three DOC Employees
Offender Lockett

## Execution Chamber

## Viewing Room

**Diagram II.1**

On June 30, members of the investigation team returned to OSP to gather additional information from the execution chamber. A team member was strapped to the execution table by two OSP strap-down team members who had strapped Lockett to the table. OSP staff observed the process to ensure that every strap was utilized in the same manner it was on the day of Lockett's execution. The team measured the ability for a person to move and their range of motion, once secured to the table, and took photographs from the viewing room to show the different perspectives from the various seating locations.

4

Exhibit 4 Page 7

### C. Collection of Evidence

Numerous items of evidence were collected and preserved during this investigation. This evidence included digital photographs, audio recordings, video recordings, documents and other items of physical evidence. The remainder of this section is a summary of the evidence collected.

During their examination, OCME staff collected a blood sample from Lockett's left femoral artery/vein. An aliquot of that sample was submitted by OCME to NMS Labs in Willow Grove, Pennsylvania, to test for the presence and concentration of midazolam and vecuronium bromide. On June 12, the investigation team obtained another aliquot of that sample and submitted it to ExperTox Laboratory in Deer Park, Texas, to test for the presence and concentration of potassium. In accordance with their normal procedure, OCME had not requested NMS Labs to test for the presence and concentration of potassium. The results of these examinations are included in the *Findings* section of this summary. The remainder of the sample is being stored by OCME.

On May 1, evidentiary items related to the administration of execution drugs to Lockett were released by SWIFS to the investigation team. These items were delivered by a team member to ExperTox. Evidence items that were inside Lockett's body bag and body are being maintained at SWIFS, the Oklahoma State Bureau of Investigation Laboratory or the OHP evidence storage facility. The team also collected the execution drugs and containers that were prescribed to offender Charles Warner. Custody was transferred from OSP personnel to a team member, who hand-delivered them to ExperTox for testing.

On May 2, approximately 200 items of evidence were collected at OSP, during the facility tour. They consisted of items from Lockett's cell, the execution chamber, the executioners' room and video footage from inside the facility prior to the execution. Executions are not recorded; therefore, there was no video footage of the actual execution. These items are being maintained at the OHP evidence storage facility.

### D. Review of Surveillance and Camcorder Video

Thirty-two compact disks containing surveillance and camcorder video footage were collected and viewed. Following is a summary of this video provided by DOC:

5

Exhibit 4 Page 8

1. Video surveillance footage from OSP for April 29, from 5:15 a.m. to 5:22 p.m., that recorded Lockett's movements in H-Unit and IHCC;

2. Camcorder video footage for the planned use of force that showed the extraction of Lockett from his cell on the morning of April 29. The footage contained statements explaining the force, restraints to be used and each extraction team member's duties. The footage also captured his treatment at H-Unit medical, his transport to IHCC, his treatment at IHCC and his X-ray;

3. Camcorder video footage of Lockett refusing a meal on April 29. The footage captured Lockett refusing a meal and had a statement from DOC personnel that Lockett had refused all three meals that day.

### E. Documentation Provided by Oklahoma Department of Corrections

Throughout this investigation, several hundred pages of documents were requested and obtained from DOC. This team requested any documentation related to Lockett and his execution, including but not limited to logs, incident reports, timelines and historical medical records. Following is a non-inclusive summary of those documents obtained from DOC.

1. Memorandums from Warden Trammel to OSP personnel;
2. Legal documentation related to Lockett's court proceedings;
3. Use-of-force documentation from April 29, including TASER training records;
4. Property inventory and log of items sent to Lockett's family;
5. Sequence of events, execution logs and execution timeline;
6. Lockett's historical medical records, mental health check information and case manager reports;
7. Execution drugs chain-of-custody forms;
8. Execution duties listed by department and training/practice logs;
9. Lockett's 30-day notification packets;
10. DOC execution procedures;
11. Various incident reports;
12. Affidavit of Warden Anita Trammell related to the execution drugs;
13. Diagram of the execution chamber;
14. Death warrant for Clayton Lockett;

6

Exhibit 4 Page 9

15. Execution debrief personnel log;

16. Execution chamber key log;

17. Interoffice memorandums, emails and training documents related to the execution duties of DOC personnel.

## F. Interviews

During this investigation, 113 people were identified to interview. Of those, 108 were interviewed, four media witnesses who viewed the execution declined to interview and one OCME employee was on extended leave and not available to interview. Follow-up interviews of select witnesses were also conducted. Each interview, with the exception of four, was audio recorded and reduced to a typed report by a transcription service. The four interviews that were not recorded included the three executioners and the pharmacist. Below is a summary of those that were interviewed:

1. The physician, Warden Trammell and three additional DOC personnel that were in the execution chamber at the time of the execution;

2. The paramedic, one DOC employee and the three executioners that were in the executioners' room at the time of the execution;

3. Persons that viewed the execution from the viewing room or overflow area, including personnel from DOC, Office of the Attorney General, media outlets, Lockett's attorneys, members of the Neiman family, the Noble County District Attorney and Sheriff's offices, the Perry Police Department and the Secretary of Safety and Security;

4. Governor Fallin and eight members of her staff;

5. Members of DOC's administrative staff including the Director, Associate Director, District Manager, current and former members of DOC's General Counsel staff;

6. OSP corrections officers involved in different aspects of the execution, including staff who interacted with Lockett several days leading up to the execution;

7. DOC medical and mental health staff members;

8. OCME staff involved in the examination and chain-of-custody of Lockett's body and evidence;

7

Exhibit 4 Page 10

9.  Employees of Ray Francisco's Embalming Service responsible for the transport of Lockett's body;

10. The pharmacist that filled the prescription of execution drugs.

## III.   FINDINGS

After reviewing and considering all interviews, documentation and evidence gathered during this investigation, this team has reached several conclusions regarding Lockett's execution. Some factors ultimately contributed to the issues that arose during the process, while others directly affected how those issues were handled by the personnel in the execution chamber. Each of this team's findings is listed below, along with a detailed timeline of events.

### A.   Timeline

The following is a timeline of events that occurred in regards to Lockett's execution. The approximate times associated with each event have been compiled utilizing witness accounts and documentation obtained during this investigation.

***April 29, 2014***

| | |
|---|---|
| 12:00-4:30 a.m. | DOC personnel conducted a unit check and count in H-Unit every 30 minutes. At 12:30 a.m., personnel conducted a welfare check of Lockett and no problems were noted or discovered. |
| 4:30-5:05 a.m. | The Correctional Emergency Response Team (CERT) arrived at H-Unit and began preparations to remove Lockett from cell SW-3-JJ to escort him to IHCC for x-rays. |
| 5:06 a.m. | CERT arrived at cell SW-3-JJ and Lockett refused to comply with orders. He was covered by a blanket and moving, but would not uncover or approach the cell door to be restrained. |
| 5:09-5:50 a.m. | CERT exited the area of cell SW-3-JJ to prepare for cell entry and extraction. Blood was observed by DOC personnel inside cell SW-3-JJ. A use of force plan was established and approval was given by DOC administration to utilize a TASER. |

8

Exhibit 4 Page 11

| | |
|---|---|
| 5:30 a.m. | DOC personnel performed another check and Lockett failed to comply with the order to approach the cell door and uncover himself. |
| 5:50 a.m. | CERT arrived at cell SW-3-JJ for extraction and determined Lockett had attempted to jam the door. The door was forced open, Lockett refused to comply with verbal commands and a TASER was deployed. CERT members observed self-inflicted lacerations on Lockett's arms. |
| 5:53 a.m. | Lockett was secured by CERT, removed from the cell, placed on a gurney and transported to H-Unit medical. A razor blade from an issued, disposable shaving razor was located inside the cell and confiscated. |
| 5:53-6:45 a.m. | Lockett was medically evaluated at H-Unit medical. |
| 6:35 a.m. | Lockett was transported from H-Unit medical to IHCC. He was placed in IHCC holding cell S2 and remained in handcuffs and leg irons. |
| 6:45 a.m. | DOC personnel entered cell S2 and medical staff evaluated Lockett's lacerations. |
| 7:00-8:15 a.m. | DOC personnel entered cell S2 every 15 minutes to check Lockett. |
| 8:15 a.m. | Lockett was removed from cell S2 and taken to the IHCC emergency room to be examined by DOC medical staff. |
| 8:40 a.m. | Lockett was returned to cell S2. |
| 8:50-9:35 a.m. | DOC personnel entered cell S2 every 10-15 minutes to check Lockett. |
| 9:15 a.m. | Lockett refused visits from his attorneys. |
| 9:42 a.m. | Lockett refused a food tray. |
| 9:55 a.m. | DOC personnel entered cell S2 to check Lockett. |
| 10:15-10:30 a.m. | DOC personnel entered cell S2 to check Lockett every 15 minutes. |
| 10:25 a.m. | Lockett confirmed his refusal to visit with his attorneys. |
| 10:45 a.m. | DOC personnel entered cell S2 to check Lockett and adjust restraints. |
| 11:11 a.m. | Lockett refused a food tray. |

Exhibit 4 Page 12

| | |
|---|---|
| 11:20 a.m. | DOC personnel entered cell S2 to check Lockett and adjusted restraints. |
| 11:35a.m.-3:55p.m. | DOC personnel entered cell S2 to check Lockett every 15-20 minutes. |
| 3:35 p.m. | DOC personnel retrieved the execution drugs from refrigerated storage at OSP for transport to the execution chamber. |
| 4:10 p.m. | DOC personnel entered cell S2 to adjust restraints, redress and prepare Lockett for transport from IHCC to H-Unit. |
| 4:15 p.m. | DOC personnel placed the execution drugs in the executioners' room. |
| 4:31 p.m. | The three executioners and paramedic entered the executioners' room and began preparation. |
| 4:40 p.m. | Lockett was transported to H-Unit and placed into shower SW-4. |
| 4:55-5:10 p.m. | Lockett visited with a DOC mental health staff member. |
| 5:19 p.m. | The five strap-down team members and Warden Trammell entered the cell area to remove Lockett from shower SW-4. |
| 5:21 p.m. | Lockett was removed from shower SW-4 and escorted to the execution chamber. |
| 5:22 p.m. | Lockett was placed onto the execution table and strapped down. |
| 5:26 p.m. | The strap-down team exited the execution chamber. |
| 5:27-6:18 p.m. | The paramedic and physician attempted IV placement access in multiple locations and were unsuccessful. The physician believed he started an IV in Lockett's right groin area. |
| 5:45-5:57 p.m. | Victim's witnesses, media personnel, and Lockett's attorneys were summoned to the viewing room and seated. |
| 6:18 p.m. | The paramedic and physician determined the IV line was viable. |
| 6:20 p.m. | The paramedic re-entered the executioners' room. |
| 6:22 p.m. | DOC Director Robert Patton and selected officials were summoned and seated in the viewing room. |

10

Exhibit 4 Page 13

| | |
|---|---|
| 6:23 p.m. | Director Patton received approval from the Governor's Office to proceed with the execution. He then approved Warden Trammell to proceed. The blinds between the viewing room and execution chamber were raised and Lockett was asked if he wished to make a statement. He refused and Warden Trammell announced that the execution was to begin. |
| | The full dose of midazolam and an appropriate saline flush were administered. A DOC employee began to keep time on a stopwatch. |
| 6:30 p.m. | The signal was given that five minutes had elapsed and the physician determined Lockett was conscious. DOC personnel began to keep additional time on a stopwatch. |
| 6:33 p.m. | The signal was given that two minutes had elapsed and the physician determined Lockett was unconscious. Warden Trammel signaled for the execution to continue. The full dose of vecuronium bromide, an appropriate saline flush and a majority of the potassium chloride were administered. |
| 6:33-6:42 p.m. | Lockett began to move and make sounds on the execution table. It should be noted that the interview statements of the witnesses regarding Lockett's movements and sounds were inconsistent. |
| | The physician inspected the IV insertion site and determined there was an issue, which was relayed to Warden Trammell. |
| 6:42 p.m. | At the direction of Warden Trammell, the blinds were lowered. The executioner stopped administering the potassium chloride. |
| 6:42-7:06 p.m. | It should be noted that the interview statements of the individuals in the execution chamber were inconsistent. However, it was determined the following events did occur inside the execution chamber during this time period. |

- The paramedic re-entered the execution chamber to assist the physician.
- The physician attempted IV access into Lockett's left, femoral vein. However, no access was completed.

11

Exhibit 4 Page 14

- When questioned by Warden Trammell, the physician initially believed that Lockett may not have received enough of the execution drugs to induce death. He also believed there were not enough execution drugs left to continue the execution.
- The physician and paramedic continued to monitor Lockett's heart rate utilizing an EKG machine. While attempting to gain the IV access, it was observed that Lockett's heart rate continued to decrease.
- The physician made the observation that the drugs appeared to be absorbing into Lockett's tissue.
- The physician and paramedic concluded that Lockett's heart rate had entered a state of bradycardia and eventually slowed to an observed six beats per minute.
- There were three different recollections of Lockett's movements during this period. Four reported that Lockett did not move, one reported he moved slightly and the last recalled a more aggressive movement.

The following events occurred outside the viewing room door in the H-Unit hallway.

- Director Patton, OAG representatives Tom Bates and John Hadden and Secretary Thompson removed themselves from the viewing room and discussed with the Governor's Office about how to proceed.

| | |
|---|---|
| 6:56 p.m. | Director Patton halted/stopped the execution, which was relayed to the execution chamber. |
| 6:57-7:06 p.m. | Witnesses were escorted out of the viewing room. |
| 7:06 p.m. | The physician pronounced Lockett deceased. |
| 7:50 p.m. | After being unstrapped from the execution table, Lockett's body was removed from OSP and transferred to the Office of the Chief Medical Examiner transport. |

12

Exhibit 4 Page 15

## B. Autopsy Results for Clayton D. Lockett

Based on the autopsy, Lockett's cause of death was listed as *Judicial Execution by Lethal Injection*. The manner of death was listed as *Judicially Ordered Execution*. SWIFS pathologists concluded that Lockett died as the result of judicial execution by lethal injection. Following is a summary of the findings made by SWIFS personnel during their examination of Lockett's body and additional information obtained by the investigation team from SWIFS or through the investigation:

1. Judicial execution with:
   a. Execution protocol medications used: midazolam, vecuronium and potassium chloride.
   b. History of difficulty finding intravenous access sites resulting in numerous attempts to start an IV.
   c. Attempts in both antecubital fossa, both inguinal regions, left subclavian region, right foot and right jugular region.
2. Superficial incised wounds of the upper extremities consistent with history of self-inflicted incised wounds with a safety razor.
3. Contusions and abrasions of extremities.
4. Cardiac hypertrophy (480 grams)
5. Mild coronary artery atherosclerosis.
6. Hydroxyzine detected.
   a. Lockett was prescribed hydroxyzine, but the prescription had ended March 8. There were emails from DOC personnel alleging Lockett had been hoarding medication. SWIFS personnel stated there were higher than therapeutic levels of hydroxyzine present in Lockett's system and hydroxyzine should not have interfered with the execution drugs administered. They also could not determine when or how much of the hydroxyzine was taken.
7. No evidence of dehydration.
8. No Taser marks on the body.
9. Toxicology indicated elevated concentrations of midazolam in the tissue near the insertion site in the right groin area, which is indicative of it not being administered into the vein as prescribed in execution protocols. The presence of midazolam in the psoas muscle indicates midazolam was distributed

13

Exhibit 4 Page 16

throughout Lockett's body during the execution. According to SWIFS pathologists, the concentration of midazolam located in Lockett's blood was greater than the therapeutic level necessary to render an average person unconscious.

10. Vecuronium bromide was found in the femoral blood sample taken from Lockett's body. The presence of vecuronium bromide in the psoas muscle indicates vecuronium bromide was distributed throughout Lockett's body during the execution.

11. Potassium was found in the femoral blood sample taken from Lockett's body.

### C. DOC Execution Protocols

Regarding whether DOC correctly followed their current execution protocols, it was determined there were minor deviations from specific requirements outlined in the protocol in effect on April 29. Despite those deviations, it was determined the protocol was substantially and correctly complied with throughout the entire process. None of the identified deviations contributed to the complications encountered during this execution.

### D. IV Insertion, Viability and Administration of Execution Drugs

The physician and paramedic made several attempts to start a viable IV access point. They both believed the IV access was the major issue with this execution. This investigation concluded the viability of the IV access point was the single greatest factor that contributed to the difficulty in administering the execution drugs.

While exploring this issue, several DOC personnel made statements referencing Lockett purposefully dehydrating himself. Lockett made statements to the paramedic that he had been dehydrating himself for three days. However, SWIFS pathologists found no indication that Lockett was dehydrated at the time of his execution. SWIFS also concluded Lockett's blood loss from the self-inflicted wounds to his arms should not have caused issues with the IV access.

14

Exhibit 4 Page 17

Interviews and documentation indicated several vein checks had been performed by DOC medical personnel leading up to and on the day of the execution. Each check indicated that Lockett's veins were "good". At least three interviews of DOC medical personnel indicated they viewed Lockett's veins on the morning of the execution. Their observations concluded his veins were "good" and acceptable for IV access.

The IV insertion process was started by an emergency medical technician licensed as a paramedic. The paramedic had been licensed in emergency medical services for more than 40 years and as a paramedic for over 20 years. This person had also instructed at the intermediate level. The licenses possessed at the time of the execution were valid until 2015 and were from the Oklahoma State Department of Health and the National Registry of Emergency Medical Technicians. The paramedic provided the prison a copy of the above licenses in January or February 2014. The paramedic estimated he/she had been involved in every lethal injection execution in Oklahoma, except for two. His/her specific assignments were to start an IV, ensure a proper infusion of saline, attach a cardiac monitor to Lockett and during the execution, make sure the executioners did their part of the procedure aseptically, at the correct time and the correct speed.

The IV access was completed by a physician licensed as a medical doctor. The physician graduated medical school over 15 years ago, currently worked in emergency medicine and was certified in family medicine. His license expires July 1 of each year and was current at the time of the execution. He had not provided a current copy of his license to DOC prior to April 29, but days later was called and asked for a copy. This was his second execution with the first being four to five years earlier. The physician understood his duties were to assess Lockett to determine if he was unconscious and ultimately to pronounce his death. He was contacted two days prior to the execution date and asked to fill in for another physician that had a scheduling conflict.

Before Lockett was moved into the chamber, the paramedic prepared the IV lines and available execution tools. He/she also verified the drugs were properly labeled and were for Lockett. After Lockett was brought to the chamber and secured to the execution table, the paramedic began to assess his veins. The paramedic first attempted access in the left arm and found a vein with an 18-gauge needle/catheter and observed flashback, a condition sought during IV placement. The paramedic did not have adhesive tape on

15

Exhibit 4 Page 18

his/her person to secure the catheter. Before the tape was retrieved, the vein became unviable. The paramedic then attempted two additional IV insertions into the left arm using the same type needles/catheters, but never observed flashback.

After these attempts, the physician became involved and attempted IV access into Lockett's left, external jugular vein utilizing a 1¼ inch, 14-gauge needle/catheter. During his interview, the physician stated he penetrated this vein and obtained flashback. Seconds later, it became unviable and he was unable to continue with that vein. As the physician was attempting this access, the paramedic was attempting IV access into Lockett's right arm. After three attempts, the paramedic was unable to start a viable IV access point in this arm.

Next, the physician attempted to locate the subclavian vein on Lockett's left side utilizing a central venous catheritization kit. During the attempt, the physician observed a very small amount of flashback, but he was unable to repeat it. The physician believed the needle was penetrating through the vein. He noted during his interview he did not have access to an ultrasound machine, which is a commonly used tool to locate and penetrate veins.

As the physician attempted subclavian access, the paramedic attempted IV access in two separate locations on Lockett's right foot with 20 gauge needles/catheters. The paramedic said the veins rolled and disappeared during those attempts. The paramedic believed the needle penetrated the veins, but flashback was never observed. The paramedic did not attempt access into any other veins because the physician made the decision to attempt access into a femoral vein.

The physician requested a longer needle/catheter for the femoral access. The paramedic attempted to locate a 2 or 2½-inch, 14-gauge needle/catheter, but none were readily available. The physician also asked for an intraosseous infusion needle, but was told the prison did not have those either. Both agreed their preferred needle/catheter length would have been 1¾ to 2½ inches. The physician had never attempted femoral vein access with a 1¼ inch needle/catheter; however, it was the longest DOC had readily available. An additional central venous catheterization kit was available, but the physician did not think about utilizing one for femoral access.

16

Exhibit 4 Page 19

Lockett's scrub pants and underwear were cut in order to expose the femoral area. The physician located the femoral vein and believed the vein was penetrated because he observed good flashback. The paramedic taped the catheter to Lockett's body, and stated during his/her interview it became positional. The physician believed it was bending because of its length. He and the paramedic positioned the catheter where they were able to observe slow infusion of saline and secured it with adhesive tape. The autopsy did not conclude the femoral vein was punctured. However, SWIFS personnel indicated they only examined the portion of the femoral vein that had been dissected by OCME and not the entire vein.

The physician was asked about starting a second IV line. He stated he was not going to make another attempt. The physician and paramedic were comfortable with the IV placement and the infusion of saline through the line. This was not the first execution in Oklahoma where only one IV access point had been obtained and protocol allowed for only one access point.

Warden Trammell decided to cover Lockett's body with a sheet, including the IV insertion area, which, according to her, was normal in all executions. Another reason for her decision was to maintain Lockett's dignity and keep his genital area covered. From that time, no one had visual observation of the IV insertion point until it was determined there was an issue and the physician raised the sheet. Warden Trammell acknowledged it would be her normal duty to observe an IV insertion point for problems. She believed if the IV insertion point had been viewed, the issue would have been detected earlier. The physician added that an IV would normally be monitored by watching the flow of the IV line and the area around the insertion point for any signs of infiltration. This investigation found that neither of these observations occurred, which led to the issue being discovered several minutes after the execution began.

After the IV insertion was complete, the paramedic went into the executioners' room and the physician remained in the execution chamber. Once Warden Trammell announced it was time to begin the execution, the paramedic began the procedure to administer the drugs. The paramedic first used a hemostat to clamp the IV line above the access port, to stop the flow of execution drugs from going up the line. The IV drip was never reestablished after that point. The midazolam and the appropriate flushes were

17

Exhibit 4 Page 20

administered into the single access port by the executioners in the order they were presented by the paramedic. The paramedic and executioners were certain the drugs were pushed steady and in the proper manner because of their past experiences in performing the same roles. The DOC employee in the executioners' room then began to keep time using a stopwatch.

According to execution protocol, the vecuronium bromide shall not be administered until at least five minutes after the administration of midazolam. Prior to the execution, DOC administration determined if Lockett was not unconscious after five minutes, he would be checked every two minutes, until he was declared unconscious. Five minutes after the administration of midazolam, the physician determined Lockett was conscious. After an additional two minutes, the physician determined that Lockett was unconscious.

Warden Trammell signaled for the execution process to continue. The executioners, with assistance from the paramedic, began administering the vecuronium bromide, the potassium chloride and the appropriate saline flushes. Both syringes of the vecuronium bromide, appropriate saline flushes, the first full syringe of potassium chloride and a portion of the second syringe of potassium chloride were administered. At some point during the administration of these two drugs, Lockett began to move and the physician recognized there was a problem.

The physician approached Lockett and indicated to Warden Trammell that something was wrong. He looked under the sheet and recognized the IV had infiltrated. At this same time, Warden Trammell viewed what appeared to be a clear liquid and blood on Lockett's skin in the groin area. The physician observed an area of swelling underneath the skin and described it as smaller than a tennis ball, but larger than a golf ball. The physician believed the swelling would have been noticeable if the access point had been viewed during the process.

The execution process was stopped as one of the executioners was administering the second syringe of potassium chloride. The executioner immediately stopped pushing the syringe with approximately 10 milliliters of potassium chloride remaining. The remainder of the drug was later wasted into a bio-hazard bin by the paramedic.

18

Exhibit 4 Page 21

The blinds to the execution chamber were lowered and the paramedic exited the executioners' room to assist the physician. The physician told the paramedic the catheter dislodged. The paramedic observed the catheter was tilted to one side and believed it was no longer penetrating the vein. The physician decided to attempt IV insertion into the left-side femoral vein. The physician first penetrated Lockett's femoral artery and another access point into the vein was never completed because the physician believed the drugs were being absorbed into his tissue.

The physician and paramedic were unsure when the catheter became dislodged and how much of each drug had made it into Lockett's vein. The autopsy indicated elevated concentrations of midazolam in the tissue near the insertion site in the right groin area, which was indicative of the drugs not being administered into the vein as intended. Thus, the IV access was not viable as early as the administration of the midazolam.

### E.  Toxicology Results of Femoral Blood Sample: Clayton D. Lockett

On May 14 and May 19, OCME documented the toxicology results they received from NMS Labs on an aliquot of the femoral blood sample they obtained from Lockett's body on April 30. The results indicated a midazolam concentration of 0.57 mcg/mL and a vecuronium concentration of 320 ng/mL. On June 26, ExperTox completed toxicology testing of an aliquot of the same femoral blood sample. The results of this test indicated a potassium concentration of 0.74 mole/L. It should be noted that testing for the concentration of potassium after death can be problematic due to the body's natural processes, which cause an increase in the concentrations of potassium in the blood over time.

### F.  Toxicology Results of Execution Supplies: Clayton D. Lockett

On May 5, ExperTox completed testing of the execution supplies utilized during Lockett's execution. They analyzed the contents by liquid chromatography/triple quad mass spectrometry (LC/MSMS) and inductively coupled argon plasma-mass spectrometry (ICP-MS) for the detection and quantitation of midazolam, vecuronium bromide and potassium chloride. ExperTox reported the following:

Exhibit 4 Page 22

1. The two syringes labeled midazolam contained residues consistent with the listed label content of 5 mg/mL.
2. The two syringes labeled vecuronium bromide contained residues consistent with the listed label content of 1 mg/mL.
3. The two syringes labeled potassium chloride contained residues consistent with the listed label content of 2 meq/mL.
4. The IV Tubing connected to two 0.9% NaCl one liter IV bags contained sodium chloride, blood, residues of vecuronium bromide at the final concentration of 0.013 g/mL and residues of potassium chloride at the final concentration of 1.3 meq/mL.

### G. Toxicology Results of Execution Drugs: Charles Warner

On May 5, ExperTox completed testing of the drugs intended for use during the execution of Charles Warner. They analyzed the contents by LC/MSMS and ICP-MS for the detection and quantitation of midazolam, vecuronium bromide and potassium chloride. These tests were also utilized to determine drug agent potency. ExperTox reported the following:

1. The two 0.9% NaCl injection USP 1 liter IV bags tested consistent with the listed contents.
2. The seven 0.9% NaCl 50 mL bags tested consistent with the listed contents.
3. The two syringes labeled midazolam tested consistent with the listed label content of 5 mg/mL.
4. The two syringes labeled vecuronium bromide tested consistent with the listed label content of 1 mg/mL.
5. The two syringes labeled potassium chloride tested consistent with the listed label content of 2 meq/mL.

### H. Execution Protocol Training of Execution Team

This investigation determined that DOC personnel did conduct training sessions as required by the protocol in effect on April 29. The sessions were conducted during the weeks and days leading up to the execution and consisted of planning meetings, on-the-job training for each of the respective positions in the execution chamber and

20

Exhibit 4 Page 23

executioners' room and walk-through training sessions for all involved staff members. The paramedic, physician and the three executioners were not included in this training prior to the day of the execution. The final training session included DOC administrative staff reviewing the sequence of events with all parties in the execution chamber just prior to the execution.

Field Memorandum OSP-040301-01, *Procedure for the Execution of Offenders Sentenced to Death*, outlines the training requirements that should occur prior to an execution. The following is a summary of the training procedures that were conducted prior to Lockett's execution.

1. A deputy warden or designee was required to review the sequence of events inside the executioners' room with the executioners and paramedic prior to each execution. Documentation and interviews substantiated this requirement was completed on April 29 at 5:06 p.m.

2. The paramedic was required to give the following instructions to the executioners, "Administer the drugs at a steady flow without pulling back on the plunger of the syringe." The paramedic did not give this statement prior to this execution. However, the three involved executioners had been involved in multiple executions prior to Lockett's and each acknowledged their roles and duties. The paramedic also acknowledged his/her role to ensure the executioners did their job aseptically, at the correct time, speed and dosage.

3. The warden was required to review the sequence of events with the physician and other DOC personnel in the execution chamber prior to beginning the execution. Interviews and documentation indicated this occurred on April 29 at 5:15 p.m.

4. DOC protocol required the strap-down team to conduct a walk-through of the strap-down procedures no later than two weeks prior to the execution. There were multiple walk-through training sessions conducted prior to Lockett's execution. The last session was conducted within two weeks of Lockett's execution, as required by protocol.

21

Exhibit 4 Page 24

This investigation revealed areas of training that need to be addressed. It was noted there was no formal training process involving the paramedic, the physician or the executioners and their specific roles. They were not involved in any pre-execution training or exercises to ensure they understood the overall process. For those individuals, the current protocol had very minimal training requirements. The executioners only receive formal training from the paramedic on the day of the execution and informal training from previous executioners during actual executions.

Warden Trammell and Director Patton both acknowledged the training DOC personnel received prior to the execution was inadequate. Warden Trammell stated the only training she received was on-the-job training and that DOC had no formalized training procedures or processes concerning the duties of each specific position's responsibility. The warden and director both indicated DOC had no training protocols or contingency plans on how to proceed with an execution if complications occur during the process.

### I.   Contingency Planning for Executions

The DOC execution protocol in effect on April 29 had limited provisions for contingencies once the execution process began. One contingency allowed the physician to assist with initial IV access and the other concerned life-saving measures if a stay was granted. After it was determined that problems were present during Lockett's execution, personnel involved with the execution were unaware of how to proceed due to the lack of policies and/or protocols in place at that time. It was determined that no contingency actions were taken inside the chamber other than the physician attempting to locate the femoral vein on Lockett's left side, which was never completed prior to his death.

### J.   Cessation of Execution Protocols

When an issue with the administration of execution drugs was discovered, the blinds between the chamber and viewing room were lowered. Several conversations took place inside and outside the chamber regarding how to proceed. The conversation outside the chamber included whether to continue or how to stop the execution. The conversations inside the chamber included whether to provide life-saving measures.

22

Exhibit 4 Page 25

Outside the execution chamber, there were several conversations between Director Patton, Secretary Thompson, OAG representatives at the execution and General Counsel Steve Mullins with the Governor's Office. It was determined between Director Patton and General Counsel Mullins, who had conversed with the Governor, that the execution would be stopped. Director Patton then relayed to the witnesses and the personnel in the chamber that the execution was being stopped. In an additional conversation, General Counsel Mullins further told Director Patton that they would begin preparing a stay at the direction of the Governor. Lockett died prior to the order for a stay being relayed to the personnel inside the execution chamber. There was a conversation inside the chamber about administering life-saving measures to Lockett, including transporting him to the emergency room, but no order was given.

### K.  Two Executions Scheduled on the Same Day

It was apparent the stress level at OSP was raised because two executions had been scheduled on the same day. This was the first time since 2000 two offenders were scheduled to be executed the same day. Four days prior to the execution, the protocol was revised to accommodate the logistics for two offenders.

Several comments were made about the feeling of extra stress. Warden Trammell believed this caused extra stress on all staff. The paramedic stated he/she felt stress and a sense of urgency in the air. This was based on him/her having been involved in numerous executions.

### L.  Maintenance of Daily Logs

In accordance with protocol, OSP staff maintained a daily log of events and occurrences related to Lockett. Protocol stated, "Seven days prior to the execution of an offender sentenced to death, a daily log will be kept regarding every aspect of the proceedings except names." This investigation determined the information recorded on the logs was incomplete.

23

Exhibit 4 Page 26

### M. Use of Midazolam, Vecuronium Bromide and Potassium Chloride

The new three drug protocol utilized in this execution included the administration of midazolam, vecuronium bromide and potassium chloride. It was determined vecuronium bromide and potassium chloride had both been used in previous executions as the second and third drugs to be administered. This was the first Oklahoma execution where midazolam was used.

On April 14, midazolam was the newest drug added to the protocol after it was determined pentobarbital was not available. Pursuant to the death warrant, a dosage of 100 mg was ordered and administered to Lockett. According to protocol, vecuronium bromide was to be administered at a total quantity of 40 mg and the potassium chloride at a total quantity of 200 meq. These dosages were equivalent to the quantities used in other Oklahoma three-drug methods dating back to at least 2011.

This investigation could not make a determination as to the effectiveness of the drugs at the specified concentration and volume. They were independently tested and found to be the appropriate potency as prescribed. The IV failure complicated the ability to determine the effectiveness of the drugs.

On the day of the execution, OAG representatives presented an affidavit to Warden Trammell related to the execution drugs. The warden signed the affidavit and attested that the drugs had been obtained legally from a licensed pharmacy and had been handled appropriately since their acquisition. Interviews of DOC and OAG staff revealed this type of affidavit had been signed in the past, but never on the day of an execution. According to OAG representatives, the affidavit was executed on the day of the execution, due to ongoing litigation concerns regarding the drugs.

### N. Historical Incident Reports and Medical Records

The investigation team obtained historical incident reports, emails and medical records from OSP regarding Lockett. The incident reports included approximately 42 instances where Lockett was disciplined for behavioral issues and for contraband located or suspected by DOC personnel. Examples include:

1. A cellular telephone was discovered in Lockett's cell several months prior to the execution;

24

Exhibit 4 Page 27

2. DOC personnel suspected Lockett had been hoarding Vistaril (hydroxyzine) from a prescription that ended March 3;

3. A homemade rope was discovered on the floor of Lockett's cell during his extraction on the day of the execution;

4. A razor blade from an issued, disposable shaving razor was discovered in Lockett's cell on the day of the execution.

The review of Lockett's medical records by a medical professional indicated that he had no past medical conditions or factors that would be considered problematic for IV insertion or drug administration.

## O. Lockett's Movements and Sounds after Drug Administration

The description of Lockett's movements and sounds varied among the witnesses. The movement descriptions ranged from quivering to thrashing, but most agreed Lockett's head did rise off the table. There were differing recollections regarding whether Lockett's eyes opened after he was deemed unconscious.  The sound descriptions varied from mumbling to Lockett making statements. The recollections varied greatly; therefore it was difficult to determine what was said, if anything.

Several conclusions were made pursuant to the execution table assessment. While strapped to the table, the team member made attempts to move all parts of his body. He was able to rotate his feet inward and outward, move his shoulders slightly and his head had a full range of motion. He was not able to bend or move his knees and had minimal movement in his hips as he attempted to move from side to side. He could not move his hips up and down. The hands had no movement and the arms had minimal movement due to the elbow having limited motion. Based on what was observed, witnesses would have a different perspective of the amount of movement depending on where they were seated. Due to the restrictiveness of the straps, the movements were minimal to non-existent with the exception of the head and feet.

25

Exhibit 4 Page 28

## IV.    RECOMMENDATIONS

Based on the findings, the following recommendations are made for future lethal injection executions in Oklahoma. DOC, the Office of the Attorney General and any other entity or individual responsible for execution protocols in this state are urged to thoroughly research, review and deliberate these recommendations prior to their implementation. Further, DOC should review and consider policies and protocols from other states responsible for executions. Any changes to the current policies and protocols should comply with Oklahoma and federal law.

### A.  Observation of IV Insertion Point(s) and Infusion

1. The IV catheter insertion point(s) should remain visible during all phases of the execution and continuously observed by a person with proper medical training in assessing the ongoing viability of an IV. This person should remain inside the execution chamber during the entire process.

2. Once the appropriate saline infusion has started, it should not be stopped, except for the times that execution drugs are being administered. It should be continuously monitored to assist in ensuring IV viability in accordance with current medical practices and standards;

3. After one hour of unsuccessful IV attempts, DOC should contact the Governor to advise the status and potentially request a postponement of the execution.

### B.  Training and Maintenance of Execution Log for Condemned Offenders

1. Conduct formal, specific training related to information documented on all execution logs.

2. The information to be recorded on execution logs should include, but not be limited to:

   a. all statements or behaviors that could be detrimental to completing an execution;

   b. all meals provided to an offender and what portions of the meals the offender consumed or refused;

26

Exhibit 4 Page 29

   c.  all medication provided to an offender and the observations made by personnel as to whether the offender ingested the medication as prescribed;

   d.  all liquids consumed by the offender.

**C. Additional Execution Supplies**

DOC should maintain and provide their own equipment and supplies ensuring their operability prior to each execution.

   1.  DOC should obtain from the selected pharmacist, one complete, additional set of each execution drug being utilized for an execution to be used in the event an issue arises with the primary set.

   2.  DOC should consult with appropriate medical personnel to determine any and all supplies or equipment necessary including but not limited to the following:

     a.  Heart monitoring equipment;

     b.  Venous ultrasound equipment;

     c.  Appropriate needle/catheters to coincide with the IV access options listed in protocol.

**D. Contingency Plans & Protocols/Policy**

DOC should evaluate and establish protocols and training for possible contingencies if an issue arises during the execution procedure. DOC should consider planning for contingencies including, but not limited to:

   1.  Issues with execution equipment or supplies;

   2.  Issues with offender IV access, including obtaining alternate IV access site(s);

   3.  The offender is not rendered unconscious after execution drug administration;

   4.  A combative offender;

   5.  Unanticipated medical or other issues concerning the offender or an execution team member;

   6.  Issues regarding order, security or facilities at OSP.

Exhibit 4 Page 30

### E.  Formal and Continuing Training Program for Execution Personnel

DOC should establish formal and continual training programs for all personnel involved in the execution process. They should explore successful training procedures used by other correctional institutions and implement accordingly.

### F.  Formal After-Action Review of the Execution Processes

At the conclusion of each execution, all personnel with assigned execution duties should attend an after-action review. The review should be completed within five business days and conducted by the director or his designee. The events that occurred during the execution should be discussed in detail and each involved person should discuss their responsibilities and observations. The review should serve as an opportunity for all involved personnel to voice their opinions, concerns and/or recommendations in order for continuous improvement to the process. The review should be formally documented and retained for future reference.

### G.  Defined Execution Terminology

It was apparent during this investigation that specific terminology should be clearly defined so they are understood by all personnel involved in the execution process. This will allow DOC, OAG and Governor's Office personnel to have a common understanding of how each term affects the execution process and the actions that should take place, if such terms are used. Defined terms should include, but are not limited to "stop," "stay," and "halt".

### H.  Completion of One Execution per Seven Calendar Days

Due to manpower and facility concerns, executions should not be scheduled within seven calendar days of each other.

### I.  Updated Methods of Communication

The current communication methods used during the execution process are antiquated and require unnecessary multi-tasking from key personnel in the execution chamber. DOC should explore options on how to update the following:

28

Exhibit 4 Page 31

1. Communication between the execution chamber and executioners' room.
   a. DOC should research and implement modern methods that allow personnel in these two areas to communicate clearly.
   b. The current processes, including the use of color pencils and hand signals, could be used as a contingency if other modern methods fail.
2. Communication between DOC and the Governor's Office.
   a. DOC should research and implement methods to modernize the communication link that would allow direct, constant contact between the personnel in the execution chamber and the Governor's Office.

## J. Disposition of Executed Offender's Property

DOC should explore maintaining an executed offender's personal property and any items removed from his/her cell until the autopsy report is completed. This would allow DOC administrative personnel time to determine if such property should be maintained for an additional period of time, if appropriate circumstances exist. In any event, no property should be released until it has been properly searched and inventoried.

## K. Execution Witness Briefing

As a result of the changing execution protocols and procedures, DOC should conduct a prepared pre-execution briefing with all attending witnesses. This briefing should include, but not be limited to the following:

1. An overview of the events the witnesses will view during the execution process, including an explanation that witnesses will not be allowed to view all aspects of the execution;
2. Requirements regarding the conduct of witnesses throughout the process.

29

Exhibit 4 Page 32

1

1    UNITED STATES DISTRICT COURT

2    FOR THE DISTRICT OF ARIZONA

3    ───────────────

4    Joseph Rudolph Wood III, et       )
     al.,                              )
5                                      )   No.  **CV 14-1447-PHX-NVW**
                        Plaintiffs,    )
6    vs.                               )
                                       )        **Phoenix, Arizona**
7    Charles L. Ryan, et al.,          )        **July 23, 2014**
                                       )          **3:27 p.m.**
8                                      )
                        Defendants.    )
9    ───────────────

10

11

12                BEFORE:  **THE HONORABLE NEIL V. WAKE, JUDGE**

12

13        (*Telephonic Motion for Emergency Stay of Execution*)
                        (*REDACTED*)

14

15

16

17

18

19                          .

20

21   Official Court Reporter:
     Laurie A. Adams, RMR, CRR
     Sandra Day O'Connor U.S. Courthouse, Suite 312
22   401 West Washington Street, SPC 43
     Phoenix, Arizona 85003-2151
23   (602) 322-7256

24   Proceedings Reported by Stenographic Court Reporter
     Transcript Prepared by Computer-Aided Transcription

25

2

```
 1    APPEARANCES

 2    For the Plaintiffs:

 3            FEDERAL PUBLIC DEFENDER'S OFFICE
              By:  Robin C. Konrad, Esq.
 4            850 W. Adams Street
              Suite 201
 5            Phoenix, AZ 85007

 6    For the Defendants:

 7            OFFICE OF THE ATTORNEY GENERAL
              By:  Jeffrey A. Zick, Esq.
 8            1275 W. Washington
              Phoenix, AZ 85007
 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1              P R O C E E D I N G S

 2         THE COURT:  Ms. Konrad.

 3         MS. KONRAD:  I just filed a Motion for Emergency Stay

 4  of Execution.  Mr. Wood's execution started at 1:52.  He was

 5  being sedated at 1:57.  Since that time he has been gasping,     15:27:50

 6  snorting, and unable to breathe and not dying.  And we're

 7  asking -- our motion asks for you to issue an emergency stay

 8  and order the Department of Corrections to start lifesaving

 9  techniques as required under their protocol.

10         THE COURT:  Do you have an Assistant Attorney General   15:28:11

11  there?

12         MS. KONRAD:  I do not.  I'm in the office right now.

13         THE COURT:  Okay.  I have been pulled out of a

14  meeting.  We will do everything we can to deal with this with

15  the urgency and demands.  And I have a court reporter here.  We  15:28:26

16  are on the record.

17         I want to make attempt right now to obtain

18  participation of an attorney for the State.  Who would that be?

19         I mean --

20         MS. KONRAD:  Jeff Zick.                                  15:28:44

21         THE COURT:  Do you have any -- do you have numbers for

22  any of these people?  The reality is we'll take anybody I can

23  reach, but we should start with the most appropriate person.

24  It seems like Mr. Zick.

25         MS. KONRAD:  Let me -- just a second, Judge Wake.       15:28:58
```

4

```
 1              THE LAW CLERK:  I have got a number.

 2              THE COURT:  Ms.  Konrad.

 3              THE LAW CLERK:  The work number is 602-542 --

 4          MS. KONRAD  Judge Wake?

 5              THE COURT:  Yes.                              15:29:28

 6          MS. KONRAD:  542-5025 is the main Number.

 7              THE LAW CLERK:  8594 is his direct number.

 8              THE COURT:  We have 8594 as his direct number.

 9          MS. KONRAD:  Yes.  That is Jeff Zick's direct number.

10              THE COURT:  Now, I must tell you, I don't know how to  15:29:44

11      do conference calling on my phone.  Are you able to do it on

12      your end?

13          MS. KONRAD:  Yes.  I will attempt to conference him

14      in.

15              THE COURT:  What's the best way -- my staff here knows  15:29:53

16      how to do it.  So why don't we try to do it on my end.

17          MS. KONRAD:  Okay.

18              THE COURT:  Go ahead.

19          MS. KONRAD:  Okay.

20              THE COURT:  Ms. Konrad, do you have the numbers and  15:30:05

21      names for any backup people?  Because I probably won't have you

22      on as I'm reaching them.

23          MS. KONRAD:  Sure.  A backup number is Jeff Sparks.

24      Mr. Sparks is also on the case.  Mr. Sparks is 548-7670.

25              THE COURT:  Now --                            15:30:24
```

5

```
1            MS. KONRAD:  Also let me give you the cell phone
2     number for Mr. Zick.
3            THE COURT:  Yes.
4            MS. KONRAD:  It's ███████.
5            THE COURT:  All right.  And in case I lose you, what's   15:30:36
6     the number to call you back?
7            MS. KONRAD:  ███████████.
8            THE COURT:  All right.  Please hold and we'll try.
9            MS. KONRAD:  Okay.  Thank you, Judge.
10           Ms. Konrad, we're going to try another number.       15:31:37
11           MS. KONRAD:  Okay.  Thank you.
12           MR. ZICK:  Hello?
13           THE COURT:  Mr. Zick?
14           MR. ZICK:  Yes.
15           THE COURT:  This is Judge Wake calling.            15:32:03
16           MR. ZICK:  Hi, Judge Wake.
17           THE COURT:  I need to put you on a conference call
18    with Robin Konrad.
19           MR. ZICK:  I'm sorry.  Let me step out of my office.
20    I had the director on the line.  I can step out of my office.   15:32:14
21           THE COURT:  Hold on a minute.
22           Ms. Konrad, are you there?
23           MS. KONRAD:  I am.
24           THE COURT:  I just reached Mr. Zick on his cell phone.
25    He is stepping out because he was speaking to the director at   15:32:24
```

UNITED STATES DISTRICT COURT      Exhibit 5 Page 5

1  this moment.  Hold on a minute until I get him back.

2          MR. ZICK:  I'm here.

3          THE COURT:  Mr. Zick, Ms. Konrad has advised me that

4  Mr. Wood has not yet expired, and this has been going on for,

5  what, nearly an hour and a half.                          15:32:43

6          And Ms. Konrad, I'm going to ask you to state very

7  succinctly the motion you filed and the relief you are seeking,

8  and then I'm going to invite you, Mr. Zick, to tell us

9  everything that is relevant to this that, of course, I will

10  need to hear from you.                                    15:32:59

11          Go ahead, Ms. Konrad.

12          MS. KONRAD:  According to the attorney who is

13  witnessing, Mr. Wood -- the execution started at 1:52 p.m.  At

14  1:57 p.m., the Department of Corrections reported that he was

15  sedated but at 2:02 he began to breathe.  At 2:03 his mouth    15:33:15

16  moved, and since that time Mr. Wood has continued to breathe.

17  He has been gasping and snorting for over an hour.  And in our

18  motion, we are respectfully requesting that the Court stop the

19  execution and require the Department of Corrections to use the

20  lifesaving provisions required in its protocol.            15:33:34

21          THE COURT:  Mr. Zick, I invite you to tell me the

22  facts as you know them.  And that would include the details of

23  what the protocol provides for this situation.

24          Go ahead, Mr. Zick.

25          MR. ZICK:  Okay.  What I can tell you that I know from    15:33:46

1    speaking with Dawn Northup, who is general counsel with the

2    Department of Corrections, and with the director, is that the

3    consciousness check, according to -- that complies with the

4    protocol that had taken place, the individual who does the

5    consciousness check determined, medically determined that Mr.          15:34:06

6    Wood was unconscious; that his mouth was open; that at some

7    point during the -- when the drugs were given, an involuntary

8    reaction or a snoring-type reaction was taking place; that it

9    had been ongoing.  A second consciousness check was given.  He

10   is unconscious --                                                        15:34:34

11        THE COURT:  Mr. Zick, I appreciate the need to address

12   this as quickly as possible, but could you please give me, to

13   the extent you know, the time frames of these steps that you

14   have articulated, the second consciousness check?

15        MR. ZICK:  I don't have the exact time frame of the                 15:34:48

16   second consciousness check.

17        THE COURT:  Very well then.  Just please continue with

18   what you know.

19        MR. ZICK:  Okay.  And so that involuntary reaction,

20   according to the medical individual who was doing the                    15:35:01

21   consciousness check, indicated that that was something that is

22   going to occur.  A second dose of drugs was given, and I don't

23   have the time frame for that.  They didn't give me that

24   information.  That involuntary reaction continues, but I am

25   told that Mr. Wood is effectively brain dead and that this is            15:35:26

```
 1   the type of reaction that one gets if they were taken off of

 2   life support.  The brain stem is working but there's no brain

 3   activity.

 4        THE COURT:  And tell me briefly how it is, is he -- do

 5   you have the leads or probes necessary to determine his brain     15:35:50

 6   state?

 7        MR. ZICK:  Repeat that, Judge.  I'm sorry.

 8        THE COURT:  Do you have the leads connected to

 9   determine his brain state?

10        MR. ZICK:  That, I don't -- I don't believe there are       15:36:03

11   leads connected on the head, but I'm not sure.  I know that

12   this individual is medically trained.

13        THE COURT:  Okay.  What I'm wondering is what the

14   basis is for the conclusion that he is effectively brain dead.

15        MR. ZICK:  It's because of the medical training.  And      15:36:17

16   all I know is that's the information that was given to me.  I

17   could certainly find that out.

18        THE COURT:  Well, if there are not monitors connected

19   with him, if it's just a visual observation, that is very

20   concerning as not being adequate.                                15:36:34

21        Tell me, what is the current status and what is the

22   anticipated plan of action from this minute forward?

23        MR. ZICK:  Well, from this minute forward, I can tell

24   you that the director is on the phone with the governor's

25   office.  The only contingency plan for this is in the protocol.  15:36:55
```

```
 1    I think it's cited in the motion that was filed.

 2              THE COURT:  I have not been able to read the motion

 3    because I have just called you immediately.  So please tell me

 4    what the protocol provides in that respect.

 5              MR. ZICK:  If I could step back into my office.       15:37:12

 6              THE COURT:  Certainly.

 7              MS. KONRAD:  I can read you the motion, Judge.

 8              THE COURT:  Let's do that.  Mr. Zick, hold on and

 9    we'll hear this from Ms. Konrad.

10              MS. KONRAD:  The contingency procedure is an Automatic  15:37:25

11    External Defibrillator will be readily available on site.  In

12    the event of cardiac arrest, trained medical personnel and

13    emergency transportation shall be available in proximity to

14    respond to the inmate should any medical emergency arise.  If

15    at any point the team member determines any part of the        15:37:43

16    execution is not going according to procedure, they shall

17    advise the IV team leader who notifies the director, and the

18    director will determine the appropriate procedures and stand

19    down if necessary.

20              THE COURT:  Mr. Zick, do you dispute her summary      15:37:57

21    there?

22              MR. ZICK:  That is the contingency plan that is listed

23    in the protocol, correct.  Yes.

24              THE COURT:  And so at this point, he's still

25    breathing, but you believe --                                  15:38:08
```

```
 1            MR. ZICK:  He is.
 2            THE COURT:  You believe from visual observations that
 3    he is brain dead, correct?
 4            MR. ZICK:  It is an involuntary snoring that is
 5    apparently a reaction of the brain stem and not of the brain.        15:38:19
 6            THE COURT:  Are there -- what are the indications as
 7    to whether -- well, I understand you have already answered
 8    that.
 9            Now, you were just talking with the director.  Are you
10    able to tell me what the director anticipates doing at this          15:38:36
11    moment?  And please remind me of what the governor's role is
12    under the protocol.
13            MR. ZICK:  I'm not sure what the governor's role is
14    under the protocol, and I don't have the protocol in front of
15    me.  All I know is that the governor's office received a call        15:38:54
16    from Julie Hall and then called the director.  And the
17    direct -- Dawn Northup was on the phone with me when the
18    director received that call.  I don't know -- I can't tell you
19    what the minute plan is right now.
20            THE COURT:  All right.  And Ms. Konrad, are you --          15:39:13
21            MR. ZICK:  I'm sorry, Judge, if I may.
22            THE COURT:  Go ahead.
23            MR. ZICK:  I just received a note that said that Mr.
24    Wood stopped the snoring and involuntary action and the heart
25    has slowed considerably.  So that's the updated information to      15:39:30
```

1   the minute that I have.

2           THE COURT:  Now, before I get to some substance here,

3   more substance, Ms. Konrad, I don't recall from my previous

4   studies of protocols that may be out of date that the governor

5   has any role.  Is that correct?                           15:39:48

6           MS. KONRAD:  Can you repeat that, Judge?  I'm sorry.

7           THE COURT:  I'm saying I don't recall from my previous

8   examinations of protocols, which may be out of date now, that I

9   don't recall that the governor has any role.  Does the governor

10  have any role?                                            15:40:04

11          MS. KONRAD:  Off the top of my head, it's not -- I

12  don't recall the governor having any role written in the

13  protocol, either.  Of course, as the governor of this state she

14  could stop the execution, I assume.

15          THE COURT:  I would assume -- go ahead, Mr. Zick.      15:40:16

16          MR. ZICK:  Judge, I do recall the only -- the role of

17  the governor that I recall in the protocol is simply calling to

18  ensure that there are no stays of execution prior to the

19  commencement of the execution.

20          THE COURT:  All right.  Now, of course I am            15:40:31

21  considering right now based on what's presented to me whether

22  the execution should be suspended, but I am also -- it would be

23  most helpful to know what the director intends to do

24  immediately.

25          I am also very concerned, Ms. Konrad, that depending   15:40:49

1  on the accuracy of the information Mr. Zick has passed on that

2  suspending the execution may do more harm than good.

3       Mr. Zick, what can you do very promptly to advise me

4  of the director's intentions?  And if that means doing a quick

5  call while we wait for three or five minutes, we'll do that.        15:41:17

6  But I do intend to resolve this matter with extreme urgency in

7  light of the nature of the matter and the inability to

8  deliberate at any length.

9       So Mr. Zick, are you able -- what do you suggest in

10 terms of getting us the most accurate information about the        15:41:40

11 director's intention?

12      MR. ZICK:  I can go back into my office and if he's

13 still on the phone I can talk with him, or I can give him an

14 immediate call.

15      THE COURT:  Ms. Konrad, do you have any problem             15:41:53

16 proceeding that way?  I would expect we would be back in

17 contact within 5 or 10 minutes.

18      MS. KONRAD:  You can reach me at this same number,

19 Judge Wake.

20      THE COURT:  I might prefer just to remain on the line        15:42:05

21 and not have to reestablish the connection and allow Mr. Zick

22 to make that call to the director, and I expect that his call

23 will be taken.

24      MS. KONRAD:  That would be perfect.

25      THE COURT:  We will remain on the line, then, and Mr.        15:42:20

1  Zick, please do that.  And again, I do need to make a decision

2  within a few minutes as to whether to suspend the execution.

3  So go ahead, Mr. Zick.

4          MR. ZICK:  Okay.  I will do that.  Thank you.

5          THE COURT:  All right.                              15:42:34

6          Ms. Konrad, I don't want to lose the phone connection,

7  but I'm going to put you on mute so that I can converse with my

8  staff.

9          MS. KONRAD:  That's perfectly okay, Judge Wake.  Thank

10  you.                                                        15:42:52

11          THE COURT:  We're going to do that right now.  And

12  please hold however long it is.  Thank you.

13          MS. KONRAD:  Okay.

14          THE COURT:  We're going to go off the record while

15  we're off the phone.                                        15:43:01

16          (Discussion off the record from 3:43 p.m. until 3:47

17  p.m.)

18          MS. KONRAD:  Judge Wake put us on mute.

19          THE COURT:  I have you both.  Go ahead, Mr. Zick.

20          MR. ZICK:  Okay.  The updated information, before I    15:47:50

21  get to any contingency, is that Mr. Wood has no respiration

22  right now and his heart rate is 20 and falling.  That's on the

23  medical side.

24          The director indicated that in consultation with the

25  IV team leader, who is a medical doctor, Mr. Wood is apparently  15:48:10

```
 1    comatose; that he cannot change course at this point, and the
 2    plan, I suppose, is to push chemicals based on the input from
 3    the IV team leader.
 4              THE COURT:  Increase the chemical dosage?
 5              MR. ZICK:  Right.                                  15:48:37
 6              THE COURT:  Do we have -- do you have a sense of what
 7    the risk, the chances are of pain at this time?
 8              MR. ZICK:  In talking with the director, who has been
 9    in consultation with the IV team leader, there has been no
10    appearance of any pain.                                     15:48:57
11              THE COURT:  And with respect to the gasping and
12    attempted breathing that Ms. Konrad reported initially, that,
13    of course, could be indicative of pain.  But your report is
14    that is now done, is that correct, that --
15              MR. ZICK:  There's no respiration.                15:49:14
16              THE COURT:  Ms. Konrad, I'm trying to lead this
17    discussion in a way that gets to the decisions I have to make,
18    and I have not been meaning to exclude anyone.  I invite you to
19    tell me what you request.  And I just got your paper, and I
20    have read it.  I invite you to tell me what it is that you ask  15:49:33
21    of the Court and briefly your basis.  And again, my principal
22    focus here is on the chance of pain.
23              Go ahead, Ms. Konrad.
24              MS. KONRAD:  Judge Wake, when we filed this motion 45
25    minutes ago when we got word he was gasping for over an hour,  15:49:52
```

```
 1    our request was to immediately stay the execution and perform
 2    lifesaving techniques.  I'm not a medical professional.  I
 3    would still -- Mr. Zick has said the situation has changed.
 4    Without any further information, I'm not sure what more to say
 5    other than we're requesting the stay of execution.  I'm not       15:50:18
 6    sure if that's possible at this time.
 7              THE COURT:  I understand.
 8              Mr. Zick, do you want to be heard briefly in response
 9    to that statement?  You don't have to say anything more.
10              MR. ZICK:  I don't have anything other than the         15:50:36
11    information I just gave.
12              THE COURT:  All right.  First of all, I thank both
13    counsel.  Ms. Konrad, I thank you for the urgency with which
14    you have addressed all this, and Mr. Zick, I thank you for the
15    luck that you are available and your prompt responses to my       15:50:51
16    questions.
17              Looking at this from the perspective of Eighth
18    Amendment prohibition of cruel and unusual punishment, I look
19    at this in terms of what can be done, if anything, to eliminate
20    or reduce pain that may be experienced.  It's a matter of         15:51:09
21    degrees of risk with less than certain knowledge.
22              Based on Mr. Zick's summary, it does appear to me that
23    there is no serious risk of pain being experienced at this
24    time.  Now, maybe I should qualify that, that there -- we have
25    to deal with degrees of uncertainty, but it does not appear       15:51:37
```

1    that with lack of physical reaction that there is pain.

2         I am also concerned that if it were possible to

3    suspend this in a better circumstance, I would be disposed to

4    do that if it did not create even more risk of pain.  It is not

5    appearing to me that that is a realistic possibility at this          15:52:02

6    time.  So -- and I summarize Mr. Zick, and I'm relying on --

7    and I do appreciate your presentation and information you have

8    gathered that he has no physical response, is not breathing,

9    that the heart rate is dropping.

10        And again, I want to confirm, the heart rate is               15:52:30

11   dropping.  It's not stable at a low rate, but it is dropping.

12   Is that your understanding, Mr. Zick?

13        MR. ZICK:  That's my understanding.  When the motion

14   was filed, I believe his heart rate was above 20, but I can't

15   verify that.  All I know is that I was told his heart rate was      15:52:49

16   20 when I called the director based on the Court's wish.

17        Wait.  I just -- I'm sorry, Judge.

18        THE COURT:  Go ahead.

19        MR. ZICK:  I just learned that the IV team leader has

20   confirmed Mr. Wood's death.                                         15:53:07

21        THE COURT:  All right.  Let me finish my thought,

22   because it's my responsibility.

23        Counsel, I have addressed this with utmost urgency,

24   everything that's humanly possible to respond to Ms. Konrad's

25   motion and approach to the Court.  To finish the thought, even      15:53:26

```
 1   without this new confirmation, it does appear to me, and it is
 2   my judgment, that there was not a serious prospect of pain and
 3   that terminating the execution did not have prospect of
 4   eliminating pain, and even without my medical expertise, raises
 5   serious questions of whether keeping him alive could result in     15:53:53
 6   pain.
 7          However, so I take -- counsel, that is my judgment in
 8   the circumstances, and of course I take responsibility for
 9   that.  This new input that the team leader has confirmed that
10   Mr. Wood has expired resolves the matter as well.                   15:54:14
11          Ms. Konrad, I know you are in quite a spot here, and I
12   don't want -- I want to give you the opportunity to consider
13   what it is that you want to request of the Court, if anything
14   further.
15          MS. KONRAD:  Yes, Judge Wake.  I would just like to          15:54:35
16   say for the record, at this point the finding that there was no
17   evidence of pain is premature.  The reason --
18          THE COURT:  I'm sorry, Ms. Konrad.  I wonder, because
19   I don't want you to be misled.  I am not finding that there was
20   not pain before.  I'm not finding that at all.  I'm addressing     15:54:58
21   the circumstance that we are in now.  With the necessity of
22   having had even this extremely accelerated discussion, I am
23   addressing the situation now, and that's what I'm addressing.
24   So I do invite you to say whatever you would like about that.
25   But I did not want you to misunderstand me as suggesting that       15:55:16
```

1   there had been a lack of pain before.   That is a matter that

2   may come before the Court in plenary matter soon.

3          So go ahead, Ms. Konrad.

4          MS. KONRAD:   Thank you, Judge.   That was the main

5   concern that I just wanted to make sure that we wouldn't come          15:55:31

6   to you in this emergency posture if we hadn't had true concern

7   and thought that our client was, in fact, suffering based on

8   the witness's observations of him.   And I really appreciate you

9   coming, and I know that you were at a ceremony for Judge

10  Broomfield so I just would like to thank you for taking the          15:55:53

11  time to hear this out even though the client eventually expired

12  while we were on the phone.

13         THE COURT:   Not at all.   It's my responsibility.   And

14  I have attempted to deal with it as rapidly as humanly

15  possible.                                                            15:56:07

16         Anything further, Mr. Zick?

17         MR. ZICK:   No, Your Honor.

18         THE COURT:   All right.   Well, I'm going to have the

19  court reporter type up this transcript and file it so it's

20  publicly available.   And just let me pause for a moment.          15:56:18

21         Mr. Zick, there are no other warrants of execution out

22  for any of the other plaintiffs, correct?

23         MR. ZICK:   Correct, Judge.

24         THE COURT:   All right.   So there will -- there will be

25  time to deal with whatever consequence these events have for          15:56:45

1   other plaintiffs.

2          So with that, again, I thank both counsel for your

3   diligence and the utmost urgency with which we addressed this

4   matter.

5          Okay.  With respect to the motion that Ms. Konrad has          15:57:01

6   filed, that's the Motion For Emergency Stay of Execution,

7   Document Number 26, it is ordered that the motion is denied as

8   moot for the reasons stated on the record.

9          With that, I thank you all, and we will be adjourned.

10         (Proceeding concluded at 3:57 p.m.)                             15:57:20

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1

 2

 3

 4

 5

 6                    C E R T I F I C A T E

 7

 8          I, LAURIE A. ADAMS, do hereby certify that I am duly

 9   appointed and qualified to act as Official Court Reporter for

10   the United States District Court for the District of Arizona.

11          I FURTHER CERTIFY that the foregoing pages constitute

12   a full, true, and accurate transcript of all of that portion of

13   the proceedings contained herein, had in the above-entitled

14   cause on the date specified therein, and that said transcript

15   was prepared under my direction and control.

16          DATED at Phoenix, Arizona, this 23rd day of July,

17   2014.

18

19                         s/Laurie A. Adams

20                         _____

21                         Laurie A. Adams, RMR, CRR

22

23

24

25
```

SWORN DECLARATION OF SPENCER J. HAHN

STATE OF ALABAMA                          )
                                          )
COUNTY OF MONTGOMERY                       )

I, Spencer J. Hahn, a resident of Montgomery, Alabama, hereby declare, under penalty of perjury, the following:

1.  I am an Assistant Federal Defender in the Capital Habeas Unit of the Federal Defenders for the Middle District of Alabama, in Montgomery, Alabama, where I have worked since October 1, 2014. I have been licensed to practice law since 2004.

2.  Ron Smith designated me and our Executive Director, Christine Freeman, to witness his execution. This declaration contains my observations of what occurred immediately before, during, and after Ron's execution.

3.  At approximately 10:20 p.m., Christine and I, along with members of the press (including Kent Faulk) who had been waiting in a van next to our transport car, were escorted into the witness room. While waiting, I had noticed two people in an Etowah County Medical Examiner vehicle; they remained outside.

4.  I asked the corrections officer who drove us if anyone from the victim's family was present, and was told that someone was. Once inside the witness room, I heard a radio transmission that witnesses were being taken to room 8, followed by footsteps and the shadows of feet passing our (closed) door. Whoever was in room 8 was allowed to leave before we did, as I heard a similar radio transmission about room 8, and saw the reverse of what I saw after the first message. They left and entered through the other end of the hall from us and the press.

5.  The Warden read the death warrant to Ron, offered him a chance to make any final statement ("No, ma'am"), and the Warden left the room.

6.  Shortly thereafter, the second guard left the room, and the prison chaplain approached Ron, held his right hand, and kneeled in front of him for a minute or so. As the prison chaplain approached, Ron appeared to be mouthing, repeatedly, what I believe was the Lord's Prayer.

1

Exhibit 6 Page 1

7. The midazolam began around 10:30 p.m. The first thing I noticed was that Ron ran his tongue around his lips several times, as if he had a dry mouth. Then, at 10:31:55 p.m. (according to the clock above his gurney) Ron began having difficulty breathing, including regular asthmatic-sounding barking coughs every ten seconds or so. He also lifted his head and looked around, moved his arms, clenched his left hand, and moved his lips in what appeared to be an attempt to say something. Ron's eyes never closed, and he moved and coughed regularly throughout approximately the next fifteen minutes.

8. Both before and after the first consciousness check, it was obvious Ron was still awake, as he was still moving his head, hands and arms, coughing, and attempting to speak. He reacted to the arm pinch by moving his arm toward his body (away from the source of pain).

9. Sometime before the administration of the second dose of midazolam, I heard raised voices coming from the Commissioner's room. Although I couldn't make out the words, the tone indicated panic or, at the very least, extreme stress.

10. Ron again began to exhibit the signs he did after the first dose of midazolam. After several more minutes, a second consciousness check was done, during which Ron continued to move and his eyes remained open. While touching his left eyelid, the guard pushed it closed, but it opened as soon as he removed his finger.

11. Ron moved his right arm after the second consciousness check. Shortly thereafter, they must have administered the paralytic, as Ron's breathing became very shallow and he stopped moving. His eyes remained open, with the left eye opening further as his breathing became imperceptible.

12. The curtains were closed without anyone having approached Ron and, when I stood to leave, I, on my tiptoes, looked over the top of the curtain, and saw no signs of the EKG or anyone checking Ron. Leaving the building, I noticed that both members of the medical examiner's office were still in their truck.

2

Exhibit 6 Page 2

I hereby declare, pursuant to 28 U.S.C. 1746, under penalty of perjury, that the foregoing is true and correct to the best of my knowledge and belief.

Dated this 13th day of December, 2016.

Spencer J. Hahn
Assistant Federal Defender

3

Exhibit 6 Page 3



## Certificate of Analysis

| Client: Rory Griffin Deputy Director Arkansas Dept. of Corrections Pine Bluff, AK 870-692-1819 rory.griffin@arkansas.gov | Test Date: 11/17/2015 | Sample | ID # |
|---|---|---|---|
| | Project: | Potassium Chloride for injection concentrate, USP (2 mEq/mL), 20 mL | 111215AR6824 |
| | | Vecuronium Bromide for injection, 20 mg (1mg/mL when reconstituted to 20 mL) | 111215AR6825 |
| | | Midazolam injection USP, 50 mg/10 mL  (10 mL vial) | 111215AR6826 |

| ID | Method | Technique used | Acceptance criteria | Result (%) | Pass/Fail |
|---|---|---|---|---|---|
| 111215AR6824 | USP Potassium Chloride for Injection Concentrate assay method | ICP-MS | 95.0-105.0% | 101.1 | Pass |
| 111215AR6825 | USP Vecuronium Bromide API (Active Pharmaceutical ingredient) assay method | HPLC-UV | 90.0-110.0% | 102.6 | Pass |
| 111215AR6826 | USP Midazolam Injection assay method | HPLC-UV | 90.0-110.0% | 99.2 | Pass |

Testing results relate only to items tested. Test report shall not be reproduced, except in full, without approval from ▮▮▮▮▮ in writing.

**ADC 40**

Exhibit 7 Page 1

**Continued**

*11/18/2015*

Date

**Technical Director**

*11/18/2015*

Date

, Ph.D., M.T.M.
**Sr. Vice President, Technical Services**

*11/18/2015*

Date

, Ph.D.
**CEO/Chief Chemist**

**ADC 41**

Exhibit 7 Page 2



Project Code No █



# CONFIDENTIAL REPORT

## <u>Arkansas Dept. of Corrections</u>

*Prepared By:*

*Issued Date: November 23, 2015*

*FDA Registered | cGMP Compliant Facility |DEA Licensed*

████████████████████████████████     Project Code No. █████

To:   **Rory Griffin**
      **Deputy Director**
      **Arkansas Dept. of Corrections**
      **Pine Bluff, AK**
      **(870) 692-1819**
      **Rory.griffin@arkansas.gov**

## Assay & Identification Test Report

Thank you for contacting ████████████████ for the analysis of potency of three pharmaceutical products as received from the current vendors i.e. Potassium Chloride for injection concentrate, USP (2 mEq/mL), 20 mL; Vecuronium Bromide for injection, 20 mg and Midazolam injection USP, 50 mg/10 mL. Following are the results, methodology, and data associated with our analysis of the sample.

**Table 1: Sample Description**

| ID | Lot Number | Sample Description |
|---|---|---|
| 111215AR6824 | ████ | Potassium Chloride for injection concentrate, USP (2 mEq/mL), 20 mL |
| 111215AR6825 | ████ | Vecuronium Bromide for injection, 20 mg (1mg/mL when reconstituted to 20 mL) |
| 111215AR6826 | ████ | Midazolam injection USP, 50 mg/10 mL  (10 mL vial) |



**Figure 1: Samples**

*FDA Registered | cGMP Compliant Facility |DEA Licensed*

████████████████████████████████████████████████████



Project Code No. ██

## Executive Summary

The analysis for potency of the three pharmaceutical products as given in Table 1 was performed per the USP methodology.

- The assay for Potassium Chloride for injection concentrate, USP (2 mEq/mL), 20 mL was performed as per the assay method given in the USP (United States Pharmacopeia) Monograph of Potassium Chloride for Injection Concentrate. The obtained result of 101.1% was within the acceptance criteria of 95.0%-105.0% of the label claim, 2mEq/mL (Table 5).

- The assay for Vecuronium Bromide for injection, 20 mg (1mg/mL when reconstituted to 20 mL) was performed as per the assay method given in USP Monograph of Vecuronium Bromide API (Active Pharmaceutical Ingredient). The Assay result of 102.6% was within the acceptance criteria of 90.0 % - 110.0 % (for finished product) of the label claim, 20 mg of Vecuronium Bromide per vial (Table 7).

- The assay for Midazolam injection USP, 50 mg/10 mL solution (10 mL vial) was performed as per the assay method given in the USP Monograph of Midazolam injection. The Assay result of 99.2% was within the acceptance criteria of 90.0 % - 110.0 % of the label claim, 50 mg/10mL of Midazolam. (Table 9).

All three products met the potency requirements.

## Analytical Testing

**Potassium Chloride for Injection concentrate, USP (2 mEq/mL), 20 mL**

**ICP-MS**

| | |
|---|---|
| Apparatus: | Perkin Elmer ELAN 6100 ICP-MS |
| Method: | |
| Timing Parameters: | Sweeps/Readings: 20; Readings/Replicate: 1; Number of replicates: 5 |
| | Tuning File: default.tun |
| | Optimization file: default.dac |

Table 2a: Parameters in ICPMS

| Analyte | Mass | Scan Mode | MCA Channels | Dwell Time | Integration Time |
|---|---|---|---|---|---|
| K | 38.964 | Peak Hopping | 1 | 100.0 ms | 2000ms |

Signal Processing:      Detector Mode: Dual; Measurement units: cps; Autolens: On
                        Spectral Peak/profile Processing: Average;
                        Blank subtraction: Subtracted after internal standard; Smoothing: Factor 5

Calibration Information:

Table 2b: Calibration using standards

| Analyte | Mass | Curve Type | Sample units | Std Units | Std 1 | Std 2 | Std 3 |
|---|---|---|---|---|---|---|---|
| K | 38.964 | Linear Through Zero | ppm | ppm | 1.0 | 1.5 | 2.0 |

Sample Preparation: Followed USP monograph for Potassium Chloride Injection Concentrate.
For analysis of samples, ICP-MS technique was used.

*FDA Registered | cGMP Compliant Facility | DEA Licensed*



**Vecuronium Bromide for injection, 20 mg:**
**HPLC-UV analysis**
Table 3 shows the HPLC method parameters for the Vecuronium Bromide for injection, 20 mg.

Table 3: HPLC method for Vecuronium Bromide for injection, 20 mg

| HPLC-DAD Conditions | | | |
|---|---|---|---|
| System | Agilent 1100 | | |
| Column | Column ZORBAX Rx-SIL, Agilent Technologies, 150 x 4.6 mm | | |
| Mobile phase | Mobile Phase A- Solution of Sodium perchlorate in water and Acetonitrile. | | |
| | Mobile Phase B- Solution of Ammonium chloride in Ammonium hydroxide and Methanol | | |
| Isocratic | Time (min) | Mobile Phase A (%) | Mobile Phase B (%) |
| | 0 | 60 | 40 |
| | 15 | 60 | 40 |
| Flow rate | 0.3 mL/min | | |
| Injection | 20 µl | | |
| Detection | 215 nm | | |
| Column temperature | 40°C | | |

Sample preparation and analysis: Followed USP monograph for Vecuronium Bromide API assay.


**Midazolam Injection USP, 50 mg/10 mL (10 mL vial):**
**HPLC-UV Analysis**
Table 4 shows the HPLC method parameters for the Midazolam injection USP, 50 mg/10 mL.

Table 4: HPLC method for Midazolam injection USP, 50 mg/10 mL

| HPLC-DAD Conditions | | | |
|---|---|---|---|
| System | Agilent 1100 | | |
| Column | Supelco, Ascentis C18, 250mm x 4.6mm, 5µm. | | |
| Mobile phase | Mobile Phase A- Acetonitrile: Methanol: Buffer pH 5.0 (8:3:9) | | |
| | Mobile Phase B- Acetonitrile: Buffer (3:1) | | |
| Gradient | Time (min) | Mobile Phase A (%) | Mobile Phase B (%) |
| | 0 | 100 | 0 |
| | 15 | 100 | 0 |
| | 20 | 0 | 100 |
| | 35 | 0 | 100 |
| | 37 | 100 | 0 |
| | 45 | 100 | 0 |
| Flow rate | 1.0 mL/min | | |
| Injection | 50 µl | | |
| Detection | 254 nm | | |

Sample preparation and analysis: Followed USP monograph for Midazolam injection assay.

*FDA Registered | cGMP Compliant Facility | DEA Licensed*



Project Code No.

## Results and Discussion

**Potassium Chloride:**

% labeled amount of Potassium Chloride in injection concentrate $= \left(\frac{C}{Cu}\right) \times \left(\frac{Mr}{Ar}\right) \times 100$

Where,

C = concentration of potassium in the Sample solution as determined in this test (μg/mL)

Cu = nominal concentration of potassium chloride in the Sample solution (μg/mL)

Mr = molecular weight of potassium chloride, 74.55

Ar = atomic weight of potassium, 39.10

System suitability was met. The calibration data using standards having 1.0, 1.5 and 2.0 ppm concentrations showed correlation coefficient value as 0.999 ($R^2$>0.99).
Acceptance criteria for the product was met (Table 5).

Table 5: Percent labeled amount of potassium chloride

| Sample # | USP Acceptance Criteria | Result | Pass / Fail |
|---|---|---|---|
| KCl sample | 95.0 % - 105.0 % | 101.1% | Pass |

**Vecuronium Bromide:**

System suitability requirements were met (Table 6). Table 7 shows the Assay test results. Figures 2 and 3 shows the HPLC-UV chromatograms for Vecuronium Bromide standard and sample respectively. Vecuronium Bromide peak is at the retention time of 8.5 minutes.

% Label Claim Calculation $= \left(\frac{Vs}{Vt}\right) \times \left(\frac{Cs}{Ct}\right) \times 100$

Where,

Vs    = Area of Vecuronium bromide sample solution

Vt    = Average area of 5 replicate Vecuronium bromide standard solution injections.

Cs    = Concentration of Vecuronium bromide standard solution

Ct    = Concentration of Vecuronium bromide sample solution.

Table 6: System Suitability Results

| Requirements | Acceptance Criteria | Result | Pass / Fail |
|---|---|---|---|
| RSD % | NMT 2.0 % | 0.0% | Pass |
| Column efficiency | NLT 5000 | 101093.3 | Pass |



Project Code No.

**Table 7: Percent Label Claim Assay Results**

| Sample # | Acceptance Criteria | Result | Pass / Fail |
|---|---|---|---|
| 1 | 90.0 % - 110.0 % | 102.6% | Pass |

**Midazolam:**

System suitability requirements were met (Table 8). Table 9 shows the Assay test results. . Figures 4 and 5 shows the HPLC-UV chromatograms for Midazolam standard and sample respectively.

% Label Claim Calculation = $\left(\frac{Ms}{Mt}\right) \times \left(\frac{Rs}{Rt}\right) \times 100$

Where,

Ms   = Area of Midazolam sample solution

Mt    = Average area of 5 replicate Midazolam standard solution injections.

Rs    = Concentration of Midazolam standard solution

Rt    = Concentration of Midazolam sample solution.

**Table 8: System Suitability Results**

| Requirements | Acceptance Criteria | Result | Pass / Fail |
|---|---|---|---|
| RSD % | NMT 2.0 % | 0.2% | Pass |
| Tailing factor | NMT 2.5 | 0.8 | Pass |
| Column efficiency | NLT 5500 | 58160 | Pass |

**Table 9: Percent Label Claim Assay Results**

| Sample # | USP Acceptance Criteria | Result | Pass / Fail |
|---|---|---|---|
| 1 | 90.0 % - 110.0 % | 99.2% | Pass |

Project Code No.

# Figures



**Figure 2: HPLC chromatogram of Vecuronium Bromide Standard**



**Figure 3: HPLC chromatogram of Vecuronium Bromide Sample**



**Figure 4: HPLC chromatogram of Midazolam Standard**

*FDA Registered | cGMP Compliant Facility | DEA Licensed*



**Figure 5: HPLC chromatogram of Midazolam Sample**

HISTORY

| Version | Date | Comments |
|---------|------|----------|
| .01 | 11/23/15 | Corrected typo/error on page #5, Under the heading Vecuronium bromide: right below the formula-previous report has Midazolam, so changed to Vecuronium bromide. |
| | | |

*FDA Registered | cGMP Compliant Facility | DEA Licensed*



Project Code No. ███

## Description of Instrumentation Used

**Reverse Phase High Performance Liquid Chromatography (RP-HPLC):** ███ uses Agilent 1100 series instruments with quaternary pumps. Detection modules include Refractive Index, UV variable wavelength and UV Diode Array Detectors. The quaternary pumps allow the use of variable solvent chemistry to optimize resolution and run time. Diode Array detection allows for collection of data from multiple wavelengths simultaneously. The system is optimized for reverse phase chromatography, which allows the analyst to utilize a highly polar mobile phase solution that carries the compound of interest though the chromatography column. The column contains a non-polar stationary phase that interacts with the compound of interest as it is pumped through the column. The compound eventually is released from the column and travels to the detector where a signal arises based on the compound's characteristic absorbance and retention time. The analog signal is converted to a usable chromatogram where the information about the compound can be analyzed with high accuracy and precision.

**Inductively Coupled Plasma Mass Spectrometry (ICP-MS):** ICP-MS is commonly used to detect the heavy metals in a sample at trace levels. Perkin Elmer ELAN 6100 ICP-MS has some on-board features including PE Autosampler, Peristaltic Pump, Chiller and ICPMS Winlab Data System with software. The system is optimized for rapid multi-element coverage, isotopic information, low detection limits, wide Linear Dynamic Range, high sample throughput and semi-quantitative as well as Qualitative Analysis.

**Project Code No.** ████

## Wrap Up

Testing results relate only to items tested. Test report shall not be reproduced, except in full, without approval from ████████ in writing.

Thank you for consulting with ████████████. If you have any questions regarding this analysis, or if we can be of any further assistance, please call us at ████████. Following the receipt of this final report, a final invoice indicating the remaining payment will be sent to you. We will safely and securely dispose of all samples and confidential information in our possession in 30 days, unless otherwise instructed by your company.

It has been a pleasure working with you and we look forward to serving you again.

Sincerely,

████████, MS.
**Technical Director**

████████, Ph.D., M.T.M.
**Senior Vice President, Technical Services**

████████, Ph.D.
**CEO/Chief Chemist**



# FEDERAL PUBLIC DEFENDER ORGANIZATION

## EASTERN DISTRICT OF ARKANSAS

**CAPITAL HABEAS UNIT**

Jenniffer Horan
**FEDERAL DEFENDER**

**CAPITAL HABEAS CHIEF**
Scott Braden

**ASSISTANT DEFENDERS**
Julie Vandiver
John Williams
Jamie Giani

**RESEARCH LAWYER**
Jason Kearney

**INVESTIGATORS**
Dana Harrison
Joseph Cummings
Tonya Willingham

**ADMINISTRATIVE OFFICER**
Debbie Williams

**COMPUTER SYSTEMS ADMINISTRATOR**
Sharon Robinson

**OPERATIONS ADMINISTRATOR**
Jeri Robinson

**ADMINISTRATIVE ASSISTANT**
Dana Liner

**MAILING ADDRESS**
1401 West Capitol
Suite 490
Little Rock, Arkansas
72201

**PHONE NUMBER**
501-324-6114

**FAX NUMBER**
501-324-5630

March 10, 2017

Wendy Kelley, Director
Arkansas Department of Correction
PO Box 8707
Pine Bluff, AR 71611

**RE:       Execution Policies**

Dear Director Kelley:

We the undersigned are the attorneys representing the eight inmates whose executions are scheduled for the four dates in April. We have several questions and requests concerning the executions.

First, we want to confirm that we will have full access to our clients in the holding cells until it is time for them to actually walk to the execution chamber. That has been the historical practice, as two of us (Rosenzweig and Sallings) can attest.

Second, we want to confirm that we will be permitted in the viewing area during the execution process itself for our respective clients. Ark. Code Ann. § 16-90-502 guarantees this right, should we wish to exercise it. Furthermore, it has also been the historical practice as well as our reading of the statute that an attorney for the inmate does not count against the witness limit.

Third, we want to confirm that we will be able to bring cellular telephones, laptop computers, and tablet computers to the prison on the dates of the executions of our respective clients. We also want to ensure that we will have access to our telephones during the executions. That has been the historical practice. In the event that you reject this request, we inquire as to what alternative arrangements the Department will assure us regarding voice and data communications with the courts and other counsel.

Finally, we ask to be provided a copy of any protocols, memoranda, or other documents that reflect the Department's policies with regard to the issues set forth in this letter.

Thank you for your attention to this matter.

Exhibit 8 Page 1

Sincerely,

Scott Braden

*Counsel for Jason McGehee, Marcel Williams, and Bruce Ward*

Jeff Rosenzweig

*Counsel for Stacey Johnson, Jack Jones, and Kenneth Williams*

Deborah Sallings

*Counsel for Don Davis*

Lee Short

*Counsel for Ledell Lee*

2

Exhibit 8 Page 2



*honor and integrity in public service*

**Arkansas Department of Correction**

Arkansas Department of Correction
Legal Division
P.O. Box 8707
Pine Bluff, Arkansas 71611-8707
Phone: (870) 267-6371
Fax: (870) 267-6373
www.arkansas.gov/adc

March 16, 2017

Scott Braden, Capital Habeas Chief
1401 W. Capitol Avenue, Suite 490
Little Rock, AR 72201

Deborah Sallings, Attorney at Law
35715 Sampling Road
Roland, AR 72135

Jeff Rosenzweig, Attorney at Law
300 Spring Building, Suite 310
Little Rock, AR 72201

Lee Short, Attorney at Law
425 W. Broadway Street, Suite A
North Little Rock, AR 72114-5576

RE: Execution Policies

Counsel:

   This will acknowledge the receipt of your correspondence of March 10 regarding ADC policies and the scheduled executions. Your inquiries seek information ragrding those policies which affect your role as legal counsel for the condemned inmates. I will answer your questions in turn.

   First, you ask whether you will have full access to your clients in the holding cells prior to the executions. Yes. In addition to the normal visitation allowed as a matter of course for legal counsel, legal counsel for a death row inmate may visit, at the request of the inmate, each day for five days prior to the scheduled execution, including the day of the scheduled execution. You may remain with your client up until the time your client is escorted to the chamber.

   Next, we confirm that legal counsel for the inmate is permitted, at counsel's option, to be present in the viewing area during the execution process itself. You are correct that such counsel will not be excluded due to any applicable witness limit. If the inmate has multiple legal counsel, only one will be allowed to be in the viewing area.

   With respect to electronic communication devices (cell phones, tablets, laptops), you will not be allowed to bring cell phones or tablets inside the prison facility. You may bring a lap top computer into the facility so long as the device is not equipped with photography, video, or audio recording capabilities. The use of the lap top will be limited to two areas of the facility, the

deputy warden's office (where a phone line and fax will be available) and the general visitation area. You will not be permitted to take a lap top to the holding cell area nor the viewing area. You can leave it in the deputy warden's office.

However, the ADC has made arrangements to provide legal counsel with the opportunity to communicate with other counsel and the courts. While at the holding cell area, legal counsel will have access to one of two phones for outbound calls. If counsel decides to return to the deputy warden's office rather than proceeding to the viewing area, there will be two phone lines (870-850-8656, 870-850- 8657) for inbound or outbound calls. There will also be a fax machine (870-850-8864) in that office available to counsel. Counsel may also use a lap top there. Outbound lines will also be available in the general visitation, but no fax.

The ADC's Execution Procedures Administrative Directive is confidential. As it sets out the implementation of logistical procedures necessary to carry out the sentence of death, it is exempt from disclosure pursuant to Ark. Code Ann. Section 5-4-617(g) and (i). The Director has authorized me to describe for you that portion of the procedures related to attorney visitation for your convenience and that of your client. The confidential procedures do not specifically address the possession of electronic devices as those are prohibited by department-wide visitation and contraband policies with which I am sure you are familiar. From time to time the Department has made an exception to general ban on electronic devices to accommodate the need for visiting legal counsel to have a lap top, and she has decided to make that accommodation in this case.

Sincerely,

James B. DePriest
Chief Legal Counsel,
Arkansas Department of Correction

Exhibit 9 Page 2

 RE: FOIA Request
Jim Depriest
to:
John C Williams
03/20/2017 12:48 PM
Cc:
Jim Depriest
Hide Details
From: Jim Depriest <Jim.Depriest@arkansas.gov>
To: John C Williams <John_C_Williams@fd.org>
Cc: Jim Depriest <Jim.Depriest@arkansas.gov>
History: This message has been replied to and forwarded.

Thank you for the opportunity to clarify these issues.
If the attorney chooses to go to the viewing area, she will have no access to a phone during the execution.
The holding cell is not terribly far, but the attorney will have no access to those phones during the execution. The options for the attorney
are to go to the viewing area, or the deputy warden's office (outbound and inbound phone and fax available, also lap top), or to the
visitation area with representatives of the press (outbound phone available).
The attorney will not be allowed to leave and then return to the viewing area. No phone access in the viewing area.

While the ADC can appreciate your concerns regarding communications, we trust that you will have other staff assigned to monitor
communications with the courts, and these staff can have real time communications with representatives of the Governor's Office,
Attorney General's Office, and the ADC.

James DePriest
Chief Legal Counsel
Central Office, Legal Division
Arkansas Department of Correction
Office- 870-267-6371
Cell – ███████
Jim.depriest@arkansas.gov

Confidentiality Notice: This e-mail message and any attachments is the property of the State of Arkansas and may be protected by state and federal laws governing disclosure of private information. It is for the
intended recipient only. If an addressing or transmission error has misdirected this e-mail, please notify the author by replying to it. If you are not the intended recipient you may not use, disclose, distribute, copy,
print or rely on this e-mail.

Exhibit 10 Page 1

Case _____00110SWM____Document 137-3    Filed 07/16/2008    Page 1 of 24



**Arkansas Department of Correction**

*honor and integrity in public service*

Director's Office
P.O. Box 8707
Pine Bluff, Arkansas 71611-8707
Phone: (870) 267-6200
Fax: (870) 267-6244
www.arkansas.gov/doc

---

## ADMINISTRATIVE DIRECTIVE
## CONFIDENTIAL

**SUBJECT:**   Procedure for Execution

**NUMBER:**   08-28                    **SUPERSEDES:**   07-48

**APPLICABILITY:**   Management Team and designated staff

**REFERENCE:**   AR-020 - Emergency Preparedness          PAGE 1 of 26

**APPROVED:**                                **EFFECTIVE DATE:** 05/22/08

### I.   POLICY:

It shall be the policy of the Department of Correction to comply with Arkansas Code regarding the execution of persons sentenced to Death.

### II.   PROCEDURE:

**A.**   Setting of Execution Date

  1.   Judge sets date of execution. The execution date will be verified by the Warden of the condemned inmate's unit of assignment. A copy of the order shall be provided to the Director.

  2.   Governor sets date of execution and issues death warrant. The execution date will be verified by the Warden of the inmate's unit of assignment. A copy of the order shall be provided to the Director.

**B.**   Executioners

The Director will select the executioner(s). Their name(s) will be known only by the Director and as necessary, that staff person responsible for coordinating lethal agent infusion activities. The identity of the executioner(s) will be kept secret. The executioner(s) will be in the control room during the execution. The Director will be responsible for making arrangements to have the executioner(s) in the execution chamber.

*An Equal Opportunity Employer.*



PLAINTIFF'S
EXHIBIT

_____1_____

App. 102

Exhibit 11 Page 1

Orientation for the executioner(s), if needed, will be prior to the day of the execution and provided by the Director and/or designee(s). The executioner(s) shall arrive ▓▓▓▓▓▓▓▓▓▓▓▓▓ prior to the time of the execution through ▓▓▓▓▓▓▓▓▓. The executioner(s) shall be escorted by the Director or designee.

C.   Chain of Command

The Warden of the Cummins Unit, then the Director or designee, will be the chain of command for control.

D.   Witnesses

1.   The execution shall be witnessed by no more than 30 persons. This does not include executioner(s). Attendance at the execution shall include:

   a.   Director and Cummins Unit Warden or an assistant;

   b.   The Department of Correction official in charge of Medical Services or his designee;

   c.   Not fewer than 6 and no more than 12 respectable citizens;

   d.   Counsel for the inmate (optional);

   e.   Spiritual advisor to the inmate (optional);

   f.   No more than three (3) members of the media.

2.   The selection of 6 to 12 citizens to witness the execution will be made by the Director. Recommendations from staff, Board members, and others will be reviewed. Minimum criteria include:

   a.   Persons (no ex-felons) selected must be 21 years of age or older; and,

   b.   All persons will be very mature, responsible, and respected citizens of the State of Arkansas.

   c.   No inmate's family member will be allowed to serve as a witness, nor be allowed past the roadblock on the day of the execution.

3.   No family member of the victim will be present at the execution, however, a closed circuit audio-visual monitor will be placed in a designated location, and as many as five (5) close relatives of the deceased victim or surviving innocent victims who desire to view the execution via monitor

may be approved.  No audio or video recording shall be made of the execution.

    a.    Close relatives of the victim shall mean the following:

        (1)    the spouse of the victim at the time of the victim's death;

        (2)    the parents or step-parents of the deceased victim;

        (3)    the adult brothers, sisters, children, or step-children of the deceased victim; or

        (4)    any other adult relative with a close relationship to the deceased victim.

    b.    Surviving innocent victims shall mean any person innocently present during the commission of the capital offense who sustained an injury, either physical or emotional, and such injury results in a separate conviction for a lesser offense which arises out of the same course of conduct.

E.    Inter/Intra-Agency Coordination

    ███████ prior to the execution date, the following individuals shall contact and coordinate the assistance of the following:

1.    Chief Deputy Director of Institutions

    a.    Arkansas State Police and request that the Arkansas State Police be at the Cummins Unit the date of the scheduled execution and provide mobile units to block designated streets/roads during the scheduled execution;

    b.    Lincoln and Jefferson County sheriffs and request the county sheriffs have deputies on stand-by the date of the scheduled execution;

    c.    FBI for notification only;

    d.    Police departments of Grady and Gould for notification only; and

    e.    Unit wardens and advise them of their responsibilities.

2.     Cummins Unit Warden – each unit warden and request the assistance of correctional officers of the rank of sergeant or above from each unit for the date of the scheduled execution.

3.     Deputy Director of Health and Correctional Programs, or designee – county coroner and request presence.

The Office of the Attorney General will be responsible for contacting the Governor's Office and Federal Courts to establish telephone contact times, telephone numbers, and verification of the personnel with whom they will be in contact on the date of the execution.

F.     Prior Arrangements

    1.     Chaplaincy Services

        a.     The condemned inmate's minister or the Department of Correction Administrator of Chaplaincy Services will work with the inmate starting at least seven (7) calendar days prior to the execution as determined by the warden and/or minister.

        b.     The Cummins Unit Chaplain (as designated by the Administrator of Chaplaincy Services) will contact the family of the condemned inmate.

    2.     Medications

        a.     No medication shall be given to the condemned inmate seven days prior to the execution date, except medicine which is prescribed by a Department physician.

        b.     Medication prescribed for the condemned inmate by a Department physician shall be reported to the Deputy Director of Health and Correctional Programs, or designee.

    3.     Disposition of Property

The Warden of the Cummins Unit will obtain instructions from the condemned inmate as to the disposition of his or her property being maintained at the Cummins Unit.

The Cummins Unit Warden will request that a withdrawal slip be filled out if the condemned inmate has any money in the inmate trust fund so the money can be forwarded to the person designated for receipt of such by the inmate.

App. 105

Exhibit 11 Page 4

| AD 08-28 – Procedure for Execution | Page 5 of 26 |
|---|---|

4.   Burial Arrangements

    a.   The Deputy Director of Health and Correctional Programs, or designee, and the Administrator of Chaplaincy Services shall be responsible for ascertaining the identity of a funeral home to which the body will be remanded upon completion of the post-mortem examination.

    b.   The State Crime Laboratory will be informed by the Deputy Director of Health and Correctional Programs, or designee, of known funeral plans.

        (1)   The State Crime Laboratory will coordinate with the designated funeral home regarding the transfer of the body post-mortem.

        (2)   The Arkansas State Police will provide ▮▮▮▮▮ escort the body off the premises.

    c.   The Deputy Director of Health and Correctional Programs, or designee, will institute standard operating procedure for unclaimed remains should disposition of the body not be known at the time of the execution.

    d.   Transportation arrangements of the deceased inmate from the death house will be made by the Deputy Director of Health and Correctional Programs, or designee.

        The vehicle and driver should be at the Cummins Unit ▮▮▮▮▮ ▮▮▮▮▮ prior to the scheduled execution time.

5.   Explanation of Lethal Injection Procedure

    The Deputy Director of Health and Correctional Programs, or designee, shall assume the following responsibilities:

    a.   Select the member(s) of the IV Team;

    b.   ▮▮▮▮▮▮▮▮▮▮ prior to the scheduled execution date, the Warden of the inmate's unit of assignment and the Deputy Director of Health and Correctional Programs or designee(s) and a member of the IV team will explain to the condemned inmate lethal injection and conduct a physical evaluation of possible infusion site(s);

Exhibit 11 Page 5

      c.    ████████████ prior to execution, obtain the lethal injection;

      d.    Have the lethal injection, the gurney, straps, etc., available for use on the scheduled date of execution (see Attachment C); and

      e.    Maintain communication during the lethal injection procedure with the executioner(s).

G.    Inter-Unit Transfer

    1.    ████████ prior to the scheduled execution date, the Warden of the inmate's unit of assignment will confer with the Chief Deputy Director and the Warden of the Cummins Unit to finalize plans to transfer the condemned inmate to the Cummins Unit.

    2.    Knowledge of the actual time that the condemned inmate will be transferred shall be restricted to the two wardens and the Chief Deputy Director.

    3.    Females will be kept at the McPherson Unit and then transported to the Cummins Unit ████████████████ prior to the execution. A test for pregnancy will occur prior to the female being moved to the Cummins Unit.

    4.    Upon receipt at the Cummins Unit, the condemned inmate's property shall be inventoried, and those items authorized shall be retained in his or her cell.

    5.    Shakedowns of the cell and the condemned inmate will be no more than five times per day or as security dictates after the condemned inmate arrives at the Cummins Unit.

    6.    The Chief Deputy Director will coordinate the transfer with the Arkansas State Police.

H.    Visitation Privileges

    1.    Persons on Approved List

      a.    If requested by the condemned inmate, visits with the immediate family or friends who are on the approved visitors list and are approved by the warden (as determined by security needs) shall be allowed each day for five days prior to the date of the execution.

      b.    No family or friends will be allowed to visit on the day of the execution.

App. 107

Exhibit 11 Page 6

      c.    Approved visits will be no more than three hours and must be within a time period from 1:00 p.m. to 4:00 p.m. or as deemed appropriate by the Warden.

   2.   Legal Counsel and Spiritual Advisor

      a.    If requested by the inmate, visits from legal counsel and spiritual advisor shall be allowed each day for five days prior to the date of the execution.

      b.    Legal Counsel and Spiritual Advisor may be allowed to visit on the day of the execution.

      c.    Legal Counsel and Spiritual Advisor visits will be allowed at any time except during specified events.

I.   Stations/Contacts

   1.   Road Blocks

      a.    Arkansas State Police Mobile Units shall block designated routes ▓▓▓▓▓▓▓ One Department of Correction officer with a walkie-talkie shall be stationed with each police unit.

      b.    A police ribbon barricade and/or road block will be placed as indicated on Attachment A and A-1.

         (1)    Security officers shall be placed around the area of the police ribbon barricades and other posts as required in Attachment A and A-1.

         (2)    After the execution and news conference, the Arkansas State Police shall order spectators to disperse. After the spectators have dispersed, the barricades shall be removed.

   2.   Emergency Response Team

      An Arkansas Department of Correction ERT Team shall assemble ▓▓▓▓▓ ▓▓▓▓ at the direction of the Chief Deputy Director or the Emergency Preparedness Coordinator.

   3.   Director

      a.    Telephone numbers and names of contact persons within the Department of Correction will be provided by the Cummins Unit

| AD 08-28 – Procedure for Execution | Page 8 of 26 |
|---|---|

Warden to each person who has authority to issue a stay of execution as determined by the Office of the Attorney General.

(1)   The telephone in the execution chamber is to be used only by the Director ▮▮▮▮▮▮ prior to the scheduled execution, and immediately following the execution.

(2)   The warden or designee will have available a walkie-talkie in the execution chamber on a separate frequency which will be utilized to receive a stay of execution if the telephone system is not working properly.

(3)   A telephone in the waiting room adjacent to the witness room is for security purposes only.

b.   Additionally, before authorizing the execution to begin with the opening of the curtain to the witness room, the Director will have contacted the pre-designated person at the Governor's Office and the Attorney General's Office.

4.   Governor's Office/Attorney General's Office

a.   During the execution procedure, the Internal Affairs Administrator or designee shall be stationed ▮▮▮▮▮▮▮▮ and shall monitor the telephone to the Attorney General's Office. The Classification Administrator, or designee, shall be stationed ▮▮▮▮▮ ▮▮▮▮▮ and shall monitor the telephone to the Governor's Office. Each person will be available for contact for a stay of execution.

b.   Once a stay is received by any of the above, telephone or walkie-talkie (if the telephone system is not working) contact will be made to the execution chamber. Telephone numbers will be provided. Walkie-talkies on the same frequency as the one in the death chamber will be provided to each designated contact person.

5.   Witnesses/Viewers

a.   Witnesses chosen by the Director shall arrive at ▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮ prior to the execution time, where their identification shall be checked, and they will be searched by the Warden of the Diagnostic Unit or designee. They will then be transported to the Death Chamber at the Cummins Unit.

b.   Victim(s) family viewers will be chosen by the Director and shall arrive ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

AD 08-28 – Procedure for Execution | Page 9 of 26

██████████ to the execution time, where their identification will be
checked and they will be searched and briefed by the
Administrator of Mental Health Services.

c.   Arrangements for transportation and security officers for the
witnesses and viewers shall be made by the Warden of the
Diagnostic Unit.

d.   The Arkansas State Police shall provide ██████████
██████████ to act as escorts for the transportation of
witnesses and viewers.

e.   The Chief Deputy Director of Institutions will coordinate with the
Warden of the Diagnostic Unit and ██████████
██████████ the route the witnesses and viewers will take to arrive at
the Cummins Unit.

f.   The transportation vehicle and security staff will remain adjacent
to the Death House.

g.   Once the execution is completed, the witnesses will be transported
back ██████████

h.   Victim(s) family viewers will be afforded an opportunity to make a
statement to the media prior to returning to ██████████

6.   Individual stations in the death house are indicated in Attachment B.

7.   Escort Team

The escort team as identified by the Cummins Unit Warden shall be
assembled at the Cummins' Guest House and assume their positions ██████████
██████████ prior to the execution.

J.   Procedures Prior to Execution

1.   Documentation in Log Book

Upon arrival at the Cummins Unit, the warden will ensure that an
execution log book is initiated to document all of the condemned inmate's
activities throughout his stay in the death house at the Cummins Unit.

a.   A security officer will be stationed as determined by the warden to
observe the condemned inmate and record activities.

      b.    Designated Cummins Unit staff members are responsible for recording activities occurring in the death house which will conclude with the entry of the inmate into the execution chamber.

      c.    Upon entry into the execution chamber, the recorder from Internal Affairs will complete Attachment F that will be added to the log book.

      d.    A copy of the log shall be given to the Assistant to the Director for Public Information for release to the news media, Governor's Office, the Attorney General's Office, and the Director's Office within 24 hours after the execution unless an exception is made.

2.    Last Meal

The condemned inmate may request one special meal on the evening of the scheduled execution. This request must be for food within reason based on availability in food service, legality, etc.

      a.    The Cummins Unit Warden shall visit with the condemned inmate and advise the inmate of the menu schedule to include the inmate's request for the last meal.

      b.    The last meal is to be served at the last regular scheduled meal time or no later than four hours prior to the time of execution.

3.    Preparation of Condemned for Execution

      a.    The condemned inmate may shower and be dressed in the clothes in which the inmate shall be executed.

      b.    At the time of execution, the condemned inmate will wear a short sleeve shirt. No belts or jewelry will be allowed to be worn by the condemned inmate.

K.    Execution Process

1.    The following will have been done just prior to the time set for the execution:

      a.    The Cummins Unit Warden shall have the condemned inmate removed from the holding cell in socked feet and strapped to the gurney (see Attachment D).

Exhibit 11 Page 10

    b.    The Spiritual Advisor may escort the condemned to the death chamber entrance as determined by security needs, but legal counsel is not allowed.

    c.    The Deputy Director of Health and Correctional Programs or designee shall have catheters placed in each arm or other appropriate areas and a saline solution started (see Attachment C).

    d.    The Cummins Unit Warden shall summon the witnesses and have them escorted to the Death Chamber Viewing Room. The Cummins Unit Building Major will have each witness sign their name, and give the date and time of their arrival in the Viewing Room (see Attachment E). The door shall be locked by the building major.

    e.    The Administrator of Mental Health Services will have the victim(s) family viewers sign, print their name, and give the date and time of their arrival in the predetermined location to view by monitor the execution.

    f.    After the witnesses are in the Death Chamber Viewing Room and the condemned inmate is in the execution chamber, the Cummins Unit Warden shall open the curtains, and face the witnesses. The recorder will turn on the microphone and the audio feed.

    g.    The Director or designee shall then ask the condemned inmate if he or she has any last words or statements. The inmate shall be allowed to respond, and then the Cummins Unit Warden shall state "the officials are ready to proceed with the execution." The recorder will then turn off the microphone and audio feed.

2.    Unless specified, the time for execution will be 9:00 p.m. At the time of execution, the following shall occur:

    a.    The executioners shall administer the lethal injection. Once the instruction is given to commence the execution, the procedure for lethal injection will proceed to completion (see Attachment C).

    b.    When the inmate no longer exhibits any sign of life, the Cummins Unit Warden shall request the coroner to be brought into the Death Chamber, and the microphone and audio feed shall be turned on.

    c.    The coroner shall then pronounce the death and be escorted out of the Death Chamber. The death shall be recorded in the inmate's medical file.

d.  After the inmate is pronounced dead, the Director or designee shall read the order of the court, the time the lethal injection was administered, and the time of death to the witnesses. The microphone and audio feed shall then be turned off, and the warden shall close the curtain.

The Director will call the Classification Administrator ▮▮▮▮▮▮, the Public Information Officer ▮▮▮▮▮▮▮▮, and the representative from the Attorney General's Office ▮▮▮▮▮▮ to advise that the execution has been completed.

e.  The Director will protect the confidentiality of the executioner(s) upon exiting the Chamber.

f.  When the inmate has been pronounced dead, the Warden of the Cummins Unit or designee shall order the witnesses to be escorted from the Death Chamber to the outside of the Cummins Unit or designated area.

g.  Witnesses will leave by the same procedure as they arrived. The stretcher shall be brought into the Death Chamber by the transportation attendants who shall then remove the body and transport it to the Crime Laboratory or other location designated by the Director. The transportation vehicle will depart through the sally port.

L.  Final Documentation

1.  The Internal Affairs Administrator shall gather and compile all pertinent information and shall submit a final report to the Director.

2.  Certification of Execution

a.  The Director shall certify the fact of the execution of the condemned inmate to the clerk of the court by which such sentence was pronounced.

b.  The clerk shall file such certificate with the papers of the case and enter the same upon the records of the case.

3.  Cause of death ruling and/or post-mortem examination may be requested by the Deputy Director of Health and Correctional Programs, or designee, through the State Medical Examiner's Office at the Crime Laboratory.

| AD 08-28 – Procedure for Execution | Page 13 of 26 |
| --- | --- |

III.    <u>REFERENCE</u>:

ACA 16-90-501 et seq.

IV.    <u>ATTACHMENTS</u>:

Attachment A -    Cummins Unit Building Map
Attachment A-1 -  Cummins Unit Map
Attachment B -    Death Chamber Map
Attachment C -    Lethal Injection Procedures
Attachment D -    Escort Team Procedures
Attachment E –    Witness Sign-In List
Attachment F -    Internal Affairs Log

08-28
08May22 (revised)

ARKANSAS DEPARTMENT OF CORRECTION

CUMMINS UNIT

EXECUTION CHAMBER

ATTACHMENT B

LEGEND

| Symbol | Description |
| --- | --- |
| | Window |
| ⊗ | Light Switch |
| | Telephone |
| | Clock |
| T | Thermostat |

ATTACHMENT C
Revised May 22, 2008

LETHAL INJECTION PROCEDURE

SECTION I. General

1.     The Deputy Director for Health and Correctional Programs, or designee, is responsible for having the chemicals for lethal injection, the gurney, straps, etc., available for use on the scheduled date of execution. Unless otherwise stated, the Deputy Director, or the designee, shall be healthcare trained, educated, and/or experienced in matters related to the establishment and monitoring of IVs, the mixing and administration of lethal chemicals, and assessing the presence or absence of consciousness.

2.     When the lethal chemicals have been received, the Deputy Director, or the designee, shall verify as to type and concentration, and thereafter supervise any necessary mixing or reconstituting of the chemicals in such a manner as will meet lethal injection requirements (see Section IV) and in accordance with manufacturer's instructions. The mixed or reconstituted chemicals shall be transferred to an appropriate syringe and thereafter placed in a designated Lethal Injection Drug Box. The box will be secured and conveyed to the Cummins Unit.

3.     The Deputy Director, or designee, shall maintain personal, physical custody of the Lethal Injection Drug Box and physically convey the box to the Cummins Unit for secure storage in the institutional vault until such time as it is delivered to the execution chamber for use. If not used, the Deputy Director, or designee, will maintain possession of the box, and document the proper destruction of the contents.

4.     Orientation of the executioner(s) to the Department's *Lethal Injection Procedure*, if needed, will be conducted prior to the day of the execution and provided by the Director and/or designee(s).

5.     On the evening of the execution, the executioner(s) shall, under the supervision of the Deputy Director, or designee, enter the injection room prior to the scheduled time of the execution and shall immediately inventory the Lethal Injection Drug Box to ensure that all lethal chemicals are accounted for and that the infusion device(s) are in readiness.

6.     Prior to the IV Team being summoned to initiate the intravenous infusion devices, the Deputy Director, or designee, will affix cardiac monitor leads to the condemned inmate at standard 3-lead positions: RA, LA, and LL.

7.     The execution gurney will be positioned in the death chamber so that the Deputy Director, or designee, and the executioner(s) can directly observe the condemned inmate's face and IV infusion site(s).

App. 116

Exhibit 11 Page 15

**SECTION II.   IV Set-Up Procedure**

1.     The Deputy Director, or designee, shall have an intravenous infusion device placed in each arm, or other standard anatomical venous point of entry, of the condemned inmate and a solution of D5NS available for an infusion medium. The individual(s) engaged in this activity will be referred to as the IV Team and shall be qualified as set forth in Section V.

2.     An IV administration set shall be inserted into the outlet of the bag of D5NS IV solution.  Two (2) IV bags will be set up in this manner.

3.     The administration set tubing for both set-ups will be connected to the receiving port of the three-way control devices; one left arm/side, the other for the right arm/side.

4.     IV extension tubing will be connected to the discharge ports on the right/left three-way control devices and shall be thereafter connected to the applicable right and left IV insertion site(s).  Extension tubing will be of sufficient length to accommodate distance from control device to IV insertion site(s).

5.     The tubing shall be cleared of air and made ready for use.

6.     Intravenous cathlon-like devices shall be initiated through standard procedure for such devices. Once the infusion of the IV solution has been assured, the IV devices shall be secured as appropriate.

7.     At this point, the administration sets shall be running at a slow rate of flow (KVO), and ready for the insertion of syringes containing the lethal chemicals.  The Deputy Director, or designee, shall ensure that the cardiac monitor is 'on' and functioning properly and maintain observation of IV infusion(s) to ensure that the rate of flow is uninterrupted.  NO FURTHER ACTION shall be taken until the prearranged signal to start the injection of lethal chemicals is given by the Warden.

8.     In the event that a patent intravenous infusion site cannot be established, the IV Team shall be directed by the Deputy Director, or designee, to evaluate other possible infusion sites. All effort will be made to establish two (2) unrelated intravenous infusion sites.  If one (1) patent infusion site is established, and a second site proves to be a futile effort, the Deputy Director, or designee, may direct the IV Team to suspend further action. In the case that no patent infusion site is established after reasonable attempts as determined by the IV Team, the Deputy Director, or designee will direct the IV Team to suspend further action and thereafter summon trained, educated, and experienced person(s) necessary to establish a primary IV line as a peripheral line or as a central venous line,

Exhibit 11 Page 16

EVERY EFFORT WILL BE EXTENDED TO THE CONDEMNED INMATE TO ENSURE THAT NO UNNECESSARY PAIN OR SUFFERING IS INFLICTED BY THE IV PROCEDURE. STANDARD PRACTICE OF USING A LOCAL ANESTHETIC WILL BE ACCOMMODATED AS NECESSARY.

SECTION III. Injection Procedure

1.   The three-way control device facilitates the movement of infusion fluid from saline bag and allows for the interdiction of lethal chemical. A valve serves to direct which fluid source is entering the IV set up.

2.   When the signal to commence is given by the Warden, the executioner(s) shall administer the lethal chemicals under the direction of the Deputy Director, or designee, as follows:

   a.   Syringe #1 (containing Sodium Pentothal) shall be inserted into the designated receiving port of the three-way control device.

   b.   The flow of IV solution will be interrupted by moving the three-way valve assembly towards the IV solution receiving port.

   c.   The contents of Syringe #1 shall commence with a steady even flow of the lethal chemical. Only a minimum amount of force will be applied to the syringe plunger.

   d.   When the contents of Syringe #1 have been injected, the three-way valve assembly will be moved so as to shut off the infusion of lethal chemical and resume infusion of IV solution.

   e.   Syringe #1 will be replaced by Syringe #2 and the procedure described in subparagraphs a-d for Syringe #1 will be repeated. This process will be repeated for all subsequent syringes.

   f.   Following the administration of the first three (3) syringes, the Deputy Director, or designee, will assess and monitor the condemned inmate's lack of consciousness by using standard procedures for assessing consciousness as used by medical paraprofessionals, such as checking for movement, opened eyes, eyelash reflex, and response to verbal commands and physical stimuli. Once the Deputy Director, or designee, determines that the condemned inmate is unconscious, and at least three (3) minutes have elapsed from starting Syringe #1, all remaining chemicals will be administered to the unconscious inmate in numerical sequence; Syringe #4 through Syringe #8. In the unlikely event that the Deputy Director, or designee, determines that the condemned inmate remains conscious following the administration of Syringe #3 (normal

saline wash), the back-up syringes of the first chemical (Syringe #B1 and #B2) and a repeat normal saline wash (Syringe #B3), shall be administered into the secondary or alternative IV line. Once the Deputy Director, or designee, determines that the condemned inmate is unconscious, and at least three (3) minutes have elapsed from starting Syringe #B1, all remaining chemicals will be administered to the unconscious inmate in numerical sequence into the secondary or alternative IV line; Syringe #4 through Syringe #8.

g.     This procedure shall continue until all syringes have been administered, with the exception of any back-up syringes that are not needed.

h.     A cardiac monitor will be used to display heart function. When all lethal chemical syringes have been administered, and a flat-line is observed for a minimum of three (3) to five (5), three-second sweeps on the cardiac monitor, the Coroner shall be summoned for purpose of pronouncing death.

i.     Throughout the lethal chemical infusion process, the Deputy Director, or designee, will closely monitor the infusion site for evidence of infiltrate, vein collapse, or other challenge to the patency of the infusion site.

(1)     Should a problem be suspected, the Deputy Director, or designee, will direct reduction of lethal chemical flow rate or redirect lethal chemical to the secondary or alternative site.

(2)     If a singular infusion site is suspected to be compromised, chemical flow rate will be reduced. If problem persists, the:

(a)     administration procedure will cease;

(b)     curtain to death chamber will close; and

(c)     the IV Team summoned, and the infusion site problem corrected.

(3)     If all efforts to re-establish patent infusion site fail, the Deputy Director, or designee, will direct the IV Team to suspend further action and a trained, educated, and experienced person(s) necessary to establish a primary IV line as a peripheral line or as a central venous line will be summoned to facilitate an IV infusion site.

(4) When the infusion compromise is corrected, the IV Team and the summoned person(s) will be excused, the curtain reopened, and the lethal injection procedure continued.

Exhibit 11 Page 18

## SECTION IV. Lethal Chemical(s)

1.   The following identifies the contents of the Lethal Injection Drug Box; denoting administration sequence and chemical makeup of each lethal chemical used.

| SYRINGE LABELED/ MARKED | CONTENTS |
|---|---|
| #1/#2 | Sodium Pentothal, 3.0 grams (two (2) syringes of 1.5 grams in 60 cc) |
| #3/#6 | Normal Saline, 50 cc each |
| #4/#5 | Pancuronium Bromide, 100 mg (two (2) syringes of 50 mg in 50 cc) |
| #7/#8 | Potassium Chloride, 240 mEq (two (2) syringes of 120 mEq in 60 cc) |

Back up syringes:

| | |
|---|---|
| #B1/B2 | Sodium Pentothal, 3.0 grams (two (2) syringes of 1.5 grams in 60 cc) |
| #B3 | Normal Saline, 50 cc |

## Section V. IV Team Qualifications

The following certified or licensed individuals with at least two (2) years of professional experience may be on the IV team:

1.   Emergency Medical Technician-Intermediate, or

2.   Emergency Medical Technician-Paramedic, or

3.   Nurse, or

4.   Physician Assistant, or

5.   Physician.

LETHINJ.doc
Revised May 22, 2008

Exhibit 11 Page 19

ATTACHMENT D

<u>ESCORT TEAM PROCEDURES</u>

NOTE:  During the practice session, the following procedures will be utilized.

I.      The condemned inmate shall be escorted from the holding cell into the execution chamber.

II.     The condemned inmate shall be ordered to lie down on his/her back on the gurney.

III.    The condemned inmate shall be strapped to the gurney as follows:

      A.    The condemned inmate's ankles and wrists shall be buckled down simultaneously.

      B.    The strap across the stomach and above the knees shall be placed on the inmate.

      C.    The restraint device across the chest shall be placed on the inmate.

      D.    Prior to securing of chest restraint, cardiac monitor leads shall be affixed to the condemned at standard 3-lead locations; RA, LA, and LL.

IV.     When all escort team steps have been completed, the IV Team will be summoned to initiate intravenous infusion devices.  The Escort Team will stand by to assist loosening and relocating wrist devices and/or arm restraint as necessary.

V.      When infusion devices have been declared patent, all restraint devices will be checked.  The Deputy Director, or designee, shall thereafter excuse the members of the Escort and IV Team from the execution chamber.

Exhibit 11 Page 20

ATTACHMENT E

We, the undersigned, did serve as witnesses in the scheduled execution of _____, SK # _____, on _____.

| | Print Name | Address | Date/Time | Signature |
|---|---|---|---|---|
| 1. | | | | |
| 2. | | | | |
| 3. | | | | |
| 4. | | | | |
| 5. | | | | |
| 6. | | | | |
| 7. | | | | |
| 8. | | | | |
| 9. | | | | |
| 10. | | | | |
| 11. | | | | |
| 12. | | | | |
| 13. | | | | |
| 14. | | | | |
| 15. | | | | |
| 16. | | | | |
| 17. | | | | |

App. 122

Exhibit 11 Page 21

| Print Name | Address | Date/Time | Signature |
|---|---|---|---|
| 18. | | | |
| 19. | | | |
| 20. | | | |
| 21. | | | |
| 22. | | | |
| 23. | | | |
| 24. | | | |
| 25. | | | |
| 26. | | | |
| 27. | | | |
| 28. | | | |
| 29. | | | |
| 30. | | | |

App. 123

Exhibit 11 Page 22

Attachment F

## Internal Affairs Log of Timed Activities

DATE OF EXECUTION: _____

LOG OF TIMED ACTIVITIES INVOLVING THE EXECUTION OF INMATE

_____ SK # _____

1. Internal Affairs arrives at death house at: _____

2. Condemned begins last meal at: _____

    Meal consisted of: _____

    _____

    _____

    _____

3. Condemned finishes last meal at: _____

    Portions consumed: _____

    _____

    _____

4. Condemned begins shower at: _____

5. Condemned finishes shower at: _____

6. Condemned dresses in clean whites:

    Start: _____
    Finish: _____

7. Escort Team arrives at: _____

8. Condemned removed from quiet cell at: _____

9. Arrival of condemned in Death Chamber at: _____

10. Condemned is restrained:

    Start: _____
    Finish: _____

11. Catheters inserted _____

Start: _____
Finish: _____

12. Escort Team exits Death Chamber at: _____

13. Witnesses enter Viewing Room at: _____

14. Death Chamber Viewing Room doors locked at: _____

15. Director places two telephone calls: _____ and _____

16. Curtains of Viewing Room opened at: _____

17. The Director asked the condemned for his/her last words at: _____

STATEMENT: _____
_____
_____
_____

18. Warden advises the officials are ready to proceed with the execution at: _____

19. Lethal injection administered/switch activated at: _____

20. Absence of consciousness assessed at: _____

21. Warden summons the coroner at: _____

22. Coroner enters the Death Chamber at: _____

23. Coroner pronounces death at: _____

24. Order of Court is read by the Director at: _____

25. Curtains of Viewing Room are closed at: _____

26. Witnesses exit the Viewing Room at: _____

27. Body departs Death Chamber at: _____

REMARKS: _____
_____
_____

_____
ExecLog(pc)                    INTERNAL AFFAIRS ADMINISTRATOR, OR DESIGNEE

App. 125

Exhibit 11 Page 24

DECLARATION OF BRIAN MENDELSOHN

Brian Mendelsohn, pursuant to the provisions of 28 U.S.C. § 1746, makes the following declaration:

1. My name is Brian Mendelsohn.   I am an attorney licensed to practice in the State of Georgia.  Since my graduation from the Columbia University School of Law in 1990, I have practiced exclusively in the areas of criminal defense and capital appeals.  From 1990 to 1995, I was a staff attorney with the Georgia Resource Center where I represented Georgia death row inmates in direct and post-conviction appeals in state and federal court.   In 1995, I became a staff attorney with the Federal Defender Program for the Northern District of Georgia.   In this capacity, I represented indigent defendants charged with federal crimes, including those charged in capital cases.  I also continued to represent Georgia death row inmates in federal habeas corpus challenges to their convictions and sentences.   In 2006, I became the First Assistant at the Federal Defender Program.

2. When I became the First Assistant, I also assumed the role of the Chief of the Capital Habeas Unit ("CHU") at the Federal Defender Program.  The CHU is charged with representing death-sentenced inmates in federal habeas corpus proceedings reviewing their state-court convictions and sentences, and, pursuant to *Harbison v. Bell*, 556 U.S. 180 (2009), and 18 U.S.C. § 3599(e), in "every subsequent stage of available judicial proceedings," including clemency proceedings

Exhibit 12 Page 1

and litigation surrounding execution warrants.  Our CHU has four attorneys, three investigators, and three paralegals.

3.  In my 26 years doing capital habeas corpus work in Georgia, I have participated in at least ten last stage, execution warrant cases where I have been lead or co-counsel.  I have also been involved in many other execution warrant and executive clemency cases in Georgia in my role as CHU Chief.

4.  Handling a last stage, execution warrant is a monumental task that has many moving parts and takes place in many different forums.  First, the attorneys must develop and present grounds for executive clemency.  To do this, attorneys must take a fresh look at the case with an eye toward convincing the governor or the parole board to grant clemency.  The process involves going back over records, contacting guilt-innocence and mitigation witnesses, jurors, experts, law enforcement investigators, ministers, corrections officers, and community members who might contribute to the case for mercy.  Because these cases go back decades, the task of merely locating the potential witnesses is daunting and time consuming.  Then, once located, someone needs to interview the witnesses and obtain letters, declarations, or statements from them.  If a witness is going to testify at a clemency hearing, the attorneys need to then spend time preparing that witness to testify.  Many times, witnesses are in remote locations making the investigation more complicated.  In a recent case in my office, the client lived much of his life in New

2

Exhibit 12 Page 2

Jersey. This meant that we had to spend substantial time there to find the information that we needed.

5. In addition, after completing the clemency investigation, the attorneys must draft a clemency application. This is not simply a recycled legal brief from the court proceedings. Instead, it needs to be a detailed, persuasive document that makes the case for mercy. In my office, a clemency petition goes through many drafts and it is filed with an appendix that includes hundreds, or even thousands, of pages of supporting documentation and exhibits.

6. In addition to clemency, there are often many legal avenues that lawyers are able to pursue to get a stay of execution. This could involve litigation in the trial court, the state habeas court, federal district court, and the state and federal appellate courts. Sometimes there are new legal claims relating to the conviction or sentence. Other times §1983 actions are the mechanism for raising the claims. No matter where the cases is litigated, a substantial amount of briefing, often on complex procedural issues, must be done. This is high pressure work that takes place with extremely short deadlines.

7. Aside from handling the clemency and the litigation, the legal team has to devote substantial time to the client and his family. The stress of a looming execution is considerable. It always falls on the attorney to spend time with the client and his family to help them through the process with everything from arranging for visits,

3

Exhibit 12 Page 3

to preparing family members to testify, to making funeral and other arrangements in case the client is executed.  This is on top of communicating with the client about steps in the litigation and being one of the few people available to support the client as he deals with the prospect of his impending death.

8.  In our office, once a warrant is signed, every member of the CHU – four attorneys, three investigators, and three paralegals -- will drop everything and work exclusively on the warrant. We have not found any other way to adequately perform the work I have just described.  Moreover, it is physically impossible for one lawyer to handle all the aspects of warrant litigation alone. We have had situations where a court hearing was scheduled for the same time as the clemency hearing. We have also had situations where a brief had to be written and filed in one court at the same time another court was holding a hearing.  As clemency proceedings and stay litigation take place at the same time, there are just too many pleadings and proceedings for one lawyer to do alone.

9.  The toll that execution warrants take on a defense team is great.  Inevitably, the shear amount of work will require the attorneys, investigators, and paralegals to work 80 plus hours per week once a warrant is signed.  The work is incredibly stressful because everyone knows that losing the case means someone is going to die.  And, that someone is a person that the attorneys and investigators have known

4

Exhibit 12 Page 4

for a substantial period of time.   The process is physically, emotionally, and psychologically grueling.

10.  For a legal team working on one execution warrant, it is impossible to work on any other case.  There are simply not enough hours in the day. My office represented five individuals who were executed between September 30, 2015 and October 19, 2016.  There were two months between each of the first four executions. The fifth one was six months after the fourth.  When the executions were happening every two months, the CHU was doing little else besides the execution warrants.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on March 24, 2017.

Brian Mendelsohn

5

Exhibit 12 Page 5

## DECLARATION OF ROBERT EDWARD LEE, JR.

I, Robert Edward Lee, Jr., pursuant to the provisions of 28 U.S.C. § 1746, make the following declaration:

1.    My name is Robert Lee. I am over the age of 18 years and competent to make this statement.  I am an attorney licensed to practice in the State of Mississippi since 1992 and the Commonwealth of Virginia since 1994. My practice has been almost exclusively focused on capital criminal and post-conviction representation.  From 1992 to 1993, I was a staff attorney with the Mississippi Capital Resource Center in Jackson, Mississippi. Since 1993, I have worked as a mitigation specialist, staff attorney, Director of Litigation, and Executive Director at the Virginia Capital Representation Resource Center (VCRRC) in Richmond, Virginia, from 1993–2000, and in Charlottesville, Virginia, from 2000–the present. I represented indigent defendants facing possible death sentences as well as death row inmates in direct and post-conviction appeals in state and federal courts. Since I arrived at VCRRC in October, 1993, Virginia has executed 86 people. Since 2001, however, Virginia has had only one year—2004—in which more than four executions were carried out; in 2004, five executions were carried out.

2.    Since its formation in 1992, VCRRC has been, and continues to be, responsible for representing, and assisting attorneys appointed to represent, persons facing the death penalty in Virginia. This representation is focused primarily on appellate and post-conviction or habeas corpus proceedings in state and federal courts. Over the years, VCRRC has had as many as a 14 staff members, including lawyers, investigators, paralegals, and other staff. Appointment as counsel for indigent petitioners in federal habeas corpus proceedings is made pursuant to 18 U.S.C. § 3599(e), and obligates counsel to represent his or her client in "every subsequent stage of available judicial proceedings," including clemency proceedings and collateral litigation surrounding execution warrants. *See also Harbison v. Bell*, 556 U.S. 180 (2009).

Exhibit 13 Page 1

3.   In my 23 years representing people sentenced to death in Virginia, I have participated in more than two dozen cases that have resulted in executions as lead or co-counsel.  I have also been directly involved in many other cases facing executions and involving executive clemency campaigns in my various roles at VCRRC, and especially ad Executive Director.

4.   Representing people facing imminent execution is an exceptionally demanding, pervasive, and unrelenting task. It inevitably involves multiple layers of proceedings—legal and otherwise—and unforgiving deadlines. Often these elements occur simultaneously in different forums and various locations.

5.   Although each case may have unique components, certain obligations of attorneys are found in virtually every case at these late stages of the proceedings. For example, attorneys must develop and present grounds for executive clemency. It is rarely sufficient for attorney to rely on issues already identified and litigated in court proceedings. Although these issues may rightly be factors in a clemency campaign, many clemency deciders are be reluctant to simply "overrule" a previous decision by a court without more, and powerful, information. Responsibility for clemency representation requires attorneys to review the case thoroughly and take a broad and fresh look at the record as well as the investigation. For example, when litigating a post-conviction case, counsel may decide not to develop evidence related to issues that clearly are defaulted and not accessible through recognized exceptions to rules of procedural default. No such barriers prevent clemency deciders from addressing these issues, and counsel will be required to examine which of these "new" issues warrant development and presentation even though they may have been previously passed over. This review requires counsel go back to examine records, contact and re-establish contacts with family members, prior counsel for the State as well as for the government, witnesses from both the guilt-innocence and sentencing phases of trial, mitigation witnesses, jurors, experts, law enforcement investigators, ministers, corrections officers, and community leaders and other members who might

Exhibit 13 Page 2

not have had direct involvement previously in the case but who might contribute to the case for mercy.

6.   Because some post-conviction capital cases may go back for many years, just finding potential witnesses can be difficult and very time consuming.   After these witnesses are identified and located, the investigation proper can begin. This requires interviewers to travel to the witnesses to conduct interviews. In-person interviews are the professional standard of care and, more often than not, absolutely necessary in order to assure potential witnesses of your legitimacy, establish trust, and go over documentary and other evidence. The number and length of these interviews can vary from witness to witness. In most instances, witnesses' statements must be taken in the form of letters, declarations, or otherwise recorded statements. This may also require travel or enlistment of local notaries or other witnesses to the statements, depending on the jurisdiction. If a witness is going to testify at a clemency hearing or may be expected to appear or speak to media, the attorneys will need to then spend time preparing that witness. It is very unusual to find people in these circumstances who have experience speaking in public or in semi-formal settings like the Q&A of an interview. The obvious importance of the matter at hand make these potential witness understandably anxious, and very interested in being sure they are accurate and well understood.

7.   Many times, witnesses are spread out or in remote locations making the investigation more complicated, time consuming, and expensive. It is not at all unusual for clients to have had the most meaningful events in their lives occur far from the jurisdiction, or even the state, in which they were prosecuted. This requires counsel to travel and conduct a substantial portion of the investigation on the road.

8.   Most importantly, a clemency investigation must be broadly based and comprehensive. I have never had a clemency decider refuse to consider evidence, or limit the information that could be presented. It may be that not every piece of information carries the same weight but, unlike court proceedings where rules of evidence, admissibility, or procedural default, may constrict a

Exhibit 13 Page 3

court's ability to review and consider certain evidence, a clemency decider is not similarly confined.

9.    In a State like Arkansas, there are particular components that add to counsel's responsibilities. For example, the State gets its own hearing before the parole board. It is critical for the inmate's representatives to identify or anticipate the State's case, rebut it where possible, and provide positive evidence to ameliorate the State's case in support of execution.   Also, in Arkansas, if the Governor intends to grant clemency, he will announce his intention and invite public comment over a 30-day period.    Counsel's    investigation    must    anticipate    potential comments,    monitor    comments,    and    prepare    responses. Otherwise, the good work done preparing the clemency the Governor found deserving of a grant of clemency, may be undone and the grant lost.   Similarly, in Arkansas victims have a right to submit written or oral recommendations regarding the request for clemency. Approaching victims' surviving family members has often proven to be a welcome and healing part of the clemency investigation. In many instances this contact may already be in place but, if it has not been successfully established by the time a clemency investigation is underway, it is an enormously significant part of the investigation.

10.   After the clemency investigation is completed, or while it is drawing to a close, attorneys must identify the substance of the clemency application, assemble and organize material for presentation, and draft the actual application. This document may have some relation to other components in the case, but it is almost always unlike other written materials in the case. It most certainly is not just another legal brief, in tone, substance, or advocacy.   It must be comprehensive, detailed, compelling, and persuasive, and make the petitioner's case for intervention in a clear and effective manner. As an advocacy piece that will have public impact and will be read by multiple clemency deciders, the application must be reviewed by an appropriately broad cross-section of knowledgeable persons, and developed through multiple drafts reflecting input from varied reviewers. Typically, the application refers to, and is accompanied by, an appendix of source materials that includes hundreds of pages of supporting

Exhibit 13 Page 4

exhibits and documentation clemency deciders will need to consult when evaluating the application.

11. In many instances, even while clemency representation is ongoing, counsel may be required simultaneously to identify, consider, investigate, research, and evaluate various legal avenues that could justify a stay of execution. Depending on the nature of the legal avenue pursued, this could involve trial court litigation and/or litigation in state or federal post-conviction proceedings, and in the state and federal appellate courts, as well as the Supreme Court of the United States. There may be new legal claims relating to the conviction or sentence that were previously unavailable because they are "new rules" or because they are based on facts that were previous not discoverable through reasonable investigation efforts. Depending on the substance of the underlying claims, there may be a number of available exception to rules of procedural default that allow post-conviction relief that might not otherwise be available to the inmate. In some circumstances, litigation under 42 U.S.C. §1983 is appropriate for raising the claims related to an imminent execution and other matters.

12. No matter what the substance of the litigation is, or where these actions are litigated, they can involve a substantial briefing, often on complex or novel procedural issues. This is sophisticated and high-pressure work that often must be accomplished within extremely short deadlines and presented to at the highest levels of the judicial system.

13. In addition to the substantive, public, and political elements of clemency representation and the complex legal aspects of litigation under threat of imminent execution, there is a human responsibility to counsel's client and at times his or her family and supporters. The anxiety and stress generated from an imminent execution is understandable and extraordinary. Correctional facilities often are aware of this fact and take special steps to address anxiety and stress in staff members. It is the responsibility of counsel to keep the client informed of developments, and this duty inevitably expands to other interested persons. Moreover, counsel must make time to spend his or her

Exhibit 13 Page 5

client, family, and close supporters to explain the process and to help them cope with a myriad of decisions and technicalities that converge as an execution nears, such arranging approval for visits, preparing family members to testify, and even making funeral and other arrangements should the client be executed. In most instances, counsel is the only person allowed regular confidential access to the client, so counsel's involvement communicating about what is going on and what lies ahead is indispensable.

14.   In my experience, although only one or two lawyers may be appointed to a client's case, managing a case with an imminent execution requires a broader team effort. Over the years it has been that practice that, if one of VCRRC's clients has an execution date, virtually everyone in the office was involved in a significant way in the broad responsibilities at hand. On a professional, intellectual, physical and emotional level, it would be impossible for a team of two or three lawyers to address the obligations set out in § 3599, and ethically required in representation under threat of imminent execution. The imbalance is especially noteworthy when the opposition party is the State with vastly superior resources available when making its case.

15.   There also is a profound professional, physical, and emotional toll exacted when confronting the threat of imminent execution. Prolonged periods without sleep, in especially anxious circumstances, can have a negative impact of the effectiveness and precision of counsel's work, further harming the client and reducing the clemency deciders' or courts' abilities to fairly adjudge the case. The amount of work that needs to be done in a compressed time frame can drive counsel to work inappropriate hours. But stopping means that important work may be done, or done on time, and could contribute ultimately with the death of the client. In virtually every case I have worked that faced execution, counsel has developed a strong belief in the merit of the case, and a personal commitment to his or her condemned client. The legal system can ask no more of a lawyer, than to have his client—to whom he has an avowed loyalty, and in whose case he has invested years and zealously advocated the merits—put to

Exhibit 13 Page 6

death. It is a personally and professionally devastating experience.

16. As Executive Director at VCRRC, I would never require counsel to simultaneously work multiple cases under threat of imminent execution. It is a doomed proposal, and does an unethical disservice to the clients. If an execution is carried out, proponents of capital punishment as well as others presume that the legal process was conducted in a thorough and competent manner. It would be a cruel deception to compress the process until it is distorted beyond any ability to accomplish that which it is proclaimed to accomplish.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on March 23, 2017 (date).

R. E. Lee Jr.

Robert Edward Lee, Jr.

Exhibit 13 Page 7

Exhibit 13 Page 8

DECLARATION BY DALE A. BAICH

I, Dale A. Baich, declare under penalty of perjury that the following information is true to the best of my knowledge and belief:

1. The Office of the Federal Public Defender for the District of Arizona ("FDO-AZ") is a Federal Defender Organization that operates under the authority of the Criminal Justice Act of 1964, 18 U.S.C. § 3006A.  FDO-AZ provides legal representation to indigent men and women, including those individuals sentenced to death.  The mission of FDO-AZ includes ensuring for those who are unable to afford retained counsel and other necessary defense services, that the right to the effective assistance of counsel guaranteed by the Sixth Amendment and the Criminal Justice Act is enforced within the District of Arizona.

2. I am the supervisor of the Arizona Capital Habeas Unit of FDO-AZ. The Capital Habeas Unit ("CHU") was established in 1996; we are appointed to represent death-sentenced prisoners pursuant to 18 U.S.C. § 3599(a)(2). The CHU currently represents seventy-one clients who are under a sentence of death.  Presently, the CHU is staffed with nineteen attorneys, three research and writing attorneys, eight investigators, seven paralegals, six assistant paralegals and one clerical assistant.

3. I have been an Assistant Federal Public Defender with the CHU since September 1996, and I became a supervisor in 2000.  Prior to joining the CHU, I was an assistant state public defender with the Office of the Ohio Public Defender for eight years. I was assigned to the death-penalty unit.

4. In general, when the CHU is first assigned to a case, a team is assigned to represent the client. The team consists of two attorneys, a fact investigator, a mitigation investigator, a paralegal, and an assistant paralegal. As a case progresses, the size of the team may fluctuate depending on case needs.

5. When a case is near the end of the habeas process, and we anticipate the State to seek an execution warrant, we increase the size of the team. We do this because we have additional responsibilities to the client at this stage of the case.  For instance, the client has the right to seek executive clemency; accordingly, we may need to conduct additional investigations.  Then, we need to prepare a clemency petition and make a presentation to the clemency board. Additionally, there may be new legal or factual issues that have



Initials
Page 1 of 5

Exhibit 14 Page 1

developed, which necessitate the filing of a successive postconviction petition in the state and federal courts, or a Rule 60(b) motion under the Rules of Civil Procedure in the federal court. Finally, a method-of-execution challenge may be in order.

6.  Decisions as to whether to proceed on any or all of the issues described in paragraph 5 are made on a case-by-case basis by the assigned lawyers in consultation with the client. It is not possible for one lawyer alone to collect all the information needed to make the critical, strategic decisions, and to competently and effectively litigate these matters in a compressed time period. This conclusion is based upon my experience as an assistant state public defender in Ohio, and as an assistant federal public defender with the CHU.

7.  In addition to litigating issues as described in paragraph 5, the team devotes considerable time to meeting with the client, and—if the family is involved—with the client's family. The attorney must simultaneously prepare the client for the process of meeting with his family; prepare the family members and other witnesses to testify at the clemency hearing; and assist the client in making funeral arrangements and related decisions in case the client is executed. The stress of an impending execution and its attendant responsibilities weighs heavily on the team.

8.  In 2010, we expected a number of our clients to be scheduled for execution. Our expectations were met when execution dates were set for three of our clients—Michael Beuke (Ohio), Ronnie Lee Gardner (Utah), and Jeff Landrigan (Arizona). Prior to 2010, a CHU client was last executed in 2002.

9.  In order to prepare for the executions that we expected to take place, I not only made the case-staffing arrangements that I described in paragraph 5, but I also arranged for counselors from Hospice of the Valley (a local hospice organization) to meet with our staff. The purpose of these meetings was to acknowledge the stress that execution place on our staff, and to discuss ways to deal with the loss of clients in a professional setting. We recognized that each staff person would react to and deal with stress differently, and we therefore made arrangements for staff to have one-on-one meetings or calls with counselors.

10.  All three clients were executed that year. Michael Beuke was executed on May 13, 2010. Ronnie Lee Gardner was executed on June 18, 2010. Jeff

Initials

Page 2 of 5

Exhibit 14 Page 2

Landrigan was executed on October 26, 2010. While our staff represented these three clients in matters leading up to their scheduled executions, it was necessary for our work on other cases to continue. This meant that staff was working significantly more than forty hours per week, for months in a row.

11.  In 2011, two Arizona clients, Eric King and Daniel Cook, were scheduled to be executed. Mr. King was scheduled for March 28, 2011, and Mr. Cook was scheduled for April 5, 2011. We had one team working on behalf of Mr. King and another team working on behalf of Mr. Cook. This was a stressful period of time. We were preparing for two separate clemency hearings, litigating issues in successor cases, and challenging the State's illegal importation of one of the drugs then used in the three-drug protocol. (A federal court subsequently agreed that the Food, Drug, and Cosmetics Act was violated when that drug was imported. *See Cook v. FDA*, 733 F.3d 1, 10 (D.C. Cir. 2013). Moreover, in May 2011, the Federal Department of Justice informed the Arizona Department of Corrections that it had violated the Federal Controlled Substances Act when it imported its supply of the drug. Both these events confirmed the issues we had litigated on behalf of our clients.) During this period, work continued in cases on behalf of other clients. Mr. King was executed on March 29, 2011. Mr. Cook's execution was stayed the day before his scheduled execution date. The stay was later lifted and Mr. Cook was executed on August 8, 2012.

12.  In 2012, we represented several clients who were under warrants of execution; of that group, Robert Towery and Robert Moorman had execution dates that were scheduled eight days apart. Both clients were initially represented by CJA counsel who asked us to serve as co-counsel during warrant litigation, owing to the constraints on their small firms, and the experience our staff has in conducting warrant litigation. In Mr. Towery's case, we were appointed as associate counsel in June 2011, because CJA counsel was representing another client who had a June execution date. Subsequent to our appointment in June, Arizona set his execution date for March 8, 2012. We represented Robert Moorman for similar reasons; his CJA counsel, who worked in a very small law office, asked for our assistance, knowledge, and expertise in warrant litigation. Mr. Moorman's execution was set for February 29, 2012, and CJA counsel was unable to mount extensive warrant-related challenges while simultaneously pursuing clemency and other legal challenges. (There were concerns regarding Mr. Towery's execution. *See Lopez v. Brewer*, 680 F. 3d 1084, 1092-93 (9th Cir. 2012) (Pregerson, dissenting from the denial of rehearing en banc)

Initials
Page 3 of 5

Exhibit 14 Page 3

("The March 8, 2012 execution of Robert Towery is perhaps the starkest example of Arizona's flawed procedures.")).  During this period, our work continued in cases on behalf of our other clients.

13.   On April 30, 2014, the CHU was appointed to represent Joseph Wood, eight days after the State of Arizona filed for a warrant of execution in his case. The CHU was substituted for Mr. Wood's appointed CJA counsel because, as I described in paragraph 11, the CHU staff has the knowledge and experience required for litigating multiple matters for clients under immediate warrant of execution. We were appointed approximately twelve weeks before the scheduled execution date. We staffed the case and assumed the role as lead counsel for Mr. Wood. In that role, we commenced litigation in federal court under Rule 60(b); made a First Amendment challenge seeking information about the source of one of the drugs that would be used to carry out the execution (midazolam), as well as information about the qualifications of the execution team members; and collaborated with CJA counsel on the clemency presentation.  During this period, our work continued in our other cases on behalf of our other clients.

14.   Mr. Wood was executed by the State of Arizona on July 23, 2014.  The State of Arizona had originally planned to execute Mr. Wood with a drug combination of 50 mg of midazolam and 50 mg of hydromorphone. In the end, the State injected Mr. Wood with fourteen additional doses of the drug. From the time of the initial injection, it took Mr. Wood one hour and fifty-seven minutes to die.

15.   I was a witness to Mr. Wood's execution. At some point during the prolonged execution, as Mr. Wood continued to breathe after the drug combination was injected, I directed other witnesses to leave the witness room and to report what was they had observed.  As a result, attorneys in our office asked for and obtained a hearing in the United States District Court for the District of Arizona; the hearing took place during that prolonged execution. *See* Civil Minutes re: Emergency Stay of Execution, *Wood v. Ryan*, No. 2:14-cv-01447-NVW-JFM (D. Ariz.), July 23, 2014. Mr. Wood died during the hearing. A detailed account of those events is described in testimony I provided in January 2017 in lethal-injection litigation in Ohio. *In re: Ohio Execution Protocol*, No. 2:11-cv-1016 (S.D. Ohio), *hearing held* Jan. 9, 2017 (Tr. 1114-1122).

16. The execution of Joseph Wood, more than other executions, had a significant traumatic impact on the staff at the CHU. Because of this, I arranged for post-execution counseling to the CHU staff. As with the situation with previous executions, our work continued in cases on behalf of our other clients.

17. After each execution, the team and other available members of the CHU participated in a debriefing. It was important to discuss the litigation, how the client reacted prior to and during the execution, and to assess what level of post-execution counseling the staff needed. In addition, we discussed strategy and made preparations for the next client we expected to be under warrant.

18. In each of the above described cases, the CHU was able to provide the needed and necessary representation to each individual client. We were able to provide the level of representation that met our statutory and ethical obligations because we were able to assemble and assign a proper team in each case, consult with the client, and decide on the appropriate legal course to pursue—whether that course involved making a constitutional challenge to the conviction or the sentence of death, seeking executive clemency, making a constitutional challenge to the method of execution, or some combination of those possibilities.

I declare under the penalty of perjury that the foregoing is true and correct. Signed this 23rd day of March, 2017, in San Antonio, Texas.

_____
Dale A. Baich

Initials
Page 5 of 5

Exhibit 14 Page 5

**DECLARATION OF WARDEN JENNIE LANCASTER**

1.  I am a former Warden and Regional Director. I spent 36 total years as a correctional professional
    in the North Carolina Department of Correction. I became Correctional Superintendent of the
    North Carolina Correctional Institution for Women in 1982. In that capacity I was responsible for
    managing women on death row in North Carolina, which at the time consisted of one woman,
    Velma Barfield, who was ultimately executed in 1984. Barfield was the first woman executed in
    the United States in 35 years. I was responsible for developing protocols for a woman,
    operational practices at the prison and directly managing the processes involved with her at
    Women's prison in the months after her execution date was established. I coordinated a great
    deal of planning with the warden of Central Prison, site of executions and death watch house. As
    a part of my preparations for Barfield's execution, I attended—earlier in 1984—the first
    execution in North Carolina after the death penalty had been reinstated. That was the first
    execution I observed.

2.  For Barfield's execution, I was involved in every aspect at every level other than the actual
    mechanics of the execution process, which the Warden was ultimately responsible for. I was
    involved in planning, intervention with staff and inmates, family outreach, and developing a
    protocol which the warden of Central Prison was ultimately statutorily responsible for managing.

3.  In 1998, I was promoted to the role of Female Command manager for all of the female prisons.
    In 1997 I was given three additional male facilities to supervise and it included maximum custody
    Central Prison, home of male death row and executions. I continued to supervise Central Prison
    in this role and then as a Region Director, until my first retirement in September 2004. In these
    roles, I supervised the warden and the administration of the death penalty in 23 executions that
    occurred from late 1998-September 2004.

4.  In January 2009, I was asked by the Governor of North Carolina to come out of retirement to
    become the Chief Operating Officer of the Department of Corrections for the state. I served in

1

Exhibit 15 Page 1

that capacity for four years.  Although no executions occurred during that time period, I was responsible for managing death row and was in a top management role involved in litigation involving potential execution protocol and death row management.

5.  I was asked by counsel in this case to give an opinion, based on my professional experience, as to the feasibility and advisability of conducting eight executions in quick succession as Arkansas has currently planned.

6.  To my knowledge, it is unprecedented to attempt so many lethal injections in such a short time period.  It is my opinion there is good reason for that.  Arkansas's current schedule demonstrates a total disregard for the people actually charged with carrying out these executions on behalf of the state and a misunderstanding of what the process requires.

7.  Based on my experience, the current schedule in Arkansas is inadvisable, unworkable and presents many challenges for the corrections leadership and staff.  The execution of one inmate presents unique job stress responsibilities for all correctional staff who have specific responsibilities for the indirect and direct administration of the death penalty.  This will be true in Arkansas, except multiplied 8 times, in a period of time less than two full weeks.  This is unacceptable professional ethical practice from my perspective as a career professional and supervisor of my executions.  The Department of Correction, the warden and staff at Cummins all are responsible to perform their duties in a humane, ethical manner that allows for the basic dignity of the inmate in all levels of the execution.  We recognize our responsibility to follow the law administer safety and security and treat inmates, without further judgment, in a humane manner, in all of our duties in corrections.

8.  In North Carolina, we deliberately managed our narrow window of scheduling executions to provide for maximum time between them, as available per the orders received by the Secretary.  In the 23 executions I supervised, there were two occasions that we had 2 inmates executed in a 10 day period.  These occurred in different years.  Our actions in scheduling recognized the staff

2

Exhibit 15 Page 2

issues involved and the respect we had for this factor, as well as our ability to carry out our responsibilities in the prescribed manner.

9. I reject any idea that holding executions in quick succession would be just as easy for a department of corrections and its staff as spacing the executions out over a period of months. This concept is not respectful of the realities of carrying out the ultimate punishment of causing death to occur in an inmate.

10. Each and every execution is immensely stressful for everyone involved. The level of stress is impossible to describe unless you have actually experienced it, but one analogy is the physical and mental stress a person might feel driving in a torrential rain—your whole body is tense and you strain to focus on every detail. It's not a stress level that can be maintained for a prolonged period of time. The stress and the long hours involved in the execution process result in physical and mental fatigue after one execution. That stress and fatigue would naturally be expected to create a risk of human error. It is well known that work stress and fatigue can be causative for human error, in many work related situations. Just consider the impact of deliberately performing duties, on a timed and detailed level, that result in an execution. Multiple executions scheduled on the same day or in quick succession would magnify and prolong the stress and fatigue experienced by execution participants.

11. Executions are time-intensive and detail oriented. It is not a simple matter of injecting someone and moving on. The intricacies involved in an execution go way beyond what happens in the final hour. Preparations must start well in advance and obligations remain after the death of the inmate is declared. Because every detail is important, the consequences of mistakes are disastrous for both the inmate and the state.

12. In my experience, I would be involved in coordination of an execution beginning the day a date was set for an individual, which by law in North Carolina was sixty to ninety days after appeals were exhausted.

3

Exhibit 15 Page 3

13. Each and every execution involves the coordination of upwards of twenty people throughout the process of preparations, logistical coordination, staging of the execution itself, debriefing process, and ensuring that witnesses, visitors, personal property, etc. are appropriately handled, all while maintaining a high level of security and ensuring day-to-day obligations are taken care of. Resources and time must also be allocated to ensure that participants are constantly in communication with courts, attorneys, the governor's office, etc. often until the time the execution is set to proceed. The logistical issues for each execution present challenges for the leaders, such as the Director, Deputy Director, the warden and executive staff, and these multiple executions will present challenges that have never been experienced or planned for before. There is a need for detailed supervision of one execution and the processes for visiting, the attorney and religious access, medical and mental health care, witness coordination, physical space allocations, etc. The plan for managing, in prescribed detail, for these functions, and more, for 8 inmates is impossible for me to imagine. It must also be recognized that there is an operational prison, with needs, emergencies, staff shortages, etc. to manage.

14. Each execution and inmate is unique and must be addressed in an individual manner. They are not robotic processes or a solemn process that would be managed in an assembly room culture. It all is a very human process, for all involved.

15. Corrections staff involved in executions must be people who have demonstrated dependable service in their professional capacity protecting inmates in their custody and who have the utmost respect for the gravity of the process. I would never select, for instance, any corrections officer or other person who was eager to volunteer to participate.

16. It is essential and critical that there is a formal/informal debriefing process after every execution for the staff and contract employees who are involved-including leadership. Participants must be given an opportunity to air concerns about their own ability to continue in another execution if called upon to do so. They must also be given an opportunity to assess the process itself and to correct deficiencies in the practice or protocol that may have manifested themselves.

4

Exhibit 15 Page 4

Fundamentally, there must be an immediate ability to assess the impact of an execution on the staff involved and to determine whether the process must be changed or improved moving forward. The debriefing process normally is conducted by the warden the day/days after the execution and is the quality assurance element for all involved parties to have confidence in their administration of the death penalty. The current scheduling in Arkansas would seem to nullify this critical, timely debrief and the ability to make significant or minimal changes, and train staff as needed.

17. The human dignity of each inmate in the custody of the Department of Corrections must also be respected as a matter of professionalism. The inmate is allowed visitation from family, counsel, and spiritual advisers for a period of time prior to the execution. The inmate must receive individual attention from a medical, psychological, spiritual, legal, and even security standpoint. Chaplains should not be called upon to minister to multiple inmates during this period of time, because that ministry is grueling. Nor should inmates be forced to share spiritual advisers in the days and moments before their scheduled death. In my experience, the role of the chaplains is a crucial role for both the inmate and the staff. It is an intense time for the inmate to receive assistance with family issues, possible amends to victims discussions, religious and spiritual concerns, possible requests (communion, confession), etc. The chaplains are affected in a unique manner and need their own care taking.

18. Participating in an execution requires a paradigm shift for corrections staff. We are charged with providing for and protecting inmates in our custody. Correctional staff are a part of the deliberate process for the taking of a life and they become part of a 1 percent of the population in the US to ever have such responsibilities. We are NOT trained to do this when hired and we are not asked in interviews about this role. It is not a video that I, and others watched as we saw the machine display the gradual slowing of the heart, the strongest muscle in our body, until there was a 5 minute flat line. The correctional staff then responsible for properly removing the dead body and preparing it for transport. The secrecy surrounding executions then prevents the participants from

5

Exhibit 15 Page 5

going home and receiving support from family, church groups, or even fellow corrections officers. Involvement in this process is simply not a topic for discussion. This makes internal debriefing processes all the more important.

19. Staff, at all levels, participate in the process of executions. This is unique to the corrections profession. It is a paradox. We are sworn to provide for the safety, security and general health and welfare of inmates in our custody; then some are asked to also plan and participate in the process of taking the life of an inmate. It is unfair and illogical to expect that corrections officers can go through this process eight times in a row while maintaining the level of focus, attention, and emotional stability required of the execution process—both to lessen the suffering of the inmate and to maintain the emotional health of the participant. I have heard some comments that staff can simply refuse to participate. We ask staff who already display loyalty and faithfulness to their profession. They do not refuse to perform duties that are necessary and lawful, in the context of their professionalism. We should respect them.

20. It is my opinion that, for the reasons set out above, it would essentially be professional malpractice for any department of corrections official to attempt to stage eight executions as currently scheduled in Arkansas.

I swear that the foregoing is true and correct to the best of my knowledge under penalty of perjury under the laws of the United States.

_3/24/17_
Date

_Jennie Lancaster_
Jennie Lancaster

6

Exhibit 15 Page 6

*Litigation Report – Expert Opinion*

# THE PHARMACOLOGY OF ARKANSAS'S LETHAL INJECTION PROCEDURE: FACTS, INTERPRETATIONS, AND ALTERNATIVES

March 21, 2017

*Researched and written by:*
Craig W. Stevens, Ph.D.
Professor of Pharmacology
Oklahoma State University-Center for Health Sciences
1111 W. 17th Street
Tulsa, OK 74107

*Prepared for and submitted to:*
Mr. John C. Williams
Assistant Federal Public Defender
Federal Public Defenders Office
1401 W. Capitol, Ste. 490
Little Rock, AR 72201

Exhibit 16 Page 1

*Expert Report: AR lethal injection pharmacology*

**Sections**

**1. Introduction** ..................................................................................................**3**
*A. Author Qualifications* ......................................................................3
*B. Materials Considered* .....................................................................4
*C. Brief Description of Arkansas's Lethal Injection Procedure*................4
*D. Referral Questions*..........................................................................5
**2. Midazolam and Fast-Acting Barbiturates are Fundamentally Different Drugs**....................**5**
*A. Pharmacological Equivalency and Pharmacological Substitution* ........5
*B. Pharmacological Classification of Midazolam and Fast-Acting Barbiturates* ....................6
*C. Mechanism of Action of Midazolam and Fast-Acting Barbiturates* ....................6
*D. The Pharmacology of the Partial Agonist, Midazolam, and Full Agonists, Barbiturates* ....8
*E. Therapeutic Uses of Benzodiazepines and Barbiturates* ....................9
*F. DEA Scheduling of Midazolam and Fast-Acting Barbiturates* ............13
*G. Summary* .....................................................................................13
**3. Dosage and Characteristics of Barbiturates Used in Lethal Injection** ....................**14**
*A. Therapeutic, Toxic, and Lethal Dosages of Intravenous (IV) Pentobarbital*....................14
*B. Blood Levels of 5 gram Pentobarbital after IV Bolus Dose in Humans*....................15
*C. Differences Among Barbiturate Drugs* ...........................................18
*D. Summary* .....................................................................................18
**4. Pharmacology of Vecuronium and Potassium Chloride** ....................**19**
*A. Pharmacological and Clinical Effects of Vecuronium*....................19
*B. Pharmacological and Clinical Effects of Potassium Chloride* ............20
*C. Importance of Achieving General Anesthesia* ...............................22
*D. Summary* .....................................................................................22
**5. Calculation of the 'Ceiling Effect' Dosage of Midazolam Used in Lethal Injection**..............**22**
*A. Introduction to the Issue of the 'Ceiling Effect' With an IV Bolus Dose of Midazolam* ........22
*B. Calculation of Ceiling Effect*..........................................................24
*C. Comparison to Clinical Studies* .....................................................32
*D. Summary* .....................................................................................34
**6. Pharmacological Considerations of Alternative One-Drug Protocols for Lethal Injections**..**35**
*Anesthetic Gases to Induce General Anesthesia and Overdose Death* ....................34
**7. Overall Summary and Conclusions** ..................................................**36**
**8. References Cited**...............................................................................**38**
**Notarized signature of Dr. Craig W. Stevens** ......................................**45**

Exhibit 16 Page 2

*Expert Report: AR lethal injection pharmacology*

## 1. Introduction

*A. Author Qualifications*

I am a full-time faculty member in the department of Pharmacology and Physiology at the College of Osteopathic Medicine, a unit of the Oklahoma State University, Center for Health Sciences campus in Tulsa, Oklahoma.

After receiving my Ph.D. in Pharmacology from the Mayo Clinic, in Rochester, Minnesota, I completed a 2 year postdoctoral fellowship at the University of Minnesota Medical School in Minneapolis, Minnesota, and secured a position as an Assistant Professor of Pharmacology with my present employer in 1990. I advanced through the academic ranks to Associate Professor of Pharmacology in 1993, and Professor of Pharmacology in 2000.

Besides my regular duties of teaching medical students, pursuing research and scholarly activities, and serving on college committees, I work part-time as a litigation consultant/expert witness on cases involving pharmacological issues. I have consulted in both civil and criminal cases, working with both the prosecution or plaintiff and the defendant.

With regard to the pharmacological issues of lethal injection, I have worked as a consultant with the state as well as with attorneys representing condemned inmates.

My *curriculum vitae* (CV) is attached as Appendix A to this report.

*B. Materials Considered*

Attorney Josh Lee, who retained me to study Arkansas's lethal injection procedures, provided me with several documents that I reviewed and relied upon in preparing this Expert Report. These materials were: (1) an email from Deputy Attorney General David Curran, to which was appended redacted package inserts and labels for the drugs that Arkansas intends to use in its execution procedure; (2) an email from Assistant Attorney General Jennifer Merritt, to which was appended a document titled "Lethal Injection Procedure (Attachment C)"; and (3) Arkansas's 2015 lethal injection statute, Ark. Code Ann. § 5-4-617 (2015). In addition to the above materials provided by Mr. Lee, I also considered pharmacological textbooks, reviews, and research studies (listed in Section 8, below), as well as *Baze v. Rees*, 128 S. Ct. 1520 (2008), and *Glossip v. Gross*, 135 S. Ct. 2726 (2015), which set the standard for when a lethal injection procedure may be said to violate the federal ban on cruel and unusual punishment. After Mr. Josh Lee left the Federal Public Defenders Office, my work as a pharmacology consultant continued with Mr. John C. Williams in the same office. Before submitting this amended report, I reviewed the Arkansas Supreme Court's opinion in *Kelley v. Johnson*, 2016 Ark. 268, and portions of the briefing in that case.

Exhibit 16 Page 3

*Expert Report: AR lethal injection pharmacology*

*C. Brief Description of Arkansas's Execution Protocol*

The execution procedure appended to the email from Deputy Attorney General Jennifer Merritt is a three-drug lethal injection protocol. First, the prisoner is to be injected with 500 mg. of the drug Midazolam. Next, after waiting five minutes, a member of the execution team ostensibly "confirm[s] the condemned inmate is unconscious," using unspecified methods. Then, the prisoner is to be injected with 100 mg (milligrams) of the muscle-paralytic drug, vecuronium bromide. Finally, the prisoner is to be injected with 240 mEq (milli-equivalents) of the heart-stopping drug, potassium chloride.

*D. Referral Questions*

Mr. Lee asked me to offer my expert opinion on several issues. First, Mr. Lee asked me to discuss the pharmacology of all the different drugs authorized by Arkansas's lethal injection statute, i.e., barbiturates, Midazolam, vecuronium bromide, and potassium chloride—with particular attention to any similarities and differences between barbiturates and Midazolam. Second, Mr. Lee asked for my opinion on whether Arkansas's chosen lethal injection procedure (Midazolam, followed by vecuronium bromide, and potassium) is sure or very likely to cause serious pain and suffering. Third, Mr. Lee asked me to address whether alternative execution procedures would significantly reduce the risk of pain and suffering and, if they would, to describe some of those procedures.

A thorough discussion of these issues follows. A summary of my opinions on the referred questions can be found in Section 7 of this Report.

**2. Midazolam and Fast-Acting Barbiturates are Fundamentally Different Drugs**

*A. Pharmacological Equivalency and Pharmacological Substitution*

Each drug has a unique chemical (atomic) structure and exerts a unique profile of pharmacological effects. Drugs are classified both by their chemical structures and by their therapeutic uses. Drugs that have very similar chemical structures are grouped together based on that structure. Drugs that have similar therapeutic uses are also grouped together by their therapeutic or pharmacological effects.

*Pharmacological equivalency* is present when two or more drugs exhibit the same or closely similar pharmacological properties. It is a working principle used by physicians who often substitute drugs due to drug allergies or for reasons of cost. Pharmacological equivalency is also the guiding principle for the FDA to accept a generic version of the same branded drug (e.g. Walgreen's ibuprofen, the generic form, is *pharmacologically equivalent* to Advil®, the branded formulation of ibuprofen. See *Meredith 2003, Borgheini 2003*).

*Pharmacological substitution* is the act of using one drug in the place of another. It is axiomatic that in order to maintain the same pharmacological and therapeutic effect of two drugs, the drug that is substituted must have pharmacological equivalency to the new drug.

Exhibit 16 Page 4

*Expert Report: AR lethal injection pharmacology*

There is no question that midazolam and fast-acting barbiturates (such as thiopental or pentobarbital) are different drugs. The key question in substituting drugs for lethal injection is one of a pharmacological nature: Does midazolam have *pharmacological equivalency* to fast-acting barbiturates such that a valid pharmacological substitution can be made? Pharmacological equivalency between midazolam, a benzodiazepine, and fast-acting barbiturates, is examined herein with respect to **pharmacological classification by chemical (atomic) structure, mechanisms of action, partial and full effects of these agents and the 'ceiling effect', therapeutic uses, and DEA scheduling of these agents.**

*B. Pharmacological Classification of Midazolam and Fast-Acting Barbiturates*

*Table 1. Visual comparison of benzodiazepine and barbiturate chemical structures.*



| BENZODIAZEPINES | BARBITURATES |
|---|---|
| Midazolam (Versed®) | Pentobarbital (Nembutal®) |
| Diazepam (Valium®) | Thiopental (Pentothal®) |

Midazolam belongs to the class of drugs called benzodiazepines whereas drugs like pentobarbital and thiopental are members of the barbiturate class of drugs (*Brenner and Stevens, 2013*). The

Exhibit 16 Page 5

*Expert Report: AR lethal injection pharmacology*

chemical structure of midazolam and pentobarbital are shown in the first row of Table 1 above to provide an accessible first exposure to the differences between the two drugs. The untrained eye clearly recognizes that midazolam and pentobarbital do not have similar structures and are not close analogs. The second row in Table 1 shows examples of other drugs from the same class of drugs as midazolam and pentobarbital. Most notably, at the center of the benzodiazepines there is 7-sided ring with two nitrogen atoms (N) attached to a 6-sided ring with one chloride atom (Cl). Quite differently, the two barbiturates do not contain such a core structure and instead consist of a single 6-sided ring containing two nitrogen atoms. The non-expert can see that the benzodiazepine, midazolam, is similar to diazepam (Valium®), and the barbiturate, pentobarbital (Nembutal®), is a close analog of thiopental (Pentothal®). There is an irrefutable difference between midazolam and fast-acting barbiturates at the atomic level.

In summary, Table 1 shows that that there is no chemical, structural **pharmacological equivalency between midazolam and fast-acting barbiturates.** However, Table 1 does show that the substitution of thiopental with pentobarbital (from one fast-acting barbiturate to another fast-acting barbiturate) does meet the test for pharmacological equivalency by chemical structure.

*C. Mechanism of Action of Midazolam and Fast-Acting Barbiturates*

The pharmacology of drugs ranges from effects on the whole organism, to effects on specific tissues or organs, down to the actual mechanism of action at the molecular level. For many drugs, the action at the molecular level can be traced upward to the effect on the whole organism, yielding a nearly complete description of drug action.

Starting at the molecular level, both midazolam and pentobarbital act on the $GABA_A$ receptor-chloride ion channel complex (henceforth $GABA_A$ receptor). GABA is the acronym for gamma-aminobutyric acid, an inhibitory neurotransmitter in the brain that is the natural activator of $GABA_A$ receptors (*Sigel and Steinmann 2012, Sieghart 2015*). When inhibitory neurons of the brain release GABA onto other brain neurons, the recipient neurons are inhibited and become more quiescent. This is an ongoing neurotransmitter action, occurring without the presence of any drugs or exogenous substances in the brain. The $GABA_A$ receptor is shaped like a funnel with a lid on it. When GABA binds to the receptor, the lid opens and chloride ions rush from the outside of the neuron to the inside. The chloride ions rushing inside the neuron causes the neuron to decrease its electrical activity.

Benzodiazepines act at the $GABA_A$ receptor on brain neurons where GABA itself acts (*Chang et al. 1981, Sigel and Barnard 1984*) but at a different molecular site than GABA on the $GABA_A$ receptor (*Cromer et al. 2002, Ernst et al. 2003*). Midazolam and all benzodiazepines do not increase the synthesis of the inhibitory neurotransmitter GABA but enhance the effect of GABA at the $GABA_A$ receptor (*Greenblatt et al. 1983*). GABA must be released by inhibitory neurons and be acting on the $GABA_A$ receptor at the same time as the benzodiazepine for drugs like midazolam to enhance GABA inhibition (*D'Hulst et al. 2009, Sieghart et al. 2012*). GABA acts on the receptor and opens the lid to the chloride ion channel (funnel) and midazolam increases the frequency that the lid opens (*Study and Barker 1981, Rogers et al. 1994*). In that way,

Exhibit 16 Page 6

*Expert Report: AR lethal injection pharmacology*

midazolam helps GABA have a greater inhibitory effect. However without GABA present, midazolam does little to the GABA$_A$ receptor.

Barbiturates such as pentobarbital also act at the GABA$_A$ receptor on brain neurons where GABA itself acts (*Olsen and Snowman 1982, Greenfield LJ 2013*). Barbiturates bind to a different spot on the GABA$_A$ receptors than benzodiazepines (*Cestari et al. 1996*). Unlike midazolam, pentobarbital and other barbiturates enhance GABA inhibition by increasing the time that the ion channel lid remains in the open position (*Study and Barker 1981*). Contrary to the mechanism of action of midazolam, pentobarbital, like all barbiturates, can cause neuronal inhibition even when GABA is not present (*Mathers and Barker 1980, Jackson et al. 1982*). Barbiturates therefore can open the lid on the ion channel by themselves and keep it open longer than benzodiazepines (*MacDonald et al. 1989, Sancar and Czajkowski 2011*). As a result, the flow of chloride ions into the neuron is not limited to enhancement only when GABA is present, but barbiturates can increase the rush of chloride ions into the neuron in the absence of GABA so that the activity of the neuron is completely shut down. Thus, barbiturates are more potent drugs at the GABA$_A$ receptor than benzodiazepines.

In summary, a large body of pharmacological research on the mechanisms of action of midazolam and fast-acting barbiturates **clearly demonstrates that benzodiazepines, like midazolam, and barbiturates, such as pentobarbital, do NOT exhibit pharmacological equivalency with regard to their detailed mechanism of action.** Compared to barbiturates, benzodiazepines bind to a different site on the GABA$_A$ receptor, need GABA to co-activate the GABA$_A$ receptor to work, and increase the frequency of the opening of the chloride ion channel, not the time it remains open.

### D. The Pharmacology of the Partial Agonist, Midazolam, and the Full Agonists, Barbiturates

Most drugs that are used clinically do something to cells or neurons that they affect. They bind to (act on) a target receptor and the receptor does something, like open an ion channel. These types of drugs that do something are called agonists. Other types of clinically-used drugs, like the antihypertensive drugs called 'beta-blockers', bind to a receptor and prevent another substance from doing something. These drugs are called antagonists.

Agonists are further subdivided into partial agonists and full agonists. As their name suggests, full agonists produce a full pharmacological effect and partial agonists only produce a partial pharmacological effect. The difference between one drug being a partial agonist and another drug being a full agonist arises from the drugs' differing mechanism of action.

As noted above, midazolam, like all benzodiazepines, increases the frequency (not the duration) of ion channel opening only when GABA is present. As GABA is a neurotransmitter synthesized by inhibitory brain neurons, the amount of GABA released onto GABA$_A$ receptors is limited. Because midazolam depends on the co-activation of GABA to produce its effects, midazolam's effects on the brain is therefore also limited. In this regard, **midazolam is a partial agonist.**

Exhibit 16 Page 7

*Expert Report: AR lethal injection pharmacology*

Barbiturates, to the contrary, do not need co-activation by GABA to produce their effects. Therefore, the neuronal inhibition produced by barbiturates is not limited. In this regard, **fast-acting barbiturates are full agonists**.

By definition, partial agonists will exhibit a 'ceiling effect' in which greater doses will not produce a greater pharmacological effect. The ceiling effect of benzodiazepines, and the lack of ceiling effect for barbiturates, is so well-accepted that many medical pharmacology textbooks contain a Figure illustrating this fact. Fig. 1 below shows one such example.



**Fig. 1.** Typical textbook example of a graph showing the differences between barbiturates (top line) and benzodiazepines (bottom line). The dose increases along the horizontal axis as you move to the right; the effects in humans increases as you move up the vertical axis. Note the **ceiling effect shown for benzodiazepines** versus the lack of ceiling effect for barbiturates. As the dose of benzodiazepine increases, a plateau ('ceiling') is reached before reliable general anesthesia is obtained. Increasing doses of barbiturates reliably produce anesthesia, coma, and death. Note: the term 'hypnosis' is medical terminology for 'sleep'. Adapted from *Brenner and Stevens 2013*.

In summary, **the fact that midazolam is a partial agonist, and that fast-acting barbiturates are full agonists, arises directly from their mechanisms of action, as barbiturates can act in the absence of GABA and increase the inhibition of brain neurons whereas midazolam and other benzodiazepines are limited with their effect only when GABA is present and thus cannot inhibit neurons as much as barbiturates. This pharmacological fact demonstrates that pharmacological equivalency is NOT met by substitution of a barbiturate with a benzodiazepine**. The ceiling effect of a midazolam and other benzodiazepines, and the lack of ceiling effect with the use of barbiturates, is beyond controversy and taught to all medical and pharmacology students.

Exhibit 16 Page 8

*Expert Report: AR lethal injection pharmacology*

## E. Therapeutic Uses of Benzodiazepines and Barbiturates

The therapeutic use of a drug is a direct result of the drug's pharmacological properties, including, most importantly, a drug's mechanism of action. As noted above, while both benzodiazepines and barbiturates act on the $GABA_A$ receptor, they do so in very different ways. Because of the difference in their mechanism of action, the FDA approves benzodiazepines and barbiturates for difference therapeutic uses. Whereas barbiturates can be used as the sole agent for general anesthesia, benzodiazepines cannot.

### i. The Anesthesia Continuum

Before examining the FDA-approved uses of midazolam, pentobarbital, and other agents, it is necessary to understand the terminology used in describing sedative and anesthetic effects. The authoritative professional organization for Anesthesiologists, the American Society for Anesthesiology (ASA), has published standards and definitions for the level of sedation and general anesthesia. There can be no question that these definitions serve as the foundation for any fact-finding. For this reason, the Continuum of Depth of Sedation Table from the ASA is presented below as Table 2 (next page).

There are four levels defined for the Continuum of Depth of Sedation. Of these four levels, there are three levels of sedation and only one level of general anesthesia (see Table 2, column headers).  These are, in order of increasing depth of sedation, Minimum Sedation Anxiolysis, Moderate Sedation/Analgesia ("Conscious Sedation"'), Deep Sedation/Analgesia, and General Anesthesia.

Two important facts come from Table 2. First, there is only one level for complete anesthesia, called General Anesthesia. This is the level which renders the patient, or a condemned inmate, to a state of unconsciousness (stated in the text below the Table, underlined) and insensate to all conscious sensation including pain (in the Table itself, end of row one, under General Anesthesia, boxed). The other three levels of sedation are characterized by response to pain and drug-induced *depression* of consciousness *without loss* of consciousness. For this reason, it is clear that any drug used as the first drug in the Arkansas lethal injection protocol must produce a state of General Anesthesia.

Second, the specific use of the term 'General' in the name of the deepest level, 'General Anesthesia,' emphasizes overall brain-activity depression characterized by lack of pain sensation and unconsciousness. Use of the just the word 'anesthesia' does not mean 'general anesthesia.' As stated in the major authoritative pharmacology textbook, *Goodman and Gilman's The Pharmacological Basis of Therapeutics:*[1] *"The clinical literature often refers to the anesthetic effects and uses of certain benzodiazepines, but the drugs do not cause a true general anesthesia because awareness usually persists."* It is clear that many uses of the word 'anesthesia' in the medical literature do not mean 'general anesthesia' and should not be interpreted as such unless there was loss of all sensation (including pain) and unconsciousness.

---

[1] Mihic SJ and Harris RA (2011) Chapter 17 Hypnotics and Sedatives, p 460, in Brunton LL et al. (Eds.), Goodman & Gilman's Pharmacological Basis of Therapeutics, Macmillan Co., New York, NY.

Exhibit 16 Page 9

*Expert Report: AR lethal injection pharmacology*



American Society of
**Anesthesiologists**

**CONTINUUM OF DEPTH OF SEDATION:**
**DEFINITION OF GENERAL ANESTHESIA AND LEVELS OF SEDATION/ANALGESIA***

**Committee of Origin: Quality Management and Departmental Administration**

**(Approved by the ASA House of Delegates on October 13, 1999, and last amended on October 15, 2014)**

| | *Minimal Sedation Anxiolysis* | *Moderate Sedation/ Analgesia ("Conscious Sedation")* | *Deep Sedation/ Analgesia* | *General Anesthesia* |
|---|---|---|---|---|
| *Responsiveness* | Normal response to verbal stimulation | Purposeful** response to verbal or tactile stimulation | Purposeful** response following repeated or painful stimulation | Unarousable even with painful stimulus |
| *Airway* | Unaffected | No intervention required | Intervention may be required | Intervention often required |
| *Spontaneous Ventilation* | Unaffected | Adequate | May be inadequate | Frequently inadequate |
| *Cardiovascular Function* | Unaffected | Usually maintained | Usually maintained | May be impaired |

**Minimal Sedation (Anxiolysis)** is a drug-induced state during which patients respond normally to verbal commands. Although cognitive function and physical coordination may be impaired, airway reflexes, and ventilatory and cardiovascular functions are unaffected.

**Moderate Sedation/Analgesia ("Conscious Sedation")** is a drug-induced depression of consciousness during which patients respond purposefully** to verbal commands, either alone or accompanied by light tactile stimulation. No interventions are required to maintain a patent airway, and spontaneous ventilation is adequate. Cardiovascular function is usually maintained.

**Deep Sedation/Analgesia** is a drug-induced depression of consciousness during which patients cannot be easily aroused but respond purposefully** following repeated or painful stimulation. The ability to independently maintain ventilatory function may be impaired. Patients may require assistance in maintaining a patent airway, and spontaneous ventilation may be inadequate. Cardiovascular function is usually maintained.

**General Anesthesia** is a drug-induced <u>loss of consciousness</u> during which patients are not arousable, even by painful stimulation. The ability to independently maintain ventilatory function is often impaired. Patients often require assistance in maintaining a patent airway, and positive pressure ventilation may be required because of depressed spontaneous ventilation or drug-induced depression of neuromuscular function. Cardiovascular function may be impaired.

Because sedation is a continuum, it is not always possible to predict how an individual patient will respond. Hence, practitioners intending to produce a given level of sedation should be able to rescue*** patients whose level of sedation becomes deeper than initially intended. Individuals administering Moderate Sedation/Analgesia ("Conscious Sedation") should be able to rescue*** patients who enter a state of Deep Sedation/Analgesia, while those administering Deep Sedation/Analgesia should be able to rescue*** patients who enter a state of General Anesthesia.

**     Reflex withdrawal from a painful stimulus is NOT considered a purposeful response.

***   Rescue of a patient from a deeper level of sedation than intended is an intervention by a practitioner proficient in airway management and advanced life support. The qualified practitioner corrects adverse physiologic consequences of the deeper-than-intended level of sedation (such as hypoventilation, hypoxia and hypotension) and returns the patient to the originally intended level of sedation. It is not appropriate to continue the procedure at an unintended level of sedation.

*Table 2. Continuum of Depth of Sedation Table from the ASA [Emphasis added]*

Exhibit 16 Page 10

*Expert Report: AR lethal injection pharmacology*

Instead of anesthesia, the term 'Moderate Sedation' or another one of the three sedation-level descriptors should be used, if loss of consciousness and insensibly to pain were not present. Textbooks or review articles that state that IV benzodiazepines can produce anesthesia mean that these agents, in general, can produce levels of sedation along the anesthesia scale (Table 2), not that they produce the specific, deepest level of anesthesia called General Anesthesia. Likewise, midazolam is sometimes referred to as 'an anesthetic' or able to produce 'anesthesia,' but this does not mean midazolam can produce 'general anesthesia'.

As shown in the next subsection, the FDA-approved indications (therapeutic uses) for midazolam do not include 'General Anesthesia' (Table 3). Section 5 below discusses clinical studies showing that midazolam is unable to produce a state of General Anesthesia.

## ii. FDA-approved Labeling of Anesthetic Effects.

Table 3 below is a list of therapeutic uses for benzodiazepines and barbiturates. Entries marked with a 'YES' indicate that this class of drugs (benzodiazepine or barbiturate) is FDA-approved for this indication and list which particular drug(s) is approved for this therapeutic use.

*Table 3. Comparison of therapeutic uses for five benzodiazepines and five barbiturates.*

| Therapeutic Use | Benzodiazepines | Barbiturates |
|---|---|---|
| Anxiety disorders | YES, alprazolam, diazepam, lorazepam | YES but only for 'sedation' with butabarbital |
| Panic Disorder | YES, alprazolam, clonazepam | NO |
| Acute Alcohol Withdrawal | YES, diazepam | NO |
| Skeletal Muscle Spasm | YES, diazepam | NO |
| Seizure Disorders | YES, clonazepam, diazepam | YES, pentobarbital (IV), phenobarbital (IV), thiopental (IV) |
| Preoperative Sedation | YES, midazolam (IM/IV) | YES, pentobarbital (IV), secobarbital |
| Outpatient Sedation | YES, midazolam (IV) | NO |
| Anesthesia Induction | YES, midazolam (IV) | YES, thiopental (IV) |
| Sole Anesthesia (brief) | NO | YES, thiopental (IV) |
| Sedation for Intubated Ptx | YES, midazolam (IV cont.) | NO |
| Co-Anesthesia (Adjunct) | YES, midazolam (IV) | YES, thiopental (IV) |
| Insomnia (short-term) | NO | YES, butabarbital, secobarbital, pentobarbital (IV) |
| Induce Coma in Brain Trauma | NO | YES, thiopental (IV) |
| Psychiatric Use (Narcoanalysis) | NO | YES, thiopental (IV) |

*Note: Benzodiazepine data of therapeutic uses are from the FDA-approved Prescribing Information labels of alprazolam (Xanax®), clonazepam (Klonopin®), diazepam (Valium®), lorazepam (Ativan®), and midazolam (Versed® injection). Barbiturate data are from current FDA-approved labels—for butabarbital (Butisol®), pentobarbital (Nembutal® injection), phenobarbital (Luminal®), secobarbital (Seconal®)—excepting the discontinued label for thiopental (Pentothal®), which is no longer marketed. All drug formulations are oral tablets except where noted; IV=intravenous, IM=intramuscular.*

As shown in Table 3, there are 14 therapeutic uses for the benzodiazepine and barbiturate drugs. Among these 14 therapeutic uses, only 5 (or 35.7%) are common to both benzodiazepines and barbiturates. These shared indications are Anxiety Disorders, Seizure Disorders, Preoperative

Exhibit 16 Page 11

*Expert Report: AR lethal injection pharmacology*

Sedation, Anesthesia Induction, and Adjunct/Co-Anesthesia (used with a general anesthetic). It should be noted that benzodiazepines for the treatment of Anxiety Disorders have almost universally supplanted the older barbiturate drugs for this use (*Howie 1975, Pieters and Snelders 2007*). Five indications are for the use of benzodiazepines only; Panic Disorder; Acute Alcohol Withdrawal; Skeletal Muscle Spasms; Outpatient Sedation; and Sedation for Intubated Patients. Four indications are for the use of barbiturates only: Sole Anesthesia (for brief procedures); Insomnia (for short-term treatment of 2 weeks); Induce Coma in Brain Trauma; and Psychiatric Use (Narcoanalysis), *i.e.*, the limited and historical use of thiopental to get the therapy patient to talk, as in 'truth serum'.

Both midazolam and thiopental are indicated for use in Anesthetic Induction. Anesthetic Induction is a procedure to **start the anesthesia process**. Although midazolam is used for Anesthetic Induction, this use does not mean that midazolam can produce a state of General Anesthesia. Both midazolam and thiopental are indicated for use in Co-Anesthesia as adjunct anesthetics along with other agents. Use of midazolam as an adjunct agent in a Co-Anesthesia protocol does not indicate that midazolam by itself can produce a state of General Anesthesia.

Thiopental, **but not midazolam,** is indicated for Sole Anesthesia, for brief (15 minute) procedures. Thiopental, a barbiturate, is able to be used by itself to provide general anesthesia, but midazolam, like other benzodiazepines, is limited in its potency and cannot produce general anesthesia but only sedation.

Use of midazolam for Preoperative Sedation or Outpatient Sedation—both uses not reaching the level of General Anesthesia—is not germane to drug use for lethal injection. Likewise, use of midazolam to treat Anxiety disorders, Panic Disorder, Acute Alcohol Withdrawal, Skeletal Muscle Spasm, or Seizure Disorders is not pertinent to the production of General Anesthesia, the level of anesthesia needed to administer the second and third drugs used in Arkansas's lethal injection protocol without pain.

With regards to specific drugs, out of five indications for midazolam, midazolam shares only one therapeutic use with pentobarbital: Preoperative Sedation.

In sum, comparison of the FDA-approved labels for benzodiazepines and barbiturates—and more specifically for midazolam and pentobarbital—**demonstrates that pharmacological equivalency of barbiturates and benzodiazepines is NOT met considering the criteria of approved therapeutic uses.** Most importantly, midazolam is not approved for use as a Sole Anesthetic as it cannot produce General Anesthesia. In contrast, the barbiturate thiopental was approved as a Sole Anesthetic for brief procedures. Midazolam cannot produce General Anesthesia, whereas barbiturate drugs like pentobarbital and thiopental are more potent (with no ceiling effect) and can produce a state of General Anesthesia. Evidence supporting these facts is elaborated below in Section 5.

Exhibit 16 Page 12

*Expert Report: AR lethal injection pharmacology*

### F. DEA Scheduling of Midazolam and Fast-Acting Barbiturates

Most prescription drugs are safe and without the potential for abuse and dependence. Thus, the vast majority of drugs prescribed by physicians do not come under the purview of the Drug Enforcement Administration (DEA). Drugs that pose a special danger of abuse or drug dependence are tightly regulated by the DEA and are called controlled substances.

Midazolam and barbiturates are controlled substances according to the DEA, as promulgated by the Controlled Substances Act of 1970. The DEA places dangerous drugs into five schedules, with Schedule I drugs having no approved medical use and being the most dangerous. Schedule II-V are drugs with medical uses but with decreasing danger of abuse and dependence. Midazolam, as with most of the other benzodiazepines like diazepam (Valium®) and lorazepam (Ativan®) are placed into Schedule IV. Fast-acting barbiturates are considered much more dangerous drugs to abuse so they are scheduled the highest level for drugs still used medically, as Schedule II controlled substances. This is evidence that midazolam is deemed safer to use by the DEA, with less evidence of abuse and drug dependence than fast-acting barbiturates. Simply put, the DEA decision to schedule midazolam and the fast-acting barbiturates differently **reflects the DEA finding that midazolam and fast-acting barbiturates do NOT exhibit pharmacological equivalency in causing drug dependence and abuse.**

### G. Summary

Pharmacological equivalency between benzodiazepines and barbiturates, and more specifically between midazolam and fast-acting barbiturates, was investigated by examining key aspects of the pharmacology of the two drug classes. The findings from this section are:

*i.* There is no pharmacological equivalency between midazolam and fast-acting barbiturates using the criterion of chemical structures for benzodiazepines and barbiturates.

*ii.* There is no pharmacological equivalency when examining the different mechanisms of action of benzodiazepines (midazolam) and barbiturates (pentobarbital, thiopental).

*iii.* There is no pharmacological equivalency between the magnitude of pharmacological effects produced by benzodiazepines (partial agonists) and barbiturates (full agonists). In particular, it is well-known that midazolam has a ceiling effect that is not present barbiturates.

*iv.* There is no pharmacological equivalency when examining the different therapeutic uses of benzodiazepines and barbiturates, or between midazolam and fast-acting barbiturates. In particular, midazolam is does not produce General Anesthesia and could not be used as a Sole Anesthetic, whereas barbiturates are used as Sole Anesthetics and do produce General Anesthesia.

Exhibit 16 Page 13

*v.* There is no pharmacological equivalency in the drug abuse and dependence properties of benzodiazepines and barbiturates as confirmed by the different scheduling of these drugs by the DEA.

### 3. Dosage and Characteristics of Pentobarbital Used in Lethal Injection

*A. Therapeutic, Toxic, and Lethal Dosages of Intravenous (IV) Pentobarbital*

Barbiturates are a class of sedative-hypnotic drugs, largely replaced in clinical therapeutics by the benzodiazepine class of sedative-hypnotics (*Brenner and Stevens 2013*). Examples of common barbiturate drugs are thiopental, pentobarbital, phenobarbital, and methohexital.

*Nembutal®️ Sodium Solution* (Pentobarbital Sodium for Injection, USP) is an FDA-approved drug formulation that is manufactured by Akorn, Inc. a subsidiary of Oak Pharmaceuticals, Inc., headquartered in Lake Forest, IL (*FDA 2015*). Its official indications are listed on the FDA label for use as: a. Sedatives; b. Hypnotics, for the short-term treatment of insomnia; c. Preanesthetics; and d. Anticonvulsant, in anesthetic doses, in the emergency control of certain acute convulsive episodes, *e.g.* status epilepticus (*Nembutal®️ Sodium Solution* Prescribing Information, Oak Pharmaceuticals). Pentobarbital sodium IV solution is also used 'off-label' for the induction and maintenance of coma to reduce intracranial pressure in brain-injured patients (*Woodcock et al. 1982*).

Clinical studies and forensic toxicology studies have determined the therapeutic, toxic, and lethal blood concentrations of pentobarbital (*Musshoff et al. 2004; Regenthal et al. 1999; Schulz et al. 2012; Winek et al. 2001*). These values are given in blood concentration ranges from the most recent paper, as shown in Table 4 below.

*Table 4. Therapeutic, toxic, and lethal ranges of pentobarbital blood concentrations. Concentrations given in mg/L (milligram per Liter) which is equal to mcg/mL (microgram per milliLiter). Half-life (t1/2) is given in the last column and is the time in hours it takes for half of the amount of drug to be cleared from the bloodstream. From Schulz et al. 2012.*

| Substance | Blood-plasma concentration (mg/L) | | | t½ (h) |
|---|---|---|---|---|
| | therapeutic ("normal") | toxic (from) | comatose-fatal (from) | |
| Pentobarbital | 1-5 (-10) | 10-19 | 15-25 | 20-40 |

There are no clinical studies determining the lethal dose of IV pentobarbital sodium in humans for obvious reasons. However, the largest IV pentobarbital sodium dose ever administered to human volunteers is reported in an early pharmacokinetic study from the 1950s (*Brodie et al. 1953*). In two volunteers, 2.5 grams pentobarbital was injected IV over 50 minutes. While blood concentrations were not determined in these volunteers, the authors note that following these large doses of IV pentobarbital, the volunteers were deeply anesthetized and had to be put on a ventilator with oxygen "until spontaneous ventilation was deemed adequate." Such studies could not be performed today due to safety and ethical concerns, but it is clear that a 2.5 gram dose given IV was a lethal dose in these two individuals as it caused them to stop breathing on

Exhibit 16 Page 14

their own. These volunteers would have died without the supportive measures of the artificial ventilator and oxygen supplementation.

The most straight-forward approach to determining the lethality of pentobarbital sodium used in lethal injection protocols is to pharmacologically model the blood concentrations of pentobarbital after a 5 gram IV bolus injection of pentobarbital sodium. Once a reasonable estimate is made of the pentobarbital blood concentrations after a 5 gram IV pentobarbital sodium dose, the blood levels obtained can be compared to lethal pentobarbital concentrations as shown in Table 4, above.

*B. Blood Levels of 5 gram Pentobarbital after IV Bolus Dose in Humans*

The study of drug movement after administration is called pharmacokinetics. The pharmacokinetics of pentobarbital sodium are characterized by a rapid distribution of pentobarbital throughout the body and into the brain. With direct IV administration, there is no absorption phase of the drug like when a pill is swallowed. For this reason, the peak blood concentration of IV pentobarbital is observed with the first time point of sampling after the IV bolus injection.

As mentioned above, there are no studies in the literature that give the blood concentrations of pentobarbital following a 5 gram IV dose, as this is higher than approved clinical doses. However, it is possible to examine the pentobarbital blood concentrations in humans from studies following the administration of lower doses of IV pentobarbital sodium. The data from these studies can then be used to model the blood concentrations of pentobarbital after a 5 gram IV dose.

In 1953, the first study of the fate of pentobarbital in humans estimated the peak amount of pentobarbital in the blood after IV bolus administration of 1 gram (= 1000 mg) pentobarbital sodium (*Brodie et al. 1953*). This study gave peak blood concentrations of about 25 mg/L after the IV dose. Twenty years later, the first study using modern techniques in pharmacokinetic analysis determined the blood concentration of pentobarbital after an IV dose of 50 mg pentobarbital sodium (*Smith et al. 1973*). These authors found that a 50 mg IV dose of pentobarbital gave an initial peak blood concentration of about 1.5 mg/L. In a second pharmacokinetic study of IV pentobarbital sodium, a 100 mg IV dose yielded an initial pentobarbital blood concentration of about 3.0 mg/L (*Ehrnebo 1974*). A figure from this second modern paper is included below (as Fig. 2, top of next page) to portray the pentobarbital blood concentration curve over time following IV administration.

Given that a 50 mg IV dose of pentobarbital gave an initial pentobarbital blood concentration of 1.5 mg/L and that a 100 mg IV dose of pentobarbital (Fig. 2, below) gave an initial pentobarbital blood concentration of 3.0 mg/L (i.e. doubling the IV dose, doubled the initial blood concentration) it follows that a 5,000 mg IV dose of pentobarbital would give an initial pentobarbital blood concentration of 150 mg/L. This is calculated from the fact that a 5,000 mg IV dose (= 5 grams) is 100 times greater than the 50 mg IV dose and 100 times 1.5 mg/L equals

Exhibit 16 Page 15

*Expert Report: AR lethal injection pharmacology*

150 mg/mL. By examining Table 4 above, this initial pentobarbital blood concentration of 150 mg/mL is 6 to 15 times greater than the lethal drug range listed as 10-25 mg/mL.



**Fig. 2.** Blood levels of pentobarbital following rapid IV injection of 100 mg to seven human subjects. Data points are the mean values of pentobarbital blood concentrations, plus and minus one standard deviation error bars. From *Ehrnebo 1974*. Note: µg/mL is equal to mg/L.

Given the above calculation that 5 grams of IV pentobarbital sodium yields an initial lethal blood concentration of 150 mg/L, the next determination is to model the fall of the pentobarbital blood concentration over time. It can be seen from Figure 2 above that the fall of pentobarbital blood concentrations occurs in two parts; the decrease in pentobarbital occurs more rapidly for the first hour, then the decrease slows down and changes slowly from the pentobarbital levels seen at one hour. The first rapid phase of the decrease in pentobarbital concentrations is due to the distribution of pentobarbital from the blood to the brain and other tissues. The second, slower phase in the decrease of pentobarbital is due to the elimination of pentobarbital from the blood by metabolism and excretion. The time it takes for the pentobarbital blood level to decrease by one-half is called the 'half-life' ($t_{1/2}$). The first rapid phase of pentobarbital decrease has a smaller half-life than the half-life of the second slower phase of pentobarbital decrease.

In order to determine the fall of pentobarbital concentrations over time, it is necessary to use the half-life data for IV pentobarbital from the pharmacokinetic studies cited above. Both of the modern pharmacokinetic studies of IV pentobarbital sodium show a rapid distribution of pentobarbital out of the blood of with a half-life of about 1 hour (*Ehrnebo 1974; Smith et al. 1973*) which lasts for about 2 hours, then a longer elimination half-life of about 22-50 hours. Using these half-life values, the pharmacokinetic modeling of a 5 gram (5000 mg) IV dose was done using an Excel® spreadsheet, as noted previously in the scientific literature (*Chamberlain 2003*).

Exhibit 16 Page 16

*Expert Report: AR lethal injection pharmacology*

The resulting graph of the decrease in pentobarbital blood levels after IV injection of 5 grams (5000 mg) is shown in Figure 3 below. This graph shows that with an initial blood concentration of 150 mg/L pentobarbital, the blood levels of pentobarbital decrease to 37.5 mg/L after 120 minutes. Within the first 5 minutes, the blood levels decrease to 141 mg/L (inset graph, Figure 3, below). Comparing these blood levels of pentobarbital with the lethal concentrations summarized in Table 4 above, after the first 5 minutes, the 5 gram IV dose of pentobarbital sodium yields blood levels of pentobarbital that are 5.6 to 14 times higher than lethal pentobarbital concentrations. After 120 minutes, the 5 gram dose gives blood levels that remain elevated above the lethal pentobarbital concentrations.



**Blood Concentration Time-Course Curve after 5000 mg IV Pentobarbital**

Fig. 3. Blood levels of pentobarbital following IV injection of 5 grams (5000 mg) as modeled by the best available data. The initial blood concentration was 150 mg/L (at left arrow). The rapid decrease (distribution phase) used a half-life of 60 min that lasted for 2 hours. The slower elimination phase used a half-life of 20 hours. Inset graph in upper right corner shows an enlargement of the first 5 minutes after IV injection (right arrow).

Exhibit 16 Page 17

*Expert Report: AR lethal injection pharmacology*

## C. Differences Among Barbiturate Drugs

Barbiturate drugs were discovered and used to a great degree before the advent of the benzodiazepine drugs in the 1960s (*Harvey 1980*). All benzodiazepines have the same mechanism of action, which differs from barbiturates' mechanism of action (see Section 2C above). Barbiturate drugs potentiate and replace the action of GABA to greatly inhibit neurons, whereas benzodiazepines need GABA present to work and are limited in their pharmacological effects (i.e. are partial agonists, see Section 2D).

The differences in various barbiturate drugs lie primarily in their pharmacokinetic characteristics, and are subclassified according to how long they exert their pharmacological effects. The barbiturates are also classified by their therapeutic effects, such that there are anesthetic barbiturates, such as thiopental, pentobarbital, amobarbital, and anticonvulsant barbiturates, such as mephobarbital and phenobarbital (*Macdonald and Barker 1979*).

Barbiturates also differ by their individual chemical nature, most importantly in a term called lipophilicity. Lipophilicity, which means 'fat-loving,' describes a physical characteristic of drugs that correlates with how rapidly a drug can cross from the bloodstream to the brain. Rapid-onset, ultrashort-acting anesthetic barbiturates, like amobarbital and pentobarbital, are more lipophilic than anticonvulsant barbiturates like mephobarbital or phenobarbital (*Toon and Rowland 1983*). Because of this, the highly lipophilic barbiturates (amobarbital and pentobarbital) have a faster onset of action, usually within 30 seconds to 1 minute after an IV bolus dose (*Sessions et al. 1954*).

Finally, the barbiturates differ in terms of their potency: anesthetic barbiturates (pentobarbital and amobarbital) are more potent in their inhibition of brain neurons than anticonvulsant barbiturates like mephobarbital and phenobarbital (*Macdonald and Barker 1979*).

The pharmacological differences between barbiturates precludes a substitution of pentobarbital with any other barbiturate except another fast-acting barbiturate.

## D. Summary

The findings from this section are:

*i.* The normal therapeutic blood concentration of pentobarbital ranges from 1-10 mg/L. Toxic blood concentrations of pentobarbital range from 10-19 mg/L and lethal concentrations of pentobarbital range from 15-21 mg/L and higher.

*ii.* A 5 gram IV bolus dose of pentobarbital sodium produces initial pentobarbital blood concentrations of about 150 mg/L, which is 6 to 15 times greater than the accepted lethal dose range. After 5 minutes, the blood concentration of pentobarbital is 5.6 to 14 times greater than the lethal blood concentrations of pentobarbital. After 2 hours, the blood concentration of pentobarbital remains above the lethal blood concentration range.

Exhibit 16 Page 18

*Expert Report: AR lethal injection pharmacology*

iii. All barbiturates share the same mechanism of action but differ in potency, time of onset, duration of action, and therapeutic indications. Only fast-acting barbiturates like thiopental or pentobarbital are suitable for use in lethal injection protocols.

**4. Pharmacology of Vecuronium and Potassium Chloride**

According to the Arkansas method-of-execution statute, § 5-4-617, the Director of the Arkansas Department of Corrections shall select one of the following options for a lethal injection protocol: a one-drug protocol using a barbiturate, or a three-drug protocol using midazolam, followed by vecuronium bromide, followed by potassium chloride. The pharmacology and mechanism of action of the first drug in the three-drug protocol, midazolam, was detailed above (Section 2) and the ceiling effect of midazolam is discussed below (Section 5). The second and third drugs listed in the Arkansas three-drug lethal protocol are vecuronium bromide, at a dose of 100 mg, and potassium chloride, at a dose of 240 mEq, which are discussed here.

*A. Pharmacology and Clinical Effects of Vecuronium*

Vecuronium, like pancuronium, is a drug classified as a neuromuscular blocker or simply called a paralytic drug. Neuromuscular blockers work by blocking the action of acetylcholine which is the neurotransmitter released from a nerve ending onto the muscle that causes the muscle to contract (*Hibbs and Zambon 2011*). Clinical uses of neuromuscular blockers are to provide muscle relaxation for endotracheal intubation, and to ensure patient immobility during surgery or mechanical ventilation (*Kovac 2009, Vecuronium Bromide for Injection Prescribing Information*). Vecuronium is a chemical analog to pancuronium and is about 1.5 to 1.75 times more potent than pancuronium (*Fahey et al. 1981*). Vecuronium has about the same onset time as pancuronium (within 5 minutes) but has a shorter duration of action, and produces no cardiovascular effects or changes in heart rate or blood pressure. With higher doses of vecuronium, the onset time can be reduced to 2.4 minutes (*Hilgenberg 1983*).

The clinical effects of vecuronium are shared by other neuromuscular blockers and include progressive loss of skeletal muscle contraction, first noted by drooping eyelids and muscle weakness (*Hibbs and Zambon 2011*). Motor weakness progresses eventually to a total flaccid paralysis. The small, quick muscles of the eyes, jaw, and larynx relax before those of the arms, legs, and trunk of the body. Finally, the intercostal muscles that expand the ribs and the diaphragm are paralyzed, and breathing ceases. Without intubation and mechanical ventilation, death ensues from a lack of oxygen (hypoxia).

There are a few studies of the effect of neuromuscular blockers given in human volunteers without an anesthetic agent. In a classic 1947 paper, a complete description of the effects of tubocurarine, an early neuromuscular blocker, on the central nervous system was examined (*Smith et al. 1947*). These researchers found that neuromuscular blockers had no effect on altering consciousness, or memory and had no analgesic effect. They concluded that these paralytic drugs should not be used alone as they may cause "serious psychic trauma." A later study, using trained anesthesiologists and the researchers themselves, found that in these awake subjects vecuronium had no effect on consciousness and, like the earlier study by Smith

Exhibit 16 Page 19

and colleagues, that the most distress came from a feeling of shortness of breath and 'air hunger,' even as they were artificially ventilated with supplemental oxygen at sufficient levels (*Topulos et al. 1993*). As early as 1950 clinicians realized that the use of paralytic drugs like vecuronium and pancuronium without adequate anesthesia leads to the possibility that a patient is awake but incapable of indicating distress or pain because of muscle paralysis (*Brice 1970*).

While these above studies were done on the researchers themselves, who were trained in the procedures and knew what to expect, most research on the adverse effects of vecuronium and other neuromuscular blockers comes from cases where conscious patients were completely paralyzed but unable to communicate with health care workers. In emergency care, patients who experienced paralysis without sedation or anesthesia reported dysphoria and severe pain (*Chong 2014*). Patients in intensive care units who were paralyzed with pancuronium because they were intubated and on mechanical ventilators, but were not sedated and were conscious, reported that they felt "buried alive"; some thought they were already dead (*Perry 1985*). Most of these patients said they would rather die than go through 4 days of being paralyzed while conscious again. A study of patients who emerged from anesthesia but were still paralyzed from neuromuscular blockers gave reports of panic, suffocation, and a feeling of already being dead (*Thomsen et al. 2015*). These experiences were horrific enough to trigger post-traumatic stress disorder (PTSD) in some unfortunate patients.

The above papers show that vecuronium or pancuronium, or any other paralytic drug, should only be used in patients that are anesthetized and unconscious. In documented cases where patients or experimental subjects were awake but paralyzed, intolerable and damaging experiences of pain, panic, and suffocation occurred.

*B. Pharmacology and Clinical Effects of Potassium Chloride*

Potassium chloride for injection is an electrolyte solution used for the treatment of hypokalemia, which means low blood-potassium levels (*Potassium Chloride for Injection Prescribing Information*). Hypokalemia can be life-threatening and can lead to dysfunction of excitable tissues such as cardiac, skeletal, and smooth muscle (*Kruse and Carlson 1990*). The low potassium of hypokalemia may result in muscular paralysis, respiratory failure, and cardiac abnormalities, which can be fatal.

Potassium chloride for injection is also used in late-term abortions of a fetus with genetic or severe, non-viable abnormalities (*Isada et al. 1992, Senat et al. 2002, Sfakianaki et al. 2014*). In these cases, potassium chloride is delivered directly into the fetal heart chamber or into the umbilical vein.

There are a few cases of high-dose potassium-chloride injection in awake patients, which only occurs as a result of an accident or intentional homicide in the hospital setting (*Wetherton et al. 2003*). The earliest report of an accidental high dose of IV potassium chloride due to improper mixing was in a male patient who immediately complained of a severe pain moving up his arm (above the site of the IV) and a ringing in his ears (*Lankton et al. 1973*). The patient then lost

Exhibit 16 Page 20

*Expert Report: AR lethal injection pharmacology*

consciousness, stopped breathing, and his heart stopped beating. Another case study in that same year reported that an IV infusion of potassium chloride produced severe pain at the site of the IV infusion (*Williams 1973*). In a forensic report of four IV potassium-chloride-induced deaths at hospital, one man who accidentally received a high-dose IV infusion of potassium chloride screamed out in pain (*Wetherton et al. 2003*). Potassium-chloride IV injections are also documented as a rare method of suicide in health care workers, but self-reports of the effects noted by these persons are unavailable (*Battefort et al. 2012, Bertol et al. 2012*).

The above studies show that IV administration of potassium chloride at high doses leads to severe pain in awake, unanesthetized patients.

### C. Importance of Achieving General Anesthesia

In the case of lethal injection using a three-drug protocol, it is crucial to insure that the first drug achieves General Anesthesia because of the intolerable effects of the second drug (muscle paralytic) and third drug (potassium chloride).

Clinical experience with non-responsive patients shows that a cautious approach to the risk evaluation of midazolam's ability to produce General Anesthesia should be taken. Patients that are non-responsive are diagnosed of being in a vegetative state after repeated tests of consciousness show no evidence of sustained, reproducible, purposeful, or voluntary behavioral response to visual, auditory, tactile, or noxious stimuli (*MacDonald et al. 2015*). These tests in non-responsive patients are the same as tests used by anesthesiologists to detect the surgical plane of anesthesia. In the non-responsive patients, studies show that up to 43% of these patients that are diagnosed as vegetative are actually aware or conscious. Additionally, studies document that some patients are not unconscious even when strong general anesthetics, like pentobarbital or inhalation agents, are used. (*Escallier et al. 2014*) These findings mandate a conservative approach to questions of the first drug used in a three-drug lethal injection protocol. In other words, even under the best circumstances, clinicians assessing non-responsive patients and anesthesiologists inducing general anesthesia appear to get it wrong a significant percentage of the time and their patients are not unconscious (or anesthetized) as often as they think.

Because even trained anesthesiologists using powerful anesthetic drugs fail to detect awareness or consciousness a significant proportion of the time, the "consciousness check" articulated in Section IV.2.h(1) of Arkansas's lethal injection protocol does not provide any assurance that the condemned inmate will be sufficiently anesthetized or that he will not experience the pain and suffering caused by the second two drugs in Arkansas's protocol. According to Section 1.1 of the protocol, the "Deputy Director, or designee" who performs the consciousness check need not even be a physician or nurse, much less an anesthesiologist. Further, because it is pharmacologically impossible for midazolam to produce a state of General Anesthesia, as discussed above in Section 2 and further below in Section 5, any determination that the prisoner is unconscious when not in a state of General Anesthesia would by definition be erroneous.

Exhibit 16 Page 21

*Expert Report: AR lethal injection pharmacology*

D. *Summary*

*i.* Vecuronium administration produces paralysis of muscles, including muscles that promote breathing, preventing movement in patients undergoing surgery.

*ii.* Vecuronium administered to unanesthetized subjects in clinical studies gives rise to pain, panic, and suffocation, without a means to communicate this to others due to complete muscle paralysis.

*iii.* Potassium chloride is used to produce cardiac arrest (stop the heart) in the condemned inmate.

*iv.* Studies show that use of potassium chloride by IV injection in an awake and unanesthetized patient leads to severe pain radiating from the site of the IV infusion and cessation of breathing and heart function while conscious.

*v.* The condemned inmate must be in a state of General Anesthesia, noted by loss of consciousness and the inability to respond to a noxious stimulus, before the administration of vecuronium and potassium chloride.

**5. Calculation of the 'Ceiling Effect' Dosage of Midazolam Used in Lethal Injection**

This section discusses the concept of the "ceiling effect" in further detail. It calculates the ceiling-effect dose of midazolam using a methodology described below; it then discusses other clinical studies regarding midazolam's ceiling effect and their bearing on the calculation contained herein.

A. *Introduction to the Issue of the 'Ceiling Effect' With an IV Bolus Dose of Midazolam*

The 'ceiling effect' refers to the fact that greater doses of midazolam do not produce a greater pharmacological effect. The ceiling effect is well-known for midazolam and all similar drugs in the class called benzodiazepine sedative-hypnotics. By way of contrast, there is no ceiling effect seen with barbiturate sedative-hypnotics like thiopental and pentobarbital (see Section 2D above). The ceiling effect of midazolam and other benzodiazepines is not controversial and is portrayed in many introductory pharmacology textbooks (see Fig. 1 above).

As detailed in Section 2D above, benzodiazepines (including midazolam) act by enhancing the inhibitory effect of the neurotransmitter, GABA, on brain neurons. The decrease in neuronal activity produced by the inhibitory neurotransmitter, GABA, is not 'all or none'. GABA simply decreases the ongoing activity of neurons by a graded amount, depending on how much GABA is present. GABA is a limited resource in the brain, as it is made and released by inhibitory brain neurons, which are finite in number. Therefore midazolam is limited in its action by the amount of GABA present, whereas barbiturates are not limited by the amount of GABA present.

Exhibit 16 Page 22

*Expert Report: AR lethal injection pharmacology*

A little more pharmacology of benzodiazepines' mechanism of action and an analogy is needed. Midazolam and other benzodiazepines potentiate the binding of GABA at the GABA$_A$ receptor, but at a site different than where GABA binds. This is called allosteric modulation. To use an analogy, the allosteric action of midazolam might be thought of as a Boy Scout helping an elderly woman (GABA) across the street. The woman can cross the street without the Boy Scout (midazolam) but his presence and assistance helps the elderly woman move faster. Midazolam and other benzodiazepines can only enhance GABA action and have no inhibitory action on brain neurons on their own. By this allosteric mechanism of action, benzodiazepines have an innate 'ceiling effect' and can only produce sedation on a limited plateau. Using our analogy, the Boy Scout can move the elderly woman across the street only so fast, the act of getting the woman across the street is still limited by the ability of the woman to ambulate on her own two legs. There is a 'ceiling effect' in how fast the woman can cross the street, even if two or more Boy Scouts were to help her.

Most telling that midazolam has a ceiling effect is the lack of a fatal blood level range for midazolam in the latest compendium of therapeutic, toxic, and fatal blood levels of over 1,000 drugs (*Schulz et al. 2012*). **Table 5 below shows the blank space for the fatal blood levels of midazolam. There are few fatalities.**

*Table 5. Therapeutic, toxic, and lethal ranges of pentobarbital and midazolam blood concentrations. Note the lack of fatal concentration ranges for midazolam. From Schulz et al. 2012.*

| Substance | Blood-plasma concentration (mg/L) | | | t½ (h) |
|---|---|---|---|---|
| | therapeutic ("normal") | toxic (from) | comatose-fatal (from) | |
| Pentobarbital | 1-5 (-10) | 10-19 | 15-25 | 20-40 |
| Midazolam | 0.04-0.1 (-0.25)[134] | 1-1.5 | | 1.5-3[46] |

## B. Calculation of Ceiling Effect

This subsection calculates midazolam's ceiling effect using a modeling approach based on extrapolation from *in vitro* and cell-culture testing. The calculation considers that the Arkansas Lethal Injection Protocol employs two syringes with 250 mg midazolam each for a total of 500 mg. The State's procedure also states that "*after at least five (5) minutes have elapsed since commencing the administration of syringe 1A* [the first 250 mg midazolam syringe]*, the Deputy Director, or designee, will confirm the condemned inmate is unconscious by using all necessary and medically-appropriate methods.*" Accordingly, the present subsection ultimately seeks to answer whether midazolam's ceiling effect is reached at or below (1) the brain concentration of midazolam produced immediately after the IV bolus administration[2] of a 500 mg midazolam dose and (2) the brain concentration 5 minutes after IV midazolam administration.

The first step of this modeling approach is to determine the concentration at which midazolam's ceiling effect occurs in studies done *in vitro* (using brain cells in a laboratory dish). Second, a calculation of the blood concentration of midazolam following a 500 mg IV bolus dose

---

[2] Bolus means a single IV injection all at one time as opposed to continuous infusion at a lower rate.

Exhibit 16 Page 23

*Expert Report: AR lethal injection pharmacology*

is made based on blood concentrations of midazolam following clinically-used doses. Third, based on the pharmacological data of midazolam crossing into the brain in preclinical studies, the extent of the 500 mg midazolam dose that enters the brain is calculated. Fourth, published studies are researched to calculate the concentration of midazolam in the brain after a 500 mg IV dose. Finally, by comparing the concentration of midazolam that produces a ceiling effect in studies done *in vitro* with the calculated concentration of midazolam in the human brain after a 500 mg dose, the ceiling-effect dose is calculated.

<u>i. Ceiling Effect of Midazolam and Other Benzodiazepines Observed In Vitro</u>

This subsection will highlight cell culture *in vitro* studies and preclinical (animals) studies from the medical literature that determined the ceiling effect of midazolam and other benzodiazepines. These studies will provide specific numerical values that can be used to model the concentration in the brain of a condemned inmate after a 500 mg IV dose of midazolam.

Table 6 below shows the threshold dose(s) that produced the observed ceiling effect in published studies of in vitro experiments. Most studies of diazepam show a ceiling effect threshold at 100 nM and <u>all three studies of midazolam gave 100 nM as the concentration producing a ceiling effect.</u>[3]

---

[3] Drug concentrations are measured with different units in different types of experiments or clinical studies. The in vitro studies presented in this subsection use Molar Concentration, which is basically a certain number of grams (1 Mole) in a liter of solution. 1 Mole of a drug in 1 Liter of solution gives a 1.0 M concentration. Then, using the metric system prefixes, we know that 1 M = 1000 mM (milli-Mole) which equals 1,000,000 µM (micro-Mole), which is equal to 1,000,000,000 nM (nano-Mole). For these types of studies, the drug solutions are mixed to make up different strengths, like 1 nM, 10 nM, 100 nM, and 1000 nM, and these different solutions are bathed on different sets of cells in a Petri dish and the pharmacological effects measured. The results shown below for the in vitro studies of benzodiazepine effects use drug solutions in the units of nM.

Other units are used in other studies below. Concentration of drug in blood is often given in ng/mL (nano-grams per milli-Liter). Again using the metric system prefixes, we know that 1 g (gram) equals 1000 mg (milli-grams) equals 1,000,000 µg (or mcg; micro-gram) equals 1,000,000,0000 ng (nano-gram). Finally, doses of drugs are administered on a per weight basis, such as 2 mg/kg, or as the same dose for everybody, such as 500 mg dose of midazolam administered intravenously (IV).

Exhibit 16 Page 24

*Expert Report: AR lethal injection pharmacology*

*Table 6. Summary of selected studies showing ceiling effect of diazepam and midazolam*

| Benzodiazepine | Ceiling effect at: | Preparation | Reference |
|---|---|---|---|
| Diazepam | 10 nM[a] | Cell culture (mouse spinal neurons) | *Skerritt and Macdonald (1984)* |
| Diazepam | 100 nM | Cell culture (oocytes) | *Sigel and Baur (1988)* |
| Diazepam | 50-100 nM | Cell culture (mouse spinal neurons) | *Rogers et al. (1994)* |
| Diazepam | 100 nM | Cell culture (HEK cells) | *Li et al. (2013)* |
| Diazepam | 100 nM | Cell culture (oocytes) | *Rüsch and Forman (2005)* |
| Midazolam | 100 nM | Brain slices (rat) | *Rovira and Ben-Ari (1999)* |
| Midazolam | 100-200 nM | Brain slices (rat) | *Bai et al. (2001)* |
| Midazolam | 100 nM | Cell culture (oocytes) | *Rüsch and Forman (2005)* |

[a] nM stands for 'nanomolar' which is a concentration term relating the number of drug molecules in a liter of solution.

A ceiling effect, which is really just a limit on the potency of a drug (see discussion of partial agonists in Section 2D), was noted with benzodiazepines, including diazepam (Valium®) and midazolam (Versed®), in the research studies that determined the mechanism of action for benzodiazepine drugs. Samples of figures from these original research papers are reproduced below (next two page) so that it will be obvious that a ceiling effect is documented and pervasive in the scientific and pharmacological literature.

Figures 4-7 on the next two pages show the actual graphs that confirm a ceiling effect for the benzodiazepines diazepam and midazolam from *in vitro* studies. The ceiling effect on these figures is denoted by a horizontal dashed blue line; this is the plateau that is reached where benzodiazepines given at higher concentrations do not produce greater effects.

Figure legends under the graphs further explain the graphs and the ceiling effect concentration. This is the lowest concentration of drug that produces the plateau effect or ceiling effect.

Exhibit 16 Page 25

*Expert Report: AR lethal injection pharmacology*



**Fig. 4.** Various doses of the benzodiazepine, Diazepam, were added with GABA (open circles) and other drugs and the current measured on the vertical scale (Y-axis). Arrow shows ceiling effect threshold at 100 nM. Horizontal dash line shows the ceiling effect. From Fig. 4 in *Li et al. 2013*.



**Fig. 5.** Various doses of the benzodiazepine, Diazepam (closed circle, top curve) were applied to cells in the presence of GABA and the current measured on the vertical scale (Y-axis). Arrow shows ceiling effect threshold at $10^{-7}$ M which is equal to 100 nM. Horizontal dash line shows the ceiling effect. From Fig. 4 in *Sigel and Baur 1988*.

*Expert Report: AR lethal injection pharmacology*



**Fig. 6.** Various doses of Midazolam (closed circle, top curve) along the horizontal scale (x-axis) were applied to cells in the presence of GABA and current measured on the vertical scale (Y-axis). Arrow shows ceiling effect threshold at 0.1 μM which is equal to 100 nM. Horizontal dash line shows ceiling effect. From Fig. 5B in *Bai et al. 2001.*



**Fig. 7.** Various doses of Midazolam (closed circle, top curve) or Diazepam (closed squares, bottom curve) along the horizontal scale (x-axis) were applied to cells in the presence of GABA and current measured on the vertical scale (Y-axis). Arrow shows ceiling effect threshold at $10^{-7}$ M which is equal to 100 nM. Horizontal dash line shows ceiling effect. From Fig 2A in *Rüsch and Forman 2005.*

Exhibit 16 Page 27

*Expert Report: AR lethal injection pharmacology*

## ii. Blood Levels of 500 Mg Midazolam after IV Bolus Dose in Humans

As mentioned above, there are no studies in the literature that give the blood concentrations of midazolam following a 500 mg IV dose in humans, as this is higher than approved clinical doses. However, it is possible to review the blood concentrations in humans from studies examining the blood concentrations after clinical doses of IV midazolam. The data from these studies can then be used to model the blood concentrations of midazolam after a 500 mg IV dose.

A clinical study measured the peak amount of midazolam in the blood after IV bolus administration of 5 mg midazolam in eight healthy volunteers (*Schwagmeier et al. 1998*). This study gave peak blood concentrations of nearly 120 ng/mL (nanogram per milliliter) after a 5 mg IV dose. It follows then that with a 500 mg IV dose, the initial amount after direct IV bolus infusion is 100 times of what occurred with the 5 mg dose, which gives <u>an initial blood concentration of 12,000 ng/mL of midazolam after a 500 mg IV dose</u>.

A direct linear modeling of the 500 mg IV dose from the 5 mg dose is supported by other studies. In a more recent study using half of the above 5 mg IV dose, a 2.5 mg IV dose of midazolam, the peak blood concentration of 51.2 ng/mL which is about half the peak blood concentration seen in the above clinical study using a 5 mg IV dose of midazolam (*Veldhorst-Janssen et al. 2011*). Therefore it is not unreasonable to use this linear relationship to extrapolate as is done above

Given the estimate that the initial concentration of midazolam in the blood after a 500 mg IV bolus dose is 12,000 ng/mL, the next determination is to model the fall of midazolam blood concentration over time to determine the amount of midazolam that is available for transfer to the brain during the first 5 minutes. Five minutes is a crucial time point, as the Arkansas Department of Corrections Lethal Injection Procedure mandates that the offender being put to death will be checked for unconsciousness at least 5 minutes after the infusion of midazolam begins.

In order to determine the midazolam blood concentrations over time, it is necessary to have established pharmacokinetic data for IV midazolam. A key paper in this regard examined the pharmacokinetic data after dosing volunteers with 0.1 mg/kg midazolam IV infusions after 1 minute, 1 hour, and 3 hour lengths of infusion (*Greenblatt et al. 2004*). The dosing of midazolam with a 1 minute bolus infusion in this study comes closest to the method to be used by the Arkansas Department of Corrections (see above). Using these data from this study,[4] it was possible to model the blood concentration curve over time following the IV dose of 500 mg midazolam (see Fig. 8 next page). The modeling of the blood concentration curve following a 500 mg IV midazolam dose was done using an Excel spreadsheet, as noted in the scientific literature (*Chamberlain 2003*) and was done above in Section 3B.

---

[4] The Greenblatt study found that a midazolam IV dose given in 1 minute had a half-life of immediate distribution (t½ alpha) of 21 min and a half-life of elimination (t½ beta) of 171.6 minutes. These parameters were plugged into the spreadsheet formula to give the model data plotted in Fig. 8.

Exhibit 16 Page 28

*Expert Report: AR lethal injection pharmacology*



**Fig. 8.** Blood concentration curve following a single IV bolus dose of 500 mg midazolam. Inset shows the region of the plot from 0-5 minutes. See text for further details. Arrows denote the initial blood concentration of midazolam and midazolam concentration after 5 minutes (inset).

The key parameters calculated above are that following the 500 mg IV dose of midazolam, the initial highest concentration of midazolam is 12,000 ng/mL and after 5 minutes, the concentration of midazolam is 10,200 ng/mL.

<u>iii. Extent of Midazolam Entering the Human Brain after an IV Bolus Dose</u>

Studies that show the amount or extent of midazolam that enters the human brain would be best done by administering an IV dose in numerous people and then sampling brain tissue at various time points afterwards. These studies, of course, cannot be done. However, a number of preclinical studies in animals provide reliable data about the fraction of midazolam that crosses into the brain from the blood. These studies are reviewed next and will provide a value that can be used to determine the amount or extent of midazolam that enters the human brain after a 500 mg IV dose.

It should first be noted that drugs in the blood bind to blood proteins such as albumin and gamma-globulins and the amount of protein binding varies with each drug. This is important as only the free (unbound) drug is available to cross from the blood into the brain to exert its effect. Midazolam is a drug with high blood-protein binding, on the order of 94-97% (*Fragen*

Exhibit 16 Page 29

*Expert Report: AR lethal injection pharmacology*

*1997*). Using 95% as an estimate, this gives only 5% of the amount of midazolam in the blood available for crossing the blood-brain barrier and entering the brain. Taking this into account for the two key parameters of interest noted above, a 500 mg IV bolus of midazolam gives <u>an initial free-drug blood concentration of 600 ng/mL</u> (12,000 X 0.05) and a <u>free-drug blood concentration at 5 minutes of 510 ng/mL</u> (10,200 X 0.05).

Preclinical studies of the fraction of midazolam that enters the brain after an IV dose are done by sampling the cerebrospinal fluid (CSF) along with the blood at various times after midazolam administration (*Arendt et al. 1983, Jones et al. 1988*). The CSF is a good surrogate for the fluid surrounding the brain cells, as it is relatively protein-free so there is little to no binding of drugs to proteins like that which occurs in the blood. The CSF circulates around and through the brain and spinal cord, bathing these tissues (*Lin 2008*). Fig. 9 below shows the concentration of midazolam in the blood and in brain CSF at the same time points from the paper by *Arendt 1983*.



**Fig. 9.** Midazolam-concentrations curve in blood (plasma, top curve) and in brain CSF (bottom curve) after a single 10 mg/kg IV bolus dose. Note that the CSF concentration is much less than blood at all time points but mirrors the blood curve. From Fig. 2 (left panel) in *Arendt et al. (1983).*

The calculations performed in the study shown in Fig. 9 yielded a brain CSF/blood concentration ratio of 0.14 or 14% (*Arendt et al. 1983*). This ratio can be used in our determinations of brain concentration after 500 mg IV dose of midazolam to calculate that an <u>initial blood concentration of 600 ng/mL midazolam equals 84 ng/mL in the brain</u> (600 X 0.14) <u>and at 5 minutes after start of infusion, the blood concentration of 510 ng/mL is equal to 71.4 ng/mL</u> (510 X 0.14) in the brain.

Exhibit 16 Page 30

*Expert Report: AR lethal injection pharmacology*

iv. Dosage of IV Midazolam That Produces a Ceiling Effect in Humans

The above data gave the measurement of midazolam in blood in the units of ng/mL, or nanogram per milliliter, is a weight per volume measure, like mixing a teaspoon of salt in a glass of water). However, the existing data on the concentration of midazolam that produces a ceiling effect from *in vitro* studies reviewed above gave a value of 100 nM (nanomolar), which is in different units. The brain concentration of midazolam, as calculated in ng/mL above, must be converted to nanomolar terms to compare it with the existing *in vitro* data showing that midazolam's ceiling effect occurs at a midazolam concentration of 100 nM. This conversion is done by using the molecular weight of midazolam which gives the relationship between grams and moles.[5] For example, a concentration of midazolam of 32.6 ng/mL in the brain equals 100 nM in molar terms.

The calculated values of the brain concentrations of midazolam following a 500 mg IV dose gave an estimate of 84 ng/mL when the infusion begins and 71.4 ng/mL after 5 minutes elapsed from the start of the infusion. These two values expressed in nM are: 84 ng/mL = 257.9 nM and 71.4 ng/mL = 219.2 nM.

Given that midazolam shows ceiling effects at 100 nM concentration (see Table 6 above), the estimated initial brain concentration for midazolam using a 500 mg IV dose is about 2.6 times higher (at 257.9 nM) than the concentration of midazolam that produces a ceiling effect (100 nM). Five minutes[6] after the 500 mg IV midazolam administration, the brain concentrations for midazolam are estimated to be 219.2 nM or approximately double the ceiling effect concentration of 100 nM shown in preclinical studies (Table 6).

The midazolam dose that results in a 100 nM concentration of midazolam, the ceiling effect concentration, is obtained by using the values of brain concentration obtained with a 500 mg IV dose above after 5 minutes. A 500 mg IV dose gives a brain concentration of 219.2 nM after 5 minutes which is 2.192 times the ceiling effect concentration of 100 nM. Therefore, a dose that is 2.192 times less than 500 mg is 228 mg. Thus, a 228 mg IV dose of midazolam would be expected to reach the threshold concentration of midazolam to produce a ceiling effect after 5 minutes.

*C. Comparison to clinical studies*

Midazolam's anesthetic effects have also been studied in the clinical setting. This section provides an overview of bispectral analysis (BIS), reports results based on BIS, and discusses discrepancies between the ceiling effect calculated using the above modeling method and the ceiling effect noted in BIS-based studies.

---

[5] Calculations were assisted by the Molar solution concentration calculator found at *www.physiologyweb.com.*

[6] Five minutes was chosen as the time point to examine as that is the time after midazolam administration that the first consciousness check is performed according to the Arkansas lethal injection protocol.

Exhibit 16 Page 31

*Expert Report: AR lethal injection pharmacology*

### i. Bispectral Analysis (BIS)

Scientific models of consciousness rely on the measurement of activity in different areas of the brain and the known functions associated with them. When a general anesthetic is given, there is inhibition of the activity in the higher-order association areas of the brain more so than in the primary processing areas of the brain (*MacDonald et al. 2015*). Most telling, as patients come out of general anesthesia, there is dramatic and sudden activation of the higher-order association areas of the brain regions that correlates with patient responding to verbal commands (*Långsjö et al. 2012*). To a first approximation, consciousness is correlated to activity in brain-association areas and therefore unconsciousness is correlated to lack of activity in these brain association areas.

Researchers and clinicians have developed a way to measure the depth of general anesthesia using the technique of electroencephalograms (EEG). The EEG recordings are processed by the computer with a method called bispectral analysis, or BIS (*Escallier et al. 2014*). BIS gives a single number, on the scale from 100 (completely awake and alert) to 0 (coma and EEG burst suppression). BIS values are the most common objective means for assessing the effects of anesthetic agents, with lower values correlated to greater degrees of brain-activity depression.

Clinical signs of anesthesia correlate moderately well with BIS scores (*Weaver et al. 1970*). BIS values less than 60 are targeted during general anesthesia procedures as that is the depth of anesthesia associated with lack of awareness (*Weaver et al. 1970*). In this study, BIS values of 60 or less correlated with General Anesthesia, 65 with Deep Sedation and 80 to Moderate Sedation (see ASA table in section 2E above). Later studies have verified that a BIS value of 40-60 is considered to reflect the state of General Anesthesia (*Escallier et al. 2014*). For example, one study showed the BIS levels of patients who moved at skin incision (mean BIS value of 65) was greater than patients who did not move in response to skin incision (mean BIS value of 40) (*Johansen and Sebel 2000*).

Using thiopental doses to induce (but not maintain general anesthesia) gave BIS values as low as 60 (*Yoo et al. 2012*). Pentobarbital has decreased the depth of General Anesthesia in cases of intractable seizures to BIS values as low as 3 to induce barbiturate coma (*Jaggi et al. 2003*). These studies show that barbiturates are capable of reducing BIS levels consistent with General Anesthesia, and that high-dose administration of barbiturates can reduce cortical brain activity to near zero.

### ii. Clinical studies of midazolam and BIS

Generally, midazolam is used as a premedicant before general anesthesia or for regional anesthesia (*Khanderia and Pandit 1987*). Midazolam is a less reliable induction agent than thiopental and induction of anesthesia using midazolam alone is unpredictable. Clinically, benzodiazepines such as midazolam are not used as much for anesthesia or induction of anesthesia but for conscious sedation (*Giovannitti and Trapp 1991*). Conscious sedation is a drug-induced state of relaxation where the patient remains conscious with reflexes intact and

*Expert Report: AR lethal injection pharmacology*

little effect on cardiovascular or respiratory function (see ASA table in section 2E above). Midazolam is often used with an opioid analgesic in outpatient procedures such as colonoscopy and oral surgery.

Clinical studies examining the relationship of midazolam's BIS values to the level of sedation are considered first. BIS values of in the range of 77-92 were reported after repeated IV doses of midazolam in a surgical outpatient study (*Sandler 2000*). In surgery patients, the BIS threshold for responding to a verbal command after midazolam was 80, whereas patients did not respond to verbal command when a BIS score of 77 was observed (*Ibrahim et al. 2001*). In a clinical study using adult healthy volunteers, IV midazolam was infused until patients become unresponsive to mild prodding or shaking (*Lui et al. 1996*). Midazolam at total doses ranging from 4.5 to 20 mg IV decreased the BIS to a mean value of 69.

Clinical studies that show a ceiling effect of midazolam with regard to lowering the BIS values are described next. These studies noted that increasing doses of IV midazolam do not produce greater pharmacological effects in lowering the BIS values. One study noted that an IV midazolam dose of 0.3 mg/kg (25 mg for a typical 180 lb. adult) did not produce greater depression of the brain (as noted by the BIS value) than a dose of 0.2 mg/kg, or about 16 mg (*Miyake et al. 2010*). The authors note that a greater maximal effect was not seen in previous studies where IV midazolam showed a maximal dose of brain activity depression yielding a BIS value of 70, but not lower (*Ibrahim et al. 2002, Kuizenga et al. 2001*). These data suggest that a ceiling effect in humans occurs after an IV infusion dose of 25 mg.

The sedation that can be produced by midazolam, **and the lack of General Anesthesia at any dose,** is insufficient to render the prisoner insensate to the torturous effects of vecuronium bromide and potassium chloride. A prisoner sedated only with midazolam would be conscious of the suffocating effects of vecuronium bromide but, as a result of its paralytic properties, be unable to communicate his or her distress. The prisoner would also be subjected to the burning sensation of the 3rd drug, potassium chloride.

<u>iii. Comparison between modeling and clinical studies</u>

The dose of IV midazolam that produces a ceiling effect in clinical studies is lower (25 mg) than the theoretical ceiling-effect dose calculated above (228 mg). The difference in these results are not unexpected. The ceiling-effect dose of 25 mg comes from clinical studies examining midazolam's effects in patients. The calculated ceiling dose of 228 mg midazolam is mainly based on in vitro and preclinical studies. It is likely that that *in vitro* data using cell cultures are less sensitive to midazolam compared to the clinical effects of midazolam in patients.

Significantly, the ceiling effect of midazolam in the range of 25 to 228 mg IV means that increasing doses of midazolam do not produce increasing effects. The ceiling effect of midazolam is the reason why midazolam cannot produce the general anesthesia needed for a first drug in a three drug protocol.

Exhibit 16 Page 33

*Expert Report: AR lethal injection pharmacology*

D. Summary

The findings from this section are:

*i.* The ceiling effect of midazolam is a direct result of midazolam's mechanism of action. Pentobarbital and other barbiturates have a different mechanism of action and therefore do not exhibit a ceiling effect.

*ii.* Research done *in vitro* shows that the ceiling effect of midazolam occurs, under those conditions, at a concentration of 100 nM.

*iii.* An IV bolus dose of 500 mg midazolam produces a brain concentration that is 2 times higher than the concentration of midazolam that produces a ceiling effect at 5 minutes.

*iv.* An IV bolus dose of 228 mg midazolam is sufficient to reach the threshold of midazolam's ceiling effect at 5 minutes after administration. Amounts beyond that dose are not expected to produce a greater effect.

*v.* Clinical studies show that the ceiling effect of IV midazolam occur at infusion doses of about 25 mg. These studies show that greater midazolam doses do not produce greater depression of brain activity and cannot produce a state of General Anesthesia.

*vi.* Midazolam at a dose of 500 mg IV cannot be relied on to render someone sufficiently unconscious to block the noxious stimuli that will occur from the application of the remaining drugs in the protocol.

### 6. Pharmacological Considerations of Alternative One-Drug Protocols for Lethal Injections

*Anesthetic Gases Produce General Anesthesia and Overdose Death*

While IV anesthetics like thiopental, pentobarbital, or propofol are used to induce anesthesia, inhalational agents (gases) are generally used to maintain general anesthesia during surgical procedures (*Potyk 1998*). Halothane was the prototypical inhalational agent, but is no longer available in the U.S. due to a high incidence of hepatic toxicity with its use (*Rosenberg and Weaver 1991*). General anesthesia for most surgical operations is done using newer inhalational agents, like sevoflurane, desflurane, or isoflurane (*Ghatge et al. 2003*). Inhalational agents, like barbiturates, are potent activators of the $GABA_A$ receptor (*Franks and Lieb 1994*). Like barbiturates and unlike benzodiazepines, inhalational general anesthetics can produce their potent effects at the $GABA_A$ receptor with or without GABA present. Inhalational general anesthetics like sevoflurane, desflurane, and isoflurane also act on a number of other ion channels to shut down brain activity (*Franks 2006*).

Desflurane and isoflurane irritate the respiratory tract during induction of anesthesia, so they are used for maintaining general anesthesia once induction with another agent has occurred (*Rosenberg and Weaver 1991*). For that reason, only sevoflurane will be considered further in

Exhibit 16 Page 34

*Expert Report: AR lethal injection pharmacology*

this section. Sevoflurane is an ideal inhalational agent, as it can be also be used for induction of anesthesia and therefore substitute for an IV general anesthetic like thiopental, pentobarbital, or propofol (*Ghatke et al. 2003*). Sevoflurane is not pungent to the patient and produces a rapid onset of general anesthesia. A state of general anesthesia occurs within 2 minutes after administration of sevoflurane for induction and is quicker than after administration of isoflurane (*Ghatge et al. 2003, Sakai et al. 2005*).

As detailed in Section 5C above, a calculation based on the EEG activity (the BIS value) during administration of an anesthetic provides an objective measure of the level of sedation. A BIS value of 40-60 is considered to reflect the state of General Anesthesia (*Escallier et al. 2014*). Sevoflurane administration reliably produces a state of General Anesthesia and decreases BIS to values consistent with General Anesthesia or deeper, with BIS values as low as 10-20 (*Kreuer et al. 2008*). In a study of women undergoing C-section, sevoflurane decreased BIS to a mean value of 39 (*Zand et al. 2014*). For interventional radiology, BIS levels titrated to the range of 40-49 were needed to prevent movement of patients undergoing procedures with sevoflurane anesthesia (*Jung et al. 2015*).

Sevoflurane administration can lead to death by cardiac and respiratory depression, as shown by the forensic reports of cases involving sevoflurane overdose deaths (*Levine et al. 2007, Rosales et al. 2007*).

The procedures for administering an anesthetic gas requires less training than placement and delivery of a drug by IV. With sevoflurane, there is no need for IV access to induce anesthesia; sevoflurane is non-irritating and can be used directly for mask induction (*Sakai et al. 2005*). There is a cost for the equipment, and the anesthesia machine should include a waste gas scavenger system.[7] Because inhalational agents like sevoflurane are even more potent than barbiturates, they can be used in over-dosage as the sole lethal agent and would produce a rapid and painless death.

Equipment costs are relatively inexpensive, with used Anesthesia Machines, including sevoflurane and isoflurane vaporizers, available on Ebay and other medical-equipment-resale sites for around $2,000.[8] Newly manufactured machines may go for 3-5 times that cost depending on the model and features. Online training for personnel operating the Anesthesia Machines is available from manufacturers' websites.[9]

---

[7] Examples of various waste gas scavenger systems are given in the 2013 white paper entitled "Management of Waste Anesthetic Gases" from the American Association of Nurse Anesthetists (AANA) available at:
www.aana.com/resources2/professionalpractice/Documents/PPM%20Management%20Waste%20Ga s.pdf

[8] Ebay Anesthesia Machines at: *www.ebay.com/bhp/anesthesia-machine*

[9] For example, at http://static.draeger.com/trainer/apollo/apollo_trainer/start.html#id=A1100

Exhibit 16 Page 35

*Expert Report: AR lethal injection pharmacology*

The inhalant drugs sevoflurane, desflurane, and isoflurane are commercially available in FDA-approved forms. Sevoflurane is available from Abbvie Pharmaceuticals in North Chicago, IL; Piramal Critical in Bethlehem, PA; Baxter Health Corporation in Deerfield, IL; Halocarbon Products in Peachtree Corners, GA; and Shanghai Hengrui, in Shanghai, China. Desflurane (Suprane®) is sold by Baxter Health Corporation of Round Lake, IL. Isoflurane (Forane®) is also available from Baxter Health Corporation and four other manufacturers.

In summary, FDA-approved, fast-acting inhalant anesthetics are commercially available, and a massive overdose of such drugs would produce a rapid and painless death.

## 7. Overall Summary and Conclusions

*i.* The State's decision to substitute midazolam for pentobarbital or thiopental as the first drug in the three-drug lethal injection protocol was made without sound medical or scientific reasoning or expert pharmacological advice. Pharmacological substitution is a legitimate method to provide equal pharmacological effects when one drug may no longer be available. For example, the muscle paralytic pancuronium, the second drug in the three-drug lethal injection protocol, can be substituted with the muscle paralytic vecuronium without violating pharmacological equivalency, as the two drugs are in the same drug class and have the same mechanism of action. Pancuronium and vecuronium have pharmacological equivalency.

However, it is not pharmacologically defensible to substitute barbiturates (like pentobarbital or thiopental) with the benzodiazepine midazolam, because no pharmacological equivalency exists. The final evidence of midazolam's non-equivalency with thiopental or pentobarbital is the fact that no state has attempted to use midazolam in a one-drug lethal injection protocol. If midazolam and pentobarbital (or thiopental) were pharmacologically equivalent, midazolam could be used as the sole agent in a one-drug lethal injection protocol using, as many states have done, using a single barbiturate drug, namely pentobarbital. **The lack of one-drug lethal injection protocols using midazolam by any State in the Union is a tacit admission that midazolam and pentobarbital (or thiopental) are not pharmacologically equivalent**.

*ii.* Because midazolam cannot induce General Anesthesia, a prisoner sedated with midazolam would consciously experience the suffocating effects of the vecuronium bromide and the burning pain of the potassium-chloride injection. The consciousness check specified by Arkansas's lethal injection protocol provides no protection; inasmuch as midazolam is pharmacologically incapable of providing adequate anesthesia, any determination that the prisoner is adequately anesthetized would necessarily be erroneous. As such, Arkansas's lethal injection protocol is sure or very likely to cause serious pain and suffering. Due to the paralytic effects of vecuroniun bromide, such serious pain and suffering would likely be invisible to observers of the execution procedure.

iii. A single-drug execution protocol would significantly reduce the risk of pain and suffering. FDA-approved, fast-acting inhalant anesthetics are commercially available and would produce a rapid and painless death.

Exhibit 16 Page 36

*Expert Report: AR lethal injection pharmacology*

*I declare that I have examined this report and all statements contained herein, and to the best
of my knowledge and belief, they are true, correct and complete. My opinions stated herein are
based on high-level of scientific and medical certainty.*

Craig W. Stevens, Ph.D.

March 21, 2017
Date

Exhibit 16 Page 37

*Expert Report: AR lethal injection pharmacology*

## 8. References Cited

Arendt RM, Greenblatt DJ, deJong RH, Bonin JD, Abernethy DR, Ehrenberg BL, Giles HG, Sellers EM, Shader RI (1983) In vitro correlates of benzodiazepine cerebrospinal fluid uptake, pharmacodynamic action and peripheral distribution. J Pharmacol Exp Ther. 227:98-106.

Bai D, Zhu G, Pennefather P, Jackson MF, MacDonald JF, Orser BA (2001) Distinct functional and pharmacological properties of tonic and quantal inhibitory postsynaptic currents mediated by gamma-aminobutyric acid(A) receptors in hippocampal neurons. Mol Pharmacol. 59:814-824.

Battefort F, Dehours E, Vallé B, Hamdaoui A, Bounes V, Ducassé JL (2012) Suicide attempt by intravenous potassium self-poisoning: a case report. Case Rep Emerg Med. 2012:323818.

Bertol E, Politi L, Mari F (2012) Death by potassium chloride intravenous injection: evaluation of analytical detectability. J Forensic Sci. 57:273-275.

Bohnert AS, Valenstein M, Bair MJ, Ganoczy D, McCarthy JF, Ilgen MA, Blow FC. (2011) Association between opioid prescribing patterns and opioid overdose-related deaths. J. American Med Assoc 305:1315-1321.

Borgheini G (2003) The bioequivalence and therapeutic efficacy of generic versus brand-name psychoactive drugs. Clin Ther. 25:1578-1592.

Brenner GM, Stevens CW (2013) *Pharmacology*, 4th edition. Pharmacology textbook for medical and health professional students, Saunders/Elsevier, Philadelphia/London.

Brice DD, Hetherington RR, Utting JE (1970) A simple study of awareness and dreaming during anaesthesia. Br J Anaesth. 42:535-542.

Brodie BB, Burns JJ, Mark LC, Lief PA, Bernstein E, Papper EM (1953) The fate of pentobarbital in man and dog and a method for its estimation in biological material. J Pharmacol Exp Ther. 109:26-34.

Cestari IN, Uchida I, Li L, Burt D, Yang J (1996) The agonistic action of pentobarbital on GABA$_A$ beta-subunit homomeric receptors. Neuroreport 7:943–947.

Chakravarthy B, Shah S, Lotfipour S (2012) Prescription drug monitoring programs and other interventions to combat prescription opioid abuse. West J Emerg Med 13:422-5.

Chamberlain J (2003) The use of spreadsheets for pharmacokinetic simulations. Scientific World Journal 3:265-278.

Chang L-R, Barnard E, Lo MS, Dolly JO (1981) Molecular sizes of benzodiazepine receptors and the interacting GABA receptors in the membrane are identical. FEBS Lett. 126:309-312.

Chong ID, Sandefur BJ, Rimmelin DE, Arbelaez C, Brown CA 3rd, Walls RM, Pallin DJ (2014) Long-acting neuromuscular paralysis without concurrent sedation in emergency care. Am J Emerg Med. 32:452-456.

Cozanitis DA (2004) One hundred years of barbiturates and their saint. J R Soc Med. 97:594-598.

Cromer BA, Morton CJ, Parker MW (2002) Anxiety over GABA$_A$ receptor structure relieved by AChBP. Trends Biochem. Sci. 27:280–287.

Exhibit 16 Page 38

*Expert Report: AR lethal injection pharmacology*

D'Hulst C, Atack JR, Kooy RF (2009) The complexity of the GABAₐ receptor shapes unique pharmacological profiles. Drug Disc. Today 14:866-875.

Ehrnebo M (1974) Pharmacokinetics and distribution properties of pentobarbital in humans following oral and intravenous administration. .J Pharm Sci. 63:1114-1118

Ernst M, Brauchart D, Boresch S, Sieghart W (2003) Comparative modeling of GABAₐ receptors: limits, insights, future developments. Neuroscience 119:933–943.

Escallier KE, Nadelson MR, Zhou D, Avidan MS (2014) Monitoring the brain: processed electroencephalogram and peri-operative outcomes. Anaesthesia 69:899-910.

Fahey MR, Morris RB, Miller RD, Sohn YJ, Cronnelly R, Gencarelli P (1981) Clinical pharmacology of ORG NC45 (NorcuronTM): a new nondepolarizing muscle relaxant. Anesthesiology 55:6-11.

FDA (2015) list of all approved drugs (Appendix B to Orange Book), June 15, 2015. *www.fda.gov*

Fragen RJ (1997) Pharmacokinetics and pharmacodynamics of midazolam given via continuous intravenous infusion in intensive care units. Clin Ther. 19:405-419.

Franks NP, Lieb WR (1994) Molecular and cellular mechanisms of general anaesthesia. Nature. 367:607-14.

Ghatge S, Lee J, Smith I (2003) Sevoflurane: an ideal agent for adult day-case anesthesia? Acta Anaesthesiol Scand. 47:917-931.

Giovannitti JA, Trapp LD (1991) Adult sedation: oral, rectal, IM, IV. Anesth Prog. 38:154-71.

Greenblatt DJ, Shader RI, Abernathy DR (1983) Current status of benzodiazepines. N Engl J Med. 309:354-358.

Greenblatt DJ, Ehrenberg BL, Culm KE, Scavone JM, Corbett KE, Friedman HL, Harmatz JS, Shader RI (2004) Kinetics and EEG effects of midazolam during and after 1-minute, 1-hour, and 3-hour intravenous infusions. J Clin Pharmacol. 44:605-611.

Greenfield LJ (2013) Molecular mechanisms of antiseizure drug activity at GABAₐ receptors. Seizure 22:589-600.

Grond S, Radbruch L, Lehmann KA (2000) Clinical pharmacokinetics of transdermal opioids: focus on transdermal fentanyl. Clin Pharmacokinet. 38:59-89.

Harvey SC (1980) Chapter 17 Hypnotics and Sedatives, In: Gilman AG, Goodman LS, and Gilman A (Eds.) Goodman and Gilman's The Pharmacological Basis of Therapeutics, Sixth Edition, Macmillan Publishing Co., New York, NY.

Hibbs RE, Zambon AC (2011) Chapter 11. Agents Acting at the Neuromuscular Junction and Autonomic Ganglia. In: Brunton LL, Chabner BA, Knollmann BC (Eds.) Goodman and Gilman's The Pharmacological Basis of Therapeutics, Twelfth Edition, Macmillan Publishing Co., New York, NY.

Hilgenberg JC (1983) Comparison of the pharmacology and vecuronium and atracurium with that of other currently available muscle relaxants. Anesth Analg. 62:524-531.

Exhibit 16 Page 39

Houston CM, McGee TP, Mackenzie G, Troyano-Cuturi K, Rodriguez PM, Kutsarova E, Diamanti E, Hosie AM, Franks NP, Brickley SG (2012) Are extrasynaptic GABA$_A$ receptors important targets for sedative/hypnotic drugs? J Neurosci. 32:3887-3897.

Howie JG (1975) Psychological medicine. Psychotropic drugs in general practice. Br Med J. 2:177-179.

Ibrahim AE, Taraday JK, Kharasch ED (2001) Bispectral index monitoring during sedation with sevoflurane, midazolam, and propofol. Anesthesiology 95:1151-1159.

Ibrahim AE, Karim A, Feldman J, Kharasch ED (2002) The influence of parecoxib, a parenteral cyclooxygenase-2 specific inhibitor, on the pharmacokinetics and clinical effects of midazolam. Anesth Analg. 95:667-673.

Isada NB, Pryde PG, Johnson MP, Hallak M, Blessed WB, Evans MI (1992) Fetal intracardiac potassium chloride injection to avoid the hopeless resuscitation of an abnormal abortus: I. Clinical issues. Obstet Gynecol. 80:296-299.

Jackson MB, Lecar H, Mathers DA, Barker JL (1982) Single channel currents activated by gamma-aminobutyric acid, muscimol, and (-)-pentobarbital in cultured mouse spinal neurons. J Neurosci. 2:889-894.

Jaggi P, Schwabe MJ, Gill K, Horowitz IN (2003) Use of an anesthesia cerebral monitor bispectral index to assess burst-suppression in pentobarbital coma. Pediatr Neurol. 28:219-222.

Johansen JW, Sebel PS (2000) Development and clinical application of electroencephalographic bispectrum monitoring. Anesthesiology 93:1336-1344.

Jones DR, Hall SD, Jackson EK, Branch RA, Wilkinson GR (1988) Brain uptake of benzodiazepines: effects of lipophilicity and blood protein binding. J Pharmacol Exp Ther. 245:816-822.

Jung YS et al. (2015) The optimal anesthetic depth for interventional neuroradiology: comparisons between light anesthesia and deep anesthesia. Korean J Anesthesiol. 68:148-152.

Khanderia U, Pandit SK (1987) Use of midazolam hydrochloride in anesthesia. Clin Pharm. 6:533-547.

Kovac AL (2009) Sugammadex: the first selective binding reversal agent for neuromuscular block. J Clin Anesth. 21:444-453.

Kreuer S et al. (2006) A-line, bispectral index, and estimated effect-site concentrations: a prediction of clinical end-points of anesthesia. Anesth Analg. 102:1141-1146.

Kreuer S et al. (2008) Comparative pharmacodynamic modeling using bispectral and narcotrend-index with and without a pharmacodynamic plateau during sevoflurane anesthesia. Anesth Analg. 106:1171-1181.

Kruse JA, Carlson RW (1990) Rapid correction of hypokalemia using concentrated intravenous potassium chloride infusions. Arch Intern Med. 150:613-617.

Kuizenga K et al. (2001) EEG changes in relation to loss of consciousness during induction with thiopental, propofol, etomidate, midazolam or sevoflurane. Br J Anaesth. 86:354-360.

Exhibit 16 Page 40

*Expert Report: AR lethal injection pharmacology*

Långsjö JW1, Alkire MT, Kaskinoro K, Hayama H, Maksimow A, Kaisti KK, Aalto S, Aantaa R, Jääskeläinen SK, Revonsuo A, Scheinin (2012) Returning from oblivion: imaging the neural core of consciousness. J Neurosci. 32:4935-4943.

Lankton JW, Siler JN, Neigh JL (1973) Letter: Hyperkalemia after administration of potassium from nonrigid parenteral-fluid containers. Anesthesiology 39:660-661.

Lavoie AM, Twyman RE (1996) Direct evidence for diazepam modulation of GABA_A receptor microscopic affinity. Neuropharmacology 35:1383-1392.

Levine B et al. (2007) A fatality from sevoflurane abuse. J Anal Toxicol. 31:534-536.

Lexchin J, Kohler JC (2011) The danger of imperfect regulation: OxyContin® use in the United States and Canada. Int J Risk Saf Med. 23:233-40.

Li P, Eaton MM, Steinbach JH, Akk G (2013) The benzodiazepine diazepam potentiates responses of α1β2y2L γ-aminobutyric acid type A receptors activated by either γ-aminobutyric acid or allosteric agonists. Anesthesiology 118:1417-1425.

Lin JH (2008) CSF as a surrogate for assessing CNS exposure: an industrial perspective. Curr Drug Metab. 9:46-59.

Macdonald RL, Barker JL (1979) Anticonvulsant and anesthetic barbiturates: different postsynaptic actions in cultured mammalian neurons. Neurology 29:432-447.

MacDonald RL, Rogers CJ, Twyman RE (1989) Barbiturate regulation of kinetic properties of the GABA_A receptor channel of mouse spinal neurones in culture. J Physiol. 417:483-500.

MacDonald AA, Naci L, MacDonald PA, Owen AM (2015) Anesthesia and neuroimaging: investigating the neural correlates of unconsciousness. Trends Cogn Sci. 19:100-107.

Mack KA, Jones CJ, Paulozzi LJ (2013) Vital signs: overdoses of prescription opioid pain relievers and other drugs among women - United States, 1999-2010. MMWR Morb Mortal Wkly Rep 62:537-42.

Mathers DA, Barker JL (1980) Pentobarbital opens ion channels of long duration in cultured mouse spinal neurons. Science 209:507-509.

Meredith P (2003) Bioequivalence and other unresolved issues in generic drug substitution. Clin Ther. 25:2875-2890.

Miyake W et al. (2010) Electroencephalographic response following midazolam-induced general anesthesia: relationship to plasma and effect-site midazolam concentrations. J. Anesthesia 24:386-393.

Musshoff F, Padosch S, Steinborn S, Madea B (2004) Fatal blood and tissue concentrations of more than 200 drugs. Forensic Sci Int 2004, 142: 161-210.

Olsen RW, Snowman AM (1982) Chloride-dependent enhancement by barbiturates of gamma-aminobutyric acid receptor binding. J Neurosci. 2:1812-1823.

Perry SW (1985) Psychological reactions to pancuronium bromide. Am J Psychiatry 142:1390-1391.

Exhibit 16 Page 41

Pieters T, Snelders S (2007) From King Kong pills to mother's little helpers--career cycles of two families of psychotropic drugs: the barbiturates and benzodiazepines. Can Bull Med Hist. 24:93-112.

Potyk DK (1998) Overview of anesthesia for primary care physicians. West J Med. 168:517-521.

Regenthal R, Krueger M, Koeppel C, Preiss R (1999) Drug levels: therapeutic and toxic serum/plasma concentrations of common drugs. J Clin Monit Comput 15: 529-544

Reves JG, Fragen RJ, Vinik HR, Greenblatt DJ (1985) Midazolam: pharmacology and uses. Anesthesiology 62:310-324.

Rogers CJ, Twyman RE, Macdonald RL (1994) Benzodiazepine and beta-carboline regulation of single GABAA receptor channels of mouse spinal neurones in culture. J Physiol. 475:69-82.

Rosales CM et al. (2007) Sevoflurane concentrations in blood, brain, and lung after sevoflurane-induced death. J Forensic Sci. 52:1408-1410.

Rosenberg M, Weaver J (1991) General anesthesia. Anesth Prog. 38:172-186.

Rovira C, Ben-Ari Y (1999) Developmental study of miniature IPSCs of CA3 hippocampal cells: modulation by midazolam. Brain Res Dev Brain Res. 114:79-88.

Rüsch D, Forman SA (2005) Classic benzodiazepines modulate the open-close equilibrium in alpha1beta2gamma2L gamma-aminobutyric acid type A receptors. Anesthesiology 102:783-792.

Sakai EM et al. (2005) Inhalation anesthesiology and volatile liquid anesthetics: focus on isoflurane, desflurane, and sevoflurane. Pharmacotherapy 25:1773-1788.

Sancar F, Czajkowski C (2010) Allosteric modulators induce distinct movements at the GABA-binding site interface of the GABA-A receptor. Neuropharmacology. 60:520-528.

Sandler NA (2000) Additional clinical observations utilizing bispectral analysis. Anesth Prog. 47:84-86.

Schulz M, Iwersen-Bergmann S, Andresen H, Schmoldt A (2012) Therapeutic and toxic blood concentrations of nearly 1,000 drugs and other xenobiotics. Crit Care. 16:R136.

Schwagmeier R, Alincic S, Striebel HW (1998) Midazolam pharmacokinetics following intravenous and buccal administration. Br J Clin Pharmacol. 46:203-206.

Senat MV, Fischer C, Ville Y (2002) Funipuncture for fetocide in late termination of pregnancy. Prenat Diagn. 22:354-356.

Sessions JT Jr, Minkel HP, Bullard JC, Ingelfinger FJ (1954) The effect of barbiturates in patients with liver disease. J Clin Invest. 33:1116-1127.

Sfakianaki AK, Davis KJ, Copel JA, Stanwood NL, Lipkind HS (2014) Potassium chloride-induced fetal demise: a retrospective cohort study of efficacy and safety. J Ultrasound Med. 33:337-341.

Sieghart W (2015) Allosteric modulation of GABAA receptors via multiple drug-binding sites. Adv. Pharmacol. 72:53-96.

Exhibit 16 Page 42

Sieghart W, Ramerstorfer J, Sarto-Jackson I, Varagic Z, Ernst M (2012) A novel GABA$_A$ receptor pharmacology: drugs interacting with the α⁺β⁻ interface. Brit. J. Pharmacol. 166:476-485.

Sigel E, Baur R (1988) Allosteric modulation by benzodiazepine receptor ligands of the GABAA receptor channel expressed in Xenopus oocytes. J Neurosci. 8:289-295.

Sigel E, Barnard EA (1984) A gamma-aminobutyric acid/benzodiazepine receptor complex from bovine cerebral cortex. J. Biol. Chem. 259:7219-7223.

Sigel E, Steinmann ME (2012) Structure, function, and modulation of GABA$_A$ receptors. J. Biol. Chem. 287:40224-40231.

Skerritt JH, Macdonald RL (1984) Benzodiazepine receptor ligand actions on GABA responses. Benzodiazepines, CL 218872, zopiclone. Eur J Pharmacol. 101:127-134.

Smith RB, Dittert LW, Griffen WO, Doluisio JT (1973) Pharmacokinetics of pentobarbital after intravenous and oral administration. J Pharmaco Biopharm 1:5-16.

Smith SM, Brown HO, Toman JEP, Goodman LS (1947) The lack of cerebral effects of d-tubocurarine. Anesthesiology 8:1-14.

Study RE, Barker JL (1981) Diazepam and (-)-pentobarbital: Fluctuation analysis reveals different mechanisms for potentiation of γ-aminobutyric acid responses in cultured central neurons. Proc. Natl. Acad. Sci. USA 78:7180-7184.

Thomsen JL, Nielsen CV, Eskildsen KZ, Demant MN, Gätke MR (2015) Awareness during emergence from anaesthesia: significance of neuromuscular monitoring in patients with butyrylcholinesterase deficiency. Br J Anaesth. 115 Suppl 1:i78-i88.

Toon S, Rowland M (1983) Structure-pharmacokinetic relationships among the barbiturates in the rat. J Pharmacol Exp Ther. 225:752-763.

Topulos GP, Lansing RW, Banzett RB (1993) The experience of complete neuromuscular blockade in awake humans. J Clin Anesth. 5:369-374.

Veldhorst-Janssen NM, Fiddelers AA, van der Kuy PH, Theunissen HM, de Krom MC, Neef C, Marcus MA (2011) Pharmacokinetics and tolerability of nasal versus intravenous midazolam in healthy Dutch volunteers: a single-dose, randomized-sequence, open-label, 2-period crossover pilot study. Clin Ther. 33:2022-2028.

Weaver CS, Hauter WH, Duncan CE, Brizendine EJ, Cordell WH (2007) An assessment of the association of bispectral index with 2 clinical sedation scales for monitoring depth of procedural sedation. Am J Emerg Med. 25:918-924.

Webster LR, Cochella S, Dasgupta N, Fakata KL, Fine PG, Fishman SM, Grey T, Johnson EM, Lee LK, Passik SD, Peppin J, Porucznik CA, Ray A, Schnoll SH, Stieg RL, Wakeland W (2011) An analysis of the root causes for opioid-related overdose deaths in the United States. Pain Med. Suppl 2:S26-35.

Wetherton AR, Corey TS, Buchino JJ, Burrows AM (2003) Fatal intravenous injection of potassium in hospitalized patients. Am J Forensic Med Pathol. 24:128-131.

White JM, Irvine RJ (1999) Mechanisms of fatal opioid overdose. Addiction 94:961-972.

Exhibit 16 Page 43

*Expert Report: AR lethal injection pharmacology*

Williams RH (1973) Potassium overdosage: a potential hazard of non-rigid parenteral fluid containers. Br Med J. 1:714-715.

Winek CL, Wahba WW, Winek CL Jr, Balzer TW (2001) Drug and chemical blood-level data 2001. Forensic Sci Int 122: 107-123.

Woodcock J, Ropper AH, Kennedy SK (1982) High dose barbiturates in non-traumatic brain swelling: ICP reduction and effect on outcome. Stroke 13:785-757.

Yoo KY, Jeong CW, Jeong HJ, Lee SH, Na JH, Kim SJ, Jeong ST, Lee J (2012) Thiopental dose requirements for induction of anaesthesia and subsequent endotracheal intubation in patients with complete spinal cord injuries. Acta Anaesthesiol Scand. 56:770-776.

Zand F, Hadavi SM, Chohedri A, Sabetian P (2014) Survey on the adequacy of depth of anaesthesia with bispectral index and isolated forearm technique in elective Caesarean section under general anaesthesia with sevoflurane. Br J Anaesth. 112:871-878.

Exhibit 16 Page 44

*Expert Report: AR lethal injection pharmacology*

**STATE OF OKLAHOMA**　　　　)
　　　　　　　　　　　　　　) SS
**COUNTY OF TULSA**　　　　　)


Now on this *21st* day of March, 2017, Craig W. Stevens, a person whose identity was satisfactorily proven, appeared before me and, after first being placed under oath, did acknowledged his signature above to be his own voluntary act and deed, and affirmed that the facts contained herein were true.


Witness my hand and official seal

*Betty Jo Westerfield*
Notary Official Signature

*Betty Jo Westerfield*
Print Name

My Commission Expires ___/__/_25/_2021

Exhibit 16 Page 45

## DECLARATION OF JOEL ZIVOT, MD

1. I received my Doctor of Medicine from the University of Manitoba, Canada, in 1988. From 1989–1993, I was a resident in Anesthesiology at the University of Toronto, Department of Post Graduate Medical Education, and from 1993–1995, I completed an additional residency in Anesthesiology and a Fellowship in Critical Care Medicine at the Cleveland Clinic Foundation, Department of Anesthesiology in Cleveland, Ohio.

2. I hold an active medical license from the State of Georgia and have held unrestricted medical licenses in Ohio, the District of Columbia, Michigan, and the Canadian provinces of Ontario and Manitoba. I also hold an active license to prescribe narcotics and other controlled substances from the federal Drug Enforcement Administration (DEA).

3. I hold board certification in Anesthesiology from the Royal College of Physicians and Surgeons of Canada and the American Board of Anesthesiology. I am also board certified in Critical Care Medicine from the American Board of Anesthesiology.

4. I have served as the Medical Director of the Cardio-Thoracic Intensive Care Unit and the Fellowship Director for Critical Care Medicine at Emory University Hospital. I am an Associate Professor of Anesthesiology and Surgery at the Emory University School of Medicine and an adjunct Professor of Law at Emory University Law School.

5. I have practiced anesthesiology and critical care medicine for 22 years, and, in that capacity, I have personally performed or supervised the care of more than 42,000 patients.

6. I am, by reason of my experience, training, and education, an expert in the fields of anesthesiology and critical care medicine. The opinions that follow are within my field of

Exhibit 17 Page 1

expertise, and are stated to a reasonable degree of medical and scientific certainty unless otherwise noted. I believe that my ethical duties prevent the participation in lethal injection. The opinions below express my medical opinion regarding the risks of the lethal injection procedure designed by the state and should not be construed as an attempt to assist the state in developing a better way to perform executions.

7. At the request of counsel, I reviewed Arkansas's lethal injection procedure, titled "Attachment C." Based on the review of that document, and my medical training and experience, I offer the following opinions.

8. The state of Arkansas uses a three-drug protocol involving Midazolam, Vecuronium Bromide, and Potassium Chloride.

9. The use of Midazolam is an inappropriate drug for lethal injection. In a surgical setting it is used as a sedative and in combination with other drugs. It is not used on its own to induce general anesthesia and is not capable of rendering a patient unaware or insensate to pain. The company that created Midazolam never contemplated that it would be used in the execution of prisoners.

10. Midazolam is prepared as a liquid and the solution is rendered at a pH of 2.5-3.5 Strong acids like Midazolam risk precipitation when mixed with weak acids or bases. The pH of normal saline is 5-6 and the mixing of Midazolam with normal saline runs the real risk of the formation of a salt precipitate. This precipitate compound will risk the obstruction of the intravenous preventing any further drug administration. Midazolam precipitate is pharmacologically inactive and will lower the total amount of Midazolam delivery in a completely unpredictable fashion.

2

Exhibit 17 Page 2

11. Midazolam injection in large doses as contemplated in the Arkansas lethal injection protocol has been associated with paradoxical hyper-reactivity reactions. This paradoxical reaction will be seen as intense agitation and movement. In this state, increasing the dose of Midazolam will only further exacerbate this agitation.

12. Vecuronium Bromide is a paralytic that, when administered, blocks the capacity of movement in a particular group of muscles known as skeletal muscles. Paralytics act only on skeletal muscles and have no effect on smooth or cardiac muscle. The inability to breathe as a consequence of Vecuronium induced muscle paralysis would be akin to the experience of suffocation. A person would still have the desire and need to breathe but would be completely unable to do so.  Midazolam will not in any way block the sensation for the need to breathe.

13. Potassium, available as Potassium Chloride, is a naturally occurring element necessary for normal bodily functions in a number of human physiological systems. Of importance here is the effect of Potassium Chloride on the heart. As potassium rises outside of the heart cell, depolarization is increasingly blocked until a point at which the heart cell is essentially held in place and cannot contract. At his point, the heart ceases to function in any capacity. The lack of heart muscle contraction causes the blood pressure to drop. The lack of blood flow, which carries oxygen to each cell in the body, ceases and progressive and rapid multi-organ failure ensues. Potassium Chloride, when injected into the body, produces an intense burning sensation of the veins. Midazolam is not a pain reliever in any dose and is insufficient to prevent the experiencing of burning by the prisoner.

Exhibit 17 Page 3

14. As a general matter, my review of the protocol shows that the execution process involves multiple complex tasks that, to be done without risking serious injury to the prisoner, require a high-level of skill and training.

15. I am aware the Arkansas Department of Correction has a supply of Midazolam that lists the expiration date as April 2017. My understanding of expiration dates and drug potency is based on my years of medical training and practice. An expiration date is an estimate of the date at which the drug manufacturer expects that the drug will either change or transform into something that 1) loses its efficacy or 2) becomes poison. As a practitioner, I would not use a drug in the month at which it is stated to expire. I do not feel confident that it can be relied upon to perform its expected function.

16. Arkansas's lethal injection protocol calls for the preparation of syringes at a different location in advance of the execution. In my opinion, this practice creates a needless risk of contamination or degradation of the chemicals. An ampule of Midazolam, or any other sterile injectable compound, is sterile while it is in the ampule. As soon as the seal is broken, it is no longer sterile. In my practice, I would insert the syringe into the ampule, draw the solution into the syringe, and inject it immediately. The delay used by the protocol creates the risk that the drug will be mislabeled, contaminated, and at increased risk of falling out of solution as a precipitate.

17. Setting of IVs is crucial to the successful delivery of a substance into the circulatory system. Multiple or unsuccessful attempts to set an IV can cause perforations in the veins and infiltration of the tissue surrounding the vein. When this happens, the substance that was meant to circulate throughout the body will instead pool in the tissue and not reach the systems of the body necessary for it to have its intended effect.

Exhibit 17 Page 4

18. Insertion of a central line is a complicated medical procedure that is not done by nurses, or EMTs. A physician's assistant may insert a central line under the supervision of a physician. The central line accesses the circulatory system through a large vein in the neck, chest, or groin. The vein accessed through a central line is not visible to the eye through the skin. In order to safely place a central line in a clinical setting, I would use an ultrasound machine and a central line kit. The lethal injection protocol allows for the placement of a central line with no way of determining where the prisoner's vein is and no clear expertise within the personnel of the execution team. Blindly stabbing at the neck, chest, or groin could hit an artery or a nerve, causing pain and blood loss. A misplaced central line may be hard to verify and an individual placing this line may be under a false impression that the line is properly positioned. In a clinical setting, a follow up chest x-ray is required prior to using a central line that has been placed in the chest to verify the proper placement and rule out the presence of a collapsed lung. Such lung collapse when occurring can lead to a tension pneumothorax that can be in itself fatal. Death in this circumstance would be as a consequence of suffocation and cardiovascular collapse.

19. The amount of liquid Midazolam called for in the protocol is roughly a third to a half of the volume of liquid in a standard Styrofoam cup. The plan calls for it to be injected in two syringes. The syringes will have to be quite large. Pushing that amount of liquid out of such a large syringe creates a great amount of pressure at the point where the liquid exists the syringe. A vein can only withstand so much pressure. When a large amount of fluid runs into a vein, especially at a rapid rate, the vein can rupture. In a clinical setting 2-4 mg would normally be administered over a minute. The Arkansas lethal injection

5

Exhibit 17 Page 5

protocol intends to inject 10-20 times this quantity over the same length of time. A real danger exists to vein patency and serious pain on injection. In a clinical setting, in order to modulate the speed of the injection, and prevent rupture, I would sit by the side of the patient and look at their vein while I was plunging the drug. I understand that the Arkansas lethal injection procedure calls for the person plunging the syringe to be in a separate room from the inmate. Viewing a vein through a window will not allow a person to have adequate sight of the vein in order to prevent rupture and properly modulate the injection.

20. The protocol purports to require that the inmate be determined to be "unconscious" after the administration of the Midazolam. "Unconscious" is an exceedingly vague term in scientific circles. The protocol does not provide any guidance to the execution team to judge whether the prisoner is "unconscious." General anesthesia is not same thing as "unconsciousness." General anesthesia is a state in which a person can undergo noxious stimuli and 1) does not experience it in the moment and 2) does not recall it. In contrast, a person can be seemingly unresponsive and still experiencing stimulus. Certain noxious stimuli will lift a person from what might at first glance appear to be a state of unresponsiveness. Many people have had the experience of not being awoken by their alarm clock but hearing the alarm clock in their dreaming state. An outside observer would have no way of knowing that the sleeping person was hearing the alarm clock. This example shows that simple observation is insufficient to determine levels of anesthesia and has no capacity to confirm the sort of unresponsiveness contemplated by the lethal injection protocol.

Exhibit 17 Page 6

21. An anesthesiologist is as much of an expert in consciousness as you can find. However, neither I, nor my peers, would ever attempt to assess anesthetic level by visual inspection alone. In a hospital setting, I would not give the okay for a surgeon to cut a patient just by looking at them. Instead, I use equipment to measure physiological signs such as heart rate, blood pressure, brain activity, before allowing painful procedures to proceed. In addition, it is important to continually monitor anesthetic depth as it is dynamic. There may be subtle physiological changes in the body that show that a person is reacting to painful stimuli. For example, if the heart rate increased from 60 bpm to 70 bpm, that would be a signal that I may need to give additional medicine. The protocol provides for no modification based on inmate signs and symptoms after the 500 mg of Midazolam has been injected. The well-known ceiling effect of Midazolam renders additional dosage completely superfluous.

22. It is my professional opinion that because the protocol uses a sedative rather than an anesthetic, fails to use personnel trained in assessing anesthetic depth, fails to instruct the personnel on signs of consciousness, and fails to provide equipment necessary to judge anesthetic depth, there is a serious risk that the prisoner will be able to feel and experience the injection and the effects of the Vecuronium Bromide and Potassium Chloride.

23. I have a great concern that the protocol does not provide a plan for resuscitation or antidote of the chemicals in the event that the execution fails. Based on my training and experience, I expect that the prisoner will never reach general anesthesia with the injection of Midazolam. I think a likely scenario is that after the first injection of the Vecuronium Bromide the prisoner will move, gasp, or otherwise show signs of

Exhibit 17 Page 7

awareness. If this happens, and the Vecuronium Bromide is not reversed, the prisoner

will suffocate. Vecuronium Bromide does have an antidote, Sugammadex. A safeguard in

the event that the prisoner shows any signs of movement that will indicate awareness or

"consciousness" would be an injection of Sugammadex.

24. It is also possible that the Midazolam may need to be reversed. Midazolam on its own is

not a fatal drug, but it can cause airway collapse or cause confusion and lack of

awareness in the patient that would cause them to fail to clear their own airway and

choke. Midazolam can be reversed with Flumazenil.

25. Potassium Chloride can also be reversed through the sequential injection of insulin, D-50

(dextrose and water), and calcium chloride.

26. In order to maximize the effects of the antidotes, the prison would also need to have on

hand qualified personnel to start life-saving measures and have immediately available

oxygen and a mask, an Ambu bag, a nerve stimulator to measure the degree of

neuromuscular blockage, cardiac monitoring, pulse oxymeter and a blood pressure cuff.

If the inmate is a diabetic, the prison would also need equipment and medicine to

measure and treat abnormal blood sugar.

I swear that the foregoing is true and correct to the best of my knowledge under penalty of

perjury under the laws of the United States and the State of Arkansas.

March 24, 2017
_____
Date

_____
Joel Zivot, M.D.

Exhibit 17 Page 8



## IN THE UNITED STATES COURT OF APPEALS
## FOR THE EIGHTH CIRCUIT

No. 16-3072

In re: Missouri Department of Corrections, Petitioner

----------------------------------

M7, Petitioner – Intervenor

----------------------------------

Richard Jordan and Ricky Chase, Respondents.

On Petition for Writ of Mandamus to the United States District Court
for the Western District of Missouri – Jefferson City
(2:16-MC-09005)

### RESPONDENTS' MOTION FOR LEAVE
### TO FILE TRANSCRIPT UNDER SEAL

James W. Craig
Emily M. Washington
Roderick & Solange MacArthur Justice Center
4400 S. Carrollton Avenue
New Orleans LA 70119
(504) 620-2259 (p)
(504) 208-3133 (f)
jim.craig@macarthurjustice.org
emily.washington@macarthurjustice.org

Attorneys for Respondents

RECEIVED

SEP 3 0 2016

U.S. COURT OF APPEALS
EIGHTH CIRCUIT

Exhibit 18 Page 1

**RESPONDENTS' MOTION FOR LEAVE TO FILE TRANSCRIPT UNDER SEAL**

Richard Jordan and Ricky Chase, Respondents in the above-captioned mandamus proceeding, move this Court for leave to file a portion of the transcript of the hearing before District Judge Bough under seal. The transcript, attached to the paper copy of this motion, is designated "Exhibit 4-B" in Respondents' pleadings in opposition to the petitions for mandamus and rehearing filed by the Missouri Department of Corrections ("MO-DOC") and M7. In support of this motion, Respondents represent the following to the Court:

1.      On July 1, 2016, the United States District Court for the Western District of Missouri conducted a hearing on MO-DOC's motion to quash a subpoena duces tecum and notice of deposition served upon MO-DOC by Respondents.

2.      A portion of the hearing was sealed with only MO-DOC and Respondents' attorneys present in the courtroom.

3.      On September 20, 2016, the district court entered a Protective Order sealing the transcript of the *in camera* portion of the July 1 hearing. Doc. 38, *Missouri Department of Corrections v. Jordan et al.*, case no. 2:16-mc-09005.

4.      Under the terms of the Protective Order, the transcript of the *in camera* portion of the transcript can only be filed in the Eighth Circuit Court of Appeals under seal.

2

Exhibit 18 Page 2

5.     In addition to the sealed transcript, Respondents submit a brief Argument Regarding Matters in Sealed Transcript, setting forth the relevance of the sealed transcript to the issues before this Court.

6.     Respondents believe that this Motion may be made publically available on PACER. See Local Rule 25A(g).

WHEREFORE, PREMISES CONSIDERED, Respondents request that this Court grant leave to file the sealed portion of the July 1 transcript and the Argument Regarding Matters in Sealed Transcript under seal.

Respectfully submitted,

/s/ James W. Craig
James W. Craig
Emily M. Washington
Roderick & Solange MacArthur Justice Center
4400 S. Carrollton Avenue
New Orleans LA 70119
(504) 620-2259 (p)
(504) 208-3133 (f)
jim.craig@macarthurjustice.org
emily.washington@macarthurjustice.org

Attorneys for Respondents

3

## CERTIFICATE OF SERVICE

I hereby certify that I have served a copy of this Motion on all parties by electronic mail. This pleading is not filed via the Electronic Case Filing system of the United States Court of Appeals for the Eighth Circuit.

This, the 30th day of September, 2016.

*/s/ James W. Craig*

4

FILED

SEP 3 0 2016

MICHAEL GANS
CLERK OF COURT

**IN THE UNITED STATES COURT OF APPEALS
FOR THE EIGHTH CIRCUIT**

No. 16-3072

In re: Missouri Department of Corrections, Petitioner

--------------------------------

M7, Petitioner – Intervenor

--------------------------------

Richard Jordan and Ricky Chase, Respondents.

On Petition for Writ of Mandamus to the United States District Court
for the Western District of Missouri – Jefferson City
(2:16-MC-09005)

**RESPONDENTS' ARGUMENT
REGARDING MATTERS IN SEALED TRANSCRIPT**

James W. Craig
Emily M. Washington
Roderick & Solange MacArthur Justice Center
4400 S. Carrollton Avenue
New Orleans LA 70119
(504) 620-2259 (p)
(504) 208-3133 (f)
jim.craig@macarthurjustice.org
emily.washington@macarthurjustice.org

Attorneys for Respondents

## RESPONDENTS' ARGUMENT
## REGARDING MATTERS IN SEALED TRANSCRIPT

On July 1, 2016, the United States District Court for the Western District of Missouri conducted a hearing on MO-DOC's motion to quash a subpoena duces tecum and notice of deposition served upon MO-DOC by Respondents. A portion of the hearing was sealed with only MO-DOC and Respondents' attorneys present in the courtroom. The sealed transcript is designated as "Exhibit 4-B" in the Respondents' oppositions to the motions filed by the Missouri Department of Corrections ("MO-DOC") and M7, MO-DOC's anonymous drug vendor.

During the in camera portion of the hearing, counsel for MO-DOC discussed matters set forth in the privilege log which had been submitted to the district court ex parte. Respondents' counsel did not have access to the ex parte privilege log.

MO-DOC's counsel focused the Court's attention on Request No. 2 of the subpoena duces tecum under consideration in the district court. That request seeks production of "All drug labels and package inserts for any drug purchased or obtained by the Department, from 2010 to the present, for use in lethal injection executions."[1] MO-DOC counsel stated:

> I'm primarily focused on request number 2 for documents about pentobarbital . . . if identified whether or not there is a responsive document to that request, that answers the question of whether it is or is not manufactured or

---

[1] Exhibit 3 to Respondents' Opposition at 5.

1

compounded pentobarbital because manufactured pentobarbital has that information, and compounded pentobarbital does not have a package insert.

So by merely saying that there exists a document that proves it's manufactured or proves that it's compounded, that answers the question does Missouri use compounded or manufactured pentobarbital.[2]

Thereafter, the district court stated "there are three responses that list No. 2."[3] Counsel for MO-DOC agreed.[4]

Thus, there is evidence that at some point after 2010, MO-DOC purchased manufactured pentobarbital for use in lethal injection executions. All parties agree that pentobarbital can be purchased in one of two forms: either compounded by a licensed pharmacy from the active pharmaceutical ingredients for the chemical; or manufactured by a pharmaceutical company under FDA-approved and monitored practices. Akorn Pharmaceuticals is the sole licensed manufacturer of pentobarbital.[5] Akorn has instituted a policy restricting the sale of Nembutal to corrections departments for use in executions.[6]

The sale of manufactured pentobarbital by M7 or another vendor to MO-DOC would violate the property and contractual rights of Akorn to determine how its

---

[2] Exhibit 4-B at 8-9.
[3] Id. at 10.
[4] Id.
[5] See Exhibit D (May 13, 2016 article) to Exhibit 15 (Declaration of Comptroller DiNapoli) to Respondent's Opposition.
[6] Exhibit B to Exhibit 15 to Respondents' Opposition.

2

Exhibit 18 Page 7

product is used. For the reasons set forth in the Oppositions filed by Respondents in the public record, mandamus should be denied if this Court, or the district court, finds that MO-DOC and M7's attempt to safeguard the confidentiality of the identity of MO-DOC's lethal injection drug vendors would facilitate the violation of the rights of Akorn and its shareholders.

Respectfully submitted,

*/s/James W. Craig*
James W. Craig
Emily M. Washington
Roderick & Solange MacArthur Justice Center
4400 S. Carrollton Avenue
New Orleans LA 70119
(504) 620-2259 (p)
(504) 208-3133 (f)
jim.craig@macarthurjustice.org
emily.washington@macarthurjustice.org

Attorneys for Respondents

3

## CERTIFICATE OF SERVICE

I hereby certify that I have served a copy of this Argument on all parties by electronic mail. This pleading is not filed via the Electronic Case Filing system of the United States Court of Appeals for the Eighth Circuit.

This, the 30th day of September, 2016.

/s/ James W. Craig

4

## <u>AFFIDAVIT OF JONATHAN I. GRONER, M.D.</u>

I, Jonathan I. Groner, M.D., do declare as follows:

1)    I am a medical doctor and Professor of Clinical Surgery at The Ohio State University College of Medicine. I graduated from Northwestern University Medical School in 1984. I completed my residency in General Surgery at the Medical College of Wisconsin and in Pediatric Surgery at Nationwide Children's Hospital. I became licensed to practice medicine in the State of Ohio in 1992 and remain licensed to practice in Ohio. I was appointed to the faculty of The Ohio State University College of Medicine in 1994. I practice surgery and train medical students and residents in the practice of surgery. My particular specialties include pediatric surgery, general surgery, and trauma surgery.

2)    I hold a certification in General Surgery and Pediatric Surgery from the American Board of Surgery and have served as an Examiner for the American Board of Surgery's General Surgery Qualifying Examination. I also hold multiple certifications in advanced burn life support and in advanced trauma life support. I have served as the president of the Central Ohio Trauma Center and served on the Ohio Emergency Medical Services Board.

1

Exhibit 19 Page 1

3)      I have done extensive research in the areas of pediatric surgery, general surgery, and trauma surgery. My related research interests include the impact of trauma on minority children, firearm trauma, ATV injuries, child abuse, and physician participation in lethal injection. I have published multiple peer-reviewed articles on the administration of capital punishment by lethal injection. I am also the author of *The Hippocratic Paradox: the Role of the Medical Profession in Capital Punishment in the United States*, 35 FORDHAM URB. L.J. 883 (2008). In that article, I wrote that, assuming the shooters hit their mark (the heart), execution by firing squad would be "nearly instantaneous and painless." That is because the "[d]isruption of blood flow to the brain, which would result from lacerations to the heart by multiple bullets, causes almost immediate loss of consciousness, resulting in rapid death with little or no pain."

4)      Counsel for the Plaintiffs asked me to opine further upon the comments I made in the Fordham article. I hold all opinions expressed to a reasonable degree of medical certainty.

5)      My analysis assumes the following execution procedure. This procedure is consistent with the procedure the State of Utah used in the 2010 execution of Ronnie Lee Gardner. I have reviewed the protocol Utah followed during that execution.

2

Exhibit 19 Page 2

A.     The inmate is placed in a chair and strapped into position so that he/she is not capable of moving. The chair and restraints allow maximum exposure of the chest (as the inmate sits in a straight, upright position).

B.     A prison official examines the inmate and locates the position of the inmate's heart by physical exam (palpation of the chest for pulse) or the use of a stethoscope (point of loudest audible heartbeat).

C.     The official pins a target to the inmate's clothing indicating the location of the inmate's heart.

D.     Four to five law enforcement officers aim high-caliber, long-barreled weapons at the target at close range.

E.     When the order is given, the officers fire their guns at the target on the inmate's chest.

6)     This procedure will cause a nearly instantaneous death for the following reasons:

A.     The location of the palpable heartbeat or the loudest audible heartbeat corresponds to the left ventricle, the largest pumping chamber of the heart. This is the chamber that pumps the blood out of the heart to the body.

3

Exhibit 19 Page 3

B.    A single bullet entering the left ventricle would tear a large hole in the left ventricle; multiple bullet holes would accelerate the process.

C.    Blood that would normally flow out of the left ventricle into the aorta would immediately begin to flow out through the hole in the ventricle and fill the chest cavity with blood.

D.    Cessation of blood flow in the aorta would cause immediate cessation of blood flow to the carotid arteries, which are the major blood supply to the brain.

E.    Cessation of blood flow to the brain causes unconsciousness within seconds.

F.    Death would follow soon after (3 to 4 minutes) from exsanguinating hemorrhage.

7)    This swift death will also be painless. From my experience as a trauma surgeon, it is clear that patients with gunshot wounds to the heart with exsanguinating hemorrhage (loss of most of the blood volume) are unconscious and do not react to pain. In fact, the rescue maneuver for a person that has penetrating trauma to the heart who arrives at the emergency department with waning signs of life—in other words, someone who is bleeding to death from a hole in the

4

Exhibit 19 Page 4

heart—is to perform an "Emergency Department thoracotomy," meaning that the chest is cut open immediately in an attempt to repair the hole in the heart. This operation is done without anesthesia. It involves cutting through skin and muscle between the ribs on the left side under the nipple. The incision is usually at least 10-12 inches long. An instrument is used to spread the ribs apart allowing visualization of the heart and aorta. An attempt is made to repair the wound in the heart.

      8)     It is my opinion that Utah's execution of Ronnie Lee Gardner by firing squad caused a swift and painless death. The media reported that Mr. Gardner pushed his left arm forward "about 2 inches against the restraints," and "in that same motion, he closed his hand and made a fist." *See* Nate Carlisle, *Firing Squad: An Eyewitness Account of Gardner's Execution*, Salt Lake Tribune, June 18, 2010, *available at* http://bit.ly/2eyfTND. This motion is consistent with reflex contractions following massive trauma to his left pectoralis muscle and ribs from the multiple high-velocity, large-caliber gunshot wounds. There was no report of verbal reaction, which is probably the most common manifestation of pain.

      9)     The current midazolam protocol has a far greater risk of causing pain and suffering compared to the firing squad. Midazolam is

5

Exhibit 19 Page 5

not a general anesthetic and, to my knowledge, is not used as a sole

agent for any surgical procedure. The administration of drugs to cause

respiratory arrest and cardiac arrest in an inmate medicated only with

midazolam is far more likely to cause a painful death.

10)   In sum, based on my medical expertise and my review of

Utah's functioning firing-squad protocol, I reaffirm my earlier

conclusion that execution by firing squad will cause rapid death with

little to no pain.

I declare under penalty of perjury under the laws of the United

States of America that the foregoing is true and correct.

JONATHAN I. GRONER, M.D.

MARCH 23. 2017

Date

6

Exhibit 19 Page 6

```
TMF 01/01.00    GENERAL PROVISIONS

TMF 01/01.01    Purpose of Technical Manual
TMF 01/01.02    Cross Reference
TMF 01/01.03    Policy
TMF 01/01.04    Definitions
```

REVISED 06/10/10                    TMF 01/01 - pg. 1

Exhibit 20 Page 1

Exhibit 20 Page 2

TMF 01/01.00   <u>GENERAL PROVISIONS</u>

TMF 01/01.01   <u>Purpose of Technical Manual</u>

    A.   The purpose of this Technical Manual is to provide the Department's policies, procedures and post orders for planning and carrying out the sentence for the execution of a person convicted of a capital offense.

    B.   This chapter shall include policies and procedures related to:

       1.   planning and preparation;

       2.   execution of the sentence;

       3.   post-execution requirements and process;

       4.   security and control;

       5.   witnesses and official visitors

       6.   news media access limitations and briefing;

       7.   delays, stays, and commutations;

       8.   support services functions;

       9.   briefing and training; and

      10.  documentation, review and audit.

    C.   Post orders are included for the staff and others involved in the execution planning, implementation, documentation and review.

TMF 01/01.02   <u>Cross Reference</u>

    A.   <u>Department Policies and Procedures Manuals</u>

       AGr05  Media Relations
       FDr14  Inmate Property

    B.   <u>Other Authority</u>

       UCA 77-19-6   Judgement of death-Warrant-Delivery of warrant-Determination of execution time.

|  |  |
|---|---|
| UCA 77-19-10 | Judgement of death-Location and procedures for execution. |
| UCA 77-19-11 | Who may be present-Photographic and recording equipment. |
| UCA 77-19-12 | Return upon death warrant. |
| UCA 26-4-6 | Investigation of deaths by county attorney-Requests for autopsies. |
| UCA 26-4-7 | Deaths over which medical examiner has jurisdiction. |
| BPPPM 3.12 | Commutation Hearings for Death Penalty Cases |

TMF 01/01.03   Policy

It is the policy of the Department that:

A.   execution of persons sentenced to death under Utah law by a court of competent authority and jurisdiction be carried out in the legally prescribed manner;

B.   the Department shall make every effort in the planning and preparation of the execution event to ensure that the execution process:

1.   adheres to the intent of the law;

2.   is handled in a manner which minimizes negative impact on the safety, security and operational integrity of the prison;

3.   accommodates the need for public access to information concerning the event;

4.   reasonably addresses the privacy interests of those persons for whom the law, Department policy or commonly-held principles of decency require such privacy;

5.   provides sufficient staffing to ensure that unplanned problems can be accommodated and overcome;

6.   prepares for stays of execution, commutations and other delays in the execution count-down;

7.   provides an opportunity for interested persons to exercise their First

Exhibit 20 Page 4

Amendment rights to demonstrate for or against capital punishment in a lawful manner;

8. ensures a firm and adequate response to unlawful civil disobedience, trespass, or other violations of the law by persons attempting to disrupt, prevent or other-wise frustrate the lawful process associated with the execution; and

9. anticipates and provides for sufficient support needs for the execution and the prison as a whole;

C. the Department shall arrest and encourage the prosecution of persons, including but not limited to, those who:

1. violate 77-19-11 UCA prohibitions against filming, taping, sketching, broadcasting or otherwise electronically documenting the death of the condemned;

2. trespass or otherwise enter upon prison property without proper permission and clearance from the Department;

3. participate in unlawful demonstrations;

4. unlawfully attempt to or disrupt, prevent or otherwise interfere with the execution;

5. being inmates, are involved in disruptive, assaultive or other proscribed behavior; or

6. unlawfully threaten, intimidate or terrorize persons involved in the execution process;

D. staff involved in the execution make every effort within the requirements and limits of these polices and procedures and the laws of the State of Utah to:

1. minimize the anxiety and negative impact of the execution on the victim's and inmate's family and friends witnessing the execution;

REVISED 06/10/10                    TMF 01/01 - pg. 4

Exhibit 20 Page 5

2. display appropriate levels of professionalism, restraint, and courtesy in interaction with witnesses, demonstrators, news media, and other non-staff persons during the execution process; and

3. not permit interactions, emotion or intimidation to prevent their proper handling of missions and duties;

E. the Department review the adequacy and/or the performance of:

1. the policies and procedures employed;

2. the Department staff members involved in the execution;

3. members of allied agencies assisting with the execution; and

4. statutes and other authority impacting the execution; and

F. the evaluation of each execution event be used to improve operational procedures for the future.

TMF 01/01.04    <u>Definitions</u>

**allied agency**          refers to another criminal justice agency

**Attorney General's Office**          staff at the Attorney General's Office or any designated contract attorney approved to carry out the responsibilities described in this technical manual

**attorney of record**          the condemned inmate's attorney and other assisting legal personnel

Exhibit 20 Page 6

| | |
|---|---|
| **broadcast media** | refers to radio and television media |
| **civilians** | any person not a member of the Department, allied law enforcement agency, nor mutual aid agencies |
| **Command Post Director** | the member who is assigned to supervise the command post functions and activities |
| **commutation** | the change from a greater to a lesser punishment after conviction |
| **drug injection box** | box or boxes each of which shall contain one complete set-up for lethal injection; with or without drugs |
| **execution building** | refers to the area containing the execution chamber |
| **execution chamber** | the immediate enclosed areas containing the condemned at the moment of execution |

Exhibit 20 Page 7

| | |
|---|---|
| mutual aid | agencies or personnel that provide medical, fire suppression, and other support services to the Draper site |
| news magazines | magazines having a national circulation being sold by news stands to the general public and by mail circulation |
| news media | collectively refers to those involved with news gathering for newspapers, news magazines, radio, television or news services |
| news media members | persons over the age of eighteen who are primarily employed in the business of gathering or reporting news for newspapers, news magazines, national or international new services or radio or television stations licensed by the Federal Communications Commission |
| newspaper | for purposes of this chapter, the publication: |

REVISED 06/10/10                                    TMF 01/01 - pg. 7

Exhibit 20 Page 8

1.    circulates among the
   general public;

2.    publishes legal notices
   in the community in which
   it is located or the area
   to which it distributes;
   and

3.    contains items of general
   interest to the public
   such as political,
   commercial, religious or
   social affairs

**pardon**        an act of grace by an
appropriate authority
exempting a person from
punishment for a crime

**press**        refers to the print media;
also see "news media",
generally

**reprieve**        the temporary suspension of
the execution

**respite**        see "reprieve"

**security**        the curtains which cover the
**curtains**        viewing room windows in the
executionchamber

**Warden**        warden assigned to the Draper
site

**witness viewing**        the areas from which the

**area**                    execution is viewed by
                            government witnesses, inmate's
                            witnesses and news media
                            witnesses

Exhibit 20 Page 10

TMF 01/02.00    PRE-EXECUTION CHECKLIST

TMF 01/02.01    General Provisions
TMF 01/02.02    Prior to Receiving Death Warrant
TMF 01/02.03    Receipt of Death Warrant to Thirty Days Prior to
                Execution
TMF 01/02.04    Twenty-Nine to Fourteen Days Prior to the
                Execution
TMF 01/02.05    Thirteen to Seven Days Prior to Execution
TMF 01/02.06    Six to Three Days Prior to Execution
TMF 01/02.07

Exhibit 20 Page 11

TMF 01/02.00     <u>PRE-EXECUTION CHECKLIST</u>

TMF 01/02.01     <u>General Provisions</u>

     A.   <u>Purpose of Chapter</u>

          1.   The purpose of this chapter is to provide a checklist of procedures and events which should occur between the issuing of the death warrant and 24 hours prior to the execution.

          2.   Full detail will not be provided for each procedure or event in this chapter. For detail, reference will be made to Chapter TMF 01/05 and other chapters where such detail may be found.

          3.   This chapter will be divided to cover the following time periods:

              a.   prior to the death warrant being issued;

              b.   issuing of death warrant to 30 days prior to the execution;

              c.   14 to 29 days prior to the execution;

              d.   7 to 13 days prior to the execution;

              e.   3 to 6 days prior to the execution; and

              f.

     B.   <u>Policy</u>

          1.   It is the policy of the Department that the count-down to the execution be completed in a systematic manner to ensure that all procedures and events which are necessary in the preparation of the execution are completed in a timely manner.

Exhibit 20 Page 12

2. This count-down, though offering flexible application, should be observed and followed as written unless deviation or adjustment is required for carrying out the execution.

3. The Executive Director/designee may direct deviation from or adjustment to the policies and procedures in this manual at any time when necessary for the good of the Department's mission in carrying out the execution. Approval for the changes shall be documented in writing.

TMF 01/02.02    Prior to Receiving Death Warrant

A.    Execution Planning Team

When it appears an execution is imminent, prior to the issuing of the death warrant, the Warden shall select an Execution Planning Team. The Team mayinclude:

1.

2.

3.

4.

5.

6.

7.

8.

9.

10.

11.

Exhibit 20 Page 13

B.   Involve Additional Planning Assistance

Other persons who may be invited to attend on a meeting-by-meeting basis, include:

1.   a representative or representatives from the Attorney General's Office;

2.   a representative from the office of the County Attorney which prosecuted the condemned;

3.   a representative from the Board of Pardons and Parole;

4.   representatives from the law enforcement agencies which investigated the case involving the condemned;

5.   representatives from law enforcement and other allied agencies who may be asked to assist with various aspects of the execution; and

6.   any other persons deemed necessary or appropriate by the Executive Director/designee, DIO Director or Warden.

C.   Develop Assignments

When it is reasonable to believe a death warrant will be issued in the near future, the Execution Planning Team and those additional persons deemed appropriate shall meet to:

1.   review the Execution Plan (TMF 01);

2.   make assignments for the pending execution;

3.   develop a schedule of events;

4.   assign responsibilities related to revision of the Execution Plan, if needed; and

5.   take any other steps necessary to prepare for the issuance of the

Exhibit 20 Page 14

deathwarrant and begin the execution count down.

D.   Identify Possible Execution Dates

1.   The Execution Planning Team shall review the Department's schedule of events and identify favorable and unfavorable dates within the period of time in which the execution may be ordered.

2.   Information concerning the Department's requests/concerns related to scheduling shall be communicated to the Attorney General's Office to be communicated to the sentencing court.

TMF 01/02.03   Receipt of Death Warrant to Thirty Days Prior to Execution

Upon receipt of a death warrant from a competent court, the following procedures shall be initiated and should be completed at least 30 days prior to execution.

A.   Receipt of Death Warrant

1.   Upon receipt of the death warrant and as soon as practical thereafter, a meeting of the Execution Planning Team shall be scheduled by the Warden.

2.   The Execution Planning Team shall then coordinate the implementation of the procedures set forth in this technical manual under the direction of the Warden.

B.   Time and Place of Execution

1.   Date

The date for the execution shall be that day set by the sentencing judge.

REVISED 06/10/10                           TMF 01/02   - pg. 14

Exhibit 20 Page 15

2.   <u>Time</u>

"The Department of Corrections shall determine the hour, within the appointed day, at which the judgment is executed." 77-19-6(3)

3.   <u>Location</u>

C.   <u>Condemned Inmate's Choice of Witnesses</u>

1.   The condemned inmate shall be informed that he may designate religious representatives, friends, or relatives not exceeding a total of five in number to witness the execution. 77-19-11 (2) (d) UCA

2.   Refer to TMF 01/07.

D.   <u>Disposition of Personal Property</u>

1.   The inmate shall be contacted for instructions concerning the disposition of his personal property.

2.   Refer to TMF 01/05.06.

E.   <u>Disposition of Funds in Inmate's Account</u>

1.   The condemned shall be contacted for instructions concerning the disposition of the funds in any accounts controlled or administered by the prison or Department.

2.   Refer to TMF 01/05.06 and TMF 01/05.07.

F.   <u>Organ Donation</u>

Organ donation is not an option for condemned inmates.

G.   <u>Disposition of Body</u>

REVISED 06/10/10                TMF 01/02   - pg. 15

Exhibit 20 Page 16

1.   The condemned shall be asked for instructions concerning the disposition of his remains following the execution.

2.   Refer to TMF 01/05.08.

H.   <u>Designate Persons Required to Assist with Execution</u>

1.   Those persons necessary to carry out the execution shall be identified.

    a.   The Executive Director/designee, DIO Director or Warden shall be responsible for identifying, selecting and obtaining the services of the executioners.  See TMF 01/05.03 and TMF 01/05.04.

    b.   The Public Affairs Director shall be responsible for coordinating the notification of the news media and selection of individual news media witnesses.  See TMF 01.08.02.

    c.   The Warden shall be responsible for designating those persons necessary to carry out and support the execution.

2.   Redundancy in assignment may be developed for all vital or important positions.  The Warden, DIO Director, and Executive Director/designee shall determine which positions require back-up and shall ensure adequate coverage is provided.

3.   "Compensation for members of a firing squad or persons administering intravenous injections shall be in an amount determined by the director of the Division of Finance." 77-19-10 (4)UCA

    a.   The Department shall negotiate with the executioners and Division of Finance the fee to be paid to the executioners.

REVISED 06/10/10                TMF 01/02  - pg. 16

Exhibit 20 Page 17

b.

c.

I.   Other Approved Witnesses

The Executive Director/designee shall
designate other approved witnesses as
outlined in TMF 01/07.03.

J.   Contact with State Medical Examiner

1.   Contact shall be made withthe State
Medical Examiner to coordinate the
Medical Examiner's role.

2.   The Medical Examiner shall be requested
to provide direction concerning:

a.   transfer of custody of the executed
inmate from the Warden to the
Medical Examiner;

b.

c.

3.   Refer to TMF 01/04.

K.   Support Services

1.   The Support Services Deputy Warden
coordinates the functions of Support
Services Section Personnel.

2.   Support Services units shall include,
but not be limited to:

Exhibit 20 Page 18

a.    the Food Services Unit (See TMF
      01/05.19); and

b.    the Maintenance Unit (See TMF
      01/05.18).

L.   The Correctional Medical Administrator
     coordinates functions of the Medical Unit
     personnel.  (See TMF 01/05.18)

M.   <u>Brief Prison Administrators</u>

1.    It is necessary to maintain as nearly as
      possible a normal prison operation
      during the execution and the activities
      preceding and following the execution.

2.    Prison administrators should be briefed
      as appropriate on plans for the
      execution, restrictions on access, crowd
      control, additional security procedures,
      etc., on an on-going basis.

3.    Briefings should begin as soon as plans
      begin to evolve which will effect the
      general prison operation, and should
      continue until the operation returns to
      normal.

TMF 01/02.04   <u>Twenty-Nine to Fourteen Days Prior to the
               Execution</u>

A.   <u>Witnesses</u>

1.    The Executive Director/designee shall
      develop a final list of witnesses
      consistent with the requirements of 77-
      19-11 (2) and (3) UCA.

2.    Any changes to the Government witness
      list shall be approved by the Executive
      Director.

3.    Each witness shall be required to sign
      an agreement prior to being cleared and
      added to the witness list.

Exhibit 20 Page 19

    4.    The Executive Director may make
additions to the witness list when
necessary.

    5.    Refer to TMF 01/05.05.

B.    <u>News Media</u>

    1.    Witness requests shall be received and
processed by the Public Affairs Office
in accordance with TMF 01/08.02.

    2.    Alternate coverage/accommodations for
members of the press selected to be
present at alternate site shall be
handled consistent with TMF 01/08.03.

C.    <u>Inmate Property and Accounts</u>

    1.    Finalize arrangements for disposition of
the condemned inmate's property and
accounts 14 days prior to execution.

    2.    Refer to TMF 01/05.06 and TMF 01/05.07.

D.    <u>Disposition of Body</u>

    1.    Finalize, if possible, decision
concerning disposition of the body.

    2.    Refer to TMF 01/05.08.

E.    <u>Selection of Executioners</u>

    1.    Finalize the selection of executioners
and their back-ups.

    2.    Refer to TMF 01/05.03 and TMF 01/05.04.

F.    <u>Medical/Medical Examiner</u>

    1.    Finalize arrangements for a physician
consistent with 77-19-10UCA.

    2.

Exhibit 20 Page 20

      3.    Refer to TMF 01/05.08.

G.   <u>Practices and Rehearsals</u>

      1.    Initiate practice sessions for persons involved in the various parts of the execution event.

      2.    Not all of the persons involved will practice together.  Individual teams will practice as units, with inter-team practices scheduled, as necessary.

**TMF 01/02.05**   <u>Thirteen to Seven to Days Prior to Execution</u>

A.   <u>Inmate Property/Accounts</u>

All paperwork on disposition of property and accounts should be completed at least seven days prior to the execution.

B.   <u>Disposition of Body</u>
All paperwork should be completed at least seven days prior to the execution.

C.   <u>Food Services</u>

      1.    At least seven days prior to execution, contact the condemned inmate to arrange last meal.  TMF 01/05.18.

      2.    Determine with the Warden, Draper Site Security Deputy Warden, and Public Affairs Director what beverage and food service will be needed at the various locations where staff will be working.

D.   <u>Purchase of Substances to Be Used in Lethal Injection</u>

      1.    Purchase substances to be used in the execution.

      2.    Refer to TMF 01/05.11.

E.   <u>Support Services</u>

Exhibit 20 Page 21

Finalize all arrangements involving the Support Services assistance with the Support Services Director.

F.   Finalize all arrangements involving the Medical Section assistance with the Correctional Medical Administrator.

G.   Allied Agencies

Finalize arrangements with allied agencies assisting with the execution.

TMF 01/02.06   Six to Three Days Prior to Execution

A.   Witnesses

1.   All witness agreements should be signed.

a.   Copies shall be provided to the:

(1)   Command Post Director; and

(2)   Auditor-in-Charge.

b.   Persons refusing to sign agreements shall not be permitted to attend.

2.   Exceptions to the time requirements will permit delayed signing of agreements for witnesses coming in from out-of-state.

B.   Brief Allied Agencies

1.   Members of allied agencies who have not participated in practice sessions or have not otherwise been briefed previously, shall be briefed and their post or responsibilities explained.

2.   Briefings will include a detailed review of the individual's post order.

C.   Inmate Property and Accounts

1.   Complete all unfinished paperwork and arrangements.

2.   If the condemned fails to cooperate in these arrangements, he shall be notified

REVISED 06/10/10                          TMF 01/02   - pg. 21

Exhibit 20 Page 22

that the property and money will be
disposed of according to state law, and
Department policy.

D.  <u>Executioners</u>

The Warden shall:

1.

2.  ensure completion of all arrangements
    necessary for security of executioners
    and protection of their identities.

E.  <u>Equipment Check/Inventory</u>

1.

2.  Refer to TMF 01/05.10(Firing Squad) and
    01/10.09 (Lethal Injection).

TMF 01/02.07

A.  <u>Observation Period</u>

1.

2.

3.  Refer to TMF 01/05.12.

B.  <u>Meeting of Execution Planning Team</u>

The Team shall meet to examine preparation
for the execution.  The checklists shall be
reviewed and immediate assignments made to
bring all items current with the schedule of
events.

REVISED 06/10/10                    TMF 01/02   - pg. 22

Exhibit 20 Page 23

Refer to TMF 01/02 pre-execution checklist
Refer to TMF 01/03 execution checklist
Refer to TMF 01/04 post execution procedure

C.    <u>Review of Procedures</u>

Conduct final review of procedures.

D.    <u>Arrangements for Pickup of Executioners</u>

    1.

    2.

E.    <u>Food Services</u>

    1.    Verify last meal preparation.

    2.    Verify beverage/food preparations for working teams.

F.    <u>Communications</u>

    1.    Verify installation of and test communications equipment for:

        a.

        b.

        c.    Information Center.

    2.    Refer to TMF 01/05.10.

G.    <u>Contact Support Agencies</u>

    1.    Contact:

        a.    the Attorney General's Office;

        b.    the State Medical Examiner's Office;

Exhibit 20 Page 24

        c.    allied law enforcement agencies; and

        d.    the Governor's Office.

    2.  Verify that each agency fully understands its role and is prepared to complete tasks.

H.   <u>Equipment Check</u>

    1.  Complete pre-execution inventory and equipment check.

    2.  All systems should be tested.

Exhibit 20 Page 25

TMF 01/03.00    EXECUTION CHECKLIST

TMF 01/03.01    General Provisions
TMF 01/03.02
TMF 01/03.03
TMF 01/03.04
TMF 01/03.05
TMF 01/03.06

REVISED 06/10/10                          TMF 01/03    – pg. 25

Exhibit 20 Page 26

TMF 01/03.00    <u>EXECUTION CHECKLIST</u>

TMF 01/03.01    <u>General Provisions</u>

     A.   <u>Purpose of Chapter</u>

        1.   The purpose of this chapter is to provide a checklist of procedures and events which should occur

        2.   Full detail will not be provided for each procedure or event in this chapter. For detail, reference will be made to Chapter TMF 01/05 and other chapters where such detail may be found.

     B.   <u>Policy</u>

        1.   It is the policy of the Department that the count-down to the execution be completed in a systematic manner to ensure that all procedures and events which are necessary to carry out the execution are completed in a carefully coordinated manner.

        2.   The execution shall be carried out in a manner consistent with state law.

TMF 01/03.02

     A.

        1.

        2.

        3.   Refer to TMF 01/05.12.

     B.

REVISED 06/10/10                          TMF 01/03   - pg. 26

Exhibit 20 Page 27

1.

2.   Refer to TMF 01/05.12.

C.   Inmate Communication

1.

2.

3.

4.   Refer to TMF 01/05.12.

D.   Food Services

1.   The Warden/designee shall contact the condemned to make arrangements for the final three meals.

2.   The final meal shall be served.

3.   Refer to TMF 01/05.18.

E.

Exhibit 20 Page 28

1.

    a.

    b.

    c.

    d.

2.    Refer to TMF 01/03.03 and TMF 01/05.08.

F.    Equipment Check

1.

2.    Refer to TMF 01/05.10 and TMF 01/05.11.

TMF 01/03.03

A.    Final Briefing

1.

2.    The final briefing shall be attended by the Executive Director/designee, DIO Director, Warden, special teams and other persons specified by the Executive Director or Warden.  The Warden shall conduct the meeting, with the Executive Director/designee and DIO Director providing policy decisions, as needed.

3.    During the briefing, participants shall:

    a.    identify problems, develop solutions and specify time lines and approve modified policy changes;

REVISED 06/10/10               TMF 01/03   - pg. 28

Exhibit 20 Page 29

        b.    provide status reports;

        c.    coordinate support services involvement; and

        d.    conduct final review of count down procedures.

B.   <u>Food Services</u>

    1.   The condemned shall be fed at specifiedtimes

    2.

    3.   Refer to TMF 01/05.18

C.   <u>Visits</u>

    1.

    2.

D.   <u>Restricting Access to Prison Property</u>

    1.

        a.

        b.

        c.

        d.

        e.

    2.

Exhibit 20 Page 30

a.

b.

3.

E.

1.

2.

3.

4.

TMF 01/03.04

A.

1.

a.

Exhibit 20 Page 31

b.

c.

2.

a.

b.

c.

3.

a.

b.

c.

4.

a.

Exhibit 20 Page 32

           b.

B.

    1.

    2.

TMF 01/03.05

    A.   Pre-Execution Procedures

        1.   The Warden shall ensure that all count-down procedures for all required activities and actions are completed.

        2.   Immediate action to complete any unfinished required procedures shall be initiated.

    B.   Execution Site Teams Assemble

        1.

        2.   The Tie-Down Teams and their back-ups will be positioned to await escort of the condemned to the execution chamber.

    C.   Contact with the Attorney General's Office

Exhibit 20 Page 33

1.

    a.

    b.

      (2)

2.

3.

    a.

    b.

4.

Exhibit 20 Page 34

TMF 01/03.06

A.   <u>Communications with Attorney General's Office</u>

Refer to TMF 01/03.05,C, above.

B.   <u>Final Sequence of Events: Preparation</u>

1.   <u>Bringing Condemned Inmate to Execution Chamber</u>

The condemned inmate shall be:

a.   removed from the observation cell by the Tie-Down Team;

b.         dressed in a clean jump suit (the color of the jump suit will be at the discretion of the Warden);

c.

d.   escorted to the execution chamber.

2.   <u>Tie-Down Procedures</u>

the condemned shall be tied down as explained in TMF 01/05.13(lethal injection) or TMF 01/05.14(firing squad).

3.   <u>Prepare Condemned Inmate for Execution</u>

The condemned shall be readied for execution:

a.   if lethal injection, by completing the I.V. set-up procedure (See TMF 01/05.15); or

b.   if firing squad, by completing the firing squad set-up procedures (See TMF 01/05.16).

4.   <u>Admit Witnesses</u>

REVISED 06/10/10                      TMF 01/03   - pg. 34

Exhibit 20 Page 35

a.   Witnesses shall be admitted and escorted to assigned viewing areas.

b.   The government witnesses shall enter first and shall be escorted to the government witness area. The escort shall remain with the witnesses.

c.   Following the government witnesses, the authorized witnesses invited by the condemned, and the victim's witnesses shall be admitted and escorted to the designated witness area.

   (1)   If any of the condemned inmate's invited witnesses, or the victim's witnesses wish to be on-site but not actually witness the execution, accommodations may be made for them.

   (2)   The escort officers shall remain with the condemned inmate's witnesses and the victim's witnesses.

d.   The last witnesses to be admitted shall be the news media representatives.

   (1)   The members of the news media selected to witness the execution shall be escorted to the designated witness room. They shall be separate from the condemned inmate's witnesses and the victim's witnesses. Escort officers shall remain with the news media witnesses and ensure their separation from the other visitors while at the execution site.

   (2)   The two pool photographers shall be escorted to a designated site, away from, and out of sight of, the execution chamber. They shall

be secured inside the
designated site until after
the execution and until such
time that they are allowed to
film the cleaned up execution
chamber.

C.   Final Sequence of Events: Execution

   1.   Staff Witness

      a.   Staff participating in the
           preparation for the execution shall
           exit the execution site.

      b.   Staff members remaining to
           participate in and observe the
           execution shall include the:

           (1)   Executive Director/designee;

           (2)   Executive Director's back-up;

           (3)   DIO Director;

           (4)   Warden;

           (5)   Executioners;

           (6)   Escort Officers; and

           (7)   other staff as designated by
                 the Executive
                 Director/designee, DIO
                 Director, or Warden.

   2.   Count-Down

      a.   At the designated hour mandated for
           the execution, when everything is
           ready, the phone communication
           shall be terminated and the
           Executive Director/designee shall
           instruct the Warden to proceed with
           the execution.

      b.   The Warden and DIO Director shall
           pull open the curtains covering the
           witness room windows.

REVISED 06/10/10                     TMF 01/03   – pg. 36

Exhibit 20 Page 37

c.   The Warden shall ask the condemned
     inmate if he has any last words or
     wishes to make a statement.

     (1)   The statement should not
           exceed two minutes.

     (2)   If the inmate uses foul
           language, the Warden should
           immediately proceed with the
           next step in the execution
           procedure.

     (3)   If the statement exceeds two
           minutes, the execution shall
           proceed without waiting for
           the conclusion of his remarks.

     (4)   Audio recording equipment may
           be used by the Department for
           the purpose of recording the
           defendant's last words.   The
           Department shall permanently
           destroy the recording made
           under this subsection not
           later than 24 hours after the
           completion of the execution.

d.

e.   The Executive Director/designee
     shall instruct the executioners in
     the case of death by injection, or
     the firing squad leader in the case
     of a firing squad execution to
     proceed with the execution:

     (1)   upon receiving the Warden's
           signal to proceed;

     (2)   after verifying the earliest
           legal execution time has
           passed; and

     (3)   if no instruction to halt has
           been received from the
           Attorney General's Office.

    f.    Following the instruction from the
          Executive Director/designee to
          execute the condemned inmate, the
          executioners shall immediately
          proceed with the execution as
          required in TMF 01/05.15(if by
          lethal injection) or TMF
          01/05.16(if by firing squad).

    q.    If the execution is ordered delayed


          the Executive Director shall
          instruct the executioners to step
          away from the execution equipment
          and shall notify them that the
          execution has been stayed or
          delayed.  The procedures set forth
          under TMF 01/06 shall then be
          initiated.

Exhibit 20 Page 39

```
TMF 01/04.00    POST-EXECUTION PROCEDURES

TMF 01/04.01    General Provisions
TMF 01/04.02    Certification of Death
TMF 01/04.03    Removing Witnesses from Execution Chamber
TMF 01/04.04    Removal of Executed Inmate
TMF 01/04.05    Removing Executioners from the Execution Area
TMF 01/04.06    Site Clean-Up
TMF 01/04.07    News Media Re-Entry to Execution Site
TMF 01/04.08    Returning to Standard Operation
TMF 01/04.09    Audit of Execution
TMF 01/04..10   Post-Execution Countdown Schedule
```

Exhibit 20 Page 40

TMF 01/04.00    POST-EXECUTION PROCEDURES

TMF 01/04.01    General Provisions

        A.    Purpose of Chapter

        The purpose of this chapter is:

        1.    to provide the procedures to be followed following the death by execution of the condemned inmate;

        2.    to identify the responsibilities for tasks to be completed; and

        3.    to provide for the transfer of the body of the condemned from the custody of the Department.

        B.    Policy

        It is the policy of the Department that:

        1.    the witnesses to the execution shall be removed from the execution chamber for the news media witnesses who shall be removed to a secondary location until permitted to return for a filming opportunity in the execution chamber;

        2.    the condemned inmate shall be examined by a licensed physician following the administering of the fatal drugs or the first volley by the firing squad to ensure that death has occurred;

        3.    the physician, when satisfied that death has occurred, shall certify the condemned inmate dead;

        4.    following the certification of death, the body of the condemned shall be surrendered to the State Medical Examiner;

        5.    after removal of the body, the chamber shall be restored and the news media permitted to return to photograph the chamber;

Exhibit 20 Page 41

6.    after the chamber has been photographed,
      the news media shall be returned to the
      designated area to brief the other
      assembled members of the news media;

7.

8.    the entire execution process will be
      reviewed and evaluated by the
      AuditBureau to permit a post-execution
      examination of the competence,
      efficiency and effectiveness of the
      execution procedures and staff (see TMF
      01/20).

TMF 01/04.02   Certification of Death

A.    After the drugs have been administered/or the
      execution completed by firing squad:

      1.    the Warden shall wait a maximum of three
            minutes;

      2.    the Warden shall then tell the DIO
            Director/designee to summon the
            attending physician to the condemned;
            and

      3.    the physician shall take the condemned's
            vital signs.

B.    If there are signs of life, the physician
      shall wait beside the condemned and check the
      vital signs every 60 seconds until vital
      signs cease.

C.    If execution is by firing squad, and if after
      a maximum of ten minutes from the first
      volley, there are still signs of life, the
      physician will inform the Warden.  The Warden
      will then initiate the steps in TMF 01/05.16.

D.    When no vital signs are detected, the
      physician shall certify death in keeping with
      standard medical practices.

TMF 01/04.03   Removing Witnesses from Execution Chamber

REVISED 06/10/10                    TMF 01/04  – pg. 41

Exhibit 20 Page 42

     2.    The Medical Examiner, or his designee,
         may issue the death certificate for
         deaths that occur at the prison. (UCA
         26-4-7, 26-4-10)

TMF 01/04.05    <u>Removing Executioners from the Execution Area</u>

    A.

    B.

    C.

TMF 01/04.06    <u>Site Clean-Up</u>

    A.    The injection team shall (if execution was by
        lethal injection):

        1.    use universal precautions and protective
            equipment to protect for blood or other
            potentially infectious materials;

        2.

        3.

        4.

        5.

    B.    The Tie-Down Team shall be responsible for:

        1.    using universal precautions and
            protective equipment to protect against
            blood and other potentially infectious
            material; and

REVISED 06/10/10                TMF 01/04   - pg. 43

Exhibit 20 Page 43

A.    After the certification of death by the physician, the curtains shall be closed by the Warden and DIO Director/designee and the witnesses shall be escorted from the witness viewing rooms

    1.

    2.

    3.

    4.

    5.

B.    The news media shall be escorted to an alternate location in the execution building until they can be returned for the filming opportunity after the execution chamber has been cleaned up.

C.    The condemned inmate's witnesses, government witnesses, and the victim's witnesses shall be escorted to waiting transportation vehicles

D.

**TMF 01/04.04**   <u>Removal of Executed Inmate</u>

A.    After the witnesses have been removed:

    1.    if the execution is by lethal injection, the IV should be cut by the executioners in order for the catheters to remain in the executed inmate's body; and

    2.

B.    The State Medical Examiner/designee shall be escorted into the death chamber

    1.    The State Medical Examiner has jurisdiction over all deaths that occur at the Utah State Prison. (UCA 26-4-7)

REVISED 06/10/10                          TMF 01/04   – pg. 42

Exhibit 20 Page 44

2.    cleaning up the execution site, using
        universal precautions where appropriate.

TMF 01/04.07    News Media Re-Entry to Execution Site

A.    After the site is restored and cleaned, the
        news media witnesses and pool photographers
        shall be escorted to the execution site.

B.    The photographers shall be permitted to
        tape/photograph the site and observation cell
        (if approved by the Warden) as required in
        TMF 01/08.

C.

TMF 01/04.08    Returning to Standard Operation

A.

        1.

        2.

B.

C.

TMF 01/04.09    Review of Execution

Refer to TMF 01/20.

TMF 01/04.10    Post-Execution Countdown Schedule

See Exhibit 04-1 for the proposed schedule for the
post-execution period.
    (Sample for Lethal Injection)

Execution

REVISED 06/10/10                    TMF 01/04   - pg. 44

Exhibit 20 Page 45

```
                    _____
                          Date
```

```
0005 DIRECTOR/DESIGNEE GIVES WARDEN OK TO BEGIN EXECUTION
0005 TO 0006  CURTAINS PULLED
0006 TO 0008  LAST STATEMENT BY CONDEMNED
0008 SIGNAL BY WARDEN TO BEGIN EXECUTION
0023 SIGNAL BY EXECUTIONER THAT DRUGS HAVE BEEN ADMINISTERED
0024 DOCTOR BROUGHT INTO EXECUTION CHAMBER
0027 DOCTOR PRONOUNCES DEATH AND DEATH WARRANT SIGNED
0028 CURTAINS CLOSED
0029
0030
0031
0034 TIE DOWN TEAM/MEDICAL EXAMINER INTO DEATH CHAMBER TO REMOVE
     BODY
0036
0037

0038 CLEAN UP CREW INTO DEATH CHAMBER
0039
0040

0040 WARDEN GIVES DIRECTIVE FOR MEDIA TO RETURN TO EXECUTION
     CHAMBER
0100 MEDIA RETURNED TO STAGING AREA
```

Exhibit 20 Page 46

(Sample for Firing Squad)

Execution Time Line

_____
Date

0005 DIRECTOR/DESIGNEE GIVES WARDEN OK TO BEGIN EXECUTION
0005 TO 0006 CURTAINS PULLED
0006 TO 0008 LAST STATEMENT BY CONDEMNED
0008 SIGNAL BY DIRECTOR/DESIGNESS TO BEGIN EXECUTION
0011 DOCTOR BROUGHT INTO EXECUTION CHAMBER
0014 DOCTOR PRONOUNCES DEATH AND DEATH WARRANT SIGNED
0015 CURTAINS CLOSED
0017
0018
0019
0021 TIE DOWN TEAM/MEDICAL EXAMINER INTO DEATH CHAMBER TO REMOVE
     BODY
0023
0025

0026 CLEAN UP CREW INTO DEATH CHAMBER
0031 WARDEN GIVES DIRECTIVE FOR MEDIA TO RETURN TO EXECUTION
     CHAMBER
0050 MEDIA RETURNED TO STAGING AREA

REVISED 06/10/10                    TMF 01/04  - pg. 46

Exhibit 20 Page 47

```
TMF 01/05.00    EXECUTION PROCEDURES

TMF 01/05.01    General Provisions
TMF 01/05.02    Death Warrant
TMF 01/05.03    Selection of Executioners by Lethal Injection
TMF 01/05.04    Selection of Executioners by Firing Squad
TMF 01/05.05    Designation of Persons Required, Permitted or
                Prohibited from Witnessing the Execution
TMF 01/05.06    Disposition of Condemned Inmate's Property
TMF 01/05.07    Disposition of Money in Inmate Account
TMF 01/05.08    Disposition of the Body of the Condemned
TMF 01/05.09    Equipment Check/Inventory: Lethal Injection
TMF 01/05.10    Equipment Check/Inventory: Firing Squad
TMF 01/05.11    Acquisition and Storage of Drugs for Lethal
                Injection
TMF 01/05.12    Observation Period and Related Activities
TMF 01/05.13    Tie-Down Procedures: Lethal Injection
TMF 01/05.14    Tie-Down Procedures: Firing Squad
TMF 01/05.15    Execution by Lethal Injection
TMF 01/05.16    Execution by Firing Squad
TMF 01/05.17    Pre-Execution Rehearsals and Practices
TMF 01/05.18    Support Services Functions
```

Exhibit 20 Page 48

TMF 01/05.00   EXECUTION PROCEDURES

TMF 01/05.01   General Provisions

    A.   Purpose of Chapter

       1.   This chapter provides the procedures which are used when the Department exercises its statutory responsibility to carry out an execution.

       2.   The topics include those procedures which are employed:

          a.   immediately prior to receiving the death warrant;

          b.   from receiving the death warrant to and during the execution;

          c.   immediately following the execution; and

          d.   during the debriefing and audit phases of the execution.

    B.   Policies

       1.   It is the policy of the Department that the procedures employed in preparing for and carrying out an execution be comprehensive and clearly defined.

       2.   The procedures shall be developed consistent with state and federal law.

TMF 01/05.02   Death Warrant

    A.   Judgement of Death

       1.   When judgment of death is rendered, a warrant signed by the judge and attested by the clerk under the seal of the court, shall be drawn and delivered to the sheriff of the county where the conviction is made.  77-19-6 UCA

       2.   The Sheriff shall deliver the warrant and a certified copy of the judgment to the UDC Executive Director/designee at

Exhibit 20 Page 49

the time of delivering the defendant to the custody of the Department.  77-19-6 UCA

3.   The warrant states the conviction and judgment, the method of execution, and the appointed day the judgement is to be executed.  The Department of Corrections shall determine the hour, within the appointed day, at which the judgement is to be executed.

B.   Return Upon Death Warrant

1.   After the execution, the UDC Executive Director/designee shall make a return upon the death warrant showing the time, place and manner in which it was executed.  77-19-12 UCA

a.   The "Certificate of Execution":

(1)   shall be signed by the Warden and the physician; and

(2)   shall include the full names and official titles of the official witnesses.

b.   The "Certificate of Execution" shall be submitted for review to the Executive Director/designee.

c.   Following review by the Executive Director/designee, the "Certificate of Execution" shall be returned to the Warden.

2.   The "Certificate of Execution" shall be directed by registered mail to the clerk of the court of the county from which the individual executed was sentenced.

3.   A return receipt shall be requested from the recipient.

4.   A copy of the certificate shall be placed in the deceased inmate's file.

TMF 01/05.03   Selection of Lethal Injection ExecutionTeam

REVISED 06/10/10                    TMF 01/05   - pg. 49

Exhibit 20 Page 50

A.   <u>Statutory Requirements</u>

    1.   The Executive Director/designee shall ensure that the method of judgment of death specified in the warrant is carried out at a secure correctional facility operated by the department at an hour determined by the department on the date specified in the warrant.  77-19-10 (1) UCA

    2.   When the judgment of death is to be carried out by lethal intravenous injection, the executive director of the department or his designee shall select two or more persons trained in accordance with accepted medical practices to administer intravenous injections, who shall each administer a continuous intravenous injection, one of which shall be a lethal quantity of sodium thiopental or other equally or more effective substance sufficient to cause death.  77-19-10 (2) UCA

B.   <u>Selection of Execution Team</u>

    1.   If the judgment of death is to be carried out by intravenous lethal injection, a minimum of two persons, each trained to administer intravenous injections shall be selected for the IV team.

    2.   Method of Selection

        a.   The DIO Director/designee and the Warden of the Utah State Prison, Draper site, shall be members of the execution team by virtue of their official position.

        b.   The Executive Director/designee, DIO Director/designee and the

REVISED 06/10/10                       TMF 01/05   – pg. 50

Exhibit 20 Page 51

Warden shall select a minimum of
four (4) additional members, other
than the DIO Director/designee and
Warden, for the execution team.

1. Of the four (4) additional
   members, a minimum of two (2)
   execution team members will be
   on the IV team.

2. No member of the execution team,
   other than the DIO
   Director/designee and Warden,
   shall be required to serve as a
   member of the execution team
   without consent.

3. The Executive Director/designee,
   DIO Director/designee, and
   Warden will designate one
   execution team member as the
   execution team leader.

   a. The execution team leader
      shall not be the DIO
      Director/designee or the
      Warden; and

   b. The execution team leader
      shall not be a member of the
      IV team.

4. The Executive Director/designee,
   DIO Director/designee, and
   Warden shall review the
   qualifications of the IV team
   members according to
   requirements outlined in
   subsection (3)(a through d) and
   other relevant information as to
   appropriate training and skills
   in administering intravenous
   injections.  One IV team member
   will be designated as the IV
   team leader.

c.  Following the examination and
    evaluation of candidates, the
    Executive Director/designee, DIO
    Director/designee and Warden, shall

REVISED 06/10/10                    TMF 01/05   - pg. 51

Exhibit 20 Page 52

select the execution team members.

    d.   All execution team members shall read and understand the execution procedures. The Warden shall conduct a review of the execution procedures annually.

3.   IV Team Qualifications

    a.   At least two (2) members of the execution team shall be designated as the IV team for an execution by lethal injection.

    b.   Each member of the IV team shall be a:

        1.   Phlebotomist;

        2.   Emergency Medical Technician;

        3.   Paramedic; or

        4.   Military Corpsman.

    c.   Each member of the IV team shall:

        1.   Have at least one (1) year of professional experience in his specialty;

        2.   Remain certified in his specialty or profession; and

        3.   Fulfill all continuing education requirements in his specialty or profession.

    d.   Prior to participating in an execution, the members of the IV team shall have participated in at least three (3) complete execution practices.

4.   Securing Services

a. The Warden/designee shall contact those chosen for the execution team to notify them of their selection and verify their willingness and availability to perform the duties of execution by lethal injection.

1.   If any person declines participation, the Executive Director/designee, DIO Director/designee and Warden will select a replacement according to the processes outlined in this section.

2.   If all of the execution team members agree to participate, their individual roles as execution team members shall be explained to them.

b.

TMF 01/05.04   Selection of Executioners by Firing Squad

A.   Statutory Requirements

1.   "The Executive Director of Corrections/ designee shall ensure that the method of judgment of death specified in the warrant is carried out at a secure correctional facility operated by the Department of Corrections." 77-19-10(1) UCA

2.   "If the judgment of death is to be carried out by firing squad, the Executive Director of Corrections or his designee shall select a five-person firing squad of peace officers." 77-19-10 (3) UCA

REVISED 06/10/10                          TMF 01/05   - pg. 53

Exhibit 20 Page 54

B. <u>Selection of Executioners</u>

1. A five-person execution team, plus two alternates and a team leader shall be chosen for the firing squad.

2. The alternate(s) shall be selected to replace any member(s) of the firing squad who are unable to discharge their required functions.

3. Persons selected for the firing squad shall be POST certified peace officers.

4. Selected peace officers will be required to demonstrate proficiency with weapons designated to carry out the execution.

    a. Under conditions substantially similar to those of the execution chamber, proficiency shall be exhibited by:

        1. Firing each weapon.

        2. At a minimum of 21 feet, accurately hitting the target of the same dimension as that which will be attached to the condemned.

    b. During the proficiency test, failure to accurately hit the specified target with one round from each weapon fired shall disqualify the officer.

5.

C. <u>Method of Selection</u>

1. The Executive Director/designee, DIO Director and Warden shall be responsible for the selection process.

REVISED 06/10/10

TMF 01/05   - pg. 54

Exhibit 20 Page 55

   2.

   3. The final choice of firing squad members shall be the responsibility of the Executive Director/designee, DIO Director and Warden.

   4. The Executive Director/designee, DIO Director/designee and Warden shall review the qualifications of the firing squad, including required proficiency as outlined in section (B4) and other relevant information.

  D. <u>Securing Services</u>

   1. The Executive Director and/orWarden shall contact those chosen for the firing squad, alternates and team leader to notify them of their selection and to verify their willingness and availability to perform the execution duties.

    a. If any person rescinds his original offer to participate, the selection team shall meet to select a replacement.

    b. If all of the selectees agree, their individual roles shall be explained to them.

   2.

TMF 01/05.05 <u>Designation of Persons Required, Permitted or Prohibited from Witnessing the Execution</u>

  A. The Utah Code limits and identifies those persons who may attend and witness the execution.  (See TMF 01/07.03.)

REVISED 06/10/10      TMF 01/05  – pg. 55

Exhibit 20 Page 56

B.   The Warden shall designate the required
     personnel to carry out the statutory
     requirements of an execution.   Staff should
     include:

    1.        Deputy Warden;

    2.     Observation Officers

    3.       Tie-down Officers,

    4.     one Team Foreman for the escort/Tie-Down
          Team;

    5.     executioners (reference TMF 01/05.03 &
          .04);

    6.     Clean-up Officers (number to be
          determined by the Warden/designee),
          assigned to clean up the execution
          chamber immediately following the
          execution;

    7.     Guide Officers (number to be determined
          by the Warden/designee);

    8.

    9.

C.   The Warden/designee shall designate the
     appropriate resources necessary to carry out
     the requirements of an execution.   The
     designated individuals shall be responsible
     for:

    1.     advising the Warden concerning any
          medical supplies, etc.;

    2.     the preparation and supervision of meals
          prepared during the observation period,
          and for the condemned inmate's last
          meal;

Exhibit 20 Page 57

3.  ordering, verifying, picking-up the drugs, equipment, etc., necessary to carry out an execution by lethal injection; and

4.  pronouncing the death of the condemned inmate.

TMF 01/05.06  Disposition of Condemned Inmate's Property

A.  Contact with Condemned Inmate

1.  At least 30 days prior to the scheduled execution the condemned inmate should be contacted to discuss arrangements for disposing of his property.

2.  At least 14 days prior to the execution property-disposition arrangements should be finalized.

3.  At least seven days prior to the execution all paperwork required for final disposition should be completed.

4.  If the condemned is uncooperative, doesn't wish to make specific property-disposition arrangements, or for any other reason has not made arrangements for disposition, he shall be notified the property will be disposed of as required under 64-13-15 (1) UCA.

B.  Options for Disposing of Property

1.  Property may be released to an authorized visitor (family, friend or attorney).  The release would follow the normal property release procedures.

2.  Property may be mailed through the U.S. Postal Service.  The prison's Mail Unit shall process the mailing consistent with standard mail procedures.  Indigent status does not cover property-release postage.

3.  Property may be donated to a charitable organization.

REVISED 06/10/10                    TMF 01/05  – pg. 57

Exhibit 20 Page 58

    4.    If the condemned fails to designate a property-disposition option:

> "if property is not claimed within one year of death...it becomes property of the state and may be used for correctional purposes or donated to a charity within the state." 64-13-15 (1) UCA

C.    Release Procedure

    1.    Following a decision to release the condemned's property, the property shall be:

        a.    inventoried by       staff; and

        b.    transferred to the property room.

    2.    The release will then follow according to the appropriate release procedures. Refer to FDr14, "Inmate Property" and FDr03, "Inmate Mail."

**TMF 01/05.07**    Disposition of Money in Inmate Account

A.    Contact with Condemned Inmate

Follow the time-table for contact with the condemned outlined for property under TMF 01/05.06.

B.    Options for Disposing of Inmate Accounts

    1.    The condemned shall be required to complete a money transfer form releasing the money in his account to his next of kin or other person or organization of his choice.

    2.    If the condemned refuses or otherwise fails to complete the necessary forms, the funds shall be disposed of consistent with state law.

**TMF 01/05.08**    Disposition of the Body of the Condemned

A.    Release to Medical Examiner

Exhibit 20 Page 59

1.  After the executed inmate is pronounced dead, the body shall be released from the restraints and removed from the execution chamber.

2.  The body shall be immediately surrendered to the State Medical Examiner/designee.

Exhibit 20 Page 60

TMF 01/05.09    Equipment Check/Inventory: Lethal Injection

    A.   Responsibility

        1.   The IV team shall conduct a check of equipment and materials necessary to conduct the execution.

        2.

    B.   Inventory

        1.

        2.

        3.

            a.

            b.

        4.

    C.   Bloodborne Pathogen Precaution

        1.   As a precaution, all persons who may come in contact with the condemned's body fluids shall be issued rubber

REVISED 06/10/10                                    TMF 01/05 – pg. 60

Exhibit 20 Page 61

gloves and bloodborne pathogen
protection supplies and equipment.

TMF 01/05.10    Equipment Check/Inventory: Firing Squad

    A.    The Warden shall ensurean equipment check of
        appliances necessary to carry out an
        execution.

    B.

        1.

        2.

        3.

        4.

        5.

        6.

        7.

    C.    The execution team leader shall be
        responsible to arrange for:

        1.    .30-caliber rifles;

        2.    live rounds of ammunition;

        3.    blank rounds of ammunition;

        4.    practice sessions and dry fire;

        5.    ensuring equipment is clean and
            operable; and

        6.    back-up equipment for items 1, 2, 3,
            above.

    D.    prior to the execution:

        1.    the executioners shall be escorted into
            the execution chamber by the DIO
            Director/designee; and

2.

E.   Bloodborne Pathogens Precaution

As a precaution, all persons who may come in contact with the condemned's body fluids shall be issued rubber gloves and bloodborne pathogen protection supplies and equipment.

TMF 01/05.11   Procurement, Storage and Accountability of Chemicals for Lethal Injection

A.   Purchase

1.
              the Warden shall provide to the pharmacist for his official records a memorandum specifying:

a.   The drugs which must be obtained;

b.   A copy of the judgment of death; and

c.   A copy of the state statute.  77-19-10(2) UCA

2.                                         the pharmacist shall order the drugs from the vendor.  Upon receiving the drugs, the pharmacist shall:

a.

b.   Immediately notify the Warden that the drugs have been received;

c.

d.

Exhibit 20 Page 63

e.

1.

2.

3.

4.

f.

3.   Storage and Handling of Drugs

a.

b.   See the next two pages for the
Equipment and Materials Checklist.

UTAH STATE DEPARTMENT OF CORRECTIONS
Equipment and Materials Checklist: Execution by Injection

| Quantity | Item | Code |
|---|---|---|
| | Sodium Thiopental (Pentathal), 500 mgm., w/diluent | A |
| | Pancuronium Bromide (Paravulon), 50 mgm. Ampules | A |
| | Potassium Chloride, 240 miliequiv. Ampules | A |
| | Valium injection, 10 mgm | A |
| | Syringe, 60 cc Lur Lock | |
| | Syringe, 10 cc Lur Lock | |
| | Syringe, 5 cc Lur Lock | |
| | Needle, 18 Ga., 1 ½ | |
| | Needle, 25 Ga., 1 ¼ | |
| | Angiocath, 14 Ga., 2 ¼" | |
| | Angiocath, 18 Ga., 1 ¼" | |
| | Angiocath, 16 Ga., 1 ¼" | |
| | Normal saline, IV bad, 1000C | |
| | Lidocaine HCL, 2% w/Epinephrine | |
| | Lidocaine HCL, 2% w/o Epinephrine 2 | |
| | Solution injection set, 70" long with | |
| | Y-injection site:  Travenol Code: #2C0005S | |
| | Extension set, 35" long; Travenol Code #2C0066 | |
| | Stethoscopes | |
| | Boxes of alcohol preps | |
| | Rolls of Kling | |
| | Adhesive tape, 1" | |
| | Adhesive tape, 2" | |
| | Scissors, bandage, Pr. | |
| | Tourniquet | |
| | Hemostat, sterile | |
| | Flashlight, w/batteries | A |
| | Batteries, flashlight, (spares) | A |
| | Ace wraps 3" | |
| | Needle holders | |
| | 10 packs sterile gauze | |
| | Sharp containers | |

| | BIO-Hazardous trash bags | |
|---|---|---|
| | Extra large impervious gowns | |
| | IV hangars | |
| | Mayo stand | |
| | Terry cloth towels | |
| | Goose neck light | |
| | Blood spill kits | |
| | Trash containers | |
| | Electronic Heart Monitor (EKG) | |

TMF 01/05.12   Observation Period and Related Activities

     A.   Access

        1.

        2.

        3.

     B.   Preparation of the Observation Cell

        1.

           a.

           b.

           c.

        2.   Stocking the Cell

Exhibit 20 Page 66

a.   The observation cell shall be
     outfitted with the following items:

     (1)   mattress (1);

     (2)   pillow (1);

     (3)   pillow case (1);

     (4)   sheets (2);

     (5)   blankets (2);

     (6)   towel (1);

     (7)   soap, small (1);

     (8)   toilet paper, roll (1);

     (9)   jump suit (color to be
           determined by the Warden) (1);

     (10)  socks (1 pr.);

     (11)  shower thongs (1 pr.); and

     (12)  pocket comb, no metal (1).

b.   If requested, the cell will also
     have the following items purchased
     new

     (1)   Bible (1);

     (2)   magazine

     (3)   newspaper
               ; and

     (4)   photographs

c.   The following items may be given on
     request, as needed,

     (1)   toothbrush (1);

Exhibit 20 Page 67

(2)   toothpaste

(3)

d.   If the condemned inmate receives
mail the officer shall allow the
condemned inmate adequate time to
read the mail

f.

g.   Additional property shall be
approved by the warden.

3.   <u>Test Equipment</u>

a.

b.

C.

1.

2.

3.

REVISED 06/10/10                        TMF 01/05  - pg. 67

Exhibit 20 Page 68

4.

5.

6.

a

b.

D.   <u>Securing Condemned Inmate's Property/Cell</u>

1.

2.

3.

Exhibit 20 Page 69

b.

    (1)

    (2)

    (3)

    (4)

c.

    (1)

    (2)

    (3)

    (4)

4.    Personal property shall be separated from prison property, and the personal property put into a suitable container and sealed.  Each search team member shall initial the seal.

5.    The designated property officer shall sign for and assume responsibility for the inventoried property.

6.

    a.

Exhibit 20 Page 70

b.

7.

8.  The personal property shall be taken to
    the DIO property room for storage.

E.  <u>Observation Function</u>

1.

a.

b.

c.

d.

e.

f.

g.

2.

a.

b.

3.

4.

5.

F.    Activities During the Observation Period

1.

2.    Unless previously served, meal service,
including the last meal, shall be served
during the observation period.

3.

Exhibit 20 Page 72

4.

a.

b.

c.

Exhibit 20 Page 73

TMF 01/05.13   <u>Tie-Down Procedures: Lethal Injection</u>

A.   <u>Transfer of Condemned Inmate to Execution Site</u>

1.   The condemned inmate shall be escorted from the observation cell to the execution chamber by the Tie-Down Team.

2.

a.

b.

c.

d.

B.   <u>Positioning of Tie-down Team</u>

1.

2.

3.

4.

5.

C.   <u>Securing Inmate to Gurney</u>

REVISED 06/10/10                          TMF 01/05 - pg. 73

Exhibit 20 Page 74

1.

2.

    a.

    b.

    c.

    d.

    e.

    f.

    g.

3.

Exhibit 20 Page 75

       4.

       5.    Upon completion of the execution and as directed by the Warden, the Tie-Down Team shall enter the execution chamber and remove the straps in the reverse order as outlined above.

TMF 01/05.14   Tie-Down Procedures: Firing Squad

     A.   Bringing Condemned Inmate to Execution Chamber

        The condemned inmate should be escorted from the observation cell to the execution chamber by the Tie-Down Team

     B.   Positioning the Tie-Down Team

       1.

       2.

       3.

       4.

     C.   Securing the Inmate to the Chair

       1.

       2.

Exhibit 20 Page 76

        a.

        b.

    3.

    4.

    5.    Upon completion of the execution and as
directed by the Warden, the Tie-Down
Team shall re-enter the execution
chamber and remove the straps in reverse
order as outlined above.

TMF 01/05.15   <u>Lethal Injection Protocol</u>

    A.

      1.

      2.

REVISED 06/10/10           TMF 01/05 - pg. 76

Exhibit 20 Page 77

B.   Preparation of Syringes

1.

a.

b.

c.

2.   The execution team leader shall
provide the drug box to the IV team
leader.

a.   The IV team leader shall prepare
each chemical in accordance with
the manufacturer's instructions and
draw them into the two (2) sets of
syringes.

b.   The second member of the IV team
and the execution team leader shall
observe
preparation of the chemicals and
verify that the instructions and
procedures have been carried out
correctly.

c.

3.   The syringes containing the chemicals
shall be prepared and loaded in the
following order:

a.   Two 60-cc syringes, each containing
240 milliequivalents of Potassium
Chloride in 50-cc and label
syringes "Syringe #3.

b.   Two 60-cc syringes, each containing
fifty (50) milligrams of
Pancuronium Bromide in 50-cc and

label syringes "Syringe #2".

c.   Two 60-cc syringes, each containing three (3) gm of Sodium Thiopental in 50-cc and label syringes "Syringe #1".

d.   The secondary syringes containing each of the three chemicals are to serve the following purposes.

1.   Secondary syringe of Sodium Thiopental is prepared in the event the condemned has not lost consciousness sixty (60) seconds after the first administration of the chemical.

2.   Secondary syringes containing Potassium Chloride and Pancuronium Bromide are prepared in the event the condemned has not been pronounced dead after the first administration of the chemicals.

4.   Any syringes that are loaded with lethal injection chemicals that are not used during the execution shall:

a.   Be returned to the Warden by the execution team leader;

b.   Be destroyed by the Warden.

5.   Any unused chemicals that were not mixed in preparation of the lethal injection shall:

a.   Be returned to the Warden by the IV team leader;

b.   Be destroyed by the Warden.

REVISED 06/10/10                    TMF 01/05 - pg. 78

Exhibit 20 Page 79

C.

D.

E.   The IV team leader:

    1.   Shall, along with the second IV team
       member, verify two (2) labeled sets of
       each of the three (3) chemicals are
       present, filled, and clearly labeled;

    2.   Provide the two (2) labeled sets of each
       of the three (3) chemicals contained in
       the drug box to the execution team
       leader who will verify, along with
       another execution team member, selected
       by the execution team leader, the
       appropriate number of syringes have been
       surrendered and are clearly labeled; and

    3.   Prepare the IV set-up.

F.   IV Set-up Procedure by IV Team

    1.   The connector of Administration Set
       (McGaw V1417 or equivalent) shall be
       inserted into the bag of Normal Saline
       IV solution.

    2.   The Flo Trol clamp located above the "Y"
       site shall control the flow of solution.

    3.   A 35-inch Extension Set (Travenol 2C0066
       or equivalent) shall be connected to the
       needle adapter of the Administration
       Set.

4.  The set-up for administration into the back-up IV site may require additional Extension Sets due to the potential of additional distance.

5.  All connections should then be taped to ensure they do not come apart during the procedure.

6.  The tubing shall be cleared of air by removing the protector from the needle adapter and opening the Flo Trol clamp letting the tube fill with solution.

7.  The Flo Trol clamp shall then be closed and the protective cap over the needle adapter replaced.

8.  Steps 1 through 7 shall be repeated for the second set-up.

G.  <u>Injection Procedure by IV Team</u>

1.  The Warden shall order the condemned person escorted to the execution chamber and strapped to the gurney.

2.  The IV team shall run the IV lines to the condemned person by the following:

a.  Site and insert one (1) primary IV line; and

b.  Site and insert one (1) back-up IV line.

3.  The IV team members shall determine the location of the IV sites on the body of the condemned person.

4.

a.

b.

c.

d.

Exhibit 20 Page 81

H.   IV Placement Process by IV Team

    1.   The angiocath shall be inserted into the vein of the primary IV site.

    2.   To best ensure that a needle is inserted properly into a vein, the IV team members shall look for the presence of blood in the valve of the sited needle.

    3.   The inner needle is then withdrawn and the needle adapter is placed on the angiocath.

       a.

       b.

    4.   The flow of normal saline shall be started and administered at a slow rate to keep open.

    5.   Step 1 through 3 shall be repeated for the back-up IV site.

    6.   The Administration Sets shall be running at a slow rate of flow, to keep open and ready for the insertion of syringes containing the injection chemicals.

    7.   Both set-ups shall be observed by the IV team members to ensure they are both patent and functioning properly.

    8.   No further action is necessary at this time.

I.   Lethal Injection Procedure

    1.   The execution team shall:

REVISED 06/10/10                    TMF 01/05 – pg. 81

Exhibit 20 Page 82

a.   Securely connect the electrodes of the cardiac monitor to the condemned person; and

b.   Ensure the equipment is functioning properly.

2.   At the designated hour mandated for the execution, when everything is ready:

a.   The DIO Director/designee and Warden shall pull open the curtains covering the witness room windows.

b.   The Warden shall ask the condemned inmate if he has any last words or wishes to make a statement.

1.   The statement should not exceed two minutes.

2.   If the inmate uses foul language, the Warden should immediately proceed with the next step in the execution.

3.   If the statement exceeds two minutes, the execution shall proceed without waiting for the conclusion of his remarks.

4.   The Department, for the purpose of recording the condemned inmate's last words, may use audio recording equipment.

a.   The Department shall permanently destroy the recording made under this subsection not later than 24 hours after the completion of the execution.

b.   No form of duplication of the audio shall be permitted.

c.   The Warden, witnessed by the DIO Director/designee, shall

REVISED 06/10/10                                    TMF 01/05 - pg. 82

Exhibit 20 Page 83

destroy any audio
recording.

c.    At the conclusion of the remarks,
or when the Warden determines it is
time to proceed, a prearranged
signal shall then be given by the
Warden to the Executive
Director/designee.

d.    The Executive Director/designee
shall order the execution team
leader to begin the administration
of the chemicals providing:

1.    The earliest legal execution
time has been verified and has
passed; and

2.    No instruction to halt has
been received from the
Attorney General's Office.

e.    Following the instruction from the
Executive Director/designee to
execute the condemned inmate, the
execution team leader shall
immediately proceed with the
execution.

f.

1.

2.

3.

3.    Upon the Executive Director/designee's
order to proceed, the execution team
leader shall begin the following

REVISED 06/10/10                 TMF 01/05 - pg. 83

Exhibit 20 Page 84

sequence:

a.  The flow of the normal saline into the arm shall be cut off using the Flo Trol clamp.

b.  The clamp should be moved as close to the "Y" site as possible.

c.  The 18 ga needle of Syringe #1 (three (3) gm of Sodium Thiopental) shall be inserted into the "Y" site and the injection shall commence.

    1.  A steady, even flow of the injection shall be maintained with only a minimum amount of force applied to the syringe plunger.

    2.  When the entire contents of the syringe have been injected, syringe #1 shall be removed from the "Y" site.

d.  The Flo Trol clamp should then be opened fully and allowed to run for 15 seconds.

e.  The Flo Trol clamps shall then be closed.

f.  A period of sixty (60) seconds shall pass after the administration of the Sodium Thiopental and closure of the Flo Trol clamp.

    1.  After the passage of sixty (60) seconds:

        a. If it appears to the Warden based on his visual inspection that the condemned person is not unconscious:

           i.  The Warden shall notify the Executive Director/designee;

           ii. The Executive Director/designee

REVISED 06/10/10                                TMF 01/05 – pg. 84

Exhibit 20 Page 85

will order the
execution team to
switch to the back-
up IV site;

iii.   The Executive
Director/designee
shall order that the
back-up IV site be
used with a new flow
of Sodium Thiopental

(secondary syringe
labeled Syringe #1);
and

iv.   The Executive
Director/designee
shall order the
remaining sequence
of chemicals to be
injected through the
back-up IV site.

2.   If it appears to the Warden
based on his visual inspection
that the condemned person is
unconscious after the first
injection of Sodium
Thiopental, the Warden shall
notify the Executive
Director/designee who will
then order the execution team
to continue to the next step
in the sequence.

g.   The 18 ga needle of Syringe #2
(fifty (50) milligrams of
Pancuronium Bromide) shall be
inserted into the "Y" site and the
injection shall commence;

1.   A steady, even flow of the
injection shall be maintained
with only the minimum amount
of force applied to the
syringe plunger.

2.   When the entire contents of
the syringe have been
injected, Syringe #2 shall be

REVISED 06/10/10                          TMF 01/05 - pg. 85

Exhibit 20 Page 86

removed from the "Y" site.

h.   After syringe #2 has been given, the Flo Trol clamp should be opened fully for 15 seconds.

i.   The Flo Trol clamp shall then be closed.

j.   The 18 ga needle of Syringe #3 (240 milliequivalents of Potassium Chloride) shall be inserted into the "Y" site and the injection shall commence;

   1.   A steady, even flow of the injection shall be maintained with only the minimum amount of force applied to the syringe plunger.

   2.   When the entire contents of the syringe have been injected, Syringe #3 shall be removed from the "Y" site.

k.   The Flo Trol clamp shall then be opened fully and allowed to run for 15 seconds.

l.   The Flo Trol clamp shall then be closed.

m.   An execution team member designated by the execution team leader shall start a stopwatch once the lethal injections are complete.

n.   The execution team leader shall:

   1.   Observe the heart monitor; and

   2.   Advise the attending physician electrical activity of the heart has ceased as indicated by a flat line on the heart monitor.

o.   The Warden shall notify the Executive Director/designee if it appears an additional set of lethal chemicals needs to be administered

REVISED 06/10/10                    TMF 01/05 - pg. 86

Exhibit 20 Page 87

due to the following conditions:

1.   Heart monitor does not indicate a flat line after ten (10) minutes; or

2.   The attending physician is not able to declare the time of death after ten (10) minutes.

p.   In the event death has not occurred;

1. The Executive Director/designee will order the process established in subsection (2)(f) of this section and subsequent sections to continue with the secondary set of syringes until death has occurred.

q.   During the execution by lethal injection, the DIO Director/designee and Warden shall:

1.   Watch the primary IV site for failure, leakage, the catheter coming out of a vein, or any other problem.

2.   In the event that an IV fails, leaks, if the catheter comes out of the vein, or any other problem arises, the execution team shall be ordered to switch to the back-up IV.

3.   In the event the execution team is ordered to switch to the back-up IV, the DIO Director/Warden shall watch the back-up IV site for failure, leakage, the catheter coming out of a vein, or any other problem.

J.   Post Lethal Injection Steps

1.   When the physician declares death, the Executive Director/designee, DIO

REVISED 06/10/10                                    TMF 01/05 - pg. 87

Exhibit 20 Page 88

Director/designee and Warden shall be informed.

2. The DIO Director and Warden shall close the viewing room curtains.

3. The Executive Director/designee shall make appropriate contact with the Governor and Attorney General informing them of the completion of the execution.

K. Disposal of BIO-Hazardous Contaminated Items

1. The execution team leader shall place items that have been contaminated with blood or other potentially infectious materials (OPIM) that have the potential to puncture into a puncture proof container (sharps container).

2. The execution team leader shall place other types of blood or other potentially infectious materials in trash containers lined with a red BIO-Hazardous waste bag.

3. The Correctional Medical Administrator shall ensure that the contaminated waste is disposed of in the proper Dumpster.

TMF 01/05.16   Execution by Firing Squad

A.

B.

1. Refer to TMF 01/05.10.

2. The team leader shall load the weapons and prepare to issue them to the members of the firing squad.

3. Two rounds shall be loaded in each weapon.

4. Care shall be taken to preclude any knowledge by the members of the firing

REVISED 06/10/10                    TMF 01/05 – pg. 88

Exhibit 20 Page 89

       squad of who is issued the weapon with
       two blank cartridges.

C.    The Warden shall direct that an aiming point
       or target be placed over the condemned
       inmate's heart.

D.    Upon completion of "C", above, the Warden
       shall direct the person who placed the target
       to exit the execution chamber.

E.    After the target is in place and all
       witnesses are secured, the Warden shall
       direct that the viewing room curtains be
       opened.

F.    After all preliminaries are completed, the
       Warden, at the conclusion of the condemned
       inmate's last words (which shall not exceed
       two minutes and cease at any point should the
       condemned use foul language), shall place the
       hood over the condemned's head.

     (1)   Audio recording equipment may be used by
          the Department for the purpose of
          recording the defendant's last words.

     (2)   The Department shall permanently destroy
          the recording made under this subsection
          not later than 24 hours after the
          completion of the execution.

     (3)   No form of duplication of the audio
          shall be permitted.

     (4)   The Warden, witnessed by the DIO
          Director/designee, shall destroy any
          audio recording.

G.    The DIO Director/designee, Warden, and any
       other observers shall exit the execution
       chamber.

H.    When the Warden enters the executioners' room
       and secures the door, if no stay or delay in
       the execution has been ordered, the Executive
       Director/designee shall immediately order the
       firing squad team leader to begin the cadence
       for the executioners to fire.

Exhibit 20 Page 90

I.   A designated execution team member shall start a stopwatch once the first volley has been fired.

J.   If the condemned inmate appears to be unconscious, upon the order of the Executive Director, the Warden and DIO Director shall re-enter the execution chamber after the first volley.

   1.   The Warden shall wait a maximum of three minutes after the first volley and then call for the physician to check the vital signs of the condemned.

      a.   If there are signs of life, the physician shall wait beside the condemned and check the vital signs every 60 seconds.

      b.   When no vital signs are detected, the physician shall certify death in keeping with standard medical practices.

      c.   After death is certified, the Warden shall direct that the viewing room curtains be closed.

   2.   If, after a maximum of ten minutes from the first volley, the inmate is unconscious but alive, the Warden shall direct the physician to make a final check of the condemned's vital signs.

      a.   If on final check, vital signs are detected, the Warden shall order the physician to exit the execution chamber.

      b.   The Warden and DIO Director shall re-enter the executioner's room.

      d.   The Executive Director/designee shall order the firing squad team leader to make the weapons ready to fire.

      e.   The Executive Director/designee shall immediately order the firing squad team leader to begin the

REVISED 06/10/10                    TMF 01/05 – pg. 90

Exhibit 20 Page 91

cadence for the firing squad to
fire a second volley.

    f.   After the firing of the second
volley, the Warden and DIO Director
shall re-enter the execution
chamber and proceed with paragraph
"J,1", above.

K.   If, after the first volley is fired, the
condemned is obviously conscious, the
Executive Director/designee shall instruct
the firing squad team leader to immediately
prepare the weapons to fire again.

   1.   The firing squad team leader shall ready
the weapons in a controlled and safe
manner.

   2.   The firing squad team leader shall
ensure the executioners do not see which
weapon contains the blank cartridges.

   3.   When the weapons are ready, if the
condemned is still obviously conscious,
the Warden shall ensure no staff members
are in the execution chamber.

   4.   Upon notice from the Warden that the
execution chamber is clear, the
Executive Director shall immediately
order the firing squad team leader to
begin the cadence for the executioners
to fire a second volley.

   5.   After the second volley, continue with
"J", above.

L.   The Executive Director shall make
notification of the condemned's death to the
Governor and the Attorney General.

TMF 01/05.17   Pre-Execution Rehearsals and Practices

A.   A minimum of three rehearsals and practices
shall be conducted to carry out an execution
in a timely fashion maintaining the necessary

REVISED 06/10/10              TMF 01/05 - pg. 91

Exhibit 20 Page 92

security.  Practice/rehearsal shall be
provided for but will not be limited to:

1.   briefing;

2.   removing the condemned inmate from the
     observation cell;

3.

4.   escort to execution chamber;

5.   tie-down procedures completed;

6.   approximate time for IV injection
     procedure (execution time approximate);

7.   clearing and escorting witnesses to/from
     execution site;

8.   security curtains opened and closed;

9.   condemned inmate's body removed from
     execution table/chair;

10.

11.  clean-up;

12.  debriefing outlined;

13.  firing of weapons; and

14.  ensure sufficient precautions are taken
     to minimize the risk of bio-hazardous
     exposure.

B.   Planning backward from the execution shall be
     used to develop realistic time lines for each
     function involved in the execution.

C.

1.   Discrepancies, concerns or proposed
     modifications due to system problems

shall be immediately reported to the
Warden.

2.

TMF 01/05.18    Support Services Functions

A.    Food Services

1.    Observation Period Meal Service

a.

b.    The Food Services Director/designee
shall confirm the condemned's
choice of a last meal.  The
confirmation should be made 48-24
hours prior to the execution.

c.

d.

e.    Alcoholic beverages shall not be
served nor used for cooking.

2.    Beverage and Food Service for Staff

a.    Because of the length of time many
persons will be required to remain
on site without being able to
leave, it may be necessary to serve
food and beverages to those
assigned to the execution.

REVISED 06/10/10                    TMF 01/05 - pg. 93

Exhibit 20 Page 94

b.

c.  Food and beverage services may be provided to:

  (1)  the command post;

  (2)  the Information Center;

  (3)  the food preparation area of the building in which the execution will occur;

  (4)  to the Draper site Security Deputy Warden for delivery to perimeter posts; and

  (5)  other sites as needed.

d.

B.  Medical Staff

1.  Receipt of Death Warrant

Upon receipt of the death warrant the Correctional Medical Administrator shall:

a.  review the medical procedures, post orders and equipment checklist and make recommendations in writing to the Warden concerning any back-up or duplication of any medical

paraphernalia that may be necessary
to carry out an execution; and

b.   shall confer with the Chief
Physician and assign all execution-
related tasks to be completed.

2.   <u>Thirteen to Seven Days</u>

a.   At least thirteen days prior to the
execution the Warden shall provide
to the pharmacist, for his official
record, authorization to purchase
drugs. Authorization shall be in
the form of a memorandum including:

(1)   the names of the drugs which
shall be obtained;

(2)   a copy of the judgement of
death; and

(3)   a copy of the state statute
(77-19-10 (2) UCA).

b.   At least seven days prior to the
execution the pharmacist shall
order the drugs from the vendor
(refer to chapter TMF 01/05.11).

(1)   If the state's prime vendor
cannot deliver the drugs, the
pharmacists shall make
arrangements with other
vendors or hospitals to obtain
the drugs.

(2)   If the drugs cannot be
delivered to the prison by the
primary vendor or their
delivery service to the
prison, the pharmacist shall
notify the Correctional
Medical Administrator.

(2)   The Correctional Medical
Administrator shall make
arrangements with the Draper
site Security Deputy Warden to
have an officer accompany them

Exhibit 20 Page 96

to the location where the
other drugs may be obtained.

c.

3.

4.

5.

a.

b.

c.

6.

a.

(1) the sodium pentothal syringes
shall be prepared by the
pharmacist at the direction of
the Warden when it appears the
execution shall be carried
out;

REVISED 06/10/10                    TMF 01/05 - pg. 96

Exhibit 20 Page 97

       (2)   a medical-response team shall
be on standby to provide any
medical attention which may be
needed during the time of the
scheduled execution;

       (3)   a USP emergency equipment kit
and a back-up kit shall be
made available at the
execution site; and

       (4)   the Correctional Medical
Administrator (CMA)/designee
and a USP Medical staff with
skills in intravenous
injections, I.V. set-up,
cut-down, etc., shall be
available at the execution
site to provide medical
assistance in the execution
chamber, if necessary.

  b.   Equipment and lethal drugs shall be
gathered up by the CMA/designee
following the execution.

       (1)   The CMA/designee shall be
responsible for the disposal
of the medical equipment used
for lethal injection in
accordance with TMF 01/05.15.

       (2)

C.   <u>Maintenance Staff</u>

  1.   <u>Receipt of Death Warrant</u>

     a.   Upon receipt of the death warrant
the Deputy Warden Support Services
shall:

       (1)   review the maintenance
procedures and the equipment
checklist and make recom-
mendations in writing for
changes, additional equipment,
etc. as is viewed essential

REVISED 06/10/10               TMF 01/05 - pg. 97

Exhibit 20 Page 98

and provide such
recommendations to the Warden
prior to the scheduled
execution date; and

(2)   confer with the Maintenance
Director and assign all
execution related tasks to be
completed.

b.   The Maintenance Director shall then
prepare a task completion calendar
which shall be presented to the
Deputy Warden Support Services for
approval, including:

(1)   a review of the maintenance
procedure and the equipment
checklist;

(2)   recommendations to the Warden
in writing of changes,
additional equipment, etc. as
is viewed essential
prior to the scheduled
execution date;

(3)   identification of strategies
to ensure that all systems,
equipment, and mechanisms
associated with the execution
facility are functional and
are readily repairable given
an unexpected malfunction;

(4)   identification of emergency
equipment, materials, and
substances necessary to ensure
that system, equipment, and/or
mechanism malfunctions are
expeditiously remedied;

(5)   establishment of inspection
checklist and time frames for:

(a)   the facility designated
for the execution;

(b)   the observation cell; and

(c)   emergency backup systems;

    (6)   ensuring that all maintenance service/repair trucks are in good operational condition and supplied with equipment, tools, and supplies necessary to correct all execution related emergencies; and

    (7)   identification of maintenance personnel necessary to address all execution day maintenance emergencies.

2.

The Maintenance Director shall:

a.   complete a pre-inventory check of the necessary equipment; and

b.   complete a written report to the Deputy Warden Support Services of equipment, etc. requiring repair, replacement or duplications, including recommendations to correct problems and time frame necessary to make necessary corrections.

3.

The Deputy Warden Support Services shall direct the Maintenance Director to:

a.

c.   conduct an inspection of the following equipment:

    (1)   execution chamber;

    (2)   observation cell; and

    (3)   emergency back-up systems and equipment.

4.

TMF 01/05 - pg. 99

Exhibit 20 Page 100

a.

(1)

(2)

(3)

b.   A pre-inventory check shall be
completed to ensure equipment is
operational and in proper working
order.

5.

a.

(1)

(2)

(a)

(b)

(c)

(3)   emergency back-up systems and
equipment.

b.   Emergency equipment shall be
checked to ensure readiness for the
execution.

6.

a.   Complete the procedures as outlined
in 5, above.

b.

c.

Exhibit 20 Page 101

Exhibit 20 Page 102

d.

    (1)

    (2)

    (3)

    (4)

    (5)

    (6)

Exhibit 20 Page 104

```
TMF 01/07.00   WITNESSES

TMF 01/07.01   General Provisions
TMF 01/07.02   News Media Witnesses
TMF 01/07.03   Designation of Persons Required, Permitted or
               Prohibited from Witnessing
TMF 01/07.04   Witness Agreement
```

REVISED 06/10/10                    TMF 01/07  - pg. 107

Exhibit 20 Page 105

TMF 01/07.00   <u>WITNESSES</u>

TMF 01/07.01   <u>General Provisions</u>

      A.   <u>Purpose of Chapter</u>

         The purpose of this chapter is to:

         1.   identify the types and number of witnesses permitted to attend the execution; and

         2.   to provide legal requirements concerning the witnessing of the execution.

      B.   <u>Policy</u>

         It is the policy of the Department that:

         1.   procedures for selecting witnesses to the execution shall conform with 77-19-11 UCA;

         2.   witnesses shall enter into written agreements before being approved for attendance; and

         3.   witnesses shall be subject to search prior to being admitted.

TMF 01/07.02   <u>News Media Witnesses</u>

      A.   Members of the news media shall be permitted to witness the execution.

      B.   Selection shall be at the discretion of the Executive Director/designee.

      C.   Refer to TMF 01/08 for news media selection procedures.

TMF 01/07.03   <u>Designation of Persons Required, Permitted or Prohibited from Witnessing</u>

      A.   The Utah Code limits and identifies those persons who may attend and witness the execution.

Exhibit 20 Page 106

1. The Executive Director of Corrections or his designee shall:

   a. cause a physician to attend the execution, 77-19-10 (5) UCA; and

   b. permit the attendance at the execution of members of the press and broadcast news media named by the Executive Director of the Department/or his designee, 77-19-11 (4) UCA.

2. At the discretion of the Executive Director of the Department of Corrections/designee, the following may attend the execution:

   a. the prosecuting attorney, or his designated deputy, of the county in which the defendant committed the offense for which he is being executed, 77-19-11 (2)(a) UCA;

   b. no more than two law enforcement officials from the county in which the defendant committed the offense for which he is being executed, 77-19-11 (2)(b) UCA;

   c. the Attorney General or his designee, 77-19-11 (2)(c) UCA;

   d. religious representatives, friends, or relatives designated by the defendant, not exceeding a total of five persons, 77-19-11 (2)(d) UCA; and

   e. unless approved by the Executive Director, no more than five close relatives of the deceased victim, as selected by the Executive Director, but giving priority in the order listed in TMF 01/01.04.

3. The persons enumerated in Subsection (2) may not be required to attend, nor may any of them attend as a matter of right, 77-19-11 (3) UCA.

Exhibit 20 Page 107

4. The following persons may also attend the execution:

   a. staff as determined necessary for the execution by the Executive Director of the Department of Corrections/designee; and

   b. no more than three correctional officials from other states that are preparing for executions, but no more than two correctional officials may be from any one state, as designated by the Executive Director of the Department of Corrections or his designee, 77-19-11 (7)(a) UCA.

5. Other necessary staff designated by the Executive Director of the Department of Corrections/designee shall be permitted to the execution.

   a. The "necessary staff" shall include those persons identified in the post orders and procedures in TMF 01.

   b. "Necessary staff" shall not be limited to members of the Utah Department of Corrections but may include members of allied agencies assisting with the execution.

6. The Department is empowered and directed by 77-19-11 (8) UCA to adopt rules governing the attendance of persons at the execution.

7. No person under the age of 18 may attend the execution.

B. For those persons who shall carry out the execution or serve in support roles in the execution area, refer to TMF 01/05.05 B, C.

REVISED 06/10/10                    TMF 01/07 - pg. 110

Exhibit 20 Page 108

TMF 01/07.04   <u>Witness Agreement</u>

(See following page for Witness Agreement.)

**Rules of Conduct for Witnesses Observing an Execution
at the
Utah State Prison**

1.  That you will not bring onto prison property anything constituting legal or illegal contraband under any applicable statute, rule, or policy including any firearm, dangerous weapon, implement of escape, explosive, spirituous of fermented liquor, medicine, poison, or any other item creating a threat to the safety, security, or management of the prison;

2.  That you agree to submit to a reasonable search for contraband and other searches as considered necessary by the Department for entry to Department prison and staging area property;

3.  That you conduct yourself in a lawful and orderly manner;

4.  That you comply with all lawful directives of correctional personnel while on Department property;

5.  That you will not bring to the execution site any photographic or recording equipment; and

6.   That you understand that the Department of Corrections will not provide mental health services to witnesses.

7.  That you understand the Department of Corrections is required to record/report the names of all witnesses in attendance as well as provide the information to media representatives.


I have read the above rules and agree to abide by them.  I understand that my failure to comply with the rules will result in my immediate removal from Department of Corrections property and that I may be subject to criminal prosecution.



_____          _____
    Signature of Witness                          Date


_____          _____
UDC Representative                                Date



REVISED 06/10/10                    TMF 01/07 - pg. 111

Exhibit 20 Page 109

TMF 01/08.00    NEWS MEDIA PROCEDURES

TMF 01/08.01    General Provisions
TMF 01/08.02    News Media Selection
TMF 01/08.03    Alternate Coverage/Accommodations
TMF 01/08.04    News Media Attendance at the Execution
TMF 01/08.05    Limitations on Coverage
TMF 01/08.06    News Media Briefing
TMF 01/08.07    News Media Support and Equipment
TMF 01/08.08    Media Representative Agreement

Exhibit 20 Page 110

TMF 01/08.00   <u>NEWS MEDIA PROCEDURES</u>

TMF 01/08.01   <u>General Provisions</u>

    A.   <u>Purpose of Chapter</u>

        The purpose of this chapter is:

        1.   to provide the policies, procedures and requirements for providing access to the execution and information relating to the execution to the news media;

        2.   to provide the procedure for:

            a.   releasing background information;

            b.   releasing information during the execution;

            c.   coverage of the execution; and

        3.   to provide requirements for safeguarding the institution and protected information.

    B.   <u>Policy</u>

        1.   It shall be the policy of the Department to permit press access to the execution and information concerning the execution consistent with the requirements of the constitutions and laws of the United States and state of Utah.

        2.   The Department is generally required to provide no more access to the news media, to the inmates and facilities it supervises and controls than that available to the general public.

        3.   The Department and the Utah Code recognize the need for the public to be informed concerning executions conducted by the Department of Corrections.

            a.   The Department will participate and cooperate with the news media to inform the public concerning the execution.

            b.   Information should be provided in a timely manner.

4.   If the condemned is willing, the
     Department may allow an opportunity
     forthe condemned to speak with the news
     media.  If allowed, the interview may:

     a.   include those members of the news
          media selected to witness the
          execution;

     b.   include additional members of the
          news media authorized by the
          Department, but not including more
          than one reporter from the same
          agency; and

     c.   be held at a time and location
          determined by the Department.

5.   During exigent circumstances,
     communication may be temporarily
     suspended until the situation has been
     stabilized.  Exigent circumstances shall
     include, but not be limited to:

     a.   riots;

     b.   hostage situations;

     c.   fires or other disasters; or

     d.   other inmate disorders.

6.   Refer to Chapter AGr05,"Media Relations"
     for general news media access to
     information, inmates and facilities.

TMF 01/08.02   News Media Selection

A.   Number in Attendance

     The Department shall permit members of the
     press and broadcast news media to witness the
     execution.

B.   Authority to Select

     The Executive Director/designee shall be
     responsible for selecting the members of the

REVISED 06/10/10                    TMF 01/08 - pg. 114

Exhibit 20 Page 112

news media who will be permitted to witness the execution.  77-19-11(4) UCA

C.   Selection Process

1.   After the court sets a date for the execution of the death penalty, news directors or editors may submit a written list of news media witnesses (one per organization) and other news personnel needed at the execution, to the attention of the Executive Director at least 30 days prior to the execution. When administrative convenience or fairness to the news media dictates, the Department in its discretion may extend the request deadline.

2.   Requests for consideration may be granted by the Executive Director/designee provided they contain the following:

a.   a statement setting forth facts showing that the requesting individual falls within the definition of "member of the press and broadcast news media" set forth in these regulations;

b.   an agreement to act as a pool representative as described in these regulations;

c.   an agreement that the media member will abide by all of the conditions, rules and regulations while in attendance at the execution; and

d.   agreement that they will conduct themselves consistent with existing press standards.

3.   Upon receipt of a news director's or editor's request for permission for news media witnesses to attend the execution, the Executive Director/designee may take such steps as he deems necessary to verify the statements made in the request. After verifying the information in the requests, selection

REVISED 06/10/10                    TMF 01/08  - pg. 115

Exhibit 20 Page 113

of witnesses shall be made by the
Executive Director/designee.

4.   The Executive Director/designee shall
identify the media members who have been
selected to witness the execution.
Media members shall be selected on a
rotating basis from the following
organizations:

a.   Salt Lake daily newspapers;

b.   television stations licensed and
broadcasting daily in the State of
Utah;

c.   one newspaper of general
circulation in the county in which
the crime occurred;

d.   one radio station licensed and
broadcasting in the State of Utah;
and

e.   the remainder from a pool of
broadcast, print and wire services
news media organizations operating
in Utah.

5.   In the event that the Executive Director
is unable to name a news media witness
from each of the above-described
organizations, he shall name other
qualifying media members to attend.

6.   No news media witnesses other than those
named to attend the execution as
described in this chapter shall be
permitted to witness the execution.

D.   Pool Photographers

1.   Two photographers shall be appointed as
pool photographers to photograph/film
the execution chamber following clean
up.

2.   The pool photographers may be selected
from agencies other than those

represented among those witnessing the execution.

TMF 01/08.03   Alternate Coverage/Accommodations

A.   Additional Media Selected

1.   The Executive Director may designate additional members of the press and broadcast news media who request and receive permission to be allowed at a location designated by the Executive Director on prison property during the execution.

2.   The additional media selected shall be from both the print and broadcast media.

B.   Alternate Location

1.   The alternate location shall be a press briefing area.

2.   Media members must contact the Department's Public Affairs Director at least 14 days prior to the execution date to make any special arrangements for hook ups or other necessary arrangements.  Any expense incurred shall be borne by the specific news media requiring special equipment or hook ups.

3.   No special access nor briefings will be provided to members of the press who are not selected as witnesses nor selected for the alternate site.

4.   The alternate site shall be made available to the selected members of the news media at 1700 hours the day prior to the scheduled execution date.

C.   Briefing Media at the Alternate Site

1.   The Public Affairs Director shall arrange for:

a.   pre-execution briefings;

b.   distribution of media briefing packages;

        c.    briefings throughout the execution event; and

        d.    post-execution briefings by the news media who witnessed the execution.

    2.    The news media witnesses to the execution shall be returned to the media briefing area to answer questions from media members at the alternate site.

TMF 01/08.04   <u>News Media Attendance at the Execution</u>

    A.    The Warden/designee shall permit the members of the press and broadcast news media, selected by the Executive Director/designee in accordance with these regulations, to witness the execution.

    B.    Each news media witness attending the execution shall be carefully searched prior to admittance to the execution chamber.

        1.

        a.    Electronic or mechanical recording devices include, but are not limited to, still, moving picture or video cameras, tape recorders or similar devices, broadcasting devices, or artistic paraphernalia, such as notebooks, and drawing pencils or pens, etc.

        b.    Violation of this prohibition is a class B misdemeanor. 77-19-11(5)

        c.    Only a small notebook (no larger than 4" x 6") and a pen or pencil issued by the Department shall be permitted.

    2.    Only the selected members of the news media (witnesses and two pool photographers) shall be allowed to

Exhibit 20 Page 116

attend the pre-execution briefing.  The
group will be escorted into a briefing
room.

a.

b.

c.

3.

a.

b.

4.   Persons requesting to witness the
execution shall be required to sign a
statement or release absolving the
institution or any of its staff from any

REVISED 06/10/10                          TMF 01/08  -  pg. 119

Exhibit 20 Page 117

legal recourse resulting from the exercise of search requirements or other provisions of the witness agreement.

C.   The Warden/designee shall not exclude any news media witness duly selected in accordance with these regulations from attendance at the execution except as described in these regulations, nor may the Warden/designee cause a selected news media witness to be removed from the execution chamber unless the media member:

  1.   refuses to submit to a reasonable search as permitted in these regulations;

  2.   faints, becomes ill or requests to be allowed to leave during the execution;

  3.   causes a disturbance within the execution chamber; or

  4.   refuses or fails to abide by the conditions and regulations set forth by the Department.

D.   The execution chamber shall be arranged so as to provide space for the attending news media witnesses and the space arranged shall have a view of the execution site, with the exception of:

  1.   a view of the members of the firing squad, if employed; or

  2.   if lethal injection is chosen, those directly administering the method of execution, who shall be concealed from the view of the media members so that their identities will remain unknown.

E.   The selected news media witnesses shall be transported as a group to the execution location prior to the execution and shall be allowed to remain there throughout the proceeding.

F.   The Department shall designate a representative or representatives to remain with the media members throughout the execution proceedings for the purpose of supervising and escorting.

REVISED 06/10/10                    TMF 01/08  -  pg.120

Exhibit 20 Page 118

G.   News media witnesses shall be admitted to the execution area on the date set for the execution only after:

1.   proof of identification have been presented to the Public Affairs Director/designee at the staging area;

2.   receiving an orientation by the Public Affairs Director/designee; and

3.   signing an agreement to abide by conditions required of news media witnesses to the execution.

H.   After the execution has been completed and the site has been restored to an orderly condition, news media witnesses may be permitted to return to the execution chamber for purposes of filming, photographing and recording the site.

1.   Re-entry to the site shall be permitted only after the site has been restored to an orderly condition, including:

a.   removal of the body of the condemned;

b.   evacuation of those involved in administering the execution; and

c.   clean up of the execution chamber.

2.   Restoring the site to an "orderly condition" prior to the filming opportunity shall not unnecessarily disturb the physical arrangements for the execution.

3.   Media members permitted to return to the execution chamber for the filming and recording of the site shall include:

a.   the news media witnesses who were selected to witness the execution;

b.   one pool television camera man; and

c.   one pool newsprint photographer.

REVISED 06/10/10                          TMF 01/08  -  pg. 121

Exhibit 20 Page 119

4.  The film/videotape shall not be used in any news or other broadcast until made available to all agencies participating in the pool.  All agencies receiving the film/videotape will be permitted to usethem in news coverage and to retain the film/videotape for file footage.

I.  News media representatives shall, after being returned from the execution to the staging area, act as pool representatives for other media representatives covering the event.

1.  The pool representatives shall meet at the designated media center and provide an account of the execution and shall freely answer all questions put to them by other media members and shall not be permitted to report their coverage of the execution back to their respective news organizations until after the non-attending media members have had the benefit of the pool representatives' account of the execution.

a.  News media members attending the post-execution briefing shall agree to remain in the briefing room and not leave nor communicate with persons outside the briefing room until the briefing is over.

b.  The briefing shall end when the attending news media members are through asking questions or after 90 minutes, whichever comes first.

2.

TMF 01/08.05   Limitations on Coverage

A.  The Warden, with the concurrence of the Executive Director, may alter these regulations to impose additional conditions, restrictions and limitations on media coverage of the execution when such requirements become necessary for the

REVISED 06/10/10                           TMF 01/08 – pg. 122

Exhibit 20 Page 120

preservation of prison security, personal
safety or other legitimate interests which
may be in jeopardy.

B.   If extraordinary circumstances develop, the
additional conditions and restrictions
shallbe no more restrictive than required to
meet the exigent circumstances.

TMF 01/08.06   <u>News Media Briefing</u>

A.   <u>Pre-Execution Briefing Packets</u>

1.   The Public Affairs Director shall
prepare a press briefing packet for
reporters approved to witness the
execution, or to cover the execution
from the news media staging area.

2.   The briefing press packet should be
provided to news media representatives
as they arrive at the staging area.

3.   The contents of the press briefing
packet shall include, but not be limited
to, biographical information on the
condemned, the list of official
witnesses, pool reporters, family
witnesses, execution procedures,
sequence of events, and the history of
executions in Utah.

4.   Updates will generally be communicated
and/or distributed to the press on an
hourly basis beginning about 1700 hours
the day preceding the execution.
Briefing updates should include:

a.   a summary of activities related to
the execution procedures and
sequence of events; and

b.   a summary of the condemned inmate's
activities during his final 24
hours.

B.   <u>Death Announcement</u>

1.   The Public Affairs
Representative/designee shall read a
prepared statement to the press, prior
to the post-execution press conference,
announcing that the execution has been
completed.

2.  The announcement shall include, but not be limited to:

    a.  the time of the execution;

    b.  the time the condemned was pronounced dead; and

    c.  the condemned's final words.

C.  <u>Post-Execution Conference</u>

1.  The post-execution conference shall begin immediately following the arrival of the pool reporters from the execution site.

2.  The Public Affairs Director shall introduce the members of the press who witnessed the execution and facilitate the post-execution conference.

3.  The Executive Director, Deputy Director, Institutional Operations Division Director and/or Warden may appear and answer questions at the press conference.

4.  The post-execution conference shall continue for ninety minutes or until the questioning of the reporters who witnessed the execution has been completed; whichever comes first.

D.  <u>Travel Routes</u>

1.

2.

E.  <u>Media Center</u>

1.  The Media Center shall be located in the designated staging area.

REVISED 06/10/10                         TMF 01/08  – pg. 124

Exhibit 20 Page 122

2.   The Public Affairs Director shall assume responsibility for routine press briefings at the Media Center.

3.   Press briefings and the post-execution conference will be held at the Media Center.

4.   News media personnel may not access nor occupy any other part of the staging area.  The media shall have access only to the designated media center.

5.   Members of the news media may not seek, speak to or interview any official visitor while at the staging area.

6.

TMF 01/08.07   <u>News Media Support and Equipment</u>

A.   <u>Telephones</u>

1.   The Public Affairs Director shall coordinate all telephone needs with the Deputy Warden Support Services at the Utah State Prison.

2.   Each news agency requiring dedicated telephone lines, shall submit in writing its telephone needs to the Public Affairs Director 14 days prior to the scheduled execution.  Agencies requesting dedicated phone lines will be responsible for the cost of those lines.

3.   The Department shall install a reasonable number of telephones, for local use and collect calls only, for news media use at the Media Center.  If the Department is unable to install collect-call only telephones, personal cellular phones may be used.

B.   <u>Electrical Outlets</u>

REVISED 06/10/10                    TMF 01/08 - pg. 125

Exhibit 20 Page 123

Each news agency must communicate its needs for electrical power to the Public Affairs Director 14 days prior to the scheduled execution.

C.  <u>Refreshments</u>

The Public Affairs Director may inquire about having a private caterer at the staging area for the media to purchase items.

D.  <u>News Media Support Vehicles</u>

1.

2.

TMF 01/08.08   <u>Media Representative Agreement</u>

(See following page for Media Representative agreement.)

REVISED 06/10/10                          TMF 01/08 - pg. 126

Exhibit 20 Page 124

**Rules of Conduct for Media Representatives Observing an Execution**
**at the**
**Utah State Prison**

1.  That you will not bring onto prison property anything constituting legal or illegal contraband under any applicable statute, rule, or policy including any firearm, dangerous weapon, implement of escape, explosive, spirituous of fermented liquor, medicine, poison, or any other item creating a threat to the safety, security, or management of the prison;

2.  That you agree to submit to a reasonable search for contraband and other searches as considered necessary by the Department for entry to Department prison and staging area property;

3.  That you conduct yourself in a lawful and orderly manner;

4.  That you comply with all lawful directives of correctional personnel while on Department property;

5.  That you will not bring to the execution site any photographic or recording equipment;

6.  That you understand that the Department of Corrections will not provide mental health services to witnesses; and

7.  That you understand the Department of Corrections is required torecord/report the names of all witnesses in attendance as well as provide the information to media representatives.


I have read the above rules and agree to abide by them.  I understand that my failure to comply with the rules will result in my immediate removal from Department of Corrections property and that I may be subject to criminal prosecution.


News Organization_____


_____          _____
   Signature of News Media Witness                    Date


_____          _____
   News Agency Editor/Producer                        Date


REVISED 06/10/10                     TMF 01/08 - pg. 127

Exhibit 20 Page 125

Exhibit 20 Page 126

TMF 01/20.00    REVIEWAND DOCUMENTATION

TMF 01/20.01    General Provisions
TMF 01/20.02    Review Assignment
TMF 01/20.03    Documentation of Execution
TMF 01/20.04    Retention and Safeguarding Documentation
TMF 01/20.05    UDC Employee Questionnaire

TMF 01/20.00    REVIEW AND DOCUMENTATION

TMF 01/20.01    General Provisions

      A.    Purpose of Chapter

          The purpose of this chapter is to provide the policies, procedures and requirements for reviewingthe execution process.

      B.    Policy

          1.    It shall be the policy of the Department that of the execution process shall be performed as ordered by the Executive Director.

          2.    Auditors assigned to perform thesereviewsshall beallowed access to designated aspects of the executionpreparation.

          3.    Auditors participating in the reviewof the execution are not to be involved in the execution preparationprocess, but shall act as observers only and, at all times, act in such a way that they create the least disruption possible in that process.

          5.    Appropriate documentation of the execution shall be created, collected, safeguarded, and retained to provide an adequate review trail and a proper historical record.

          6.    Documentation shall be protected in accordance with 64-13-25(2) UCA.

TMF 01/20.02    ReviewAssignment

      Authority to Conduct a Review

          1.    The Executive Director shall be responsible for determining if a reviewis to take place in each execution.

          2.    The Auditor(s) selected for the execution review shall, upon direction

from the Executive Director, prepare a questionnaire to be completed by staff involved in the execution process.  The survey shall be approved by the Executive Director and all responses shall be confidential.  Only the Executive Director may grant release of the survey responses.

TMF 01/20.03   Documentation of Execution

Documentation to be Retained

Documentation which shall be retained shall include:

1.   the warrant and all other legal papers;

2.   correspondence, both official and unofficial, which is received by the Department of Corrections;

3.   minutes of meetings held for purposes of planning or disseminating information;

4.   inter-agency written communication;

5.   intra-departmental written communication;

6.   logs, journals, chronological notes, etc., of key locations; and

7.   a newspaper file.

TMF 01/20.04   Retention and Safeguarding Documentation

A.   Execution File

1.   An execution file shall be established for each condemned person.  The file shall be organized into sections which should include:

a.   legal documents;

b.   official correspondence;

      c.   unofficial correspondence;

      d.   intra-departmental written communication;

      e.   chronological notes, logs, etc.; and

      f.   meeting minutes.

2. Each section of the execution file shall have material filed in chronological order.

3. All working documents which cannot be filed during the execution process or immediately after, shall be copied and a copy shall be placed in the execution file.

4. All intra-departmental communication shall have a courtesy copy to the execution file.

B. <u>Execution File Maintenance</u>

   1.

   2.

C. <u>Access to Execution File</u>

Only those individuals authorized by the Executive Director of Corrections, DIO Director, or Warden, shall have access to the execution file.

D. <u>Long-Term Storage</u>

To ensure that all documents concerning an execution shall be retained to provide a reviewtrail and an adequate historical record, the execution file shall be stored in accordance with the archive's plan of the Department.

TMF 01/20.05   UDC EMPLOYEE QUESTIONNAIRE

_____
Name of the Condemned

INSTRUCTIONS:

Please complete this questionnaire as soon after the execution as possible.  Answer
each question completely and accurately.  Add as many pages as necessary if answers
need more space.

Complete and return this questionnaire to the AuditBureau at Utah Department of
Corrections, 14717 S. Minuteman Drive, Draper, 84020, by _____.

Thank you.


FULL NAME:_____
TITLE:_____
LOCATION:_____
FUNCTION DURING THE
EXECUTION:_____

1.  Were you provided adequate direction for your area of responsibility?

    If you answered "No," please explain what direction would havebeen
    beneficial to you.

    _____
    _____
    _____


2.  Were you adequately trained or briefed in your area of  responsibility?

    Yes___No___

    If you answered "No," please explain what training or briefing would have
    been beneficial to you.

    _____
    _____
    _____


3.  Did you observe anything that you thought was not adequately addressed?

    Yes___No___

    If you answered "Yes," please explain.

    _____
    _____
    _____

Exhibit 20 Page 131

4.    Please make any additional comments or suggestions.

_____
_____
_____
_____
_____
_____
_____
_____

**THANK YOU!**

TMF 01/21.00    TRAINING AND BRIEFING

TMF 01/21.01    General Provisions
TMF 01/21.02    Training and Briefing Components

TMF 01/21.00   <u>TRAINING AND BRIEFING</u>

TMF 01/21.01   <u>General Provisions</u>

    A.   <u>Purpose of Chapter</u>

       The purpose of this chapter is to provide the policy and procedure concerning briefing and training of staff, members of allied agencies and others involved in an execution.

    B.   <u>Policy</u>

       It is the policy of the Department that staff and others involved in carrying out an execution:

      1.  receive comprehensive briefings covering:

         a.  their duties and responsibilities;

         b.  the specifics of post orders covering assigned positions;

         c.  communication and chain of command;

         d.  overview of functions and activities during the execution;

      2.  are provided copies of post orders outlining the duties and responsibilities of assigned positions;

      3.  receive the level of briefing and training necessary based on the requirements of assigned duties;

      4.  rehearse and practice functions which involve:

         a.  difficult timing;

         b.  a high degree of skill;

         c.  procedures of a highly critical nature; and/or

         d.  moderately difficult or complex interaction with others; and

Exhibit 20 Page 134

5.    receive instructions concerning back-up systems to provide:

    a.    problem-resolution assistance;

    b.    policy decisions;

    c.    crisis management assistance; and

    d.    information requests.

**TMF 01/21.02**    <u>Training and Briefing Components</u>

A.    <u>General</u>

Training and briefing shall include, but not be limited to:

1.    issuing all members or other participants a post order for their assigned positions;

2.    providing an orientation or briefing covering assigned duties and general operational information;

3.    if necessary, detailed training covering legal, operational or technical aspects of assigned position;

4.    if necessary, rehearsal of job functions; and

5.    key positions in Manual TMF 01.

B.    <u>Post Orders</u>

1.    Each member or other participant shall be issued the post order or instructions for his assigned position.

2.    The post order shall include, but not be limited to:

    a.    the position title;

    b.    location(s) of assignment;

    c.    title of supervisor;

      d.    supervisory role, if any;

      e.    duties and responsibilities--
            general and specific; and

      f.    emergency role.

3.    When appropriate, one or more chapters
      of TMF 01 may be issued with a post
      order.

4.    All post orders (and any accompanying
      manual material) shall be returned at
      the completion of the execution event.

C.    <u>Briefing/Orientation</u>

1.    Most assignments will be very
      specialized, involving a narrow range of
      duties.  For such positions,
      briefing/orientation sessions will be
      all the training required in addition to
      the general training skills and
      experience of the persons assigned.

2.    Orientation sessions shall include but
      not be limited to:

      a.    an overview of the execution
            process and operational components;

      b.    location of assigned post;

      c.    chain of command and organizational
            information;

      d.    an overview of the countdown of
            activities and procedures leading
            to the execution;

      e.    an explanation of support and
            crisis intervention systems;

      f.    interaction with the news media;

      g.    a review of the specific post order
            requirements, duties and other
            elements; and

        h.   a question-and-answer period.

D.    <u>Training/Rehearsal</u>

    1.    For assignments requiring more technical or complex functions, critical timing or interaction elements, or duties of a particularly difficult nature, more comprehensive training shall be required.

    2.    Team leaders shall be responsible for training and scheduling rehearsals as needed for team members.

Exhibit 20 Page 137

Exhibit 20 Page 138

## AFFIDAVIT OF JOSEPH CUMMINGS, III

I, Joseph Cummings, III, do declare as follows:

1.      I am currently employed as an Investigator with the Eastern District Federal Public Defender Office of Arkansas. I was assigned to complete a work request pertaining to the Lethal Injection Litigation that is currently being litigated by our office. One of the work requests I received requested that I contact various pharmaceutical companies to obtain information about the products sevoflurane and isoflurane. First, was to verify if sevoflurane and/or isoflurane are available for purchase to Department of Correction Agencies. Second, to establish whether the company has any objections to the use of their products by Department of Correction Agencies for use in executions; and if the company has any provisions set forth in their distribution contracts to prevent their products from being obtained by Department of Correction Agencies for use in executions.

2.      On July 18, 2016, I contacted Piramal Healthcare. Piramal Healthcare is located at 3950 Schelden Circle in Bethlehem, Pennsylvania. I spoke to Ester Kessler by telephone to discuss the issues stated above. Ms. Kessler is a Sales Representative for Piramal Healthcare. Ms. Kessler stated if the Arkansas Department of Correction was a member of the Federal Supply Schedule or Managed Healthcare Associates, the Arkansas Department of Correction would have access to their products, isoflurane and sevoflurane, through multiple wholesale companies at a discounted price for purchase. Ms. Kessler stated the products, isoflurane and sevoflurane, would be available for direct purchase from the manufacturer if the Arkansas

1

Exhibit 21 Page 1

Department of Correction was not a member of the Federal Supply Schedule or Managed

Healthcare Associates.

3.      I declare under penalty of perjury under the laws of the United States of America that

the above information is true and correct to the best of my knowledge.

        FURTHER AFFIANT SAYETH NOT.

                                        Joseph I. Cummings, III
                                        Capital Habeas Unit Investigator
                                        Federal Public Defender Office-Eastern District

                        ACKNOWLEDGMENT

STATE OF ARKANSAS          )
                           )
COUNTY OF PULASKI          )

        Subscribed and sworn to before me, a Notary Public, on this 20th day of July, 2016.

                                Notary Public

My Commission Expires:

CYNTHIA L WESTLAKE
PULASKI COUNTY
NOTARY PUBLIC - ARKANSAS
My Commission Expires May 31, 2017
Commission No. 12361103

2

Exhibit 21 Page 2

Nitrogen Induced Hypoxia as a Form of Capital Punishment

Michael P. Copeland, J.D.

Thom Parr, M.S.

Christine Papas, J.D., Ph.D.

East Central University

Nitrogen Induced Hypoxia

## Executive Summary

At the request of Oklahoma State Representative Mike Christian, the authors of this study researched the question of whether hypoxia induced by nitrogen gas inhalation could serve as a viable alternative to the current methods of capital punishment authorized under Oklahoma law. As per the above, this study does not express an opinion on the wider question of whether Oklahoma should continue to administer capital punishment in general. The scope of this study is limited to the assumption that capital punishment will continue to be administered in Oklahoma, and given that assumption, analyzing whether hypoxia via nitrogen gas inhalation would be an effective and humane alternative to the current methods of capital punishment practiced in Oklahoma law.

This study was conducted by reviewing the scientific, technical, and safety literature related to nitrogen inhalation.

*The study found that:*

1. An execution protocol that induced hypoxia via nitrogen inhalation would be a humane method to carry out a death sentence.
2. Death sentence protocols carried out using nitrogen inhalation would not require the assistance of licensed medical professionals.
3. Death sentences carried out by nitrogen inhalation would be simple to administer.
4. Nitrogen is readily available for purchase and sourcing would not pose a difficulty.
5. Death sentences carried out by nitrogen inhalation would not depend upon the cooperation of the offender being executed.

Accordingly, it is the recommendation of this study that hypoxia induced by the inhalation of nitrogen be offered as an alternative method of administering capital punishment in the State of Oklahoma.

The views expressed in this study are solely those of its authors and do not necessarily reflect those of the university at which we are affiliated.

**Introduction**

      Nitrogen is an inert gas that at room temperature is colorless, odorless, and tasteless. It is the most common gas in the earth's atmosphere, comprising 78.09% of the air that humans breathe on a regular basis.

      When combined with the normal 20.95% oxygen found in the atmosphere, nitrogen is completely safe for humans to inhale. However, an environment overly enriched in nitrogen will lack the appropriate level of oxygen necessary for human survival and will thus lead to hypoxia and rapid death. (U.S. Chemical Safety and Hazard Investigation Board, 2003, p. 1).

      Nitrogen hypoxia has been suggested as a means of administering capital punishment in the popular media on previous occasions. For example, in1995 the National Review featured an article by Stuart Creque titled *Killing With Kindness: Capital Punishment by Nitrogen Asphyxiation (1995)*. Creque's article was written in response to a 9th Circuit U.S. District Court decision that California's gas chamber was an unconstitutionally cruel and unusual punishment. The article suggested nitrogen could provide a simple and painless alternative to the gas chamber that would require no elaborate medical procedures to administer.

      The idea of administering capital punishment via nitrogen hypoxia resurfaced more recently in a Tom McNichol Slate magazine article titled *Death by Nitrogen (2014)*. The article was inspired by the stay of execution issued by the U.S. Supreme Court for a Missouri man facing execution via lethal injection. Again, the author suggested nitrogen induced hypoxia as a painless alternative to traditional methods of execution, adding that it offered the additional benefits of requiring no medical training to administer and lacked any of the supply issues that exist with lethal injection.

Preliminary Draft. Do Not Cite

Exhibit 22 Page 3

Nitrogen Induced Hypoxia

The capital punishment protocols cited that utilize nitrogen to administer a death sentence do not actually rely on the nitrogen itself to bring about death. Nitrogen simply displaces the oxygen normally found in air and it is the resulting lack of oxygen which causes death. Without oxygen present, inhalation of only 1-2 breaths of pure nitrogen will cause a sudden loss of consciousness and, if no oxygen is provided, eventually death. (European Industrial Gases Association, 2009, p. 3).

Since nitrogen has not previously been used for capital punishment there is a lack scientific literature that specifically addresses its performance for that purpose. However, there have been medical experiments which involved human subjects breathing pure nitrogen until they became unconscious. Beyond those experiments, most of the data related to nitrogen induced hypoxia comes from documented suicides in humans and research in high altitude pilot training.

*Author's Note: in some cases the lay press will inadvertently refer to hypoxia as asphyxiation. This is technically inaccurate in this context, as asphyxia is the inability to breathe in oxygen **and** the inability to exhale carbon dioxide. Hypoxia is the pathology related to the inability to intake oxygen even though one may still be able to exhale carbon dioxide. As will be seen later, the ability to exhale carbon dioxide is critical to the proposed method of execution, as it prevents the acidosis normally associated with asphyxiation.*

## Medical Literature

The adult brain uses about 15 per cent of the heart's output of oxygenated blood (Graham, 1977, p.170). Hypoxia is the condition of having a lower-than-normal amount of oxygen in the blood. Anoxia is an extreme form of hypoxia in which there is a complete absence of oxygen in the blood (Brierley, 1977 p.181). If the supply of oxygen in the blood is reduced

below a critical level it will result in a rapid loss of consciousness and eventually irreversible brain damage will occur (Graham, 1977, p.170).

A complete immediate global loss of oxygen to the brain, (a scenario in which no residual oxygen in the lungs or blood is delivered to the brain), will result in a loss of consciousness in eight to ten seconds, and a loss of any electrical output by the brain will occur a few seconds later. The heart may continue to beat for a few minutes even after the brain no longer functions (Brierley, 1977 p.182).

Ernsting (1961) performed a study on human volunteers that hyperventilated on pure nitrogen gas. The subjects performed the test multiple times, varying the length of time they inhaled the nitrogen. When the subjects inhaled nitrogen for eight-to-ten seconds they reported a dimming of vision. When the period was expanded to fifteen-to-sixteen seconds, the subjects reported some clouding of consciousness and impairment of vision. When the tests were expanded to seventeen-to-twenty seconds, the subjects lost consciousness. There was no reported physical discomfort associated with inhaling the pure nitrogen. (p. 295)

Unlike asphyxiation, hypoxia via the inhalation of nitrogen allows the body to expel the carbon dioxide buildup that is normally associated with the respiratory cycle. This helps prevent a condition known as hypercapnia - an accumulation of carbon dioxide in the blood. The result of this buildup of carbon dioxide is respiratory acidosis - a shifting of the ph levels in the blood to become more acidic. This is the pathology many people associate with suffocating. Some of the symptoms of respiratory acidosis are expected to be present in cases of asphyxiation, but not expected to be present under pure hypoxia are anxiety and headaches, (Merrick Manuel, 2013).

**Suicide Data**

Nitrogen Induced Hypoxia

Perhaps one of the greatest testaments to both the humanity of nitrogen induced hypoxia as well as the ease of administration is its rapidly gaining popularity as a self-selected means of suicide. Suicide by hypoxia using an inert gas is the most widely promoted method of human euthanasia by right-to-die advocates (Howard, M.O. et. al., 2011, P. 61).

The trend toward using an "exit bag" filled with an inert gas such as nitrogen or helium likely started with a publication of *Final Exit: The Practicalities of Self Deliverance and Assisted Suicide for the Dying*. The authors of the publication sought to identify methods of death that were swift, simple, painless, failure-proof, inexpensive, non-disfiguring and did not require a physician's assistance or prescription (Howard, M.O. et. al., 2011. p 61).

This method of suicide is indeed simple. It involves a clear plastic bag fitted over the head, two tanks filling the bag with helium via vinyl tubing, and an elastic band at the bottom of the bag to prevent the bag from slipping off the head. The parts needed to create the bag are inexpensive and available locally without prescription (Howard, M.O. et. al., 2011. p 61-62).

Reports of deaths observed via this method suggest that it is painless. Jim Chastain, Ph.D. President of the Final Exit Network of Florida described the process this way:

> In the several events I have observed the person breathes the odorless, tasteless helium deeply about three or four times and then is unconscious. no gagging or gasping. Death follows in 4-5 minutes. A peaceful process.

Derek Humphrey, current chair of the Final Exit advisory board is quoted as saying:

> In the approximate 300 cases which have been reported to me there has never been mention of choking or gagging. When I witnessed the helium death of a friend of mine it could not have been more peaceful (Final Exit, 2010).

However, it should be noted that deviations from the above protocols have not always been as successful. When masks were placed over the face (instead of using bags of helium over

the head) it has been reported some problems have occurred. This is typically a result of the mask not sealing tightly to the face, resulting in a small amount of oxygen being inhaled by the individual. This extends the time to become unconscious and extends the time to death. This may result in purposeless movements by the decedent (Ogden et al, 2010. p 174-179).

**Research on High Altitude Pilot Training**

A great deal of research on the effects of hypoxia on human beings comes from aerospace medicine. Pilots that fly at high altitudes are subject to becoming hypoxic if their cabins lose air pressure. Altitude hypoxia has similar effects as the hypoxia one gets from breathing inert gases although it is caused by the inability of the lungs to absorb the oxygen in the air rather than a lack of oxygen in the air.

The Federal Aviation Administration (2003, p. 11) states:

> Hypoxia is a lack of sufficient oxygen in the body cells or tissues caused by an inadequate supply of oxygen, inadequate transportation of oxygen, or inability of the body tissues to use oxygen. A common misconception among many pilots who are inexperienced in high-altitude flight operations and who have not be exposed to physiological training is that it is possible to recognize the symptoms of hypoxia and to take corrective actions before becoming seriously impaired. While this concept may be appealing in theory, it is both misleading and dangerous for an untrained crew member. Symptoms of hypoxia vary from pilot to pilot, but one of the earliest effects of hypoxia is impairment of judgment. Other symptoms can include one or more of the following:
> (1) Behavioral Changes (e.g. a sense of euphoria).
> (2) Poor coordination.
> (3) Discoloration in the fingernails (cyanosis).
> (4) Sweating.
> (5) Increased breathing rate, headache, sleepiness, or fatigue
> (6) Loss or deterioration of vision
> (7) Light-headedness or dizzy sensations and listlessness.
> (8) Tingling or warm sensations.

Nitrogen Induced Hypoxia

Indeed, hypoxia has caused several airline accidents which are often fatal. The onset of hypoxia is typically so subtle that it is unnoticeable to the subject. The effects of hypoxia are often difficult to recognize. (Federal Aviation Administration, 2014, Ch. 8-1-2 (A) 5)

Attempts to train pilots to notice hypoxia are conducted using a hyperbaric chamber to simulate high altitudes. Often a trainee will be asked to remove his or her mask and perform simple tasks. At low levels of hypoxia, trainees typically feel little more than euphoria and a sense of confidence. At higher levels of hypoxia, trainees will quickly become unconscious. Time of useful consciousness at altitudes above 43,000 is 5 seconds (Federal Aviation Administration, 2003, p. 13).

## Findings

Based on the review of the literature related to hypoxia induced by inert gases, this study makes the following findings:

1. An execution protocol that induced hypoxia via nitrogen inhalation would be a humane method to carry out a death sentence.
2. Death sentence protocols carried out using nitrogen inhalation would not require the assistance of licensed medical professionals.
3. Death sentences carried out by nitrogen inhalation would be simple to administer.
4. Nitrogen is readily available for purchase and sourcing would not pose a difficulty.
5. Death sentences carried out by nitrogen inhalation would not depend upon the cooperation of the offender being executed.
6. Use of nitrogen as a method of execution can assure a quick and painless death of the offender

**Finding 1. An execution protocol that induced hypoxia via nitrogen inhalation would be a humane method to carry out a death sentence.**

**Rationale:**

Nitrogen Induced Hypoxia

As an inert gas, nitrogen is odorless, colorless, tasteless and undetectable to human beings. It is 78% of the air we breathe on a daily basis, and thus there is little chance that any subject would have an unusual or allergic reaction to the gas itself.

Because the subject is able to expel carbon dioxide, the anxiety normally associated with acidosis in asphyxiation would not be present.

The literature indicates after breathing pure nitrogen, subjects will experience the following: within eight-to-ten seconds the subjects will experience a dimming of vision, at fifteen-to-sixteen seconds they will experience a clouding of consciousness, and at seventeen-to-twenty seconds they will lose consciousness. There is no evidence to indicate any substantial physical discomfort during this process.

There is a possibility that subjects will feel euphoria prior to losing consciousness and a slight possibility they will feel a tingling or warm sensation. After the subjects are unconscious, it should be expected some of the subjects will convulse. Most electrochemical brain activity should cease shortly after loss of consciousness, and the heart rate will begin to increase to varying degrees until it stops beating 3 to 4 minutes later. Observed suicides involving inert gas hypoxia are described as peaceful, so long as caution is taken to eliminate the possibility of the subject inadvertently receiving supplemental oxygen during the process. Inert gas hypoxia is considered such a humane and dignified process to achieve death that it is recommended as a preferred method by right-to-die groups.

**Finding 2.  Death sentence protocols carried out using nitrogen inhalation would not require the assistance of licensed medical professionals.**

**Rationale:**

Nitrogen Induced Hypoxia

The administration of a death sentence via nitrogen hypoxia does not require the use of a complex medical procedure or pharmaceutical products. The process itself, as demonstrated by those who seek euthanasia, requires little more than a hood sufficiently attached to the subject's head and a tank of inert gas to create a hypoxic atmosphere.

While a state execution would likely have a more elaborate mechanism to create hypoxia, nothing in the process would require specialized medical knowledge or the use of regulated pharmaceutical products. Accordingly, except for the pronouncement of death, the assistance of licensed medical professionals would not be required to execute this protocol.

**Finding 3.  Death sentences carried out by nitrogen inhalation would be simple to administer.**

**Rationale:**

When considering a substitute method of capital punishment it is important to consider more than just what happens if everything goes according to protocol. The likelihood of mishaps must also be considered, as well as the consequences that would flow if those mishaps should occur.

Because the protocol involved in nitrogen induced hypoxia is so simple, mistakes are unlikely to occur. Oxygen and nitrogen monitors may be placed inside the contained environment to insure the proper mixes of gas are being expelled into the bag and inhaled by the subject.

However, the protocol should be careful to prevent the possibility of oxygen entering into the hood, as that can prolong time to unconsciousness and death, as well as increase the possibility of involuntary movements by the subject.

Nitrogen Induced Hypoxia

The risks to witnesses are minimal, as any potential leak of the nitrogen would not be harmful in a normally ventilated environment.

**Finding 4. Nitrogen is readily available for purchase and sourcing would not pose a difficulty.**

**Rationale:**

Nitrogen is utilized harmlessly in many fields within United States industries. Nitrogen is used in welding, hospital and medical facilities, cooking, and used in the preparation of liquid nitrogen cocktails. Nitrogen is used as a process to extend the life of food products such as potato chips. Nitrogen is used in doctor's offices to remove skin tags as well as other procedures. Accordingly, sources of nitrogen to be used for administering a death sentence should be easy to find and readily available for purchase for such purpose.

**Finding 5. Death sentences carried out by nitrogen inhalation would not depend upon the cooperation of the offender being executed.**

**Rationale:**

Some forms of capital punishment require the offender to submit or comply to some degree in order to assure an efficient and humane method of execution. With proper protocol and utilizing such devices as a restraint chair, nitrogen inhalation can be administered despite the presence of a non-compliant offender. The use of nitrogen can be used by non-medical personnel and a delivery system can be designed to ensure the execution is carried out without issue.

Nitrogen Induced Hypoxia

### Conclusion

As per the above, it is the recommendation of this study that hypoxia induced by the inhalation of nitrogen be offered as an alternative method of administering capital punishment in the State of Oklahoma.

Nitrogen Induced Hypoxia

## References

Brierley, J.B. *Experimental hypoxic Brain Damage* Journal of Clinical Pathology. 1977, 11, 181-187.

Creque, S. A. (1995). Killing with kindness--capital punishment by nitrogen asphyxiation. *Natl Rev*, *47*(17), 51.

Ernsting, J. *The Effect of Brief Profound Hypoxia upon the Arterial and Venous Oxygen Tensions in Man.* J. Physiol. 169, Air Force Inst. of Av. Med. 1-23-1963 pp. 292-311.

Federal Aviation Administration, Department of Transportation, (7/24/14) - Aeronautical Information Manual. Retrieved online at: https://www.faa.gov/airtraffic/publications/atpubs/aim/aim0801.html on 9/14/2014

Federal Aviation Administration, Department of Transportation, (1/2/2003) AC 61-107A-Operations of Aircraft at Altitudes Above 25,000 Feet MSL And/Or Mach Number (MMO) Greater Than .75

Final Exit Network, The. (March 17,201, 2010lium Deaths Do Not involve Gagging Say Observers. Retrieved on 9/14/2014 http://assisted-dying.org/blog/2010/03/17/helium-deaths-do-not-involve-gagging-say-observers/

Graham, D.I. *Pathology of hypoxic brain damage in man,* J. clin. Path., 30, Suppl. (Roy. Coll. Path.), 1977. 11, 170-180

*Hazards of Inert Gases and Oxygen Depletion.* IGC Document 44/09/E European Industrial Gases Association. 2009.

*Hazards of Nitrogen Asphyxiation.* No. 2003-10-B, U.S. Chemical Safety and Hazard Investigation Board. June, 2003.

Howard, M. O., Hall, M. T., Edwards, J. D., Vaughn, M. G., Perron, B. E., & Winecker, R. E. (2011). Suicide by asphyxiation due to helium inhalation. *The American journal of forensic medicine and pathology*, *32*(1), 61-70.

Humphry, D. (2002). *Final exit: the practicalities of self-deliverance and assisted suicide for the dying.* Random House LLC.

Merrick Manuel The. (2013, October) *Repertory Acidosis.* Retrieved from: http://www.merckmanuals.com/professional/endocrine_and_metabolic_disorders/acid-base_regulation_and_disorders/respiratory_acidosis.html on 9/14/2014.

Nitrogen Induced Hypoxia

McNichol, T. Death by Nitrogen - Slate Magazine. 14 Sep. 2014
http://www.slate.com/articles/news_and_politics/jurisprudence/2014/05/death_by_nitrogen_gas_
will_the_new_method_of_execution_save_the_death_penalty.html.

Ogden, R.D., Hamilton, W.K., Whitcher, C., (2010 Mar) *Assisted suicide by oxygen
deprivation with helium at a Swiss right-to-die organisation.*J. Med. Ethics: 174-9.

Ogden, R. D., & Wooten, R. H. (2002). Asphyxial suicide with helium and a plastic bag.
*The American journal of forensic medicine and pathology, 23*(3), 234-237.

Death by nitrogen gas: Will the new method of                                    of 11

# Appendix D

| Sign In | Sign Up |

## Death by Nitrogen: Will This New Method of Execution Save the Death Penalty?

| Sign In | Sign Up |

JURISPRUDENCE   THE LAW, LAWYERS, AND THE COURT.   MAY 22 2014 11:47 AM

## Death by Nitrogen

If lethal injection falls out of favor, death penalty states could turn to a new method: nitrogen gas.

By Tom McNichol



Justice Samuel Alito issued an order halting the execution of a Missouri inmate.

Photo by Saul Loeb/AFP/Getty Images

On Wednesday night, the Supreme Court stopped an execution by lethal injection. The condemned Missouri man, Russell Bucklew, says he has a medical condition, affecting his veins, that would make the injection cause hemorrhaging—and make him feel like he's choking on his own blood. The court took the unusual step of intervening at the last minutes, when every other court had turned Bucklew down, and also of sending the case back to the lower courts to decide whether to hold a hearing about Bucklew's claim.

The Supreme Court ruled in 2008 that Kentucky's three-drug protocol for carrying out lethal injections was constitutional, but there's no question that the method looks grimly suspect in the wake of Clayton Lockett's apparently painful, botched execution in Oklahoma last month. Not so long ago, though, this was the method that represented progress. Hanging. Firing squad. The guillotine. The electric chair. The gas chamber. Lethal injection. Every age seems to feature a new and improved method of capital punishment, billed as more efficient and humane. The spectacle of Lockett's death, and the Supreme Court's hesitation, shines a spotlight on the latest idea—death by nitrogen.

As long as there's a will to kill criminals, someone will come up with an improved form of capital punishment.

This new proposed method, known as nitrogen asphyxiation, seals the condemned in an airtight chamber pumped full of nitrogen gas, causing death by a lack of oxygen. Nitrogen gas has yet to be put to the test as a method of capital punishment—no country currently uses it for state-sanctioned executions. But people do die accidentally of nitrogen asphyxiation, and usually never know what hit them. (It's even possible that death by nitrogen gas is mildly euphoric. Deep-sea divers exposed to an excess of nitrogen develop a narcosis, colorfully known as "raptures of the deep," similar to drunkenness or nitrous oxide inhalation.)

Advertisement

You can oppose the death penalty and still see the merit in making executions more humane. As Boer Deng and Dahlia Lithwick argued in *Slate*, opponents of the death penalty inadvertently have made lethal injection *less* safe, by forcing prison officials into using inferior methods and substandard drug providers. As the states struggle to obtain drugs, such as pentobarbital, for lethal injections because of an export ban by the European Union, lethal injection has been turned from a method of execution into a medical experiment.

Proponents say that death by nitrogen, by contrast, adheres to the constitutional prohibition against cruel and unusual punishment. The condemned prisoner would detect no abnormal sensation breathing the odorless, tasteless gas, and would not undergo the painful experience of suffocation, which is caused by a buildup of carbon dioxide in the bloodstream, not by lack of oxygen.

In late April, Louisiana Department of Corrections Secretary James LeBlanc suggested to a state legislative committee that Louisiana should look into using nitrogen gas as a new method of execution, since lethal injection has become so contentious. "It's become almost impossible to execute someone," LeBlanc complained to the Louisiana House Administration of Criminal Justice Committee.

"Nitrogen is the big thing," LeBlanc told the committee. "It's a painless way to go. But more time needs to be spent [studying] that." The committee instructed LeBlanc to do some research on the subject and report back. In the meantime, Louisiana has delayed a pending execution. "I'm not taking anything off the table," says state Rep. Joseph P. Lopinto III, chairman of the state's Administration of Criminal Justice Committee. "If someone says nitrogen gas is the way to go, then we can debate that and do it if need be."

Exhibit 22 Page 15

Death by nitrogen gas: Will the new method of execution save the death penalty?                Page 2 of 11

As long as 32 states have capital punishment on the books, there should be a less reliably cruel method of execution than lethal injection. "If we're going to take a life, then we should do it in the most humane, civilized manner as is possible," says Lawrence Gist II, an attorney and professor of business and law at Mount St. Mary's College. "Right now, nitrogen is the best of the available options."

Gist, a death penalty opponent, runs a website dedicated to promoting nitrogen asphyxiation for state-sanctioned executions. Polling suggests the public could get behind the idea. In a recent NBC News poll, 1 in 3 people said that if lethal injections are no longer viable, executions should be stopped altogether. But many others were open to alternative methods of putting prisoners to death. About 20 percent opted for the old version of the gas chamber (which traditionally used hydrogen cyanide to kill), 18 percent for the electric chair, 12 percent for death by firing squad, and 8 percent for hanging.

Nitrogen gas, unlike the lethal drugs that states have relied on, is widely available. The gas is used extensively in industrial settings, from aerospace to oil and gas production "Lethal injection is just fine if you can get the pentobarbital," says Kent Scheidegger, legal director of the Criminal Justice Legal Foundation, a group that favors capital punishment. "But if that's not available, an alternative like nitrogen gas would work."

**Top Comment**

I always thought that people who voluntarily went to witness a cyanide gas chamber execution were morons.  You have to have a special kind of faith in window caulking. More...

-Pete R

**Join In**

In contrast to lethal injection, no medical expertise would be needed to introduce nitrogen gas into a sealed chamber. The gas chamber itself is technology that has been around since the 1920s. In fact, three states—Arizona, Missouri, and Wyoming—still authorize lethal gas as a method of execution (depending on the choice of the inmate, the date of the execution or sentence or the possibility that lethal injection is held unconstitutional).

The last gas chamber execution in the U.S. was in 1999—the  method fell out of favor because hydrogen cyanide is a poison causing suffering that lasts 10 minutes or longer. Lethal injection, of course, was supposed to be painless and better. What if it's not? That's the question the Supreme Court now finally seems to be returning to. The history of capital punishment suggests that as long as there's a will to kill criminals, someone will come up with an improved way. The new tool in the executioner's bag may turn out to be nitrogen, a better way to carry out a gruesome task.

Tom McNichol is a writer in San Francisco.

---

PROMOTED STORIES                                   MORE FROM SLATE

5 States that Will Take the Most of Your Paycheck in        **A Conservative Judge Annihilates**
Income Taxes Monster                                        **North Carolina's Ultrasound**
                                                            **Requirement**
5 Easy To Obtain Jobs That Pay Very Well Excite Education

15 Hot Female Athletes Who Are Only Famous For Their        Louis C.K. Wrote "Charlie Hebdo" on His Shirt For His
Looks RantSports                                            Madison Square Garden Show

4 Surgeries to Avoid AARP                                   Slate's Favorite Smartphone Apps of 2014

Oprah Winfrey's Surprising DNA Test Ancestry                This Puzzle's Simple Design Is Gorgeous and Mind-
                                                            Boggling

**This New App is Replacing Human**                         AP Takes Down "Piss Christ" Image After Complaints
**Financial Advisors** PCMagazine                           About Double Standard

                                                            Protests Have Achieved Some of America's Greatest
                                                            Ideals

Exhibit 22 Page 16

alt.suicide.methods

Killing with kindness - capital punishment by nitrogen asphyxiation          (too old to reply)

**Philbert**                                                                                      9 years ago

http://www.findarticles.com/p/articles/mi_m1282/is_n17_v47/ai_17374449

Capital punishment needn't be cruel or unusual -- especially if you use
nitrogen asphyxiation to put people to sleep.

LAST October, Judge Marilyn Hall Patel of the 9th U.S. District Court ruled
that execution in California's gas chamber is a form of cruel and unusual
punishment, the first ruling ever by a state or federal judge to invalidate
a method of execution on Eighth Amendment grounds. She noted that the
evidence showed that the condemned man might remain conscious for several
minutes, experiencing the emotions of `anxiety, panic, terror,' as well as
`exquisitely painful muscle spasms' and `intense visceral pain.'

On its face, Judge Patel's ruling applies only to the gas chamber, but every
method of execution in current use involves toxic chemicals or physical
trauma to induce death -- and every method can go awry. An ideal hanging
snaps the condemned man's neck cleanly; a botched one either strangles him
slowly or severs the head entirely from the body. A firing squad that misses
its mark leaves the condemned man conscious as he bleeds to death. In the
electric chair, according to eyewitness accounts, some condemned men have
literally been cooked until their flesh was charred and loosened from the
bone; some had sparks and flame emanating from their cranial-cap electrodes.

Besides society's concern for the condemned man's physical suffering, all of
these methods implicitly require an executioner to inflict some degree of
trauma upon the condemned. Concern for the executioner's conscience drives
such customs as loading one of the guns for a firing squad with a blank
cartridge, so that each member of the squad can imagine that his will be the
non-lethal shot. And with lethal injection, the executioner's use of skills
and procedures normally devoted to life-saving poses ethical questions for
medical caregivers.

Given these defects, abolitionists will presumably press to have each of
these methods declared `cruel and unusual.' The intended result of these
efforts is to make the death penalty unconstitutional in practice, even if
it remains constitutional in theory.

It is in fact possible to conceive of a method of execution that would cause
neither pain nor physical trauma, require no medical procedure (other than
pronouncing death), and use no hazardous chemicals. A case of accidental

Exhibit 22 Page 17

death suggests such a method.

Early in the Space Shuttle program, a worker at Kennedy Space Center walked into an external fuel tank (a vessel nearly as big inside as a Boeing 737) to inspect it. He was not aware that it had been purged with pure nitrogen gas to prevent oxygen in the air from corroding its interior. Since nitrogen is the major component of ordinary air, pure nitrogen has no distinctive feel, smell, or taste; the worker had no indication that anything was out of the ordinary. After walking a short distance into the tank, he lost consciousness and collapsed. A co-worker, not realizing that his collapse had an external cause, ran in to aid him and succumbed also. By the time other workers realized what was happening, the two men were dead.

More recently, a bizarre accident involving nitrogen killed two people in the Bay Area. They had stolen from a hospital a gas cylinder containing what they thought was laughing gas. However, the cylinder contained not the anaesthetic nitrous oxide but pure nitrogen. When the two men stopped their car to partake of their booty, the nitrogen gas displaced the air in the car, leaving them without oxygen. Had they had any indication of the problem, they could have saved their lives simply by opening the car doors.

These deaths were similar in cause to a relatively common drowning accident known as shallow-water blackout, mentioned specifically in certification classes for recreational scuba diving. When a person is skin diving (that is, without scuba gear), his bottom time is limited by how long he can hold his breath. Occasionally, a skin diver will attempt to lengthen the time he can stay under by hyperventilating before a dive. Unfortunately, this can lead to his losing consciousness underwater, sometimes only a few feet before reaching the surface.

THE connection between nitrogen asphyxiation and shallow-water blackout lies in human respiratory physiology. When you hold your breath, you begin to develop a powerful urge to breathe. This is caused not by the depletion of oxygen from your body, but by the buildup of carbon dioxide in your bloodstream, which changes the pH of the blood. The ambitious skin diver ``blows off'' most of the carbon dioxide in his bloodstream when he hyperventilates; as a result, he notices the urge to breathe much later than he normally would, at a point when his blood oxygen is dangerously low. If his blood oxygen falls too low before he reaches the surface, he blacks out and drowns. Because the Kennedy Space Center workers continued to exhale carbon dioxide with each breath, neither of them noticed an unusual urge to breathe, even though they were completely deprived of oxygen.

Nitrogen asphyxiation is a unique way to die. The victim is not racked by a choking sensation or a burning urge to breathe, because as far as his body

Exhibit 22 Page 18

knows, he is breathing normally. Carbon dioxide is not building up in his bloodstream, so he never realizes that anything is wrong, nor does he experience any discomfort; he simply passes out when his blood oxygen falls too low.

Nitrogen asphyxiation is therefore a perfect method of execution. It uses a cheap and universally available working medium that requires no special environmental precautions for its storage and disposal. Its first symptom is loss of conscious sensation, a primary goal in a humane execution. It involves no physical trauma, no toxic drugs; the executed man's organs will even be suitable for donation, a factor cited in a recent stay of execution for a Georgia killer.

Assuming that the prisoner's guilt has been sufficiently proved, nitrogen asphyxiation is perhaps the most gentle way to deal with him. A condemned man awaiting death by nitrogen asphyxiation would experience no more pain or suffering than he created in his own mind.

**Dell Printers** 
dell.com/Printers
Discover Professional-Grade Color From Dell Business Printers.

**nubbins**                                                                                     9 years ago

```
x-no-archive:yes
```

Maybe even go out laughing.

- nubbins -


# Hey, Sandra Bullock Lied
lifecoolbeauty.com/sandra-secret
Her Fans Are In Shock. Her Huge Secret
Is Finally Exposed!

**Philbert**                                                                                    9 years ago

> Post by nubbins
> x-no-archive:yes
> Maybe even go out laughing.
> - nubbins -

You're thinking of nitrous oxide aka laughing gas. The article is about nitrogen.

**nubbins**                                                                                     9 years ago

```
x-no-archive:yes
```

> Post by Philbert
> > Post by nubbins
> > Maybe even go out laughing.

| You're thinking of nitrous oxide aka laughing gas. The article is about
| nitrogen.

You are absolutely correct, sir. I was not paying due attention. Gets
me in trouble in class all the time. Who would mind if a doctor
diagnosed onychomycosis as cryptorchidism, really? Details, details.

- nubbins -

**d\*\*\*@hotmail.com**                                    9 years ago

Awesome article. I think you just solved the puzzle for me. Thank you.

**Philbert**                                               9 years ago

Google nitrogen suicide for a lot of stuff. Basically people find that
euthanising animals works pretty well using nitrogen, plus it's safe to
use
unless it's in a very high concentration.

Rabbits don't like nitrogen because they have adaptive traits for living
in
holes where nitrogen can build up, unlike other animals and humans.

On 4/6/06 3:25 PM, in article
| Post by d\*\*\*@hotmail.com
| Awesome article. I think you just solved the puzzle for me. Thank you.

**slunky**                                                 9 years ago

Thanks for finding an article on it. I've been saying it for weeks, and
was starting to wonder if I had just imagined it or what.

--
-slunky

**Cesar**                                                  9 years ago

Thanks for the great post and it was interesting and informative. I
have concern that when the death penalty is ruled out as cruel and
inhumane, it leaves the potential that the prisoners on death row could
at some point get release and re-enter society. When prisons become
too full, it can be ruled that a certain amount of prisoners be
released early. In the years to come, laws could change and see a
prisoner sentenced to death instead getting a life sentence of 20 years
then getting out. Of course, it would help those that were wrongly
convicted in the first place.

**Jimmy**                                                  9 years ago

Exhibit 22 Page 20



# HAZARDS OF INERT GASES AND OXYGEN DEPLETION

## IGC Document 44/09/E

Revision of IGC Doc 44/00/E

*EUROPEAN INDUSTRIAL GASES ASSOCIATION AISBL* 

AVENUE DES ARTS 3-5 • B – 1210 BRUSSELS
Tel : +32 2 217 70 98 • Fax : +32 2 219 85 14
E-mail : info@eiga.eu • Internet : http://www.eiga.eu

Exhibit 22 Page 21

IGC Doc 44/09/E



# HAZARDS OF INERT GASES AND OXYGEN DEPLETION

**PREPARED BY :**

| | |
|---|---|
| ARRIETA, Angel | PRAXAIR EUROHOLDING |
| BRICKELL, Phil | THE LINDE GROUP |
| CAMPARADA, Vincenzo | SOL |
| FRY, Christina | AIR PRODUCTS |
| GACHOT, Roger | AIR LIQUIDE |
| LEWANDOWSKI, Janusz | LINDE GAS |
| NIELSEN, Arvid | YARA |
| PATEL, Milan | AIR PRODUCTS |
| RITLOP, Danilo | MESSER GROUP |

## Disclaimer

All technical publications of EIGA or under EIGA's name, including Codes of practice, Safety procedures and any other technical information contained in such publications were obtained from sources believed to be reliable and are based on technical information and experience currently available from members of EIGA and others at the date of their issuance.

While EIGA recommends reference to or use of its publications by its members, such reference to or use of EIGA's publications by its members or third parties are purely voluntary and not binding.

Therefore, EIGA or its members make no guarantee of the results and assume no liability or responsibility in connection with the reference to or use of information or suggestions contained in EIGA's publications.

EIGA has no control whatsoever as regards, performance or non performance, misinterpretation, proper or improper use of any information or suggestions contained in EIGA's publications by any person or entity (including EIGA members) and EIGA expressly disclaims any liability in connection thereto.

EIGA's publications are subject to periodic review and users are cautioned to obtain the latest edition.



© EIGA 2009  -  EIGA grants permission to reproduce this publication provided the Association is acknowledged as the source

**EUROPEAN INDUSTRIAL GASES ASSOCIATION (AISBL)**
Avenue des Arts 3-5   B 1210 Brussels     Tel +32 2 217 70 98     Fax+32 2 219 85 14
E-mail: info@eiga.eu     Internet: http://www.eiga.eu



Exhibit 22 Page 22

**IGC**                                                                    DOC 44/09

## Table of Contents

1   Introduction ......................................................................................................... 1

2   Scope and purpose ............................................................................................. 1

3   Definitions ........................................................................................................... 1

4   General Information about Inert Gases and Oxygen Depletion .......................... 1

    4.1   Oxygen is essential for life .......................................................................... 2
    4.2   Inert gases give no warning ......................................................................... 2
    4.3   Inert gases act quickly ................................................................................. 2
    4.4   The ambiguity of inert gases ........................................................................ 3
    4.5   Watchfulness with regard to inert gases and oxygen depletion ................... 3

5   Some typical situations with inert gas and/or oxygen depletion hazards ........... 3

    5.1   Confined or potentially confined spaces and enclosures ............................. 3
    5.2   The use of inert cryogenic liquids ................................................................ 3
    5.3   Areas near where inert gases are vented or may collect .............................. 4
    5.4   Use of inert gas instead of air ...................................................................... 4
    5.5   Dangers of improper inhalation (abuse) of inert gases ................................. 4

6   Hazard mitigation and preventive measures ...................................................... 5

    6.1   Information, training ..................................................................................... 5
    6.2   Proper installation and operation ................................................................. 5
    6.3   Identification and safeguarding of potentially hazardous areas .................... 5
    6.4   Ventilation and atmospheric monitoring for inert gases and oxygen deficiency ................. 5
        6.4.1   Ventilation/ monitoring of rooms which people regularly enter or work in ............. 5
        6.4.2   Ventilation/ monitoring prior to entry into confined spaces or enclosures ............. 6
        6.4.3   Ventilation/monitoring for entry into other spaces where inert gases may be present ...... 6
        6.4.4   Notes on purging requirements ................................................................. 7
    6.5   Testing of oxygen content ............................................................................ 7
    6.6   Work permit .................................................................................................. 7
    6.7   Lock-out Tag-out procedure .......................................................................... 8
    6.8   Protection of personnel ................................................................................. 8

7   Confined space entry ......................................................................................... 8

8   Rescue and first-aid ........................................................................................... 8

    8.1   Basic rules ................................................................................................... 9
    8.2   Rescue plan elements .................................................................................. 9
    8.3   Equipment .................................................................................................... 9
    8.4   Rescue training ............................................................................................ 10
    8.5   First Aid ....................................................................................................... 10

9   Conclusions ....................................................................................................... 10

10   References ....................................................................................................... 10

Appendix A: Summary for operators ....................................................................... 12

Appendix B1: Rescue considerations from normally accessible rooms ................... 15

Appendix B2: Rescue considerations from Confined Spaces ................................... 16

Appendix B3: Rescue considerations from pits, trenches ........................................ 17

Appendix C: Accidents involving oxygen deficiency ................................................ 18

Appendix D: Hazard of inert gases sign .................................................................. 21

Exhibit 22 Page 23

**IGC** _____ DOC 44/09

**1      Introduction**

EIGA is very concerned about the accidents that industrial gas companies and users of inert gases continue to report each year, where the direct cause has been lack of oxygen resulting in asphyxiation. EIGA identified that existing information on the hazards of inert gases was not sufficiently directed at the users who were most at risk. This document sets out the essential information that is necessary to prevent asphyxiation accidents involving inert gases.

**2      Scope and purpose**

It is intended that this document is used as a training package suitable for supervisors, line managers, direct workers and users wherever inert gases are produced, stored, used, or where oxygen depletion could otherwise occur.

This document has 4 parts:

The main document is intended for line managers and supervisors and gives the background of the subject, the typical description of oxygen deficiency accidents and the recommended rescue preparations to be in place in case of accident.

Appendix A is a simplified summary of the main document, designed to be reproduced as a pamphlet for sharing with workers and end users.

Appendix B gives an introduction to rescue considerations from normally accessible rooms, confined spaces or pits and trenches.

Appendix C lists some actual accidents that have taken place in recent years, which can be used as examples to underline the potentially fatal hazards of inert gases.

Appendix D gives an example of a warning sign or poster to highlight the hazards of inert gases and asphyxiating atmospheres.

**3      Definitions**

**Asphyxiation**: the effect on the body of inadequate oxygen, usually resulting in loss of consciousness and/or death. This is also known as suffocation or **anoxia**.

**Asphyxiant**: any material which reduces the amount of available oxygen either by simple dilution or by reaction.

**Inert gas**: A gas that is not toxic, which does not support human breathing and which reacts little or not at all with other substances. The common inert gases are nitrogen and the rare gases like helium, argon, neon, xenon and krypton.

**Flammable gas**: a gas whose major hazard is flammability. Note that all flammable gases also act as asphyxiants.

**User**: for the purpose of this document this term covers any individuals, companies or other organisations that make use of the products sold by industrial gas companies. Users may be, but are not necessarily, customers.

**4      General Information about Inert Gases and Oxygen Depletion**

In spite of the wealth of information available, such as booklets, films and audio-visual aids, there are still serious accidents resulting in asphyxiation caused by the improper use of inert gases or by oxygen depletion. It is therefore absolutely essential to draw attention to the hazards of inert gases and oxygen depletion. Accidents due to oxygen depleted atmospheres are usually very serious and in many cases fatal.

1

Exhibit 22 Page 24

**IGC**                                                                    DOC 44/09

Although carbon dioxide is not an inert gas, most of the information in this document is applicable as it too will cause oxygen depletion. However, the specific hazards and physiological effects of carbon dioxide are more complex than those of inert gases. This document does not cover these aspects. (See IGC Doc. 67 "CO2 cylinders at user's premises" for more details about the additional hazards of carbon dioxide).

### 4.1 Oxygen is essential for life

Oxygen is the only gas that supports life. The normal concentration of oxygen in the air we breathe is approximately 21 %. Concentration, thinking and decision-making are impaired when the oxygen concentration falls only slightly below this norm. These effects are not noticeable to the affected individual.

If the oxygen concentration in air decreases or, if the concentration of any other gases increase, a situation is rapidly reached where the risks of asphyxiation are significant. For this reason any depletion of oxygen below 21 % must be treated with concern:

**Asphyxia – Effect of $O_2$ Concentration (from NL/77 Campaign against Asphyxiation)**

| $O_2$ (Vol %) | Effects and Symptoms |
|---|---|
| 18-21 | **No discernible symptoms** can be detected by the individual. A risk assessment must be undertaken to understand the causes and determine whether it is safe to continue working. |
| 11-18 | Reduction of physical and intellectual performance **without the sufferer being aware.** |
| 8-11 | Possibility of fainting within a few minutes without prior warning. **Risk of death below 11%.** |
| 6-8 | Fainting occurs after a short time. **Resuscitation possible** if carried out immediately. |
| 0-6 | Fainting almost immediate. **Brain damage**, even if rescued. |

*WARNING: The situation is hazardous as soon as the oxygen concentration inhaled is less than 18 %.*
With no oxygen present, inhalation of only 1-2 breaths of nitrogen or other inert gas will cause sudden loss of consciousness and can cause death.

### 4.2 Inert gases give no warning

It is absolutely essential to understand that with inert gases such as nitrogen, argon, helium, etc., asphyxia is insidious - there are no warning signs!
- Inert gases are odourless, colourless and tasteless. They are undetectable and can therefore be a great deal more dangerous than toxic gases such as chlorine, ammonia, or hydrogen sulphide, which can be detected by their odour at very low concentrations.
- The asphyxiating effect of inert gases occurs without any preliminary physiological sign that could alert the victim. Lack of oxygen may cause vertigo, headache or speech difficulties, but the victim is not capable of recognising these symptoms as asphyxiation. Asphyxiation leads rapidly to loss of consciousness – for very low oxygen concentrations this can occur within seconds.

### 4.3 Inert gases act quickly

In any accident where the supply of oxygen to the brain is affected, prompt emergency treatment is critical. Proper medical treatment (resuscitation) if given quickly enough can prevent irreversible brain damage or even death in some instances.

Furthermore, and this is often poorly understood, the emergency rescue procedure to save the victim must be carefully thought out in advance to avoid a second accident, where members of the rescue

2

Exhibit 22 Page 25

**IGC**                                                                                    DOC 44/09

team can become victims. Unplanned interventions resulting in the fatalities of would-be rescuers are sadly not unusual.

### 4.4    The ambiguity of inert gases

Everyone, particularly customers, must be aware of the ambiguity of the expression "inert gas" (sometimes called "safety gas", when it is used to prevent fire or explosion), whereby an "inert gas" is often perceived, understood and wrongly taken to be a harmless gas!

### 4.5    Watchfulness with regard to inert gases and oxygen depletion

Considering the hazards mentioned above, it is essential to provide all those who handle or use inert gases (gas company personnel as well as customers) with all the information and training necessary regarding safety instructions. This includes the means of prevention and procedures to be respected to avoid accidents, as well as planned rescue procedures to be implemented in the event of an accident.

### 5    Some typical situations with inert gas and/or oxygen depletion hazards

### 5.1    Confined or potentially confined spaces and enclosures

Confined, restricted or enclosed spaces are particularly dangerous situations where an inert gas may be **normally present** (inside a process vessel), may have **accumulated** (from leaks or vents) and/or because the space has not been **adequately vented or purged,** and/or the renewal of air is poor or **ventilation is inadequate.**

Examples of such spaces include:
- Confined spaces: tanks, vessels, reservoirs, the inside of "cold boxes" of liquefaction equipment, cold storage rooms, warehouses with fire suppressant atmospheres, etc.
- Enclosures: analyzer or instrument cabinets, small storage sheds, temporary/tented enclosures, or spaces where welding protective gas is used, etc

The precautions required for safe access by personnel will be different in each of these cases as explained in Appendix B.

### 5.2    The use of inert cryogenic liquids

It is to be noted, that the use of inert cryogenic liquids such as nitrogen or helium is accompanied by two primary hazards:
- The fluids are very cold (-196°C for nitrogen and -269°C for helium) and can cause serious cold burns on contact with the skin.
- Once vaporised both products will generate a large volume of cold inert gas (e.g. 1 litre of liquid nitrogen will yield 680 litres gaseous product) that will displace ambient air, causing oxygen deficiency and may accumulate in low points.

In processes where cryogenic liquids are handled and vaporisation takes place, special care must be taken to avoid situations where personnel are exposed to oxygen deficiency. These may be in rooms which people regularly enter or work in.

Examples of such spaces include:
- The internal rooms of a building where cryogenic liquid cylinders/dewars are filled and/or stored,
- Laboratory rooms,
- Elevators (lifts) used for transport of dewars,
- Rooms where liquid nitrogen food freezers are operated. (Tunnel, cabinet)
- Rooms where Magnetic Resonance Imaging (MRI) scanner or other liquid helium cooled equipment is used
- Rooms in which cryogenic de-flashing equipment is operated.

3

Exhibit 22 Page 26

# IGC

Notes: Due to the extremely low temperature of liquid helium a secondary hazard may exist where the product is flowing through hoses or pipes. In this case it is possible for the components of air to liquefy on the outside of the hose/pipe, possibly leading to pooling of liquid containing levels of enriched oxygen. [See Ref. 7].

## 5.3    Areas near where inert gases are vented or may collect

The risk of asphyxiation can arise, even outdoors, in the vicinity of:
- Gas leaks
- Vent exhausts
- Outlet of safety valves and rupture disks
- Openings of machines in which liquid nitrogen is used for freezing
- Blind flanges
- Near manways/access to vessels or purged enclosures (e.g. ASU cold boxes, electrical enclosures)

Any cold gas or heavier-than-air gas will travel or "flow" – often unseen - and collect even outdoors, in low spaces such as:
- Culverts
- Trenches
- Machine pits
- Basements
- Elevator (lift) shafts

Similarly and just as dangerously lighter-than-air gases (e.g. helium) will rise and collect in unventilated high points such as:
- Behind false ceilings
- Under a roof

## 5.4    Use of inert gas instead of air

### Planned Use
In many workplaces, there are often compressed inert gas distribution networks that are used for process applications, safety or instrumentation purposes, e.g. inerting/purging of reactors or using nitrogen as a pressure source to operate pneumatic equipment (such as jackhammers) or as instrument fluids.

Additionally, nitrogen is often used as either a backup to, or substitute for, an instrument air system. Where it is used as a backup supply in case of instrument air compressor failures it is quite common to find a nitrogen supply connected to an air supply by means of isolation valves, It must be appreciated that most pneumatically operated instruments vent continuously and that the vented nitrogen may accumulate in poorly ventilated control panels/cubicles or plant rooms. This can present a serious asphyxiation risk. Where nitrogen is used temporarily to substitute for compressed air in this way, it must be done under strictly controlled conditions such as a permit to work, and all relevant personnel shall be informed.

### Improper Use
In situations where piped breathing systems exist there is always the potential for employees, who are insufficiently trained or not familiar with the systems, to connect the breathing apparatus to a nitrogen system with fatal results. Such systems must be clearly marked and ideally the breathing air system should have a dedicated connection type not used elsewhere in the premises.

## 5.5    Dangers of improper inhalation (abuse) of inert gases

There has been increased of reporting and presentations in TV-programmes on the careless approach and dangerous misuse of breathing in gases such as helium and other inert rare gases. The media reports in particular trivialise the effects of inhaling helium to achieve a very high-pitched voice. Inhalation of helium can lead to unconsciousness, cessation of breathing and sudden death. [See Ref. 6 for more information]

Exhibit 22 Page 27

**IGC**                                                                    DOC 44/09

## 6      Hazard mitigation and preventive measures

### 6.1    Information, training

All persons who handle or who use inert gases shall be informed of:
- Safety measures that should be adopted when using gases.
- The hazard represented by the release of inert gases in to the working space and the potential for oxygen depletion.
- Procedures to be observed should an accident occur.

This information and training should be systematically and periodically reviewed in order to ensure that it remains up to date and appropriate for the hazards identified.

### 6.2    Proper installation and operation

Equipment for the manufacture, distribution or use of inert gas must be installed, maintained and used in accordance with:
- All applicable regulations.
- The recommendations of the supplier
- Industrial gas industry standards and codes of practice

Newly assembled equipment for inert gas service must undergo a proof test and be leak-checked using suitable procedures.

Each inert gas pipeline entering a building should be provided with an easily accessible isolation valve outside the building. Ideally such valves should be remote activated by push buttons or other safety monitoring equipment.

Discontinued inert gas lines shall be physically disconnected from the supply system when not in use.

At the end of each work period, all valves that isolate the inert gas should be securely closed to avoid possible leakage between work periods.

### 6.3    Identification and safeguarding of potentially hazardous areas

Measures should be taken to identify potentially hazardous areas, or restrict access to them, e.g.
- Warning signs should be displayed to inform of an actual or potential asphyxiation hazard (An example is shown in Appendix D). The warning sign should be associated with measures to prevent unauthorised entry to the areas.
- Temporary or permanent barricades, for example physical lock on vessel manway or barricades around temporary excavations.
- Communication to site personnel to ensure awareness and understanding.

### 6.4    Ventilation and atmospheric monitoring for inert gases and oxygen deficiency

Typically there are three situations where the need for ventilation or atmospheric monitoring must be assessed in order to avoid asphyxiation accidents from inert gases and/or oxygen depletion:

#### 6.4.1  Ventilation/ monitoring of rooms which people regularly enter or work in

Examples in this category would include:
- Rooms containing **inert gas pipelines** with possible leaks such as compressor houses, control rooms (with control/analyser panels).
- Rooms where **inert cryogenic liquid** is used or stored (see 5.2 above)

Building/room size, ventilation capacity, system pressures, etc. must be determined for each specific case. The following guidelines can be applied to ventilation system design:
- Ventilation must be continuous while the hazard exists. This can be achieved by interlocking the ventilation system with the process power supply.

5

Exhibit 22 Page 28

**IGC**                                                                    DOC 44/09

- Ventilation system design should ensure adequate air flow around the normal operating areas.
- Good engineering practice indicates a minimum ventilation capacity of 6-10 air changes per hour.
- The use of devices to indicate correct system operation, such as:
  - Warning lights
  - "Streamers" in the fan outlet,
  - Flow switches in the suction channels (monitoring should not rely only upon secondary controls such as "power on" to the fan motor).
- Exhaust lines containing inert gases shall be clearly identified, and should be piped to a safe, well ventilated area outside the building, away from fresh air intakes.
- Consideration should be given to the use of workplace atmospheric monitoring, e.g. personal oxygen analyser or an analyser in the work area, location to be based on assessment of the areas described in 5.3.
- People working in or entering the area shall be aware of action required in event of alarms from atmospheric monitors or loss of ventilation.

### 6.4.2   Ventilation/ monitoring prior to entry into confined spaces or enclosures

As described in 5.1 above, these spaces would include enclosures or vessels which:
- Are not routinely entered and
- Are known to have contained inert gas or
- May contain inert gas or low concentration of oxygen
- Any vessel not known and verified to contain atmospheric air.

In these cases the following guidelines apply to prepare a safe atmosphere prior to entry:
- Sources of inert gas must be isolated from the space or enclosure by positive blinds or by disconnection of lines. Never rely only on a closed valve.
- The vessel or enclosure must be adequately purged with air (i.e. remove the inert gas and substitute with air).
  - It is necessary to have at least 3 complete air changes within the enclosure involved.
  - Purging shall continue until analysis confirms that the quality of the vessel atmosphere is safe for personnel entry. If there is any doubt that effective purging has taken place, the analysis should be made in the interior of the vessel by taking a sample at several locations by probe, or if this is not possible, by a competent person using a self contained breathing apparatus.
  - The purge system must ensure turbulence for adequate mixing of air and inert gas to take place (to avoid "pockets" of dense or light inert gases remaining or to avoid "channelling" of gases due to inadequate purging).
  - Removal of argon or cold nitrogen from large vessels and deep pits can be difficult due to the relatively high density of the gas compared with air. In that case the gas should be exhausted from the bottom of the space.
  - Ventilation should never be carried out with pure oxygen, but exclusively with air.
- Another method of removing inert gases is to fill the vessel with water and allow air to enter when the water is drained off.
- Oxygen content of the atmosphere in the enclosure/vessel shall be monitored continuously or repeated at regular intervals.
- Consideration should also be given to the use of personal oxygen monitors.

Where a safe atmosphere cannot be created and confirmed, then the task must only be performed by competent personnel provided with a positive breathing air supply.

### 6.4.3   Ventilation/monitoring for entry into other spaces where inert gases may be present

This type of confined space is one that has any of the following characteristics:
- Limited opening for entry and exit
- Unfavourable natural ventilation

Examples are listed in sections 5.1 and 5.3 and include;
- Underground works
- Trench/pit deeper than 1 metre
- Small rooms where gases are stored but not designed for continuous worker occupancy.

Exhibit 22 Page 29

**IGC**                                                                    DOC 44/09

In the majority of these cases the presence of inert gases is not anticipated when entering such spaces. However, the one essential safeguard in all cases is to sample the atmosphere in the room, enclosure, trench, pit, etc. for oxygen prior to any entry. Where appropriate a continuous fixed point monitoring device should be used.

The fact that an oxygen deficient atmosphere is not normally expected is the greatest danger.

### 6.4.4 Notes on purging requirements

The guidance for air changes, mentioned in section 6.4.2, is valid where nitrogen is the inert gas involved because its density is very near to that of air and oxygen.

If the gas to be purged has a density very different from the density of air, such as helium, argon or carbon dioxide, etc. the ventilating air may not adequately mix and the purge may be inadequate.

For inert gases of this type the volume of gas to be displaced (air changes) must be at least 10 times that of the volume involved. The preferred method of removal of very dense gases (e.g. argon or cold nitrogen vapour) is to suck out the gas from the bottom of the space.

In the presence of toxic or flammable gases, it is mandatory to perform an additional analysis of the gases present in the confined space, before entry of personnel. For obvious reasons, the measurement of only the oxygen content is not sufficient in this case. All other dangerous toxic or flammable gases must also be analysed.

In the specific case of flammable gases, a nitrogen purge must be used first to prevent any explosion risk and then subsequently purge with ventilating air.

### 6.5    Testing of oxygen content

Historically, the need to check that an atmosphere is respirable has been considered to be of the greatest importance. In the past, simple means were employed, such as, for example, the lighted candle or the canary bird.

Currently, various types of oxygen analysers are available, which are often reliable and simple and to operate. The selection of the type of apparatus depends on the nature of the work in the place to be monitored (presence of dust, temperature and humidity, multiple detectors, portable equipment, etc.).

- Oxygen analysers are critical equipment and must be properly maintained and calibrated in order to sufficiently reliable.  It is also important to ensure that fixed and portable detectors are properly positioned to measure a representative sample of the atmosphere.
- A simple way check to confirm that an oxygen analyser is operating properly before use is to measure the oxygen content of the open air (21 %). This check should be part of the work permit requirements.
- All oxygen analysers should be fitted with an alarm device to indicate possible defects (e.g. low battery).
- The minimum safe oxygen concentration for entry into a space that is being controlled or measured because of the risk is 19.5 % oxygen. There are applications with oxygen concentrations below 19.5 % where entry is permitted provided that further precautions are taken in accordance with proper risk assessment and national regulations (e.g. fire suppression). [See Ref 4]

### 6.6    Work permit

For certain types of work, safety instructions and a special work procedure must be set up in the form of a work permit, this particularly relates to any form of confined space entry. [See Ref 8]
This procedure is necessary during work carried out by subcontractors in air separation cold boxes, or where vessel entry is required.

Exhibit 22 Page 30

**IGC**                                                                    DOC 44/09

<u>It is important that a work permit procedure deals with the detailed information that must be given to involved personnel before the start of work. This information should include contractual conditions together with documented risk assessments, procedures and the training of site workers.</u>

**6.7     Lock-out Tag-out procedure**

To ensure any sources of inert gas have been properly isolated, the implementation of a stringent, formal lock-out and tag-out procedure is necessary before safe entry into a confined space.

**6.8     Protection of personnel**

The type of work to be performed, the layout of the premises and the assessment of potential rescue scenarios will determine the provision of additional protective measures. This additional protection should include organisational measures and/or safety equipment such as:

- Fixed or personal oxygen monitoring equipment
- The wearing of a harness so that the worker can be easily and rapidly taken out of an enclosed space in the case of an emergency. Preferably, this harness is to be connected to a hoist to facilitate removing the victim. (In practice, it is extremely difficult for one person to lift up another person in the absence of a mechanical aid of some kind.)
- The provision of an alarm system in case of an emergency.
- The wearing of a self contained breathing apparatus (not cartridge masks, which are ineffective in a case of lack of oxygen).
- In the case of work inside a confined space, a standby person should be placed on watch outside the space/vessel.
- Having a self contained breathing apparatus on stand by.
- The wearing of other personal protective equipment such as safety boots, hard hat, goggles or gloves, depending on the hazards of the location and task.

**7     Confined space entry**

The employer has an overriding duty to ensure that tasks in confined spaces with potentially hazardous atmospheres are performed **without entry** whenever this is practical. Only if it there is no practical alternative shall people be required to enter confined spaces.

Any entry into a confined space or enclosure with a potentially hazardous atmosphere shall be carefully controlled and have:
- A written method statement for the work to be undertaken with the space.
- A documented risk assessment for performing this task in this particular vessel.
- Formal, stringent lock-out and tag-out procedures.
- An assessment of potential scenarios where rescue may be required.
- An emergency (rescue) plan to deal with any possible accident scenario related to entry in to the enclosure or vessel.
- Rescue personnel and equipment should be available as required by the rescue plan.
- Trained and competent personnel in roles of; entrant, stand-by watch, rescue team (where required) and supervisor/permit issuer.
- A safe work permit issued and signed before entry is allowed.

This document is not a detailed procedure for confined space entry, but focuses on the considerations which are important where there is an actual or potential hazard from inert gases or oxygen deficiency.

**8     Rescue and first-aid**

Awareness training in the hazards of inert gases and oxygen deficient atmosphere is of vital importance for everyone who might enter a space or who might discover and affected person in a space with potentially asphyxiant atmosphere, in order to prevent subsequent fatalities as result of "unplanned rescue" attempts.

8

Exhibit 22 Page 31

**IGC**                                                                          DOC 44/09

Training in rescue work is fundamental since quickly improvised rescue without the formality of a procedure, often proves to be ineffective, if not catastrophic, i.e. the rescue worker lacking foresight becomes a second or even a third victim. This is one of the most common causes of multiple fatalities in cases involving asphyxiation.

## 8.1    Basic rules

If a person suddenly collapses and no longer gives any sign of life when working in a vessel, a partially enclosed space, a trench, a pit, a small sized room, etc., it MUST be assumed that the person may lack oxygen due to the presence of an inert gas (which is, as mentioned, odourless, colourless and tasteless):

***WARNING:** the discoverer must assume that his life is at risk entering the same area!*

The risk is that the rescuer will become the second victim, which obviously must be avoided at all costs. Ideally he should raise an alarm and call for assistance so that a prepared rescue can be carried out.

Rescuers intent on saving a possible asphyxiation victim should only do so if they have the necessary equipment, have been suitably trained, have proper assistance and support.

## 8.2    Rescue plan elements

The method of rescue will be determined by the access to particular space. If practical a non-entry rescue is preferred. Appendix B lists the considerations which should be given to rescue plans from three different situations:
- Rescue from normally accessible rooms
- Rescue from Confined Spaces
- Rescue from pits, trenches or excavations

In each case the Rescue plan must have elements which address:
- How the alarm is raised
- Identification of possible rescue scenarios (not only for low oxygen effects)
- Any scenarios in the surrounding work place which may or may not require immediate exit from the space (e.g. site evacuation in event of fire elsewhere)
- Stand-by watch trained to keep visual and verbal contact with the entrant and to ensure the entrant exits the space if symptoms of oxygen deficiency are suspected or observed
- Any assistance which may be needed/given from outside the space to help entrant escape from the space, without further entry.
- Re-checking/confirmation of atmosphere prior to rescue
- Manpower and equipment required to move unconscious person from that space
- Provision of first aid/medical treatment (e.g. resuscitation and/or oxygen treatment) inside the space if necessary
- Safe access by rescue and/or medical personnel if necessary
- How to make the space safe/prevent further injury after the rescue.

## 8.3    Equipment

A successful rescue action may need some of the following equipment. The actual needs must be assessed as part of the rescue plan and made available and accessible during the confined space work:
- A portable audible alarm devices, e.g.; personal horn, whistle, klaxon etc. to alert nearby people that assistance is required.
- Telephone or radio at the work site so that an alarm can be raised in event of problems
- A safety belt or harness connected to a line
- Mechanical aid such as pulley, hoist, to extract the victim.
- Possibly a source of air or oxygen to ventilate the confined space, such as:
  - A compressed air hose connected to the plant compressed air network,
  - A ventilation device.

9

Exhibit 22 Page 32

**IGC**                                                                DOC 44/09

- Additional oxygen monitors for rescue team for re-checking conditions inside the space
- Positive pressure breathing air supply. This may be an externally fed breathing air system or self-contained breathing apparatus (SCBA).
  *WARNING: Cartridge masks for toxic gases are not suitable as they do not replenish missing oxygen.*
- A resuscitation kit supplied with oxygen for the victim. In general, such a kit includes a small oxygen cylinder, a pressure regulator, an inflatable bag, and a mask to cover both the nose and mouth of the victim.
- Stretcher to carry injured person out of the space, away from work place and/or to ambulance.

It should be noted that any equipment identified as necessary to carry out an emergency rescue from a confined space should be defined on the basis of a full risk assessment and the emergency plan developed from it. Where this equipment is not available, a rescue should not be undertaken.

### 8.4    Rescue training

Where an emergency plan considers that a rescue is to be performed, it is recommended that there is an annual programme of training including **practical rescue drills**. It is also a good practice to consider a rescue exercise before start of confined space work.

### 8.5    First Aid

Where there is a potential hazard from inert gases/oxygen deficiency it is advisable to have personnel available who are formally qualified to give first aid and/or perform **resuscitation** in the event of an accident. The simplest first aid treatment for someone suffering from effects of oxygen deficiency is to bring the affected person **into fresh air** – as long as it safe to do so!

In most countries additional training is required so that first aiders are qualified to **provide Oxygen** as medical treatment for anoxia and other conditions.

### 9    Conclusions

There are two essential points to remember related to oxygen deficiency accidents involving inert gases:
- Accidents resulting from oxygen deficiency due to inert gases happen unexpectedly and the reactions of personnel may be incorrect. To avoid this, all personnel who may work with, or may be exposed to, inert gases must have routine awareness training in respect of the hazards of these gases.
- Accidents involving asphyxiant atmospheres are always serious, if not fatal. It is absolutely necessary to carry out both regular and periodic awareness training sessions for all personnel, as well as rescue drills.

### 10    References

[1] CGA document SB-2 2007 Oxygen-Deficient Atmospheres

[2] EIGA Asphyxiation campaign documents 2003 – including Dangers of Asphyxiation leaflet; Oxygen Deficiency training presentation and Newsletter 77/xx

[3] Oxygen deficiency hazards. Video tape EIGA, 1997

[4] EIGA Position Paper PP-14: Definitions of Oxygen Enrichment/Deficiency Safety Criteria – August 2006.

[5] US Chemical Safety and Hazard Investigation Board website Video Room www.csb.gov

[6] EIGA position Paper PP-24: Abuse of Gases

[7] IGC Doc 004 Fire Hazards of Oxygen and Oxygen Enriched Atmospheres

Exhibit 22 Page 33

**IGC**                                                        DOC 44/09

[8] IGC Doc 040 Work Permit Systems

Exhibit 22 Page 34

**IGC**                                                                     DOC 44/09

## Appendix A: Summary for operators

**1    Why do we need oxygen?**

| |
|---|
| **OXYGEN IS ESSENTIAL FOR LIFE** |
| **WITHOUT ENOUGH OXYGEN WE CANNOT LIVE** |

When the natural composition of air is changed, the human organism can be affected or even severely impaired.

If gases other than oxygen are added or mixed with breathing air, the oxygen concentration is reduced (diluted) and oxygen deficiency occurs.



If oxygen deficiency occurs due to the presence of inert gases (e.g. nitrogen, helium, argon, etc.) a drop in physical/mental efficiency occurs without the person's knowledge; at about 11 % oxygen concentration in air (instead of the normal 21 % concentration) fainting occurs without any prior warning.

Below this 11 % concentration there is a very high risk that death due to asphyxiation will occur within a few minutes, unless resuscitation is carried out immediately!

See also EIGA Safety Newsletter **NL/77 Campaign against Asphyxiation**

**2    Causes of oxygen deficiency**

a)   When liquefied gases (such as liquid nitrogen, liquid argon, or liquid helium) evaporate, one litre of liquid produces approximately 600 to 850 litres of gas. This enormous gas volume can very quickly lead to oxygen deficiency unless there is adequate ventilation.



b)   In the event of gases other than oxygen leaking out of pipe work, cylinders, vessels, etc., oxygen deficiency must always be expected. Checks should be made periodically for possible leaks.

Spaces with limited or inadequate ventilation (e.g. vessels) must not be entered unless air analysis has been made, safe conditions are confirmed and a work permit has been issued.

Exhibit 22 Page 35

**IGC**                                                                    DOC 44/09

c) If work has to be carried out in the vicinity of ventilation openings, vent pipes or vessel man ways for example, personnel must be prepared to encounter gases with low oxygen concentration or without oxygen at all, being discharged from these openings.



d) Oxygen deficiency will always arise when plant and vessels are purged with nitrogen or any other inert gases.

**3      Detection of oxygen deficiency**

| HUMAN SENSES CANNOT DETECT OXYGEN DEFICIENCY |
|---|

Measuring instruments give an audible or visual alarm of oxygen concentration and can indicate the oxygen content.

These instruments should always be tested in the open air before use.

If the presence of toxic or flammable gases is possible, specific instruments should be used.



**4      Breathing equipment**

Breathing equipment must be used in situations where oxygen deficiency has to be expected and which cannot be remedied by adequate ventilation.

Cartridge gas masks necessary for use in the presence of toxic gases (such as ammonia, chlorine, etc.) are useless for this purpose.

Recommended types of breathing equipment are:
• Self contained breathing apparatus using compressed air cylinders;
• Full-face masks with respirator connected through a hose to a fresh air supply.

NOTE:

13

Exhibit 22 Page 36

**IGC**                                                                                          DOC 44/09

> It should be born in mind that when wearing these apparatus, particularly with air filled cylinders, it might sometimes be difficult to enter manholes.
> Periodic inspection of the correct functioning of the equipment shall be carried out in accordance with local regulations.
> Users shall be trained and shall practice handling of the equipment regularly.

**5       Confined spaces, vessels, etc.**

Any vessel or confined space where oxygen deficiency is expected and which is connected to a gas source shall be disconnected from such a source:

By the removal of a section of pipe; or
by inserting a blanking plate before and during the entry period.

Reliance on the closure of valves alone might be fatal.

A space or vessel should be thoroughly ventilated, and the oxygen content shall be measured periodically before and during entry period.

If the atmosphere in such a vessel or space is not breathable, a qualified person shall use breathing equipment.

**Permission** to enter such a space shall be given **only after** the issue of an **entry permit** signed by a **responsible** person.

As long as a person is in a vessel or confined space, a watcher shall be present and stationed immediately outside of the confined entrance.

He shall have a self-contained breathing apparatus readily available.

The person inside the confined space to facilitate rescue shall wear a harness and rope. The duty of the watcher should be clearly defined. A hoist may be necessary to lift an incapacitated person.



**6      Emergency Measures**

In the event of a person having fainted due to oxygen deficiency, he can only be rescued if the rescue personnel are equipped with breathing apparatus enabling them to enter the oxygen deficient space without risk.

Remove the patient to the open air and administer oxygen without delay from an automatic resuscitator if available or supply artificial respiration. Guidelines and instructions for resuscitation can be obtained from the European Resuscitation Council (Internet Homepage: www.erc.edu ).
Continue until patient revives or advised to stop by qualified medical personnel.

Exhibit 22 Page 37

**IGC**                                                              DOC 44/09

### Appendix B1: Rescue considerations from normally accessible rooms



**Planned Rescue Scenario:**
If work is undertaken **on inert gas or cryogenic liquid systems within an enclosed room** it is suggested that:

- The entrant carries a personal oxygen monitor in addition to any fixed systems as the oxygen concentration may vary within the room if ventilation is absent or inadequate for the leak rate.
- The atmosphere within the space is checked before entry
- A stand-by watch is posted outside the space, to keep visual and verbal contact with the entrant and to ensure the entrant leaves the room unaided in case of early symptoms of oxygen deficiency
- The stand-by watch can raise an alarm by telephone or radio on event of problems

- The stand-by watch has Self Contained Breathing Apparatus (SCBA) ready so that he can safely enter the enclosed room to go to the assistance of, or to extract the victim if necessary.
- Unless a plan is in place so that the entrant can be safely removed by the standby-watch alone, then the rescue team should have been warned of the confined space entry work in progress, and be ready with Self Contained Breathing Apparatus (SCBA) and other equipment so that they can safely enter the Confined space to go to the assistance of, or to extract the victim if necessary.
- Plans have been made to obtain treatment/assessment from qualified medical personnel for the victim as soon as possible after he is retrieved from the room.

  

**Unplanned Rescue Scenario:**
If a person is found collapsed in a room where there is a potential inert gas leak / oxygen deficient atmosphere, then the discoverer must assume that **his life is at risk** entering the same area.
He should raise an alarm and call for assistance so that a prepared rescue can be carried out.

ONLY if the collapsed person can be reached, from outside the room should any consideration be given to extracting the victim from the space and bringing him out to fresh air and medical attention.

IF the victim has collapsed as a result of an oxygen deficient atmosphere and been there for any length of time it is very likely that he is dead and the discoverer's life is risked in vain.

Exhibit 22 Page 38

**IGC**                                                                    DOC 44/09

### Appendix B2: Rescue considerations from Confined Spaces



**Planned Rescue Scenario:**
If work is undertaken within a **Confined Space** such as a vessel or a difficult access space, with potential inert gas/ oxygen deficient atmosphere, it is essential that:

- The atmosphere within the space is made safe, ventilated and checked before entry
- The entrant carries a personal oxygen monitor.
- If practical the entrant wears a body harness with life line, so that he can be removed from the space by persons outside. A hoist or other mechanical aid may be needed
- A stand-by watch is posted outside the space, to keep visual and verbal contact with the entrant and to ensure the entrant exits the Confined Space if symptoms of oxygen deficiency are suspected or observed
- The stand-by watch can raise an alarm to call a trained rescue team by telephone or radio on event of problems
- The rescue team should have been warned of the confined space entry work in progress, and be ready with Self Contained Breathing Apparatus (SCBA) and other equipment so that they can safely enter the Confined space to go to the assistance of, or to extract the victim if necessary.
- The stand-by watch should never enter the Confined Space.
- Plans have been made to obtain treatment/assessment from qualified medical personnel for the victim as soon as possible after he is retrieved from the room.





**Unplanned Rescue Scenario:**
All Confined Spaces shall be closed or barricaded to prevent unauthorised access. There should be no possibility for uncontrolled entry into the Confined Space, so the "unplanned rescue" situation should not occur!

If however a person is found collapsed in a Confined Space where there is a potential inert gas / oxygen deficient atmosphere, then the discoverer must assume that **his life is at risk** entering the same area. He must raise an alarm and call for assistance so that a prepared rescue can be carried out.

IF the victim has collapsed as a result of an oxygen deficient atmosphere and been there for any length of time it is very likely that he is dead and the discoverer's life is risked in vain.

Exhibit 22 Page 39

**IGC**                                                                 DOC 44/09

## Appendix B3: Rescue considerations from pits, trenches



**Planned Rescue Scenario:**

If work is undertaken in an **excavation, trench, pit**, or other open spaces with potential inert gas / oxygen deficient atmosphere, it is strongly recommended that:

- The atmosphere within the space is checked before entry

- The entrant carries a personal oxygen monitor, as the oxygen concentration may vary within the space if there is limited fresh air circulation.
- A stand-by watch is posted outside the space, to keep visual and verbal contact with the entrant and to ensure the entrant exits the area unaided if symptoms of oxygen deficiency are suspected or observed.
- The stand-by watch can raise an alarm to call a trained rescue team by telephone or radio on event of problems.
- The stand-by watch has Self Contained Breathing Apparatus (SCBA) ready IF it is practical for him enter the enclosed room to go to the assistance of, or to extract the victim alone. OR
- The rescue team should have been warned of the confined space entry work in progress, and be ready with Self Contained Breathing Apparatus (SCBA) and other equipment so that they can safely enter the space to extract the victim if necessary
- Plans have been made to obtain treatment/assessment from qualified medical personnel for the victim as soon as possible after he is retrieved from the room.



**Unplanned Rescue Scenario:**
If a person is found collapsed in a trench, pit or other space where there is a potential inert gas leak / oxygen deficient atmosphere, then the discoverer must assume that **his life is at risk** entering the same area. He should raise an alarm and call for assistance so that a prepared rescue can be carried out.

IF the victim has collapsed as a result of an oxygen deficient atmosphere and been there for any length of time it is very likely that he is dead and the discoverer's life is risked in vain.
In addition it will often require several people to remove a victim from these kinds of spaces.

Exhibit 22 Page 40

**IGC**                                                                    DOC 44/09

## Appendix C: Accidents involving oxygen deficiency

The following list highlights real accidents recorded by EIGA, some of them very recent. The list illustrates how essential it is to regularly draw the attention of our personnel, as well as that of our customers, to the hazards of inert gases and oxygen deficiency.

1.  A new pipeline in a trench was being proof tested with nitrogen. A charge hand entered the trench to investigate the cause of an audible leak. He was overcome by nitrogen and died.

2.  A workman was overcome by lack of oxygen after entering a large storage tank, which had been inerted with nitrogen. Two of his workmates, who went to his aid, without wearing breathing equipment, were also overcome and all three died.

3.  A man was overcome on entering a steel tank which had been shut up for several years. The atmosphere inside the tank was no longer capable of supporting life due to removal of oxygen from the air by the rusting of steel.

4.  A worker from a contractor company had to carry out welds inside a vessel. The vessel had been under a nitrogen blanket, but was ventilated with air before work started. In order to be on the safe side, the welder was asked to wear a fresh air breathing mask. Unfortunately a fellow worker connected the hose to a nitrogen line and the welder died from asphyxiation.

    *This accident happened because the nitrogen outlet point was not labelled and had a normal air hose connection.*

5.  Welding work with an argon mixture was performed inside a road tanker. During lunchtime the welding torch was left inside the tank, and as the valve was not properly closed, argon escaped. When the welder re-entered the tank, he lost consciousness, but was rescued in time.

    *Equipment that is connected to a gas source, except air, must never be left inside confined spaces during lunch breaks, etc. Merely closing the valves is not a guarantee against an escape of gas. If any work with inert gas is carried out in vessels, etc. take care with adequate ventilation or the use of proper breathing equipment.*

6.  A driver of a small-scale liquid nitrogen delivery service vehicle was making a delivery. He connected his transfer hose to the customer-installed tank, which was situated in a semi-basement. After he had started to fill, one of the customer's employees told him that a cloud of vapour was forming around the tank. The driver stopped the filling operation and returned to the area of the tank to investigate. On reaching the bottom of the stairs, he collapsed, but fortunately he was seen by one of the customer's staff that managed to put on breathing apparatus, go in and drag the man to safety. The driver fully recovered.

    Unknown to the driver, the bursting disc of the storage tank had failed prior to the start of his fill and as soon as he started filling, nitrogen escaped in the vicinity of the storage tank. The oxygen deficient atmosphere overcame him when he went down to investigate without wearing his portable oxygen monitor, which would have warned him of the oxygen deficiency. The installation had been condemned and was no longer being used. Not only was the tank situated in a semi-basement, but the relief device was also not piped to a safe area.

7.  During a routine overhaul of an air separation plant, a maintenance technician had the task of changing the filter element on a liquid oxygen filter. The plant was shut down and a work permit was issued each day for each element of work. In spite of these precautions, the technician collapsed when he inadvertently worked on the filter after it had been purged with nitrogen. The fitter collapsed apparently asphyxiated by nitrogen. All efforts to revive him failed.

Exhibit 22 Page 41

**IGC**                                                                          DOC 44/09

8. At a cryogenic application, the equipment pressure relief valve located on the equipment **inside** the building opened because the pressure in the storage tank **outside** increased above the setting of the equipment pressure relief valve. Personnel about to enter the room the next morning were warned by the frosted appearance and did not enter.

9. A customer was supplied with 2 low temperature-grinding machines, which were located in the same area in the factory. The customer installed a joint nitrogen extraction system between the two machines. One machine was switched off for cleaning while the other machine was left running. One of the operators who had entered the unit for cleaning fell unconscious and was asphyxiated before help arrived. The linked extraction system had allowed exhausted nitrogen from the operating machine to flow into the unit to be cleaned.

10. A driver was fatally asphyxiated during commissioning of a nitrogen customer station. The customer station tank was located in a pit that was not recognized as a confined space by the design team, distribution operation team or the driver. The driver was sent to do the commissioning by himself.
    During the commissioning the driver made a mistake in opening the liquid supply line valve, instead of the gas vent valve, for purging and cool down of the tank. It is believed he did not immediately notice the valving error partially due to a modified manifold that allowed gas to vent from an uncapped drain in the liquid supply line. When the driver opened the valve gas started venting as would normally occur except from the wrong location. Once he noticed that liquid rather than gas venting, he went into the pit to correct the valving error. At this point he walked into a nitrogen rich/oxygen deficient atmosphere.

11. A group of workers were routinely working at the in-feed end of a tunnel freezer. As the temperature of the tunnel was approaching the desired set point, a new operator noticed that there was a cloud of $N_2$ gas coming out at exit end of the freezer. He suddenly increased the speed of the scroll fan in order to remove the gas from exit to product entrance. The exhaust and scroll fans were running on manual mode. As a result, the $N_2$ cloud moved to product entrance and five workers who were working around the loading table passed out. Fortunately, there were no serious injuries and all of them returned to work after taking a rest.

12. On an ASU still in commissioning phase three painters from a sub-subcontractor were working on a ladder to complete external painting works on nitrogen/water tower. To complete the painting of top tower section a wooden plank was put across the exhaust section to atmosphere. One painter climbed on the plank, surrounded by the nitrogen stream, and fell off inside the tower. The two other painters rushed from the ladder to the plank to rescue their team mate. Both collapsed into the tower as well. The three painters died before they could be rescued.

13. An experienced contractor was used to purge a natural gas pipeline, 0.5m diameter 10 km long, with nitrogen before start-up. When one contractor employee and two customer employees entered the remotely located chamber, they were asphyxiated and later found dead in the chamber. Two blind flanges were leaking and the oxygen monitor was not used.

14. A customer nitrogen tank, volume 10 $m^3$, on a PSA plant was to be inspected by the competent body. The inspector entered the tank and lost consciousness immediately. Two persons from the gas company participating in the inspection managed to bring the inspector out without entering the tank. The inspector recovered.

15. A liquid $CO_2$ tank was installed. The tank should be purged with air but mistakenly the hose was connected to nitrogen. The tank manhole was situated 4 m above ground. For reasons unknown, a contract employee brought a ladder, entered the tank and was asphyxiated. Previously that morning employees had been told not to enter the tank before the atmosphere was officially checked.

16. Employee stepped into a control cubicle where the instrument air was temporarily replaced with N2 during shutdown. The green light outside the door was on indicating safe atmosphere. As soon as he stepped into the cubicle his personal $O_2$ monitor alarmed indicating 18% $O_2$ or less. After exiting safely he opened the door and when $O_2$ level was OK, checked the fan. The ventilation fan was not running. The light was wrongly wired.

Exhibit 22 Page 42

**IGC**                                                                    DOC 44/09

17. The perlite in a storage tank under erection had to be emptied by a contractor company, familiar with this job. During this work one of the workers fell down in the perlite, depth approximately 3m, and was asphyxiated.

18. During the cleaning and painting maintenance of the internal and external surfaces of a water tank, one operator suffered anoxia due to nitrogen being used to purge the vessel instead of air. Two employees tried to rescue the victim and fainted. These two operators were rescued and transported to hospital for intensive care however the original operator died.

19. During the installation of a new LIN phase separator on LIN pipe work at a customer site, a technician went into the roof space. His personal oxygen-monitoring device began to alarm immediately, indicating low oxygen levels. The technician left the roof space immediately and informed the customer. Later in the same week, the customer owned food-freezing machinery was operating, and a project engineer measured concentrations far below 19% in the production room. He left the room, asked all subcontractors to stop work and leave the room, and informed the customer. Investigation showed that the customer had not connected the exhaust ducting to the food-freezing machine that they owned and installed. The exhaust pipes ended in the attic space, not being extended to the atmosphere. Customer had "bridged" the alarm/trip output so LIN supply would not be shut off by low $O_2$ concentrations.

20. An experienced site employee wanted to take some photographs to add to a report concerning production problems relating to problems with leaks in the argon condenser. In the control room he asked a Contractor to accompany him to take photographs of equipment in the cold box. One hour later the two men were found unconscious in a manhole access to the cold box. Emergency authorities were called and declared the two men dead.

21. Two people on a customer's site were asphyxiated and died whilst attempting to unblock a pipe, using Argon gas in a confined space. The use of Argon gas in this application is not authorised. The incident took place in a sump 2 metres below ground level, which is used to drain water from a nearby trench.



22. An air compressor that provided instrument air to an acetylene plant and for breathing air failed. A back-up nitrogen supply from a liquid cylinder was connected to the piping system to replace the function of the air compressor. An operator put on a full respiratory face mask to load Calcium Carbide into the hopper and inhaled nitrogen. He died.

Exhibit 22 Page 43

**IGC**                                                                    DOC 44/09

---

**Appendix D:  Hazard of inert gases sign**



| DANGER OF DEATH |
| :---: |
| Potential Asphyxiating Atmosphere |

21

Exhibit 22 Page 44



# Safety Bulletin

**U.S. Chemical Safety and Hazard Investigation Board**



# HAZARDS OF NITROGEN ASPHYXIATION   No. 2003-10-B | June 2003

## Introduction

Every year people are killed by breathing "air" that contains too little oxygen. Because 78 percent of the air we breathe is nitrogen gas, many people assume that nitrogen is not harmful. However, *nitrogen is safe to breathe only when mixed with the appropriate amount of oxygen.*

These two gases cannot be detected by the sense of smell. A nitrogen-enriched environment, which depletes oxygen, can be detected only with special instruments. If the concentration of nitrogen is too high (and oxygen too low), the body becomes oxygen deprived and asphyxiation occurs.

This Safety Bulletin is published to bring additional attention to the continuing hazards of nitrogen asphyxiation.[1]

- Nitrogen is widely used commercially. It is often used to keep material free of contaminants (such as oxygen) that may corrode equipment, present a fire hazard, or be toxic.

- Nitrogen asphyxiation hazards in industry resulted in 80 deaths from 1992 to 2002. These incidents occurred in a variety of facilities, including industrial plants, laboratories, and medical facilities; almost half involved contractors.

- Good practices and awareness of hazards minimize the risk of nitrogen asphyxiation (Figure 1).

Many incidents reviewed by CSB were caused by inadequate knowledge of the hazard or inadvertent use of nitrogen rather than breathing-air delivery systems.

This bulletin focuses only on the hazard of asphyxiation, though nitrogen also presents cryogenic and high-pressure hazards.

## Commercial Uses of Nitrogen

One of the most important commercial uses of nitrogen is as an inerting agent to improve safety. Nitrogen is inert under most conditions (i.e., it does not react with or affect other material).

It is often used to keep material free of contaminants, including oxygen—which can corrode equipment or present a fire and explosion hazard when in contact with flammable liquids or combustible solids. In such cases, a flow of nitrogen is maintained in a vessel to keep oxygen out. Nitrogen is also used to purge air from equipment prior to introducing material, or to purge flammable or toxic material prior to opering equipment for maintenance.

In industrial and commercial settings where a nitrogen-enriched environment may present a hazard, such as when using supplied air or working in or around spaces that are confined,

---

[1] In 1998, the U.S. Chemical Safety Board (CSB) investigated a nitrogen asphyxiation incident that occurred in Hahnville, Louisiana. As part of that investigation, CSB reviewed the prevalence of asphyxiation incidents.

※ Figure 1. Sign warning of nitrogen hazard.

DO NOT ENTER IF ALARM IS SOUNDING NITROGEN ATMOSPHERE

**DANGER**

THIS BUILDING CONTAINS AN PURGED ENCLOSURE CHECK FOR ADEQUATE OXYGEN BEFORE ENTERING AUTHORIZED PERSONNEL ONLY

Exhibit 22 Page 45

**2**

precautions must be taken to ensure that sufficient oxygen is provided to personnel.

✳ Nitrogen is safe to breathe only when mixed with the appropriate amount of oxygen.

## Effects of Oxygen-Deficient Atmosphere

Nitrogen is not a "poison" in the traditional sense. It presents a hazard when it displaces oxygen, making the atmosphere hazardous to humans. Breathing an oxygen-deficient atmosphere can have



CSB Safety Bulletins offer advisory information on good practices for managing chemical process hazards. Case studies provide supporting information. Safety Bulletins differ from CSB Investigation Reports in that they do not comprehensively review all the causes of an incident.

U.S. Chemical Safety and Hazard Investigation Board
Office of Investigations and Safety Programs
2175 K Street NW, Suite 400
Washington, DC 20037-1848
202-261-7600
www.chemsafety.gov

serious and immediate effects, including unconsciousness after only one or two breaths. The exposed person has no warning and cannot sense that the oxygen level is too low.

The Occupational Safety and Health Administration (OSHA) requires employers to maintain workplace oxygen at levels between 19.5 and 23.5 percent. As shown in the table on page 3, the human body is adversely affected by lower concentrations.

As the oxygen concentration falls below 16 percent, the brain sends commands to the breathing control center, causing the victim to

✳ In industrial and commercial settings where a nitrogen-enriched environment may present a hazard, . . . precautions must be taken to ensure that there is sufficient oxygen in the atmosphere.

breathe faster and deeper. As the oxygen level continues to decrease, full recovery is less certain. An atmosphere of only 4 to 6 percent oxygen causes the victim to fall into a coma in less than 40 seconds. Oxygen must be administered within minutes to offer a chance of survival. Even when a victim is rescued and

resuscitated, he or she risks cardiac arrest.

✳ Nitrogen . . . presents a hazard when it displaces oxygen.

## Statistics on Nitrogen Asphyxiation

From reported data for the United States, CSB identified 85 nitrogen asphyxiation incidents that occurred in the workplace between 1992 and 2002. In these incidents, 80 people were killed and 50 were injured.[2]

### Profile of Affected Industries and Activities

Of the 85 incidents reported, 62 percent occurred in chemical plants and refineries, food processing and storage facilities, metal and manufacturing operations, and other industrial, maritime, and manufacturing sites, including nuclear plants.

Approximately 13 percent of the incidents involved maintenance

[2] Data sources for the CSB review include regulatory agencies, media reports, technical publications, and contacts with safety personnel; however, only those incidents that were reported and accessible are represented. Although the summary data reported above are not all-inclusive, the numbers clearly indicate that nitrogen asphyxiation presents a serious hazard in the workplace. Statistical analysis is based on available, limited information.

Exhibit 22 Page 46

### Effects of Oxygen Deficiency on the Human Body

| Atmospheric Oxygen Concentration (%) | Possible Results |
|---|---|
| 20.9 | Normal |
| 19.0 | Some unnoticeable adverse physiological effects |
| 16.0 | Increased pulse and breathing rate, impaired thinking and attention, reduced coordination |
| 14.0 | Abnormal fatigue upon exertion; emotional upset, faulty coordination, poor judgment |
| 12.5 | Very poor judgment and coordination, impaired respiration that may cause permanent heart damage, nausea, and vomiting |
| <10 | Inability to move, loss of consciousness, convulsions, death |

SOURCE: Compressed Gas Association, 2001.

✳ CSB identified 85 nitrogen asphyxiation incidents that occurred in the workplace between 1992 and 2002 . . . 80 people were killed and 50 were injured.

activities, such as railcar and tank truck cleaning, painting, maintenance, and repair. These incidents are categorized as "maintenance" because incident reports do not include enough information on the type of industrial setting; they could have occurred at manufacturing sites, which would increase the 62 percent estimate above.

Likewise, trenches and manholes — not specifically

identified as being in manu-facturing facilities — account for about 14 percent of the incidents. The remainder of the incidents occurred in laboratories and miscellaneous industries, such as medical and transportation.

The data show that employees and contractors alike are victims of asphyxiation. Of the 85 incidents reviewed, 42 involved contractors, including construction workers;

✳ Of the 85 incidents reviewed, 42 involved contractors, including construction workers; these 42 incidents account for over 60 percent of the fatalities.

✳ . . . 130 workplace fatalities and injuries occurred from breathing nitrogen-enriched air. Over 60 percent of these victims were working in or next to a confined space.

these 42 incidents account for over 60 percent of the fatalities.

### Causal Information

From the CSB data, a combined total of 130 workplace fatalities and injuries occurred from breathing nitrogen-enriched air. Over 60 percent of these victims were working in or next to a confined space.[3,4]

One characteristic of a confined space is its capability to contain an atmosphere that may be totally different from outside air. Confined spaces in manufacturing sites typically include equipment such as reactors, vessels, tanks, and boilers. Other such spaces are railcars, trenches, and areas accessible by manholes.

[3] "Next to a confined space" means that a person's breathing zone is affected by the atmosphere emanating from the space. The person may be standing in the immediate area but not actually in the space.
[4] According to OSHA, a confined space can be entered to perform work, has limited means of egress, and is not designed for continuous employee occupancy. A "permit-required confined space" includes a space that contains or has the potential to contain a serious safety or health hazard, such as a hazardous atmosphere.

Exhibit 22 Page 47

4

## Failure to Detect Oxygen-Deficient Atmosphere

Failure to detect an oxygen-deficient (nitrogen-enriched) atmosphere was a significant factor in several incidents.

In the data evaluated for this study, 67 of the 85 incidents involved circumstances where personnel were in or around a confined area—such as a railcar, room, process vessel, or tank (Figure 2)—and nitrogen was initially present in high levels or later collected in the area. These incidents accounted for 62 fatalities and 33 injuries. In each of the 67 incidents, personnel failed to detect elevated levels of nitrogen and take appropriate precautions.

When fatalities and injuries occurred in "open areas" (including areas with ventilation, laboratories, buildings, and outside in the vicinity of equipment), the hazard of asphyxiation was not expected and personnel were typically caught off guard. In some cases, personnel unknowingly created a nitrogen-enriched atmosphere by mistakenly using nitrogen instead of air to

flush equipment prior to entry. In either situation, inadequate knowledge of the hazard and failure to detect additional nitrogen resulted in a fatal concentration of gas.

※ When fatalities and injuries occurred in "open areas" . . . the hazard of asphyxiation was not expected and personnel were typically caught off guard.

## Mix-Up of Nitrogen and Breathing Air

Confusing nitrogen gas with air and problems with breathing-air delivery systems accounted for 12 of the 85 incidents, and approximately 20 percent of fatalities.



※ Figure 2. Confined area.

The data provide examples of workers inadvertently using nitrogen instead of air because of interchangeable couplings on lines and poor or nonexistent labeling.

In one incident, a worker mistakenly used nitrogen instead of air to purge a confined space. An inert atmosphere was unexpected and undetected. One worker was killed, and a colleague also died while attempting rescue. In another case, workers inadvertently connected the hose for their breathing-air respirator to a pure nitrogen line.

※ In one incident, a worker mistakenly used nitrogen instead of air to purge a confined space . . . In another case, workers inadvertently connected the hose for their breathing-air respirator to a pure nitrogen line.

## Fatalities and Injuries During Attempted Rescue

One of the most difficult issues concerning hazardous atmosphere emergencies is the human instinct to aid someone in distress. Approximately 10 percent of fatalities from the CSB data were due to attempts to rescue injured persons in confined spaces.

Exhibit 22 Page 48

5

✱ Approximately 10 percent of fatalities from the CSB data were due to attempts to rescue injured persons in confined spaces.

## Asphyxiation Hazards Outside Industry and Effect on General Public

Asphyxiation hazards may also be present outside industry, especially among people who use breathing air, such as firefighters, divers, and medical patients. Statistics on these types of incidents are difficult to collect and are not included in this bulletin, though one such case is summarized below.

# Selected Case Studies

## Failure to Recognize Asphyxiation Hazards Near Confined Spaces

### Employee Dies After Partially Entering a Nitrogen-Purged Tank

Two coworkers and the victim were cleaning filters in a hydrogen purifying tank. The tank was partly purged with nitrogen to remove internal dust particles.

The victim used a lift to access the *external* area of the upper tank, which was fitted with a manway. As he leaned into the tank opening, his coworkers noticed that he was not responding to their communication. They found the victim unconscious, and he later died as a result of oxygen deficiency.

### Employee Overcome While Testing Atmosphere

An operator was conducting a flammable gas test on a tower feedline that discharged into a low-pressure flare gas header. The test was required for a hot work permit to take flash photos.

The chief operator issued a work permit that required a supplied-air respirator. Two contractor pipefitters wore respirators and removed the safety valve. The operator, however, wore no respiratory protection. After climbing the scaffold, he was overcome by nitrogen gas from the open flare line before he could complete atmospheric sampling.

The operator backed away, turned, and slumped to his knees. He was disoriented and briefly lost consciousness. An investigation concluded that the incident was due to elevated levels of nitrogen gas that had inadvertently entered the flare system.

## Inadequate Monitoring of Atmosphere

### Contractor Asphyxiated Inside Tank Car

White mineral oil in a tank car at an oil refinery was offloaded by injecting nitrogen gas into the car. An employee of a railcar cleaning company was asphyxiated while cleaning the nitrogen-filled tank car.

## Corrupt Breathing Air Supply

### Two Laborers/Painting Contractors Asphyxiated

Two painting contractors were abrasive-blasting tubes inside a boiler at a chemical plant. They each wore supplied-air respirators connected to a 12-pack cluster of compressed air cylinders. Another subcontractor monitored the work outside the confined space.

Work proceeded normally throughout the night shift; however, at 3:00 am, the attendant got no response after repeatedly sounding the air horn. When another contractor employee was sent into the boiler to assess the situation, he found the two men lying on opposite ends of the scaffolding.

When the plant health, safety, and environmental department tested the compressed air 12-pack, they found that it contained less than 5 percent oxygen. The "air" had been manufactured with too low a

Exhibit 22 Page 49

6

concentration of oxygen. (Note: This fatal incident prompted OSHA to issue a safety alert on the batch of breathing air.)

## Mix-Ups Between Nitrogen and Air

### Three Employees Asphyxiated in Coating Tank

The atmosphere inside a coating tank was tested and ventilated the day before work was to be performed. On the following day, a contractor entered the tank to clean it and collapsed. Two plant employees entered to attempt rescue, but they were also overcome.

The tank had been ventilated with what was thought to be compressed air but was actually nitrogen. The atmosphere was not tested prior to beginning work. All three men were asphyxiated.

### Employee Killed by Overexposure to Pure Nitrogen

A contractor planned to use an air-powered hammer to chip residue from a furnace in an aluminum foundry. He wore an airline respirator. Of two compressed gas lines with fittings, one was labeled "natural gas" and the other had an old paper tag attached with "air" handwritten on it. However, this line actually contained pure nitrogen.

A splitter diverted one part of the gas stream to the air hammer and the other part to the airline respirator. Once the respirator was in place, the worker breathed pure nitrogen and was asphyxiated.

### Four Killed and Six Injured in Nursing Home

A nursing home routinely ordered large pure oxygen compressed gas cylinders for residents with respiratory system diseases. The supplier mistakenly delivered one cylinder of pure nitrogen with three cylinders of oxygen; a nursing home maintenance employee mistakenly accepted the nitrogen tank.

Another maintenance employee took this cylinder, which had a nitrogen label partially covering an oxygen label, to connect it to the oxygen supply system. The tank was fitted with nitrogen-compatible couplings. The employee removed a fitting from an empty oxygen cylinder and used it as an adapter to connect the nitrogen tank to the oxygen system. Four deaths and six injuries occurred as a result of pure nitrogen being delivered to the patients.

# Good Practices for Safe Handling of Nitrogen

## Implement Warning Systems and Continuous Atmospheric Monitoring of Enclosures

The atmosphere in a confined space or small enclosed area may be unfit for breathing prior to entry, or it may change over time, depending on the type of equipment or work being performed. Recognizing this hazard, good practice calls for continuous monitoring of a confined space to detect oxygen-deficient, toxic, or explosive atmospheres. The entire confined space should be monitored—not just the entry portal.

✳ The atmosphere in a confined space or small enclosed area may be unfit for breathing prior to entry, or it may change over time . . .

Warning and protection systems include flashing lights, audible alarms, and auto-locking entryways to prevent access. Such devices, if properly installed and

Exhibit 22 Page 50

maintained, warn workers of hazardous atmospheres. Personal monitors can measure oxygen concentration and give an audible or vibration alarm for low oxygen concentrations.

✳ Good practice calls for continuous monitoring of a confined space to detect oxygen-deficient, toxic, or explosive atmospheres.

### Ensure Ventilation With Fresh Air

Because the atmosphere of a confined space or small/enclosed area changes during the course of work, it is essential to maintain continuous forced draft fresh-air ventilation before the job begins through to completion. Areas with the potential to contain elevated levels of nitrogen gas should be continuously ventilated prior to and during the course of the job.

Ventilation is also required in rooms and chambers into which nitrogen may leak or vent. In a few of the study cases, people who were simply working close to the nitrogen-containing confined space, room, or enclosure were asphyxiated.

Systems must be in place to properly design, evaluate, and maintain ventilation systems. A warning system will alert workers of a dangerous atmosphere.

Personnel should be trained on how to properly respond and evacuate in the event of failure of the system.

### Implement System for Safe Rescue of Workers

Rescue may be necessary in the event of continuous monitoring, ventilation failure, or another emergency condition. The ability to immediately retrieve immobilized workers is a critical component of confined space entry preplanning.

✳ It is essential to maintain continuous forced draft fresh-air ventilation before the job begins through to completion.

One method is to attach a body harness and lifeline to personnel entering confined areas. This procedure also benefits potential rescuers because they do not have to enter the confined area to retrieve the victim. However, when a worker enters a pipeline, some furnaces, ducts, or other narrow-diameter confined spaces, pulling on a line attached to a body harness may cause the person to bunch up and become stuck inside.

Depending on the situation, wristlets or anklets attached to a lifeline and a retrieval mechanism allow the confined space attendant to pull the person out by the arms

or legs. The attendant and rescue personnel should be available at all times. Rescuers must have an effective system to communicate with personnel inside enclosures. No one should enter a dangerous atmosphere without proper personal protective equipment.

The last measure of defense requires personnel to actually enter the confined area to retrieve the victim. This approach should be used only when personnel are appropriately trained, have donned rescue equipment, and have dependable breathing air.

Approximately 10 percent of fatalities from the survey data occurred to personnel attempting rescue. These deaths could have been prevented if a reliable retrieval system was in place. Such a system would also prevent many entry worker fatalities because it provides for quickly removing the worker from a dangerous atmosphere to a safe one.

### Ensure Uninterrupted Flow and Integrity of Breathing Air

Breathing air must be supplied when workers enter environments where oxygen is or may become deficient. Workers may use either a self-contained breathing apparatus (SCBA) or an airline respirator, which consists of a long hose connecting a breathing air supply to the respirator or hood.

Because a worker using an airline respirator does not control the

Exhibit 22 Page 51

8

✳ **Breathing air must be supplied when workers enter environments where oxygen is or may become deficient.**

source of supply, air may suddenly or inadvertently be interrupted. For example, a power failure may stop an air compressor, the air supply may simply run out, or the supply hose may become twisted or obstructed (e.g., by a vehicle). When supplied air is used, facility management systems must protect against interruption of airflow and provide alternate sources of power for the compressors.

A comprehensive management system includes the following:

- Continuous monitoring of air supply.

- Routine inspection and replacement of supplied-air hoses.

- Restriction of vehicular traffic in the area of supply hoses.

When using supplied air, a worker should carry a small backup cylinder (escape pack)—attached to a different supplied-air system—with enough breathing air to last 5 to 10 minutes.

Breathing air is manufactured either by purifying and compressing air or by mixing nitrogen and oxygen to the appropriate ratio. A breathing-air compressor and its hoses should be specifically manufactured for

and dedicated to breathing-air systems. The compressor should have a moisture trap, an oil trap, and a carbon monoxide sensor and alarm. When breathing air is manufactured by mixing nitrogen and oxygen, the pressure of the cylinders during filling must be known to ensure that the correct amounts are mixed. The final product must be tested to ensure its integrity.

## Prevent Inadvertent Mix-Up of Nitrogen and Breathing Air

To prevent interchanging compressed nitrogen with compressed industrial grade air or compressed breathing-quality air, specific fittings should be used for each cylinder. Cylinders for nitrogen, industrial grade air, and breathing-quality air have distinct, incompatible fittings that cannot be cross-connected.

✳ **Personnel should understand that the fittings are *intended* to be incompatible to ensure safety.**

Personnel should understand that the fittings are *intended* to be incompatible to ensure safety. Cylinders should be clearly labeled; typical cylinders are shown in Figure 3. Labels on piping systems, compressors, and



✳ Figure 3. Compressed gas cylinders.

fittings are additional reminders of which gas is contained inside. Color coding also helps to identify systems.

## Develop and Implement Comprehensive Training Programs

The good practices for safe handling of nitrogen, described above, are effective only if personnel are trained on the importance of the following:

- Use of ventilation systems, retrieval systems, and atmospheric monitoring equipment—both how to use them and how to determine when they are not working properly.

- Dangers of nitrogen-enriched atmospheres and the systems to

Exhibit 22 Page 52

9

prevent interchanging breathing air and nitrogen.

- Implementing good hazard communication, which includes safe handling of air and nitrogen delivery systems.
- Mandatory safety practices and procedures for entry into confined spaces, such as permits, providing an attendant, monitoring, ventilating, rescue, and contractor oversight.
- Precautions when working around equipment that may contain elevated levels of nitrogen.
- The reason for special fittings on compressed gas cylinders.
- Proper use of air supply equipment.

Training should cover new and revised procedures for confined space entry, and establish measurements for employee proficiency. Contractors as well as employees should be trained.

✳ Contractors as well as employees should be trained.

# References and Additional Information

American National Standards Institute (ANSI)/American Society of Safety Engineers (ASSE), 2003. *Safety Requirements for Confined Spaces*, Z117.1-2003.

ANSI/ASSE, 2003. *Criteria for Accepted Practices in Safety, Health, and Environmental Training*, Z490.1-2001.

ANSI, 2002. *Standards on Signage and Labeling*, Z535 Series.

Compressed Gas Association, Inc., 2002. *Standard for Compressed Gas Cylinder Valve Outlet and Inlet Connections*, V-1, 10th edition.

Compressed Gas Association, Inc., 2001. *Safety Bulletin, Oxygen-Deficient Atmospheres*, SB-2, 4th edition.

Compressed Gas Association, Inc., 1999. *Handbook of Compressed Gases*, 4th edition, Kluwer Academic Publishers.

Federal Aviation Administration (FAA), 2003. *NASA Physiology Training*, www.faa.gov/avr/cmo/coa/PH-TR.html.

Finkel, Martin H., 2000. *Guidelines for Hot Work in Confined Spaces; Recommended Practices for Industrial Hygienists and Safety Professionals*, ASSE.

Harris, Michael K., Lindsay E. Booher, and Stephanie Carter, 1996. *Field Guidelines for Temporary Ventilation of Confined Spaces*, American Industrial Hygiene Association (AIHA).

Kletz, Trevor, 1995. *What Went Wrong? Case Histories of Process Plant Disasters*, Gulf Publishing Company.

Institution of Chemical Engineers (IChemE), 2003. *Accident Data Base*, she@iclme.org.uk.

Martin, Lawrence, 1997. "Effects of Gas Pressure at Depth: Nitrogen Narcosis, CO and $CO_2$ Toxicity, Oxygen Toxicity, and 'Shallow-Water' Blackout," *Scuba Diving Explained, Physiology and Medical Aspects of Scuba Diving*, Best Publishing Company.

McManus, Neil, 1999. *Safety and Health in Confined Spaces*, Lewis Publishers/CRC Press.

National Institute for Occupational Safety and Health (NIOSH), 2002. "State FACE Investigations of Fatal Confined-Space Incidents," *Traumatic Occupational Injury*, www.cdc.gov/niosh/face, Oct-Nov 2002.

Occupational Safety and Health Administration (OSHA), 2003. *Safety and Health Topics: Confined Spaces*, www.osha.gov/SLTC/confinedspaces/index.html.

Exhibit 22 Page 53

10

OSHA, 2002. *Accident Investigation Summary Index Page*, www.osha.gov, Oct-Nov 2002.

OSHA, 1994. "Permit-Required Confined Spaces," *Federal Register*, 29 CFR 1910.146, May 1994.

Rekus, John F., 1994. *Complete Confined Spaces Handbook*, Lewis Publishers/CRC Press.

Safety Engineering, 2002. *Daily Incident Alert Archives*, www.safteng.net, Oct-Nov 2002.

The Bureau of National Affairs, Inc. (BNA), 1998. *Occupational Safety and Health Reporter*, Vol. 27, No. 46, April 22, 1998.

BNA, 1996. *Occupational Safety and Health Reporter*, Vol. 25, No. 47, May 1, 1996.

U.S. Air Force, 2003. *Hypoxia*, www.batnet.com/mfwright/hypoxia.html.

U.S. Chemical Safety and Hazard Investigation Board (USCSB), 2002. *Incident Data Base*, www.csb.gov, Oct-Nov 2002.

The U.S. Chemical Safety and Hazard Investigation Board (CSB) is an independent Federal agency whose mission is to ensure the safety of workers, the public, and the environment by investigating and preventing chemical incidents. CSB is a scientific investigative organization; it is not an enforcement or regulatory body. Established by the Clean Air Act Amendments of 1990, CSB is responsible for determining the root and contributing causes of accidents, issuing safety recommendations, studying chemical safety issues, and evaluating the effectiveness of other government agencies involved in chemical safety.

No part of the conclusions, findings, or recommendations of CSB relating to any chemical incident may be admitted as evidence or used in any action or suit for damages arising out of any matter mentioned in an investigation report (see 42 U.S.C. § 7412(r)(6)(G)). CSB makes public its actions and decisions through investigation reports, summary reports, safety bulletins, safety recommendations, case studies, incident digests, special technical publications, and statistical reviews. More information about CSB may be found at www.chemsafety.gov.

*Information about available publications may be obtained by contacting:*

U.S. Chemical Safety and Hazard Investigation Board
Office of Prevention, Outreach, and Policy
2175 K Street NW, Suite 400
Washington, DC  20037-1848
(202) 261-7600

*CSB investigation reports may be purchased from:*

National Technical Information Service
5285 Port Royal Road
Springfield, VA  22161
(800) 553-NTIS or (703) 487-4600
Email: *info@ntis.fedworld.gov*
For international orders, see:
*www.ntis.gov/support/cooperat.htm.*

### *Salus Populi Est Lex Suprema*
### People's Safety is the Highest Law

Exhibit 22 Page 54

*J. clin. Path.*, **30**, Suppl. (Roy. Coll. Path.), **11**, 181–187

# Experimental hypoxic brain damage

## J. B. BRIERLEY

*From the Medical Research Council Laboratories, Carshalton, Surrey*

The majority of hypoxic episodes that result in histologically proven damage in the human brain cannot be adequately defined in physiological terms. They are usually accidents so that basic information such as the precise duration of a cardiac arrest or the blood pressure and heart rate during a period of severe hypotension is very rarely available. In such cases, neuropathological descriptions, however exhaustive, may well explain the final neuropsychiatric status of the patient but can at best indicate only tentatively the nature of the episode itself.

The experimental approach is justified if it can indicate whether damage of a particular type in neurones and in white matter is or is not a direct consequence of a particular hypoxic stress adequately delineated in physiological terms.

At the outset it must be recalled that the energy for the normal functioning of the central nervous system is derived from the oxidative metabolism of glucose. A deficiency of oxygen or glucose will impair function and if severe and protracted enough will lead to irreversible brain damage. Interruption of the oxygen supply produces the most rapid impairment of brain function. Thus consciousness is lost about 10 sec after circulatory arrest. Abrupt anoxia exemplified by inhalation of an inert gas or sudden decompression to an altitude above 50 000 ft leads to loss of consciousness after a slightly longer interval (17–20 sec). This rapid loss of consciousness in instances of profound hypoxia may well be responsible for the widely held view that enduring brain damage may begin soon after consciousness is lost.

### Types of hypoxia

Before considering the relationships between the known neuropathological patterns in the human brain that are ascribed to hypoxia and their apparent counterparts in the brains of experimental animals, it will be useful to classify the several types of hypoxia. However, it will be shown that there is no justification for the assumption that each type of hypoxia can, *per se*, give rise to brain damage. The original classification of Barcroft (1925) must be modified in

the light of subsequent information from human and experimental animals sources as follows:

#### 1 ISCHAEMIC
Blood flow is arrested in the brain as a whole or in the territory of a single artery.

#### 2 OLIGAEMIC
A reduction in blood flow in the brain as a whole or within the territory of a single artery may occur as a result of a greatly reduced cardiac output or major systemic hypotension from any cause.

#### 3 ANOXIC
The arterial oxygen tension is 0 mm Hg. It occurs if inert gases are inhaled, if there is total obstruction of the upper respiratory tract or in the event of sudden exposure to an altitude greater than 50 000 ft (the combined tensions of water vapour and carbon dioxide within the pulmonary alveoli then exceed the ambient pressure and no oxygen can enter the lungs).

#### 4 HYPOXIC
There is some reduction in a pO₂ short of anoxaemia. This occurs in chronic pulmonary disease and in congestive heart disease; when the inspired oxygen is diluted by an inert gas (as in some anaesthetic accidents) and also in exposures to altitudes less than 50 000 ft.

#### 5 ANAEMIC
There is some reduction in the amount of circulating haemoglobin available for combination with oxygen. It can occur after severe haemorrhage, in severe hypochromic anaemia but the commonest apparent cause of anaemic brain damage is carbon monoxide intoxication.

#### 6 HISTOTOXIC
This implies the poisoning of oxidative enzymes within neuronal mitochondria. Cyanide and azide are examples.

#### 7 HYPOGLYCAEMIA
A deficiency of the principal substrate, glucose, *per*

Exhibit 22 Page 55

*se* can also give rise to ischaemic cell change even if the level of arterial oxygenation is normal.

The previous contributors to this section of the Symposium have defined the nature and time course of ischaemic cell change and have pointed out that it is the principal neuronal response to all types of hypoxia in the brains of rodents as well as in those of primates including man. In this survey of the brain damage attributable to hypoxia in all its forms, only the patterns of distribution of ischaemic cell change will be considered with emphasis on the contributions from experimental studies.

## 1 Ischaemic

Arrest of circulation within a single brain artery results in an infarct which can range in size from the 'total territory' in an anatomical sense to a small volume of tissue close to the point of arterial occlusion. Where the cortex of cerebrum or cerebellum is concerned the extent of infarction is determined by the level of systemic blood pressure at and after the instant of occlusion and, in particular, by the functional efficiency of the leptomeningeal vessels that anastomose with the cortical branches of neighbouring arteries. If these anastomotic systems and the major arteries in the neck and the circle of Willis are normal, the cortical infarct will be small. If one or both are the site of occlusive vascular disease, the infarct will be larger.

It must be borne in mind that the basal ganglia and the internal capsule, in particular, are supplied by end-arteries (penetrating or ganglionic branches of the major cerebral arteries). Occlusion of an arterial trunk proximal to the ganglionic branches produces an infarct in these deeply placed regions of grey and white matter even in the healthy experimental primate. Evidently the retrograde flow of blood from leptomeningeal anastomoses into the arterial stem may never enter all its ganglionic branches or, if it does so, it may be too little and too late to avert irreversible tissue damage. Thus, for example, division of the middle cerebral artery close to its origin from the internal carotid artery in the baboon leaves the sensory and motor cortex intact and cortical infarction is confined to some portion of the insula. A variable hemiparesis involves only the contralateral face and upper limb and its neuropathological basis has been shown to lie entirely within white matter, ie, in the genu and supralentiform portions of the internal capsule, where after a survival of three years there is a sharply circumscribed cystic infarct (Symon and Brierley, 1976). The limited neurological deficit and the small, deeply placed infarct that follow division of the middle cerebral artery in a healthy experimental

primate are sharp reminders that such 'models' cannot provide two of the most important factors in the aetiology of 'stroke' in man. These are some impairment in cardiac function (leading to some reduction in cerebral blood flow) and some degree of occlusive vascular disease. These factors, singly or together, account for the extension of the infarct into the centrum semi-ovale and even into the whole of the anatomical cortical territory. It follows, that in the human brain, ischaemic necrosis in some portion of an arterial territory can seldom be explained satisfactorily without careful examination of the myocardium, the coronary arteries and the major arteries of the neck and brain.

Overall or global arrest of the brain circulation leads to a loss of consciousness in eight to 10 sec and the EEG is isoelectric a few seconds later. Respiration fails at about the same time while the heart may continue to beat for a matter of minutes. Neuropathological descriptions of the consequences of circulatory arrest (including 35 personal cases) provide the best examples of the involvement of the 'selectively vulnerable' regions of the brain in hypoxia. Frequently, little of the cerebral cortex is normal but damage is usually greater in the posterior half of each cerebral hemisphere, in the floors of sulci rather than over the crests of gyri and in the third, fifth and sixth layers rather than in the second and fourth. Certain portions of the hippocampus (zones h.1—Sommer sector—and h.3-5,—endfolium) are vulnerable as are the Purkinje cells of the cerebellum. Many sensory nuclei in the brain stem are vulnerable in the infant and young child (Ranck and Windle, 1959; Brierley, 1965, 1976).

Where circulatory arrest has been studied in the experimental animal, it is important to recognize that earlier studies were concerned to define the maximum period of arrest of the cerebral circulation beyond which some degree of irreversible brain damage would occur. Attempts to define such a 'threshold' have been reviewed by Hoff *et al* (1945), Meyer (1963) and Brierley (1976). The general conclusion from these studies has been stated by Schneider (1963) as follows: 'A complete revival without neurological or histological damage cannot be brought about after a complete stop of brain circulation of more than four to five min duration'.

In contrast to the experiments summarized above, certain recent studies have attempted to define a much greater period of circulatory arrest after which there can be some evidence of recovery in at least a neurophysiological sense and histological examination can show that some parts of the brain are normal. Thus Hossmann and Sato (1970) claimed that '. . . unequivocal signs of neuronal recovery can be detected after complete ischaemia of more than one

Exhibit 22 Page 56

hour's duration'. Hirsch *et al* (1975) failed to confirm these results and attributed 'recovery' after such protracted ischaemia in the experiments of Hossmann and Sato (1970 and subsequent studies) to the protective effects of anaesthesia and the progressive fall in temperature that must occur in the isolated head during such periods of time.

It must be emphasized that experimental studies of the effects of circulatory arrest (or any other form of hypoxia) on the brain, whether directed towards the definition of a 'threshold' for a particular hypoxic stress or to the capacity for recovery after an extended period of the same stress, have clinical relevance only if spontaneous respiration has been resumed in the unmedicated animal, and detailed neurological assessments, together with serial recordings of the EEG, have been made during an adequate period of survival. All these are essential for a meaningful appraisal of 'recovery'. Finally, after *in-vivo* perfusion-fixation of the brain, neuropathological examination of the brain must be comprehensive. Unfortunately clinico-pathological studies according to such standards have not yet been reported in support of the claim that 'recovery' of the central nervous system can occur after periods of circulatory arrest far in excess of those hitherto accepted as 'critical' where the inception of minimal brain damage is concerned.

## 2 Oligaemic hypoxia

A reduction of blood flow in a single artery of the human brain is usually due to a combination of systemic hypotension and occlusive disease in the vessel itself. If flow is sufficiently impaired the outcome will be an infarct involving grey and white matter. Such a local reduction in flow can only be inferred if thrombosis and embolism can be excluded. There are, as yet, no experimental models of this particular situation.

Global oligaemia implies some reduction in the overall flow of blood through the brain. Experimental studies in the Rhesus monkey have shown that, if arterial oxygenation remains normal, cerebral perfusion pressure (mean arterial blood pressure − venous sinus pressure) must be reduced to 25 mm Hg for at least 15 min before brain damage is produced (Brierley *et al*, 1969; Meldrum and Brierley, 1969). However, it was only possible to damage the brain if the profound hypotension was continued beyond the point of apnoea when mechanical ventilation was required in order to maintain a normal arterial oxygen tension. These experiments clearly demonstrated that in the healthy spontaneously breathing primate, global oligaemia *per se* is unlikely to lead to brain damage

if respiration does not fail. In these monkeys, typical ischaemic neuronal alterations were not evenly distributed in the cerebral cortex but were restricted to the arterial boundary zones of the cortex of the cerebrum and also of the cerebellum. They were variable in the basal ganglia. The pysiological basis of lesions along arterial boundary zones has been discussed by Zülch and Behrend (1961) and by Meldrum and Brierley (1961). When perfusion pressure falls below 45-50 mm Hg the capacity of the vascular bed to maintain a constant cerebral blood flow (autoregulation) is lost (there is then maximum vasodilatation) and flow becomes directly dependent upon perfusion pressure. The reduction in flow is greatest in the vessels most remote from the arterial stem, ie, at the boundary of each arterial territory.

In the clinical situation, a reduction in brain perfusion pressure while arterial oxygenation remains normal is virtually confined to the technique of hypotensive anaesthesia with controlled ventilation and then only when perfusion pressure through the brain is lowered by excessive head-up tilt (Brierley and Cooper, 1962). The two additional factors that may result in brain damage after a period of relatively moderate hypotension are some degree of hypoxaemia and some element of occlusive disease in the extra- and/or intracranial arteries. The frequency of these two factors in addition to the reduction in brain blood flow due to the initial systemic hypotension is largely responsible for the fact that ischaemic damage along arterial boundary zones of the cortex of cerebrum and cerebellum is the commonest neuropathological outcome of hypoxia in all its forms. It is important to appreciate that no experimental model permitting the introduction and control of oligaemia, hypoxaemia and partial vascular occlusion is yet available.

Previous contributors to this section of the Symposium have emphasized that this 'boundary zone' pattern of brain damage can only be identified if blocks for histological examination are selected with an awareness of the anatomical distribution of the cortical arteries of cerebrum and cerebellum.

## 3 Anoxic

Anoxia, induced by breathing pure nitrogen, has been studied in human volunteers by Gastaut *et al* (1961) and Ernsting (1963). After a few seconds the EEG shows low voltage activity at 11 to 13 c/s and consciousness is lost at 17 to 20 sec. In experimental animals, longer periods of nitrogen breathing lead, after an initial hyperventilation, to slowing of respiration, bradycardia and a falling blood pressure. Apnoea occurs at about the third minute while blood pressure is still appreciable (5-20 mm Hg) at

Exhibit 22 Page 57

the fifth minute (Swann and Brucer, 1949). In the Rhesus monkey, the responses to nitrogen breathing are similar and if mechanical ventilation is begun soon after the 'last breath', the blood pressure rises, spontaneous respiration is resumed and the EEG, previously isoelectric, returns to normal. Subsequent neuropathological examination reveals no brain damage (Brierley and Meldrum, unpublished observations). Evidently the period of anoxaemia and of secondary circulatory impairment is too brief to lead to ischaemic neuronal alterations so that it must be concluded that pure anoxic anoxia cannot produce brain damage.

## 4 Hypoxic

In spontaneously breathing experimental animals, including primates, the minimal level of arterial oxygen tension that does not lead to early apnoea and cardiac failure is about 20 mm Hg. At this level the cerebral vascular bed is fully dilated, the cerebral A-V oxygen difference is reduced (due to reduced oxygen consumption and increased blood flow) but the EEG is normal. This precarious state can be disturbed by a slight fall in perfusion pressure and the immediate decline in the EEG is evidence of some reduction in cerebral blood flow. This may occur as a consequence of a period of cardiac arrhythmia. A progressive fall in heart rate and blood pressure together with slowing of respiration herald the cardio-respiratory crisis that sets the limit to the period during which the organism can tolerate this level of hypoxia. Where the circulatory failure is concerned the final bradycardia and falling blood pressure may not be a direct effect of hypoxia on the myocardium but a consequence of the stimulation of chemoreceptors in the carotid bodies or brain stem (Cross *et al*, 1963). As blood pressure continues to fall respiration ceases and the EEG becomes isoelectric at about the same time. Adequate resuscitation commenced soon after the 'last breath' can, as after anoxic anoxia, allow the heart to recover, spontaneous respiration to be resumed and the EEG to return to normal. Brain damage is rarely seen and only when there has been a prolonged period of cardiac impairment and an even longer period of isoelectric EEG (Brierley, Prior, Calverley, and Brown—unpublished results). Brain damage in such animals consists of ischaemic neuronal alterations along the arterial boundary zones of the cerebrum and cerebellum and sometimes in the basal ganglia. This pattern of damage, indistinguishable from that seen after oligaemic hypoxia, underlines the fact that systemic hypoxaemia can only bring about brain damage through the medium of a secondary reduction in perfusion pressure.

In the human subject exposed to hypoxia not severe enough to bring about failure of respiration and the heart, the initial increase in cerebral blood flow may be so restricted by occlusive vascular disease in the arteries of the brain and/or neck that ischaemic brain damage may ensue.

## 5 Anaemic

There is no convincing evidence that a simple reduction in circulating haemoglobin due to severe hypochromic anaemia (iron-deficient or haemolytic) or to haemorrhage can result in brain damage. Carbon monoxide intoxication remains the sole example of anaemic hypoxia (due to the formation of stable carboxyhaemoglobin) that can be associated with ischaemic cell change and also with damage in white matter. The pathology in the human brain has been reviewed by Meyer (1963), Lapresle and Fardeau (1966) and Brierley (1976). Ischaemic alterations may be seen in the vulnerable regions of the cortex of cerebrum and cerebellum and of the hippocampus. Necrosis in the globus pallidus is not invariable (Meyer, 1928; Lapresle and Fardeau, 1967) and damage in white matter varies considerably.

The presence of some element of perfusion failure in the genesis of, at least, the cortical damage was suggested by the report of Poursines *et al* (1956). A woman, aged 33 years, lived 26 days after attempted suicide with illuminating gas. In her brain, laminar necrosis was distributed along arterial boundary zones but information concerning respiratory and cardiac functions early in the survival period was lacking. The case of Neubuerger and Clarke (1945), dying 13 days after carbon monoxide poisoning, exhibited patchy myocardial infarction suggesting a direct effect of carbon monoxide on the myocardium.

Among experimental studies, that of Lewey and Drabkin (1944) in the dog was important because, after intermittent exposures to carbon monoxide for up to 11 weeks the electrocardiograms were abnormal and the brain damage was considered to be similar to that seen in man but was not described in detail. Further details of electrocardiographic abnormalities were presented by Ehrich *et al* (1944). Recently Ginsberg *et al* (1974) exposed 19 Rhesus monkeys to 0·2 or 0·3 per cent carbon monoxide for 60 to 325 min with a carboxyhaemoglobin level of 72 to 77 per cent throughout. Cardiac arrhythmias and some degree of hypotension were common but the EEG was only intermittently isoelectric. Grey matter damage (globus pallidus and hippocampus) was seen in less than a fifth of the brains while white matter was abnormal in the majority. Apparently the degree of intoxication was not sufficient to produce the

Exhibit 22 Page 58

more extensive grey matter damage so often seen in the human brain.

Further confirmation of a direct effect of carbon monoxide on the heart was provided by Hodjati *et al* (1976) who irrigated the cerebral circulation of one dog from one carotid artery of a donor animal. A mean carboxyhaemoglobin level of 52 per cent in the donor animal led to bradycardia, hypotension and its death in 10 to 15 min. All the recipients survived.

## 6 Histotoxic

Cyanide, the best known cause of histotoxic hypoxia, acts by inhibiting cytochrome oxidase in mitochondria while the oxygen tension and content of arterial blood remain normal. The few human cases with delayed death and evidence of brain damage have been reviewed by Brierley (1976). There was loss of neurones in cerebral cortex and cerebellum and a single case showed haemorrhagic necrosis in each globus pallidus. Hyperaemia and haemorrhages occurred in white matter.

Numerous experimental studies have suggested that cyanide, in any form and administered by any route, can damage neurones and myelin sheaths. In the first experimental study (Meyer, 1933) subcutaneous injections of potassium cyanide in dogs and rabbits produced typical ischaemic alterations in cerebral cortex, globus pallidus, hippocampus and cerebellum. White matter damage was most marked in the corpus callosum. Subsequent studies were more concerned with white matter damage because of its apparent similarity to the plaques of multiple sclerosis. However, the report of Levine and Stypulkowski (1959) was noteworthy because it suggested that grey matter damage in the rat brain after the administration of cyanide was largely due to concomitant ischaemia and hypoxic hypoxia. Brierley *et al* (1976) gave sodium cyanide to rats by intravenous infusion. There was full physiological monitoring in an anaesthetized group and restricted monitoring in the unanaesthetized remainder. White matter, particularly the corpus callosum, was damaged in six of 19 animals and grey matter additionally in only one. In the latter animal bradycardia, epileptic seizures and hypotension were particularly marked and it was concluded that the neuronal damage was brought about through the medium of the secondary effects of cyanide on the circulation. In a recent study in *M mulatta* (Brierley *et al*, 1977) sodium cyanide was given by intravenous infusion. The effects of the infusion on respiration, heart rate, blood pressure, blood gases and the EEG were monitored in the lightly anaesthetized animals. Brain damage was seen in four of 11 animals. It involved white matter in all four but ischaemic cell

change was restricted to the striatum of a single animal. In the latter there had been a period of bradycardia, hypotension and raised central venous pressure. It was concluded that in the lightly anaesthetized and spontaneously breathing Rhesus monkey, as in the rat, there is no evidence for the entity of hypoxic neuronal damage of purely histotoxic type.

## 7 Hypoglycaemia

Hypoglycaemic damage in the human brain is usually associated with irreversible coma and Meyer (1963) stated that the neuropathological findings '. . . closely resemble those which occur in other types of anoxia'. Most of the selectively vulnerable regions may be involved but with a tendency to spare the globus pallidus and cerebellum. Although hypoglycaemic coma may be associated with cardiovascular disturbances and epileptic seizures the ability of hypoglycaemia *per se* to produce ischaemic damage in physiologically monitored experimental primates has been demonstrated only recently.

Kahn and Myers (1971) and Myers and Kahn (1971) studied the long-term effects of insulin-induced hypoglycaemia in Rhesus monkeys. Blood glucose fell to 20 mg/100 ml after one and a half to three eh and was maintained at this level for four to 10 h with normal blood oxygenation. In seven of 11 animals there was neuronal loss with a gliomesodermal reaction in striatum, cerebral cortex and hippocampus.

In order to define the earliest neuronal alterations due to insulin-induced hypoglycaemia, lightly anaesthetized Rhesus monkeys received insulin intravenously while EEG, EKG, heart and respiratory rates were recorded and blood gas tensions, pH and glucose content were measured at intervals (Meldrum *et al*, 1971). When blood glucose was below 20 mg/100 ml for more than two h and the brains were fixed by perfusion, typical ischaemic cell change (from the stage of microvacuolation) was seen in the cortex and occasionally in striatum, hippocampus and cerebellum. Thus a major deficiency in substrate alone can produce the same type of neuronal damage as a deficiency of oxygen.

## Conclusion

It will be evident from this brief review that ischaemic cell change is the cytopathological common denominator in all types of hypoxia. Nevertheless there is no pattern of its distribution specific for each category with the exception of circulatory arrest (global ischaemia) and pure hypoglycaemia after both of which ischaemic neuronal alterations may occur

Exhibit 22 Page 59

*J. B. Brierley*

uniformly within the 'selectively vulnerable' regions of the brain. In the remaining categories of hypoxia, ie, oligaemic, anoxic, hypoxic, histotoxic and probably anaemic (carbon monoxide), an initially pure hypoxic stress in the intact and spontaneously breathing animal gives rise, sooner or later, to terminal secondary impairments of respiration and particularly of circulation. In the healthy experimental animal, however, it is only rarely that the associated period of reduced cerebral blood flow is long enough to cause brain damage but not too long to preclude recovery. In such instances, brain damage consists of a concentration of ischaemic cell change along the arterial boundary zones.

Experimental studies have shown that the terminal hypoxic cardio-respiratory deterioration or crisis consists of a slowing of respiration to the point of apnoea with a fall in blood pressure and in heart rate (but the heart may continue to beat long after the 'last breath'). There is a more or less parallel decline in EEG background activity and an isoelectric state is reached at about the time of the 'last breath'. There is no evidence to suggest that systemic hypoxia of any type can lead to brain damage unless the EEG has been isoelectric for an appreciable period. In the paralyzed and mechanically ventilated animal exposed to systemic hypoxia, initial hyperventilation as well as the 'last breath' cannot occur and the duration of hypoxia may be considerably prolonged. For this reason 'thresholds' for brain damage defined in such preparations must be applied with considerable caution to the spontaneously breathing experimental animal and to man.

There is now ample evidence to show that in the intact healthy, and spontaneously breathing animal tolerance to hypoxia is limited by the respiratory and circulatory systems and not by the intrinsic energy reserves of the brain itself. If effective resuscitation is begun soon after the 'last breath' the EEG will return and the brain will be undamaged. Thus a depression of central nervous system function up to and some time after the 'last breath' and the appearance of transiently isoelectric EEG need have no structural consequences.

The relative frequency of all degrees of ischaemic damage in the human brain after hypoxic episodes does not, however, necessarily imply a greater susceptibility of the brain itself. The existence of a single type of hypoxia in human patients is rare. It should be stressed that several types of hypoxia, each constituting a relatively mild stress can, in combination, produce brain damage. The additional factors most probably responsible for the increased extent and frequency of brain damage in man are twofold. Preexisting cardiac disease will impair the capacity to maintain a high level of blood flow

through a cerebral vascular bed initially fully dilated by hypoxia. It will also impair the rapid restoration of normal cerebral blood flow after any terminal cardio-respiratory crisis. Secondly, preexisting occlusive disease in the arteries of brain and neck and any impairment of the normal reactivity of the smaller cerebral vessels will further reduce cerebral blood flow during and after hypoxia.

In conclusion, experiments in physiologically monitored, spontaneously breathing animals can show that hypoxia gives rise to an integrated series of responses in the respiratory and circulatory systems and in the nervous system itself. Initially these serve to maintain brain function and respiration in particular. Ultimately these compensatory cardio-respiratory responses may fail. Experiments have also shown that where the human brain is concerned the commonest cause of damage must be sought in some failure of brain perfusion.

The author is greatly indebted to Dr Pamela F. Prior (The EEG Department, the London Hospital) for many helpful suggestions and comments in the preparation of the manuscript.

References

Barcroft, J. (1925). *The Respiratory Function of the Blood. Part I. Lessons from High Altitudes.* Cambridge University Press, Cambridge.

Brierley, J. B. (1965). The influence of brain swelling, age and hypotension upon the pattern of cerebral damage in hypoxia. *Excerpta Medica International Congress Series,* 100, 21-28.

Brierley, J. B. (1976). Cerebral hypoxia. In *Greenfield's Neuropathology,* 3rd edition, edited by W. Blackwood and J. A. N. Corsellis, pp. 43-85. Arnold, London.

Brierley, J. B., Brown, A. W., and Calverley, J. (1976). Cyanide intoxication in the rat: physiological and neuropathological aspects. *Journal of Neurology, Neurosurgery and Psychiatry,* 39, 129-140.

Brierley, J. B., Brown, A. W., Excell, B. J., and Meldrum, B. S. (1969). Brain damage in the Rhesus monkey resulting from profound arterial hypotension. I. Its nature, distribution and general physiological correlates. *Brain Research,* 13, 68-100.

Brierley, J. B., and Cooper, J. E. (1962). Cerebral complications of hypotensive anaesthesia in a healthy adult. *Journal of Neurosurgery and Psychiatry,* 25, 24-30.

Brierley, J. B., Prior, P. F., Calverley, J., and Brown, A. W. (1977). Cyanide intoxication in *Macaca mulatta.* Physiological and neuropathological aspects. *Journal of Neurological Science,* 31, 133-137.

Cross, C. E., Rieben, P. A., Barron, C. I., and Salisbury, P. F. (1963). Effects of arterial hypoxia on the heart and circulation: an integrative study. *American Journal of Physiology,* 205, 963-970.

Ehrich, W. E., Bellet, S., and Lewey, F. H. (1944). Cardiac changes from CO poisoning. *American Journal of Medical Science,* 208, 511-523.

Ernsting, J. (1963). Some effects of brief profound anoxia upon the central nervous system. In *Selective Vulnerability of the Brain in Hypoxaemia,* edited by J. P. Schadé and

Exhibit 22 Page 60

W. M. McMenemey, pp. 41-45. Blackwell Scientific, Oxford.

Gastaut, H., Fischgold, H., and Meyer, J. S. (1961). Conclusions of the International Colloquium on Anoxia and the EEG. In *Cerebral Anoxia and the Electroencephalogram*, edited by H. Gastaut and J. S. Meyer, pp. 599-617. Thomas, Springfield, Illinois.

Ginsberg, M. D., Myers, R. E., and McDonagh, B. F. (1974). Experimental carbon monoxide encephalopathy in the primate. II. Clinical aspects, neuropathology, and physiologic correlation. *Archives of Neurology*, 30, 209-216.

Hirsch, H., Oberdörster, G., Zimmer, R., Benner, K. U., and Lang, R. (1975). The recovery of the electrocorticogram of normothermic canine brains after complete cerebral ischemia. *Archiv. für Psychiatrie und Nervenkrankheiten*, 221, 171-179.

Hodjati, H., Dergal, E., Montalbert, C., Goldbaum, L. R., and Absolon, K. B. (1976). Cross-circulation experiments in dogs discerning the target organ of carbon monoxide intoxication. (Abstract.) *British Journal of Surgery*, 63, 655.

Hoff, E. C., Grenell, R. G., and Fulton, J. F. (1945). Histopathology of the central nervous system after exposure to high altitudes, hypoglycemia and other conditions associated with central anoxia. *Medicine (Baltimore)*, 24, 161-217.

Hossmann, K. A. and Sato, K, (1970). Recovery of neuronal function after prolonged cerebral ischemia *Science*, 168, 375-376.

Kahn, K. J., and Myers, R. E. (1971). Insulin-induced hypoglycaemia in the non-human primate. I. Clinical consequences. In *Brain Hypoxia*, edited by J. B. Brierley and B.S. Meldrum, pp. 185-194. (Clinics in Developmental Medicine 39/40, Spastics International Medical Publications). Heinemann, London.

Lapresle, J., and Fardeau, M. (1966). Les leuco-encéphalopathies de l'intoxication oxycarbonée. Étude de seize observations anatomo-cliniques. *Acta Neuropathologica*, 6, 327-348.

Lapresle, J., and Fardeau, M. (1967). The central nervous system and carbon monoxide poisoning. II. Anatomical study of brain lesions following intoxication with carbon monoxide (22 cases). *Progress in Brain Research*, 24, 31-74.

Levine, S., and Stypulkowski, W. (1959). Effect of ischemia on cyanide encephalopathy. *Neurology (Minneapolis)*, 9, 407-411.

Lewey, F. H., and Drabkin, D. L. (1944). Experimental chronic carbon monoxide poisoning of dogs. *American Journal of Medical Science*, 208, 502-511.

Meldrum, B. S., and Brierley, J. B. (1969). Brain damage in the Rhesus monkey resulting from profound arterial hypotension. II. Changes in the spontaneous and evoked electrical activity of the neocortex. *Brain Research*, 13, 101-118.

Meldrum, B. S., and Brierley, J. B. (1971). Circulatory factors and cerebral boundary zone lesions. In *Brain Hypoxia*, edited by J. B. Brierley and B. S. Meldrum, pp. 20-33.

(Clinics in Developmental Medicine 39/40. Spastics International Medical Publications). Heinemann, London.

Meldrum, B. S., Horton, R. W.., and Brierley, J. B. (1971). Insulin-induced hypoglycaemia in the primate: relationship between physiological changes and neuropathology. In *Brain Hypoxia*, edited by J. B. Brierley and B. S. Meldrum, pp. 207-224. (Clinics in Developmental Medicine 39/40. Spastics International Medical Publications). Heinemann, London.

Meyer, A. (1928). Über das Verhalten des Hemisphärenmarks bei der menschlichen Kohlenoxydvergiftung. *Zeitschrift für die gesamte Neurologie und Psychiatrie*, 112, 172-186.

Meyer, A. (1933). Experimentelle Vergiftungsstudien. III. Über Gehirnveränderungen bei experimenteller Blausäurevergiftung. *Zeitschrift für die gesamte Neurologie und Psychiatrie*, 143, 333-348.

Meyer, A. (1963). Anoxic poisons and the problems of anoxia and selective vulnerability. In *Greenfield's Neuropathology*, 2nd edn, edited by W. Blackwood *et al.*, pp. 237-261. Arnold, London.

Myers, R. E., and Kahn, K. J. (1971). Insulin-induced hypoglycemia in the non-human primate. II. Long-term neuropathological consequences. In *Brain Hypoxia*, edited by J. B. Brierley and B. S. Meldrum, pp. 195-206. (Clinics in Developmental Medicine 39/40. Spastics International Medical Publications). Heinemann, London.

Neuburger, K. T., and Clarke, E. R. (1945). Subacute carbon monoxide poisoning with cerebral myelinopathy and multiple myocardial necroses. *Rocky Mountain Medical Journal*, 42, 29-35 and 196.

Poursines, Y., Alliez, J., and Toga, M. (1956). Étude des lésions corticales d'un cas d'intoxication oxycarbonée. *Revue Neurologique*, 94, 731-735.

Ranck, J. B. Jr., and Windle, W. F. (1959). Brain damage in the monkey, *Macaca mulatta*, by asphyxia neonatorum. *Experimental Neurology*, 1, 130-154.

Schneider, M. (1963). Critical blood pressure in the cerebral circulation. In *Selective Vulnerability of the Brain in Hypoxaemia*, edited by J. P. Schadé and W. M. McMenemey, pp. 7-20. Blackwell, Oxford.

Swann, H. G., and Brucer, M. (1949). The cardiorespiratory and biochemical events during rapid anoxic death. I. Fulminating anoxia. *Texas Reports on Biology and Medicine*, 7, 511-538.

Symon, L., and Brierley, J. B. (1976). Morphological changes in cerebral blood vessels in chronic ischemic infarction: flow correlation obtained by the hydrogen clearance method. In *The Cerebral Vessel Wall*, edited by J. Cervós-Navarro, *et al.*, pp. 165-174. Raven Press, New York.

Zülch, K. J., and Behrend, R. C. H. (1961). The pathogenesis and topography of anoxia, hypoxia and ischemia of the brain in man. In *Cerebral Anoxia and the Electroencephalogram*, edited by H. Gastaut and J. S. Meyer, pp. 144-163. Thomas, Springfield, Illinois.

Exhibit 22 Page 61

292

*J. Physiol.* (1963), 169, *pp.* 292–311
*With 9 text-figures*
*Printed in Great Britain*

# THE EFFECT OF BRIEF PROFOUND HYPOXIA UPON THE ARTERIAL AND VENOUS OXYGEN TENSIONS IN MAN

By J. ERNSTING

*From the Royal Air Force Institute of Aviation Medicine,*
*Farnborough, Hants.*

(*Received 23 January* 1963)

The partial pressure of oxygen in the alveolar gas may be reduced either by decreasing the total pressure of the environment or by replacing the oxygen normally present in the inspired air by an inert gas. The severe anoxia induced by rapid decompression from 565 to 155 mm Hg absolute, whilst breathing air, may be terminated by the delivery of 100% oxygen to the respiratory tract. The effects of such brief profound anoxia upon the alveolar and arterial gas tensions and upon the central nervous system have been studied extensively (Ernsting & McHardy, 1963; Ernsting, Gedye & McHardy, 1960; Ernsting, 1962). The effect of the resultant severe but short-lived arterial hypoxaemia upon the supply of oxygen to various organs of the body is of considerable interest. The oxygen content of the venous blood flowing from a region reflects the balance between the supply of oxygen to it and its metabolic oxygen consumption. Continuous measurements of the oxygen content of the venous blood flowing from several regions have been made in subjects exposed to brief but profound hypoxia. In the experiments described in this paper a short period of over-ventilation, nitrogen being used as the inspired gas, was employed in place of rapid decompression to induce hypoxia. This method allowed more extensive observations to be made than were considered practical in a decompression chamber.

## METHODS

*Induction of hypoxia.* Three healthy men, aged from 33 to 38 years, were used. The subject lay on a couch and breathed through a valve box, to the inlet of which two taps were connected in series. The side arm of the tap next to the box was open to the atmosphere. One arm of the second tap was connected to a demand valve which was supplied with nitrogen, whilst the other arm was connected to a second demand valve supplied with oxygen. Before the experiment was started the hoses between the two demand regulators and the second tap were purged with the gas delivered by the corresponding regulator. The dead space between the two taps was purged with nitrogen to ensure that 100% nitrogen was delivered directly the first tap was operated. During each rest period the first tap was positioned so that the subject breathed air. Nitrogen was administered by instructing the subject to expire maximally at the end of a normal expiration, and at this instant the first tap was turned so that the subject breathed from the demand valve which supplied nitrogen.

Exhibit 22 Page 62

During the period of breathing nitrogen the subject was instructed to breathe as deeply as possible at a rate of about 20 breaths per minute. After 7–20 sec over-ventilation with nitrogen the first tap was returned to its original position so that air was breathed again. At the same time the subject was told to cease over-breathing.

*Respired gas tensions.* The partial pressures of oxygen and carbon dioxide in the gas passing the subject's lips were recorded continuously in all the experiments by means of a respiratory mass spectrometer (Fowler & Hugh-Jones, 1957). Preliminary studies showed that the output of the instrument was linearly related to the partial pressure of each of these gases. The delay between a sudden change of partial pressure of either at the sampling tip and the beginning of the response of the recording pen motor was 0·2 sec and 90% of the total response occurred in a further 0·1 sec. Calibrations employing gas mixtures of known composition were performed at intervals throughout each experiment. Over a 30 min period no significant change occurred in the sensitivity of the instrument. The pulmonary ventilation was recorded in some of the experiments by collecting the expired gas in a recording Tissot spirometer.

*Blood sampling.* In separate experiments blood was sampled continuously from various sites in the cardiovascular system. Blood was obtained from the brachial artery and the femoral vein through a Cournand needle introduced into the vessel after local analgesia had been produced with 2% lignocaine. A catheter was introduced into the right side of the heart through a large-bore needle which had been inserted into a vein in the antecubital fossa. The position of the catheter was determined during its introduction by recording the pressure at the tip by means of a strain-gauge pressure transducer. The catheter was advanced until its tip lay in the pulmonary artery. Blood flowing through the internal jugular vein was sampled by means of a radio-opaque catheter which was introduced into a vein which had been exposed through an incision in the right antecubital fossa. This catheter was advanced under direct fluoroscopic control with the subject's head held against his left shoulder. The catheter entered the right internal jugular vein and was placed so that its end lay above the level of the tip of the right mastoid process. When in place, the patency of the Cournand needle or the intravascular catheter was maintained when sampling was not in progress by a flow of sterile physiological saline (NaCl 0·9 g/100 ml.), approximately 2 ml./min containing heparin (200 i.u./100 ml.).

*Recording of blood oxygen saturation and pH.* The blood from the intravascular needle or catheter flowed through a tubular cuvette oximeter (Fig. 1) and was then diluted 1 : 10 with neutral physiological saline to which heparin had been added (Sherwood-Jones, Robinson & Cooke, 1960). The diluted suspension of blood was then passed through a microflow-glass-electrode–calomel-reference-electrode system. The saline reservoir and microflow-electrode system were immersed in a water-bath which was maintained at 38° C. The flow of blood and the desired dilution of the blood with saline were produced by means of a two-cylinder pump with a single piston, the velocity of which could be varied. The pump was constructed so that the cross-sectional area of one cylinder, which was charged with saline, was 10/11 of that of the other cylinder into which the mixture of saline and blood was drawn after it had passed through the glass-electrode system. In all the experiments a blood sampling rate of 20 ml./min was used.

The outputs of the oximeter amplifier and of the pH meter were fed on to two of the pen motors of a recorder. Preliminary experiments showed that the output of the oximeter amplifier was linearly related to the oxygen saturation of the blood flowing through the cuvette. At the beginning and end of each period of recording the output of the oximeter was calibrated by drawing a fully saturated sample of blood and a second sample of a known degree of unsaturation through the cuvette. A linear relation was also found between the pH of the blood and the output of the pH meter. The output of the latter was calibrated at intervals by using two phosphate buffers (pH 6·84 and 7·60). The time course of the response of the entire measuring system to a sudden change in the oxygen saturation and pH of the blood entering the sampling system was determined at the end of each experiment.

Exhibit 22 Page 63

294                    *J. ERNSTING*

When sampling was required the drip of heparinized saline was turned off and the speed of the sampling pump was increased until blood was withdrawn at 20 ml./min. Sampling was continued for 1 min before the subject breathed nitrogen and was maintained until all the disturbances produced by the procedure had subsided.

*Electroencephalogram (e.e.g.) and electrocardiogram (e.c.g.) recording.* In many of the experiments the e.e.g. was recorded. Two pairs of saline pad electrodes were placed on the scalp over the frontal and occipital regions of the left side of the head. The potential changes from each pair of electrodes were amplified and recorded at a high paper speed. In addition, lead II of the e.c.g. was recorded.



Fig. 1. Apparatus for the continuous measurement of the oxygen saturation and pH of blood. Blood is drawn into the apparatus through a catheter and then it passes through the cuvette oximeter. Saline at 38° C driven by the pump in the direction indicated by the arrows mixes with the blood and the diluted blood flows through the pH electrode assembly back to the pump.

*Arterial pressure and calf blood flow.* The arterial blood pressure was recorded through a Riley needle by means of an unbonded strain-gauge pressure transducer which was filled with physiological saline containing heparin. The needle was connected to the transducer by means of a 3 cm length of polyethylene tubing with an internal diameter of 1 mm. Pre-liminary measurements demonstrated that the complete recording system faithfully reproduced the magnitude and phase of sinusoidal pressure fluctuations at frequencies of up to 20 c/s. The Riley needle was inserted into the brachial artery and the transducer was placed on the same horizontal plane as the tip of the needle. The output of the amplifier connected to the transducer, which was fed to one channel of the recorder, was calibrated by means of a mercury manometer before and after each series of measurements. Blood flow through the calf was measured by means of venous occlusion plethysmography, with a mercury-in-rubber strain gauge (Whitney, 1953) to measure changes in the circumference of the calf. The lower limb was supported so that the lower border of the calf was just above the horizontal level of the sternal angle. The circulation to the foot was occluded by means of a cuff placed around the ankle, which was inflated to 250 mm Hg 1 min before the calf blood-flow measurements were started. The venous outflow from the calf was obstructed for 5 sec of every 10 sec period by inflating the cuff placed around the lower part of the thigh to between 30 and 40 mm Hg. The exact pressure used in the venous cuff was adjusted at the beginning of each experiment so that the circumference of the calf increased at a constant rate during each collection period. The output of the gauge was calibrated while it was in position by producing a known reduction of its length. The circumference of the calf at the level at which the gauge was fixed was measured at the end of each experiment.

Exhibit 22 Page 64

In all the experiments the subject was carefully observed during and following the period of over-ventilation with nitrogen. If any severe disturbance of consciousness or respiration occurred, oxygen was administered.

RESULTS

*Effect upon consciousness.* The increase of pulmonary ventilation achieved by each subject during nitrogen breathing was measured from the spirometer records. The mean pulmonary ventilation of the three subjects was increased to 80 l./min at b.t.p.s. during the period of over-ventilation. When the duration of over-ventilation with nitrogen was greater than 8–10 sec the subject reported a transient dimming of vision. In the experiments in which nitrogen breathing was carried out for 15–16 sec the subject experienced some general clouding of consciousness and impairment of vision. Vision was frequently lost in these experiments for a short period. In the few experiments in which nitrogen was breathed for 17–20 sec unconsciousness supervened and was accompanied on most occasions by a generalized convulsion. The duration of the interval between the start of over-ventilation with nitrogen and the onset of symptoms was 12–14 sec.

*End-tidal gas tensions.* A typical record of the partial pressures of oxygen and carbon dioxide in the gases flowing through the mouth-piece is presented in Fig. 2. The end-tidal oxygen tension fell very rapidly when the subject commenced over-ventilation with nitrogen. It reached a value of less than 10 mm Hg at the end of the third expiration and remained below this level until air was inspired after 16 sec of nitrogen breathing. During the over-ventilation period the end-tidal carbon dioxide tension also fell rapidly. With the restoration of air breathing and the cessation of over-breathing the end-tidal oxygen and carbon dioxide tensions rose gradually to regain their control values. Each of the three subjects over-ventilated, whilst breathing nitrogen for a period of 15–16 sec on six separate occasions. The time course of the changes of the end-tidal tensions of oxygen and carbon dioxide has been measured for each of these 18 experiments and mean curves for each of these variables are presented in Fig. 3.

*Arterial blood oxygen saturation and pH.* Blood was sampled from the brachial artery of each subject on three separate occasions during which the subject over-ventilated with nitrogen for 16 sec. The records of the response of the entire system to a sudden change in the composition of blood at the tip of the Cournand needle showed a mean delay of 0·7 sec to the beginning of the response of the pen motor recording oxygen saturation and a further 0·9 sec elapsed before 90 % of the total response had occurred. The corresponding times for the response of the pH recording system were 1·4 sec and 2·0 sec respectively. Corrections for these delays in response were applied to the recorded values of oxygen saturation and pH. A

Exhibit 22 Page 65

*J. ERNSTING*



Fig. 2. Respiratory gas tensions and systemic arterial oxygen saturation and pH before, during and after 16 sec over-ventilation with nitrogen. The tensions of oxygen and carbon dioxide were recorded at the lips, whilst the blood was sampled continuously from the brachial artery. Delay time of oxygen saturation record, 0·7 sec of pH record, 1·5 sec.



Fig. 3. Effect of over-ventilation with nitrogen upon end-tidal tensions of oxygen (●) and carbon dioxide (○). Each point represents the mean of eighteen values from three subjects; each bar represents ± 1 s.e. of the mean. The period of over-ventilation with nitrogen is indicated by the hatched bar.

Exhibit 22 Page 66

Case 4:17-cv-00179-KGB   Document 2-2   Filed 03/27/17   Page 474 of 534

typical experimental record of the arterial oxygen saturation and pH is presented in Fig. 2. The arterial oxygen saturation and hydrogen-ion concentration began to fall 4–5 sec after the commencement of nitrogen breathing and both fell very rapidly at first and then more slowly until air breathing was started again at 16 sec. The oxygen saturation then increased rapidly whilst the pH gradually returned to its control value. The mean time courses of the changes of arterial oxygen saturation and pH have been calculated for the nine experiments and these values together with their standard errors are shown in Fig. 4.



Fig. 4. Effect of over-ventilation with nitrogen upon arterial oxygen saturation (O) and arterial pH (△). Each point represents the mean of nine values from three subjects; each bar represents ±1 s.e. of the mean.

*Venous blood oxygen saturation and pH.* Blood was sampled from the femoral vein, the pulmonary artery and the right jugular bulb on separate occasions in each of the subjects. The delay in the response of the recording systems was lengthened considerably when intravascular catheters were employed. On none of these occasions did any significant change of pH occur during the period of nitrogen breathing. The mean time courses of the oxygen saturation of the venous blood drawn from these three sites are presented in Fig. 5.

Exhibit 22 Page 67

298                                    *J. ERNSTING*

*Electroencephalogram changes.* The resting e.e.g. shows no specific
electrical activity and no change occurred in any experiment until 15–18
sec after the beginning of the period of over-ventilation with nitrogen.
When nitrogen over-breathing was carried out for 8–12 sec low voltage



Fig. 5. Effect of over-ventilation with nitrogen upon the oxygen saturation of
blood flowing through the femoral ( × ) and internal jugular (△) veins and the
pulmonary artery (○). Each point represents the mean of three values obtained
from three subjects.

activity at 11–13 c/s appeared in both channels of the e.e.g. 15 sec after the
beginning of the procedure and persisted for 7–9 sec. When the duration
of nitrogen over-ventilation was extended to 15–16 sec, similar changes
arose in the e.e.g. but they persisted for slightly longer. Occasionally the

Exhibit 22 Page 68

11–13 c/s activity was replaced by high-voltage 2–4 c/s activity, which
appeared 4–6 sec after the beginning of the change of the e.e.g. This slow
activity generally persisted for 4–6 sec. When nitrogen breathing was
extended to 18–20 sec the initial fast, low-voltage activity was always
replaced by high-voltage 2–4 c/s activity after 5 sec, which lasted for about
10 sec. Control experiments in which a subject over-ventilated for a similar
period whilst breathing air produced no change of e.e.g. activity.



Fig. 6. Effect of over-ventilation with nitrogen for various periods upon the
heart rate. △, nitrogen for 17 sec; □, nitrogen for 11 sec; ○, nitrogen for 8 sec;
×, air for 15 sec. Each point represents the mean of three values obtained from
three subjects.

*Cardiovascular changes.* The period of over-ventilation with nitrogen
produced a transient acceleration of the heart rate. This commenced at the
beginning of the period of over-ventilation and reached a maximum about
30 sec later. The magnitude of the increase varied directly with the dura-
tion of the nitrogen over-ventilation. The mean changes of the heart rate
for the three subjects when they over-ventilated with nitrogen for various
periods are presented in Fig. 6. There were no consistent changes in the
shape of the e.c.g. in these experiments. In one subject, however, there
was a transient flattening of the 'T' wave, which started 5 sec after the
beginning of the nitrogen over-ventilation and persisted for 10 sec. In

Exhibit 22 Page 69

300                    *J. ERNSTING*

several experiments the subjects over-ventilated whilst breathing air. This caused a relatively small and transient increase of heart rate which had subsided 10 sec after the end of the over-ventilation period (Fig. 6).

The period of over-ventilation produced marked respiratory variations of the arterial blood pressure. The mean and pulse pressure were both increased during the deep expiratory efforts and decreased during each inspiration. The mean blood pressure was increased by about 20 mm Hg during the period of over-breathing. Directly the subject ceased over-ventilation the arterial pressure fell and reached a minimum after some 15 sec from the beginning of nitrogen breathing. The minimal value was less than the mean blood pressure before the over-ventilation period. The fall of mean pressure was accompanied by a reduction of the pulse pressure. It was followed by a secondary rise of pressure and an increase of pulse pressure, both of which reached a maximum at about 30 sec after the beginning of the period of over-ventilation with nitrogen. In all, two separate periods of over-ventilation with nitrogen were studied for each of the three subjects and the mean values of arterial pressure before, during and after the period of over-ventilation with nitrogen are presented in Fig. 7. The blood flow through the calf was calculated from the rate at which the circumference of the part increased during each venous-congestion period (Whitney, 1953). The mean value for the calf blood flow obtained in twelve separate periods of over-ventilation with nitrogen in the three subjects are shown in Fig. 7. The flow of blood into the calf was increased during the period of over-ventilation, following which it returned to the resting level, to increase again between 20 and 40 sec after the beginning of over-ventilation.

### DISCUSSION

Preliminary experiments in which the subjects over-ventilated with nitrogen for various periods showed that unconsciousness supervened if the duration of this procedure exceeded 16–17 sec. In the majority of these experiments, therefore, the period of over-ventilation with nitrogen was limited to 16 sec. This period of nitrogen over-breathing produced only a transient disturbance of the e.e.g. The low-voltage 8–13 c/s activity was generally associated with a transient dimming of vision and could not be distinguished from that produced by closure of the eyelids. Further, apart from a transient flattening of the 'T' wave on one occasion, no significant change was seen in the e.c.g., although only a standard limb lead (II) was recorded. In view of these findings it was considered that the degree of hypoxia induced by over-ventilation with nitrogen for 15–16 sec was within acceptable limits for resting subjects.

Exhibit 22 Page 70

The concentration of oxygen in the gas contained within the respiratory tract at the beginning of the nitrogen breathing period was reduced very rapidly by the very large voluntary increase of pulmonary ventilation. The reduction of the lung volume to a minimum before the first breath of nitrogen was taken decreased the quantity of oxygen to be washed out. The combination of these two manoeuvres resulted in a very rapid fall of end-tidal oxygen tension to 10 mm Hg after 8 sec of over-ventilation. The rate of rise of the end-tidal oxygen tension following the cessation of nitrogen over-ventilation and the return to breathing air was considerably less than the rate at which it had fallen. This difference reflects the reduction of alveolar ventilation associated with the resumption of a more normal breathing pattern.



Fig. 7. Effect of over-ventilation with nitrogen upon the mean systemic arterial pressure (△) and the blood flow through the calf (●). The results are from three subjects, each pressure point representing the mean of six values whilst each blood flow point is the mean of twelve values; each bar depicts ±1 s.e. of the mean value.

*Arterial oxygen saturation and pH*

The delay of 4–5 sec between the beginning of nitrogen breathing and the reduction of the oxygen saturation of the brachial artery blood was a reflexion of the circulation time from the pulmonary capillaries to the sampling point in the systemic arterial tree. A similar delay occurred

Exhibit 22 Page 71

302                            *J. ERNSTING*

between the restitution of air breathing and the subsequent increase of the arterial oxygen saturation. The reduction of the end-tidal oxygen tension to below 10 mm Hg was associated with an arterial oxygen saturation of less than 40 %. The increase of the pH of the arterial blood was related to the fall of the alveolar carbon-dioxide tension and the reduction of the blood oxygen saturation (Christiansen, Douglas & Haldane, 1914). The mean increase of the arterial pH produced by the over-ventilation amounted to 0·18 unit. This gave a calculated value for the minimal arterial carbon-dioxide tension of 22·5 mm Hg as compared with the observed end-tidal value of 17 mm Hg. The changes of arterial oxygen tension produced by over-breathing with nitrogen have been calculated from the simultaneous measurements of the oxygen saturation and pH of the arterial blood by means of standard oxygen dissociation curves (Dill, 1944). The mean time course of the oxygen tension for all the experiments is presented in Fig. 8. together with the curve for the end-tidal oxygen tension. During over-ventilation the end-tidal oxygen tension may be taken as representative of the mean alveolar tension of this gas. When allowance is made for the 4 sec delay between the change of alveolar gas composition and the resultant change of the oxygen tension of the arterial blood at the sampling point, it is apparent that the arterial oxygen tension fell in the same manner as the alveolar oxygen tension until this was less than 16 mm Hg. Beyond this point the systemic arterial oxygen tension was consistently greater than that of the alveolar gas until air breathing was restored. There was a statistically significant difference ($P < 0.01$; $n = 9$) between the oxygen tensions of the arterial blood and of the alveolar gas for the last 7 sec of the period of nitrogen breathing. The oxygen tension of the mixed venous blood during nitrogen breathing was between 35 and 40 mm Hg (Fig. 9), and hence the oxygen tension of the alveolar gas was less than that of the blood entering the pulmonary capillaries for nearly the whole period of nitrogen over-ventilation. During this procedure, therefore, there was a reversal of the normal oxygen-tension gradient between the alveolar gas and the mixed venous blood. Since the oxygen saturation of the systemic arterial blood was considerably less than that of the mixed venous blood, oxygen must have passed from the blood flowing through the pulmonary capillaries into the alveolar gas during the latter part of the nitrogen-breathing period. Such a reversal of the normal direction of passage of oxygen across the alveolar capillary membrane has been demonstrated following rapid decompression to high altitude (Luft, Clamann & Adler, 1949; Ernsting & McHardy, 1960) and during rapid ascent following a breath-holding dive to a water depth of 60–100 ft. (18–30 m; Rahn, 1963). In both these situations the oxygen tension of the alveolar gas is reduced rapidly below that of the mixed venous blood.

Exhibit 22 Page 72

*BRIEF PROFOUND HYPOXIA*          303

*Venous pH and oxygen saturation*

The absence of any detectable change of the pH of the blood sampled from the three venous sites following the period of over-ventilation with nitrogen demonstrated the marked carbon dioxide buffering power of the peripheral tissues and the rapid diffusibility of this gas. The constancy of the venous pH was unexpected, since the reduction of the oxygen saturation of the venous blood would of itself have produced an increase of pH (Christiansen *et al.* 1914). At a constant carbon-dioxide tension the greatest increase of pH due to this mechanism, associated with the decrease of



Fig. 8. Effect of over-ventilation with nitrogen upon end-tidal oxygen tension (●) and systemic arterial oxygen tension (△). Each point represents the mean of eighteen end-tidal values and nine arterial values. Each bar denotes ± 1 s.e. of the mean value.

20-2

Exhibit 22 Page 73

304                              *J. ERNSTING*

oxygen saturation of the cerebral venous blood by 27 ‰ was calculated to
be of the order of 0·012 unit. The over-all sensitivity of the system used
for the measurement of the pH of the venous blood was such, however,
that a change of this magnitude might not have been detected.



Fig. 9. Effect of over-ventilation with nitrogen upon the oxygen tension of the
systemic arterial (△), femoral venous (+), internal jugular (□) and pulmonary
arterial (○) blood. Each point represents the mean of the values obtained from
three subjects.

The pattern of the reduction of the oxygen saturation of the venous
blood produced by the period of nitrogen breathing varies markedly with
the site of sampling (Fig. 5). The oxygen content of the jugular venous
blood was the first to change and it exhibited the greatest reduction and
the most rapid recovery. In contrast the oxygen saturation of the femoral
venous blood started to fall last, was reduced by the smallest amount and
recovered the most slowly. Mixed venous blood showed changes which

Exhibit 22 Page 74

were intermediate between those of the jugular and femoral venous bloods. The maximal fall of the oxygen saturation of the femoral venous blood was half that which occurred in the blood sampled from the pulmonary artery, whilst the maximal reduction of the oxygen content of the jugular blood was more than twice the latter. The changes of the oxygen tension of the blood sampled from these venous sites have been calculated from the measured values of oxygen saturation and pH and the mean curves are presented in Fig. 9, together with the mean curve for the arterial oxygen tension. It is apparent that during the period of severe hypoxia the oxygen tension of the blood flowing from the lower limbs, the brain and the whole body was greater than that of the arterial blood flowing into these regions.

*Cardiovascular effects of profound hypoxia*

The limited measurements made in this study demonstrate that the period of over-ventilation with nitrogen produced significant changes in the cardiovascular system. The control experiments in which the subject over-breathed with air make it possible to distinguish two phases in the cardiovascular response. First, during the period in which the pulmonary ventilation was increased there was a moderate rise of heart rate and the arterial pressure and calf blood flow were raised (Fig. 7). Immediately the over-ventilation ceased the arterial pressure and calf blood flow returned to their resting values. These changes occurred when either air or nitrogen was breathed. When the over-breathing was performed with nitrogen the rise of heart rate persisted for considerably longer and there was a secondary increase of arterial pressure and calf blood flow. These secondary changes were absent when air was substituted for nitrogen and were due, therefore, to the severe hypoxia induced by the nitrogen. Throughout each experiment the calf blood flow was directly proportional to the mean systemic arterial pressure. Thus the observed changes of calf blood flow were a result of the concomitant changes of arterial pressure. The secondary changes which occurred after over-ventilation with nitrogen were probably the result of an increase of cardiac output and of systemic arteriolar constriction which were produced reflexly by chemoreceptor stimulation. It is apparent that the arterioles of the calf did not contribute to this vasoconstriction, and the most probable sites for the increase of peripheral resistance were the splanchnic and cutaneous circulations. The rise of the oxygen saturation of the jugular venous blood above the control value when air breathing was restored (Fig. 5) suggests that there was an increase of the over-all cerebral blood flow at this time. In the steady state moderate arterial hypoxaemia, even when accompanied by hypocapnia, is known to produce a dilatation of the cerebral vessels (Kety &

Exhibit 22 Page 75

306                           J. ERNSTING

Schmidt, 1948). The rate at which the cerebral vasodilatation develops
when arterial hypoxaemia is induced suddenly is not known, but the
present experiments suggest that the cerebral vessels respond to a fall of
arterial oxygen tension within 20 sec.

### Pulmonary gas exchange in profound hypoxia

The arterial oxygen-tension values derived in this study demonstrated
that during over-ventilation with nitrogen the oxygen tension of the
arterial blood was significantly greater than that of the alveolar gas. The
time for which this state existed was only 7–8 sec, although during this
period the rates of change of alveolar and arterial oxygen tensions were
relatively slow. Furthermore, this length of time is large relative to the
average transit time of 0·73 sec (Roughton, 1945; Roughton & Forster,
1957) for a red cell through the pulmonary capillaries lining ventilated
alveoli. It would appear, therefore, that the observed difference between
systemic arterial and alveolar oxygen tensions cannot be accounted for on
the basis of the short period for which the condition existed. Such a
difference could be produced by the presence of either a shunt of venous
blood into the systemic arterial tree or a higher tension of oxygen in the
blood leaving the pulmonary capillaries than in the alveolar gas. Mixed
venous blood flowing into the systemic arterial tree without having
transversed the capillaries of ventilated alveoli would raise the oxygen
tension of the systemic arterial blood above that of the alveolar gas. The
effect of the normal quantity of venous admixture upon the arterial
oxygen tension would be insignificant, because of the relative steepness of
the blood-oxygen dissociation curve over the range concerned here. If,
however, the proportion of the cardiac output perfusing ventilated alveoli
was reduced during nitrogen breathing, this effect could become significant.
In order for this mechanism to account for the total observed oxygen-
tension gradient the venous-arterial shunt would have to amount to at
least half of the total cardiac output. There is at present no evidence in
favour of such a degree of shunting during severe hypoxia. It would
appear probable, therefore, that the tension of oxygen in the blood leaving
the pulmonary capillaries is considerably greater than that in the alveolar
gas during over-ventilation with nitrogen.

Since no measurements were made of the rate of gaseous exchange
during the period of over-ventilation with nitrogen it is impossible to
examine quantitatively the factors affecting the exchange of oxygen
between the pulmonary capillary blood and the alveolar gas. It is of
value, however, to compare the effects of over-ventilation with nitrogen
with those produced by moderate hypoxia in the steady state. Thus,
Lilienthal, Riley, Proemmel & Franke (1946) found that at an alveolar

Exhibit 22 Page 76

oxygen tension of 46 mm Hg at rest the difference between the tensions of oxygen in the alveolar gas and the systemic arterial blood amounted to 9·1 mm Hg. They calculated that under these circumstances the oxygen tension of the mixed venous blood was 19 mm Hg less than that of the alveolar gas and that the oxygen tension of the blood leaving the pulmonary capillaries was about 8 mm Hg less than that of the alveolar gas. Although in the nitrogen over-ventilation experiments the oxygen tension gradient between the alveolar gas and the mixed venous blood was reversed, it was of the same order as that which existed in the experiments performed by Lilienthal *et al.* (1946). Furthermore, the mean difference between the oxygen tensions of the arterial blood and the alveolar gas obtained in the present study, which amounted to 11 mm Hg, was only slightly greater than that found in moderate hypoxia by Lilienthal *et al.* (1946). The arterial–alveolar oxygen-tension difference observed in nitrogen over-ventilation experiments was probably due, therefore, to a mechanism analogous to that which was deduced by Lilienthal *et al.* (1946) to be responsible for the existence of an alveolar to end-pulmonary capillary blood-oxygen tension difference in moderate hypoxia. The limited rate at which oxygen was transferred from chemical combination in the pulmonary blood into the alveolar gas under the circumstances which existed in the nitrogen-breathing experiments gave rise to a large oxygen-tension difference between the blood leaving the pulmonary capillaries and the alveolar gas.

*Exchange of oxygen between blood and peripheral tissues in profound hypoxia*

The reduction in the rate at which oxygen is carried to a part caused by a short period of arterial hypoxaemia depends upon the degree and duration of the desaturation of the arterial blood and the arterial flow to the part. In the resting state the total blood flow to the brain is over twice that to the lower limbs. Thus in the present experiments the deficit of the oxygen supply to the brain was twice that to the lower limbs. The effect of such a deficit in the oxygen supply to a region upon the oxygen content of the blood flowing from it will be determined in part by the relation between the magnitude and nature of its oxygen store and its metabolic oxygen consumption. Where the available oxygen store is small in relation to the oxygen uptake, the venous oxygen saturation will be reduced to a greater extent than when the store is large in relation to the oxygen consumption. Quantitatively the most important oxygen store is that contained by the blood, and the greater proportion of this resides in the small and large veins. Muscle possesses in addition a specific oxygen storage mechanism in the form of oxymyoglobin. The amount of oxygen stored in this manner in man is, however, relatively small (Drabkin, 1950)

Exhibit 22 Page 77

308                            *J. ERNSTING*

and the oxygen tension in muscle must be reduced below 10 mm Hg
before a significant proportion of the oxygen held in this form is liberated
(Hill, 1936). Finally, all tissues contain oxygen in simple physical solution,
although quantitatively this store is relatively small. The brain, in contrast
to the lower limbs and the body as a whole, has a high arterial inflow, a
high oxygen consumption and a small oxygen store. For a specified tran-
sient arterial hypoxaemia all these factors tend to produce a greater fall of
the oxygen saturation in the jugular blood than in the blood flowing from
the lower limbs.

The pattern of the fall of the saturation of venous blood caused by a
transient arterial hypoxaemia will be modified by changes of blood flow
into the region and of the capacity of its vascular bed. In the present
experiments there were transient changes of calf blood flow during and
after the period of hypoxaemia. There was also evidence which suggested
that the cerebral blood flow changed, although no direct measurements of
this quantity were made. If an increase of blood flow occurred during the
period of hypoxaemia, the deficit of the oxygen supply would have been
increased. If, however, the increase of blood flow did not occur until the
arterial oxygen saturation was rising, it would have produced a more
rapid recovery of the venous oxygen saturation, or even a rise to above the
control value. Although no direct measurements of the capacity of the
vessels of the calf were made, it was noted that the volume of this region
was decreased by the period of over-ventilation with nitrogen. Eckstein,
Hamilton & McCammond (1958) have shown that the reflex reduction of
the distensibility of the capacity vessels produced by over-ventilation is in
part due to the hypocapnia and in part a result of the intrathoracic
pressure changes associated with the over-ventilation. Such a reduction
of the blood content of the calf would have tended to increase the venous
desaturation produced by the arterial hypoxaemia.

During the period of over-ventilation with nitrogen, the oxygen tension
of the arterial blood was reduced to 20–30 mm Hg below that of the venous
blood normally flowing from the regions studied. Thus the oxygen tension
of the arterial blood during this period was lower than the mean capillary
oxygen tension (Barcroft, 1938) which existed before nitrogen breathing
was commenced. Furthermore, during the period of profound hypoxaemia
the oxygen tension of the blood flowing from the regions under investiga-
tion was greater than that of the arterial blood perfusing them. Although
the oxygen content of the blood leaving the tissue capillaries was probably
raised by admixture with the blood already present in the venules and veins
of the part, it is apparent that during the period of severe hypoxaemia the
oxygen tension of the capillary blood was markedly reduced. Thus the
diffusion of oxygen into the various tissues from the blood flowing through

Exhibit 22 Page 78

them was severely reduced by the period of hypoxia. Indeed, in some areas, especially those with a relatively high capillary blood flow, the capillary oxygen tension may have been reduced below that of the surrounding tissues, so that oxygen actually diffused into the blood as it flowed through them. Thus direct measurements of the oxygen tension of the grey matter of the cerebral cortex in animals breathing air have given values of the order of 18–25 mm Hg (Cater, Garattini, Marina & Silver, 1962), whilst in the present experiments the arterial oxygen tension was reduced to about 17 mm Hg. The effect of a given reduction of the rate at which oxygen diffuses into a tissue upon the cellular oxygen tension will depend upon the relation between the cellular oxygen consumption and the extravascular oxygen store. There is considerable evidence that the cellular oxidative enzyme systems will continue to function normally until the local oxygen tension is reduced to below 5 mm Hg (Keilin, 1930). Thus the cellular metabolic oxygen uptake will probably remain unchanged until severe hypoxia is induced. In the brain, where the only extravascular oxygen store is oxygen dissolved in tissue fluid, and the metabolic oxygen uptake is high, sudden arterial hypoxaemia will produce a very rapid fall of the cellular oxygen tension.

In the present series of experiments it was found that unconsciousness ensued if over-ventilation with nitrogen was continued for longer than 17 sec. A more rapid fall of arterial oxygen tension can be produced by sudden reduction of the environmental pressure to below 140 mm Hg whilst air is breathed. Thus in one series of experiments in which the arterial oxygen tension was reduced to below 20 mm Hg in about 1 sec, unconsciousness ensued 8 sec after the induction of arterial hypoxaemia (Ernsting *et al.* 1960). The delay between a sudden occlusion of the cerebral circulation and loss of consciousness in man also amounts to between 7 and 8 sec (Rossen, Kabat & Anderson, 1943). Thus the time which elapses between a sudden reduction of the arterial oxygen tension to below 20 mm Hg and the onset of unconsciousness is very similar to the interval which occurs between sudden occlusion of the cerebral circulation and loss of consciousness. Kety (1950) has calculated that at any one moment the total oxygen content of the brain and of the cerebral capillary blood is about 7 ml. Thus at the normal level of cerebral oxygen consumption the oxygen tension of the brain following cessation of the supply of this substance would be reduced to zero in about 8 sec. These results suggest that when unconsciousness supervenes following the sudden induction of severe cerebral hypoxia the cellular oxygen tension in many regions of the brain will be virtually zero. This conclusion is in close agreement with the results of calculations made by Thews (1962) with respect to hypoxia of slow onset. His calculations suggest that when the arterial oxygen tension is

Exhibit 22 Page 79

310                 *J. ERNSTING*

reduced to the level which produces unconsciousness, the oxygen tension of the neurones which are furthest from their vascular supply will be of the order of 2–4 mm Hg.

### SUMMARY

1. Brief profound hypoxia was induced by voluntary over-ventilation whilst breathing nitrogen. Unconsciousness ensued when this procedure was performed for longer than 16 sec. Voluntary over-ventilation with nitrogen for 16 sec reduced the end-tidal oxygen tension to below 10 mm Hg for 8 sec.

2. Continuous recordings were made of the systemic arterial oxygen saturation and pH during 16 sec of nitrogen over-ventilation. The calculated minimal arterial oxygen tension was 16 mm Hg. There was therefore a reversal of the normal alveolar-arterial oxygen tension difference.

3. The oxygen saturation and pH of venous blood flowing through the jugular bulb, the femoral vein and the pulmonary artery were recorded continuously. The oxygen tension of the jugular blood exhibited the most rapid and most profound reduction when nitrogen was breathed. The femoral-vein oxygen tension exhibited only a very transient and slight fall, whilst the oxygen tension of the blood flowing through the pulmonary artery exhibited a moderate fall.

The author wishes to thank the Director General Medical Services, Royal Air Force, for permission to submit this paper for publication.

### REFERENCES

BARCROFT, J. (1938). *Architecture of Physiological Function*, 2nd ed. p. 244. London: Cambridge University Press.

CATER, D. B., GARATTINI, S., MARINA, F. & SILVER, I. A. (1962). Changes of oxygen tension in brain and somatic tissues induced by vasodilator and vasoconstrictor drugs. *Proc. Roy. Soc.* B, 155, 136–157.

CHRISTIANSEN, J., DOUGLAS, C. G. & HALDANE, J. S. (1914). The absorption and dissociation of carbon dioxide by human blood. *J. Physiol.* 48, 244–271.

DILL, D. B. (1944). Oxygen dissociation curves for human blood at 37° C. In BRONK, D. W. *Handbook of Respiratory Data in Aviation.* Washington: Committee on Medical Research.

DRABKIN, D. L. (1950). The distribution of the chromoproteins, haemoglobin, myoglobin and cytochrome in the tissues of different species, and the relationship of the total content of each chromoprotein to body mass. *J. biol. Chem.* 182, 317–333.

ECKSTEIN, J. W., HAMILTON, W. K. & McCAMMOND, J. M. (1958). Pressure-volume changes in the forearm veins of man during hyperventilation. *J. clin. Invest.* 37, 956–961.

ERNSTING, J. (1962). Some effects of brief profound anoxia upon the central nervous system. In McMENEMEY, W. H. and SCHADE, J. P., *Selective Vulnerability of the Brain in Hypoxaemia.* Oxford: Blackwell.

ERNSTING, J., GEDYE, J. L. & McHARDY, J. R. (1960). Anoxia subsequent to rapid decompression. *Flying Personnel Research Committee Report,* No. 1141. London: Air Ministry.

ERNSTING, J. & McHARDY, G. J. R. (1960). Brief anoxia following rapid decompression from 560 to 150 mm Hg. *J. Physiol.* 153, 73P.

ERNSTING, J. & McHARDY, G. J. R. (1963). The oxygen saturation and pH of the arterial blood during brief profound anoxia induced by rapid decompression from 560 to 140 mm Hg. In CUNNINGHAM, D. J. C. and LLOYD, B. B., *The Regulation of Human Respiration.* Oxford: Blackwell.

Exhibit 22 Page 80

*BRIEF PROFOUND HYPOXIA*          311

FOWLER, K. T. & HUGH-JONES, P. (1957). Mass spectrometry applied to clinical practice and research. *Brit. med. J.* i, 1205–1211.

HILL, R. (1936). Oxygen dissociation curves of muscle haemoglobin. *Proc. Roy. Soc. B,* 130, 472–483.

KEILIN, D. (1939). Cytochrome and intra-cellular oxidase. *Proc. Roy. Soc.* B, 106, 418–444.

KETY, S. S. (1950). Circulation and metabolism of the human brain in health and disease. *Amer. J. Med.* 8, 205–217.

KETY, S. S. & SCHMIDT, C. F. (1948). The effects of altered arterial tensions of carbon dioxide and oxygen on cerebral blood flow and cerebral oxygen consumption of normal young men. *J. clin. Invest.* 27, 484–492.

LILIENTHAL, J. L., RILEY, R. L., PROEMMEL, D. D. & FRANKE, R. E. (1946). An experimental analysis in man of the oxygen pressure gradient from alveolar air to arterial blood during rest and exercise at sea level and at altitude. *Amer. J. Physiol.* 147, 199–216.

LUFT, U. C., CLAMANN, H. G. & ADLER, H. F. (1949). Alveolar gases in rapid decompressions to high altitudes. *J. appl. Physiol.* 2, 37–48.

RAHN, H. (1963). Lessons from breath holding. In CUNNINGHAM, D. J. C. and LLOYD, B. B. *The Regulation of human respiration.* Oxford: Blackwell.

ROSSEN, R., KABAT, H. & ANDERSON, J. P. (1943). Acute arrest of the cerebral circulation in man. *Arch. Neurol. Psychiat., Chicago,* 50, 510–528.

ROUGHTON, F. J. W. (1945). The average time spent by the blood in the human lung capillary and its relation to the rate of CO uptake and elimination in man. *Amer. J. Physiol.* 143, 621–633.

ROUGHTON, F. J. W. & FORSTER, R. E. (1957). Relative importance of diffusion and chemical reaction rates in determining rate of exchange of gases in the human lung, with special reference to true diffusing capacity of pulmonary membrane and volume of blood in the lung capillaries. *J. appl. Physiol.* 11, 290–302.

SHERWOOD-JONES, E., ROBINSON, J. S. & COOKE, W. H. (1960). A device for the continuous measurement and recording of intravascular pH. *Lancet,* 278, 1329.

TREWS, G. (1962). Implications of the physiology and pathology of oxygen diffusion at the capillary level. In McMENEMEY, W. H. & SCHADE, J. P. *Selective Vulnerability of the Brain in Hypoxaemia.* Oxford: Blackwell.

WHITNEY, R. J. (1953). The measurement of volume changes in human limbs. *J. Physiol.* 121, 1–27.

Exhibit 22 Page 81

*J. clin. Path.*, **30**, Suppl. (Roy. Coll. Path.), **11**, 170-180

# Pathology of hypoxic brain damage in man

D. I. GRAHAM

*From the University Department of Neuropathology, Institute of Neurological Sciences, Southern General Hospital, Glasgow*

The energy requirements of the brain demand amongst other things adequate supplies of oxygen and glucose. These are provided by the functions of respiration and circulation. Neurons are particularly susceptible to hypoxia since they have an obligative, aerobic, glycolytic metabolism. The adult brain receives about 15 per cent of the cardiac output, or as expressed in terms of blood flow, about 45 ml/ 100 g/minute in the adult and about twice as much in children (McIlwain, 1966). The respiratory quotient of the brain is almost unity and glucose is the principal source of energy by oxygenation. If the supply of oxygen or glucose is reduced below a critical level consciousness is lost after a few seconds and irreversible brain damage may occur if the 'hypoxia' is more prolonged.

**Physiology**

The supply of oxygen to the brain depends on the cerebral blood flow (CBF) and the oxygen content of the blood. Cerebral blood flow in turn depends on the cerebral perfusion pressure (CPP) which is defined as the difference between the mean systemic arterial pressure (SAP) and the cerebral venous blood pressure. Blood flow to the brain shows a remarkable capacity for remaining constant, with hypercapnia, hypoxia and extreme hypotension affecting it to any marked extent. The preservation of CBF in response to changes in arterial blood pressure is brought about by autoregulation which can be defined as the 'maintenance of a relatively constant blood flow in the face of changes in perfusion pressure' (Harper, 1972). The mechanism of this autoregulation is still uncertain but it appears to be lost or at least severely impaired in a wide range of acute conditions producing brain damage (Bruce *et al*, 1973; Harper *et al*, 1975). Thus there are many situations in which cerebral autoregulation may be impaired before an episode of hypoxia. The level of CPP at which brain damage is produced is not known in man but in the presence of normal auto-regulation the critical level of SAP is about 50 mm Hg (Harper, 1972). In primates with a normal $PaO_2$, it would appear that brain damage does not occur until the CPP falls to less than 25 mm Hg (Brierley *et al*, 1969).

The energy state of the brain may also be severely reduced in the presence of normal supplies of oxygen and glucose by substances which poison the oxidative enzymes of nerve cells. These considerations form the basis of the various categories of brain hypoxia (Brierley, 1976; Adams, 1976).

**Categories of brain hypoxia**

1 STAGNANT
(a) Ischaemic is due to local or generalized arrest of blood supply; (b) oligaemic is due to local or generalized *reduction* in blood supply.

2 ANOXIC AND HYPOXIC
(a) Anoxic, an absence of oxygen in the lungs which leads to tissue anoxia; (b) hypoxic, a reduced oxygen tension in the lungs which leads to tissue hypoxia.

3 ANAEMIC
Anaemic is where there is insufficient haemoglobin in the blood to carry the oxygen in chemical combination.

4 HISTOTOXIC
Histotoxic is due to poisoning of neuronal respiratory enzymes.

5 HYPOGLYCAEMIC
Hypoglycaemic is due to a deficiency of the substrate glucose.

6 FEBRILE CONVULSIONS AND STATUS
  EPILEPTICUS

**Hypoxic brain damage**

Hypoxic brain damage may occur in any situation where there is an inadequate supply of oxygen or glucose to nerve cells. It is therefore a potential hazard to any patient subjected to general anaesthesia, a severe episode of hypotension, cardiac arrest, status epilepticus, carbon monoxide or

170

Exhibit 22 Page 82

barbiturate intoxication and hypoglycaemic coma.
The eventual degree of clinical recovery will be
determined by whether or not satisfactory resuscita-
tion can be achieved before permanent brain damage
ensues. Crises of this kind are not uncommon in
clinical practice but the central question as to 'what
duration of anoxia or ischaemia defines the watershed
between recovery of the tissue and extensive perma-
nent injury?' has not been critically defined in man
(Plum, 1973). Reasons for this include the lack of
precise physiological data about a patient's cardio-
vascular and respiratory status at the time of a crisis
since the immediate priority is resuscitation, and the
inadequate neuropathological examination of the
brains from fatal cases.

Postmortem examination of patients with severe
hypoxic brain damage is usually carried out under
warrant by the forensic pathologist who often feels
obliged to slice the unfixed brain in the mortuary.
Under these conditions it is impossible to recognize
recent hypoxic brain damage up to and including
frank cerebral infarction even when subsequent
histological examination shows severe and extensive
neuronal necrosis. When the brain has been properly
dissected after adequate fixation (up to three weeks'
immersion in buffered 10 per cent formol saline)
an infarct of about 18 to 24 hours' duration may just
be recognizable but even an experienced neuro-
pathologist may fail to identify extensive diffuse
hypoxic brain damage if it is less than some three to
four days' duration (figs 1 and 2). The extent and
severity of hypoxic brain damage can be identified
and its distribution analysed only by the micro-
scopical examination of many large, bilateral and
representative sections of the brain.! It is, however,
often possible to establish that a patient has suffered
hypoxic brain damage on the basis of a more
restricted histological examination provided that the
pathologist knows that certain parts of the brain are
selectively vulnerable and is familiar with the cyto-
logical and histological appearances of ischaemic
nerve cell change.

The identification of ischaemic cell change is
made difficult in the human brain because of the
frequent occurrence of histological artefact. The
commonest artefacts are 'dark cells', 'hydropic cells'
and 'perineuronal and perivascular spaces' (Cammer-
meyer, 1961). They are due partly to postmortem
handling and to the slow penetration of fixative.
Studies in experimental primates and in selected
human material have shown that there is an identifiable
process, namely ischaemic cell change, which is the
neuropathological common denominator in all types
of hypoxia.

The earliest histological stage of recent hypoxic
neuronal damage in experimental animals in per-



Fig 1  *Coronal section of brain from patient who
survived 48 hours after cardiac arrest. There are no
macroscopic abnormalities.*



Fig 2  *Same patient as in figure 1. Note subtotal
('laminar') necrosis of the third, fifth and sixth cortical
layers with relative sparing of the second and fourth
layers (darker staining). Cresyl violet. × 4.*

fusion-fixed material is microvacuolation (Brown
and Brierley, 1966; Brierley *et al*, 1971a and b;
Meldrum and Brierley, 1973). This rather subtle
histological change is difficult to identify in human
material so that perhaps the earliest incontrovertible
evidence in man of hypoxic brain damage is the
second stage, ie, ischaemic cell change. The cell
body and nucleus are shrunken and become tri-
angular in shape. The cytoplasm, which usually still
contains microvacuoles, stains intensely with eosin
and from bright blue to dark mauve with the very
useful Luxol fast blue/cresyl violet technique (Adams
and Miller, 1970); the nucleus stains intensely with
basic aniline dyes. The succeeding stage of ischaemic
cell change with incrustations is characterized by

Exhibit 22 Page 83

Case 4:17-cv-00179-KGB   Document 2-2   Filed 03/27/17   Page 491 of 534



Fig 3

Fig 4

Fig 3   *Bottom: normal cortex. H and E × 500. Top:  Ischaemic cell change. The nerve cells are small and triangular and contain hyperchromatic nuclei (arrows). The cytoplasm is intensely eosinophilic. There is also some disintegration of the neuropil. H and E × 500. Top inset:  Ischaemic cell change with incrustations. Note the granules on the surface of the cell. H and E × 500.*

Fig 4   *Homogenizing cell change. Note the Purkinje cells with swollen homogeneous cytoplasm and hyperchromatic nuclei (arrows). Cresyl violet. × 500.*

further shrinkage of the nerve cell cytoplasm and the development of small, relatively dense granules lying on or close to the surface of the nerve cell (fig 3). Finally the neuron undergoes homogenizing cell change when the cytoplasm becomes progressively paler and homogeneous and the nucleus smaller. This type of change is most commonly seen in the Purkinje cells (fig 4) of the cerebellum. The time course of ischaemic cell change is relatively constant for neurons according to their size and site so that the interval between a hypoxic episode and death if between two and 18 to 24 hours can be assessed with reasonable accuracy. If the patient survives for more than 24 to 36 hours more advanced changes occur in neurons, and early reactive changes appear in astrocytes, microglia and endothelial cells. After a few days the dead nerve cells disappear and reactive

changes become more intense, including the formation of lipid phagocytes, even though the latter may not appear if damage is restricted to neuronal necrosis. When survival is for more than a week or so the damaged tissue becomes rarefied due to loss of myelin and there is a reactive gliosis. Collagen and reticulin fibres are also laid own, the whole appearing as a glio-mesodermal reaction.

The differing susceptibility of nerve cells to hypoxia has been known for many years. According to Jacob (1963), 'in general the nerve cells are the most sensitive followed by oligodendroglia and astrocytes while the microglia and the cellular elements of the vessels are the least vulnerable'. Recent work suggests that local metabolic rather than vascular factors largely determine the pattern of selective vulnerability (Brierley, 1976).

Exhibit 22 Page 84

*Pathology of hypoxic brain damage in man*                                           173



Fig 5   *Coronal section of brain from patient who survived three days after sudden stroke. There is a large recent swollen infarct in territories of left middle and anterior cerebral arteries. Part of the infarct is 'anaemic' and part is 'haemorrhagic'. Note the asymmetry of the lateral ventricles, the displacement of the midline structures to the right, the supracallosal hernia to the right (black arrow) and deep grooving (white arrows) along the line of bilateral tentorial herniae.*



Fig 6   *Recent infarction in cerebral cortex. There is irregular pallor (infarction) of staining of the affected areas. H and E × 15·6.*

## 1 STAGNANT HYPOXIC BRAIN DAMAGE
This is divided into two main types, viz, ischaemic and oligaemic.

### Ischaemic
If the blood flow through an artery is arrested, eg by thrombus or an embolus, an infarct will develop within part or the whole of the distribution of the occluded vessel. The earliest macroscopic change is swelling of the infarct and its edges may be just discernible in the fixed brain within 12 to 18 hours. The lesion may be 'haemorrhagic' or 'anaemic' (fig 5) and at an early stage there is irregular, blotchy pallor of the affected cortex (fig 6). A sharp



Fig 7   *Recent infarction in white matter. There is a sharply defined border between the abnormal (pale) and normal white matter. H and E × 40.*

and often very irregular line of demarcation between normal and abnormal myelin also appears early, the abnormal myelin staining palely (fig 7). A large infarct may swell sufficiently to constitute a space-occupying mass within 24 to 48 hours (Adams, 1966) resulting in tentorial herniation with secondary distortion of the mid-brain and infarction in the medial occipital (calcarine) cortex. The necrotic tissue is ultimately removed and replaced by a rather shrunken and cystic gliomesodermal scar.

A generalized arrest of blood flow to the brain is most commonly the result of cardiac arrest. This is usually a complication of some surgical procedure under general anaesthesia. Milstein (1956) estimated that about 300 deaths in the United Kingdom were caused by cardiac arrest related to surgery but by 1970 the number of such deaths had dropped to 100

Exhibit 22 Page 85

174                                                                                                    *D. I. Graham*



Fig 8a  *Normal right Ammon's horn to compare with figure 8b.*



Fig 8b  *Right Ammon's horn. Necrosis in the Sommer sector is seen macroscopically.*



Fig 9a  *Normal right Ammon's horn. To compare with figure 9b. The arrows delineate the Sommer sector. Cresyl violet. × 9.*



Fig 9b  *Right Ammon's horn showing recent selective neuronal necrosis of Sommer sector (between arrows) and in endfolium. Cresyl violet. × 9.*

per annum in England and Wales (Wylie, 1975), the difference in mortality being attributed to better methods of resuscitation.

If cardiac arrest is of abrupt onset and occurs in a patient at normal body temperature, complete clinical recovery is unlikely if the period of arrest is more than five to seven minutes (Brierley, 1972). A short period of cardiac arrest combined with periods of reduced cerebral perfusion pressure before or after the arrest may be as important as the duration of complete arrest (Miller and Myers, 1972) and may lead to accentuation of the ischaemic damage in the arterial boundary zones (Brierley, 1976).

If death occurs within 24 to 36 hours of the arrest,

the brain, apart from a variable degree of swelling, may appear normal externally and on section even after adequate fixation. Within 36 to 48 hours it is sometimes possible to identify laminar or patchy discolouration in the depths of sulci, particularly in the posterior halves of the brain and selective necrosis in the Sommer sector of the Ammon's horn (fig 8a and b). Microscopy reveals diffuse neuronal necrosis with a characteristic pattern of selective vulnerability. Ischaemic damage is commonly greater within sulci than at the crests of gyri and is maximal in the third, fifth and sixth layers of the parietal and occipital lobes (fig 2). In the Ammon's horn the Sommer sector and endfolium are the most vulnerable (fig 9a

Exhibit 22 Page 86

and b). These changes are sometimes associated with necrosis of the baso-lateral portion of the amygdaloid nucleus. The pattern of damage in the basal ganglia is less constant and tends to be most frequent in the outer halves of the head and body of the caudate nucleus, and in the outer half of the putamen. Damage in the globus pallidus may occur in all types of hypoxia but is especially common in carbon monoxide intoxication. Primary hypoxic damage in the thalamus is most common in the anterior, dorso-medial and ventro-lateral nuclei. In the cerebellum there is characteristically diffuse necrosis of Purkinje cells. Damage to the brain stem nuclei tends to be more severe in infants and young children than in adults.

Patients with severe diffuse brain damage due to cardiac arrest rarely survive for more than a few days (Bell and Hodgson, 1974) but occasionally they may remain alive in a persistent vegetative state for up to six months or longer (Brierley *et al*, 1971; Jennett and Plum, 1972). With increasing survival, the necrotic tissue is replaced by a glio-mesodermal scar. When this occurs there may be an appreciable reduction in the weight of the brain and evidence of atrophy of both the cortical gyri and cerebellar folia. In coronal slices ventricular enlargement may be considerable. Whereas the cortex of the parietal and occipital lobes will be reduced to a thin band of discoloured tissue, often with a line of cleavage between it and the underlying white matter, that of the frontal and temporal lobes may appear essentially normal. While the parahippocampal gyri are usually normal, the hippocampi may show the features of Ammon's horn sclerosis. Even when

cortical necrosis is severe and survival is for only a few weeks the thalami may appear grossly normal. Eventually evidence of retrograde degeneration will be seen in the corresponding thalamic association nuclei (fig 10).

*Oligaemic*

Because of autoregulation a moderate fall in cerebral perfusion pressure does not lead to a reduction in cerebral blood flow. However, when vasodilatation is maximal, autoregulation ceases and the cerebral blood flow will fall parallel to the perfusion pressure. Oligaemic brain damage due to systemic arterial hypotension conforms to one of three patterns (Adams *et al*, 1966), of which the first two types are the most common.

1  Ischaemic damage is concentrated along the boundary zones between the arterial territories of the cerebral cortex and in the cerebellum (fig 11). If the lesions are large and of several days' duration they can be recognized macroscopically provided that the brain is cut in the coronal plane (fig 12a). They vary in size from foci of necrosis in the cortex to large, wedge-shaped lesions extending from the cortex almost to the angle of the lateral ventricle. In the cortex, damage is most frequent and most severe in





Fig 10  *Coronal section of brain from patient who survived for four years in a persistent vegetative state after cardiac arrest. The cortex is greatly narrowed and there is gross essentially symmetrical enlargement of the ventricles. The Ammon's horns and the thalami are also small.*

Fig 11  *Diagram to show arterial boundary zones in cerebral and cerebellar hemispheres. The right cerebral hemisphere is shown at three levels, viz, 1 = frontal, 2 = mid-temporal and 3 = occipital. Each boundary zone is stippled. ACA = anterior cerebral artery, MCA = middle cerebral artery, PCA = posterior cerebral artery, SCA = superior cerebellar artery and PICA = posterior inferior cerebellar artery.*

Exhibit 22 Page 87



Fig 12a   *Coronal section of brain from patient who survived for 17 days after a myocardial infarct. Note focally haemorrhagic infarcts (arrows) in the boundary zones between the anterior and middle cerebral arterial territories, and between the middle and posterior cerebral arterial territories. Compare distribution of lesions with figure 11.*

Fig 12b   *Same case as illustrated in figure 12a. Slices of cerebellar hemispheres to show duskily haemorrhagic infarcts at dorsal angle of each hemisphere, ie, in the boundary zones between the superior and posterior inferior cerebellar arterial territories. Compare with figure 11.*

**Fig 12a**



**Fig 12b**

the parieto-occipital regions, ie, in the common boundary zone between the territories of the anterior, middle and posterior cerebral arteries: it decreases towards the frontal pole along the intraparietal and the superior frontal sulci, ie, between the anterior and middle cerebral arterial territories, and towards the temporal pole along the inferior temporal gyrus, ie, between the middle and posterior cerebral arterial territories. The lesions are usually asymmetrical and may be unilateral, the pattern of ischaemic damage often being determined by atheroma and variations in the calibre of the vessels forming the circle of Willis. In the cerebellum the boundary zone between the territories of the superior and posterior inferior cerebellar arteries lies just beneath the dorsal angle of each hemisphere (fig 12b). There is variable involvement of the basal ganglia particularly in the head of the caudate nucleus and the upper part of the

putamen. The Ammon's horn and brain stem are usually not involved. While infarction in the cortical boundary zones may occur in the absence of ischaemic lesions in the basal ganglia and cerebellum the converse is not common.

On the basis of clinical evidence (Adams *et al*, 1966; Adams, 1974) and experimental studies on primates (Brierley *et al*, 1969) this type of brain damage appears to be caused by a major and abrupt episode of hypotension followed by a rapid return to a normal blood pressure. It is often seen after a conscious patient has collapsed as a result of a sudden reduction in cardiac output, viz, due to ischaemic heart disease, and it may occur in the anaesthetized subject during dental or neurosurgical procedures, particularly in the sitting position (Brierley, 1970). More recently it has been described following the use of methylmethacrylic bone cement (Adams *et al*,

Exhibit 22 Page 88

*Pathology of hypoxic brain damage in man* 177

1972), in patients undergoing emergency treatment with antihypertensive agents (Graham, 1975) and in patients dying from blunt head injury (Graham *et al*, 1975). Because of the precipitate decrease in arterial pressure there is a transient failure of autoregulation and a severe reduction in CBF in the regions most removed from the parent arterial stems, ie, the boundary zones.

2  Ischaemic damage is generalized in the cortex of the cerebrum and cerebellum, is minor or absent in the hippocampi and is often severe in the thalami. The number of reported cases is small (Brierley and Cooper, 1962; Adams *et al*, 1966) but it would seem that this type of damage appears to be associated with hypotension of a relatively slow onset but of long duration.

3  Ischaemic damage is generalized in the cortex of the cerebrum and cerebellum but with variable accentuation along the arterial boundary zones. The hippocampi are usually spared and there is patchy damage in the basal ganglia. This type of damage appears to be associated with the abrupt onset of hypotension which is responsible for the accentuation of damage within the boundary zones followed by a sustained period of less severe hypotension which causes the diffuse damage.

## 2 ANOXIC AND HYPOXIC BRAIN DAMAGE

These terms imply that the blood leaving the lungs is either devoid of or has a greatly reduced oxygen content. Hypoxaemia of this severity will occur if there is obstruction of the air passages, after the inhalation of inert gases and in aviation accidents producing decompression. Even though it is still widely believed that brain damage can result from a simple reduction in the oxygen content of arterial blood, there is a lack of critical physiological data about cases purporting to show a correlation between neurological dysfunction and brain damage ascribed to the hypoxaemia. Indeed there is good experimental evidence in Rhesus monkeys and in baboons (Brierley, 1972) that the severity of the hypoxia required to produce brain damage also produces myocardial depression and a reduction in cardiac output. Thus, Brierley concluded that hypoxic hypoxia can produce brain damage only through the medium of a secondary depression of the myocardium, the pattern of damage being similar to that of oligaemic hypoxic brain damage as described above.

## 3 ANAEMIC BRAIN DAMAGE

This occurs classically in carbon monoxide poisoning. The neurological complications of carbon monoxide poisoning are many (Garland and Pearce, 1967) but there is not a combination of neurological



Fig 13  *Carbon monoxide poisoning. There is infarction of the superior pole of the globus pallidus (arrow). Celloidin section—myelin stain.* × 1·6.

and psychiatric symptoms that can be regarded as the specific consequences of such poisoning since similar symptoms and signs may be encountered after cardiac arrest, hypoglycaemia, etc.

When death occurs within a few hours after poisoning, the organs display the pink/red colour characteristic of carboxyhaemoglobin. When survival is for 36 to 48 hours, the brain shows evidence of congestion, and petechiae are frequently seen in the white matter and the corpus callosum. Although there is a particular predilection for infarction of the globus pallidus in carbon monoxide poisoning (fig 13), there is also neuronal necrosis in other selectively vulnerable regions such as the Ammon's horn and the cerebral and cerebellar cortex.

Changes in the white matter are a common and often conspicuous neuropathological consequence of carbon monoxide poisoning. Damage to white matter tends to occur, particularly in patients who develop delayed signs of intoxication after a period of relative normality following acute poisoning.

Recent experimental work in the Rhesus monkey (Ginsberg *et al*, 1974) has underlined the importance of systemic circulatory factors in the production of brain damage, the concentration of damage in the white matter possibly being due to a combination of a toxic effect of carbon monoxide together with a moderate reduction in blood flow and perhaps an additional acidosis.

## 4 HISTOTOXIC BRAIN DAMAGE

The histotoxic effects of the cyanide ion and sodium azide are due to the inhibition of cytochrome oxidase. In acute intoxication death ensues rapidly from respiratory failure. In such cases the brain shows

Exhibit 22 Page 89

hyperaemia and multiple petechial haemorrhages. In longer surviving cases necrosis has been identified in the lentiform nucleus and in the cortex of the cerebrum and cerebellum (Brierley, 1976). Experimental studies have now shown that brain damage produced by either cyanide (Brierley, 1975) or azide (Mettler and Sax, 1972) cannot be attributed to histotoxic hypoxia alone but results from their secondary effects on respiration and circulation.

## 5 HYPOGLYCAEMIC BRAIN DAMAGE ¶

Hypoglycaemia in man may lead to permanent brain damage. It may be due to an excess of insulin given either for the treatment of diabetes mellitus or psychosis and in rare instances of islet cell tumour of the pancreas and in examples of idiopathic hypoglycaemia in infants (Brierley, 1976).

In cases of short survival the brain may appear normal. There may be atrophy of the cortex and hippocampi and enlargement of the ventricular system in cases surviving for a number of weeks. Microscopy shows that the brain damage is very similar in type and distribution to that seen in ischaemic hypoxic brain damage, ie, nerve cell loss and a glio-mesodermal reaction in the striatum, the cortex and the hippocampus, except that there is often relative sparing of the Purkinje cells in the cerebellum.

Studies of hypoglycaemia in experimental animals have shown that ischaemic cell change is the principal neuropathological consequence of uncomplicated hypoglycaemia (Meldrum *et al*, 1971; Brierley *et al*, 1971a and b) and in longer surviving animals there is nerve cell loss and a variable glio-mesodermal reaction in the striatum, the cerebral cortex and the hippocampus (Kahn and Myers, 1971). These experiments show that the blood glucose level must fall to about 1 mmol/l (20 mg/100 ml) if uncomplicated hypoglycaemia is to produce brain damage, though a higher level of blood sugar may produce similar damage if complicated by some hypotension, hypoxaemia or epileptic activity. It is therefore quite possible that if a patient has been in hypoglycaemic coma for some time, both oligaemic and hypoxic factors may have contributed to the brain damage.

A different type of neuropathological change has been described in the human infant as a consequence of hypoglycaemia (Anderson *et al*, 1967). Neuronal changes were generalized and included chromatolysis with cytoplasmic vacuolation in some and fragmentation of nuclear chromatin in others. It has, however, been suggested that these appearances could be attributed to autolysis (Brierley, 1976).

## 6 FEBRILE CONVULSIONS AND STATUS EPILEPTICUS

Status epilepticus may be defined broadly as a convul-



Fig 14  *Status epilepticus. Celloidin section of right temporal lobe from a child who died in coma five days after a series of convulsions. Note widespread neuronal necrosis in cortex and Ammon's horn. There is also some nerve cell loss in the thalamus. Cresyl violet.* × *1·8.*

sive episode lasting over an hour without an intervening period of consciousness (Corsellisand Meldrum, 1976). It has long been recognized as a serious danger to life at any age but it offers a special threat in childhood. The basic neuropathology is that of severe and diffuse ischaemic damage of stagnant hypoxic type in which there is widespread necrosis of the cortex, Ammon's horn, basal ganglia, thalamus, cerebellum and parts of the brain stem (fig 14). Thus status epilepticus, particularly in children, constitutes a medical emergency. Fortunately many patients make an uneventful recovery but some have a permanent intellectual or neurological deficit caused by hypoxic brain damage.

Experimental studies in subhuman primate (Meldrum and Horton, 1973; Meldrum and Brierley, 1973; Meldrum *etal*, 1973) have emphasized that several factors may contribute to the brain damage, eg, arterial hypotension and hyperpyrexia. Evidence of an impaired neuronal energy metabolism was also found due to a combination of excessive neuronal activity and accumulative effects of secondary changes such as hypoxia, hypoglycaemia, hypotension, etc.

## Conclusions

Hypoxic brain damage may occur in diverse clinical situations where there is an inadequate supply of oxygen or glucose to nerve cells. Many patients who experience an episode of severe hypoxia die within a few hours when the pathologist will not be able to

Exhibit 22 Page 90

identify any macroscopic abnormalities in the brain. If the patient survives for more than a few hours, however, varying degrees of damage are easily identified, particularly if the brain has been properly dissected after adequate fixation.

The identification of early hypoxic brain damage is made difficult in the human brain because of histological artefact. The earliest clearly identifiable structural damage is selective neuronal necrosis as shown by ischaemic nerve cell change with incrustation formation. If the hypoxic insult is more severe then frank infarction may occur. In each instance the necrotic tissue is replaced by a glio-mesodermal reaction.

The distribution of hypoxic damage is most easily assessed in large representative sections of the brain. It is not usually feasible for the general pathologist to undertake a comprehensive neuropathological analysis in every case of suspected hypoxic brain damage. Fortunately, however, it is possible to establish that a patient has experienced an episode of hypoxia sufficiently severe to produce widespread hypoxic damage by the histological examination of bilateral small blocks from the 'selectively vulnerable areas', namely, the Ammon's horns, the thalamus and the cerebellum.

My thanks to Professor J. H. Adams for helpful criticism, to Mrs Ann Gentles for typing the manuscript and to Mrs Margaret Murray for photographic assistance.

### References

Adams, J. H. (1966). Echoencephalography. (Letter.) *Lancet*, 1, 487-488.
Adams, J. H. (1974). Ischaemic brain damage in arterial boundary zones in man. In *Pathology of Cerebral Microcirculation*, edited by J. Cervós-Navarro, pp. 397-404. de Gruyter, Berlin.
Adams, J. H. (1976). The neuropathology of cerebral hypoxia. In *Gradwohl's Legal Medicine*, 3rd ed., edited by F. E. Camps, A. E. Robinson, and B. G. B. Lucas, pp. 337-348. Wright, Bristol.
Adams, J. H., Brierley, J. B., Connor, R. C. R., and Treip, C. S. (1966). The effects of systemic hypotension upon the human brain. Clinical and neuropathological observations in 11 cases. *Brain*, 89, 235-268.
Adams, J. H. Graham, D. I., Mills, E., and Sprunt, T. G. (1972). Fat embolism and cerebral infarction after use of methylmethacrylic cement. *British Medical Journal*, 3, 740-741.
Adams, J. H., and Miller, L. (1970). Nervous system techniques for the general pathologist. Association of Clinical Pathologists Broadsheet, No. 73.
Anderson, J. M., Milner, R. D. G., and Strich, S. J. (1967). Effects of neonatal hypoglycaemia on the nervous system: a pathological study. *Journal of Neurology, Neurosurgery and Psychiatry*, 30, 295-310.
Bell, J. A., and Hodgson, H. J. F. (1974). Coma after cardiac arrest. *Brain*, 97, 361-372.
Brierley, J. B. (1970). Systemic hypotension—neurological and neuropathological aspects. In *Modern Trends in Neurology*, 5, edited by D. Williams, pp. 164-177. Butterworths, London.
Brierley, J. B. (1972). The neuropathology of brain hypoxia. In *Scientific Foundations of Neurology*, edited by M. Critchley, J. L. O'Leary, and B. Jennett, pp. 243-252. Heinemann, London.
Brierley, J. B. (1975). Comparison between effects of profound arterial hypotension, hypoxia, and cyanide on the brain of *Macaca mulatta*. *Advances in Neurology*, 10, 213-221.
Brierley, J. B. (1976). Cerebral hypoxia. In *Greenfield's Neuropathology*, 3rd ed., edited by W. Blackwood and J. A. N. Corsellis, pp. 43-86. Arnold, London.
Brierley, J. B., Adams, J. H., Graham, D. I., and Simpson, J. A. (1971). Neocortical death after cardiac arrest. *Lancet*, 2, 560-565.
Brierley, J. B., Brown, A. W., Excell, B. J., and Meldrum, B. S. (1969). Brain damage in the rhesus monkey resulting from profound arterial hypotension. I. Its nature, distribution and general physiological correlates. *Brain Research*, 13, 68-100.
Brierley, J. B., Brown, A. W., and Meldrum, B. S. (1971a). The neuropathology of insulin-induced hypoglycaemia in a primate (*M. mulatta*): topography and cellular nature. In *Brain Hypoxia* edited by J. B. Brierley and B. S. Meldrum, pp. 225-230. (Clinics in Developmental Medicine, no. 39/40). Spastics International Medical Publications and Heinemann, London.
Brierley, J. B., Brown, A. W., and Meldrum, B. S. (1971b). The nature and time course of the neuronal alterations resulting from oligaemia and hypoglycaemia in the brain of Macaca mulatta. *Brain Research*, 25, 483-499.
Brierley, J. B., and Cooper, J. E. (1962). Cerebral complications of hypotensive anaesthesia in a healthy adult. *Journal of Neurology, Neurosurgery and Psychiatry*, 25, 24-30.
Brown, A. W., and Brierley, J. B. (1966). Evidence for early anoxic-ischaemic cell damage in the rat brain. *Experentia* (*Basel*), 22, 546-547.
Bruce, D. A., Langfitt, T. W., Miller, J. D., Schutz, H., Vapalahti, M. P., Stanek, A., and Goldberg, H. I. (1973). Regional cerebral blood flow, intracranial pressure and brain metabolism in comatose patients. *Journal of Neurosurgery*, 38, 131-144.
Cammermeyer, J. (1961). The importance of avoiding 'dark' neurons in experimental neuropathology. *Acta Neuropathologica*, 1, 245-270.
Corsellis, J. A. N., and Meldrum, B. S. (1976). Epilepsy. In *Greenfield's Neuropathology*, 3rd ed., edited by W. Blackwood and J. A. N. Corsellis, pp. 771-795. Arnold, London.
Garland, H., and Pearce, J. (1967). Neurological complications of carbon monoxide poisoning. *Quarterly Journal of Medicine*, 36, 445-455.
Ginsberg, M. D., Myers, R. E., and McDonagh, B. F. (1974). Experimental carbon monoxide encephalopathy in the primate. II. Clinical aspects, neuropathology and physiologic correlation. *Archives of Neurology*, 30, 209-216.
Graham, D. I. (1975). Ischaemic brain damage of cerebral perfusion failure type after treatment of severe hypertension. *British Medical Journal*, 4, 739.
Graham, D. I., Adams, J. H., and Doyle, D. (1975). Ischaemic brain damage in arterial boundary zones in non-missile head injuries. In *Blood Flow and Metabolism in the Brain: Proceedings of the Seventh International Symposium on Cerebral Blood Flow and Metabolism, Aviemore*, edited by A. M. Harper, W. B. Jennett, J. D. Miller, and J. O. Rowan, pp. 13.29-13.30. Churchill Livingstone, Edinburgh.
Harper, A. M. (1972). Control of the cerebral circulation. In *Scientific Foundations of Neurology*, edited by M. Critchley, J. L. O'Leary and B. Jennett, pp. 235-243. Heinemann, London.

Exhibit 22 Page 91

*D. I. Graham*

Harper, A. M., Jennett, W. B., Miller, J. D., and Rowan, J. O. Eds. (1975). *Blood Flow and Metabolism in the Brain: Proceedings of the Seventh International Symposium on Cerebral Blood Flow and Metabolism, Aviemore.* Churchill Livingstone, Edinburgh.

Jacob, H. (1963). CNS tissue and cellular pathology in hypoxaemic states. In *Selective Vulnerability of the Brain in Hypoxaemia*, edited by J. P. Schadé and W. H. McMenemey, pp. 153-163. Blackwell, Oxford.

Jennett, B., and Plum, F. (1972). Persistent vegetative state after brain damage: a syndrome in search of a name. *Lancet*, 1, 734-737.

Kahn, K. J., and Myers, R. E. (1971). Insulin-induced hypoglycaemia in the non-human primate. I. Clinical consequences. In *Brain Hypoxia*, edited by J. B. Brierley and B.S. Meldrum, pp. 185-194. (Clinics in Developmental Medicine, no. 39/40). Spastics International Medical Publications and Heinemann, London.

McIlwain, H. (1966). *Biochemistry and the Central Nervous System*, 3rd ed. Churchill, London.

Meldrum, B. S., and Brierley, J. B. (1973). Prolonged epileptic seizures in primates: ischemic cell change and its relation to ictal physiological events. *Archives of Neurology*, 28, 10-17.

Meldrum, B. S., and Horton, R. W. (1973). Physiology of status epilepticus in primates. *Archives of Neurology*, 28, 1-9.

Meldrum, B. S., Horton, R. W., and Brierley, J. B. (1971). Insulin-induced hypoglycaemia in the primate: relationship between physiological changes and neuropathology. In *Brain Hypoxia*, edited by J. B. Brierley and B.S. Meldrum, pp. 207-224. (Clinics in Developmental Medicine, no. 39/40). Spastics International Medical Publications and Heinemann, London.

Meldrum, B. S., Vigouroux, R. A., and Brierley, J. B. (1973). Systemic factors and epileptic brain damage. *Archives of Neurology*, 29, 82-87.

Mettler, F. A., and Sax, D. S. (1972). Cerebellar cortical degeneration due to acute azide poisoning. *Brain*, 95, 505-516.

Miller, J. R., and Myers, R. E. (1972). Neuropathology of systemic circulatory arrest in adult monkeys. *Neurology*, 22, 888-904.

Milstein, B. B. (1956). Cardiac arrest and resuscitation. *Annals of the Royal College of Surgeons of England*, 19, 69-87.

Plum, F. (1973). The clinical problem: how much anoxia-ischemia damages the brain? *Archives of Neurology*, 29, 359-360.

Wylie, W. D. (1975). "There, but for the Grace of God . . .". *Annals of the Royal College of Surgeons of England*, 56, 171-180.

Exhibit 22 Page 92



> SEE ALL MERCK MANUALS

**Merck Manual > Health Care Professionals > Endocrine and Metabolic Disorders >
Acid-Base Regulation and Disorders**

## Respiratory Acidosis

*Respiratory acidosis is primary increase in $PCO_2$ with or without compensatory increase in $HCO_3^-$; pH is usually low but may be near normal. Cause is a decrease in respiratory rate, volume (hypoventilation), or both due to CNS, pulmonary, or iatrogenic conditions. Respiratory acidosis can be acute or chronic; the chronic form is asymptomatic, but the acute, or worsening, form causes headache, confusion, and drowsiness. Signs include tremor, myoclonic*

Exhibit 22 Page 93



## Treatment

- Adequate ventilation
- $NaHCO_3$ almost always contraindicated

Treatment is provision of adequate ventilation by either endotracheal intubation or noninvasive positive pressure ventilation (for specific indications and procedures, see Respiratory Failure and Mechanical Ventilation). Adequate ventilation is all that is needed to correct respiratory acidosis, although chronic hypercapnia generally must be corrected slowly (eg, over several hours or more), because too-rapid $PCO_2$ lowering can cause a posthypercapnic "overshoot" alkalosis when the underlying compensatory hyperbicarbonatemia becomes unmasked; the abrupt rise in CNS pH that results can lead to seizures and death. Any $K^+$ and $Cl^-$ deficits are corrected.

$NaHCO_3$ is almost always contraindicated, because $HCO_3^-$ can be converted to $PCO_2$ in serum but crosses the blood-brain barrier slowly, thus increasing serum pH without affecting CNS pH. One exception may be in cases of severe bronchospasm, in which $HCO_3^-$ may improve responsiveness of bronchial smooth muscle to β-agonists.

## Key Points

- Respiratory acidosis involves a decrease in respiratory rate and/or volume (hypoventilation).
- Common causes include impaired respiratory drive (eg, due to toxins, CNS disease), and airflow obstruction (eg, due to asthma, COPD, sleep apnea, airway edema).
- Recognize chronic hypoventilation by the presence of metabolic compensation (elevated $HCO_3^-$) and clinical signs of tolerance (less somnolence and confusion than expected for the degree of hypercarbia).
- Treat the cause and provide adequate ventilation, using tracheal intubation or noninvasive positive pressure ventilation as needed.

Last full review/revision February 2013 by James L. Lewis, III, MD
Content last modified October 2013

Audio   Figures   Photographs   Sidebars   Tables   Videos

Copyright   © 2010-2014 Merck Sharp & Dohme Corp., a subsidiary of Merck & Co., Inc., Whitehouse Station, N.J., U.S.A.   Privacy   Terms of Use
Permissions

# ORIGINAL ARTICLE

# Suicide By Asphyxiation Due to Helium Inhalation

Matthew O. Howard, PhD,* Martin T. Hall, PhD,† Jeffrey D. Edwards, MSW,* Michael G. Vaughn, PhD,‡ Brian E. Perron, PhD,§ and Ruth E. Winecker, PhD¶

**Abstract:** Suicide by asphyxiation using helium is the most widely promoted method of "self-deliverance" by right-to-die advocates. However, little is known about persons committing such suicides or the circumstances and manner in which they are completed. Prior reports of suicides by asphyxiation involving helium were reviewed and deaths determined by the North Carolina Office of the Chief Medical Examiner to be helium-associated asphyxial suicides occurring between January 1, 2000 and December 31, 2008 were included in a new case series examined in this article. The 10 asphyxial suicides involving helium identified in North Carolina tended to occur almost exclusively in non-Hispanic, white men who were relatively young (M age = 41.1 ± 11.6). In 6 of 10 cases, decedents suffered from significant psychiatric dysfunction; in 3 of these 6 cases, psychiatric disorders were present comorbidly with substance abuse. In none these cases were decedents suffering from terminal illness. Most persons committing suicide with helium were free of terminal illness but suffered from psychiatric and/or substance use disorders.

**Key Words:** asphyxia, helium, suicide, right-to-life

(*Am J Forensic Med Pathol* 2010;XX: 000–000)

Publication, in 1991, of the right-to-die manifesto and suicide "how-to" guide, Final Exit: The Practicalities of Self-Deliverance and Assisted Suicide for the Dying,[1] raised a maelstrom of controversy regarding the appropriateness of suicide as a response to terminal or "hopeless" physical illness and exposed divisions within the right-to-die movement itself. In the 1990s, many right-to-die advocates were engaged in public education as to the purported virtues of advanced directives, living wills, and legalized physician-assisted suicide.[2] At the same time, other elements of this movement, including the Self-Deliverance New Technology (NuTech) Group, were developing technologies to "empower people to die on their own terms by controlling the timing and manner of their own death."[2 (p. 8)] NuTech members, including Derek Humphry, author of Final Exit, sought to identify multiple suicide methods that were swift, painless, failure-proof, inexpensive, and nondisfiguring. The group also considered it vital that the method be simple, leave little or no indication that the death was unnatural in nature, and not require a physician's assistance or prescription.[2]

With its detailed descriptions of diverse suicide methods and specific endorsement of the plastic bag asphyxiation method, publication of Final Exit brought an easily understood and generally effective suicide method to the masses. The book was a commercial success, appearing on the New York Times bestseller list and selling more than 1.5 million copies in the decade following its publication. In 2007, Final Exit was named one of the 25 most influential books of the past quarter-century by book critics and editors of USA Today.[3]

Concerns that suicides in nonterminally ill depressed persons might follow exposure to methods elucidated in Final Exit were soon raised,[4] and dramatic increases in plastic bag asphyxial suicides were observed in New York City[5] and the United States[6] in the year following publication of Final Exit. Investigators concluded that "most persons exposed to Final Exit were not terminally ill and had used it as a suicide manual … (and that) it is likely that a psychiatric disorder would have been diagnosed in most of these people."[5 (p. 1509)]

Efforts by NuTech and others to develop a more effective suicide method and widely disseminate it to the public have continued to the present. In 2000, a supplement to Final Exit was published that presented the first description of helium-assisted plastic bag asphyxiation.[7] Advocates emphasized the enhanced lethality of this approach, reduction in time required for death to occur to less than 5 minutes, and elimination of the need for a sedative prescription. Proponents of the method also noted that materials needed to complete such suicides are readily accessible and that asphyxiation due to helium inhalation is often undetected by autopsy (where findings are typically nonspecific) or toxicological analysis (because special sampling and assay methods are required). Thus, such suicides are likely to remain undetected in cases where the helium delivery apparatus and plastic bag are removed before the death scene is examined and no other information is available implicating death by helium-assisted asphyxiation. Modifications of the helium method were published in 2002[8] and 2009,[9] a DVD including a step-by-step demonstration of the method is available for purchase,[10] and instructional videos depicting the method are accessible on the internet. A schematic of the helium delivery apparatus is presented in Figure 1.[9]

Given the recent development, broad dissemination, and notable lethality of helium-assisted suicide, we endeavored to better understand characteristics of suicides by this method. First, we reviewed findings of extant studies examining suicides by asphyxiation due to helium inhalation. Second, we report new findings from the largest series of these suicides heretofore examined. Results of this investigation may lead to improved identification of helium-assisted suicides by medical examiners, enhanced screening and prevention efforts on the part of physicians and other professionals treating individuals at risk for suicide, and shed new light on unintended deleterious consequences of widespread dissemination of detailed suicide methods to the general public.

## MATERIALS AND METHODS

The current report presents findings from 2 related studies. The first is a review of published investigations of suicides by asphyxiation due to helium inhalation. The second is a case series of suicides by asphyxiation due to helium inhalation occurring in North Carolina between 2000 (the year in which the method was first described) and December 31, 2008.

Manuscript received January 19, 2010; accepted March 3, 2010.
From the *School of Social Work, University of North Carolina at Chapel Hill; †Department of Behavioral Medicine, School of Medicine, University of Kentucky; ‡School of Public Health, Saint Louis University; §Department of Psychiatry, School of Medicine, University of Michigan; and ¶North Carolina Office of the Chief Medical Examiner.
Supported by NIH grants DA15929, DA15556, DA021405 (M.O.H.) and DA007304 (M.T.H.).
Correspondence: Matthew O. Howard, Frank Daniels Distinguished Professor, Tate-Turner-Kuralt Building, 325 Pittsboro, CB 3550, Chapel Hill, NC 27599–3550. E-mail: mohoward@email.unc.edu.
Copyright © 2010 by Lippincott Williams & Wilkins
ISSN: 0195-7910/10/0000-0001
DOI: 10.1097/PAF.0b013e3181ed7a2d

Copyright © Lippincott Williams & Wilkins. Unauthorized reproduction of this article is prohibited.

Exhibit 22 Page 95



**FIGURE 1.** Schematic of plastic bag asphyxiation suicide using helium gas in final exit. Reprinted with permission from *Final Exit: The Practicalities of Self-deliverance and Assisted Suicide for the Dying.*[9] (p.4)

## Identification of Published Reports

A broad search of the general medical literature was undertaken for any relevant reports addressing suicide by asphyxiation due to helium inhalation. This process entailed searching the PubMed database for the period January 1, 1957 to November 1, 2009 using the search phrase "suicide and helium." Seven pertinent records were identified as follows: 6 English-language case studies[11–16] and a Danish-language case study.[17] A search of EMBASE using the identical approach for the period January 1, 1988 to November 1, 2009 identified the same 7 reports. The 6 English-language reports relevant to this review were published between 2002 and 2007 and present a total of 14 cases.[11–16] The Danish study included a synoptic abstract in English indicating that the decedent was a 35-year-old man who had committed suicide with a plastic bag and helium using a "new and highly lethal technique."[17] The case reports included in this review constitute the entirety of published research on helium-assisted suicide and are presented in Table 1.

## Identification of Suicides by Asphyxiation Due to Helium Inhalation in North Carolina

All deaths determined by the North Carolina Office of the Chief Medical Examiner (NCOCME) to be asphyxia suicides due to helium inhalation that occurred between January 1, 2000 and December 31, 2008, were included in this study. These suicides were identified through a search of the manner and cause of death fields of the electronic records maintained by the NCOCME. The presence of helium was confirmed by toxicological testing in 9 of 10 identi-

fied cases. Only the first reported case (ie, 2001) was not subjected to toxicological testing for helium. Specimens from suspected helium asphyxiation cases autopsied at the NCOCME are collected in 20 mL headspace vials. In some cases, given that one central laboratory conducts testing for all medical examiner cases in the state, blood samples are delivered to the NCOCME in standard collection vials. Immediately upon arrival, 5 mL of blood from the standard autopsy vial is transferred to a headspace vial for later analysis. Medical records associated with these deaths were manually reviewed and abstracted including the OCME Report of Investigation, State of North Carolina Death Certificate, Report of Autopsy, Toxicology Report, Case Encounter Form, Pathologist's Notes, and Supplemental Report of Cause of Death. On January 5, 2010, the University of North Carolina Institutional Review Board determined that the reported research does not require Institutional Review Board approval under pertinent federal regulations. Characteristics of the 10 cases identified are presented in Table 2.

## RESULTS

### Review of Published Cases

The first death attributed to suicide by asphyxiation due to helium inhalation reported in the medical literature occurred in September 2000,[11] shortly after the description of the method was published. Several investigators asserted that suicides by the helium method had not been seen in their localities prior to publication of the 2000 Supplement to Final Exit.[11,12,15,16]

The 14 decedents whose cases were presented in the 6 published reports ranged in age from 19 to 81 (M age = 50.0, SD = 21.8, median = 48.5). Between these extremes, decedents were approximately evenly divided between those in their 20s, 30s, 40s, 60s, and 70s. Medical and psychiatric histories were scant or entirely unreported for some cases, but revealed a history of depression, prior suicide attempt(s), paranoid schizophrenia, or some combination thereof in 4 (25.6%) cases. In 4 (25.6%) additional cases, psychiatric dysfunction may have contributed to the suicide, given that 3 of these decedents were determined to be in good health (ages 49, 49, and 76) and one mentioned the recent death of his wife as a reason for his suicide in a note left at the death scene. In 5 other cases (including 4 decedents in their 20s or 30s), no medical or psychiatric histories were reported. A terminal disease process was present in only 2 of 14 (14.3%) cases. In 2 (14.3%) additional cases involving men ages 71 and 78, "failing health" and "unspecified health problems" were possible contributing factors. Medical disorders were not implicated in 10 of 14 (71.4%) suicides.

In all reported cases, routine toxicological testing did not reveal the presence of helium and manner and cause of death determinations relied heavily on death scene investigations. Autopsy findings tended to be absent or nonspecific in the 12 cases that involved an autopsy.

In 8 cases (57.1%), a suicide note was found, and in 4 cases (28.6%) right-to-die literature was found at the death scene.

A number of helium delivery devices were employed. Five cases involved use of a mask; 4 of these cases were reported in 2002 or 2003, before plastic bag asphyxiation (without use of a mask) became preferred by advocates of the helium method.[8] Characteristics of the plastic tubing used, use of rubber bands and Velcro straps to secure plastic bags to the neck, types of helium canisters employed, and use of multiple plastic bags in 1 case were consistent with published descriptions of helium-assisted suicide.[8]

### Characteristics of Suicides by Asphyxiation due to Helium Inhalation in North Carolina

Asphyxial suicides in North Carolina involving helium inhalation tended to occur almost exclusively in non-Hispanic, white

*© 2010 Lippincott Williams & Wilkins*

Copyright © Lippincott Williams & Wilkins. Unauthorized reproduction of this article is prohibited.

Exhibit 22 Page 96

**TABLE 1. Published Case Reports of Suicides by Asphyxia Due to Helium Inhalation**

| Authors/Date/Location | Characteristics of Decedent | Medical/Psychiatric History | Death Scene | Helium-Delivery Apparatus | Autopsy Findings | Toxicology Findings |
|---|---|---|---|---|---|---|
| Ogden and Wooten (2002), South Carolina[11] | Woman, 60, white, suffering from adenoid cystic carcinoma with related eye involvement and diplopia. Death occurred 9/2000. | History of depression and a prior suicide attempt. Unclear whether depression/suicide attempt antedated carcinoma diagnosis. | Decedent discovered on living room floor of home with suicide note and copy of her will. The book *Final Exit*, *Final Exit* videotape, and Spring 2000 Hemlock society newsletter were found on a nearby coffee table. | Found with surgical mask over face and clear plastic bag over head. Next to body was refillable industrial tank of helium. Clear plastic tube led from plastic bag to helium tank valve. | Does not appear an autopsy was conducted. It was noted at death scene that decedent's skin color was unremarkable and no external signs of poisoning were observed. | Blood/urine tests for medications and psychotropic substances were negative. |
| Gilson et al. (2003), Tucson, Arizona[13] | Cases 1 and 2: man, 49 and woman, 48, who were common-in-law married. | No specific information presented; decedents were reportedly in good health. Motivation for suicide unclear. | Couple found living supine by police on floor of master bedroom in their residence. Couples' attorney had called police after receiving a mailed suicide note. No right-to-die materials found. | Each decedent had 13 plastic bags over their heads, which were secured by plastic straps around their necks. | Remarkable only for early decompositional changes. | Unremarkable for both decedents. |
| Gilson et al. (2003), Tucson, Arizona (continued) | Cases 3 and 4: husband, 78; wife, 76 | Husband repeatedly in "failing health" and "depressed"; wife in "good health" other than a recent minor elective surgery. | Couple found in bed by neighbor. Suicide notes were found close to bodies. Notes referring to the Hemlock society were found in apartment. No right-to-die materials found. | Both decedents were wearing filter cartridge-style masks attached to helium tanks with plastic tubing. | External exams unremarkable. Internal exams not performed per family's wishes. | Negative for ethanol, medications, and illicit drugs for both decedents. |
| | Case 5: man, 81 | Advanced squamous cell carcinoma of throat, cachectic. | Found by daughter in bed. Family unable to provide information as to whether "right-to-die" literature or suicide note were found at death scene. | Plastic bag over head with plastic tube running from inside plastic bag to helium tank. | Not clear that an autopsy was conducted. | Blood and urine tests were negative, but it was not clear what substances were assayed. |
| | Case 6: man, 71 | Decedent mentioned unspecified health problems and the recent death of his wife as principal reasons for his suicide. | Found expired in chair in living room or home by police. A suicide note found, but no right-to-die literature. | Plastic bag over head secured with elastic band and Velcro strap at neck. Plastic tube from helium tank connected to the mask inside plastic bag. | External exam unremarkable except for decomposition. | Toxicology tests not performed due to decomposition. |
| | Case 7: man, 25 | Medical history unknown; motivation for suicide unclear. | Found dead in empty bathtub of his apartment by landlord. Right-to-die literature and suicide note were not found. | Plastic bag over head with plastic tube running from helium tank to bag with tube passing through a sink where warm water was running. | Unremarkable except for decompositional changes. | Remarkable only for ethanol (234 mg/dL) in decomposition fluid. |
| Gallagher et al. (2003), Indiana[13] | Woman, 19, well-nourished | History of prior suicide attempts (number and nature not described). No description of medical history. Had searched methods of suicide on the internet. | Decedent found supine in backseat of car with helium tank on floor and valve between knees. Many signed suicide notes and a page from the "Church of Euthanasia" website entitled "How to kill yourself" were left in an envelope on the driver's seat. A hand-written message to a local general store was also found in the envelope with a list including tubing, mask, and duct tape. A letter was found in decedent's residence describing where her body was located. | Decedent wore air filter gas mask coated with a substance similar to correction fluid. A helium tank obtained from a local supply company was attached via plastic tubing to bag with filter. Duct tape sealed mask to skin of face covering nose and mouth. | Conjunctival petechial hemorrhages bilaterally. Nares and oral cavity contained frothy white edema fluid. R lung ~670 g; L lung ~620 g. Lungs congested with severe pulmonary edema. No evidence of trauma, injury, or explanation for death other than helium inhalation. | Routine toxicology unremarkable. Presents a method by which specimens can be collected and analyzed for the presence of helium. |
| Auwaerter et al. (2007) Freiburg, Germany[14] | Man, 23 | No information presented. | Decedent was found dead in "lying" position in unidentified location. A nearly empty bottle of tequila, blister pack of travel sickness medication, and pack of ibuprofen tablets were found. | A helium gas canister was connected to a plastic bag with polypropylene tubing. The bag was over the decedent's head and affixed to neck with a rubber band. | Nonspecific findings included "an osseous swelling of the brain and of the lungs and an acute hyperemia of the kidneys." No evidence of severe illness or injury. | Routine tests revealed a BAC of 0.9 mg/g; diphenhydramine in lean serum (0.61 μg/mL) and urine (12.2 μg/mL). Ibuprofen found in urine and gastric content. A positive test for helium by novel assay method was reported. |

*(Continued)*

Exhibit 22 Page 97

Copyright © Lippincott Williams & Wilkins. Unauthorized reproduction of this article is prohibited.

**TABLE 1.** (Continued)

| Author/Date/Location | Characteristics of Decedent | Medical/Psychiatric History | Helium-Delivery Apparatus | Death Scene | Autopsy Findings | Toxicology Findings |
|---|---|---|---|---|---|---|
| Grassberger & Kranzkopf (2007) Vienna, Austria[13] | Case 1: man, 28 | History of paranoid schizophrenia; otherwise, no medical history reported. | Found with plastic bag over head sealed at neck with duct tape. A 10 L tank of putty balloon helium was connected to the bag via plastic tubing. | Decedent found expired in his apartment reclining in a chair. Mouth contained frothy white edema fluid. A suicide note was left which named his mental illness as the primary reason for his suicide. No right-to-die literature found in domicile. | External exam unremarkable. Engorgement of right atrium and ventricle, pulmonary edema, and a few subpleural petchia. | Bloodline tests for 6 classes of illicit drugs were negative. Not clear whether ethanol was assayed. |
| | Case 2: man, 39 | Not reported | Plastic tubing led from industrial helium tank into plastic mask. | Found expired in an empty bathtub wearing a plastic mask over face. Right-to-die literature and suicide note were found. | Autopsy remarkable, only for early decompositional changes. | Tests of decomposition fluid identified a BAC of 1 mg/L. |
| | Case 3: man, 39 | Not reported. | Plastic bag over head connected via plastic tubing to a 10 L helium tank was affixed to neck with rubber band. | Found supine on floor of his apartment with plastic bag over head. A suicide note was found. | External/internal exams unremarkable except for advanced decompositional changes. | Negative except for traces of benzodiazepines in urine. |
| Schon & Ketterer (2007) Bern, Switzerland[14] | Man, 64, white | Not reported | A gas canister labeled "helium" was found on a table at side of room opposite from where body was found. The helium canister was connected to the 17 L blue plastic garbage bag that was found over the decedent's head. In addition to the plastic ribbon used to tie the bag, the decedent had inserted a rubber band into the bag's collar. The bag was secured tightly around decedent's neck. | Decedent found expired in hotel room lying supine on bed with garbage bag over head. No alcohol bottles, medications or drug paraphernalia were found. A rental receipt for the helium canister was found, but no suicide note or self-help materials. An inquiry at the decedent's home town revealed that another person in the area had committed suicide using the same method within the same week. | No external injuries/petechial hemorrhages found, except for a ligature mark impression attributed to a rubber band around neck. Nose, mouth, and airways filled with frothy reddish fluid. Lung/brain edematous. Internal organs acutely congested. Pulmonary emphysema and hypertrophy/dilation of right atrium/ventricle noted. No other potential causes of death were identified. | No obvious evidence of alcohol/drug abuse, but no toxicology assays performed. |

© 2010 Lippincott Williams & Wilkins

Copyright © Lippincott Williams & Wilkins. Unauthorized reproduction of this article is prohibited.

Exhibit 22 Page 98

**TABLE 2.** Characteristic of Suicides by Asphyxiation due to Helium Inhalation in North Carolina, 2000–2008

| Year of Death | Characteristics of Decedent | Medical/Psychiatric History | Helium-Delivery Apparatus | Death Scene Description | Autopsy Findings | Toxicology Exam Findings |
|---|---|---|---|---|---|---|
| 2001 | Man, 47, never-married, white (non-Hispanic) graduate school education | Long history of depression treated by his physician. Depression listed as a contributing cause of suicide. Little information available about medical or psychiatric history or acute precipitants of suicide. | Plastic bag over head, secured with velcro tie material band. Plastic tubing was taped to top of head, extended down left arm under shirt sleeve and exited at left cuff. The tubing was connected to a T-valve and attached to 2 helium tanks. | Found in living room of his home by a co-worker and police. Two bottles of temazepam and a will and suicide note found at scene. | Early decompositional changes noted at death scene; no autopsy conducted. | Trace levels of 7-aminoclonazepam, and temazepam (0.016 mg/L) were identified in a 1 mL sample of vitreous humor. |
| 2003 | Man, 31, married, white (non-Hispanic), 13 yr of education | Suicide note mentioned "chronic pain" as a reason for suicide. However, medical and psychiatric history are not known. | Clear blue, thin plastic bag over head secured with 2 large yellow rubber bands around neck. Clear plastic tube taped to inside of plastic bag, extending out of bag, looping around left arm and connected to helium tank. | Decedent found in his apartment. Had left a suicide note describing how he planned the suicide. No medications found in apartment. | Pathological diagnosis: bilateral pulmonary congestion. No significant external/internal injuries. Lungs: R lung: 750 g; L lung: 640 g. Parenchyma of both lungs show extensive congestion w/o obvious consolidation or focal lesions. Brain: 1500 g. Leptomeninges thin, delicate and congested. Cerebral hemispheres unremarkable w/mild generalized edema w/o evidence of herniation. Microscopic exams of lungs, kidneys, and brain show vascular congestion. No evidence of injury. | Two 8.0 mL aortic blood samples were positive for helium as was one lung sample. No ethanol detected in an 18.0 mL aortic blood sample. |
| 2005 | Man, 31, married, white (non-Hispanic); 16 yr of education | Medical and psychiatric history and acute precipitants of suicide are unclear. | Found with white plastic trash bag around head with tube hooked to helium tank valve at one end and the other end within the plastic bag. Tubing was connected to the helium tank w/duct tape. The bag was secured to neck with bag tie, which was knotted in a bow knot on right anterior neck. A clear vinyl plastic tube extended into the bag through a hole made in the rear of the bag space, held in place by black electrical tape. | Death occurred in motel. Decedent found supine in bed. Medications found at scene were an OTC sleep aid, ibuprofen, and hydrocodone. Receipts from a local hardware store were found for helium tank, tubing, and tape. No suicide note or right-to-die materials were found. | Pathological diagnoses: pulmonary vascular congestion and edema, slight diffuse cerebral swelling, moderate coronary atherosclerosis. R lung: 920 g; L lung: 700 g. Lungs on section demonstrate marked vascular congestion. Bronchial branches contain clear fluid and intra-alveolar edema. Brain: 1500g with mild diffuse swelling and narrowing of sulci. No evidence of acute trauma. | 10 mL aortic blood sample revealed trace levels of cyclobenzaprine and propoxyphene and was positive (0.91 mg/L) for diphenhydramine, and helium. Diphenhydramine was believed to have contributed to the death. No ethanol or organic bases were identified. |
| 2005 | Man, 21, never married, white (non-Hispanic), 12 yr of education | History of symptoms, treatment, and hospitalization for paranoia/suicidal ideation. Not clear whether patient suffered from psychotic illness. | Plastic bag over head with elastic strap securing bag around neck. An empty helium canister found on floor beside decedent. A cylinder of helium and plastic tubing were found in decedent's bedroom closet. | Found in bedroom at parent's home sitting in chair. The following medications were found in home: Trazodone (100mg), Geodon (80mg), Risperdal (3mg), Trileptal (300mg), and Zoloft (50mg). No suicide note left, but insurance policy and will were found on coffee table. | Pathological diagnostic: pulmonary vascular congestion and edema, cerebral edema, and early decompositional changes. R lung: 640 g; L lung: 590 g. Brain: 1,500 g. microscopic lung sections show variable degrees of pulmonary vascular congestion and intra-alveolar hemorrhage. | Post-mortem exam revealed an ethanol level of .40 mg/dL and the presence of helium in 15.0 mL and 5.0 mL aortic blood samples, respectively. |
| 2005 | Man, 39, never married, white (non-Hispanic), 12 yr of education | No history of suicide attempts per family. Little information available about medical or psychiatric history and acute precipitants of suicide. | Found with plastic bag over head secured with a metal clip to hold bag tight around neck. Plastic tubing ran from a nearby helium tank to the back of the plastic bag. Duct tape covered front of bag and had 0.5 cm circular hole in it. Tube was connected to helium tank, which was turned on and near decedent's hand. | Found lying supine in bed at home by mother. No suicide note left. No insurance policy and will were found on coffee table. | Final anatomic diagnostic: congestion of lungs with early pulmonary edema. Brain: 1,325 g. Vessels over right hemisphere congested. R lung: 610 g.; L lung: 560 g Lungs boggy with congestion. Microscopic sections show that alveolar spaces were partially filled with clear edema fluid. | Positive for helium in 4.0 mL subclavian vessel blood sample, but negative for ethanol in 17.0 mL subclavian blood sample. |

(Continued)

Copyright © Lippincott Williams & Wilkins. Unauthorized reproduction of this article is prohibited.

Exhibit 22 Page 99

**TABLE 2.** (Continued)

| Year of Death | Characteristics of Decedent | Medical/Psychiatric History | Helium-Delivery Apparatus | Death Scene Description | Autopsy Findings | Toxicology Exam Findings |
|---|---|---|---|---|---|---|
| 2005 | Man, 34, unmarried, white (non-Hispanic); 9 yr of education | History of alcohol dependence and bipolar disorder. Prior psychiatric treatment for both disorders. Was living in car and taking Zoloft. | Had clear plastic bag over head with tubing connecting it to a helium tank. A velcro closure secured the bag around neck. | Found dead in driver's seat of a car parked in the yard of a relative's house. A picture of his girlfriend was found on dashboard. | Pathological diagnoses: pulmonary edema and vascular congestion; atherosclerotic coronary artery disease, focal, mild to moderate. R lung: 760 g; L lung 820 g. Lungs heavy and congested. Lung sections revealed areas of atelectasis, pulmonary edema, and collections of pigment-laden intra-alveolar macrophages. | 20.0 mL and 6.0 mL aortic blood samples were positive for ethanol (770 mg/dL and 700 mg/dL, respectively. Ethanol was listed as a contributing cause of suicide. |
| 2006 | Woman, 60, never married white (non-Hispanic), 12 yr of education | Obese (5'9", 303 lbs). No medical or psychiatric history information available except that EKG leads were found on right lower leg, left lower leg and left arm. No acute precipitant of suicide were identified | Decedent had clear plastic bag over head with ¼ inch plastic tubing attached to helium tank in back car seat and inside of plastic bag. A tan elastic band was used to secure bag to neck. The plastic tubing was taped to lower margin of plastic bag. | Decedent found in front passenger seat of car in motel parking lot where she had stayed. Letters to different people and "a very organized" suicide note were found in car. Note referred to pgs. 132–137 in Final Exit 3rd edition which describe helium-assisted suicide. Decedent had set e-mail to respond to messages with "Return to Sender due to Suicide." | Pathological diagnoses: Plastic bag over head with evidence of helium inhalation; pulmonary vascular congestion (R lung: 430 g; L lung: 400 g); decomposition. Sectioned lungs showed vascular congestion with patchy intra-alveolar edema. No evidence of acute trauma. | A 20-mL blood sample from pleural cavity was positive for helium and ethanol (40 mg/dl). Elevated BAC may have been partially or totally due to decomposition. |
| 2007 | Man, 41, married (but recently separated from wife), white (non-Hispanic), 14 yr of education | Previously disabled in motor vehicle accident with neck and back injuries. Was reportedly depressed from recent separation from wife and pending sale of home. Wife reported that decedent was taking prescribed antidepressant, Neurontin, Oxycontin and Vicodin. | Clear blue plastic bag covered head and was wrapped with duct tape. Black tubing was connected at one end to the inside of bag and at the older end to a 55lb helium tank used to fill balloons for parties. | Found expired at home sitting in chair in basement. No suicide note left. | No autopsy. | A 13.0 mL subclavian blood sample was negative for ethanol, but positive for helium. |
| 2007 | Man, 45, never married, white (non-Hispanic) | History of alcohol and drug abuse and diabetes. Decedent has been very depressed per family's report. Family noted a history of social, medical and emotional problems. Was taking Coumadin, Clonidine, Aspirin, Verapamil, Atenolol, and Lovastatin. | Clear plastic bag was found over head. Two black tubes led from helium tank into the plastic bag. Had purchased these materials at local hardware store. The helium tank was from a party store balloon-filling kit. | Found sitting in chair in parent's home. Patient was pulseless and not breathing. The book Final Exit was lying open and face down on the bed. A suicide note was left describing how severely depressed the decedent had felt and apologizing for the suicide. | No autopsy, but blue nail beds and burst capillaries in lower legs bilaterally were observed at death scene. | 19.0 mL subclavian blood sample was negative for ethanol and positive for helium. |
| 2008 | Man, 56, married, white (non-Hispanic), 12 yr of education | History of depression and substance abuse. | Decedent had a bag over his head with a tube attached to it and to a helium tank positioned on car passenger seat. | Found in car in garage at home by wife with car running and exhaust piped into the vehicle. A suicide note was found. | No autopsy. | 18.0 mL subclavian blood sample was positive for helium and negative for ethanol. Carbon monoxide detected at <5.0% saturation. |

OTC indicates over-the-counter; BAC, blood alcohol concentration; EKG, electrocardiogram.

© 2010 Lippincott Williams & Wilkins

Copyright © Lippincott Williams & Wilkins. Unauthorized reproduction of this article is prohibited.

Exhibit 22 Page 100

suffocations in the year final exit was published. *Am J Psychiatry*. 1994;151: 1813–1814.

7. Humphry D. *Supplement to Final Exit: The Latest How-to and Why of Euthanasia/Hastened Death*. Junction City, OR: Norris Lane and ERGO; 2000.

8. Humphry D. *Final Exit: The Practicalities of Self-Deliverance and Assisted Suicide for the Dying*. 3rd ed. New York, NY: Delta; 2002.

9. Humphry D. *Final Exit: The Practicalities of Self-deliverance and Assisted Suicide for the Dying*. 3rd ed. Addendum. Junction City, OR: ERGO; 2009.

10. Humphry D. *Final Exit on DVD: The Art of Self-deliverance From a Terminal Illness*. Junction City, OR: ERGO; 2006. ISBN: 978–0–9768283–0–3.

11. Ogden RD, Wooten RH. Asphyxial suicide with helium and a plastic bag. *Am J Forensic Med Pathol*. 2002;23:234–237.

12. Gilson T, Parks BO, Porterfield CM. Suicide with inert gases: Addendum to Final Exit. *Am J Forensic Med Pathol*. 2003;24:306–308.

13. Gallagher KE, Smith DM, Mellen PF. Suicidal asphyxiation by using pure helium gas: case report, review, and discussion of the influence of the internet. *Am J Forensic Med Pathol*. 2003;24:361–363.

14. Auwaeter V, Perdekamp MG, Kempf J, et al. Toxicological analysis after asphyxial suicide with helium and a plastic bag. *Forensic Sci Int*. 2007;170: 139–141.

15. Grassberger M, Krauskopf A. Suicidal asphyxiation with helium: Report of three cases. *Wien Klin Wochenschr*. 2007;119:323–325.

16. Schon CA, Ketterer T. Asphyxial suicide by inhalation of helium inside a plastic bag. *Am J Forensic Med Pathol*. 2007;28:364–367.

17. Bamung SK, Feddersen C. Suicide by inhaling helium inside a plastic bag[In Danish]. *Ugeskr Laeger*. 2004;166:3506–3507.

18. Recupero PR, Harms SE, Noble JM. Googling suicide: suicide information on the internet. *J Clin Psychiatry*. 2008;69:878–888.

19. Tyson AS. Military investigates West Point suicides. *Washington Post*. January 30, 2009.

20. Ward D. Helium in an "exit bag" new choice for suicide: at least 19 people in B.C. have used method since 1999. *Vancouver Sun*. December 8, 2007.

21. Lam A. Asian Americans' rising suicide rates—three students take their lives. *New American Media*. August 13, 2009.

22. Bowers P. Final exit: compassion or assisted suicide? *Time*. March 2, 2009.

23. Disposable helium tank for sale at Amazon.com. Available at: http://www.amazon.com/BuyCostumes-Disposable-Helium-Tank/dp/B000WR8QQG/ref=pd_sbs_hpc_3. Accessed November 6, 2009.

24. Poklis JL, Garside D, Gaffney-Kraft M, et al. A qualitative method for the detection of helium in postmortem blood and tissues. In: Proceedings from the Society of Forensic Toxicologists; October 17–21, 2005; Nashville, TN.

25. Lubell KM, Swahn MH, Crosby AE, et al. Methods of suicide among persons aged 10–19 years—United States, 1992–2001. *MMWR Morb Mortal Weekly Rep*. 2004;53:471–474.

26. Lubell KM, Kegler SR, Crosby AE, et al. Suicide trends among youths and young adults aged 10–24 years—United States, 1990–2004. *MMWR Morb Mortal Weekly Rep*. 2007;56:905–908.

27. Hu G, Wilcox HC, Wissow L, et al. Midlife suicide: an increasing problem in U. S.Whites, 1999–2005. *Am J Prev Med*. 2008;35:589–593.

28. Barber C. Trends and rates in methods of suicide: United States, 1985–2004. Harvard Injury Control Research Center (cbarber@hsph.harvard.edu). Report based on data from the Web-based Injury Statistics and Reporting System (WISQARS), National Center for Injury Prevention and Control, Centers for Disease Control and Prevention, U.S. Vital Statistics. Available at: http://www.cdc.gov/ncipc/wisqars.

29. Gould MS, Marrocco FA, Kleinman MS, et al. Evaluating iatrogenic risk of youth suicide screening programs: a randomized controlled trial. *JAMA*. 2005;293:1635–1643.

30. American Psychiatric Association.Practice guidelines for the assessment and treatment of patients with suicidal behaviors. In: *Practice Guidelines for the Treatment of Psychiatric Disorders Compendium*. 2nd ed. Arlington, VA: American Psychiatric Association; 2004:835–1027.

© 2010 Lippincott Williams & Wilkins

Copyright © Lippincott Williams & Wilkins. Unauthorized reproduction of this article is prohibited.

Exhibit 22 Page 101

men who were relatively young (M age, 41.1; SD, 11.6; range, 21–60; median, 40.0). In 6 of 10 cases, decedents suffered from significant psychiatric dysfunction; in 3 of these 6 cases, psychiatric problems were present comorbidly with substance abuse. Medical histories identified chronic pain, disability, and chronic pain associated with injuries suffered in a motor vehicle accident, and diabetes (with probable coronary artery disease in 3 decedents). One decedent was found with electrocardiogram leads attached to her body, but autopsy and toxicological findings were negative for potential explanations for the death other than helium-assisted suicide. In none of the 10 cases were decedents suffering from terminal illness.

Helium delivery devices were consistent with those recommended in Final Exit (eg, use of T-valves, 2 helium tanks, Velcro and other neck fasteners), and all were associated with use of a plastic bag rather than mask.[8] In 5 cases, a suicide note was found; in 2 cases, a will was left; in 1 case, insurance papers were left; and in 2 cases, right-to-die materials were found.

Autopsies were performed in a majority of cases and typically revealed evidence of pulmonary vascular congestion and mild cerebral edema. Ethanol and diphenhydramine were considered contributing causes of death in 1 case each.

## DISCUSSION

Despite reports identifying a plethora of prosuicide internet sites providing detailed instructions in methods of suicide including helium-assisted asphyxiation,[18] media accounts of helium-assisted suicides,[19–21] and the recent arrests of Final Exit Network members for allegedly assisting in asphyxial suicides involving helium,[22] scientific investigations of such suicides are largely absent from the medical literature. This dearth of information is unfortunate given the tragic consequences of such acts and because it is possible that suicides by the helium method are underestimated and increasingly common for reasons described later in the text.

The methods by which helium-assisted suicides are carried out have been carefully detailed and widely publicized and the approach is promoted as simple, painless, and quick.[8] Materials needed for helium-assisted suicides are easily obtained and inexpensive. One well-known internet vendor currently sells disposable helium tanks for less than $50, and reports that customers who bought helium tanks also often bought the book Final Exit.[23] Unless there is a high index of suspicion for helium involvement in a death, the death may be erroneously attributed to natural causes or underlying illness because standard toxicological assays are unlikely to detect helium and autopsy findings are generally nonspecific.[14,16] Standard toxicological assays using GC/MS employ helium as the carrier gas and therefore cannot detect helium unless another gas (eg, nitrogen) is substituted for the helium. Auwaeter et al[14] and Gallagher et al[13] developed useful methods of collecting, preserving, and analyzing gas samples taken from decedents' for qualitative detection of helium. In all North Carolina cases, helium-delivery devices were found at the death scene, and toxicological testing was conducted in 9 of 10 cases. However, it is possible that an unknown number of such suicides went undetected, if and when helium-delivery devices and plastic bags were removed from the death scene prior to investigation. The author of Final Exit states that a person may choose to leave right-to-die materials to be found to make an ethical statement that they are committing "rational suicide" or, conversely, make plans to have the helium delivery apparatus and plastic bag removed following their death if they prefer to keep the suicidal nature of the death concealed.[8] Toxicological testing for helium has been conducted at the NCOCME in suspected cases since 2003 by a novel testing procedure using a dual cell thermal conductivity detector.[24]

Of particular concern, are recent national reports of notable increases in the prevalence of suicide due to suffocation (a category that includes deaths by plastic bag asphyxiation with or without helium assistance as well as hanging and strangulation) since the 1990s and especially since 2000.[25–27] Such increases have been observed in respondents of widely varying ages, including adolescents, and both genders. Observers have noted that the reasons for these increases are poorly understood, that declining rates of suicide observed in the 1990s have been largely reversed, and that recent increases in suicides due to suffocation account for most of the recent overall increases in rates of suicide.[28] It is possible that greater awareness of the plastic bag asphyxiation method and the enhanced lethality of the method when used with helium may account for the significant increases in suicides due to suffocation reported since 2000.

Given the national growth in adolescent, young adult, and adult suffocation suicides since 2000,[25,26] and relatively young age, psychiatric dysfunction, and absence of terminal illness characteristic of many identified cases, it is possible that many persons committing suicide by the helium method are neither hopelessly nor terminally ill, but rather psychiatrically disordered. Although the author of Final Exit cautions readers to be certain they are hopelessly ill, and not just depressed and to talk to their doctor,[8] depressive illness and substance dependency often impair the very capacities required to make these assessments and undertake these actions.

Prospective studies are needed to better understand the prevalence, incidence, predictors, and characteristics of asphyxial suicides due to helium inhalation. It is important to learn more about decedents' medical and psychiatric histories and the circumstances in which depressed and/or suicidal persons encounter descriptions of the helium method (eg, internet demonstrations of the process). At present, professionals working with persons at risk for suicide should routinely assess whether patients have read or viewed instructional materials describing specific methods of suicide such as helium-assisted plastic bag asphyxiation. Inquiries of this nature do not increase subsequent risk for suicide and can provide critically important information to guide appropriate preventative actions where indicated.[29,30] Medical examiners should also increase their index of suspicion for suicides by asphyxiation associated with helium inhalation. Medical ethicists and the general public may also want to carefully weigh the unintended adverse consequences of widely disseminated suicide methods likely to appeal to some depressed persons (irrespective of their physical health status or age) against the putative benefits associated with making these methods more widely known and available.

## ACKNOWLEDGMENTS

The authors thank P. Barnes, Administrative Services Manager, and other staff of the North Carolina Office of the Chief Medical Examiner for their assistance.

## REFERENCES

1. Humphry D. *Final Exit: The Practicalities of Self-Deliverance and Assisted Suicide for the Dying.* New York, NY: Delta; 1991.
2. Côté R. *In Search of Gentle Death: A Brief History of the NuTech Group.* Mt. Pleasant, SC: Corinthian; 2008.
3. The most memorable books of the last 25 years: 25 books that leave a legacy. April 9, 2007. Available at: http://www.usatoday.com/life/top25-books.htm. Accessed November 6, 2009.
4. Sacks MH, Kemperman I. Final exit as a manual for suicide in depressed patients. *Am J Psychiatry.* 1992;149:842.
5. Marzuk PM, Tardiff K, Hirsch CS, et al. Increase in suicide by asphyxiation in New York City after the publication of final exit. *N Engl J Med.* 1993;329:1508–1510.
6. Marzuk PM, Tardiff K, Leon AC. Increase in fatal suicidal poisonings and

Copyright © Lippincott Williams & Wilkins. Unauthorized reproduction of this article is prohibited.

Exhibit 22 Page 102

**Report on Study of Methods of Execution &
Recommendations for Procedures**

**Submitted by:  Louisiana Department of Public Safety & Corrections**

**February 18, 2015**

House Resolution 142 of the 2014 Regular Legislative Session was enrolled and signed by the Speaker of the House on June 5, 2014 to study and make recommendations relative to the different forms of execution and the methods of execution to determine the best practices for administering the death penalty in the most humane manner.

The Secretary of the Louisiana Department of Public Safety and Corrections, James Le Blanc, chaired this work and held an organizational meeting on July 22, 2014 to organize a study committee to conduct this work.  At that time, he assigned the following individuals to serve on the committee:

Burl Cain, Warden, Louisiana State Penitentiary
William Kline, Executive Counsel, DPS&C Legal Department
Seth Smith, Chief of Operations, DPS&C Office of Adult Services
Stephanie LaMartinere, Assistant Warden, Louisiana State Penitentiary
Bruce Dodd, Deputy Warden, Louisiana State Penitentiary
James Hilburn, Attorney, Shows Cali & Walsh, LLP
Jeff Cody, Attorney, Shows Cali & Walsh, LLP
Angela Whittaker, Executive Mgmt Officer, DPS&C Secretary's Office

The committee met on the following dates:

August 11, 2014:  Planning meeting to develop resource and research needs of the group.

September 2, 2014:  Report and discussion on research findings.

October 31, 2014:  Report and discussion regarding identifying experts and discussion on additional research compiled.

December 4, 2014:  Report and discussion regarding research and protocol options and drafting the required written report.

January 8, 2015:  Review of research and draft report and consensus on recommendations for protocol options.

January 22, 2015:  Review and approval final report.

Exhibit 23 Page 1

**Background:**

Capital punishment, or the death penalty, is a sentence used in the justice process whereby an offender is put to death as punishment for a crime he/she committed. The death penalty in the United States is a legal sentence and states determine whether the death penalty will be used as a form of punishment for crimes committed within their borders.

In Louisiana, the death penalty may be applied in cases involving first degree murder, a violation of La. R.S. 14:30, in circumstances such as:

(1)   The murder was committed during the commission of or attempt of, a specified felony such as aggravated kidnapping, second degree kidnapping, aggravated escape, aggravated arson, aggravated rape, forcible rape, aggravated burglary, armed robbery, assault by drive-by shooting, first degree robbery, second degree robbery, simple robbery, terrorism, cruelty to juveniles, or second degree cruelty to juveniles.

(2)   The murder was committed while the defendant was engaged in "ritualistic acts."

(3)   The murder was committed for pecuniary gain or pursuant to an agreement that the defendant would receive something of value.

(4)   The defendant caused or directed another to commit murder, or the defendant procured the commission of the offense by payment, promise of payment, or anything of pecuniary value.

(5)   The defendant has been convicted of, or committed, a prior murder, a felony involving violence, or other serious felony.

(6)   The capital offense was committed by a person who is incarcerated, has escaped, is on probation, is in jail, or is under a sentence of imprisonment.

(7)   The defendant was a drug dealer or has prior convictions involving the distribution of a controlled substance.

(8)   The victim was under the age of 12 years.

(9)   The victim was 65 years or older.

(10) The victim was a fireman, peace officer, or correctional officer engaged in his lawful duties.

(11) The victim was a witness in a prosecution against the defendant, gave material assistance to the state in any investigation or prosecution of the defendant, or was an eyewitness to a crime alleged to have been committed by the defendant or possessed other material evidence against the defendant.

(12) The murder was especially heinous, atrocious, cruel or depraved (or involved torture).

Before a jury may impose the death penalty it must consider whether there were any mitigating circumstances against imposing the death penalty. Louisiana Code of Criminal Procedure Art. 905.5 provides for the following mitigating circumstances:

(a)   The offender has no significant prior history of criminal activity;

(b)   The offense was committed while the offender was under the influence of extreme mental or emotional disturbance;

(c)   The offense was committed while the offender was under the influence or under the domination of another person;

(d)   The offense was committed under circumstances which the offender reasonably believed to provide a moral justification or extenuation for his conduct;

(e)   At the time of the offense the capacity of the offender to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was impaired as a result of mental disease or defect or intoxication;

(f)   The youth of the offender at the time of the offense;

(g)   The offender was a principal whose participation was relatively minor;

(h)   Any other relevant mitigating circumstance.

Pursuant to La. R.S. 15:569 and 570, every sentence of death executed on or after September 15, 1991, shall be by lethal injection, that is, by the intravenous injection of a substance or substances in a lethal quantity into the body of the offender until such person is dead.

Including Louisiana, there are currently 34 states that authorize the death penalty. Most all of these states have adopted lethal injection as the primary means of implementing the death penalty. While 18 of those states have solely authorized lethal injection as the execution method, the rest of the states that impose the death penalty have also set forth alternative methods of execution such as electrocution, lethal gas, hanging, and the use of firing squads. The methods of execution for each such state are set forth in the chart below.

**Research from Other Capital Punishment States:**

| State | Lethal Injection | Electrocution | Gas Chamber | Hanging | Firing Squad | Methods and Alternatives | Lethal Injection Drugs |
|---|---|---|---|---|---|---|---|
| Alabama | x | x | | | | Lethal injection, unless inmate affirmatively selects electrocution | 500 mg - midazolam hydrochloride; 600 mg - rocuronium bromide; 240 milliequivalents - potassium chloride |
| Arizona | x | | x | | | Lethal injection; inmate sentenced on or before 11/15/92 may choose lethal injection or lethal gas | midazlam/ hydromorphone |
| Arkansas | x | x | | | | Lethal injection, but electrocution if lethal injection declared unconstitutional | Statute specifies a barbituate preceded by a benzodiazepine |
| California | x | | x | | | Lethal gas or lethal injection may be chosen by inmate; if inmate fails to choose either method, then lethal injection | |
| Colorado | x | | | | | Lethal injection | Statute specifies sodium thiopental or equivalent |
| Connecticut | x | | | | | Lethal injection | |
| Delaware | x | | | | | Lethal injection | |
| Florida | x | x | | | | Lethal injection, unless inmate affirmatively selects electrocution; if both deemed unconstitutional, then any constitutional method | |
| Georgia | x | | | | | Lethal injection | |
| Idaho | x | | | | | Lethal injection | |
| Indiana | x | | | | | Lethal injection | |
| Kansas | x | | | | | Lethal injection | |
| Kentucky | x | x | | | | Lethal injection; inmates sentenced on or before 3/31/98 may choose lethal injection or electrocution | |

Study Response to HR 142 of the Louisiana 2014 Regular Legislative Session
P a g e | 5

Exhibit 23 Page 4

| State | Lethal Injection | Electrocution | Gas Chamber | Hanging | Firing Squad | Methods and Alternatives | Lethal Injection Drugs |
|---|---|---|---|---|---|---|---|
| Louisiana | x | | | | | Lethal injection | midazlam/hydromorphone |
| Mississippi | x | | | | | Lethal injection | Statute specifies an ultra short-acting barbituate in combination with a paralytic agent |
| Missouri | x | | x | | | Lethal gas or lethal injection | |
| Montana | x | | | | | Lethal injection | Statute specifies an ultra-fast-acting barbituate in combination with a chemical paralytic agent |
| Nebraska | x | | | | | Lethal injection | |
| Nevada | x | | | | | Lethal injection | |
| New Hampshire | x | | | x | | Lethal injection; but may be by hanging if lethal injection deemed "impractical" | Statute specifies an ultrashort-acting barbituate in combination with a chemical paralytic agent |
| New Mexico | x | | | | | Lethal injection, but only for crimes committed prior to July 1, 2009; otherwise, capital punishment repealed | |
| North Carolina | x | | | | | Lethal injection | |
| Ohio | x | | | | | Lethal injection | midazlam/ hydromorphone |
| Oklahoma | x | x | | | x | Lethal injection; but electrocution if lethal injection held unconstitutional; if both lethal injection and electrocution held unconstitutional, then firing squad | midazlam/ hydromorphone |

Study Response to HR 142 of the Louisiana 2014 Regular Legislative Session

P a g e | 6

Exhibit 23 Page 5

| State | Lethal Injection | Electrocution | Gas Chamber | Hanging | Firing Squad | Methods and Alternatives | Lethal Injection Drugs |
|-------|------------------|---------------|-------------|---------|--------------|--------------------------|------------------------|
| Oregon | x | | | | | Lethal injection | Statute specifies an ultra-short-acting barbituate in combination with a chemical paralytic agent and potassium chloride |
| Pennsylvania | x | | | | | Lethal injection | Statute specifies an ultrashort-acting barbituate in combination with chemical paralytic agents |
| South Carolina | x | x | | | | Electrocution, but inmate may choose lethal injection; if fails to choose either, then lethal injection; but if convicted prior to date of statute, then electrocution unless chooses lethal injection; if lethal injection held unconstitutional, then electrocution | |
| South Dakota | x | | | | | Lethal injection | |
| Tennessee | x | x | | | | Lethal injection; but offender, whose capital offense occurred prior to 1/1/99, may choose electrocution;  if those methods deemed unconstitutional, then use any constitutional method | |
| Texas | x | | | | | Lethal injection | |
| Utah | x | | | | x | Lethal injection; but firing squad if court determines inmate has a right to this alternative;  if lethal injection is held unconstitutional, then firing squad | Statute specifies that one of the intravenous injections shall be sodium thipoental or equivalent |

Study Response to HR 142 of the Louisiana 2014 Regular Legislative Session

P a g e | 7

Exhibit 23 Page 6

| State | Lethal Injection | Electrocution | Gas Chamber | Hanging | Firing Squad | Methods and Alternatives | Lethal Injection Drugs |
|---|---|---|---|---|---|---|---|
| Virginia | x | x | | | | Inmate may choose lethal injection or electrocution; if refuses to choose, then lethal injection | |
| Washington | x | | | x | | Lethal injection, unless inmate chooses hanging | |
| Wyoming | x | | x | | * | Lethal injection; if lethal injection is held unconstitutional, then lethal gas.<br><br>*Wyoming Senate recently approved legislation that allows for the use of a firing squad. Concurrence is pending by the House. | Statute specifies an ultra-short-acting barbituate, alone or in combination with a chemical paralytic agent and potassium chloride |

It may be noted that the basis for utilizing a particular method of execution is not necessarily uniform among the states that offer more than one execution method. In some states, lethal injection is the primary execution method unless it should be declared unconstitutional, in which case the statute next provides for an alternate method, or a series of alternate methods in the event a successive method should be deemed unconstitutional. In other states, the condemned inmate is actually given a choice between lethal injection and another alternate method of execution.

In Louisiana, between 1919 and May 21, 1957, executions were conducted by the local parish law authorities. Prior to August 6, 1941, the penalty in Louisiana was carried out by hanging. The last hanging in Louisiana was on March 7, 1941. Between August 6, 1941 and June 9, 1961, executions were performed by electrocution in the electric chair. Between 1941 and 1957, a portable electric chair was transported from parish to parish in order that the death penalty could be administered in the parish where the crime was committed. After 1957, the State became responsible for administering the death penalty. Prior the reinstatement of capital punishment, the last death in the electric chair was on June 9, 1961.

In 1967, there was a rising tide of litigation against the death penalty. Federal courts suspended all executions pending a final decision by the U.S. Supreme Court. In 1972, the U.S. Supreme Court struck down all capital punishment laws as unconstitutional. All individuals under death sentenced at that time were re-sentenced to life in prison.

Effective October 1, 1976, the new Louisiana death penalty statute was adopted.  The state's death penalty law was again revised in 1978, specifying that the sentencing judge must sign the death warrant rather than the governor.  Capital punishment was reinstated in Louisiana on June 29, 1979.

In 1990, the legislature approved the use of lethal injection for those sentenced after January 1, 1991.  In 1991, the legislature provided that every death sentence executed after September 15, 1991 would be by lethal injection.  Since the reinstatement of the death penalty in 1979, there have been 28 executions performed, 20 by electrocution and 8 by lethal injection. The last one was on January 7, 2010.

The death penalty has risen to the forefront of national headlines recently due to the shortage of drugs historically used in the lethal injection process.  States continuing to carry out executions have been forced to obtain drugs from other sources or substitute drugs normally used in the process.  The alternatives have provided inmates with new grounds for appeal as they request transparency regarding execution methods.

To date, Louisiana has 85 offenders in custody who have been sentenced to death.

**Study:**

This study was conducted by reviewing available scientific, technical and safety literature related to various methods of execution.  It is not intended to express an opinion about Louisiana's law for administration of capital punishment.

**Lethal Injection Protocols:**

Through February 2011, Louisiana had in place a three drug protocol which included 3 gm sodium thiopental, 50 mg pancuronium bromide and 240 meq potassium chloride.

In February 2011, after lawsuits, international trade restrictions and raw materials shortages complicated the market for drugs used in executions and the lack of availability of sodium thiopental, a decision was made to modify the three 3 drug protocol to use pentobarbital in lieu of sodium thiopental.  This decision was based on experiences in Oklahoma using pentobarbital and the use of it being upheld in the United State District Court in the Western District of Oklahoma.  Base on the change, the protocol then called for 1 gm of Pentobarbitol, 50 mg pancuronium bromide and 240 meq potassium chloride.

In January 2014, the protocol was again updated to provide two options for lethal injection.  They are:

A)  5 gm of Pentobarbital or
B)  10 mg of Midazolam and 40 mg of Hydromorphone

**Recommended Protocols:**

**A. Lethal Injection**

We are recommending for consideration a lethal injection protocol that calls for the use of a one drug protocol utilizing 5 gm of Pentobarbital injected intravenously (IVP). This protocol has been used in numerous states, including Texas, as a one drug method. The availability of this drug to Departments of Corrections is however severely hampered and there could be issues obtaining a supply of Pentobarbitol or any other drug to be used for lethal injection. Drug suppliers have refused to sell drugs to the prison systems for use in executions and other entities have refused to sell to Louisiana DOC. It is this committees understanding that suppliers have threatened providers with no longer supplying the drugs to their businesses if they in turn sell to correctional agencies for the purpose of lethal injection. As a result, suppliers fear the backlash of bad publicity to their businesses if involved in providing the drugs to correctional agencies.

This committee also recommends reconsideration of a bill that combines the language from the original and amended versions of House Bill 328 of the 2014 Legislative Session authored by Representative Lopinto. The attached draft legislation (Appendix A) amending LA R.S. 15:569 outlines what is needed to allow for the recommendations within this report and will provide for the confidentiality of information related to the execution of a death sentence. The amended version of the prior bill stated that "The name, address, qualifications, and other identifying information of any person or entity that manufactures, compounds, prescribed, dispenses, supplies or administers the drugs or supplies utilized in an execution shall be confidential, shall not be subject to disclosure, and shall not be admissible as evidence or discoverable in any action of an kind in any court or before any tribunal, board, agency, or person. The same confidentiality and protection shall also apply to any person who participates in an execution or performs any ancillary function related to an execution and shall include information contained in any department records, including electronic records, that would identify any such person." Such legislation would provide some security to those tasked to and involved in carrying out the state's order to execute an individual as punishment for a qualifying crime.

It should also be noted that the U.S. Supreme Court will consider in April whether a multi-drug protocol used in recent lethal injections in other states violates the Constitution with regard to cruel and unusual punishment.

**B. Induced Hypoxia via Nitrogen**

It is the recommendation of this study group that hypoxia induced by the inhalation of nitrogen be considered for adoption as an alternative method of administering capital punishment in the State of Louisiana.

It is important to note that the recommendation would induce hypoxia, which is a deficiency of oxygen reaching the tissues of the body. In nitrogen induced hypoxia, there is no buildup of carbon dioxide in the bloodstream so the subject passes out when the blood oxygen falls too low. The research reviewed suggests that this method would be the most humane method and would not result in discomfort or cruel and unusual punishment to the subject.

Though the exact protocol and nitrogen delivery device have not been finalized, it has been determined that a Gas Chamber would not be used. Options for the nitrogen delivery device include a mask or a device similar to an oxygen tent house (small clear oxygen tent covering only the head and neck area). Research as to the best method of delivery is ongoing.

Oklahoma has recently filed similar legislation to allow for induced hypoxia (refer to Appendix B). Also, you will find attached the Executive Summary (Appendix C) of the research conducted in Oklahoma that supports this method as a humane method which does not require the assistance of licensed medical professionals. We have also attached the documents (Appendix D) which make up the research used in Oklahoma by this committee in developing this recommendation. This method is believed to be simple to administer and nitrogen is readily available.

**Conclusion:**

This committee submits this study response to House Resolution 142 of the 2014 Regular Legislative Session to make recommendations to consider relative to the different forms of execution and the methods of execution upon agreement that the above considerations represent the best practices for administering the death penalty in the most humane manner. There are two sides to the debate on the death penalty. Proponents believe that the death penalty reduces crime and provides safe communities, while also honoring the victim and those left behind who grieve a loss. Opponents believe that the cost of capital punishment doesn't justify the outcome, that it does not deter crime, and that there are social injustices that are not addressed that make justice system inequitable. As a whole, this committee takes no stand on either side of this debate, but submits this response based on the request for this study and the research and materials available to the group.

We close reminding readers that many are directly impacted by the process of capital punishment: the victim, the victim's friends and family; law enforcement; the judiciary, the prosecutor, the defense attorney, the jurors, the public, the offender, the offender's family, and the staff tasked to carry out the protocol, to name just a few. We understand that the decision to act on these recommendations for consideration is an enormous task before you that cannot be taken lightly. We trust that we have provided the information you needed to consider Louisiana's options.

Exhibit 23 Page 10

**Amendment to LSA-R.S. 15:569**

# Appendix A

\*\*Delete current Sections A and B; rewrite statute to read as follows:

Section 1.  R.S. 15:569 is hereby amended to read as follows:

§569. Place for execution of death sentence; manner of execution; confidentiality

Every sentence of death executed in this state on or after August 1, 2015, shall be conducted by either of the following methods:

(1) Lethal injection, which is the intravenous injection of a substance or substances in a lethal quantity into the body of a person convicted until such person is dead. Execution by lethal injection shall be permitted in accordance with procedures developed by the department.

(2) Induced hypoxia via nitrogen or an inert gas, which is the administration of gas in a lethal quantity upon the body of a person convicted until such person is dead. Execution by nitrogen or inert gas shall be permitted in accordance with procedures developed by the department.

A. The method of execution shall be chosen by the secretary of the department based upon the availability of the department to administer the lethal injection or induced hypoxia.

B. Every sentence of death imposed in this state shall be executed at the Louisiana State Penitentiary at Angola.  Every execution shall be made in a room entirely cut off from view of all except those permitted by law to be in that room.

C. No licensed health care professional shall be compelled to administer the lethal injection or induced hypoxia.

D. The name, address, qualifications, and other indentifying information of any person or entity that manufactures, compounds, prescribes, dispenses, supplies, or administers the drugs or supplies utilized in an execution shall be confidential, shall not be subject to disclosure, and shall not be admissible as evidence or discoverable in any action of any kind in any court or before any tribunal, board, agency, or person.  The same confidentiality and protection shall also apply to any person who participates in an execution or performs any ancillary function related to an execution and shall include information contained in any department records, including electronic records, that would identify any such person.

E. The provisions of the Administrative Procedure Act, R.S. 49:950, et seq., shall not apply to the procedures and policies concerning the process for implementing a sentence of death.

Exhibit 23 Page 11

# Appendix B

```
1              STATE OF OKLAHOMA

2        1st Session of the 55th Legislature (2015)

3   HOUSE BILL 1879                    By: Christian

4

5

6                        AS INTRODUCED

7        An Act relating to criminal procedure; amending 22
         O.S. 2011, Section 1014, which relates to the manner
8        of inflicting punishment of death; providing
         alternative method for inflicting punishment of
9        death; and providing an effective date.

10

11

12  BE IT ENACTED BY THE PEOPLE OF THE STATE OF OKLAHOMA:

13      SECTION 1.    AMENDATORY    22 O.S. 2011, Section 1014, is

14  amended to read as follows:

15      Section 1014.  A.  The punishment of death shall be carried out

16  by the administration of a lethal quantity of a drug or drugs until

17  death is pronounced by a licensed physician according to accepted

18  standards of medical practice.

19      B.  If the execution of the sentence of death as provided in

20  subsection A of this section is held unconstitutional by an

21  appellate court of competent jurisdiction or is otherwise

22  unavailable, then the sentence of death shall be carried out by

23  nitrogen hypoxia.

24
```

1    C.  If the execution of the sentence of death as provided in

2    ~~subsection~~ subsections A and B of this section is held

3    unconstitutional by an appellate court of competent jurisdiction or

4    is otherwise unavailable, then the sentence of death shall be

5    carried out by electrocution.

6    ~~C.~~ D.  If the execution of the sentence of death as provided in

7    subsections A ~~and~~, B and C of this section is held unconstitutional

8    by an appellate court of competent jurisdiction or is otherwise

9    unavailable, then the sentence of death shall be carried out by

10   firing squad.

11   SECTION 2.  This act shall become effective November 1, 2015.

12

13   55-1-6354    GRS    01/20/15

14

15

16

17

18

19

20

21

22

23

24

# Execution by gas gets panel flak

JOHN MORITZ
ARKANSAS DEMOCRAT-GAZETTE

An 11-year hiatus in executions in Arkansas led one lawmaker to propose studying the method of gas asphyxiation, but her proposal was criticized Monday over fears that it would only add to the state's legal burden of defending death-penalty laws.

A self-described opponent of the death penalty, Rep. Mary Broadaway, D-Paragould, proposed that the House Judiciary Committee commission a study on the "hypoxia" method of death, saying it is the responsibility of the state to determine "the least painful solution" if it wants to conduct executions.

See **EXECUTION**, Page 5A

Exhibit 24 Page 1

# Execution

● Continued from Page 1A

There are 34 men on Arkansas' death row. Lethal injection is the method currently mandated in state law, but the state has not executed anyone since 2005, in part because of legal challenges and difficulty obtaining drugs.

Hypoxia executions would be conducted using nitrogen or another inert gas devoid of oxygen to asphyxiate the condemned. The method is different from the traditional gas chamber, which uses cyanide or another gas to poison the prisoner.

According to Andrew Fulkerson of Paragould, a retired prosecutor and judge who studied the hypoxia method and approached Broadway about its use in Arkansas, the method has the potential to be less painful than lethal injection.

Oklahoma is the only state to have legalized hypoxia executions, approving the practice last year after a botched lethal injection and a nationwide shortage of execution drugs. A spokesman with Oklahoma's Department of Corrections said nitrogen hypoxia has not yet been put to use and that there is no approved protocol for how it would be carried out.

"This is not a referendum on the death penalty; this is about Arkansas having chosen to have the death penalty and having problems getting the drugs," Broadway said.

Broadway's proposal came days after U.S. Supreme Court Justice Samuel Alito denied a request by a group of Arkansas' death-row inmates for more time to file their appeal in their challenge to the execution statute. However, Jeff Rosenzweig, a lawyer for the prisoners, repeated Monday his earlier assurances that he would file their case before the Oct. 19 due date.

The prisoners allege their rights under the U.S. and Arkansas constitutions are violated by a provision of a state law, passed in 2015, that exempts the suppliers of execution drugs from public disclosure. Eight of nine inmates involved in the lawsuit have had their executions scheduled but placed on hold as they mount their appeal.

In recent court filings, Attorney General Leslie Rutledge's office has cast the prisoners' requests for more time as attempts to push the lawsuit past January, when the state's supply of potassium chloride — one of the three execution drugs — expires.

Because the current three-drug-cocktail method of execution has been declared constitutional by the state Supreme Court, Rutledge's legislative director, Cory Cox, told the Judiciary Committee on Monday that the state should not look at approving more methods of execution that could prompt another lawsuit.

Although he said the attorney general's office wouldn't object to a study, he asked that lawmakers hold off on taking action on any conclusions that might be made.

"We would caution as attorneys for the state anything that might look as throwing doubt at what has been declared constitutional by the state Supreme Court," Cox said.

At the request of the committee chairman, Rep. Matthew Shepherd, R-El Dorado, Broadway agreed to withdraw her request for the study. Even so, Fulkerson was called to testify before lawmakers.

Broadway told reporters after the meeting that her proposal was not a "deliberate" attempt to authorize a new way to execute the inmates, though she said it made sense to have a backup. Broadway added that while she is not seeking re-election next month, she will support any attempt to raise the issue during the next legislative session, which begins in January.

"If we want to stick our heads in the sand, and we don't want to look at anything until we are proven that [the current law] is an unconstitutional method which is simply preventing us from implementing our death penalty. ... I think we're being very short-sighted," Broadway said during the meeting.

Oklahoma was the first state to develop the three-drug lethal-injection protocol in the 1970s, and it soon became the most popular form of lethal injections. However, Fulkerson said in his testimony that Oklahoma failed to research or consider the method, which led to trouble obtaining drugs and a botched execution in 2014.

Recent botched executions in several states have prompted questions about the ethics of the execution method and caused states like Arkansas to clamp down on disclosing the source of the drugs.

"[Oklahoma] also introduced hypoxia with a similar lack of in-depth study on the issue, so I would encourage [Arkansas] to do that," Fulkerson said.

A spokesman for the Arkansas Department of Correction said in an email that the state never used the gas chamber method of execution. Before enacting lethal injection, the state used the electric chair, which remains the legal alternative if lethal injection is invalidated in court.

Before Fulkerson's testimony, Rep. Laurie Rushing, R-Hot Springs, questioned whether it was necessary to find the most humane method of execution.

"If you've ever had a child that was murdered, have you ever had a child that was raped, have you ever had a child that was left out, just left out to suffer?" Rushing said. "If you have, then you would understand why even if it's in the least-humane way, and this way may be more humane, but we have people right now that have done those crimes that need to be punished instead of wasting taxpayer money."

In a text sent later Monday, Rushing said she was "sticking up" for her colleague, Rep. Rebecca Petty, R-Rogers, whose daughter Andi Brewer was kidnapped and killed in 1999 by a man who now sits on death row.

"I don't think it is appropriate to ask me what my personal experiences are with regard to having a child that's been murdered," Broadway responded. She said adopting a new method would allow the state to carry out executions if the current law is declared unconstitutional or the state is unable to replace the drugs that expire next year.

The eight inmates whose executions are on hold are Stacey Johnson, Jason McGehee, Terrick Nooner, Don Davis, Bruce Earl Ward, Marcel Williams, Jack Jones Jr. and Kenneth Williams. A ninth death-row inmate, Ledell Lee, is involved in the case, but his execution has not been set.

If the prisoners file their appeal on time, the stay on their executions will remain in place as long as the U.S. Supreme Court is considering their case.

Exhibit 24 Page 2

Exhibit 10



# Midazolam
## Injection, USP

Rx only

**DESCRIPTION**

**CLINICAL PHARMACOLOGY**





Exhibit 25 Page 1

Exhibit 10

Exhibit 25 Page 2

Exhibit 10

**INDICATIONS AND USAGE**

**CONTRAINDICATIONS**

**WARNINGS**

**PRECAUTIONS**

Exhibit 25 Page 3

Exhibit 10

Exhibit 25 Page 4

Exhibit 10

Exhibit 25 Page 5

Exhibit 10



Exhibit 25 Page 6

Exhibit 10

Exhibit 25 Page 7

Exhibit 10

Parenteral drug products should be inspected visually for particulate matter and discoloration prior to administration, whenever solution and container permit.

**HOW SUPPLIED**

Midazolam Injection, USP is available in the following:

1 mg/mL midazolam hydrochloride equivalent to 1 mg/mL midazolam
   2 mL Vial packaged in 10s 
   5 mL Vial packaged in 10s
   10 mL Vial packaged in 10s

5 mg/mL midazolam hydrochloride equivalent to 5 mg/mL midazolam
   1 mL Vial packaged in 10s
   2 mL Vial packaged in 10s
   10 mL Vial packaged in 10s

**STORAGE**

Store at 15°-30°C (59°-77°F), excursions permitted to 15°-30°C (59°-86°F) [See USP Controlled Room Temperature].

Exhibit 25 Page 8

# State hunting for volunteers to witness April's 8 executions

**JEANNIE ROBERTS**
ARKANSAS DEMOCRAT-GAZETTE

A shortage of required citizen witnesses to watch eight lethal injections over a 10-day period next month prompted the state prison director Tuesday to call on Rotary Club members to volunteer.

Citizen witnesses are there

**PANEL RATS** down execution curbs. Page 7A.

to verify that the individual executions are carried out according to law. A volunteer must be at least 21 years old, an Arkansas resident, have no felony criminal history and

have no connection to the inmate or to the victim.

"The last time these were set, we actually did not have enough people volunteer," Department of Correction Director Wendy Kelley told Little Rock Rotary Club 99 members. "You seem to be a group that does not have job-

ny backgrounds and are over 21. So if you're interested in serving in that area, in this arduous role, just call my office."

The eight executions are scheduled two at a time beginning April 17 and ending April 27.

Department of Correction spokesman Solomon Graves

said he does not have a current count on the number of citizen witnesses who have signed up for the role. Kelley is making informal inquiries to find more volunteers, he said.

Depending on the response received, further re-

See **PRISON**, Page 2A

Exhibit 26 Page 1

# Prison

● Continued from Page 1A

cruitment may not be necessary," Graves said.

The state's death penalty law, A.C.A. 16-90-502, Section 3, requires that the prison director procure no fewer than six and no more than 12 citizen witnesses for each execution. Kelley must determine that witnesses meet the requirements and that they do not present a security risk.

Graves said that while the legal requirement pertains to each individual execution, "nothing prohibits a witness from service during multiple executions."

Judd Deere, spokesman for Attorney General Leslie Rutledge, said he could not speculate about the impact on the execution schedule if a sufficient number of citizen witnesses can't be found.

As the execution day approaches, "the attorney general will work in consultation with the governor and the Department of Correction director to make sure the law is followed as far as executions being carried out," Deere said.

Graves would not say whether the lack of witnesses would halt or postpone the executions, only that Kelley would "continue her informal recruitment efforts."

Finding volunteers among members of the Little Rock Rotary Club 99 may be difficult, said Bill Booker, acting president of the club.

"What I suspect is that some people might support the death penalty, but when it comes to witnessing something like that, it's a different story," Booker said Tuesday. "It may cause emotional trauma for quite a while. It would be one of the most significant things you'll ever see in your life."

Booker, a funeral director at Roller Funeral Home in Little Rock, said he will not volunteer for the task.

"It's a lot different to be involved after the death has occurred," Booker said, adding that he vividly remembers stopping to help at the scene of a fatal traffic accident 40 years ago and helping a young man as he was dying.

Viewing an execution would be too much for him, he said.

"At this point in my life, I don't know if I'd want to risk being traumatized by it," Booker said. "That doesn't mean that I oppose the death penalty."

Rotarian Charlotte Gadberry said she has no interest in volunteering as a citizen witness.

"I can't imagine she [Kelley] will get a lot of volunteers," Gadberry said. "I don't think I could handle it. I'm not real sure how I feel about the death penalty, but it seems like there should be a better way of treating our fellow man."

Rotarian Karen Fetzer said she would not witness an execution but that Kelley may find some volunteers in the Rotary Club 99 crowd.

"It's just a personal preference for me," Fetzer said. "But there are others in our population who may be up for it."

None of the handful of Arkansas residents interviewed Tuesday by the Democrat-Gazette said they would volunteer for the assignment.

Charles Moore of Camden, who served two tours during the Vietnam War, said he's seen enough death in his lifetime.

"I stacked bodies on top of each other in Vietnam," said Moore, a retired disabled veteran who operates the Camden nonprofit children's foundation Planting A Seed. "I don't believe in an eye for an eye."

The subject spurred an argument between Jayme Hickman of Little Rock and her mother, Linda Fitzhugh, of Sheridan as they were sitting on a hill in the River Market District in Little Rock watching Hickman's two children play.

"No," Hickman said, shaking her head. "I don't agree with killing a person. Both families lose in that situation."

Fitzhugh interrupted by directing Hickman's gaze to the two children.

"What would you do if they hurt your daughters? They should execute them," Fitzhugh said loudly. "We don't need to be taking care of them with taxpayers' money."

In the end, Fitzhugh admitted that she couldn't bring herself to witness an execution.

Betty Fernau of Conway, who has officiated at weddings in prison, suggested a solution to the problem.

"I've heard jury duty can be traumatizing, depending on the case," Fernau said. "It seems like this is part of our judicial system. Finding witnesses should work the same way as calling jurors to a trial.

"If I were called to witness, I would see it as my duty and I would appear. But I would not volunteer."

Graves said anyone interested in volunteering should contact Kelley in writing at P.O. Box 8707, Pine Bluff, Ark. 71611.

The pace of the scheduled executions — prompted by the fact that midazolam, one of the three lethal-injection drugs, will expire at the end of April — is unprecedented not only for the state, but for the nation.

If the eight executions are carried out next month, Arkansas will be the first state to execute that many inmates in that compressed of a timeline since 1976 — the year the U.S. Supreme Court reinstated the death penalty.

Arkansas has executed 27 inmates since 1976. The quickest pace for executions was three in one day on Aug. 3, 1994, and Jan. 8, 1997.

Department of Correction data show that 189 men and one woman have been executed in the state since 1915, when executions first began being tracked.

During that time, the most inmates executed in one year in Arkansas was 10 in 1926 and 1930. The most executed within close proximity on the calendar was four in one day on Feb. 12, 1926, and Nov. 14, 1930. There were four executions in the month of October 1959 and the month of May 1960.

Kelley said Tuesday that the close proximity of the eight execution dates will not affect the department's readiness for the lethal injections.

"The staff will be prepared," Kelley said. "We will be doing practice rounds and having lots of meetings. The protocols are confidential, but we will be prepared. We want everything to go as smoothly as possible for the inmate as well as the staff in the room and the witnesses."

With the execution dates fast approaching, the atmosphere at the Varner Unit's Supermax — home to 34 male death-row inmates — is somber, Kelley said.

"I don't think the eight executions in 10 days has anything to do with it," Kelley said. "I think the fact that an execution is set for any of them would make it somber back there."

No extra security has been assigned to the unit, Kelley said. When the proclamation from Gov. Asa Hutchinson setting the execution dates was released in late February, each of the inmates was seen in private. Prison chaplains have made repeated rounds on death row, helping each inmate determine whether he wants a spiritual adviser and, if so, assisting in appointing one.

"I've been down there since the date was set," Kelley said. "It doesn't have anything to do with the number of inmates being executed. It's just part of the process."

The last inmate to be executed in the state was Eric Nance on Nov. 29, 2005. The state has not put anyone to death since then because of legal challenges to the state's death penalty process and a federal lawsuit opposing the use of the drug midazolam. Death penalty opponents claim that the drug does not induce a complete level of unconsciousness, which allows the inmate to feel pain.

On Monday, attorneys for nine death-row inmates — including the eight scheduled to die next month — filed a petition for a rehearing with the U.S. Supreme Court. The argument is that the two executions at a time within the 10-day time frame is "truly extraordinary" and presents substantial new ground for considering the prisoners' case.

"Executing eight men in ten days is far outside the bounds of what contemporary society finds acceptable," the petition read.

According to the governor's proclamations, the executions are scheduled to be carried out as follows:

■ Don Davis and Bruce Earl Ward, April 17.
■ Ledelle Lee and Stacey Johnson, April 20.
■ Marcell Williams and Jack Jones Jr., April 24.
■ Jason McGehee and Kenneth Williams, April 27.

Exhibit 26 Page 2