```
 1              IN THE UNITED STATES DISTRICT COURT
                   EASTERN DISTRICT OF ARKANSAS
 2                        WESTERN DIVISION

 3    JASON MCGEHEE, STACEY
      JOHNSON, MARCEL WILLIAMS,        No. 4:17CV00179-KGB
 4    KENNETH WILLIAMS, BRUCE WARD,
      LEDELL LEE, JACK JONES, DON
 5    DAVIS and TERRICK NOONER,

 6                     Plaintiffs,     Monday, April 10, 2017
                                       Little Rock, Arkansas
 7    v.                               8:38 a.m.

 8    ASA HUTCHINSON, Governor of
      the State of Arkansas, in his
 9    official capacity; and WENDY
      KELLEY, Director, Arkansas
10    Department of Correction, in
      her official capacity,
11
                       Defendants.
12
         TRANSCRIPT OF HEARING ON MOTION FOR PRELIMINARY INJUNCTION
13                            VOLUME 1
              BEFORE THE HONORABLE KRISTINE G. BAKER,
14                 UNITED STATES DISTRICT JUDGE

15    APPEARANCES:

16    On Behalf of Plaintiffs McGehee, M. Williams, Ward, Davis and
      Nooner:
17
           MR. JOHN CHARLES WILLIAMS, Assistant Federal Defender
18         MR. SCOTT W. BRADEN, Assistant Federal Defender
           MS. JAMIE GIANI, Assistant Federal Defender
19         MS. JULIE VANDIVER, Assistant Federal Defender
             Federal Public Defenders Office
20           1401 West Capitol Avenue, Suite 490
             Little Rock, Arkansas  72201
21

22    On Behalf of Plaintiff Davis:

23         MS. DEBORAH RUTH SALLINGS, Attorney at Law
             35715 Sample Road
24           Roland, Arkansas  72135

25    [APPEARANCES CONTINUED ON NEXT PAGE]
```

1    [APPEARANCES CONTINUED]

2

     On Behalf of Plaintiffs Johnson, K. Williams and Jones:

3

         MR. JEFFREY M. ROSENZWEIG, Attorney at Law
4          300 Spring Building, Suite 310
           Little Rock, Arkansas  72201-2421

5

6    On Behalf of Plaintiff Lee:

7        MR. LEE DEKEN SHORT, Attorney at Law
           Short Law Firm
8          425 West Broadway, Suite A
           North Little Rock, Arkansas  72114

9

10

11   On Behalf of Defendants:

12       MR. LEE RUDOFSKY, Solicitor General
         MS. CHRISTINE A. CRYER, Assistant Attorney General
13       MS. KATINA RENE HODGE, Assistant Attorney General
         MS. JENNIFER L. MERRITT, Assistant Attorney General
14       MR. COLIN R. JORGENSEN, Assistant Attorney General
           Arkansas Attorney General's Office
15         323 Center Street, Suite 200
           Little Rock, Arkansas  72201-2610

16

17

18

19

20

21

22

23

24

25       Proceedings reported by machine stenography; transcript
     prepared utilizing computer-aided transcription.

1
2
3                  I N D E X (Volume 1 - April 10, 2017)

WITNESSES
FOR THE PLAINTIFFS:    DIRECT    CROSS    REDIRECT    RECROSS

4   Joel Bruce Zivot          13
    Jennie Lancaster          93       123       134        136
5   Jim Hilkey               136       161       171        177
    Carol Wright             178       202       209        211
6   Joseph Cummings          212       216
7
    EXHIBITS RECEIVED:
8
    Plaintiffs' 1.....................................14
9   Plaintiffs' 23....................................51
    Plaintiffs' 19....................................52
10  Plaintiffs' 25....................................64
    Plaintiffs' 26....................................64
11  Plaintiffs' 11 through 15.........................72
    Plaintiffs' 2....................................139
12
    Defendants' 29..................................219
13
14
15
16
17
18
19
20
21
22
23
24
25

P R O C E E D I N G S

1

2          THE COURT:  Good morning.  We are here this morning on

3    the record in Case No. 4:17CV179, McGehee versus Hutchinson.

4          Let's go ahead, for the record, if y'all would state your

5    names and introduce the folks who are with you at the table.

6          Counsel for plaintiffs -- do you want to start, Mr. Short?

7    I'm not sure who is directing traffic over there.

8          MR. WILLIAMS:  My name is John Williams for the

9    plaintiffs, Your Honor.  With me I have Jamie Giani from the

10   Federal Public Defender's Office; Julie Vandiver from the

11   Federal Public Defender's Office; Scott Braden, the Capital

12   Habeas Unit chief; Deb Sallings, who represents Mr. Davis; Jeff

13   Rosenzweig, who represents Mr. Kenneth Williams.

14          MR. ROSENZWEIG:  Jack Jones and Stacey Johnson.

15          MR. WILLIAMS:  Ledell Lee, who represents -- I'm

16   sorry.  Lee Short, who represents Ledell Lee.  And the Federal

17   Public Defender's Office represents Jason McGehee, Marcel

18   Williams and Bruce Ward and Terrick Nooner and Don Davis.

19          MR. BRADEN:  If I might, we have Sharon Robinson, who

20   is with the Federal Public Defender's Office, who is helping us

21   with our computer stuff and exhibits if you don't mind.

22          THE COURT:  I don't mind.  That's fine.  Thank you.

23      Counsel for defendants.

24          MS. MERRITT:  Good morning, Your Honor.  My name is

25   Jennifer Merritt.  I represent the State of Arkansas; Governor

Elaine Hinson, RMR, CRR, CCR
United States Court Reporter

1   Asa Hutchinson; and Wendy Kelley, director of the Arkansas

2   Department of Correction.  With me today is Arkansas Solicitor

3   General Lee Rudofsky.  I have Senior Assistant Attorney General

4   Christine Cryer with me today.  I have Assistant Attorney

5   General KaTina Hodge and Senior Assistant Attorney General Colin

6   Jorgensen.  Also with us today, Your Honor, is our paralegal,

7   Claudia Luckey.

8             THE COURT:  All right.  Thank you.  We convened a

9   little early this morning to take up some of the housekeeping

10  matters that counsel raised in an email to the Court.  I'll

11  state two things, and I might repeat it.  One is the last

12  transcript in this proceeding had counsel and the Court

13  discussing the production of certain ADC policies and a request

14  that the Court review those in camera.  I will report that

15  through an informal communication, an email, from counsel on

16  Friday, counsel was able to resolve those issues.  They were

17  able to resolve those issues, so the Court did not take any

18  action.  And nothing was submitted to the Court for review.  No

19  rulings were made by the Court.

20         Likewise, the Court made itself available over the weekend

21  to resolve any discovery issues or any other matters that were

22  presented.  No matters were presented to the Court for

23  resolution over the weekend.  The Court did receive an email

24  last night from Mr. Williams asking that the Court convene at

25  about 8:30 this morning in order to take up several issues.  So

1    why don't we start there and take up these issues.

2        The first one on the list -- and I'm going to just go in

3    order, Mr. Williams.  If you want to switch the order around,

4    you are welcome to.  But the order on the list is first

5    extending the evidentiary hearing at least to Thursday and

6    perhaps beyond.  It's at the request of plaintiffs.  My

7    understanding from the email is that defendants object to any

8    extension beyond Thursday.

9        Then the next issue is that we will start at 9 a.m. -- I'm

10    going to skip over the 8:30 because we've already ruled on

11    that -- 9 a.m. this morning by Telelink.

12        Would you pronounce the doctor's last name for me?

13            MR. WILLIAMS:  Zivot.

14            THE COURT:  Dr. Zivot, Z-i-v-o-t.  Nine to eleven this

15    morning is when he is available.  So we agreed last week at the

16    last telephone conference that we would go ahead and take his

17    testimony at this time.

18        Is Dr. Zivot still available on Thursday if we don't finish

19    all of the testimony?

20            MS. VANDIVER:  He is, Your Honor.

21            THE COURT:  Because he's available on Thursday, what I

22    will do is I will let plaintiffs proceed with presenting his

23    testimony today for the two-hour period, however much of that

24    you require.  And then you will have the opportunity to cross if

25    he's available to come back Thursday.  So I won't split it

1   equally today.  Instead, we'll just go ahead through the direct.

2   You'll have the opportunity to cross on Thursday.  And, as I

3   said before, in my court the moving party always gets the last

4   word.  So if you have rebuttal evidence or any argument in

5   regard to that, understand and appreciate that with his schedule

6   as well.

7        Why don't we take up the issue of going beyond 5:15 each

8   evening to get in the proof and then extending it to Thursday.

9        Mr. Williams, I'm happy to hear from you.  And then I'll

10  hear from counsel for defendants in regard to their objection.

11          MR. WILLIAMS:  I think we've both agreed that to

12  present all our proof we need at least until Thursday and

13  probably into the evening hours.  I think any dispute, if there

14  is one, is whether we need Friday.  Just looking at what we

15  have, plaintiffs think they probably do, especially for

16  rebuttal.  And I'll let the defendants state their objection.

17          MS. MERRITT:  Thank you, Your Honor.  Again, Jennifer

18  Merritt for the State.  When we initially scheduled this

19  conference, Your Honor, in consultation with the prisoners'

20  lawyers, they initially informed us they would have two

21  witnesses.  And we mutually agreed on a three-day hearing:  For

22  today, Tuesday and Wednesday.  Since that time, the prisoners'

23  witness list has grown to I believe it's 14 witnesses at this

24  point.  We do have an objection with regard to a number of those

25  witnesses.  They are proposing to come into the court and to

1  testify regarding executions that occurred in other states using

2  other protocols.  And we do have an argument to make on that.

3  If the Court wants to hear more about that at this time, we're

4  certainly glad to do that.  The point is I believe the issues

5  can be narrowed if the Court were to rule favorably on our

6  motion to exclude some of the irrelevant witnesses.

7       Moreover, our expert witnesses are not available to stay

8  through Friday.  Dr. Antognini specifically is --

9  A-n-t-o-g-n-i-n-i.  He needs to return home for Good Friday and

10  for the Easter weekend.  He's not available to stay to consult

11  with me with regard to the expert issues.

12       In addition, I personally, as lead counsel for the State in

13  this matter, am under legal process to testify myself in a

14  deposition in a case on Friday.  I previously moved that

15  deposition.  It had been scheduled for Monday.  I moved it to

16  Friday with the understanding that this hearing would be over.

17       So for all of those reasons, the State objects to

18  continuing this hearing through Thursday.  But we are agreeable

19  -- I mean Friday, past Thursday.  We are agreeable to going

20  through Thursday and to working as late in the evening as the

21  Court would allow us to in order to get the proof in.  Thank

22  you, Your Honor.

23            THE COURT:  Mr. Williams.

24            MR. WILLIAMS:  I don't think I'll speak to the witness

25  issues now, except they can cross-examine on that.  I mean,

1    there have been some moving parts.  And the fact is we have the

2    burden of proof.  It's a significant burden.  Given the

3    circumstances at issue here, we think that Friday would be

4    appropriate, if necessary, and if the Court is willing.  I think

5    they have attorneys who can handle the testimony.  I think

6    Friday would probably be rebuttal testimony from our experts.

7    But I will just leave it at that.

8          THE COURT:  How late in the evening is the request

9    for?  I will tell you I'll set it if you don't have a request.

10   I've already confirmed with court reporters, court security

11   staff, everyone else in terms of working late into the evening.

12         MR. WILLIAMS:  I'll just say, first, this evening may

13   be a little bit of an issue in terms of going late in terms of

14   the witnesses we have available here today.  As late in the

15   evening as the Court wishes is fine with us.  I think we had

16   talked about perhaps to seven or so.  But I'll let the

17   defendants say what they want to on that too.

18         MS. MERRITT:  Whatever the Court would like to do with

19   regard to scheduling, it's fine with the State, Your Honor.  We

20   all have to prepare for the next day, so I would rather not go

21   until ten o'clock or midnight.  But beyond that, we are happy to

22   do whatever the Court wishes to do in that regard.

23         THE COURT:  All right.  Any other issues that the

24   parties want to raise?

25       Ms. Merritt, you may proceed.

1          MS. MERRITT:  I'm sorry, Your Honor.  One other issue.

2     I am the only lawyer on our team who is prepared for the

3     experts.  I am handling both the direct examination and

4     cross-examination on all expert issues.  So for that additional

5     reason, we object to continuing at least any of the State's

6     proof or anything that I would have to respond to with regard to

7     experts through Friday.  That's all.  Thank you, Judge.

8          THE COURT:  All right.  Any other issues anyone wants

9     to raise with the Court?

10          MS. MERRITT:  One other issue, Your Honor, if I could.

11    The matter of allocation of time between the parties, the State

12    requests that the Court allocate the time equally.  We all have

13    a number of witnesses, expert testimony, to present.  And I

14    believe that we all should have an equal opportunity to present

15    our case.  And for that reason, we would ask the Court to

16    allocate the time equally.  I understand that some of the

17    plaintiffs' witnesses are not available during even Monday or

18    Tuesday of this week.  They have indicated to me on the phone

19    not only do they want to call Dr. Zivot on Thursday morning, but

20    there's another witness, I believe, Mr. Williams, that you want

21    to call on Wednesday.

22          MR. WILLIAMS:  Groner.

23          MS. MERRITT:  Dr. Groner, who is an expert on certain

24    issues, again.  So that would be cutting into the State's time,

25    even assuming we split the case fifty-fifty, as well as go

1   through Thursday.  So to the extent the plaintiffs are given an

2   opportunity to call witnesses out of time, the State would

3   request that we be provided an opportunity to have equal time

4   during their case in chief so that we can get all of our

5   evidence and testimony in the record.

6           THE COURT:  I will take a look at that and see.  I

7   will say this.  I don't have any problem if counsel can work out

8   scheduling issues.  We're just going to roll, so everybody needs

9   to be prepared to have a witness ready to go in the hopper.  And

10  if we have to take people out of turn, we'll take people out of

11  turn.  The rules are going to apply equally to both sides.  So

12  if you are going to object to them taking somebody out of turn,

13  don't ask to do it yourselves.  That's how it's going to go.  I

14  will certainly look at this, and I'll visit with my staff in

15  regard to how late we go in the evening and how long we go this

16  week.  I'll take into consideration all of the issues that have

17  been raised at this point.  What I will likely do is wait until

18  after we have Dr. Zivot on and off.  Then I'll make a ruling on

19  that.

20      Are there any other issues that you wish to raise?

21          MS. MERRITT:  Nothing for the State, Your Honor.

22          MR. WILLIAMS:  I think for the plaintiffs just a

23  little thing.  For experts, we often get technology orders

24  allowing them to bring technology to the courthouse.  And I

25  don't know if we need to list the specific witnesses we have in

1    mind.  But I can do that a little bit later in the morning with

2    specificity.

3              THE COURT:  It will make it easier if you can give me

4    a list of names.  That will make it easier for them to clear

5    court security downstairs.  They will refer to that list.  You

6    can consider this an oral motion.  This is the same for both

7    sides.  Consider it an oral motion.  Give me a list.  If there's

8    an assistant or someone else that's going to accompany the

9    expert, give me that person's name as well.  You can let them

10   know, if they have any issues getting through court security

11   downstairs, they are welcome to ask the court security officer

12   to contact Ms. Washington.  She's going to sit at her computer

13   and will have access to emails.  And they can certainly ask her

14   during this process if they run into any issues downstairs.

15   Tracy Washington is her name.  I think she's been copied on the

16   majority of the emails.  You can pass out her name and contact

17   information.

18        Anything else?  All right.  We have about ten minutes left.

19   We're going to take a recess.  I'm going to visit with my folks

20   about scheduling and sort of talk to them about what our

21   facility has said in regard to those issues.  Then I'll be out

22   about five till nine so we can make certain that we have Dr.

23   Zivot ready to go on the Telelink.

24        We're in recess until five till nine.

25        (Recess from 8:51 a.m. until 9:09 a.m.)

```
1              THE COURT:  Are we ready to proceed, counsel for

2    plaintiffs?

3              MS. VANDIVER:  Yes, Your Honor.  And I apologize for

4    the delay.  The judge in the Northern District was kind enough

5    to enter an order to allow Dr. Zivot to bring in his computer so

6    he can access our exhibits, but it didn't get communicated to

7    security.  So he had to run back to his car.

8              THE COURT:  All right.  That's fine.  Let's go ahead

9    and get started now.

10        Dr. Zivot, if you would, please stand and raise your right

11   hand.  Ms. Washington is going to administer the oath.  She's

12   the courtroom deputy in my court.

13           JOEL BRUCE ZIVOT, PLAINTIFFS' WITNESS, DULY SWORN

14             THE COURT:  You may proceed.

15             MS. VANDIVER:  Thank you.

16                          DIRECT EXAMINATION

17   BY MS. VANDIVER:

18   Q.   Please state your name for the record.

19   A.   It's Joel Bruce Zivot.

20   Q.   And you are a medical doctor.  Is that correct?

21   A.   Yes.

22   Q.   And could you, on your computer, look at what's been marked

23   as Plaintiffs' Exhibit No. 1.

24   A.   You will have to tell me what it is.  I'm sorry.

25   Q.   It's a copy --
```

1    A.    I don't have these labeled in the same way.

2    Q.    It's a copy of your CV.

3    A.    Yes.  Okay, okay.

4    Q.    And you recently provided this to me.  Is that right?

5    A.    Yes.

6    Q.    And is that an accurate summary of your qualifications?

7    A.    Yes.

8          MS. VANDIVER:  Your Honor, I move to admit Plaintiffs'

9    Exhibit 1, which is a summary of Dr. Zivot's qualifications and

10   experience.

11         MS. MERRITT:  No objection.

12         THE COURT:  Exhibit 1 is admitted.

13      (Plaintiffs' Exhibit 1 received in evidence.)

14   BY MS. VANDIVER:

15   Q.    Dr. Zivot, can you please tell the Court a little bit about

16   your education?

17   A.    Yes.  I went to -- I attended medical school at the

18   University of Manitoba in Winnipeg, Canada.  I then went to do a

19   residency in the field of anesthesiology at the University of

20   Toronto.  From there I completed that program and obtained a

21   specialty certification in the field of anesthesiology.  I then

22   went to the Cleveland Clinic in Cleveland, Ohio, and completed

23   an additional two years of subspecialty training in clinical

24   critical care medicine and also qualified for the American

25   equivalent of anesthesiology.  So I am boarded in anesthesiology

1    and critical care medicine.  I recently completed a master's in

2    bioethics as well at Emory University.

3    Q.   And you said you are boarded.  What does that mean?

4    A.   So to be a boarded specialist designates that one has

5    completed training in a recognized specialty within -- there's

6    an organization within the United States that codifies various

7    medical specialties and verifies their training.  After

8    completing the training, I sit for an exam that's put on in this

9    case by the American Board of Anesthesiology.  And after passing

10   that exam, I'm designated as board certified in the field of

11   anesthesiology.

12        I've also done the same thing for critical care medicine,

13   which is a separate board.  In this case it's a subdiscipline of

14   anesthesiology and also put on by the American Board of

15   Anesthesiology.  I'm also qualified in the equivalent to the

16   state in Canada through something called the Royal College of

17   Physicians of Canada.  So that verifies me as a specialist in

18   those two disciplines.

19   Q.   And let's talk briefly about those two disciplines.  So

20   what is the medical field of anesthesiology?

21   A.   So an anesthesiologist is, again, a physician who has

22   completed training and is board certified.  The job of

23   anesthesiologist, there are many components to it.  Classically,

24   an anesthesiologist will be in an operating room and provide an

25   anesthetic.  The purpose of that anesthetic is to enable a

1   surgical procedure to take place.  The form of that anesthetic

2   can be multitude, and the nature of the patient can be very

3   different as well.  Anesthesiologists must be able to manage a

4   variety of patients with coexisting illnesses and understand a

5   variety of surgical procedures.  Anesthesiology is an ongoing

6   arrangement during the anesthetic.  There's always a

7   anesthesiologist or a designate present in the operating room.

8   Anesthesiologists are also involved in the care of patients

9   prior to surgery and the care of patients afterwards.

10        For me, that takes the form of my other specialty, which is

11  critical care medicine.  So on occasion, I care for patients

12  after surgery or before surgery who are critically ill and

13  require an intensive care unit.  Intensive care units are places

14  where the sickest patients are placed.  Patients in those units

15  typically require the assistance of mechanical ventilation or

16  where they are hooked up to a mechanical ventilating device via

17  something called an endotracheal tube, or their blood pressure

18  or other kind of physiologic parameters are so unstable that

19  they require constant attention through the continuous infusion

20  of intravenous drugs and so on.

21  Q.   Are you licensed to practice medicine?  I think that

22  probably goes without saying.

23  A.   Yes, I am.  In the State of Georgia.  And I've also held

24  licenses in the District of Columbia, Michigan, Ohio and in two

25  Canadian provinces.

1   Q.   Tell us about your current employment.

2   A.   So I'm currently employed with Emory University here in

3   Atlanta.  I hold the rank of associate professor of

4   anesthesiology and surgery.  I'm also an adjunct professor of

5   law.  I teach at the law school, and also I teach in the

6   undergraduate school of Emory University.

7   Q.   In that position, do you also treat patients?

8   A.   Yes, I do.  I do.  So primarily, or my primary duty there

9   is to be what's referred to as a clinician.  So I do some

10  research.  But the majority of my time is spent in the direct

11  care of patients either in the operating room or in the

12  intensive care unit.

13  Q.   And are you -- do you actually administer anesthesia to

14  patients?

15  A.   Yes, I do.

16  Q.   And do you start IVs?

17  A.   I do.

18  Q.   Do you mix drugs?

19  A.   I do.

20  Q.   And how often do you do those things?

21  A.   Well, my time is divided between anesthesiology and

22  intensive care.  So for a week at a time, I might be in the

23  operating room every day doing all those things.  Then it may

24  alternate with a week attending in an intensive care unit.  I'm

25  back and forth in that fashion.

1        MS. VANDIVER:  Your Honor, I would like to offer Dr.

2    Zivot as an expert in the field of anesthesiology and critical

3    care medicine.

4        THE COURT:  That's fine.  I will tell you, I don't

5    really need you to offer him.  You are welcome with all these

6    witnesses to go through CVs and establish credentials.  But if

7    he's qualified to testify, he's qualified to testify.  You can

8    launch into that examination.

9        MS. VANDIVER:  Thanks, Your Honor.

10   BY MS. VANDIVER:

11   Q.   Dr. Zivot, have you testified as an expert witness before?

12   A.   I have.

13   Q.   And about how many times?

14   A.   I recently was deposed in a matter in Missouri on a death

15   penalty issue.  The name of the defendant there was Russell

16   Bucklew.  I have been a witness also in court in a matter in

17   Florida in a capital case.  In that case the name of the

18   defendant was Eddie Wayne Davis.  Then recently, I was also -- I

19   guess last July I was involved in a competency hearing in -- the

20   defendant's name was Chris Calmer.  That defendant had chronic

21   pain.  And there was some issue related to his chronic pain that

22   was germane to his case.

23   Q.   Have you ever witnessed an execution?

24   A.   I have.  On one occasion.

25   Q.   And how was it that you came to witness an execution?

1    A.    I was retained by the inmate and asked to evaluate him with

2    respect to coexisting medical conditions that was -- and he also

3    at the same time requested that I be a witness at his execution

4    should the execution go forward.  So I agreed to those terms,

5    and that's how it was that I came to witness an execution.

6    Q.    And did witnessing that execution help give you an

7    understanding of lethal injection and that process?

8    A.    Yes, very much so.  It was quite, you know, a stirring

9    experience.

10   Q.    We've already talked a bit about anesthesiology.  And I

11   think you touched on this, but I want to ask it a little more

12   directly.  Is that -- when a surgery is performed, what's the

13   role of the anesthesiologist?

14   A.    So an anesthesiologist is there to really allow a person to

15   endure a noxious event.  When I say "noxious," I would say

16   something that would be widely understood to be very painful.

17   Anesthesiology allows a person to endure a painful procedure.

18   Now, further, the enduring of a painful procedure requires a

19   monitoring of all of the physiologic parameters that attend to a

20   painful procedure, so an anesthesiologist will monitor those

21   procedures in response to pain.

22        Further, surgery can create a cascade of events that can be

23   life threatening.  For example, there can be bleeding,

24   hemorrhaging that can occur in the context of a surgical

25   procedure.  An anesthesiologist needs to recognize when bleeding

1    occurs and to provide blood transfusions or any other sorts of

2    interventions that may be required.  Patients who have surgery

3    can either be well, or they can be ill.  And if they are ill and

4    also getting surgery, they will require ongoing medical care as

5    well as the anesthetic support that would be necessary for the

6    surgeon to be able to do what it is that he or she needs to do.

7    Q.    Thanks.  Now, what is an anesthetic?

8    A.    So an anesthetic is a state.  And the state of an

9    anesthetic has certain components.  An anesthetic requires that

10   a patient should, again, have no pain or at least minimal pain.

11   An anesthetic requires that a person has their physiologic

12   reactions, as I alluded to a moment ago, that those physiologic

13   reactions are kept in check.  An anesthetic requires that a

14   person generally not remember the experience, and an anesthetic

15   requires that the person be able -- is able to hold still, not

16   to move during a surgical procedure.  And those are kind of the

17   broad what we call the pillars of an anesthesia and what an

18   anesthetic basically is in the operating room.

19   Q.    So a little more basically, to break that down, is an

20   anesthetic, is that one drug when you are doing -- trying to put

21   someone in anesthesia, if I'm using that term correctly, is that

22   just one drug you are administering?

23   A.    Well, so an anesthetic requires, you know, different

24   things.  It requires, again, an evaluation of a patient prior to

25   surgery and the creation of what we call an anesthetic plan.

1   And that plan, again, is based upon the physical state that

2   someone should be in, blood work and other kinds of testing.

3   All of that is kind of collated together.  Then a person is

4   brought to the operating room, and we apply monitors.  So there

5   are a number of monitors that are, again, applied routinely in

6   an anesthetic.  And these monitors include something to monitor

7   blood pressure; something to monitor the heart rate; something

8   to monitor what's called oxygen saturation, which is the degree

9   of oxygen in the blood; temperature; something to monitor the

10  degree of neuromuscular blockade it's called, if that should be

11  present; and something that measures the amount of exhaled

12  carbon dioxide gas, which is a monitor that tells me something

13  about the state of ventilation.  So all of that is put in place.

14  A patient is administered oxygen via mask.  And I'll start to

15  inject medications through an intravenous that I have placed.

16  And there are a number of medications that are injected.  It's

17  not a single medication, to answer your question.  It's a number

18  of medications.

19       An average anesthetic might involve six, eight or more

20  different medications via an intravenous or also that can be

21  administered by the method of inhalation.  And all of those

22  things are done on an ongoing and continuous basis.  So

23  medication may be started and provided through a special pump

24  that then infuses the medication on a continuous basis, so it's

25  not a discrete moment.  It's a series of things followed by a

1   constant and ongoing, you know, medical and medication

2   evaluation.

3   Q.   And how are you able to tell that these things are working

4   the way that you want them to?

5   A.   Sure.  Well, I think that -- let me just say that we do not

6   presently have a monitor that we can apply to a person's brain

7   where we can see into their brain and read their thoughts and

8   see what it is that they are experiencing.  Anesthetics are

9   wrongly referred to as a state of sleep.  You know, we may

10  colloquially say that you are going to go to sleep now.  But

11  when you emerge from sleep, you know, you have a different sort

12  of experience than when you emerge from an anesthetic.

13  Anesthetics, we know that they work based upon our vast

14  experience.  We can surmise a patient's depth of anesthesia,

15  it's called, which is the degree where the anesthetic is

16  blocking those adverse consequences, by inferentially looking at

17  things like blood pressure and heart rate, for example.

18       So if an individual's heart rate and blood pressure should

19  increase at a moment where the surgeon is cutting with a knife,

20  then I would interpret that to mean that the anesthetic depth is

21  insufficient.  So I'll add a certain kind of medication or

22  medications to increase the depth of that anesthetic.  We know

23  that, again, that most folks after an anesthetic report, you

24  know, that they don't have any recollection of the experience.

25  I will say that I'll give a medication at times before the

1   anesthetic.  I know -- maybe I'll leave this for now, if I could

2   mention midazolam at this point, or what would you like for me

3   to do?

4   Q.   Let's get there.  Yeah.

5   A.   Anyway, so we really only know by inference by those

6   physiologic changes that I've mentioned.  Plus, afterwards, you

7   know, I'll ask a patient, you know, what was their experience

8   like and what do they recall and so on.  And that's how we know

9   basically.  That's the state of the art.

10  Q.   And a related question is, when you are involved in the

11  surgery, how do you determine whether or not the surgeon can

12  proceed?  Like you said, if the surgeon is going to cut, what

13  are you looking for before you give them the okay to cut?

14  A.   So, again, based upon our experience and the reaction that

15  we see after the anesthetic agents are administered, we know

16  that after a certain period of time, the way these drugs

17  generally circulate, we can say to a surgeon, you know, proceed.

18  Now, when we say that, we are always watching the reaction of

19  the patient.  So when a surgeon, you know, puts a knife to the

20  skin, if a patient reacts in any way at all, if their blood

21  pressure or heart rate goes up when they are touched with a

22  blade, then we would interpret that -- I would interpret that to

23  mean the anesthetic depth is insufficient.  And so I may tell

24  the surgeon to hold on for a moment while I administer more

25  anesthesia.  And, again, the anesthetic can change during the

 1    entire surgical procedure.  And I'm constantly kind of watching

 2    the patient and watching the surgeon.  So if the stimulus should

 3    be such that now the patient begins to register it, you know,

 4    then I'll inform the surgeon, and I'll make a change.

 5    Q.   And a couple of minutes ago you said there's no machine

 6    that we can use to look at and see someone's thoughts.  Is there

 7    a machine that doctors use to measure states of awareness?

 8    A.   There is a device.  The device is called the BIS, B-I-S,

 9    monitor.  And this monitor basically uses an EEG technology,

10    electroencephalogram, which are some stickers placed on the

11    surface of the head.  And it can read through two separate

12    channels, it's called, electrical activity.  And this is -- a

13    company makes this monitor.  And through a proprietary

14    algorithm, they've generated a number out of a hundred where a

15    hundred is awake and zero means no electrical activity.  And

16    they say that if the number falls below 60, then that's likely a

17    person whose depth of anesthesia will be sufficient.

18         Now, that's been turned into awareness.  You know, it's

19    been called awareness, although the company never makes any

20    claim that it's an awareness monitor.  And studies have shown

21    these monitors to be, you know, very problematic.  There are

22    many reasons why the monitors are not reliable.  So it's not a

23    standard monitor.  It's used commonly by people in various

24    locations, some places more than others.  But it's not

25    considered to be necessary for the performance of, you know, the

1    conduct of a regular, normal and safe anesthetic.

2    Q.    Okay.  I'm going to now move to asking you some questions

3    about lethal injection, particularly in Arkansas.  And you've

4    been provided with some documents about the lethal injection

5    procedure in Arkansas.  Is that right?

6    A.    Yes.

7    Q.    And there's a document that we've been calling Attachment

8    C?

9    A.    Yes.

10   Q.    You've been able to look at that.

11   A.    Yes.

12          MS. VANDIVER:  Your Honor, this is Plaintiffs' Exhibit

13   -- one moment -- 32.

14   BY MS. VANDIVER:

15   Q.    So I want to talk specifically about the protocol.  But

16   before we get into that, can you give the Court sort of a

17   thumbnail of your opinion regarding Arkansas's lethal injection

18   protocol?

19   A.    Sure.  Let me say at the outset, too, that in no way am I

20   intending to be prescriptive into how to make this better.  I

21   have no comment.  I have no knowledge of how to improve lethal

22   injection.  I understand that what the State intends to do here

23   is to use a combination of chemicals and procedures to kill an

24   inmate, to kill a person.  And when I look through this, and to

25   the extent that I can compare it to what I do, you know, I have

1   a lot of concerns, many concerns.  I'm concerned about the

2   qualifications of the individuals that are to perform these

3   sorts of things.  I'm concerned about the combination of the

4   medications and how they will be prepared and how they will be

5   injected.  I'm concerned about the way that they will be handled

6   and mixed.  And I have serious concerns that if this is done as

7   it's described that an inmate may not die or that death will be

8   or death will be part of a very painful experience for the

9   inmate.

10  Q.    Okay.  Let's talk about this in more specific terms.  The

11  protocol that Arkansas uses is a three-drug protocol.  Correct?

12  A.    Yes.

13  Q.    And can you tell us what those three drugs are?

14  A.    Yes.  The first drug is called midazolam.  The second drug

15  is called vecuronium bromide.  And the third drug is potassium

16  chloride.

17  Q.    Okay.  And let's talk about each of those drugs in turn.

18  So the first drug you mentioned is midazolam.  Is that a drug

19  that you use in your medical practice?

