```
 1                IN THE UNITED STATES DISTRICT COURT
                    EASTERN DISTRICT OF ARKANSAS
 2                        WESTERN DIVISION

 3   JASON MCGEHEE, STACEY
     JOHNSON, MARCEL WILLIAMS,        No. 4:17CV00179-KGB
 4   KENNETH WILLIAMS, BRUCE WARD,
     LEDELL LEE, JACK JONES, DON
 5   DAVIS and TERRICK NOONER,

 6                    Plaintiffs,      Tuesday, April 11, 2017
                                       Little Rock, Arkansas
 7   v.                                8:30 a.m.

 8   ASA HUTCHINSON, Governor of
     the State of Arkansas, in his
 9   official capacity; and WENDY
     KELLEY, Director, Arkansas
10   Department of Correction, in
     her official capacity,
11
12                    Defendants.

13     TRANSCRIPT OF HEARING ON MOTION FOR PRELIMINARY INJUNCTION
                              VOLUME 2
14            BEFORE THE HONORABLE KRISTINE G. BAKER,
                    UNITED STATES DISTRICT JUDGE
15   APPEARANCES:

16   On Behalf of Plaintiffs McGehee, M. Williams, Ward, Davis and
     Nooner:
17
          MR. JOHN CHARLES WILLIAMS, Assistant Federal Defender
18        MR. SCOTT W. BRADEN, Assistant Federal Defender
          MS. JAMIE GIANI, Assistant Federal Defender
19        MS. JULIE VANDIVER, Assistant Federal Defender
            Federal Public Defenders Office
20          1401 West Capitol Avenue, Suite 490
            Little Rock, Arkansas  72201
21
22   On Behalf of Plaintiff Davis:

23        MS. DEBORAH RUTH SALLINGS, Attorney at Law
            35715 Sample Road
24          Roland, Arkansas  72135

25   [APPEARANCES CONTINUED ON NEXT PAGE]
```

1    [APPEARANCES CONTINUED]

2

     On Behalf of Plaintiffs Johnson, K. Williams and Jones:
3
          MR. JEFFREY M. ROSENZWEIG, Attorney at Law
4            300 Spring Building, Suite 310
             Little Rock, Arkansas  72201-2421
5

6    On Behalf of Plaintiff Lee:

7         MR. LEE DEKEN SHORT, Attorney at Law
             Short Law Firm
8            425 West Broadway, Suite A
             North Little Rock, Arkansas  72114

9


10

11   On Behalf of Defendants:

12        MR. LEE RUDOFSKY, Solicitor General
          MS. CHRISTINE A. CRYER, Assistant Attorney General
13        MS. KATINA RENE HODGE, Assistant Attorney General
          MS. JENNIFER L. MERRITT, Assistant Attorney General
14        MR. COLIN R. JORGENSEN, Assistant Attorney General
             Arkansas Attorney General's Office
15           323 Center Street, Suite 200
             Little Rock, Arkansas  72201-2610
16

17

18

19

20

21

22

23
          Proceedings reported by machine stenography; transcript
24   prepared utilizing computer-aided transcription.

25

```
 1            I N D E X (Volume 2 - April 11, 2017)

 2
     WITNESSES
 3   FOR THE PLAINTIFFS:      DIRECT    CROSS    REDIRECT   RECROSS
     Craig W. Stevens           232      235       352        360
 4
     Spence Hahn                363      378       387
 5
     Ziva Branstetter           388      415       429
 6
     Lawrence J. Fox            432      457
 7
     Dale Baich
 8
     FOR THE DEFENDANTS:
 9   Dale Reed                  536      553

10
     EXHIBITS RECEIVED:
11   Defendants' Exhibit 16.................................... 235

12   Defendants' Exhibit 30.................................... 288

13   Defendants' Exhibit 31.................................... 300

14   Defendants' Exhibit 6.................................... 325

15   Defendants' Exhibit 12.................................... 339

16   Defendants' Exhibit 26.................................... 342

17   Defendants' Exhibit 14.................................... 350

18   Defendants' Exhibit 5 and 8.............................. 362

19   Plaintiffs' Exhibit 10.................................... 367

20   Plaintiffs' Exhibit 7.................................... 433

21   Plaintiffs' Exhibit 6.................................... 449

22   Plaintiffs' Exhibit 35.................................... 451

23   Plaintiffs' Exhibit 5.................................... 455

24   Plaintiffs' Exhibit 21.................................... 514

25   Plaintiffs' Exhibit 31.................................... 514
```

Christa R. Jacimore, RDR, CRR, CCR
United States Court Reporter

1          (Continuing at 8:30 a.m.)

2          THE COURT:  Good morning.  We are back on the record

3    with counsel in Case No. 4:17CV179.

4          I'll say a few things this morning, first in regard to time

5    calculations.  At this point plaintiffs are left with 16 hours

6    and 11 minutes and defendants have 12 hours and 33 minutes,

7    based upon what we calculated as being used yesterday and not

8    punishing either side for ending the day before five o'clock

9    yesterday.  If you have questions about that, see Mr. Keller or

10   Ms. Washington.  Those numbers are probably going to float,

11   depending -- we just looked at it as if we were going to be in

12   court every day until 8:15 p.m., but that may or may not happen.

13   So understand and appreciate that.  We're just looking at it to

14   be roughly 60/40, 60 for the plaintiffs and 40 for the

15   defendants, in regard to allocation of time.

16         Today let's confine objections to the lawyer who is

17   actually going to do the cross-examination.  So don't

18   double-team or triple-team.  If it's not your witness, don't

19   object.  I'm not going to recognize the objection.  That rule is

20   going to apply going forward from this point.

21         Yesterday evening -- and I'm just going to put it on the

22   record, and I put this on the record in every case and trial

23   that I have in regard to e-mail communications with the Court

24   during the proceedings.

25         Ms. Merritt left something in the courtroom last night and

1    e-mailed Mr. Keller at 5:57 to determine whether anyone was

2    still here so she could come back and get it.  And Mr. Keller

3    e-mailed her back this morning to say that he just saw it at

4    8:56 p.m., that he was not still at the courthouse, but that he

5    would be here early tomorrow morning and that she could call.

6    So that's the communication that took place last night

7    informally with the Court.

8        If there are any that are substantive or not substantive, I

9    just make a record of those throughout the proceedings so

10   everybody knows.

11       All right.  Are there any matters that you all wish to take

12   up with me this morning?  Counsel for plaintiffs?

13           MR. WILLIAMS:  Does the Court want us to talk about

14   the exhibits, the matter that you mentioned at the end of the

15   day yesterday?

16           THE COURT:  Sure.

17           MR. WILLIAMS:  Julie Vandiver will handle that for us.

18           THE COURT:  Okay.

19           MS. VANDIVER:  Thank you, your Honor.  As to the

20   exhibits and the defendants' response to the preliminary

21   injunction motion, we do have some objections.  As to Exhibit 4,

22   which is the report of Daniel Buffington, we object for the

23   reasons stated in our *Daubert* motion and I won't restate those.

24       The State attached as Exhibits 8, 9, 10, and 11 opinions or

25   testimony from witnesses in other states testifying about lethal

1   injection.  Those people are not witnesses in this court.  We

2   object to their prior testimony or their opinions because

3   they're not present at this hearing.  We're not able to cross-

4   examine them, just as you're not able to assess their

5   credentials or their credibility, and those -- they're

6   testifying on topics that are coming in on the witness stand by

7   witnesses that are before you, so we think that that is the more

8   competent evidence.  So we do object to that.

9         And I'd like to note, if the Court does accept these

10  exhibits, to point out that Exhibit 10 was authored by Mark

11  Dershwitz six days before the Dennis McGuire execution, which

12  was widely considered to be botched.  So if the Court does take

13  that exhibit, I think you should give it very little weight

14  because it shows how they had misapprehended the risks of the

15  midazolam protocol.

16        With regard to No. 12, it's a scientific paper, which we do

17  object to unless they lay a foundation with their expert.

18        We have no objections to 1, 2, 3, 5, 6, 7, or 13 through

19  24.

20        THE COURT:  All right.  Thank you.  I'll take those

21  objections under advisement.

22        You may proceed, Mr. Jorgensen.

23        MR. JORGENSEN:  Good morning, your Honor.  I'll do the

24  same thing regarding the exhibits that are attached to the

25  complaint, the prisoners' complaint, on behalf of the

1    defendants.

2         We first object to Exhibits 4 and 5.  Exhibit 4 is a report

3    out of the state of Oklahoma, and Exhibit 5 is a record of

4    proceedings out of a case, an Arizona District Court case.  And

5    we would just make our same continuing objection about relevance

6    of proceedings, protocol, executions, or any other matters of

7    other states on that.  We understand you've already overruled

8    that objection many times.  We just want to make sure we make it

9    clear and that we raise that same continuing objection as to

10   Exhibits 4 and 5 to the complaint.

11        Next, Exhibit 18 to the complaint is a motion and pleading

12   filed with the Eighth Circuit in a Missouri case.  First of all,

13   we make our same continuing relevance objection because it's a

14   record of a proceeding in another state.  But also we have

15   several other objections to this:  Hearsay, best evidence rule,

16   and rules of professional conduct that prohibit counsel from

17   also serving as a witness.

18        We assume that the reason for the use of this exhibit is

19   the reference at page -- Exhibit 18, page 7, to evidence of

20   Missouri's ability to purchase a particular drug for use in a

21   lethal injection execution.  There's no citation or record

22   evidence in this exhibit of that; it's just a fact stated by an

23   attorney in a pleading with no citation to any evidence.  And so

24   we would say that's hearsay, and, also, counsel cannot testify.

25   And we also make the normal relevance objection to that one.

1          Finally, Exhibit 22 is a report about nitrogen-induced

2    hypoxia by four different authors, and the report states on the

3    face of it on every page that it is a preliminary draft, "Do not

4    cite," and we assume that is the words of the authors of this

5    preliminary draft report.  So if the authors have proclaimed

6    that this report should not be cited, we think the Court should

7    take that as direct evidence that this is an unreliable report

8    and should not be used for any purpose in this case.  So we

9    object to Exhibit 22.

10          We would also object to any of their exhibits, as they did,

11    of affidavits of individuals who are not testifying in this

12    court for the same reasons they objected to our, I believe, 8

13    through 11.  They have -- Exhibits 13 and 14 are affidavits of

14    people who are not going to be here to testify.  So if you

15    exclude 8 through 11 on the State's side, we would ask that you

16    exclude 13 and 14 from the prisoners.

17          I believe that's all.

18          THE COURT:  All right.  I'll take those under

19    advisement as well.  We'll go ahead and get started with our

20    testimony.  At another break I'll give you the opportunity, to

21    the extent you want to, to respond to each other's objections.

22    Let's go ahead with our testimony now, and then I'll hear from

23    you again if you wish to address it.  You don't have to address

24    it, but if you want to, you may.

25          Are we ready for the next witness?

1        MR. WILLIAMS:  We are.  We call Dr. Craig Stevens.

2     **CRAIG W. STEVENS, PLAINTIFFS' WITNESS, DULY SWORN**

3                   DIRECT EXAMINATION

4  BY MR. WILLIAMS:

5  Q.    Good morning, Dr. Stevens.

6  A.    Good morning.

7  Q.    Could you please state your name for the record.

8  A.    Craig W. Stevens.

9            THE WITNESS:  That's not on.

10  BY MR. WILLIAMS:

11  Q.    Stevens with a V?

12  A.    Stevens with a V.

13            THE COURT:  Is there a red light on the base?

14            THE WITNESS:  There is now.  Thank you, your Honor.

15            THE COURT:  You can move that full base, Dr. Stevens,

16  if you want to pull it towards you, as well as away.  It moves,

17  as well as the wire that it's attached to.

18            THE WITNESS:  Thank you.

19       Craig W. Stevens.  That's Stevens with a V, S-t-e-v-e-n-s.

20  BY MR. WILLIAMS:

21  Q.    What is your current position?

22  A.    I'm a professor of pharmacology at Oklahoma State

23  University Center for Health Sciences College of Osteopathic

24  Medicine in Tulsa, Oklahoma.

25  Q.    And what is your training for that position?

1    A.    A Ph.D. in pharmacology basically trains me to the full

2    extent of the effects of drugs on organisms.  Adverse effects,

3    how the drugs work is very important.  Usually it's an extensive

4    period, anywhere from five to seven years, plus two years of

5    post-doctoral fellowship.

6    Q.    And is most of your professional time spent doing

7    consultations like this or is it spent teaching, or how do you

8    spend your time?

9    A.    As an academic, full-time academic researcher, most of it

10   is spent in teaching, research and scholarly activity, and

11   service, which is a lot of committee work at the college, and

12   some outreach, which this is part of when I do litigation

13   consulting.

14   Q.    Okay.  And have you consulted in litigation on lethal

15   injection before?

16   A.    Yes, I have.

17   Q.    And have you consulted for only capital defendants?  Have

18   you consulted for the State ever?

19   A.    Yes, I have.  Both the State and for condemned inmates, if

20   you will.

21   Q.    Have you given any testimony regarding midazolam before?

22   A.    Yes.  Most recently last January, in Ohio.

23        MR. WILLIAMS:  Insofar as it's necessary, I would move

24   to admit Dr. Stevens as an expert in pharmacology.

25        THE COURT:  All right.  You may go ahead and go

1   forward with your questioning.

2   BY MR. WILLIAMS:

3   Q.   On pharmacology, you touched on this a little bit just now,

4   but can you tell me in a bit more detail what pharmacology is

5   and what we are talking about when we talk about pharmacology.

6   A.   Right.   Pharmacology is a medical discipline.   I'm at a

7   medical school, and every medical school has a department of

8   pharmacology.   It's concerned with the overall study of the

9   mechanism of drug action, how drugs affect human physiology, the

10  adverse effects of drugs.   It's basically anything to do with

11  drugs.   So it's the study of drugs and organisms.

12  Q.   And how is that different from pharmacy?

13  A.   Pharmacy is more concerned with the formulation of

14  commercial drug preparations and the dispensing and interactions

15  of drugs.   A little bit of overlap.   They're also very much

16  concerned with the adverse effects of patients getting two or

17  more drugs.

18       But they're separate.   In other words, the medical school

19  is where a pharmacologist would be.   Pharmacists are usually at

20  a pharmacy school.

21  Q.   So the training is different?

22  A.   The training is very different.

23  Q.   How much time would it take to get a pharmacy degree versus

24  a pharmacology degrees?

25  A.   Usually to train to be a professor of pharmacology is

1   longer because it takes from five to seven years to get a Ph.D.,

2   and most positions you need at least two years of what's called

3   a post-doctoral fellowship and then you might start as assistant

4   professor.

5        For a pharmacy degree I'm not quite as familiar with, but

6   that can be done in a shorter time, and from pharmacy school,

7   you can just go right to working at a Wal-Mart or go into

8   academics, whichever route.

9   Q.   So in this particular case, have you reviewed the lethal

10  injection protocol that Arkansas intends to use?

11  A.   Yes, I have.

12  Q.   And have you reviewed any other sort of materials,

13  articles, things of that nature, in preparing a report?

14  A.   Yes.  I've done -- in preparation of my report, I've looked

15  throughout the literature and effects of midazolam in

16  particular, compared them to the effects of barbiturates to have

17  kind of a compare and contrast.

18        MR. WILLIAMS:  At this point we would move to

19  introduce the report, which is Exhibit 16.

20        THE COURT:  Any objection?

21        MS. MERRITT:  No, your Honor.

22        THE COURT:  Exhibit 16 is admitted.

23     (Defendants' Exhibit 16 received in evidence.)

24  BY MR. WILLIAMS:

25  Q.   Talking again about the protocol, what drugs does Arkansas

1  intend to use in the executions coming forward?

2  A.   It's my understanding it's what's called a three-drug

3  protocol.  The first drug is midazolam, and that's used in two

4  doses of 250 milligrams each.  And then that's followed by

5  consciousness check.  And then vecuronium, which is a

6  neuromuscular blocker, is used.  It's a paralytic.  And that's

7  given in two syringes of 500 -- I'm sorry, two syringes of 50

8  milligrams, for a total of 100 milligrams of vecuronium.  And

9  then that's followed by 240 milliequivalents of potassium

10  chloride, which is used to stop the heart.

11 Q.   When my office first contacted you, what did we ask you to

12 assess or to discuss?

13 A.   Yes.  Quite a while back we talked about certain referral

14 questions, which I actually list in my report.  You wanted me to

15 take a broad look at the pharmacology of the lethal injection

16 drugs midazolam, vecuronium, and potassium chloride and, in

17 particular, look at the difference between that and the

18 midazolam or benzodiazepine versus barbiturates and come to some

19 finding whether the protocol might lead to serious or adverse

20 effects and pain and suffering, in particular.

21 Q.   And we'll get to the reasons here in a second, but did you

22 reach a conclusion as to whether you think that the protocol

23 will lead to serious pain and suffering?

24 A.   I do, because of the nature of midazolam.

25 Q.   And, more specifically, what is that?

Stevens - Direct                                                    237

1    A.    Midazolam is a benzodiazepine, so, therefore, it cannot

2    produce the unconsciousness needed to assure not to have pain

3    and suffering with injection.

4    Q.    And we'll talk about why that is so here in a few minutes,

5    but I'd like to start by focusing on the second and third drugs

6    in the protocol.  And the second drug I think you mentioned is

7    vecuronium bromide?

8    A.    Right.

9    Q.    What is vecuronium bromide?

10   A.    It's generally known in the class of neuromuscular

11   blockers, and it's used to paralyze the patient, for example,

12   undergoing surgery.  So it actually blocks the impulses from the

13   nerves to the muscles.  Therefore, even if you have the will to

14   move, to reach for water or whatever, you can't do it because

15   the nerve impulses are blocked from activating your muscles to

16   do that.

17   Q.    And do you have any idea what would happen if someone

18   injected vecuronium bromide into a person without any sort of

19   anesthetic?

20   A.    Yes.  There's actually been some early studies where that

21   happened, and those are also cited in my report.  We can look in

22   more detail if you like.  But in general, a person would feel

23   like they can't breathe, for example, because it would also

24   block the muscles that control breathing.  So it would --

25   Q.    Do you have any opinion as to whether vecuronium bromide by

1   itself would cause suffering?

2   A.   It's my opinion that if vecuronium was not preceded by a

3   drug that produces unconsciousness, it would cause suffering.

4   Q.   Did you just refer to vecuronium bromide as a neuromuscular

5   blocker?

6   A.   Yes.

7   Q.   Are there other similar neuromuscular blockers?

8   A.   Yes.

9   Q.   Can you name some of those?

10  A.   Sure.  Pancuronium, rocuronium, tubocurarine.  There's all

11  sorts of -- it's a whole class of different neuromuscular

12  blockers that basically work the same way.

13  Q.   And do you know if other lethal injection protocols use

14  different neuromuscular blockers such as the ones you've named?

15  A.   I believe there has been.  I couldn't tell you right now

16  which state, but I think there has been other neuromuscular

17  blockers substituted as a second drug, yes.

18  Q.   And are the effects effectively the same?  Is there a

19  difference between the way those drugs act upon a person?

20  A.   No.  Those drugs should act the same because they're

21  members of a class of drugs.  And, you know, we'll get to, like,

22  class characteristics, but it's an important thing in

23  pharmacology because when you have a class of drugs, you can

24  pretty much be assured that all the members of that class will

25  work the same way, and that's why they're classified and grouped

Stevens - Direct

1   together like that.

2       So as a pharmacologist, when we say neuromuscular blockers,

3   there may be, you know, six, seven, eight new ones come out and

4   are lumped into that class, but they're going to work the same

5   way.  There might be differences in potency, you might be able

6   to use a little bit more of one, a little bit less of one, but,

7   in general, the mechanism of action is the same for all members

8   of the class.

9   Q.   So talking now about potassium chloride, what is that drug?

10  A.   Yeah, that's more or less an electrolyte solution.  We've

11  all heard for, like, the saline bag that hangs on the stand in

12  the hospital and drips through the IV, for example, to get fluid

13  replenishment.  That's sodium chloride.  In this case the sodium

14  is replaced with potassium.  Therapeutically it's used in cases

15  of low potassium in the blood, in what's called hypokalemia.

16  But in this case it's being used at very high concentrations,

17  and because it's an electrolyte, that means it can alter the

18  electrical characteristics of in this case the heart, which is

19  an electrical beating organ, if you will.  And that's why

20  defibrillators work, which is electric shock.  You know, they

21  work because it's an electrical organ.  So by using potassium

22  chloride, we alter the electrical capabilities of the heart,

23  and, therefore, it can stop it at high doses.

24  Q.   Do you have any knowledge or opinion about what that drug

25  would do to a person or make the person feel were it entered

1    into their body by itself, without anesthesia?

2    A.    Yes.   Again, in my report I actually was able to find some

3    early literature or cases where potassium chloride was injected

4    inadvertently without any anesthetic on board.   It's described

5    as a burning feeling, very painful, and there's some

6    descriptions in my report.

7    Q.    So is there any way to, I mean, stop this feeling of pain

8    before the drugs are injected?   What would you have to do?

9    A.    Basically the only way that you can assure that the effects

10   of the second and third drug are not experienced is by making

11   sure the first drug produces unconsciousness, which includes

12   loss of any response to pain.

13   Q.    Okay.   And are you familiar with the term called "general

14   anesthesia"?

15   A.    Yes, I am.

16   Q.    And what does that denote?

17   A.    General anesthesia denotes a state where surgical

18   intervention can occur.   In other words, you can place the

19   patient -- in most cases it's a patient -- into a state where

20   you can make a cut and there's no reaction, there's no memory of

21   it, and the patient does not squirm on the table because you've

22   reached a deep enough state where the patient is unconscious and

23   doesn't respond to pain.

24          MR. WILLIAMS:   Sharon, if we can turn to page 10 of

25   Dr. Stevens's expert report.   It's Exhibit 16.

Stevens - Direct

1    BY MR. WILLIAMS:

2    Q.    Dr. Stevens, can you tell us what we're looking at there?

3    A.    Sure.  This is a table that was obtained from the American

4    Society of Anesthesiologists, kind of the main professional

5    society for anesthesiologists in the United States.  I'm sorry.

6    Q.    Go ahead.

7    A.    I was going to say, what it shows, it's labeled the

8    Continuum of Depth of Sedation:  Definition of General

9    Anesthesia and Levels of Sedation/Analgesia.

10    Q.    So I see we've got four separate categories here.  What do

11    these categories mean?

12    A.    Along the top there there's four different levels that have

13    been defined by the American Society of Anesthesiologists.

14    Starting with minimal sedation, anxiolysis, and then it gives

15    some characteristics below that that you'd expect at that level.

16    It continues with moderate sedation, deep sedation, and then

17    finally reaches general anesthesia on the right there.

18    Q.    And I know we can't see it on this highlighted portion, but

19    down below are these terms sort of defined a little bit more?

20    A.    They are, underneath the table directly from the ASA.  It

21    talks about each of the categories with more descriptors.

22    Q.    So if we were to look at this responsiveness row, tell us a

23    little bit about what that is telling us for each of these

24    columns.

25    A.    Right.  Well, first, right there, if you stop right there,

Stevens - Direct                                                242

1    you can see that I've boxed the first descriptor under

2    responsiveness, and you can see I've put a blue box there, which

3    I have noted there with emphasis added in the bottom that it's

4    not until you get to general anesthesia that you get the

5    characteristic of unarousable even with painful stimulus.

6    Q.   So say that a particular drug, whatever it is, could only

7    achieve deep sedation.  Would that be sufficient to block the

8    painful stimulus from the vecuronium bromide and the potassium

9    chloride?

10   A.   No, it would not.

11   Q.   Is it your opinion that it's essential to reach general

12   anesthesia?

13   A.   That is my opinion.

14   Q.   Now, did we ask you to talk a little bit about

15   benzodiazepines and barbiturates and what those things are and

16   what those terms mean?

17   A.   Yes.

18   Q.   So, speaking generally, what is a barbiturate?

19   A.   A barbiturate is an older drug.  Actually almost two

20   centuries ago is when the first ones came out, late nineteenth

21   century.  And they were discovered to have qualities to depress

22   the brain activity, CNS, central nervous system.  That was

23   commonly used.  So they're a CNS depressant, a very potent class

24   of those.

25   Q.   So what sort of drugs are included, for example, in that

1   class?

2   A.    Those would be drugs like thiopental, pentobarbital,

3   phenobarbital, Brevital.  There's a number of barbiturates.

4   They used to be used quite a bit.

5   Q.    Is Nembutal a barbiturate?

6   A.    It is.  Nembutal is the trade name of phenobarbital in

7   solution.

8   Q.    And speaking generally again, what is a benzodiazepine?

9   A.    Benzodiazepines were discovered middle of last century, so

10  they're much newer, and they were found to be also CNS-

11  depressant drugs, but to a milder degree.

12      So what has happened is that benzodiazepines in most

13  indications when they're used have replaced barbiturates.  In

14  the old days, in the '50s, for example, 1950s, barbiturates were

15  used to help people that can't sleep.  Now strictly

16  benzodiazepines are used.

17  Q.    Is there a reason that those were developed to replace

18  barbiturates?

19  A.    There is.  The very good reason is that they're much, much

20  safer.  The classic overdose from barbiturates, which used to

21  happen a lot, of course, is Marilyn Monroe, who was on

22  barbiturates and also drank alcohol, unfortunately.  But

23  barbiturates, because, as we'll see, they don't have a ceiling

24  effect, they go directly to strongly inhibit the brain neurons,

25  can very easily cause respiratory depression and death, whereas

1    benzodiazepines are much more limited in their action.  So

2    they're much more milder in inhibiting the brain neurons and

3    causing those effects.

4    Q.   We'll talk about that in just a second, but just to give us

5    an idea of what a benzodiazepine is, are there some well-known

6    drugs that fall under the class of benzodiazepines?

7    A.   There are.  Probably the most famous one is Valium.  Also

8    Xanax.  Those are both trade names for diazepam and alprazolam.

9    But there's a number of them out there, and they're used for

10   both long-term uses for general anxiety disorders as well as for

11   sleeping.  Shorter-acting drugs are used for sleeping, longer-

12   acting ones for general anxiety disorders and things like that.

13   Q.   So where does midazolam fall in those classifications?

14   A.   Midazolam is a benzodiazepine.  It's formulated to use as

15   an IV formulation.  So it's different than Xanax, for example,

16   which is only available in oral.  So midazolam, because it's

17   more soluble and liquid, it's been formulated as an IV and an

18   injectable, IM-type formulation.

19        MR. WILLIAMS:  Sharon, can we please look at page 5 of

20   the exhibit.

21   BY MR. WILLIAMS:

22   Q.   Specifically this chart, Dr. Stevens, what are we looking

23   at here with this chart?

24   A.   Yes.  This chart was just kind of what I thought was a good

25   visual chart comparing benzodiazepines and barbiturates and

1   their actual chemical structures.

2   Q.   So I think it's self-apparent, although you have to look at

3   it especially if you haven't studied chemistry in a while, but

4   are these different chemical structures?  And how are they

5   different?

6   A.   Yes.  So what I've done on the left-hand column, the top is

7   labeled benzodiazepines, and we can see the first one, the top

8   left is midazolam, with its trade name Versed in parentheses,

9   and directly below that is diazepam, with its trade name Valium

10  in parentheses.

11       Basically, one can see that they're very similar.  They

12  both have that central benzodiazepine structure, which you can

13  see, kind of the two rings that are attached there and then the

14  one ring on the bottom.  And that's to compare and contrast with

15  the barbiturates which are shown in the right column, and that

16  shows pentobarbital, which is Nembutal, trade name, and

17  thiopental, which had the trade name of Pentothal.  Completely

18  different chemical structure than the benzodiazepines.

19  Q.   I think you used the term "pharmacological equivalency" in

20  your report.  What do you mean by that?

21  A.   Well, that was an attempt to show that if one wanted to

22  substitute one drug for another drug, you would want to have --

23  if you want the same results, you would want to have what's

24  called pharmacological equivalency.  In other words, if you

25  wanted to substitute a barbiturate, you would pick another

1    barbiturate.  If you wanted to substitute a benzodiazepine for

2    another drug, you'd pick another benzodiazepine.  In that sense,

3    they are pharmacologically equivalent.  So you can look at not

4    only the chemical structures as one example of that equivalency,

5    but also the way they work is another good example.

6    Q.   We'll talk about that momentarily.  Let's look at the chart

7    on page 8.

8         MR. WILLIAMS:  Let's get the text down below it, if we

9    can.  Sorry.  There's some blocked text down below.  Right.

10        Let's get both, if we can.  Thank you.

11   BY MR. WILLIAMS:

12   Q.   So tell us what we're looking at here, please.

13   A.   This is a classic textbook figure.  It's in a number of

14   textbooks, five or six of just the ones that I had on my shelf

15   and other textbooks I found it in.  And it's also included in a

16   textbook that I'm co-author on with Dr. Brenner.

17        Anyway, so what this shows in a conceptual way, when it

18   says dose there increasing along the bottom or what's call the X

19   axis, the horizontal access, there's not numbers there.  So it's

20   a conceptual graph.  It's not meant to be certain doses.

21        And then along the -- what's called the vertical or Y axis,

22   you can see there's different pharmacological effects.  So

23   there's sedation, hypnosis -- and that means sleep-inducing, not

24   Svengali hypnosis.  It means -- that's a medical term meaning

25   sleep, basically.  It's important to realize that.

1        And then anesthesia is there.  Note it doesn't say general

2    anesthesia.  It just says anesthesia.  So it's using a very

3    general term.  And then we see coma and death.

4        And what we notice is that the older drugs, barbiturates,

5    they can -- as you increase the dose, which is shown on the

6    right there, as you increase towards the right, rather, the

7    barbiturates can go from sedation to the effect of hypnosis or

8    sleep-inducing, they can produce anesthesia, they can even

9    produce general anesthesia, they can produce coma, and they can

10   produce death as you increase the dose.

11       What happens with benzodiazepines, as you increase the

12   dose, you don't quite make it up to true anesthesia or general

13   anesthesia.  You can definitely increase sedation.  They use it

14   to prevent anxiety every day in millions of patients.  You can

15   definitely use it to induce sleep.  It is used a lot for that as

16   well.  But they taper off and they have what's called a ceiling

17   effect, which is nothing more than what's shown here.

18       So the important point to realize is that this is in just

19   about every medical textbook where they show this graph.  So

20   it's a very common, well-known difference between barbiturates

21   and benzodiazepines.

22            MR. WILLIAMS:  Can we go back to that chart on page

23   10.  Just the top part is fine.

24   BY MR. WILLIAMS:

25   Q.   So if we were to think about the graph we just showed and

1    to try to map that onto this, where are barbiturates?

2    A.    Barbiturates can take you all the way to general

3    anesthesia.

4    Q.    And where are benzodiazepines going to take you?

5    A.    They can take you only to the first three stages, and

6    probably the greatest amount of effect would be deep sedation.

7    Q.    And midazolam is a benzodiazepine?

8    A.    That's correct.

9           MR. WILLIAMS:  Can we go back to the previous chart,

10   on page 8.

11   BY MR. WILLIAMS:

12   Q.    So down below in bold, you use a term that I think is used

13   a lot in this litigation, "ceiling effect."  Can you just

14   describe that in a little more detail and what that term means.

15   A.    Right.  Ceiling effect actually came from graphs like this,

16   and if you can imagine that there's a little domicile underneath

17   that blue line, you can see that that would kind of create a

18   ceiling.

19          So, in other words, the effect, as you increase the dose,

20   instead of being linear like the barbiturates, it actually

21   smooths out and reaches a plateau.  So ceiling effect could also

22   be called plateau effect, and sometimes it's called that as

23   well.  So it's a very natural kind of finding with certain types

24   of drugs.

25   Q.    So we started with the what.  Let's talk about the why.

1    And let's talk about how these drugs actually work in people's

2    bodies.  You use the word "agonist" to describe both

3    barbiturates and benzodiazepines in your report.  What do you

4    mean by the word "agonist"?

5    A.    Yeah.  When we talk about drugs, there's kind of a binary

6    distinction that you start with.  Drugs can either work by

7    being -- turning on a receptor after you give the drug -- they

8    bind to certain particles or proteins that are called receptors.

9    So they can turn it on, and in that sense they're called

10   agonists.  Or they can block it, and in that sense they're

11   called antagonists.

12        And antagonists, even though they don't turn on the

13   receptor, but just block, they can be used clinically as well.

14   The most famous example is beta blockers for high blood pressure

15   or hypertension.  So even though they don't kick on the

16   receptor, they block the natural circulating agents that cause

17   high blood pressure.  So even if it doesn't do something at the

18   receptor level, it can still be used clinically.  Anyway, I

19   digress there.

20        So the agonists are something that turn on the receptor.

21   So both barbiturates and benzodiazepines are agonists.

22   Q.    You say receptor.  What does that mean?  Kind of help us

23   conceptualize where in the body that is going on.

24   A.    Right.  In this case we're definitely concerned about what

25   is happening in the brain, but probably the most famous metaphor

1    for drugs working as receptors is a lock and key.  Keys would be

2    the drugs.  So key you can think of as a drug in this case

3    floating around in the brain, and then the receptor is the lock.

4    At the actual structure level, receptor is a protein that has a

5    certain shape and the drug has a certain shape, and we got some

6    idea of that from that one chart that showed the chemical

7    structure.  But if you put it in realtime 3D, it actually

8    assumes a shape.  So, anyway, keys fit into locks.  Drugs fit

9    into receptors.  Only certain drugs -- just like locks on our

10   door, only certain keys work.  In that case only certain drugs

11   activate certain receptors.

12   Q.    And then when the receptor is activated, why is that

13   important?  What happens when the receptor is activated?

14   A.    Right.  Depending on the type receptor, different things

15   happen.  In this case, the receptor that's both, activated by

16   both barbiturates and benzodiazepines, is called a GABA

17   receptor.  GABA is the acronym for gamma-aminobutyric acid.

18   Now, that's not maybe commonly known.  People use GABA because

19   it is a mouthful.  But GABA is actually the major inhibitory

20   neurotransmitter in the brain.

21        So without GABA in our brains right here, right now, we'd

22   all be seizing and going nuts because GABA kind of puts the

23   brakes on neurons.  It's an inhibitory neurotransmitter at very

24   high levels in the brain.  Without GABA in our brains, we'd all

25   be seizing and having seizures.

1   Q.    So you talk about benzodiazepines as a partial agonist, and

2   you've previously described what an agonist is.  What do you

3   mean by partial agonist?

4   A.    Right.  When a drug is a partial agonist, it doesn't

5   produce the same effect as a full agonist.  So it's a relative

6   term.  In this case it comes directly from the graph like we saw

7   on Figure 1, which I think is still up.

8         So you can see here barbiturates can be considered a full

9   agonist or just a regular agonist because they can go all the

10  way up to whatever you're measuring on the Y axis, whereas

11  benzodiazepines because they have a plateau effect or a ceiling

12  effect are considered partial agonists.  You can give more and

13  more of the drug, but you still can't reach that largest effect

14  of a full agonist.

15  Q.    And so why is that?  I mean, how does this actually work in

16  the person's brain?

17  A.    It works because of how the drugs actually work.  This is

18  called mechanism of action, and this is something that should be

19  the beginning of any discussion of drugs, how the drugs work.

20  It makes sense, right?  And that's, of course, what we teach our

21  medical students.

22        So if you look at how barbiturates actually work in the

23  brain, at these GABA receptors we talked about, these locks, if

24  you will, barbiturates work very different than benzodiazepines.

25  Q.    So how do benzodiazepines work at the GABA receptor?  Kind

1   of paint a picture for me as to what is going on inside that

2   person's body.

3   A.   Sure.  So in the brain there's a bunch of neurons that have

4   GABA receptors on them, sitting kind of on the surface of a

5   neuron, if you can think about it, which is just a cell in the

6   brain that gets a special term, "neuron."

7        So the GABA receptors are sitting there.  Normally GABA is

8   coming by, which is a natural inhibitory neurotransmitter.  So

9   it's a key that will then lock onto or bind the GABA receptor,

10  cause the neuron to be inhibited, not fire as much, not be as

11  excitable or --

12  Q.   So I hate to interrupt you, but I think you've said that

13  without GABA, we'd just be seizing all over the place.  Right?

14  A.   Sure.

15  Q.   So GABA kind of helps calm us?  Is that what you're saying?

16  A.   You can think of there's a balance in the brain and it's an

17  exquisite balance because you also have excitatory

18  neurotransmitters.  So you have inhibitory transmitters and

19  excitatory neurotransmitters.  It just so happens that if we

20  didn't have the inhibitory neurotransmitters, the excitatory

21  neurotransmitters would take over.

22       There's a lot of research to suggest, for example, people

23  that have anxiety disorders, they may not have enough GABA and

24  so, therefore, they're a little bit more anxious.  OCD, there's

25  some evidence perhaps.

1        So there's a lot of things that can be related to that at

2    that initial yin-yang and/or balance of the excitatory and

3    inhibitory neurotransmitters in the brain.  Just kind of put it

4    on that level.  It's actually more complex with all the

5    substances, but that's just one way to think of it.

6    Q.    So GABA then is attached to the receptor.

7    A.    The GABA receptor -- GABA is a neurotransmitter, the major

8    inhibitory neurotransmitter, and it binds to the GABA receptor.

9    Q.    And then this happens no matter whether you have any sort

10   of drug or chemical in your body?

11   A.    Correct.  Because we all have drugs and chemicals in our

12   brain, but we just call them differently.  We call them

13   neurotransmitters.  But essentially they're like internal drugs,

14   if you will, because they're substances just like drugs.  It

15   just so happens that we make them ourselves.

16   Q.    And so we've got a GABA neurotransmitter binding onto the

17   receptor, and say that midazolam is then injected into a person.

18   Where is that midazolam going and how is it working?

19   A.    Right.  So benzodiazepines like midazolam, they get into

20   the brain and they are in the same fluid around the neurons like

21   the GABA, and they actually bind to the GABA receptor, too.  A

22   different place than where the GABA binds.  So if you look at

23   molecularly, it's a different spot on the lock, if you will.

24        But they bind and they cause GABA to work a little bit

25   better, they tend to be a little bit better at inhibiting

1   neurons.  However, the key point, and this point I think has

2   been missed in a lot of this type of testimony, is that

3   benzodiazepines only work with GABA present.  They cannot work

4   without GABA.  And so, you know, you were getting back to the

5   reason for the ceiling effect.  You can take it all the way down

6   to this molecular action.  If you have benzodiazepines on board,

7   they can only produce so much inhibition when there's GABA with

8   them binding to the GABA receptor.

9   Q.   So is GABA not in limitless quantity in our bodies?

10  A.   No.  It's not infinite.  It's finite.  And so, therefore,

11  you can imagine -- obviously people have different levels of

12  GABA, but it is a limited resource.  You can't have infinite

13  levels of neurotransmitters.  And so when the GABA is kind of

14  bound up to its receptor, however much GABA there is and however

15  many receptors, any additional midazolam, there's no free GABA

16  to work with it, and so it's -- if you have a case where you can

17  give more and more midazolam but if there's not GABA to join

18  hands with it and bind to the GABA receptor to cause neuronal

19  inhibition, you're not going to get a greater effect.  That's

20  why you have the classic plateau effect or ceiling effect occur.

21  Q.   So it's accurate to say that what we're seeing here,

22  though, looks simple.  It's the product of a mechanism where the

23  midazolam can only attach to so many receptors and produce an

24  effect, to a limited extent, based upon the presence of GABA?

25  A.   Very well put, yes.  That's correct.

1    Q.    So barbiturates, do they not do the same thing?

2    A.    No, they don't.  Very importantly and why benzodiazepines

3    have replaced them and are much more safer is because

4    barbiturates can go to the same receptor, the GABA receptor that

5    GABA binds to, that benzodiazepines bind to, and they bind to

6    yet a different spot on that receptor, a different spot on the

7    key.  But they don't need GABA.  They can directly activate the

8    GABA receptor, causing neuronal inhibition and increasing

9    neuronal inhibition or brain cell inhibition.

10        So the barbiturates, as shown on the graph, you give more

11   and more of them, you get greater and greater depression of the

12   brain cells.  And so, therefore, that's why they can go straight

13   to death and they don't have a ceiling effect.

14   Q.    So regardless of the presence or absence of GABA --

15   A.    That's correct.

16   Q.    -- barbiturates will continue to produce their effect?

17   A.    That's correct.  They don't need GABA.

18   Q.    So I think you talked a little bit about why that

19   development happened, I guess, in pharmacology for, you know, I

20   guess what we'd think of as common medical uses.  Tell me a

21   little bit again about why that's important and, I guess,

22   compare the clinical context where you're trying to prescribe

23   drugs within the lethal injection context.  What's the

24   importance of benzodiazepines versus barbiturates there?

25   A.    Right.  So clinically benzodiazepines -- for example, let's

1    say someone can't sleep.  They can get a prescription of Xanax

2    or some similar benzodiazepines, perhaps, and you can take that

3    and it helps them sleep.  The potential for overdose is very,

4    very, very little, especially at prescribed doses, compared to

5    the old days when all we had was barbiturates to prescribe for

6    someone to sleep.  In that case, you could very easily overdose

7    on barbiturates by taking double or triple the amount of the

8    prescribed drug or even the normal dose of the barbiturate, but

9    having a couple drinks.

10        So it's made it much safer because benzodiazepines are

11   limited, like we discussed, by the GABA.  So it's changed the

12   nature of clinical pharmacology in regards to what drugs doctors

13   prescribe now.

14   Q.   I think this is pretty obvious from your graph, but can

15   barbiturates lead to death by themselves?

16   A.   Yes, they can.

17   Q.   Can benzodiazepines lead to death by themselves?

18   A.   Very rarely, yeah.  No.

19   Q.   In what context would that be?

20   A.   The studies that I've seen only talk about benzodiazepines

21   leading to death when they're combined with other drugs, like

22   opioids, which are drugs like morphine and fentanyl and

23   Oxycontin and things like that.  Used by themselves, in fact,

24   the references that I found that talk about toxic dose ranges,

25   they don't even have a number for the benzodiazepines.  And

1    that's in my report as well.

2    Q.    And where is that in your report?

3    A.    If we go to page 23.

4    Q.    And the chart, please.

5    A.    So what this is is a table from a reference published in

6    2012, but there's other references that also show this.  And

7    I -- it was a large table of many substances, so what I did is,

8    I went down and took the midazolam row and pasted it next to the

9    pentobarbital row.  So in the actual reference, they would be in

10   alphabetical order and there would be other drugs.  But, anyway,

11   it's an excerpt, if you will, from the original table but

12   accurate to that regard.

           And what you see, it has substance, then it has blood-

14   plasma concentrations and then it has different descriptions,

15   and then it has half-life at the end.  That's how long the drug

16   lasts.  It's a measure of the elimination of the drug.

           What you see is pentobarbital has a therapeutic or normal

18   dose range of 1 to 5, for example; toxic from 10 to 19; and

19   comatose or fatal from 15 to 25.

           Then midazolam has a therapeutic dose range given there,

21   and it has what's called a toxic dose range and it's not really

22   clear what that means, but under the comatose-fatal, nothing.

           So that to me is very telling in the sense that the

24   professional toxicologists that gather this data and do these

25   kind of tables, there's such little evidence that can be

1   strictly attributed to just midazolam alone that there's not

2   even a value there.

3   Q.   Do you know if any state has adopted a one-drug midazolam

4   protocol?

5   A.   No.  And I think that's very telling.  If it's an

6   equivalent to pentobarbital, for example, why not just use it by

7   itself like they have done with pentobarbital?

8   Q.   So there's actually one drug, pentobarbital, with the --

9   A.   I believe so.

10  Q.   -- barbiturate protocols?

11       Let's look at the chart, please, on page 11.  Can you tell

12  us what that is showing us.

13  A.   Yes.  What I've done here, I've looked at five different

14  benzodiazepine drugs and five different barbiturate drugs, and I

15  went to the FDA-approved label and I looked at the therapeutic

16  uses that were listed on the FDA label and kind of made a

17  compendium there.

18       The reason I did that was to show, first of all, what

19  indications midazolam is actually indicated for, according to

20  the FDA, and also to give a comparison as a group between benzos

21  and barbiturates.

22  Q.   Did this confirm or contradict what you said before about

23  the mechanism of action of the ceiling effect?

24  A.   It confirms it because what you see is that benzodiazepines

25  are not used in cases, for example, where you need sole

Stevens - Direct                                               259

1    anesthesia.  And you can see that under that in about the middle

2    of the table:  Sole anesthesia (brief).  Benzodiazepines, no.

3    But it was indicated for thiopental, and that was being used in

4    a number of other -- and induce coma in cases of brain trauma,

5    thiopental was used for that, a barbiturate.

6         So this just shows another view of the comparison from the

7    FDA's point of view of what was approved to use these drugs for

8    and how benzos and barbiturates different.

9    Q.   So to sum up, this says what you found, that

10   benzodiazepines should not be used or cannot be used for general

11   anesthesia by themselves; is that correct?

12   A.   That's correct.

13   Q.   Now you talked a little bit about the ceiling effect of

14   midazolam, and we can go back to page 8 in that chart.  I think

15   your testimony has talked a little bit about the mechanisms of

16   drug action and, you know, why that chart looks the way it does,

17   based upon the pharmacological action of the drug in one

18   person's body.

19   A.   Correct.

20   Q.   Say that someone wanted to try to figure out a number for

21   the ceiling effect, you know, whether that's a useful exercise

22   or not.  What are the various ways that that might be attempted?

23   A.   There's two ways that came to my mind, and I did make an

24   attempt to do it to figure it out.  One is to go to controlled

25   but what's called in vitro studies where you just basically have

1    cells or tissues in a dish.  And people can think of a petri

2    dish and can imagine that.  So there's a number of experiments

3    where they've done that and they've put different concentrations

4    of benzodiazepines, for example, including midazolam.  And you

5    can start to see the effects the drugs have and you can even eke

6    out a particular ceiling effect from those types of studies.

7        And so you can get a concentration from that study and then

8    try to calculate what it might be after injection in humans.

9    Again, of course, we don't have any real data because no one has

10   injected 500 milligrams and had a look at the drug.

11   Q.   So just to understand what you're doing in the lab, just to

12   picture myself there, you've got -- when you say in vitro, you

13   have something in a dish?

14   A.   Correct.

15   Q.   And then you are able to -- what is your step?  What is

16   your first step?

17   A.   You can measure the effect of the drugs.  You would then --

18   in some of those dishes you would put different concentrations

19   of midazolam, for example, and some you would put saline as a

20   control, and then you'd measure the electrical activity of those

21   cells.

22       So you might see that with midazolam you start to see some

23   inhibition of the electrical activity because we know that it

24   inhibits brain cells by inhibiting their electrical activity.

25   So you can kind of mirror that in cells in a dish.  You can see

1    at what doses or what concentrations it started to inhibit.  You

2    can see where that plateau was seen or the ceiling effect was

3    seen in those dishes.

4    Q.    And so you did all that here?

5    A.    I did.

6    Q.    And what did you find?

7    A.    Well, I did that and then I tried to translate it to what

8    might be seen after IV injection of a very large dose, like 500

9    milligrams in a human.  I had to figure out what might be in the

10   brain, had to try to figure out the concentration of the drug in

11   the brain, various steps that were liable to certain

12   assumptions.  And I ended up with an approximation of about 228

13   or 220 milligrams IV would yield a similar concentration like I

14   saw on these in vitro studies.

15   Q.    So did you -- well, you said 228.  Is that lower or higher

16   than what Arkansas intends to inject?

17   A.    That's lower.  About half, theoretically.

18   Q.    You say you made a number of assumptions, and I take it

19   that you're saying that this is, you know, something that hasn't

20   really been attempted before, what you were doing with measuring

21   in vitro?

22   A.    Right.  In other words, it was an attempt that I think is

23   scientifically valid, but it probably needs to be worked on more

24   and more and more to make -- maybe there's other experiments out

25   there that could make it more robust, is what it's called.  In

1    other words, it's an attempt to use what you have right now.

2    But the second approach, I think, is probably more viable

3    because it comes directly from human studies.

4         MS. MERRITT:  Excuse me, your Honor.  I would like to

5    object to the admission of Dr. Stevens's testimony regarding his

6    ceiling effect dose calculation as he just admitted his

7    methodology has never been subject to any peer review.  He's the

8    first person to ever create this calculation.

9         Under Rule 702 of the Federal Rules of Evidence, testimony

10   by expert witnesses has to be based on sufficient facts or data,

11   must be the product of reliable principles and methods, and the

12   Court must find that the expert has reliably applied the

13   principles and methods to the facts of the case.

14        What Dr. Stevens just described to the Court is that he has

15   done his best to look at what happened in a petri dish, and then

16   he admitted to extrapolating data of what might then happen in

17   humans to approximate what he admitted is basically a rough

18   estimate of what is the ceiling effect.

19        I submit that his testimony in this regard is not

20   sufficiently reliable and it should be excluded under Rule 702.

21        Thank you, your Honor.

22        THE COURT:  I'll overrule the objection at this stage

23   of the proceeding given the evidentiary constraints of this

24   proceeding for much the same reason in regard to the *Daubert*

25   motions made on your expert.  I'm letting all the science in.  I

1    understand and appreciate the basis of both sides' objections.

2        You may proceed.

3            MR. WILLIAMS:  Thank you.

4    BY MR. WILLIAMS:

5    Q.   And just to give a little bit maybe more foundation, have

6    you done in vitro studies before?  Is that something you have

7    done?  Did you just do that for the first time for this?

8    A.   Our lab has performed in vitro studies, correct.  I've not

9    done the studies that I used as a foundation in this case,

10   though.  These studies were from the literature.

11   Q.   Yes, but you've done in vitro studies in other contexts

12   before?

13   A.   Yes, I have.

14   Q.   Okay.  Just tell us a little bit -- I mean, I think we

15   walked through it a little bit.  What does that entail?  What is

16   an in vitro study?  Tell me how you've done it in the past in

17   different contexts.

18   A.   Right.  In vitro studies, vitro is glass.  Vitreous, you

19   know that word, probably, and so we've got in vitro and --

20   Q.   I'm sorry.  Vitreous?

21   A.   Glass is vitreous.  Vitreous, or whatever, is an adjective

22   for glass.

23   Q.   Okay.

24   A.   So I was just saying that's where the word -- the Greek

25   word comes from vitro, which is glass, so in glass, basically,

1    which means in a dish.

2    Q.   Understood.

3    A.   And so even though they're plastic nowadays, but -- so you

4    would have a cell line.  So in my laboratory right now, we have

5    certain cell lines.  We look at certain cells of the brain that

6    you can purchase and then you can grow them in incubators.  So

7    the field has moved away from whole animal studies to using

8    cells and tissue studies more and more so.

9         Anyway, you would have cells that are growing in a dish and

10   you have some measure that you can make.  It may be something

11   where you dump a dye on there and the dye gets darker the more

12   the drug has an effect, for example.

13        So we've done studies where we have these cells growing,

14   and then we look at the effects of opioids like morphine on the

15   cells and see a change that happens, an effect of the morphine

16   drug.  So these are very common, modern pharmacology methods.

17   Q.   So what's a concrete example of how you've done a study

18   like that before in a different context?

19   A.   Right.  Probably something that we do routinely, we look at

20   what's called glial cells, they're the cells in the brain that

21   are in between the neurons.  There's neurons and glial cells.

22   They're like the support cells of the brain.  And we -- our lab

23   was one of the first to note that when you put opioids on there,

24   it inhibits the release of certain other substances called

25   cytokines.  So it was just a simple study to show that opioids

1    have another effect besides analgesia.  They also have an effect

2    on these brain cells.

3    Q.    Is that kind of like pure theory?  Or you're doing it for

4    applications?

5    A.    No.  It has a real-world application because opioids might

6    help become antiinflammatory agents in cases like

7    neurodegenerative diseases.  So it's another use of a classical

8    drug class.  So what we get directly in the laboratory may have

9    results in the clinic.

10   Q.    So you've never calculated the ceiling effect using in

11   vitro studies before, but suffice it to say that you have used

12   in vitro studies to calculate other measurements in other

13   contexts?

14   A.    That's correct.

15   Q.    So having calculated the ceiling effect through this

16   method, did you go and try to look at and confirm as much as

17   possible -- and I understand that we cannot, you know, study --

18   unless it is in an execution with this protocol, we cannot study

19   what the effect of 500 milligrams of midazolam is.  But did you

20   go and look at other studies that have attempted to discern what

21   the ceiling effect or the effects of midazolam are on the body?

22   A.    I did, and the best studies I could find were studies that

23   looked at humans after administration of much lower doses of

24   midazolam and looked at the effect on the brain in terms of the

25   EEG, which is a measure, if you will, of the electrical activity

1    of brain neurons.

2    Q.    And so what did those studies tell you?

3    A.    Those studies, which I have cited in my -- on page 33 of my

4    report actually noted that at a certain dose of midazolam, there

5    was a certain amount of depression of the EEG that was seen by

6    the BIS, which I think the Court may be familiar, the bispectral

7    index, which is nothing more than a shorthand measure for the

8    EEG effect.

9         So an EEG, we know, you know, the electrodes and we see the

10   scratchy lines and all that.  And BIS just looks at all those

11   scratchy lines, passes it through a computer, and gives you a

12   number from zero to one hundred, one hundred being fully awake,

13   zero being essentially no brain activity.

14        In those studies they noted that a certain dose, in this

15   case .3 milligrams per kg, milligrams per kilogram, did not

16   produce a greater depression on the brain as noted by the BIS

17   value than a dose of 0.2 milligram per kilogram.  And that was

18   cited as the Mayake, M-a-y-a-k-e, et al., 2010 paper.

19        It goes on in my report to cite two other papers as well

20   that support that there is a noticeable ceiling effect at

21   midazolam using this measure of the EEG.

22   Q.    So taking your in vitro study and comparing it to these

23   clinical studies you looked at, were you able to come up with

24   a -- some sort of range, if not a precise number, for what the

25   ceiling effect of midazolam might be, at which point it stops

1    producing any sort of anesthetic effect?

2    A.    Yes, I was.  The clinical studies I've just described

3    roughly come out to about an IV infusion dose of 25 milligrams.

4    The in vitro-derived figure was about 220.  So it's about an

5    order of magnitude or about ten times different.  So right now

6    it looks like the ceiling effect is somewhere in the range from

7    25 milligram to 220 milligram when given IV.

8    Q.    So we sort of engaged in this exercise of trying to

9    calculate what the ceiling effect is.  Is that -- how important

10   to you is that number?

11   A.    That number is not as important to me as the basic

12   mechanisms of action of the drugs.  It was an exercise.  You

13   know, is it robust as I would like?  You know, can it be

14   published in *Science Magazine*, the premier journal of scientific

15   findings?  Probably not yet.  But it is a start and it's an

16   attempt to use what best data we have now.

17        The most important thing is the actual mechanism of action

18   that these drugs have.  So in either event, the 200 or 220

19   milligram figure that I derived from the in vitro studies, it's

20   still about half of what Arkansas plans to use as the first drug

21   in their lethal injection protocol.

22   Q.    Did anything in your study of the number change your

23   opinion that midazolam and other benzodiazepines cannot produce

24   general anesthesia?

25   A.    No.  It did not affect that at all.

1   Q.   So just moving, again, to some of the conclusions that you

2   reached and the things we've discussed, can midazolam render

3   someone insensate to the pain caused by vecuronium bromide and

4   potassium chloride?

5   A.   I don't believe it can.

6   Q.   And to summarize again why that is, why is that?

7   A.   Simply because of the way a drug works.  You know, drugs

8   have certain mechanisms they work, and you cannot give more and

9   more of a drug and expect it to change its nature.  It's in

10  the -- the very chemical nature of a drug is how it works in the

11  body or, in this case, the brain.  So to me it's a very simple

12  issue.  Benzodiazepines can't ever produce the same effect as

13  barbiturates because they work differently.

14  Q.   And so in your opinion will the midazolam protocol likely

15  cause the inmates to experience suffering?

16  A.   I think it will, yes.

17  Q.   And would you characterize that pain as extreme?

18  A.   Yes, I would.

19  Q.   Is that because of the effects of the second and third

20  drugs --

21  A.   That's correct.

22  Q.   -- that we've already discussed?

23           MR. WILLIAMS:  Can I take a minute with co-counsel,

24  please?

25           THE COURT:  You may.

1          (Counsel conferring.)

2     BY MR. WILLIAMS:

3     Q.    So, Dr. Stevens, did we ask you to discuss or to examine

4     sort of the pharmacological properties of potential alternative

5     drug protocols that Arkansas could use?

6     A.    Yes, you did.

7     Q.    Do you recall looking at something called sevoflurane?

8     A.    Yes, I did.

9     Q.    And what is that?

10    A.    That's considered an inhalational general anesthetic,

11    meaning it's given by a mask, and it's a gaseous agent.

12    Q.    So it's a gas?

13    A.    Yes.  It's a gas.

14    Q.    Not a liquid?

15    A.    Not a liquid, not a pill form.  It has to be administered

16    as a gas.

17    Q.    And did you look at something called isoflurane?

18    A.    I did.

19    Q.    How is isoflurane different from sevoflurane?

20    A.    They're very similar chemically, but it's been noted in the

21    literature that both desflurane and isoflurane cause more

22    irritation of the respiratory tract.

23    Q.    So do you think isoflurane would be inappropriate for that

24    reason?

25    A.    Yes, I would.  In this case I think sevoflurane, if one

1    were to go that route, would be better.

2    Q.   So does sevoflurane lack some of the, I guess, detriments

3    that isoflurane has?

4    A.   To my knowledge it does, yes.

5    Q.   And how, for example?

6    A.   The literature talks about sevoflurane not being as pungent

7    to the patient, smell, taste, not as irritating to the

8    respiratory and bronchial tract.

9    Q.   How about its -- how about how quick it works?

10   A.   Also that it works very rapid and it's quicker than

11   isoflurane, for example, and there's papers in my report that

12   are cited for that.

13   Q.   We talked about the mechanism of action of barbiturates and

14   benzodiazepines.  Is sevoflurane kind of like a barbiturate in

15   the way it works or is it like a benzodiazepine?  How does it

16   work?

17   A.   Yes.  To use a very mixed metaphor, it's -- sevoflurane is

18   like barbiturates on steroids, which is really mixing things up,

19   but -- so it works also to inhibit brain neurons, but to a much

20   stronger degree than even barbiturates in the sense that you

21   don't need GABA present.  It also acts on other types of

22   receptor systems by blocking the excitation.  So it's very

23   strong and it can produce even greater inhibition of brain

24   neurons.

25   Q.   So can sevoflurane cause death on its own?

1    A.    It can also cause death, yes.

2              MR. WILLIAMS:  I have nothing further on direct.

3              THE COURT:  All right.  Cross-examination?

4              MS. MERRITT:  Your Honor, if the Court could possibly

5    indulge me with a five-minute restroom break before we get

6    started, I would appreciate it so much.

7              THE COURT:  We'll just go ahead -- let's take a ten-

8    minute break.  We'll come back in here -- let's be back in here

9    at ten till ten.  We'll just take our morning break.

10        We're in recess.

11        (Recess at 9:39 a.m.)

12                     REPORTER'S CERTIFICATE

13        I certify that the foregoing is a correct transcript from
     the record of proceedings in the above-entitled matter.

14

15                                  Date:  April 11, 2017
     /s/ Christa R. Jacimore, RDR, CRR, CCR
16        United States Court Reporter

17

18

19

20

21

22

23

24

25

1          (Continuing at 9:55 a.m.)

2          THE COURT:  You may take the stand.  You may begin

3    with cross when you're ready.

4          MS. MERRITT:  Thank you, Your Honor.

5                    CROSS-EXAMINATION

6

7    BY MS. MERRITT:

8    Q.   And good morning again, Dr. Stevens.

9    A.   Good morning.

10   Q.   As you testified on direct, you are a Ph.D. pharmacologist,

11   correct?

12   A.   That's correct.

13   Q.   And for the last 27 years or so, you have primarily worked

14   as a professor of pharmacology, right?

15   A.   That's correct.

16   Q.   And you're also a science researcher?

17   A.   Correct.

18   Q.   And so you conduct lab and animal studies, correct?

19   A.   I have in the past, that's correct.

20   Q.   And you study other people's lab and animal studies, right?

21   A.   Say that again, please.

22   Q.   You also study other people's studies and interpret results

23   of those kinds of studies?

24   A.   Right, I read other papers and keep up with the literature

25   as much as possible, that's correct.

1   Q.   Thank you.  Have you ever been a principal investigator in

2   a drug, human phase, clinical trial?

3   A.   Not involving humans, no.

4   Q.   And you also provide consulting and expert witness services

5   in litigation, as you testified on direct, right?

6   A.   That's correct.

7   Q.   Are you licensed in any healthcare field?

8   A.   No, I am not.

9   Q.   Are you a registered healthcare provider?

10  A.   No, I am not.

11  Q.   So that means you've never provided direct healthcare to

12  patients.  Isn't that true?

13  A.   That's correct.  I have a Ph.D.

14  Q.   So you've never directly administered medicine to a

15  patient, have you?

16  A.   No, that would be illegal.

17  Q.   You've never directly administered sedative drugs to

18  patients?

19  A.   No, I have not.

20  Q.   Nor have you ever directly administered anesthetic drugs to

21  patients, correct?

22  A.   That's correct.

23  Q.   Or any other drug for that matter?

24  A.   That's correct.

25  Q.   Now, Dr. Stevens, the Federal Public Defenders Office first

1    retained you as an expert witness in Arkansas lethal injection

2    litigation back in 2015.  Isn't that right?

3    A.    That seems right, yes.

4    Q.    And that was in connection with the *Johnson v. Kelley* case

5    that nine death row inmates had filed in the Circuit Court of

6    Pulaski County, Arkansas.  Isn't that right?

7    A.    The details -- at this time, I can't exactly recall the

8    names as you mentioned them, but I trust your expert judgment on

9    that.

10   Q.    Okay.  Thank you.  I wouldn't mislead you in that regard.

11   A.    Okay.

12   Q.    Do you understand those same nine inmates are the

13   plaintiffs in this case?

14   A.    Yes, I believe so.

15   Q.    Okay.  And in the 2015 case in Pulaski County, Arkansas,

16   the prisoners retained you to give opinions about what was then

17   a new lethal injection protocol in Arkansas, right?

18   A.    I believe so.

19   Q.    And specifically they asked you to give opinions about the

20   efficacy of using midazolam as the first drug in a three-drug

21   protocol, didn't they?

22   A.    I believe so.

23   Q.    Okay.  Now, were you also retained in 2015 to offer

24   opinions about what other alternative drugs might be available

25   to the Arkansas Department of Correction to use in executions,

 1  other than midazolam?

 2  A.    I believe so, yes.

 3  Q.    And in fact, isn't it true that you wrote two reports that

 4  were submitted to the court in the 2015 litigation as evidence

 5  in support of the prisoners' midazolam claim?

 6  A.    Yes, I believe so.

 7  Q.    Okay.  Let's take a look at what we have marked as

 8  Defendants' Exhibit 30.  I'll put it on the ELMO so we can all

 9  look at it together.  Okay.  Dr. Stevens, can you identify this

10  document for the record, please?

11  A.    Yes.  It's the report that is dated September 28, 2015.

12  Q.    What's the title of the report?

13  A.    The title is:  "The Pharmacology of Arkansas's Lethal

14  Injection Procedure:  Facts, Interpretations, and Alternatives."

15  Q.    And the date of that report?

16  A.    September 28, 2015.

17  Q.    And you prepared and submitted that report for Mr. Josh Lee

18  of the Federal Public Defenders Office, right?

19  A.    That's correct.

20  Q.    Now, showing you what is page 2 of Defendants' Exhibit 30,

21  and that's just a brief -- can you describe what we're looking

22  at here?

23  A.    Yes.  It's basically a table of contents.

24  Q.    Okay.  I'm sorry.  I'm having trouble getting it all on one

25  page here.  Okay.  There's an introduction section, Section 1,

1    right?

2    A.    Correct.

3    Q.    Section 2 talks about midazolam and fast-acting

4    barbiturates, whether they're the same pharmacologically or

5    different, right?

6    A.    Correct.

7    Q.    Section 3 of your 2015 report talks about dosage and

8    characteristics of barbiturates as used in lethal injection,

9    right?

10   A.    Correct.

11   Q.    And Section 4 talked about pharmacology of vecuronium and

12   potassium chloride?

13   A.    Correct.

14   Q.    Section 5 discusses calculation of the ceiling effect

15   dosage of midazolam as used in lethal injection, correct?

16   A.    Correct.

17   Q.    Section 6 talks about comparison of the effects of

18   midazolam and pentobarbital on consciousness?

19   A.    Correct.

20   Q.    All right.  Section 7 is about the pharmacological

21   considerations of alternative one-drug protocols for lethal

22   injections, right?

23   A.    That's correct.

24   Q.    And back in 2015 -- and we'll go into a little more detail

25   later, I'll go into this report, certain sections of it in more

Stevens - Cross

1   detail -- you did offer opinions about fast-acting barbiturates

2   as a potential alternative to the state.  Is that right?

3   A.    Correct.

4   Q.    And then back in 2015, you held the same opinion you told

5   today about anesthetic gases, right?

6   A.    Correct.

7   Q.    And then in 2015, you also talked about opioids, and at

8   that time you felt that opioids would be an alternative for the

9   state to use in lethal injection -- or, excuse me -- in judicial

10  executions?

11  A.    These are possibilities of drug classes, correct.

12  Q.    We're not going to go into great detail, but I'm trying to

13  establish for the Court what we've litigated before in 2015.  Do

14  you understand?

15  A.    Yes.

16  Q.    Okay.  The main thing I think I wanted to talk about is the

17  ceiling effect calculation that you did in 2015.  And, again, on

18  direct examination just now, you admitted that this technique

19  that you have used to attempt to calculate the ceiling effect

20  dosage for midazolam is experimental.

21  A.    Say that again, please.

22  Q.    It's experimental, your methodology for calculating the

23  ceiling effect dose.

24  A.    The methodology I think is sound.  I think the problem is

25  there's a lot of steps between in vitro to human.

1  Q.   Right.  And in fact, hasn't the FDA cautioned researchers

2  that in vitro animal data can't be easily, or you can't directly

3  correlate that with the effect of a drug on a human, right?

4  A.   No, I would disagree.  The FDA's very adamant that

5  preclinical studies need to be done for drugs before they can be

6  approved for human use.

7  Q.   Right.  But that's not what I asked.  What I said was, even

8  -- once you've done the preclinical animal studies, you can't

9  necessarily say that a drug is going to have the same effect on

10 a human as it does on an animal.  You would agree with that,

11 right?

12 A.   It depends on the drug class.

13 Q.   Okay.  And if you'll indulge me for just a second, I have a

14 document that I only have on my little phone, so I'm going to

15 try to put it here, and the phone's probably going to --

16          MS. MERRITT:  Your Honor, may I approach the witness?

17 It might be easier for him to see what I'm showing.  It's not

18 working on the ELMO.

19          THE COURT:  Has opposing counsel seen it?

20          MS. MERRITT:  No.  I just got.

21          THE COURT:  Show it to opposing counsel.

22          MS. MERRITT:  Ma'am?

23          THE COURT:  Show it to opposing counsel first.

24          MS. MERRITT:  Thank you.

25      (Counsel confer.)

1    BY MS. MERRITT:

2    Q.    I'm not trying to pull a fast one.  My expert literally

3    just emailed a link to something that he thought was relevant on

4    this point, and I have shown it to opposing counsel, and I'm

5    going to provide the document I have by email to Mr. Williams.

6          You have your readers?

7    A.    I can see, yes.

8    Q.    And I want to make sure we make a record.  I apologize for

9    leaning over you.

10   A.    No problem.

11   Q.    What I'm showing you, Doctor, it's a guidance document.  It

12   says, "Guidance for industry investigators and reviewers

13   regarding exploratory IND studies."  Can you tell the Court and

14   me what is an exploratory IND study?

15   A.    First of all, "IND" stands for investigational new drug.

16   So that's the first application.  A company or group of

17   individuals that wants to market a new drug has to do an IND

18   application to the FDA.

19   Q.    And is that similar to what you were just telling me about

20   you need to do animal studies before you can give a drug to a

21   human, right?

22   A.    Correct.  It's part of the FDA process.

23   Q.    Okay.  And this is just an excerpt, but what it says is --

24   I want you to confirm that I'm reading this box that's been

25   highlighted in yellow.  It says, "In addition, animal testing

1    does not always predict performance in humans."  Right?

2    A.    That's correct.

3    Q.    Okay.

4    A.    I might note that that was from 2006.  We should have that

5    in the record.

6    Q.    Okay.  And you conceded this on direct, animal data doesn't

7    directly translate to humans.

8    A.    Not in all cases, but in many cases and in more cases

9    animal data is the de rigueur of the studies to get drugs

10   approved.

11   Q.    But you conceded on direct your ceiling calculation,

12   ceiling dose calculation -- pardon me -- was kind of your best

13   guess, extrapolating from the animal data, right?

14   A.    It actually came from in vitro data more than animal data.

15   Q.    Thank you for correcting me.  The in vitro is literally the

16   Petri dish data?

17   A.    Correct.

18   Q.    So you did your best to extrapolate from in vitro data to

19   then calculate what could be the ceiling effect in humans,

20   right?

21   A.    Correct.

22   Q.    And you made a number of assumptions to make that leap?

23   A.    I did.  And I made an error in the first report I did on

24   this as well.

25   Q.    Okay.  So in the first report, you conclusively state in

1   paragraph -- the bottom of page 27 of Defendants' Exhibit 30,

2   you say:  "An IV bolus dose of 20-milligram midazolam is

3   sufficient to reach the threshold of midazolam's ceiling effect.

4   Amounts beyond that dose cannot be expected to produce an

5   anesthetic effect."  Right?

6   A.    Correct.

7   Q.    And do you remember that in briefing that we did, the state

8   did in the Arkansas Supreme Court, we pointed out this error,

9   that your calculation couldn't possibly be correct because

10  clinicians routinely use doses in excess of 20 milligrams to

11  sedate or anesthetize patients or induce anesthesia, right?

12  A.    I'm not aware of the clinician's use of the particular

13  dose.

14  Q.    Okay.  But you conceded you made a big mistake here, right?

15  A.    It wasn't a big mistake.  I missed by a factor of ten in a

16  simple arithmetic mistake.  So, yes.

17  Q.    So your opinion about the ceiling dose of midazolam in 2015

18  was that it was a 20-milligram dose, right?

19  A.    It was off by ten because that was the nature of the

20  mistake.  I didn't carry the time properly.

21  Q.    So the answer is "yes"?  So you went from 20 milligrams in

22  2015 to now you're telling the Court the actual ceiling dose is

23  closer to 228, but even that's a guess, right?

24  A.    No.  What I'm saying is that there was an arithmetic error

25  that was corrected in an amended report that came after this

1   particular report.  There was an amended report.

2   Q.   At this time you told the Arkansas court 20 milligrams was

3   the ceiling.  Fair enough?

4   A.   I -- as I wrote there, it seemed at that time it was

5   sufficient before I realized my error in the dosage, yes.

6   Q.   I understand.  But you didn't tell the Court this is my

7   best guess.  You made a statement 20 milligrams is sufficient to

8   reach the threshold of midazolam's ceiling effect.  Amounts

9   beyond that dose cannot be expected to produce an anesthetic

10  effect.  That was your opinion in 2015, right?

11  A.   And the second part of that is still my opinion.

12  Q.   Okay.  Now, back in 2015, you provided to the Arkansas

13  state court basically the same report that you have now, right?

14  You've updated it a little bit, and we'll talk about that.  Is

15  that fair?

16  A.   The basic bones are the same.  It's been changed a bit.

17  Q.   Okay.  So the same table, Table 6 in your report that we

18  talked about with Mr. Williams, was also in the 2015 report that

19  was submitted in Arkansas state court, right?

20  A.   As far as I know, yes.

21  Q.   And this Table 6 talks about Nembutal, Brevital,

22  commercially available barbiturate drugs that you thought would

23  be better, right, for use in lethal injection executions?

24  A.   If you mean by "better," are barbiturate drugs better than

25  benzodiazepines?  Yes.

1  Q.    Okay.  And on page 32 of your 2015 report, at the top, that

2  first highlighted section, you gave your opinion, the same

3  opinion you're giving the Court now, which is that:  "A one-drug

4  lethal injection protocol that would deliver a massive overdose

5  of Brevital or Nembutal, both of which are FDA-approved and

6  commercially available, would, if competently performed, produce

7  a rapid and painless death."

8        Right?

9  A.    I believe so, yes.

10 Q.    Okay.  And then you also gave an opinion to the Arkansas

11 state court about anesthetic gases, right?

12 A.    Correct.

13 Q.    And you gave the same opinion about sevoflurane,

14 desflurane, and isoflurane that you've given the Court here

15 today, right?

16 A.    Correct.

17 Q.    You also said that those drugs were commercially available,

18 right?

19 A.    To the best of my knowledge at that time, yes.

20 Q.    Okay.  Again, you also opined to the Arkansas state court

21 that opioid analgesics, and specifically a massive overdose of

22 either fentanyl, fentanyl transdermal patches would be an

23 appropriate method of execution in Arkansas.

24 A.    Yes.  At that time I was particularly moved by the number

25 of opioid overdose deaths in Oklahoma, and I'm sure it occurs in

1   Arkansas as well, and was quite active with the community in

2   working on that.  And so I found it very ironic in a sense that

3   all these issues about lethal injection when yet every day

4   thousands of people are dying from opioid overdose.  So I think

5   that's reflected in this particular section.

6   Q.   And I understand -- I think we are well aware of the opioid

7   problem we have in this country.  But tell me, Doctor, how is it

8   that someone overdoses and dies from an overdose of an opioid?

9   Can you explain that?

10  A.   Yes.  Opioid overdoses -- opioid receptors are present in

11  certain areas of the brain that control respiration, control

12  cardiorespiratory systems, if you will, and because there's

13  receptors there, if you have too much drug on board, too much

14  opioids, like OxyContin, fentanyl, morphine, they can actually

15  inhibit the firing of those neurons that drive respiration that

16  we do unconsciously, of course.  We breathe all the time.  So,

17  basically, respiratory depression seems to be the maim mechanism

18  of opioid overdose death.

19  Q.   So for us laypeople, when they literally stop breathing,

20  they don't want to breathe, they just stop breathing?

21  A.   The neurons in the brainstem that control that get

22  inhibited by the opioid drug so that they don't fire, so that

23  doesn't drive the mechanisms to breathe, correct.

24  Q.   Okay.  So they simply stop breathing and they die.  Are

25  folks that pass away from an opioid overdose, are they

1  experiencing severe pain during that process when they stop

2  breathing?

3  A.    Well, I'm not sure as far as -- you know, I don't think

4  I've read studies, like, where people were, like, saved after

5  they had severe respiratory depression.  I don't know of any

6  personal reports of that.  But opioids in many individuals are

7  known to produce euphoria, which is why they're abused to a

8  large extent, and definitely lack of pain, an analgesia, which

9  is why they're used clinically.  So in that sense it would seem

10 that it could be relatively painless.  Other people have nausea

11 or vomiting, so it's hard to say for sure.

12 Q.    Okay.  So there's no scientific data to show that a person

13 who passes away from lack of breathing from an opioid overdose

14 is suffering any kind of severe pain or conscious awareness of

15 that at that moment, right?

16 A.    Actually, I'm not sure about that, but I've not done the

17 research to actually look at that particular issue.

18 Q.    Well, didn't you -- you told the Arkansas court that

19 FDA-approved opioid injectables and transdermal fentanyl patches

20 are commercially available and a massive overdose of such drugs

21 would produce a rapid and painless death, right?

22 A.    Correct.  I mean, I was -- in this context, the doses would

23 be higher, controlled, yes, I agree.  I thought we were talking

24 about more of the opiate overdose in the community context.

25 Q.    In fairness, I was asking that.  But in terms of lethal

1    injection or judicial execution, with a high enough dose, you

2    believe it would result in a rapid and painless death?

3    A.    I think it could, yes.

4    Q.    And the manner and mode of death -- forgive me, but I'm not

5    a scientist or doctor, I'm a lawyer, as my colleague said --

6    they would stop breathing and die?

7    A.    I'm sorry.  I missed that.

8    Q.    They would stop breathing and die from a massive overdose

9    of an opioid, right?

10   A.    Yes.

11   Q.    And the lack of breathing would cause the body to shut down

12   and eventually die?

13   A.    Among other things.

14   Q.    Among other things, sure.  Okay.  You talked about

15   pharmaceutical, or pharmacological substitution of drugs in your

16   direct examination, and I just want to make sure that we're on

17   the same page about something.  You also devote a lot of your

18   report talking about the difference between benzodiazepines and

19   barbiturates, and you give this opinion about the

20   pharmacological substitution is only a legitimate method to

21   provide equal pharmacological effects when one drug may no

22   longer be available, and then you talk about the pancuronium,

23   vecuronium, different types of the same drug.  Is that fair?

24   A.    Right.  Different drugs of the same class type.

25   Q.    Thank you, Doctor.  Now, are you aware in Arkansas, there's

1   no requirement that -- we're under the Eighth Amendment -- that

2   the state use a pharmacological equivalent?  The purpose here is

3   to carry out a judicial death sentence, right?

4   A.   Yes, as far as I know.

5   Q.   Okay.  And the law in Arkansas provides two methods of

6   execution.  Are you aware of that?

7   A.   I guess not as much as the nondrug one, if there is one.

8   I'm not sure.

9   Q.   It's two lethal drug options.  So lethal injection is the

10  method of death in Arkansas, and we can either use a barbiturate

11  or we can use the three-drug midazolam protocol that the U.S.

12  Supreme Court upheld in *Glossip* and used in other jurisdictions.

13  Are you aware of that?

14  A.   Okay.  Yes.

15  Q.   So barbiturate is one option, right?

16  A.   Okay.

17  Q.   And then we have the midazolam option.  So the state

18  doesn't have to make a determination about pharmacological

19  substitution or equivalence, does it, in that regard?  They have

20  one of two choices.

21  A.   Well, it's not exactly a comparison between the one and two

22  choices, because on one choice you have a single drug, a

23  barbiturate, and the other one is a three-drug protocol with the

24  benzodiazepine.  So you're not comparing directly a barbiturate

25  to be benzodiazepine in a three-drug protocol, for example.

1   Q.   Sure, and I'm not attempting to compare the two.  I'm

2   saying, as a matter of law, the Arkansas Department of

3   Correction only has two options for its lethal injection drug

4   protocol.  Okay?  One is a barbiturate, one is a three-drug

5   midazolam protocol.  And the statute says ADC can pick one based

6   on availability of the drugs.  Is it your understanding that the

7   ADC went with the midazolam protocol because they were unable to

8   obtain a barbiturate?

9   A.   That is a little bit beyond my knowledge, as far as what

10  the ADC decided and why.  I don't really know that.

11  Q.   Okay.  Very good.  On page -- bottom of page 35 of your

12  2015 report, you again are giving opinions about general

13  anesthesia, midazolam not being able to induce that.  You also

14  talk about the consciousness check, right, and why you don't

15  feel like that provides sufficient protection?  Is that right?

16  A.   I mention it right there, correct.

17  Q.   Okay.  We'll talk about that later.  Okay.  I think we've

18  really gone over what I need to on this report.

19          MS. MERRITT:  State moves to admit Defendants'

20  Exhibit 30, Your Honor.

21          THE COURT:  Any objection?

22          MR. WILLIAMS:  No objection.

23          THE COURT:  Defendants' Exhibit 30 is admitted.

24      (Defendants' Exhibit 30 received in evidence.)

25  BY MS. MERRITT:

1    Q.    Just so we're clear, you understand that Defendants'

2    Exhibit 30 was submitted to the Pulaski County court in support

3    of the prisoners' motion for summary judgment on their midazolam

4    claim?

5    A.    As far as the whole legal part of it, I, unfortunately,

6    don't remember the exact --

7    Q.    Maybe that's better for you.

8    A.    Well, I'm a pharmacologist, not a lawyer, even though I

9    want to be one.  Just kidding.

10   Q.    You do know it was provided to the Court in support of the

11   midazolam claim that the prisoners asserted in the state court

12   action in 2015, right?

13   A.    I do know that.  I emailed it to Josh Lee, and I'm not

14   always clear what happens after that.

15   Q.    Okay.  Would you agree with me -- I'm showing you the first

16   page of Exhibit 30.  Here, in the upper right-hand corner, it

17   says electronically filed, Pulaski County Circuit Court, filed

18   on September 28, 2015.  Does that appear to be what that shows?

19   A.    Yes.  That's nice, and I wish the lawyers would actually

20   send me those kind of things because then I would be more aware.

21   But I never got that in that case.

22   Q.    Okay.  Next we're going to talk about Defendants'

23   Exhibit 31.  Would you please identify Defendants' Exhibit 31

24   for the record, Doctor?

25   A.    Yes.  This is titled, "Response to Materials Submitted by

1    the State of Arkansas," and that was on November 9, 2015, which
2    I prepared and sent to Josh Lee.
3    Q.    How did this report come about?
4    A.    It was like any report, from a request and a letter of
5    engagement from a lawyer, in this case, Josh Lee.
6    Q.    What did Josh Lee ask you to do?
7    A.    He asked me to respond to materials submitted by the State
8    of Arkansas.
9    Q.    Materials submitted by the State of Arkansas to support its
10   summary judgment motion on the midazolam claim?
11   A.    Again, that's beyond my pay grade.  I think if we look at
12   it, it will actually say probably what he gave to me.
13   Q.    Fair enough.  Let's do that.  Okay.  Can you just briefly
14   summarize for the Court the materials that you reviewed in
15   connection with this supplemental report?
16   A.    Yes.  A number of files were attached to emails to me as
17   PDFs, including what's highlighted there in yellow.  Dr. Mark
18   Heath, Dr. Mark Dershwitz, another thing from Dershwitz, an
19   affidavit from Dr. Buffington, an excerpt of the state's brief,
20   article by Liu, et al, 1996, and a copy of the -- a redacted
21   copy of the midazolam label.
22   Q.    Okay.  So is it your understanding that Mr. Lee was sending
23   to you a number of exhibits that the state had provided to the
24   Pulaski County Circuit Court in support of the state's position
25   on the midazolam claim and you were asked to respond to that

1    particular evidence?  Is that fair?

2    A.    That's fair to say.

3    Q.    Okay.  And so part of what you looked at and what you were

4    responding to at that time was testimony of Mark Heath, Dr. Mark

5    Dershwitz, from other cases.  Is that fair?

6    A.    That's my understanding.

7    Q.    And what's your understanding about who Dr. Mark Heath is?

8    A.    He's an expert, or was an expert, or still is, I'm not

9    sure, that was involved in a number of cases.  As far as

10   background, don't really know, you know, much about him.

11   Q.    Is he an anesthesiologist?

12   A.    I'm sorry.  Yes, he's an anesthesiologist.  It looks like

13   at that time he was in New York.  But I've never met the

14   gentleman, I've never --

15   Q.    Okay.  Looks like he's given opinions or testimony in

16   Florida litigation.  Is that fair?

17   A.    I believe so.

18   Q.    And he testifies for the prisoners, right?

19   A.    I believe so.

20   Q.    Okay.  And then who is Dr. Mark Dershwitz?

21   A.    Again, right now, just a name to me.  Before this report,

22   I'd not heard of him, researched him or even Googled him.  So

23   I'm not sure of his background.

24   Q.    I'm sorry.  Is he an anesthesiologist too?

25   A.    Well, we could scroll down and see, perhaps.  But off the

 1   top of my head, I believe he is an anesthesiologist, but he may
 2   have other degrees as well.  I think one of them is also a Ph.D.
 3   in pharmacology.  I don't know if that was him or Dr. Heath.
 4   Q.   Okay.  I'm going to go grab my exhibit notebook and I'm
 5   going to show you those transcripts, and I'm going to show you
 6   some transcripts and I'm going to see if those are the ones you
 7   looked at in connection with your supplemental report.  Okay?
 8   A.   Okay.
 9            MS. MERRITT:  May I approach the witness, Your Honor?
10            THE COURT:  You may.
11   BY MS. MERRITT:
12   Q.   Okay.  Again, sorry for the proximity here.
13   A.   I don't mind.
14   Q.   All right.  So we're looking at the defendants' exhibit
15   binder.
16   A.   Correct.
17   Q.   And Exhibit 8 is a transcript from a criminal case in the
18   State of Florida, *State of Florida v. Robert Henry*, and it is
19   dated March 10, 2014.  Is that right?
20   A.   Yes --
21   Q.   Can you confirm that's what Exhibit 8 is?
22   A.   Yes, that's correct.
23   Q.   And did you review this exhibit in connection with your
24   supplemental report in Arkansas?
25   A.   I believe so.

1    Q.    Okay.  Let's look at Defendants' Exhibit 9, please, sir.

2    It is a transcript of an evidentiary hearing, again in Florida,

3    in the *Howell* matter.  Is that right?

4    A.    That's what it says here, yes.

5    Q.    And did you review a transcript of the evidentiary hearing

6    in the Florida *Howell* matter in connection with your 2015

7    supplemental report in Arkansas state court?

8    A.    Yes, but I don't know, like, if a lot of things would be

9    referenced that way and this is the exact thing that I saw.  I

10   mean, I don't have it with me now.

11   Q.    Okay.

12   A.    So I'm just saying it says it there, the case number, and

13   that lines up with what I've written here, but I don't know if

14   that's the exact document I saw.

15   Q.    Okay.  I understand and appreciate where you're coming

16   from.  It does show -- Defendants' Exhibit 9 does show an

17   electronic file mark from Pulaski County Circuit Court, right?

18   A.    Yes.

19   Q.    And so it looks like this 40-page-long document was an

20   exhibit that was provided to the state court by the State of

21   Arkansas, right?

22   A.    Correct.

23   Q.    And so if you want to count the pages, it is the same

24   exhibit, I mean -- does it appear to be the same?

25   A.    Yes, it appears to.

1   Q.   Okay.  Now, the last thing I want to show you is

2   Defendants' Exhibit 11.  This is another transcript in the

3   *Knight* matter.  And this is Dr. Mark Heath's testimony.  Does it

4   appear that this is the same transcript that you would have

5   reviewed in connection with your 2015 supplemental report in

6   Arkansas?

7   A.   As far as I know.

8   Q.   Okay.

9           MS. MERRITT:  Your Honor, the state moves to admit

10  Defendants' Exhibits 9, 10, and 11.

11          THE COURT:  Any objection?

12          MR. WILLIAMS:  Yes, we do object.  We don't object to

13  him being questioned about these, obviously, but under 703,

14  these are not -- this isn't material that he relied upon to form

15  an opinion.  He in fact rejected this material.  He reviewed it

16  and rejected the opinion, so he didn't rely upon it to form his

17  own opinion.  And I'd just add to that, it's stale anyway.

18          THE COURT:  All right.

19          MS. MERRITT:  If I could respond, Your Honor?  He

20  directly reviewed in response to this particular material in his

21  supplemental report, and I think it is important to establish

22  his foundation for his opinions in Defendants' Exhibit 31.

23          THE COURT:  Given my rulings on these issues in regard

24  to stuff I've let in, I'm just going to go ahead and overrule

25  the objection and let these in.  At this stage of the

Stevens - Cross                                    295

1    proceeding, it is being tried to me with evidentiary standards

2    that we've discussed that are appropriate at the preliminary

3    injunction phase, so I will assess them in accordance with that.

4    You can go ahead.

5              MS. MERRITT:  Thank you, Your Honor.

6    BY MS. MERRITT:

7    Q.   And so I'm not going to go into great detail on Defendants'

8    Exhibit 31, but I wanted to show the Court that in connection

9    with the state court case, you were offering rebuttal opinions

10   about anesthesiology issues and their opinions about the

11   efficacy of midazolam, right?

12   A.   I was offering a pharmacological opinion, correct.

13   Q.   So you offered a response to Dr. Mark Heath's testimony,

14   right?

15   A.   Yes.

16   Q.   And then you responded to Dr. Mark Dershwitz's

17   February 2014 testimony?

18   A.   Yes, I did.

19   Q.   And you were rebutting Dr. Mark Dershwitz's opinions,

20   right?

21   A.   For all three of those, there are certain aspects and

22   issues that I brought up, so it was kind of parsed out in

23   different issues.

24   Q.   Okay.  And then in the supplemental report filed in the

25   Pulaski County Circuit Court case in the fall of 2015, you also

1  provided a rebuttal response to Dr. Daniel E. Buffington's

2  affidavit, correct?

3  A.   That's correct.

4  Q.   Let's briefly look at page 14 of the supplemental report

5  from 2015.  It appears to me that you're providing a very

6  detailed -- we'll continue on here -- response to some of the

7  state's legal arguments that were made in their summary judgment

8  papers.  Is that fair?

9  A.   Well, I guess you'd have to define what a detailed legal,

10  whatever you said.  I mean, I'm not -- those aren't terms that

11  I'm as familiar with as you are.

12  Q.   Okay.  Well, you provided it looks like, let's see

13  paragraph 6.1, 2, 3, 4, that are all on page 14 of your report,

14  paragraphs 6.5, 6.6, 6.7, 6.8, 6.9, goes through page 15,

15  talking about rebutting different arguments that the state made

16  in their brief.  Fair enough?

17  A.   Right, based on pharmacology, not legal arguments.  I think

18  you said legal.

19  Q.   Sure.  And so essentially you concluded that your review of

20  the previous expert testimony by Drs. Heath and Dershwitz, the

21  affidavit by Dr. Buffington, as well as the state's brief, do

22  not alter the conclusions reached in my report.  Correct?

23  A.   That's correct.

24  Q.   And so did we point out to you at that time that we didn't

25  think your 20-milligram ceiling calculation could possibly be

1    right?  Did the state argue that in their brief?

2    A.    Did you say Mr. Lee in the beginning there?

3    Q.    Did the state argue to the Pulaski County Circuit Court

4    that your opinion about the ceiling effect or ceiling dose of

5    midazolam was unreliable and should not be relied upon because

6    the 20-milligram dose that you opined was the ceiling was less

7    than the dosages that were reported in some of the very

8    references that you cited in your report?  Do you recall that?

9    A.    I didn't testify.  I just submitted that report.  So I

10   didn't get anything back directly to me from what happened at

11   that trial.  So I don't know.

12   Q.    Okay.  Let's refresh your memory, I think, on this.  On

13   paragraph 6.5, can you read that for the Court?

14   A.    At the top, 6.5?

15   Q.    Paragraph 6.5, at the top of the page.

16   A.    "The state writes on the bottom of page 61 that

17   'Dr. Stevens' methodology has no general acceptance in the

18   scientific community and is so unreliable that it cannot be

19   considered in this case.'  This is incorrect as my report is

20   well-referenced and relies on peer-reviewed publications.  Each

21   step in my methodology is supported by data from the

22   pharmacological literature."

23   Q.    Okay.  So does this refresh your recollection that the

24   state did point out what we perceived to be an obvious error in

25   your ceiling dose calculation?

Stevens - Cross

1   A.   No.  I mean, that's the excerpt from the state brief that I

2   reviewed for this particular document.  I thought you were

3   talking about some trial -- something came out during trial,

4   which I didn't testify.

5        Now, right there, they were talking about my general

6   methodology, going from in vitro all the way to, you know, brain

7   concentrations in humans, I think is what they were talking

8   about.  But to be clear, why I wrote 6.5, I would have to read

9   the state's brief again to see what exactly I was responding to

10  there.

11  Q.   That's fair enough.  I think maybe we can get there if you

12  look at paragraph 6.8.  Can you read that for the Court?

13  A.   Okay.

14  Q.   Can you read it for the Court, please?

15  A.   Sure.  "6.8:  The state criticizes the conclusions in my

16  report concerning the threshold dose of 20 milligrams IV

17  midazolam to reach a ceiling effect (page 65).  They write, 'If

18  Dr. Stevens had reached an honest conclusion based on his own

19  observation of the doses that are actually used in the clinical

20  setting, namely, the fact that clinicians sometimes use doses of

21  midazolam that are a hundred percent more than 20 milligrams for

22  the purpose of achieving full-blown anesthesia, he could not

23  have reached his no greater pharmacological effect conclusion at

24  the top of page 27.'"

25  Q.   You can stop.  We were arguing to the court the foundation

1    for your opinion about the 20-milligram ceiling dose of

2    midazolam should not be relied upon, should be rejected under

3    *Daubert*.  Is that your understanding then in what you were

4    responding to in this supplemental report?

5    A.   Right.  But you were saying that you could achieve

6    full-blown anesthesia, which I disagree.

7    Q.   I understand that.  I'm asking specifically about our

8    challenge in the state court with regard to your ceiling dose

9    calculation.  We did litigate that issue in the state court,

10   right?

11   A.   Okay, yes.

12   Q.   Okay.  Now, since that time you admitted you've discovered

13   an error.  How did that happen?  How did you figure out that the

14   20-milligram dose that you had told the Arkansas court

15   repeatedly about was wrong?

16   A.   Right.

17   Q.   How did you reach that conclusion?

18   A.   That was in consultation, I believe, with Josh Lee, but I'm

19   not a hundred percent sure.  It's two years ago and I don't

20   remember exactly how it came out.

21            MS. MERRITT:  And the state moves to admit Defendants'

22   Exhibit 31.  I don't believe I moved for admission on that one.

23            THE COURT:  You did not.

24       Is there any objection to Defendants' Exhibit 31?

25            MR. WILLIAMS:  No objection.

1            THE COURT:  That will be admitted.

2        (Defendants' Exhibit 31 received in evidence.)

3            MS. MERRITT:  Thank you.

4    BY MS. MERRITT:

5    Q.    Did Dr. Antognini testify about the error in your

6    calculation in connection with another case?

7    A.    Yes, I heard him say that, I believe, in Ohio, I believe.

8    Q.    What is your understanding about the outcome of the state

9    court case in connection with you had offered these previous

10   opinions?

11   A.    Well, I guess the fact that we're here means that it wasn't

12   successful for the plaintiffs, or the inmates, rather.  Not

13   plaintiffs.

14   Q.    What did the FPD lawyers tell you what happened?  Did you

15   know their claim had been dismissed?

16   A.    I guess I did not.  They might have said it, but I did not

17   retain legal information, or I didn't understand it, perhaps.

18   It's quite confusing sometimes.

19            MR. WILLIAMS:  I just object insofar she's making

20   legal conclusions and putting them into his mouth.

21            THE COURT:  You can explore this, but, you know, I

22   think it's beyond the scope of what he can testify to.  But

23   you're welcome to explore it and you can use your time however

24   you want.

25            MS. MERRITT:  Okay.

1  BY MS. MERRITT:

2  Q.   Is it your understanding that the state court case is now

3  over?

4  A.   I did not know that or have no knowledge of that.

5          MR. WILLIAMS:  Same objection.

6  BY MS. MERRITT:

7  Q.   Well, what I'm asking is, have you been retained in

8  connection with the state court case?  Are you still an expert

9  in that matter, to your understanding?

10 A.   That is almost a philosophical question.  When is an expert

11 not an expert any longer?  I cannot answer that.  There's been

12 many cases I thought I was done and then I get a phone call.  So

13 that's a good question, and I've struggled with that.  And so in

14 this case, all I know is that we're in federal court now.

15 Q.   Okay.

16 A.   And what happens in state court, if anything will ever

17 happen with me again in that venue, I have no idea.

18 Q.   Okay.  Fair enough.  Let's talk about how you did get

19 involved in this particular case in federal court.  Who

20 contacted you and told you about this case?

21 A.   Mr. John Williams.

22 Q.   And what did he tell you about this new federal court

23 lawsuit?

24 A.   I guess detail-wise, legal-wise, if he told me anything, I

25 don't retain or remember exactly what the deal was.  Basically,

Stevens - Cross

1    we needed to submit a report to the federal court was the first

2    order of business, I believe.

3    Q.    Okay.   And so he asked you to submit a report to the

4    federal court again about the efficacy of the state's three-drug

5    midazolam protocol for use in lethal injection executions,

6    right?

7    A.    To the best of my knowledge, that's the gist of it, yes.

8    Q.    Okay.   And you did in fact produce a new litigation report

9    that has already been admitted in evidence as Plaintiffs'

10   Exhibit 16, right?

11   A.    Yes.   If you're referring to the March 21, 2017, report,

12   that's correct.

13   Q.    I apologize.   I'm getting my papers organized.   I think

14   it's easier to leave this in the notebook.   Okay.   This is my

15   copy of the Plaintiffs' Exhibit 16.   Does this appear to be the

16   report that you have submitted in this case?

17   A.    Yes, it does.

18   Q.    And what's the date on that one?

19   A.    This is dated March 21, 2017.

20   Q.    Okay.   Page 2 of Plaintiffs' Exhibit 16, again, kind of a

21   table of contents for the current report, right?

22   A.    That's correct.

23   Q.    And is it fair to -- and I'm trying to kind of move it

24   along.   Is it fair to say the topics of this current report are

25   similar to the topics in the 2015 litigation report that was

1    submitted in connection with the state court matter?

2    A.    Yes, there were some changes made, but some of the basic

3    foundation is the same structure.

4    Q.    Okay.  Page 3 of your report says, "Before submitting this

5    amended report, I reviewed the Arkansas Supreme Court's opinion

6    in *Kelley v. Johnson*, 2016, Arkansas 268, and portions of the

7    briefing in that case."

8          Right?

9    A.    Correct.

10   Q.    And so again you expressly amended your report in response

11   to the Arkansas Supreme Court's opinion, right?

12   A.    In response to Mr. Williams, and he did send along that.

13   Did I read it all and understand it all?  No, probably not.

14   Q.    Did you get a sense that the Arkansas Supreme Court relied

15   upon the opinions in the 2015 report?  I'm sorry.  That's not a

16   very good question.  What is your understanding about whether

17   the Arkansas Supreme Court found your opinions as a valid basis

18   to support the prisoners' midazolam claim?

19   A.    I'm not sure what the Supreme Court actually used for their

20   findings in that regard.

21   Q.    Okay.  Do you know whether the state Supreme Court reviewed

22   your testimony and evidence about the alleged commercial

23   availability of the alternative execution drugs that you

24   identified in the 2015 report?

25   A.    Again, you're asking me to be a little bit more of like a

1   lawyer that would read these briefs in detail and all that, and

2   as a pharmacologist, I probably did read it a lot.  I probably

3   didn't retain because it did not have to do with, per se, my

4   field.  So I'm not sure what the opinions were based on or if

5   they actually looked at the commercial availability.  I could

6   review it again and I might retain it for the next half hour and

7   could tell you, but at this point, sitting here, I'm not sure

8   exactly what their findings were based on.

9   Q.   Okay.  And that's not going to be necessary.  I'm just

10  trying to get a sense of when you were retained in this case,

11  were you -- was it your understanding that you were trying to

12  address some of the deficiencies that the Arkansas Supreme Court

13  had found in the *Johnson* case?

14  A.   I guess it wasn't presented to me, or if it was, I don't

15  remember it that well, like particularly that particular reason.

16  For me, it was more based on the pharmacology and, you know,

17  just revamped to submit it to the federal court, if you will.  I

18  mean, it wasn't -- maybe Mr. Williams did explain that to me at

19  one time, more in detail, but I might not have retained that.

20  Q.   As best I can tell, the 2017 report seems to make two major

21  changes from 2015, and I'll see if you can agree with me on

22  that.  First, you did correct the mistake in the calculation of

23  what you allege to be the ceiling dose of midazolam.  That

24  changed your opinion about that ceiling dose from 20 milligrams

25  to 228 milligrams.  Is that right?

1  A.    Right.  Because it was a ten-fold error, basically.

2  Q.    And then basically you changed up some of your

3  recommendations about available alternatives that you thought

4  might be available to the ADC to use in executions instead of

5  midazolam, right?

6  A.    That may be.  I have not done a side by side, you know, at

7  this point.

8  Q.    Okay.  Let's look at page 10 of the 2017 current report,

9  Plaintiffs' Exhibit 16.  Actually, before we get there, page 8,

10  real quick.  You talked about this chart with Mr. Williams.

11  This does show that benzodiazepines, including midazolam, reach

12  a level of anesthesia, correct?

13  A.    It shows going up towards anesthesia, I agree.  I mean,

14  it's a conceptual graph, so it's not meant to really be accurate

15  as far as what the total effect on the Y curve is.

16  Q.    Okay.  And then -- can you read for the Court the

17  highlighted section there, the explanation of Figure 1?

18  A.    Yes.  "As the dose of benzodiazepine increases, a plateau,"

19  parentheses, "(ceiling) is reached before a reliable general

20  anesthesia is obtained."

21  Q.    Okay.  Now, I am going to show you a book.  Do you

22  recognize this book?

23  A.    I do.  And thank you for buying it.  You just increased my

24  royalty by 75 cents.

25  Q.    Awesome.  I'm glad to do it.  This has been very useful to

1    me in the last few years.  I appreciate it.

2    A.    I'm glad it was helpful.

3    Q.    Can you identify this for the record, please?

4    A.    Yes.  It's called "Pharmacology," a rather unimaginative

5    title.  And it is by George M. Brenner, who initially got the

6    contract a long time ago.  He was the previous chair of my

7    department.  Now he is professor emeritus, basically retired.

8    And then I'm listed as second author, Craig W. Stevens, Fourth

9    Edition.

10   Q.    Okay.  Looks like we got it in December 2015.  I just want

11   to show you a chart that looks to me like it's the same.  Let's

12   go back again to Plaintiffs' Exhibit 16, page 8, with this

13   figure, you say what's kind of a crude, I guess, representation

14   of what effects barbiturates would have versus benzodiazepines,

15   correct?

16   A.    Correct.

17   Q.    And so in the litigation report that you've submitted to

18   the Court, you say that a ceiling or plateau is reached before

19   reliable general anesthesia is obtained, right?

20   A.    That's correct.

21   Q.    From a benzodiazepine like midazolam?

22   A.    Correct.

23   Q.    You said this was a basic textbook drawing, right?

24   A.    Correct.

25   Q.    So this is that same textbook drawing?

1    A.    Yes, it's similar.

2    Q.    You mean --

3    A.    I mean it's -- the one in my book was -- I mean, the one in

4    my report that I submitted to this Court is not an exact

5    duplicate of the textbook one just because I didn't want to get

6    into rights or anything like that.  I thought I would just mock

7    it up.  It's different but similar.

8    Q.    It is not identical, but it shows the same information.  Is

9    that fair?

10   A.    That's a good way to put it.

11   Q.    Okay.  Very good.  Now, the explanation in the book is

12   different than the explanation that you give in your litigation

13   report, Dr. Stevens.  So I think it's a really important point.

14   What it says as an explanation under the figure in your textbook

15   is that, "Benzodiazepines exhibit a ceiling effect, which

16   precludes severe CNS depression after oral administration of

17   these drugs."

18        Right?

19   A.    That's correct.

20   Q.    It goes on to say, "Intravenous administration of

21   benzodiazepines can produce anesthesia and mild respiratory

22   depression."

23        Right?

24   A.    That's correct.

25   Q.    All right.  You didn't say that in your litigation report.

1   A.   I actually didn't say it in the book either.  That was

2   something written by my co-author.  And we can address more the

3   terms of using anesthesia versus using general anesthesia.

4   Q.   I just want to confirm for the Court that the textbook is

5   not the same quite in the way that you explain the data.

6   A.   It's not the same because it's serving different purposes,

7   correct.

8   Q.   Okay.  Let's look at page 10 of Plaintiffs' Exhibit 16,

9   and, again, we looked at this in some detail on direct.  There's

10  one important point.  Let me see if I can zoom.  So this is a

11  chart of a "Continuum of Depth of Sedation:  Definition of

12  General Anesthesia and Levels of Sedation/Analgesia," prepared

13  by the American Society of Anesthesiologists, right?

14  A.   Correct.

15  Q.   And the American Academy of Anesthesiologists describes a

16  state of deep sedation as the equivalent of analgesia.  Am I

17  saying that right?

18  A.   Analgesia is good.  You said American Academy.  It is the

19  American Society of Anesthesiologists.

20  Q.   Thank you.  So it equates deep sedation/analgesia as the

21  same thing?

22  A.   Looking at two different factors, but it does group them

23  into the third category, that's correct.

24  Q.   Okay.  And what this says, in terms of the level of a

25  response that one might expect a patient to see when under deep

```
 1    sedation or analgesia, is a purposeful response following
 2    repeated or painful stimulation, right?
 3    A.    Correct.
 4    Q.    So if a person purposefully responds to a painful stimulus,
 5    that would indicate that the person was in a level of deep
 6    sedation or analgesia, but not general anesthesia, according to
 7    the American Society of Anesthesiologists.  Fair?
 8    A.    That's my reading of it.
 9    Q.    Okay.  And it also says that even under a deep
10    sedation/analgesia state, in regards to the airway of the
11    patient, it does say intervention may be required, as well as
12    saying that spontaneous ventilation may be inadequate even under
13    a level of deep sedation and analgesia and not general
14    anesthesia.  Fair?
15    A.    That's what it says, correct.
16    Q.    And so what that means is, if a patient is deeply sedated
17    and in this analgesic state, that they still might stop
18    breathing.  Is that right?
19    A.    That has more to do with the practice of anesthesiology, so
20    I'm probably not the best person to ask that question.
21    Q.    Well, that's what -- I'm just trying to translate into
22    layman's terms what this chart says.  And you're using this in
23    your report, right?
24    A.    Correct.  And I think I used it to show the category of
25    general anesthesia.  As far as your question, you know, would a
```

1   person stop breathing under the third level, that's more of a

2   clinical judgment question.  So that's not how I used the chart.

3   Q.   So it does say "spontaneous ventilation."  That just means

4   breathing on one's own?

5   A.   Correct.

6   Q.   It says, "Spontaneous ventilation may be inadequate under

7   deep sedation/analgesia."  That's what the chart says.

8   A.   Correct.

9   Q.   All right.  One more point on this.  It talks about reflex

10  withdrawal, and I think that's something the anesthesiologists

11  will talk more about.  But this chart from the American Society

12  of Anesthesiologists -- and I'm sorry.  My --

13  A.   Yeah.

14  Q.   There's a little -- there are two stars up here when

15  they're talking about purposeful response following repeated or

16  painful stimulation, that shows that a patient is in a deep --

17  deeply sedated state but not a general anesthetic state.  And

18  what I'm interested in is this reflex withdrawal issue, right?

19  So the American Society of Anesthesiologists have explained that

20  a reflex withdrawal from a painful stimulus is not, in all caps,

21  considered a purposeful response, right?

22  A.   Correct.

23  Q.   Okay.  Do you know what a reflex withdrawal is?

24  A.   Not as well as a neurologist would know.  From my early,

25  early work on animal studies at Mayo using rats, we tended to

1   think of a reflex withdrawal as something that did not involve

2   the brain.  So just a simple spinal cord reflex, for example.

3   But I'm not sure that's --

4   Q.   Are you aware -- and I don't know the name of the study,

5   but there's a study about frogs, where they were testing a

6   frog's reflex withdrawal and they actually disconnected the

7   brain from the body and the frog would still swat at the painful

8   stimulus.  Are you aware of that study?

9   A.   Yes, I've actually cited that study early on, when I did

10  some research like that.

11  Q.   And so doesn't that show that when there is a reflex

12  withdrawal to a painful stimulus, that that movement is coming

13  from somewhere other than the brain, that's what that frog study

14  shows, right?

15  A.   Well, in that study, they took the needle and pithed --

16  it's called pithing.  They scraped all the brain out and

17  everything.  And in that study, yes.  In humans, again, probably

18  a neurologist needs to talk about that.

19  Q.   Sure.  But at least in frogs, they had no brain and the

20  frog could still move in response to a painful stimulus, right?

21  A.   In that particular instance, yes.

22  Q.   Okay.  Can midazolam be used to induce a state of general

23  anesthesia?

24  A.   I've never seen it phrased "induce a state of general

25  anesthesia."  Usually I've seen it indicated for induction of

Stevens - Cross

1    anesthesia.

2    Q.    So is the answer I don't know or --

3    A.    The answer is, we have to be very careful when we talk

4    about anesthesia versus general anesthesia.

5    Q.    And you're not an anesthesiologist, so you wouldn't be the

6    best equipped person probably to talk about the difference in

7    those two things.  Would you agree with that?

8    A.    I would agree that I could just talk about what the FDA

9    indicates for midazolam.

10   Q.    Okay.  And let's look at what the FDA says about midazolam

11   and whether it can be used to induce anesthesia.  I'm going to

12   show you what we have marked with a better sticker Defendants'

13   Exhibit 6.  Do you recognize this document, Dr. Stevens?

14   A.    Yes.  It's -- it looks like the label from midazolam

15   injection preparation, and it might be from Aspira, could be

16   from Pfizer.  It will say at the bottom.  But, yes, I recognize

17   it.  It looks like a typical FDA label.

18   Q.    Is this part at the top here, is that what we call a black

19   box warning?

20   A.    That is the infamous black box.

21   Q.    Why do we have black box warnings?

22   A.    Black boxes, some pretty bad, and they can be.  They're

23   supposedly put up front to give the physician a little extra

24   attention to that area.  I've never done a study of how many

25   black boxes exist.  They seem more common now than they used to

Stevens - Cross                                                     313

1   be, and that just may be a movement within the FDA to call more

2   attention to problems that are known to occur.  But it's not

3   uncommon for a drug to have a black box.

4   Q.   Is the intention there to make sure you get the doctor's

5   attention about potential side effects of a drug that could

6   cause death or serious bodily injury, that kind of thing?

7   A.   It would be for that.  It could be just for certain adverse

8   effects, allergies.  It could be a number of severe anaphylactic

9   reactions to certain drugs, which would be like an allergy.  So,

10  yes, it is not necessarily just death, but it's definitely

11  something that's an elevated level of warning.

12  Q.   Okay.  So what the black box warning for midazolam says is

13  that, "Intravenous midazolam has been associated with

14  respiratory depression and respiratory arrest, especially when

15  used for sedation in noncritical care settings."  Right?

16  A.   Correct.

17  Q.   And we are using IV midazolam in Arkansas lethal injection

18  protocol, right?

19  A.   Correct.

20  Q.   It says, "In some cases, where this was not recognized

21  promptly and treated effectively, death or hypoxic

22  encephalopathy has resulted," right?

23  A.   That's correct, that's what it says.

24  Q.   So the FDA -- and tell me, what is the FDA's involvement in

25  approving this package insert?

1  A.   It seems -- I'm not exactly sure.  I know the manufacturer

2  kind of starts the process by submitting a proposed package

3  insert, and then it seems like there might be some

4  conversations, give-and-take, back and forth, but eventually FDA

5  agrees and approves the one that, you know, is marketed with the

6  drug.

7  Q.   And in fact, doesn't the FDA require a warning when a drug,

8  if not managed or treated properly, could cause a patient's

9  death?

10 A.   As far as how the black box comes about, usually there will

11 be FDA letters to healthcare where they send it out to all the

12 doctors that have a DEA license or number, something like that,

13 database.  And so it might do a few iterations of that and

14 eventually the label may change.  So that part I'm not sure

15 exactly the total process.  So it may start with just a warning

16 letter to doctors before a black box label, for example.

17 Q.   But the FDA reviewed and approved this language?

18 A.   As far as I know, they were involved with that, correct.

19 Q.   Okay.  Now, the manufacturer of midazolam goes on to say

20 and highlighted in yellow:  "Continuous monitoring of

21 respiratory and cardiac function is required when using

22 intravenous midazolam.  It should only be used in hospital

23 settings for that reason."  Right?

24 A.   It says that.

25 Q.   That's because in a hospital setting or otherwise, if you

Stevens - Cross

1  were to use intravenous midazolam without continuous monitoring

2  of respiratory and cardiac function, the patient could simply

3  stop breathing and die, right?

4  A.   Well, I think that would be rare, but you do want to be

5  ready for the rare case in a hospital.  But to say that a

6  patient without the monitoring would die, that's not true.  The

7  monitoring just helps alarm you to if there are problems.

8  Q.   It could happen, and that's why the FDA requires this

9  warning about the risk of death from overdose of midazolam,

10  right?

11  A.   Right.  But then it's a little misleading, here it says, go

12  on and see warnings, go on and see dosage administration, and

13  then further on, if you read, they'll talk about most likely in

14  the presence of CNS depressant drugs.  In other words, when you

15  have opioids, like fentanyl, that you do at the same time as

16  midazolam.  So this is a shorthand version that leads to further

17  information.

18  Q.   Okay.  Do you know about, like, what would be an

19  appropriate dose?  It says, "Initial intravenous dose for

20  sedation in adult patients may be as little as 1 milligram but

21  should not exceed 2.5 milligrams in a normal healthy adult."

22  Right?

23  A.   That's what it says.

24  Q.   So for sedation, a 1 to 2.5-milligram dose is the most that

25  the manufacturer and the FDA have approved, correct?

1    A.    That looks like it, yes.

2    Q.    In Arkansas, we're using a 500-milligram dose.

3    A.    Right.

4    Q.    Further down on the first page of Defendants' Exhibit 6,

5    we're talking about the clinical pharmacology of midazolam,

6    right?

7    A.    Correct.

8    Q.    And it says here, "Sedation in adult and pediatric patients

9    is achieved within three to five minutes after intravenous

10   injection," right?

11   A.    That's correct.

12   Q.    And the time of onset is affected by the total dose

13   administered.

14   A.    That's correct.

15   Q.    Okay.  So the more midazolam, the higher the dose, the

16   faster the onset.  Is that right?

17   A.    Of sedation.

18   Q.    Or any -- okay.  The effect of the drug, whatever it is.

19   A.    Right.  We keep kind of glossing over that.  This is all

20   referring to sedation.

21   Q.    Sure, because that's the only approved clinical use that

22   we're talking about at this time, a 1 to 2.5-milligram dose.

23   A.    Well, we moved down to clinical pharmacology, but still

24   we're talking about sedation.

25   Q.    As used in a clinical setting?

1   A.   As used here, correct.

2   Q.   Okay.  This is a later part of Defendants' Exhibit 6,

3   "Indications and Usage."  There's a red arrow there that I put

4   there.

5   A.   Yes.

6   Q.   "The drug can be used intravenously as an agent for

7   sedation" --

8   A.   "Anxiolysis" --

9   Q.   Thank you.

10  A.   -- "or amnesia."

11  Q.   -- "prior to or during diagnostic, therapeutic, or

12  endoscopic procedures," such as, and it goes on to talk about

13  other things, cardiac catheterization, whatnot, right?

14  A.   Correct.

15  Q.   So it's your understanding that a doctor in a clinical

16  setting might administer an appropriate clinical dose of

17  midazolam and then perform what would otherwise be a very

18  painful medical procedure on the patient?

19  A.   As far as pain, very painful, I'm not a hundred percent

20  sure.  And, also, usually midazolam is given with another drug.

21  I personally will violate my own HIPAA and tell you that I had

22  midazolam and fentanyl for a colonoscopy.  And so it's used

23  usually with another agent when it is used for this particular

24  point here, diagnostic or therapeutic --

25  Q.   Thank you.  But what the manufacturer has said and what the

Stevens - Cross

1    FDA approved is that midazolam alone can be used intravenously

2    as an agent for sedation, anxiolysis, and amnesia prior to or

3    during a diagnostic, therapeutic, or endoscopic procedure,

4    right?

5    A.   You inserted "alone," and it doesn't say that.

6    Q.   Fair enough.  Moving on.  It can also be used intravenously

7    for induction of general anesthesia.

8    A.   That's what it says.

9    Q.   So I asked you earlier whether it could be used for that

10   purpose and you weren't sure.  But the manufacturer is saying

11   yes.

12   A.   I agree.

13   Q.   Okay.  And then earlier you were a little hesitant to talk

14   about the warnings or the side effects of midazolam in the black

15   box, but this is the more detailed information that the

16   manufacturer is providing, right?

17   A.   Yes, the warnings.

18   Q.   So what it says is:  "Midazolam must never be used without

19   individualization of dosage particularly when used with other

20   medications" -- not only, but "particularly when used with other

21   medications capable of producing central nervous system

22   depression."  Right?

23   A.   Yes.

24   Q.   "Prior to the intravenous administration of midazolam in

25   any dose, the immediate availability of oxygen, resuscitative

1  drugs, age- and size-appropriate equipment for bag/valve/mask

2  ventilation and intubation, and skilled personnel for the

3  maintenance of a patient airway and support of ventilation

4  should be ensured."  Right?

5  A.   Correct.

6  Q.   "Patients should be continuously monitored with some means

7  of detection for early signs of hypoventilation, airway

8  obstruction, or apnea."  Right?

9  A.   Correct.

10 Q.   That means -- that means because they might stop breathing?

11 A.   Apnea is where you might have breath that stops for a

12 minute and continues, for example, like sleep apnea that you've

13 all heard of.

14 Q.   Airway obstruction would be the inability to breathe?

15 A.   Could be tongue rolling back.  I don't know.  Again, that's

16 a little bit out of my field.

17        THE COURT:  I think opposing counsel wants to

18 interpose an objection.

19        MR. WILLIAMS:  Are we looking at Exhibit 6?  What page

20 on Exhibit 6?  I'm confused.

21        MS. MERRITT:  Page 3.  There's no Bates number.

22        MR. WILLIAMS:  Thanks.  Thank you.

23 BY MS. MERRITT:

24 Q.   It goes on to read, "Hypoventilation" -- do you know what

25 that is, hypoventilation?

1   A.   Underventilated.  Basically, "hypo" means under.  So

2   decreased respiration.

3   Q.   Okay, decreased respiration.  "Hypoventilation, airway

4   obstruction, and apnea can lead to hypoxia and/or cardiac arrest

5   unless effective countermeasures are taken immediately."  Right?

6   A.   Correct.  That's an "and" instead of "or."  But, yes,

7   otherwise you're reading it correctly.

8   Q.   And what is hypoxia?

9   A.   Hypoxia is just lack of oxygen, the body is lacking oxygen.

10  Q.   Would it cause you to die if you don't treat it?

11  A.   In extreme cases, for sure.

12  Q.   Okay.  It goes on to talk about the clinical pharmacology

13  of midazolam, and it says in the yellow highlighted section:

14  "Midazolam should be administered as an induction agent only by

15  a person trained in general anesthesia and should be used for

16  sedation/anxiolysis/amnesia only in the presence of personnel

17  skilled in early detection of hypoventilation, maintaining a

18  patent airway and supporting ventilation."  Right?

19  A.   Correct.

20  Q.   Again, that's because this drug is very dangerous and if

21  not monitored, if the patients are not monitored constantly,

22  right?

23  A.   I wouldn't characterize it as a very dangerous drug.  I

24  would characterize it that there's been some unfortunate deaths,

25  I know, like that was used in dental surgery and things like

Stevens - Cross                                                    321

1    that with kids and there's been some unfortunate mishaps usually

2    with another drug on board.  But I would not characterize it as

3    a very dangerous drug, no.

4    Q.    It goes on to say:  "Serious cardiorespiratory adverse

5    events have occurred after administration of midazolam.  These

6    have included respiratory depression, airway obstruction, oxygen

7    desaturation, apnea, respiratory arrest and/or cardiac arrest

8    sometimes resulting in death or permanent neurologic injury."

9    A.    Yes, it does say that there.

10   Q.    Okay.  Again, this is page 5 of Defendants' Exhibit 6.

11   Goes on about risks:  "Serious and life-threatening

12   cardiorespiratory events have been reported.  Excessive single

13   doses or rapid intravenous administration may result in

14   respiratory depression, airway obstruction and/or arrest," and

15   that's because it is a powerful CNS depressant.

16   A.    I would not characterize it as a powerful CNS depressant,

17   no.

18   Q.    It says it is because it is capable of depressing the CNS

19   and that's why we have to be careful with the drug, right?

20   A.    It says the potential for these latter effects are

21   increased in debilitative patients and those receiving

22   concomitant medications.

23   Q.    Okay.  We've talked a bit about general anesthesia,

24   induction general anesthesia, and, again, the FDA-approved label

25   for midazolam does show that the drug can be used for induction

1    of anesthesia, right?

2    A.    That's correct.

3    Q.    Induction of general anesthesia.

4    A.    It actually says both, yes.

5    Q.    Okay.  And then it says in the highlighted portion:  "When

6    midazolam is used before other intravenous agents for induction

7    of anesthesia, the initial dose of each agent may be

8    significantly reduced," and it goes on to talk about the dose of

9    midazolam varies depending on whether the patient is

10   premedicated or unpremedicated, right?

11   A.    That's correct.

12   Q.    So the manufacturer is contemplating here that midazolam

13   alone can be used to induce general anesthesia.  Isn't that

14   fair, Doctor?

15   A.    That gets to the practice more of anesthesiology.  You'll

16   have to ask somebody else about that.

17   Q.    But you are giving opinions to the Court in this case that

18   midazolam cannot induce a state or maintain a state of general

19   anesthesia, correct?

20   A.    That is correct.

21   Q.    And so your opinion is directly contradicted by the

22   FDA-approved label, isn't it?

23   A.    It is in no way contradicted.  They talk about sedation and

24   they talk about induction of anesthesia.  No mention of the sole

25   anesthesia can be done with midazolam.  I mean, it's not

1    contraindicated.

2    Q.    It says right here midazolam can be used before other

3    intravenous agents for induction of anesthesia, right?

4    A.    For induction.

5    Q.    And when you do that, you have to be extra careful and use

6    a lower, significantly reduced dose, right?

7    A.    If you have other agents on board, like a pre-medication --

8    Q.    No, it's saying if you don't, when midazolam is used before

9    other intravenous agents for induction of anesthesia, the

10   initial dose of each such agent may be significantly reduced at

11   times to as low as 25 percent of the usual initial dose of the

12   individual agents.  Okay.  That's what it says, right?  Did I

13   read that accurately?

14   A.    Right.  I guess I'm not --

15   Q.    I'm not asking a question.  Did I read what I just read

16   accurately?

17   A.    As far as I know.

18   Q.    Okay.  Now, do you know what the average induction dose

19   would be for midazolam?

20   A.    No, I'm not sure of the actual dosage.

21   Q.    Okay.  Do you have any idea the duration of action of an

22   additional induction dose of midazolam?

23   A.    No, I'm not sure of that either.

24   Q.    So if an anesthesiologist putting a patient -- inducing

25   general anesthesia with midazolam, let's say to use a

1    30-milligram dose of midazolam in order to induce a state of

2    general anesthesia, do you have any knowledge about how long

3    that 30-milligram dose of midazolam would be effective in the

4    patient?

5    A.    The question was worded poorly because you had a false

6    predicate.  It cannot be used to induce general anesthesia.  You

7    said --

8    Q.    Midazolam cannot be used --

9    A.    You said to maintain general anesthesia.

10   Q.    I did not say "maintain."

11   A.    I apologize then.

12   Q.    Again, my question is, if an anesthesiologist used a

13   30-milligram dose of midazolam in order to induce a state of

14   general anesthesia alone, as the sole induction agent, do you

15   have any idea how long that 30-milligram dose would remain

16   effective to keep that patient in the induction phase?

17   A.    No, not in the induction phase like that.

18   Q.    Or how long they would remain sedated under that dose?

19   A.    I mean, sedation with midazolam, they talk about, on

20   average, half-life of three hours, but it's pretty quick in and

21   out.  So, again, I'm not sure how long in a clinical scenario a

22   patient would stay sedated.

23   Q.    Okay.  But, again, the duration of action of midazolam,

24   like any drug, also is dose dependent, right?

25   A.    To a certain degree, that's correct, yes.

1    Q.    Okay.  And I understand and appreciate your limitations on

2    your opinion in that regard.  But a 30-milligram dose of

3    midazolam would last much longer in a patient than a 1-milligram

4    dose.  Is that fair?

5    A.    I would think so.

6    Q.    Okay.  So we talked about the need for providing a patent

7    airway and monitoring a patient when under the influence of

8    midazolam.  What would happen if such assistance was not --

9    would not be provided to a patient?

10   A.    That's beyond my pharmacology opinion.

11   Q.    Okay.

12            MS. MERRITT:  Your Honor, the state moves to admit

13   Defendants' Exhibit No. 6.

14            THE COURT:  Any objection?

15            MR. WILLIAMS:  No objection.

16            THE COURT:  Defendants' Exhibit 6 is admitted.

17        (Defendants' Exhibit 6 received in evidence.)

18            MS. MERRITT:  Thank you.

19   BY MS. MERRITT:

20   Q.    Do you know, Doctor, if after the administration of an

21   induction dose -- let me take it back one level.  Do you know if

22   a 30-milligram dose of midazolam, how long would that take to

23   become effective to induce a state of general anesthesia?  Do

24   you know?

25   A.    I don't think it would induce a state of general

1  anesthesia, A.  But as a sedative, probably within minutes.

2  Q.    Minutes, okay.  And so within three minutes, four minutes,

3  wherever you're most comfortable, that the drug is at its full

4  effect.  If the patient was thereafter subjected to a very

5  noxious stimulus as part of the anesthetic induction process, do

6  you believe that that patient would be aware of and consciously

7  experiencing severe pain?

8  A.    I think there's a lot of assumptions, like noxious

9  stimulus, that we're talking about doing surgery --

10 Q.    You can't say yes or no, you don't know?

11 A.    I guess I'd have to really listen to you rephrase that

12 again, maybe.

13 Q.    I'll break it down.  How about I try this?

14 A.    Okay.

15 Q.    So an anesthesiologist administers a 30-milligram dose of

16 midazolam to induce anesthesia.  Okay?

17 A.    Okay.

18 Q.    After that, during the induction of the anesthesia process,

19 is it your understanding that the doctor then immediately place

20 an endotracheal tube in a patient in order to maintain a patent

21 airway?

22 A.    Again, a little bit beyond pharmacology.

23 Q.    That's an example of a noxious stimulus I'm talking about.

24 Do you have a general knowledge about what an endotracheal tube

25 is?

1   A.    I have basically layperson's plus knowledge.  I don't know

2   how noxious it is, though.

3   Q.    You would not anticipate that would be a pain-free

4   procedure?

5   A.    It may be uncomfortable.  Whether it be truly painful like

6   a surgical incision, I have no idea.

7   Q.    And I wasn't asking you to compare it to that.  I'm simply

8   trying to figure out if you have an opinion about whether a

9   patient who was given a 30-milligram dose of midazolam for

10  induction of anesthesia and then within a minute or two after

11  that was subjected to a noxious stimulus from the insertion of a

12  breathing tube down the patient's throat, whether you have an

13  opinion about whether that patient would be aware of and

14  consciously experiencing that pain.

15  A.    I think I don't have an opinion because I don't really know

16  what that all involves and haven't been there to see a patient's

17  reaction.  You know what I mean?  I really don't know that

18  procedure.

19  Q.    Okay.  Fair enough.  You're not saying -- I mean, it is

20  your opinion, Doctor, and correct me if I'm wrong, but you don't

21  believe the FDA would approve a drug to use for the induction of

22  general anesthesia knowing it would be used for stimulating

23  procedures such as an endotracheal intubation, would it?

24  A.    Well, I guess there's some assumptions there, like if it's

25  the sole drug, if it's mixed balanced anesthesia --

1    Q.    Doctor, I don't want to keep going over it.  We reviewed

2    Defendants' Exhibit 6, the manufacturer and the FDA have said

3    this drug alone may be used for the induction of general

4    anesthesia, right?

5    A.    I think some of the alones that you've inserted, not in

6    every instance did it happen alone.  So I think that's one thing

7    that I'm not sure the FDA always meant alone, and I believe

8    anesthesiologists usually will use more than one drug.

9    Q.    I'm not asking you what they usually do.  What I'm asking

10   you is, doesn't the FDA-approved package inserts say midazolam

11   can be used for the induction of general anesthesia?  It says

12   that, right?

13   A.    It can be used.

14   Q.    Okay.  And then it also goes on to give very detailed

15   instructions about the different dosages that would be required

16   if midazolam is used before any other drug, right?

17   A.    If it's used with another pre-medication or not, yes.

18   Q.    Okay.  Thank you.  You make a reference in your current

19   report about the phenomenon of awareness while a person is under

20   general anesthesia, and you talk about the fact that even

21   trained anesthesiologists don't always know when a patient might

22   be aware of what's going on around them, right?

23   A.    I believe I had an introductory little paragraph on that,

24   correct.

25   Q.    It's not a significant section.  I'm just trying to figure

1   out, would you agree that it's extremely rare for a patient to

2   experience awareness while under anesthesia?

3   A.   I may not agree with that characterization because I don't

4   know the current rates and stuff.  Again, an anesthesiologist

5   would be better versed in the data.

6   Q.   Okay.  I'll ask them about that then.  Again, just briefly,

7   to go back to your ceiling effect, the dose calculation that you

8   did.  You testified on direct that it's based on what might be

9   -- you've looked at the animal studies and in vitro studies,

10  you've tried to extrapolate what the results or the

11  pharmacological effect might be on humans based on that animal

12  and in vitro data, right?

13  A.   Right.  I tried to calculate concentration in brain and

14  blood and --

15  Q.   Okay.  So back in 2015, based on your calculations and your

16  analysis, you thought 20 milligrams was the uppermost limit of

17  what would be effective in a human, right?

18  A.   Right, I made a ten-fold error.

19  Q.   And now it's 228.  And, again, you would concede that's not

20  an absolute answer, right?  It's an estimate of what you've come

21  up with based on your new analysis, right?

22  A.   Right.  It's the best I came up with at that time.

23  Q.   And then don't you also cite some studies, I think you

24  talked about on direct, that under some of the studies that you

25  looked at, the ceiling effect was shown to be 25 milligrams,

1    right?

2    A.    That's correct.

3    Q.    Can you clarify what types of studies those were?

4    A.    Yeah.  I believe I cited three different studies where they

5    used the BIS, or the bispectral index measure.  That's nothing

6    more than a fancy EEG algorithm that ends up with a single

7    number from zero to one hundred.

8    Q.    And then other studies and your own opinion is that the

9    ceiling is really more like 228, right?

10   A.    That -- there's a difference.  I come up at the end of that

11   part, talking about the clinical studies, saying that it looks

12   like about 25 milligrams we start to see that on the BIS of a

13   ceiling effect.

14   Q.    Okay.

15   A.    So that's based on clinical studies.

16   Q.    The 25?

17   A.    Yes.

18   Q.    Okay.  But beyond that, it's not ethical to conduct a

19   clinical study of a 500-milligram dose of midazolam on a human,

20   right?

21   A.    That's correct.

22   Q.    And why is that?

23   A.    Because it's above the clinical usage range, and you can't

24   just give as much of any drug as you want.  There's dosages that

25   are useful and recommended.

1    Q.    In fact, I mean, 500 milligrams is far beyond the known
2    fatal dose of that drug, isn't it, Doctor?
3    A.    There is no fatal dose known listed.  We showed you that
4    table.  It's zero, blank, for midazolam.
5    Q.    That's not what the FDA says or the manufacturer says,
6    though, right?  They say you can die from midazolam because you
7    stop breathing.
8    A.    Under their conditions, again, mostly with other drugs on
9    board --
10   Q.    Death row inmates are not going to be given mechanical
11   ventilation support, are they?
12   A.    As far as I know, no.
13   Q.    The purpose is to cause death, correct?
14   A.    I believe so.
15   Q.    All right.  Now, you also said that your ceiling dose
16   calculation is based on GABA and the amount of GABA one has in
17   their brain, right?
18   A.    To a certain extent.  I mean, I basically went from the in
19   vitro data and I haven't really factored in the GABA
20   concentrations.  Again, it's very hard to get an accurate
21   measure of the human brain concentrations of GABA in a living
22   human being.
23   Q.    And that's because everyone has a different amount of GABA
24   in the brain, right?
25   A.    It is within a range, I'm sure.  But, yeah, it could

1   differ, you know, a half percent, I mean 50 percent from one

2   person to another.  I don't know.  I don't know.

3   Q.   So based just on variability between person to person, even

4   if you're right that there is a ceiling dose -- and, of course,

5   the state contests that and will produce our own evidence on

6   that point during our case.  But assuming you're right there is

7   a ceiling dose, it could be different for me than it is for you,

8   right?

9   A.   At the exact level, it could be different, that's correct.

10  Q.   And, again, your ceiling dose calculation has never been

11  subject to a peer review, has it?

12  A.   No, not the one in vitro.  The one from clinical studies is

13  more solid.

14  Q.   Your current calculation of a 228-milligram ceiling dose of

15  midazolam has never been subject to peer review, right?

16  A.   That's correct.

17  Q.   Nor has it been published in any scientific journal or

18  anything like that, and you admitted it's not -- you're not

19  there for that, right?

20  A.   It is not as robust as I would need to publish it, that's

21  correct.

22  Q.   Okay.  Would your midazolam calculation, the ceiling dose,

23  would it be different if you relied on different studies?  I

24  guess what I'm saying is, looks like in your report there's a

25  variety of data on midazolam ceiling dosages, anywhere from a

1   ten to a hundred.  So it is an order of magnitude difference in

2   the studies that you yourself reference, right?

3   A.    The doses they use differ, that's correct.

4   Q.    Let me make sure I'm understanding because I think your

5   report shows something different.  Look at the Table 6 on page

6   25 of your 2017 report, which is Plaintiffs' Exhibit 16.

7   A.    Okay.

8   Q.    Okay.  Can you tell us -- I'm going to back up so we can

9   see.  Can you tell us what Table 6 shows, Doctor?

10  A.    Yes.  Those are selective studies of benzodiazepines,

11  actually, just diazepam and midazolam, where they were using

12  different in vitro preparations, or methodology, and they used a

13  concentration range of the noted benzodiazepine and came up with

14  a ceiling effect at that particular dose in the second column.

15  Q.    Okay.  So looking at the diazepam, one study found that the

16  ceiling effect was 10 nanomolars?

17  A.    Correct.

18  Q.    And then a different study showed anywhere from 50 to a

19  hundred.

20  A.    Correct.

21  Q.    There's a broad variability between studies.  Isn't that

22  fair?

23  A.    It's a range.  Like in most studies, you get a range.

24  Q.    What's the difference in the order of magnitude between ten

25  and a hundred?

1   A.    It's a one -- It's one order of magnitude difference.

2   Q.    Okay.  And regarding the midazolam studies, there's also a

3   one order of magnitude difference between the ceiling effect

4   according to the Bai study, correct, B-a-i?

5   A.    Yes, one order.

6   Q.    So even according to the in vitro data that you were

7   looking at, your result could vary ten-fold, depending on which

8   study you relied on.  Isn't that fair?

9   A.    It's not really ten-fold.  Well, I guess that one study for

10   diazepams was an outlier, 10 nanomolar.  But generally I think a

11   hundred was a good, consistent value, if you look at the ranges

12   and you look at the actual graphs.

13   Q.    Would your midazolam calculation turn out different if you

14   chose to use data from different studies?

15   A.    Well, these were the studies -- and I searched quite a bit.

16   These were the only studies I found that had those kind of

17   graphs where you could see where the dosage trailed off.  So I'm

18   not sure there's a lot of other studies out there.

19   Q.    We talked about the BIS, and it shows electric activity in

20   the brain, right?

21   A.    Correct.

22   Q.    And is it your understanding that anesthesiologists are

23   trying to get to a certain BIS level in order to show that a

24   patient is in a state of general anesthesia?

25   A.    Again, more anesthesiology-oriented question.

1  Q.   You do give some opinions about that, though, in your

2  report.  You talk about the BIS.

3  A.   Right.  I talk about the effects of drugs on the BIS, but

4  not whether anesthesiologists use the BIS, which was more like

5  your question.

6  Q.   Okay.  That's fair.  The highlighted section on page 32 of

7  Plaintiffs' Exhibit 16, and you're citing studies for this.  You

8  say:  "BIS values less than 60 are targeted during general

9  anesthesia procedures as that is the depth of anesthesia

10  associated with lack of awareness."  Right?

11  A.   Yes, from a study cited there and not my own opinion.

12  Q.   And you go on to say:  "In this study, BIS values of 60 or

13  less correlated with general anesthesia."  Right?

14  A.   Right.  Again from a study.

15  Q.   Okay.  And then you go on to say:  "Later studies have

16  verified that a BIS value of 40 to 60 is considered to reflect

17  the state of general anesthesia."  And you state yet another

18  article for that proposition, correct?

19  A.   Correct.

20  Q.   I'm going to show you two articles.  The first is

21  Defendants' Exhibit 12.  I wrote on this one.  It doesn't have

22  the sticker, but that's what this is.  Do you recognize this

23  article?

24  A.   Yes, I have read it, not recently, unfortunately, but I

25  remember it.

1   Q.   Do you know if you cite this one in your report or you just
2   read it in the course of conducting your research?
3   A.   I believe I've cited it.  I could be wrong, or at least I
4   cited it in a response, perhaps, to another expert citing.  I'm
5   not sure.
6   Q.   Okay.
7   A.   I guess I can look.
8   Q.   This one is called -- can you read the title of the study
9   or the paper for the Court, please?
10  A.   Sure.  "Electroencephalogram Bispectral Analysis Predicts
11  the Depths of Midazolam-Induced Sedation."
12  Q.   And the highlighted portion about methods, it says,
13  "Twenty-six consenting adult patients were administered 4.5 to
14  20 milligrams intravenous midazolam," correct?
15  A.   That's correct.
16  Q.   "... until they became unresponsive to tactile
17  stimulation."  Right?
18  A.   Correct.
19  Q.   And so this study defines tactile stimulation as mild
20  prodding or shaking, right?
21  A.   Correct.
22  Q.   And so then the researchers were recording the EEG levels,
23  right?
24  A.   Yes, that's correct.
25  Q.   So they were monitoring the BIS to see what the effect on

1    these 26 adults, what effect a 4.5 to a 20-milligram IV dose of

2    midazolam would have on their BIS levels.  Is that a fair

3    characterization --

4    A.    I think that's what they were attempting, yes.

5    Q.    I'm not going to go into huge detail on this.  I'm going to

6    leave that to my experts.  But this is a chart, I think it's on

7    page 3 of Defendants' Exhibit 12, and it's a little bit hard to

8    see.  Can you see that okay, Doctor?

9    A.    Yes, I can.

10   Q.    Okay.  So the explanation under this figure, it says,

11   Figure 1:  "Electroencephalogram bispectral index as a function

12   of the level of midazolam-induced sedation during the onset and

13   recovery phases."  Did I read that correctly?

14   A.    Yes, you did.

15   Q.    And so what this says right here, it says "bispectral

16   index," right?

17   A.    Correct.

18   Q.    In other words, that's the BIS level of the patients that

19   they were monitoring in this study?

20   A.    I believe so.

21   Q.    Okay.  And so there were 26 patients, and so we expect to

22   see, and I'm not going to count them all, but 26 plot points for

23   each patient.  Is that right?

24   A.    Yes.  And I'm not sure -- there's definitely more than 26

25   points on there.

Stevens - Cross                                             338

1   Q.   Yeah.

2   A.   So there might be multiple readings at different times.

3   Again, I'd have to read the methods and really understand the

4   graph.

5   Q.   I understand that.  What I'm interested in is, I see four

6   plot points below the BIS level of 60.  Do you see that too?

7   A.   I do see those highlighted, yes.

8   Q.   And so the researcher that published this article gave

9   patients anywhere between 4 and a half and 20 milligrams of

10  midazolam, right?

11  A.   That's correct.

12  Q.   And it looks like four out of those 26 patients reached a

13  BIS level under 60, right?

14  A.   Well, no, because that's what I was just saying, there's

15  much more than 26 dots.  So it is four out of however many dots

16  there are above that line.

17  Q.   So if they had four readings then, I guess, four BIS

18  readings?

19  A.   Yes.  I mean, H column could be the 26, so that would be --

20  let's see.  One, two, three, four, five, six, seven -- eight

21  times 25 would be about 200.  So it's four out of 200 readings

22  were below that.

23  Q.   They did in fact observe BIS levels under 60 based on those

24  dosages of midazolam.  Is that right?

25  A.   Yes, but we don't know what dosages.

1  Q.   There's no doubt about it, they wouldn't have put plot

2  points under 60 if they didn't observe those readings, would

3  they?

4  A.   There were some outliers.  Whether that's due to the

5  machine or --

6  Q.   I'm not asking you to characterize --

7  A.   But it is four out of 200.

8  Q.   There are four plot points under 60, right?

9  A.   That's correct.

10 Q.   And there's one plot point all the way down to 40, correct?

11 A.   It appears so.

12 Q.   Okay.  Let's look at one more article.

13         MS. MERRITT:  And I'm sorry, Your Honor.  I move to

14 admit Defendants' Exhibit 12.

15         MR. WILLIAMS:  No objection.

16         THE COURT:  Defendants' Exhibit 12 is admitted.

17         MS. MERRITT:  Thank you.

18     (Defendants' Exhibit 12 received in evidence.)

19 BY MS. MERRITT:

20 Q.   Doctor, I'm going to show you what I have marked as

21 Defendants' Exhibit 26.

22 A.   Okay.

23 Q.   Can you please read the title of this article?

24 A.   "The Effect of Gender on Compensatory Neuromuscular

25 Response to Upper Airway Obstruction in Normal Subjects Under

1    Midazolam General Anesthesia."

2    Q.    Okay.  Are you familiar with this study?

3    A.    I have not seen the study yet.

4    Q.    Okay.  We've got a copy with your attorneys.  I'm sure

5    they'll let you look at it, or the state's attorneys, if you

6    want.

7    A.    Right.  I'm reluctant to comment on it without reading it

8    in detail.

9    Q.    Okay.  I'm not going to ask you any details about the

10   report since you don't know it.  I'm just going to make sure I'm

11   reading this table properly.  Can you help me with that?

12   A.    I will assist if I can.

13   Q.    Table 1 says "Subject Demographics," and it's talking about

14   men and women that were in the study, right?

15   A.    Correct.

16   Q.    And then it's giving age, height, weight, different BMI,

17   different demographics about the subjects of the study, right?

18   A.    Correct.

19   Q.    And then it's talking about midazolam dosages, total

20   midazolam dose, and the mean midazolam dose, right?

21   A.    It looks like it, yes.

22   Q.    Okay.  And then it gives two different BIS readings, a

23   passive BIS and an active BIS range, correct?

24   A.    That's what it says.

25   Q.    And these scientists found ranges, and again these dosages

1    are all -- looks like they're all under 5 milligrams, right?
2    A.    Well, those are averages, so, again, we don't know the
3    actual doses.   Those are averages, plus or minus --
4    Q.    It appears to be an average clinical dose of midazolam
5    then?
6    A.    Yeah, whether that's a clinical dose or what the actual
7    dose is, it's not clear.   And, again, I haven't read the methods
8    or anything.
9    Q.    Fair enough.   It's showing BISs between 53.4 and 55.9 for
10   the men, right?
11   A.    Well, it's showing something called passive BIS, which,
12   again, I'm not sure what they're talking about, and something
13   called active BIS, again, I'm not sure what they're talking
14   about.   I haven't seen that before, so I don't know what that
15   means.
16   Q.    Okay.   Well, we know what the BIS is.
17   A.    We know what BIS is by itself, if it's consistent with
18   other studies, yes.
19   Q.    Okay.   And for women, the passive and active BIS ranges
20   went from 51.5, plus or minus a degree of error, to 54.2, right?
21   A.    At least as far as that reporting, yes, on that table.
22   Q.    It looks like this study is -- well, it's from October
23   of 2009, as reflected on page 1.
24          MS. MERRITT:   I move to admit Defendants' Exhibit 26,
25   Your Honor.

```
 1              MR. WILLIAMS:  No objection.
 2              THE COURT:  Defendants' Exhibit 26 will be admitted.
 3         (Defendants' Exhibit 26 received in evidence.)
 4   BY MS. MERRITT:
 5   Q.   Do you still believe that anesthetic gas is an available
 6   alternative method of execution in Arkansas?
 7   A.   That's a little bit farther statement than I would go with.
 8   Anesthetic gas is available, I believe.  Whether it's available
 9   to Arkansas, you know, whether it's appropriate, I don't -- I
10   don't know that part of it, the more legal part.
11   Q.   Okay.  So just like your opinion was in Arkansas state
12   court, you know that anesthetic gases are commercially available
13   drugs, right?
14   A.   Right.  I mean, I've seen them on the Web or whatever,
15   found the companies.
16   Q.   But you don't have any evidence that they're actually
17   available to the State of Arkansas to use in any kind of
18   execution?
19   A.   As far as I know, no.
20   Q.   Okay.  Do you know whether any state has ever used that
21   kind of anesthetic gas as an execution method?
22   A.   I don't know.
23   Q.   How would sevoflurane gas lead to the death of an inmate?
24   A.   Sevoflurane, I believe it's more, again, anesthetic gas,
25   it's not something that we commonly teach the medical students
```

 1   because anesthesiology is more specialized, but we do talk about

 2   it.  It also inhibits brain neurons very powerfully.

 3   Q.    So it's a CNS depressant like midazolam is?

 4   A.    It's not just like midazolam, but it can be considered to

 5   also inhibit neurons, correct, it's more powerful.

 6   Q.    That would again lead to apnea, airway obstruction,

 7   respiratory problems if it's not managed in a clinical setting?

 8   A.    Those clinical setting questions are again better for our

 9   anesthesiologist colleagues, but I think pharmacologically it is

10   a potent inhibitor of brain neuron activity.

11   Q.    And brain neuron activity is required to manage

12   respiration?

13   A.    It's required to breathe, that's correct.

14   Q.    Thank you.  Is respiratory depression a known side effect

15   of midazolam?

16   A.    Respiratory depression has been noted in certain cases to

17   be part -- a side effect of midazolam, correct.

18   Q.    So "yes"?

19   A.    Yes.

20   Q.    That's why constant monitoring and oftentimes mechanical

21   ventilation is required to keep a patient anesthetized with

22   midazolam alive, right?

23   A.    Again, that's an anesthesiologist question.

24   Q.    Okay.  Doctor, so getting back to what you said in your

25   2015 report about a massive overdose of an opioid, we talked

1  about that would cause a person to stop breathing and that's how

2  people die when they OD on heroin or other opioid drugs, right?

3  So is it fair to say a massive overdose of any drug that causes

4  respiratory depression and apnea would cause a painless death,

5  just like your opinion was with regard to opioids?

6  A.   No, I think not.  And, you know, opioids, for example, we

7  probably romanticize that the heroin user that overdoses at

8  least went feeling high.  Now, whether that's true or not, I

9  have no idea.  But they're using the drug for the euphoria, at

10 least initially.  After a while, unfortunately, they're using

11 the drug to just not feel bad.  They don't get as high as they

12 do in the beginning when using the drug.  So that's kind of, you

13 know, how someone would actually feel, you know, is it totally

14 painless or not, I just don't know.

15 Q.   Okay.  But you did tell Judge Griffen in the state court

16 that an opioid overdose would cause respiratory depression,

17 right?

18 A.   I agree with that, yes.

19 Q.   And that would cause the person to stop breathing and

20 eventually die, right?

21 A.   Correct.

22 Q.   And then you also told Judge Griffen that that phenomenon

23 would be a quick and painless death for that person, right?

24 A.   When you say told her [sic], you mean in my report?

25 Q.   You put it in your report, correct?

1  A.    Yes.

2  Q.    So what I'm trying to figure out is whether that same

3  respiratory depression function that one might experience with

4  an opioid would hold true with regard to other CNS depressants

5  that would inhibit respiratory function.

6  A.    Right.  I think the answer to that is that, A, we really

7  don't know, and B, not necessarily the same.  So if you're dying

8  from an opioid overdose, for example, if you're feeling euphoria

9  from the opioid, which some users have, you know, said it's

10  better than an orgasm, they're talking about the rush of the

11  opioid.  And so if you feel that way and then die, that's not

12  the same, for example, as having a paralytic like vecuronium,

13  respiratory depression, and dying.  You know what I mean?

14  Q.    Right.

15  A.    So there's other effects of the drug that may influence

16  just the fact of respiratory depression.

17  Q.    Okay.  I'm with you on that.  In your 2015 report, you said

18  that a fast-acting barbiturate like Nembutal would be an

19  available alternative method of execution, but you deleted that

20  whole discussion from your 2017 report that you've provided to

21  this Court.  Why did you do that?

22  A.    I don't remember the exact reason.  I know it was in

23  consultation with, you know, the attorney I'm working with.  I

24  mean -- and I don't remember exactly why or if I ever sussed out

25  the reasoning.  So I guess I'm not exactly sure.

1  Q.   So as you sit here today, you're not sure whether you

2  deleted that section because the attorneys asked you to or

3  because you yourself conducted further research and changed your

4  opinion about the availability of that drug?

5  A.   I don't think I conducted any further research.  I think it

6  was just maybe it wasn't needed for this particular venue.  Not

7  really sure, unfortunately.  I don't remember the -- the

8  mind-set at the time.

9  Q.   Okay.  That's fair enough.  What about the opioid analgesic

10  section of the 2015 report, it's noticeably absent from the 2017

11  litigation report submitted to the Court in this case.  Again,

12  same reason?

13  A.   Kind of the same reason.  I know it was, you know, I'm

14  working with someone, so I tend to work pretty closely, and the

15  back and forth, and I'm not sure whose idea came up first or why

16  exactly, but it kind of evolved that way.

17  Q.   Dr. Stevens, are you, in your capacity as a pharmacologist,

18  able to provide the State of Arkansas with any drugs for use in

19  executions?

20  A.   When you say "provide," you mean, like, bring them to you

21  guys myself?

22  Q.   Well, sure.  Dispense.  Can you buy them from anyone and

23  sell them to us?  Are you a provider, seller, supplier of any

24  kind of drug?

25  A.   No.  I have labs and I have a Schedule II license because I

1    work with drugs that are Schedule II that I can do research on.

2    I guess I could steal them and bring them here, but probably not

3    a good idea.

4    Q.    You're not a supplier -- I'm not asking you to do that.

5    You're not a supplier or seller of drugs?

6    A.    No, just for laboratory research.

7    Q.    You don't dispense drugs?

8    A.    No, I do not.

9    Q.    Do you know the identity of any manufacturer or seller of a

10   fast-acting barbiturate that would be willing to sell it to the

11   State of Arkansas to use in a lethal injection execution?

12   A.    Personally, no.

13   Q.    All right.  Are you aware that the ADC, in fact, in

14   response to your report, they reached out to the manufacturer of

15   Nembutal and tried to buy it and the manufacturer said no way?

16   Are you aware of that?

17   A.    I am not aware of all the -- the reaching out part and all

18   that.

19   Q.    Are you generally familiar with the fact that drug

20   manufacturers do not want their drugs to be used by the

21   Department of Correction in execution processes?

22   A.    I know some drug manufacturers, and especially the ones

23   that are either headquartered or have European connections,

24   because the EU doesn't allow capital punishment for its member

25   nations.  But I don't know -- you know, obviously, that's one

1    part of the equation, can you buy the drug from a commercial

2    supplier.  There's other ways to get the drug.

3    Q.    Sure.  Are you aware that in the past, the ADC did try to

4    get the drug through an overseas supplier and the DEA

5    confiscated that drug?  So we've tried -- the ADC's tried other

6    ways to get these drugs and they've not been able to procure a

7    supplier at this point.  Are you aware of that fact?

8    A.    Right.  But yet there are still other ways to get the drug.

9    Q.    Such as what?

10   A.    Well, you could compound the drug, phenobarbital

11   compounded.

12   Q.    Are you aware in the state court the prisoners asserted an

13   Eighth Amendment challenge to the use of compounded drugs

14   because they alleged in that case that the compounded drugs are

15   so inherently unsafe and unreliable that the use of a compounded

16   drug would result in an Eighth Amendment violation?  Are you

17   aware of that?

18   A.    I'm not aware of the findings in that case.

19   Q.    Are you aware of any compounder who would actually be

20   willing to compound any fast-acting barbiturate for the ADC to

21   use in a lethal injection execution?

22   A.    Not personally.

23   Q.    Now, manufacturers of controlled substances like midazolam,

24   they have put strict distribution controls in effect to make

25   sure that their drugs don't end up in the hands of the

1    Department of Correction for use in executions.  You're aware of

2    that, right?

3    A.    I think I saw something from Pfizer on that, for example.

4    Q.    We're going to talk about that.  Defendants' Exhibit 14 is

5    a release from Pfizer on this topic.  Defendants' Exhibit 14,

6    this looks like a release issued by the Global Policy &

7    International Public Affairs department of Pfizer about Pfizer's

8    position on the use of our products in lethal injections for

9    capital punishment.  Have you seen this document before, Doctor?

10   A.    I think I remember this one from last night.  I looked at

11   it.

12   Q.    So what's the gist of what this is?

13   A.    It's basically talking about how they're going to tighten

14   up their distribution so the Department of Corrections can't be

15   using it for lethal injection, and it follows pretty much a

16   template of other company press releases in that their drugs are

17   for human health and to promote health and welfare of human

18   beings, not the opposite.

19   Q.    Sure.  And so Pfizer manufactures midazolam, doesn't it?

20   A.    Yes, among many, many drugs.

21   Q.    As well as pancuronium bromide, right, which is similar to

22   the vecuronium that we use in our protocol?

23   A.    Correct.

24   Q.    Midazolam, rocuronium bromide, vecuronium bromide, and

25   potassium chloride.  So Pfizer lists all the drugs we use and

1    they're going to make sure we don't get them, right?

2    A.   Right, among other -- there's probably other companies that

3    also make those.

4    Q.   Absolutely.  You're right about that.  I agree.  But I'm

5    not testifying.

6          MS. MERRITT:  I move to admit Defendants' Exhibit 14,

7    Your Honor.

8          THE COURT:  Any objection?

9          MR. WILLIAMS:  No.

10         THE COURT:  Defendants' Exhibit 14 is admitted.

11      (Defendants' Exhibit 14 received in evidence.)

12         MS. MERRITT:  Your Honor, if I could have one moment?

13         THE COURT:  You may.

14      (Counsel confer).

15         MS. MERRITT:  Your Honor, the state tenders the

16   witness.

17         THE COURT:  Do you want to proceed with redirect?

18         MR. WILLIAMS:  Might we break for a little bit, five

19   minutes, or however --

20         THE COURT:  We can take our lunch break now and just

21   come back early, if that's acceptable to everybody.

22      We'll go ahead -- let's go ahead and take an hour.  We'll

23   come back in here at ten till one.  We're in recess for an hour

24   for our lunch break.  We'll come back in at ten till one.

25         (Lunch recess at 11:51 a.m.)

1

2                    C E R T I F I C A T E

3        I, Eugenie M. Power, Official Court Reporter, do hereby

4   certify that the foregoing is a true and correct transcript of

5   proceedings in the above-entitled case.

6

7   /s/ Eugenie M. Power, RMR, CRR, CCR        Date:  April 11, 2017
    United States Court Reporter
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (Proceedings continuing at 1:03 p.m.)

2              THE COURT:  We're back on the record with counsel in

3     Case No. 4:17CV179.

4          You may take the stand.

5          I think there was a question about exhibits that were

6     admitted.  Let me double-check one thing, so we can take it up

7     at the next break perhaps or before this witness leaves the

8     stand.  I think there was a question about numbering of exhibits

9     and what was admitted.

10         You are welcome to start your redirect whenever you are

11    ready.  We'll take up that, as I said, before this witness

12    leaves the stand.

13                        REDIRECT EXAMINATION

14    BY MR. WILLIAMS:

15    Q.   Welcome back, Dr. Stevens.  I don't think we'll keep you up

16    here too long.  Let me -- we have the label, Exhibit 6.  We're

17    going to take a look at Exhibit 6.  We talked quite a bit about

18    the FDA label.  And a lot of that discussion was more -- was it

19    more anesthesiology, or was it more pharmacology?

20    A.   A lot of it had to do with the practice of anesthesiology,

21    that's correct.

22    Q.   Okay.  But you can read FDA labels.

23    A.   Correct.

24    Q.   Okay.  So let's take a look -- or I can put it on the ELMO.

25    Let's look at page 6 of the document.  I'm sorry.  The numbers

1  are off.  It's page 6 of the document, which would be page 3 on

2  the bottom of the insert.

3      Sorry for the delay.  Keep going down.  It should be that,

4  horizontal.  You can take it -- yeah.

5      So we talked about this quite a bit.  Induction of

6  anesthesia, for induction of general anesthesia before

7  administration of other anesthetic agents.  Does that say that

8  you can use midazolam on its own --

9  A.    No.

10  Q.    -- to produce general anesthesia?

11  A.    No.  It's just talking about when it's used for that

12  particular purpose, not implying by itself.

13  Q.    And just noting the comma after this part on the side.

14  A.    Correct.

15  Q.    You have to keep reading.  Let's go one page up.  Keep

16  going through the vertical page.  You can take an excerpt from

17  the top, down about there.

18      So did you have a chance to look at some of this material

19  about adverse reactions --

20  A.    Yes, I did.

21  Q.    -- for midazolam?  And what is this telling you about

22  paradoxical reactions there?  Are you seeing anything about, you

23  know, death by itself?  What does this tell you?

24  A.    No.  If we look down there, after IV administration, it

25  shows some of the following adverse reactions and some idea of

1   the percent in adult patients.  And if you notice, hiccups was

2   the highest one at 3.9 percent, nausea, vomiting, coughing,

3   oversedation, headache and drowsiness.  So in normal usage, you

4   don't see a lot of respiratory depression, obviously, at least

5   in those studies that were done to approve the drug.

6   Q.   And just tell me if I'm reading this correctly.  But it

7   says the majority of serious adverse effects, particularly those

8   associated with oxygenation and ventilation, have been reported

9   on midazolam administered with other medications capable of

10  depressing the central nervous system.

11  A.   Exactly.  Like I mentioned before, the only problems that

12  have really been serious with midazolam is when you have an

13  opioid or another central nervous system depressant or you are

14  drinking alcohol, which usually doesn't happen in the OR, but it

15  could happen with abuse, but anyway.

16  Q.   But this is a broader question.  I mean, the FDA has not

17  used this label to tell states what they should do during

18  executions.  Is that correct?

19  A.   No.  Of course not.  This is for the health and welfare of

20  patients according to the FDA.

21  Q.   And the State protocol, you've reviewed that.  Right?

22  A.   Yes, I did.

23  Q.   And are they proposing to use midazolam to kill the

24  prisoner by itself?

25  A.   No, they are not.  And it would definitely be an off-label

1   use, to say the least.

2   Q.   Right.  So what is the purpose of midazolam in the

3   protocol?

4   A.   The purpose of midazolam --

5   Q.   The stated purpose.

6   A.   The stated purpose that one would want would be to produce

7   an unconsciousness and insensation to pain; in other words, the

8   state of general anesthesia.

9   Q.   Okay.  And nothing in the label says that this drug can do

10  that by itself.

11  A.   That's correct.  It cannot.

12  Q.   You were asked a little bit about your textbook and

13  particularly a graph, where the textbook said benzodiazepines

14  can produce anesthesia.  I think -- were you correct that you

15  said you personally did not write that part of the textbook?

16  A.   Correct.  That was from the co-author, although --

17  Q.   Although you put your name on it.

18  A.   Correct.  And I take responsibility.

19  Q.   What are the purposes of that textbook?  I mean, who was

20  that geared at?  When would you use that textbook, and kind of

21  what's the market for it, I guess?

22  A.   Right.  The market it's used for, it's used for -- fairly

23  well used across the nation and even overseas.  Actually, it's,

24  I noticed, a Polish edition, which was neat to see.  But it's a

25  first course in pharmacology textbook.  So it might be the

1    medical students, nursing students, dental students, any allied

2    health students.  That would be kind of an introductory

3    pharmacology textbook.

4    Q.    So it just sort of illustrates basically the differences

5    between benzodiazepines and barbiturates?

6    A.    Correct.  And it doesn't go into that much detail.

7    Q.    Okay.  And correct me if I've got your testimony wrong

8    before.  Did you talk generally about the use of the term

9    "anesthesia" by itself?

10   A.    Right.

11   Q.    I mean, is that a term that is meaningful by itself?

12   A.    No.  Indeed, I wasn't the first to recognize that in my

13   report, because there is a major authoritative textbook in

14   pharmacology.  And it's quite famous in many circles.  It's

15   called *Goodman and Gilman's, The Pharmacological Basis of*

16   *Therapeutics*.  And the same thing that I've noticed with the use

17   of anesthesiology -- I'm sorry -- with the use of anesthesia is

18   they also notice -- and, in fact, they say -- and this is a

19   quote -- the clinical literature often refers to the anesthetic

20   effects and uses of certain benzodiazepines, but the drugs do

21   not cause a true general anesthesia, because awareness usually

22   persists."

23          In other words, there's a looseness in the semantics of

24   using the term "anesthesia."  If you want to be more precise,

25   then you should use the stages like the ASA say and reserve

1    general anesthesia for only that most deepest stage of

2    unconsciousness and insensation to pain.  But people talk about

3    anesthesia even though they really mean, according to the ASA,

4    sedation.

5    Q.    So it's like a blanket term.

6    A.    It's being used a little bit more loosely than the specific

7    term, so it's like two terms:  One you use when you are talking

8    to medical students, and you can be somewhat more imprecise.  Of

9    course, for proceedings like this, we want to be as super

10   precise as possible.

11   Q.    And is this going to have a future edition of this

12   textbook?

13   A.    It actually is.

14   Q.    When is that coming out?

15   A.    That is due to come out the fall of 2017, so I guess coming

16   up.

17   Q.    Is it going to say what it says now?

18   A.    No.  Actually, I've looked at that and tried to make it a

19   little bit clearer.

20   Q.    You were asked a little bit about the testimony in other

21   cases of anesthesiologists -- I believe the testimony was --

22   named Heath and Dershwitz.  Are you familiar with -- are they

23   anesthesiologists?

24   A.    I believe they are, yes.

25   Q.    And are you an anesthesiologist?

1   A.   I am not.

2   Q.   So you are looking at this in a different way?

3   A.   I am.

4   Q.   In a pharmacological way?

5   A.   Correct.

6   Q.   And we talked a little bit about, you know, your report and

7   a mathematical error that was made in the report.  How was that

8   discovered again?  I think you got into that with Ms. Merritt.

9   A.   Yeah.  I believe it was with Josh Lee, early on, and

10  myself, where it was initially discovered.  I'm not sure it was

11  brought up by --

12  Q.   Could it have been a little later?

13  A.   It could have been, yes.  Unfortunately, I seem to be

14  drawing a blank on exactly how that came about in time frame.

15  Q.   Let me put it this way.  Was it brought to your attention

16  by an expert on the other side?

17  A.   I think that probably explains how it came up, yes.  That

18  would have been earlier in 2015, I believe.

19  Q.   So did Dr. Buffington point this expert or point this out

20  to you?

21  A.   It's possible, yes.  It could have been Dr. B.

22  Q.   Could it have been something different?

23  A.   Yeah.  I really -- unfortunately, it was a couple of years

24  ago, and I just don't quite recall exactly how it went.

25  Q.   Well, suffice it to say, I believe that Ms. Merritt said

1    that this study was done -- this in vitro study was done to say,

2    quote, what the pharmacological effect might be, unquote, of

3    midazolam.  Is that correct?  Is that why you did the study?

4    A.    No.  It really did not ever come into question what the

5    pharmacological effect might be.  I knew from a wee little

6    pharmacologist that there's very significant differences between

7    benzodiazepines and barbiturates.  So the study was on just to

8    try to get some kind of handle on the dosages and the ceiling

9    effect using what at that time I considered the best available

10   data of the in vitro studies.

11   Q.    So before you did that, you know what the pharmacological

12   effect of benzodiazepines and midazolam is.  Correct?

13   A.    Very much so, yes.

14   Q.    And I think we discussed that already in some detail, did

15   we not?

16   A.    That's correct.

17   Q.    But what ultimately is the pharmacological effect of

18   midazolam?

19   A.    It's to enhance the actions of GABA, the inhibitory

20   neurotransmitter, but only in the presence of GABA.

21   Q.    And GABA being in limited quantities in the body?

22   A.    That's correct.

23   Q.    And is that what produces the ceiling effect?

24   A.    That's exactly what produces the ceiling effect.  It's the

25   basic mechanism of action.

1   Q.   So did anything you hear in your cross-examination change

2   your opinion that midazolam would be unable to achieve the level

3   of anesthesia needed to prevent pain from the second and third

4   drugs?

5   A.   No.  Nothing has changed.

6   Q.   Okay.  Just one second, please.

7           MR. WILLIAMS:  That's all on redirect.

8           MS. MERRITT:  I apologize, Your Honor.  If sometimes I

9   don't hear, it's because I wear hearing aids.  And if people --

10  if sound is muffled to me, sometimes I don't hear, so I

11  apologize.

12                       RECROSS-EXAMINATION

13  BY MS. MERRITT:

14  Q.   Two quick points.  Just going back to the Defendants'

15  Exhibit 6, which has been admitted, the midazolam information --

16  again, Defendants' Exhibit 6 is the FDA-approved package insert

17  for the drug.  Right?

18  A.   Correct.

19  Q.   And then you were just asked on redirect again about using

20  midazolam as an anesthetic induction agent, and there was some

21  language in there that we didn't talk about before I want to

22  talk about now.  This is, again, under page 1 of Defendants'

23  Exhibit 6, the clinical pharmacology section of the insert.

24       It says here:  "When midazolam is given IV as an anesthetic

25  induction agent, induction of anesthesia occurs in approximately

1    1.5 minutes when narcotic premedication has been administered

2    and in 2 to 2.5 minutes without narcotic premedication or other

3    sedative premedication."  Did I read that right?

4    A.    You did.

5    Q.    Okay.  So according to this information, midazolam can be

6    given intravenously as an anesthetic induction agent without any

7    narcotic premedication.  Isn't that right?

8    A.    It appears so, yes.

9    Q.    Okay.  Then one other point, on page 6 of the defendants'

10   exhibit -- we talked about this in quite a bit of detail.  Just

11   again, this whole section is about the induction of

12   anesthesia -- and pardon me -- for induction of general

13   anesthesia before the administration of other anesthetic agents,

14   isn't it?

15   A.    That's correct.

16   Q.    And this whole part over here is talking about dosages for

17   unpremedicated patients.  Right?

18   A.    That's correct.

19   Q.    That's all I have.  Thank you.

20         THE COURT:  Let's clear up the issue of exhibits.  In

21   regard to exhibits, the previous testimony that you moved to

22   admit, according to the record, it was 9, 10 and 11.  I think

23   you raised a question with Ms. Washington about that.  That's

24   what the transcript reflects, the testimony of Dr. Dershwitz and

25   also Dr. Heath.

1    MS. MERRITT:  Yes, Your Honor.  At this time, if I can

2  run to my table and grab my list.

3      There were two other exhibits that we discussed with Dr.

4  Stevens:  Defendants' Exhibit 5, his pharmacology textbook

5  excerpt that we produced in the record, and then Defendants'

6  Exhibit 8, which is one of the transcripts of Dr. Dershwitz that

7  we talked about I intended to introduce.  And I inadvertently

8  omitted to do so.  But at this time I move to admit Defendants'

9  Exhibits 5 and 8.

10        THE COURT:  Is there any objection to 5?

11        MR. WILLIAMS:  No objection to 5.

12        THE COURT:  I assume it's the same objection to 8.

13        MR. WILLIAMS:  Same objection.

14        THE COURT:  I'll recognize the same objection to 8.  I

15  admitted it with the understanding of the evidentiary phase that

16  we're in at this point.  So I'll give it what it's worth under

17  that standard for a preliminary injunction evidentiary standard.

18      I think we've cleared that up.

19      Anything further for this witness?

20      (Defendants' Exhibits 5 and 8 received in evidence.)

21        MR. WILLIAMS:  Nothing further.

22        THE COURT:  You may step down.

23        THE WITNESS:  Thank you, Your Honor.

24        THE COURT:  You may call your next witness.

25        MR. WILLIAMS:  We call Spencer Hahn.

1          **SPENCER HAHN, PLAINTIFFS' WITNESS, DULY SWORN**

2          MS. HODGE:  So I'm not interrupting Mr. Hahn's

3    testimony, the State raises the same relevancy objection about

4    other states' execution procedures with this witness.

5          THE COURT:  All right.  I'll recognize that is a

6    continuing objection.  I've overruled it, so I'll allow you to

7    proceed.

8          MR. WILLIAMS:  Thank you.

9                        DIRECT EXAMINATION

10   BY MR. WILLIAMS:

11   Q.   Good afternoon, Mr. Hahn.  Could you please state your name

12   for the record.

13   A.   I can.  My name is Spencer Hahn, H-a-h-n.

14   Q.   And what do you do for a living?

15   A.   I'm an assistant federal defender with the Capital Habeas

16   Unit for the Middle District of Alabama.

17   Q.   And how long have you done that?

18   A.   Since October 1st, 2014.

19   Q.   And have you worked in other legal positions before that?

20   A.   I have.  In the four and a half years that preceded that, I

21   was an assistant state appellate public defender in the state of

22   Idaho.  And before that, I was an Oregon trial attorney, public

23   defender, in Portland, Oregon, for six years.

24   Q.   So during any of these positions, have you witnessed an

25   execution?

1    A.    With my employment with the CHU, yes, I have.

2    Q.    And what execution was that?

3    A.    On December 8, 2016, I witnessed the execution of Ronald

4    Bert Smith Jr.

5    Q.    And what was the method of execution for Mr. Smith?

6    A.    Lethal injection via a three-drug protocol.

7    Q.    And do you know what the three drugs in that protocol were?

8    A.    I do.  Midazolam, 500 milligrams, followed by an injection

9    of 600 milligrams of one of the bromides -- I can't remember if

10   it was pancuronium or vecuronium bromide -- followed by 240

11   milliequivalents of potassium chloride.

12   Q.    So could you tell me a little bit about the lead-up to that

13   execution?  Just how did you come to witness it?

14   A.    Well, I'm one of two attorneys who are a member of, I

15   guess, the team that's assigned to litigate lethal injection.

16   When my predecessor who had that position left, I took over a

17   spot on that team.  We litigated Christopher Brooks, who was

18   executed in January of 2016.  And as part of that litigation, I

19   became familiar with the protocol and with the execution

20   chamber.  And because of my familiarity with the protocol, the

21   execution chamber, and the lethal injection litigation, I

22   volunteered to be one of the attorney witnesses so that the

23   members of Mr. Smith's legal team could be at the office and

24   handle last-minute filings with the Supreme Court.

25   Q.    So were you the only person in the office who witnessed

1    that execution?

2    A.    No.   Our executive director, Christine Freeman, witnesses

3    all the executions as well.

4    Q.    Okay.   And were you the only two who worked on the case

5    before it came to execution?

6    A.    Oh, no.   A great number of people.   Ms. Freeman heads up

7    the Trial Unit and is also the executive director.   She does

8    review all final work.   We have a CHU director, Leslie Smith.

9    We have, I think, eight other attorneys in the CHU.   We have a

10   fairly large CHU.   We handle all of the death row inmates who

11   are in capital habeas for the state of Alabama, which has a

12   fairly large row.

13   Q.    And the lead-up to all that -- when I say "all that," I

14   mean the execution of Mr. Smith -- were just some of the

15   attorneys -- did you say eight attorneys are in the office?

16   A.    Everybody pitched in on it.   We had had a previous

17   experience.   It had been -- when I started, no one had been

18   executed in the state of Alabama for a couple of years.   Then in

19   January 2016, Christopher Brooks was executed.   We had a chance

20   to sort of prep ourselves.   That was our sort of first

21   experience with that.   But, basically, everybody in the CHU

22   pitched in, all the paralegals and all the attorneys.   There was

23   the regular legal team for Mr. Smith, and then there was the

24   lethal injection legal team, who were on it full time.   Then

25   there were other members of the CHU who handled part-time duties

1    and that sort of thing.

2    Q.    So is it fair to say, it was an all-hands-on-deck type

3    situation?

4    A.    Absolutely.  Anytime an execution is going to be happening,

5    we all pitch in.

6    Q.    So did I hear you say that you kind of knew what the

7    execution chamber looked like before you arrived?

8    A.    Yes.  As part of the litigation for lethal injection, which

9    predated Mr. Smith's complaint, Federal Chief Judge Watkins of

10   the Middle District had the parties, which would be the Alabama

11   Attorney General's Office, and our office, our lethal injection

12   team, had the attorneys for the parties tour the death chamber

13   so that we could all get eyes on and try to figure out where the

14   disputes would be and such.  So I had an opportunity to spend

15   about an hour at the death chamber in December of 2015.

16   Q.    And can we pull up Exhibit 10, please, Exhibit 10,

17   Plaintiffs' 10.

18         I think there are two pages here, if we can scroll down.

19   Take a look -- focus on that one.  Focus on that one.  Does that

20   look familiar to you?

21   A.    It does.  This is the death chamber.  If you look at the

22   window on the right, there's a window next to a door.  There's a

23   gentleman wearing a blue shirt in there.  Then there is what

24   appears to be a video camera.  Where that gentleman is sitting

25   is where I was sitting when I observed the execution of Ronald

1    Smith.

2              MR. WILLIAMS:  We move to admit Exhibit 10 at this

3    point.

4              MS. HODGE:  Subject to our relevance objection, I have

5    no other.

6              THE COURT:  I've overruled that objection.  I

7    recognize it as a continuing objection.  Exhibit 10 is admitted.

8         (Plaintiffs' Exhibit 10 received in evidence.)

9    BY MR. WILLIAMS:

10   Q.   So you said that you were sitting about where this man in

11   blue was sitting.

12   A.   Correct.

13   Q.   And are we able to see the whole room, or does it kind of

14   end just right after the part that's cut off on the right-hand

15   side of the photo?

16   A.   So on the right-hand side of the photo, the area that's cut

17   off, basically -- I don't know if it's a trapezoid.  I can't

18   remember my geometry that well.  But, basically, there's a

19   straight wall there with another window similar to that window.

20   Q.   Okay.

21   A.   This picture is being taken from the perspective of a

22   mirror copy of the room that you are looking at across -- I'm

23   sorry.  I keep touching this and marking it -- but a mirror copy

24   of this room across.  That's where the victims' family members

25   are permitted to sit if they are going to choose to witness an

1   execution.  There's then another windowed wall just off to the

2   right here that faces straight on the execution gurney.

3   Q.   To stop you -- we can't see that in this photo.  Right?

4   A.   We cannot.

5   Q.   So that would be facing the feet position?

6   A.   That is correct.  That is where the commissioner and

7   general counsel for the Alabama Department of Corrections sit.

8   There's a phone in there for the governor to reach them if they

9   need to.  They have a similar window set up as the window that I

10  looked through.

11  Q.   And then what is this window that is sort of above the head

12  on the gurney?

13  A.   The warden or the person the warden designates to act as

14  executioner looks through that window during the course of the

15  execution.

16  Q.   And you said you sat here?

17  A.   Yes.

18  Q.   So you had a very good view of the execution, it looks

19  like.

20  A.   I would like to think, given my experience, having scoped

21  out the death chamber before, I felt that that was probably

22  going to give me the best opportunity to see, to have the

23  clearest view possible from my position.

24  Q.   Okay.  And when you first entered the viewing area, what

25  did you see?  What was going on?

1    A.    The drapes were closed.  I took the seat as close as I

2    possibly could to that corner window.  I told Ron that's where I

3    would be sitting so that when he looked over he would know there

4    would be sort of a friendly face there, I suppose.  They opened

5    the curtain shortly thereafter.  Ron was strapped down.  As you

6    can see on the gurney there, they have the arm angle -- arms out

7    at about a 45-degree angle.  Each arm was strapped down.  He was

8    strapped down at the wrist and at the forearm.  I could not see

9    below the waist.  They had swaddled him in a sheet fairly

10   tightly, so I don't know if these restraints there were

11   activated.  There was the restraint across the chest.  So if you

12   look sort of -- there's a middle restraint there, which I could

13   not see.  But that smaller more narrow restraint was across his

14   chest.  His head was free to move about.

15   Q.    Okay.  I mean, how did he -- the curtains were closed, and

16   then they opened?

17   A.    They opened.  He looked a little scared.  He was looking

18   around.  When the curtains opened, he glanced in my direction.

19   I waved my arm up above my head as much as I could, because

20   although this is supposed to be that two-sided glass, where you

21   aren't supposed to be able to see through it, as you can see, it

22   doesn't actually fully serve that function.  The lights were off

23   in our room.  So I'm certain -- I'm fairly confident that he

24   couldn't fully make out everybody who was in there.  But I

25   wanted to make as big a movement as I could so that he knew I

1    was actually there for him.

2    Q.   So did the warden come into the room at any point?  How did

3    you know the execution was about to begin?

4    A.   So when they opened the drapes, there were two corrections

5    officers in uniform in the room, along with the prison chaplain.

6    The prison chaplain was standing down sort of at the right edge

7    of this picture.  You can't see actually exactly where he was

8    standing.  But there was a corrections officer over Ron, what

9    would be Ron's left shoulder.  And there was a corrections

10   officer over what would be Ron's right shoulder.

11        Warden Steward then came into the room, was handed this

12   microphone that's plugged in there on the wire, just above where

13   Mr. Smith's left arm would be -- was handed the microphone, and

14   she read the death warrant.  At the end of reading the death

15   warrant, she asked Mr. Smith if he had any last words.  And he

16   said, "No ma'am."  At that point she exited the room.  Shortly

17   thereafter, one of the two corrections officers exited the room.

18   Q.   Was that the one who was at his left or at his right?

19   A.   At what would be his right.

20   Q.   What would have been Ron Smith's right?

21   A.   Yes.

22   Q.   So did the other officer at his left stay in position?

23   A.   He did initially.

24   Q.   Were you blocked from seeing the execution at any point?

25   Was there only one officer in the room at that point?

1   A.   There was the one officer.  And then down toward -- past

2   the feet, at the corner, there was the prison chaplain.

3   Q.   So were you blocked from seeing the execution at any point

4   by either of those two people?

5   A.   The only time that my view was blocked was during the

6   consciousness check, when initially the officer walked around

7   where Ron's left arm was sticking out, walked around and stood

8   in that crook between his body and his arm.  And I couldn't see

9   for the millisecond that he walked past that, but I had a

10  full-on view of his face and his arm.

11  Q.   Okay.  And what was the chaplain doing while you were in

12  there?

13  A.   So once the second corrections officer left or one of the

14  two corrections officers left, leaving only one behind, and the

15  warden left, the chaplain approached, kneeled at the left arm of

16  Mr. Smith, reached out his right hand and grasped his left hand.

17  And they began to pray.  He lowered his head, and they began to

18  pray.  Ron appeared to be mouthing what looked like the Lord's

19  Prayer.  But without the microphone on, I couldn't actually make

20  out the words that he was doing.  But it appeared he was

21  repetitively mouthing the Lord's Prayer.

22  Q.   Okay.  So could you hear anything that was going on in the

23  room?

24  A.   Not at that point.  At that point I could see that Ron

25  seemed to be talking.  I couldn't see the face of the chaplain.

1    The chaplain stayed down for about 30 to 45 seconds, then stood

2    up and stepped backward back into position.  At that point the

3    -- there's -- you see this little black box there.  I believe it

4    was coming out.  There's a little black box to the left of the

5    window I told you the warden looks through.  There are lines

6    that run through the wall there, IV line.  There was an IV line

7    running into Ron.  The IV line kind of kicked at about 10:30 as

8    if something was being run through it.  At that point Ron kind

9    of put his head back and rested for a second.

10   Q.   So let me stop you.  How did you know it was 10:30?

11   A.   Well, although this picture doesn't have it, they have

12   since installed digital clocks.  There's a digital clock right

13   above the warden's window.  And then, if you were looking out of

14   the warden's window, you would see a digital clock that's

15   identical above the commissioner's window.  So I made note of

16   the time.  Mentally I made note.  I wasn't allowed to have a

17   paper or pencil.

18   Q.   Okay.  So no paper or pencil in the room.  Did anyone have

19   paper or pencil in the room?

20   A.   The media witnesses were allowed to have that.

21   Q.   Okay.  Did they take notes too?

22   A.   I believe so.  I saw one of -- there was a media witness

23   sitting off to my left shoulder.  When I turned to my boss to

24   tell her that they were going to start the execution, I noticed

25   that he had a pencil and paper.

1    Q.    Okay.  So you could see the time.  At 10:30 you said --

2    A.    I saw the line move in mid-air, kick.

3    Q.    Okay.  Then what happened at that point?

4    A.    Well, at 10:31:55, Ron brought his head up and started to

5    kind of look around, and he started clenching and unclenching.

6    I was just focused on his left side, his left fist.  He started

7    to kind of move his arms and move his chest and began giving

8    this almost asthmatic barking cough about every ten seconds.  I

9    don't know if you know anybody who has asthma, but it sounds

10   like a seal is barking.  And he would do one of these coughs

11   about every ten seconds.  He was looking around, trying to mouth

12   words and clenching his fists.

13   Q.    So how long did that go on?

14   A.    It continued throughout the execution, until they injected

15   the paralytic, so somewhere in the neighborhood of 16 to 17

16   minutes all told.

17   Q.    So during that period, I mean, what is going on?  So does

18   Alabama have, you know, a provision for a consciousness check

19   like Arkansas does?

20   A.    They do.  At approximately five minutes in.  So

21   approximately 10:35, the corrections officer, whose job is to

22   remain in the room and conduct a consciousness check, stepped

23   around Ron's arm, stepped into that crook area, and stared at

24   him and said, "Inmate Smith, Inmate Smith," twice, in a fairly

25   loud voice.  I could make it out.  It was below a shout but

1    above a normal speaking voice.

2    Q.    So you could hear that even without a microphone to the

3    room?

4    A.    Correct.  Mr. Smith's eyes remained open.  He continued

5    moving.  At that point the protocol calls for an eyelid brush.

6    So at that point the corrections officer reached his right hand

7    out to Mr. Smith's left eye and brushed his eyelid and

8    eyelashes.  Once that was complete, he stepped back around Mr.

9    Smith's left arm, stepped behind Mr. Smith's left shoulder and

10   reached out and pinched him on the fat on the back of his arm.

11   Mr. Smith's arm then moved as if heading towards his body.  But

12   because it was strapped down, he couldn't get it very far.

13   Q.    So the pinch, could you tell how long that lasted?

14   A.    It was short.  It was just what you would expect an average

15   pinch to take.

16   Q.    And what did you see him -- did you see him respond, or

17   what happened?

18   A.    As I said, he started to move his arm as if toward his

19   body.  And at that point the corrections officer stepped back

20   into position with his back up against the wall, standing sort

21   of at a parade rest, I guess you would call it.  At that point I

22   realized Mr. Smith was still conscious.  He continued to show

23   movement.  His eyes were open.  He attempted to mouth words.  I

24   thought to myself, I don't know what they are going to do.  I

25   then began to hear sort of loud panicked voices coming from the

1  commissioner's room.  I didn't know what was going on in there,

2  but it sounded like they were having some issues, trying to

3  figure out --

4          MS. HODGE:  Your Honor, I'm going to object.  This

5  witness can't speculate as to whether or not the commissioner or

6  other persons were panicked or that something was going wrong.

7  He just testified he didn't know what was being said.

8          THE COURT:  I'll overrule the objection.  You can

9  proceed.

10 BY MR. WILLIAMS:

11 Q.   So you didn't hear what was being said.

12 A.   No.  I could hear the tone of the voices.

13 Q.   You could hear the tone.

14 A.   Right.  At that point the corrections officer remained

15 standing there.  They began the second dose of 500 milligrams of

16 midazolam.

17 Q.   So when you say the second dose, they had already injected

18 how much?

19 A.   500 milligrams.  They have a back-up dose that they use if

20 the person is still conscious after the first consciousness

21 check.

22 Q.   And was there another jiggling?  Is that how you --

23 A.   What caused me primarily to notice it was that Ron reacted

24 the exact same say.  He put his head back for a second.  Then

25 his head came back up, and he started struggling again and

1    clenching and unclenching his hands while mouthing words.

2    Q.    So his arms are strapped down pretty tight.  Right?

3    A.    They were tight, yes.  But there was some give in those

4    restraints.

5    Q.    Okay.

6    A.    He was able to move the arms, and he could actually

7    basically move his wrists up like this (indicating).

8    Q.    So are the hands strapped down?

9    A.    Uh-huh.  They are strapped down at the wrist.

10   Q.    At the wrist.

11   A.    And at the forearm.

12   Q.    So you could sense a struggle there.

13   A.    Yes.  And then approximately five minutes after I noticed

14   that, a second consciousness check was conducted.  The

15   difference between this consciousness check and the first

16   consciousness check was with respect to the eyelid aspect.  This

17   time the corrections officer, instead of just brushing the

18   eyelid up, he actually brushed it down as well at the end, as if

19   trying to hold it shut.  It then popped back open.  He went back

20   around, pinched the fat on the back of the arm.  This time his

21   arm didn't move back this way, but his right arm fist clenched

22   and unclenched.

23   Q.    So you are able to see the right arm from your vantage

24   point?

25   A.    Yes, I was.

1    Q.   So, I mean, at that point what did you think was going to

2    happen?  What's going through your mind?  You have two

3    consciousness checks, which you don't expect to see unless you

4    have a second injection of the drug midazolam under the

5    protocol.  Is that right?

6    A.   Yes.  At that point I turned to my boss.  And I said, "I

7    think they are going to call this off.  He is still conscious.

8    They don't have a protocol for going with a third injection of

9    midazolam."

10   Q.   And did that happen?

11   A.   It did not.  Shortly thereafter, I noticed that his

12   breathing slowed, and he stopped moving completely.  I then

13   leaned down in my chair like this and rested my left arm on the

14   armrest, because I was trying to convince myself that his

15   breathing was not getting more shallow.  So I held up my left

16   thumb, and I put it so that the top of his chest reached the top

17   of my left thumb, and I watched.  As I watched, his breathing

18   got shallower and shallower.  And within about one to two

19   minutes, they came up and closed the curtains.  And it was

20   fairly obvious Mr. Smith was deceased.

21   Q.   So then he was pronounced dead?

22   A.   I don't know about that.  They closed the curtains.  When I

23   got up -- they then had us leave.  I got up, I stood on my tippy

24   toes.  There's a little gap between the curtains.  And when I

25   stood on my tippy toes, I could see nobody had actually come to

1    approach him.  But as we left the building, the medical

2    examiner's officials were still sitting in their van outside.

3    They would be the folks who would pronounce death.

4    Q.    Okay.  So in total, how long did this execution last?

5    A.    Seventeen to 18 minutes, from when I believe they started

6    the midazolam at 10:30.

7    Q.    And then the -- beyond that, do you think they injected the

8    drug, the second drug after?

9    A.    After the first consciousness check.  In terms of when you

10   are saying second drug, do you mean the paralytic?

11   Q.    Yes.

12   A.    They injected the paralytic after they had already done two

13   pushes of midazolam.

14   Q.    Okay.

15   A.    And from that point, it was about a minute to two minutes

16   before it was over.

17   Q.    Okay.

18              MR. WILLIAMS:  Nothing further for now.

19              MS. HODGE:  May I have one minute, Your Honor?

20              THE COURT:  You may.

21                        CROSS-EXAMINATION

22   BY MS. HODGE:

23   Q.    Good afternoon, Mr. Hahn.

24   A.    Good afternoon.

25   Q.    I'm going to try to sort my papers out and then ask you a

1  few follow-up questions.  You testified on direct that you've

2  been practicing law -- I think I got the numbers right -- for

3  about 10 years.  Is that correct?

4  A.   I was admitted in September of 2004 in the State of Oregon,

5  so we're approaching 12 1/2 years now, I think.

6  Q.   And you've worked as an attorney since you've been

7  licensed.  Is that correct?

8  A.   Correct.

9  Q.   And you are not a medical doctor.  Is that correct?

10 A.   Absolutely not.  I'm not a medical doctor at all.

11 Q.   And I gather from your answer that you don't have any sort

12 of medical training.

13 A.   I was a philosophy major in college.  The only medical

14 training that I have is I did spend a month in a hospital ICU

15 with my wife after she had a stroke.  That's the only real

16 substantial experience I have.

17 Q.   I'm sorry to hear that.

18 A.   Thank you.

19 Q.   You haven't performed any medical or scientific testing on

20 midazolam, have you?

21 A.   I have not.

22 Q.   Have you read information about the drug midazolam?

23 A.   Lots and lots of information.

24 Q.   You've been in the courtroom while the plaintiffs' expert,

25 Dr. Stevens, has been testifying.  Is that correct?

1    A.    I was in here for probably about half of his testimony.  I

2    stepped in and out and checked my email.

3    Q.    Were you in here when Dr. Stevens opined that midazolam

4    cannot be used as an anesthetic and could not be used to induce

5    deep anesthesia or death?

6    A.    Yes.  I think that was covered about 18 different times.

7    Q.    You disagree with that opinion, don't you?

8    A.    Do I disagree with his opinion that -- oh, you mean in

9    terms of whether it can cause death?  I think what you are

10   getting at is that we have pled an alternative in Alabama in our

11   litigation based on some information from Oklahoma as well as I

12   believe Dr. Buffington's testimony in a deposition that we had

13   that 500 milligrams, according to those two experts, could cause

14   death in a person.

15   Q.    And my question is you disagree with Dr. Stevens'

16   testimony, his opinion.

17   A.    Well, personally, I don't disagree.  There are two experts

18   who do, and we pled that as an alternative.

19   Q.    You have relied on that in the State of Alabama.  Those

20   opinions are different from Dr. Stevens' that the State of

21   Alabama he has relied on.  Isn't that correct?

22   A.    Absolutely.  We have relied on that in our pleadings to

23   establish an alternative, yep.

24   Q.    Hasn't the State of Alabama also relied on testimony that

25   establishes that midazolam could be used to induce deep

1    anesthesia and death?

2    A.    They made an offer to us to permit a 500-milligram

3    midazolam-only protocol.  So, yes, they have to some extent

4    relied on that.

5    Q.    You mean "they" meaning the State.  You personally are in

6    litigation as the attorney representing inmates in the State of

7    Alabama.

8    A.    The Attorney General's Office offered a one-time only deal

9    where one of our clients would be executed with --

10   Q.    I appreciate that, Mr. Hahn.  I can rephrase the question.

11   A.    Absolutely.

12   Q.    Okay.  I'm asking about your reliance as an attorney, who

13   represents death row inmates, on information that suggests that

14   midazolam can be used to produce deep anesthesia and induce

15   death.

16   A.    I don't know about the deep anesthesia part.  But the death

17   part, yes, I would agree with you.

18   Q.    You testified that you have done -- that you have read a

19   lot of information on midazolam.  Then you are aware that one of

20   the side effects of midazolam is respiratory depression.

21   A.    That's what I heard testified to today, and I think it's

22   probably in one of the pamphlets or inserts or something.  But,

23   again, I'm not a doctor or a medical professional.

24   Q.    Because you are not a doctor or a medical professional --

25   scratch that.  I want to turn your attention to the Christopher

1    Brooks' execution.  Are you familiar with that?

2    A.    Yes, I am.  I didn't witness it.  But, yes, I am.  Our

3    office litigated that case.

4    Q.    Mr. Brooks was executed using Alabama's midazolam protocol

5    that calls for the 500-milligram dosage.  Isn't that correct?

6    A.    He was, yes.

7    Q.    And you are aware that Mr. Brooks' execution was not

8    problematic.  Isn't that correct?

9    A.    That's not correct.

10   Q.    Okay.  Do you have any evidence that proves that there were

11   problems with Mr. Brooks' execution?

12   A.    Yes, I do.

13   Q.    What would that be?

14   A.    Well, it would be the statement of one of our investigators

15   who witnessed the execution.

16   Q.    And wouldn't you agree with me that that statement is

17   limited to one movement of the left eye?

18   A.    The statement does mention that after the paralytic was

19   injected his left eye popped open and remained open, yes.

20   Q.    So that's the extent of your testimony that there was

21   problems with Mr. Brooks' execution?

22   A.    Correct.  That and the expert that we retained who

23   discussed the meaning of that, and the fact that based on the

24   fact that there was muscle movement after the injection of the

25   paralytic, something went wrong with the paralytic.

1   Q.   You are aware that following an administration of midazolam

2   an inmate might display nonpurposeful movement?

3   A.   I've heard testimony to that effect in various forums.  I'm

4   not personally aware of whether an inmate would demonstrate

5   nonpurposeful movement.

6   Q.   Okay.  Would it surprise you to know that in all of the

7   articles that I was able to find regarding the Christopher

8   Brooks' execution using the 500-milligram dosage of midazolam

9   that witnesses reported the execution was not problematic?

10  A.   Yeah.  I think Kent Faulk -- and I think there was an AP

11  reporter -- both of whom witnessed the Ron Smith execution as

12  well.  I don't believe that they reported on any problems with

13  the execution.

14  Q.   So you don't have any -- I have those.  So you are familiar

15  and have read those where they reported that media witnesses

16  present said there did not appear to be signs of struggle or

17  distress during the procedure?

18  A.   I read those articles, yes.

19  Q.   You gave some testimony about the consciousness check

20  performed in Mr. Smith's case.  I want to shift gears and talk

21  about Mr. Smith's execution.  Before I do, have you -- how is it

22  that you came to be a witness in this case?

23  A.   Mr. Williams from the Federal Defender's Office contacted

24  me -- I think it was the middle of last week or early last week

25  -- and said that he anticipated calling me as a witness

1    regarding the Ron Smith execution.

2    Q.    Did you review any documentation in preparation for

3    testifying today?

4    A.    I did.  I reviewed my affidavit, which I drafted I think

5    December 13th of 2016, about five days after the execution.  And

6    I reviewed my testimony in the Ohio litigation, which I gave in

7    January of 2017.

8    Q.    Did you, by chance, review the ADC's lethal injection

9    protocol?

10   A.    No.  I don't know anything about Arkansas's protocol other

11   than that they use three drugs, and it looks like maybe the

12   dosages are the same.

13   Q.    So you don't know whether or not that the ADC's protocol,

14   for example, calls for a medically trained or educated designee

15   to perform the consciousness check?

16   A.    Correct.  I have no idea if they do.

17   Q.    You haven't viewed or seen any photographs or videos of the

18   ADC's execution chamber?

19   A.    No.  I have no idea what it looks like.

20   Q.    When you were representing Ronald Smith, you challenged

21   Alabama's use of a 500-milligram protocol following Christopher

22   Brooks' execution.  Isn't that correct?

23   A.    Yes.  We actually pled the details of Christopher Brooks'

24   execution.

25   Q.    And those details were insufficient to secure a stay in Mr.

1    Smith's execution.  Isn't that correct?

2    A.   Yes.  And there was a statute of limitations issue that I

3    think the federal court there decided we were not within two

4    years of a change in the protocol.

5    Q.   And since you mentioned that, you have been part of what

6    I'll call Alabama's midazolam lethal injection team.  Is that

7    correct?

8    A.   Absolutely.

9    Q.   Where you have filed these similar actions on behalf of

10   several death row inmates challenging midazolam, consciousness

11   checks, and other portions of the Alabama protocol.  Isn't that

12   correct?

13   A.   Yes.  I think I actually talked to the 11th Circuit death

14   clerk the other day, who was surprised to see five more appeals

15   come up.  I think we calculated that we have ten folks currently

16   pending before the 11th Circuit on the same or similar

17   complaints.  And they were in what was consolidated by Chief

18   Judge Watkins as the, quote, midazolam litigation.

19   Q.   And in those cases, the district court there in Alabama has

20   opined that all of those claims have been -- are time barred,

21   because they should have been brought 16 years ago, when the

22   State of Alabama introduced its three-drug protocol.  Isn't that

23   correct?

24   A.   Yes.  With respect to Chief Judge Watkins, he's wrong on

25   the statute of limitations issue.  And we hope to prevail on

1   appeal.  But you are correct.  He has ruled against us on the

2   statute of limitations ground.

3   Q.   And he's ruled against you for your statute of limitations

4   issues on all of your claims, including the three-drug protocol,

5   the consciousness check and your equal protection claims.  Isn't

6   that correct?

7   A.   Yeah.  I think the equal protection claim was only raised

8   by one of the defendants.  I think that was Cary Grayson.  I

9   think the others didn't have an actual equal protection claim.

10   But, yes, he has ruled against us on all untimeliness grounds.

11              MS. HODGE:  May I have just a second, Your Honor?

12              THE COURT:  You may.

13   BY MS. HODGE:

14   Q.   Mr. Hahn, you testified that you witnessed Mr. Smith's

15   execution and that there were -- that he moved following the

16   administration of midazolam.  You don't have any way of knowing

17   whether or not Mr. Smith was experiencing any level of pain, do

18   you?

19   A.   I wasn't in Mr. Smith's body.  No, I couldn't say what he

20   was experiencing.

21   Q.   Okay.

22              MS. HODGE:  Your Honor, I pass the witness.  Thank

23   you, Mr. Hahn.

24              THE WITNESS:  Thank you.

25              THE COURT:  Redirect.

1                          REDIRECT EXAMINATION

2    BY MR. WILLIAMS:

3    Q.    Just briefly.  Were you able to raise any of these issues

4    with any court or cocounsel who was not in the room during the

5    execution?

6    A.    I'm sorry.  What do you mean by raise any of these issues?

7    Q.    So were you able to -- you seem to be alarmed about --

8    A.    You are saying could I contact anyone during the execution?

9    Q.    Yes.

10   A.    I wasn't permitted to.  We lost our challenge to the access

11   to the court's claim.  Had I had the opportunity to do so, I

12   would certainly have attempted to reach Chief Judge Watkins by

13   telephone and told him in the middle of the execution they were

14   going on to a second consciousness check, and I would have asked

15   for an emergency stay.

16              MR. WILLIAMS:  Thank you.

17              THE COURT:  Anything further?

18              MS. HODGE:  No, Your Honor.  Thank you.

19              THE WITNESS:  May I be excused, Your Honor?

20              THE COURT:  You may.

21              THE WITNESS:  Thank you.

22              THE COURT:  You may call your next witness.

23              MS. GIANI:  Plaintiffs called Ziva Branstetter.

24        **ZIVA BRANSTETTER, PLAINTIFFS' WITNESS, DULY SWORN**

25              MS. HODGE:  I apologize.  Just so I'm not interrupting

 1   the standing objection for relevance for other states, I'll do

 2   it at the beginning of each witness so I'm not interrupting

 3   testimony to give my standing relevance objection.

 4           THE COURT:  That's fine.  I will note the continuing

 5   objection to this line of questioning with this witness.  You

 6   may proceed.

 7                    DIRECT EXAMINATION

 8   BY MS. GIANI:

 9   Q.   Good afternoon.  Can you please start by just stating your

10   full name for the record.

11   A.   Certainly.  Ziva Branstetter.

12   Q.   And could you just give us a brief outline of your

13   professional background and experience.

14   A.   Yes.  I'm a graduate of Oklahoma State University.  I've

15   been a professional working journalist since 1988.  I worked at

16   the *Tulsa World* for about 24 years.  And then I left two years

17   ago to start an investigative news website called The Frontier

18   with several other reporters from the world.  I was recently

19   hired by the Center for Investigative Reporting as the senior

20   investigations editor, which I start in like a week.  And I'm a

21   Pulitzer finalist.  And I'm the vice president of the Board of

22   Investigative Reporters and Editors.

23   Q.   In your work as a journalist, have you covered executions?

24   A.   Yes.  I've witnessed four executions.

25   Q.   And where were those executions?

1    A.   They were all in Oklahoma, starting in 1990, and ending

2    with the Lockett execution.  I was chosen as a witness for the

3    Richard Glossip execution as well, but that was called off.

4    Q.   When you referred to the Lockett execution, who were you

5    referring to there?

6    A.   I'm sorry.  The Clayton Lockett execution, April 29th,

7    2014.

8    Q.   You said you've witnessed four executions.  Were all of

9    those single executions or set for single executions?

10   A.   Yes.  Actually, three of them were, and then -- three

11   episodes.  Then the fourth was Clayton Lockett.  There were to

12   be a double-header sort of, as the governor's staff said.  That

13   night there was going to be Charles Warner was going to be the

14   second execution.  Clayton Lockett was the first execution.  Of

15   course, when that went wrong, they called off the second

16   execution.

17   Q.   Were you covering both executions that night, both the

18   Lockett and the Warner execution?

19   A.   No.  So since I began, I was in charge of the death penalty

20   coverage at the *Tulsa World,* I decided that we needed two

21   reporters, even if it was one inmate, to adequately cover.

22   Sometimes there's protesters outside, so we always brought two.

23   Especially this evening we wanted two reporters.  So my

24   reporting partner, Cary Aspinwall, was chosen as a witness for

25   -- actually, since the crime happened, the Lockett -- some of

1  these crimes happened in our jurisdiction.  We got to witness

2  it.  She was chosen as a witness for the second execution for

3  Charles Warner.  So I witnessed Lockett, and she was supposed to

4  witness the Warner execution.

5  Q.   So since you weren't witnessing the Warner execution, were

6  you able to report right away on the Lockett execution?

7  A.   Yes.  As soon as they let us out of the room.

8  Q.   Can you describe your experience witnessing the Lockett

9  execution, I guess starting with when you arrived at the

10 facility to, you know --

11 A.   Sure.  So they do give you pen and paper when you go into

12 the death chamber.  You arrive at the media center.  And I'm

13 referring to a sort of minute-by-minute account that I took that

14 night in my notes.

15 Q.   I'm sorry.  Let me -- is that minute-by-minute account, is

16 that part of an article that you wrote on the execution?

17 A.   Correct.  Yes, for the *Tulsa World*.  It was part of our

18 Pulitzer entry.  And I kept notes.

19 Q.   Just to clarify, was that one of the reports that you filed

20 right after the execution?

21 A.   Correct.  So I filed it about 2:30 a.m.  I'm sorry to

22 interrupt.  So about 5:30 p.m., they took all -- there were 12

23 media witnesses.  They took us all in two vans up to the death

24 chamber.  You get searched extensively.  You are all given the

25 same notebook and a pen.  You go into a holding area -- it's

1    called the law library -- while they usher other groups of

2    witnesses into the sort of four-room complex where our execution

3    chamber is.  And the media witnesses are sort of led down a long

4    hallway and into the death chamber, into the viewing chamber.

5         There are official witnesses there:  The sheriff of the

6    county where the crime occurred, the former sheriff, the public

7    safety commissioner, the Department of Corrections director,

8    people like that.  Two federal public defenders were then as

9    well and 12 media witnesses.

10        So we -- you know, we were waiting.  You can hear inmates

11   banging very loudly on the cell bars.  And I wrote in my story

12   that's supposedly a sign of some kind of send off that they do.

13   Then we were taken -- we were just waiting.  And the thing I

14   noticed about it is it took much longer to begin, for the shades

15   to be drawn up.

16   Q.   Longer than from your previous three experiences?

17   A.   Correct.  Normally, it is like, you know, it's six o'clock,

18   the shades come up, and within eight minutes.  In fact, we did a

19   study that within six to eight minutes all the inmates

20   previously had -- most of them, the vast majority, had died.

21   But it took 23 minutes past its scheduled starting time with the

22   Clayton Lockett execution, because they had a great deal of

23   trouble, we found out later, getting vein access and getting an

24   IV set.

25        And so about at 6:23 p.m., they asked if he had any last

1   words, the warden.  Anita Trammell asked Clayton Lockett if he

2   had any last words, and he said no.  And they said, "Let it

3   begin."  Then 6:28 is when they started injecting the midazolam,

4   50 milligrams of midazolam in each arm, so a hundred milligrams

5   total.

6   Q.   That's what the protocol called for was 50 milligrams in

7   each arm?

8   A.   Correct.

9   Q.   Do you know if that's what actually happened with Mr.

10  Lockett?

11  A.   Nobody knows how much -- the amount of drugs that Clayton

12  Lockett got either at the first, second or third drug because

13  his IV infiltrated.  The IV line was not properly set.  It was

14  going into his groin, and they didn't have the correct size

15  needles.  So anyway, it infiltrated and went into his tissue.

16  Q.   So it wasn't one in each arm.

17  A.   No.  We thought that it was.  It's hard to tell, because

18  the IVs are coming out of the wall, and the offender had a sheet

19  pulled up over the gurney.  The purpose of that was to protect

20  his privacy is what they said.  But it made it very difficult

21  for them to tell the line had infiltrated.

22  Q.   At the time you were witnessing, you assumed it was going

23  according to protocol?

24  A.   Yes.  I'm sorry.  Yes.  Everyone assumed that.  In fact, I

25  wrote it.  We didn't learn really the full truth of this for --

1    we're still, you know, still trying to learn the full truth of

2    it.  It took a while for the state to investigate it and to get

3    all the facts out.

4    Q.    Then what happened after the injection of midazolam?

5    A.    So according to my notes, you know, 6:28, they inject

6    midazolam; 6:29, his eyes are closed, his mouth is open

7    slightly; 6:31, the doctor checked Clayton Lockett's pupils is

8    what I've written.  I'm not sure if they brushed his eyelids.

9    Sometimes it's hard to tell.  He had his back to me.  But he

10   definitely looked very closely at his face, and he put his hand

11   on his chest and kind of jiggled his chest gently, not real

12   violently.  And he said, "Mr. Lockett is not unconscious."  And

13   this is 6:31.  So 6:33, after a full minute without any

14   movement, the doctor conducted a second consciousness check.

15   And he said, "Mr. Lockett is unconscious."  This was at 6:33.

16   Q.    Let me interrupt you right there for just a second.  You

17   say the doctor.

18   A.    Yeah.

19   Q.    How do you know it was a doctor that was performing this

20   check?

21   A.    Our protocol called for a doctor or I believe a military

22   equivalent.  It called for a doctor, and the Department of

23   Corrections said it was a doctor.  I had no reason to not

24   believe that.  It was also identified as a doctor in later civil

25   litigation.

1  Q.    Okay.  So this doctor did two consciousness checks.  Is

2  that correct?

3  A.    Correct.

4  Q.    The first one, the result he said was Mr. Lockett was still

5  conscious.

6  A.    Correct.  That was at 6:31.

7  Q.    Do you know why he made the determination that Mr. Lockett

8  was still conscious?

9  A.    I don't.

10  Q.    Were you able to -- where were you seated in relation to

11  the execution chamber?

12  A.    There were four broad viewing windows -- it looked a lot

13  like the chamber we just saw the picture of, quite a bit -- and

14  two rows of metal folding chairs, one much higher than the

15  other.  And I was in the second row.  It's a better vantage

16  point.  You are higher up.  And I was right in the middle.

17  Q.    So do you feel like you could see pretty much everything

18  that was happening?

19  A.    Yes, yes, everything.  And I just remember him putting his

20  hand on his chest and looking very closely at his face.

21  Q.    Did you see any movement during that consciousness check

22  from Mr. Lockett or prior to the consciousness check?

23  A.    Prior, yes.  At 6:28 -- as far back as 6:28, I had that he

24  spent several minutes blinking and pursing and licking his lips.

25  And then his eyes were closed.  His mouth was open.  There was

1    like a brief minute there where I thought, okay, he's

2    unconscious.  This is what I'm used to expecting.  And then, you

3    know, he started moving at 6:36.

4    Q.   Was this after the second consciousness check?

5    A.   Correct.  After he had been pronounced unconscious.

6    Q.   And this was after the injection of the midazolam as well?

7    A.   Correct.

8    Q.   Okay.  Can you tell us then what happened after that?

9    A.   So three minutes after he was pronounced unconscious, he

10   kicked his right leg, rolled his head to the side.  He mumbled

11   something.  No one -- I couldn't understand what he said, but he

12   clearly was trying to talk.  And then the next minute, my notes

13   reflected that his body started writhing at 6:37 and bucking.

14   And I wrote, and many people wrote that it looked like he was

15   trying to get up.  And then he uttered some other unintelligible

16   statements.  I have in my notes the defense attorney began

17   crying.  6:38, one minute later, he -- Clayton Lockett was

18   grimacing, and he was clenching his teeth.  He was bucking.  And

19   I mean the most shocking thing to me -- and I've been around the

20   block 25 years covering a lot of things in Oklahoma.  And it

21   really looked like he was trying to get up off the table.

22   Q.   So I guess a couple of follow-ups from there.  Just to

23   confirm, this was after he had been declared unconscious.

24   A.   Well after, yeah.  So the first consciousness check was

25   6:31.  Two minutes later he's declared unconscious.  And then he

1    begins moving three minutes after that, 6:33.  6:36, then he's

2    continuing to move for several -- three full minutes he moved

3    after being pronounced unconscious.

4    Q.    And was this -- were you able to tell if the second and

5    third drugs were being administered?

6    A.    We believe that they were.  Their protocol calls for -- at

7    least it calls for five minutes after the first drug is

8    administered.  And in some of our later reporting we wrote about

9    the amount of drugs that were returned and so forth.  But, you

10   know, at this time we didn't know.  There were drugs spilled on

11   the floor.  He had a large sort of bulge in his flesh where the

12   flesh had infiltrated with the drug.  So what I heard from

13   experts that we talked to is that the drugs were having a much

14   slower effect because they were in his tissue and not in his

15   bloodstream.  But, no, we don't know how much of the second or

16   the third drug got into his system.  In fact, the investigation

17   showed that.

18   Q.    So let me back up a little bit.

19   A.    Uh-huh.

20   Q.    From your perspective, were his movements voluntary?

21   A.    Yes, absolutely.

22         MS. HODGE:  Your Honor, I'm going to object.  There is

23   no foundation for this witness to be able to opine whether or

24   not Mr. Clayton's movements were voluntary.

25         THE COURT:  I'll take it for what it's worth.  I'm

1   going to let you proceed and ask the questions.  You may

2   proceed.

3   BY MS. GIANI:

4   Q.   I'm sorry.  I don't know if you answered or not.

5   A.   Yes.  They were absolutely voluntary.  I mean, I'm an

6   observer of human behavior, as we all are.  And we filed an open

7   records lawsuit against the State of Oklahoma, the *Tulsa World*

8   and the Reporters Committee for the Freedom of the Press.  And I

9   was the lead plaintiff.  We through that got 101 transcripts of

10  all the interviews that the state conducted.  And there were

11  maybe one or two witnesses who were sort of very official types

12  for the government that said, oh, maybe he had a seizure.

13  Everyone across the board thought that he was trying to get up:

14  The executioner, the paramedic, the doctor, the warden.  So this

15  isn't just my, you know, reflection.

16  Q.   Have you seen someone have a seizure or convulse before?

17  A.   When I was a kid once at the pool, yeah, I did.

18  Q.   Did it look like that?

19  A.   No.  He was talking.  I mean, there was a witness for the

20  state who heard him say -- and it's a curse word.  But he said,

21  "This shit is fucking with my mind."  I didn't hear that.  I

22  just heard him say, "Man," you know.  And that's the only word

23  that I wrote down when I reported this that I actually heard him

24  say, because it depended on where you were sitting as to what

25  you heard on the microphone.

1  Q.    So did Mr. Lockett's execution differ from the other three

2  executions you had witnessed?

3  A.    Yes, markedly.

4  Q.    And I think you talked about it started later.  But

5  compared to the other three executions, was there, for instance,

6  more movement from Mr. Lockett?

7  A.    Yeah.  The other three executions I witnessed -- 1990,

8  Charles Troy Coleman, Jay Wesley Neill.  About ten years after

9  that, I believe -- it's not a duty that I volunteer for eagerly.

10 It's something that if no one else will do it, I did it as an

11 editor, as a senior reporter -- then Michael Wilson, who they

12 were all about eight minutes.  The inmates all ended up sort of

13 snoring at the end.  And it was -- they were all very much the

14 same.  Clayton Lockett's execution lasted 43 minutes.

15 Q.    And after the execution, did you write articles both about

16 the execution and what happened afterwards?

17 A.    I did.  I mean, so after all this movement, of course, they

18 called off the execution essentially, as we reported, then

19 lowered the blinds.  The director of corrections came in and

20 said, "We're stopping this."  And then:  "We had a vein failure"

21 is what he said, which our later reporting and medical experts

22 said that veins don't fail.  An IV -- the investigation found

23 the IV was improperly placed.  And then there was a lot of

24 confusion when we got back to the media center.  Charles

25 Warner's execution was stayed.

1       So we spent -- I mean, I'm still writing about this

2   execution today.  We spent three or four months investigating it

3   very thoroughly and with a lot of records and a lot of

4   interviews of experts on both sides.  I got 109 autopsy reports

5   of every inmate who has been executed in Oklahoma.  I collected

6   a lot of data on the amount of drugs that were in their

7   bloodstream, what their weight was, what their gender, how many

8   IV lines they had, where the IV lines were.  We collected

9   protocols from every state that was actively executing people

10   and compared all of those protocols on ten different factors.  I

11   mean, it was a very -- the only thing I was determined to do was

12   get facts, because Oklahoma is a very, you know, red state.

13   There's a lot of politics, a lot of anger.  So I just wanted to

14   get the facts out, so that's what we tried to do.

15   Q.    Had you written about this execution before the execution?

16   A.    Yes.  We covered the legal back and forth probably for six

17   months or so, because, of course, this was a new drug, and so

18   you had the situation in Ohio with the problematic execution.

19   People were concerned.  There was a fight over the secrecy law

20   in Oklahoma, which is very much like Arkansas and other states.

21   So, yes, we covered all those legal proceedings.

22   Q.    So this was the first execution in which Oklahoma used a

23   three-drug protocol with midazolam as the first drug?

24   A.    Correct.

25   Q.    And did state officials and corrections officials make any

1   statements affirming their belief that everything was going to

2   go according to plan?

3   A.    They did, yeah.  They did.  In fact, the warden had an

4   affidavit saying that she had checked the drugs and they were

5   according to protocol.  And then she was informed by the

6   Department of Corrections director that she didn't really check

7   the drugs and she couldn't say that, so they issued a second

8   affidavit.

9   Q.    But they were assuring the public and everyone else that

10  they anticipated everything would go according to plan.

11  A.    They did.

12  Q.    In your mind, and based on your experience witnessing the

13  execution and your investigation and reporting on it, did things

14  go according to plan?

15  A.    Not at all.

16  Q.    I think you mentioned a little bit ago that you interviewed

17  some experts in your reporting.

18  A.    Uh-huh.

19  Q.    About how many -- well, experts on what, I guess?

20  A.    The majority were experts, sort of medical experts.  So we

21  had several anesthesiologists.  We had the man who created the

22  three-drug cocktail protocol -- it started in Oklahoma -- Dr.

23  Jay Chapman.  He's the medical examiner.  He created this.  So I

24  interviewed him.  We interviewed Mr. -- I interviewed Mr.

25  Dershwitz.  I interviewed a Kentucky school -- we interviewed

1   Mark Heath, who we noted in all of our reporting whether people

2   had testified for the state or for the inmates in various

3   states, and we're aware of this phenomenon.  But there were

4   several people that we interviewed that really weren't very

5   active in terms of being experts -- I can't find the name --

6   Frank Romanelli from the University of Kentucky, who was a

7   professor, associate dean, professor at the University of

8   Kentucky College of Pharmacy.  And what we were trying to do is

9   find out about this drug and educate ourselves about whether was

10  it a sedative or was it an anesthetic, how much ceiling effect.

11  All the things y'all have been talking about we were trying to

12  find out as well but then put it in layman's terms.

13  Q.    And about how many experts did you interview in that

14  regard?

15  A.    I would say eight people that we ended up quoting and that

16  we, you know, vetted and felt like were reputable people on both

17  sides, and including a legal expert on death penalty legal

18  issues.

19  Q.    As far as being sufficient to anesthetize the prisoners,

20  how many of those experts opined that it was sufficient?

21  A.    One.

22  Q.    Who was that?

23  A.    That was Mr. Dershwitz.

24  Q.    Was he known to testify, or had he testified previously for

25  the state in other states?

1    A.    Yes.  We noted that he had testified on behalf of the state

2    in Florida and that Oklahoma was attempting to use his testimony

3    in Florida as a means to say, hey, midazolam will work because

4    he said so in Florida.  And part of the criticism of that by

5    other experts was, well, you are not talking to him.  He's not

6    here.  He doesn't -- you know, it was very indirect.  But I

7    talked to him as well.

8    Q.    Okay.  Are you aware of any formal investigation into the

9    Lockett execution?

10   A.    Yes.  The state did quite a lengthy investigation.  They

11   interviewed more than a hundred people.  This happened on

12   April 29th, and the report came out in September.

13   Q.    How did that investigation come about?  What caused that to

14   happen?

15   A.    The governor appointed the public safety commissioner,

16   Michael Thompson, who witnessed the execution and was over the

17   Department of Public Safety, to conduct it.  But basically he

18   oversaw it and had the investigators with his agency conduct the

19   investigation.

20   Q.    And did you report on that investigation as well?

21   A.    I did report on the investigation.  And I also agreed to

22   talk to the state.  As I told you, and as I tell anyone, I feel

23   like part of my job as a media witness is to say what I saw,

24   just the facts.  So, yes, we did report on the investigation.

25   Basically, it found that the staff of the prison was under a

Branstetter - Direct                                            403

1    great deal of pressure that night because there were two

2    executions back to back, and that added a lot of pressure two

3    hours in between them.  The protocols were lacking.  There was

4    no ultrasound machine in case they couldn't get a line.  But the

5    pressure over all the staff was a very important issue.  And the

6    IV line being improperly placed, the paramedic, I believe, said

7    the pressure kind of led to some of that.

8    Q.    And you referenced earlier these transcripts from -- was it

9    the Department of Public Safety that interviewed everybody?

10   A.    Yeah, 101.

11   Q.    Are those the transcripts you were referring to?

12   A.    Correct.

13   Q.    That you got through -- was it a public information

14   request?

15   A.    Yes.  And it remains pending today.  We are still seeking

16   some records that have been withheld.  But that's kind of a

17   normal part of the back and forth of open records in Oklahoma.

18   That's your only route of appeal if you are denied.

19   Q.    And you reviewed all of those transcripts from all of these

20   different people.

21   A.    Probably 50,000 pages of records over the last three years.

22   Q.    And you mentioned some of the findings in the report.  I

23   would like to go to Plaintiffs' Exhibit 19.  I believe this has

24   already been admitted, but I want to double-check if I can.

25             THE COURT:  I have it as admitted.

1          MS. GIANI:  We have obtained a certified copy just in

2    case that was going to be an issue if you would like me to give

3    you the certified copy.

4          THE COURT:  Certainly.

5      Thank you.

6          MS. GIANI:  That certified copy should be the same,

7    identical to what's in Plaintiffs' Exhibit 19.

8    BY MS. GIANI:

9    Q.   I want to go through a little bit of this report,

10   particularly the findings and recommendations.

11   A.   Okay.

12   Q.   Or some of them.  Maybe not all.

13       So if we could go to page 29, Sharon.

14       In Section I, it says, "contingency planning for

15   executions."

16   A.   Uh-huh.

17   Q.   "The DOC execution protocol in effect on April 29th" -- is

18   that the date of Lockett's execution?

19   A.   Correct.  It was supposed to be beginning at 6 p.m., but it

20   was 6:23 p.m.

21   Q.   -- "had limited provisions for contingencies once the

22   execution process began."  Does that finding square with what

23   you found in your investigation as well?

24   A.   Yes.  So they did not have -- once they had trouble finding

25   good vein access in the normal places, they went to -- I think

1    it's called a central line, but they did an IV in the groin.

2    And the doctor said, "We don't have the right size needles."

3    They didn't have an ultrasound machine.  I mean, we have several

4    quotes from the transcripts that we reported in where, you know,

5    the staff was talking about the pressure of just get it done,

6    hurry up.  The paramedic mentioned it.  One member of the

7    execution team told the investigators, "The warden, you know,

8    said it was very bad.  And she said, "Well, we're all going to

9    be going to federal court."  There was an air of urgency.

10   Everyone that was closely associated with this described it that

11   way.

12   Q.   I think there's actually another finding.

13   A.   Yes.

14   Q.   Let's go to -- let's see.  Maybe we can go to the

15   recommendations.  Sorry.  Okay.  Page 35, Section H.  I believe

16   this is getting into the recommendations.  "But due to manpower

17   and facility concerns, executions should not be scheduled within

18   seven calendar days of each other."

19   A.   Yes.

20   Q.   And I guess -- have there been any executions in Oklahoma

21   since Clayton Lockett's?

22   A.   Well, there was Charles Warner.  That was roughly six

23   months after.  I mean, I think things keep getting put off.  But

24   come to find out, they had substituted a drug.  So the second

25   drug, the paralytic -- of course, you have vecuronium bromide.

1          MS. HODGE:  Your Honor, I object to relevance.

2          THE COURT:  I'll overrule the objection.  You can

3     proceed with this line of questioning with this witness.

4          THE WITNESS:  Yes.  There was a second, Charles

5     Warner.  Then there have not been any since then after the

6     discovery in the *Glossip* case that the drug had been substituted

7     without the knowledge apparently of the Attorney General's

8     Office is what many people have reported.

9     BY MS. GIANI:

10    Q.    So there have not been any double executions --

11    A.    No.

12    Q.    -- carried out in Oklahoma --

13    A.    No.

14    Q.    -- since Clayton Lockett's.

15    A.    There wasn't that night, because it didn't work.

16    Q.    Right.  Thank you.  Okay.  Here's where I was trying to

17    find earlier, page 30, Section K.  The two executions scheduled

18    on the same day.  I think this is the finding that correlates

19    with the recommendation.  Is that your understanding?

20    A.    Correct.

21    Q.    And it says:  "It was apparent the stress level at OSP" --

22    what is OSP?

23    A.    Oklahoma State Penitentiary in McAlister, which is where

24    the male death row is.

25    Q.    -- "was raised because two executions had been scheduled on

1    the same day.  This was the first time since 2000 two offenders

2    were scheduled to be executed the same day.  Four days prior to

3    the execution, the protocol was revised to accommodate the

4    logistics for two offenders.  Several comments were made about

5    the feeling of extra stress.  Warden Trammell believes this

6    causes extra stress for all staff.  The paramedic stated he or

7    she felt stress and a sense of urgency in the air, and this was

8    based on him or her having been involved in numerous

9    executions."

10   A.    Uh-huh.

11   Q.    So is that what you were referring to earlier?  Did that

12   come from these transcripts that you reviewed?

13   A.    Correct.  So, you know, there's thousands of pages.  We

14   didn't use everything.  We just picked out, tried to summarize

15   as best we could.  The transcripts and the paramedic described

16   the scene as a cluster and told investigators they were very

17   stressed and that people inside the chamber were stressed

18   because of the double execution.  And he said there was an air

19   of urgency there, quick, quick, got to get it done, got to get

20   it done is how he described it.  And the doctor said, "I was

21   hesitant to do anything."  I said, "I don't know, you know, what

22   my status is inside here."  He said he didn't think he would

23   have to do anything other than do like a consciousness check.

24   And, you know, it was clear that no one was ready for this

25   situation that occurred.

1   Q.   Okay.  Did you review Warden Trammell's transcript as well?

2   A.   I did.

3   Q.   Was that, this extra stress, kind of a common theme

4   throughout her transcript?

5   A.   Yeah, especially for her.  She kind of took -- it's hard on

6   these prison workers, because -- you know, I felt for her, just

7   as a human being.  But, yes, especially signing that affidavit,

8   she said, "I signed the damn thing."  This is what she told the

9   state.  "I did not write that policy.  I did not choose those

10  drugs."  The protocol gave her sole responsibility for choosing

11  the policy and choosing which of the five protocols they were

12  going to use.  And, instead, it was the Attorney General's

13  Office.  And then they had her sign an affidavit saying she did

14  it.  Luckily, she was advised that was not a good idea.  And she

15  went back -- and she testified to this in federal court -- went

16  back and signed another affidavit.

17  Q.   Was there also -- well, let me see.  Was there also an

18  issue with there being some confusion about what a stop or stay

19  meant?

20  A.   Uh-huh, yes.  So the statute calls for the governor to run

21  the executions.  What we found in our investigation is that she

22  wasn't running the execution.  It was essentially her general

23  counsel and someone whose name has been redacted from all the

24  transcripts, who we don't know who it was, who was on the phone

25  with the prison and said, "Let it begin."  Then, when things

1    went wrong, there was this game of essentially telephone tag,

2    where no one knew who was really in charge.  Eventually, they

3    reached her at a Thunder game.  And she talked to her general

4    counsel.  And he said, "I think we need to call this off."  And

5    the quote was, "Do what you've got to do, Steve."  Then so Steve

6    Mullins was the general counsel.  He decided to call, to halt

7    the execution.

8         But there was a lot of confusion on stop the execution and

9    stay the other one.  So part of the investigation recommended

10   that they be very clear on what those terms mean, that they be

11   more clear on the chain of command in terms of phones, that kind

12   of thing.

13   Q.   Is it clear whether, after the execution went awry, whether

14   Clayton Lockett received any life-saving measures?

15   A.   They wouldn't say.  There was no evidence of that.  He died

16   on the gurney.  And he wasn't like transported to a hospital or

17   anything.  That was a big question a lot of us had, what's

18   happening behind the blinds.  There was not any evidence that

19   there was life-saving measures.

20   Q.   So I guess, to be clear, when y'all were escorted out of

21   the witness room, had death been declared at that point?

22   A.   No.  There was a lot of confusion, as you can imagine.  I

23   believe at that point -- let me look at my notes.  So Robert

24   Patton -- yeah, it had not.  We left, and he was -- Lockett was

25   pronounced dead at 7:06 p.m., and we left about 6:50 p.m.

1    Q.    So the execution had not concluded by the time --

2    A.    Correct.

3    Q.    -- you all left the room.

4    A.    We were ushered out of there.  I remember being mad,

5    because I wanted to see the end of it -- not mad.  I felt like I

6    was unfulfilling my job.  And it was very difficult, because the

7    public -- we're there to represent the public, and we couldn't

8    see what happened, and we couldn't accurately report on what

9    happened.  In fact, we were informed officially that he died of

10   a heart attack, which is not correct.

11   Q.    Let me look at page 35, Section F, the last sentence, the

12   review.  This is talking about formal action review of the

13   execution processes.  "The review should serve as an opportunity

14   for all involved personnel to voice their opinions, concerns

15   and/or recommendations in order for continuous improvement to

16   the process.  And the review should be formally documented and

17   retained for future reference."  Do you know if Oklahoma

18   implemented this policy or this recommendation?

19   A.    They have not been any more transparent about their

20   procedures today than they -- I mean, transparency is a problem

21   still.

22   Q.    Was there a review of the, I guess, the Glossip/Warner

23   execution --

24   A.    Uh-huh.

25   Q.    -- the Warner execution?

1    A.   Drug mix-ups, yeah.  So I was chosen as a witness -- and I

2    can't remember if I said that -- in Glossip as well.  It's

3    random.  You are drawn out of a hat.  And then it went way past

4    the time where we were supposed to go, and it was called off

5    because they had substituted -- the pharmacist had substituted

6    rocuronium bromide for vecuronium bromide.  So there was a lot

7    of discussion about how that happened.  Then there a grand

8    jury, which is a secret process.  But that produced a report

9    that I and many, many media reported on.  And basically that

10   decision was made by people in the governor's office.  The

11   general counsel ended up resigning and the Department of

12   Corrections director, Patton.  So there was sort of a

13   housecleaning afterwards about that decision to substitute that

14   drug, which our protocol was more specific than that.

15   Q.   In that investigation, was there a review process after the

16   Warner execution --

17   A.   Uh-huh.

18   Q.   -- that the department went through?

19   A.   Yes.  I'm trying to remember if it was between Lockett and

20   Warner or between Warner and Glossip.  They completely revamped

21   the death chamber, so they did improve communication.  And our

22   investigation showed that in Lockett they were communicating by

23   like if something went wrong, they would stick like a red pencil

24   through this hole in the wall, red meaning stop, I guess, and

25   yellow meaning, oh, things might be going wrong, and green

1    meaning things are going fine.  It was just very shocking to me
2    that that sometime in Oklahoma was how they were communicating.
3    So they improved communication procedures.  Interestingly, they
4    cut the number of media witnesses by more than half after they
5    expanded the execution chamber.  But, yeah, they did do their
6    best to improve things.  And then they still had problems with
7    substituting the drug after that.
8    Q.    So regardless of whether there are still some problems in
9    the process --
10   A.    Right.
11   Q.    -- this execution, Lockett's execution and Warner's
12   execution, resulted in modifications to the protocol to address
13   the problems.
14   A.    It did.  Yes, it did.  You know, the protocol is sort of an
15   ever-changing document.  You know, it's hard to get your hands
16   on it sometimes.  But I believe they have an ultrasound now, and
17   they have more procedures in place in terms of going through the
18   procedures, practicing, you know, back-up drugs, definitely
19   improvements that they have made in their protocols because of
20   this whole process.  They have a new -- Joe Allbaugh is the new
21   director of corrections, a Bush Administration official, who is
22   very experienced.
23   Q.    So having gone through more of this report now -- first of
24   all, this report was commissioned by the governor.  Is that
25   correct?

1   A.    Correct.  The governor appointed it.

2   Q.    This was -- the report was issued in September after the

3   April execution?

4   A.    Uh-huh, yes, 2014.

5   Q.    So --

6   A.    Yeah.

7   Q.    Five-month investigation?

8   A.    Correct, 101 people interviewed.  It was announced at a

9   press conference.  Everybody was there.  They released it on

10  their website.

11  Q.    And you looked at the stuff that they gathered through your

12  public information request?

13  A.    Correct.  A lot of what they found -- some critics were not

14  happy with the fact that people weren't like fired over there,

15  there weren't big disciplinary actions right away because of

16  this investigation.  It did -- the facts confirmed what we had

17  said in our earlier investigations, and it brought a lot of

18  things to light.  It was very thorough.

19  Q.    And this report was the result of that thorough

20  investigation?

21  A.    Correct.  It was.

22  Q.    You mentioned earlier that there were two public defenders

23  in the room as well witnessing the execution.

24  A.    Uh-huh.

25  Q.    I think you said that one of them began crying --

1   A.    Uh-huh.

2   Q.    -- when this was happening.  Were they able to call anyone

3   when this was going on?

4   A.    No.  No one could have a phone in there.  They couldn't

5   call anyone.  And I remember I was -- you know, after they

6   closed the blinds, the press was there.  It was David Autry

7   started interviewing him.  I was frustrated, because I couldn't

8   get in on that interview and hear what he was saying.  But then

9   I moved closer, and I could hear him talking about they were

10  asking about were there drugs there to reverse it.  Our protocol

11  did call for, if there's a stay, for the inmate to be --

12  essentially receive emergency treatment.  So one of the stories

13  I wrote was that the state wouldn't say whether or not that

14  occurred.

15  Q.    And that was the confusion between stop and stay the

16  execution?

17  A.    Correct.  Are you stopping Lockett's?  Are you staying

18  Warner's?  You know, what does stop mean?  What does stay mean?

19  There's three or four people in this chain of telephone.

20  Q.    So from your perspective, was this defense attorney

21  distressed that he couldn't communicate properly with someone?

22  A.    Yeah.  I mean, he was weeping.  I will say also that the

23  transcript showed that Stephanie Neiman's parents, her mother

24  was very distraught by the experience.

25  Q.    101 people, that's quite a few.  Were these all people --

1    was it 101?  Did I get that right?

2    A.    (Witness nods head.)

3    Q.    So these were all people that were somehow involved in this

4    execution either as a witness or a participant or otherwise?

5    A.    There was a former sheriff.  There was a current sheriff.

6    So the victim's parents and, you know, her whole family, people

7    from the state.  The only person's name that isn't in there --

8    and we're trying.  We don't know why -- is the attorney general,

9    Scott Pruitt -- and whoever ordered the actual execution on the

10   governor's phone.  But, yeah, everyone was interviewed, the

11   governor.  I was interviewed.  The media didn't have to be

12   interviewed, but I thought it was the right thing to do.

13   Q.    So a singular execution affects a lot of people.

14   A.    It does.  On all sides.

15   Q.    That's all I have for direct.

16            THE COURT:  Cross-examination.

17                    CROSS-EXAMINATION

18   BY MS. HODGE:

19   Q.    Good afternoon.

20   A.    Hi.

21   Q.    I understand from your direct that you've been reporting

22   for 25 years.  Is that correct?

23   A.    Yeah.  I started when I was ten.

24   Q.    You haven't been engaged in the practice of medicine at

25   all.  Is that correct?

1    A.    No, ma'am.

2    Q.    You have no medical training.

3    A.    Just from being a mom.  But, no, I don't.

4    Q.    I hear you on that.  So any information that you've

5    testified about on direct examination is solely something

6    someone else has told you and that you are reporting.  Is that

7    correct?

8    A.    Yes.  Except for the spreadsheets I made, the databases

9    with the autopsies.  I took pieces of information and put them

10   in spreadsheets.

11   Q.    But you weren't responsible for gathering that information

12   to create the underlying autopsy reports.  Correct?

13   A.    Correct.

14   Q.    And you gave some testimony about Dr. Gershwin?

15   A.    Dershwitz.

16   Q.    Dershwitz from Florida?

17   A.    Correct.

18   Q.    And some other experts you said that you interviewed.  You

19   weren't responsible for conducting any of your own independent

20   investigations or medical studies or reports regarding those

21   interviews.  Is that correct?

22   A.    Not regarding their research.  So the facts we gathered for

23   the autopsy data, there was 109.  And we put in probably 20, 25

24   pieces of data in terms of the IV access, the percentage of

25   blood, drugs in the blood.

1    Q.    Let me ask you a better question.  I understand what you

2    are saying.  I meant in terms of medical opinions about

3    midazolam.

4    A.    Correct, absolutely.

5    Q.    Correct, meaning you haven't done any independent research,

6    and you don't have any medical training to do so.  Isn't that

7    correct?

8    A.    I think of journalism as scientific.  But, no, I'm not a

9    doctor.  I haven't taken any special courses.  I did a lot of

10   research.

11   Q.    Okay.  Of what other medical professionals or other persons

12   have said about midazolam.  Is that correct?

13   A.    Correct.  We wanted to get on both sides.

14   Q.    Let me ask you this.  Let me take a step back.  How did you

15   get involved in this case?

16   A.    Let's see.  As I said, I'm not the first to volunteer for

17   these things.  I don't think the same reporters should go

18   witness every execution.

19   Q.    I mean involved in testifying in this case.

20   A.    Oh, I'm sorry.  I was contacted by the Federal Public

21   Defender's Office.

22   Q.    When was that?  When was that?

23   A.    That was about ten, maybe eight days ago, a week ago.

24   Q.    Did you review any documents in preparation for your

25   testimony?

1    A.    Just what I reported, because I was very clear with them.

2    I've been subpoenaed before in other cases.  I haven't had to

3    testify.  And I've always said I'm not going to give my opinion

4    or be for you or one side or the other, just say what I

5    reported.  So I wanted to make sure that I stuck to the facts

6    and that the facts were accurate.

7    Q.    So all the testimony that you've given today will be found

8    in something that you've reported.

9    A.    Correct.

10   Q.    And is that where you are reviewing today?

11   A.    Yes, ma'am.

12   Q.    Do you mind if I take a look at that?

13   A.    Sure, yeah.  I need it back, because it has my notes on it.

14   But these were all the Pulitzer entry stories.

15   Q.    At the beginning of your testimony, you reported that you

16   submitted a story about the Lockett execution within hours or

17   minutes after you witnessed it.  Isn't that correct?

18   A.    I went back and started writing.  These days, it's a

19   process where you are sort of building this story and on the

20   way --

21   Q.    I mean the story that you put out initially.

22   A.    Yeah, yeah.  It was like 2:30 a.m., 2 a.m.  I had to go on

23   NPR at like 3:30 a.m.

24   Q.    I believe you conceded on direct examination some of what

25   you reported in that initial story was inaccurate.

Branstetter - Cross                                    419

1  A.   The state gave us inaccurate information.

2  Q.   I believe you testified on direct that there were

3  medications that were flowing through Mr. Lockett's arms based

4  on your observation of the execution.  That wasn't correct.

5  A.   The IV tubes were leading down under the sheet, and his

6  arms were strapped down.  The one thing I did note in my story

7  -- and I'm not sure if others noted it -- that he lifted up the

8  sheet and looked at his arm.  And I don't know why.

9  Q.   I'm just asking about the accuracy of your reporting and

10 testimony.  I'm just asking --

11 A.   No.  The IV was in his groin.

12 Q.   When you testified that there were drugs being administered

13 in his arms, that was inaccurate.  Correct?

14 A.   Yes.  At that time in the story, not in later stories.

15 Q.   You gave extensive testimony about this Plaintiffs' Exhibit

16 No. 19, which was the report, the investigation following the

17 Lockett execution.  Do you recall that?

18 A.   Right, yep.

19 Q.   Are you aware -- I asked you if you reviewed any documents,

20 and you handed me these.  And I don't see in here a copy of the

21 Arkansas Department of Corrections lethal injection protocol.

22 A.   Right.

23 Q.   Is it safe to say you have never seen Arkansas -- the ADC's

24 lethal injection protocol?

25 A.   Right.

1    Q.    Is it also safe to say that none of the testimony you've

2    given today is in reference to the ADC's lethal injection

3    protocol?

4    A.    Correct.

5    Q.    If I may give you these back.

6    A.    Thank you.

7    Q.    And so when you are discussing this report of the Lockett

8    execution, you testified that he received 100 milligrams of

9    midazolam during that execution.  You are not aware as you sit

10   here today what milligram dosage that the ADC uses in its lethal

11   injection protocol, are you?

12   A.    I believe it's 500.

13   Q.    Have you learned that from listening to testimony today?

14   A.    I read all the filings on PACER.

15   Q.    Okay, okay.  So you then are aware that the lethal

16   injection protocol that the ADC uses is much different from the

17   Lockett execution that you just testified about.

18   A.    It is.  It is.  I don't know how much Clayton Lockett got,

19   but it would be five times more if Clayton got the maximum.

20   Q.    That's for the first dose.  You understand that the ADC

21   protocol allows for a second 500 dose of midazolam.

22   A.    You have back-up drugs.

23   Q.    Are you aware that the ADC's lethal injection protocol

24   requires an inspection of the IV lines before and following

25   administration of its lethal injection drugs?

1    A.    I'm not -- so our protocol review was for states that had

2    executions 2008 and forward, I think it was, when we did this

3    story.  I think your protocol has changed since then.

4    Q.    I'm referencing the 2015 version that's the subject of this

5    lawsuit.

6    A.    Right.  No, I'm not.

7    Q.    So you said you reviewed protocols 2008 forward.  You mean

8    2008 back?

9    A.    So this story was in right -- in June, after the execution,

10   we had a three-part series.  And I reviewed 20 active death

11   penalty states.  Arkansas was not one of the ones I had a

12   protocol for just because of where the executions fell.

13   Q.    So I understand your testimony to be that you can't give

14   any testimony about any ADC protocol because you haven't

15   reviewed any from before 2015, the current one, or before 2015.

16   A.    I am not an expert in Arkansas protocol.

17   Q.    And so that would include any testimony that you gave

18   similar to -- that would include any testimony that you gave in

19   reference to the Lockett execution about the dosage of

20   midazolam, the consciousness check, the placement of the IV

21   lines, the stress level, the qualification of the paramedic, the

22   opinions of the physicians.  None of that testimony that you

23   just gave in Lockett can you give any opinions about with regard

24   to the ADC lethal injection procedure, can you?

25   A.    Yeah.  Nobody knows what's going to happen here.  I mean,

1    yeah, absolutely.  That's what happened in Oklahoma, and I'm

2    testifying to what I saw in Oklahoma and what we investigated in

3    Oklahoma.

4    Q.    And you haven't talked to anyone in the ADC about the level

5    of stress for double executions in the State of Arkansas, for

6    example.

7    A.    I've read the court filings of both sides.  So beyond that,

8    no.  I haven't done any interviews.  I asked the AG's office for

9    any statements that they issued, and they sent me something.

10   Q.    I believe you just testified that Clayton Lockett received

11   a 100 dose of midazolam, or we're not sure whether he received a

12   100-milligram dose of midazolam because of the issue with the IV

13   line in that case.  Correct?

14   A.    The infiltration, yeah.

15   Q.    And you testified that following that execution or

16   following that execution that the state commissioned this

17   Plaintiffs' Exhibit No. 19, which is a multi-page report --

18   A.    Yes.

19   Q.    -- on the execution.  Correct?

20   A.    Correct.

21   Q.    And you are aware that this multi-page report was filed in

22   Charles Warner's case in Oklahoma in 2014.  Correct?

23   A.    So there was an investigation after Lockett, and that was

24   produced in September.  And then there was also a separate grand

25   jury that had to do with Charles Warner's drug substitution.

1    Q.    You are way ahead of me.  Let me ask you a more simpler

2    question if I can.  Even after the state commissioned this

3    report, isn't it true that the State of Oklahoma was authorized

4    to execute Charles Warner via lethal injection?

5    A.    Which report are you talking about?

6    Q.    The Lockett report that's attached to his pleading filed in

7    this case.

8    A.    Yes, absolutely.

9    Q.    Plaintiffs' Exhibit 19.  Aren't you aware that Charles

10   Warner received 500 milligrams of midazolam similar to the ADC

11   protocol?

12   A.    I did not witness it, but that is what I understand.  I

13   covered the Supreme Court arguments in this case.

14   Q.    You identified your co --

15   A.    Author.

16   Q.    Your colleague, your co-author, Cary Aspinwall?

17   A.    She's with the *Dallas Morning News* now.

18   Q.    You all have been working together and have two reporters

19   working hand in hand covering executions in Oklahoma.  Isn't

20   that correct?

21   A.    It's a small newsroom.  And anyone on the investigative

22   staff would tend to do -- anything that went wrong, that's

23   what -- that was sort of our bailiwick, so yeah.  I was her

24   supervisor.

25   Q.    You were.  And she observed the Charles Warner execution.

1    A.   She did.

2    Q.   Is that correct?

3    A.   She had already done the victim story and all the work and

4    the clemency coverage.

5    Q.   And you interviewed Ms. Aspinwall immediately following the

6    execution.  Correct?

7    A.   Yeah.  They make us do these silly videos.

8    Q.   And you are aware from that investigation and that report

9    that there was no problems with the administration of 500

10   milligrams in the Warner execution.  Is that correct?

11   A.   That's correct.  That went very smoothly.  Absolutely.

12   Q.   And that there were several media witnesses, not just your

13   colleague, Ms. Aspinwall, that reported that Warner's execution

14   went as planned without any problems.

15   A.   Correct.

16   Q.   Isn't that correct?

17   A.   Yes.

18   Q.   And that was in January of 2015?

19   A.   It was, yes.

20   Q.   You testified that you were identified as a witness in the

21   Glossip case -- for Mr. Glossip in Oklahoma.  Is that correct?

22   A.   I was chosen, yeah.

23   Q.   And that his execution has been stayed.  You gave that

24   testimony.  Correct?

25   A.   Correct.  And I've interviewed him on the phone several

1    times.

2    Q.   The stay of Mr. Glossip's execution has zero to do with the

3    500-milligram dosage of midazolam.  Isn't that correct?

4    A.   Yeah.  I mean, he hasn't been executed.

5    Q.   Well, his stay --

6    A.   His stay, yes.

7    Q.   His stay has nothing to do with Oklahoma's use of 500

8    milligrams of midazolam.

9    A.   Correct.

10   Q.   And it's because Charles Warner's execution went off

11   without a hitch using 500 milligrams of midazolam.  Correct?

12   A.   I don't know if I would equate those two things.  So

13   Charles Warner's problem was the second drug being substituted.

14   Q.   I'm not asking you about the second drug.  I'm asking you

15   about the 500 milligrams of midazolam.

16   A.   There was no problem.

17   Q.   There was no problem.  And that is not the basis for the

18   stay of Glossip's execution, as you understand it.  Is that

19   correct?

20   A.   That is correct.

21   Q.   You gave some testimony about the witness, another witness

22   to the Glossip -- I'm sorry -- the Lockett -- I'll get all these

23   names --

24   A.   That's okay.

25   Q.   -- the Lockett execution.  Was it a federal defender --

1    A.    Who was crying?

2    Q.    -- who was crying?  And I believe you testified that he was

3    distressed because he couldn't use the phone to get a stay in

4    that execution.  Is that the -- did I get that testimony right?

5    A.    Well, she asked me if he could use a phone, and I said no.

6    And was that -- as I recall the questioning was was that part of

7    the reason for his distress.  I mean, mainly he was distressed

8    because of what had happened, and he didn't know what was going

9    on with his client.

10   Q.    Absolutely.  If he was that distressed, he could have

11   exited the room to use the phone.  Correct?

12   A.    No.  They told us to sit down and be quiet.

13   Q.    So it's your testimony that he could not -- that he told --

14   it's not your testimony that he told you he did not leave to use

15   the phone because someone prevented him from using the phone.

16   A.    There was no phone in there.  There was one land line

17   and --

18   Q.    I'm asking whether or not you observed him being prevented

19   from leaving to use the telephone.

20   A.    No.  I didn't observe that.  We were told to sit down and

21   be quiet.  We're used to that.

22   Q.    In your direct examination, you testified that your

23   experience, based on your observations and the witnesses that

24   you interviewed, that Mr. Lockett was not conscious and that he

25   was bucking and attempting to get off the table.  Do you

1   remember that testimony?

2   A.   That he was not conscious?

3   Q.   That you perceived him to be -- you perceived him to be

4   unconscious?

5   A.   No.  The doctor -- after the doctor pronounced him

6   unconscious.

7   Q.   That's what I'm asking.  That's what I said.  I understood

8   your direct testimony to be that Mr. Lockett was conscious and

9   attempting -- was bucking and attempting to get off of the

10  table.

11  A.   I'm sorry.  I misunderstood you.  Correct.

12  Q.   You are aware that that description of Mr. Lockett's

13  conduct is disputed in this report.

14  A.   No.  I'm not aware of that.

15  Q.   You weren't aware?

16  A.   I mean, I'm sure that someone disputed it.  I think I

17  testified that there were some government witnesses, especially

18  Michael Thompson, who said that he might have been having a

19  seizure.  But I don't have like a tally of who said what.

20  Q.   So you are only presenting one part of it, the witnesses

21  who said that he was bucking and trying to get off the table.

22  You don't have the statements of the witnesses whose

23  observations were not that.

24  A.   I'm sorry.  I don't understand what you are saying.

25  Q.   You will agree with me that the report indicates that

```
 1   witnesses differed about Mr. Lockett's conduct during the
 2   execution.
 3   A.   So I wasn't testifying about the whole report.  I was
 4   testifying about our story about the transcripts, which is a
 5   slightly different thing.
 6   Q.   So you don't want the Court to consider any testimony
 7   you've given about what witnesses observed during the Lockett
 8   execution based on this report.  Is that correct?
 9   A.   I want the Court to consider whatever testimony the Court
10   wants to consider.
11   Q.   Your intent here is -- what I hear you saying is your
12   intent was not for the Court to perceive you giving an opinion
13   about this report but about a story you had written about
14   obtaining the transcripts.  Is that correct?
15   A.   I'm sorry.  There's several different things going on.  I
16   did a story about the report.  That isn't one of the stories
17   here.  I covered the press conference about the report.  Much of
18   what was in the report we had already disclosed and reported
19   except for -- you know, the conclusions of the state, obviously,
20   after interviewing 101 people, you know, that is a neutral
21   source that we felt like was important to report.  So I think
22   all of it is important.
23   Q.   In your investigation of this issue, you are aware that
24   Florida has conducted many executions using 500 milligrams of
25   midazolam?
```

1    A.    I don't have -- I haven't done like an in-depth story

2    recently on Florida's execution rate.

3    Q.    Well, you testified that you interviewed Dr. Dershwitz from

4    Florida and that you had done some research about Florida's

5    execution?

6    A.    In our 2014 series, there was three or four months after

7    the execution I talked to him for that story, yeah.  And he

8    indicated that the problem is not -- what he said, the problem

9    is not the drug.  The problem is the IV and the application of

10   it.  So I felt like it was a good balance for the story, because

11   he testified for the state.  We wanted to get people on both

12   sides of this.

13   Q.    That the problem was not the drug.

14   A.    That's exactly what he said.

15            MS. HODGE:  I pass the witness.  Thank you.

16            THE COURT:  Redirect.

17            MS. GIANI:  Sharon, can you go to Exhibit 19, page 18.

18   I don't know if we might need -- 6:33 to 6:42.

19                      REDIRECT EXAMINATION

20   BY MS. GIANI:

21   Q.    I'm not sure.  You were cross-examined about an

22   inconsistency in the report.  I'm not sure what part they were

23   referring to, but this is my best guess.  "Lockett began to move

24   and make sounds on the execution table.  It should be noted that

25   the interview statements of the witnesses regarding Lockett's

1    movements and sounds were inconsistent."

2    A.    Right.

3    Q.    Is that finding in the report consistent with what your

4    investigation --

5    A.    Yes.

6    Q.    -- showed?

7    A.    Some people said they thought it was involuntary.  Some

8    people heard him say words.  Some didn't.  It's just like

9    anyone, a group of people who witness something traumatic.  They

10   all have slightly different vantage points.

11   Q.    Out of the 101 people interviewed, approximately how many

12   people thought his movements were involuntary or might have been

13   involuntary?

14   A.    I read all those transcripts.  It's been a while since I

15   read them all.  But I would say the vast majority thought they

16   were voluntary, thought, you know, that it was a response.

17   Q.    Everybody agreed that Lockett began to move and make sounds

18   on the execution table?

19   A.    Yes.

20   Q.    Okay.  That's all.

21             THE COURT:  Anything further for this witness?

22             MS. HODGE:  No.  Thank you, Your Honor.

23             THE COURT:  You may step down.  Thank you.  We'll go

24   ahead and take our afternoon break.  We'll be in recess until

25   ten after three, ten after three.  We're in recess.

1          (Recess at 2:56 p.m.)

2                     REPORTER'S CERTIFICATE

3      I certify that the foregoing is a correct transcript from
the record of proceedings in the above-entitled matter.

4

5    /s/Elaine Hinson, RMR, CRR, CCR        Date:  April 11, 2017.
United States Court Reporter

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1          (Proceedings continuing in open court at 3:16 PM.)
 2              THE COURT:  Mr. Braden, you may begin and call your
 3   next witness.
 4              MR. BRADEN:  We would call Professor Larry Fox, or
 5   Lawrence Fox, by video or television or whatever it is.
 6              THE COURT:  Professor Fox, the courtroom deputy,
 7   Tracy Washington, is going to step in the camera and administer
 8   the oath to you.
 9              LAWRENCE FOX, PLAINTIFFS' WITNESS, DULY SWORN
10                          DIRECT EXAMINATION
11   BY MR. BRADEN:
12   Q     Good afternoon, Professor Fox.  Could you state your full
13   name, please.
14   A     Lawrence J. Fox.
15   Q     And what is your profession, sir?
16   A     I'm a lawyer.
17   Q     How do you practice law?
18   A     I practice law in a law firm; I practice law in a law
19   clinic; and I teach at the Yale Law School.
20   Q     How long have you taught law?
21   A     I started in 1999 teaching a full course in professional
22   responsibility, and since then, I've expanded.
23   Q     Can you tell the judge, please --
24   A     I am not a professor.  And if some of the colleagues at
25   this law school heard that I was being called a professor,
```

1    they'd be very upset.  I'm a lecturer.

2    Q     Tell us what you lecture about.

3    A     I lecture on professional responsibility.  I teach a

4    course that's basically the law governing lawyers, and I also

5    run a clinic called the Ethics Bureau at Yale that addresses

6    ethical problems as they arise in the practice, on a pro bono

7    basis, I might add.

8    Q     You provided to me the other day a copy of your

9    curriculum vitae, which we have marked as Exhibit 7.  Is that

10   correct and up to date?

11   A     I believe it is.

12          MR. BRADEN:  We would move to admit the CV of

13   Mr. Fox.

14          THE COURT:  Any objection?

15          MR. RUDOFSKY:  No objection, Your Honor.

16          THE COURT:  Exhibit 7 is admitted.

17       (Plaintiffs' Exhibit 7 received in evidence.)

18   BY MR. BRADEN:

19   Q     In your time teaching ethics, have you authored any books

20   on the topic of lawyers and ethics?

21   A     I have authored with a co-author six books, and I

22   authored one book on my own.  I have a case book that's in its

23   fourth edition and various other books, books on representing

24   organizations, a book on representing litigation ethics, a book

25   on a guide for clients to their ethical responsibilities of

 1    their lawyers, and a few others.

 2    Q      I know you mentioned that you are a lecturer at Yale.

 3    Have you lectured at other universities on the issues of ethics

 4    and lawyers?

 5    A      I did.  I started at Cornell.  I then lectured at the

 6    University of Pennsylvania.  Then I moved to Harvard.  And I've

 7    been at Yale for eight years.

 8    Q      In the course of your career, are you a member of any

 9    professional board that's relevant to the issue of ethics?

10    A      Well, I have held various positions relevant to ethics.

11    I was a member and chair of the ABA Standing Committee on

12    Ethics and Professional Responsibility.  I was a member of the

13    Ethics 2000 Commission.  I was an advisor to the restatement of

14    the law governing lawyers.  I have chaired my law firm's ethics

15    committee.  I was involved in the preparation of the ABA Death

16    Penalty Representation Project guidelines.

17    Q      Have you ever testified as an expert witness about ethics

18    and lawyers and lawyers' responsibilities before?

19    A      I have testified in court probably ten different times,

20    maybe a few more.  By deposition, I've testified more.

21    Q      Have any of your briefs or pleadings been cited by the

22    United States Supreme Court?

23    A      Three have been cited by the United States Supreme Court.

24    The first was -- well, just recently In Re: Christianson cited

25    me as the legal expert that was quoted in that decision.  I did

Fox - Direct

1    *Maples v. Thomas*, my brief was quoted in that, and *Holland v.*
2    *Florida*, our brief was quoted in that.  In each case, the
3    petitioner was successful before the United States Supreme
4    Court.
5    Q    Just to make it clear, I contacted you recently about
6    issues concerning the dates of executions and the
7    responsibility of lawyers in the state of Arkansas.  Is that
8    correct?
9    A    You did.
10   Q    And after discussing that, do you have an opinion about
11   the ethical responsibilities and duties of the lawyers in the
12   situation that I described to you, which was the setting of
13   eight execution dates within ten days where two of the clients
14   are represented by my office, two of the clients are
15   represented by my office's co-counsel, and three of the clients
16   are represented by one individual CJA panel lawyer?  What is
17   your opinion on that as an expert?
18   A    Let me start by saying --
19              MR. RUDOFSKY:  Your Honor, we don't have an
20   objection if the testimony here is limited to only professional
21   responsibility or ethics, but we do if it's suggestive of what
22   the law of ineffective assistance of counsel is.  That's
23   obviously a question for you and not a fact question or even an
24   expert question for the witness.
25              THE COURT:  I'll overrule the objection as I've done

Fox - Direct

```
 1  with all the others.  I'll note it and certainly I'll take that
 2  into consideration when I give weight to the testimony for this
 3  proceeding at this stage of the litigation.
 4       You may proceed.
 5            MR. BRADEN:  Thank you.
 6  BY MR. BRADEN:
 7  Q    Give me a thumbnail or give the Court a thumbnail of your
 8  opinion on this situation, and then we'll go into it in a
 9  little bit more detail.
10  A    Okay.  I am of the view and was of the view then when you
11  first presented this problem to me that the lawyers involved
12  were systematically violating four, at least four different
13  rules of professional conduct, all of which are part of -- a
14  standard of care of lawyers, all of which are part of the
15  fiduciary duty of lawyers, and that as a result, the lawyers
16  were obliged to seek court permission to withdraw from the
17  representation because the Rules of Professional Conduct of
18  this court where we sit today provide that it's mandatory that
19  you withdraw if the continued representation would violate the
20  Rules of Professional Conduct, and this violated four in my
21  view, and we can discuss each of them in turn.
22  Q    Let's talk about the four professional responsibility
23  rules that you're talking about, but first let's talk about
24  where do you derive these rules?
25  A    Well, the Rules of Professional Conduct have been adopted
```

1   by the courts.  The Supreme Court of Arkansas has adopted the

2   Rules of Professional Conduct based on the American Bar

3   Association model rules and, in turn, the federal court has

4   adopted the Arkansas Rules of Professional Conduct to control

5   the conduct of lawyers appearing in federal court in the

6   Eastern District of Arkansas.  As is typical and across the

7   country, almost every federal court has adopted the Rules of

8   Professional Conduct.  So the source of the rules is the

9   Arkansas Supreme Court, which made them, gave them the force of

10  law, and provided that the violation of these rules could

11  result in discipline and it could also result in liability for

12  the lawyer.

13          MR. BRADEN:  To make the record clear here, Your

14  Honor, and I'm not sure that this necessarily needs to be

15  admitted as an exhibit because I believe you can take notice of

16  the fact that our Exhibit 4 is the Arkansas Rules of

17  Professional Responsibility adopted by the Arkansas Supreme

18  Court.  I would either move it for an exhibit or have you take

19  judicial notice of their existence.

20  BY MR. BRADEN:

21  Q    So let's look at the first rule in the Arkansas Rule of

22  Professional Conduct, Rule 1.1 called Competence.  What does

23  that direct or what does that say?

24  A    I treat 1.1 and 1.3 together, Competence and Diligence.

25  That is the most basic of the rules, that the lawyer has to be

Fox - Direct

able to understand the law and implement the law on behalf of
the client in a competent matter, which requires the gathering
of the rules, the gathering of the law, and the application of
the law to the facts of the case and the gathering of the facts
necessary to present the client's case based on whatever its
situation might be.

So here, competence, part of competence is knowledge and
part of competence is enough time for study and enough time to
complete the work because no lawyer can be competent no matter
how competent they are if they're given ten minutes to prepare
something that would take an hour or they're given a day to do
something that would take a month.

Q    Mr. Fox, just before we go on, I should have actually
read this just so the record is clear, but let me read 1.1,
Competence.  And this is the rule adopted by the Arkansas
Supreme Court.  "A lawyer shall provide competent
representation to a client.  Competent representation requires
the legal knowledge, skill, thoroughness, and preparation
reasonably necessary for the representation."  So is this
situation in compliance with this rule?

A    Absolutely not.  This is an impossible situation because
the lawyers here cannot be competent because they don't have
enough time, they don't have enough resources, they don't have
enough energy to take on this responsibility, given the special
nature particularly of capital proceedings that are, in my

1   view, the brain surgery of the legal profession.

2   Q      Let me just read 1.3 since you kind of are looking at

3   these rules in tandem.  1.3 entitled Diligence.  "A lawyer

4   shall act with reasonable diligence and promptness in

5   representing a client."

6          Have you been involved in any capital cases?  Do you have

7   some firsthand knowledge of that?

8   A      I have a lot of firsthand knowledge of that.  I've

9   actually been responsible post-conviction for two different

10  death penalty cases, and I have been consulted in probably 25

11  or 30 different capital cases since we started the clinic here

12  at Yale.  So I regularly look at these cases through the lens

13  of professional responsibility because lawyers call me on a

14  regular basis seeking my very best advice as to what they

15  should do under interesting, difficult circumstances.  And as I

16  said, I believe that capital litigation is of a whole different

17  character.  Not a difference in -- it's a difference in kind,

18  not a difference in degree when you have to do a capital case.

19         So in one of the two cases I had, we handled that case

20  with a team of five for about two and a half months leading up

21  to an execution date.  And I'm fully familiar with how we

22  allocated our resources, how hard we worked, how many tasks we

23  had, what was required to work on the clemency part of this,

24  and to search for any other basis on which we could challenge

25  the imposition of the death penalty as to this particular

1    client.  And we were successful in getting clemency, but only

2    two hours before the execution was actually scheduled.

3    Q    I suspect the opponent, the defendants in this, when they

4    talk to you as they probably will here in a little bit, they're

5    going to ask you a question along the lines of well, gee, how

6    can they possibly be acting unethically because they filed

7    thousands of pages of pleadings and they've presented two

8    hearings in federal district court in a matter of eight days or

9    so.  Does that qualify as compliance with these rules?

10   A    You can't come up with a rule of thumb that says that a

11   given number of pages of investigation and a given number of

12   interviews undertaken, a given number of motions filed fulfills

13   the competence and diligence requirement because every case is

14   different and the quantity of matters that have to be addressed

15   in a death case are profound.

16        Death is different.  There's no way you can do a

17   cost-benefit analysis.  If only one in a hundred clemency

18   petitions is granted, you are nonetheless going to do your

19   level best to put together the best presentation you possibly

20   can put together on why your client is entitled to clemency,

21   even though you know the odds are long, because the alternative

22   is the death of your client.  And as I said, when it comes to

23   life and death, there's no way to do a cost-benefit analysis

24   that I know of and there's no way to say that one shoe fits

25   all, and there's no way to say that because lawyers have been

1   working for a full month day and night, they have, in fact,

2   covered all the territory that has to be covered.  Each case

3   has to be analyzed separately.

4   Q     So basically what you're saying is that what may be

5   happening perhaps in front of Judge Baker today doesn't

6   necessarily reflect what's not being done because we have to be

7   here today.  Is that right?

8   A     Well, that brings us to the last of the rules that we

9   talk about before we get to the 1.16 rule.  1.7 is the conflict

10  of interest rule.  It's the concurrent conflict of interest.

11  And the lawyers in this situation are facing the worst of the

12  concurrent conflicts of interest you could imagine.  Because

13  every hour they allocate to one client is an hour taken away

14  from another client when, in fact, a team that's larger than

15  your team should be working day and night around the clock on

16  behalf of one client while another team is working round the

17  clock on the second client, and so on.  You can't tell a lawyer

18  facing three possible executions in the next few weeks, well,

19  you'll just divide your time in thirds, because every hour you

20  spend on client A, you're stealing from client B.

21        To make a mundane example, when we as lawyers have two

22  clients who are going after a similar, the same pie, $100 of

23  assets, you can't represent both of them because there's not

24  enough assets to cover it.  And so the lawyer for A should be

25  seeking the whole $100 for that client while a different lawyer

1    has to be representing B because otherwise you have an

2    impossible conflict of interest.  Same here.  I don't know how

3    you're doing it.

4         But that brings me to the last one, if I may.  Because of

5    that, you look at Rule 1.16.  1.16(a) is an incredibly

6    important rule.  And it's obligatory.  It says that a lawyer

7    shall not proceed with a matter if the lawyer's continuing

8    representation would violate these rules.  And, of course, we

9    now know that it would violate 1.1, 1.3, we didn't talk about

10   1.4 yet, 1.7, and 1.16(a) requires then you must withdraw.

11   Q    Let's back up a little bit and talk about 1.4, which is

12   Communication.  And tell Judge Baker why that's important and

13   what is important about that in a lawyer's ethical

14   responsibilities.

15   A    Well, from my own experience handling one of these post

16   all legal means except the clemency and collateral attack, I

17   know that you have to have enough time and be allocated enough

18   resources to pursue these matters, and if you are not, you have

19   an obligation to withdraw from the representation.

20   Q    Do lawyers --

21   A    And communication, you asked specifically about

22   communication.  I'm sorry.

23   Q    Yes.

24   A    Communication is the linchpin because that is one of our

25   fiduciary duties.  It's in the rule, but it's also a fiduciary

1    duty, just like competence is and diligence is.  And the

2    fiduciary duty says you don't just answer the client's phone

3    calls and you don't just talk to the client once a month.  You

4    have to be in constant contact with the client particularly in

5    this final phase where all stops are put out.  You know no

6    bounds of what you're doing to do to try to prevent an

7    execution of your client who you've represented for so long.

8         So in order to be able to fulfill the duty of

9    communication under 1.4, you have to develop rapport with a

10   client.  You have to develop trust with a client.  And my

11   experience is that the clients on death row are not

12   particularly good at this, that it's hard to develop that kind

13   of rapport.  So you can't even say that it would be okay to

14   handle this by bringing in brand-new lawyers because they would

15   have to start from square one, whereas the lawyers who have

16   been handling these matters have built up a reservoir of good

17   will, one would hope, or at least the best reservoir of good

18   will one can develop dealing with clients who are often

19   impaired in some way and otherwise suffering from the effects

20   of being under a sentence of death.

21   Q    Is the purpose of this rule of communication for the

22   lawyers to explain to the client, whether it be General Motors

23   or whether it be Wal-Mart or whether it be a man condemned to

24   death, is the purpose to explain to them what is happening in

25   their legal case and answer the questions of basically what

1    happens next?

2    A      Well, it's more than answering questions.  You've got to

3    take the affirmative.  The rule is written to require that the

4    lawyer take the initiative.  You can't just -- I thought I made

5    this clear, but you can't just say, I'm going to talk to you

6    once a month and any time you call me, I'll talk to you.  If an

7    event takes place, you've got to pick up the phone or you've

8    got to go visit the client in most cases and you've got to talk

9    to the client about what that development is.

10          These clients today should know all about this hearing,

11   should have been explained to them, but, of course, that would

12   take time away from the substantive portion of this hearing,

13   yet the clients are entitled to that and the clients perhaps

14   have a lot to bring to these proceedings because the clients

15   are the ones who are being deprived of the services they're

16   entitled to.  Even if they're not entitled to free counsel,

17   they're entitled to the counsel that they have and an

18   opportunity to have the time, the energy developed to take the

19   initiative to handle all reasonable avenues of defense.

20   Q      Can this duty or responsibility, and I guess maybe it's a

21   duty because it's under these rules, can that be delegated to a

22   nonlegal member of the team?

23   A      Nonlegal members can contribute.  But we have a different

24   rule, Rule 5.3, which says that every nonlawyer member of the

25   team must be supervised by a lawyer who takes complete

Fox - Direct

1    responsibility for the work of that individual.  We can't have

2    nonlawyers taking full responsibility for what happens in a

3    representation.  Only lawyers are officers of the court.  Only

4    lawyers can offer privilege.  Only lawyers have the experience

5    and the knowledge and the background necessary to deliver legal

6    services.  We're in a special category because lawyers are

7    special only in the sense that they have special

8    responsibilities to their clients and to the Court.  And that's

9    why we have 1.16, so that the lawyer knows that the lawyer has

10   to bring to the attention of the Court as soon as possible a

11   situation where the lawyer's conduct is going to be violative

12   of the Rules of Professional Conduct, and, more importantly, of

13   the fiduciary duties that lie behind those Rules of

14   Professional Conduct.

15   Q    Some people might say, Mr. Fox, that a motion to withdraw

16   at the time these dates were set or even now would appear to be

17   gamesmanship or might even -- or it would be a situation where

18   the lawyers that have been involved in these are walking away

19   from these clients in this extreme situation.  What should a

20   lawyer do?

21   A    Well, you're between a rock and a hard place.  You're in

22   an impossible situation.  I gave you the advice that you should

23   seek to withdraw, but I understand why you wouldn't do that.

24   And in the alternative, what you're doing is this proceeding,

25   which seems to me exactly what you have to do.  You don't want

1    to abandon the client, that's the worst thing, but you want to

2    not be in a position where you're delivering services to the

3    client that the client may think are the full benefit they're

4    entitled to, but this is only half a loaf or maybe it's only a

5    quarter of a loaf.  And besides your being driven crazy by the

6    allocation of time and the allocation of loyalty and the guilt

7    that you feel when you're only working for client A and you

8    know client B desperately needs attention, too, the situation

9    is intolerable when the lawyers and the client don't have the

10   time to dedicate to these important tasks that are every bit as

11   much a part of the process of capital punishment as any other

12   part of the case.

13        Clemency, collateral attack, attack on the method of

14   execution all are rights that the client has to put forward

15   represented by a lawyer, even if the state doesn't have to pay

16   for that lawyer, and that lawyer has to deliver full services.

17   We don't have any quasi services in the Rules of Professional

18   Conduct.  Lawyers are judged by a very high standard, not the

19   best you can do under the circumstances.  Of course, we'll

20   always do the best we can under the circumstances, but we have

21   to bring it to the attention of the Court to seek relief if

22   that's the situation we're put in.  A conscientious member of

23   the bar will do that.

24   Q    Are you familiar -- and I think you've mentioned this as

25   we've talked here this afternoon.  Are you familiar with the

1   2003 ABA Guidelines for the conduct of lawyers in capital

2   cases?

3   A      Yes.  I chaired the ABA Death Penalty Representation

4   Project for ten years.  It was such a hard job, nobody would

5   take it, so I was stuck with it for ten years.  And the purpose

6   of the project originally was to get lawyers to volunteer to

7   take on these cases.  The second part of it was to come up with

8   these guidelines for lawyers because these representations were

9   so difficult.  So over a long period of time, through the good

10  offices of my project, lawyers from throughout the ABA came

11  together.  If you look at the acknowledgments in the ABA

12  Guidelines, you'll see that there are dozens of lawyers,

13  defense lawyers, prosecutors who participated in this process.

14  When we got the final work product done, everybody signed off

15  on it, including the criminal justice section, which became a

16  co-sponsor.

17         We were thrilled to get that co-sponsorship because the

18  criminal justice section is divided exactly equally between

19  prosecutors and defense lawyers, and their counsel unanimously

20  sponsored this before the ABA House, and I had the distinct

21  honor of actually presenting it to the House, and because there

22  was no dissent in the House, all 550 members either stood

23  silent or said yea, I was the only speaker because they don't

24  let you have more than one speaker unless it's a contested

25  matter.  I was the one speaker.  They called the question and

1    there was a unanimous vote for adoption of these.  And I am

2    thrilled to see each year somebody compiled how many times

3    courts will use these standards as a way of measuring the

4    effectiveness of lawyers in ineffective assistance of counsel

5    claims, and I think we're up to 350 or 400 citations of the

6    guidelines.  They are just that, guidelines, but of course,

7    they become the standard of care when courts adopt them.

8    Q    Have those ABA Guidelines at least been discussed by the

9    United States Supreme Court?

10   A    Oh, yes, they've been referred to several times.  I

11   wouldn't say many.  Several times.  But every time we see them

12   cited, we, of course, are thrilled because the process of

13   adopting them was a remarkably balanced, thorough, careful,

14   laborious process.  And to get consensus like that at the ABA

15   where everybody wants to have their own opinion was really an

16   accomplishment.  And it doesn't fall to me to get credit for it

17   much because others worked so much harder, but as I said, I

18   stole the glory by getting to present them to the ABA House

19   delegates.

20           MR. BRADEN:  Just so the record is clear, Your

21   Honor, the ABA Guidelines that Mr. Fox and I have been

22   discussing are Exhibit 6. I'm not sure whether you can take

23   judicial notice of them or whether I would move to admit them,

24   because as he says, they've not necessarily been adopted by the

25   state, but they are by the ABA.

1          MR. RUDOFSKY:  We have no objection, Your Honor.

2          THE COURT:  I'll admit Exhibit 6.

3      (Plaintiffs' Exhibit 6 received in evidence.)

4  BY MR. BRADEN:

5  Q    Mr. Fox, I'm not sure you have them in front of you right

6  now, but I just want to cite you just briefly to guideline

7  10.15.1 about the duties of post-conviction counsel.  Do these

8  guidelines indicate that the paramount duty of post-conviction

9  counsel is to seek a stay when their client has an execution?

10 A      Absolutely.  I've referred to that, we've used it in

11 cases where we've been, and as I said, I've only had two cases

12 where I was actually the lawyer involved, we obviously rely on

13 that as our authority for doing that, that this is a totally

14 legitimate, reasonable opportunity for us as lawyers to seek

15 the relief at the last moment because there are avenues

16 available, and as long as we act in good faith and consistent

17 with our obligations as officers of the court, we can't say no

18 to these because how do you say you're not going to try?  I

19 mean, General Motors can decide if I'm defending them in a

20 class action, well, I'd rather pay a lot of money and get it

21 all settled than have you guys have a ten-week trial.  That's

22 easy enough.

23      But that's why death is different because there's no

24 alternative.  If we don't pull out the stops with all of the

25 reasonable opportunities we have, then we're not lawyers and

1    we're not worthy of the name.

2    Q    Do you know a person named Linda Klein?

3    A    I do.

4    Q    Who is that?

5    A    She's the current president of the American Bar

6    Association.  She's a lawyer in Atlanta, Georgia, and a friend.

7    Q    I sent to you, and if you'll pardon me a moment, let me

8    pass this out.

9            MR. BRADEN:  May I approach, Your Honor?

10            THE COURT:  You may.  Thank you.

11   BY MR. BRADEN:

12   Q    Let me just explain this, and I think you know this, but

13   about 35 or 40 minutes ago, Ms. Klein sent a letter to the

14   governor of the state of Arkansas, and have you had a chance to

15   review that?

16   A    I have.

17            MR. BRADEN:  And it's dated April 11, 2017.  And,

18   Your Honor, we didn't have this available to us because it just

19   came into existence a few minutes ago, but we would move to

20   admit this for your consideration, and I'm not sure what

21   exhibit we're up to.  We move to admit it as Exhibit 35.

22            THE COURT:  Any objection?

23            MR. RUDOFSKY:  Just our continuing objections to

24   relevance in this context.

25            THE COURT:  I'll overrule the objection and admit

1    Plaintiffs' Exhibit 35.

2         (Plaintiffs' Exhibit 35 received in evidence.)

3    BY MR. BRADEN:

4    Q    The letter speaks for itself, but there's just a couple

5    parts of it I'd like to refer you to and maybe have you discuss

6    just a little bit.

7    A    I have it in front of me.

8    Q    So looking at the third paragraph on the first page, and

9    I think this letter pretty much reflects everything you've

10   testified about, but do you agree with that first paragraph, I

11   mean, that third paragraph that flows over into the second

12   page?

13   A    I wish I'd written it.  Yes, I agree with it.  I didn't

14   know -- by the way, I did not know that this letter was coming.

15   I didn't write it, I didn't have any role in it.  I'm proud

16   that Linda stepped up to the plate, but I didn't want anybody

17   to think I had been involved with that.  I wish I had thought

18   of it, as I say.

19   Q    This letter speaks pretty much exactly to everything

20   you've been talking about about the duties of the lawyers, and

21   I see on the second page at the bottom of the first or the

22   beginning, the first non-complete paragraph, there are some

23   case citations there.  Do you recognize those cases?

24   A    *Wiggins*, you mean, *Ortiz*, and *Rompilla*?

25   Q    Yes, sir.

```
 1   A    I am.  Rompilla is in our case book.  Wiggins, I was an
 2   amicus.  I wrote an amicus brief in Wiggins.  I guess that's
 3   it.  I wrote an amicus brief for the American Bar Association
 4   in the Supreme Court in Wiggins v. Smith.
 5   Q    I'm sorry to the Court and to you, Mr. Fox.  My questions
 6   might be just slightly repetitive from what you've talked
 7   about, but I just wasn't able to incorporate this into my
 8   questioning of you, but looking at the first full paragraph on
 9   the second page --
10   A    Just as long as I don't give you different answers to the
11   same question.
12   Q    I hope you don't.  So the first sentence there says the
13   guidelines recognize the extraordinary time and effort that is
14   required from defense counsel in the days and weeks immediately
15   preceding a scheduled execution.  Is that talking about one
16   case?
17   A    No.  What do you mean?  It's talking about all cases.
18   Q    Right.  But I mean the extraordinary time that --
19   A    Just one case, yes.
20   Q    Right.
21   A    I've rarely gotten so little sleep.
22   Q    This letter also recognized the guidelines that we've
23   just been talking about here that are Exhibit 6.  Throughout
24   there, you can see some citation to that.
25   A    Exactly.
```

1    Q    So if you were asked by President Klein to join in this

2    letter, would you?

3    A    I would have, but I would have asked her to add in more

4    on the conflict of interest that's created by the problems of

5    the limited time, and I also would have urged her to have

6    addressed the withdrawal question under Rule 1.16 because the

7    Rules of Professional Conduct that have been adopted by the

8    Arkansas Supreme Court, in fact, start out word for word like

9    the Model Rules of Professional Conduct adopted by the ABA, at

10   least with respect to these rules that we're talking about

11   here.

12   Q    And let's talk about that very briefly.  And probably we

13   should have covered this at the beginning of your testimony,

14   but when Arkansas adopted their Rules of Professional Conduct,

15   where did they get them from?

16   A    Well, the ABA has a Standing Committee on Ethics and

17   Professional Responsibility and it also from time to time has

18   appointed commissions to rewrite the rules.  The last major

19   rewrite of the rules was in 1982, and then there was a second

20   rewrite of the rules that was pretty significant in the year

21   2000.  That's the one that I worked on heavily because I had

22   been chair of the committee the year before and asked for this

23   commission to be put together.

24        Those rules that Arkansas has conform almost word for

25   word in all relevant respects with the model rule.  What

1    happens is the ABA House of Delegates adopts policy, so it

2    adopted the Model Rules, but the only thing that happens then

3    is a book is published.  The question is, will anybody salute?

4    And, in fact, we're happy to report that 49 of the 50 states

5    have adopted a very close version of the Model Rules, of the

6    model Model Rules.  And almost all of the states have adopted

7    identical rules to the ones we're discussing.  There are other

8    rules where there's more variation, but the ABA doesn't do

9    anything but publish a book.  Its adoption by the Arkansas

10   Supreme Court and the Pennsylvania Supreme Court and New York

11   Court of Appeals, it gives them the force of law.

12   Q    And that's why they're discussed as model rules because

13   nobody's necessarily adopted them until the states start

14   weighing in, so to speak?

15   A    Right.  When we publish model rules, we hold our breath

16   really to see if anybody's going to adopt them.  There's

17   nothing to require it.  What happens is, in each state, a group

18   of lawyers will get together and recommend to the state Supreme

19   Court whatever version of the model rules they seek and, of

20   course, ultimately the state Supreme Courts will decide exactly

21   how they're going to proceed.  And in this case Arkansas

22   adopted pretty much the Ethics 2000 changes to the rules.

23   Q    In our exhibits, Exhibit 5 is a list of the dates that

24   different states have adopted these rules.  And I know I

25   provided it to you, you may not have it in front of you, but it

1   notes that Arkansas adopted three rules on December 16th, 1985.

2   Do you agree with that?

3   A     Yeah, that's the original Model Rules of Professional

4   Conduct.  That was a set of rules that was revolutionary.

5   Before that, we had a model code that was hard to understand

6   and hard to enforce, so we changed the format entirely.  They

7   came up with an idea of black letter rules and then comments,

8   the comments only being interpretive of what the rules are.

9   It's the rules that the lawyers are required to abide by.  Some

10  states only adopt the rules.  Most states adopt the rules and

11  the comments.

12  Q     So when I was in law school, those were referred to as

13  the canons, is that right?  The Canons of Professional

14  Responsibility?

15  A     You're not that old.

16  Q     You'd be surprised.

17          MR. BRADEN:  Anyway, Your Honor, I would move to

18  admit Exhibit 5 showing the date Arkansas adopted these rules.

19          THE COURT:  Any objection?

20          MR. RUDOFSKY:  Can we have a second, Your Honor?

21          THE COURT:  You may.

22          MR. RUDOFSKY:  No objection.

23          THE COURT:  Exhibit 5 is admitted.

24      (Plaintiffs' Exhibit 5 received in evidence.)

25          THE COURT:  Why don't we go ahead if we can,

Fox - Direct

1    Mr. Braden, why don't we go ahead and we need to take a short

2    court reporter break, so why don't we take a five-minute break.

3          MR. BRADEN:  That's fine, Your Honor.

4          THE COURT:  We'll take a five-minute break, but if

5    you could just give us a moment.

6       (Recess at 3:57 PM.)

7                    C E R T I F I C A T E

8       I, Karen Baker, Official Court Reporter, do hereby certify

9    that the foregoing is a true and correct transcript of

10   proceedings in the above-entitled case.

11

12

13

14   /s/ Karen Baker, RMR, CRR, CCR
                                        Date: April 11, 2017
     --------------------------------
15   United States Court Reporter

16

17

18

19

20

21

22

23

24

25

Karen Baker, RMR, CRR, CCR
United States Court Reporter

1          (Continuing at 4:07 p.m.)

2              MR. BRADEN:  Mr. Fox, I appreciate your time, and if

3     you'll wait a little bit, I'm sure that the defendants may have

4     some questions for you.

5              THE WITNESS:  Thank you.

6                          CROSS-EXAMINATION

7     BY MR. RUDOFSKY:

8     Q.    Good afternoon, Mr. Fox.

9     A.    Good afternoon.

10    Q.    Before we, I guess, get into sort of the guts of your

11    examination, let me just ask you a question about the letter

12    that we all just received from the ABA.  About how long did you

13    receive that letter ago?

14    A.    20 minutes ago.

15    Q.    Okay.  And so I realize you said that you'd agree to sign

16    that letter.  Is it your habit of signing things that you've

17    only read very cursorily?

18    A.    No.

19    Q.    Okay.  Thank you.  Let's go back now and start with some

20    basic information.  When did counsel first contact you in this

21    case?

22    A.    I don't remember exactly when that occurred.

23    Q.    Are we talking three days ago?  A week ago?  Two weeks ago?

24    Three weeks ago?

25    A.    I can't -- I would say two weeks ago.  Maybe less.  I

1    don't -- I don't remember.  It's been a very extremely busy

2    time.

3    Q.   I appreciate that.  I'm sorry.  You were starting -- you

4    were going to say --

5    A.   I haven't kept my hours on this.  I'm doing this pro bono,

6    so I haven't been writing down my time, as I do for other

7    things.

8    Q.   And I don't want to put words in your mouth.  Is it fair to

9    say around two weeks ago, maybe a little more?

10   A.   I couldn't swear to it.  That would sound about right.

11   Q.   Okay.  Thank you.  Who contacted you from the Federal

12   Defender's Office?

13   A.   The gentleman who just interviewed -- questioned me.

14   Q.   Okay.  And about how long did you speak for?

15   A.   The first time?

16   Q.   Yes.

17   A.   I don't remember.

18   Q.   What did you talk about?

19   A.   I was told that there was a 1983 claim that had been

20   brought on the ground that the lawyers here were being asked to

21   represent multiple clients on a foreshortened schedule in post-

22   exhaustion of habeas proceedings and that executions had already

23   been scheduled, and they wanted to talk to me about what I

24   understood the standard of care was for lawyers handling these

25   kinds of matters.

1    Q.   Do you know that there are other claims involved as well in
2    this litigation?
3    A.   I don't know what other claims are involved in this
4    litigation.
5    Q.   So you haven't read the complaint in this litigation?
6    A.   I believe I did read the -- part of the complaint.  I don't
7    remember exactly.
8    Q.   And I don't mean to be flip here, sir.  I assume if you
9    read the full complaint, you would know that there were other
10   claims involved in this litigation.
11   A.   All I have focused on is what I've worked on here, what I
12   testified to here.
13   Q.   Okay.
14   A.   If I --
15   Q.   Let me ask this another way.
16   A.   I don't remember.
17   Q.   What documents have you reviewed relevant to this
18   litigation?
19   A.   I reviewed the -- you know, I don't remember what I
20   reviewed.
21   Q.   How long ago did you review these documents, sir?
22   A.   I saw the complaint because I saw at least the portion of
23   the complaint that brings us all here, and I saw the motion.
24   Q.   Which motion?
25   A.   The motion that's before the Court today, to enjoin these

1  executions to provide enough time for the lawyers to avoid the

2  conflict of interest and to give them enough time to undertake

3  the responsibilities they have on behalf of their clients.

4  Q.   And did you see the --

5  A.   I reviewed the fact that -- you're not going to interrupt

6  me?

7  Q.   Sure.

8  A.   I reviewed the fact that the time for the clemency

9  proceedings had been foreshortened as well, and so -- and I

10  found out that the reason for all this was the fact that the

11  drug that is used in the execution protocol in Arkansas was

12  about to expire.

13  Q.   Sir, when you say that you found out, who did you find out

14  from?  Or was that in reading the complaint or the motion?

15  A.   I don't remember the source.  I don't -- I did not --

16  probably both were the source.

17  Q.   How many times between the first time that counsel called

18  you and your appearance here today have you spoken with the

19  Federal Public Defender's Office?

20  A.   Substantively, twice.  Everything else has been scheduling.

21  Q.   And how long was each conversation?

22  A.   15, 20 minutes, maybe.

23  Q.   And the second conversation, what did that involve?

24  A.   Pardon me?

25       MR. BRADEN:  Your Honor, excuse me.

```
 1   A.   All of the conversations involved my recommendation that
 2   they move to withdraw because I think they were compelled to
 3   move to withdraw.
 4              THE COURT:  Mr. Braden has a point to make, sir.
 5              MR. BRADEN:  I object.  Under Rule 26, the
 6   communications between me and my expert are not -- are
 7   privileged, and I think that Mr. Rudofsky is getting into that.
 8        I know that all the bells and whistles of Rule 26 haven't
 9   necessarily been complied with here, but that's one part of it
10   that I would object to.  They have not been complied with
11   because of the foreshortened scheduling here.  But when we
12   have -- if and when we have a full hearing on the merits, we
13   will follow Rule 26 and disclose expert reports as that rule
14   requires.  But one thing that rule doesn't allow is for somebody
15   to get into the privileged communication between me and my
16   experts, either on the phone or by e-mail.
17              THE COURT:  Mr. Rudofsky?
18              MR. RUDOFSKY:  Your Honor, as far as I understand, and
19   I'm happy to be proven wrong if I'm wrong, that rule is about
20   consulting experts.  This is a testifying expert.  This is a
21   witness on the stand.  I'm allowed to ask what he was told and
22   what he talked about with his lawyer.
23              THE WITNESS:  I actually don't think so.
24              MR. BRADEN:  I just had this marked, your Honor, but I
25   misplaced it.  It's a mess over here.
```

1          MR. RUDOFSKY:  Counsel, are you talking about (4)(c)

2    which talks about the rules that protect communications between

3    a party's attorney and any witness required to provide a report

4    under Rule 26(a)(2)(B)?

5          MR. BRADEN:  Yes.  Thank you.  So under Rule (4)(c),

6    trial preparation protection for communications between a

7    party's attorney and expert witnesses, the rule protects

8    communications between the party's attorney and any witness

9    required to provide a report under Rule 26, regardless of the

10   form of the communication, except to the extent of the

11   communications which -- and then it lists a few things that

12   would be required to disclosed in the report.

13       I realize we haven't done a report here, but if we were in

14   a trial on the merits, this witness would have to provide a

15   report under Rule 26, so he would fall under this rule.

16         MR. RUDOFSKY:  And, your Honor, I would point to

17   subsection (ii) there which allows me to ask about any

18   information or factual information that he's provided by the

19   attorney in forming his opinions.

20         THE COURT:  I agree that Mr. Rudofsky under Rule 26 --

21   and it's 26(b)(4)(C), subsections (ii) and possibly (iii), which

22   say that except to the extent the communications identify facts

23   or data that the party's attorney provided and that the expert

24   considered in forming the opinions to be expressed or identify

25   assumptions that the party's attorney provided and that the

1    expert relied on in forming the opinions to be expressed.

2         The assumptions is in subpart (iii) of that rule.

3         I think Mr. Rudofsky is in the parameters of those two

4    subpoints.  If he strays from that, you can certainly renew the

5    objection, Mr. Braden.

6              MR. BRADEN:  Thank you, your Honor.

7              MR. RUDOFSKY:  Thank you, your Honor.

8    BY MR. RUDOFSKY:

9    Q.   Mr. Fox, let me make my question more specific just to

10   conform precisely to the rule.  To the extent that you relied on

11   it to give an opinion that you provided here today or are

12   thinking about providing on cross-examination, what did counsel

13   tell you in those two phone calls that you haven't already

14   discussed with us?

15   A.   He told me of the allocation of responsibility among the

16   lawyers, how many lawyers have how many cases, what the time

17   schedule was, and what the number of personnel were that were

18   available to handle that, those assignments and engagements that

19   they were going to undertake on behalf of these clients.

20   Q.   And, again, how many lawyers did he tell you were

21   representing each client?

22   A.   He told me that there was a group of four representing four

23   and there was one representing three and that there were some --

24   some minor help from others, but basically that was it.

25   Q.   And four and three -- I went into law because I'm not very

```
 1  good in math, but -- is seven.  So I understand there are nine
 2  plaintiffs in this case.  What about the other two?
 3  A.   I don't believe I was told exactly how many lawyers those
 4  two had.
 5  Q.   Were you told not exactly how many lawyers?  I mean --
 6  A.   No.  I don't recall any discussion about that.
 7  Q.   Okay.
 8  A.   I had a -- the ones I addressed were -- or that triggered
 9  my response to him about being forced to seek withdrawal were
10  the ones I just identified.
11  Q.   And just so the Court is clear because I want to make sure
12  if your opinions are not responsive to two of them, which seven
13  prisoners are we talking about?
14  A.   I don't know.
15  Q.   I think you testified that you're working this case pro
16  bono, so I assume this sort of speaks for itself, but you're not
17  being paid for your testimony here today?
18  A.   Are you asking me if I'm being paid for my testimony?
19  Q.   Yes, if you're being paid to be here or paid a fee.
20  A.   I thought you just said I was doing it pro bono.  I'm doing
21  it pro bono.
22  Q.   I would like to confirm that.  So the answer is no;
23  correct?
24  A.   You just said it.  I'm sorry.  I'm confused.
25  Q.   Okay.  Let's try again.
```

1    A.    I am doing it pro bono.  I am not receiving any

2    compensation for my time --

3    Q.    Okay.

4    A.    -- or effort in this regard.

5    Q.    Okay.  Do you oppose the death penalty?

6    A.    Do I oppose the death penalty?  Yes.

7    Q.    And you've said that --

8    A.    Do you want to know the reason?

9    Q.    No.  Just asking if you oppose the death penalty.

10   A.    Okay.

11   Q.    You've called for a moratorium on the death penalty;

12   correct?

13   A.    I have called for a moratorium?  No.

14   Q.    Your testimony is, you've never called for a moratorium on

15   the death penalty?

16   A.    I may have signed something about that.  I don't remember

17   it.

18   Q.    Okay.

19   A.    I don't recall.

20   Q.    I know that because you're on telelink, I can't provide you

21   this document in person, but there's an article that's entitled:

22   "ABA Adopts Guidelines for Capital Cases," that has a quote of

23   yours, and I want to know if this is an accurate quote.

24   Obviously, if you don't remember making it, tell us you don't

25   remember making it.

1     It says:  "The new guidelines represent 'evolving standards
2   that are totally consistent with a call for a moratorium,' said
3   Lawrence J. Fox, a Philadelphia attorney."
4     Do you remember making that statement?
5   A.   That's correct.
6   Q.   So you have called for a moratorium?
7   A.   No.  What we've said is, if you can meet these standards,
8   then you wouldn't need a moratorium.  That's what that sentence
9   says.  In fact --
10  Q.   Okay.  Do you believe the State's --
11  A.   My position on the death penalty is that we cannot have the
12  current state where these individuals who are accused of capital
13  murder are so badly represented at every step of the way, denied
14  resources time and time again.  The series of ineffective
15  assistance of counsel cases I get to review in the death penalty
16  area is shocking.
17  Q.   And you believe that's true today, sir; correct?
18  A.   Oh, absolutely.
19  Q.   So most of the capital defendants today don't get good
20  representation, as you would consider it?
21  A.   I never saw so many cases where there was abysmal
22  representation with so much on the line.
23  Q.   And I understand you've spent a good part of your career
24  trying to raise the standards of representation for capital
25  defendants.  Would you agree?

1    A.    I try to raise the allocation of resources.  There's such a

2    misallocation of resources.  There's not enough given for

3    defense, and then I have to go find private law firms to

4    contribute millions of dollars in expenses and hundreds of

5    thousands of lawyer hours to try and re-deal with the bad

6    representation initially.  It's a crusade of mine to get really

7    good representation, because when defendants accused of capital

8    crimes get good representation, we don't get death penalty.

9    Q.    So I understand that you have spent a lot of time and a lot

10   of energy in trying to get funding for capital defendants,

11   which, of course, is very admirable.  My question, though, was,

12   have you also tried and spent a lot of your career trying to

13   raise the standards of representation for capital defendants?

14   A.    I try and raise the standards of representation for

15   everyone.

16   Q.    Capital defendants --

17   A.    That's my goal.

18   Q.    Capital defendants more or everybody?

19   A.    Well, more because there's more on the line, but my goal in

20   life is to raise the standards for the profession.

21   Q.    And --

22   A.    Not raise the standards, raise the compliance with the

23   standards.  I know what the standards are.

24   Q.    And I think you may have said this, but I'm just going to

25   rephrase it a little bit.  Tell me if you agree.  Because they

1    face the ultimate sanction, I take it your position is that the

2    capital defendants deserve basically the gold standard of

3    representation.  Is that right?  Or no?

4    A.    They deserve the gold standard of representation.

5    Q.    Okay.  The ABA Guidelines that you were a part of revising

6    in and around, I guess, between 2000 and 2003 -- is that the

7    right time period I have?

8    A.    I think it was even longer than that, but it ended in 2003.

9    I thought it was a five-year project, but maybe it was shorter.

10   Q.    You put a lot of your sort of heart and sweat into that

11   project; yes?

12   A.    Actually, no.  I left it to the experts.  I was a

13   cheerleader for it.

14   Q.    So you would not consider yourself an expert then?

15   A.    I do consider myself an expert on what conflicts of

16   interest a lawyer must avoid and when a lawyer must withdraw

17   from a representation and what an obligation of communication is

18   and what the obligation of competence is.

19   Q.    In the death penalty --

20   A.    I don't consider myself an expert on death penalty cases.

21   I've never handled a death penalty case.  I've handled two

22   habeas cases.  But mostly what I've done is try to recruit

23   others to handle habeas cases.  And I'm very proud of the fact

24   that the project at the ABA has been able to enlist 250 law

25   firms to take on death penalty representation after the disaster

1   has occurred.

2   Q.    You signed onto the ABA Guidelines, yes, as part of the

3   committee?

4   A.    As chair of the ABA Death Penalty Representation Project, I

5   very much signed onto the guidelines.

6   Q.    And I don't want to go through all of the times that this

7   occurs in the guidelines.  I could.  There's about 20 or 30.

8   But let me just ask you this:  You would agree that within the

9   guidelines, the phrase "high-quality legal representation" is

10  repeated numerous times; correct?

11  A.    Of course.  That's what we're looking for is high-quality

12  representation.  A man facing death or a woman facing death

13  should have high quality of representation.

14  Q.    And, in fact, at one point it says:  Counsel must make,

15  quote, unquote, extraordinary efforts on behalf of the accused.

16        You would agree that that's what the ABA Guidelines say and

17  you agree that's the standard you want?  Yes?

18  A.    It's the standard I want.  We haven't come close to

19  achieving it.  We haven't even gotten to mediocre yet.

20  Q.    But that's the standard in the ABA Guidelines; correct?

21  A.    That's the goal of the ABA Guidelines.  The goal is to get

22  good representation.  Now, you may be perfectly happy with

23  mediocre representation, but I think the only thing a civilized

24  society can ever do is seek the highest quality of

25  representation.  We'll never achieve it, apparently, because

1    we're never going to allocate the resources necessary.  We've

2    got to do the best we can, and we certainly cannot do what's

3    happening here, deny these individuals the right to counsel just

4    before their planned execution because some medicine is about to

5    expire.

6    Q.    You'd agree with me that the requirement for high-quality

7    legal representation in the guidelines that you helped write, or

8    at least that you signed onto, are in excess of what the

9    Constitution requires for effective representation; correct?

10   A.    Apparently.

11   Q.    And when you say apparently, meaning that's what the

12   Supreme Court says, although you --

13   A.    There's a long line of cases --

14   Q.    -- although you might not agree with it.

15   A.    There's a long line of shocking cases accepting mediocrity,

16   finding acceptability under the most extraordinary

17   circumstances.  It's a national disgrace.

18   Q.    And the national disgrace is --

19   A.    You can have the death penalty, but not allocate enough

20   resources.

21   Q.    And the national disgrace --

22   A.    That's a different thing from setting rules of professional

23   conduct, by the way.

24   Q.    Thank you.  The national disgrace that I assume you're

25   speaking of is your disagreement with the Supreme Court on what

1    level of representation is needed for effective assistance of

2    counsel.  Is that fair?

3    A.   I think that's a fair statement, that the Supreme Court has

4    accepted a level of representation that is -- shocks the

5    conscience.  But you've compounded it in Arkansas with what

6    you're doing today.

7              MR. RUDOFSKY:  One second, your Honor.  I apologize.

8    BY MR. RUDOFSKY:

9    Q.   Sir, are you aware of the United States Supreme Court case

10   *Bobby v. Van Hook*?

11   A.   No.

12   Q.   Okay.  It's at 558 -- for everybody following along, it's

13   at 558 U.S. 4 (2009), and unfortunately, of course, you're on

14   telelink, so I'm going to read you the paragraph that I'm

15   focused on.

16        "To make matters worse, the Court of Appeals (following

17   Circuit precedent) treated the ABA's 2003 Guidelines not merely

18   as evidence of what reasonably diligent attorneys would do, but

19   as inexorable commands with which all capital defense counsel

20   'must fully comply.'  *Strickland* stressed, however, that

21   'American Bar Association standards and the like' are 'only

22   guides' to what reasonableness means, not its definition.  We

23   have since regarded them as such."

24        And I'm taking out the citations.

25        "We have said of state --" "What we have said of state

1    requirements is *a fortiori* true of standards set by private

2    organizations."  Quote, "'While states are free to impose

3    whatever specific rules they see fit to ensure that criminal

4    defendants are well-represented, we have held that the Federal

5    Constitution imposes one general requirement:  that counsel make

6    objectively reasonable choices.'"

7         I take it from your testimony that you would disagree with

8    the Supreme Court in terms of how they treat the ABA Guidelines

9    and the Model Rules.

10   A.   There's a difference between the ABA Guidelines and the

11   Model Rules.  The ABA Guidelines are guidelines.  They were

12   published by the ABA and the courts have followed them or not

13   followed them.  Lots of courts have followed them.

14        The Model Rules have been adopted in every state as the

15   law.  The lawyers are required to meet those standards or

16   they'll be disciplined.  And each of those reflects a standard

17   of care that's enforceable.  Very different situation.

18        The Arkansas Supreme Court has adopted these Rules of

19   Professional Conduct.  If you violated them or any of the other

20   lawyers in this courtroom violate them or, I guess, if I violate

21   them, we all could be disciplined.  That's very different from

22   the guidelines.

23   Q.   So let me --

24   A.   And my argument here, my testimony here, is about the

25   violation of the rules, rules which reflect the standard of

1   care, rules that reflect the fiduciary duty of lawyers that is

2   the minimum that is required.  Not the maximum that's required.

3   Q.   So let me take this --

4   A.   We can't give our clients a little bit of loyalty; we've

5   got to give them our full loyalty.

6   Q.   Let me take this one at a time.  Two things you said in

7   your answer.  I understand from your answer that you would at

8   least agree with the Supreme Court that the ABA Guidelines from

9   2003 are not the standard of care for ineffective assistance of

10  counsel claims; correct?

11  A.   Not correct.  Many courts have adopted them as the standard

12  of care.  The Supreme Court has not adopted them as the standard

13  of care, but we've got cases where that standard was enforced.

14  And once a court enforces it, then it becomes the standard at

15  least in that courtroom.  So I'm not going to agree with you.

16  Q.   Would you agree that the Supreme Court has not adopted

17  them?

18  A.   Absolutely.

19  Q.   Okay.

20  A.   I'm saddened by that, but they haven't.

21  Q.   I got that part.

22       And you would agree in this case -- and I'm asking you

23  just, again, what the case said.  "What we have said of state

24  requirements is *a fortiori* true of standards set by private

25  organizations."

1        The Supreme Court is making the same statements for state

2    standards and state requirements that it's making for the ABA

3    Guidelines.  Do you simply agree with that or you disagree that

4    that's what *Bobby Van* [sic] said?  Or you don't know?

5    A.   I didn't follow your argument at all, so you're just going

6    to have to start all over again.  Maybe I'm stupid.

7    Q.   No, no.  That is not true.

8    A.   Well, you and I agree.

9    Q.   "What we have said of state requirements is *a fortiori* true

10   of standards set by private organizations."

11       So the Supreme Court is about to tell you what they're

12   saying about standards set by private organizations and they say

13   we have already said this about state requirements.

14       And then they say:  "'While states are free to impose

15   whatever specific rules they see fit to ensure that criminal

16   defendants are well-represented, we have held that the Federal

17   Constitution imposes one general requirement:  that counsel

18   makes objectively reasonable choices.'"

19       So it's not ineffective assistance -- at least from what

20   the Supreme Court is saying, it's not ineffective assistance of

21   counsel merely because you violate a state rule.  At least

22   that's my understanding of *Bobby Van* [sic].  It might not be

23   yours.

24   A.   Yeah, I agree with your statement merely because -- but, in

25   fact, it could be that a violation of a state rule is very much

1    a violation of due process.  And a violation of due process

2    occurs when a lawyer is representing a client and cannot deal

3    with the conflict of interest because the lawyer has a second

4    client, a limited amount of time, and no way of knowing how to

5    allocate that time and as an objective matter cannot fulfill all

6    the obligations in the time that's presented because the time

7    that's presented is so unreasonable.

8    Q.    And I think that's where we've come back to your point that

9    I believe you said on cross, which each case has to be analyzed

10   separately.  They all can't be sort of just taken as a general

11   rule, they violate this, they violate that.  You have to

12   actually look at the specifics of the case and the type of

13   representation given; correct?

14   A.    I don't know what that means.

15   Q.    Did you say that each case --

16   A.    The general rule --

17   Q.    Did you say that each case --

18   A.    Let me finish with my answer.

19   Q.    Okay.

20   A.    You and I are arguing now.  Let me answer the question.

21         Generally, there's a general rule that says no lawyer

22   should be forced to represent a client on death row under a

23   limited time constraint that would not permit that lawyer to

24   reasonably mount whatever it is.

25         The one thing I know that we're talking about here because

1    I've done two of them is clemency petitions and what's involved

2    there.  And to say that you can do a clemency petition with one

3    individual working for a few weeks is unreasonable in the

4    extreme and would apply to any case because what is required as

5    a minimum to do that is an enormous amount of investigation,

6    research, preparation, effort, analysis, you name it, to say

7    nothing of the other collateral claims that the lawyer should,

8    must pursue as long as there's a reasonable basis for doing so.

9    Q.    And your point there is that people would not be able to

10   get the best representation, which is what they deserve because

11   it's the death penalty?

12   A.    I'm not talking about the best representation.  Just giving

13   somebody enough time is not the best representation.  It might

14   be barely adequate representation.  But it is a requirement so

15   that a lawyer isn't put in a conflict of interest situation

16   where the lawyer says, wait a minute, if I spend all day in

17   court on my 1983 claim, then I've got three clients who I can't

18   help.

19   Q.    And so as I understand it, and I'm just repeating back your

20   testimony, is, it might be adequate, but it's certainly not good

21   in your book?

22   A.    No, it's not adequate.  It's not adequate.

23   Q.    And I believe you said it might be barely adequate.  Are

24   you now changing your testimony?

25   A.    Yes, I guess I'm changing my testimony if that's what I

```
 1   said.  It's not adequate, the amount of time involved in this
 2   matter.  I would not give advice to a client to seek withdrawal
 3   from a representation of a death penalty, potential death
 4   penalty client unless the standard was so far below what it
 5   should be that it was required that additional times be provided
 6   to cure the conflict.
 7   Q.    And so I don't want to ask about -- just given your answer,
 8   I don't want to ask about attorney-client privilege, but were
 9   you giving the counsel advice about whether they should withdraw
10   or not as their lawyer?
11   A.    I did not -- they did not retain me and I did not offer my
12   services.  I offered my opinion that that's what they should do.
13   Q.    So it wasn't -- it wasn't attorney-client privileged legal
14   advice?
15   A.    We'd have to think about that.
16   Q.    So you don't know if it was as their lawyer or not?
17   A.    Well, I hadn't considered it at the moment.
18   Q.    Do you teach ethics, professional ethics?
19   A.    I do.
20   Q.    And so you gave them an answer without considering whether
21   you were acting as their lawyer or not?
22   A.    I gave them the advice I gave them.  Whether I was acting
23   as their lawyer or acting as a resource for them other than a
24   lawyer, I don't know.
25   Q.    And I guess the reason I asked is, if you were acting as
```

1    their lawyer, I'm not sure it's particularly appropriate for you

2    to be on the witness stand in this case defending the advice you

3    gave them.  That seems a little bit like a conflict to me.  Do

4    you agree with that, or no?

5    A.    I don't agree with that.

6    Q.    Okay.  And why not?

7          MR. BRADEN:  Your Honor, before Mr. Fox answers, I

8    object.  We presented Mr. Fox as an expert witness, not a member

9    of our legal defense team.  We have not consulted him as a

10   lawyer.  He's not advising us as a lawyer.  He's an expert under

11   Rule 26.

12         MR. RUDOFSKY:  Your Honor, they've presented him as an

13   expert in legal ethics.  I think I'm certainly entitled to ask

14   him whether he has even thought about whether this creates an

15   ethical dilemma or not.

16         THE COURT:  I'm not sure -- you know, I've overruled

17   relevance objections.  You can spend your time however you wish

18   to spend your time.  I'm not really sure -- we seem pretty far

19   afield as to what the claim is, what the basis of the claim is,

20   and what the focus is.  So, again, you can spend your time

21   however you want to spend your time.  I'll acknowledge and

22   recognize the objection.  I'm overrule the objection and let

23   Mr. Rudofsky proceed.  I'll take whatever questions and answers

24   come in under this line of questioning for what I think it's

25   worth at this stage of the proceedings given the claims and what

1   the legal standards are.

2        You can proceed.

3            MR. RUDOFSKY:  Thank you.

4   BY MR. RUDOFSKY:

5   Q.   Let's move quickly then to the work that these nine

6   plaintiffs have had done for them.  As you said, I believe, you

7   only knew the number of lawyers representing seven plaintiffs,

8   not the nine; correct?

9   A.   I may have heard the number, but I focused on the one

10  lawyer with three and four lawyers with four.

11  Q.   Do you know how many prisoners are represented by both the

12  FPD and more private lawyers?

13  A.   I don't understand the question.

14  Q.   Do you know how many prisoners are represented by both the

15  Federal Public Defender and private counsel?

16  A.   I don't know the exact number.  I know that I assumed for

17  purposes of my opinion that there were not enough personnel

18  available and the time constraints that were being placed for

19  these lawyers to provide the services that were necessary for

20  each of them and that they were --

21  Q.   You assumed that for purposes of your opinion?

22  A.   Yes.  And they were put in a conflict of interest situation

23  because the time they were allocating for one was being robbed

24  from another.

25  Q.   Do you know the background and experiences of the lawyers

1    in this case?

2    A.    No.

3    Q.    Do you know how long each lawyer has represented the

4    prisoners, each of the prisoners in this case?

5    A.    I don't.

6    Q.    Are you aware of the legal steps that the counsel have

7    taken since the first time execution dates were set in 2015,

8    through today?

9    A.    No.

10   Q.    Are you aware of the lethal injection challenge that these

11   nine prisoners brought in state court?

12   A.    Yes.

13   Q.    So you're aware that they brought one in federal court --

14   actually, they brought one in state court in 2015, litigated

15   that all the way up until certiorari was denied by the U. S.

16   Supreme Court, and now they've brought one in federal court,

17   too?

18   A.    I think I knew that.

19   Q.    Okay.  Are you aware of the case prisoners brought about

20   clemency issues last week in federal court?

21   A.    Yes.

22   Q.    Have you reviewed those filings?

23   A.    No.

24   Q.    Have you reviewed filings of the state lethal injection

25   case?

1    A.    No.

2    Q.    Are you aware that six of the nine prisoners sought

3    clemency?

4    A.    I thought all of them were seeking clemency.

5    Q.    Assuming I'm right that six of the nine are seeking

6    clemency, have you read those clemency petitions?

7    A.    No.

8    Q.    Are you aware that Prisoner Ward's counsel filed a

9    complaint in state court claiming to be incompetent to be

10   executed?

11   A.    I'm sorry.  I didn't hear the predicate to that question.

12   Q.    Are you aware that Prisoner Ward's counsel filed a

13   complaint in state court claiming that Prisoner Ward was

14   incompetent to be executed?

15   A.    No.  I did consider that that is one of the things that has

16   to be considered by a lawyer representing somebody on the eve,

17   or as an execution approaches, that claim is often made.  And

18   that's the time to make it because it's contemporaneous view of

19   the inmate that has to be the basis for any relief that is

20   granted.  It can't be what the mental state was two years ago or

21   five years ago.  The "too incompetent to be executed" claim has

22   to be given -- has to be brought at the time of the execution.

23   Q.    Have you reviewed the filings in that case?

24   A.    No.

25   Q.    Are you aware that Prisoner McGehee has filed a motion to

1  recall the mandate and for reconsideration in the Arkansas

2  Supreme Court?

3  A.    No.

4  Q.    Have you reviewed the filings in those cases?

5  A.    No.

6  Q.    Are you aware that Prisoner Johnson has filed a petition to

7  reinvest jurisdiction to file a writ of coram nobis and petition

8  for recall and a request for a stay in the Supreme Court?

9  A.    No.

10  Q.    Are you aware that Prisoner Ledell Lee filed a motion to

11  recall the mandate and for a new trial and a motion to -- for

12  the Court to take this case and to stay the execution in the

13  Arkansas Supreme Court?

14  A.    No.  I did not make an inventory of the claims that they

15  had.

16  Q.    So I'm assuming --

17  A.    I just --

18  Q.    -- you're not aware of any of the other claims that have

19  been brought or the documents in them?

20  A.    I have heard about the -- generally about the claims, but I

21  did not individualize them and I did not review any individual

22  claims.

23  Q.    So you haven't analyzed in those specific cases whether or

24  not prisoners' counsel have provided effective assistance of

25  counsel; correct?

1    A.    I have not done that.

2    Q.    Okay.

3    A.    I have -- what I've addressed was the concern that was

4    brought to my attention about the lack of personnel and the

5    shortness of time to accomplish what should take a lot longer.

6          And I also addressed -- and I don't think I ever mentioned

7    this in my direct.  One of the issues that troubles me was that

8    the present scheduling takes no account of the emotional aspect

9    of the execution process.  Having been through a fair number of

10   these cases where all is lost and the individual client is

11   executed, I know how those lawyers are left bereft, shocked,

12   depressed, and otherwise rendered impaired in some respects from

13   bouncing right back and coming on to do another client's

14   execution two days later.

15   Q.    Thank you.  You also don't know whether the prisoners'

16   counsel have had any discussion with their clients about what

17   you would consider the alleged conflict in this case; correct?

18   A.    I don't think it's an alleged conflict.  I think it's a

19   conflict.

20   Q.    You don't know that they have -- that they have or haven't

21   discussed this with their clients, do you?

22   A.    No.  That's lawyer-client.  I don't --

23   Q.    You also don't know if the prisoners have consented to

24   this, do you?

25   A.    Well, if they consented, it couldn't possibly be informed

1  consent.

2  Q.    That's not what I asked you.  You don't know whether they

3  consented to this, do you?

4  A.    I don't know whether they've consented, but I wouldn't give

5  that consent the worth of the paper it's written on if it's, in

6  fact, in writing.

7  Q.    Do you know when the first time the prisoners could have

8  brought the lethal injection case in federal court is?

9  A.    No, I don't.

10  Q.    Do you also know that section 3599 -- I guess 18 USC 3599,

11  which talks about appointing counsel, does not authorize counsel

12  in lethal injection 1983 cases?

13         MR. BRADEN:  Your Honor, I would object to that.

14  That's a mischaracterization of the law, and we dealt with that

15  in our briefing.  And I just would object to him characterizing

16  it that way.

17         THE COURT:  Mr. Rudofsky, what's your response?

18         MR. RUDOFSKY:  My response is, I have two cases here

19  that say it's not a mischaracterization, and I'm entitled to ask

20  the witness who is supposed to be an expert in this field if he

21  agrees with that statement.

22         THE COURT:  You may proceed.

23  A.    Do you want to restate the question, please?

24  Q.    Sure.  Do you understand that section 3599 does not

25  authorize Federal Public Defender's counsel to appear in lethal

1   injection 1983 cases?

2   A.   No, I don't know that to be the fact.  In fact, I -- to the

3   contrary --

4   Q.   Do you dispute that or do you just not know one way or the

5   other?

6   A.   My understanding, the 3599 permits the lawyers in the

7   Federal Public Defender's Offices to bring those claims on

8   behalf of the clients they're representing in clemency and

9   other -- any other collateral attack they're going to bring on

10  the possible execution of their clients.

11  Q.   In *Link v. Luebbers*, which is an Eastern District of

12  Missouri case, 2011 Westlaw 2938115, the Court says the

13  following:  "In light of the Court's reasoning in *Harbison*, the

14  Court believes that civil litigation challenging the State's

15  lethal injection protocol is not included in 3599(e), and

16  therefore, counsel may not be compensated for work performed in

17  such cases."

18       I take it, like you disagree with the Supreme Court's

19  ineffectiveness standard, you disagree with this case?

20  A.   That's a question of compensation.  I think the question I

21  had was whether they can bring such a claim under 3599.  I don't

22  know why they cannot.

23  Q.   If 3599 authorized them to bring a claim, their fees would

24  be paid for.  Do you not agree with that?

25  A.   Well, I don't know enough about the jurisprudence in this

1    area.  That's one district court opinion.  I don't know whether

2    there are others.  I know that the individual defense counsel

3    are of the view that 3599 authorizes them to do that.

4    Q.    I'll read you only one more since you've fairly said that

5    you don't know how many cases are out there.  This is *Winfield*

6    *v. Steele*, 2015 Westlaw 1879545.  This is from the Eastern

7    District of Missouri, too.

8         "A review of several district court cases suggests that the

9    majority of courts would not compensate counsel for pursuing

10   1983 litigation."

11        Again, I assume, like you disagree with the Supreme Court's

12   ineffectiveness jurisprudence, you disagree with this case?

13   A.    Well, no, that says the majority.  So there must be a

14   minority that is, in fact, authorizing it, and I assume that the

15   Supreme Court has not finally decided this case.  So there's

16   authority both ways, if I'm hearing you correctly.

17   Q.    So the one case that the Court found in the minority, what

18   you're telling this Court is, you would agree with that case as

19   opposed to the majority cases.

20   A.    It's not for me to agree to what 3599 permits.  What I was

21   saying was that these lawyers are taking the position that they

22   are authorized to bring that, that somebody has to bring it on

23   behalf of these clients, and that there's neither the time nor

24   the loyalty permission for them to do that under these

25   circumstances where there's this race to judgment.

1   Q.   Last set of questions.  You would agree, as I understand,

2   that most Federal Public Defenders and most capital defendant

3   counsel are overworked in this country?

4   A.   Yes.

5   Q.   Okay.  And you would agree that most of them are

6   underresourced and underfunded?

7   A.   I think the defense is seriously underfunded and

8   underresourced.

9   Q.   Most defense.  I'm not talking here.  I'm speaking across

10  the country.

11  A.   I think that's been my observation from the cases I've been

12  in, that they are underresourced.

13  Q.   And you would agree that most capital defense counsel have

14  to respond to emergency motions within their practice on a

15  relatively routine basis; correct?

16  A.   Yes.

17  Q.   Short time frames?

18  A.   They have to when they have to because there are short time

19  frames, but --

20  Q.   So you disagree with the fact that there should be short

21  time frames.  I understand that.  But you --

22  A.   No, no.  The Court gets to decide the time frames normally,

23  and the time frames have to be reasonable because otherwise

24  you're denying the benefit of counsel.  To say that you have a

25  project that requires a month and counsel only has two weeks to

1   do it, that's a problem.

2   Q.    And what I'm saying --

3   A.    A serious due process problem.

4   Q.    And what I'm asking you, sir, is, across the country, not

5   only being overworked and underfunded, but you agree with me

6   that capital habeas defense -- or capital defense counsel often

7   have to require [sic] to emergency stays in stressful times on

8   short notice; correct?

9   A.    Everybody has to do that.

10  Q.    Capital defense counsel more than most?

11  A.    I don't know that.  I haven't made that judgment.

12  Q.    Okay.  But they do have to?

13  A.    But no one --

14  Q.    Thank you.

15  A.    -- has the responsibility that capital defense counsel has

16  because nobody else is dealing with life and death.  Nobody else

17  is stuck with a situation where they can't make a cost-benefit

18  analysis.  No one else has to dedicate themselves the way these

19  individuals do.

20  Q.    And that's why it's your view that they deserve the gold

21  standard of defense; correct?

22  A.    It's my view that they -- in this situation, they don't

23  need the gold standard.  They just need an adequate period of

24  time and resources to present all of the post-conviction motions

25  and other proceedings that they are -- that are available to

1    these individuals who are facing death.

2    Q.   I just want to make sure I understand your testimony.  I'm

3    not talking about these -- I'm not talking about these folks.

4    I'm talking about capital defendants in general.  Your theory

5    is, they need the gold standard of defense because they're

6    facing death.  Is that wrong?

7    A.   I believe that -- I wish they could get that gold standard.

8    They can't because the Supreme Court won't authorize it.  But

9    they have to at least have enough opportunity, enough personnel,

10   and enough time to present all of the motions and proceedings

11   that they are entitled to undertake as they approach an

12   execution.  And to put them in this conflict of interest

13   situation is a terrible, terrible dilemma.  Terrible dilemma.

14            MR. RUDOFSKY:  Thank you, sir.

15            THE COURT:  Redirect?

16            MR. BRADEN:  Your Honor, we have no other questions

17   for Mr. Fox.

18       We appreciate your time, Mr. Fox.

19       I think this is the last video witness.  We have other

20   witnesses, but our last video witness.  And we would thank

21   Jeremy for helping us get these set up.

22       Thank you.

23            THE COURT:  Thank you, Mr. Fox.  That will conclude

24   your testimony, Mr. Fox.

25            THE WITNESS:  Thank you, your Honor, for permitting me

1    to appear this way.

2              THE COURT:  You're welcome.  Have a good evening.  We

3    appreciate it.

4              THE WITNESS:  Thank you.

5              THE COURT:  Do you have other witnesses to call this

6    evening?

7              MR. BRADEN:  I'm sorry?

8              THE COURT:  Do you have any other witnesses to call

9    today?

10             MR. BRADEN:  We have Dale Baich that we could call.

11             THE COURT:  Why don't we take a short break?  I'm not

12   sure we need to switch out technology.  We'll take a 15-minute

13   break now.  We'll come back in here at ten after five.  Ten

14   after five.

15             MS. MERRITT:  Your Honor, could I ask for

16   clarification on one point?

17             THE COURT:  Sure.

18             MS. MERRITT:  We had initially -- counsel have been

19   talking about schedule and when we should stop.  Ultimately it's

20   up to the Court.

21        We wanted to let the Court know that we've got two

22   witnesses that have been waiting.  They're here.  The lawyers

23   are fine with stopping, that things are looking good in terms of

24   scheduling.  But the witnesses are here and they're actually on

25   the plaintiffs' list as well as the defendants' list.  So I

1  wanted to let the Court know so that you're fully aware of

2  what's going on.  They've been waiting for several hours.  So if

3  we're going to stop after Baich, I want to let my folks know so

4  they can go home and that they need to come back.

5           THE COURT:  I have no problem with ending early

6  tonight.  What I don't want to have happen, I don't want to end

7  early tonight and then be here until 8:15 Thursday night.  So I

8  want to keep rolling if that's what we need to do so we're not

9  here late in the day on Thursday.  I would appreciate getting in

10  all the proof we can so that we can end the proceeding earlier

11  in the day on Thursday.

12      I don't have any problem staying until 8:15.  I will not

13  stay later than 8:15 on Thursday night.  This hearing will end

14  at 8:15 Thursday night.

15      So I'll let you all talk about what you want to do with

16  that.  All right?

17           MS. MERRITT:  Thank you.

18      (Recess at 4:57 p.m.)

19                  REPORTER'S CERTIFICATE

20      I certify that the foregoing is a correct transcript from
   the record of proceedings in the above-entitled matter.

21

22                                Date:  April 11, 2017

   /s/ Christa R. Jacimore, RDR, CRR, CCR
23      United States Court Reporter

24

25

1          (Proceedings continuing in open court at 5:29 PM.)

2          THE COURT:  We are back on the record with counsel

3    and the parties.  What have Counsel decided in regard to this

4    evening or if you have issues to present to me?  Counsel for

5    the plaintiffs?

6          MR. WILLIAMS:  Our next witness is Dale Baich.

7    We're estimating that he will take an hour.  At that point,

8    we've both called Dale Reed, who is here, one of the ADC

9    witnesses, and we're both ready to go with him.  I guess the

10   dispute is whether to proceed beyond that to Rory Griffin.  The

11   plaintiffs would prefer not to do that tonight.  I think

12   defendants would.  Looking at the schedule, we see a packed

13   Thursday which is kind of engendered by Dr. Zivot's presence

14   there and all the rebuttal testimony that needs to be taken in

15   response to him.  So that's our position right now.

16         THE COURT:  All right.  How long do you think Dale

17   Reed will go?  Do you have any estimate, either side?

18         MR. WILLIAMS:  I don't think we do.

19         MS. MERRITT:  An hour perhaps.  And for the record,

20   Your Honor, the parties both had Dale Reed as well as Rory

21   Griffin on their exhibit list, and both Mr. Reed and

22   Mr. Griffin have been here for the last several hours in the

23   conference room just because we are aware and we appreciate the

24   Court's indulgence in terms of extending the court day.  And

25   while we certainly understand and appreciate where the

1  plaintiffs are, we also want to use the court time as best that

2  we can and make sure that we don't have to run over, because we

3  understand the Court's position on that.

4           THE COURT:  How long would Rory Griffin be?

5           MS. MERRITT:  Maybe an hour as well.  The lawyer

6  who's working with those particular witnesses is with them in

7  the room.

8           THE COURT:  Why don't you ask and find out?  Three

9  hours is going to put us past the 8:15 time when I've told the

10  courthouse that we're going to close it.  So I'm not sure.

11  That's the concern I have is it's us, but it's also a whole lot

12  of other people that we're requiring to be here.

13          MS. MERRITT:  I don't think we actually have much to

14  do with Mr. Reed, the State, so again, we're all kind of

15  flying -- shooting by the hip here in terms of not knowing

16  what's coming up.  I believe that we could get through all the

17  witnesses.

18          MS. HODGE:  Ms. Cryer said she can get to all of

19  them, they'll be short directs and she can get through both of

20  the ADC witnesses within the 8:15 time frame.

21          THE COURT:  I won't hold you to it with cross.  If

22  Mr. Griffin has to come back tomorrow, he can come back

23  tomorrow.  I say we just see what we can get done.  We're not

24  going to go past 8:15, so that's sort of where we're at.

25          MS. MERRITT:  Thank you, Your Honor.

```
 1              THE COURT:  Go ahead and call your next witness if
 2    you're ready.
 3              MR. BRADEN:  We call Dale Baich.
 4              THE COURT:  Please raise your right hand and
 5    Ms. Washington will administer the oath.
 6              DALE BAICH, PLAINTIFFS' WITNESS, DULY SWORN
 7              MS. HODGE:  Just making a record, I won't interrupt.
 8    This is the same objection about introduction of another
 9    state's lethal injection protocol and evidence about executions
10    that have occurred in other states.  My standing objection, and
11    I won't interrupt during his testimony.
12              THE COURT:  I'll recognize the standing objection to
13    his testimony.  I overruled it.  You may proceed.
14                          DIRECT EXAMINATION
15    BY MR. BRADEN:
16    Q     Would you state your name, please.
17    A     Dale Baich.
18    Q     Will you spell that, please?
19    A     B-a-i-c-h.
20    Q     What is your profession, sir?
21    A     I'm an assistant federal public defender in the office of
22    the Federal Public Defender for the District of Arizona.  I'm
23    the supervisor of the capital habeas unit.  In addition, I'm an
24    adjunct professor of law at the Sandra Day O'Connor College of
25    Law.
```

Baich - Direct

```
1    Q      Does that mean you're a lawyer?
2    A      I'm a lawyer.
3    Q      How long have you been employed with the Federal Public
4    Defender office in Arizona?
5    A      Just over 20 years.
6    Q      And how long have you held the position as the chief or
7    supervising attorney of the habeas unit?
8    A      About 17 years.
9    Q      Some of this testimony we've heard a little bit of
10   yesterday, but I'd like for you to go over just briefly.  What
11   is a capital habeas unit and what is it in Arizona?
12   A      In Arizona, our capital habeas unit has a staff of 43
13   people.  20 are lawyers and the remainder are investigators,
14   paralegals, assistant paralegals.  And we represent people who
15   are under a sentence of death in Arizona in their federal
16   habeas corpus proceedings.  We also represent clients in other
17   districts around the country when capital habeas units in those
18   districts have conflicts.
19   Q      Sounds from your title, but let me just make the record
20   clear, is your office funded by or part of the Administrative
21   Office of the United States Courts?
22   A      Yes.
23   Q      And they provide your funding; is that correct?
24   A      All of it.
25   Q      What basically is your duties as supervising attorney?
```

1   A       Herding cats.  I have a co-supervisor and we manage the

2   capital habeas unit, we assign cases to the different lawyers

3   and teams.  When we get a new case into the office, we put

4   together a team that consists of two lawyers, a paralegal, a

5   fact investigator, mitigation investigator, and an assistant

6   paralegal, so that would be a core team that we would have in a

7   case.  We also work with the panel to keep them informed of

8   current -- the current status of habeas law.  We provide

9   training and we track cases in the district.

10  Q       When you say panel, just to make it clear, do you mean

11  the Criminal Justice Act panel lawyers that are appointed by

12  the Court?

13  A       Yes.

14  Q       Under what statute is your office appointed to represent

15  the habeas corpus inmates that you represent?

16  A       18, U.S. Code, 3599.

17          MR. BRADEN:  Sharon, if you could pull up -- sorry

18  here, Judge, I've lost my place -- Exhibit 8, please.

19      I would move to admit this, Your Honor, but this is part

20  of the United States Code, so I just ask you to take judicial

21  notice of it, and it's Exhibit 8.

22      Sharon, if you would scroll down to kind of the bottom of

23  the page to part E there.

24  BY MR. BRADEN:

25  Q       Mr. Baich, will you look at that?  And actually it

Baich - Direct

1    continues on to the next page.  But is this the statutory

2    provision that your office -- that is used to appoint your

3    office?

4    A    Yes, it is.

5    Q    Is this the same statutory provision that's used to

6    appoint Criminal Justice Act attorneys when they act, when

7    they're appointed to represent these cases themselves?

8    A    It is.

9    Q    And is this statute specific to death penalty cases or

10   what we as a shorthand would call 2254 cases?

11   A    Yes, it is.

12   Q    And just to make it clear, I'm sure the judge knows this,

13   but what's a 2254 case?

14   A    A 2254 case is a challenge of a state conviction or

15   sentence in federal court.  After the case is exhausted on

16   direct appeal in the state court and through state collateral

17   proceedings, the prisoner has the right to petition the federal

18   courts for review.

19   Q    Once you're appointed under this statute to represent

20   your clients in habeas corpus proceedings, do you represent

21   them in other areas?

22   A    Yes.

23   Q    Can you explain to us what that is?

24   A    Sure.  When a case comes in, we review the file, make an

25   assessment of the case, we investigate, retain experts.  At

Baich - Direct

```
 1   some point in time, we may ask for permission from the district
 2   court to return to state court to exhaust a claim.  There may
 3   be a civil rights issue that we pursue in federal court.  We
 4   also represent our clients in clemency proceedings.
 5   Q    When you say civil rights action, under what federal
 6   statute do you represent them?
 7   A    28, U.S. Code, 1983.
 8   Q    I think it might be 42?
 9   A    42, I'm sorry.
10   Q    So to use a little bit of shorthand here, in those 1983
11   cases, do you bring challenges to lethal injection or methods
12   of execution?
13   A    We do file methods of execution challenges in some of our
14   cases or on behalf of some of our clients.
15   Q    Actually, you've been involved in several of them around
16   the country; is that right?
17   A    Yes.  Along with litigation in Arizona, we worked on the
18   Warner/Glossip litigation in Oklahoma.
19   Q    We'll talk about that in just a minute.  So tell me about
20   executions in Arizona that you and your office or relevant
21   executions to what we're talking about here.
22   A    Since Furmin, 34 prisoners have been executed in Arizona
23   and our office has represented, I believe, 22 of those
24   prisoners.  And what I'd like to do is look at 2010 going
25   forward because there was a ten year lull in executions in
```

Baich - Direct

1    Arizona.  So beginning in 2010, we've represented 14 clients

2    who have been executed.

3    Q     So what do you do in your office or what do you believe

4    that you are required to do under the statute when a client of

5    yours has an execution date?

6    A     Well, we -- after the Ninth Circuit decides the case if

7    it's an Arizona case and a petition for cert is pending, we

8    generally begin to look at issues related to clemency.  We also

9    increase the amount of time that we spend with our client in

10   order to prepare him for clemency if he decides that he wants

11   to do that.  We also may bring in an expert to evaluate the

12   client if we think that the client may be incompetent or

13   decompensating.  And then, finally, we look to recent

14   developments in the law.  For instance, within the last couple

15   of years, the U.S. Supreme Court decided the case of *Martinez*

16   *v. Ryan* where cause could be or ineffective assistance of

17   post-conviction counsel could be cause to excuse default in

18   habeas.  So we go back and re-evaluate all our cases to see if

19   *Martinez* applies or the recent case of *Hurst v. Florida*, does

20   *Hurst* apply to our cases.  So we're always looking at new

21   issues to explore.

22   Q     So when you have a client that has an execution date set,

23   does your staffing change or in the assignment of lawyers?

24   A     Yes.  I mentioned the core team earlier, and once a date

25   is set, we increase the size of the team.  In our office, we

Baich - Direct

1    have a dedicated set of attorneys and staff who handle method

2    of execution litigation.  So that team would be brought on to

3    work along with the client's habeas team.  In addition, we have

4    lawyers in our office who specialize in competency matters so

5    if there's a -- if the team thinks that the client may be

6    decompensating, we would bring in that competency team to work

7    with the habeas team.  And the closer that we get to an actual

8    date, we bring in whatever lawyers or investigators or

9    paralegals we need in order to provide the representation that

10   our clients deserve.

11   Q    Why -- you've mentioned that you have a dedicated team

12   that deals in methods of execution.  Why don't the lawyers that

13   have just been working on the habeas case deal with that?

14   A    Well, what we learned early on is that that area of

15   litigation, methods of execution, is really complicated and

16   sort of a specialty.  And for me as a manager, it makes more

17   sense to be efficient in that if I have a dedicated team who

18   has litigated the issue over time, then that team could be the

19   most effective in representing the client on that issue.  In

20   addition, the habeas team is focusing on other issues.  Do we

21   need to file a 60(b) motion to reopen the habeas case, does

22   *Martinez* apply to this case, is our client decompensating.  So

23   from a legal perspective, I think it makes more sense to have

24   an established team handle the method of execution litigation.

25   Q    So the burden of the execution work is divided or split,

Baich - Direct                                              501

1    so to speak, in your office; is that right?

2    A    Yes.  No one small habeas team handles the burden of the

3    whole case.

4    Q    And by the time that you increase your staffing, the

5    lawyers in your office that are handling just the, for the lack

6    of a better term, the execution or habeas part of the case, how

7    many lawyers wind up doing that?

8    A    The core team remains in place.  We may add a third

9    lawyer or depending on how the issues develop, we may add a

10   fourth lawyer to that team.

11   Q    How many people are on your method of execution team?

12   A    We have three lawyers, one investigator, and one

13   paralegal.

14   Q    And that is the only thing they do is what we've been

15   doing here this week, right, this kind of stuff?

16   A    Well, it's not the only thing that they do in the office.

17   They have other responsibilities on other teams, but when a

18   method of execution issue becomes ripe, then they're called in

19   to work on it.

20   Q    So they work with the core habeas team?

21   A    Yes.

22   Q    You mentioned that you increase -- that you spend time

23   visiting with your client, but you increase the time as the

24   execution dates approach.  Why is that?

25   A    Well, first, there's so much going on, so many decisions

Karen Baker, RMR, CRR, CCR
United States Court Reporter

Baich - Direct

1    that need to be made, and it's important to keep the client

2    fully informed and to engage him during that period of time.

3    The second thing is it's the humanitarian thing to do.  Our

4    client may be close to the end of his life and we need to be

5    there to help him through what he's facing.  It may be trying

6    to help him reconcile with his family or making funeral

7    arrangements or donating his body to research for life.  So we

8    have a role in helping the client through that.

9    Q     And from what you've mentioned here, some of that

10   obviously can be assigned to perhaps an investigator or some

11   other person, but can the central role of staying in

12   communication with the client be left to somebody that's not

13   the lawyer?

14   A     No.  You're right, it is -- we do spread it out, you

15   know.  There may be a paralegal, there may be an investigator

16   who's got the relationship with the client, but it's the lawyer

17   who needs to inform the client and help him make the decisions

18   that need to be made.

19   Q     Why is it important for a lawyer to carry that duty?

20   A     I think under the attorney-client relationship, the

21   attorney has that duty.  He or she is the one that could give

22   legal advice, to answer legal questions, and to let the client

23   know that his case is being given, you know, due consideration

24   by the office and very serious consideration by the office.

25   Q     Some of their questions just can't be answered by

Baich - Direct

1    investigators?

2    A     Correct.  You know, we've had situations where

3    investigators have come back to us after seeing the client and

4    saying the client has these questions, and what we do is we

5    make arrangements for the lawyer to visit the client to answer

6    those questions.  We don't send a paralegal back or a lawyer or

7    a investigator back to give the legal advice or communicate

8    that advice.

9    Q     What happens in your office in a clemency case, what does

10   that entail?

11   A     It's usually the habeas team that takes the lead in

12   putting together the clemency package.  In Arizona, we have a

13   very short window after the Arizona Supreme Court issues a

14   warrant of execution, we have maybe 35 days and maybe up to 60

15   days before the execution date is set.  So we have a very

16   compressed time period.  So we will start preparing for

17   clemency a little before the execution date is actually set.

18   And we have to go out and reinvestigate the case, and by that,

19   I don't mean that we start from scratch, but during the habeas

20   phase, we talk to witnesses, we interview people, we collect

21   records.  Some of that information may be stale, we need to

22   make sure that it's up to date.

23         We come up with a strategy for presentation to the

24   clemency board.  We have had some clients who said they did not

25   want to pursue clemency and if that was their decision, we

Baich - Direct

1    respected it.  But in Arizona, there's a hearing that takes
2    place in front of the board.  The time is unlimited.  We're not
3    limited to one hour or two hours, so we get to put on a
4    full-blown hearing.
5    Q    I may not have heard you right, but didn't you say that
6    in the last few years, your office has been involved in 14
7    executions?
8    A    Yes, since 2010.
9    Q    During that time, did you ever have more than one
10   execution in a month?
11   A    Twice.  In 2011, we had Eric King and Daniel Cook
12   scheduled very close together.  I think they were maybe two
13   weeks apart.  And in that instance, we had a dedicated team who
14   worked on Eric King's case and a dedicated team that worked on
15   Dan Cook's case.  Eric King was executed.  Dan Cook got a stay
16   the night before he was scheduled to be executed and that stay
17   lasted for about a little over a year.  In 2013, we had -- I'm
18   sorry, in 2012, we had the case of Robert Moormann and Robert
19   Towery.  They were scheduled to be executed one week apart.  We
20   were consulting with Moormann's CJA panel lawyers and we were
21   representing Towery in his habeas case.  And we had method of
22   execution litigation in both of those cases.
23        And I just remembered a third instance in 2013.  Ed Schad
24   and Robert Jones, they were scheduled to be executed one week
25   apart from each other, and we were assisting Ed Schad's lawyer

Baich - Direct

1    who was from another CHU, but we were working with her and her

2    team and then we were representing Jones in his habeas case and

3    clemency.  Both Shad and Jones had a method of execution

4    challenge, but in that case, the district court ordered the

5    Department of Corrections to provide us with the information

6    about the drug that was going to be used in those executions,

7    and when the Department disclosed that information, that ended

8    the litigation on the method of execution claim in that case.

9    And both Mr. Jones and Schad were executed.

10   Q     When you had these multiple executions within these short

11   periods of time, were they represented by the same lawyers?

12   A     They were not.  Each client had his own team in place:

13   Two lawyers, the investigators, paralegals, and whatever other

14   support staff was needed.

15   Q     So I think I've heard you right in what you've been

16   talking about, that your office could probably handle two cases

17   that have days within a short period of time; is that right?

18   A     We were able to handle it, but it was a struggle because

19   having two executions so close to each other, there was a lot

20   of reaction by the staff to that.  Everybody reacts differently

21   in that situation and we wanted to accommodate our staff as

22   best we could.

23   Q     Could your office with the staff of 20 lawyers handle the

24   representation of three clients that are set to be executed

25   within ten days?

Baich - Direct

1    A    That would tap us out.  If we had three clients scheduled

2    in that short of period of time, that's all we would be able to

3    do.  We would not be able to do the other work that needs to be

4    done on behalf of our other clients, and there would be a real

5    tug for resources, whether it be financial or staff resources.

6    Q    You've mentioned this, but I'd like for you to talk a

7    little bit more about your involvement in the 1983 lethal

8    injection challenge in Oklahoma.  How did that come about that

9    you became involved in that?

10   A    A number of years ago, our office was approached by the

11   capital habeas unit in the Western District of Oklahoma to take

12   a case because that capital habeas unit had a conflict, so we

13   were appointed to represent the client in his habeas case.  And

14   while that case was proceeding, Oklahoma executed Clayton

15   Lockett and things did not go according to plan there.  So we

16   met with our colleagues in the capital habeas unit in Oklahoma

17   City and decided to move forward on a 1983 challenge to the

18   Oklahoma lethal injection protocol.

19   Q    And so in that challenge in Oklahoma, both you and the

20   federal public defenders office in Oklahoma City were

21   proceeding under 42, U.S.C., 1983?

22   A    We were.  And our involvement though -- in that case,

23   there were 20 plaintiffs, and our involvement only was on the

24   method of execution part of it.  The panel lawyers for the

25   capital habeas unit stayed on to litigate the habeas issues in

Baich - Direct

```
 1    those cases.
 2    Q    So you've talked about the executions that have happened
 3    in Arizona, and I'd like to talk for just a minute about some
 4    of those.  Have you been a witness to any of those executions?
 5    A    I have witnessed 13 executions.
 6    Q    I'd like to talk a little bit about one specific
 7    execution.  Were you a witness to the execution of, and I'm
 8    sorry, I didn't note down the client's name, but Mr. Wood?  His
 9    first name?
10    A    Joe Wood.  Yes.
11    Q    What was the method of execution in Arizona when he was
12    executed?
13    A    I can't remember the date of the crime, if it was before
14    1982 or 1992, Mr. Wood could have elected to be executed by
15    lethal gas.  If it was after, I think it's April of 1992, then
16    lethal injection was the only method available and at the time
17    under the Arizona protocol, Arizona used a combination of
18    midazolam and hydromorphone.
19    Q    Do you recall how much of each chemical they used?
20    A    50 milliliters of each, and the drugs were mixed
21    together.
22    Q    And because I'm not very good at math, tell me what that
23    breaks down to in milligrams if you remember.
24    A    Oh, did I say milliliters?  Then I meant milligrams.
25    Sorry.
```

Baich - Direct

1    Q     So you previously testified that it was 750 milligrams of

2    hydromorphone and 750 milligrams of midazolam; is that right?

3    I don't know the statistics of it.

4    A     Yes.  It's a fact that Joe Wood was executed with that

5    amount.

6    Q     How many injections do you recall that that was?

7    A     After the execution, I learned that 15 injections of this

8    drug combination was administered throughout the execution.

9    Q     Tell me about being in the execution room and what you

10   saw.

11   A     In Arizona at the time, the witnesses are brought into

12   the viewing room and once they're all assembled, two monitors

13   are turned on, and the witnesses saw Joe Wood strapped to the

14   gurney.  If I could, as an aside, under the current version of

15   the protocol, the witnesses would see the prisoner being

16   escorted into the chamber and then strapped to the gurney.  So

17   we saw the IV team insert the lines into Mr. Wood's peripheral

18   veins, one in his right arm and one in his left arm.  That took

19   about ten minutes, and when that process was completed, the

20   sound went off and then the video went off and the curtains to

21   the execution room opened and the witnesses saw Mr. Wood laying

22   on the table.

23   Q     What happened next?

24   A     The warden read the execution warrant and asked Joe if he

25   had any last words and he did.  When his last words were

1   completed, the process began.  We did not see the chemicals

2   being injected.  And as an aside, under the new Arizona

3   protocol, the witnesses will see the chemicals being injected,

4   the syringes being pushed, on a video monitor.  And Joe licked

5   his lips, he was turning his head from one side to the other,

6   he was looking around, and as time passed, his eyes began to

7   close.  His breathing appeared to be shallow.  It seemed like

8   the color in his face was going from a very pink color to

9   almost an ash color and he was very still.  And from my

10  perspective, I had thought his breathing had stopped.

11      And it looked like the other 11 lethal injection

12  executions that I had witnessed where, again, the client's eyes

13  close and the breathing gets shallow and the client becomes

14  very still.  And it was at about nine minutes, I think, I

15  thought I saw his lip move, his lower lip move ever so

16  slightly, and then about a minute or so later, it appeared like

17  he yawned.  I mean, his mouth just opened very wide and his

18  head jerked back.  He bucked up against the restraints that

19  were holding him down.  And I was sitting in the third row.

20  The witnesses sit on like bleacher style seats and there's

21  three risers, and I saw everybody sort of jump up off of their

22  seat and his mouth closed, and then maybe 20, 30 seconds later,

23  his mouth opened again.

24      Again, it looked like a very big yawn.  And, again, the

25  witnesses jumped up out of their seats.  And then it closed and

Baich - Direct

1    then he just started gulping and gasping and struggling to

2    breathe.  And a reporter from the Arizona Republic, Michael

3    Keiffer, counted at least 640 gulps and gasps and this went on

4    for a total of an hour and 57 minutes before he died.

5    Q    So you watched for an hour and 57 minutes while this man

6    slowly died.  Is that right?

7    A    Yes.

8    Q    As a lawyer, setting aside your feelings as a person, as

9    a lawyer, what did you do about this?

10   A    Well, one of the things that I did and that I always do

11   as a lawyer representing a client is I take notes.  So I had a

12   paper and pencil with me and I had my watch and I recorded what

13   I saw.  And after about 25, 30 minutes of this gasping and

14   gulping, I became very concerned.  I think everybody in the

15   room was sitting there thinking when is he going to die.  And I

16   wrote a note about what I observed, and at about one hour after

17   the execution had started, and it started at 1:52 p.m., I gave

18   the note to one of the other lawyers who was witnessing.

19   Q    So you had two lawyers witnessing in the room?

20   A    We had three lawyers.  So I gave her the note and I

21   leaned forward and I said, you know, get up, leave, call the

22   office, they'll know what to do.  And Julie Hall was the

23   lawyer, she stood up, walked right out the door and eventually

24   made it to a phone.  I think it took about ten minutes or more

25   for the corrections staff to escort her to a place in the

Karen Baker, RMR, CRR, CCR
United States Court Reporter

1   prison where our investigator was stationed with a cell phone.

2   Q     So you didn't have access to a phone near the execution

3   chamber; is that right?

4   A     We did not.  And then about five minutes later, I wrote

5   another note and gave it to Kevin Lerch, who was the other

6   lawyer who was witnessing, and told him to go out and pass on

7   more information.

8   Q     If you'd been the only lawyer in the room, would you have

9   been able to do that?

10  A     Well, I could have left, but I would have never been able

11  to get back into the room.

12  Q     So you would have missed a lot of your observations; is

13  that right?

14  A     Yes.

15        MR. BRADEN:  Sharon, will you pull up Exhibit 21,

16  please?

17  BY MR. BRADEN:

18  Q     Just looking at the cover here of this, what is this,

19  Exhibit 21?

20  A     This is a transcript of a emergency hearing that went on

21  during the execution of Joe Wood.

22  Q     So where was this hearing held, in what court?

23  A     It was before the U.S. District Court for the District of

24  Arizona, and it was before Judge Wake.

25  Q     This hearing comes as a result of you sending a note out;

1    is that right?

2    A     Yes.

3            MR. BRADEN:  Sharon, would you go to I think it's

4    page 2 if you don't mind?  I'm sorry, page 6.  If you'd scroll

5    down a little bit more so we can see line 12 in that paragraph.

6    BY MR. BRADEN:

7    Q     So line 12 there has Ms. Konrad talking.  Who is that?

8    A     Robin Konrad was one of my colleagues.  She was an

9    assistant federal public defender in our office and she was

10   stationed back at our office in Phoenix.  Executions in Arizona

11   take place at the Arizona State Prison in Florence, Arizona

12   which is about an hour and 20 minutes southeast of Phoenix.

13   Q     This hearing was conducted while Mr. Wood was dying,

14   right?

15   A     Yes.

16   Q     What was the result of this hearing?

17   A     The end result was that Mr. Wood had died during the

18   hearing and the judge dismissed the motion to stay the

19   execution as moot.

20   Q     Looking at line 12 there in that paragraph, is Ms. Konrad

21   reporting to the federal court what you were witnessing in the

22   execution room at the time?

23   A     Yes.  That looks like the words that I used in the note

24   that I sent out with Julie Hall.

25   Q     At the time of the last sentence in that paragraph 19 and

1    20, or in there, 17 to 20, you talk about life-saving

2    provisions in the protocol.  Did Arizona have life-saving

3    protocols and what does that mean?

4    A    My recollection at the time is that Arizona had a

5    defibrillator in the execution chamber.  It did not have

6    re-Versed (sic) or Narcan.  I think that's how it's pronounced,

7    the drug that can reverse the effects of midazolam.  And we

8    were asking the Court to basically stop the execution and

9    direct the Department of Corrections to try and save Joe's

10   life.

11   Q    As a result of Mr. Wood's execution, has Arizona made any

12   changes to the chemicals they use in their protocol?

13   A    Yes.  Arizona no longer uses midazolam.  It agreed to

14   never use that drug or any other benzodiazepine in an execution

15   going forward and that agreement is part of a court order.

16   Q    That was an agreement with the state of Arizona?

17   A    Yes.

18   Q    They agreed to that, that wasn't imposed on them by a

19   court; is that right?

20   A    Correct.

21            MR. BRADEN:  Sharon, let's look at Exhibit 31.  If

22   you would go to page 10.  I'm sorry, go back to the first page.

23   Let me stop here, I'm a little sloppy with my exhibits.

24   Exhibit 21 is a transcript of a hearing in federal court.  I

25   would move that either the judge take judicial notice of that

Baich - Direct                                                      514

1    or move to admit it as an exhibit.

2            THE COURT:  I'll recognize the State's continuing

3    objection to those types of documents, but I will -- whatever's

4    appropriate, I will consider it.  I'll go ahead and admit it as

5    an exhibit at this point.  And I'll also review it as something

6    I can take judicial notice of since it's a transcript from a

7    proceeding in another case.

8        (Plaintiffs' Exhibit 21 received in evidence.)

9    BY MR. BRADEN:

10   Q    Looking at the first page here of Exhibit 31, what is

11   this?

12   A    This is the current version of the Arizona Execution

13   Protocol.

14   Q    When was it adopted?

15   A    January 11th, 2017.

16   Q    Being that your professional career is done with dealing

17   with cases in the Arizona Department of Corrections, you are

18   familiar with this document, right?

19   A    I am.

20           MR. BRADEN:  I would move to admit Exhibit 31.

21           MS. CRYER:  We have our same objection, Your Honor.

22           THE COURT:  I'll overrule the objection, but I'll

23   recognize it and I'll accept and admit Exhibit 31.

24       (Plaintiffs' Exhibit 31 received in evidence.)

25           MR. BRADEN:  Now, Sharon, let's go to page 10.  If

1    you could go to the very bottom, 710.05.  It's actually going

2    to spill over into the next page.

3    BY MR. BRADEN:

4    Q    So what is this provision?

5    A    This is the part of the protocol that allows the director

6    to designate witnesses to executions.

7              MR. BRADEN:  Then, Sharon, if you could just go to

8    the next page.  And you can see it continues there.  Actually,

9    Sharon, if you don't mind, back up and blow up 1.1.16.

10   BY MR. BRADEN:

11   Q    That paragraph, kind of that last, who are allowed to be

12   witnesses in the execution hearing?

13   A    Well, there are a number of witnesses.  The State has

14   official witnesses.  There are media witnesses.  The victim's

15   family members are able to witness, and then the prisoner can

16   invite five people to witness his execution.

17   Q    And how many of those can be lawyers?

18   A    Under the protocol, three members of his legal team are

19   able to be witnesses.

20             MR. BRADEN:  Let's, Sharon, go to page 18, please.

21   On page 18 if you'll look at 1.5.1.3 which is the paragraph

22   right at the top right there, let's look at that for a minute.

23   BY MR. BRADEN:

24   Q    Are you familiar with this provision?

25   A    I am.

Baich - Cross

1  Q     Tell me what it is.

2  A     Well, it allows the legal team to have space at the

3  Department of Corrections in a conference room where we're able

4  to bring in computers and phones.  In addition, it allows that

5  if an attorney is a witness to the execution, the attorney can

6  bring a mobile phone to the witness room, but the phone is held

7  by a correction officer and if the phone is needed during the

8  execution, then the correction officer will allow the attorney

9  to use it.  The attorney would have to step outside of the

10 witness room to make the call.

11 Q     So under this protocol now instead of having to take the

12 ten-minute walk to the director's office or wherever you had to

13 in Mr. Wood, you had immediate access to a phone; is that

14 right?

15 A     Yes.  And this is new to the protocol.  This is after --

16 this was added in after the Joe Wood execution.

17             MR. BRADEN:  Can I have just a second, Judge?

18             THE COURT:  You may.

19             MR. BRADEN:  That's all I have for this witness,

20 Judge.

21             THE COURT:  All right.  Cross-examination.

22                        CROSS-EXAMINATION

23 BY MS. HODGE:

24 Q     Good afternoon, Mr. Baich.

25 A     Good evening.

Baich - Cross

1    Q    Good evening is right.  Am I pronouncing your name

2    correctly?

3    A    You are.

4    Q    I want to follow up on a few of your -- on direct

5    examination, you were asked by Mr. Braden what you do in method

6    of execution cases, and I believe I understood your testimony

7    to be that you would investigate, retain experts, pursue state

8    court litigation, federal court civil rights litigation,

9    prepare for clemency hearings, and challenge method of

10   execution, if necessary, if applicable in those cases.  Did I

11   get that testimony correct?

12   A    Yes.

13   Q    Are you aware that counsel for the plaintiffs in this

14   matter have done all six of these things in this current, in

15   this litigation and in state court litigation?

16   A    I heard cross-examination earlier and I've read news

17   accounts, so I'm aware of what I heard today and what I've read

18   in the media.

19   Q    So you haven't had any discussions with counsel for the

20   plaintiffs regarding your testimony in this matter?

21   A    Regarding my testimony?

22   Q    Yes.

23   A    Yes, I have had discussions.

24   Q    And in those discussions, were you provided information

25   about the work that they've done in either this current lawsuit

Karen Baker, RMR, CRR, CCR
United States Court Reporter

Baich - Cross

```
 1   before Judge Baker in the previous state court case that went
 2   up to the Arkansas Supreme Court or the federal action that was
 3   tried last week to Judge Marshall?
 4   A     They did not provide me with that information.  That
 5   said, I was aware of it because I read accounts of it in the
 6   media.
 7   Q     You've been following the case.  So you are aware then
 8   that the things you're telling the Court you would normally do
 9   in pursuing defending inmates in your CHU unit, those things
10   have also been done by counsel for the plaintiffs here in
11   Arkansas?
12   A     Sure.  And that's what we would do for one client in one
13   case.
14   Q     You gave some testimony that you were able to do that on
15   more than one occasion when you had multiple clients.  Isn't
16   that correct?
17   A     Yes.
18   Q     So just like these, counsel for these plaintiffs who had
19   multiple clients, your testimony is that you were able to
20   represent them?
21   A     Because our CHU is four times as big as their CHU, I'm
22   able to put together different teams so that no one lawyer is
23   representing two clients who are under warrant at the same
24   time.
25   Q     And you can't give any testimony about what the
```

Baich - Cross

1   distribution of lawyers, staff, or resources for the counsel

2   for plaintiffs in this case because you don't have any of that

3   information, correct?

4   A     I do know that they have four lawyers in that CHU.

5   Q     But you can't give any testimony about the distribution

6   of work, attorneys, assignment of staff or resources for the

7   plaintiffs in this case because you don't have any of that

8   specific information, correct?

9   A     That's correct.

10  Q     You testified that one of the things you would be doing

11  is preparing for clemency, and that is something you expect to

12  happen and so that you would start preparing, investigating,

13  seeking witnesses in advance of the 30 to 60-day period.  Did I

14  get your testimony correct?

15  A     Yes.

16  Q     Are you aware that some of the plaintiffs in this case

17  were originally scheduled for execution back in 2015?

18  A     Again, I may have read about that in the media, and I

19  think a stay may have been issued.

20  Q     So the lawyer could have been reasonably preparing for

21  some of the same issues in advance of any clemency hearings

22  like is done in your CHU.  Isn't that correct?

23  A     Well, if a lawyer had -- if you look at a case in a

24  vacuum, you could accept that statement, but there are other

25  things that are going on in other cases.  For instance, I

Baich - Cross

1    mentioned the *Martinez v. Ryan* case, and in Arizona, we had 19

2    cases pending in the Ninth Circuit that all got sent back to

3    the district court for *Martinez* hearings.  And I'm aware from

4    professional meetings that CHU supervisors have that here in

5    the Eastern District of Arkansas, there were a lot of *Martinez*

6    cases that went to hearings.

7    Q    But you're not aware that any of the nine plaintiffs in

8    this case had to seek *Martinez* hearings or *Hurst* hearings for

9    that matter?

10   A    I don't know which clients, whether they're a part of

11   this group or people who are further back in line.

12   Q    Or whether or not the *Hurst* decision applies to any of

13   the plaintiffs in this case, you're not aware of that, correct?

14   A    Correct.

15   Q    You gave some testimony about witnessing Mr. Wood's

16   execution in, was it 2014?

17   A    Yes.

18   Q    You were there as an attorney witness; is that correct?

19   A    Yes.

20   Q    And you have no medical training; is that correct?

21   A    I do not.

22   Q    And you haven't performed any research on midazolam; is

23   that correct?

24   A    Well, we have worked with experts over the years in our

25   Oklahoma litigation as well as our Arizona litigation, so I am

Baich - Cross

```
 1   aware of midazolam and that it shouldn't be used as part of the
 2   lethal injection protocol.
 3   Q     The Oklahoma litigation that you were involved in, did it
 4   involve Charles Warner?
 5   A     Yes.
 6   Q     You're aware that Oklahoma executed Charles Warner using
 7   a 500-milligram dose of midazolam, correct?
 8   A     Yes.
 9   Q     And there has been no determination by Oklahoma that that
10   500-milligram dosage of midazolam in the Warner case should not
11   have been used, correct?
12   A     We do know that Mr. Warner said before he was executed
13   that he --
14   Q     I didn't ask you what Mr. Warner said.  I'm asking you,
15   because your statement was that according to your research,
16   that Oklahoma -- that there was a -- let me back up.  I
17   understood your testimony to be that your work with Oklahoma
18   indicated that midazolam should not be used in an execution.
19   My question was, aren't you aware that Oklahoma used a
20   500-milligram dose of midazolam in the Warner execution, and I
21   think your answer was yes?
22   A     I'm aware that they used 500.
23   Q     And then my follow-up question was not what Mr. Warner
24   said, was whether or not any court in Oklahoma has indicated
25   that the state of Oklahoma should not have used a 500-milligram
```

Baich - Cross

1  dosage of midazolam in the Charles Warner case?

2  A    That is an open question because the *Warner/Glossip*

3  litigation is still pending in the U.S. District Court for the

4  Western District of Oklahoma.  That litigation is on hold.

5  Q    Not as it relates to Charles Warner, correct?

6  A    That's not correct.

7  Q    His stay -- the decision to stay his execution was

8  denied, correct?  He was executed in January of 2015, correct?

9  A    Yes, but I thought your question was is the issue

10  resolved, and the answer is no, it's not.

11  Q    I'm asking you specifically about Charles Warner, and my

12  questions have been related to Charles Warner and Oklahoma's

13  use of 500 milligrams of midazolam in that case.

14  A    Uh-huh.

15  Q    And whether or not any opinion, there has been any

16  decision in Oklahoma that the Oklahoma Department of

17  Corrections should not have used the 500-milligram dosage of

18  midazolam in the Charles Warner execution.

19  A    The answer is not yet.

20  Q    The answer is no.  Isn't that correct?

21  A    No.

22  Q    Do you have a decision from any authority in an Oklahoma

23  court that says that this issue about 500 milligrams of

24  midazolam as it relates to Charles Warner is currently pending

25  before the Court?

Baich - Cross                                                    523

1    A      Yes.

2    Q      Okay.  With respect to Charles Warner.  Otherwise he

3    wouldn't have been executed.  Do you understand my question,

4    Mr. Baich?

5    A      Let me explain if I can.

6    Q      Do you understand my question?

7    A      I obviously don't.

8    Q      Then I can rephrase it.

9    A      Sure.

10   Q      The state of Oklahoma lawfully executed Charles Warner

11   using a three-drug protocol that involved 500 milligrams of

12   midazolam.  Yes or no?

13   A      I think that's an open question because the grand jury in

14   its investigation -- again, it's not about midazolam, but --

15   Q      But that is -- my question is limited, Mr. Baich, to

16   midazolam.  So if your answer begins with, This is not about

17   midazolam, then you aren't answering my question.  And it's a

18   very specific one, and I think you do understand it.

19   A      I think we'll have to disagree, because the issue of what

20   happened in the Charles Warner execution is pending before --

21   Q      That is not my question.

22   A      -- the district court in the Western District of

23   Oklahoma.

24          THE COURT:  It's getting late in the day.  Our court

25   reporter can only take down one person talking at one time.


                     Karen Baker, RMR, CRR, CCR
                     United States Court Reporter

1    Please do not talk over each other.

2            THE WITNESS:  I apologize.

3            THE COURT:  I'm fussing at both of you.  So you can

4    move on and ask your next question.

5    BY MS. HODGE:

6    Q    You are aware that in the Wood execution, that the dosage

7    of midazolam used to execute Mr. Wood was not the same as the

8    dosage that is called for in the ADC's protocol, correct?

9    A    Correct.  It was more in Arizona.

10   Q    You use a higher dosage of midazolam?

11   A    Yes.

12   Q    Have you read the ADC's Lethal Injection Protocol?

13   A    Which ADC?

14   Q    The Arkansas Department of Correction.

15   A    I have not.

16   Q    And so are you aware that the Arkansas Department of

17   Correction's Lethal Injection Protocol calls for an initial

18   dose of 500 milligrams of midazolam?

19   A    I accept what you're saying, yes.

20   Q    Okay.  And the initial injection of lethal chemicals in

21   the Wood case only called for 500 milligrams of midazolam, I

22   mean, 50 milligrams of midazolam.  Correct?

23   A    That's correct.

24   Q    You testified that you were asked on direct as a result

25   of Joe's execution, and you're referring to Mr. Wood, has there

Baich - Cross

1   been any changes in Arizona, and your answer was that there was

2   an agreement by the state of Arizona to never use midazolam in

3   an execution.   Is that correct?

4   A   Midazolam or any other benzodiazepine.

5   Q   Isn't it true that six months prior to that agreement,

6   the State of Arizona had announced that it no longer had a

7   supply of midazolam and that their current supply had expired

8   and that's the reason they would not be using midazolam?

9   A   That could be one reason.

10  Q   Haven't you given testimony to that effect in prior

11  proceedings?

12  A   Could you be more specific?

13  Q   Have you been asked before whether or not the State

14  agreed not to use midazolam because they did not have a supply

15  of midazolam and their current supply had expired?

16  A   Yes, that's one of the reasons why.

17  Q   And that decision came well before the settlement in the

18  Woods matter, correct?

19  A   Yes.

20  Q   During the Wood execution, the IV team member who was

21  conducting the consciousness checks was medically trained,

22  correct?

23  A   I don't know.

24  Q   You don't know the answer to that?

25  A   No.   Because we don't know the qualifications of that

1   individual.

2   Q      Have you read the transcript, the entire transcript that

3   counsel for the plaintiffs talked to you about in the Woods

4   case?

5   A      Yes.

6   Q      And are you aware that the transcript reflects that a

7   physician conducted a consciousness check and determined that

8   Mr. Wood was unconscious at the time of the execution?

9   A      That was the representation that was made.

10  Q      You are also aware that the physician indicated that

11  Mr. Wood was comatose and was not experiencing any pain at that

12  time, correct?

13  A      That's the representation that the attorney general made.

14  Q      After --

15  A      At the hearing.

16  Q      After consultation with the persons performing the

17  execution?

18  A      The attorney general was on the phone with the director

19  of the Department of Corrections, so the attorney general was

20  just relaying what was told to him.

21  Q      That's being relayed to the federal judge, correct?

22  A      Yes.

23  Q      So you don't have any way of knowing whether or not

24  Mr. Woods was experiencing any pain; you personally don't?

25  Isn't that correct?

Baich - Redirect

```
1    A     No.

2    Q     Following Mr. Wood's execution, the State commissioned a

3    report about his execution.  Are you aware of that?

4    A     I am.

5    Q     Have you read that report?

6    A     I have.

7    Q     You're aware then that the report concludes that during

8    the execution, Mr. Wood was totally unresponsive to external

9    stimuli and that the gasping and snorting and bodily reflexes

10   were a normal part of the dying process and that they were

11   involuntary?  You're aware that the report concluded that,

12   correct?

13   A     That's what the report concluded, yes.

14              MS. HODGE:  May I have just a second, Your Honor?

15              THE COURT:  You may.

16              MS. HODGE:  We pass the witness.

17              THE COURT:  Redirect?

18                        REDIRECT EXAMINATION

19   BY MR. BRADEN:

20   Q     Let me just follow up on a couple questions that you were

21   just asked.  So what did Mr. Warner say?

22   A     Mr. Warner said it feels --

23              MS. HODGE:  Your Honor, we object to hearsay.

24              THE COURT:  I'm going to overrule it in this

25   proceeding.  You may ask it.
```

Baich - Redirect

```
 1            THE WITNESS:  I believe it was reported in the media
 2     that he said, "I feel it burning."
 3     BY MR. BRADEN:
 4     Q     Is the lethal injection challenge in Oklahoma concerning
 5     Mr. Warner or Mr. Glossip still ongoing?
 6     A     It is.  After the snafu with the drugs during the
 7     scheduled execution of Richard Glossip, the State of Oklahoma
 8     agreed with us to stay the federal proceedings and hold them in
 9     abeyance until after the grand jury investigation was completed
10     and until a new protocol was prepared and until we had an
11     opportunity to review that protocol, and the State agreed that
12     it would not seek execution dates until after all of that
13     happened.  Once everything is final, then the lawsuit in the
14     Western District of Oklahoma will become live again and we'll
15     proceed to litigate the midazolam issue and any other issues
16     related to the Oklahoma protocol.
17     Q     So there's been no resolution of the *Warner/Glossip* issue
18     in Oklahoma, right?
19     A     That's correct.
20     Q     So let's switch to Arizona for just a minute.  So how
21     much midazolam was Mr. Wood injected with?  I think we talked
22     about it in my direct, but let's get that nailed down.
23     A     750 milligrams.
24     Q     And what was the other chemical?
25     A     Hydromorphone.
```

Baich - Redirect

```
 1   Q    And how many milligrams did he get of that?

 2   A    750 milligrams.

 3   Q    That was delivered in how many injections?

 4   A    A total of 15.

 5   Q    So Arizona entered into a settlement agreement dealing

 6   with midazolam; is that right?

 7   A    Yes.

 8   Q    And were you a part of that negotiation?

 9   A    Yes.

10   Q    So I doubt that you're inside the mind of the attorney

11   general of the state of Arizona, but were there other reasons

12   just besides the difficulty to get midazolam that they agreed

13   not to use that any farther?

14   A    Nothing that --

15        MS. HODGE:  I'm going to object.  He can't testify

16   about what's in the mind of the attorney general.

17        THE COURT:  I think the question prefaced it with

18   that.  And if he's involved in the negotiation, I'm going to

19   let him testify as to what he knows in regard to the

20   negotiation.

21   BY MR. BRADEN:

22   Q    What were the reasons?

23   A    The attorney general didn't state any reason other than

24   what was previously mentioned that they could not find

25   midazolam and that the drug that it had expired.
```

1    Q    That agreement came after Mr. Wood's execution?

2    A    Yes.

3              MR. BRADEN:  That's all I have, Judge.

4              MS. HODGE:  Your Honor, I have four follow-up

5    questions.

6                      RECROSS-EXAMINATION

7    BY MS. HODGE:

8    Q    In the Arizona settlement agreement, you will agree with

9    me that the settlement expressly says that Arizona does not

10   admit liability for any misconduct or anything that occurred

11   related to your claim number one which involved the midazolam

12   issue in the Woods case, correct?

13   A    Do you have a copy of the agreement?

14   Q    You just testified that you were there during the

15   investigation.  Is your testimony now that when I'm asking you

16   questions that you don't know anything about the agreement?

17   A    I'm sorry, it's late.  I've been up for 36 hours

18   straight.  The agreement speaks for itself, what's on the

19   paper, and I just can't remember what's on the paper.

20   Q    As a member, as an attorney in the action, are you

21   telling me you don't remember that Arizona did not admit

22   liability for the Woods -- in the Woods settlement agreement?

23   A    I don't think there was any issue of liability that was

24   part of that discussion.  Again, I think the document would

25   speak for itself.

Baich - Recross                531

```
1   Q     Do you have the document with you?

2   A     I could pull it up on my iPad if you'd like.

3   Q     Do you have the document with you?

4   A     A paper copy, no.  I could get an electronic copy within

5   a few minutes.

6   Q     Okay.  And is your testimony that you don't recall

7   whether or not the settlement agreement does not admit

8   liability?

9   A     Yes.

10  Q     That the state of Arizona did not admit liability?

11  A     I really don't think liability was part of the

12  discussion.

13  Q     You testified that over the course of about two hours,

14  Mr. Wood received 750 milligrams total of midazolam in the

15  execution; is that correct?

16  A     Yes.

17  Q     Are you aware that the Arkansas Department of

18  Correction's Lethal Injection Protocol calls for a

19  500-milligram dose of midazolam and then a second 500-milligram

20  dose of midazolam following a five-minute consciousness check?

21  A     I accept your representation, yes.

22  Q     And so under the Arkansas protocol, a condemned inmate

23  would receive far more midazolam under the ADC's protocol in a

24  shorter amount of time than Mr. Woods received in the execution

25  you observed, correct?
```

Baich - Recross

```
 1   A     Ceiling effect issues aside, if you're talking about
 2   volume, yes, there's more volume, but I know there's ongoing
 3   discussion about the ceiling effect.
 4   Q     But not from your testimony because you don't have any
 5   medical training, correct?
 6   A     But I've consulted with experts on the ceiling effect.
 7   Q     You just testified that Charles Warner made a statement
 8   that felt like he was burning.  I want to show you what we'll
 9   mark as defendant's exhibit -- okay, I want to direct your
10   attention to the monitor then.
11            THE COURT:  Is this marked as an exhibit?
12            MS. HODGE:  No, it's used for impeachment only.
13            THE COURT:  Have you shown it to opposing counsel?
14            MS. HODGE:  We can show it to them.
15            MS. MERRITT:  I didn't know we had to show
16   impeachment evidence in advance.
17            THE COURT:  If this is some new document, I'm going
18   to play by the rule that everybody's got to show each other
19   what they have.  So just showing it to them before you play it,
20   I think that's respect and courtesy when you bring something
21   new in.  So it's late in the day, show it to the other side.
22   We can take a break if we need to do that.  It's 6:45 p.m. now.
23   So do you want to take a short break?  Is it lengthy?
24            MS. HODGE:  No.  It's two minutes.
25            THE COURT:  We can go ahead and try to finish up
```

 1   with this witness before we break.

 2           (Video played in open court.)

 3              MR. BRADEN:  To the extent they're moving to admit

 4   that, we would object.  First off, it's hearsay, and I think

 5   that the -- I think it's just one person's view of what

 6   somebody else told them, what they observed as you'll probably

 7   see when you hear it.  This person is relating the views of

 8   several people.  Mr. Baich has his views so it's multiple

 9   views, but ultimately it's hearsay.

10              THE COURT:  I'll overrule the objection.  I don't

11   know what you intend to do with it.  You haven't moved to admit

12   it yet.  You can use it however you wish to use it.

13   BY MS. HODGE:

14   Q    Okay.  We'll start.  Before I start, before -- go ahead

15   and just start the video.  Is it showing on your screen,

16   Mr. Baich?

17   A    Not yet.

18           (Video played in open court.)

19   BY MS. HODGE:

20   Q    Mr. Baich, you gave testimony that Charles Warner

21   testified that he felt something, but you've seen this video

22   now and understand that witness to the execution said that he

23   made that statement before he was even injected with drugs.

24   Did you see that from the video?

25   A    I did.

```
 1   Q     Okay.
 2              MS. HODGE:  We pass the witness, Your Honor.
 3              THE COURT:  Anything further?
 4              MR. BRADEN:  Just one question.
 5                     FURTHER REDIRECT EXAMINATION
 6   BY MR. BRADEN:
 7   Q     Mr. Baich, with the Court's indulgence, I'm going to show
 8   you something on the iPad here.
 9              THE COURT:  Have you shown it to opposing counsel?
10   Rules are going to go both ways.
11              MS. HODGE:  We object, Your Honor.  It's not
12   relevant.  This article is not about midazolam at all.  It's
13   about an issue that Oklahoma, I believe Ms. Branstetter
14   testified to, an issue about substitution of the third drug,
15   which is not at issue in this current litigation and has zero
16   to do with the midazolam issue, so we would object for
17   relevance.
18              THE COURT:  I'll overrule the objection.
19              MR. BRADEN:  Your Honor, they just played a video --
20              THE COURT:  I'll overrule the objection.  You can go
21   ahead.
22   BY MR. BRADEN:
23   Q     Can you look at this quickly, Mr. Baich?  If you don't
24   mind, I'll look over your shoulder.  What is that I'm showing
25   you?
```

1    A    It's an article published in The Guardian on October 8th,

2    2015.

3    Q    When was Mr. Warner's execution?

4    A    January 15th, 2015.

5    Q    And looking at this article here, can you -- I'm just

6    going to point instead of direct you, but can you read that

7    sentence right there that I just pointed to you?

8    A    "The execution lasted 18 minutes and Warner said he had

9    been poked with a needle five times.  When the drugs began

10   flowing, Warner said, quote, my body is on fire, end quote."

11   Q    Thank you.  That's all I have.

12            THE COURT:  Anything further for this witness?

13            MS. HODGE:  No, Your Honor.  Thank you.

14            THE COURT:  Thank you very much.  You may step down.

15   Why don't we go ahead and take a break.  We'll take a break

16   until 7:00.  We'll take a seven-minute break and let everybody

17   stretch and we'll come back on the record then with our next

18   witness.  We're in recess.

19        (Recess at 6:56 PM.)

20              C E R T I F I C A T E

21      I, Karen Baker, Official Court Reporter, do hereby certify
     that the foregoing is a true and correct transcript of
22   proceedings in the above-entitled case.

23   /s/ Karen Baker, RMR, CRR, CCR
     --------------------------------      Date: April 11, 2017
24   United States Court Reporter

25

1          (Continuing at 7:07 p.m.)

2              THE COURT:  All right.  Are we ready to call our next

3   witness?

4              MS. CRYER:  We are.

5              THE COURT:  All right.

6              MS. CRYER:  Your Honor, I was thinking the state was

7   going to call --

8              MS. VANDIVER:  That was my understanding too.

9              MS. CRYER:  Your Honor, we call Dale Reed.

10             THE COURT:  You may approach, Mr. Reed.

11            **DALE REED, DEFENDANTS' WITNESS, DULY SWORN**

12             THE COURT:  You may have a seat.  That microphone

13  moves, the base moves and the whole microphone moves, so you can

14  move that around and get comfortable.

15       And you may proceed when you're ready.

16                        DIRECT EXAMINATION

17  BY MS. CRYER:

18  Q.   Good evening, Mr. Reed.  Would you please state your full

19  name for the record.

20  A.   Marshall Dale Reed.

21  Q.   Mr. Reed, where are you employed?

22  A.   I'm the Chief Deputy Director for the Department of

23  Correction.

24  Q.   How long have you been employed by the Arkansas Department

25  of Correction?

1  A.    Forty-three years and ten months.

2  Q.    All right.  We're going to play a little bit of *This Is*

3  *Your Life*.  I'm going to ask if you would slowly start back at

4  the beginning of your employment with the ADC, and we're going

5  to work your way forward.  Okay?

6  A.    Okay.

7  Q.    All right.  What year were you hired by the ADC?

8  A.    1973, I was a correctional officer 1.

9  Q.    Where were you assigned to work?

10  A.    The Cummins Unit.  I worked in the East Building area for

11  about six weeks and then went to outside security, field --

12  working field crews.

13  Q.    And how long did you remain a correctional officer, CO-1,

14  entry level?

15  A.    That would be about three months now at what they called a

16  CO-2 back then.

17  Q.    What is the current equivalent of a CO-2?

18  A.    Sergeant.

19  Q.    How long did you remain a sergeant?

20  A.    I made lieutenant in 1976, so I guess that would be three

21  years.

22  Q.    And were you -- when you were promoted to lieutenant, were

23  you still located at the Cummins Unit?

24  A.    Yes, ma'am.

25  Q.    Okay.  How long did you stay a lieutenant?

1   A.    About one year.  About a year later, I was promoted to

2   captain --

3   Q.    At the Cummins Unit?

4   A.    -- at the Cummins Unit.

5   Q.    Okay.  What happened next?

6   A.    About a year later, I was promoted to major at security in

7   Cummins Unit, 1978.

8   Q.    What about next?

9   A.    Was promoted to deputy assistant warden in 1982 at Cummins.

10  Q.    Was the title back in the early '80s assistant warden?

11  A.    Excuse me.  '83.

12  Q.    Was the title in '83 assistant warden?

13  A.    Assistant warden then.  Deputy warden is what we refer to

14  it now.

15  Q.    Was that at the Cummins Unit?

16  A.    Yes, ma'am.

17  Q.    When you were promoted to deputy warden at the Cummins Unit

18  in 1983, was death row, including the execution chamber, was

19  that housed at the Cummins Unit?

20  A.    It was.

21  Q.    Okay.  At some point were the inmates that were housed on

22  death row moved from the Cummins Unit?

23  A.    They were moved to the maximum security unit.

24  Q.    Do you recall about when that occurred?

25  A.    Not exactly.

1   Q.   Okay.  Was it in the 1980s?

2   A.   It was.

3   Q.   After your -- let's go back to your employment.  After you

4   are the assistant warden at the Cummins Unit in 1983, did you

5   promote up from there?

6   A.   Yes.

7   Q.   Where did you go?

8   A.   I went to the Varner Unit as warden in 1988 --

9   Q.   Okay.

10  A.   -- which is right across the canal from Cummins.

11  Q.   Okay.  And how long were you warden at the Varner Unit?

12  A.   For five years.

13  Q.   Okay.  And then I think that gets us up, if I'm counting on

14  my fingers right, to 1993.

15  A.   Yes, ma'am.

16  Q.   What happened in '93?

17  A.   I was promoted to the Cummins Unit as a warden there.

18  Q.   How long were you the warden at the Cummins Unit?

19  A.   For ten years, until 2003.

20  Q.   So from '93 to 2003, ten years?

21  A.   Yes, ma'am.

22  Q.   Okay.  When you were the warden at the Cummins Unit, were

23  executions carried out?

24  A.   Yes, ma'am.

25  Q.   Okay.  I'm going to show you what has previously been

1   marked, but I do not believe it's been received yet, this is --

2   we're going to look at Exhibit 1, Defendants' Exhibit 1.  This

3   is attachment A to the exhibit, page 6.  All right.

4       Mr. Reed, can you see what I have put up on the

5   teleprompter?

6   A.   Yes, ma'am.

7   Q.   All right.  This is a list of -- this is page 6 of a list

8   of executions that have been carried out in Arkansas, beginning

9   in 1913.  And I'll submit to you that this list begins

10  January 24, 1964.  Do you see that information on the top of the

11  page?

12  A.   Yes, ma'am, I do.

13  Q.   Okay.  Silly question.  Were you employed by the ADC in

14  1964?

15  A.   No, ma'am.

16  Q.   All right.  1990, there were two executions, apparently, in

17  1990.  Were you the warden at that time?

18  A.   At the Varner Unit, not -- nearby.

19  Q.   But not at the Cummins Unit?  All right.  In '92, it looks

20  like there were two executions.  Were you at Cummins yet?

21  A.   No, ma'am.

22  Q.   Let's start in 1994.  In May of '94, were you the warden at

23  the Cummins Unit?

24  A.   Yes, ma'am.

25  Q.   And were you the warden that presided over the executions

1   of Charles Pickens and Jonas Whitmore?

2   A.    Yes, ma'am.

3   Q.    Were those two executions carried out on the same night?

4   A.    Yes, ma'am.

5   Q.    As you sit here today, do you recall any problems or issues

6   that occurred with those executions?

7   A.    There were no problems.

8   Q.    Do you recall whether or not you were consulted -- you or

9   your staff at the Cummins Unit were consulted with regard to

10  setting two executions on one night?

11  A.    During that time, there were several coming up, we knew

12  that, and we were asked at the request, I was told, of Governor

13  Huckabee at the time how the staff would -- how would we think

14  the best way to carry out those executions would be, in a single

15  manner or multiples.  And we were asked that question.

16  Q.    Okay.  Do you recall at that time what your preference was?

17  A.    We conferred with all our staff and we felt that multiple

18  executions were best for the staff at that time.

19  Q.    Could you explain to the Court why?

20  A.    Well, there's a lot of serious prep time that goes into an

21  execution.  There's really -- for some people, it's about a

22  three-week-long concentration of efforts.  And for everybody

23  involved, there's two weeks of getting ready, meetings with

24  staff, doing practices, getting all the things in place.  So it

25  was -- if you had spread those out, the staff would have had

1    those increments spread out further and it would have been

2    harder on them, more stressful than doing two in a night.

3    Q.    Let's look at the executions that occurred, and I believe

4    there were three that occurred on August 3, 1994.  Do you see

5    those?

6    A.    Yes, ma'am.

7    Q.    Were you the warden at the Cummins Unit at that time?

8    A.    Yes, ma'am.

9    Q.    Do you recall being present for those three executions?

10   A.    Yes, ma'am.

11   Q.    As I asked before with the May of '94 executions, do you

12   recall there being any problems or issues that occurred with

13   those three executions?

14   A.    There were no problems.

15   Q.    Were you and your staff able to carry out three executions

16   in one night?

17   A.    Yes, ma'am.

18   Q.    Okay.  Looks like there were two executions in 1995.

19   However, those were done on separate nights, I believe.

20   A.    Yes, ma'am.

21   Q.    All right.  And then in '96, did you have one execution?

22   A.    Yes, ma'am.

23   Q.    Let's look at January 8, 1997.  How many executions were

24   carried out on that night?

25   A.    Three.

1   Q.   Do you recall anything out of the ordinary about those

2   three executions?

3   A.   Only thing out of the ordinary on that set of executions

4   was, there was a legal issue that was brought about after inmate

5   Kirk Wainright was placed on the gurney and there was -- I don't

6   know exactly how long the wait was, 15, 20 minutes, or 15 to 30.

7   I don't really remember the exact time.  But he was there on the

8   gurney, waiting on something that was filed with the courts

9   before the execution could start.

10  Q.   Was Mr. Wainright's execution delayed?

11  A.   It was.

12  Q.   Was another inmate moved around -- in other words, on this

13  list, Mr. Wainright's name appears first.  Do you recall that

14  night whether he was the first to be executed?

15  A.   I don't recall whether he was the first.  In the order that

16  he was in, I would say so, though, because of the order of the

17  list.

18  Q.   To your recollection and knowledge, was Mr. Wainright's

19  counsel present when these legal issues were going on?

20  A.   I'm sure they were present.  I don't know exactly where

21  they were at the time, right off the top of my head.

22  Q.   Okay.  Other than the delay with Mr. Wainright's execution,

23  the time of his execution that night, do you recall any other

24  issues or problems that occurred that evening?

25  A.   No, ma'am, not that evening.

1   Q.   Okay.  Let's move along to -- let's skip on down to

2   September 8, 1999.  I believe there were two inmates --

3   according to this list, there were two inmates that were

4   executed on that night.

5   A.   Yes, ma'am.

6   Q.   Were you the warden at the Cummins Unit on that night?

7   A.   Yes, ma'am.

8   Q.   And were you present for both executions?

9   A.   Yes, ma'am.

10  Q.   Okay.  To the best of your memory, were there any problems

11  or issues that arose on September 8, 1999?

12  A.   There were no problems.

13  Q.   Okay.  As we go down the list, looks like this list ends on

14  January 6, 2004.  Were you still warden at the Cummins Unit on

15  January 6, 2004?

16  A.   I was the warden at the Ouachita River Unit at that time,

17  but I was there with the warden of Cummins for that execution.

18  Q.   Okay.  You were physically present?

19  A.   Yes.

20  Q.   But to give it a term, you were not in charge?

21  A.   No.  I was there for assistance.

22  Q.   And as far as you can recall, when Riley Dobi Noel was

23  executed in July of 2003, do you recall whether you were the

24  warden still at Cummins at that time?

25  A.   I was actually -- at that point, I'd been promoted in about

1  June to the Ouachita River Unit, but I was there for that

2  execution because it was so close to the time I was leaving, so

3  I was doing the prep.

4  Q.    Okay.  And to your knowledge, all of these executions were

5  by lethal execution?

6  A.    Yes, ma'am.

7  Q.    Once you were transferred to the Ouachita River Unit, were

8  you involved with executions that occurred after January 2004 in

9  your position as warden?

10 A.    No, I was not.

11 Q.    Okay.  Tell me, if you would, tell the Court what goes on

12 at the unit in preparation for an execution.  Let me rephrase

13 that.  Speaking back during the time that you were a warden at

14 the Cummins Unit, explain to the Court what went on at the unit

15 in preparation for that execution.

16 A.    Well, once the execution date was set, then we would have

17 first a meeting with all the agencies and different entities

18 that had any part to play in it.  And then from there, I would

19 set schedules for staff to meet with them on their particular

20 issue.  We'd have meetings, usually took the better part of a

21 week, really, because you would schedule a certain part of the

22 staff for a certain day and you'd go through their role with

23 regard to the execution.  And then during that two-week period,

24 we'd have practice, tie-down practice twice, generally, in the

25 two-week period, where you'd actually bring all the staff

1    together that would do the execution and actually get a staff

2    member that's similar to the inmate in stature and go through

3    the process so the staff could practice tying down the inmate

4    and actually carrying out a simulated execution.  So we'd do

5    that two times in two weeks, but usually we'd do probably about

6    three sets, you know.  We'd do it three times in two weeks.  So

7    it would be about twelve times, probably, we would actually go

8    through the whole part of the process.

9    Q.   How were the members of the execution team selected?

10   A.   The supervisory staff at Cummins at the time when I was

11   there identified officers that were tenured, and, of course,

12   were -- they had tenure, they were used to dealing with

13   troublesome inmates.  A lot of them worked -- most of them

14   probably worked in the administrative seg area, maximum security

15   area.  And so they picked staff that were seasoned and that knew

16   could handle those duties professionally and with dignity to the

17   inmate during the process.  So they actually selected those

18   people based on their observations and how they performed and

19   their tenure.

20   Q.   If an employee was selected to be a member of the execution

21   team, was their participation mandatory?

22   A.   It was not.  During that time, whenever we had the meetings

23   with staff, we let the staff know that if they had issues with

24   performing that duty, that all they had to do was come to one of

25   us, not in the middle of a large meeting, they could catch us,

1   you know, outside of a group, because that might would cause

2   them problems to do that in front of somebody.  But they had

3   that option.  They knew that.

4   Q.   Did you feel as warden of the unit, of the Cummins Unit,

5   that you knew your staff?

6   A.   Yes, ma'am.

7   Q.   Did you, in your opinion, if staff members had not felt

8   comfortable or had not wanted to participate in the execution

9   process, in your opinion, do you think they would have come to

10  you and said they did not want to participate?

11  A.   I believe those staff would have come to somebody.  We had

12  a good team relationship, you know, with those staff, and there

13  are some that might would have felt comfortable coming to me,

14  some to the assistant warden, perhaps.  But they would have felt

15  okay with coming to somebody if they needed not to be on the

16  team.

17  Q.   And as far as you can recall, do you recall it ever being

18  brought to your attention, whether personally or through your

19  staff members, that there was a member of an execution team that

20  did not want to participate?

21  A.   I don't recall that happening.

22  Q.   Did you create the execution protocol while you were the

23  warden at the Cummins Unit?

24  A.   No.

25  Q.   Do you know who did?

1    A.    The warden previous to me, Willis H. Sargent actually was

2    charged with creating the policy when executions actually

3    started over again in Arkansas.  So he actually was responsible,

4    along with Director Lockhart, I believe, at the time of putting

5    that process in place.  So when I got to Cummins, I used the

6    process that was proven to be effective by Warden Sargent, and

7    it pretty much carries on today.

8    Q.    Tell the Court, if you would, about your interaction with

9    the inmates who were on death row, getting ready to be executed.

10   A.    When an inmate was transferred -- they were at the max at

11   one point, and then, of course, they moved to Varner.  But

12   whenever they were transferred over to Cummins, I would be there

13   when they got there and start the actual log books that we have

14   to start and talk to them about, just briefly about the process,

15   which usually those guys have been around a long time, so they

16   kind of knew a lot about the process too.  But I would tell them

17   what's going to be happening with them there at the unit,

18   discuss the fact that we were going to meet all their needs, and

19   if they had some needs, they just needed to let me know.  Basic

20   thing we wouldn't do is surprise them with anything.  When they

21   come in, that's what I told them, that, you know, we've got to

22   work through this together, if you will, and so there wasn't

23   going to be any surprises.  And if, you know, they acted well,

24   then their privileges would be easier to grant, because we

25   wanted to do everything that we could for them during those last

1    days.  And if they were cooperative, then that was easier for us

2    to do that, contact visits and other things that they could get

3    if they weren't acting out.  And then, of course, I would see

4    them every day and just make sure they got everything, checked

5    on their mail, just have a conversation with them every day.

6    Q.    What if an inmate -- again, I'm referring specifically to

7    those that were housed on death row.  What if an inmate had an

8    issue or a problem with one of the staff members that was

9    assigned to guard him?

10   A.    We had that happen probably a couple of times over the 21

11   that I was involved in where there was some kind of, I think,

12   personality conflict, the inmate didn't feel good about that

13   person that was watching, because there's always a staff member

14   watching the inmate while they're there, taking notes and

15   whatnot, interacting.  There was a couple of cases where there

16   were, I think it was more perceived than real, but we just moved

17   those staff members out of the -- off the team, just to -- to

18   keep it -- just reduce that stress on the inmate and reduce

19   problems.  So that's what we focused on and still focus on.

20   Q.    Were there any debriefing options made available to your

21   staff after an execution?

22   A.    Yes, we had a mandatory debriefing after every one.

23   Q.    Why was it mandatory?

24   A.    Because we felt like if there were, a lot of people,

25   correctional officers particularly, maybe they wouldn't want to

1  own up to the fact that maybe they were having some sort of

2  personal issue or mental issue.  So we made it mandatory for

3  everybody to be there, including myself and the director, so

4  that you couldn't -- people couldn't get out of it.  So,

5  therefore, all the employees would be there and participate and

6  it was just a place where the team can go over the issues and

7  what happened, and if there are any -- if anybody was troubled,

8  then we could refer them somewhere else or deal with their

9  issue.  It was effective, in my opinion.  It's an effective

10 process.

11 Q.    Was it important to you that your staff be taken care of?

12 A.    Oh, yes.

13 Q.    Now, let's go ahead and let's move a little bit forward

14 because, obviously, you're no longer the warden at the Ouachita

15 River Unit.

16 A.    Right.

17 Q.    How long did you stay or maintain your role as warden at

18 the Ouachita River Unit?

19 A.    For 12 years.

20 Q.    And then I assume you were promoted?

21 A.    Three years ago, I was appointed the chief deputy director

22 by Ms. Kelley.

23 Q.    And as the chief deputy director of the ADC, are you

24 currently involved in the execution process?

25 A.    Yes.

1   Q.    Okay.  What is your role as chief deputy director in the

2   execution process?

3   A.    Well, I oversee the Cummins Unit, which is where the

4   executions take place, and I work on logistics, in terms of

5   making sure all the practices go off and be a part of those

6   practices.  I interact with law enforcement and other agencies

7   to make sure that we have all the perimeters covered and

8   everybody's where they're supposed to be for practices, and to

9   support the warden, as well.  You know, that's one of my roles

10  too, to support him in this role.

11  Q.    Is the execution team required to perform double duty?  And

12  let me explain what I mean by that.  On the night of an

13  execution, are the execution team members required to, let's

14  say, provide security to the inmates at the Cummins Unit and

15  leave their post for a few minutes and come over and then

16  perform their duties on the execution team?

17  A.    The escort team has a time to come to a prescribed place

18  where they can gather a couple of hours before the execution.

19  As a matter of fact, they're just brought in to perform that

20  part of the task.  And, of course, the people that are working

21  the cell area that are keeping the logs, they're on 12-hour

22  shifts, and their shifts change at six, so we have people

23  rotating.  They're not there, like, 24 hours a day or for three

24  days in a row or anything like that.

25  Q.    Is additional security ever brought in from other units?

A.   We do bring in extra security from various units across the
state to take care of the perimeter and some jobs not directly
related to the executions so that the Cummins Unit staff just
have the task of handling the -- what we need to do to fulfill
the execution.  So they are brought in from various parts of the
state, and that just relieves some of the burden on security
there, that they just have that one role.

Q.   Okay.  Let me ask you about a hot topic in this litigation,
the drugs.  What is your involvement with the drugs that are
used for the execution protocol?

A.   I have no involvement with the drugs.

Q.   Okay.  The main drug we have been talking about so far is
midazolam.

A.   Yes, ma'am.

Q.   Have you had any role or responsibility or duty to obtain
or look for midazolam?

A.   No.

          MS. CRYER:  Your Honor, I believe that's all the
questions that I have at this time.

          THE COURT:  All right.  Cross-examination.

          MS. VANDIVER:  Your Honor, I need a little bit of
guidance on what to do about the protective order and the
confidential exhibits with this witness and with folks in the
courtroom, and I'm not sure how I should approach that.

          THE COURT:  All right.  I have a proposal.  I know

1    that the protective order is in place.  I'm going to assume that

2    what you have are unredacted confidential copies or redacted

3    copies of the confidential exhibits.  Why don't we take off the

4    public monitors.  Then counsel should still be able to see the

5    exhibits.  So be advised that if you have folks behind you that

6    you would rather not see confidential exhibits -- I'm not sure

7    who is still in the courtroom, other than folks who are involved

8    in it at this hour.  I'll turn off the monitors to the back, and

9    that way only the witness, counsel, the Court, and court staff

10   can see the exhibit.

11            MS. VANDIVER:  And I also can provide the witness too.

12   I have a binder of the confidential exhibits I can give him as

13   well.

14            THE COURT:  If you have that, that would be easier for

15   everybody.  I have a binder.  I think all counsel have a binder.

16   That way we don't have to get into the electronics at all.

17            MS. VANDIVER:  I assume, Mr. Reed, since he works for

18   the defendant, is under the protective order.

19            THE COURT:  Ms. Cryer, I don't know if you heard that

20   question.  Is Mr. Reed under the protective order?  Is it

21   appropriate to show him these documents at this time?

22            MS. CRYER:  Absolutely.

23            THE COURT:  All right.

24                    CROSS-EXAMINATION

25   BY MS. VANDIVER:

1  Q.   Mr. Reed, my name is Julie Vandiver, and I, along with my

2  co-counsel here, represent Bruce Ward, Don Davis, Marcel

3  Williams, Kenneth Williams, Ledell Lee, Stacey Johnson, Jack

4  Jones, and Jason McGehee.  Are those names familiar to you?

5  A.   Yes, ma'am.

6  Q.   The state has set execution dates for them this month.  Is

7  that right?

8  A.   Yes, ma'am.

9  Q.   And were you consulted about the setting of those dates?

10  A.   I was not consulted about the date setting.

11  Q.   I'd like to -- the binder that I just showed you --

12  actually, let me -- let's talk about something else.  Do you

13  have a white binder up there?  Now, this is not confidential.

14  This is something that --

15          MS. VANDIVER:  Is it hard to turn the monitor on and

16  off again?

17          THE COURT:  No, it shouldn't be.  It will take just a

18  minute to warm it up.  Do you want to use the ELMO?

19          MS. VANDIVER:  Yeah.

20          THE COURT:  It will take just a minute for it to come

21  back on.

22          MS. VANDIVER:  Okay.

23  BY MS. VANDIVER:

24  Q.   Mr. Reed, you testified on direct that you were involved in

25  several executions while you were the warden of the Cummins

1   Unit.  Is that correct?

2   A.   Yes, ma'am.

3   Q.   And can you -- I missed the time frame.  I know that there

4   was a line on the defendants' copy of the exhibit, so I think it

5   was that you began being the warden there in '93?

6   A.   Yes, ma'am.

7   Q.   And that continued until --

8   A.   2003.

9   Q.   -- 2003.  Okay.  Thank you.  So counsel on direct brought

10  you through a lot of these double and triple executions that

11  happened, and the last double execution that appears on this

12  list, which I'm showing you, was on September 8, 1999.  Do you

13  agree?

14  A.   Yes, ma'am.

15  Q.   And so that was almost 18 years ago, right?

16  A.   Whenever -- whenever '99 is to right now, I guess --

17  Q.   So let's just say if a baby had been born on the night of

18  this execution, that baby would be about to graduate from high

19  school?

20  A.   It's possible, I guess.

21  Q.   A long time ago.  She also asked you about how did these

22  executions go, and I just would like to talk about the duration

23  between these executions, all of them.

24  A.   Uh-huh.

25  Q.   So if I'm correct, the first execution, if I was following

1    along, the first execution that you did was a double execution

2    of Pickens, Charles Pickens and Jonas Whitmore.  Is that right?

3    A.    That's right.

4    Q.    So that was on May 11, 1994, according to this chart.

5    A.    Right.

6    Q.    And so the next execution was a triple execution that

7    happened on August 3 of 1994, according to this chart.

8    A.    Right.

9    Q.    This chart seemed right to you?  Have you verified it?

10   A.    It does.

11   Q.    So that was three months apart.  Is that right?

12   A.    Right.

13   Q.    Okay.  And the next execution after that triple execution

14   was on April 19, 1995.  So that was about eight months later,

15   right?

16   A.    Yes, ma'am.

17   Q.    Okay.  You tell me if my math is wrong because I just did

18   this over there.

19   A.    I'm looking.  I'm looking.  Looks pretty good.

20   Q.    Usually, I use a computer for this.  So that one was on

21   May 19, 1995.  The next one was on August 31, 1995.  So that's

22   about four months.  Is that right?

23   A.    Right.

24   Q.    And after that, the next one was on August 8, 1996.  So now

25   that's about 11 months.  Is that right?

Reed - Cross

1   A.    I think so, uh-huh.

2   Q.    Okay.  Between August 8, 1996, and January 8, 1997, that's

3   about five months, right?

4   A.    Yes, ma'am.

5   Q.    Between January 8, 1997, and August 6, 1997, that's about

6   seven months.  Do you agree?

7   A.    Yes, ma'am.

8   Q.    Between August 6, 1997, and July 8, 1998, that's about 11

9   months.

10  A.    Yes, ma'am.

11  Q.    Let's see here.  Between July 8, 1998 -- did I skip one?

12  July 8, 1998, and -- no, I'm confusing myself here -- and

13  February 16, 1999, that's about seven months, correct?

14  A.    Yes, ma'am.

15  Q.    And between February 16 and April 12, that's about two

16  months?

17  A.    Yes, ma'am.

18  Q.    Of the same year.  And between April 12, '99, and September

19  8, '99, is about five months?

20  A.    Yes, ma'am.

21  Q.    Between September of '99 and May of '00, that's about eight

22  months?

23  A.    Yes, ma'am.

24  Q.    Between May of 2000 and December of 2000, that's about

25  seven months.

1    A.    Yes, ma'am.

2    Q.    And between December of 2000 and May of '01, that's about

3    five months.

4    A.    Yes, ma'am.

5    Q.    Now, you said Riley Dobi Noel, that was the last execution

6    you were involved in.  Was that your testimony?

7    A.    It was July of '03.  I can't read it.  I'm sorry.

8    Q.    I'm sorry.

9    A.    That would have been the one, the last one --

10   Q.    So the last execution before that had been about two years

11   before, which was on May 8, '01?

12   A.    Yes.

13   Q.    So during the time that you were at the Cummins Unit

14   overseeing executions, there was never executions scheduled

15   seven or eight in a ten- or eleven-day period?

16   A.    No.

17   Q.    And I need a little bit of clarification on your testimony.

18   I didn't -- I didn't quite catch it.  You said that when you did

19   an execution, you would do a practice, and -- or before you did

20   an execution, you would do a practice.

21   A.    Right.

22   Q.    And I think you said you did three a week for three weeks?

23   A.    We usually do two -- we have two weeks that we put into

24   this span.  We just do two practices each week, spaced out to

25   whatever the schedule will let us space it out, depending on

```
 1   what's going on.  During those practices, we'd usually do about
 2   three -- do it three times.  So it would be like --
 3   Q.    Like three heats or something?
 4   A.    Three times, you'd repeat the process.
 5   Q.    Okay.  So you said in two weeks you would do it three
 6   times, and each time you practiced, you would do it -- run
 7   through it three times?
 8   A.    About 12 times in two weeks.
 9   Q.    And you said that when you did it, you would get an officer
10   who was similar in stature to the inmate that was condemned.
11   A.    Right.
12   Q.    Why is that important?
13   A.    Because we're practicing to do the execution, and we want
14   to have the person that's similar to the person in stature so
15   that we're -- they're used to that.  The officers have to know
16   what they're dealing with.  You can't -- the inmate's not coming
17   until five days before, and, quite naturally, you couldn't ask
18   him to do that, so you would use an officer that volunteered to
19   do that.  And that's because we want to make sure everything's
20   right.  We go to the cell, just like we do when an inmate's
21   there, and walk through the whole process; the securing of him,
22   the cuffs, the taking him into the area, strapping him down.
23   And that's practice.  That's what you do.
24   Q.    So in this situation, are you in charge of the practices
25   now for the executions that are coming up?
```

1    A.   The warden of the Cummins Unit is in charge with regard to

2    the immediate action.  I'm his supervisor.  I am there involved

3    in those practices.

4    Q.   So in a two-week period, you did 12 practices, and here in

5    -- again, I'm getting into math -- in a two-week period, the ADC

6    is asking you to execute seven or eight people, right?

7    A.   They've scheduled -- seven executions are scheduled, right.

8    Q.   Part of that is your -- part of that is your job, right?  I

9    mean, you have to be involved in it?

10   A.   Right.

11   Q.   Yes.  And so are you going to do 12 practices for each of

12   the seven condemned or eight condemned inmates with a guard or

13   an officer of a similar stature?

14   A.   Probably not since they're that close together.

15   Q.   Okay.  We'll move on here.  Okay.  Now I'm going to ask you

16   about a confidential exhibit, which is in your book, and I can

17   help you find it, if you need me to.  But that skinny book that

18   you have there.

19   A.   Yes, ma'am.

20   Q.   The first tab says A --

21          MS. VANDIVER:  And, Your Honor, we've numbered or

22   marked all our confidential exhibits as A through F to make it

23   easier to understand when we're talking about a confidential

24   exhibit.  And the pagination is the pagination that we got from

25   the state, so it's not consecutive.  So that might explain

Reed - Cross

1    these -- Exhibit A is these emails that were given to us.
2    BY MS. VANDIVER:
3    Q.   So could you look in that Exhibit A, there's a page that
4    has ADC 578 on it.  And if you need some help finding it, I'll
5    be happy to come over and help you find it.  And it looks sort
6    of like a table.
7    A.   Right.
8    Q.   You found it?  Okay.  So can you describe what this
9    document is?
10             MS. CRYER:  Your Honor, may I?  I'm sorry.  I have a
11   question.  There are one or two people in the courtroom.  I
12   don't know if it's appropriate for them to hear the
13   conversations about the confidential documents.
14             THE COURT:  All right.  I'm not certain who is in the
15   courtroom.  Yes, ma'am?
16             UNIDENTIFIED SPECTATOR:  We would oppose the closure
17   of the courtroom.  We can ask for a recess to contact our
18   counsel.
19             MS. CRYER:  Your Honor, I believe according to the
20   protective order that's in place --
21             THE COURT:  You are welcome to take a recess and go do
22   that, and we'll take a recess.  We're not going to be here much
23   longer tonight.
24             UNIDENTIFIED SPECTATOR:  That's all right.  I don't
25   want to hold the court up.  We'll deal with it in the morning.

 1      (Continuing at 7:07 p.m.)

 2          THE COURT:  All right.  Are we ready to call our next

 3  witness?

 4          MS. CRYER:  We are.

 5          THE COURT:  All right.

 6          MS. CRYER:  Your Honor, I was thinking the state was

 7  going to call --

 8          MS. VANDIVER:  That was my understanding too.

 9          MS. CRYER:  Your Honor, we call Dale Reed.

10          THE COURT:  You may approach, Mr. Reed.

11           **DALE REED, DEFENDANTS' WITNESS, DULY SWORN**

12          THE COURT:  You may have a seat.  That microphone

13  moves, the base moves and the whole microphone moves, so you can

14  move that around and get comfortable.

15      And you may proceed when you're ready.

16                      DIRECT EXAMINATION

17  BY MS. CRYER:

18  Q.   Good evening, Mr. Reed.  Would you please state your full

19  name for the record.

20  A.   Marshall Dale Reed.

21  Q.   Mr. Reed, where are you employed?

22  A.   I'm the Chief Deputy Director for the Department of

23  Correction.

24  Q.   How long have you been employed by the Arkansas Department

25  of Correction?

Reed - Direct

1   A.    Forty-three years and ten months.

2   Q.    All right.  We're going to play a little bit of *This Is*

3   *Your Life*.  I'm going to ask if you would slowly start back at

4   the beginning of your employment with the ADC, and we're going

5   to work your way forward.  Okay?

6   A.    Okay.

7   Q.    All right.  What year were you hired by the ADC?

8   A.    1973, I was a correctional officer 1.

9   Q.    Where were you assigned to work?

10  A.    The Cummins Unit.  I worked in the East Building area for

11  about six weeks and then went to outside security, field --

12  working field crews.

13  Q.    And how long did you remain a correctional officer, CO-1,

14  entry level?

15  A.    That would be about three months now at what they called a

16  CO-2 back then.

17  Q.    What is the current equivalent of a CO-2?

18  A.    Sergeant.

19  Q.    How long did you remain a sergeant?

20  A.    I made lieutenant in 1976, so I guess that would be three

21  years.

22  Q.    And were you -- when you were promoted to lieutenant, were

23  you still located at the Cummins Unit?

24  A.    Yes, ma'am.

25  Q.    Okay.  How long did you stay a lieutenant?

1    A.    About one year.  About a year later, I was promoted to

2    captain --

3    Q.    At the Cummins Unit?

4    A.    -- at the Cummins Unit.

5    Q.    Okay.  What happened next?

6    A.    About a year later, I was promoted to major at security in

7    Cummins Unit, 1978.

8    Q.    What about next?

9    A.    Was promoted to deputy assistant warden in 1982 at Cummins.

10   Q.    Was the title back in the early '80s assistant warden?

11   A.    Excuse me.  '83.

12   Q.    Was the title in '83 assistant warden?

13   A.    Assistant warden then.  Deputy warden is what we refer to

14   it now.

15   Q.    Was that at the Cummins Unit?

16   A.    Yes, ma'am.

17   Q.    When you were promoted to deputy warden at the Cummins Unit

18   in 1983, was death row, including the execution chamber, was

19   that housed at the Cummins Unit?

20   A.    It was.

21   Q.    Okay.  At some point were the inmates that were housed on

22   death row moved from the Cummins Unit?

23   A.    They were moved to the maximum security unit.

24   Q.    Do you recall about when that occurred?

25   A.    Not exactly.

1   Q.   Okay.  Was it in the 1980s?

2   A.   It was.

3   Q.   After your -- let's go back to your employment.  After you

4   are the assistant warden at the Cummins Unit in 1983, did you

5   promote up from there?

6   A.   Yes.

7   Q.   Where did you go?

8   A.   I went to the Varner Unit as warden in 1988 --

9   Q.   Okay.

10  A.   -- which is right across the canal from Cummins.

11  Q.   Okay.  And how long were you warden at the Varner Unit?

12  A.   For five years.

13  Q.   Okay.  And then I think that gets us up, if I'm counting on

14  my fingers right, to 1993.

15  A.   Yes, ma'am.

16  Q.   What happened in '93?

17  A.   I was promoted to the Cummins Unit as a warden there.

18  Q.   How long were you the warden at the Cummins Unit?

19  A.   For ten years, until 2003.

20  Q.   So from '93 to 2003, ten years?

21  A.   Yes, ma'am.

22  Q.   Okay.  When you were the warden at the Cummins Unit, were

23  executions carried out?

24  A.   Yes, ma'am.

25  Q.   Okay.  I'm going to show you what has previously been

1  marked, but I do not believe it's been received yet, this is --

2  we're going to look at Exhibit 1, Defendants' Exhibit 1.  This

3  is attachment A to the exhibit, page 6.  All right.

4        Mr. Reed, can you see what I have put up on the

5  teleprompter?

6  A.   Yes, ma'am.

7  Q.   All right.  This is a list of -- this is page 6 of a list

8  of executions that have been carried out in Arkansas, beginning

9  in 1913.  And I'll submit to you that this list begins

10 January 24, 1964.  Do you see that information on the top of the

11 page?

12 A.   Yes, ma'am, I do.

13 Q.   Okay.  Silly question.  Were you employed by the ADC in

14 1964?

15 A.   No, ma'am.

16 Q.   All right.  1990, there were two executions, apparently, in

17 1990.  Were you the warden at that time?

18 A.   At the Varner Unit, not -- nearby.

19 Q.   But not at the Cummins Unit?  All right.  In '92, it looks

20 like there were two executions.  Were you at Cummins yet?

21 A.   No, ma'am.

22 Q.   Let's start in 1994.  In May of '94, were you the warden at

23 the Cummins Unit?

24 A.   Yes, ma'am.

25 Q.   And were you the warden that presided over the executions

Reed - Direct

1   of Charles Pickens and Jonas Whitmore?

2   A.    Yes, ma'am.

3   Q.    Were those two executions carried out on the same night?

4   A.    Yes, ma'am.

5   Q.    As you sit here today, do you recall any problems or issues

6   that occurred with those executions?

7   A.    There were no problems.

8   Q.    Do you recall whether or not you were consulted -- you or

9   your staff at the Cummins Unit were consulted with regard to

10  setting two executions on one night?

11  A.    During that time, there were several coming up, we knew

12  that, and we were asked at the request, I was told, of Governor

13  Huckabee at the time how the staff would -- how would we think

14  the best way to carry out those executions would be, in a single

15  manner or multiples.  And we were asked that question.

16  Q.    Okay.  Do you recall at that time what your preference was?

17  A.    We conferred with all our staff and we felt that multiple

18  executions were best for the staff at that time.

19  Q.    Could you explain to the Court why?

20  A.    Well, there's a lot of serious prep time that goes into an

21  execution.  There's really -- for some people, it's about a

22  three-week-long concentration of efforts.  And for everybody

23  involved, there's two weeks of getting ready, meetings with

24  staff, doing practices, getting all the things in place.  So it

25  was -- if you had spread those out, the staff would have had

 1   those increments spread out further and it would have been

 2   harder on them, more stressful than doing two in a night.

 3   Q.   Let's look at the executions that occurred, and I believe

 4   there were three that occurred on August 3, 1994.  Do you see

 5   those?

 6   A.   Yes, ma'am.

 7   Q.   Were you the warden at the Cummins Unit at that time?

 8   A.   Yes, ma'am.

 9   Q.   Do you recall being present for those three executions?

10   A.   Yes, ma'am.

11   Q.   As I asked before with the May of '94 executions, do you

12   recall there being any problems or issues that occurred with

13   those three executions?

14   A.   There were no problems.

15   Q.   Were you and your staff able to carry out three executions

16   in one night?

17   A.   Yes, ma'am.

18   Q.   Okay.  Looks like there were two executions in 1995.

19   However, those were done on separate nights, I believe.

20   A.   Yes, ma'am.

21   Q.   All right.  And then in '96, did you have one execution?

22   A.   Yes, ma'am.

23   Q.   Let's look at January 8, 1997.  How many executions were

24   carried out on that night?

25   A.   Three.

1  Q.   Do you recall anything out of the ordinary about those

2  three executions?

3  A.   Only thing out of the ordinary on that set of executions

4  was, there was a legal issue that was brought about after inmate

5  Kirk Wainright was placed on the gurney and there was -- I don't

6  know exactly how long the wait was, 15, 20 minutes, or 15 to 30.

7  I don't really remember the exact time.  But he was there on the

8  gurney, waiting on something that was filed with the courts

9  before the execution could start.

10 Q.   Was Mr. Wainright's execution delayed?

11 A.   It was.

12 Q.   Was another inmate moved around -- in other words, on this

13 list, Mr. Wainright's name appears first.  Do you recall that

14 night whether he was the first to be executed?

15 A.   I don't recall whether he was the first.  In the order that

16 he was in, I would say so, though, because of the order of the

17 list.

18 Q.   To your recollection and knowledge, was Mr. Wainright's

19 counsel present when these legal issues were going on?

20 A.   I'm sure they were present.  I don't know exactly where

21 they were at the time, right off the top of my head.

22 Q.   Okay.  Other than the delay with Mr. Wainright's execution,

23 the time of his execution that night, do you recall any other

24 issues or problems that occurred that evening?

25 A.   No, ma'am, not that evening.

1    Q.   Okay.  Let's move along to -- let's skip on down to

2    September 8, 1999.  I believe there were two inmates --

3    according to this list, there were two inmates that were

4    executed on that night.

5    A.   Yes, ma'am.

6    Q.   Were you the warden at the Cummins Unit on that night?

7    A.   Yes, ma'am.

8    Q.   And were you present for both executions?

9    A.   Yes, ma'am.

10   Q.   Okay.  To the best of your memory, were there any problems

11   or issues that arose on September 8, 1999?

12   A.   There were no problems.

13   Q.   Okay.  As we go down the list, looks like this list ends on

14   January 6, 2004.  Were you still warden at the Cummins Unit on

15   January 6, 2004?

16   A.   I was the warden at the Ouachita River Unit at that time,

17   but I was there with the warden of Cummins for that execution.

18   Q.   Okay.  You were physically present?

19   A.   Yes.

20   Q.   But to give it a term, you were not in charge?

21   A.   No.  I was there for assistance.

22   Q.   And as far as you can recall, when Riley Dobi Noel was

23   executed in July of 2003, do you recall whether you were the

24   warden still at Cummins at that time?

25   A.   I was actually -- at that point, I'd been promoted in about

1    June to the Ouachita River Unit, but I was there for that

2    execution because it was so close to the time I was leaving, so

3    I was doing the prep.

4    Q.    Okay.  And to your knowledge, all of these executions were

5    by lethal execution?

6    A.    Yes, ma'am.

7    Q.    Once you were transferred to the Ouachita River Unit, were

8    you involved with executions that occurred after January 2004 in

9    your position as warden?

10   A.    No, I was not.

11   Q.    Okay.  Tell me, if you would, tell the Court what goes on

12   at the unit in preparation for an execution.  Let me rephrase

13   that.  Speaking back during the time that you were a warden at

14   the Cummins Unit, explain to the Court what went on at the unit

15   in preparation for that execution.

16   A.    Well, once the execution date was set, then we would have

17   first a meeting with all the agencies and different entities

18   that had any part to play in it.  And then from there, I would

19   set schedules for staff to meet with them on their particular

20   issue.  We'd have meetings, usually took the better part of a

21   week, really, because you would schedule a certain part of the

22   staff for a certain day and you'd go through their role with

23   regard to the execution.  And then during that two-week period,

24   we'd have practice, tie-down practice twice, generally, in the

25   two-week period, where you'd actually bring all the staff

1    together that would do the execution and actually get a staff

2    member that's similar to the inmate in stature and go through

3    the process so the staff could practice tying down the inmate

4    and actually carrying out a simulated execution.  So we'd do

5    that two times in two weeks, but usually we'd do probably about

6    three sets, you know.  We'd do it three times in two weeks.  So

7    it would be about twelve times, probably, we would actually go

8    through the whole part of the process.

9    Q.    How were the members of the execution team selected?

10   A.    The supervisory staff at Cummins at the time when I was

11   there identified officers that were tenured, and, of course,

12   were -- they had tenure, they were used to dealing with

13   troublesome inmates.  A lot of them worked -- most of them

14   probably worked in the administrative seg area, maximum security

15   area.  And so they picked staff that were seasoned and that knew

16   could handle those duties professionally and with dignity to the

17   inmate during the process.  So they actually selected those

18   people based on their observations and how they performed and

19   their tenure.

20   Q.    If an employee was selected to be a member of the execution

21   team, was their participation mandatory?

22   A.    It was not.  During that time, whenever we had the meetings

23   with staff, we let the staff know that if they had issues with

24   performing that duty, that all they had to do was come to one of

25   us, not in the middle of a large meeting, they could catch us,

1    you know, outside of a group, because that might would cause

2    them problems to do that in front of somebody.  But they had

3    that option.  They knew that.

4    Q.    Did you feel as warden of the unit, of the Cummins Unit,

5    that you knew your staff?

6    A.    Yes, ma'am.

7    Q.    Did you, in your opinion, if staff members had not felt

8    comfortable or had not wanted to participate in the execution

9    process, in your opinion, do you think they would have come to

10   you and said they did not want to participate?

11   A.    I believe those staff would have come to somebody.  We had

12   a good team relationship, you know, with those staff, and there

13   are some that might would have felt comfortable coming to me,

14   some to the assistant warden, perhaps.  But they would have felt

15   okay with coming to somebody if they needed not to be on the

16   team.

17   Q.    And as far as you can recall, do you recall it ever being

18   brought to your attention, whether personally or through your

19   staff members, that there was a member of an execution team that

20   did not want to participate?

21   A.    I don't recall that happening.

22   Q.    Did you create the execution protocol while you were the

23   warden at the Cummins Unit?

24   A.    No.

25   Q.    Do you know who did?

1    A.   The warden previous to me, Willis H. Sargent actually was

2    charged with creating the policy when executions actually

3    started over again in Arkansas.  So he actually was responsible,

4    along with Director Lockhart, I believe, at the time of putting

5    that process in place.  So when I got to Cummins, I used the

6    process that was proven to be effective by Warden Sargent, and

7    it pretty much carries on today.

8    Q.   Tell the Court, if you would, about your interaction with

9    the inmates who were on death row, getting ready to be executed.

10   A.   When an inmate was transferred -- they were at the max at

11   one point, and then, of course, they moved to Varner.  But

12   whenever they were transferred over to Cummins, I would be there

13   when they got there and start the actual log books that we have

14   to start and talk to them about, just briefly about the process,

15   which usually those guys have been around a long time, so they

16   kind of knew a lot about the process too.  But I would tell them

17   what's going to be happening with them there at the unit,

18   discuss the fact that we were going to meet all their needs, and

19   if they had some needs, they just needed to let me know.  Basic

20   thing we wouldn't do is surprise them with anything.  When they

21   come in, that's what I told them, that, you know, we've got to

22   work through this together, if you will, and so there wasn't

23   going to be any surprises.  And if, you know, they acted well,

24   then their privileges would be easier to grant, because we

25   wanted to do everything that we could for them during those last

1   days.  And if they were cooperative, then that was easier for us

2   to do that, contact visits and other things that they could get

3   if they weren't acting out.  And then, of course, I would see

4   them every day and just make sure they got everything, checked

5   on their mail, just have a conversation with them every day.

6   Q.   What if an inmate -- again, I'm referring specifically to

7   those that were housed on death row.  What if an inmate had an

8   issue or a problem with one of the staff members that was

9   assigned to guard him?

10  A.   We had that happen probably a couple of times over the 21

11  that I was involved in where there was some kind of, I think,

12  personality conflict, the inmate didn't feel good about that

13  person that was watching, because there's always a staff member

14  watching the inmate while they're there, taking notes and

15  whatnot, interacting.  There was a couple of cases where there

16  were, I think it was more perceived than real, but we just moved

17  those staff members out of the -- off the team, just to -- to

18  keep it -- just reduce that stress on the inmate and reduce

19  problems.  So that's what we focused on and still focus on.

20  Q.   Were there any debriefing options made available to your

21  staff after an execution?

22  A.   Yes, we had a mandatory debriefing after every one.

23  Q.   Why was it mandatory?

24  A.   Because we felt like if there were, a lot of people,

25  correctional officers particularly, maybe they wouldn't want to

1  own up to the fact that maybe they were having some sort of

2  personal issue or mental issue.  So we made it mandatory for

3  everybody to be there, including myself and the director, so

4  that you couldn't -- people couldn't get out of it.  So,

5  therefore, all the employees would be there and participate and

6  it was just a place where the team can go over the issues and

7  what happened, and if there are any -- if anybody was troubled,

8  then we could refer them somewhere else or deal with their

9  issue.  It was effective, in my opinion.  It's an effective

10 process.

11 Q.   Was it important to you that your staff be taken care of?

12 A.   Oh, yes.

13 Q.   Now, let's go ahead and let's move a little bit forward

14 because, obviously, you're no longer the warden at the Ouachita

15 River Unit.

16 A.   Right.

17 Q.   How long did you stay or maintain your role as warden at

18 the Ouachita River Unit?

19 A.   For 12 years.

20 Q.   And then I assume you were promoted?

21 A.   Three years ago, I was appointed the chief deputy director

22 by Ms. Kelley.

23 Q.   And as the chief deputy director of the ADC, are you

24 currently involved in the execution process?

25 A.   Yes.

1    Q.    Okay.  What is your role as chief deputy director in the

2    execution process?

3    A.    Well, I oversee the Cummins Unit, which is where the

4    executions take place, and I work on logistics, in terms of

5    making sure all the practices go off and be a part of those

6    practices.  I interact with law enforcement and other agencies

7    to make sure that we have all the perimeters covered and

8    everybody's where they're supposed to be for practices, and to

9    support the warden, as well.  You know, that's one of my roles

10   too, to support him in this role.

11   Q.    Is the execution team required to perform double duty?  And

12   let me explain what I mean by that.  On the night of an

13   execution, are the execution team members required to, let's

14   say, provide security to the inmates at the Cummins Unit and

15   leave their post for a few minutes and come over and then

16   perform their duties on the execution team?

17   A.    The escort team has a time to come to a prescribed place

18   where they can gather a couple of hours before the execution.

19   As a matter of fact, they're just brought in to perform that

20   part of the task.  And, of course, the people that are working

21   the cell area that are keeping the logs, they're on 12-hour

22   shifts, and their shifts change at six, so we have people

23   rotating.  They're not there, like, 24 hours a day or for three

24   days in a row or anything like that.

25   Q.    Is additional security ever brought in from other units?

Reed - Direct                                                    552

1   A.   We do bring in extra security from various units across the

2   state to take care of the perimeter and some jobs not directly

3   related to the executions so that the Cummins Unit staff just

4   have the task of handling the -- what we need to do to fulfill

5   the execution.  So they are brought in from various parts of the

6   state, and that just relieves some of the burden on security

7   there, that they just have that one role.

8   Q.   Okay.  Let me ask you about a hot topic in this litigation,

9   the drugs.  What is your involvement with the drugs that are

10  used for the execution protocol?

11  A.   I have no involvement with the drugs.

12  Q.   Okay.  The main drug we have been talking about so far is

13  midazolam.

14  A.   Yes, ma'am.

15  Q.   Have you had any role or responsibility or duty to obtain

16  or look for midazolam?

17  A.   No.

18        MS. CRYER:  Your Honor, I believe that's all the

19  questions that I have at this time.

20        THE COURT:  All right.  Cross-examination.

21        MS. VANDIVER:  Your Honor, I need a little bit of

22  guidance on what to do about the protective order and the

23  confidential exhibits with this witness and with folks in the

24  courtroom, and I'm not sure how I should approach that.

25        THE COURT:  All right.  I have a proposal.  I know

1    that the protective order is in place.  I'm going to assume that

2    what you have are unredacted confidential copies or redacted

3    copies of the confidential exhibits.  Why don't we take off the

4    public monitors.  Then counsel should still be able to see the

5    exhibits.  So be advised that if you have folks behind you that

6    you would rather not see confidential exhibits -- I'm not sure

7    who is still in the courtroom, other than folks who are involved

8    in it at this hour.  I'll turn off the monitors to the back, and

9    that way only the witness, counsel, the Court, and court staff

10   can see the exhibit.

11        MS. VANDIVER:  And I also can provide the witness too.

12   I have a binder of the confidential exhibits I can give him as

13   well.

14        THE COURT:  If you have that, that would be easier for

15   everybody.  I have a binder.  I think all counsel have a binder.

16   That way we don't have to get into the electronics at all.

17        MS. VANDIVER:  I assume, Mr. Reed, since he works for

18   the defendant, is under the protective order.

19        THE COURT:  Ms. Cryer, I don't know if you heard that

20   question.  Is Mr. Reed under the protective order?  Is it

21   appropriate to show him these documents at this time?

22        MS. CRYER:  Absolutely.

23        THE COURT:  All right.

24                     CROSS-EXAMINATION

25   BY MS. VANDIVER:

1   Q.   Mr. Reed, my name is Julie Vandiver, and I, along with my

2   co-counsel here, represent Bruce Ward, Don Davis, Marcel

3   Williams, Kenneth Williams, Ledell Lee, Stacey Johnson, Jack

4   Jones, and Jason McGehee.  Are those names familiar to you?

5   A.   Yes, ma'am.

6   Q.   The state has set execution dates for them this month.  Is

7   that right?

8   A.   Yes, ma'am.

9   Q.   And were you consulted about the setting of those dates?

10  A.   I was not consulted about the date setting.

11  Q.   I'd like to -- the binder that I just showed you --

12  actually, let me -- let's talk about something else.  Do you

13  have a white binder up there?  Now, this is not confidential.

14  This is something that --

15          MS. VANDIVER:  Is it hard to turn the monitor on and

16  off again?

17          THE COURT:  No, it shouldn't be.  It will take just a

18  minute to warm it up.  Do you want to use the ELMO?

19          MS. VANDIVER:  Yeah.

20          THE COURT:  It will take just a minute for it to come

21  back on.

22          MS. VANDIVER:  Okay.

23  BY MS. VANDIVER:

24  Q.   Mr. Reed, you testified on direct that you were involved in

25  several executions while you were the warden of the Cummins

1    Unit.  Is that correct?

2    A.   Yes, ma'am.

3    Q.   And can you -- I missed the time frame.  I know that there

4    was a line on the defendants' copy of the exhibit, so I think it

5    was that you began being the warden there in '93?

6    A.   Yes, ma'am.

7    Q.   And that continued until --

8    A.   2003.

9    Q.   -- 2003.  Okay.  Thank you.  So counsel on direct brought

10   you through a lot of these double and triple executions that

11   happened, and the last double execution that appears on this

12   list, which I'm showing you, was on September 8, 1999.  Do you

13   agree?

14   A.   Yes, ma'am.

15   Q.   And so that was almost 18 years ago, right?

16   A.   Whenever -- whenever '99 is to right now, I guess --

17   Q.   So let's just say if a baby had been born on the night of

18   this execution, that baby would be about to graduate from high

19   school?

20   A.   It's possible, I guess.

21   Q.   A long time ago.  She also asked you about how did these

22   executions go, and I just would like to talk about the duration

23   between these executions, all of them.

24   A.   Uh-huh.

25   Q.   So if I'm correct, the first execution, if I was following

1    along, the first execution that you did was a double execution

2    of Pickens, Charles Pickens and Jonas Whitmore.  Is that right?

3    A.    That's right.

4    Q.    So that was on May 11, 1994, according to this chart.

5    A.    Right.

6    Q.    And so the next execution was a triple execution that

7    happened on August 3 of 1994, according to this chart.

8    A.    Right.

9    Q.    This chart seemed right to you?  Have you verified it?

10   A.    It does.

11   Q.    So that was three months apart.  Is that right?

12   A.    Right.

13   Q.    Okay.  And the next execution after that triple execution

14   was on April 19, 1995.  So that was about eight months later,

15   right?

16   A.    Yes, ma'am.

17   Q.    Okay.  You tell me if my math is wrong because I just did

18   this over there.

19   A.    I'm looking.  I'm looking.  Looks pretty good.

20   Q.    Usually, I use a computer for this.  So that one was on

21   May 19, 1995.  The next one was on August 31, 1995.  So that's

22   about four months.  Is that right?

23   A.    Right.

24   Q.    And after that, the next one was on August 8, 1996.  So now

25   that's about 11 months.  Is that right?

Reed - Cross

1    A.    I think so, uh-huh.

2    Q.    Okay.  Between August 8, 1996, and January 8, 1997, that's

3    about five months, right?

4    A.    Yes, ma'am.

5    Q.    Between January 8, 1997, and August 6, 1997, that's about

6    seven months.  Do you agree?

7    A.    Yes, ma'am.

8    Q.    Between August 6, 1997, and July 8, 1998, that's about 11

9    months.

10   A.    Yes, ma'am.

11   Q.    Let's see here.  Between July 8, 1998 -- did I skip one?

12   July 8, 1998, and -- no, I'm confusing myself here -- and

13   February 16, 1999, that's about seven months, correct?

14   A.    Yes, ma'am.

15   Q.    And between February 16 and April 12, that's about two

16   months?

17   A.    Yes, ma'am.

18   Q.    Of the same year.  And between April 12, '99, and September

19   8, '99, is about five months?

20   A.    Yes, ma'am.

21   Q.    Between September of '99 and May of '00, that's about eight

22   months?

23   A.    Yes, ma'am.

24   Q.    Between May of 2000 and December of 2000, that's about

25   seven months.

1    A.    Yes, ma'am.

2    Q.    And between December of 2000 and May of '01, that's about

3    five months.

4    A.    Yes, ma'am.

5    Q.    Now, you said Riley Dobi Noel, that was the last execution

6    you were involved in.  Was that your testimony?

7    A.    It was July of '03.  I can't read it.  I'm sorry.

8    Q.    I'm sorry.

9    A.    That would have been the one, the last one --

10   Q.    So the last execution before that had been about two years

11   before, which was on May 8, '01?

12   A.    Yes.

13   Q.    So during the time that you were at the Cummins Unit

14   overseeing executions, there was never executions scheduled

15   seven or eight in a ten- or eleven-day period?

16   A.    No.

17   Q.    And I need a little bit of clarification on your testimony.

18   I didn't -- I didn't quite catch it.  You said that when you did

19   an execution, you would do a practice, and -- or before you did

20   an execution, you would do a practice.

21   A.    Right.

22   Q.    And I think you said you did three a week for three weeks?

23   A.    We usually do two -- we have two weeks that we put into

24   this span.  We just do two practices each week, spaced out to

25   whatever the schedule will let us space it out, depending on

1    what's going on.  During those practices, we'd usually do about

2    three -- do it three times.  So it would be like --

3    Q.    Like three heats or something?

4    A.    Three times, you'd repeat the process.

5    Q.    Okay.  So you said in two weeks you would do it three

6    times, and each time you practiced, you would do it -- run

7    through it three times?

8    A.    About 12 times in two weeks.

9    Q.    And you said that when you did it, you would get an officer

10   who was similar in stature to the inmate that was condemned.

11   A.    Right.

12   Q.    Why is that important?

13   A.    Because we're practicing to do the execution, and we want

14   to have the person that's similar to the person in stature so

15   that we're -- they're used to that.  The officers have to know

16   what they're dealing with.  You can't -- the inmate's not coming

17   until five days before, and, quite naturally, you couldn't ask

18   him to do that, so you would use an officer that volunteered to

19   do that.  And that's because we want to make sure everything's

20   right.  We go to the cell, just like we do when an inmate's

21   there, and walk through the whole process; the securing of him,

22   the cuffs, the taking him into the area, strapping him down.

23   And that's practice.  That's what you do.

24   Q.    So in this situation, are you in charge of the practices

25   now for the executions that are coming up?

1   A.   The warden of the Cummins Unit is in charge with regard to

2   the immediate action.  I'm his supervisor.  I am there involved

3   in those practices.

4   Q.   So in a two-week period, you did 12 practices, and here in

5   -- again, I'm getting into math -- in a two-week period, the ADC

6   is asking you to execute seven or eight people, right?

7   A.   They've scheduled -- seven executions are scheduled, right.

8   Q.   Part of that is your -- part of that is your job, right?  I

9   mean, you have to be involved in it?

10  A.   Right.

11  Q.   Yes.  And so are you going to do 12 practices for each of

12  the seven condemned or eight condemned inmates with a guard or

13  an officer of a similar stature?

14  A.   Probably not since they're that close together.

15  Q.   Okay.  We'll move on here.  Okay.  Now I'm going to ask you

16  about a confidential exhibit, which is in your book, and I can

17  help you find it, if you need me to.  But that skinny book that

18  you have there.

19  A.   Yes, ma'am.

20  Q.   The first tab says A --

21        MS. VANDIVER:  And, Your Honor, we've numbered or

22  marked all our confidential exhibits as A through F to make it

23  easier to understand when we're talking about a confidential

24  exhibit.  And the pagination is the pagination that we got from

25  the state, so it's not consecutive.  So that might explain

Reed - Cross

1    these -- Exhibit A is these emails that were given to us.

2    BY MS. VANDIVER:

3    Q.   So could you look in that Exhibit A, there's a page that

4    has ADC 578 on it.  And if you need some help finding it, I'll

5    be happy to come over and help you find it.  And it looks sort

6    of like a table.

7    A.   Right.

8    Q.   You found it?  Okay.  So can you describe what this

9    document is?

10          MS. CRYER:  Your Honor, may I?  I'm sorry.  I have a

11   question.  There are one or two people in the courtroom.  I

12   don't know if it's appropriate for them to hear the

13   conversations about the confidential documents.

14          THE COURT:  All right.  I'm not certain who is in the

15   courtroom.  Yes, ma'am?

16          UNIDENTIFIED SPECTATOR:  We would oppose the closure

17   of the courtroom.  We can ask for a recess to contact our

18   counsel.

19          MS. CRYER:  Your Honor, I believe according to the

20   protective order that's in place --

21          THE COURT:  You are welcome to take a recess and go do

22   that, and we'll take a recess.  We're not going to be here much

23   longer tonight.

24          UNIDENTIFIED SPECTATOR:  That's all right.  I don't

25   want to hold the court up.  We'll deal with it in the morning.

1              THE COURT:  I appreciate it.  If you all would step

2       out if you haven't signed this protective order.  And then the

3       other gentleman in the back is Judge Moody.

4              MS. CRYER:  I don't know about that gentleman back

5       there.  He looks kind of shady to me.

6              THE COURT:  He's making sure I do everything right.

7         Are we satisfied then?  I assume that's an expert witness

8       that signed the protective order, in the back?  I don't know.

9              MS. CRYER:  That's Rory Griffin.

10             THE COURT:  I'm sorry.  You may proceed.

11        [Page 562, line 11, through page 568, line 20, under seal

12       and filed under separate cover.]

13

14

15

16

17

18

19

20

21

22

23

24

25

1        [Page 562, line 11, through page 568, line 20, under seal

2   and filed under separate cover.]

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          [Page 562, line 11, through page 568, line 20, under seal

2    and filed under separate cover.]

1          [Page 562, line 11, through page 568, line 20, under seal

2     and filed under separate cover.]

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Reed - Cross

1          [Page 562, line 11, through page 568, line 20, under seal

2     and filed under separate cover.]

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Reed - Cross

1          [Page 562, line 11, through page 568, line 20, under seal

2     and filed under separate cover.]

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19          [Page 562, line 11, through page 568, line 20, under seal

20     and filed under separate cover.]

21               THE COURT:  Thank you.  You may proceed.  I think it's

22     up.  Can you see that?

23               MS. VANDIVER:  It starts out dark.

24          (Video playing.)

25               THE COURT:  I'm going to just repeat to set the

Reed - Cross                                      569

1    preface for the folks in the back.  This is a video that is

2    publicly available on the ADC website of the death chamber.

3               LAW CLERK:  The monitors are not working in the back.

4               THE COURT:  And my apologies.  I don't think the

5    public monitors in the back are working despite our best efforts

6    up here to turn them on.  I think you can see that, but, again,

7    it is publicly available on the ADC website.

8          (Video continuing.)

9               MS. VANDIVER:  Can you pause right there, Sharon?

10   BY MS. VANDIVER:

11   Q.    Is this the execution chamber at the Cummins Unit?

12   A.    Yes, ma'am.

13   Q.    And you stated that when you did the executions in the '90s

14   and the early 2000s that you would be in the room, right?

15   A.    Yes, ma'am.

16   Q.    So can you help me out a little bit and explain the layout

17   here.  I see the gurney.  Where are the -- is this -- what am I

18   looking through here?

19   A.    That's the -- where the witness room is, those that will be

20   witnessing the execution.  It's for the witnesses or the

21   attorneys and now the victim in the witness room.

22   Q.    Now, where are the executioners in relation -- can I see

23   where they're -- correct me if I'm wrong.  They're in some sort

24   of a separate room?

25   A.    They're right there where that door is at the head of

Reed - Cross

1    gurney, that's where they are, by where that window is.

2    Q.   Okay.  Who else is in this -- I guess have you reviewed the

3    lethal injection protocol -- you said that you didn't recognize

4    the attachment C that I showed you.  Have you reviewed other

5    parts of the lethal injection protocol?

6    A.   Not -- I haven't.  I haven't dealt with the protocol.

7    Q.   Okay.  When you were involved in executions, who else was

8    in that room with you other than --

9    A.   The director.

10             MS. CRYER:  Your Honor --

11             MS. VANDIVER:  I'm not asking for names.

12             MS. CRYER:  I wanted to clarify that.  Thank you.

13   A.   The director at the time and a person from -- internal

14   affairs division has a person assigned in there to log

15   everything in there.  I would be in there.  And there's one

16   other person that's around the gurney to observe the condemned,

17   a medically trained person.

18   Q.   So it sounds like four people, plus the person on the --

19   the person on the gurney.

20   A.   Ma'am?

21   Q.   Four people; you, the director, and an IAD person, and then

22   another person, and then the person on the gurney.

23   A.   Well, there's a person that observes the person on the

24   gurney.  The inmate I'm not --

25   Q.   Well, I was counting the inmate as a person, and then four,

1    plus him, would be five.

2    A.    Right.

3    Q.    Okay.  Do you know when the executions are going to take

4    place?

5    A.    When?

6    Q.    When during the day?

7    A.    Seven o'clock and 8:15.

8    Q.    Okay.  So the first one is at 7 o'clock, and it needs to be

9    wrapped up by 8:15?

10   A.    Well, that's the next scheduled execution.

11   Q.    Okay.  And I take it, based on your previous testimony,

12   that you don't have any involvement with the selection of

13   personnel for things that happen either in this room or in the

14   chemical room.  Is that right?

15   A.    Right.  I don't have any --

16   Q.    And for these scheduled executions, are you going to be in

17   this room?

18   A.    I am.

19   Q.    You are?

20   A.    I am.

21   Q.    So tell me what your role is going to be.

22   A.    I'm going to be there as an observer and to help with the

23   process if --

24   Q.    But you haven't looked at the protocol?

25   A.    Ma'am?

Reed - Cross

1   Q.   You haven't looked at a lethal injection protocol?

2   A.   No.

3   Q.   So your understanding is that you're going to be helping in

4   what way?

5   A.   In the room observing, just as I did when I went to

6   Quachita and came back and observed in there for one of those

7   executions.  The warden hadn't done one.

8   Q.   Do you have any responsibilities in the room?

9   A.   Whatever the director would have me to do, if there's

10  something that I need to do.

11  Q.   But if you have any responsibilities, she hasn't

12  communicated that to you, other than just being in that room?

13  A.   No, we hadn't communicated about any specific duties, other

14  than I'm going to be in the room during the execution, which --

15  Q.   And the execution is the -- the first executions are

16  scheduled for Monday, correct?

17  A.   Right.

18  Q.   And it's been a long week, so I think today is Tuesday,

19  right?  So that's coming up.

20  A.   Right.

21  Q.   And so you don't know what you're going to be doing in this

22  room, other than just being there?

23  A.   We'll be doing the same thing I did in the room the other

24  times I was there.

25  Q.   Which was what?

1   A.   Observe and just the process, makes sure everything gets

2   done.

3   Q.   To make sure everything gets done.  That sounds like a

4   critical role.  What does that involve?

5   A.   I'm there for the practices.  I'm there when the inmate

6   moves.  I make sure the inmate is on the gurney.  I've done that

7   when I was warden, I'll do that now.  I mean, that process.

8   Q.   But you haven't seen the protocol?

9   A.   I haven't studied the drug protocol, no.

10  Q.   Have you seen another kind of protocol that relates to

11  inmate movement or tying down or anything like that?

12  A.   The policy, I have -- I'm privy to that.  But I don't know

13  what your question really is about.

14  Q.   So you have seen some sort of policy regarding how the

15  execution is supposed to take place?

16  A.   Right.

17  Q.   Okay.  When you are in that room next week, if something is

18  going wrong, do you have the authority to stop the execution?

19  A.   The director is the only person that has authority to stop

20  the execution.

21  Q.   Okay.  Let's see.  When you are in that room and you feel

22  like, let's say, hypothetically, something is going wrong, would

23  you have the authority to ask for lifesaving measures to be

24  taken?

25  A.   Anything that happened, we might confer with the director

1    on, if I was in there.

2              MS. VANDIVER:  Now I feel like I need to get into some

3    of these confidential exhibits, so I don't know if we just want

4    to start in the morning or ask them to leave again.

5              THE COURT:  My understanding is you don't think you're

6    going to finish with this witness this evening?

7              MS. VANDIVER:  No.

8              MS. CRYER:  Your Honor, I am fine, if we want to take

9    up Mr. Reed again tomorrow.  And I already, I believe, made it

10   known to opposing counsel, Mr. Reed is not available in the

11   morning, nor is Mr. Griffin or Ms. Kelley.  I have no problem

12   with him coming back tomorrow to finish up his testimony, but he

13   cannot be available in the morning.

14             THE COURT:  It will be in the afternoon at some point?

15             MS. CRYER:  Yes, Your Honor.

16             THE COURT:  And is that true for the other two

17   witnesses as well, are they available in the afternoon,

18   Mr. Griffin and Ms. Kelley?

19             MS. CRYER:  Yes, Your Honor, they are.

20             THE COURT:  Do you have other witnesses in the morning

21   that you wish to put on?

22             MS. CRYER:  Yes, yes.

23             MS. VANDIVER:  And I think we have Dr. Groner for the

24   morning too.

25             MR. ROSENZWEIG:  That's correct.

1          MS. CRYER:  I wanted to make sure that everyone knew

2    that, unfortunately, Mr. Reed cannot be here at 8:30 in the

3    morning.

4          THE COURT:  We'll go ahead and take a break now.  This

5    would be a good place to stop for the evening since we're not

6    going to conclude it.  Right now it's about seven after eight.

7    We'll be back here at 8:30 in the morning.

8        Again, you are welcome to leave all of your materials in

9    here.  No one else will be in here.  The courtroom should be

10   open right around 8 o'clock.

11       Thank you very much, Mr. Reed and Mr. Griffin, for staying

12   here with us to help us with this matter.  I appreciate it.  I

13   know everybody has shuffled their schedules around, and the

14   Court appreciates it very much.

15       So with that, we'll be in recess until tomorrow morning at

16   8:30.

17       (Overnight recess at 8:10 p.m.)

18                    C E R T I F I C A T E

19       I, Eugenie M. Power, Official Court Reporter, do hereby

20   certify that the foregoing is a true and correct transcript of

21   proceedings in the above-entitled case.

22

23   /s/ Eugenie M. Power, RMR, CRR, CCR        Date:  April 11, 2017
     United States Court Reporter

24

25