20  A.    It is.

21  Q.    Tell us about it.

22  A.    So midazolam -- medications come in classes.  So in a

23  certain kind of class of medication, you have more than one kind

24  that fits within that class.  And classes are the gathering up

25  of medications that have similar properties and similar effects.

```
 1   Midazolam is in a class of medications referred to as
 2   benzodiazepine.  And benzodiazepine -- the classic
 3   benzodiazepine that people may have heard of is the drug Valium
 4   or diazepam, which is an old drug which has been around for a
 5   while.  Benzodiazepines are used to promote sleep.  People take
 6   -- and they also are able to treat certain kinds of anxiety
 7   states.  They also have an effect on short-term memory, that
 8   they can impair short-term memory.  And they also can sometimes
 9   be used to treat seizures.  Midazolam here is a liquid
10   medication, and it's injected through an intravenous.  And I
11   will use midazolam either before or during an anesthetic where
12   I'm intending to calm someone's anxiety prior to an anesthetic
13   beginning or where I'm, again, trying to create some amnesia for
14   the experience.  And that's the way that midazolam will
15   generally be used.
16   Q.   And how does this drug work?
17   A.   So midazolam works on something called a receptor.  And the
18   receptor is a place where -- and there is in the brain something
19   called the benzodiazepine receptor.  So there's a specific
20   location where the midazolam molecule will attach in order to do
21   its job.  It's important here, because it's a bit like a lock
22   and a key.  So once the key is in the lock, that then -- that
23   receptor then can no longer function in the way that it would
24   normally function.  And there's only a certain number of
25   receptors.
```

1      So as an example, I ask you to imagine pouring from a

2   pitcher of water into a cup.  And once the pitcher -- once the

3   cup is full, no matter how much more water is poured into the

4   cup, it will just spill out and will have no effect.  So

5   midazolam we say has what's called a ceiling effect.  So once

6   the benzodiazepine has been attached to these receptors,

7   additional dosages have no effect.

8   Q.   And what is the normal clinical dose of midazolam?

9   A.   So it varies.  When midazolam causes someone to be calm, it

10  may correspondingly lower someone's blood pressure a little bit,

11  although it doesn't have a direct effect on blood pressure.  So

12  if I'm anxious, my anxiety might be manifest as an accelerated

13  heart rate and accelerated blood pressure.  So when I give

14  midazolam, it might lower their blood pressure just a little bit

15  if they're anxious and anxiety is popping up their blood

16  pressure a bit.

17      If someone is very elderly or very, very frail, then a

18  small amount of midazolam may already have an effect.  And I say

19  small, like 1 milligram or 2 milligrams.  I've also given

20  midazolam to, you know, a young healthy anxious person and have

21  given 10 milligrams of midazolam.  And I've seen, you know, no

22  apparent effect.  So it ranges from maybe as low as 1 to as much

23  as 10, you know, in a single injection.

24  Q.   And how does that compare to the dosage used by the

25  Arkansas lethal injection procedure?

1    A.   Well, you know, as it's recorded, it's a much larger -- you

2    know, the lethal injection protocol uses a larger quantity,

3    250 milligrams or as much as 500 milligrams are administered.

4              MS. MERRITT:  Your Honor, I'm sorry.  That

5    mischaracterizes the protocol.  Arkansas uses a 500-milligram

6    dosage.

7              THE COURT:  You can proceed.

8    BY MS. VANDIVER:

9    Q.   Dr. Zivot --

10   A.   500 milligrams.

11   Q.   Right.  In two syringes.

12   A.   In two syringes.

13   Q.   Now, does midazolam prevent a person from experiencing

14   sensation or pain?

15   A.   No.  First of all, two things.  Midazolam is not what's

16   referred to as an analgesic.  Analgesics are medications that

17   take pain away.  So, for example, a drug like Tylenol or a drug

18   like Motrin, you know, these are over-the-counter analgesics.

19   We know that they work to take some pain away.  Narcotics, for

20   example, morphine, hydromorphone, there are many of these.

21   These are analgesics.  But midazolam is not considered to be an

22   analgesic in any dose.

23        And the other thing about midazolam, too, which is quite

24   striking, is that when midazolam is injected, I have had

25   conversations with people after the midazolam has been injected

1   that are perfectly reasonable and regular or where you have a

2   back-and-forth exchange of something that I would determine to

3   be, you know, a normal conversation.  And afterwards, after the

4   rest of the medications are given, the anesthetic is done, and I

5   have a conversation with that individual in the recovery room,

6   they will have no recollection of that conversation.  And why

7   that's important is because midazolam in no way blocks the

8   experience in the moment.  But what it does do is it makes you

9   not remember the experience, but it certainly still occurs for

10  you in the moment.  You know, the apprehension or the

11  nervousness, you know, it does have some effect, but not much.

12  And, again, pain, for example, all that is still there.  It's

13  just not recalled afterwards.

14  Q.   So if you were having a conversation with a person and you

15  said something very rude to them, they might react to that in

16  the moment.

17  A.   Yes.  I would say that they would.

18  Q.   But they wouldn't recall it later.

19  A.   Correct, correct.

20  Q.   And, Dr. Zivot, what is an induction agent?

21  A.   So an anesthetic, an induction agent is an agent that's

22  intended to create the kind of deep unresponsiveness that

23  signals the beginning of an anesthetic when surgery will then

24  momentarily begin.  So we don't gradually move someone to this

25  unresponsive state.  We can do it fairly quickly with certain

1    kinds of medications.  For example, the medication that I began

2    to use when I was at the beginning of my career was a drug

3    called sodium thiopental, which is a barbiturate, in the

4    barbiturate class.  And I would inject that medication.  That

5    would render the patient in this unresponsive state.  And now

6    the drug that's commonly used is a drug called Propofol, which

7    is, again, intended to induce and create kind of an instant and

8    rapid unresponsiveness that is required to begin the surgical

9    procedure.

10   Q.    And is midazolam used as an induction agent?

11   A.    Midazolam has been described as an induction agent.  When

12   it was first introduced, I think the company hoped that it would

13   be used in that way.  But I have used it like that early in my

14   career when midazolam was first available.  But I find it to be

15   not a good drug for that purpose.  And I -- you know, I never

16   use it like that, not for many years.  And I have not seen

17   anybody use midazolam as an induction agent in that way.  None

18   of my colleagues do, not the places I've practiced.  It's not

19   used like that.

20   Q.    And why not?  Why do people turn away from using it as an

21   induction agent?

22   A.    It doesn't create the kind of rapid unresponsiveness that

23   the other sorts of induction agents create, so it's just not

24   practical in that way.

25            MR. RUDOFSKY:  Objection, Your Honor.  I would just

1   like to make sure that Dr. Zivot is testifying about why he

2   doesn't use it as opposed to speculating about why other people

3   don't use it.

4            THE COURT:  I'll let you proceed with the questioning.

5            MS. VANDIVER:  Thank you, Your Honor.

6   BY MS. VANDIVER:

7   Q.   Dr. Zivot, if you were going to perform a painful procedure

8   on someone or give the okay for a painful procedure to be

9   performed on a patient, would you ever use midazolam alone as an

10  anesthetic?

11  A.   No.  You know, there is one exception that I would use

12  something like that.  There are certain kinds of situations

13  where someone may have an irregular heartbeat.  And an irregular

14  heartbeat may be life threatening to them, and it requires doing

15  something called cardioversion, where you are likely familiar

16  with this, where you apply paddles to the chest and use

17  electricity to kind of restart the heart with electricity.  Now,

18  that's a very painful procedure.  But when someone's blood

19  pressure might be very low as a consequence of that irregular

20  rhythm, and in that way delivering an anesthetic that won't

21  further lower their blood pressure is tricky.  So midazolam,

22  when given, will not lower blood pressure very much.  And it

23  will create this amnesia.  Even saying that, I would never use

24  midazolam alone.  You know, what we say here is that we're

25  trying to recognize that we're going to -- about to hurt someone

1    quite severely.  But we hope that the midazolam will block the

2    memory of the pain.  That's the best that I can do.  And that's

3    in an emergency situation.  So anything short of an emergency I

4    would not ever use midazolam solely as an agent where something

5    was going to be painful.

6    Q.   So if someone was coming in for a scheduled surgery or an

7    elective procedure, you would not use midazolam alone.

8    A.   Not as a sole agent, no.

9    Q.   Can midazolam alone kill you?

10   A.   Well, benzodiazepines, as a class, they were the

11   replacement sleeping pill for barbiturates.  So barbiturates

12   used to be the sleeping pill that people would take, and

13   barbiturates could kill you.  It was recognized that as a

14   complication of barbiturate use, they could kill you.  And so

15   benzodiazepines evolved as the replacement, because they didn't

16   kill you.  So they were much, much safer.  And they have no

17   direct toxic effect.  They don't toxify cells in a direct way

18   that causes the cells to die.  They create a state that, you

19   know, where someone is less responsive and may, again, address

20   things like anxiety.

21        But they are not, you know, used -- they have no lethal

22   dose per se.  Again, people who have coexisting medical

23   conditions may be near death.  And when midazolam is given, even

24   a tiny drop in blood pressure the midazolam might cause might

25   then subsequently result in death of an individual.  But they

1    are not thought to be agents that kill.

2         Further, benzodiazepines have an antidote.  So in a

3    circumstance where too much benzodiazepine has been given, where

4    a person may be, again, ill by some other method or breathing

5    insufficiently or something, I can administer an antidote that

6    will immediately reverse the benzodiazepine.  So in that way we

7    think of them as a class of drugs to be quite safe.

8    Q.   Okay.  Let's talk about the next drug in the protocol,

9    which you said is vecuronium bromide.

10   A.   Yes.

11   Q.   Am I pronouncing that correctly?

12   A.   You are, yes.

13   Q.   Tell us about that drug.

14   A.   So vecuronium bromide is in a class of drug called a

15   nondepolarizing muscle relaxant.  Now, the word "relaxant" here

16   is unfortunate, because there is nothing relaxing about these

17   drugs in the way that we would commonly understand what it would

18   mean to be relaxed.  And people may also mistakenly think that

19   we're talking about muscle relaxants that are prescribed if

20   you've got soreness to your muscles.  These drugs are nothing

21   like that at all.

22        What these drugs do is, when they are injected, they

23   interfere with the signal that would indicate that it's time for

24   a muscle to constrict, to contract, to move.  So if I want to

25   bend my arm, my brain sends a signal to the muscle.  A certain

1   chemical is released.  It traverses a little kind of a gap.  The

2   chemical then attaches to a receptor, and then the muscle

3   contracts.  And that's what happens.

4        Now, when I give one of these neuromuscular blocking drugs

5   or these muscle relaxants, now my brain sends a signal, so I

6   still want to move.  But now the muscle is paralyzed and will

7   not be able to move as long as the drug is in place.  So it

8   creates what's called paralysis.  And that paralysis targets the

9   group of muscles in the body that are called skeletal muscles.

10  So it's all the things we think about.  There are actually three

11  kinds of muscles in the body.  There's heart muscle.  There's

12  intestinal muscle, and then there's skeletal muscle.  So

13  skeletal muscle is all the muscles that we think about.  And,

14  importantly, one of the skeletal muscles is a muscle called the

15  diaphragm.  That's the muscle that we use that allows us to

16  breathe.

17       So these neuromuscular blocking drugs will block the

18  ability of the diaphragm to contract, so a person will not be

19  able to breathe or move at all in any way.  Now, their heart

20  would still beat, and their intestines will still contract.  But

21  they will not be able to breathe.  They will not be able to

22  speak.  They will not be able to do any of these things.  And if

23  the drug is given by itself, they will be completely awake and

24  aware that they are now in this paralyzed state.

25  Q.   Is this drug ever given in a medical context?

1    A.    It's given commonly in medicine, yes, in combination with

2    other drugs that create a lack of awareness.  The reason why we

3    use these drugs is because even when a patient is in a deep

4    anesthetic state, the muscles can contract.  So the muscles have

5    their own intention here even when separate from the brain's

6    impulse.  When they are exposed to something noxious, as a

7    protection, they will contract.  And that contraction, the

8    tightening of the muscles can make access to the internal organs

9    of the body more difficult.  And so a surgeon will request that

10   the patient be relaxed, it's called, or paralyzed, to allow for

11   surgery.

12         Also, when an individual is under a deep anesthetic state,

13   we frequently place something called an endotracheal tube.  It's

14   a plastic tube that goes through the mouth across the vocal

15   cords into the trachea and into the windpipe.  Then it's

16   attached to a breathing machine.  And even in a deep anesthetic

17   state, there can be breathing or struggling against the

18   ventilator.  So when an individual is paralyzed, then, of

19   course, none of that struggling can occur.  And it's easier then

20   to provide mechanical ventilation in that setting as well.

21   Q.    Now, I believe you answered this question, but I want to be

22   clear.  Does this drug block pain?

23   A.    In no way does this drug block pain, no.

24   Q.    And I believe you answered this too.  Does it sedate a

25   person?

1    A.    No.  It doesn't provide any sedation.

2    Q.    And would you ever give this drug to an awake person?

3    A.    You mean as a sole agent?

4    Q.    Uh-huh.

5    A.    Is that what you mean?  No.  I would never do that, no, no.

6    It would be extremely painful and terrifying for an individual

7    to be paralyzed under those circumstances.

8          MS. MERRITT:  Your Honor, I just wanted to make sure.

9    Just to clarify for the record, was the doctor just answering a

10   question about vecuronium bromide in terms of pain and sedation

11   qualities, or was he purporting to offer testimony about

12   midazolam?  I'm just confused.

13         THE COURT:  I think we're on vecuronium bromide.  That

14   was what the testimony and question related to.  Counsel can

15   correct me if I'm wrong.

16         MS. VANDIVER:  I believe that's right, Your Honor.

17   BY MS. VANDIVER:

18   Q.    And would you ever give midazolam, only midazolam, before

19   administering a paralytic such as vecuronium?

20   A.    There are circumstances where, when someone is critically

21   ill, where I'm concerned that other agents that would create a

22   deeper state of unresponsiveness may themselves further cause a

23   deterioration in a clinical state, and so I might give midazolam

24   again because I need to paralyze them.  Now, that's not

25   something that happens in the operating room.  That's more a

1    circumstance in an intensive care unit, where someone has

2    life-threatening lung dysfunctions, and they cannot be

3    ventilated in any way.  And, again, in that circumstance, to be

4    frank, if the patient survives, I would apologize later, because

5    I recognize that that sort of procedure is not ideal and that

6    there's a chance that when I give the midazolam and I paralyze

7    them that they will have a recollection of being paralyzed, that

8    the midazolam won't block.  But sometimes I've done something

9    like that, you know, for a brief experience, to try to

10   facilitate ventilation.  And many times what happens, you

11   know -- so that's a scenario where I might do something like

12   that.  But it would not be considered to be an ideal or even,

13   you know, something that I would choose, you know, if the

14   situation were not quite so critical.

15   Q.   And if a person that's been administered vecuronium bromide

16   is not moving, does that mean that they are not experiencing --

17   having experiences or able to feel what's happening to them?

18   A.   No.  It doesn't mean that at all.  Again, as I said before,

19   when vecuronium bromide or drugs of that class are given by

20   themselves, of course, they experience everything.  They are

21   just not able to articulate it.  And I would say, too, that as

22   they are paralyzed, they will die.  If not intervened on, they

23   will die of suffocation because they can't breathe.  So it's

24   like being held underwater.  So they can't breathe.  They can't

25   move.  And if I do nothing other than just give them that drug,

1    then they will again die of suffocation.

2         I think I've not answered your question exactly.  Can you

3    ask me again?  What was the point that you were asking me there?

4    Q.   If a person that's been administered vecuronium bromide is

5    not moving, if we don't see them moving, does that mean that

6    they are not experiencing what's happening around them or to

7    them?

8    A.   No.  And I think I probably made this point before, that

9    their lack of movement here is a function of being paralyzed.

10   It has nothing to do with their ability to gauge what's

11   happening around them.  So, no.  If someone is paralyzed, they

12   necessarily won't move no matter what you do to them.  They

13   can't move.  So it's not a question of them -- in this way it is

14   not in any way indicative of unresponsiveness in the way that we

15   are here.

16   Q.   Is there a way that you -- that you, if you're monitoring

17   them, would be able to see whether or not a person who has been

18   given vecuronium was experiencing pain?

19   A.   Well, there is a monitor that I can use that can determine

20   the degree of what's called neuromuscular blockade.  So if a

21   patient doesn't move in the setting of something that's noxious,

22   then there are two possibilities.  Either they can't move

23   because they are paralyzed, or they are not moving because they

24   are in a depth of anesthesia that's sufficient to block the

25   sensation.  So sometimes I can't tell by looking per se as to

1   whether or not they are paralyzed.  So I'll apply this monitor.

2   The monitor can then tell me the degree of paralysis.  Though if

3   someone is entirely unparalyzed, then I can interpret a lack of

4   responsiveness to mean that the depth of anesthesia is

5   sufficient.  But if someone is entirely paralyzed, then I can't

6   know.  I may not know with certainty whether or not their lack

7   of movement here reflects, you know, a sufficient depth of

8   anesthesia.  And it may, again, be manifest as even a slight

9   increase in heart rate or blood pressure.  And I would interpret

10  that in this scenario to perhaps mean, you know, insufficient

11  anesthetic depth.  Then I'll react to it in that way.

12  Q.    How long does this drug last?  How long would the effect

13  last, vecuronium bromide?

14  A.    Well, I mean, depending upon the quantity that's given.

15  But if I was to give, you know, a quantity to create rapid

16  paralysis, which is what, you know, would be required at the

17  beginning of a surgical procedure, then a single dose, I might

18  give a single dose of approximately 20 milligrams in an adult.

19  That will probably last 30 minutes or so, 40 minutes maybe

20  before the drug wears off.  And it will eventually, you know,

21  wear off on its own, or it can also be reversed by another drug.

22  So one of those two things would occur.

23  Q.    And you mentioned in a hospital setting you would be

24  breathing for this person.  Right?

25  A.    Correct.  Once I give a neuromuscular blocking drug, I am

1   committed to establishing ventilation for that individual either

2   via an endotracheal tube, a breathing tube, or a mask that I

3   would apply.  And I would be either providing ventilation, you

4   know, with a special kind of a device, that I can, you know,

5   squeeze a bag to ventilate, or more commonly I'll hook them up

6   to a machine that will now breathe for them in their paralyzed

7   state.

8   Q.    And if you don't do that, what will happen to them?

9   A.    They will die.

10  Q.    By suffocation?

11  A.    By suffocation.  By, you know, in this case what happens is

12  the oxygen level will fall.  And the falling of oxygen will, you

13  know, set up a cascade of events, you know, that will eventually

14  cause death.

15  Q.    How long will that take?

16  A.    Well, you know, I might say -- ask you how long can you

17  hold your breath for.  So most people, after, you know, a minute

18  or so of breath holding become extremely uncomfortable.  And now

19  imagine holding your breath for five minutes or ten minutes or

20  30 minutes.  Certainly after five minutes of a lack of oxygen

21  you are starting to die.  And death may take longer depending

22  upon, you know, what's happened to you.  But certainly after

23  five minutes your brain is dying.  Other organs may last a bit

24  longer.  But something in that range is certainly when dying

25  begins.

1  Q.   Let's talk about the final drug in the protocol, which you

2  said is potassium chloride.  Tell the Court what that drug is.

3  A.   So potassium chloride is a combination of two naturally

4  occurring elements.  These are elements that are normally within

5  the body.  And potassium here specifically is involved in the

6  way that all cells in the body contract.  They are very

7  important.  Potassium is very important for the way that the

8  heart muscle contracts.  And the amount of potassium that's in

9  the bloodstream is normally kept via some feedback mechanisms in

10  a fairly narrow range.  And if potassium is too high or too low,

11  in both of those circumstances the way that will be immediately

12  seen will be the effect on the ability of the heart muscle to

13  contract efficiently.  When potassium is extremely high, the

14  heart will stop contracting.  And when potassium is extremely

15  low, the heart can also stop contracting.

16  Q.   And the lethal injection protocol here calls for this drug

17  to be injected intravenously.  Right?

18  A.   Yes.

19  Q.   And how does potassium feel when it's injected?

20  A.   Potassium, when it's injected, is quite painful.  People

21  complain about it when it's given through what's called a

22  peripheral vein, so a vein maybe in the arms or in the legs.

23  When potassium is injected, it's quite painful.  And in order to

24  mitigate the experience of pain, we'll mix it in a very large

25  volume of solution.  So the amount of potassium that's delivered

1   at any one moment to the vein is quite small; and, further,

2   delivered over an extended period of time, over hours.  So now

3   you are taking the quantity of potassium.  You are giving it

4   into a large volume, mixing a large volume, injecting it very

5   slowly.  And when we do it this way, people don't complain of it

6   as painful.

7   Q.    And why do you use potassium in a clinical setting?  What's

8   the purpose?

9   A.    Potassium can be low for a number of reasons.  And, again,

10  when potassium is low, it can result in adverse effects on the

11  heart.  So potassium is supplemented, given to maintain, again,

12  that normal potassium level that we know is associated with the

13  maximum and efficient amount that creates the right kind of

14  heart muscle contraction.

15  Q.    And you mentioned that when you give this drug in a

16  clinical setting that you do it -- you dilute it, and you give

17  it over a long period of time.  What kind of dose do you give in

18  a clinical setting?

19  A.    So I might give -- I generally don't give more than what's

20  called -- the quantity is in what's called milliequivalents.  So

21  I don't give more than 20 milliequivalents through a peripheral

22  intravenous, because more than 20 milliequivalents is painful.

23  It's hard to get it diluted sufficiently to make it not be

24  tender.  I will give as much as 40 milliequivalents, so double

25  that, through what's called a central line, because the caliber

1   of the vein is larger.  And we know from experience that the

2   discomfort associated with, you know, a dose of that size is not

3   significant.

4   Q.    Go ahead.

5   A.    So that's it.  Yeah.

6   Q.    How does that relate -- how does that kind of dosage

7   compare to the dosage in Arkansas's lethal injection protocol?

8   A.    So the Arkansas lethal injection protocol will give 120

9   milliequivalents or 240 milliequivalents -- no -- 120

10  milliequivalents, I believe, or I'm not sure if it's 120 or 240

11  now that I look at it again.  I think it's two syringes, I

12  think.

13  Q.    Let me just open my book.

14  A.    Let's say it's 120 milliequivalents or 240

15  milliequivalents.  Honestly, I think the difference is moot

16  because that's much more than I would normally give.  And it's

17  given without dilution as an injection through a peripheral

18  vein.  So that quantity of potassium given at that speed through

19  a peripheral vein will be extremely painful.

20  Q.    Okay.  And how do we know that it's painful?

21  A.    I've had patients complain of it.  You know, it's

22  described.

23  Q.    Would you ever give midazolam to block the painful

24  experience of the potassium chloride injection?

25  A.    No.

1   Q.    Why not?

2   A.    It won't take the pain away.  It's not, you know, -- not

3   only is it painful, but it's caustic.  So certain things can be

4   painful but doesn't, you know, leave a mark.  Potassium will

5   burn up a vein.  So it will destroy the vein when given in

6   quantity as well.  It's not simply that it's painful.  It's

7   painful because it's destroying the vein as it passes along its

8   length.  So midazolam will not prevent the destruction of the

9   vein by potassium, nor will it block the pain.

10  Q.    Okay.  I think that we talked about this a moment ago.  But

11  Arkansas is planning to get these drugs into the prisoner

12  through an IV access.  Is that correct?

13  A.    Yes.

14  Q.    And do you think that the IV access is important to whether

15  or not this procedure is going to work in the way that the

16  department anticipates?

17  A.    I mean, the IV access is critical here.  This is an

18  intravenous injection, and it has to be through a vein of a

19  certain caliber and quality that will withstand all of the

20  things that are to be pushed through it.  So the placing of an

21  intravenous catheter in the right vein is critical and central

22  to the success or at least to the success of the attempt.

23          MS. MERRITT:  Excuse me, Your Honor.  I need to lodge

24  an objection.  As we have briefed in our motion to dismiss as

25  well as our response to the motion for preliminary injunction

1    motion, a number of issues that Dr. Zivot proposes to testify

2    about, including qualifications of the participants, the method

3    of IV access, the combination of medications regarding

4    preparation and injection of the medicines, the handling and

5    mixing of drugs, all of those issues are barred as a legal

6    matter for a number of reasons.  First, they are time barred.

7    The ADC's procedures with regard to IV team qualifications,

8    which with regard to assessing whether the vein has been

9    sufficiently -- whether the IV is working properly, the

10   monitoring of the IV for infiltration or for any problems with

11   the IV infusion sites, challenges to the preparation and mixing

12   of drugs, all of these things not only could have been raised

13   with regard to the 2008 protocol that's attached as an exhibit

14   to the complaint, but actually have been litigated in the *Nooner*

15   *v. Norris* case that already went up before the Eighth Circuit.

16   So there's no need for the doctor to get into those issues at

17   this time.

18        In addition, this Court has to presume that the ADC will

19   follow the protocol as written.  So therefore, the issue of

20   proper IV placement has to be assumed.  We can't assume future

21   negligence.  We cannot assume that something will go wrong.  The

22   issue for the Court to decide is whether the protocol as written

23   is constitutional.  So as a result, the State objects to Dr.

24   Zivot offering any testimony regarding qualifications of

25   participants, qualifications of IV team members, issues about

1    preparation and injection of drugs, handling and mixing of

2    drugs.  We believe his testimony should be limited to the issue

3    of the efficacy of the drug protocol itself.

4            THE COURT:  I'll recognize a continuing objection.

5    I'll note for the record that the motion to dismiss on these

6    issues was filed at 8:35 p.m. Friday, after the close of

7    business.  The plaintiffs responded somewhere around 2 a.m. this

8    morning in a 30-page response.  The Court is not prepared to

9    rule on this particular issue at this time.  I'm happy for you

10   to go ahead and spend your time with this witness however you

11   choose, and I'll recognize the continuing objection to this line

12   of questioning.

13           MS. VANDIVER:  Thank you, Your Honor.

14   BY MS. VANDIVER:

15   Q.   Let's see.  I think the question was what could go wrong

16   with the setting of IVs in this protocol.

17   A.   Well, I understand the claim that one needs an intravenous

18   to begin and that the protocol says an intravenous will be

19   placed.  But that is -- the reason why I think it's noteworthy

20   is because that is not a simple thing to do.  And the mere

21   utterance that it will be done, I have concerns, because I know,

22   having started IVs, that sometimes that can be exceedingly

23   difficult and that if an IV is poor, poorly placed, everything

24   else subsequent to that will go awry.

25           I'm an expert in the placing of IVs.  I've done it for 25

1    years, and I still have circumstances where I have trouble.  And

2    the circumstance -- and no one is trained to place an IV in

3    someone who is to be executed.  No one in my training of

4    intravenous access ever said to me, by the way, this is a

5    technique that you can also use to execute someone.  So I would

6    push back to say that there's such a thing as training to start

7    an IV in someone who is to be executed.

8         When I start an IV in somebody as a patient, that person is

9    a volunteer, or they are there, you know, under their own, you

10   know, under their consent.  So they help me.  And they can

11   endure what I have to do to them and so on.  And they understand

12   that the pain that I'm inflicting upon them for the intravenous

13   is for the greater good of helping them.  But this is not that

14   case at all.  So -- and there's, of course, been circumstances

15   where IV access has been very difficult to obtain, as I read, in

16   the setting of lethal injection.

17   Q.   Now, I want to talk about that.  So have you seen evidence

18   in other executions that this part of the process has gone

19   wrong?

20   A.   Well --

21             MS. MERRITT:  Again, objection as to other executions,

22   Your Honor.

23             THE COURT:  I'll recognize a continuing objection.  I

24   overrule it.

25             MS. MERRITT:  Thank you, Your Honor.

1            THE WITNESS:  So I witnessed an execution in Georgia.

2    And the execution was of Mr. Marcus Wellons.  What was

3    interesting about that from a witness perspective is what I

4    could see and what I could not see.  So what I was not allowed

5    to see was the part where the intravenouses were placed.  Now,

6    within the Georgia protocol, I think similar to Arkansas, two

7    intravenouses are to be placed.  By the time that we were

8    ushered into the observation room, I saw Mr. Wellons lying on a

9    gurney with his arms secured by his sides.  And I counted at

10   least three separate locations where intravenouses were placed.

11   Two were connected, and one was not.  Now, his legs were

12   covered.  And only the parts of his arms that I could see, you

13   know, I saw three locations.

14         I've reviewed other autopsies in the past of people who

15   have been executed and have noticed that there are not

16   infrequently more than two attempts to place an intravenous.

17   The most well-known case is the case of Clayton Lockett in

18   Oklahoma, who had multiple attempts at intravenouses:  Arms,

19   legs, neck, chest.  None of them were ultimately successful.

20   And all of this can be -- is widely known within the public

21   record.  It's easy to read about the great difficulty.  And not

22   only in that circumstance was it difficulty in the IV team, but

23   there was a physician on hand, who claimed to have expertise in

24   starting IVs, who was not there for the purpose of starting an

25   IV, but was drawn in by necessity, I guess.  And even he was

1    unable to start an IV.  And this was a person who there was

2    nothing clearly anticipated that he would be so difficult to

3    start an IV on.  But sometimes it's just difficult, very

4    difficult.

5    BY MS. VANDIVER:

6    Q.    I'm sorry.  Go ahead.

7    A.    Anyway, all of that is part of the starting of the IV.

8    When the protocol says we're going to start an IV, that's just a

9    claim.  And whether or not that will be able to be done, you

10   know, I would push back.

11   Q.    I want to just deal with a couple of exhibit issues here.

12   So you reviewed some documents regarding the autopsy examination

13   of Clayton Lockett.  Is that correct?

14   A.    Yes.

15   Q.    And one of them I sent to you -- I don't know if you have

16   the numbers there on your computer -- as Exhibit 23.  Are you --

17   A.    Is that the 800-page document?

18   Q.    Well, this is a shorter document, about 600 -- I'm sorry --

19   an eight-page document.  Do you have your computer there with

20   you?

21   A.    Yeah.  Just tell me what that refers to.

22   Q.    The first page says United Forensic Services, P.C.  and

23   there's like a two-page document signed by Joseph I. Cohen.

24   Then there's -- the rest of that document has Office of the

25   Chief Medical Examiner.

1    A.    I've reviewed that.  I know the document you are speaking

2    of, yes.

3    Q.    And is this part of what you used in forming your opinion

4    in this case?

5    A.    Yes.  This was actually a second autopsy that was attempted

6    to be done, what was I guess called an impartial autopsy.  And

7    the autopsy, of course, cites limitations, because certain

8    organs were missing, and other things were not able to be done.

9    So it's kind of an incomplete evaluation.  But it does comment

10   on the multiple puncture sites that were seen.

11              MS. VANDIVER:  Your Honor, I move to admit Exhibit 23.

12              MS. MERRITT:  Your Honor, does my continuing objection

13   apply to the admission of evidence regarding other executions?

14              THE COURT:  It will.

15              MS. MERRITT:  Thank you, Your Honor.

16              THE COURT:  Exhibit 23 is admitted over the State's

17   objection.

18        (Plaintiffs' Exhibit 23 received in evidence.)

19   BY MS. VANDIVER:

20   Q.    Also, there's another exhibit, Exhibit No. 19, that is an

21   official report:  The Oklahoma Department of Public Safety

22   report entitled "The Execution of Clayton Lockett."  Did you

23   review that as well?

24   A.    Yes.

25              MS. VANDIVER:  Your Honor, is that --

1    BY MS. VANDIVER:

2    Q.   Has that helped you form your opinion in this matter?

3    A.   Yes.

4            MS. VANDIVER:  Your Honor, I would move to admit

5    Exhibit 19.

6            THE COURT:  I'll admit Exhibit 19 over the State's

7    continuing objection.

8        (Plaintiffs' Exhibit 19 received in evidence.)

9    BY MS. VANDIVER:

10   Q.   Dr. Zivot, are you familiar with the case of Romell Broom?

11   A.   It may have been in the list of autopsies.

12   Q.   If you recall, this is a man that was -- his execution was

13   not successful.

14   A.   Oh, yes, yes.

15   Q.   Were you able to review these photographs of Mr. Broom of

16   the multiple IV puncture sites?

17   A.   You know, I did.  But I don't recall it specifically.  But

18   now that you bring it to mind, yes, I recall it.

19   Q.   Okay.  I think we may have another sponsor for that

20   exhibit.  I'll just move past that right now.

21       Do you recall that the Arkansas protocol requires that the

22   IV team be -- whoever is on the IV team be an EMT, a nurse, a

23   physician's assistant or a physician?

24   A.   Yes.

25   Q.   And does that alleviate your concerns regarding the IV

1    access?

2    A.    No.

3    Q.    Do you recall from your review of the protocol that if the

4    IV team isn't able to get peripheral venous access, which I

5    believe you said means arms -- does that mean arms?

6    A.    Arms and legs, usually.

7    Q.    That they have a back-up plan to use a central line?

8    A.    Yes.

9    Q.    Can you explain to us what a central line is?

10   A.    Sure.  So a central line -- an intravenous might be

11   referred to as a line.  The line might be peripheral or central.

12   So both of these things, first of all, are catheter in a vein

13   attached to tubing, which is the line.  In the veins of the arms

14   and legs, they are of smaller caliber.  And they generally can

15   be seen.  They can be seen, or they can be felt.  And then the

16   technique of putting a needle in those veins is based upon your

17   ability to see them or feel them.  These veins, again, are

18   smaller caliber.  And the way they are placed is something

19   called a tourniquet is applied, like a rubber band, that will

20   create some restriction of flow in, say, an arm.  Then the veins

21   will become engorged and able to be seen, say, on the hand.

22   Then the IV is placed.

23         A central line is a vein within the chest and abdomen and

24   the neck, starting -- I guess the neck, under the collar bones,

25   or in the groins.  These are the classic locations of a central

1    line.

2         Now, these veins cannot be seen, and they cannot be felt.

3    There's only two ways to find them.  One is to hope that they

4    are anatomically where they are supposed to be, to use what are

5    called landmarks to be able to identify where they are, or to

6    use something called ultrasound, which is a device that can be

7    placed on the skin that uses sound waves to visualize where the

8    veins are.  And then once the veins are identified in their

9    location, a different sort of kit, a different sort of needle is

10   used to puncture these veins.  It's usually a needle of a longer

11   length, and it has other kinds of attachments to it that make

12   the placement of a catheter in a central vein effective.  And

13   it's something that is really a much bigger step up from what

14   would be done normally with veins in the arms or legs.

15        So, for example, a nurse will not be trained to place a

16   central line, nor will a physician assistant, nor will an EMT

17   necessarily be trained to place central lines.  The only person

18   in that list that will be trained, might be trained, would be

19   the physician.  And being trained is not the same thing as being

20   able to do it.

21        So, for example, in my practice, I place a lot of central

22   lines because the population that I care for is quite critically

23   sick.  And sometimes peripheral IVs can't be placed.  So I'm an

24   expert in the placement of central lines.  I have colleagues,

25   anesthesiologists, who are board certified, who are my partners,

1   who don't place as many central lines as me.  And if they are in

2   a situation where they need to place a central line, they may

3   ask for my assistance to come in and place a central line with

4   them or for them, because I'm in a group of individuals who

5   knows how to place central lines.

6   Q.   So if you don't use this ultrasound to see the vein, what

7   can happen?

8   A.   Well, veins of these size are right next to arteries, okay.

9   So arteries and veins run together.  And if you can see in my

10  fingers here, it's like that.  It's not like that (indicating).

11  The artery and the vein are right next to each other.  So now

12  I'm sticking a needle through the skin blind, because I don't

13  exactly know where the vein is.  And I can as easily hit the

14  artery as hit the vein.  That's the first thing.  If I hit the

15  artery, it's going to be a much different sort of situation than

16  if I hit the vein.

17       Second of all, there are other structures.  So, for

18  example, if I'm starting a central line under the collarbones or

19  in the neck, the lungs are right there.  So now I could miss the

20  vein, miss the artery, but, in fact, hit the lung with a needle.

21  And that will cause a lung to collapse.  I could hit the

22  esophagus if I'm heading at it from underneath the collarbone.

23  I could hit the trachea.  There's lots of other structures that

24  I can hit because I'm using a needle that's about that long that

25  I'm reaching to try to reach the vein from the skin to where the

1    vein is.

2    Q.    And what does happen if you hit the artery?  You said it

3    would be a different situation.  What would we see?

4    A.    If I hit the artery, then it could bleed immediately.  And

5    the bleeding then will collapse the vein next to it, so now --

6    if I just hit the artery and stop, and now I'll never be able to

7    cannulate that vein.  That vein is now not accessible to me

8    anymore.  If I put the catheter into the artery by mistake, then

9    now I'm injecting into the artery.  And that is an entirely

10   different kind of situation.  If I introduce air, a small

11   quantity of air, into my injection, that can go directly into

12   the brain and cause a stroke or directly into the heart and

13   cause a heart attack.

14        And certain medications cannot be injected into arteries.

15   They cause the artery to spasm.  And when the artery is blocked,

16   the blood flow distal to the artery is also blocked.  So if it's

17   an artery up here under the collarbone, the whole arm can become

18   what's called ischemic, where now there's no blood flow to the

19   arm because I damaged the artery that supplies blood to it, or

20   the same can occur within the leg.  If I hit an artery in the

21   leg, it can cause damage.  The blood flow is impaired.  The leg

22   becomes ischemic, which means it doesn't have any blood flow,

23   and it becomes damaged.  The vein can be obliterated by the

24   artery.  There can be a large quantity of blood that can now

25   pool underneath the skin.  All of these things are possible.

1   Q.   Okay.  So let's assume that the IV team is able to get

2   venous access.  Do you know where the person in this protocol

3   that's actually pushing the chemicals is located in relation to

4   the inmate?

5   A.   Well, my understanding is that they are in another room.

6   They are not in the same room.  They are separated by a wall.

7   IV tubing passes from the inmate through some aperture in a wall

8   in another room.  So now a person is injecting from another

9   location.

10  Q.   Does that matter?  Is that significant?

11  A.   Well, I would never do it that way myself, because, as I'm

12  injecting, I want to always be certain that the vein is patent,

13  that the IV is working, because even after I place an IV and

14  connect it, when I begin to inject, the IV may no longer be in

15  the right place.  So I need to be visually inspecting at all

16  times the IV that I can inject into or to be able to examine it.

17       In this circumstance, the person that's injecting has no

18  feedback, no way of knowing whether the catheter is actually in

19  the vein at all.  So sometimes it might be hard to inject.  But

20  it's hard to inject a 60 cc syringe IV at any time.  It's going

21  to be difficult to do.  So how much resistance that might be

22  present, you know, may be not feedback and give the information

23  that you need to tell you the vein is no longer or that the IV

24  is no longer in the vein.

25  Q.   So we don't deal with syringes every day in the legal

1   field.  So what do you mean -- when you say a 60 cc syringe,

2   that probably doesn't mean a lot to all of us.  So can you

3   explain that?

4   A.    Sure.  So a syringe basically is a device that has two

5   components.  It has like -- it's a long tube that has markings

6   on the side of it, and another piece that's a plunger can be

7   inserted into it that has like a rubber stopper.  And basically

8   the plunger can be either withdrawn or advanced.  On the other

9   end is a very small little opening that a needle can attach to.

10  So the plunger might be depressed all the way initially.  And

11  then I pull the plunger back while the needle is inside of an

12  ampoule or liquid that I then aspirate into this now tube.  And

13  as I pull back, I generate negative pressure.  And the negative

14  pressure then draws the fluid into the tube.  Now the tube is

15  full.  A 60 cc syringe is probably, again, a caliber -- probably

16  the caliber of a quarter or something a little, maybe more like

17  a half-dollar in caliber.  It's probably about 4 inches long, a

18  tube of that long.  So that is now full of liquid.

19       Now, as I inject, I'm injecting through a very small little

20  hole.  And the force required to inject through that small

21  little hole, you know, is larger the smaller the aperture.  So

22  when I use a big syringe, there's a much kind of wider plunger

23  to a small hole.  And that kind of downsizing creates friction

24  and resistance.  If the syringe itself is fairly small and the

25  caliber of the barrel is the same as the caliber of the hole,

1    it's quite easy to plunge.  But because 60 cc syringes have the

2    widest aperture, those are kind of the biggest syringes we use.

3    It's difficult to do that normally.

4        Now, when you add the friction of injecting that through a

5    tube and then into a vein -- and it's not easy to inject that

6    rapidly even if you want to.  And the harder you push, you know,

7    the more resistance you get, or you can generate a lot of

8    pressure by the liquid being forcefully injected through the tip

9    that can actually rupture the vein.  So that's the concern.

10   Q.   And if a vein ruptures, does that hurt?  Can you feel it

11   when a vein ruptures?

12   A.   Yes.  And what happens now is, if you don't realize that

13   the vein has ruptured, you continue to inject.  Now all that

14   fluid that would normally have been carried away through a vein

15   is now right there in the place where it is now ruptured.  And

16   now it starts to swell.  And as the tissue begins to swell,

17   depending on what it is -- again, if it's potassium that we're

18   injecting, all the potassium is now burning, you know, the skin

19   in that very local, you know, contained area.  And that's

20   extremely painful, or even just the pressure of anything that

21   swells, it's called "extravasate" is the word.  Extravasation is

22   known to be painful.

23   Q.   Okay.  Thank you.  I want to start talking about something

24   that the State uses, the term "consciousness check."  Let's talk

25   a little bit about consciousness.  What is consciousness?  Is

1    that a medical term that you use?

2    A.    Consciousness is a very imprecise term.  And so although it

3    has a common usage and maybe even a common understanding, when

4    we consider that as a scientific question, it becomes much

5    murkier as to what that means.  So consciousness is kind of the

6    experience that we are having now, where we have some sense that

7    we know what's around us.  We recognize and hear things.  We

8    interact.  You know, we're awake.  That's what we consider to be

9    conscious.

10        So I guess unconscious would be the opposite of that,

11   however that would be characterized.  What I can tell you is

12   that this question of consciousness from a scientific

13   perspective continues to evolve.  And it's important here,

14   because there are circumstances where we have assumed that

15   people are, quote, unconscious.  And as technology and

16   understanding has evolved, we increasingly now understand that

17   these unconsciousness states are much more uncommon or unusual

18   than we might first imagine or that the ability to obtain these.

19   And I'll give you a couple of examples.

20        So if someone has a head injury, a brain injury, that the

21   injury might be so severe that they may be called vegetative --

22   which is an unfortunate term.  But vegetative, again, is a

23   common understanding.  We might say that that's an individual,

24   when you come up to them, you call their name, you know, you

25   pinch them, you interact with them, and they merely lie there.

1   They don't react to you in any way.  You know, they don't blink.

2   They don't acknowledge any kind of reaction to you no matter

3   what you do to them.  So we thought that these people were,

4   quote, unconscious, that they had no interior life of any kind.

5   And that's what we assumed.  Now, technology has shown us

6   something quite different.  With, you know, more recent

7   investigations of neural states, we now recognize that many

8   individuals that we consider to be vegetative are, in fact, just

9   in a circumstance where we kind of assess their responsiveness.

10  But we can, through, for example, things like functional

11  magnetic resonance imaging can now show that there's, in fact,

12  the capacity to even in a way answer a yes/no question in

13  someone who by all accounts was not in any way responsive.

14      Now, as another example, consider an anesthetic.  So all

15  the things that I talked about, where we create this state of

16  unresponsiveness -- and I use that term specifically, and I do

17  not use the term "unconscious," because unconscious is imprecise

18  and not helpful.  And, in fact, I never promise a patient that

19  they will not have some interior experience that they may have.

20  And I ask about it afterwards, because I recognize that, you

21  know, what we're doing here is not the same thing as

22  obliterating the capacity to have an interior experience.  I

23  certainly know that when an anesthetic is done properly that

24  even though I use many more drugs and even though I could

25  document that a person is unresponsive, that when the anesthetic

1    is over, I've not, you know, wiped their mind clean.  You know,

2    their mind continues to be present.  And it's very much in

3    evidence after the anesthetic is done.  So there is an interior

4    experience that still can take place, but we just can't easily

5    measure.  And this happens -- you know, it happens in

6    anesthesia.  It's a recognized phenomenon.  It's called

7    awareness in one form.  How often awareness occurs is unclear,

8    because honestly we don't always ask for it.  But it's something

9    that -- the reason why this is so important here is because

10   there is this interior experience that we recognize that I can't

11   always see.  And I've had, again, patients where their blood

12   pressure was fine, their heart rate was fine, they didn't move,

13   they had all the usual stuff.  There was no inkling that they

14   had any kind of awareness.  And afterwards I discovered that

15   they have had, in fact, some awareness of the procedure.  So I

16   recognize that I'm not able to always know when someone has an

17   interior experience or someone does not.

18   Q.    Can these interior experiences include pain?

19   A.    Absolutely.  You know, these interior experiences can be

20   terrifying, because, for example, if a person is paralyzed and

21   they are not able to communicate it, now they are lying there on

22   the operating room table fully aware of what's happening and

23   feeling pain and have no way of communicating it to anybody in

24   any way.  It's so terrifying, in fact, that, you know, these

25   experiences have led people to develop posttraumatic stress

1    disorder and other sorts of adverse reactions as a direct

2    consequence of these awareness experiences.

3    Q.    What do you know -- in any of the documents that you've

4    reviewed, have you learned about how Arkansas is going to assess

5    consciousness?

6    A.    Yes.  So what is described is something that I believe

7    might be called a pinch test, or it begins with kind of a

8    brushing of the eyelash and then maybe calling the inmate's name

9    and then pinching them in a way that's not specified in some way

10   in some part of the body.  Actually, I believe there's another

11   document that talks about pinching their nailbeds or pinching

12   their trapezius muscle and pinching them in that way.  There's

13   no such thing as a medical pinch.  I don't know what that means,

14   so I don't know what they mean exactly or how they know how hard

15   to push and all that.

16   Q.    Is that -- the process that you've described, is that a

17   good way to assess consciousness, which let's just say is a

18   squishy term?  You know, is this a good way to be determining

19   whether or not a painful procedure can proceed?

20   A.    I would say not.  A pinch is not the same thing as a blade

21   or a potassium chloride.  A pinch is a pinch.  So what you are

22   assuming by making that claim is that one kind of stimulus is

23   equal to another kind in an important and fundamental way.  So

24   if you are saying what I'm asking for is can a person withstand

25   the blade of a knife or the injection of potassium chloride,

1   then I must have something that would be widely understood to be

2   as painful as a knife or as the injection of potassium chloride.

3   Anything less than that would be inconsequential.

4           MS. VANDIVER:  I just want to deal with a couple of

5   exhibit things here.  Your Honor, Exhibit 25 is the defendants'

6   response to our interrogatories.  And I believe what Dr. Zivot

7   is referring to is on page 9 of that exhibit, which I would move

8   to admit Exhibit 25.

9           THE COURT:  Is there any objection?

10          MS. MERRITT:  No, Your Honor.

11          THE COURT:  Exhibit 25 is admitted.

12      (Plaintiffs' Exhibit 25 received in evidence.)

13          MS. VANDIVER:  Exhibit 26, this is one of the items

14  that was revealed or disclosed in discovery, which is titled

15  "EMT Review," which I believe is what Dr. Zivot was talking

16  about with the trapezius pinch.  I would also like to move that

17  into evidence.

18          MS. MERRITT:  No objection, Your Honor.

19          THE COURT:  Exhibit 26 is admitted.

20      (Plaintiffs' Exhibit 26 received in evidence.)

21  BY MS. VANDIVER:

22  Q.  So, Dr. Zivot, I want to talk again about that EMT document

23  that we just talked about.  I know that you might not have it

24  organized in the same way I do, but we're calling it Exhibit 26.

25  And on the top of it, it says "3-2, The Initial Assessment."  Do

1    you know what I'm talking about?

2    A.    Yes.

3    Q.    So what context -- you've had a chance to review this

4    document.   Right?

5    A.    Yes.

6    Q.    What is this document designed for?

7    A.    So this is a document that is designed therapeutically.   So

8    what is happening here, EMTs are in a very difficult spot.   They

9    are out somewhere maybe in the field.   And they come upon a

10   person who they don't know anything about.   They may not be able

11   to speak to them for whatever reason about what their complaint

12   is.   So they are just trying to make a quick assessment as to

13   whether or not an individual is responding in a way where a lack

14   of response if left could result in harm.   So it's a test that's

15   just meant to be a quick verification.

16        And if, you know, by any one of those methods a person

17   doesn't respond, then an assumption may be made there's

18   something wrong with that individual that might require an

19   escalation of intervention on the part of the EMT.   It may just

20   be scoop and run, pick up the person and put them on a gurney

21   and run.   It may involve managing their airway or other sorts of

22   things.   You are just trying to in a therapeutic way, and it's

23   important that you are right.

24        So it's the opposite of here.   Like in the EMT

25   circumstance, you are trying to make someone better.   So you are

1    trying to interact with them in some way to either reassure that

2    they are okay or they are not okay.  Here it's a very different

3    sort of thing.  You know, you are trying to determine that they

4    are unresponsive to the most painful possible kind of thing and

5    not only to the pain of what you are going to do to them but to

6    what's happening to them in a larger sense.  That's what you are

7    trying to block.  And the pinch test to my mind in no way

8    guarantees either of those things.

9    Q.   So in your opinion, is this guidance, either through the

10   sort of paragraph that describes the eyelash, escalating to the

11   pinch, or this EMT document, is this sufficient guidance to a

12   person in order to determine awareness or to monitor awareness?

13   A.   Well, I'm certain -- I believe if you ask the author of

14   that document that they would not say this document also works

15   for lethal injection, so I can't speak to that.  I think if I

16   look at that, is that something that can be transposed to lethal

17   injection, I would say no.  I don't know why I would think that

18   it would.

19   Q.   And are there any medical conditions that could confound

20   this pinch test?

21   A.   Well, sure.  I mean, in order to be pinched, the skin has

22   to be able to experience -- has to have the capacity to

23   recognize when one is being touched.  So, again, normally we

24   don't think about it under normal health conditions.  When

25   people touch our skin, you know, we can feel that we are being

1    touched.  But there are medical conditions; for example,

2    diabetes, when individuals who are diabetics, they classically

3    develop something called a peripheral neuropathy.  And the

4    neuropathy means that the nerve supply to the skin is now

5    impaired.  So they can't feel pinching, and they don't feel pain

6    in the same way.  And in the worst example, in a diabetic,

7    diabetics have to be very careful about their feet because a

8    diabetic can get a sore on their foot, a cut or something or

9    even an ingrown toenail that festers, becomes infected.  And you

10   would never know, because anybody else would feel that, but you

11   wouldn't.  And that can become so severe, in fact, that you

12   can't -- that you develop a situation where your leg now becomes

13   destroyed and has to be amputated.  And I'll tell you that I

14   have done surgical procedures on individuals that are extremely

15   bad diabetics or they have peripheral neuropathy, where their

16   leg has been cut off with virtually no anesthetic because they

17   cannot feel it.  So a saw should hurt a lot more than a pinch.

18   Q.    Does the ADC make any provision for these -- whether or not

19   there's medical conditions like this?

20   A.    No, not that I see.

21   Q.    In a medical setting, would you just look at a person and

22   then pinch them before allowing a surgeon to cut into them?

23   A.    No, I would not.

24   Q.    In a medical setting, I think you testified earlier you

25   would be using equipment to sort of tell you what's going on

1    with a person.  Is that right?

2    A.    Yes, yes.

3              MR. RUDOFSKY:  Objection, Your Honor.  States facts

4    not in evidence.  I believe his testimony was that he doesn't

5    necessarily need a machine but sometimes uses one.

6              THE COURT:  You can proceed.  I'll overrule the

7    objection.

8    BY MS. VANDIVER:

9    Q.    Dr. Zivot, when you are monitoring anesthesia, are you

10   using equipment?

11   A.    Yes.

12   Q.    Tell us a little bit about what that is.

13   A.    Well, I think I mentioned before that there are the

14   standard monitors, you know, that are applied,

15   electrocardiograms, stickers attached to the chest, something on

16   the finger that measures oxygen or put to the ear or the nose, a

17   blood pressure cuff or catheter actually in the artery itself

18   that measures blood pressure, a neuromuscular blocking drug, a

19   temperature probe and something that measures what's in their

20   exhaled gases, specifically carbon dioxide, which can tell me

21   something about the degree of their ventilation.  So all those

22   things are the standard monitors for any anesthetic.

23   Q.    And in your review of the ADC protocol and documents

24   related to their methods, do you see that they use any equipment

25   to monitor vital signs?

1    A.    No.

2    Q.    I want to talk a little bit about autopsies.  In your

3    training or practice, do you review autopsy reports?

4    A.    I do.

5    Q.    And have you had the opportunity to review any autopsy

6    reports from persons executed by lethal injection?

7    A.    I have.

8    Q.    And were those lethal injections -- did they use midazolam?

9    A.    They did.

10   Q.    Can you tell the Court a little bit about the files that

11   you reviewed?

12   A.    Yes.  You gave me a list of files of a number of

13   individuals that were executed using a combination of drugs that

14   are identical to the Arkansas protocol, which includes

15   midazolam, vecuronium bromide and potassium chloride.  These

16   were individuals in the State of Florida who were executed in

17   that fashion.  And there are a number of names that I can't

18   recall, but I know you have a list of these names.

19        So I reviewed these autopsies of these individuals that

20   were performed subsequent to their execution with midazolam,

21   vecuronium and potassium.  And the results were quite striking

22   in a very important way, because, as I understand what I think

23   would be the common sense of what lethal injection is supposed

24   to do, that one might imagine that an individual falls off to

25   sleep, whatever that might be, and then dies, and that's what

1   happens, but the autopsies paint a very different kind of

2   picture.  Most of these autopsies show, for example, what's

3   called heavy lungs, okay?  So the lungs, there's a right and a

4   left lung.  And the right lung is normally -- is a little bit

5   larger than the left, and they have a weight that can be

6   measured.  So in an autopsy, the lungs will be visually

7   inspected and weighed.  One looks for the presence of fluid or

8   congestion and then just weighs the lung.  And in several of

9   these, the lungs were heavy, like twice the normal weight,

10  meaning they were full of fluid.  So the question is how did the

11  fluid get there.  If a person was to be executed and the fluid

12  was there before, that would be very manifest, very evident.  If

13  they were lying flat, they would have froth appearing in their

14  mouth.  They couldn't be able to breathe.  They would be in

15  something called pulmonary edema.  There's no way that you would

16  be able to not see that that had happened.  So that occurs as a

17  consequence of the execution itself.

18       Now, the only way that you can get -- there's a couple of

19  possible ways that this could occur.  But one way that it

20  couldn't occur is that if death was instantaneous, if there was

21  instantaneous death, then the lungs would not get engorged like

22  that.  They would just be frozen in the moment that they are.

23  So what this points to is a slow kind of death, a slower death.

24  And where fluid now accumulates in the lungs because of impaired

25  circulation, say, or because of injury, now a person is

1    paralyzed.  They can't breathe.  And the lack of oxygen sets up

2    rapidly an injury picture.  And that injury picture is manifest

3    with fluid now filling into the lungs.  And it's quite striking

4    how much pulmonary edema is in these individuals.  And that

5    shouldn't be -- that does not occur as a consequence of

6    midazolam.  That does not occur as a consequence -- a direct

7    consequence of potassium.  It does not occur as a direct

8    consequence of vecuronium.  It occurs as an indirect consequence

9    of a situation where circulation is slowly reduced, pulmonary

10   edema ensues.  And I can tell you that when you -- the

11   experience that a person would have when their lungs are filling

12   up with fluid is terrifying.  It's like when you drink a glass

13   of water and you feel that the liquid goes down the wrong tube,

14   we say colloquially, where we actually aspirate the liquid, say,

15   into our trachea and how painful that is.  You begin to cough

16   violently to keep the fluid out of the lungs, that the lungs are

17   designed to be fluid free at all times.  So now these

18   individuals are displaying commonly these heavy lungs and

19   pulmonary edema, which can only occur as a consequence of a not

20   instantaneous death.  There's no other explanation for it.

21   Q.    Dr. Zivot, I'm going to tell you these names.  And tell me

22   if that sounds right to you, that you reviewed these.

23   Petitioner's Exhibit 11, Juan Chavez?

24   A.    Yes.

25   Q.    Petitioner's Exhibit 12, William Happ?

1    A.    Yes.

2    Q.    Petitioner's Exhibit 13, Paul Howell?

3    A.    Yes.

4    Q.    Petitioner's Exhibit 14, Darius Kimbrough?

5    A.    Yes.

6    Q.    And Petitioner's Exhibit 15, Thomas Knight.

7    A.    Yes.  One of those names -- I'm sorry I can't recall -- did

8    not have an autopsy on that list.  For religious reasons, an

9    autopsy was not performed.

10              MS. VANDIVER:  Your Honor, I would move to admit

11   Petitioner's Exhibits 11 through 15.

12              THE COURT:  I'll recognize the State's continuing

13   objection, but I'll admit the exhibits unless there's a

14   different objection the State wishes to posit.

15              MS. MERRITT:  We object.  Relevance.

16              THE COURT:  I'll recognize the continuing objection.

17   I just wanted to make sure there was no other basis for an

18   objection.  And there's not, as I understand it.  I take that to

19   be a relevance objection is the continuing objection.

20              MS. MERRITT:  Right.  As well as hearsay.

21              THE COURT:  I'll overrule on both.  You can go

22   forward.

23         (Plaintiffs' Exhibits 11 through 15 received in evidence.)

24              MS. VANDIVER:  Your Honor, I'm getting pretty close to

25   being done with Dr. Zivot, but he does have to go in ten

1    minutes.  So I don't know that I'll be able to totally finish my

2    direct, but I'm almost there.

3    BY MS. VANDIVER:

4    Q.   So I want to talk a little bit more about midazolam.  You

5    mentioned, and we talked about the size of the dosage of

6    midazolam, that it comes in a large syringe or two syringes.

7    About how much liquid are we talking about?

8    A.   I think it's 5-milligram per cc concentration.  I think

9    that's right, so it would be -- like 50 cc's would be

10   250 milligrams.  So 500 milligrams would be 100 cc's.

11   Q.   Is that a fair amount of liquid?

12   A.   Yeah.  That's like a third of a Styrofoam cup or a half a

13   Styrofoam cup of liquid.

14   Q.   And can you tell us what precipitation is, I mean, other

15   than like rain?

16   A.   Sure.  So when a drug is mixed, like the thing that was

17   difficult about midazolam or the benzodiazepine molecule is if

18   you mix it in water, you will still see particles.  So it

19   doesn't dissolve, okay?  We know that certain things dissolve in

20   oil, and certain things dissolve in water.  So, for example,

21   when you make oil and vinegar salad dressing, and you mix oil

22   and water together, you can mix it, and it seems like it's one

23   thing.  But if you let it sit for a moment, you can see there's

24   a clear line that separates the water from the oil, the vinegar

25   from the oil.  The same thing happens with injecting drugs.  If

1   you are trying to take a drug and get it to dissolve in the

2   blood, okay -- and in chemistry, there's a principle that if you

3   have two substances that have -- that differ in something called

4   acid and base status and you mix them together, two liquids,

5   when they mix together, it can form what's called a precipitate.

6   And that's when you look at it; and now, where the liquid was

7   clear, you now see kind of particles floating around in there.

8   And that's a precipitate.  And when a drug precipitates, it's no

9   longer effective.  It doesn't work.  It has to be in the liquid

10  form in order for it to be effectively given.  So midazolam is

11  interesting because it's configured in a way that it's actually

12  quite a strong acid, because in a strong acid state, it's a

13  liquid.  But as soon as it hits the blood, it can actually -- it

14  can actually -- the blood, which is not a strong acid, it can

15  actually precipitate.

16       Now, in the small quantity that we give, if there is some

17  precipitation, it's not consequential, because we're not doing

18  it for that.  But it can occur, and it may not even be seen.

19  But we know chemically that it will take place.  But in this

20  circumstance, you've got a very, very large quantity of

21  midazolam that's now mixing in the plasma.  And that will cause

22  a precipitate that might be able to be seen.  At least it will

23  be in the bloodstream.  It will be particles now floating around

24  as opposed to the liquid that could occur.  And those particles,

25  when the particles are made, then those particles, again, will

1    have nothing to do with contributing to the effectiveness of

2    midazolam.  So you think you are delivering a certain large

3    quantity.  And, in fact, some of it, or much of it precipitates.

4    And you are actually delivering a much lower dose than you think

5    you are delivering.  And that's the problem here.

6    Q.   And what is a paradoxical reaction?

7    A.   So a paradoxical reaction is the opposite reaction that you

8    would expect.  Now, we understand that drugs like midazolam when

9    given can do two things.  They can give -- they can cause

10   sedation, or they can actually cause excitation.  They can make

11   someone agitated.  And we see these paradoxicals, opposite

12   reactions.  And probably it's a misnomer because it's just the

13   scope of reactions that are possible.  But here it implies that

14   the normal or desired reaction is sedation, and another reaction

15   is agitation.  And in large dosages, like contemplated in the

16   Arkansas lethal injection protocol, large dosages we know have

17   been associated with agitation.  We see that.

18   Q.   Are you aware that the midazolam that the ADC has expires

19   at the end of the month?

20   A.   Yes.

21   Q.   And as a physician, what is your understanding of

22   expiration dates of drugs?

23   A.   So an expiration date is a mark that -- it's a prediction

24   by the company that makes the drug that says that if you use a

25   drug beyond this date we cannot guarantee its effectiveness.

1   And what they are warning you is for two things.  They are

2   warning you that over time that their drug they recognize can

3   degrade.  And in degradation, two things can happen.  It can

4   become ineffective, or it can become poison.  It depends.  I

5   liken it to the same thing as buying milk.  So when you buy

6   milk, milk has an expiration date on it.  And if you look

7   through the milk freezer, the milk fridge, you will see that

8   there are milks of various kinds of expiration dates.  Now, me,

9   I grab the milk that has the farthest away expiration date.  I

10  would not buy the milk that expires tomorrow, because I also

11  understand that expiration is not perfect in the naught.  It's

12  likely that things expire, you know, in a degrading over-time

13  state.  So it's not that they are saying that expiration begins

14  to occur at that moment.  It may be that it occurs some other

15  time in the future, but by that moment expiration is complete.

16  It's hard to say.

17       But we never use medications where expiration date is close

18  at hand.  We would like to use -- I think we would use

19  medication dates that have expiration dates six months from now,

20  not a matter of days.  We would never use that.

21  Q.   So we talked a little bit about syringes, and you reviewed

22  the protocol.  Do you recall when and where the lethal injection

23  chemicals are put into syringes?

24  A.   Well, it's part -- it's in another location, some mixing

25  room I think or something where they are doing this.  Then it's

1    actually not in the -- I think it might not be in the execution

2    chamber.  It's in another location.  Then they are put into some

3    kind of a box.  Then they are driven or transported in some way

4    over to the execution chamber.  So it's some kind of separation

5    physically of where the drug is compounded, which is what

6    basically is happening when you reconfigure it or you are

7    compounding it, and then it's moved to another location.

8    Q.   And do you have any concern about that practice?

9    A.   Well, you know, I wouldn't do it like that.  When I'm going

10   to compound a drug, I'll compound it.  I'll use it myself right

11   away.  I don't take it in another room and leave it sit for a

12   while and then move it in a car.  You know, it's right close at

13   hand.  Then I'm watching it to be certain that it's done

14   correctly.

15        Sometimes these things are done by trained pharmacists.  So

16   when trained pharmacists do them, of course, they are doing them

17   under a very different kind of sterile location, under something

18   called a hood.  And it's done in a certain sort of way.  And

19   they are handled in a certain sort of way.  They are kept

20   refrigerated in some way, and it's very closely monitored.

21   Putting something in a box and shipping it is not in any way

22   akin to having it done in a hood or having it done by me and

23   then using it.

24            MS. VANDIVER:  So it's almost eleven here.  It's

25   almost noon there.  Do you need to go?

1          THE WITNESS:  I do.  I could have maybe time if

2     there's one final question.

3          MS. VANDIVER:  I probably have about 10 more minutes,

4     10 or 15 more minutes.

5       Your Honor, would that be okay if I finish up my direct

6     with him when he's here in person on Thursday?

7          THE COURT:  That's fine.

8          MS. VANDIVER:  I don't want to keep you.

9          THE WITNESS:  That could go longer, so I don't know.

10          MS. VANDIVER:  I have no further questions for Dr.

11     Zivot at this time.

12          THE COURT:  All right.  Thank you, Dr. Zivot.  We will

13     see you back on Thursday for counsel to finish up the direct and

14     for cross-examination.

15          MS. VANDIVER:  Thank you.

16          THE COURT:  Why don't we take a 15-minute break.

17     We'll come back on the record at 11:15.

18       (Recess at 11:02 a.m.)

19                    REPORTER'S CERTIFICATE

20       I certify that the foregoing is a correct transcript from
       the record of proceedings in the above-entitled matter.

21

22     /s/Elaine Hinson, RMR, CRR, CCR       Date:  April 10, 2017
       United States Court Reporter

23

24

25

1     (Proceedings continuing in open court at 11:19 AM.)

2         THE COURT:  Here's what the Court will do.  We're

3  going to start our days early at 8:30, we'll go until 8:15 p.m.

4  We'll take an extra break from 5:15 to 5:30 p.m. and the

5  schedule will be in effect Monday through Thursday.  I'm going

6  to split the time 60/40; 60 for the plaintiffs; 40 for the

7  defendants.  The plaintiffs will have both opening and

8  rebuttal, plus they have the burden so I'm going to allocate it

9  60/40.  We've had folks on the clock, we've put people on the

10  clock already with Dr. Zivot.  If an objection goes longer than

11  two minutes, I'm counting it against the people who make the

12  speaking objection.  We'll take up any business we have to take

13  up at any of our scheduled breaks or we can come in earlier

14  than 8:30 or stay after 8:15 to take up any matters we need to

15  take up.

16         I understand that there was a request regarding opening

17  statements and also perhaps a request to argue a motion to

18  dismiss.  In regard to opening statements, I don't need opening

19  statements.  If you want to do an opening statement, it's going

20  to count against your clock.  And in regard to arguing the

21  motion to dismiss, most motions in federal court are decided

22  without argument.  If there's something that's necessary for me

23  to consider that's not in the moving papers, I'm happy to hear

24  that at some point, either before 8:30 or after 8:15, but I

25  don't know that that's going to be of benefit for me.  I've

Karen Baker, RMR, CRR, CCR
United States Court Reporter

1  reviewed it in detail.  I haven't reviewed all of the response

2  yet since it was filed at 2 in the morning.  I've given it a

3  cursory review.

4      I'm satisfied that we need to go forward today and we

5  need to go forward with the evidentiary hearing, so I'm not

6  going to rule definitively on all those matters.  I'm not

7  prepared to do that today.  I will state again for the record

8  so the record's clear, the complaint was filed March 27th of

9  2017, motion to dismiss was filed after 8:30 p.m. on Friday,

10  which Friday was April 7th.  And at 2:00 a.m. today,

11  April 10th, is when plaintiffs' counsel filed a response to the

12  motion to dismiss.  So the motion to dismiss was filed along

13  with a separate response to the motion for preliminary

14  injunction.  So with that, does either side want to take their

15  time to make an opening statement to me?

16          MR. RUDOFSKY:  Yes, Your Honor, we would like to.

17          THE COURT:  I will also say one other thing.  What

18  I'll likely do if there's time remaining on either side, what

19  I'll do is split that time equally, so if you don't use all

20  your time, it's going to be divided in half and be given out to

21  both sides.  We'll be in that rebuttal case most likely at that

22  point.  So that roughly equates, and Mr. Keller and I are going

23  to do the math, and we'll have a better calculation after we

24  come back from lunch, but I think it is about two hours -- 21

25  hours and 15 minutes for the plaintiffs; 14 hours and 9 minutes

1    or so for the defense.  Mr. Keller and Ms. Washington along

2    with the Court will be keeping time and you can check it at

3    breaks and at the beginning and end of the days.  You can go

4    ahead then.  Do plaintiffs want to use their time for opening

5    statement?  You're not required to.

6            MR. WILLIAMS:  No, Your Honor.  And on today's

7    schedule, can I just clarify that we may not have enough

8    witnesses to get us into the 8:00 hour just because of who's

9    here.

10           THE COURT:  Okay.  You may proceed, counsel for the

11   defense, if you want to give an opening statement.

12           MR. RUDOFSKY:  Thank you, Your Honor.  Good morning

13   and may it please the Court.  In the coming days you're going

14   to hear a lot of evidence from both sides, Your Honor.  As you

15   know, the State believed and still believes that an evidentiary

16   hearing is unnecessary because all of these claims are legally

17   flawed.  But we are where we are and so the State will strongly

18   be contesting the prisoners' alleged proof in this case.  You

19   won't really be hearing from me very much over the next few

20   days.  You'll be hearing from my able colleagues for the State.

21   But I'd like to think I still have a little bit of an important

22   job here.  My job is to make sure that we don't all miss the

23   forest for the trees.  So here's the forest.

24           None of prisoners' claims are legally cognizable.  The

25   State does not begrudge the prisoners trying everything in

1  their power to delay and prevent the imposition of lawful death
2  sentences for the horrific murders they have committed, but
3  these claims are legally meritless and certainly do not justify
4  a stay of execution.  I know Your Honor understands but given
5  the state of death penalty litigation today, there will be
6  cases brought very shortly before execution dates, always.
7  This tactic, and I say that respectfully, not disrespectfully,
8  is used in the hopes that a court will enter a stay on the
9  theory that an execution could always go forward at a later
10  date.

11      But even putting aside the issue of not being able to
12  resupply lethal drugs, the Courts have recognized that
13  last-minute stay tactics can basically be used to push off
14  executions for decades if not to entirely avoid them.  That's
15  why the courts, including the United States Supreme Court,
16  require a clear and rigorous showing of a likelihood of success
17  on the merits to obtain a stay.  Prisoners' claims in this case
18  do not even survive a motion to dismiss, much less do they meet
19  the heightened standard for a stay.  For example, prisoners
20  make two claims that no court in this country has ever
21  suggested are legally valid claims.  They claim that eight
22  executions performed two per night with multiple days between
23  them causes some free floating numbers or timing violation that
24  is yet to be discovered in the cruel or unusual punishment
25  clause.

1        Despite numerous instances in our history, both the

2   state's history and the country's history of two or more

3   executions a night and multiple executions per week, no court

4   has ever declared such a claim as valid under the 8th

5   Amendment.  And putting aside matters of Article III standing

6   that we present in our brief, that's because the 8th Amendment

7   has always been understood to protect an individual's right to

8   be free from wanton infliction of pain or punishment, and also

9   to be free from punishment that is disproportionate to an

10  individual's circumstances.  The 8th Amendment simply is not

11  violated based on how many other executions are scheduled near

12  an individual's execution.  Like the free-floating 8th

13  Amendment claim based on the execution schedule, plaintiffs'

14  ineffective of counsel claim is not legally cognizable.

15       We explain in briefing that the Sixth Amendment right to

16  effective assistance of counsel does not apply in the

17  post-conviction context.  We also explain that the Court cases

18  are clear that Section 3599's appointment of counsel does not

19  carry with it an effectiveness guarantee like the

20  constitutional protection does.  But even if this weren't the

21  case, the prisoners are not pointing backwards to an actual

22  deficiency, rather they are pointing forward to a speculative

23  future deficiency, and to be fair, if you look closely at the

24  complaint, they're not even alleging a future deficiency, they

25  are claiming that the schedule will be difficult for counsel

1    and thus counsel might be at less than their best.  That, of

2    course, is not an ineffective assistance of counsel claim.  No

3    court has recognized such a radical claim.  I understand in

4    plaintiffs' filing last night or this morning, they like to in

5    some sense change their claim to a conflict-free counsel claim,

6    and I think their point there is in cases of conflict, courts

7    sometimes presume prejudice if there is a clear and actual

8    conflict.  The failure of this argument is that there is no

9    conflict.  What they simply say is that they have a lot of

10   clients and not a lot of time.  That is essentially the

11   definition of being a lawyer.  We all have a lot of clients and

12   we all don't have very much time and have to pick and choose

13   the right strategy to use for each of them within the confines

14   of our jobs and our lives.  That does not create a conflict and

15   it certainly does not create ineffective assistance of counsel.

16   Even claims that might not be entirely frivolous were the first

17   time arose are legally meritless in this context because of the

18   prisoners' history of litigation.  And, Your Honor, I know we

19   briefed this to a significant extent and detail, but I think

20   it's very important to understand that this litigation did not

21   just start yesterday.

22        Let's take the prisoners' challenge to the three drug

23   cocktail.  While you wouldn't know it from their complaint and

24   PI motion, all of the parties in this case just finished within

25   a month, just finished litigating this exact challenge in state

court.  Our brief walks through that in significant detail, I won't do this here, but I will say perhaps the most important thing for this court to understand is that prisoners originally brought both federal and state cruelty claims and then intentionally dropped the federal ones when the State removed this case to federal court.  The prisoners were also forthright about why they dropped the federal claims.  It was specifically in order to ensure they not go back and litigate in state court.  And this was a tactical decision.  This wasn't a fly by the seat of our pants decision.

This decision was made because the state court judge that we were all in front of was very, very public about his anti-death penalty stance.  The prisoners got the benefit of their bargain.  Unfortunately, they lost.  They now seek to try to get the benefit of the bargain they didn't choose the first time.  In state court, the challenge was litigated all the way through summary judgment including discovery.  While the circuit court denied the state's summary judgment, the Arkansas Supreme Court reversed that decision in toto.  The state Supreme Court only addressed the second prong of *Glossip* because it found for the State and therefore didn't need to reach the first prong.  It found that the prisoners failed to plead and then failed to produce any evidence of a known, feasible alternative method of execution that was readily available to ADC.

1          As we explained in our briefing, both the Arkansas

2     Supreme Court and the state circuit court then confirmed

3     expressly that the Arkansas Supreme Court decision was on its

4     merits.  It terminated the case in state court.  Again, both

5     courts said that.  The United States Supreme Court denied

6     certiorari, and in short, all the prerequisites for res

7     judicata are met.  In their filing last night, the prisoners'

8     only real response to this is that the case in state court

9     involved sovereign immunity, but that's really no response at

10    all.  As Your Honor knows, especially in state court, sovereign

11    immunity would be bounded up with the merits.  And in this

12    case, that's a perfect example.  We went through a motion to

13    dismiss, we then went through discovery and we then went all

14    the way to the summary judgment phase.  This was a decision as

15    both of those courts said on the merits.  It can't be that if

16    we went to summary judgment and the prisoners won they could

17    enforce res judicata, but because we went to summary judgment

18    and the State won, the State can't enforce res judicata.  That

19    makes no sense and finds no safe harbor in law or logic.

20         I can't stress enough that this is precisely the type of

21    strategic, serial, piecemeal litigation and the type of

22    claim-splitting that the doctrine of res judicata was intended

23    to prevent.  The entire midazolam claim should be barred under

24    res judicata, but if the Court decides otherwise, collateral

25    estoppel precludes the prisoners from being able to show a

1    known, feasible alternative method of execution that is readily

2    available to ADC.  Each alternative identified in the

3    prisoners' current complaint either was or could have been

4    identified in the previous state court complaint.  And any

5    supporting information in the present complaint either was or

6    could have been provided in the earlier case.  Because

7    collateral estoppel applies to the second *Glossip* prong, the

8    midazolam claim must fail here.

9         In any event, putting res judicata and collateral

10   estoppel aside, the prisoners' midazolam claim cannot survive a

11   motion to dismiss in its own right because prisoners fail to

12   alleged in a nonconclusory manner the availability to ADC of a

13   known and feasible alternative method of execution.  Of all the

14   chemicals and gases that the prisoners propose, the only one

15   that they alleged is readily available to ADC is sevoflurane,

16   an anesthetic gas.  But sevoflurane, and I apologize if I get

17   that name mixed up, it's a little difficult for me to

18   pronounce, that's why I went to law school, has never been used

19   for executions in any state in the country or, quite frankly,

20   we think the world.  As a matter of law, it cannot be

21   considered a known and feasible alternative.

22        As in the prior state court case, the prisoners also

23   alleged a firing squad.  But they don't allege that ADC has the

24   necessary building for it.  They don't allege the ADC has the

25   people who are willing to perform the role.  They don't allege

1    how much training would be necessary or what qualifying tests

2    would be needed, and perhaps, most importantly, they don't

3    allege how often the firing squad would miss their mark during

4    the first volley and thus they cannot properly allege that the

5    firing squad will significantly reduce the likelihood of severe

6    pain, which after all, is what the second prong of *Glossip* is

7    all about.  Without belaboring the point, the prisoners haven't

8    even pled enough to get past *Glossip's* second prong.

9         Obviously, the Court doesn't need me to regurgitate our

10   entire brief.  But let me just quickly touch on two other

11   claims.  First, the protocol claims.  And these are the non

12   sort of midazolam claims, the training claims, the

13   consciousness check claims.  There are a plethora of reasons

14   that these claims are legally meritless, but chief among these

15   reasons is the three-year time bar to 1983 actions.  Almost all

16   of the parts of the protocol that prisoners complain about have

17   been part of the protocol since 2008.  The prisoners claim thus

18   occurred long ago and the three-year bar applies.  Now, I

19   understand that the prisoners make an argument that given the

20   change to midazolam everything should be sort of out the window

21   and they should be allowed to challenge all parts of the

22   protocol anew, but that doesn't make any sense.

23        The consciousness check is still a check for

24   consciousness.  Being able to put in an IV is still being able

25   to put in an IV.  If they had problems with these protocols

1    before, they should have brought them and litigated them at the

2    time.  Moreover, *Nooner v. Norris* takes care of almost each

3    challenge prisoners have launched in this claim.  As was true

4    in *Nooner*, our protocol satisfies the constitutional standard

5    to guard against the wanton infliction of pain.  And the best

6    practices type of attack quite frankly that you also just heard

7    from Dr. Zivot, the best practices type of attacks made by the

8    prisoners are simply not of constitutional magnitude.  This is

9    not a question of whether the lethal injection has been

10   performed as it would have been in a doctor's office or a

11   hospital.  It's not a question, quite frankly, of what

12   Dr. Zivot thinks is the best practices or what he would do.

13   It's a question of what is constitutionally acceptable to avoid

14   an objectively intolerable risk of needless suffering and

15   severe pain.

16        The Eighth Circuit is clear in case after case that

17   accident and maladministration of the protocol is not

18   actionable.  Second, the claim that the execution schedule

19   might cause additional stress and thus risk an accident or

20   maladministration of the protocol is equally problematic to the

21   protocol claims.  As I just said, the Eighth Circuit is clear

22   in case after case that a risk of maladministration or accident

23   is not cognizable under the 8th Amendment.  But more

24   importantly, their allegation is entirely speculative.  Their

25   allegation requires you to say that a two execution per night

1   schedule with a number of days' break in between, in a

2   constitutionally problematic way increases the risk of accident

3   or maladministration of the protocol.

4        Number one, it's speculative that there's any additional

5   stress.  Number two, it's speculative that any additional

6   stress there might be is stress that the prison folks, the IV

7   team, the execution team, cannot handle.  And three, as we said

8   even if all that wasn't true, this runs headlong into the cases

9   that the risk of accident and maladministration is not

10  actionable.  The Eighth Circuit's case law makes good sense in

11  this context.  Otherwise, the Court will quickly find itself

12  policing what jobs executioners and the IV team can do and

13  can't do in the days leading up to the execution.  What

14  activities cause stress, what activities cause too much stress.

15  How much stress is too much constitutional stress.  These are

16  not questions the Court should be deciding, these are questions

17  for the ADC in carrying out their protocol, and this court

18  shouldn't be sitting and, quite frankly, in our view has no

19  authority to sit as a general supervisory board to decide

20  whether the ADC has made the best decision about what is most

21  or least stressful.  That's what the prisoners really want.

22  The prisoners in this case want the Court to substitute its

23  judgment for ADC's judgment.

24       But the 8th Amendment doesn't require that and, quite

25  frankly, it doesn't license that.  Even if one could speculate,

1    and it would just be rank speculation, that the contemplated

2    schedule put a little bit of added stress on participants in

3    the execution, it would be no more stress than preparing for

4    and participating in this litigation, the litigation in front

5    of Judge Marshall, and the other litigations that the prisoners

6    and their counsel have brought.  Such stress is part of the

7    job.  It's part of life.  It certainly doesn't rise to an

8    objectively intolerable risk which is the limited issue that

9    the 8th Amendment focuses on.

10        So let me end by returning to where I started.  Your

11   Honor is going to hear a long list of witnesses and, quite

12   frankly, that's the smart play here.  If I was on the other

13   side, that's exactly what I would be doing too.  The more

14   information the Court hears, the more it muddies up the water

15   and the better it is for prisoners.  I fully understand and

16   respect why Your Honor gave them an evidentiary hearing,

17   especially given the stakes involved.  But I ask you to keep

18   three things in mind as we proceed.  First, their claims are

19   not legally valid, which I think I've probably been over now

20   enough.  Second, at some point, even when death is at issue,

21   enough really is enough.  The State is entitled to and has a

22   significant interest in finally imposing lawful death

23   sentences.  The State has an interest in bringing closure to

24   the victims' families.  The State has an interest in bringing

25   justice to the victims.  And the State has an interest in being

1  able to maintain the death penalty as a legitimate and actual

2  deterrent effect.

3       Legally implausible and factually dubious claims cannot

4  be permitted to grind the wheels of justice to a halt.  Third,

5  and finally, as this hearing goes on, I'd very respectfully ask

6  Your Honor to try to conduct it in a way that allows you either

7  to rule from the bench or to rule very, very quickly the

8  following day.  I think it's probably common sense that one of

9  our sides is going to be up at the Eighth Circuit following

10  this decision, and what I am most concerned about is that we

11  don't end up fighting about this on a day of the execution.  I

12  don't believe it's fair to the prisoners, I don't believe it's

13  fair to the victims' families.  And so I would ask Your Honor

14  to as much as possible, especially from our point of view,

15  judge the legally cognizable nature or lack thereof nature of

16  these claims and be in a position to rule as soon as possible.

17  Thank you.

18       THE COURT:  All right.  It is now 20 till 12.  We

19  are scheduled to take a break at 12:15.  Do you have your next

20  witness?

21       MS. GIANI:  Yes, Your Honor.  Plaintiffs call Jennie

22  Lancaster.  Your Honor, she's asked to take a quick restroom

23  break before starting her testimony.

24       THE COURT:  That's fine.

25       MS. GIANI:  Ms. Lancaster is ready to testify.

Lancaster - Direct

```
 1              THE COURT:  Ms. Lancaster, if you would, please
 2    approach.  Before you have a seat, if you would, stop and raise
 3    your right hand and Ms. Washington will administer the oath.
 4          JENNIE LANCASTER, PLAINTIFFS' WITNESS, DULY SWORN
 5              THE COURT:  The most important person to hear you is
 6    the court reporter.  So if she can't hear you, she'll speak up.
 7    You may proceed with questioning whenever you're ready.
 8              MS. GIANI:  Thank you, Your Honor.
 9                        DIRECT EXAMINATION
10    BY MS. GIANI:
11    Q     Before we get started can you just state your name for
12    the record.
13    A     Jennie Lou Lancaster.
14    Q     And can you just tell us about your professional
15    background and experience.
16    A     I graduated from college in 1971, was an intern that
17    summer in corrections.  Back then, women and college graduates
18    didn't really get into the business.  Went to divinity school
19    and stayed two weeks and came back and said, I think I know
20    what I want to do.  Worked in a jewelry store for nine months
21    and then got an opportunity in 1972 to work with male juvenile
22    offenders in the North Carolina Department of Correction
23    Division of Prisons.  I worked with them about eight years,
24    then was asked to apply for a promotion.  I was in that
25    promotion for six weeks and then was asked to go to Women's
```

1    Prison as the associate warden for programs.  In 1982, I was
2    made warden of Women's Prison at the North Carolina
3    Correctional Institution for Women.  I was warden from '82 to
4    '87.  Promoted downtown and was made the female command manager
5    for ten years.
6          We had our management structure where our prison
7    separated in commands:  A youth command, institution command,
8    medium custody command.  And so as a female command manager, I
9    was in charge of all six of the female prisons in North
10   Carolina.  We made a decision as an agency to regionalize and
11   created five different management regions, four prisons.  We
12   have a lot of prisons in North Carolina.  And I was made the
13   first region director in the central region.  I had 12 major
14   institutions, all of the death row, inpatient medical, mental
15   health, the big prison farm, most of the male maximum custody,
16   and the three largest female facilities.  I retired the first
17   time in 2004, September, as the central region director.  And
18   then Governor Perdue asked me to come out of retirement in 2009
19   as the chief operating officer of the North Carolina Department
20   of Correction.  I was in that role for three years, and then
21   in 2012, we consolidated with two other agencies and I became
22   the commissioner of adult corrections.  Retired again in
23   January of '13 for good.  Total of 36 years.
24   Q    Okay.  In your various roles in corrections in North
25   Carolina, did you ever have a role in developing execution

Lancaster - Direct

1    protocols?

2    A      Yes.  And I would like -- before I get into that, Your

3    Honor, I'd like to make a general statement if I can.

4             THE COURT:  You may.

5             THE WITNESS:  I'm here to share my personal

6    experience in North Carolina.  I have professional colleagues

7    who have shared similar experiences and I have professional

8    colleagues who have had different experiences that I'll talk

9    about.  I respect, I've read the affidavit from former Director

10   Norris, and I respect his experience, I respect any of us who

11   are in correctional agencies who are given the responsibilities

12   of administering and carrying out the death penalty.  And so we

13   may have different experiences, but I want my respect for

14   what's happened in terms of the people and the responsibility

15   that have it.  So I'm going to be sharing my experiences, but

16   they may differ from others.

17            THE COURT:  All right.

18   BY MS. GIANI:

19   Q      Can you start with sharing your experience as to what, if

20   any, roles you've had in developing execution protocols?

21   A      Well, it came very unexpected in 19 -- I went to Women's

22   Prison in 1982.  Went in 1980, I was made warden in 1982.  We

23   had one woman on death row at that time, Velma Barfield.

24   Started working, you know, with her lawyers probably in early

25   1984.  Because of her appellate process, they began to tell me

1    that they actually believed that there was a good possibility

2    that she would be facing potentially execution.  We'd had our

3    first execution since we had reinstated the death penalty in

4    North Carolina by adding the jury phase in March of 1984.  I

5    started talking to my bosses and looked around the country and

6    there was no one that had any experience at all in the

7    preparation, the protocols of managing a female inmate who was

8    due potentially to be executed.

9         So over that period of six to eight months, she was

10   ultimately executed November 2nd of 1984.  We had a number of

11   things that happened in that six to seven month period, but I

12   worked very closely with the warden of Central Prison which is

13   where all our executions occur.  Maintained her as an inmate at

14   Women's, talked with colleagues who had death row inmates but

15   had not faced an execution in other states.  So there was no

16   primer, there was no training, there was nothing for any of us

17   to know exactly what we needed to do in referencing with the

18   women at women's.  We had protocols, we had the execution

19   protocol well written and detailed at Central Prison, so my

20   first experience was the warden at Women's Prison in 1984.

21   Q    So you said this was the first execution of a woman in

22   some time?

23   A    Oh, yeah, 30 plus years, I believe.  In the United

24   States, not just North Carolina.

25   Q    So that process, because it had been some time, it took a

Lancaster - Direct

1    while to develop that process?

2    A      Yes, yes.

3    Q      And what sorts of things did you consider when you

4    developed that protocol?

5    A      Well, we looked at practical things.  One was she was at

6    Women's on death row at the Women's Prison.  And we had

7    different physical structure, we had different security

8    structures compared to male maximum custody Central Prison

9    which is where all the male death row inmates were.  So we

10   looked first at our first responsibility is public safety and

11   security, so we looked at any kind of security changes and

12   protocols we needed to make and we made some.  We looked at the

13   issues regarding we had contact visiting at Women's Prison,

14   always have had it, including death row inmates.  Central

15   Prison did not have contact visiting with their maximum

16   custody.

17          So we worked through the continuation of contact visiting

18   at Women's, we put some different restrictions in there, we

19   looked at actually when would be, how would we transfer her,

20   when we would transfer her to Central to the death watch area.

21   We looked at staffing.  I had to deal with a lot of staffing

22   issues about how to manage her from a staffing standpoint in

23   the facility.  The facility she was housed in also had maximum

24   custody inmates, safe keepers, and disciplinary segregation.

25   It was a multi status building which is pretty typical for

1    women's facilities.  So in looking at actually who we were

2    going to staff that facility with, knowing that we were in the

3    very public, which is another issue about all this, there was a

4    tremendous amount of national and international media attention

5    to this case because it was the first woman.

6         So we had to develop media strategy over a three-month

7    period with the secretary's office.  So picking the staff, how

8    to communicate with her family, looking at her medical needs

9    and mental health needs, communicating with the warden at

10   Central Prison as we got closer to actual making some

11   decisions, which were clearly not public about moving and when

12   we were going to move and those kind of things.  And also what

13   was unique is the Women's Prison is a very -- I wouldn't try to

14   be sexist and say an emotional facility, but women talk a lot,

15   women have a lot of communication and interaction with each

16   other.  A lot of our women knew Velma because they had been

17   housed in that facility on segregation.  Safe keepers, maximum

18   custody, so they knew the kind of inmate she was.  She was an

19   older woman.

20        I realized that I thought I needed to have a

21   communication strategy also with my population, particularly

22   the six weeks prior to.  Like I said, it was so much in the

23   news media.  We had news media interviews, three different

24   types every Friday for three months.  Her clemency process

25   literally had Amnesty International and the other folks at it.

Karen Baker, RMR, CRR, CCR
United States Court Reporter

1    The clemency decision was denied in September of 2004, so it

2    was everywhere in terms of the focus.  My focus was being the

3    warden of that facility.  My focus was the caretaking role that

4    we have in this business.  Let me just carve that out a minute

5    because it gives me an opportunity to say this.  I've often

6    said that corrections people are out of sight, out of mind.  I

7    call them the silent actors in this whole process of not only

8    managing executions, but also criminal justice.

9         Inmates get -- when they're suspects and when they go to

10   trial, there may be levels of publicity about it, but what

11   happens to them when they get sent to prison is pretty much out

12   of sight, out of mind for a lot of people.  We don't judge

13   again when an inmate comes to prison, that's not our job.  They

14   have received a legal judgment from the Court.  It is our job

15   and what we're sworn to do and what I've always been as an

16   ethical professional manager is if you're willing to work with

17   us, our job is to work with you.  We are responsible to manage

18   the women, the men, in our custody according to the

19   constitution, the law, our policies.  It's an ethical, moral

20   environment.  Our prisons are small communities.  We have our

21   own cultures.  We have ethics and morality in how we run our

22   prisons.  There's always many more inmates than there are

23   employees, and if you think about it, and the kinds of things

24   that inmates bring with them to prison, there's a lot of mental

25   illness, there's substance abuse, there's family dysfunction,

Lancaster - Direct

1    there are a number of things that typically are a part of an

2    inmate's makeup and our people who don't get paid very well are

3    in there serving time with them.

4         I used to tell my long-termers, I'm doing life with you,

5    except you're doing it on the installment plan and I'm doing

6    the life sentence with you because you keep coming in and out.

7    I'm doing life with you.  But it is true.  And a lot of

8    attention other than what you see on the stupid TV shows, which

9    really frustrate me sometimes how they dramatize some of this

10   stuff, but it is a real, thriving human environment and we are

11   caretakers.  We are guided by our caretaking.  But that's our

12   primary role, provide custody, security, public safety, and if

13   we can allow opportunities for inmates to make changes, that's

14   what we do.  So I caveat that to say that was a part of what my

15   responsibilities were to manage that facility and to pay

16   attention to what was happening within that facility.

17        To communicate, we had a strategy about how we were

18   communicating with the inmate population.  I had to make a lot

19   of decisions with our staff to say our personal opinions about

20   the death penalty don't have a place here.  You're going to

21   hear different things from these women, you're going to hear

22   questions, what do you think about Ms. Barfield, what do you

23   think about the death penalty.  Our role is to listen but it's

24   not to engage in our personal opinions.  Telling staff if you

25   have a personal opinion in the role that you're in, come talk

Lancaster - Direct

1    to me, talk to me, we'll work through whatever your roles were.
2    We had medical people, mental health people that had been
3    involved working with her, and it's, like, what changes about
4    this, are any changes going on about this.  And the family
5    involvement was pretty intense.
6         It's another part of what we do in prisons.  We are
7    their -- family members of inmates many times have not
8    committed crimes.  They are victims too, sometimes, and
9    depending on what happens with their person, we are the ones
10   that are responsible for sitting down with the families,
11   listening to the families, talking to the families,
12   facilitating the kinds of things from a moral standpoint that
13   you do.  So it's another whole world there, and as a warden,
14   it's the best job in the world in corrections, because it's
15   like having a large family and you work with folks every day to
16   set the kind of culture and atmosphere hopefully that will keep
17   people safe, try to be as fair and consistent as you can be,
18   that's a difficulty.  So it was with that approach, not only
19   did I learn to do this, I didn't pick up a book and read about
20   this, you learn, but I think it is true in how most of us in
21   this country look at our responsibilities in managing our
22   prisons.
23   Q    You said a lot there, so I'm going to --
24   A    I wanted to say a lot there because it's a context for
25   which I answer other things.

Lancaster - Direct

1    Q    Okay.  And I do want to go back through and touch on some

2    of the things that you've said.  But one thing I wanted to ask,

3    you know, is you talked a lot about Velma Barfield.  So this

4    was in the context of one execution, right?

5    A    Yes.

6    Q    And so is each execution sort of an individual

7    experience?

8    A    Absolutely.  Each one's different.  The circumstances

9    that present themselves and can present themselves with each

10   individual case.  Protocol is the same, but the circumstances

11   that can present itself, there's usually something more than

12   not that can be unique that happens or something that happens.

13   So in that way, yes, each one's unique.

14   Q    Have you previously witnessed or otherwise participated

15   in executions?

16   A    Yes.

17   Q    How many?

18   A    Total of 23.  I had to go back actually and look on our

19   timeline and count to make sure that I was being accurate.

20   When I became the central region manager, one of the facilities

21   under my direct supervision of the warden was Central Prison,

22   and in that role, I was the primary support person, I was the

23   primary resource for that warden, and doing planning with him

24   and being a part of actually probably pretty intensely involved

25   the last week of a scheduled execution.  And I was always

Lancaster - Direct

1   present at least at one rehearsal.  Early on at more, but then
2   I would usually go to one rehearsal.  And then I was present at
3   night with the warden and his staff during the actual, I would
4   go with the warden upstairs when we would -- usually an hour
5   before the actual countdown of the process would start and I
6   would be present with the warden and all of our staff till the
7   end of the execution.
8   Q    You mentioned with Velma, in that role, you were a warden
9   at that time?
10  A    Yes.
11  Q    Were there any other roles that you played in different
12  executions?
13  A    Well, that was a pretty big role.  No, the supervision of
14  Central Prison, we have not had another execution of a woman.
15  But the direct supervision, the warden in our state has a lot
16  of statutory responsibility for administering the death
17  penalty.  And so I was the conduit, not only the support for
18  him, there were three hims, I had three wardens, all fine, fine
19  folks -- one went on to become the director of prisons -- but
20  also be the liaison with the secretary's office, with our
21  lawyers, with any other news media, public information, trying
22  to take as much off of the warden as I could and being in that
23  role of primarily support, problem-solving with the warden.
24  Q    Can you just walk us through from your experience the
25  execution process from when an execution date is set until

1    whatever your perspective is of when the process ends?

2    A      Our law in North Carolina, when the attorney general's

3    office sends an official letter to the secretary of correction

4    that informs that person that the appellate process has ended,

5    that an execution date can be set for this individual, we have

6    a 30 day window.  The law says the secretary of correction

7    actually sets the date.  No sooner than 60 days of receipt of

8    the letter, no longer than 90 days of receipt of that letter,

9    so we basically have a 30-day period in which the secretary of

10   correction sets the date.  So the date would be set.  My role,

11   unless they were unusual circumstances that might come up that

12   would warrant, I frequently went to Central Prison, but I'd say

13   probably two weeks before a scheduled date, that's when from

14   the legal process that's going on, where are we with that,

15   what's happening now with witnesses, have we got everybody

16   lined up, what's happening, and we allow victims' families as

17   well as inmate families to be witnesses.

18          That is a process in and of itself to work with.  We had

19   people that -- it's intense because you have to talk with

20   people individually, you have to let folks know our

21   expectations.  Our chaplains are very involved.  So my role

22   would be any kind of question, any kind of circumstances that

23   come up, decisions that get made with the warden, so if he

24   gets --

25               MR. RUDOFSKY:  I apologize for interrupting.  Can we

 1  just have the same continuing objection to relevance?  Assuming
 2  you're going to overrule it.  If you're not, great, but --
 3               THE COURT:  I'll recognize a continuing objection.
 4               THE WITNESS:  Anyway, his role, you know, really
 5  begins when he knows he's got an execution date and the
 6  planning again goes from everything from managing witnesses,
 7  securing witnesses, we have laws about who they have to be,
 8  some of them, and he would let me know if there was something
 9  he needed to bounce off of me for the most part.  My role
10  became much more intense about two weeks before an execution.
11  I was over there practically every day.
12  BY MS. GIANI:
13  Q    So are there quite a few staff that are involved in any
14  execution?
15  A    Yes.  You've got direct involvement.  We have, the night
16  of an execution, I would say what we would consider our team,
17  probably 20 people, with various roles.  You have secondary
18  folks that are doing things and, you know, executions occur in
19  a operational prison, so you have the operation of the prison
20  that's also going on that you have to make sure that is being
21  managed and looked after while the warden and the designated
22  staff are doing what they have to do.
23  Q    Does the process end the moment death is declared?
24  A    The legal order has been completed when there's a
25  declaration of death.  The staff have to continue by the

Karen Baker, RMR, CRR, CCR
United States Court Reporter

1    removal of the body, whatever if there's any different

2    circumstances other than what we normally do about the

3    transport of the body, and working -- if there's anything that

4    comes up at the last minute, we have to work with families

5    about what they're going to do.  And believe it or not,

6    sometimes they're still not sure.  We have a -- we send all of

7    our executed inmates' remains to the UNC Medical School and

8    they're there for maybe six or seven hours and that's where the

9    families, and it's up to the warden to make these plans, that's

10   where the family has to tell us what they're going to do in

11   terms of taking responsibility for the body.

12   Q    After an execution, in your experience, did you have sort

13   of a debriefing or an assessment period?

14   A    Yes.  We'd have what I'd call kind of a -- we for a long

15   time gathered because the secretary would want to thank not

16   just the team but some associated people who were doing

17   different responsibilities, usually at 4:00 a.m. or so, for how

18   things went and for the jobs that they had just done.  The

19   warden conducted, every time, an individual debriefing.  We

20   also had the involvement of a psychologist for about five or

21   six executions, but the warden's debrief was probably more

22   important than anything, because it gave individual members

23   particularly of the team an ability not only to talk about or

24   ask questions about them, but anything they observed.  So there

25   was always a warden debriefing probably within the first three

Lancaster - Direct

1   or four days, and if there was anything I need to know, the

2   warden would let me know.  We had mental health assistance

3   externally for our people and never received any information

4   and didn't want any, any summary, any report-backs from our

5   external source that was available to staff to see.  We simply

6   paid the bills.

7   Q      Why was this individual debriefing with the warden

8   important as opposed to just a group assessment?

9   A      Well, one of my biggest issues when I think about the

10  responsibilities that are put on correctional staff, and that's

11  burdensome, this is a difficult thing to do, it's the secrecy

12  that surrounds it.  Inherently this is a very secretive process

13  for good reasons, but it also has its downfall.  You're not

14  supposed to go home and talk to your family, you don't go to

15  church, you don't go to the rotary club, you're not supposed to

16  talk about what happened amongst your peers and your

17  colleagues.  There's a lot of reasons for confidentiality, but

18  it can cause isolation.  And so one of the things that we

19  wanted to make sure, and this was not my thinking, this is the

20  wardens who are responsible for these folks and knew their

21  people, they knew their people.  All of our people who

22  participate did come from Central Prison.  They were not from

23  other prisons, they were from Central Prison.

24         He wanted the opportunity to give them a chance to be

25  honest, to ask questions, to say if they had become

Lancaster - Direct

1  uncomfortable, and any observations they may have had about

2  other people in the team.  When I started supervising Central

3  Prison, I would say there was a seasoned group of employees who

4  had already been a part of executions.  If we had to start

5  again now in North Carolina, we're similar to Arkansas, we've

6  not had an execution in 11 years.  I understand I don't think

7  there's one here since 2005.  There's no doubt in my mind that

8  at Central Prison all of our folks who have really had primary

9  roles are no longer there.  So it's a matter of what it would

10  be now is going through again I think what the process would be

11  and selecting people.

12      I think you'd have to spend a lot more time because you

13  just haven't had people that have done that before.  That's my

14  expectation of what would happen in terms of a warden's role.

15  The debriefing I think becomes more important when you have new

16  folks, they need to be able to ask questions, but they need to

17  be able to do it where they're not going to feel that somebody

18  is saying, oh, you can't handle it.  I've heard this.  I've

19  heard it from legislators who say, oh, staff have problems,

20  this is some of the legal things that we had to negotiate.

21  We'll go find people who don't have a problem.

22      Quite frankly, I don't ever want to have any problem with

23  anybody working for me that's involved in this that doesn't

24  have certainly a level of reaction, professional, ethical,

25  managed, but at the level of the responsibility, we're not

1  trained to do this.  We don't get interviewed to do this.  It

2  is a part of our job, it's the reason I've done it all these

3  times.  I think it's the same kind of responsibility I have to

4  staff as I do when I ask them to do every day in their job.  No

5  more, no less.  It's kind of a longer thing about, but the

6  engagement with staff, I think, is important and they have to

7  be able to have a sense of privacy about it because it's such a

8  secretive process.  Talking to the warden is one way to do it.

9         THE COURT:  It's 12:15.  We'll take our lunch break.

10  You will be back on the stand after our lunch break.  You may

11  step down.  Counsel, do y'all have anything that you wish to

12  raise with the Court at this time?  Otherwise we will be in

13  recess for our lunch break.

14         MS. GIANI:  We have nothing, Your Honor.

15         THE COURT:  Ms. Merritt.

16         MS. MERRITT:  Your Honor, I have one question.  And

17  it's something I've got somebody back at the office looking

18  into.  I'm concerned about the issue of Dr. Zivot and whether

19  he's still under oath and whether plaintiffs' counsel are going

20  to talk to him and work with him and coach him for his Thursday

21  continuation of his redirect.  To me, it would be like my

22  witness was on the stand and he got a three-day break and I

23  could go work with him some more.  I'm not sure if that's

24  appropriate.  I just wondered if the Court had any guidance on

25  that issue at this time.

```
 1              THE COURT:  I don't think direct is concluded.  He's
 2   not under cross-examination at this time.  He'll be under
 3   cross-examination Thursday.  He's an expert witness, right, I'm
 4   going to assume that almost all these folks, if you wanted to
 5   put them up for that could be, which opens up the door to
 6   hearsay, reliance on a lot of other things and frankly getting
 7   all the information of what's happening in the courtroom.  So
 8   I'm not sure what your question or concern goes to in light of
 9   that.  I don't know that that's any different than it would be
10   if you've got an expert witness and you want him to sit in the
11   courtroom today and hear all of this, they certainly could,
12   there's nothing wrong with that.  So what is the concern about?
13              MS. MERRITT:  I agree with all that, Your Honor it
14   strikes me as kind of odd that in the middle of a witness's
15   testimony that they would take a three-day break and then come
16   back and continue, and during that three-day period, get to
17   work with counsel and research issues.  I don't know, it just
18   struck me as kind of strange, and I wanted to alert the Court
19   that I'm looking into that and I may raise an objection just to
20   put it on the record.
21              THE COURT:  I don't think you were on the call, but
22   I announced on the call on Thursday that this is what we'd do.
23   They wanted to hold him until Thursday late in the day and not
24   start his testimony until then, and I required them to start it
25   today for the two hours and then told them they could bring him
```

Lancaster - Direct

 1    back Thursday to finish if we didn't finish.  So I don't know

 2    that -- you're certainly welcome to make any record you want.

 3    At that time, the only objection was the State didn't want to

 4    have to present its defense witnesses without ever hearing from

 5    him at the beginning of this hearing and holding him till

 6    Thursday, so I'm not sure that there would be a good way to

 7    figure that out.  You're certainly welcome to raise any

 8    objection you want.  I might take the position that it wasn't

 9    raised at the beginning when I made the initial ruling and I

10    required them to engage in this practice.

11             MS. MERRITT:  Very well, Your Honor.  Thank you.

12             THE COURT:  Anything else?  With that, we're in

13    recess till 1:15.

14         (Lunch recess at 12:20 PM until 1:17 PM.)

15             THE COURT:  Just a couple housekeeping things and

16    then we'll get started again.  In regard to the schedule, I

17    recognize that today setting the deadline for running the clock

18    till 8:15 is probably not fair to the plaintiffs' lawyers.

19    We'll end at whatever time the witnesses are ready to end today

20    and we won't count that time against anybody.  I will cut it

21    off from the back end.  Under no circumstances will we go past

22    8:15 p.m. on Thursday.  And the same is true with a schedule

23    like that, I understand and appreciate it's difficult for

24    everybody.  If it's not your witness and you don't need to be

25    in the courtroom at that time, I'm fine with you moving in and

1    out of the courtroom as you see fit during these days and

2    evenings however you wish.  You may proceed.

3    BY MS. GIANI:

4    Q     Thank you, Your Honor.

5          Ms. Lancaster, I think when we left off, you had talked

6    about being a part of or witnessing 23 executions.  Is that

7    right?

8    A     Yes.

9    Q     And were all 23 of those, did you have some sort of

10   supervisory role?

11   A     Yes.

12   Q     Did you witness the effects that those executions had on

13   your staff?

14   A     There was one occasion where literally we did, I did see

15   based on a clemency decision that came down late, anyway, did

16   see almost some, I don't know how to describe it, immediate

17   facial expressions, nothing inappropriate, based on the

18   decision that came at the last minute.  It was kind of

19   unexpected.  And we proceeded forth with an execution that

20   night.  I have seen -- when you say witness, there's different

21   ways to say witness.  You can witness what happens to somebody

22   over periods of time and, yes, I know of and have seen the

23   impacts, you know, when you want to look at a level of real

24   impact occur with some of our employees.

25   Q     In your experience, are executions stressful for either

1   yourself or staff members?

2   A       Absolutely.  You think about, you know, when I think

3   about it, I think just applying a common sense standard of

4   employment in our country and the various things people do for

5   a living and the kind of occupations where you may be trained,

6   or part of that responsibility is to be a part of conducting a

7   execution where the end result is there is a deceased person.

8   There's no training really for this.  There's rehearsal about

9   procedures.  We all do a lot of that.  And following our

10  procedures is critical, detailed procedures.  And our folks,

11  all of us need to follow those procedures.

12          But to say how to prepare yourself, how to prepare your

13  family for the eventual, I think it for us in North Carolina,

14  once we began to really see executions pick up, 2003, we had

15  seven, they were not back to back and we've never had a

16  multiple executions in one night.  We have had two occur within

17  a 14-day period, one time.  But to begin to see and what the

18  warden would tell me about seeing and calling folks in and

19  saying, you know, you seem to be taking more sick leave, this

20  is not everybody, but in instances.

21              MS. CRYER:  Objection, Your Honor, hearsay.

22              THE COURT:  I'm going to overrule the objection,

23  just permit it.  Go ahead.

24              THE WITNESS:  I understand that objection.  I would

25  hear from the warden, but I also had personal conversations

                    Karen Baker, RMR, CRR, CCR
                    United States Court Reporter

Lancaster - Direct

1    with one in particular employee, outstanding employee.  I will

2    not name what role they played.  Very involved in a number of

3    executions, and the kind of personnel decisions we had to make

4    because of behavior eventually regarding substance abuse was

5    very difficult.  And it was no doubt in our minds and I think

6    eventually that person's that the impacts of what that

7    particular role was had finally caused a level of personal

8    stress for him.  He ended up leaving in lieu of us probably

9    having to do a personnel investigation and dismiss him.  That's

10   probably an extreme, but in conversations, direct conversations

11   with former wardens, I worked with three wardens that were --

12   that conducted executions while I was their supervisor.

13        And the fact we haven't had any executions for about ten

14   years, almost 11, it's easier to talk about it and it's easier

15   to really share more personal experiences and feelings once

16   you're not under that window of this could happen again in

17   three months, this could happen again in six months.  And

18   certainly heard from all three of those wardens various levels

19   of how those responsibilities impacted them.

20   Q    I think you said that in 2003, you had seven executions?

21   A    Yes.

22   Q    And for North Carolina, at least during your time there,

23   that was one of the busier times?

24   A    That was, I believe, our busiest in terms of the most in

25   one calendar year.

Karen Baker, RMR, CRR, CCR
United States Court Reporter

```
 1    Q      So over the whole year, there were seven?
 2    A      Yes.
 3    Q      And you said that that was when you began to see more
 4    perhaps adverse reactions from your staff?
 5    A      If you think about it, we start rehearsing ahead of time,
 6    you start doing things in preparation, and when you start
 7    stringing together those kinds of things, you are that
 8    particular year pretty engaged in that process throughout that
 9    calendar year.  I believe that's the time that we discussed
10    bringing somebody on board on contract, a psychologist, and it
11    was in consultation with the head of our medical services for
12    the agency.  We believed that we needed somebody external, but
13    somebody who could be confidentially available to staff, not
14    EAP, not somebody that works for us because staff just would
15    not avail themselves to that, and that's the feedback I got
16    also from the warden.
17           So we did put somebody on contract, it was Dr. Hilkey,
18    and made the decision we were all in agreement that he would
19    actually be present at actual executions.  His role was
20    explained to the staff that he is here so that he sees what
21    you're experiencing, what you're going through, what the
22    process is.  He will be available absolutely confidentially if
23    any of you want to seek seeing him.  He would do -- during
24    rehearsals, he would do kind of some mental health debriefing
25    about them, but we made him available.  I never ever knew how
```

Lancaster - Direct

1    many people sought to see him.  I never asked, we never got a

2    report.

3         That was not the purpose for doing that.  There was

4    skepticism, you know, kind of like who is this person, and

5    obviously there's no interaction when an actual process of

6    execution is going on, there's no external interaction going

7    on, people are doing their job, they're doing the things that

8    they're trained to do.  But we did that because with the number

9    of executions that were occurring, it was becoming an issue

10   that the warden wanted us to look at and do something different

11   on behalf of our staff.

12   Q    Was that based on feedback he was getting from the staff

13   or issues he was noticing?

14   A    Yes, that's what he presented to me.

15   Q    I think you mentioned a while back and I wanted to follow

16   up that your execution policies were very detailed.  Is that

17   right?

18   A    Yes.

19   Q    And why is that?

20   A    There's no room for error and there's a lot of external

21   stakeholders and you're very aware of all of the external

22   stakeholders.  When you are the responsible people for carrying

23   out the law and how that's done, and the more information in a

24   case like this, the more information -- there's not such a

25   thing as too much information about what staff are expected to

Lancaster - Direct

1   do, when, how, the detail of what their jobs are, and being

2   able to rehearse actual real rehearsals, which I understand

3   happened here, practices, rehearsals, but we all do it.  It's

4   really important to get people comfortable with what's going to

5   be expected with them because you're on the clock.  We're on a

6   clock, we all establish what our clock is.  Our clock started

7   at 1:00 a.m. and the time the execution would begin was

8   2:00 a.m., so everything was designated within that hour as to

9   who did what and how.  And it was important for the staff's

10  comfort level to understand exactly what they were expected to

11  do.

12  Q    I think you said there's no room for error.  Why do you

13  say that?

14  A    It's really hard to kind of find words to fit that.  It's

15  the ultimate law, it's the ultimate, in my opinion from my

16  perspective, legal responsibility placed on state employees.

17  We're state employees, and yet we have courts, we have victims,

18  we have the media, we have advocacy groups that are against the

19  death penalty, we have all kind of external stakeholders, but

20  the focus is on the Department of Correction to legally,

21  constitutionally, ethically, clinically achieve the completion

22  of the court order, which is the death of an individual at a

23  designated time in a period.  We are trained not to make

24  errors.

25  Q    Based on your professional knowledge and experience, is

1    it advisable in your opinion to conduct eight executions by

2    lethal injection in a 10-or 11-day period?

3    A    I don't believe it's advisable for any of the parties.

4    If we had, in North Carolina the ability to impact that kind of

5    scheduling, I think we would try to impact it in a way that put

6    more distance.  I understand that there are multiple -- we

7    haven't had them, but I do understand, and no, multiple

8    executions in one night occur throughout the United States in

9    various places.  That is not I think out of what you would call

10   a norm of what can occur in various states, they may have

11   multiple executions in one night.  Having those compressed into

12   a time frame of ten days would be problematic for me as a

13   professional and there's no down time in between.  What do

14   those employees do, do they take vacation or they come to work,

15   are they expected to work, what kind of schedules are they on,

16   how is the facility running, the debrief part.

17        I don't know what the protocol will be here, I know they

18   have thought through all this, I would assume.  But having such

19   a brief period of time between double executions in a night for

20   feedback, questions certainly will be limited.  It's not that

21   it could not occur, but it will be limited.  And it's

22   unprecedented.  I don't think any of us really do know what may

23   be impacts or effects of this because it's never been done in

24   this way before is my understanding of what I've read.

25   Q    In your mind, does this sort of schedule increase a risk

1    of error in this detailed process?

2    A     What I would say is there would be every single effort

3    made by correctional staff not to make an error.  That is the

4    intentions of any of us and it will be the intentions of the

5    people here to absolutely do their job as is prescribed.

6    Knowing the tension, the expectations of that get built up

7    around an execution, from a common sense standpoint, the

8    fatigue, I'm fatigued after one and I'm not as involved as the

9    warden and some of the other staff are.  It's a different kind

10   of fatigue because you're building up for being able to do what

11   you're supposed to do and do it the way it's prescribed.  So

12   from my perspective, I certainly could see fatigue, stress, you

13   don't know, and I think the other issue is it would be this

14   issue for us, we don't have seasoned people who have done this

15   that are continually doing this.  How are they going to react

16   in such a compressed period of time so that we would know how

17   to intervene or to do something different.

18          I absolutely trust the intention of every single employee

19   who's involved in this to do their job.  The ability to do that

20   over this period of time, and as I understand it, it will be

21   the same people.  Now, I do think we had some things that staff

22   did in our state that don't happen here.  There were very

23   stressful parts of an execution.  But that would be where my

24   concerns would come from, and again, we don't know, but I can

25   certainly see the mental and the physical fatigue in knowing

1    what that schedule would be like for ten days.

2    Q    You mentioned these corrections officers doing their job.

3    You may have touched on this before, but is participating in an

4    execution just like another part of a corrections officer's

5    job?

6    A    No.  Some of my colleagues, and I say we have a very

7    small and exclusive club in the United States that are a part

8    of doing this.  And really only people who have done it

9    understand because you've been there too.  Actually

10   correctional officers are good at taking orders and being told

11   what to do, where to be posted, they are selected in our state

12   and I assume here, you don't want people volunteering and

13   waving their hand saying, hey, I want to be a part of this.

14   You look at your good employees, you look at people who do

15   their job every day in a responsible, professional, ethical

16   manner.  That's the folks you're looking for.  And it's hard to

17   say no to a warden that is talking to you and saying I want to

18   discuss this possibility with you, you can say no and nobody

19   will ever know I've even talked to you about it.

20       Actually when I look at the concerns that I have, it's

21   the people who are in charge.  It is those of us making

22   decisions, it's that warden, it's that deputy warden, it's the

23   people designated to tell those correctional officers what to

24   do.  It's those folks who have to make those decisions.

25   Protocol is one thing, but how to deal with families, how to

Lancaster - Direct

1    deal with those unknown occurrences, how to make sure that the

2    inmates have an access to the spiritual advisor level and

3    access that they need.  Attorney access, the media, legal

4    issues, and you're trying to make the very best decision on

5    behalf of your people.  I think we underestimate the stress

6    that's on us as decision-makers and the implementers.  We may

7    not be the people who are standing behind the curtain, but we

8    are there responsible for who those people are.  And, actually,

9    it is those groups of people that I've had more conversations

10   with about how difficult this is.

11   Q    So you're aware of other supervisory level corrections

12   officers?

13   A    Yeah.  And colleagues in other states that have had

14   similar roles as I do, a few.  I won't name them obviously, but

15   where we share very, very similar experiences.

16   Q    Have you testified in a case like this before?

17   A    No.

18   Q    Why not?  Or why now I guess I should say.

19   A    I never discussed the death penalty while I was working.

20   I did talk about managing a female offender execution because

21   it was so unusual and at female offender conferences and was a

22   part of the National Institute of Corrections doing some

23   training around managing women who are on death row because we

24   were beginning to see and subsequently across the country,

25   there have been more women executed.  But I deliberately, I'm

1   very protective over my people and always will be.  This

2   instance because of the time frame and the number of executions

3   actually impacted me more than -- I read the stories about

4   executions, of course you do.

5        You've been doing this business, you read things about

6   your own business.  Don't know if I'd ever do this again.  But

7   it was that really how I see myself is I'm talking on behalf of

8   other colleagues.  This isn't about Jennie Lancaster, this is

9   about our staff, this is about our directors, it's about the

10  people here that we do our job every day just doing -- we do a

11  hard job every day, and it's stressful just working in a

12  prison.  There's plenty of data out there to tell you that, the

13  kind of health problems we have and how many times our people

14  go to the ER versus other state employees.  But when you put

15  this kind of thing in, that's why I agreed to do this.

16  Q    When you say this kind of thing, what are you --

17  A    This kind of multiple executions within such a compressed

18  time period.  It certainly raised the level of concerns for me

19  just as a professional who's been through this.

20  Q    I think that's all the questions I have, unless, is there

21  anything else that you think is important to add that I

22  neglected to ask you about?

23  A    No.  You know, I end with that term that I came up with a

24  long time ago, we are the silent actors in this whole thing.

25  Rightfully so, victims, the court system, prosecutors, all the

Lancaster - Cross

1    legal apparatus involved in getting things done, the people who

2    are there taking care of folks every day, we tend to be the

3    ones that are least understood.  So that's it.

4    Q      Thank you.  That's all the questions I have.

5              THE COURT:  All right.  Cross-examination.

6                        CROSS-EXAMINATION

7    BY MS. CRYER:

8    Q      Good afternoon, Ms. Lancaster.  I may jump around a

9    little bit with some of my questions, but hopefully I can get

10   right to the point on most of them, okay?

11   A      Okay.

12   Q      I want to make sure that I understand your testimony.

13   You actually presided -- when you were the warden, you presided

14   over one execution; is that correct?

15   A      The warden of Central Prison presides statutorily over

16   the administration of the death penalty.  I was the warden of

17   the inmate, I was the warden of the facility where Velma

18   Barfield was housed.  I worked with the warden of Central

19   Prison regarding operational issues and those kind of things.

20   I was not the warden responsible for the administration of the

21   death penalty.  That's the warden of Central Prison.

22   Q      I may use some language that you and I may get an

23   agreement on and maybe wouldn't.  My understanding in Arkansas

24   is that we have different prison facilities, different prison

25   units, and that each prison unit has their own staff.

Lancaster - Cross

1   A      Right.

2   Q      Is that what you're talking about or what you're

3   referring to in North Carolina?

4   A      Yes.

5   Q      Okay.  So while you had a female inmate who was assigned

6   to death row --

7   A      At Women's Prison.

8   Q      -- she was actually housed with you?

9   A      Yes.

10  Q      And when it was time for her execution, I assume she was

11  transported to the male facility for her execution?

12  A      She was transported -- with our planning together, she

13  was transferred five days ahead of time to the death watch area

14  and we had the appropriate staffing, the number of female staff

15  that needed to be there, the whole thing.  So she moved five

16  days ahead of time.

17  Q      And the staff that was actually present during her

18  execution, was that part of your staff from the women's unit?

19  A      No, Central Prison.

20  Q      Central Prison.  Okay.  Did you have any interactions or

21  dealings with the Central Prison staff after that execution?

22  A      Yes.

23  Q      Were you involved in the debriefing?

24  A      Yes.  Oh, yes.  Yes, we had a debriefing actually that

25  involved the director of prisons.  We divided up, we had

Lancaster - Cross

1    Central Prison staff, we had Women's staff that actually were

2    the supervisors of the death row housing area, a couple of

3    other staff and we did three different levels over several days

4    of debriefing with an external mental health person.

5    Q    So this may be a silly question, but would you agree with

6    me that debriefing of staff after an execution is extremely

7    important?

8    A    Sure, it is.

9    Q    Perfect.  Your involvement in the other 22 or 23

10   executions, I believe those occurred between 1997 and 2004?

11   A    Yes.

12   Q    All right.  And my understanding is, again, that you

13   were, I believe, a regional director, and that underneath your

14   supervision were the individual prison facilities, correct?

15   A    Yes.

16   Q    And then within each of those prison facilities, you had

17   the warden, deputy warden, and their staff?

18   A    Yes.

19   Q    And that your involvement with those executions would be

20   as the regional director, not as the warden as you had in 1984,

21   correct?

22   A    Yes.

23   Q    And I believe you testified earlier that you created the

24   policy in I believe 1984 with regard to the female execution?

25   A    We created -- we didn't create an execution.  The

1  execution protocol at Central Prison was established.  We

2  created procedures to accommodate the fact this was a woman,

3  down to even what she was going to wear the night of the

4  execution.

5  Q    So let me ask, assuming another female were to be placed

6  on death row and have to go through an execution, would the

7  same protocol be applied to her today?

8  A    I think that -- we have three women on death row right

9  now, one that's been there 30 years.  I would say 90 percent of

10 it probably would still be applicable, but you know, the folks

11 who will be currently responsible for it if and when that

12 happens certainly need to look at what they're presented with

13 to make any alterations.

14 Q    Of course.  What about the protocol that is used at

15 Central Prison for the male inmates, is the protocol that would

16 be used today, assuming that North Carolina were to carry out

17 an execution, would the protocol today be the same that it was

18 during your employment?

19 A    There's been one -- in the last four years that I worked

20 when I was at the top of the agency, we did not have an

21 execution.  We have ongoing litigation, and we made an

22 alteration to the execution manual then having to do with drug

23 protocols.  That's the only one that I'm aware of -- well, it's

24 the only thing that happened in my four years happened to be on

25 the transition team by our new governor-elect where you go in

1    and you talk to folks, you know, that are running agencies and

2    you try to find out what's going on, what are things that the

3    new governor and his new secretaries need to know.  Myself and

4    one of my colleagues were both on the transition team and

5    because we were the only ones with experience with executions,

6    we were asked to particularly sit down with the new secretary

7    of correction and the new director of prisons and to go over

8    some of that, and what I was told is there had been one

9    additional alteration to the manual and that had to do, again,

10   with specific drug cocktail protocol based on legislative

11   directive.

12   Q    Let's talk about as far as the protocol goes for X number

13   of days before the execution.

14   A    Everything's the same.

15   Q    Everything's the same, okay.  I believe I heard you

16   testify earlier with regard to there being a need to

17   compartmentalize the duties of the staff members who are going

18   to help carry out the execution.

19   A    What do you mean by compartmentalize?  I don't remember

20   if I used that word, but just help me understand.

21   Q    Sure, and you maybe didn't.  Would you agree with me that

22   it is important for members of the execution team to understand

23   what their role is?

24   A    Absolutely.

25   Q    As a member of the team?

1    A      Yes.

2    Q      And to spend their time focusing on their specific role?

3    A      Yes.  The only thing I would add to that is when you're

4    responsible for us, it would be the warden, then you're

5    responsible for what everybody's doing, so it isn't just what

6    these specific escort team or the team that's in with the

7    gurney or those kind of things, you are responsible for what

8    everybody's doing.  That's the on-site responsible person for

9    us is the warden.

10   Q      But again, on a day-to-day basis, on days that we're not

11   even talking or looking or discussing about executions, the

12   warden is the overall person in charge?

13   A      Yes.

14   Q      You talked a little bit about how it's important if you

15   have an execution team to have a seasoned group of employees

16   that are going to be participating in and involved as the

17   execution team.  Is that correct?

18   A      I think it certainly would be preferable.  In my

19   experience --

20   Q      Sure.

21   A      My experience was there were people at Central Prison who

22   had been a part of execution so they were seasoned for me.  At

23   some point obviously everybody has to have their first time

24   doing it.

25   Q      Sure.

Lancaster - Cross

1    A    But for me, they were people that had already had

2    experiences in managing executions.

3    Q    Let me ask, have you spoken with anyone affiliated or

4    employed by the Arkansas Department of Correction with regard

5    to any type of experience or education that the individual

6    members of the team will have?

7    A    No.  I've read the affidavit from Larry and from the

8    director.

9    Q    Okay.  In fact, that kind of helps me a little bit.  Let

10   me back up and even kind of go back to the beginning.  When

11   were you first contacted about participating in this case?

12   A    A month ago maybe.  No longer than five weeks.

13   Q    Do you recall who it was that contacted you?

14   A    I believe it was Jamie.

15   Q    What did Jamie ask you?

16   A    That she had been given my name, referred to me as

17   someone who had experience with executions and who had made

18   statements about impacts on staff, was I aware of what was

19   going on in Arkansas regarding the schedule.  And I said I was

20   aware from the news media.  And she said we'd like to talk to

21   you about it.  And we had a conversation then and then I think

22   we scheduled another conversation to talk more in detail about

23   what my experiences have been.

24   Q    To your knowledge, did the second conversation involve

25   anyone other than Jamie or was it --

Lancaster - Cross

1    A    I think there was another lawyer with the federal

2    defender, appellate defender's office.

3    Q    Were you provided any documentation to review prior to

4    writing your declaration?

5    A    Yes.  I saw a redacted version, a very redacted version

6    of an execution protocol.

7    Q    Was that something that the plaintiffs' attorney sent you

8    or was that something that you found on your own?

9    A    No, no, something I requested just if I was going to try

10   to discuss with them the questions I had, that any information

11   that could be helpful for me to understand some of what would

12   go on here would put me in a better position to answer any

13   questions.

14   Q    Okay.  Other than the redacted ADC protocol, do you

15   recall reviewing any other documents prior to signing your

16   declaration?

17   A    I don't think so.  I wish I had looked back over it.

18   Nothing comes to my mind right now.  I know that redacted

19   protocol.

20   Q    Okay.  And looking at what has been attached to the

21   complaint in this case which is document entry 2, and I'm

22   looking pages 194 through 199, and it indicates that your

23   declaration was signed on March 24th of this year.  Does that

24   sound right?

25   A    Yes.

Lancaster - Cross

1    Q    Okay.  Do you recall or are you able to give me any type

2    of time frame of when you first heard from Jamie with regard to

3    helping on this case and the date that you signed your

4    declaration?

5    A    I'd say three weeks, no longer than three weeks.

6    Q    Okay.  Between the time that you signed your declaration

7    and you appeared here today, have you reviewed any additional

8    documents?

9    A    The protective order that I think you put out, Judge.

10   Q    Why did you review the protective order?

11   A    I needed to sign a statement of confidentiality, but also

12   reviewing that, so I reviewed that.

13   Q    All right.  Anything else other than the protective

14   order?  I think you mentioned Mr. Norris's affidavit?

15   A    Yes.  And Judge Kelley's -- judge, excuse me, Director

16   Kelley.  I can't think of anything else.

17   Q    And other than signing or other than, I don't know, did

18   you prepare this declaration or was that something that was

19   prepared for you and signed?

20   A    I got a general outline from the attorneys and I edited

21   and then submitted it back.

22   Q    Other than this declaration, have you provided any type

23   of other written report?

24   A    No.

25   Q    Are you being paid to be here today?

Lancaster - Cross

1    A     No.

2    Q     I know you provided testimony a few moments ago with

3    regard to the scheduling of the executions in Arkansas that are

4    set to begin next week, and you made reference to your opinion

5    with regard to multiple executions.  Let me ask you, did you

6    perform any type of research to come up with your opinion on

7    multiple executions?

8    A     I think I said previously I'm aware and have talked with

9    colleagues that have had two executions in a night, so from

10   that standpoint, I'm certainly aware that it's not -- I

11   wouldn't call it commonplace, but it's certainly happened in

12   many places.  To research this kind of schedule, no, because I

13   read a lot, you know, in the news media like anybody else does,

14   and I believe, you know, not all of what I read, and have read,

15   I tend to be somebody that will read things that come out

16   regarding legal opinions about executions and those kind of

17   things, but other than that, no, I didn't.  This is primarily

18   my experience and opinions.

19   Q     So you are -- and I think you've already testified, you

20   are aware that other states other than Arkansas --

21   A     Absolutely.

22   Q     -- have carried out multiple executions.  Are you aware

23   that there are other states such as Texas that will carry out

24   execution day after day after day?

25   A     Yes.

Lancaster - Cross

1   Q     Not every day.  So I'm not trying to put words in your

2   mouth, but they do have sometimes an expedited schedule.  Let

3   me follow up on one thing you also testified to.  At the close

4   of your testimony, you mentioned that there were things that

5   they do in North Carolina during the executions that add

6   additional stress.

7   A     I don't know how executioners are chosen here.  We use

8   staff, we have three employees that are trained to administer

9   the lethal injection.

10  Q     Is there a schedule that you believe would be better --

11  I'm trying to figure out how to word this.  How much down time

12  do you think is required in between executions in order for the

13  staff to fully recover?  Would you think a week?

14  A     Well, you know, I wouldn't say fully recover.  Recover

15  is -- I'm not sure it's a word I'd use.  I know we had one

16  opportunity to really discuss this.  It was in December of

17  2003, I believe.  We knew we were going to have two within a

18  30-day period and it was December, so you had December

19  holidays, you wanted to give your staff time off, all those

20  kind of things and we had flexibility.  The law in North

21  Carolina does not say it has to be on a Thursday.  That is our

22  policy and that's how we've always operated so we had fairly

23  intense discussions about it and we decided to do one one week

24  on a Thursday and one the following week on a Thursday.  But we

25  certainly would not, in our discussions did not want to do it

1    any sooner than that.

2                MS. CRYER:  Your Honor, may I have just one moment,

3    please?

4                THE COURT:  You may.

5                MS. CRYER:  Ms. Lancaster, thank you.  Your Honor, I

6    believe that's all the questions I have at this time.

7                THE COURT:  Redirect?

8                          REDIRECT EXAMINATION

9    BY MS. GIANI:

10   Q     On the scheduling issue, I think you said that like

11   Arkansas, North Carolina hasn't executed anyone in about 11

12   years; is that right?

13   A     Eleven years.

14   Q     So if executions were to restart and you were either in

15   your same position or otherwise were able to have some input

16   into the process, what would that input be as far as

17   scheduling?  I'm assuming, and maybe this is incorrect, so

18   correct me, that there would be several people or a number of

19   people who would be slated for execution?

20   A     30 to 40.  If there was some -- and from a legal

21   standpoint, I don't know what it would be exactly, but if there

22   was a once and for all mandate that came down from the U.S.

23   Supreme Court that our attorney general's office said, okay, we

24   are going -- we need -- and we would be, we work with them

25   closely, so this would not come as they would tell us something

1    tomorrow.  We would know how the legal process is going.

2    However, and I do believe I would probably be asked to come

3    back and be a part of a discussion, but what we have previously

4    talked about, we've been concerned about that when I was still

5    working, that we would need to elicit whoever the governor was,

6    it doesn't matter, the governor with us to go to the general

7    assembly even if it meant calling them back in an emergency

8    session to significantly alter the current statute about

9    executions scheduled in North Carolina.

10          I don't know what we would propose, but we would

11   certainly propose something very, very different, because it

12   would be impossible within the scheduling that we have now.

13   And we had some discussions with the AG's office just in

14   general.  And we've talked to -- that was part of the briefing

15   of the new secretary, who was going to have the responsibility

16   in the agency, so we would have to go back to the -- we would,

17   and I think we'd have a lot of support, go back to the general

18   assembly and change the statute.

19   Q    So you wouldn't feel equipped or you don't think that the

20   Arkansas Department of Correction --

21   A    No way.

22   Q    I think that's all I have.

23              THE COURT:  May this witness step down?

24              MS. CRYER:  I have one more question if I may.

25              THE COURT:  You may.

| | |
|---|---|
| 1 | RECROSS-EXAMINATION |
| 2 | BY MS. CRYER: |
| 3 | Q    Ms. Lancaster, would you agree that the pre-execution |
| 4 | preparation would be the same whether there may be one or more |
| 5 | executions in a given night? |
| 6 | A    I think the details of the execution protocol itself |
| 7 | would be the same.  I think that looking at things like the |
| 8 | debriefing part, the number of rehearsals they may have, would |
| 9 | probably fit what the event was. |
| 10 | Q    And do you have any evidence that Arkansas's schedule |
| 11 | issue is very likely to fail and cause the inmate needless |
| 12 | suffering? |
| 13 | A    No. |
| 14 | Q    Okay.  That's all I have. |
| 15 | THE COURT:  Anything further? |
| 16 | MS. GIANI:  No, Your Honor. |
| 17 | THE COURT:  You may step down. |
| 18 | THE WITNESS:  Thank you, Your Honor. |
| 19 | THE COURT:  You may call your next witness. |
| 20 | MS. GIANI:  The plaintiffs call Dr. Jim Hilkey. |
| 21 | **JIM HILKEY, PLAINTIFFS' WITNESS, DULY SWORN** |
| 22 | DIRECT EXAMINATION |
| 23 | BY MS. GIANI: |
| 24 | Q    Good afternoon, Dr. Hilkey.  Could you first state your |
| 25 | full name for the record. |

1   A     Yes, my name is James H. Hilkey.  That's H-i-l-k-e-y.

2   Q     Could you just talk a little bit about your professional

3   background and qualifications?

4   A     Certainly.  Born and raised in northern California, was

5   educated at Westmont College, a degree of psychology which was

6   conferred in 1968.  From there, I have a master's degree in

7   counseling psychology that was conferred from Arizona State

8   University in 1970.  From Arizona State University, I was

9   admitted to a doctoral program in counseling and clinical

10  psychology.  My Ph.D. was conferred in 1975 from Indiana State

11  University.

12  Q     Could you tell us a little bit about the course of your

13  career?

14  A     Certainly.  During my tenure at Indiana State University,

15  I was a presidential intern at the United States Federal

16  Penitentiary in Terre Haute, Indiana.  From that position,

17  which was a summer appointment, I did a pre-doctoral internship

18  at the U.S. penitentiary, which was a maximum security federal

19  penitentiary in Terre Haute.  From that internship, the

20  required pre-doctoral internship, I was hired as the clinical

21  director of a substance abuse program for federal opiate

22  addicts in Terre Haute.  In 1976, I was promoted to the chief

23  of psychology services at the federal correctional institution

24  in Butner, North Carolina.  That was a newly formed federal

25  prison.  It was a prison psychiatric hospital actually with a

Hilkey - Direct

1  mission to perform pretrial forensic evaluations for the
2  federal courts.  We also had a general population unit there
3  and also a research contingent where we were investigating the
4  conditions of confinement on recidivism.  So there were three
5  separate missions and I was the chief over those three areas.
6  My primary clinical responsibilities, however, was to conduct
7  forensic psychological evaluations for the federal courts.  So
8  did that for many years before I retired in 1996, I believe.
9  Q    Sharon, can you pull up Exhibit 2?  Is this a CV that
10 you've provided?
11 A    Yes.
12 Q    Sharon, can you scroll through and make sure that we've
13 got all the pages in there.
14      Does that accurately set out your background and
15 qualifications?
16 A    It does, yeah.  And I guess I should add a little bit
17 more to after my retirement, post-retirement from the federal,
18 prison system, I have been in private practice as a forensic
19 and clinical psychologist.  I have a small private practice
20 where I see patients but majority of my time is in terms of
21 conducting forensic psychological evaluations for military,
22 federal, and state courts.
23           MS. GIANI:  I move to admit Plaintiffs' Exhibit 2.
24           THE COURT:  Any objection?
25           MS. CRYER:  No, Your Honor.

1          THE COURT:  Exhibit 2 is admitted.

2          (Plaintiffs' Exhibit 2 received in evidence.)

3    BY MS. GIANI:

4    Q    Sharon, can you scroll to page 4, please.  I want to look

5    there at the bottom of the screen.

6          There's an entry for 1999 to 2004.  Could you tell us a

7    little bit about that?

8    A    Yes.  This was my second time that I was a contract

9    employee with the North Carolina Department of Corrections.

10   Years earlier, I had done a period of psychological evaluation.

11   In 1999, I was approached by Jennie Lancaster and Dr. Tom

12   Owens, who at the time was the director of mental health

13   services for the North Carolina Department of Correction, and

14   asked if I would be willing to consult with the department in

15   terms of developing a critical incident debriefing program for

16   the staff in the North Carolina Department of Corrections.  I

17   agreed to do that.  I had some experience prior to that request

18   in the area.  Dr. Owens and I had worked together at Butner and

19   he was familiar with my interest and my work in critical

20   incident debriefing.

21   Q    You said you had prior experience with critical incident

22   debriefing?

23   A    Yes.  I first became of -- I hadn't had any academic

24   training in critical incident debriefing, but I believe in

25   November of 1987, I got a call on a Sunday afternoon asking if

1    I would be available to go to Oakdale, Louisiana.  At that time

2    the Cuban detainees had taken over the federal detention center

3    in Oakdale, Louisiana and there were a number of, at that time

4    14 hostages, and I was asked to go and work with other

5    psychologists designated from the Federal Bureau of Prisons and

6    with the FBI to provide assistance in terms of working with the

7    correctional staff who were responsible for maintaining the

8    security of the facility.  They had completely lost control of

9    the interior of the institution and so the perimeter people

10   needed support, but we also set up a support group for the

11   families of the officers who were hostages.  And that tenure I

12   thought was going to be a couple of days ended up over a two

13   week period of time, and that was my first exposure to the

14   whole idea of critical incidence and the role of the importance

15   of debriefing.

16         From that experience, I and several other people were

17   asked to join a task force for the Federal Bureau of Prisons in

18   terms of developing a Bureau of Prisons-wide program for

19   critical incident debriefing.  Critical incident debriefing is

20   a -- first of all, critical incident is anything that can

21   happen in the line of duty.  It could be the staff observing or

22   coming on a suicide, could be a wrongful death in terms of an

23   escapee where an officer would have to maybe take the life of

24   the escapee.  It could be a catastrophic incident within the

25   institution, but anything that would be an abnormal situation

1   that would require some attention, some psychological first

2   aid, if you will, so we did develop that program for the

3   Federal Bureau of Prisons and implemented that program and

4   based on that experience, led to my consultation with the North

5   Carolina Department of Corrections.  Long answer to your

6   question, I'm sorry.

7   Q     That's fine.  You kind of answered some other questions.

8   A     Okay, good.

9   Q     Why did Jennie Lancaster and, I'm sorry, was it Dr. Tom

10  Owens; is that right?

11  A     Yes.

12  Q     Why did they approach you?

13  A     Again, Dr. Owens was familiar with my work and in talking

14  with the warden and the superintendent of the North Carolina

15  Department of Correction, they deemed it important to have

16  someone outside the agency to work specifically with the staff.

17  Correctional staff by nature I think tend to be somewhat

18  nontrusting.  The whole issue of confidentiality is a very

19  important issue and the thought was having an outside person

20  would ensure a greater confidentiality in terms of facilitating

21  people talking about the trauma that they may have been exposed

22  to.  So that was part of the decision.  This is a fairly

23  specialized field and a lot of people had not had the same type

24  of experience or training that I had, and I think that was part

25  of the reason I was asked to do it.

Hilkey - Direct

1   Q    So what exactly is critical incident debriefing?

2   A    The term was coined by actually a professor, clinical

3   professor in emergency health at the University of Maryland

4   which back in the early 1980s, and Dr. Mitchell had worked

5   extensively with Maryland EMS workers, firefighters, first

6   responders, and his experience had shown that people who were

7   first responders initially did not show any type of

8   psychological problems.  They seemed to carry on their work,

9   but in an unpredictable way, people after maybe the third,

10  fourth, one hundredth call, developed severe psychological

11  symptoms, sometimes immobilization to the degree of psychosis,

12  quite a number of very aberrant reactions.  Dr. Mitchell

13  realized that it was important to be able to help people

14  process and deal with the accumulation of the psychological

15  sequelae that they were exposed to and developed a systematic

16  program for debriefing, and this primarily involved, again,

17  first responders, EMS, firefighters, people who had to

18  intervene in very serious catastrophic situations.

19       Sometimes people refer to psychological debriefing as

20  psychological first aid.  It's a way of helping deal with a

21  person's normal reaction to an abnormal situation.  And it's

22  not psychotherapy, it is not crisis intervention, per se.  It's

23  really helping people cope with the normal psychological

24  reactions that tend to be cumulative over time so that they can

25  lessen the probability of more acute problems happening later

1    on.  And not only is it for the welfare of the individual, but

2    also for the agency in terms of increasing adequate functioning

3    for the agency in which the employee is associated with.  So

4    over the years, the whole concept of critical incident

5    debriefing has developed into a very systematic approach where

6    groups of homogenous responders are placed together.

7          There's a process for sort of casual introduction, people

8    talking in a very cognitive way about the experience, slowly

9    working down to what the person saw, just observers, what they

10   thought about the experience, working down to more of an

11   affective level in terms of talking about what their own

12   reactions were, and then talking about ways of perhaps

13   responding differently, so it is a very prescribed set of

14   practices that takes a great deal of time.  The research that

15   people have done looking at the effects of critical incident

16   debriefing shows that it significantly reduces the effect of

17   response to traumatic events as long as these steps are

18   prescribed.  There have been other studies that show that there

19   are casualties when these techniques are not followed as

20   outlined by the work of Dr. Mitchell, and so it does involve a

21   very specific way of dealing with the crisis and this work is

22   continuing to emerge as time goes on.

23         There's been increased studies looking at how trauma

24   affects a number of different professions and specifically with

25   regard to the execution experience, that not only affects the

Hilkey - Direct

1   role of the executioners, but it affects the administrative

2   staff, the families of staff, attorneys who were responding to

3   their clients' impending death.  There's a number of

4   unidentified victims that occur from this critical incident.

5   Q     I want to, I've marked down a few things that you said

6   that I wanted to follow up on.  So is it fair to say that

7   critical incident debriefing tends to focus on sort of, I don't

8   know if this is the right terminology, but higher risk

9   professions?

10  A     Anyone who's exposed to a traumatic event, and trauma I

11  think is really in the eyes of the beholder.  What may be

12  traumatic for one person may not be traumatic for another

13  person.  So in response to a critical incident, it's important

14  to understand what the culture of that agency or that

15  profession is, how the individual uniquely responds to a

16  critical incident, and so it can be quite different based on a

17  number of different factors, which takes time to discern and

18  need to be familiar with the culture in which you're working.

19  Q     And I'm trying to remember exactly how you stated it, but

20  is there some sort of accumulation or cumulative effect from

21  repeated traumatic exposure?

22  A     That is what the research says and it's typically, people

23  who tend to be first responders or who are in the law

24  enforcement or in corrections tend to deal with stress in

25  almost a dissociative way.  They tend to deny that they are

1    under stress because it's not part of the culture to admit

2    weaknesses so it's sort of a macho or kind of a -- I think the

3    same thing happens with emergency room physicians, they're sort

4    of macho kind of, the people who like to be in the front line,

5    and the culture is that you don't talk about the things that

6    bother you.

7          It's kind of a can-do attitude, so the profession kind of

8    almost works against disclosing or talking about the affective

9    domain which is cumulative, and if those are not dealt with, a

10   number of things can happen.  Stress-related illnesses,

11   behaviorally it can result in irritability and poor

12   relationships with family.  There's a number of sequelae that

13   can affect performance.  So it's not only the humane thing to

14   do, but it's a cost-effective thing in terms of increasing

15   productivity so that people can return to normal functioning,

16   which is one of the goals of critical incident debriefing.

17   Q    And so these reactions that you just talked about, I

18   think I have a couple questions.  If there is this culture

19   where you aren't supposed to, for instance, admit weakness,

20   does that mean that the effects aren't still felt?

21   A    No, I think they're felt, but they're not expressed and

22   so the -- it sets up a conflict so that it's not talked about

23   but it's still -- it's manifest in other kinds of sometimes

24   inappropriate ways, excessive drinking, absenteeism, careless

25   or reckless behavior, maybe sequelae from not dealing with the

Hilkey - Direct

1    actual sequelae of witnessing the event.

2    Q     And I think you said earlier that these are kind of sort

3    of normal expected reactions to repeated exposure to trauma?

4    A     That's a very good way, I think, of explaining the whole

5    debriefing process to a prospective employee is saying your

6    reactions are normal, the situation that you've experienced is

7    abnormal.  So it takes out of the pathological realm and people

8    who have experienced and they start feeling queasy or start

9    feeling light-headed or physiological reactions or other

10   things, they can normalize that experience and share that

11   experience so that they can not feel like they're strange.

12   Q     I think you just used, you said you talk about with

13   prospective employees.  Is debriefing something that's done

14   prior to a critical incident in certain circumstances?

15   A     In environments where it's predictable, and in our

16   experiences in North Carolina and this is something that I did

17   not know, but learned from the help of more seasoned staff was

18   that the critical incident debriefing began long before the

19   date of the execution.  I was asked to join the execution team

20   in rehearsals.  Sometimes there would be three, four, five

21   rehearsals prior to the actual execution date, so not only did

22   I get a chance to get to know the staff, observe the roles that

23   they had, but it also provided the opportunity to do some

24   psychoeducation about self-care.  The stress that is involved

25   in an execution predates the actual execution date because

1    people have anticipatory responses, they're thinking about

2    what's going to happen, what is going to be my personal

3    reaction to someone that I'm going to be responsible for

4    killing who I've known for maybe 10, 15 years.  So making that

5    person, changing those roles from caregiver to a person who's

6    going to end that person's life has a direct effect on the

7    person's psychological well-being.  It's almost turning the

8    things upside down.  Maybe a good way to talk about that would

9    be a physician that I spoke with after an execution, the person

10   said all my training I've --

11              MR. RUDOFSKY:  Objection, Your Honor, hearsay.

12              THE COURT:  I'll overrule the objection.

13              MR. RUDOFSKY:  Can we have a continuous objection on

14   relevance, please?

15              THE COURT:  I'll recognize the continuing objection,

16   but I overrule it.  You may proceed.

17              THE WITNESS:  This physician told me that for my

18   whole training, I've been working to prevent my patient from

19   flatlining and here my role is to make sure that that person

20   flatlines.  The person left service shortly after that

21   execution.  So it gives -- I think it illustrates the example

22   of that change of reality, I guess, is the best way to say it.

23   Had a number of medical professionals, nonphysicians who talked

24   about that changing role as well, nursing staff in particular,

25   and the impact that that had on caring for and then working on

1   ending a person's life.

2   BY MS. GIANI:

3   Q     And so you were made -- let me, I think I have a couple

4   other follow-up questions then I'm going to back up a little

5   bit.  You also mentioned that this area is continuing to

6   develop; is that right?

7   A     That is correct.

8   Q     So is there an even greater understanding now, for

9   instance, than when you worked in North Carolina?

10  A     There are.  One of the things is the adherence to these

11  prescribed steps is much more detailed than it was at the time

12  that I was involved with the North Carolina system.  The kind

13  of the deconstructing of the incident from going from talking

14  in generalities to content to thought to affect is much more

15  clearly described now in the literature in terms of the

16  procedures.  There's actual protocols and training that's

17  devoted to that.  The other thing that is current that I was

18  not aware of at the time that I was involved was the working of

19  having people who had similar roles in smaller groups rather

20  than putting people together who had varying different roles in

21  the execution process inhibits the discussion.

22        So, for instance, isolating or having EMTs or nursing

23  staff in a small group would facilitate the discussion because

24  there's a more common sense of community there, there's a more

25  familiar, the issues that are generated from that an execution

Hilkey - Direct

1   would be more unique to that specific population.  So breaking
2   them down to different roles or professional affiliations would
3   facilitate the debriefing process.  Now, people in corrections,
4   and this is borne out by the work that Osofsky's done in terms
5   of his research looking at execution squads --
6   Q     Are you referencing a particular study?
7   A     Yes, I am.  It's the *Psychologic Experience of Security*
8   *Officers Who Work with Corrections.*  And I have the article, I
9   don't think there's an actual -- it's May 2002.  It's S-U-R-J.
10  I'm not sure exactly what that acronym stands for.  But
11  Osofsky, he and his son have done a lot of work in terms of
12  looking at execution squads and the psychological impact on
13  people in Louisiana and in state prison and then also the
14  Holman State Prison in Alabama.  What Osofsky found is very
15  similar to our experiences is that people tend not to talk
16  about the affective components of that.  Osofsky found that
17  people took a high pride in their work, they tend to do their
18  work with great professionalism and they did not find that
19  there were overt signs of depression looking at the Beck
20  Depression Index, which is a self-report checklist.  So some of
21  the clinical instruments they used to measure psychological
22  sequelae did not show.
23          However, in individual interviews, they found that those
24  folks had great deals of struggle about their conflicting roles
25  about the jobs that they were asked to do.  So as true with a

Karen Baker, RMR, CRR, CCR
United States Court Reporter

1   lot of research when you use instruments that all the data

2   tends to collect around the mean and you lose important

3   information, but looking at anecdotal references, Osofsky found

4   that people struggled a great deal, often times long term.  As

5   one warden said, the pain goes away but the wound is still

6   there.  And that's, I thought, a good way to describe what

7   people have used to describe their experiences.

8   Q    Is this critical incident debriefing, is this something

9   that's been done in other departments of corrections, are you

10  aware, or is this --

11  A    Yes, it was done -- Warden Vasquez in San Quentin back in

12  1992, there hadn't been an execution in San Quentin for many,

13  many years and he had the insight to informally deal with the

14  psychological debriefing before it was a coined term.  So

15  certainly it is a common practice in most correctional

16  facilities to have some form of psychological debriefing and it

17  varies, I think, from state to state in terms of how that's

18  implemented.

19  Q    I guess I should -- I'm going to try to back up a little

20  bit now.  First of all, is an execution considered to be a

21  critical incident?

22  A    Yes, absolutely.

23  Q    Why is that?

24  A    First of all, it is an abnormal experience, it is a

25  traumatic experience, and it is something that's out of the

1   norm that involves the death of another human being, and so

2   that in itself would define as a stressful or a traumatic

3   situation.  The vicarious experience of that, people who

4   directly observe that, the people who are indirectly affected

5   such as all the way down from the sentencing judge to the

6   representation by counsel, all of the people who are involved

7   in that process are affected either directly or indirectly.  So

8   those are certainly a critical incident.

9   Q    Specifically now, I'm backing up to your work in North

10  Carolina.  Can you just kind of walk us through what that

11  experience entailed, for instance, did you develop a sort of

12  protocol or what exactly was your role there?

13  A    It was I had never seen an execution, I'd never been

14  involved in the execution.  So I went in with this experience

15  based on my experience from the Federal Bureau of Prisons at

16  that time, there were no death penalties in the federal system,

17  so I wasn't exposed to that experience, so I did not have any

18  kind of personal experience with -- it was very much a learning

19  process.  But what knowledge that I had and with the help of

20  Jennie Lancaster and people who were much more experienced,

21  they were very, very helpful in terms of talking about their

22  own personal experiences, which gave me some insight about what

23  it was like for them to go through the process and ask

24  questions, what would have been helpful for you, what would

25  have helped you cope with this, and how would you have lessened

1    the impact of this on you and the staff that you've known over

2    the years.

3            So that was data collection for me.  From that, we

4    thought it was important to deal with the maintenance or the

5    pre-debriefing, which is talking about levels of fatigue, how

6    are you going to deal with the fact that you're under a code of

7    silence.  You really cannot talk about your experiences and how

8    are you going to deal with the feelings when you're prohibited

9    from talking about this with family, friends, members of your

10   church community.  So talking about coping strategies of what

11   kinds of support systems can you develop in your correctional

12   community, but also what kinds of health maintenance can you

13   do, making sure that you've adequately exercised, rest, diet,

14   all those factors looking at use of alcohol, many of the

15   officers said how do you cope, people would say, we go get

16   hammered, take a case of beer and go to the beach, go out in

17   the woods and just fire rounds of ammunition.

18           And so we talked about ways that people commonly dealt

19   with that and tried to give some psychoeducation about other

20   alternative ways of dealing with potential stress reactions

21   that they possibly would encounter.

22   Q    During your time working on this project in North

23   Carolina, did you see any sort of, I don't know if secondary

24   trauma or primary trauma effects from participation in

25   executions?

1   A      I did not see any direct or immediate.  I didn't see

2   anybody decompensate or fall out following an execution.  I

3   maintained contact with some people.  There were people who did

4   use the confidential contacts and some people followed over

5   many years.  And interestingly, it was primarily higher upper

6   echelon administrators who I knew and who reached out.  My

7   staff, not so much.  And that is a area of concern and part of

8   it has to do with the culture.  Again, it's not easy for people

9   in a paramilitary situation to talk about things that are

10  disturbing or affect.  There's an element of trust so I know

11  that some people, and I believe Arkansas has stated that they

12  have an EAP person.  The National Institute of Corrections

13  in 2013 did a white paper looking at the stressors of people in

14  correctional work.

15  Q      Do you happen to have a citation?

16  A      That I do.  Yes.  This is a white paper, it was a

17  cooperative agreement published by the National Institute of

18  Correction dated December 21st, 2013.  The authors are Caterina

19  Spinaris, S-p-i-n-a-r-i-s, Michael Denhof, and Gregory Morton.

20  Q      Before you talk about it, you said it's a white paper

21  from the National Institute of Corrections?

22  A      Yes.

23  Q      What does that mean?

24  A      A white paper is a requested paper based on the needs of

25  an agency that identifies some area that needs to be researched

1    and given some professional attention to, so the authors of

2    this paper looked at the elements that contributed to stress

3    for workers in a correctional environment, making

4    recommendations about the demographics of the population and

5    also possible interventions to ameliorate the stress of work.

6    What the paper suggests is that correctional officers are much

7    more prone to stress-related disorders than even law

8    enforcement personnel.  They're among the highest group of

9    professional occupations that undergo stress.  So you have a

10   population who's being asked to do an additional very stressful

11   situation in an already stressful environment, so it's an

12   additional layer of concern that demands extra attention.

13        Again, I think Jennie Lancaster talked in very great

14   detail about the culture of the correctional environment.  And

15   I like her term that we are sort of the silent or I forgot the

16   exact term, but the unspoken caretakers.  The correctional

17   staff are required to take care of every person that every

18   other agency has really failed.  Parents have failed, churches

19   have failed, schools have failed, so we're tasked with caring

20   for this population and it's a day in and day out very

21   difficult situation.

22   Q    Based on your experience in North Carolina and your

23   professional experience generally, your knowledge of this area,

24   trying to think of the best way to ask this, but let me just

25   take it step by step.  So is it important to have debriefing

1    before the execution?

2    A      I think it's not a single event intervention.  It is a

3    inclusive process that starts prior to an execution.  It

4    follows with an immediate intervention directly following the

5    execution, and then periodic follow-ups.  Because, again, the

6    nature of the population of the staff who are carrying out

7    these, again, the effects are long term.  My experience has

8    been that some of the symptoms don't show up for some time and,

9    again, it tends to be a cumulative effect, so a direct

10   intervention or a debriefing right after may not show any

11   direct results.  And it's not sufficient to say that you've

12   simply done one intervention.

13          Likewise, the white paper that I referenced earlier says

14   that most EAP programs that are contracted through agencies are

15   not effective because agencies that provide employee assistance

16   programs do not have the knowledge of the unique environment in

17   which the correctional officers or the correctional staff work,

18   so it's a very specified job description.  Exposure to

19   something such as an execution is beyond the scope of most EAP

20   providers so they really don't know how to respond to this

21   unique situation.  So typical EAP programs according to this

22   NIC paper and my own experience, it tends not to be effective.

23   Q      In your experience, is part of this debriefing process a

24   chance to kind of assess whether participants might wish to

25   continue?

Hilkey - Direct

1    A      That is -- I'm glad you mentioned that because that is

2    another -- the final factor is to identify those staff members

3    who may need referral to a physician or a more specified mental

4    health provider.  So it's identifying those staff members who

5    are at risk.  And, again, research shows that the people who

6    have benefited from that tend to have higher retention rates,

7    less reports of psychological sequelae, less physical problems.

8    So, again, if this process is employed effectively,

9    productivity for the individual and for the agency is enhanced.

10   Q      Is one of the effects of the psychological sequelae, I

11   hope I'm saying that correctly, as you just mentioned, does it

12   affect performance?

13   A      Absolutely.  It affects performance, affect or feelings,

14   the behavior in terms of sick use or the attendance ratios,

15   interpersonal relationships, relationships with family.  And

16   families of correctional officers oftentimes are neglected in

17   this process because what we learned from our Oakdale

18   experience was that the people, the hostages that came out of

19   that experience even though they were debriefed, in fact, when

20   they were finally released, we hospitalized them for 48 hours,

21   much to their -- they weren't real happy about it, let's say

22   that, but we felt that we needed to assess them for

23   psychological and medical damage, but also to prepare them for

24   reentry into the family.

25          I don't think we did a very good job, quite frankly,

Hilkey - Direct

1   because a majority of the people who came out of that

2   experience ended up in divorce, high incidence of alcoholism,

3   and what we learned anecdotally was that people needed to talk

4   about this experience over and over and over again.  And family

5   members got tired of hearing about it, get over it already, you

6   couldn't because it was -- we didn't do an effective job, quite

7   frankly, in helping those people debrief from that situation.

8   There were a number of casualties from that, long term.

9   Q     You mentioned you had -- well, did you -- when you were

10  in North Carolina or any other time, have you witnessed

11  executions?

12  A     I have witnessed five executions.

13  Q     Were all of those in North Carolina?

14  A     They were.

15  Q     What was that experience like for you?

16  A     I think I'm still bothered by it quite frankly.  The

17  first thing I was bothered by was the fact that I didn't have a

18  reaction.  It was very professional, extremely well rehearsed

19  and it went off in North Carolina without a hitch.  I saw no

20  botched executions.  But the day of the execution, I would find

21  myself looking at my watch and saying ten hours, five hours.  I

22  would leave my house and go to meet with the administrative

23  staff about 10:00.  Drive up to the institution, you'd see a

24  hearse there and, for me, I guess the best way to describe this

25  was it was surreal, because most times death is unpredictable,

1    you don't know when it's going to happen and this is a

2    situation where you know exactly what time a person was going

3    to die, and so the preparation for me psychologically was

4    trying to put my head around what I was going to be witnessing

5    and how was I going to cope personally with other people in

6    possible need.

7         And I can remember the chaplain coming up and saying hey,

8    Jim, you haven't deal with this, and he was absolutely right,

9    because I think sometimes the caregivers are the last people to

10   practice what we preach.  I still think about that whole

11   experience and I think there's a kind of numbing, and it's very

12   much what I think Osofsky and his son talk about, there's a

13   kind of disassociation that happens, almost a

14   depersonalization, but the images that I have are very vivid

15   and they don't go away.  And I think I'm fairly well

16   psychologically balanced, but I guess I'm a little bit shocked

17   about, I can get a little bit emotional thinking about it on

18   the stand.  And preparing for this testimony today brings up a

19   lot of memories.  I think, and I was not nearly as directly

20   involved as people who have to do this task, my role was very

21   limited and it wasn't nearly as intensive as people.

22        The thing I think that bothered me the most was talking

23   with people who were caretakers.  In a way, correctional

24   officers as a rule are kind of a crusty group of people, but

25   I've learned to really love these guys.  They're compassionate.

1    And the length of time in North Carolina before someone was

2    executed when I was working there was between 10 and 15 years,

3    so a person who's caring for this person day in and day out,

4    the sense of being a surrogate person ends up with the role of

5    having to kill their child.  It's almost that, that's how I

6    conceptualize it, and that was just mind boggling to me of

7    asking a person to end a person's life who you've known

8    intimately in many ways.  We select correctional people who

9    have the ability to enforce rules, to set firm limits, but also

10   can do that in a way of compassion and then asking them to

11   reverse roles I think takes its toll on people, and also people

12   who observe those folks.

13   Q    Do you think that based on your experience, a cumulative

14   exposure to a critical incident like an execution in a short

15   period of time could increase the risk of these participants

16   suffering psychological -- how do you say it -- sequelae?

17   A    Sequelae.  Psychological problems, maybe that's a better

18   word we can use.

19   Q    Let's say that.

20   A    I absolutely do.  We certainly know from the research and

21   other EMS workers that certainly the cumulation is going to be

22   intense and people who have responded to mass casualty, there's

23   a lot of research on the -- there was a very serious Amtrak

24   incident in Maryland a number of years ago, so we know that the

25   intensity or the combined effect of a catastrophic event and I

1  think executing seven or eight people in a short period of time

2  could be classified as a catastrophic event.  So the issue is

3  we really don't know because I don't know of any situation

4  where this many people are planned to be executed in that short

5  of time, so it sounds like to me a very dangerous experiment,

6  and we don't know what's going to happen so it's kind of

7  uncharted area from my professional perspective.

8  Q     Again, one of these problems can be an effect on

9  performance; is that correct?

10 A     Performance, behavior.  There's a number of areas that it

11 certainly impacts.

12 Q     Okay.  That's it on direct.

13       THE COURT:  Our court reporter actually has asked

14 for a short break.  Let's go ahead and take a break now.  It's

15 a little bit earlier than what we scheduled.  Let's go ahead

16 and take our 15-minute break.  We'll go ahead and come back in

17 at 3:05.  We are in recess.

18       (Recess at 2:49 PM.)

19            C E R T I F I C A T E

20    I, Karen Baker, Official Court Reporter, do hereby certify

21 that the foregoing is a true and correct transcript of

22 proceedings in the above-entitled case.

23

24 /s/ Karen Baker, RMR, CRR, CCR
   -------------------------------        Date: April 10, 2017
25 United States Court Reporter

1          (Continuing at 3:07 p.m.)

2               THE COURT:  You may proceed when you're ready.

3                          CROSS-EXAMINATION

4     BY MS. CRYER:

5     Q.    Good afternoon, Dr. Hilkey.  How are you?

6     A.    I'm well.  Thank you.

7     Q.    All right.  So I think I can pare your testimony down to

8     three opinions.  The first one is that correctional workers are

9     often crusty guys.  The second one is that crusty guys have

10    feelings too.  And the most important one is that an execution

11    is a critical incident and debriefing after an execution is

12    vital.

13    A.    Well, I don't know if I'm going to reduce my testimony to

14    saying that correctional officers are all crusty guys.

15    Q.    I'm sorry.  I was trying to add humor.

16    A.    I think I get your point.  I certainly think the last

17    point, that critical incident debriefing in my opinion is

18    critical, yes, ma'am.

19    Q.    That's the one I was serious about.  I was teasing you

20    about the other two.  Okay.  Have you spoken with any of the

21    officials with the Arkansas Department of Correction regarding

22    their debriefing processes?

23    A.    No, ma'am, I have not.

24    Q.    Okay.  Let me ask, when were you first contacted by

25    plaintiffs' counsel in this case?

1    A.    About a week and a half ago to two weeks.

2    Q.    Do you recall who it was that contacted you?

3    A.    I initially spoke with Ms. Lancaster, who had informed me

4    about the case here in Arkansas and told me I may be getting a

5    call from Ms. Giani.

6    Q.    Did you in fact receive a call?

7    A.    I did.

8    Q.    Did you review any documents prior to giving your testimony

9    today?

10   A.    I did have a chance to read Judge Baker's protective order.

11   I saw a reduction of some notes that Ms. Giani sent me.  And

12   I've certainly reviewed a number of articles.

13   Q.    All right.  Did you say that Ms. Giani sent some notes to

14   you?

15   A.    Yes, right, an abstraction, I believe, of some of the

16   protocol or the proposed debriefing for Arkansas.

17   Q.    Okay.  Not handwritten notes, you're talking --

18   A.    No, no.  Just an abstraction, yes.

19   Q.    All right.  And did you provide any type of oral or written

20   report to plaintiffs' counsel in this case?

21   A.    No written report.  Ms. Giani and I spoke at length over

22   the phone and certainly prior to my testimony.

23   Q.    All right.  Do you recall how many telephone conversations

24   there were?

25   A.    Related to the case, probably two.  A number of phone calls

1    because of messed-up flight arrangements, but that was not

2    germane to my testimony.

3    Q.    Okay.  Now, my understanding -- and I want to go back to

4    your testimony.  And I'm looking at a copy of your CV.  My

5    understanding -- and please correct me if I'm wrong.  But my

6    understanding is that the main part of your work history that

7    relates to what we're here talking about today started in 1988

8    when you went down to Louisiana?

9    A.    That was the first time that I was exposed to the whole

10   concept of critical incident debriefing.  Then my work has kind

11   of -- as a subspecialty, it's been part of my professional

12   career since that time.

13   Q.    And I believe you mentioned that you were on a task force

14   for correctional medical care?

15   A.    I was -- one of the task forces I was on was for the Bureau

16   of Prisons in terms of developing protocols for critical

17   incident debriefing for the federal Bureau of Prisons.

18   Q.    I apologize.  That was back in 1985?

19   A.    Yes, ma'am.

20   Q.    And then am I correct that the time in which you spent

21   actually observing the five executions was during your tenure as

22   a consultant between 1999 and 2004?

23   A.    That is roughly, yes, ma'am.

24   Q.    To your recollection, did the protocol that the prison used

25   during the executions that you observed change or did they

1    remain the same?

2    A.    I don't know that -- I didn't know that it changed

3    substantially.  There were minor changes we made based on each

4    of the executions.  Part of the debriefing process is also

5    meeting with the administrative staff in terms of reviewing the

6    procedures.  So I can't recall any specific changes, but

7    essentially the protocols remained the same over my tenure with

8    the Department of Corrections.

9    Q.    And I believe you testified that it's important to

10   understand the culture that we are talking about.

11   A.    It is, yes, ma'am.

12   Q.    And I know that you mentioned an accident on an Amway [sic]

13   train or a different incident.  But I want to focus really on

14   what we're talking about with regard to correctional officers.

15   A.    Yes, ma'am.

16   Q.    Would you say that -- would you agree with me that

17   correctional officers are exposed to stress each and every day?

18   A.    Absolutely.  That's borne out by the citation that I gave

19   during my direct.

20   Q.    And that preparing for an execution is a stressful event?

21   A.    It is.  That has been my experience, yes, ma'am.

22   Q.    And it's very important following the execution for there

23   to be a debriefing program or debriefing protocol in place?

24   A.    Yes, a protocol would be the right word.  Yes, ma'am.

25   Q.    What is your understanding, if you have one, of what

1  Arkansas's protocol is for debriefing?

2  A.    And I wish I could answer that more directly.  What I

3  received seemed very -- what I understand was that there would

4  be an EAP contact, there would be an opportunity for referral to

5  an employee assistance program, that a member of the mental

6  health, I assume a psychologist or a psychiatrist, associated

7  with the Department of Correction would be responsible for doing

8  the debriefing.  And that is the extent that I know.

9  Q.    Okay.  I guess let me ask this in a different way.  Are you

10  aware there's a mandatory post-execution debriefing that is

11  facilitated by a mental health professional?

12  A.    That is my understanding.  I think it is identified as a

13  single session, from what I understand, and there may be more,

14  but it wasn't articulated in the materials that I read.

15  Q.    And that if staff members do not feel comfortable or do not

16  feel that they can proceed and help carry out an execution, that

17  they have the opportunity and option of begging off, so to

18  speak, saying they can't do it?

19  A.    I did read that, yes, ma'am.

20  Q.    And you were correct about the referral program available

21  through the Arkansas Employee Assistance Program that is there.

22  A.    That's my understanding, yes, ma'am.

23  Q.    And, again, I think you would agree with me it is extremely

24  important for both the employee to be able to speak up if he or

25  she has a problem --

Hilkey - Cross

1    A.    I think that is important, and I would like to expound a

2    little bit on that answer.  It's certainly important.

3         And, again, it is difficult for individuals who have been

4    selected -- you know, there's a great deal -- I know in North

5    Carolina there was a great deal of deliberation about who was

6    asked to be on the execution squad.  I don't know personally of

7    anyone in North Carolina who refused or who reneged on the

8    request by the warden to not participate.  So, again, I've often

9    thought that this whole concept of volunteerism in that

10   situation was somewhat of a misnomer.  So, again, being

11   identified as an important person, valued by the staff, and to

12   say no would take a great deal of courage.  And I think most

13   people who go into the process, and it was certainly true for

14   me -- I did not know what I was getting into the first time.  I

15   was not prepared.  I had no experience.  And what we find in a

16   number of states right now, because there haven't been, in many

17   states, executions, and so bringing staff in who have never been

18   through that experience are ill-prepared to know what they're

19   going to encounter.  So I think that adds to the shock.  There

20   aren't veteran staff that have been through this in many state

21   agencies that are equipped to handle what they're going to

22   encounter.

23   Q.    Again, you don't have any knowledge, do you, with regard to

24   what experience the execution team members in Arkansas possess?

25   A.    That is absolutely correct, yes, ma'am.

1  Q.   When was the last time that you personally observed an

2  execution?

3  A.   Oh, I believe it was 2003.  I'm not sure exactly the date.

4  But there hasn't been any executions in North Carolina for a

5  good while.  Don't remember the last --

6  Q.   Is that why you're no longer consulting with them on that

7  issue?

8  A.   That is correct.  And the other -- part of what I did in

9  addition, I also did a number of training sessions for the

10  psychological staff in the department.  So part of my role was

11  to train and to conduct workshops in critical incident

12  debriefing, so I think I worked myself out of a job.

13  Q.   And have you ever worked as a correctional officer in a

14  prison?

15  A.   I have not.

16  Q.   And whether there is one execution taking place, two

17  executions taking place in one night, or three executions taking

18  place in one night, you would agree with me that a debriefing is

19  essential, correct?

20  A.   Absolutely.

21  Q.   Okay.  When are these -- you testified earlier about there

22  needs to be a pre-execution and, I believe, a post-execution

23  debriefing, as well as follow-ups.

24  A.   Absolutely.

25  Q.   All right.  When is it -- when would you recommend or when

1  is it that you feel that the post-execution debriefing needs to

2  occur?

3  A.   Well, the literature suggests that there's an immediate

4  debriefing, but it ranges from three weeks to six months, but

5  periodic follow-ups for a period of time.  And, again, it's the

6  nature of the accumulation of the reactions.  There are

7  oftentimes delayed reactions for a person processing this that

8  you don't see the immediate problems show.  This is borne out

9  from the research of Dr. Osofsky.

10 Q.   So if an execution occurs on a Monday night and a

11 debriefing takes place Tuesday morning, would that be an

12 acceptable time frame or time period in between the execution

13 and the debriefing for staff?

14 A.   It is the initial meeting.  It doesn't constitute a

15 comprehensive debriefing program, but it is the beginning or a

16 step in a process of debriefing.

17 Q.   Okay.  And I know that you testified on direct examination

18 that you were aware -- I believe you testified on direct

19 examination that you were aware of this having occurred in San

20 Quentin in 1992?

21 A.   That was -- I think I was asked was I aware of other ones,

22 and that's the first formal debriefing program that I was aware

23 of based on my review of the literature.  There may have been

24 others, but --

25 Q.   As you sit here today, are you aware of other states?

1  A.    There is some very interesting archival information that

2  goes back to Connecticut a hundred years ago where some informed

3  wardens were aware of the psychological problems associated with

4  execution.   It certainly wasn't formalized.   But there have been

5  sensitive correctional administrators who have been aware of the

6  implications of executions on their staff.   But the Vasquez 1992

7  is the first formal debriefing program that I was aware of.

8  Q.    Are you aware of other states that currently have a

9  pre-execution debriefing, a post-execution -- an immediate or

10  within a 24- to 48-hour period debriefing process, and then

11  follow-ups throughout the remainder of the months?

12  A.    Again, I am not sure of what -- I know that Dr. Osofsky has

13  made suggestions both to Louisiana and Alabama.   I don't know

14  what protocol they happen to use right now.   But I know he's

15  contributed based on his observations, and how that's impacted

16  their protocol, I'm not aware.

17  Q.    Would it be fair to say that a pre-execution and immediate

18  post-execution debriefing and then follow-up sessions would be a

19  best-case scenario?

20  A.    That would be important steps.   I don't know that that

21  would be all-inclusive, but it certainly would be necessary

22  steps.

23  Q.    Okay.

24        MS. CRYER:   Your Honor, may I have just one moment,

25  please?

1          THE COURT:  You may.

2          (Ms. Cryer confers with Ms. Merritt.)

3     BY MS. CRYER:

4     Q.    Dr. Hilkey, do you have any evidence that Arkansas's

5     schedule is sure or very likely to cause the protocol to fail

6     and cause the immediate needless suffering to the inmate?

7     A.    That is beyond the scope of my expertise to talk about.  I

8     assume you're talking about the pharmacological implications.

9     If that's your question, that's beyond my scope of expertise.

10    Q.    That is fair.  And would you agree that the

11    pre-execution/post-execution would be the same, debriefing would

12    be the same whether you have one execution or two executions in

13    one night?

14    A.    Yes, I think -- but I think there would be -- again,

15    there's a great deal of -- there can be a great deal of

16    unpredictability, and I think that based on whether or not there

17    would be problems associated with the execution process that

18    would create extraordinary stress on the staff, then I think you

19    would have to modify your debriefing process.  But the

20    debriefing process doesn't only involve those people directly

21    involved, but it involves the chaplaincy service, it involves

22    the correctional staff who need to escort the victim's family

23    away from this situation.  It has to be involved with the people

24    who assist the decedent's family.  So there's a number of people

25    that this impacts.  So we think about debriefing sometimes just

1    for the direct staff involved, but there are a number of

2    ancillary staff.  This process affects the whole correctional

3    community and people -- from journalists to defense attorneys,

4    sometimes even prosecutors are traumatized.  It may be hard for

5    us to believe that sometimes, but --

6    Q.   With regard to the debriefing that the Arkansas Department

7    of Correction could provide, do you have any knowledge as to the

8    individuals who are provided the debriefing, such as those who

9    perform the escort, those who administer the medication, those

10   who deal with the victim's family members, do you have any

11   knowledge in regard to what the ADC's protocol is for that

12   debriefing?

13   A.   No, I don't.  And I must confess, I don't know very much --

14   the materials I was provided were quite scant.  So I don't know

15   to the degree or what provisions have been made or the training

16   of those who are going to administer the debriefing.  I know

17   nothing about the details of that process.

18           MS. CRYER:  Okay.  Your Honor, thank you.  I believe

19   that's all I have.

20           THE COURT:  All right.  Redirect?

21           MS. GIANI:  Sharon, could you pull up Exhibit 25?  I

22   believe Plaintiff's Exhibit 25 has already been admitted.

23   Exhibit 25, page 14.

24                        REDIRECT EXAMINATION

25   BY MS. GIANI:

1   Q.   And Dr. Hilkey, if you could look at that answer No. 10,

2   starting at that paragraph, that "Without waiving the

3   objection," and read that and let me know if that appears to be

4   the language that you reviewed.

5   A.   Would you like me to read it out loud?

6            MS. CRYER:  I apologize.  Which interrogatory are you

7   looking at?

8            MS. GIANI:  I believe it is Interrogatory 10.  Is that

9   right?  It's page 14.

10           MS. CRYER:  Thank you.

11      (Witness reviews document.)

12   BY MS. GIANI:

13   Q.   And let us know when you get to the bottom and we can

14   scroll down.

15   A.   Please scroll up.

16   Q.   Yes.

17   A.   Beginning with the paragraph "Within one or two days"?

18   Q.   Yes.

19      (Witness reviews document.)

20   A.   Yes, I've read that.

21           MS. GIANI:  If you could keep scrolling to the next

22   page, Sharon.

23           THE WITNESS:  Okay.  I read that, yes.

24   BY MS. GIANI:

25   Q.   And then scroll down to Interrogatory No. 11.  I believe

1   that first part is some technical stuff.  If you could keep

2   scrolling and keep going to page 16.

3   A.   I've read that, yes.

4   Q.   And scroll -- there we go.  Does that look like the

5   language that I sent to you to review?

6   A.   Yes, it does.  Yes, it does.

7            MS. GIANI:  And Sharon, if you could please scroll

8   back up to the beginning of Interrogatory 11.

9   BY MS. GIANI:

10  Q.   And it says:  "Describe in detail the counseling services,

11  rest opportunities, or other accommodations that are or will be

12  made available to participants in the execution procedure and

13  the process by which any participant may opt out of

14  participating in any execution."

15       Did I read that correctly?

16  A.   You did.

17  Q.   And could you scroll up to Interrogatory No. 10?

18       "Describe in detail the process by which the execution

19  procedure is reviewed and assessed following and prior to each

20  execution, including who participates in the process, who is

21  consulted, whether or not employees of the ADC are allowed to

22  make input, and how revisions or modifications are proposed and

23  adopted."

24       Did I read that correctly?

25  A.   Yes, you did.

 1             MS. GIANI:  Just one moment, Your Honor.
 2   BY MS. GIANI:
 3   Q.    And so is that what you reviewed prior to coming here?
 4   A.    Yes, ma'am.
 5   Q.    Is there any mention in here of debriefing prior to
 6   executions?
 7   A.    There is not.
 8   Q.    And I believe scrolling back down --
 9             MS. GIANI:  I'm sorry to make you go back and forth,
10   Sharon.  But scrolling back down to the answer to Interrogatory
11   11, the top of page 16, I believe.
12   BY MS. GIANI:
13   Q.    And this was in response to a request about counseling, to
14   detail the counseling opportunities.  The first sentence there
15   refers to a mandatory post-execution debriefing.  Is that right?
16   A.    That is correct.
17   Q.    And so is that what you were referring to earlier, that you
18   had an understanding that there was some sort of debriefing
19   session?
20   A.    That is what I --
21   Q.    So having reviewed this, does this appear to be -- to
22   contemplate a group session?
23   A.    I'm sorry?
24   Q.    Does this appear to contemplate a group session?
25   A.    It appears to be a group session, yes, that is my

1   understanding.

2   Q.    And it's mandatory -- was it mandatory for all participants

3   in the execution?

4   A.    That's -- that's what I read, yes, ma'am.

5   Q.    So would this be a non -- I don't know if this is the right

6   way to say it, a nonhomogeneous --

7   A.    Well, it appears to be.  It seems like -- and I don't know

8   -- the problem that I have with the statement is, I don't -- it

9   doesn't delineate at what point -- all that are involved in the

10  execution process could be a hundred people.  I don't know -- I

11  don't know how this is going to be operationalized.  It is not

12  specified.

13        There's a number of things I think in the interrogatory

14  that don't seem to be specified, so it's hard to comment on the

15  efficacy of the program without more detail, I guess is the

16  problem that I had in reading this document.

17  Q.    And so as far as we can tell, or you can tell from this, is

18  there any individual follow-up provided for?

19  A.    Well, other than possible -- I guess making EAP available

20  to employees.  I don't see that there's any organized provision

21  for follow-up.

22  Q.    And you talked about the EAP issue in your direct

23  testimony.  Is that --

24  A.    That's correct, and that's based on both my -- I

25  administered the EAP program, and it was one of my duties as the

Hilkey - Redirect

1    chief of psychology at the prison I worked at, and it's verified

2    through my experience -- through the reading of the NIC document

3    that I referenced earlier that's oftentimes not the effective

4    means, because, again, staff aren't trained to deal with

5    correctional workers and the unique set of demands placed on

6    them.

7    Q.    And you were asked about other protocols, or you were asked

8    about this protocol as well.  As far as you know, are most

9    protocols protected by secrecy provisions?

10   A.    I would assume that's correct.  I don't have any direct

11   knowledge.  I know that I was not allowed to talk about what

12   I -- publicly with what my experiences were with the North

13   Carolina Department of Corrections, other than in a very

14   generalized way.

15   Q.    In your professional experience in the area of critical

16   incident debriefing, does repeated exposure to trauma have a

17   cumulative effect?

18   A.    That is based on not only my understanding of critical

19   incident debriefing, but general psychological principles in

20   general, that accumulation stressors are going to have long-time

21   effects.

22   Q.    And are those risks increased by repeated exposure?

23   A.    They would be, and also the temperament of the person being

24   exposed.  People with more fragile psychological makeup are

25   going to be more susceptible to the types of critical incidents

1    than people who are more psychologically healthy.

2         The other thing that's important is doing the adequate

3    background checks, prescreening so that the person who is

4    assigning people to play a role knows who the employee is, that

5    they understand what their temperaments are, what their

6    weaknesses are, if there's any issues that may create problems

7    later on.

8              MS. GIANI:  That's all I have.  Thank you, Dr. Hilkey.

9              MS. CRYER:  Three.

10             THE COURT:  You may.

11             MS. CRYER:  I'll be quick.

12                       RECROSS-EXAMINATION

13   BY MS. CRYER:

14   Q.   Dr. Hilkey, just to make sure, you have never administered

15   the EAP program in Arkansas, correct?

16   A.   That is correct.

17   Q.   Would you agree with me that correctional officers are

18   trained to deal with stress as it relates to their everyday job?

19   A.   I would not agree with that statement.  I think there are

20   attempts to deal with that, but, again, that is a liability, in

21   most correctional environments, that dealing with the stress, my

22   opinion is that it's -- it varies a great deal.

23   Q.   Okay.  And as you know, the executions starting next week

24   have been scheduled for two a night, correct?

25   A.   That is my understanding.

1  Q.    And that there is stress related with scheduling an
2  execution, correct?
3  A.    Yes, yes.
4  Q.    Do you have any evidence that the stress that will be
5  associated with setting the executions as it relates to the
6  executions scheduled is surely or very likely to cause needless
7  suffering to the inmate?
8  A.    Again, my answer is -- I answered that before, with
9  reference to the psychopharmacology --
10 Q.    It's not.
11 A.    My concern, quite frankly, is not to the inmate.  It's
12 really to the people who are administering the execution
13 protocol.
14          MS. CRYER:  Okay.  Thank you, Your Honor.
15          THE COURT:  Anything further for this witness?
16          MS. GIANI:  No, Your Honor.
17          THE COURT:  Thank you.  You may step down.
18          THE WITNESS:  Thank you, Your Honor.
19          THE COURT:  You may call your next witness.
20          MR. BRADEN:  Call Carol Wright.
21          **CAROL WRIGHT, PLAINTIFFS' WITNESS, DULY SWORN**
22                    DIRECT EXAMINATION
23 BY MR. BRADEN:
24 Q.    Would you state your name, please.
25 A.    Carol Wright.

1    Q.    And Ms. Wright, what is your profession?

2    A.    I'm an attorney.

3    Q.    Are you licensed -- what state are you licensed to practice

4    in?

5    A.    I'm licensed to practice in Ohio and Pennsylvania.

6    Q.    How are you employed as an attorney?

7    A.    I'm the supervising attorney in the Capital Habeas Unit for

8    the Federal Public Defenders in Columbus, Ohio, for the Southern

9    District of Ohio.

10   Q.    And how long have you been employed in that position?

11   A.    I was hired in July of 2008 to start that unit.

12   Q.    All right.  So you've been there from the beginning?

13   A.    Yes.

14   Q.    And we know each other through meeting each other at

15   meetings about this.  Is that right?

16   A.    Yes.

17   Q.    All right.  So basically you and I have the same job in

18   just different federal districts.  Is that right?

19   A.    Yes.

20   Q.    Tell me a little bit about what your duties are as the

21   supervising attorney at the Capital Habeas Unit.

22   A.    My duties include hiring and tasking everybody with

23   arranging teams for our clients.  Our duties include everything

24   that the *ABA Guidelines for the Appointment and Performance of*

25   *Defense Counsel in Death Penalty Cases* include.  We have -- also

1    we do capital habeas petitions, competency, collateral

2    litigation, lethal injection litigation, and clemency

3    proceedings.

4    Q.    I think maybe I asked this question.  I'm coming at this

5    backwards.  Just tell us briefly, what is a Capital Habeas Unit?

6    A.    Oh, I'm sorry.

7    Q.    That's my fault.  I asked the wrong question.

8    A.    We are a unit in the Federal Public Defenders Office that

9    represents state-convicted death-sentenced individuals in

10   federal habeas and in clemency matters.

11   Q.    Do you do more than federal habeas corpus petitions and

12   clemency matters for your clients?

13   A.    We certainly do.

14   Q.    What would those be?

15   A.    Any post-conviction proceeding, includes lethal injection,

16   1983 actions.  Also, we sometimes go back into state court when

17   we're authorized by a federal district court judge to exhaust

18   issues.  We do competency hearings.  We do stays of executions.

19   We do anything from the time the case is out of state court on.

20   Q.    And is there any particular federal statute in which your

21   office -- under which your office is appointed to represent your

22   clients?

23   A.    Yes, 18 U.S.C. 3599.

24          MR. RUDOFSKY:  Objection, Your Honor.  This calls for

25   a legal conclusion.  As Your Honor knows, whether 3599

1  authorizes counsel to do a number of these things is open to a

2  legal interpretation, not a factual question.

3           THE COURT:  I understand and appreciate the objection,

4  but I'm going to overrule it and I'll let this witness testify.

5           MR. BRADEN:  Thank you, Judge.

6  BY MR. BRADEN:

7  Q.   How many executions has Ohio had in recent years?

8  A.   Since 1999, when we started executing again, we've had 53

9  executions.

10  Q.   And how many of those executions has your office

11  represented or been involved in?

12  A.   Our office didn't start until 2008.  So from 2008 until

13  January of 2014, there's been 27 executions.  We've been

14  involved either as lead counsel or in some supporting role --

15  and I can explain that -- in 19 of those executions.

16  Q.   After your office started in 2008, how soon was it before

17  you were involved in your first execution litigation?

18  A.   Our first execution was in November of 2008.

19  Q.   So how many months had passed?

20  A.   Literally, I was hired July 1.  The staff, my attorneys,

21  investigators, paralegal, started at the end of September, I

22  think September 26, and we had a November -- I believe it was on

23  November 11, 2008 -- execution.

24  Q.   Tell me, just very briefly, about the makeup or the size of

25  your unit in 2008.

1    A.    At that time, it was eight people.  We had five assistant

2    federal defenders, we had two paralegals, and we had -- I mean

3    two investigators and one paralegal.

4    Q.    And how many executions did your office deal with in those

5    -- in the first year?

6    A.    The first year, it was just that one, and that was kind of

7    a late-breaking sort of thing.  There had been counsel

8    representing Mr. Bryant-Bey.  That's who was executed.  But we

9    have three different institutions in the state of Ohio that help

10   represent capitally sentenced defendants:  The state public

11   defender.  There's also a Capital Habeas Unit in the Northern

12   District of Ohio.  So there's three entities.  Mr. Bryant-Bey

13   was represented by the state public defender.  Some things had

14   gone wrong in his case.  The parole board, following clemency,

15   did not recommend clemency in the report and missed some pretty

16   significant psychological testimony, so they asked us to get

17   involved.  So we had just about 30 days to get involved.  We got

18   involved at that time, got an expert involved, had an

19   investigator, tried to review, did some end-stage litigation,

20   met with the governor's council.  But we were not able to stop

21   that execution.

22        We met with Mr. Bryant-Bey.  He asked me to witness his

23   execution, and I witnessed his execution, along with another

24   attorney from the state public defenders office and his family.

25   Q.    So tell me, or, more specifically, tell the Judge, what

1   does the representation of a condemned inmate involve during the

2   end stage?

3   A.   An awful lot of hours, an awful lot of people and

4   resources.  We have -- when we are aware of a date coming up --

5   and we have a great deal of time in Ohio.

6   Q.   Let me interrupt you there, if you don't mind, and explain

7   why you have a lot of time in Ohio.

8   A.   Right now we have executions scheduled through February

9   of 2020.  We have monthly executions this year, beginning in

10  May, if they go forward.  Everybody I'm sure is aware that we

11  currently have a preliminary injunction that's been upheld by

12  the Sixth Circuit.  After this year, I believe they're spread

13  out at about six weeks apart, and prior to this year they were

14  six weeks apart, and back in 2009, they were monthly apart.

15       One of the reasons we have a lot of time is because we've

16  been somewhat successful in our lethal injection litigation.  In

17  addition, there were requests by DRC and the parole board to

18  spread the executions out further than a month because there was

19  just too much to do for the parole board and for DRC in terms of

20  training and getting ready for an execution and debriefing after

21  an execution.

22  Q.   So let me go back to where I interrupted you.  Once you get

23  involved and you know you're dealing with an execution, what

24  does that entail?

25  A.   Well, it generally kind of depends on when we get involved.

1    But, for example, I think two years ago I was called and asked

2    if our office would get involved in a case that was all the way

3    through the system, all the way through federal habeas, and the

4    cert petition had been denied, the attorneys wanted off.  He had

5    an execution date a year in the future.  I told the judge I

6    would only get involved if I could partner with the Northern

7    District Capital Habeas Unit because I knew there was going to

8    be so much work that needed to be done in that year, because it

9    involves, of course, review of everything that's gone on, trying

10   to figure out if there's any additional end-stage litigation

11   that could go on, developing clemency presentation, the themes,

12   a campaign, building a relationship with the client, the

13   client's family, gaining the trust of the client, and competency

14   evaluations.

15        In addition, during that year, things are happening

16   legally.  For example, *Hurst* happened.  And now Ohio has a *Hurst*

17   issue, so we have *Hurst* pleadings that are going on for all of

18   our cases that are in any stage of litigation, whether they're

19   still in the district court or they're in -- they're all the way

20   out and we're doing second time or successor petitions.

21   Q.   And just so the record's clear, when you talk about *Hurst*,

22   you mean *Hurst v. Florida*?

23   A.   Yes.

24   Q.   And that deals with jury versus judge sentencing in capital

25   cases?

1   A.   Yes.

2   Q.   So let's talk about a little bit about some of these

3   specific things that you get involved in.

4        So I know every state is a little bit different, but I

5   think the role of the lawyer pretty much stays the same.  Tell

6   me about what your office does and how they approach clemency.

7   A.   Well, we review the entire record.  And certainly we are

8   aware if we have been involved at the petition stage of some of

9   the themes of mitigation, some of the themes of the case.  There

10  may be dissenting opinions, there may be a question of

11  innocence.  There may be any number of things.

12       We had a successful clemency presentation in 2010 which

13  involved reviewing the transcript for every red flag.  We found

14  some issues with the coroner.  In addition, our client had a

15  severe alcohol problem, so we had experts come in on that.  We

16  were able to get a PET scan on his brain after litigating to

17  obtain the ability to remove him from prison and get his PET

18  scan done.  The coroner's testimony that we thought had some

19  issues resulted in us speaking with the -- finding an expert

20  coroner and then speaking with the coroner's boss that had

21  overseen his performance on that autopsy.  We flew to Florida to

22  get a videotape of the coroner.  We ended up presenting a full

23  day of videos, three experts.  It was a very robust clemency

24  presentation.  In addition, we were meeting with the client all

25  of the time.  Our clients in Ohio are interviewed by the parole

1    board two weeks before our application's due.  Then our

2    application is due, then there's a clemency hearing a week

3    later.  That's approximately a month before any execution so

4    that the parole board then makes a recommendation to the

5    governor.  And then we meet with governor's council and continue

6    whatever campaign we started.

7    Q.   All that you've described about the clemency process in

8    your state, anyway, is that something that you can do in a week

9    or two?

10   A.   Oh, my goodness, no.  I mean, I didn't think I could even

11   do -- take on the one client when I had a year notice without

12   having expert counsel and resources available to partner with.

13            MR. RUDOFSKY:  Objection, Your Honor, to the extent

14   we're discussing the clemency hearings and effectiveness of

15   counsel, Judge Marshall has already resolved that issue last

16   week.

17            THE COURT:  I'll note the objection.  You may proceed

18   with the questioning.

19            MR. BRADEN:  Thank you.

20   BY MR. BRADEN:

21   Q.   What is the role of capital counsel in dealing with a

22   client?  Can you explain that a little bit and why that's

23   important?

24   A.   Sure.  First of all, I think our role is to build a

25   relationship because they're facing death and we need to be able

1    to help them deal with that.  But in addition, we need to keep

2    them informed and give them hope, and that requires an awful lot

3    of meetings and time and explanations.  We need to get them on

4    board with evaluations.  These clients have all had at least one

5    set, if not six sets of attorneys that have left them after

6    they've been sentenced to death.  They don't trust attorneys.

7    They don't trust the process.  Most of our clients have been on

8    the row for over 15 years.  They've often been abandoned by

9    attorneys.

10         So we spend a lot of time building a relationship, and then

11   we spend a lot of time maintaining that relationship.  And it's

12   the attorney's role.  Investigators can certainly fill in and

13   visit and buy a sandwich and buy a pop and tell them what's

14   going on, but when there's legal things going on, particularly

15   those last three months before an execution when everything's

16   heating up and everything's being filed and there's the whole

17   clemency process going on, you need the attorney to face-to-face

18   talk to the client on a regular basis and explain.

19   Q.   Tell me if I'm wrong about this, or just explain, does the

20   role of the lawyer working with the client increase during the

21   time of executions?

22   A.   Oh, yes.

23   Q.   Why is that?

24   A.   Well, because the client needs the support and because you

25   need the client to continue to work with you for clemency

1   purposes, for the interview purposes.  You're prepping someone

2   for an interview.  You're getting their life story out in a way

3   that it's never been told before, in a more compelling way.  You

4   have to reach out to their family.  You are responsible for

5   coming up with these themes and these witnesses.  And so you're

6   spending a great deal of time with both the client and the

7   client's family.

8   Q.   Does the lawyer have an obligation to keep the client

9   informed of the legal proceedings and the results and the wins

10  and losses?

11  A.   Absolutely.

12  Q.   And why is that?

13  A.   Well, it's an obligation under the guidelines and just

14  under our attorney-client relationship.  And a lot of these

15  things are very technical that we're filing, so it takes some

16  time to sit down and explain why midazolam doesn't work and why

17  we're fighting this challenge or doing the successor petition on

18  *Hurst* and what *Hurst* is and why it affects their cases so that

19  they understand, so that they know that someone's fighting for

20  them and that they're really worth fighting for.

21  Q.   Can these kind of conversations be passed off or assigned

22  to investigators or other people in the office?

23  A.   No, no.

24  Q.   Why not?

25  A.   Investigators don't know the intricacies of federal law,

Wright - Direct                                          189

1    and they -- I mean, these are legal conversations and it's the

2    lead attorney's responsibility to be make sure that the attorney

3    -- that the client is aware of what's going on.

4    Q.    How far is the -- just for an example, how far is the

5    prison -- and I think you've told me it's moved.  But how far is

6    the prison from your office, where your clients are kept?

7    A.    Currently, it is about an hour away.  Back in 2008, when we

8    first started, the death row was in Youngstown, Ohio, at Ohio

9    State Penitentiary, and it was about a three-hour drive.

10   Q.    And did you have to just get in the car and go talk to the

11   client?

12   A.    I got in the car and talked to the client.  And I probably

13   was with the client at least two to three times a week, and I

14   would oftentimes leave at four in the morning so I could get

15   there right when I could get in and see them, and still get back

16   to the office by one to be able to do all the legal work that

17   needs done.

18   Q.    And I suspect that took a lot of time, right?

19   A.    It took a lot of time, and it's a very stressful time.  You

20   don't sleep much, you don't eat right, you don't exercise, and

21   your family doesn't see you.

22   Q.    Tell me about, or tell the Judge the effects of one

23   execution back in 2008 or '09 when you were having them

24   serially, the effects on your staff in your office.

25   A.    It's very demoralizing for the staff.  And it was

1    particularly difficult, this first one, because we'd been kind

2    of out there in the wind, as panel attorneys or sole

3    practitioners, doing this work.  Now we had a unit.  We had

4    resources.  We were able to get a great psychologist.  We were

5    able to get an investigator.  We were able to have a paralegal.

6    And we still, with all of those resources, we weren't able to do

7    anything more and to actually succeed.

8        I remember the day I was down at the prison, I witnessed

9    the next -- I did not come back to the office.  A bunch of

10   people from the office came and met me.  We went to a bar.

11   Yeah, it's -- it's -- that's what we do, and we've continued to

12   do that.  In the meantime, I've tried to have other healthier

13   responses.  I brought a psychologist in when things continued to

14   go -- when we continued to have executions monthly in '09 and

15   '10.  That helped a little bit but didn't help some people.  We

16   ended up working with a hospice group as well and had a hospice

17   person come in and work with our group.  But it's a very

18   draining, demoralizing time for the entire unit and for the

19   entire staff, even staff that are not directly involved.  The

20   traditional unit who doesn't do any of this work, they just are

21   doing regular criminal defense work, are also affected.  They

22   know -- they see us coming in and out at all hours.  And, yeah,

23   everybody's affected.

24   Q.   Are you able to just -- or let's talk specifically about

25   this time period in 2008 to 2011 that you've referenced.

1    A.    Uh-huh.

2    Q.    In that period, were you able to just assign one lawyer,

3    maybe one investigator to the execution?

4    A.    Never.  Never.  It's always a team effort.  And it's

5    always, frankly, a team that grows exponentially.  So one of the

6    executions we had, we had a team that was two attorneys, as well

7    as a panel attorney.  There were two investigators.  There was a

8    paralegal.  As things continued to happen in that case, other

9    attorneys jumped in to do some of the pleadings that needed to

10   be done.  We continued to litigate some other issues.  So all in

11   all, it was at least six or so attorneys and staff members out

12   of a group of eight.

13   Q.    So in that situation that you've referenced and the others

14   that you're talking about, you were dealing with one execution.

15   Is that right?

16   A.    One execution.

17   Q.    All right.  And what was the -- just to make clear, I think

18   you've talked about it some, but to make it clear, what was the

19   time period between executions?

20   A.    At least monthly, if not six weeks.  And, again, back in

21   2008, 2009, we probably only had five executions.  I think the

22   most executions we've had since 1999 was in 2010 when we had

23   eight executions over the entire year, and in that year there

24   was 11 scheduled.  Three got clemency.

25   Q.    Did you, or did your office during any of those periods

1   ever have executions within a day or two apart?

2   A.    Never.

3   Q.    And was your office ever appointed or involved in

4   executions within a week apart?

5   A.    Never.  I just don't know how that could happen.

6   Q.    Let's suppose for a moment that Judge Baker here, or some

7   other federal judge, called you up and said, "Would you take

8   this case?"  What would you do if it was a case dealing with

9   executions within days apart?

10  A.    I would probably refuse, depending on whether there was

11  someone else to do it.  I think that you're automatically

12  conflicted when that happens.  You don't have enough people to

13  do --

14              MR. RUDOFSKY:  Your Honor, objection again.  This is

15  all legal conclusion, and I don't know that she's been qualified

16  as an expert witness for an opinion like this.  It is one thing

17  to say how she feels about the facts and another thing to say

18  that she thinks there's a legal conflict.

19              THE COURT:  I'm not sure that that's where her

20  testimony was necessarily heading.  I understand and appreciate

21  the objection.  This is all coming in as evidence to me.  I

22  understand and appreciate the basis of the objection, but I'm

23  going to permit the testimony.  To the extent that she offers

24  it, I'll weed through what is appropriate or what isn't

25  appropriate in regard to the legal conclusions that I need to

1    reach in the case.

2         You may proceed.

3              MS. HODGE:  And, Your Honor, I'm sorry, but along

4    those same lines, this testimony is speculative.  I think the

5    witness has testified she's never been called upon to do this

6    and she thinks she might refuse.  So we would object because it

7    calls for speculation.

8              THE COURT:  And I'll overrule that objection too.

9         You may proceed.

10             MR. BRADEN:  Could I object to having multiple

11   objectors?

12             THE COURT:  That's a big note I have here.  You're

13   double and triple teaming.  So you all can double and triple

14   team.  Generally, the person who takes the witness is the one

15   who is supposed to lodge the objection.  I didn't say anything

16   when Ms. Merritt and Mr. Rudofsky started doing it or were

17   continuing to do it.

18        In the interest of getting everything that everybody wants

19   to say on the record in the compressed time that we have, I'll

20   permit it.  But as I said earlier in the day, the rules go both

21   ways.  You may proceed.

22   BY MR. BRADEN:

23   Q.   Let me rephrase the question.  Let's suppose for one reason

24   you had two or three executions within a week period, or even a

25   month's period, what would be the problems?

Wright - Direct

1  A.   The problems are that to properly represent your client in

2  compliance with our ethical obligations, you have to have so

3  many resources associated with an execution, and to have those

4  even monthly, the resources I choose for client A would not be

5  that available for client B because they're both being dealt

6  with at the same time.  And so choices would have to be made,

7  and either client B suffers because he doesn't get a lethal

8  injection preliminary injunction hearing because there's not

9  time or effort, or his clemency presentation suffers because

10 client A's clemency presentation has to be done, and you only

11 have so many hours in the day and so many resources.

12 Q.   So let me ask you about something else.  And you've talked

13 about this, but I want to be a little bit more precise about it.

14      The federal court in Ohio in your district appoints your

15 office to represent your clients in 1983 actions.  Is that

16 right?

17 A.   Absolutely.

18 Q.   And you get involved in those?

19 A.   Oh, yes, we're very involved in the lethal injection

20 litigation.

21 Q.   So what does that entail?

22 A.   A lot of resources.  Right now -- our lethal injection

23 litigation started back in 2004, and it has now become, since

24 2011, I think, kind of an omnibus complaint with 95 plaintiffs,

25 all of whom are on death row.  We only represent 37 of those in

Wright - Direct                                    195

1   our habeas -- our Capital Habeas Unit in our habeas

2   presentations, in our habeas kind of track.  But we are

3   appointed -- whenever any client comes up for execution, our

4   office is appointed as liaison and/or lead counsel for that

5   person's lethal injection litigation because we've kind of

6   become the experts on the lethal injection litigation.

7        So we pursue preliminary injunctions for any client that

8   wants lethal injection litigation to go forward in Ohio, and we

9   are appointed by the district court specifically to do that.

10  Q.   And I'm sure the court will look at this eventually, but

11  just for the sake of explaining how this kind of works, were you

12  involved in the recent lethal injection case in Ohio that was

13  affirmed by the Sixth Circuit?

14  A.   I was.  I was in Dayton for five days.

15  Q.   And your appointment under that was under what vehicle?

16  A.   We had -- we had been appointed for Mr. Phillips, the lead

17  plaintiff, so to speak, in that case a couple of years ago when

18  he first had an execution date.  We were appointed to represent

19  him in lethal injection.

20       We were also appointed to represent Mr. Tibbetts, the

21  second plaintiff, as both habeas counsel.  After his case was

22  all the way through, his attorneys, his panel attorneys wanted

23  off the case, so we were appointed to represent him in clemency

24  and end-stage litigation.  We were also appointed to represent

25  him in 1983.

1      And then Mr. Otte, the third plaintiff in that case, we

2  were appointed to represent him in the lethal injection in the

3  Northern District, Capital Habeas Unit represents him through

4  his -- on his habeas and clemency matters.

5  Q.   The challenge to the lethal injection in Ohio, does that --

6  is that a singular task?

7  A.   Oh, no.  No.  In fact, it has -- it has taken several of my

8  attorneys, and they've only -- that's all they know is lethal

9  injection, but they know it really well.  I have two -- three of

10 us that are very much involved in that almost 90 percent of the

11 time.  I would say that's all they do is lethal injection

12 litigation.

13     In addition, we have an attorney from Porter Wright that we

14 obtained through the ABA Death Penalty Representation Project

15 that helps out with the lethal injection litigation.  And

16 there's also a lawyer tasked from the state public defender.

17     That's kind of the core team.  That team changes, depending

18 on who the panel attorneys are, or who the habeas attorneys are.

19 Some of those folks get involved in the lethal injection as

20 well.

21     This last hearing in January, I think there were nine of

22 us.

23 Q.   And while the lethal injection challenge and the 1983

24 challenge goes on, does the other work in your office stop?

25 A.   No.  But my group has grown from eight to 17, so I have a

1   lot more people that can monitor the rest of the work and keep

2   it moving as well.

3   Q.   So the habeas cases continue at pace with the 1983 actions.

4   Is that right?

5   A.   Absolutely.

6   Q.   So you've mentioned this a couple of times, but I want to

7   get a little bit more specific about it.  In your time as a

8   supervising attorney in Ohio for the habeas unit there, have you

9   ever witnessed an execution?

10  A.   I witnessed two.

11  Q.   And --

12          MS. HODGE:  Your Honor, we just continue to raise our

13  objection again to any testimony about executions that didn't

14  occur in Arkansas or that aren't related to Arkansas's current

15  midazolam protocol.

16          THE COURT:  I've recognized the continuing objection

17  and I overrule it.

18      You may proceed.

19  BY MR. BRADEN:

20  Q.   Was there any one of those executions that stood out as

21  being particularly significant to you?

22  A.   Well, both of them are particularly significant for

23  different reasons.  The first was Mr. Bryant-Bey, so I didn't

24  have a great long-term relationship with him, but it was the

25  first execution I saw, so it was certainly significant and I

1    remember every moment of it, and it was very hard.

2    Q.   Let me interrupt you there and ask you a question I should

3    have asked before.  At the time that you witnessed these

4    executions, according to the state prison protocols, how many

5    attorney witnesses were allowed in to view the executions?

6    A.   At that time, one attorney separate and apart from three

7    witnesses that the inmate chose.  So the inmate happened to

8    choose a prior attorney and myself because he didn't have a lot

9    of family members.  He had two family members, so he was able to

10   get two attorneys with that rule.  But typically it is one

11   attorney, three other people, and a religious advisor.  That has

12   since changed in the last couple of years.

13   Q.   Well, tell me -- before we go into that, tell me a little

14   bit about the second execution.

15   A.   So the second execution was Daniel Bedford.  He was one of

16   our clients.  We'd had his case for a couple of years.  I was

17   very much lead counsel and involved with him.  That was the one

18   I would drive a couple of times a week to see, particularly the

19   last couple of months.  We had an *Atkins* claim going in state

20   court --

21   Q.   What is an *Atkins* claim?

22   A.   A claim that he was ID.

23   Q.   And what's ID?

24   A.   I'm sorry.  Intellectually disabled, mentally retarded.  We

25   had filed a claim with expert affidavits in the Cuyahoga County

1   -- I'm sorry -- Hamilton County Common Pleas Court.  It had been

2   dismissed.  That was on appeal.  We felt certain it was going to

3   get reversed.  In addition, we were working up a *Ford* claim.

4   Q.   What is a *Ford* claim?

5   A.   Incompetency to be executed claim.

6   Q.   You talk in a lot of shorthand, don't you?

7   A.   Yes, we do.  Mr. Bedford had some dementia issues and we

8   believed that he had a valid *Ford* claim.  We were also doing

9   clemency, did a clemency presentation with a couple of experts,

10  some family members, some friends.  It was an all-day hearing.

11  We tried to prepare Mr. Bedford for his interview before that.

12       So we were working on an application for clemency, *Ford*,

13  *Atkins*.  *Atkins* we lost and it went up to the court of appeals

14  and was not getting decided, so we filed a *Skinner* claim, which

15  is a procedural claim in district court saying we didn't have a

16  procedure because the state courts weren't deciding this fast

17  enough.  And we also -- our *Ford* claim got dismissed and we

18  brought that then in federal court.

19       So there was a lot going on.  There was a lot of pleading.

20  There were, I want to say, at least three attorneys working kind

21  of nonstop on that.  I argued in Hamilton County one week and

22  then argued in district court the next week.  And in the

23  meantime we were kind of appealing all the way up to the Supreme

24  Court.  We were waiting for a clemency decision.

25       So I was very -- I spent a lot of time with Mr. Bedford.  I

1    went often to explain things.  We had to get state counsel to

2    help us in our *Ford* claim in state court.  So we took state

3    counsel up and introduced him and tried to -- tried to build a

4    bit of a relationship there.

5           Moving forward, we actually got a stay the day before his

6    execution.  In Ohio, we are allowed to go down at 4:30 and visit

7    with our clients, between 4:30 and 7:30 the night before the

8    execution, and again in the morning.  So as the state was

9    appealing our stay that we had gotten at 2 o'clock in the

10   afternoon, on the day before, I was driving down to the prison.

11   And our prison, where we actually execute people, is two and a

12   half hours from our office.  So they move prisoners there a day

13   before.  So I was driving down to meet with him to tell him this

14   great news about the stay, which I got to tell him, but we knew

15   it was on appeal.  I left at 7:30 in the evening, went back to

16   my hotel, had to call him then at eleven, after the circuit

17   vacated the stay.  And then I had two attorneys at the office at

18   11:30 filing the application for a stay with the U.S. Supreme

19   Court, which was denied.  So we went the next morning -- I went

20   the next morning and witnessed that execution.

21          That was -- it was an execution using a three-drug -- no, a

22   one-drug method.  I'm sorry.  We were in 2011.  We were using

23   pentobarbital at that time.  My client, they had problems with

24   the IV access --

25   Q.   Let me interrupt you before you go into that detail.

1    A.    Sure.

2    Q.    How many lawyers was he allowed to have in the witness room

3    at that time?

4    A.    Just one lawyer.

5    Q.    And you were that lawyer?

6    A.    That was me, yes.

7    Q.    So explain what happened in the execution chamber then.

8    A.    So the curtain is closed when IV access is obtained, but

9    there is a video feed so we can watch and see it, and the

10   witness room is -- the gurney is right in front of us.  There's

11   a Plexiglas -- Plexiglas between us and the actual room, but it

12   doesn't go all the way up, so you can hear over the top of the

13   Plexiglas, and Mr. Bedford was calling to me, saying, "Carol,

14   they've now stuck me five times.  They can't get the needles in.

15   Stop this."  And I could see blood running down his arm.  So I

16   got up and -- we're not allowed to have cell phones in our

17   witness room, so I had to go up, leave the room to call to the

18   person that was waiting in another part of the penitentiary to

19   call my office who had papers ready to call and file with the

20   court.  So I got up and walked out to call and let them know

21   what was going on and then came back in, but by the time I came

22   back in, they did have IVs in, so they proceeded with the

23   execution.  And it went forward.  They declared him dead.  But

24   it was a -- it was a very difficult thing to watch.

25   Q.    Are the rules different now in Ohio?

1    A.    The rules are different now.  Now one to two attorneys can

2    come, and that's so that while one is witnessing, the other

3    person can actually alert the court if something goes wrong, or

4    at least that's my understanding as to why.

5            MR. BRADEN:  That's all the questions I have, Judge.

6            THE COURT:  All right.  Cross-examination.

7                        CROSS-EXAMINATION

8    BY MS. HODGE:

9    Q.    Good afternoon.

10   A.    Good afternoon.

11   Q.    A few follow-up questions for you.  In your direct

12   examination you testified that currently your unit or group is

13   responsible for handling monthly executions in Ohio.  Is that

14   correct?

15   A.    Well, we haven't had an execution in Ohio since January

16   of 2014, because that was the Dennis McGuire execution.  They

17   used midazolam and hydromorphone and it didn't work, so --

18   Q.    So the answer is no, you're not currently responsible for

19   managing a caseload of monthly executions?

20   A.    I'm currently responsible for handling 37 death-sentenced

21   clients and the executions begin in May, yes.

22   Q.    And they will be scheduled monthly?

23   A.    The ones in 2017 are scheduled monthly.  The ones in 2018

24   forward are, I believe, every six weeks.

25   Q.    Okay.  Would you agree with me that your office is going to

1    do all that it can do to aid those clients during those monthly

2    or six-week time periods where you're defending clients that are

3    scheduled for execution?

4    A.    I would certainly agree with that.

5    Q.    Okay.  And you're going to be able to prepare their cases

6    in that monthly or six-week time period prior to their

7    executions, you and your group of -- is it 17?

8    A.    Sixteen others, yes, 17 total.  I would agree in that we've

9    been assigned to those cases several years ago, so we've been

10   preparing.

11   Q.    Okay.  Would you agree with me that nine years is

12   sufficient time to prepare for an execution?

13   A.    Nine years?

14   Q.    Yes.

15   A.    Kind of depends on what else is going on during that nine

16   years.

17   Q.    It's your testimony that an attorney who has been licensed

18   to practice 20 years couldn't prepare in nine years for an

19   execution scheduled this year?

20   A.    Again, it kind of depends on that attorney's practice and

21   what else is going on.

22   Q.    Okay.  Would you expect that attorney with reasonable years

23   of experience to be able to manage their schedule in a way that

24   they could prepare for an execution in the course of nine years?

25   A.    Certainly I would hope they could.

Wright - Cross

1  Q.   Okay.  Were you aware that some of the plaintiffs in this
2  case have been represented by the same counsel since as early as
3  2006?
4  A.   I am not aware of that.
5  Q.   Were you aware that as early as 2006 that some of the
6  plaintiffs have been represented by the same counsel and have
7  also challenged the Arkansas Department of Corrections lethal
8  injection protocol as early as 2006?
9  A.   I believe I was aware of a prior challenge.
10 Q.   Okay.  I believe you testified that you began in your
11 current unit in 2008 and that you are involved in the lethal
12 injection protocol specifically related to the recent Eighth
13 Circuit decision and that your office got pulled in because you
14 guys are considered currently experts in lethal injection
15 litigation.  Did I understand your testimony correctly?
16 A.   I think it's the Sixth Circuit decision.
17 Q.   I'm sorry.  We're in the Eighth Circuit.  Thank you, Ms.
18 Wright.  The Sixth Circuit.
19 A.   And I would say that we weren't pulled in.  We've kind of
20 been driving the train on this since 2011.
21 Q.   And you've been driving that train since 2011 because you
22 and your group consider yourselves to be experts in the area of
23 lethal injection litigation in Ohio?
24 A.   We had to become that in 2011.
25 Q.   You were able to gain that expertise in five years?

1  A.    Well, we've stumbled.  We don't win every preliminary

2  injunction hearing.

3  Q.    You were able to gain the expertise in five years?

4  A.    Yes.

5  Q.    And in five years you were able to provide successful

6  representation for clients in lethal injection matters.  Is that

7  correct?

8  A.    Sometimes.

9  Q.    And you would reasonably expect that a person, therefore,

10  who has been working on the same type of case to also be able to

11  effectively represent clients if they had been handling those

12  cases for that same amount of time?

13  A.    If they had monthly executions and monthly preliminary

14  injunction hearings, yes.

15  Q.    So is your testimony that they could only be effective in

16  representing clients over the course of several years if they

17  had been engaging in monthly preliminary injunction hearings?

18  A.    No.  I'm saying that's how we gained the expertise.  We had

19  monthly preliminary injunction hearings and we had a lot of

20  discovery and we learned a lot.

21  Q.    Okay.  Are you aware that the counsel in this case has

22  filed more than one thousand pages of complaints and exhibits in

23  just this case alone?

24  A.    That seems likely.

25  Q.    Okay.  Were you aware that they propounded and received

1    exhaustive discovery in this matter alone?

2    A.   I don't know what -- how you qualify "exhaustive."

3    Q.   Would you consider 1,500 pages of documents responsive to

4    discovery requests to be exhaustive?

5    A.   No, not in our lethal injection case, that would not be

6    exhaustive.

7    Q.   It would not?  Would you deem that to be sufficient?

8    A.   Depends on what you're looking for --

9    Q.   Okay.

10   A.   -- in your discovery.

11   Q.   Have you seen the plaintiffs' counsel's exhibit notebooks?

12   A.   I have not.

13   Q.   Okay.  They're on this --

14   A.   We kill a lot of trees, don't we?

15            MS. VANDIVER:  Those aren't ours.

16            MR. BRADEN:  Those aren't ours.

17        (Ms. Hodge confers with Ms. Merritt.)

18   BY MS. HODGE:

19   Q.   It's about the same size, but if binder color matters --

20            MS. VANDIVER:  Again, that white binder is not ours.

21            MS. HODGE:  It is your exhibits.  We just --

22            MS. VANDIVER:  So you have two copies of our exhibits

23   there.

24            MS. MERRITT:  These are the confidential exhibits A

25   through F.  And what do you have there, Kat?  And I think we --

1          (Ms. Hodge confers with Ms. Merritt).

2                MS. MERRITT:  Is yours double-sided?

3                MS. VANDIVER:  I don't know.

4                MS. MERRITT:  That's probably why.

5    BY MS. HODGE:

6    Q.   You understand my question, though, that --

7    A.   There's a lot of paper there.  I don't know what the

8    exhibits are or whether they're helpful or not.

9    Q.   Well, do you think that the attorneys would produce

10   documents in a case that wouldn't be helpful?  Is that your

11   testimony?

12   A.   No.

13   Q.   Were you aware that prior to filing this action in this

14   court that the identical plaintiffs represented by identical

15   counsel had filed a similar state court petition --

16   A.   I was aware there was a state court lethal injection

17   challenge.

18   Q.   Have you reviewed any documents related to your testimony

19   in this case?

20   A.   No.

21   Q.   So you don't really have any knowledge about what counsel

22   for the plaintiffs has or has not done in preparation for the

23   case?

24   A.   No.

25   Q.   Okay.  Did you review any documents related to their

1    representation in their state court proceeding?

2    A.    No.

3    Q.    So you don't have any knowledge about what counsel for the

4    plaintiffs in this case have or have not done in the state court

5    litigation?

6    A.    No.

7    Q.    Were you aware that plaintiffs in this case represented by

8    identical counsel simultaneously sought a preliminary injunction

9    with respect to clemency hearings in federal court here last

10   week?

11   A.    I think I saw that on --

12   Q.    Did you review any documents related to that litigation?

13   A.    No.

14   Q.    So you can't give any testimony about what counsel for the

15   plaintiffs have or have not done in their representation of the

16   plaintiffs in that litigation?

17   A.    No.

18   Q.    So your testimony today is limited solely to what your

19   opinions are regarding what your Ohio group can or cannot do in

20   terms of lethal injection litigation?

21   A.    My opinions and my experiences, yes.

22   Q.    And so you can't give any opinions or experiences

23   specifically related to any of the counsel sitting at that

24   table?

25   A.    No, I can't.

1   Q.   Okay.  And you can't render any opinions or give any

2   testimony about their effectiveness as counsel in this matter or

3   any other matter pending in Arkansas.  Is that correct?

4   A.   Correct.

5   Q.   You gave some testimony about having witnessed the Daniel

6   Bedford execution back in 2011.  Is that correct?

7   A.   Yes.

8   Q.   After the IV team was able to place Mr. Bedford's IV, his

9   execution went on without problems -- without any problems.  Is

10  that correct?

11  A.   Actually, his chest heaved and -- several times, but then

12  he was pronounced dead.

13          MS. HODGE:  I'll pass the witness.  Thank you, Your

14  Honor.

15          THE COURT:  Redirect.

16                    REDIRECT EXAMINATION

17  BY MR. BRADEN:

18  Q.   Ms. Wright, could you and your unit develop the expertise

19  you have in lethal injection and continue to represent your

20  clients with four lawyers?

21  A.   No.

22  Q.   All right.  And how many lawyers do you have working in

23  your office now?

24  A.   I have six assistant federal defenders and six research and

25  writing specialists.

1   Q.    Just very briefly, tell me about this partnership that you

2   talked about earlier and how that works.

3   A.    Because we have both a state public defender that

4   represents capitally sentenced defendants and the Northern

5   District Capital Habeas Unit.  There's three institutions in

6   Ohio, institutional sources for expertise and resources in

7   capital work.  So we partner oftentimes as co-counsel with the

8   state public defender or with the Northern District Capital

9   Habeas Unit to make sure that we have enough people and

10  resources to do all that's required in the last year before an

11  execution.

12  Q.    Now, you and I go to a lot of these boring bureaucratic

13  meetings that talk about our offices, and from those meetings,

14  do you know how many habeas units there are in the state of

15  Arkansas?

16  A.    There's one.

17  Q.    All right.  Do you know how many there are in the Eighth

18  Circuit Court of Appeals?

19  A.    I don't.

20  Q.    There's one.  Would you disagree with that?

21  A.    I would not.  I don't travel a lot.

22          MR. BRADEN:  Thank you.

23          THE COURT:  Anything further from this witness or may

24  she step down?

25          MS. HODGE:  Give me just a second, please, Your Honor.

1   Just three questions, Your Honor.  Maybe two.

2                        RECROSS-EXAMINATION

3   BY MS. HODGE:

4   Q.   Do you know, Ms. Wright, how many lawyers represent -- I'm

5   sorry.  I'll get to the microphone.  I apologize.  Do you know

6   how many lawyers currently represent each prisoner in this

7   case --

8   A.   No, I don't.

9   Q.   -- along with the federal PD?

10  A.   I do not.

11  Q.   Okay.  And is it your intent to try to provide a gold

12  standard of death penalty defense?

13  A.   My intent as a supervisor of the Capital Habeas Unit in

14  Ohio?

15  Q.   Yes.

16  A.   Certainly.

17  Q.   Thank you.

18           MS. HODGE:  I pass the witness.  I apologize.

19           THE WITNESS:  Thank you.

20           THE COURT:  Anything further?

21           MR. BRADEN:  That's all, Your Honor.

22           THE COURT:  Thank you.  You may step down.

23      You may call your next witness.

24           MR. WILLIAMS:  Call Joseph Cummings.

25           THE COURT:  Mr. Cummings, Ms. Washington will

 1   administer the oath.

 2              **JOSEPH CUMMINGS, PLAINTIFFS' WITNESS, DULY SWORN**

 3                          DIRECT EXAMINATION

 4   BY MR. WILLIAMS:

 5   Q.    Would you please state your name for the record.

 6   A.    Joseph Cummings.

 7   Q.    And how are you employed currently?

 8   A.    Through the Federal Public Defenders Office.

 9   Q.    And in what capacity?

10   A.    As an investigator.

11   Q.    How long have you been employed there?

12   A.    Since 2004.

13   Q.    Have you ever heard of a gas called sevoflurane?  I'll

14   spell that.  S-e-v-o-f-l-u-r-a-n-e.

15   A.    Yes, sir.

16   Q.    And how have you heard of that?

17   A.    Through the lethal injection litigation through our office.

18   Q.    Can you tell me a little bit more how you came to knowledge

19   of sevoflurane and whether you were asked to do anything in

20   particular?

21   A.    Yes.  I received a work request to contact multiple

22   pharmaceutical companies to see if that product was available to

23   be sold to the Arkansas Department of Correction.

24   Q.    For any particular purpose?

25   A.    Executions.

1    Q.    And did you talk to a company called Piramal Critical?

2    A.    Yes, sir.

3    Q.    And who did you speak to there?

4    A.    Esther Kessler.

5    Q.    And who is she?

6    A.    A sales representative.

7    Q.    So she has the authority to say whether something can be

8    sold to a particular person?

9    A.    Yes, sir.

10         MR. RUDOFSKY:  Your Honor, two things.  First an

11   objection.  I don't know that Mr. Cummings has the personal

12   knowledge to know what level of authority the person he spoke

13   with has.  And second, I assume that counsel is going to try to

14   elicit hearsay now in terms of what the sales representative

15   told Mr. Cummings.

16         THE COURT:  All right.

17         MR. RUDOFSKY:  So I object to that.

18         MR. WILLIAMS:  I respond that he is going to testify

19   as to, yes, what he was told.  At the preliminary injunction

20   hearing, you know, we are trying to show a likelihood of

21   success.  So that's sufficient at the preliminary injunction

22   hearing.

23         MR. RUDOFSKY:  Your Honor, just so -- I guess I want

24   you to understand the seriousness of my objection.  If they

25   wanted to call somebody from this company, they could have.

Cummings - Direct

1   This is a particularly important point, as you know, that goes

2   to the second prong of *Glossip,* and they chose not to do that.

3          THE COURT:  I understand the seriousness of the

4   objection, but I'm going to overrule it and permit the testimony

5   to come in.

6          MR. WILLIAMS:  Thank you.

7   BY MR. WILLIAMS:

8   Q.    So you talked to Ms. Kessler, and what did you ask Ms.

9   Kessler?

10  A.    I asked her about the two products.

11  Q.    You said two products.  I talked about sevoflurane.  What

12  other product?

13  A.    Excuse me if I say this incorrectly.  Isoflurane.

14  Q.    Isoflurane.  I'll spell that for the record.

15  I-s-o-f-l-u-r-a-n-e.

16     So when you asked her about the availability of those, what

17  did she tell you?

18  A.    She said that they would be available for direct purchase

19  to the Arkansas Department of Correction, and, also, there were

20  like two other avenues, that the products could be purchased at

21  a discounted price if they were part of like a federal supply --

22  excuse me one second to refresh my memory -- federal supply

23  schedule or the managed healthcare associates.

24  Q.    So do you know whether the Arkansas Department of

25  Corrections is part of that supply schedule?

1    A.    No, sir, I don't.

2    Q.    But in talking to Ms. Kessler, did it matter, did she say

3    they would be able to obtain it whether they were a part of that

4    or not?

5    A.    They would be available for direct purchase.

6    Q.    Again, you clarified that you were asking for use by a

7    department of corrections for executions?

8    A.    Yes, sir.

9    Q.    Let me clarify the timing of this call.  How many calls

10   were there?

11   A.    Two in particular that I remember.

12   Q.    And so the call we've just been discussing, do you remember

13   when that occurred?

14   A.    The first call, July 18, 2016.

15   Q.    Okay.  And did you later follow up and try to see if that

16   was still the case for Piramal Critical?

17   A.    Yes.

18   Q.    And who did you talk to, I guess, on the second call?

19   A.    Ms. Kessler again.

20   Q.    And what did she say?

21   A.    The same thing, exact same -- provided the exact same

22   information as before.

23   Q.    Okay.  So you asked her the same thing and she answered

24   with the same response?

25   A.    Yes, sir.

1   Q.   Okay.  And what date was that?  When did you ask that the

2   second time?

3   A.   This morning.

4            MR. WILLIAMS:  I have nothing further.

5            THE COURT:  Cross-examination.

6            MR. RUDOFSKY:  Thank you, Your Honor.

7                       CROSS-EXAMINATION

8   BY MR. RUDOFSKY:

9   Q.   Good afternoon, Mr. Cummings.

10  A.   Hello.

11  Q.   You just testified that you were asked by the FPD to

12  contact pharmaceutical companies to obtain information about --

13  I'm going to screw up the names as well -- sevoflurane and

14  isoflurane.  Is that correct?

15  A.   Yes, sir.

16  Q.   And I see that you've written in your affidavit about one

17  conversation you've had with one manufacturer.  Did you contact

18  any other manufacturers?

19  A.   Yes, sir.

20  Q.   And I'm assuming, since they weren't in your affidavit,

21  they said that they would not sell to the ADC for use in

22  executions.  Is that correct?

23            THE WITNESS:  Can I answer?

24            THE COURT:  You may.

25  A.   It became kind of complicated.  You know, depending on who

1    I was able to contact over the phone, they may have said let me

2    get this person to call you back at a later date.  So it was

3    situations like that.  I necessarily didn't get follow-ups.

4    People didn't return my calls, things of that nature.

5    Q.    And how many manufacturers or suppliers did you call?

6    A.    Sir, I had a long list, and I'd hate to misstate.  There

7    were multiple.

8    Q.    Are we talking on the order of ten or are we talking on the

9    order of 50?

10   A.    Ten to 20.

11   Q.    Ten to 20.  And of that, the only one you got an

12   affirmative response was the pharmaceutical company that you

13   listed here.  Is that correct?

14   A.    Yes, sir.

15   Q.    Were you asked by the federal -- by the FPD or anybody else

16   in this case to look up and see if any entity would sell any

17   other gas or drug to the Arkansas Department of Correction for

18   use in execution?

19   A.    Could you ask that question again?

20   Q.    Sure.  That was my fault.  That was a bad question.

21   A.    Yeah.

22   Q.    So aside from sevoflurane and isoflurane, were you asked as

23   part of your job responsibilities to investigate whether a

24   manufacturer or supplier would sell other drugs or other gases

25   to the Arkansas Department of Corrections for use in lethal

1    injection?

2    A.    To the best of my knowledge, at this time I can't recall

3    being asked -- anything else other than these two products.

4    Q.    I appreciate that.  Did you investigate any other drugs,

5    other than these two?

6    A.    I can't recall doing that.

7    Q.    Do you recall if anybody else in your office was asked to

8    investigate them?

9    A.    I wouldn't know.

10   Q.    Okay.  You filed an affidavit in the prior state version of

11   this case, correct?

12   A.    Sir, I apologize.  If you'll show me something to refresh

13   my memory, that might help me.  I receive so many work requests

14   from all the attorneys in our office sometimes, it gets all

15   jumbled up.

16   Q.    Fair enough.

17         MR. RUDOFSKY:  Your Honor, may I walk back to the

18   bench?

19         THE COURT:  You may.

20   BY MR. RUDOFSKY:

21   Q.    Sir, can you see that -- sir, can you see that document in

22   front of you?

23   A.    Yes, sir.

24   Q.    Does this refresh your memory about whether you filed an

25   affidavit in the state version of this case?

1   A.   That's my name, so I must have.

2         MR. RUDOFSKY:  Your Honor, we'd like to admit this.  I

3   believe it's Defense Exhibit 29.  I'm not sure what number we're

4   sort of actually up to.  In fact, this may be our first one.

5         THE COURT:  All right.  Any objection?

6         MR. WILLIAMS:  No.

7         THE COURT:  Defendants' Exhibit 29 will be admitted.

8      (Defendants' Exhibit 29 received in evidence.)

9   BY MR. RUDOFSKY:

10  Q.   Now, Mr. Cummings, this affidavit does not talk about

11  whether you investigated any drugs available and whether any

12  manufacturers or suppliers would sell drugs to the ADC, correct?

13  A.   Yes, sir.

14  Q.   On a different topic, yes?

15  A.   Yes, sir.  From what I'm reading, yes, sir.

16  Q.   In that former case, did FPD or anybody at FPD ask you to

17  investigate the alternative drug issue?

18  A.   Here?

19  Q.   In the state case, correct.

20  A.   No, sir, not -- answering your question based off what I'm

21  looking at, I would say no.

22  Q.   I'm not just asking you based -- I appreciate that.  That's

23  a fair answer.  I'm not just asking you off of this.  I'm asking

24  you at the time, which, apparently, was 2015, and I know going

25  into 2016, I'd like to know if FPD asked you or assigned you to

1   investigate whether a manufacturer or supplier would sell ADC

2   alternative drugs, sevoflurane, isoflurane, or any other drug

3   that is listed in their complaint?

4   A.   I would say no, sir.

5   Q.   Apologize.  I spoke over you.  Is the answer no?

6   A.   Yes, sir.

7   Q.   Okay.  The information you obtained in this case from the

8   suppliers -- from the manufacturer of sevoflurane, do you know

9   of any reason you couldn't have obtained that in the 2015 or

10  2016 case if you were assigned to investigate it?

11  A.   Can I answer your question to the best of my knowledge?

12  Q.   Yes.

13  A.   Based off looking at the two affidavits, I can be -- I'll

14  try to be as specific as I can.  But without reviewing my notes

15  and other things like that, it's really hard for me to answer

16  you.  And I haven't had a chance -- I receive a lot of work

17  requests.  As far as the specifics of what this one pertains to

18  that I'm looking at, I don't even remember it.  I'm being

19  honest.

20  Q.   To the best of your knowledge, in 2015, your testimony is,

21  though, that you were not asked to look to see whether a

22  manufacturer or supplier would sell ADC drugs like sevoflurane

23  or isoflurane, correct?

24  A.   Correct.

25  Q.   And there's nothing in your current affidavit that suggests

1  the information you found this time around wasn't available if

2  you had called the manufacturer or supplier in 2015, correct?

3  A.   I would have to agree, yes, sir.

4  Q.   Thank you.

5         THE COURT:  Redirect?

6         MR. WILLIAMS:  No redirect.

7         THE COURT:  You may step down.

8      You may call your next witness.

9         MR. WILLIAMS:  Your Honor, plaintiffs are out of

10 witnesses who are available today.

11        THE COURT:  All right.  It is 20 till five at this

12 time.  Why don't we go ahead and take a short break and come

13 back on the record to address just a few matters with counsel.

14 Let's go ahead and take a 15-minute break.  We'll come back in

15 here at about five till five.  So come back in at five till

16 five.

17     We're in recess.

18     (Recess from 4:43 p.m. until 4:59 p.m.)

19        THE COURT:  We are back on the record with counsel.  I

20 wanted to visit briefly to make sure I understand the parties'

21 positions, at least as it relates to the documents that are in

22 front of me.

23     In regard to the preliminary injunction stage, I don't note

24 any objections to exhibits and other materials.  There are

25 letters, there are some -- the protocol clearly is in there.  I

1   don't know what else I have in here that would be objectionable

2   to the other side.  But if you all could let me know if I can

3   either rely on the documents that are attached to the pleadings

4   in my case only or if you have objections to lodge to them.  I

5   just want to make sure that I understand where everybody is at

6   with regard to evidence that is in document form in front of me

7   that doesn't come in through an exhibit that is perhaps attached

8   to one or the other's pleadings, the complaint, or the response

9   to the preliminary injunction motion.  I don't think there's

10  anything attached to the motions to dismiss or the response to

11  that.

12         So let me know that so I can rule on any objections or deal

13  with any of those issues and so that I know what folks have

14  problems with, if there's anything in there.

15         Other than that, tonight we will go ahead and calculate

16  time that's been used today and we'll send an email later this

17  evening with an account of time, how much time both sides have

18  used.  We'll continue to do that every evening and send that

19  out.  If you have questions about it during the day, you can ask

20  Mr. Keller, you can ask Ms. Washington.

21         Does counsel have anything for me?

22             MR. WILLIAMS:  Nothing from plaintiffs.

23             MS. MERRITT:  No, Your Honor.

24             THE COURT:  All right.  With that, we're in recess

25  until tomorrow morning.  We said we would start at 8:30 with the

1   proof, so the Court will be here and available.  Ms. Washington

2   is always here in the morning at 8 o'clock, and she will open up

3   the courtroom at 8 o'clock.  You can leave your things in here.

4   No one will be in here this week except for us.  If you need

5   anything overnight before then, you can email Ms. Washington and

6   Mr. Keller and let them know.  We'll be available by 8:15 in

7   case there's any issue.  Otherwise, we'll start with proof at

8   8:30.

9        We're in recess.

10       (Overnight recess at 5:00 p.m.)

11                          C E R T I F I C A T E

12       I, Eugenie M. Power, Official Court Reporter, do hereby

13   certify that the foregoing is a true and correct transcript of

14   proceedings in the above-entitled case.

15

16   /s/ Eugenie M. Power, RMR, CRR, CCR        Date:  April 10, 2017
     United States Court Reporter

17

18

19

20

21

22

23

24

25