```
 1              IN THE UNITED STATES DISTRICT COURT
                  EASTERN DISTRICT OF ARKANSAS
 2                     WESTERN DIVISION

 3    JASON MCGEHEE, STACEY
      JOHNSON, MARCEL WILLIAMS,        No. 4:17CV00179-KGB
 4    KENNETH WILLIAMS, BRUCE WARD,
      LEDELL LEE, JACK JONES, DON
 5    DAVIS and TERRICK NOONER,

 6                   Plaintiffs,        Wednesday, April 12, 2017
                                        Little Rock, Arkansas
 7    v.                                8:40 a.m.

 8    ASA HUTCHINSON, Governor of
      the State of Arkansas, in his
 9    official capacity; and WENDY
      KELLEY, Director, Arkansas
10    Department of Correction, in
      her official capacity,
11
                     Defendants.
12
```

**TRANSCRIPT OF HEARING ON MOTION FOR PRELIMINARY INJUNCTION**
**VOLUME 3**
BEFORE THE HONORABLE KRISTINE G. BAKER,
UNITED STATES DISTRICT JUDGE

```
15    APPEARANCES:

16    On Behalf of Plaintiffs McGehee, M. Williams, Ward, Davis and
      Nooner:
17
          MR. JOHN CHARLES WILLIAMS, Assistant Federal Defender
18        MR. SCOTT W. BRADEN, Assistant Federal Defender
          MS. JAMIE GIANI, Assistant Federal Defender
19        MS. JULIE VANDIVER, Assistant Federal Defender
            Federal Public Defenders Office
20          1401 West Capitol Avenue, Suite 490
            Little Rock, Arkansas  72201
21

22    On Behalf of Plaintiff Davis:

23        MS. DEBORAH RUTH SALLINGS, Attorney at Law
            35715 Sample Road
24          Roland, Arkansas  72135

25    [APPEARANCES CONTINUED ON NEXT PAGE]
```

Elaine Hinson, RMR, CRR, CCR
United States Court Reporter

```
1    [APPEARANCES CONTINUED]

2
     On Behalf of Plaintiffs Johnson, K. Williams and Jones:
3
         MR. JEFFREY M. ROSENZWEIG, Attorney at Law
4            300 Spring Building, Suite 310
             Little Rock, Arkansas  72201-2421
5

6    On Behalf of Plaintiff Lee:

7        MR. LEE DEKEN SHORT, Attorney at Law
             Short Law Firm
8            425 West Broadway, Suite A
             North Little Rock, Arkansas  72114
9

10

11   On Behalf of Defendants:

12       MR. LEE RUDOFSKY, Solicitor General
         MS. CHRISTINE A. CRYER, Assistant Attorney General
13       MS. KATINA RENE HODGE, Assistant Attorney General
         MS. JENNIFER L. MERRITT, Assistant Attorney General
14       MR. COLIN R. JORGENSEN, Assistant Attorney General
             Arkansas Attorney General's Office
15           323 Center Street, Suite 200
             Little Rock, Arkansas  72201-2610
16

17

18

19

20

21

22

23

24
         Proceedings reported by machine stenography; transcript
25   prepared utilizing computer-aided transcription.
```

```
1              I N D E X (Volume 3 - April 12, 2017)

2
   WITNESSES
3  FOR THE PLAINTIFFS:    DIRECT   CROSS   REDIRECT   RECROSS

4  Jonathan Groner        579      599     613

5
   WITNESSES
6  FOR THE DEFENDANTS:

7  Daniel Buffington      616      659     683/701    695/702
   Larry Norris           703      724     746/752    751
8  Dale Reed (Recalled)            753     772
   Rory Griffin           779      799     874
9  Wendy Kelley           880

10

11 EXHIBITS RECEIVED:

12 Plaintiffs' 9.....................................580
   Plaintiffs' 24....................................596
13 Plaintiffs' 17....................................599
   Plaintiffs' 36....................................697
14 Plaintiffs' 37....................................700

15 Defendants' 72 and 4..............................617
   Defendants' 35, 36, 43, 50........................625
16 Defendants' 70....................................625
   Defendants' 34....................................687
17 Defendants' 7.....................................695
   Defendants' 2.....................................710
18 Defendants' 16....................................778
   Defendants' 18....................................877
19 Defendants' 13....................................877

20 Confidential Exhibits A and C.....................779

21

22

23

24

25
```

1          (Proceedings continuing at 8:40 a.m.)

2               THE COURT:  Good morning.  We are back on the record

3     with counsel in Case No. 4:17CV179.

4          Are we ready to proceed with testimony, counsel for

5     defendants or plaintiffs?  I'm not sure who is going to go

6     today.

7          Mr. Rosenzweig.

8               MR. ROSENZWEIG:  Your Honor, I call Dr. Jonathan

9     Groner.

10              **JONATHAN GRONER, PLAINTIFFS' WITNESS, DULY SWORN**

11                         DIRECT EXAMINATION

12    BY MR. ROSENZWEIG:

13    Q.   Tell us your name, please, sir.

14    A.   My name is Jonathan Groner, G-r-o-n-e-r.

15    Q.   Okay.  Dr. Groner, briefly identify what your affiliation

16    is, what your training and specialty is.

17    A.   I am a professor of surgery at the Ohio State University

18    College of Medicine.  And I'm a pediatric surgeon specializing

19    in trauma care and burn care, and I work at an institution

20    called Nationwide Children's Hospital, which is in Columbus,

21    Ohio.

22    Q.   And I assume you are board certified?

23    A.   I am board certified in general surgery and pediatric

24    surgery.

25    Q.   And how long have you been a surgeon?

1   A.    I finished my training in 1993, so almost 25 years.

2   Q.    Okay.  Dr. Groner, did you prepare a CV?

3   A.    I did.

4   Q.    Okay.  This is a copy of it, which I believe is Exhibit 9

5   in our binder.  Is this the CV you prepared and provided to us?

6   A.    Yes, sir.

7             MR. ROSENZWEIG:  Okay.  I move for introduction of

8   Exhibit 9.

9             THE COURT:  Any objection?

10            MR. RUDOFSKY:  No objection, Your Honor.

11            MR. ROSENZWEIG:  Thank you.

12            THE COURT:  Exhibit 9 is admitted.

13       (Plaintiffs' Exhibit 9 received in evidence.)

14   BY MR. ROSENZWEIG:

15   Q.    Did you also prepare a declaration or an affidavit of some

16   six pages in length with regard to this?

17   A.    Yes, I did.

18   Q.    Okay.  And for the record, that's Exhibit 19 to the

19   petition or complaint.  Doctor, if you could briefly outline

20   your experience in several particular areas of surgery in

21   dealing with gunshot wounds, in dealing with people who are

22   suffering pain, such as burn patients.  And generally tell us

23   about that.

24   A.    Well, I've been taking care of trauma patients and burn

25   patients for most of my career.  I'm currently the director of

1   the trauma program at our hospital, so I've taken care of

2   probably hundreds of gunshot wound victims over my career.  I

3   also take care of burn patients, including patients with major

4   burns.  Obviously, there's a lot of pain and suffering in

5   patients that have severe burns and sometimes prolonged

6   hospitalizations and a difficult group of patients to take care

7   of, to be sure.

8   Q.   Okay.  While we're talking about pain and suffering, in

9   your testimony today, we've used those terms.  Can you draw a

10  semantic distinction between pain and suffering?

11  A.   I think -- I mean pain has -- is a response to a noxious

12  stimulus.  It has really no time component when you say someone

13  is in pain.  And suffering is different.  If you look at

14  *Merriam-Webster's* dictionary, it says suffering implies

15  conscious endurance of pain or distress.  And that's the

16  difference.

17  Q.   Okay.  Thank you.  Doctor, you have, in your declaration,

18  you make remarks about the firing squad as an alternative method

19  of execution.  I'm going to ask you about that.  In that

20  capacity, have you had a chance to look at the Utah firing squad

21  protocol, which I believe is Exhibit 33 in our binder?

22  A.   Yes, sir.

23  Q.   Okay.  And did you -- and do you refer to the protocol in

24  your declaration?

25  A.   Yes, sir.

1  Q.    Okay.  And you've studied it and applied your own medical

2  training to the examination of it.  Is that correct?

3  A.    Yes, sir.

4  Q.    Okay.  What does -- if we could talk about this, what does

5  -- when someone is executed according to the Utah protocol, what

6  happens?  How is that carried out --

7  A.    Well, the --

8  Q.    -- in terms of the mechanics, first, of putting the person

9  in a restrained position and that type of thing?

10 A.    So in the Utah protocol, they set up the inmate in a

11 position to, obviously, expose the chest as much as possible.

12 The person is placed in a chair in an upright position.  An

13 individual marks the site of the loudest sound of the heart on

14 the chest and puts a target on it.  And then the actual

15 executioners, the riflemen, have to have some sort of

16 certification, basically that they are trained.  The weapons are

17 30-caliber long-barreled weapons, which is a fairly large

18 bullet.  And I believe there's either four or five of them that

19 fire at this target upon the appropriate signal.  And the impact

20 of that is that the heart is basically rendered immediately

21 inoperable.

22 Q.    Okay.  We'll go through that.  Let's say you have -- the

23 target would be placed where on the heart or on the chest?  What

24 part of the heart would the target be placed at?

25 A.    Well, when they are looking or feeling for the loudest

1  sound, that typically localizes the left ventricle, which is the

2  major pumping part of the heart.

3  Q.   What does the left ventricle do as opposed to other

4  chambers of the heart?

5  A.   The left ventricle is the strongest pumping chamber, which

6  pumps the blood out to the aorta and circulates to the brain and

7  body.

8  Q.   If a high caliber -- one high-caliber bullet were to enter

9  the left ventricle, what would happen?

10  A.   Well, by disrupting the left ventricle, it disrupts the

11  pump.  Then the blood stops pumping through the aorta.  I mean,

12  it's a pretty high-pressure chamber, so there's a big hole.  The

13  blood flows out to the chest.  That causes unconsciousness

14  rapidly.

15  Q.   Because there would be no blood and, thus, no oxygen going

16  to the brain.  Is that correct?

17  A.   Right.  The blood flow to the brain would stop, and that

18  causes unconsciousness.

19  Q.   About how long would it take to achieve unconsciousness

20  with one bullet?

21  A.   My guess is a few seconds.

22  Q.   Okay.  And what can you ascertain, or do you have an

23  opinion as to how much pain a person who had just undergone that

24  would sustain and suffer?

25  A.   Well, clearly a gunshot causes pain.  But the loss of

1   consciousness means there's really no suffering.  I think the

2   perception would be extremely brief.

3   Q.    Okay.  Just a second or two?

4   A.    Correct.

5   Q.    About how long would it take for that person then to

6   expire?

7   A.    Well, in terms of clinical signs of death, meaning absence

8   of any signs of life, probably a couple of minutes.  But it just

9   depends on waiting for the organs to shut down, basically.  I

10  think there's unconsciousness throughout this.

11  Q.    You have -- would it be correct that if the ventricle or

12  the heart were hit by several bullets, that that would accelerate the

13  process?  Is that correct?

14  A.    Yes, sir.

15  Q.    Okay.  Now, do you have -- you've had experience treating

16  patients who have suffered gunshot wounds to the chest.  Is that

17  correct?

18  A.    That's correct.

19  Q.    Okay.  What is the impact -- what is your perception of

20  their pain in those circumstances?

21  A.    My perception is that in those patients who have injuries

22  with major blood loss, that they are not in pain.

23  Q.    Okay.  And what observations have you made in terms of

24  incisions, in terms of splitting the chest open, etc.?  Could

25  you share with us on that?

1    A.    Well, the sort of classic lifesaving maneuver in the

2    situation where someone has been shot in the heart and comes in

3    the emergency department with major blood loss is to open the

4    chest in the emergency department without anesthesia.  That's a

5    procedure called an emergency department thoracotomy.  And

6    basically it is cutting open the chest in the emergency room to

7    attempt to either patch the hole in the heart or to cross-clamp

8    the aorta to restore some blood flow.  That is done without

9    anesthetic.

10   Q.    Are these people normally unconscious as well?

11   A.    Yes.

12   Q.    And you are not using anesthetic?

13   A.    That's correct.

14   Q.    What sort of reaction do you observe in them in those

15   circumstances?

16   A.    Typically, no reaction.  If you are able to actually patch

17   the hole, stop the bleeding, give blood, they will eventually

18   start to react, and that's when you give anesthetic.

19   Q.    Now, to ascertain where the heartbeat is, that's done,

20   among other things, with possibly a stethoscope.  Is that

21   correct?

22   A.    That's correct.

23   Q.    But there's no, really, specialized medical training to

24   isolate the heart.  Is that correct?

25   A.    That's correct.

1   Q.    Am I correct on that?

2   A.    Yes, sir.

3   Q.    Okay.  Thank you.  Now, you reference in your declaration

4   that you had read newspaper reports about the last firing squad

5   execution in Utah, about what was reported to be a reflex action

6   of the person who was being executed when he was hit by a

7   gunshot wound or by a gunshot.  Can you elaborate on that?

8   A.    Yes, sir.  The report was that the left hand appeared to

9   clench after the inmate sustained the gunshot wounds that you

10  described.

11  Q.    Would that be an automatic reflex, or what is your opinion

12  on that?

13  A.    My opinion is that does not mean that the inmate was

14  suffering.  There can be pain reflexes.  The proximity of the

15  bullet wounds to the nerves in the arm, which run through the

16  upper part of the chest, may have caused some reflex on that

17  side.

18  Q.    Okay.  There was no report of any verbal reaction by the

19  person?

20  A.    That's correct.

21  Q.    And would that be a normal reaction if one were in pain

22  under these circumstances?

23  A.    Yes, sir.

24  Q.    Without anesthetic?

25  A.    Yes, sir.

1   Q.    Okay.  Now, you've conducted, obviously, thousands of

2   surgeries in your career.  Have you used midazolam in your

3   surgical practice?

4   A.    I believe in my career I've performed close to 10,000

5   operations.  I have never used, to my knowledge, midazolam as a

6   sole anesthetic for an operation.

7   Q.    Why is that?

8   A.    The reason is that midazolam is not a general anesthetic.

9   Q.    Does it have analgesic properties?

10  A.    Midazolam does not have analgesic properties, and we do not

11  use it for analgesia.

12  Q.    So what do you use midazolam for?

13  A.    Excuse me.  Midazolam can be used as a preanesthetic agent

14  to reduce anxiety.  It can be used as a component of anesthesia.

15  In other words, it's used at the beginning of an anesthetic.

16  And the other drugs or inhalation agents are added in.

17  Q.    But it's not a sole -- you don't use it as a sole source of

18  anesthetic.

19  A.    It would be malpractice for me to do something like an

20  appendectomy with midazolam as the sole anesthetic.

21  Q.    Now, when you do use midazolam, how much do you use?

22  A.    I'm not an anesthesiologist, so I don't give the

23  anesthetics when I'm doing an operation.  I'm aware that most of

24  my patients get a dose in the range of a few milligrams.

25  Q.    Now, are you aware if there are any clinical studies about

1    the use of 250 or 500 milligrams of midazolam?

2    A.    To my knowledge, there are no clinical studies of giving a

3    250- or 500-milligram dose of midazolam.

4    Q.    And if you were to use -- if one were to use midazolam as

5    the sole -- as the sole drug, do you have an opinion as to

6    whether that would cause pain and suffering?  And compare and

7    contrast that with the firing squad.

8    A.    So, yes, my opinion is that using midazolam as an agent in

9    that situation poses substantial risk of pain and suffering.

10   Q.    Okay.  And you believe that a firing squad would be less --

11   would pose a much less -- much smaller risk of any pain.  Is

12   that correct?

13   A.    That's correct.

14   Q.    Because of the, essentially, instantaneous unconsciousness?

15   A.    That's correct.

16   Q.    Okay.  Now, did you have a chance -- did I send you a copy

17   of the declaration, which is not yet in evidence, of Dr.

18   Antognini?  And I hope I'm pronouncing that correctly.

19   A.    Yes, sir.

20   Q.    And that's Exhibit 3 in our booklet.  Do you have -- were

21   there any comments made in the declaration that you would like

22   to comment on?  For instance, when Dr. Antognini talks about

23   movement following a noxious stimulus does not equate with

24   consciousness and such movement can be initiated within the

25   spinal cord, do you have an observation with regard to that?

1   A.    Yes, sir, I do.  Again, I've done I think close to 10,000

2   operations in my career.  And that's typically not part of the

3   discussion.  So I would go back to the appendectomy example.  So

4   there's a teenager who is going to have an appendectomy, which

5   is a relatively common operation for us.  And the patient is

6   prepped and draped.  And I make the incision, and I notice the

7   abdominal muscles tense up.  It's something that happens rarely.

8   It's certainly not common, but it's not extremely rare.  It can

9   happen once in a while.  I report this to the anesthesiologist,

10  that the abdominal muscle is tensed up.  And she would say, "Oh,

11  you know, I'm sorry," and immediately give more anesthetic drug.

12  Propofol is the one that's commonly used.  So when I see

13  patients move during an operation, the typical response is to

14  give more anesthetic.

15  Q.    Okay.  Now, with regard to his observation that midazolam

16  can be used and has been used as the sole medication in a

17  variety of otherwise painful procedures, do you have a comment

18  about that?

19  A.    Well, my comment is the same as before, which is I have

20  never done an operation with midazolam as a sole anesthetic.

21  Q.    An intrusive operation.

22  A.    Correct, yes, something involving a scalpel.

23  Q.    Okay.  Now, his observation about various claims by expert

24  witnesses saying that midazolam will precipitate when

25  administered with normal saline and paradoxical reactions will

1  occur, do you have any observations about that?

2  A.    I do.  Certainly, if you look at online references

3  concerning midazolam, they do speak of paradoxical reactions,

4  including hyperactive or aggressive behavior, involuntary

5  movements, combativeness.  So those are listed as paradoxical

6  reactions in online resources on this drug.

7  Q.    Okay.  Now, his observation that only physicians,

8  especially anesthesiologists, can assess consciousness, what's

9  your observation on that?

10 A.    I would say two things.  I think there's a difference

11 between -- assessing a level of consciousness and depth of

12 anesthetic are different.

13 Q.    What's the difference between the two?

14 A.    Well, his affidavit makes a reference to the Glasgow Coma

15 Scale.  That's used to assess unconsciousness, for example, in

16 someone who has been injured.  That would not be used in the

17 operating room.  I think that assessing sort of anesthetic death

18 is a practice-based skill.  I mean, there's a reason why

19 training for anesthesiologists and anesthetists is a

20 couple-of-year program.  They certainly don't have to be

21 physicians, but it requires training of an anesthesiologist,

22 nurse anesthetist, somebody who does this every day to assess if

23 somebody is deeply unconscious in order to not experience

24 suffering when there's a painful stimulus.  In my case, the

25 painful stimulus is me basically cutting open the abdomen, as I

1  do a lot of general surgery.  I think the reference here is in

2  regards to the paralysis and the pain of a potassium chloride

3  infusion.

4  Q.   His reference to the so-called Lazarus sign, what is your

5  observation with regard to that?

6  A.   I would say I've heard of the expression.  I don't believe

7  it's common.  I certainly, doing trauma and burns, have taken

8  care of a number of patients with fatal outcomes, and I have not

9  seen that phenomenon.

10 Q.   Again, we're talking about the midazolam is not an

11 analgesic.  Is that correct?

12 A.   That's correct.

13 Q.   Okay.  His observation that because it's not clinically

14 warranted to administer extremely high doses of midazolam, it is

15 not known if midazolam would produce immobility in response to

16 noxious stimulations in humans, what's your observation on that?

17 A.   Well, I think that's an important point, that it's not --

18 it's not clinically warranted to give the dose of midazolam

19 that's in the protocol.  I mean, to me, it seems like it's a

20 human experiment.  It's never been done, and there's no data on

21 it.

22 Q.   Okay.  And his comment then after that, the data support

23 the conclusion that midazolam can act as a complete general

24 anesthetic, your opinion on that?

25 A.   I think that paragraph is based on some animal studies.

1    You know, I guess I would have to say, I operate on humans and

2    not mice, and midazolam is not a general anesthetic for humans.

3    Q.    Then his reference to the black box warning on midazolam,

4    do you have any comment about that?

5            MR. RUDOFSKY:  Your Honor, for the record, we object

6    to this line of questioning.  I understand Dr. Groner is a

7    doctor.  But, as he said, he's not an anesthesiologist.

8            THE COURT:  I overrule the objection.

9            THE WITNESS:  Could you repeat the question, please?

10   BY MR. ROSENZWEIG:

11   Q.    Okay.  Dr. Antognini, in his submission, refers to the

12   black box warning on the midazolam inserts.  Do you have any

13   comment about that, that it can cause, you know, respiratory

14   arrest, airway obstruction, which could lead to death, but may

15   involve choking, gagging, etc.?

16   A.    Right.  So, yes, I'm aware of the black box warning.

17   Because a drug can cause you to choke, gag or have a respiratory

18   arrest does not mean it's an anesthetic and does not mean it

19   prevents pain during a procedure.

20   Q.    The doctor's reference to apnea or lack of breathing, do

21   you have any comments about that?

22   A.    Again, I think there's a little of -- an illogical flaw

23   there.  I mean, you know, alcohol intoxication can also cause

24   apnea.  That doesn't mean it's a general anesthetic.  Certainly,

25   a blow to the head can also cause unconsciousness.  That doesn't

1    mean that's a general anesthetic.  I think the point is, for an

2    agent to be a general anesthetic, it has to render someone

3    deeply unconscious so that they are impervious to all pain.  Not

4    to put too fine a point on it, but someone has to be deep enough

5    I can literally cut off someone's leg, which I've done.  That's

6    how deep they have to be, and midazolam does not do that.

7    Q.    Okay.  In his remark where he's referring to Dr. Zivot's

8    declaration concerning the use of super-clinical doses for

9    midazolam, what is your -- what's your comment about that?

10   A.    There is no research on super-clinical doses.  It's

11   basically -- it's a human experiment.  It's never been done.

12   There's no data.

13   Q.    Okay.  Now, in his comment about the death -- comment about

14   your declaration stating that death by firing squad would cause

15   little or no pain, and he says that it's difficult to understand

16   how four or five bullets piercing the chest would not cause

17   severe pain, etc., in 10 to 15 seconds, do you have a comment

18   about that?

19   A.    Well, I think that this, once again, is a little bit of a

20   distinction between pain and suffering.  I think his 10 to

21   15 seconds may sound like a lot of pain.  You know, I had an

22   opportunity to meet an individual who they tried to insert IVs

23   in for two hours.

24   Q.    And we're going to get into that in a minute.

25   A.    I just think that as a surgeon who has dealt with a number

1    of gunshot wounds, I think he's off in his time level.  I

2    believe two to three seconds, not 10 to 15 seconds.

3    Q.    Okay.  Have you ever seen someone with an exsanguinating

4    hemorrhage from a gunshot wound to the heart show pain?

5    A.    I have not.

6    Q.    Now, if someone had been shot in the chest and had been in

7    severe pain, what's the likelihood that he had suffered multiple

8    gunshot wounds to his heart?

9    A.    I think that's very low.

10   Q.    Now, with regard to the reference we made -- you made a

11   minute ago concerning the looking for placement of an IV, were

12   you involved in examining an Ohio death sentence inmate named

13   Romell Broom?

14   A.    Yes, I was.

15   Q.    Under what circumstances did you examine him?  What were

16   the circumstances that you were asked to examine him?

17   A.    I was asked to examine Mr. Broom, by his attorneys, four

18   days after his scheduled execution.

19   Q.    What happened in his -- you were examining him after his

20   scheduled execution, so, obviously, he was alive.  What happened

21   that he was still alive?

22         MR. RUDOFSKY:  Excuse me, Your Honor.  Can we just

23   have our continuing objection to relevance?

24         THE COURT:  I will recognize a continuing objection.

25   You may proceed.

1          THE WITNESS:  So Mr. Broom was scheduled for an

2    execution by lethal injection in September of 2009, I believe.

3    The personnel assigned to place his IV were unsuccessful after

4    trying for two hours.  They did call in a physician at some

5    point, who was also not successful.

6    BY MR. ROSENZWEIG:

7    Q.    So the execution was called off?

8    A.    The execution was eventually called off by the governor of

9    Ohio is my understanding.

10   Q.    Then several days later, you went down to examine him.  Is

11   that correct?

12   A.    That's correct.  I believe the execution was scheduled for

13   Monday, and I was there on a Friday, as I recall.

14   Q.    And you took pictures?

15   A.    I did.

16   Q.    Is that correct?  And I believe we have those pictures as

17   Exhibit 24.  The pictures -- there are a number of pictures in

18   Exhibit 24, which were Mr. Broom with various markings on his

19   body.  Is that correct?

20   A.    That's correct.

21   Q.    And you took those pictures yourself?

22   A.    Yes, sir, I took those photographs myself.

23          MR. ROSENZWEIG:  I move for the introduction of those.

24          MR. RUDOFSKY:  We object on relevance grounds.

25          THE COURT:  I'll recognize it as a continuing

1    objection that I've overruled.  I'll admit Plaintiffs'

2    Exhibit 24.

3         (Plaintiffs' Exhibit 24 received in evidence.)

4    BY MR. ROSENZWEIG:

5    Q.   With regard -- what did you -- what did you determine

6    about, for instance, the status of Mr. Broom's veins?

7    A.   Yes, sir.  So the -- the concern was that Mr. Broom had

8    been an intravenous drug abuser and, thus, it was difficult to

9    obtain intravenous access.  I know what intravenous drug abuse

10   looks like.  I've examined those patients.  Their veins

11   basically look like railroad tracks because they have scars all

12   along the veins everywhere.  So I examined him and found, in

13   fact, he did not have signs of extensive intravenous drug abuse.

14   In fact, his veins actually looked quite normal to me.  And they

15   had attempted to place IVs in every extremity.  I actually

16   counted 18 needle marks on him, with a fair amount of bruising.

17   Q.   For instance, on this one that's here right now, the first

18   one that's marked 10, those circles, were those placed by you or

19   by the prison people?

20   A.   The circles were drawn by me with the same sort of pen that

21   we use in the operating room to mark surgical sites, but to

22   identify actual needle sticks.

23   Q.   Now, the next picture, which would be -- there are a number

24   of little pieces of paper that are on here.  Are those numbers

25   placed by you?

1  A.   Yes, sir.  Each sticker represents an intravenous IV

2  attempt.  I believe there's a total of 18.  I can see there's a

3  fair amount of bruising at the sites.  But the point of all this

4  is, his veins were normal.  I think this was a basic mismatch of

5  skill and expertise.  I don't think anyone with medical training

6  would have had any problem inserting this IV.

7  Q.   What sort of training and experience is necessary to get a

8  vein?

9  A.   Well, again, IV insertion is a practice-based skill.

10 Reading about it and doing it once in a while is not really good

11 enough.  I would say that the people who do this, to give you an

12 example, outpatient surgery, that they do several a day, they

13 get very, very good at it.  I would guess our nurse anesthetists

14 do hundreds a year.  But I also think there's a back-up plan.

15 My wife recently had rotator cuff surgery.  And the first nurse

16 missed, so she got a second person who got it in right away.  So

17 I think, you know, there are back-up plans.  I mean, IV access

18 failure is predictable in a healthcare setting.  Some people

19 have very tough veins.  People are obese.  People have some

20 diseases, diabetes, and can have bad veins.  But in this case,

21 they just did not have the technical ability to do this.

22 Q.   Okay.  Doctor, do you have an opinion as to whether a

23 firing -- ultimate opinion as to whether a firing squad is less

24 likely, much less likely to cause pain and suffering than the

25 use of midazolam to achieve unconsciousness in a three-drug

1    protocol?

2    A.    Yes, sir.  I believe the firing squad is a much, much

3    better option.

4    Q.    Okay.  And the implements needed for a firing squad are a

5    gun and bullets and people to shoot them.  Is that correct?

6    A.    Right.  I believe most law enforcement officers and prison

7    guards have expertise in this area.

8    Q.    Thank you.

9          MR. ROSENZWEIG:  I may not have moved for the formal

10   introduction of the Utah protocol, which was Exhibit 33.  If I

11   missed that, I move for its introduction.

12         MR. RUDOFSKY:  No objection.

13         THE COURT:  Exhibit 33 is admitted.

14         MR. ROSENZWEIG:  Could I have a second, Your Honor?

15         THE COURT:  You may.

16         MR. ROSENZWEIG:  I pass the witness.

17         THE COURT:  I want to make certain, Mr. Rosenzweig.

18   The Utah firing squad protocol I think is Exhibit 17.

19         MR. ROSENZWEIG:  33 I think I said.

20         THE COURT:  33 is the Ohio execution procedures.

21         MR. ROSENZWEIG:  I'm sorry.

22         THE COURT:  Make sure I'm not looking at the wrong

23   list.

24         MR. ROSENZWEIG:  17.

25         THE COURT:  Is it 17?

1          MR. ROSENZWEIG:  I'm sorry.  I wrote the wrong number

2    in my notes.

3          THE COURT:  That's all right.  I just wanted to make

4    sure we didn't have a mismatch.  17 is admitted.  I'll recognize

5    the State's continuing objection, and I've overruled that

6    objection in regard to relevance.

7          (Plaintiffs' Exhibit 17 received in evidence.)

8                         CROSS-EXAMINATION

9    BY MR. RUDOFSKY:

10   Q.   Good morning, Dr. Groner.

11   A.   Good morning, sir.

12   Q.   Happy Passover.

13   A.   Thank you.

14   Q.   You acted as a witness or affiant for the prisoners in the

15   state midazolam case.  Correct?

16   A.   Sir, I don't understand the question.

17   Q.   You are aware that there was a case brought in Pulaski

18   County Circuit Court about the midazolam protocol.  Correct?

19   A.   Yes, sir.

20   Q.   And you provided an affidavit in that case.  Correct?

21   A.   This affidavit that was referred to by Mr. Rosenzweig?

22   Q.   No.  I believe Mr. Rosenzweig was referring to the

23   affidavit in this federal case.  I'm talking about the state

24   case that happened two years ago.

25   A.   I believe that's correct.

1   Q.   Is this that affidavit?

2   A.   Yes, sir, it appears to be that.

3   Q.   And it's, obviously, a lot briefer than the affidavit that

4   you have provided in this case.  Correct?

5   A.   Yes, sir.

6   Q.   And, specifically, it doesn't include any information about

7   the Utah protocol.  Is that correct?

8   A.   Are you referring to what I'm looking at right here?

9   Q.   Yes.

10  A.   That appears to be correct, yes, sir.

11  Q.   And can I assume that's because the prisoners' counsel did

12  not ask you to investigate the Utah protocol at that point?

13  A.   Sir, I don't recall.

14  Q.   So you are not sure whether you investigated the Utah

15  protocol or not?

16  A.   I am not certain if I specifically reviewed the Utah

17  protocol at that time, the actual protocol, yes, sir.

18  Q.   And you understand that the Utah protocol was in effect at

19  this point.  Correct?

20  A.   Yes, sir.

21  Q.   Okay.  Now, in that affidavit, and I believe in the

22  affidavit you filed in this case, you wrote that execution by

23  firing squad, if skillfully performed, would result in nearly

24  instantaneous and painless death, and then you go on.  Is that

25  correct?  Did I read that right?

1   A.   Yes, sir.

2   Q.   And that's essentially the same thing that you had in your

3   affidavit and you've testified about here today.  Correct?

4   A.   I believe that's correct.

5   Q.   Okay.  But you are not here to offer an opinion on whether

6   or not it can be skillfully performed or would be skillfully

7   performed.  Correct?

8   A.   Again, I'm not sure I understand the question.

9   Q.   Sure.  I watched a TED Talk of yours, Dr. Groner.  So let

10  me just ask you this.  I understand you've only fired a gun on

11  one occasion.  Is that correct?

12  A.   I have fired a shotgun ten times on a single occasion.

13  That's correct.

14  Q.   Meaning ten shots.

15  A.   Yes, sir.

16  Q.   Okay.  That was, I think, when you were 13.  Correct?

17  A.   Yes, sir.

18  Q.   You haven't picked up a gun since then?

19  A.   I've not picked up a loaded weapon since then.  That's

20  correct.

21  Q.   You haven't shot a gun since then.

22  A.   Yes, sir.

23  Q.   So in your whole life, you haven't shot a rifle.  Correct?

24  A.   That's correct.

25  Q.   And you haven't shot a handgun.  Correct?

1  A.   Yes, sir.

2  Q.   You haven't witnessed a firing squad, I'm assuming.

3  A.   I have not witnessed a firing squad.

4  Q.   So you wouldn't consider yourself an expert in marksmanship

5  or an expert in firearms, would you?

6  A.   I am not an expert in marksmanship.  I spent a fair amount

7  of time studying firearms, because of caring for those patients,

8  obviously, it allows a certain curiosity about bullet sizes and

9  weapons, and those come up in discussion in terms of caring for

10  patients with gunshot wounds.

11  Q.   And I fully understand that.  That makes a lot of sense to

12  me.  But you wouldn't consider yourself an expert in that field

13  in the same way you would consider yourself an expert in the

14  heart, for example.

15  A.   So are you asking if I consider myself an expert in

16  marksmanship?

17  Q.   In marksmanship and in firearms.

18  A.   That's correct.  I am not an expert in marksmanship or

19  handling firearms.

20  Q.   Let me ask you this, sir.  Do you oppose the death penalty?

21  A.   Yes, sir.

22  Q.   And you are a particularly passionate opponent, as I

23  understand, of lethal injection as a method of execution.

24  Correct?

25  A.   Well, I would say that if capital punishment in the United

1   States had not evolved towards lethal injection, I probably

2   never would have become involved.  But I became interested in

3   the issue because I felt that physicians and healthcare

4   professionals were being dragged into a place where they didn't

5   belong.  And, in fact, one of the papers I wrote, which you've

6   probably read, refers to lethal injection as a medical charade.

7   Q.    It also calls lethal injection a stain on the face of

8   medicine.

9   A.    That's correct.

10  Q.    And you are not just talking about the midazolam protocol

11  specifically.  You are talking about all lethal injection.

12  Correct?

13  A.    That's correct.

14  Q.    Okay.  In fact, you've made the analogy in numerous

15  articles that lethal injection, as used in the United States, is

16  similar to certain programs carried out by the Nazis.  Correct?

17  A.    I think that that would be an oversimplification of the

18  statement, sir.

19  Q.    So let me ask it to you this way then.  You wrote an

20  article called "Lethal Injection and the Medicalization of

21  Capital Punishment in the United States."  Correct?

22  A.    That's correct.

23  Q.    Okay.  And one of those headings, subheadings in the

24  article, is "Nazi Technique for Mercy."  Is that correct?

25  A.    That's correct.

1   Q.    And another one of those headings is "The Final Solution

2   for a Growing Death Row."  Is that correct?

3   A.    That's correct.

4   Q.    And at the end of this article, is it correct that you

5   wrote:  "If it is wrong and corrupting for physicians, nurses

6   and technicians to participate in capital punishment, then it is

7   also wrong for everybody else"?

8   A.    That's correct.

9   Q.    And as I understand your position, one of the problems you

10  have with lethal injection is that, in your words,

11  paraphrasing -- but generally in your words -- it creates a

12  veneer of sort of the mentality or respectfulness that you think

13  leads to the increases in executions.  Is that correct?

14  A.    I think that the point is that the medical community's sort

15  of respectability is used to justify capital punishment.

16  Q.    I think you've written about, at least as a correlative

17  effect, that since we started to have lethal injection and this

18  veneer of respectability, the number of executions have gone

19  back up.  Is that correct?

20  A.    That's correct.  But I would say those articles are a

21  little bit old.  In fact, as I'm sure you are aware, the trend

22  has reversed now.

23  Q.    I am, mostly because of litigation, but I am.  Let me ask

24  you this.  In terms of the firing squad, is one benefit of the

25  firing squad, in your view, that it requires people to come

1    face-to-face with what they are actually doing in more of a sort

2    of direct sense than lethal injection?

3    A.    The firing squad clearly removes that veneer of medical

4    respectability of it, yes, sir.

5    Q.    So that's one benefit you think for using a firing squad.

6    Correct?

7    A.    Yes, sir.

8    Q.    You can't tell us, with the firing squad, whether the

9    marksmen will hit their mark a hundred percent of the time,

10   75 percent of the time, 50 percent of the time or 25 percent of

11   the time.  Correct?

12   A.    That's correct.

13   Q.    Okay.  And you would agree that under the Utah protocol

14   that the patient -- the prisoner is conscious during this firing

15   squad.  Correct?

16   A.    That's correct.

17   Q.    And, obviously, if the marksmen missed their mark, getting

18   the shot, and, whatever you think, whether it's one to two

19   seconds of consciousness or 10 to 15 seconds of consciousness if

20   they hit their mark, you would agree if they missed their mark,

21   we're talking about a significant amount of pain.  Correct?

22   A.    I think the -- I mean, if you read through the protocol the

23   way they have it set up, the dimensions and so forth, it's

24   designed to assure success, in terms of the range and the

25   caliber of the weapons used and the barrel length of the weapons

1    used.  I mean, the people who wrote the protocol designed it for

2    success.

3    Q.    And you understand the protocol specifically anticipates

4    the idea that the first volley might not either kill the person

5    or render him unconscious, and they provide specifically for a

6    second volley.  Correct?

7    A.    I understand there's a provision for a second volley.  I'm

8    not aware that it has ever been used.

9    Q.    And are you aware that it hasn't been used?

10   A.    Please restate the question.

11   Q.    Are you aware that a second volley has not been used?  Are

12   you affirmatively aware one way or the other, or you are just

13   not aware at all?

14   A.    No.  I would say the former.  I am not aware that a second

15   volley has been used.

16   Q.    And you understand the protocol calls for a second volley

17   because, as you said, the people who set up the protocol know

18   what they have to consider.  And in their view, it appears, at

19   least from the protocol, that there's a potential that the first

20   volley won't render you unconscious.

21   A.    That's correct.

22   Q.    And you would agree, if you are not rendered unconscious

23   and you are shot, we're talking about a significant amount of

24   pain and suffering, wouldn't you?

25   A.    If someone was shot and not rendered unconscious, that

1    person would experience pain.

2    Q.    Four to five bullets.  Right?

3    A.    That's correct.

4    Q.    Okay.  Dr. Groner, I understand that you suggest that it

5    takes one to two seconds.  If everything goes according to plan,

6    it takes one to two seconds to lose unconsciousness.  Obviously,

7    as you know, Dr. Antognini says it takes 10 to 15 seconds.  If

8    Dr. Antognini is right, you would agree that there's a

9    significant amount of pain and suffering in getting shot.

10   Correct?

11   A.    Are you saying -- excuse me, sir.  Can I just ask you to

12   restate it?  You said loss of unconsciousness.  You said loss of

13   consciousness --

14   Q.    I appreciate that clarification.  Let's assume Dr.

15   Antognini is right, that it takes 10 to 15 seconds for the blood

16   flow to stop to the brain and for you to lose consciousness.

17   Would you agree in that situation that there is a significant

18   amount of pain and suffering from being shot with five bullets

19   or four?

20   A.    So 15 seconds of pain, and then the person is totally

21   unconscious and can't experience anything anymore?

22   Q.    Yes.  That's what I'm asking you.

23   A.    So I think -- I mean, that becomes a bit of an existential

24   question.  So having met someone who is stuck with needles for

25   two hours, comparing that to someone who had significant pain

1    for 15 seconds, it's hard to know which is worse.  You know, to

2    me --

3    Q.   Can I just -- I just want to make clear -- and it's fine if

4    you are.  Is your testimony that really being stuck with needles

5    -- and I don't know if there was lidocaine or not -- but being

6    stuck with needles for a number of attempts is more painful than

7    getting shot with five bullets and being conscious for it for at

8    least 15 seconds?

9    A.   I think you have to -- I mean, the IV insertion practice/

10   stuck with needles is an oversimplification.  So a couple of

11   weeks ago, I went to give blood.  And the phlebotomist put the

12   needle in my arm and didn't hit the vein.  So she pulled it out

13   and wiggled it a little bit and stuck it again and pulled it out

14   and wiggled it, stuck it again and pulled out too much, and

15   blood squirted across my arm, onto my pants.  It's not literally

16   just stuck with needles.  I mean, it's more than that.  And

17   there's a certain amount of mental anguish maybe, anticipating

18   one's death and being stuck repeatedly by intravenous needles.

19   I think stuck with needles is an oversimplification.

20   Q.   Fair enough.  Can we at least assume that they are both

21   very painful experiences?

22   A.   I would say they are both very painful experiences.  One

23   was two hours, and the other was 15 seconds.

24   Q.   Okay.  You said a couple of things on direct that I wanted

25   to ask about, just to make sure I got them right.  I think the

1   first thing you said was reflexes.  I think you were talking

2   about the clenching of the hand.  I just want to make sure I got

3   it right.  Reflexes don't necessarily mean pain and suffering.

4   Is that accurate?

5   A.   So I think there was a specific circumstance, so I can't

6   say -- I have to be careful about generalizing.  In this

7   specific instance, where someone was shot in this location, that

8   a reflex, clenching of the hand, does not mean that there was

9   pain and suffering.

10  Q.   So you would have to know about all the different

11  circumstances to figure out whether a reflex necessarily means

12  pain and suffering or not.  Sometimes it does.  Sometimes it

13  doesn't.  Is that your --

14  A.   I was referring to the specific circumstance of this.

15  That's correct.

16  Q.   Second, I think what I heard you say is that midazolam does

17  not render you deeply unconscious.  Was that your testimony?

18  A.   I believe I said that it does not render someone deeply

19  unconscious for an operation.

20  Q.   So you would agree it renders you unconscious.  Your

21  argument is just how much unconscious.  Is that right?

22  A.   That's correct.

23  Q.   Okay.  Then I also think on direct I heard you talk about

24  not being able to generalize from animal and in vitro studies to

25  human studies.  Is that right?

1   A.   I think there was a specific reference to a specific study

2   involving mice, I believe.

3   Q.   So is your position that sometimes you can't use animal and

4   in vitro studies to predict human results but sometimes you can?

5   A.   No.  I don't think I said that.

6   Q.   No.  That's what I'm asking.  The way I understood your

7   testimony is that you would never consider just an animal and in

8   vitro study enough to determine what was going to happen in a

9   human.  At least that's how I understood your testimony.  I'm

10  just asking you, is that what you meant?

11  A.   No.  I mean, certainly we rely on animal studies for

12  research.  The specific question of because midazolam -- again,

13  I don't have the study in front of me -- appeared to cause

14  general anesthetic-like properties in animals does not always

15  mean it's translatable into a human.

16  Q.   And you would agree then that's true for the reverse of

17  midazolam too.  In studies that talk about when midazolam might

18  or might not cause unconsciousness, animal and in vitro studies

19  are not going to tell you what it's going to do in humans.

20  Correct?

21  A.   I'm still a little confused here.  I'm sorry.  I think that

22  it is known that some drugs act differently in animals than

23  humans, if that's what you are asking.  That's a little far off

24  from the discussion.

25  Q.   Let's move on.  Again, I think I got the underlying

1   proposition, which is you are not always prepared to use animal

2   and in vitro studies to figure out what's going to happen in

3   humans.  Is that right?

4   A.    That's correct.

5   Q.    Just a couple more questions.  Have you read the Arkansas

6   Department of Corrections protocol regarding midazolam and also

7   regarding the injection of midazolam?

8   A.    Yes, sir.  I believe I have read that protocol.

9   Q.    And so you understand, A, what they are going to do; and,

10  B, that they will use lidocaine if they need to insert the IV

11  and they are having trouble?  Correct?

12  A.    I don't recall that specifically.

13  Q.    So you didn't know they were going to use lidocaine?

14  A.    My recollection of the protocol -- again, I don't have it

15  in front of me -- that lidocaine was an option, but it's not

16  required.

17  Q.    Okay.  Have you read the ADC's protocol regarding the

18  training of folks on the IV team?

19  A.    I have read qualifications, I believe, of who they might

20  be.

21  Q.    And your position is those qualifications are not enough.

22  A.    My position is that the letters after your name do not

23  always imply experience.  For example, a protocol may call for a

24  physician to place a central line.  Only a very tiny portion of

25  physicians actually know how to place central lines.  And to

1   place central lines, you actually have to have a lot of

2   experience to be able to do it well.

3   Q.   I'm not really talking about a central line right now.

4   We're just talking about the original line they are going to

5   place.

6   A.   Right.  So, again, I would say that the letters after your

7   name don't always say how much experience you have in that

8   field.  You have to have clinical, daily experience.

9   Q.   Let me move back just for one more -- actually, let me ask

10  you a question about patients.  I understand that part of your

11  direct testimony was that one of the ways you understand how

12  long it's going to take to lose consciousness when you get shot

13  in the heart is because you've, obviously, done a lot of

14  operations on people who have been shot in the heart.  Is that

15  correct?

16  A.   Yes, sir.

17  Q.   Most of these patients, I'm assuming, do not reach you

18  until numerous minutes after they have been shot in the heart.

19  Right?  I assume it's not -- you don't get them a minute after

20  they have been shot or two minutes after they have been shot in

21  the usual case.  Is that correct?

22  A.   It depends on your timeline.  Having worked in urban trauma

23  centers, sometimes they come to us very fast.  I can't say it's

24  less than a minute.

25  Q.   When you say "very fast," what do you mean?  Do you mean

Groner - Redirect                                                613

1  like five minutes?

2  A.    Probably three or four is probably the fastest ever, you

3  know, someone who is shot across the street from the hospital or

4  something like that.

5  Q.    And I would assume that's the rare instance.  Most are a

6  little longer?

7  A.    Yes, sir.

8  Q.    As an average, what would you say the amount of time is

9  where you get folks, from all the surgeries you've done?

10 A.    You will have to define the question.  A trauma patient is

11 shot in the heart?

12 Q.    Yes.

13 A.    So probably four to five minutes, probably some of those

14 patients have had lifesaving things before they got to us, which

15 may sort of blur the lines a little.  They may have already

16 gotten blood and so forth.  But four to five minutes, we'll say.

17         MR. RUDOFSKY:  I think that's it.  Just one second,

18 Your Honor.

19         THE COURT:  You may.

20         MR. RUDOFSKY:  Pass the witness.

21         THE COURT:  Redirect.

22                     REDIRECT EXAMINATION

23 BY MR. ROSENZWEIG:

24 Q.    Doctor, just a very few questions.  Those persons who have

25 reached you while still alive, they did not receive a

1   large-caliber gunshot wound to the left ventricle.  Would that

2   be correct?

3   A.   That's correct.

4   Q.   Now, if I understand correctly, you think that Dr.

5   Antognini's estimate of 10 to 15 seconds of consciousness is too

6   high in your experience.  Is that correct?

7   A.   That's correct.

8   Q.   Then, thirdly, whatever your position is on the death

9   penalty and physician association with it, does that change the

10  science of blood exsanguination and loss of consciousness?

11  A.   No, it does not.

12  Q.   That's all I have.

13          THE COURT:  Anything further?

14          MR. RUDOFSKY:  No, Your Honor.

15          THE COURT:  Thank you.  You may step down.

16      Please call your next witness.

17          MR. RUDOFSKY:  Your Honor, I apologize for

18  interrupting.  I've just been handed a note by one of my

19  colleagues that says we have a confidential matter that needs to

20  be taken up with the Court at our next break, if the courtroom

21  can be closed for that or if we can do it at the front of the

22  room.

23          THE COURT:  I don't know.  Is it urgent?  Do we need

24  to take a break and do it now?

25          MS. CRYER:  Yes.

1          THE COURT:  Why don't we go ahead.  Why don't you go

2    ahead and approach the bench, and we'll turn on the white noise.

3    And we'll talk about what this issue is.

4        [Proceedings under seal under separate cover.]

5          THE COURT:  We're going to take a recess.  The Court

6    will be back out in a few minutes.  You all may stand in recess.

7    Let's just say about ten minutes, five till.

8        (Recess at 9:45 a.m.)

9                    REPORTER'S CERTIFICATE

10      I certify that the foregoing is a correct transcript from
     the record of proceedings in the above-entitled matter.

11

12   /s/Elaine Hinson, RMR, CRR, CCR      Date:  April 12, 2017
     United States Court Reporter

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (Proceedings continuing in open court at 9:56 AM.)

2               THE COURT:  If we could meet at the bench.

3          [Proceedings under seal under separate cover.]

4               THE COURT:  Are we ready to call our next witness?

5               MS. MERRITT:  Yes, Your Honor.  The state calls

6     Dr. Daniel Buffington, please.

7          **DANIEL BUFFINGTON, DEFENDANTS' WITNESS, DULY SWORN**

8                         DIRECT EXAMINATION

9     BY MS. MERRITT:

10    Q    Good morning, Dr. Buffington.

11    A    Good morning.

12    Q    I'm going to start by handing to the Court and the court

13    reporter a document that was inadvertently omitted as an

14    attachment to your report that you submitted in this matter,

15    your CV.  I've already provided that to opposing counsel both

16    via e-mail as well as a hard copy today.

17         And if I could approach, Your Honor?

18              THE COURT:  You may.  Do you want to add this or

19    make it a new exhibit?

20              MS. MERRITT:  I've marked it Exhibit 72.  I've moved

21    for admission, Your Honor.

22              THE COURT:  I will recognize the objection to the

23    admission in regard to Dr. Buffington based upon the motion in

24    limine.  I ruled on that yesterday in an informal way, but

25    since I've let all the other science in, I will let

 1   Dr. Buffington testify without addressing the *Daubert* issues at

 2   this point in regard to his testimony.  Because this testimony

 3   is being presented to the bench at the preliminary injunction

 4   stage, I will allow it to come in and give it the weight that I

 5   think is appropriate.  So, recognizing that objection, is there

 6   anything else in regard to Exhibit 72?

 7              MR. WILLIAMS:  No, Your Honor.

 8              THE COURT:  72 is admitted.

 9              MS. MERRITT:  Thank you.  In addition, Your Honor,

10   the State moves for admission of Defendants' Exhibit 4, which

11   is the declaration of Dr. Buffington.

12              THE COURT:  Aside from the objection that I just

13   articulated that I anticipate you will make and that I will

14   overrule at this stage of the proceeding, anything else in

15   regard to his report?

16              MR. WILLIAMS:  No.

17              THE COURT:  All right.  Defense Exhibit 4 will be

18   admitted.

19        (Defendants' Exhibits 72 and 4 received in evidence.)

20   BY MS. MERRITT:

21   Q    Dr. Buffington, can you please explain to the Court a

22   little bit about your educational background.

23   A    Yes.  I did my undergraduate training in biochemistry and

24   biology at the University of South Florida.  I did a doctorate

25   of pharmacy degree at Mercer University in Atlanta, Georgia,

1    that's a PharmD degree, and I also did a post-graduate

2    residency and fellowship in clinical pharmacology at Emory

3    University in Atlanta.  And subsequent to that, completed an

4    MBA with a healthcare focus as well.

5    Q    You said that you -- as a PharmD, can you tell the Court

6    a little bit about the pharmacology and toxicology course work

7    that would be included in that degree?

8    A    Yes, ma'am.  So it is a degree that supports many

9    different professional practice roles.  The pharmacology

10   training, the volume of that degree and curriculum exceeds that

11   which you would find in medical school in terms of total number

12   of courses, diversity of courses, depth and focus.  It is also

13   a longer duration of pharmacology core curriculum than you

14   would find in a Ph.D. program as well.  For example, a Ph.D.

15   program would be undergraduate which may not be pharmacology, a

16   master's which may not be pharmacology, and then once you enter

17   a Ph.D. program, it may only be a year or pharmacology courses

18   blended then into bench research.

19        So the difference is, a PharmD is a clinical practitioner

20   with the skills of both pharmacology, the desired therapeutic

21   effect, and toxicology, the study of the adverse effects of

22   medications on the human body; is then a practitioner who has

23   direct patient care responsibility roles in various healthcare

24   practice settings; is a consultant to physicians, to nurses, to

25   nurse practitioners on appropriate prescribing, safe medication

1    practice use.  It involves the training on clinical research

2    design and development, so working directly as either

3    investigator-directed studies or FDA-related drug development

4    pathway.  There's four phases of human study.  So the

5    curriculum is very extensive and prepares the most advanced

6    pharmacology practitioner in the marketplace.

7    Q      You mentioned toxicology in that description.  Can you

8    explain to the Court, is there anything else about toxicology

9    and your toxicology education, training, or experience that is

10   relevant in this matter?

11   A      I think beyond the standard toxicology components in the

12   core curriculum, I also had an extensive amount in the

13   residency and fellowship that went into additional forensic

14   capacity.  So therapeutic drug monitoring, laboratory

15   assessment, various body fluid samples, both antemortem --

16   pre-mortem for clinical use, but also postmortem for cases, and

17   that's part of what I do professionally as well is providing

18   postmortem analytic review for cases.

19   Q      Do you provide consultation to doctors,

20   anesthesiologists, and other healthcare professionals in a

21   direct patient care setting?

22   A      Yes.  As a matter of fact, I have a specialty practice in

23   the area of clinical pharmacology located in Tampa.  I'm on the

24   faculty at the University of South Florida's College of

25   Medicine and College of Pharmacy, and was also previously on

Buffington - Direct

1    with the college of nursing and taught their pharmacology

2    course, their advanced course for their nurse practitioners for

3    several years.

4          In addition to that, in a private practice level, I have

5    a consult service where patients are referred for clinical

6    evaluation for drug testing, for recommendations in guidance on

7    therapeutic decision-making to redirect therapies for

8    appropriate and safe use.  We also provide pharmacogenetic

9    testing, which is looking at how the body -- each of us in this

10   room may metabolize a same medication differently.  Different

11   rates need different amounts.  That's another component of what

12   we do, and provide clinical practice.

13         So, yes, I work with patients who are referred to our

14   practice, I work with patients who are in the emergency

15   department setting, who are in ICU settings, who are in

16   operative settings, providing consultative support for those

17   practitioners obviously on pharmacology decision-making.

18   Q    Do you also have a role in advising the federal

19   government, the Center for Medicare and Medicaid Services, with

20   regard to these issues?

21   A    I do.  For about four years now, I've served as

22   medication safety expert for Department of Health and Human

23   Services, specifically with CMS or Medicare and on several of

24   the large healthcare reform health improvement research

25   projects, and in each of those cases, including the project I'm

Buffington - Direct                                            621

```
 1   working on now, it's to improve medication use and safety.
 2   Q      And are you a licensed pharmacist as well?
 3   A      I am, in both Florida and Georgia.
 4   Q      And can you explain to the Court a little bit about the
 5   different roles that a licensed pharmacist might provide in our
 6   society?
 7   A      Sure.  Well, that really describes a title or typically a
 8   practice setting, but you could see that in what you think of
 9   stereotypically a traditional community practice setting.  But
10   it could be in a hospital setting providing consultative
11   support for various clinical teams, hospitalists, ICU,
12   infectious disease or doing clinical research on an inpatient
13   basis.  There's also a managed care, helping to design drug
14   benefit design, what comes with your insurance in terms of
15   access, but also PharmD's serve in leadership roles in research
16   and administration in government agencies like the FDA, like
17   DEA, leadership roles in pharmaceutical drug development design
18   teams.  It's quite extensive.
19   Q      Are you also involved in professional organizations
20   related to toxicology or pharmacology?
21   A      Yes, ma'am, numerous.
22   Q      Those are all in your CV?
23   A      Yes.
24   Q      Have you also provided expert opinions to courts around
25   the country in a variety of topics?
```

Buffington - Direct

1    A    Yes, in my professional career probably starting in about

2    early 1990s.  And it varies from year to year, the nature.

3    They could either be medical malpractice, questions about

4    medical decision-making and medication management, adverse side

5    effects, criminal cases, custody concerns, estate settlements.

6    It's amazing where pharmacology finds its way into the court.

7    Q    Have you ever been disqualified as an expert witness by

8    any court?

9    A    No, ma'am, I have not.

10   Q    How many times have you testified in court as an expert

11   witness?

12   A    Probably somewhere between 150 and 200 times over the

13   years.

14        MS. MERRITT:  At this time, Your Honor, I'm going

15   to, for the record, tender Dr. Daniel Buffington as an expert

16   witness in the areas of pharmacology and toxicology.

17        THE COURT:  I will take the same approach, which is

18   you may proceed with your questioning.  I'm not going to

19   recognize anybody in any particular areas.  You may go and it's

20   all subject to cross.  Go ahead.

21   BY MS. MERRITT:

22   Q    Let's talk about -- I want to cut to the chase.  So the

23   State retained you when in lethal injection litigation,

24   Dr. Buffington?  Do you recall?

25   A    In the Arkansas --

1   Q       How long have you worked with the State of Arkansas with

2   regard to its lethal injection protocol?

3   A       I think since 2015.

4   Q       Okay.  And in the course of your work, is this the first

5   time that you've looked into the issues of midazolam and

6   whether it might be effective for use in a lethal injection

7   procedure?

8   A       No, ma'am, not at all.

9   Q       Can you tell the Court a little bit about your prior

10  experience consulting with states in the area of lethal

11  injection specifically?

12  A       Yes.  So I had the opportunity to work with various

13  individuals in my own state in Florida, but also in Ohio,

14  Georgia, Alabama, I think California as well.  Numerous states.

15  Q       And have you conducted a thorough search of the available

16  scientific literature in an attempt to reach a conclusion about

17  whether the use of midazolam as the first drug in a three-drug

18  lethal injection protocol would be sure or very likely to cause

19  an inmate to suffer needlessly?

20  A       Yes, I have.

21  Q       And have you formed an opinion on that matter?

22  A       I have.

23  Q       What is that?

24  A       That the pharmacologic effects after the proper

25  administration of midazolam 500 milligrams IV as described in

Buffington - Direct

1   the ADOC's lethal injection protocol, specifically Attachment

2   C, and I think it's dated 8/6/2015, is sufficient to produce

3   sedation, anterior grade amnesia, and induce significant

4   reduced level of consciousness so that the individual would not

5   experience severe pain upon the timely administration of the

6   second and third drugs employed in the procedure.

7   Q    Thank you, Doctor.  And just your report which we have

8   admitted in evidence as Defendants' Exhibit No. 4, it lists a

9   number of references at the end of the report, correct?

10  A    That is correct.

11  Q    And did you rely upon all of those references in forming

12  your opinion in this case?

13  A    Yes.  I felt they were relevant to help explain or serve

14  as demonstrative for the points.

15  Q    In the course of preparing for this hearing today, I

16  asked you to further kind of narrow down what you considered to

17  be the very key scientific references that support your

18  opinions in this matter.  Right?

19  A    Correct.

20  Q    And what we've done is, we have attached those articles

21  as Defendants' Exhibit 12, which is the Liu article which is

22  already in evidence, and then we've also attached Defendants'

23  Exhibit 26, 29 -- I'm sorry, let me take that back.  Pardon me,

24  I misspoke.  We also attached Defendants' Exhibit 35, which is

25  a Bulach article, Defendants' Exhibit 36, the Arendt article.

Buffington - Direct

```
 1    Let me put it up here so everyone can see.  This is my working
 2    copy of the exhibit lists and I was reading off exhibits that
 3    were already in.  The Liu is already in in Exhibit 12.  You've
 4    told me that we need to talk about or at least show the Court
 5    Defendants' Exhibits 35, 36, 43, and 50.
 6    A     Correct.
 7    Q     So, in your opinion, those are really the key articles
 8    that support your opinions in this case?
 9    A     Yes, ma'am.
10              MS. MERRITT:  And at this time, Your Honor, I would
11    move to introduce Defendants' Exhibits 35, 36, 43, and 50.
12              THE COURT:  Any objection?
13              MR. WILLIAMS:  No objection.
14              THE COURT:  Those are admitted.
15         (Defendants' Exhibits 35, 36, 43, 50 received in
16    evidence.)
17              MS. MERRITT:  I also move to admit Defendants'
18    Exhibit 70, which is the Veselis article which you also
19    identified for me.
20              THE WITNESS:  Correct.
21              THE COURT:  Any objection to that, Defendants'
22    Exhibit 70?
23              MR. WILLIAMS:  No objection to 70.
24              THE COURT:  70 is admitted as well.
25         (Defendants' Exhibit 70 received in evidence.)
```

BY MS. MERRITT:

Q      Let's discuss your opinion in a little more detail.
We're going to break it down into pieces.  Why is it important,
in your opinion, that -- you say a properly administered dose.
Why is that important?

A      Sure.  So as you would think of in any clinical practice
setting -- and to a great extent I'm looking at the basis of my
opinion as comparing to what we see in clinical practice to
what's being done or ascribed in the procedure itself.  So it
would be imperative that each drug is serving a specific
desired role in the process, so you want to make sure that they
have their full and effective pharmacologic properties
introduced.  You want to make sure that the medications are
able to be absorbed, distributed, metabolized, and eliminated
in a proper fashion and that they can provide the role that
they're ascribed.

Q      So have we had situations -- we've heard about Lockett.
You've been in the courtroom this week, right?

A      Correct, and familiar with the case.

Q      You're familiar with the Lockett case.  So in your mind,
did that execution, did they experience a problem with this
element, the proper administration of the drug?

A      They do.  Including some of the testimony that we heard
from an eyewitness is that it appears that that was not a
medication-related issue at all but an administration-related

Buffington - Direct

1   issue, so a IV placement error.

2   Q     Because the IV was not placed properly, was the drug

3   absorbed fully by Mr. Lockett?

4   A     Based on the testimony we heard, that would be in

5   question.

6   Q     Would it be possible that he would have received the full

7   dose of midazolam when he had a bulging part on his body where

8   the drugs had infiltrated?  You think it's possible that he

9   received the full dose, or probable even?

10   A     It is possible.  It is less likely and it would have

11   extended the time so it would not have been as it would be

12   described in the ADOC protocol.  And, in fact, that was a

13   different drug protocol.

14   Q     Which would also affect the distribution of the drug

15   through the body?

16   A     That is correct.

17   Q     Why is a 500-milligram dose of midazolam sufficient for

18   use in Arkansas's lethal injection protocol?

19   A     Yes, ma'am.  I think it's important for this entire

20   discussion to focus on what we do know about the products and

21   not simply what we may theorize about the products.  With

22   particular on midazolam, we know that it has very unique

23   pharmacologic properties and characteristics, some of which

24   limit its use in clinical practice or refine it to certain

25   applications.

1    Q     Let me stop you there.  Why is midazolam perhaps not the

2    ideal number one choice of an anesthesiologist when he's

3    looking at inducing and maintaining a general anesthesia for a

4    surgical procedure?

5    A     I'll assume that the interpretation of your question is

6    as a sole agent?

7    Q     Correct.

8    A     Okay.  So from that perspective, it does an excellent job

9    of helping as it's already indicated for, the literature and

10   the FDA approvals have defined that.  It is very capable of

11   providing a rapid induction of general anesthesia, which means

12   in higher doses, and we use midazolam, many different forms or

13   fashions, for different types of procedures.  But if you're

14   saying why would you not use it or why it is less desirable in

15   other commercially available products is that while it is fast,

16   it is also fleeting.  So in comparison to a major surgery, an

17   extensive surgery that may take hours, the necessity to re-dose

18   to sustain the level of sedation to deep sedation and general

19   anesthesia, which it's capable of, would actually not be safe

20   for the patient from a patient safety perspective because you'd

21   be providing excessive quantities in rapid fashion to the point

22   that you're giving too much to that patient and making the

23   management of the patient's vital signs and stability in

24   question.

25         So it serves a great role as a rapid fashion to induce

1    induction, which is actually not an onramp to general

2    anesthesia; it is reaching levels of general anesthesia.  And

3    then at that point, it can be used as we've heard in other

4    testimony, in combination with other medications.  So that's

5    where the art and science of medication prescribing and

6    decision-making come in.  So it's ideal in that early role.

7          As it relates to the lethal injection protocol, if the

8    entire duration of the process is short, then the question

9    logically comes in, is it within the duration of the effect you

10   would see from midazolam, and it is.  So there's really not a

11   question here in this case of why would you desire to have

12   maintenance of anesthesia if the entire protocol or process is

13   from start to finish short in duration.

14   Q    So the efficacy of using midazolam to maintain general

15   anesthesia, that's not even relevant in your opinion, right?

16   A    That is correct.

17   Q    For the reasons you just stated?

18   A    Correct, because the lethal injection protocol, based on

19   the time and duration, does not necessitate maintenance.  It

20   necessitates the induction of a low level of anesthesia and

21   then the rapid administration of a second and a third drug,

22   each playing their own role.  So to attempt to isolate out

23   midazolam alone is not relevant because it's playing a role

24   with two other products.  The expectation to say you need

25   maintenance is not clinically relevant either if the entire

1    duration is short.

2    Q     Doctor, do you know what the typical induction dose would

3    be for a patient to get them to that level of general

4    anesthesia quickly, as surgeons do often in hospitals?

5    A     That's going to vary from the surgeon's decision and the

6    nature, so this is where the art and science comes in, the

7    depth of what they need for a particular procedure, what

8    they're going to do during that procedure, and their

9    anticipated duration.  But typically it's .2 to .3 milligrams

10   per kilogram, so based on body weight.  But I've seen upwards

11   of .4, .5.

12   Q     So 20 to 30 milligram dose of midazolam would typically

13   be sufficient to induce general anesthesia?

14   A     Routinely.

15   Q     And how long -- the duration of that dose, how long would

16   the patient in your opinion stay in that deeply sedated general

17   anesthetic state upon the administration of a normal clinical

18   dose, 20, 30 milligrams?

19   A     I would encourage augmenting the question to say what is

20   the pattern of the effect.  So after the administration within

21   five to ten or 15 minutes is when we see the sedation drop, so

22   you can administer this to someone, even a 20 and 30 milligram

23   dose, and there's no necessity based on the way the individuals

24   absorbing and processing that they're going to be asleep in

25   three minutes, in five minutes.  So you've got a ten, roughly

1  an average ten-minute window to see the individual drop to

2  level of sedation.  Then you would say it's going to be patient

3  dependent, but anywhere from 30 minutes to an hour or longer

4  for the duration of that effect.

5  Q     And would the onset of action with midazolam, does that

6  get faster as the dose increases?

7  A     It does, faster and greater.  So it's a term that we use

8  in pharmacology called dose-dependent effect.  The lower the

9  dose, the lesser the effect.  The greater the dose, the greater

10 the effect.  And when we say effect, it's important especially

11 for this conversation is that we speak of what are the desired

12 effects.  There is sedation, there is anesthesia.  There's also

13 a very key pharmacologic property with midazolam which is why

14 we use it routinely in clinical practice as two products,

15 midazolam and a different category product, propofol, carry

16 with it the ability to induce anterior grade amnesia so that

17 whatever you have done during that procedure, you don't recall.

18 You wake up from the procedure and you have no recollection of

19 the discomfort, the pain, what transpired.  The higher that

20 dose, the greater the degree of amnesia and the duration post

21 the event.

22 Q     Why is the amnestic effect important?

23 A     If you're having any type of painful procedure, whether

24 that's a diagnostic procedure like a colonoscopy, whether it's

25 a cardiovascular procedure, whether it's a Cesarean section,

1   whether it's resetting of a major bone fracture, there are
2   substantial pain that may occur, and the ability to have that
3   procedure performed and have no recollection after the
4   procedure is a significant advantage.
5   Q     So, Doctor, would you expect that a 100-milligram dose of
6   midazolam, for example, would have a much faster onset as well
7   as duration of action as compared to a typical clinical 20,
8   30-milligram dose?
9   A     Maybe slightly faster, but I wouldn't say we're
10  significantly changing the rate of onset.  But it's definitely
11  associated with a longer duration.
12  Q     And what about a 500-milligram dose of midazolam?
13  A     The only doses of 500 that I'm aware of have resulted in
14  death, so I'm not familiar with any clinical practice.  The
15  highest dose I've seen in clinical practice is for patients
16  with status epilepticus, and I've seen upwards of 80 to
17  100 milligrams administered over a period of time.
18  Q     Okay.  So do you have an opinion about how long an inmate
19  in Arkansas who would be administered a 500-milligram dose of
20  midazolam, how long they would stay in that deep general
21  anesthesia level?  Do you have an opinion on that?
22  A     Well, as we've already stated and what we know from the
23  literature on the product is at doses far less than that, you
24  could expect an hour.
25  Q     An hour, okay.  What is pain?

1  A      Pain is actually a perception.  So you can have

2  analgesics, medications that help to block pain impulse, but

3  you can also have anesthetics, medications that help to

4  decrease your capacity to sense things around you.  So it could

5  be alertness, but it could also be as we've seen in testimony

6  in this trial, effects on your vital signs.

7         So pain is in and of itself a not universal.  We could

8  take the same amount of pressure in a pinch and pinch ten

9  people and they're not going to all say they feel the same

10  thing.  You can have pain that is very light to where it's

11  discomfort or you could have pain that's the other end of the

12  spectrum or a continuum that would be severe.

13        So we typically use a zero to ten pain scale system to

14  have patients help articulate because we can't measure pain.

15  The person has to articulate if they felt a sensation and to

16  what degree or magnitude and how they would articulate it.  So

17  the term, the entire process of describing pain impulses, is

18  called nociception, and nociception is a series of receptors

19  that help to convey from wherever the pain started.  And the

20  pain could be thermal, so it could be temperature.  The pain

21  could be pressure, so you could get pinched.  If you've ever

22  pinched your finger in a door frame or in a car door or

23  something, that can be painful and temporary or fleeting.  Or

24  it could be a wide variety of other stimulus.

25        So we refer to nociception as noxious stimuli.  So it's

1    very important to understand that noxious stimuli does not

2    equate to severe pain.  The term when we use that medically is,

3    it means a stimulus.  So touch, pressure, temperature, that is

4    sufficient to signal the nociception process.  And with

5    nociception, you can also have, like when we talked about

6    reflexes or body movements that are related to nociception that

7    don't equate to severe pain.  So it's important that pain could

8    be discomfort, but it could also be excruciating and the two

9    are not the same.

10   Q     In that regard, can you talk a little bit about the

11   reflexive action that we might see during a surgical procedure

12   that doesn't -- and how that equates to pain?

13   A     Sure.  So that's perplexing for many, but even during a

14   period of neuromuscular blockade where a medication is

15   administered to restrain the patient from being able to move

16   during a particular procedure, or an anesthetic or a medication

17   that reduces your level of sedation, and as we've heard, that's

18   a continuum, in the course of those, you can have autonomic

19   reflex actions that are not purposeful or not necessarily

20   indicative of a level of noxious stimuli.  So that's why in

21   many operative settings, in dental practices, in topical

22   anesthetics versus IV anesthetics, the practitioner who's

23   assessing the patient may do a series of things from audible,

24   calling the patient's name, requesting a particular command,

25   touching the patient in a manner that would elicit some type of

1    response, so brushing the eyelashes, there's another area that
2    we -- a process we call sternal rub.  So if you're working with
3    a patient in an emergency room or acute trauma setting and
4    you're not sure if they've passed or if they're unconscious or
5    what level they are, you can take your knuckles and rub on
6    their sternum bone and it typically elicits a quick response.
7    So it's a degree of discomfort, not necessarily severe pain,
8    but it's a stimulation.  So there is the capacity for autonomic
9    reflex reactions that do not equate or can't be assumed to any
10   degree of certainty to be indicative of severe pain.
11   Q    And in the clinical setting in a hospital, can doctors
12   eliminate all pain for patients?
13   A    No.  That's very rare.
14   Q    And so they do their best with medications to minimize
15   the pain?
16   A    They do.  And there may be aspects of what a patient can
17   take, there may be aspects of what's available to administer;
18   there may be aspects of the acuteness of the situation or the
19   moment that whether it's an inpatient ICU, an emergency
20   department.  There are many times that patients experience
21   pain, low levels of pain.  We call it minimal, moderate, or
22   severe.
23   Q    Is there any evidence that the Arkansas Department of
24   Correction's lethal injection protocol will induce or create
25   severe pain in the patient or in an inmate?

Karen Baker, RMR, CRR, CCR
United States Court Reporter

1   A      No.  I saw no evidence that would provide a presumption

2   that the proper administration of drug one, two, and three

3   would induce or create pain, and I'd be glad to explain the

4   components.

5   Q      Please do.

6   A      So I think what we've heard in the course of the

7   testimony is a discussion as a foundational concept that

8   somehow medication two and three are certain to provide pain or

9   create pain.  That's quite a misnomer.  The administration of

10  vecuronium, while it does have the capacity, isolated out -- so

11  even an isolated discussion is not relevant because these

12  medications are administered in a sequence, but in an isolated

13  sense, we have many medications that we track, hundreds,

14  including every one that's in the protocol and every one that

15  was used before, thiopental and pentobarbital as well.  We have

16  categories with IV medications that we refer to as vesicants

17  and irritants.  So when we look at a medication that's going to

18  be administered IV, we look for that to identify is there a

19  capacity for discomfort.

20         So an irritant is something that if the vein is like a

21  tube or a hose, the inner wall or the lumen is tissue as well

22  and can be sensitive to either the concentration or the

23  chemical that's in there.  So these medications, all of which

24  are clearly vascular irritants, but if you go back and look at

25  the literature, there's nothing that ascribes or warns or

1   cautions vecuronium as "caution when using this" because you're

2   going to induce pain with infusion.

3          Now, with a vascular irritant, could a patient have

4   discomfort, could they have a warmth sensation, could they even

5   have a tingling sensation, the answer is yes.  And in clinical

6   practice, there's options to deal with that.  So the same thing

7   here, you can look at the volume, you can look at the rate of

8   administration.  So it is simply not supported to state that

9   with any degree of certainty that vecuronium administration

10  alone would be severe pain.

11  Q    What about the potassium chloride, do you have an opinion

12  on that?

13  A    The same thing.  Potassium chloride, I would say we have

14  more information and we do warn patients.  However, in clinical

15  practice settings, there are times in actual patients where we

16  have to give higher concentration and give it rapidly, so it's

17  not something that rises to the level of saying it's not

18  allowed in clinical practice because of the level, and it's

19  also not the assumption.  There's no foundation to say more

20  likely than not that you will experience severe pain.

21  Q    Didn't Dr. Zivot talk about that a little bit on Monday

22  morning?

23  A    Yes.

24  Q    So he agrees with you on that?

25  A    Yes.

1    Q     Help us to understand the effects of benzodiazepine and

2    specifically midazolam on the brain.

3    A     So we heard a demonstration already that focuses on the

4    fact that midazolam is a benzodiazepine as a class or family of

5    medications, and it's unique in the sense that we -- many of

6    the other related products in that class have the capacity to

7    be used orally and for longer durations.  Midazolam has found

8    its role as an IV because of its advantage of being

9    short-acting and very effective at inducing sedation, and the

10   anterior grade amnesia, so it plays a very strong clinical

11   role.  Where it works in the brain is on GABA receptors, and

12   GABA is one of the primary neurotransmitters, and in this

13   particular case, GABA is in multiple parts.  GABA receptors are

14   in multiple parts of the brain.  And for the anterior grade

15   amnesia, the temporal cortex and the hippocampus, two distinct

16   zones in the brain, are where midazolam plays its key role in

17   terms of that.

18        But I think it's important to note that it's a broader

19   discussion than saying it affects the GABA receptors.  It

20   primarily affects the GABA receptors subtype A, so when we

21   think of a receptor or a lock and key, in this particular case

22   the lock has many holes and is susceptible to other medications

23   that may be able to affect the other subtypes.  And we don't

24   fully understand the impact on all the other subtypes yet.  So

25   I think it's a bit misleading to say that we can understand or

1    opine that you have the capacity to fully bind GABA receptors

2    or that we would ever mechanically deplete GABA, the

3    neurotransmitter, from the body.  So what we heard in the

4    description of a calculation, a theoretical calculation, would

5    simply be a academic attempt to say what would happen if, but

6    those conditions aren't demonstrated in the human body.

7         So it's also -- when you say ceiling effect, you would

8    say ceiling effect to what effect, not to every effect.  And we

9    also know that midazolam is biphasic, which means that for many

10   of its effects, it has the ability to hit a point, plateau, and

11   then hit another point, so I think that what we clearly see

12   clinically and I think we heard that in testimony from

13   Dr. Zivot as well, is the effect is what matters, not the

14   theoretical aspirations.  I see you put up the --

15   Q    I'm going to talk about that.  So it appears to me as a

16   layperson that some of these issues, the GABA, the ceiling

17   effect, and maybe I'm simple-minded, Doctor, so help me

18   understand, and help the Court.  It seems to me like these

19   things are really missing the point when the manufacturer of

20   midazolam says it can be used to induce general anesthesia.

21   A    Not only can it, it is in clinical practice settings for

22   targeted procedures, painful procedures, and surgeries.

23   Q    Like what?

24   A    As I mentioned earlier, you could have cesarean sections,

25   you could have cardioversion procedures, you could have

```
 1   resetting of bone fractures, a lot of different procedures.
 2   Q     And midazolam for those procedures is used as the sole
 3   agent to induce quickly a state of deep enough anesthesia to
 4   perform those procedures?
 5   A     And strategically because --
 6   Q     Is the answer yes or no?
 7   A     It is, yes.
 8   Q     And why?
 9   A     Because it is short-acting and it's sufficient duration
10   for those procedures.  Now, it's also used as an induction
11   agent which means getting you to a level of general induction,
12   a general anesthesia, and then converted to another medication
13   for procedures that are going to be longer in nature.
14   Q     Is there a need to add a second medication under the
15   Arkansas protocol?
16   A     No, because the entire duration of the protocol is short
17   in nature.
18   Q     So it's within that initial induction phase?
19   A     Yes.
20   Q     So the 500-milligram dose of midazolam used in Arkansas
21   will keep you in that induction period of a deep, either a deep
22   sedation or general anesthesia -- we can have the
23   anesthesiologist talk about that, but it'll keep you there long
24   enough to complete the procedure under the protocol, right?
25   A     That's correct.  And the anesthetic effect lasts post
```

Buffington - Direct

```
1   even the completion of a procedure.
2   Q      So you would expect a 500-milligram dose of midazolam to
3   maintain anesthesia well beyond 30 minutes or an hour or even
4   two hours?
5   A      I don't think we could say two hours because we don't
6   have 500-milligram research data.
7   Q      Gotcha.  But certainly 30 minutes?
8   A      Past the procedure.
9   Q      I gotcha.  And so what I showed you, Doctor, is I've got
10  up here on the ELMO is Defendants' Exhibit 6, which is already
11  in evidence.  Do you recognize this document?
12  A      I do.  It's a little blurry, but yes.
13  Q      What is the document?
14  A      It's a little blurry, but yes.
15  Q      I'm sorry, I'm moving it around too.  That's not helpful.
16  What is it?
17  A      This is the FDA-approved package inserts for midazolam.
18  Q      Okay.  And here in the middle of the first page of
19  Defendants' Exhibit 6, it talks about giving midazolam
20  intravenously as an anesthetic induction agent.  Correct?
21  A      That is correct.
22  Q      Does it say here that you can use it without any narcotic
23  medication?
24  A      Absolutely.
25  Q      Or other sedative medication?
```

Buffington - Direct

1    A      That is correct.  It actually gives you guidance that if

2    you do, you will have a synergistic effect or a blended effect

3    with the other agent and you can actually use less.  That's a

4    patient safety guidance statement.  Because you wouldn't need

5    to use the full amount because you're getting some of the

6    effect from the other agent.

7    Q      Very good.  You've heard the evidence in court this week

8    and you've indicated to me that you think that the opinions of

9    the plaintiffs' experts are based on some fundamentally flawed

10   concepts.  Correct?

11   A      Yes.

12   Q      And can you explain to the Court what those are?

13   A      Well, I think the first one is the premise that you will,

14   but for having the three medications, have severe pain, and

15   that is simply not consistent with the literature and what we

16   know.  Now, I mentioned --

17   Q      Can I stop you there?  You mean in terms of the

18   literature of what midazolam can do in terms of anesthesia?

19   A      And what vecuronium does as a foundation that giving

20   vecuronium would be severe pain and that potassium chloride

21   would be.  Now, both those agents are irritants, but that

22   doesn't mean severe pain.  And many patients have those

23   medications every day with no experience of severe pain.  The

24   other issue is if they come out of the vein, that's called

25   extravasation.  So if you rupture the vein, then you can have

1   tissue damage, and more likely with the potassium than the

2   other two.

3   Q    In this case, though, we are going to assume that the

4   Arkansas Department of Correction follows its protocol as

5   written, right?

6   A    That is correct.

7   Q    So is it speculative to say that they might miss a vein,

8   they may have to -- you know, anything like that about venous

9   access in your mind, is that speculative or is that very likely

10  to occur?

11  A    I would say unlikely would be the term.

12  Q    Does the procedure have sufficient safeguards in effect

13  that if that happens, they've got a plan for what to do?

14  A    As I read it, yes.

15  Q    Okay.  I'm showing you Defendants' Exhibit 12, which is

16  in evidence.  Are you familiar with, this is the Liu article.

17  Are you familiar with this, Doctor?

18  A    Yes, I am.

19  Q    And what relevance does this article or study have to

20  your opinions in this case?

21  A    So the first discussion we had was whether or not there

22  would, in fact, be a foundation or an assumption of pain.  This

23  particular article goes to a second flawed concept, and that is

24  that midazolam does not achieve levels of sedation, depth of

25  sedation sufficient to achieve general anesthesia.  So this

Buffington - Direct

1    particular article, the authors looked at a series of patients

2    and gave them between, at the analysis of the study, between 4

3    and 20 milligrams, an average of, I think, 9.5 milligrams per

4    patient continuously to the point that they using a

5    standardized scale that is used in anesthesiology called the

6    OAAS, the Observer Assessment of Alertness and Sedation scale.

7    And there's five tiers in that:  Five, four, three, two, one.

8    One being the lowest level of sedation.  So they used midazolam

9    in repeated doses to get the individual down to a one.

10           At each level of scoring, the five, they plotted what the

11    BIS values, Bispectral Index, as a measurement of EEG,

12    brain-wave activity, was at each of those points.  So when

13    everybody was at a five, what was the BIS value?  When

14    everybody was at a three, what were the BIS values?  When

15    everybody was at a one, the lowest point, and what they

16    demonstrated very clearly in this study is that midazolam does

17    get patients down to the range of the industry definition of

18    general anesthesia, which is 60.  So there were patients who

19    achieved well below that, I think 54 was the lower documented,

20    possibly even a 40.

21    Q    So I'm showing you what is, I think, the third page in

22    this Defendants' Exhibit 12.

23    A    Figure 1.

24    Q    Figure 1.  So does this kind of demonstrate for the Court

25    what you were just testifying about?

Buffington - Direct

1    A     It does.  And if you look at the density of those plots,

2    it also shows that between 60 and 70 as we saw in the graph

3    yesterday from the anesthesiology society is that even 60 to 70

4    is labeled deep sedation and that's a period where you may have

5    a response but there's still no certainty in the plaintiffs'

6    statements that you'll have pain, that would --

7    Q     You mean consciously experience the pain?

8    A     That is correct.

9    Q     As opposed to an autonomic response?

10   A     That is correct.

11   Q     Like a reflex withdrawal?

12   A     That's correct.

13   Q     Okay.  So this study -- in your mind, what's the main

14   thrust for the Court?

15   A     I think this helps us to understand that there is

16   sufficient depths of sedation, a/k/a anesthesia as it's

17   defined, to achieve a low level of consciousness that a patient

18   would not experience pain if the medications are administered

19   properly.  Because it shows us that the midazolam is, in fact,

20   capable of achieving that and, in fact, consistent with the

21   FDA's approval of the product, stating that you can in larger

22   doses achieve, this would even average 9.5 milligrams.  We just

23   said earlier that induction of anesthesia, general anesthesia

24   is with 20, 25, 30, 35.  So even twice and two and a half times

25   this amount is able to achieve BIS levels consistent with

1    general anesthesia.

2    Q      Would you expect, Doctor, that as the dose of midazolam

3    increases, the BIS level would go down?

4    A      Yes.

5    Q      Is Dr. Stevens' ceiling effect calculations

6    scientifically valid in your mind?

7    A      I think it's an academic endeavor.  I don't discourage.

8    I think that to a great extent what we do in animal and in

9    vitro testing helps to give us preclinical concepts that we

10   then test in human phase testing.  So I don't fault the

11   endeavor, but I think that it has many assumptions and it links

12   or chains together questions that we just can't equate to

13   human, so I don't think it's something that in its state, as he

14   stated in his own testimony, is not publishable yet and not

15   ready because of the elements that are there, so the academic

16   steps are intriguing, but I think that it would be

17   inappropriate to assume from that or presume what an effect

18   would be in a human.  And, in fact, if you look at the diagram

19   or the table that was demonstrated from his textbook --

20   Q      Thank you, Doctor, for pausing there for me.  I want to

21   show it to the Court and we can follow along with you.  I am

22   putting up the actual book which excerpts of which have been

23   introduced into evidence as Defendants' Exhibit 5.  This is

24   Dr. Stevens' pharmacology text.  Is this the chart you were

25   just referencing?

Buffington - Direct                                    647

1   A      Yes, it is.

2   Q      Okay.  Please continue.

3   A      So if we're to look at that, that chart in itself is not

4   referenced.  This as a graphical cartoon does not tell us where

5   that data comes from.  In fact, even in the citation in the

6   report, it only cited back to the book to which in the book the

7   cartoon doesn't have a reference, so it's a graphical

8   demonstrative.  However, what we see in there is inconsistent

9   with what we know about the literature on the product.  Would I

10  say barbiturates are greater effect, the answer is yes, but

11  again, they are dose-dependent as well.  But what we know even

12  from the package insert and the medical research on the product

13  as well as clinical practice, is we do see patients who enter

14  the stage of coma.  It's in the black box warning.

15         We do see deaths.  There's nearly 10,000 deaths a year.

16  NIDA, the National Institute of Drug Abuse, has benzodiazepines

17  as one of its top concerned categories.  We heard yesterday

18  that may be when in combination with other medications like

19  opiates or others, that's true, but not all those deaths are

20  that way.  I review far too many autopsy reports where a single

21  benzodiazepine was the only agent.  So the graphic or the

22  cartoon is misleading in that sense.  And what we know about

23  the product is it has similar respiratory depression capacity

24  as we see with opiates and barbiturates.  So the potential for

25  serious adverse side effects, and if I was to only base my

1    opinion -- and he stated clearly this is an introductory

2    pharmacology text, but if I was to base my professional opinion

3    on this, I would walk away and say benzodiazepines may be safe,

4    they're not, or that benzodiazepines don't cause coma,

5    respiratory depression, and death, and they do.  So it's a bit

6    disingenuous.

7    Q    Doctor, does the fact that barbiturates may be more

8    effective than a benzodiazepine mean that benzodiazepines

9    cannot be used to render an inmate sufficiently, in a

10   sufficient state of anesthesia to endure the procedure?

11   A    No.  It's just an alternative product that you would use

12   in a different fashion.  In this case, it is understandable

13   that you would use larger and greater doses and that you would

14   also have different expectations from it.

15   Q    Again, does that relate back to what you were talking

16   about in terms of dose, the dose-dependent nature?

17   A    That's correct, and the amnestic effect.  So that

18   whatever's happening during that procedure and certainly by the

19   time you get to these doses, they're well documented well

20   below.  As a primary pharmacologic feature of the medication is

21   that the person's not going to be perceiving pain during that

22   therapy, during that three-drug protocol.

23   Q    Dr. Zivot testified on Monday about in his clinical

24   practice, his opinion is that he would not use a drug within

25   its stated month of expiration.  Did you hear that testimony?

1    A    No, I heard even longer than that.  If I'm not mistaken,

2    I heard six months.

3    Q    Oh, six months.

4    A    Which I'm agasp.

5    Q    Let me show you one thing real quick.  I'd like to put up

6    redacted photographs of the lethal injection drug vials that

7    were in the ADC's possession back in 2015 when this protocol

8    was first adopted.  It is Defendants' Exhibit 7.  The first

9    page, not sure if we'll be able to read it.

10   A    I can tell you I can't.  It looks like 6 of 2018.

11   Q    So what I'm trying to show is that this drug vial, for

12   example, says expiration date of 6/2016?

13   A    That is correct.

14   Q    What does it mean when a drug manufacturer puts only a

15   month and a year on a drug in terms of expiration date?

16   A    Clearly there's no need to put a specific date since it's

17   not relevant, meaning a day of the week.  So that means the

18   month of April.  So as the month of April passes, and you now

19   become May of that year, then that manufacturer has dated that

20   product to be expired.  Absolutely inappropriate to assume that

21   that product is somehow degradated that date or the day prior.

22   The pharmaceutical manufacturers are required per the FDA to

23   assure that that product is 100 percent in tact through that

24   day.  So what that means is the true degradation may be well

25   after, and in fact, the FDA periodically retests this and the

1    last report that I saw, most products were four and five years

2    post the expiration date before they even fell to 90 percent of

3    their original integrity, pharmacologic effect.

4    Q      You mean potency of the drug?

5    A      That's correct.

6    Q      And is there any evidence at all that any of the drugs,

7    or specifically the midazolam in the ADC's lethal injection

8    protocol, would spontaneously turn to poison on May 1st?

9    A      No.  Matter of fact, we have very few medications in the

10   entire collection of commercially available pharmaceutical

11   products that you would ever even say that with.  The one that

12   comes to mind is tetracycline and it has the ability years

13   after its dating to crystallize, which is then a cardio-toxic

14   substance.  I thought that was -- I was agasp at what I heard.

15   Q      It's really hard to read, but I think if we were to get

16   out our -- at least I can zoom in enough, Doctor, so

17   Defendants' Exhibit 7, this middle photograph, does that appear

18   to have a specific day of the month as well as a month and year

19   for expiration or can you not read it?

20   A      I can't, but it would be the manufacturer's prerogative,

21   but it's the same thing, there would be zero potential to read

22   that as it would be a problem the next day.  That is the date

23   that the manufacturer is obligated to have a dating strategy,

24   an expiration dating strategy that assures 100 percent

25   integrity of the product through that date.  So are we, in

1    fact, saying that most medications or all medications for that

2    matter are still good after an expiration date?  In effect, we

3    are saying that, but the manufacturer has, per FDA compliance,

4    dated the product with which they can say full confidence it is

5    still 100 percent on that date.

6    Q    Is the Arkansas Department of Correction proposing to use

7    any expired drugs in these scheduled executions?

8    A    No.

9    Q    Is the use of midazolam within its last month of -- let

10   me rephrase the question.  Are you aware of when the ADC's

11   midazolam expires?

12   A    It's April, this month.  This month.

13   Q    And so according to the FDA, that midazolam can be used

14   through the last day of the month; is that right?

15   A    That is correct.

16   Q    And is there any evidence that the ADC's use of its

17   current supply of midazolam is sure or very likely to cause

18   needless suffering to the inmates?

19   A    Absolutely none.

20   Q    Is there any need for the ADC to send out its current

21   supply of lethal drugs for independent testing for either

22   potency or purity or anything else?

23   A    If it's still in its commercially available packaging,

24   the answer is not at all.

25   Q    So if Wendy Kelley were to testify or she's offered an

Buffington - Direct

1    affidavit that says we've been storing these drugs according to

2    manufacturer's instructions, we have purchased FDA-approved

3    drugs, there's no need to test?

4    A    There would be no requirement or necessity to do that.

5    Q    When hospitals buy vials of IV drugs do they ever send

6    them out for testing?

7    A    Zero percent of the time.

8    Q    What about in a pharmacy, if I go down to Wal-Mart and I

9    am buying some kind of medication, do they send that out before

10    they dispense it to me?

11    A    Zero percent of the time.  What may happen is if a

12    product has been removed from its original packaging and

13    prepared and either added to another diluent or solution or

14    made into a compounded product, then in those cases, if it's

15    for contemporaneous use, meaning for immediate use, then no,

16    they're not.  If they're made in bulk or made for an extended

17    what we call shelf-life, meaning you want to know that you're

18    going to make a batch for two weeks ahead, in some of those

19    cases there's testing, but that's not what's taking place in

20    the ADOC protocol.

21    Q    So let me make sure I understand.  In the manufacturing

22    process of the drug that ends up in these vials right here?

23    A    That's correct.

24    Q    Are the drugs tested for potency and purity before they

25    get sent out by the manufacturer?

1    A      Yes.

2    Q      Is that, in fact, required by the FDA?

3    A      Yes.

4    Q      Briefly, we've heard a little bit about paradoxical

5    reactions with regard to midazolam.  Do you have any opinions

6    about that as it relates to this case?

7    A      Paradoxical reactions are when you give a medication, so

8    clearly many medications out of the thousands that we have,

9    have that noted in their literature.  And that's when a

10   medication administered to a patient has the potential for an

11   opposite or abnormal effect.  So we're not just saying a side

12   effect, we're saying it's perplexing because it's the opposite

13   of what you'd say is a way to paraphrase that.  So in that

14   particular case, midazolam, it is noted that you can have cases

15   of paradoxical reaction and that may be because of another

16   medication on board, it may be because of a patient's own

17   medical conditions, but if that were to occur in this

18   particular case with midazolam being the first agent, the

19   paradoxical effect that we know for midazolam would be

20   stimulation as opposed to sedation and you wouldn't pass the

21   consciousness check and the procedure wouldn't continue.

22          So it seems yes, it's in the literature; yes, we

23   understand it.  It's extremely rare and an outlier, but if it

24   did occur, it wouldn't impact the inmate because the procedure

25   would be terminated.

```
1   Q      Thank you.  Have we heard any evidence that would give
2   you any concern that there may be a paradoxical reaction in any
3   of these inmates?
4   A      No.  It's extremely rare.
5   Q      Let's talk a little bit about the adverse reactions that
6   might be expected to the use of midazolam.  I'm again referring
7   to Defendants' Exhibit No. 6.  And what are some of the adverse
8   reactions that we might expect to see in these inmates?
9   A      Well, you could see any of what are posted, but they're
10  -- it's a large quantity administered very rapidly.  So in that
11  particular case, I don't think that the hiccups and the
12  coughing are going to be the issue but you could see someone
13  who has nausea or has vomiting.  You could see the sedation
14  obviously.  So, again, these are listed with standard
15  expectations with standard dosing.  All of these percentages
16  and likelihoods would be significantly magnified, so the
17  biggest concern is on respiratory depression.
18  Q      And maintaining that airway?
19  A      But that's also -- in fact, this is a case where you're
20  using a medication for its adverse side effect properties as
21  well.
22  Q      Right.  So hiccups and coughing would not be unexpected
23  in using midazolam?
24  A      No, I've seen it in patients.
25  Q      Now, in paradoxical reactions, they are more common in
```

Buffington - Direct

1    pediatric patients, right?

2    A    Correct.  And even then, it's only up to 2 percent.  It's

3    even less in adults.  And again, that wouldn't be relevant to

4    the case because if they had that, you wouldn't move forward if

5    the patient's overstimulated.

6    Q    Prisoners are also making a claim in this case that

7    because the lethal drugs are drawn up into the syringes earlier

8    in the day on the day of the execution, that somehow within a

9    span of that day those drugs are either going to degrade to the

10   point that they won't work or that they will become

11   contaminated.  Do you have any opinions on that issue?

12   A    Yes.  It's preposterous.  There is no reason to believe

13   any of those as stated.  Sterility is the one that we commonly

14   look at and I've used the term a couple of times today, if it's

15   administered in a contemporaneous manner.  These aren't

16   prepared weeks prior, these aren't prepared days prior.  These

17   are prepared the day of and they are given in an IV form.

18   They're not compounded, they're not mixed with two and three

19   drugs together where you're concerned about drug interactions

20   in terms of stability and precipitation.

21        In fact, the normal saline we heard testimony the other

22   day, the normal saline as the diluent or liquid for putting the

23   midazolam in is listed on the package insert as an appropriate

24   solution for a diluent.

25   Q    And does this relate to the precipitation issue that we

Buffington - Direct

1    heard Dr. Zivot talk about?

2    A    A concept of precipitation, yes.

3    Q    Again, what does that mean?

4    A    That means that the medication could have an interaction

5    with another substance or a different type of diluent like you

6    can use certain liquids and they'd be appropriate and other

7    liquids have demonstrated that they ensure stability of the

8    product.  And the medication, we call it "fall out of solution"

9    where you actually -- it goes from being a clear liquid to

10   being able to see particulate matter, and that's actually the

11   medication.  And there would be no expectation of a

12   precipitation in the ADOC protocol.

13   Q    Is it your understanding that Dr. Zivot in a declaration

14   that he provided earlier in the case, his testimony was that he

15   was concerned about the midazolam somehow mixing with the

16   saline and that would cause a precipitation?

17   A    That's correct, and that's what I stated that the normal

18   saline is, in fact, in the manufacturer's package insert as an

19   acceptable diluent, or solution, to put the midazolam with.

20   Q    So I'm showing you again Defendants' Exhibit 6, the

21   FDA-approved package insert for midazolam.  And can you read

22   that for the Court, please, the highlighted section?

23   A    The bottom section?

24   Q    Where my finger is.

25   A    "Both the 1 milligram per mill and 5 milligram per mill

1   formulations of midazolam may be diluted with .09 percent

2   sodium chloride, also known as normal saline, or 5 percent

3   dextrose and water."  And they go on to state many of the

4   solutions that are commonly used in IV rooms and preparations,

5   that would not be recommended because it's been documented to

6   create precipitation.  So the guidance from the manufacturer is

7   stating that those liquids are appropriate diluents to mix.

8   Q    Is it common in a clinical setting for anesthesiologists

9   to have drugs on hand for emergency situations or if they're

10  going to do a surgery so that they would not immediately draw

11  the drug out of the vial and immediately use it, they would

12  draw it in syringes prior to the procedure?

13  A    It is all over the map.  There are operating suites where

14  they are stocked and stored with supplies, there are others

15  where they're stat call teams that bring the medications from a

16  central pharmacy to the operating room suite, so it is

17  possible.

18  Q    So it would be not uncommon for a central pharmacy to

19  prepare syringes of anesthetic drugs and they would be

20  transported over to the OR and perhaps stored for the day and

21  used?

22  A    Beyond not uncommon, it's the norm.  In fact, hospitals

23  today and health systems are using central fill facilities,

24  which is a dedicated facility geographically located near

25  multiple hospitals and ambulatory clinics, and all of the IV

1    preparation compounding is done in those facilities and then

2    sent out for the procedures so that only stats need to be done

3    at the point of care.  I also looked at the midazolam dating.

4    There's been multiple authors have looked at even making the

5    preparation and leaving it at room temperature for a extended

6    period of time, that there was no degradation even at 36 days.

7    Q    That was specifically with regard to midazolam?

8    A    It was.

9    Q    Let's talk a little bit about the executions in other

10   states that we've heard a lot about this week.

11   A    Yes.

12   Q    Are you aware of any what the plaintiffs would like to

13   call botched executions using the same protocol as Arkansas

14   when it was properly administered?

15   A    Any problem cases, no.

16   Q    Correct.

17   A    No, I think that Warner, the case we heard about

18   yesterday from Oklahoma; Smith from Alabama, that was recent.

19   And then I think there's been between 10 and 20 cases in

20   Florida with the same protocol, no complications or

21   medication-related concerns.

22   Q    So the Lockett experience in Oklahoma was an outlier

23   because of problems getting IV access, right?

24   A    Yes, it's been documented.

25   Q    Is there anything else that you would like to address in

 1  terms of what you've heard in court today?  Have you formed any
 2  other opinions that you think are germane to the issues before
 3  the Court?
 4  A    I just think it's important for the Court to understand
 5  that midazolam is an appropriate selection as the first agent
 6  based on its documented capacities to achieve the appropriate
 7  levels of sedation and anesthesia.  It can be used alone or in
 8  combination.  It's got actual analytic data with BIS values
 9  that support that.  The amnestic feature is a distinct
10  advantage, and that its dose-response related.
11          MS. MERRITT:  One moment, Your Honor, if I could.  I
12  have no further questions at this time.  Thank you,
13  Dr. Buffington.
14          THE WITNESS:  Thank you.
15          THE COURT:  Why don't we take a short break?  We'll
16  just take a five minute break to give our court reporter a
17  break and we'll come back and do cross-examination.  We'll be
18  in recess until 11:05.
19      (Recess at 11:02 AM, until 11:11 AM.)
20          THE COURT:  You may proceed with cross.
21                    CROSS-EXAMINATION
22  BY MR. WILLIAMS:
23  Q    Good morning, sir.
24  A    Good morning.
25  Q    So I'd like to start by talk about your resume a little

Buffington - Cross

1    bit.

2    A      Yes, sir.

3    Q      I noticed you like music.

4    A      Yes.

5    Q      What's your instrument?

6    A      I play saxophone and guitar.

7    Q      I gave up the saxophone when I was a kid and I sort of

8    regret it.

9           So here's what I need to do here.  This is your CV here?

10   A      Yes.

11   Q      And I see that you're the president and CEO of Clinical

12   Pharmacology Services?

13   A      That's correct.  It's a private practice.

14   Q      And can you tell me a little bit more about what Clinical

15   Pharmacology Services is and does?

16   A      Yes, sir.  As a specialty practice, we work with patients

17   who are on high-risk and chronic drug therapies.  So patients

18   are referred to our clinic who are taking multiple medications.

19   We frequently refer to that as polypharmacy.  We identify

20   adverse drug reactions, do pharmacogenetic testing to identify

21   if doses of particular targeted medications need adjusted based

22   on a patient's individualized needs, perform clinical research

23   trials, typically phase 2 and 3 which are in the series of four

24   human phase studies with the FDA.  Those are early pivotal

25   trials.  And provide drug information support for hospitals,

Buffington - Cross

```
 1    health systems, medical practices, government agencies as I
 2    stated with Medicare and work closely with Florida Medicaid,
 3    and also forensic.
 4          So some of the drug information questions on cases are
 5    patient specific or clinical treatment related, others may be
 6    of a forensic nature, so working with medical examiners on
 7    cases where they've had a death that may be medication-related
 8    or where a pharmacologic agent is involved in a particular
 9    criminal case and that needs retesting or information about its
10    properties and effects.
11    Q    So is your consultation work also in connection with this
12    entity?
13    A    One of them, yes.
14    Q    Are there other entities?
15    A    Yes.
16    Q    What are other entities are you the president of or do
17    you run?
18    A    So the other is the American Institute of Pharmaceutical
19    Sciences.  That's a nonprofit 501(c)(3) practice and research
20    institute.  So we deal with nationwide projects that are
21    looking at medication safety, that are looking at patient and
22    practitioner education to optimize medication use and pattern,
23    so a lot of that right now is focused on opiate use and
24    appropriate safety measures for patients in practices.  I'm
25    also on faculty with the University of South Florida where we
```

1    have the medical clinics as well.

2    Q     So your time personally is spent more on business

3    matters, more on medical matters, more on consulting matters?

4    A     The consulting is a component, so just like an oncologist

5    does consults with patients in oncology issues, that's part of

6    their specialty.  So I would say the majority is clinical in

7    nature and then other is research, and then to a lesser extent,

8    forensics.

9    Q     So then how much of your time is spent on court

10   consultations such as death that we have here?

11   A     It varies from time or year to year, but 5 to 15 percent.

12   Q     And when did you begin consulting with the State of

13   Arkansas in this case?

14   A     I don't have a date, but I think it was in 2015 on

15   Johnson and Kelly.

16   Q     Did you consult with the State only in the capacity as a

17   litigation expert or have you consulted with them more broadly

18   on their lethal injection protocol?

19   A     No, it's been as a litigation response.

20   Q     So you listed some other states and I want to talk about

21   your work in those states too.

22   A     Yes.

23   Q     Florida, what did you do in Florida for that state?

24   A     It's been a consultant with regards to drug information

25   support.  No litigation for Florida.

1    Q     So when you say drug information support, what do you

2    mean by that?

3    A     Working with the State with regards to providing

4    information about different pharmaceuticals, about their

5    pharmacologic effects, building drug information compendia.

6    Q     So maybe I misunderstood.  I understood that to be lethal

7    injection related consultation.

8    A     That's part of it.

9    Q     So did you help them draw up their protocol?

10   A     I did not.

11   Q     So they never asked you to give your opinion on whether

12   midazolam is a appropriate drug?

13   A     That is correct.

14   Q     Did they ever ask you about any other drugs they may now

15   use or have used in the past?

16   A     No, sir.

17   Q     California, you mentioned California.  Have you litigated

18   in California?

19   A     No, sir.

20   Q     Excuse me?

21   A     No, sir.

22   Q     What have you done for California?

23   A     Just same thing, drug information response to this point.

24   Q     And have you consulted with the Department of Correction

25   specifically?

Buffington - Cross                                    664

1    A    Yes.

2    Q    And is that regarding lethal injection drugs?

3    A    Multiple things.

4    Q    So lethal injection drugs is one of them?

5    A    Yes.

6    Q    And how long has that been going on?

7    A    I think over a year.

8    Q    And are they trying to put together a new drug protocol?

9    A    I can't speak on their behalf, I don't know.

10   Q    So what did they ask you to do?

11   A    Drug information compendia material, information on

12   products.

13   Q    When you say compendia material, I'm just trying to get a

14   better sense of your interactions with these departments.

15   A    Sure.  In that particular case it's just providing

16   information about a multitude, whether that's clinical research

17   data, published monographs, FDA materials.

18   Q    So have you advocated for them to use a particular drug

19   in lethal injection?

20   A    No, sir.

21   Q    Would the same be true of Florida?

22   A    That's correct.

23   Q    So your experience with the Florida protocol, and I don't

24   know if you know this for sure, but I believe was the first

25   midazolam protocol, was you're telling me nonexistent?  You had

Buffington - Cross                                          665

1    nothing to do with that protocol?

2    A     That is correct.

3    Q     Okay.  Georgia, you said Georgia?

4    A     Yes.

5    Q     What have you done in Georgia?

6    A     Same thing, there were just questions about the

7    medications.  The litigation work has only been with Alabama,

8    Arkansas, and Ohio.

9    Q     Not Virginia?

10   A     Oh, actually, yes.  Thank you.  Just one particular

11   hearing.

12   Q     So the Georgia you said -- please repeat what you did

13   with Georgia.

14   A     The same as I stated with Florida, just providing drug

15   information support.

16   Q     That's directly with the Department of Corrections?

17   A     I would have to see who made the request on that.

18   Q     But California was directly with the Department of

19   Correction?

20   A     To my recollection.

21   Q     And Florida was directly with the Department of

22   Correction or not?

23   A     To my recollection.

24   Q     That did include some consultation regarding lethal

25   injection drugs?

Buffington - Cross

1    A      No, sir.

2    Q      But California did?

3    A      Yes.

4    Q      Alabama, was that limited to litigation?

5    A      Yes.

6    Q      And Ohio, was that limited to litigation?

7    A      Yes, it was.

8    Q      And are you still working on those cases?

9    A      I think the Ohio is under appeal.  I don't know the

10   status of the Alabama cases.

11   Q      Okay.  So I want to talk a little bit more about your

12   education.  Walk me through, if you could, just starting with

13   your undergraduate, and I see you studied biology there.  Did

14   you get a degree in biology?

15   A      I did not.  I was accepted under early admission to

16   Mercer's PharmD program.

17   Q      Then you proceeded to Mercer.  At that point, is that

18   when you can take the title of Doctor?

19   A      That is correct.

20   Q      After you get a Doctor of Pharmacy?

21   A      That is correct, like a doctor of medicine, doctor of

22   osteopath.

23   Q      Anyone who gets a PharmD, in your opinion, can call

24   themselves Doctor?

25   A      That is the correct title, yes.  Anyone who gets a

1   doctorate degree is able to call themselves Doctor.

2   Q     So I could call myself Doctor?

3   A     You actually could.  I don't know why you don't.

4   Q     So let's talk about post-graduate.  Well, fellowship and

5   a residency.  I'm just wondering if you could give me a little

6   more detail about what those entailed.  So why don't we just

7   start with the one earlier, the clinical pharmacokinetics

8   residency.

9   A     So that's working directly with therapeutic drug

10  monitoring with different services from cardiology, oncology,

11  rheumatology, anesthesiology, and pediatrics to look at

12  providing -- so a residency, best way to phrase it, is probably

13  75 percent patient care activity and about 25 research.  So the

14  residency was very diverse therapeutic focus and team

15  involvement.  The clinical research fellowship is the flip of

16  that, so it's about 25 percent patient care team activity and

17  about 75 percent research.

18  Q     So is this sort of a package deal, did you have to do two

19  years, or could you have just stopped with the clinical

20  pharmacokinetics?

21  A     Even for physicians, residency and fellowship aren't

22  required, they've just become customary.  So I could have done

23  the fellowship at a different location or didn't have to do

24  either one.  They both represent post-graduate extended

25  training.

Buffington - Cross

```
1    Q      So mapping this on to this portion of the resume under
2    employment, I see a clinical research fellowship and a clinical
3    research fellow here, which I suppose is the parallel.  This
4    says clinical pharmacy resident.  Was that a pharmacy
5    residency?
6    A      It was managed by the clinical pharmacy department
7    members.
8    Q      So your training has been in pharmacy?
9    A      Well, pharmacy as a curriculum and an area of practice,
10   but yes, and the fellowship was medicine managed as well.
11   Q      So you have no sort of degree in pharmacology or any
12   advanced training in that?
13   A      That absolutely is the core curriculum within a pharmacy
14   degree.
15   Q      But you don't have the sort of credentials that
16   Dr. Stevens has, for example?
17   A      No, they would be broader.  His is a basic science
18   degree.  Mine is a clinical degree working directly with
19   patients.
20   Q      Okay.  So is pretty much all of your time taken up with
21   clinical pharmacological services?
22   A      No.  There's --
23   Q      So if you were to divide between clinical pharmacology
24   services and the American Institute of Pharmaceutical Sciences
25   and your teaching responsibilities, how much would you divide
```

1    between those?

2    A    I wish life were that simple to be able to assign a pie

3    chart.  There are other responsibilities.  The Medicare

4    medication safety expert role is approaching a 50 percent time

5    commitment.  That is in Washington and Baltimore at the

6    Medicare headquarters.  The American Institute of

7    Pharmaceutical Sciences is only a time commitment when there is

8    an active project or symposia or initiative that we're doing,

9    so it is not as simple as an individual pie chart.

10   Q    Sure.  So I noticed here that you have a number of what

11   look like faculty appointments?

12   A    That is correct.

13   Q    So it sounded like you highlighted University of South

14   Florida.  What is your capacity with University of South

15   Florida?

16   A    I'm on faculty there.  The others would be considered

17   adjunct faculty where I serve as an experiential preceptor for

18   students.  Just like in med school, in pharmacy school and

19   nurse practitioner, your last year is assignments at different

20   clinical practice settings, so I take students from all three

21   of those domains.

22   Q    So these are all sort of preceptorships?

23   A    All of those others would be, yes.

24   Q    So assistant clinical professor is what you would call a

25   preceptorship on University of Florida?

1   A      That was faculty for a period of time, but now it's just

2   experiential.

3   Q      Clinical assistant professor of pharmacology in Nova

4   Southeastern University.  That's a preceptorship?

5   A      Where do you see that one?

6   Q      There.

7   A      Correct, yeah.  All the rest of these would be

8   preceptorships at this juncture.

9   Q      So are those paid positions?  Are you an employee?

10  A      It depends on the school.  About half of them are paid

11  positions and about half are gratis.

12  Q      What about Idaho State?

13  A      It is a preceptor and nonpaid.

14  Q      Okay.  What about Creighton?

15  A      I'd have to go back and look whether they paid or not.

16  Q      What about Shenandoah?

17  A      Same for all of these at this juncture.

18  Q      Are you authorized to prescribe drugs?

19  A      Yes.

20  Q      And how does that work?

21  A      In the state of Florida, pharmacists have multiple

22  capacities for prescriptive authority.

23  Q      And what's yours?

24  A      Any of those multiple pathways as the Florida Pharmacy

25  Law 465 ascribes.

1    Q      Are pharmacists usually allowed to prescribe drugs?

2    A      Yes.

3    Q      And midazolam, have you prescribed that?

4    A      Yes.  I would say order.  It's never been on an

5    outpatient basis.  On an inpatient, you wouldn't call it

6    prescribed.

7    Q      What was the context there, why did you do that?  First

8    let me ask how many times have you done that?

9    A      I don't recall.

10   Q      Have you done that pretty much all your career?

11   A      Midazolam in particular or other products?

12   Q      Midazolam in particular.

13   A      No, it's not a frequent item.

14   Q      Okay.  So kind of what context would you prescribe

15   midazolam?

16   A      It would have been during a procedure during a clinical

17   research-related patient.

18   Q      Okay.  Are you an anesthesiologist?

19   A      No, sir, pharmacologist.

20   Q      So you can't really testify to anesthesiology-related

21   matters?

22   A      I would testify to the pharmacologic aspects within

23   anesthesiology, yes.

24   Q      You testified a little bit about vecuronium bromide?

25   A      That's correct.

Buffington - Cross

```
1    Q     I don't want to mischaracterize your testimony, but I
2    think you said it would not cause pain by itself?
3    A     That's correct.  You can look through the literature.  It
4    is not notorious for causing pain, so you would not be able to
5    say more likely than not a person would have pain, severe pain,
6    moderate pain or even low level of discomfort.
7    Q     Do you disagree that vecuronium bromide is a
8    neuromuscular blocker?
9    A     That's absolutely the class it is in.
10   Q     What does it do when it gets injected into your body?
11   A     As it's absorbed and reaches muscle tissue, it blocks the
12   capacity for contraction.
13   Q     Okay.  That is not a painful experience in your
14   estimation?
15   A     No.  It's a peaceful experience.
16   Q     So the inability to breathe and paralysis of the
17   diaphragm is a peaceful experience?
18   A     You can't say that that's what every patient is going to
19   experience.  It's a dose continuum as well.  There's not a pain
20   associated, and I think what you were describing would be maybe
21   something more of a psychological effect.
22   Q     So you're saying there's no physical effect?
23   A     You would not expect a physical pain associated with
24   vecuronium bromide.
25   Q     At 100 milligrams?
```

Buffington - Cross

1    A    That is correct.

2    Q    Potassium chloride, did I hear you say the same thing

3    that, by itself, it would not cause pain?

4    A    By itself, it can, but you can't based on the literature

5    that we have, and even personal experience, say that every

6    patient you give it to is going to have severe burning pain.

7    So both of the products, including midazolam, are irritants so

8    we already know that patients can have some discomfort when

9    administered.

10   Q    So is that, the vecuronium bromide -- excuse me, the

11   potassium chloride dose-dependent?  What doses are you talking

12   about?

13   A    You can have irritation at any level and you can have

14   irritation increase with rate of administration, but as we

15   stated before, in clinical practice settings there's large

16   quantities given as well, but I assume you're asking the

17   question as a hypothetical giving it alone.

18   Q    Yes, giving it alone.

19   A    Giving it alone, you're going to typically see 20 to 40.

20   In critical settings, you may see 60s, 80s, and there's not a

21   absolute certainty that the person is going to have a severe

22   pain with that.  They may have some more discomfort; they may

23   not have discomfort.

24   Q    So you would say that a 500-milligram injection would not

25   cause pain?

Buffington - Cross

1    A     Are you back to midazolam?

2    Q     Excuse me, potassium chloride.

3    A     240 mill equivalents.

4    Q     Yes.

5    A     I'm saying there would be no certainty to state in front

6    of this court that you absolutely would have severe pain.

7    Q     Okay.  I believe you testified that midazolam can cause

8    death by itself?

9    A     It can.  There are numerous reported cases.

10   Q     Do you think it would be appropriate to have a one-drug

11   midazolam protocol for that reason?

12   A     I do not.

13   Q     Why is that?

14   A     Because I think that you're looking for other factors,

15   and we don't have as much knowledge of 500 milligrams as a

16   single lethal modality.  So that's not what its role is in this

17   protocol.  Its role is to provide deep and profound anesthesia

18   and prepare for the administration of the next two agents.

19   Q     But you do think it could cause death by itself?

20   A     There's lethality at 10 and 20-milligram doses.

21   Q     I wanted to ask you about that.  This is from your

22   report, and I've underlined a portion.  And I would just read.

23   "The toxic plasma concentration range for midazolam in humans

24   is 1.0 to 1.5 mcg/ML."  And that cites the Reganthal study.  So

25   toxicity means what in this context?

1   A    Means that you can have severe toxic side effects at a

2   particular documented concentration.  So authors have

3   documented complications in cases at that concentration.

4   Q    And what about does this speak to fatality?

5   A    No.  I think that's talking about toxic plasma

6   concentration.

7   Q    So I'm going to show you the Reganthal study which I

8   don't think is an exhibit.  This is the study cited in his

9   report.

10              MS. MERRITT:  Okay.  Just for the record, he's just

11  handing this to me for the first time.

12              THE COURT:  My understanding of this is that it is a

13  study that's cited in the witness's report.

14              MR. WILLIAMS:  Yes.  This is the study, and he can

15  correct me if I'm mistaken, but I believe this is the study

16  cited in his report.

17  BY MR. WILLIAMS:

18  Q    Is this the Reganthal study?

19  A    I would have to look deeper inside.  I've got multiple by

20  Reganthal.  96 to 99 will help you figure out if it's the right

21  reference.

22  Q    In the back of the CV, I think the date may be wrong, but

23  Drug Levels, Therapeutic and Toxic Serum Plasma Concentrations

24  of Common Drugs, from the *Journal of Clinical Monitoring and*

25  *Computing,* and that appears to be the same title and journal.

1    A       It does, but it looks like there's a discrepancy in the

2    reference in the body.

3    Q       So what's the discrepancy?

4    A       It looked like it was a different date.

5    Q       Yes.

6    A       May be a different article.

7    Q       Might there also be an error in your reporting of the

8    date?

9    A       Very possibly.

10   Q       Okay.  Let's look at some of the charts that are

11   contained in here.  This basically tells us, as I understand

12   it, what you're telling us here, toxic levels of certain drugs,

13   and it's alphabetically organized.  Is that correct?  Is that

14   what this is showing, different levels of --

15   A       Correct.  So if you go back to the top for the headers of

16   the columns, it's showing you typical therapeutic ranges,

17   toxic, and then lethal and comatose.  It's this author's way of

18   showing the disparity of effects or transition of effects at

19   different serum concentrations.

20   Q       Okay.  If we look at pentobarbital, which is at the top

21   there, do you see that there's both a toxic level and comatose

22   lethal level?

23   A       I do.

24   Q       Is that what you'd expect to see knowing what you know

25   about pentobarbital?

 1   A     No.  I don't know the nature of the question, but I could

 2   provide you examples of patients who may have different

 3   medications or different conditions where those numbers may

 4   vary so I would have to go back and see the reference the

 5   author used.  If I'm targeting -- if I'm being asked on a

 6   particular medication, I'm going to look at the citations on

 7   the particular product.

 8   Q     So but would you expect to find in general a comatose

 9   lethal level for pentobarbital?

10   A     You could with many medications, yes.

11   Q     It's a drug that can kill you by itself?

12   A     Yes.  So can benzodiazepines.

13   Q     On that question, see midazolam here?

14   A     Yes.

15   Q     That is a benzodiazepine, correct?

16   A     Correct.

17   Q     And I think the 1 to 1.5 maps on to what you wrote in

18   your report, does it not?

19   A     Yes.

20   Q     Is there a comatose or, excuse me, a comatose lethal

21   level for midazolam in this report?

22   A     Not listed in this author's work, no, nor for many of the

23   other medications.

24   Q     So is it your testimony that midazolam does not have a

25   ceiling effect?

Karen Baker, RMR, CRR, CCR
United States Court Reporter

1    A      That is correct.  We have not demonstrated a ceiling

2    effect in humans at all, only in theoretical analytic models.

3    Q      So have you studied any sort of the structures or the

4    physical properties of these drugs?

5    A      Yes.

6    Q      Okay.  And it's your testimony that there is no ceiling

7    effect of midazolam?

8    A      That is correct.  We have no human data that would

9    support that, only theoretic data.

10   Q      Is theoretic data typically accepted in the scientific

11   community?

12   A      No.  Matter of fact, the FDA prohibits using in vitro and

13   animal data to opine human effect.

14   Q      So those studies are not useful?

15   A      I did not say that at all.  Those studies are useful to

16   help to design perceptions going into designing a human phase

17   trial, so they give us -- matter of fact, the DEA has a

18   tremendous -- sorry, FDA has a tremendous amount of

19   investigator guidance to help people take animal and in vitro

20   data and set target dosing ranges for human phase and to build

21   in clinical metrics or end markers to look for safety when

22   you're going from animal and in vitro, and it is very clear you

23   should not use or attempt to opine animal data as a correlate

24   with human effect.

25   Q      But besides that, just the general structure of GABA

1   receptors and things like that, you don't think that's

2   sufficient to say that there's a ceiling effect?

3   A      Absolutely not.

4   Q      You testified about the Ronald Bert Smith execution, I

5   believe?

6   A      Yes, Georgia.  Alabama.

7   Q      Alabama.  Fairly recent?

8   A      Yes.

9   Q      It's your opinion that there was no problem in that

10  execution?

11  A      There were no medication-related problems identified.

12  I'm not aware of a problem in that execution.

13  Q      Do you study autopsies of these executions?

14  A      I have seen some, yes.  I can't tell you how many I've

15  seen, but probably in excess of 15.

16  Q      So you're qualified to do that as pharmacist?

17  A      Yes.  I have to review them routinely.

18  Q      Did you review the Smith execution?

19  A      No.

20          MR. WILLIAMS:  Could I have just a second, please,

21  Your Honor?

22          THE COURT:  You may.

23  BY MR. WILLIAMS:

24  Q      Do you compound drugs as a pharmacist?

25  A      Have I, yes.  Do I now in my current capacity, no.

Buffington - Cross                                    680

1    Q      Are you able to?

2    A      I could today.

3    Q      Could today.  What would you need to do that?  What does

4    that entail?  Just help me understand that process.

5    A      A laboratory.  So most pharmacies have the equipment for,

6    and we divide it into two categories called sterile and

7    nonsterile compounding.

8    Q      And is that fairly simple to do if you have the

9    facilities?

10   A      Yes.  That's a bit of a misnomer.  Compounding

11   commercially available products is very straightforward and

12   does involve a skill and an art to the process or procedures.

13   If you're saying compound a medication from a raw substance to

14   elucidate an end chemical, that may be more difficult.

15   Q      So do you know whether other states have acquired

16   compounded pentobarbital for use in executions?

17   A      I don't know which states.  I know some have.

18   Q      Have you talked to other pharmacists in the past about

19   compounding pentobarbital for executions?

20   A      Not pento, but just multiple medications in general.

21   Q      And medications that would be useful for executions?

22   A      That is correct.

23   Q      Do you think that Arkansas could get compounded

24   pentobarbital?

25   A      I actually went back as a request from Alabama to discern

Buffington - Cross

```
1    if those individuals who I had been at a national conference
2    with stated that they were interested in providing those
3    services, and they stated that they would have to meet with the
4    State directly.  So I found no one who would answer directly
5    yes to the question at that time.  And my understanding is that
6    Arkansas's corrections department did go out and attempt to
7    procure product and was not able to.
8    Q    And do you still have the personal opinion that there are
9    people out there who would compound pentobarbital for Arkansas?
10   A    I would say no at this juncture until I identified that
11   those folks were there.
12   Q    So have you changed your opinion on that?
13   A    What opinion?
14   Q    Well, I believe you opined in the declaration in Alabama
15   that it was your personal opinion that there are compounding
16   pharmacies that would provide compounded drugs for states for
17   use in executions?
18   A    Correct.  And that's what I stated.  I, at their request,
19   went back to identify those to make them as a referral or a
20   liaison to engage and none of them were able to.  So my answer
21   now as I just stated is no, I don't think there are.
22   Q    So if you said in the declaration that it remains your
23   personal opinion despite your interviews with the Alabama
24   compounding pharmacies, that's incorrect?
25   A    You lost me.
```

Buffington - Cross

1    Q      So if you were to look back at your declaration and if
2    the declaration said -- and I can track down the declaration if
3    we need to.
4    A      I remember the discussion and what followed and ensued
5    and it was based on having had that discussion at a national
6    conference with some colleagues.  I went back and asked them
7    specifically, which is the reason I said yes in the
8    declaration, went back and asked them specifically, I think
9    there were 15, and the answer was no to all.  So my answer to
10   you today accurately is I do not know of anyone who will do
11   that today.
12   Q      Okay.  Do you think there are people out there who would
13   do that?  Is it your personal opinion?
14   A      I think I just answered that, no, unless I was able to
15   identify them to answer yes.
16   Q      So could you personally compound any sort of drug for use
17   in executions?
18   A      Well, now we're back to the other question, are you
19   talking about elucidating from a separate raw product to
20   chemically extract or are you talking about purchase of raw
21   product to prepare separate from a pharmaceutical grade
22   preparation?
23   Q      Let's talk about either.
24   A      I'm not -- I don't have the lab to do the extraction.
25   And I don't have direct access to the pharmaceutical grade

1    product either.

2    Q    Just a second, please.  Nothing further, thank you.

3            THE WITNESS:  Thank you.

4            THE COURT:  Redirect?

5                    REDIRECT EXAMINATION

6    BY MS. MERRITT:

7    Q    I have just a few follow-up questions, Dr. Buffington.

8    Mr. Williams asked you about compounding drugs, whether

9    Arkansas might be able to obtain compounding drugs.  Do you

10   remember what the inmates' position on the use of compounding

11   drugs was back in the 2015 litigation?

12   A    I do not.

13   Q    Do you know who Dr. Larry Sasich is?

14   A    Sasich, yes.

15   Q    And I'm going to show you what has been marked as

16   Defendants' Exhibit 34.  This is a affidavit of Larry Sasich,

17   who's also a doctor of pharmacy, right?

18   A    Yes.

19   Q    It bears an electronic file mark of September 28th, 2015.

20   A    Correct.

21   Q    In the Pulaski County Circuit Court, correct?

22   A    Correct.

23   Q    Does this refresh your recollection about whether the

24   inmates relied upon Dr. Sasich's opinions with regard to the

25   use of compounding drugs in the 2015 state court litigation?

Buffington - Redirect                          684

1    A    I do.  I've seen this in similar comments from him in

2    other states as well.

3    Q    And so what is your understanding about basically what

4    Dr. Sasich is saying in this affidavit?

5    A    I think he was questioning the product integrity with

6    regard to compounding.

7    Q    Throughout the affidavit, it relates to a Mr. Hill and a

8    Mr. Warren, and Warren Hill in Fulton County.  So does it

9    appear to you that this was actually prepared in connection

10   with the Arkansas inmates at all?

11   A    No.

12   Q    But they use it as an exhibit in their prior state court

13   case?

14   A    Correct.

15   Q    And can you read for the Court what the purpose of the

16   affidavit is?

17   A    The risks of using compounded drugs.

18   Q    Okay.  So Dr. Sasich was offering opinions to the Pulaski

19   County Circuit Court that the use of compounded drugs was

20   risky.

21   A    I would assume the plaintiffs were if that was their

22   attachment as well.

23   Q    Right.  Did Mr. Sasich also opine that there was no

24   evidence at that time that the pentobarbital selected for use

25   in the nontraditional compounding of that drug for lethal

Buffington - Redirect

1   injection has been produced in an FDA registered and inspected

2   facility?

3   A   That is correct.

4   Q   So he was questioning, I guess, the prominence or the

5   qualifications of the specific compounding pharmacy that was

6   used in that particular case, right?

7   A   Correct.

8   Q   And Dr. Sasich also pointed out to the Court in the

9   Arkansas state case that some compounding pharmacies might

10  obtain what I will call ingredients for their compounded drugs

11  for maybe less than reputable sources.  Is that fair?

12  A   Correct.  In this case, he referred to from international

13  sources as opposed to anything that's been inspected in the

14  U.S.

15  Q   In fact, are you aware that death row inmates across the

16  country have litigated the issue of use of compounded drugs and

17  they routinely say that doing so would violate the Eighth

18  Amendment?

19  A   I don't know to what extent, but I know it's been a

20  common rebuttal.

21  Q   Let me go back to paragraph 9 of Dr. Sasich's affidavit.

22  It was his opinion that the drug must be FDA-approved to be

23  safe.  Is that fair?

24  A   No, I would actually differ with that point.

25  Q   Okay.

Buffington - Redirect

1   A     You can take active product ingredient if it's clinically

2   acceptable, the ingredient, and it doesn't have to be a

3   FDA-regulated facility.

4   Q     I think I misread what he's saying.  He is saying if it's

5   not an FDA-regulated facility, then it would be outside perhaps

6   the scope of what that kind of facility would be able to

7   produce.  Is that fair?

8   A     What year was this, '15?  I think his comment was

9   impacted by some of the legislative efforts at that time.  But

10  they would have to -- the more important part is not the FDA

11  regulated, it's what's stated underneath that it would have to

12  use FDA-sanctioned, good manufacturing practices.

13  Q     Okay.  So the prisoners' expert in the state court opined

14  to that court -- in the state court case opined that

15  counterfeit or substandard ingredients and/or poor practice on

16  the part of drug compounders often results in drugs which are

17  contaminated or subpotent and which do not have the strength,

18  quality or purity represented on their labeling.  Did I read

19  that right?

20  A     You did.  That is a potential.

21  Q     He, in fact, told the Pulaski County Circuit Court that

22  the risk of using compounded drugs is demonstrated and

23  extremely high.  Correct?

24  A     He did.

25  Q     And then Dr. Sasich goes on to talk about FDA surveys and

Buffington - Redirect

1  problems that the FDA has found with compounded drugs.  Is that

2  right?

3  A    That is correct.  And that's what I was referring to if

4  you go back to around that time frame, it was a peak area of

5  interest.  And he also has served as a site surveyor for

6  organizations that certify institutions.

7  Q    Dr. Sasich was also concerned that compounded injectable

8  pentobarbital or other compounded drugs may contain endotoxins

9  which can induce an inflammatory response that manifests as a

10 painful reaction, fever, and increased heart and respiratory

11 rates that can cascade to organ failure and a painful death.

12 Is that right?

13 A    He did state that.

14 Q    He also was concerned that compounded drugs that are too

15 potent, super potent in his words, may result in a person

16 experiencing suffocation and gasping for breath.  Right?

17 A    Yes.  I would assume he means before the third agent.

18       MS. MERRITT:  I'm not going to keep going through

19 it.  I move to admit Defendants' Exhibit 34, Your Honor.

20       THE COURT:  Any objection?

21       MR. WILLIAMS:  No objection.

22       THE COURT:  Defendants' Exhibit 34 is admitted.

23       (Defendants' Exhibit 34 received in evidence.)

24 BY MS. MERRITT:

25 Q    While the State hasn't taken a position on the use of

1    compounded drugs or not, there's no evidence in this case that

2    there is a known and available willing supplier of any kind of

3    compounded drug to the Arkansas Department of Correction for

4    use in lethal injection executions, is there?

5    A    I think beyond that, I think there was an attempt to find

6    that and there was no luck to do that.

7    Q    Okay.  I'll leave it at that.  You were asked about some

8    testimony that you gave in a prior case about the potential

9    availability of a compounded pentobarbital in another

10   jurisdiction.  As you sit here today, are you aware of the

11   identity of any compounding pharmacy that is willing to

12   compound pentobarbital or any other drug and sell it to the ADC

13   for use in lethal injection executions?

14   A    No, and that's based on actually trying to find some in

15   response to that testimony and was unsuccessful.

16   Q    So you've made that effort and you came up short?

17   A    That's correct.

18   Q    Is a 500-milligram dose of midazolam sufficient to induce

19   unconsciousness in an inmate?

20   A    Yes.

21   Q    And while unconscious, would an inmate be able to feel

22   and experience pain?

23   A    At the level and depths that a 500-milligram dose would

24   produce, the answer would be no.

25   Q    Is there any scientific basis to conclude that while

1   unconscious, an inmate would feel and experience severe pain

2   upon the administration of vecuronium bromide?

3   A     No.  And based on the doses that are even used in

4   clinical practice for the nature of discomfort that may

5   associate the intravenous administration of vecuronium, that

6   would not rise to any presumption that it would be a level of

7   pain or even have the capacity to reverse some effect of

8   midazolam.

9   Q     So you disagree with any contention that perhaps the

10  vecuronium bromide will somehow shake an inmate out of the

11  state of unconsciousness and bring him back up to consciousness

12  plane?

13  A     That's correct.  That dose is far less than that with

14  surgical incisions, bone fracture repair, and other painful

15  interventions like a colonoscopy that can be significantly

16  painful.  Those don't reverse or have patients come back or

17  emerge through just because of the occurrence of a noxious

18  stimuli.

19  Q     Is there any scientific basis upon which to conclude that

20  while unconscious an inmate would feel or experience severe

21  pain upon the administration of potassium chloride?

22  A     In the course of the ADOC if administered properly, no.

23  Q     So in your opinion, is the Arkansas lethal injection

24  protocol sure or very likely to cause these inmates to suffer

25  severe pain?

1    A      No.

2    Q      In fact, do you believe that the Arkansas protocol is

3    designed to minimize any risk of pain and suffering for the

4    inmate?

5    A      Yes, based on the appropriate sequence and administration

6    of those three medications.

7    Q      Thank you, Doctor.

8              THE COURT:  I have some questions, Doctor.  I need

9    you to help me understand exactly what you're testifying to in

10   regard to the scope of your work that you did for Alabama as

11   distinguished from work you may have done in this case.  And in

12   regard to work for Alabama, I'm not certain that I understand

13   the testimony you've given.  As I understood it, you were

14   retained in doing some work for Alabama?

15             THE WITNESS:  That's correct.

16             THE COURT:  In regard to that, Alabama asked you to

17   or you were at a professional conference perhaps, I don't know

18   that the State necessarily asked you to do it, but you became

19   aware of folks who would compound pentobarbital?

20             THE WITNESS:  Yes.  I was at a conference, a

21   national conference, and the session was on lethal injection

22   medications and it was a small work group in attendance and

23   there were multiple people who said that they were interested

24   in providing that type of service.  In the course of a

25   deposition in the Alabama case, opposing counsel, actually the

```
 1    gentleman who testified yesterday, Steven --
 2               MS. MERRITT:  Baich?
 3               THE WITNESS:  No.  Hahn?  Was the opposing counsel
 4    and had asked that question in a similar fashion to today, was
 5    I aware, and I stated that I was.  And that I thought there
 6    were -- based on that discussion at the national meeting, I was
 7    asked to go back and pursue would they work with the Alabama
 8    Department of Corrections and on all answers, the answer was no
 9    and that they had many other questions regarding the process of
10    being involved.
11               THE COURT:  I thought you testified initially that
12    the answer was they want to meet with the State of Alabama
13    directly.  Help me understand how that fits in, because you
14    testified to that, so I'm trying to figure out the continuum of
15    sort of how this evolved and where we ended up.
16               THE WITNESS:  That is correct.  So where I left off
17    was answering that all said no and that I provided the list of
18    names to Alabama.
19               THE COURT:  All said no to you?
20               THE WITNESS:  That is correct.  And it is my
21    understanding and I could confirm that for the Court that the
22    Alabama Department of Corrections then found out that they had
23    no successful candidates out of that list.
24               THE COURT:  What do you base that last statement on?
25               THE WITNESS:  Just later dialogue with counsel.  My
```

1    only request was could I go back and ask them if they would,

2    and the answers were no.

3              THE COURT:  Counsel wouldn't permit you to do it and

4    said Alabama hadn't been successful.  Do you know the details

5    of Alabama's efforts?

6              THE WITNESS:  No, ma'am.  I can find out.

7              THE COURT:  In regard to Arkansas or work you have

8    been retained to do in this case, you have not been retained to

9    approach any compounding pharmacist on behalf of the Arkansas

10   Department of Correction in Arkansas, have you?

11             THE WITNESS:  You are correct.  And it's my

12   understanding that they've already done that exercise

13   themselves and had no positive.

14             THE COURT:  You were relying for that information

15   upon an affidavit from Director Kelley; is that right?

16             THE WITNESS:  No, just guidance from counsel,

17   comments from counsel.

18             MS. MERRITT:  I think the evidence is not going to

19   show -- I don't know that --

20             THE COURT:  We'll get there.  I just want to

21   understand what his testimony is.

22             MS. MERRITT:  I think he might be misunderstanding

23   what was in Director Kelley's affidavit.  She did make efforts

24   to obtain a barbiturate and her efforts were unsuccessful.

25             THE WITNESS:  I would assume that's the same comment

```
 1   though.
 2             THE COURT:  All right.  That helps me.  I appreciate
 3   it very much.
 4             MS. MERRITT:  Can I ask one follow-up question in
 5   response to what the Court was asking?
 6             THE COURT:  You may.  And I will also let
 7   plaintiffs' counsel ask a follow-up question if you have any
 8   based upon what I've done.
 9                  FURTHER REDIRECT EXAMINATION
10   BY MS. MERRITT:
11   Q    Dr. Buffington, in connection with Alabama's efforts to
12   obtain a compounded barbiturate --
13   A    Yes.
14   Q    -- do you know if that was before or after the Ronald
15   Bert Smith execution?
16   A    Long before, and I don't think it was limited to
17   barbiturate.  It was compounded medications for lethal
18   injection protocol.
19   Q    Any compounded drugs?
20   A    That's correct.
21   Q    So as far as you know, their efforts were unsuccessful,
22   correct?
23   A    Correct.
24   Q    Alabama has adopted the same three-drug protocol that the
25   Arkansas Department of Correction uses here, right?
```

Buffington - Further Redirect                                694

```
1    A    That's correct, and it was successful.
2    Q    It was successful in the Bert, Ronald Bert Smith
3    execution?
4    A    Correct.
5    Q    Thank you.
6              THE COURT:  I actually have one more clarifying
7    question.  When was the professional conference?
8              THE WITNESS:  That was in 2015 was the depo.  I'd
9    have to go back and loot at the month, but I actually think he
10   reminded me yesterday that was in March, the deposition, so it
11   would have been about three weeks prior to that.  First week of
12   March is national meeting where I'm on the board of trustees.
13             THE COURT:  So 2015 is your recollection about the
14   year?
15             THE WITNESS:  That's correct.
16             THE COURT:  How about the conversation of the
17   dialogue with Alabama later, do you know when that occurred?
18             THE WITNESS:  No.  Again, my understanding was that
19   I was not able to find anyone who was willing to do that.
20             THE COURT:  Thank you.  Any further follow-up?
21             MR. WILLIAMS:  Yes.  Could I have a minute?
22             THE COURT:  You may.
23             MS. MERRITT:  Your Honor, while we wait for
24   Mr. Williams, I wanted to clear up one thing.  If I did not
25   move for admission of Defendants' Exhibit 7, I do so now.
```

```
 1            THE COURT:  I don't think you did.  And those are
 2   the redacted photos of the legal injection drug vials?
 3            MS. MERRITT:  Yes, Your Honor.
 4            THE COURT:  Any objection to those coming in?
 5            MR. WILLIAMS:  No objection.
 6            THE COURT:  Thank you.
 7        (Defendants' Exhibit 7 received in evidence.)
 8            THE COURT:  We could facilitate this if we took our
 9   lunch break now.
10            MR. WILLIAMS:  That'd be fine.
11            THE COURT:  All right.  Why don't we go ahead and
12   we'll break for lunch now.  We'll come back in at 1:00.  We'll
13   be back on the record at 1:00.  We're in recess.
14        (Recess from 12:00 PM until 1:05 PM.)
15        (Proceedings continuing in open court at 1:05 p.m.)
16            THE COURT:  You may proceed when you're ready.
17                       RECROSS-EXAMINATION
18   BY MR. WILLIAMS:
19   Q    Welcome back.
20   A    Thank you.
21   Q    So before lunch you testified, if I'm correct, that you
22   do not believe compounded pentobarbital is available to states
23   for lethal injections.  You originally thought that, but you
24   changed your mind after talking to about 15 compounding
25   pharmacies in relation to an Alabama case.  Is that correct?
```

```
1    A     That is correct.
2    Q     Okay.  And do you remember when you had these discussions
3    with the compounding pharmacies about the compounded
4    pentobarbital?
5    A     Not with specificity.  Do you have the date of the
6    affidavit?
7    Q     So the date of the affidavit was April 22nd.  And I will
8    show that to you in a second.
9    A     Of what year?
10   Q     Of 2016.
11   A     So I was off by a year.
12   Q     And were you authorized to negotiate on behalf of
13   Alabama?
14   A     No.  It was just a request that based on a statement I
15   made -- a personal statement I made in a deposition to pursue
16   that question.
17   Q     Okay.  And after that, did you make any subsequent
18   attempts anywhere to talk to other compounding pharmacies or
19   pharmacists about pentobarbital for lethal injections?
20   A     No, sir.
21   Q     Okay.  So I'll share this with counsel.
22         So in reviewing this, is this the declaration you gave on
23   April 22nd?
24   A     It does appear so, yes, sir.
25   Q     And on page 5 by the stamp at the top --
```

Buffington - Recross

1    A     Yes, sir.

2    Q     -- that's your signature?

3    A     Yes, it is.

4    Q     And at the top of paragraph 8, I'll just read the first

5    sentence.  "I maintain my belief that there are pharmacies in

6    the United States that are able to compound pentobarbital for

7    use in lethal injections because other states have been

8    reported to obtain compounded pentobarbital for use in

9    executions."  So at least at that point you maintained a

10   personal belief that compounded pentobarbital was available

11   despite the conversations you had with the compounded

12   pharmacies?

13   A     Yes, and explained my logic, but I have no idea when

14   those may have been compounded or purchased, but there were

15   other states that had.

16              MR. WILLIAMS:  And I just move to admit this as

17   Exhibit 36.

18              THE COURT:  Any objection?

19              MS. MERRITT:  No objection.

20              THE COURT:  Exhibit 36 is admitted.

21        (Plaintiffs' Exhibit 36 received in evidence.)

22   BY MR. WILLIAMS:

23   Q     We talked a little bit about some of your other

24   litigation work.  Did you give testimony in Ohio in a recent

25   case?

1   A     I did, yes, sir, in January.

2   Q     In January of this year.  Do you mind if I share with you

3   some of the transcript from that?

4   A     Sure.

5   Q     So if we could just read from that.  And I'd like to

6   start at the top -- well, about the middle of page 981, line

7   10, the question was, "All right.  But you do recall -- do you

8   recall being deposed sometime on or about March 17th, 2016, in

9   general?"  And what was your answer there?

10  A     "No, sir."

11  Q     And then the question was, "All right.  Do you ever

12  remember giving any deposition testimony about where you were

13  asked questions about whether you believe that it was possible

14  to obtain compounded pentobarbital?"  And how did you answer?

15  A     "Yes, I do recall that."

16  Q     Okay.  And then the questioner said, "You do remember

17  that.  And if you provided that testimony, and then after the

18  deposition, if I understand it, you went and contacted some

19  compounding pharmacies of which that you know of and

20  inquired -- made inquiry whether, in fact, they could provide

21  or would be willing to provide compounded pentobarbital to the

22  Alabama Department of Corrections?"  And what was your answer?

23  A     "That is correct."

24  Q     And did you proceed to answer further?

25  A     Yes.  I said, "I was not commissioned to do that by

1  Alabama.  It was a request by opposing counsel."

2  Q    And that is correct?  Were you asked by Alabama or by

3  opposing counsel?

4  A    To the best of my recollection, it emanated from opposing

5  counsel's question during my deposition.  I can't tell you if

6  both or if anything in writing.

7  Q    Okay.  Well, whatever it might have been, the questioner

8  went on to say, "Right.  Right.  And so you did that.  And you

9  contacted, if I haven't said that already, about 15, is that

10 right, roughly 15?"  And you answered?

11 A    "I think I started with ten and added five more calls."

12 Q    Okay.  And then you were asked, "And at least among those

13 15 that you contacted, you didn't find anybody who was at least

14 willing or capable of providing compounded pentobarbital to

15 Alabama?"  And you answered?

16 A    "Not without further information.  So they weren't --

17 they were not comfortable putting my name under their name on a

18 list and providing it blindly."

19 Q    Okay.  They were not comfortable saying, "Put my name on

20 the list and providing it blindly back"?

21 A    Correct.

22 Q    So -- and then we'll skip down because there's hemming

23 and hawing there.  But on line 20, it says -- and we refer to

24 the declaration that we've discussed just now.  In paragraph 8

25 you said that despite your inquiry of these 15, you said, "I

1  maintain my belief that there are pharmacies in the United

2  States that are able to compound --"  And then the Court

3  interrupted and said "Pharmacies -- pharmacists," and then the

4  question continued, "I'm sorry.  I maintain my belief that

5  there are pharmacists in the United States that are able to

6  compound pentobarbital for use in lethal injections because

7  other states have been reported to have obtained compounded

8  pentobarbital for use in executions."  Did I read that

9  correctly?

10  A    And I answered, "I do agree with that statement," which

11  is 100 percent consistent with the last document.

12  Q    Thank you.

13          MR. WILLIAMS:  I would move to admit that as

14  paragraph 37 -- or Exhibit 37.

15          THE COURT:  37.

16          MS. MERRITT:  No objection.

17          THE COURT:  Plaintiffs' 37, that's the next number.

18          MR. WILLIAMS:  Plaintiffs' 37.

19          THE COURT:  Right.  We did 36 already.  This one's

20  37 and it's admitted.

21      (Plaintiffs' Exhibit 37 received in evidence.)

22          MR. WILLIAMS:  Nothing else.

23          THE COURT:  Anything further?

24          MS. MERRITT:  Yes, Your Honor, I think I have two

25  quick questions.

1                    FURTHER REDIRECT EXAMINATION

2    BY MS. MERRITT:

3    Q      If I could use the ELMO, please.

4           Good afternoon, Dr. Buffington.

5    A      Good afternoon.

6    Q      On Plaintiffs' Exhibit 36, would you please read the

7    highlighted portion on paragraph 8?

8    A      Yes.  It is the last portion of the paragraph 8, it says,

9    "I have not been able to locate at this time a pharmacist or a

10   pharmacy willing and able to compound pentobarbital for the

11   ADOC and none of the pharmacists that I contacted indicated

12   that they were able and willing to provide compounded

13   pentobarbital to the ADOC for use in lethal injection."

14   Q      Okay.  So you swore that to be true on April 22nd of

15   2016?

16   A      Yes.

17   Q      And since that time, have you made any further efforts on

18   behalf of the Alabama Department of Correction or otherwise to

19   identify compounding pharmacies who would be willing to

20   compound pentobarbital for use in lethal injection executions?

21   A      Not on behalf of any state and nor am I aware of a

22   pharmacy that would.

23   Q      Okay.  As you sit here today, are you aware of any

24   compounding pharmacy who would be willing to compound

25   pentobarbital and sell it to the ADC for use in lethal

1    injection executions?

2    A    I am not aware of one.

3    Q    Thank you.

4         THE COURT:  Anything further?

5                   FURTHER RECROSS-EXAMINATION

6    BY MR. WILLIAMS:

7    Q    But despite what you said in that statement, at least in

8    January, you believed that there are compounding pharmacies who

9    will sell compounded pentobarbital for use in lethal

10   injections?

11   A    Yes.  Those are two very different questions, and I

12   stated that my logic for that is simply based on the fact that

13   other states have been able to.  I am not aware of any pharmacy

14   that will provide compounded pentobarbital.

15   Q    Fair enough.  So you have no affirmative knowledge, but

16   it's your personal belief that there are pharmacies there that

17   will sell?

18   A    My speculation based on the fact that other pharmacies

19   have prior to this date.

20   Q    Okay.  Thank you.

21         THE COURT:  Anything further?

22         MS. MERRITT:  No, Your Honor.

23         THE COURT:  You may step down.

24   You may call your next witness.

25         MS. CRYER:  Your Honor, I call Larry Norris.

| | |
|---|---|
| 1 | **LARRY NORRIS, DEFENDANTS' WITNESS, DULY SWORN** |
| 2 | DIRECT EXAMINATION |
| 3 | BY MS. CRYER: |
| 4 | Q    Good afternoon, Mr. Norris. |
| 5 | A    Good afternoon. |
| 6 | Q    Would you state your full name for the record, please. |
| 7 | A    Larry Brown Norris. |
| 8 | Q    Mr. Norris, are you currently employed? |
| 9 | A    No.  I'm retired. |
| 10 | Q    And where were you last employed? |
| 11 | A    I was director of the Arkansas Department of Correction |
| 12 | for the State of Arkansas. |
| 13 | Q    And how long were you employed with the Arkansas |
| 14 | Department of Correction? |
| 15 | A    Total of 39 years. |
| 16 | Q    We're going to go on -- I believe I explained to Mr. Reed |
| 17 | last night, we're going to take a trip down memory lane and |
| 18 | we're going to do a "This is Your Life."  If you would, please, |
| 19 | start back and, first of all, let me ask, what is your |
| 20 | educational background? |
| 21 | A    I have an Associate's Degree in Nursing from the |
| 22 | University of Arkansas at Monticello.  I have a Bachelor's |
| 23 | Degree in General Studies from the University of Arkansas at |
| 24 | Pine Bluff, and a Master of Arts Degree in Criminal Justice |
| 25 | from the University of Arkansas at Little Rock. |

1   Q      When did you obtain those degrees?

2   A      Oh.  '89, the master's; '74, the associate; and I

3   honestly can't remember about the bachelor's, about '83 or so.

4   Q      It's been a minute?

5   A      Yes, ma'am.

6   Q      Let's go back and, if you would, let's talk about your

7   employment with corrections.  When did that begin?

8   A      So I started in corrections as a phlebotomy technician at

9   the Plasma Center at the Cummins Unit in 1971, January.

10  Q      Were you a State employee at that time?

11  A      I was not, and probably misspoke a little earlier.  I

12  have 39 years in corrections, but the first two or three years

13  was as a contractor working in corrections.  In 1974, I then

14  became a State employee.  And then in '76, I was promoted to

15  infirmary administrator at the Cummins Unit.  And then in '77,

16  I was promoted to assistant warden for treatment at Cummins.

17  Q      All right.  Let me stop you right there before we get --

18  let's start with the medical part first and then we'll get into

19  your employment with the part that I'm going to refer to as the

20  security side.

21  A      Yes, ma'am.

22  Q      If you would, starting back in 1971, tell the judge what

23  some of your job duties and responsibilities were as a

24  phlebotomy technician.

25  A      So in general terms, the process is plasmapheresis where

Norris - Direct

```
 1  whole blood is drawn from a donor.  It is placed in a
 2  centrifuge and spun down.  And the plasma is extracted from the
 3  red cells.  The red cells are reinfused.  And the plasma is
 4  stored and then shipped for medical research and other things.
 5  Q    How often -- how many days a week would you -- how many
 6  days a week did you work at the Cummins Unit during that time?
 7  A    So the Plasma Center operated on Saturday, Sunday, and
 8  Monday till about noon, so two and a half days a week.
 9  Q    Okay.  And how did you go about drawing the plasma or
10  drawing the blood out of the inmate?
11  A    Well, you just start an intravenous line and then you
12  draw the blood much like you do at the Red Cross when you
13  donate blood through a blood bank, through an IV.
14  Q    What training did you have to undergo in order to learn
15  how to insert an IV?
16  A    Well, I was trained there as a phlebotomy technician to
17  start IVs.
18  Q    And I understand that you maybe worked two and a half
19  days a week as a phlebotomy technician.  Approximately how many
20  IVs would you start over the two and a half day shift?
21  A    Well, when I reviewed it, I said at least 50 a weekend.
22  That's probably conservative, but at least 50 a week.
23  Q    Okay.  Did you have any other job duties or
24  responsibilities as a phlebotomy technician?
25  A    No, ma'am.
```

Norris - Direct

1   Q    Okay.  I believe you testified then that you promoted to

2   infirmary administrator at the Cummins Unit?

3   A    Yes, ma'am.

4   Q    Okay.  Tell the judge what some of your job duties and

5   responsibilities were in that capacity.

6   A    So in, I believe it was '74, I became a registered nurse

7   and was interviewed and asked to consider coming to Cummins as

8   the infirmary administrator to help with medical care there.

9   And I did take that job.  And that really amounted to helping

10  to provide medical care for the inmate population, included

11  holding a triage or sick call in the morning, following

12  physicians' protocols on treatment options, assisting the

13  physician in emergency procedures when it was necessary, and

14  generally being involved in total patient care for inmates who

15  presented themselves with being sick or having other problems,

16  injuries and things like that.

17  Q    During this time, I believe you testified that that was

18  around 1976?

19  A    Yes, ma'am.

20  Q    Were the inmates assigned or sentenced to death row

21  housed at the Cummins Unit?

22  A    Yes, ma'am.

23  Q    Okay.  In 1977, I believe you said you promoted from the

24  infirmary administrator to assistant warden at the Cummins

25  Unit?

1   A    That's correct, assistant warden for treatment at

2   Cummins.

3   Q    Is it fair to say that you left the medical side and that

4   you began your history or employment on the security side?

5   A    Well, no.  Actually, that assistant warden for treatment

6   job did entail supervising the medical area and food service

7   and laundry and education and those treatment type aspects,

8   mental health and those kind -- it was the administrative

9   position right under the warden that dealt with those areas of

10  the facility.

11  Q    Where did you go after becoming the assistant warden?

12  A    So the next year, in '78, I was moved to assistant warden

13  for security.

14  Q    Okay.

15  A    And stayed in that position until late 1982.

16  Q    Where did you go after that?

17  A    I was promoted to warden at the maximum security unit at

18  Tucker, Arkansas.

19  Q    And when you were promoted to the warden at the maximum

20  security unit, were there inmates housed at that facility?

21  A    No, ma'am.  We were building the facility.  The inmate

22  work crews were living at Tucker, which is an adjacent

23  institution.  And the inmate work crews were brought from

24  Tucker over to the max unit to continue the construction.  The

25  first part of the facility was built under contract with an

1  outside contractor.

2       And then in July of '83, we moved the first group of

3  inmates into the facility and continued the construction

4  process with the inmates coming over from Tucker.

5  Q    At some point during your tenure at the maximum security

6  unit as warden, were the inmates housed on death row moved to

7  the maximum security unit?

8  A    Yes, ma'am, they were.

9  Q    Do you by any chance recall about what year?

10 A    It would have been after '86, but to tell you the exact

11 time, I really can't remember.

12 Q    Not a problem.

13 A    We finished the last wing in like the spring of '86, and

14 as soon as it was finished then we moved those guys over.

15 Q    Did you provide direct supervision to them as the warden

16 over the maximum security unit during your tenure at that unit?

17 A    Yes, ma'am, I did.

18 Q    All right.  At some point were you promoted from warden

19 at the maximum security unit?

20 A    Yes, ma'am.  In '88, I was promoted to assistant director

21 for institutions with the Department of Correction.  My office

22 was in Pine Bluff.  It's the central office.

23 Q    All right.  What were some of your job duties and

24 responsibilities in that role?

25 A    Well, generally, I was between the director of correction

Norris - Direct

1    and the warden, so I supervised the wardens, I was in the

2    grievance process, I believe, at that time, and dealt with

3    administrative issues from the central office to the warden's

4    level.

5    Q     How long did you stay in that position?

6    A     In November '92, I was named interim director and stayed

7    in that position until May of '93.  That's not right.  It's

8    been a long time.  I was named director in December '93.  I

9    have to go backward.  I'm sorry.

10   Q     That's all right.

11   A     And I was interim from May '93, and then there was

12   another fellow that was director from November '92 to May '93,

13   and I was interim before he showed up, so I guess it was in '92

14   that I was interim the first time.

15   Q     When did you become the director?

16   A     December 13th, '93.

17   Q     How long did you maintain or keep your position as

18   director of the ADC?

19   A     16 years and three weeks.

20   Q     And at some point I assume you left?

21   A     I did.

22   Q     Why did you leave?

23   A     I was tired.  I retired.

24   Q     In preparation for this lawsuit or in conjunction with

25   this lawsuit, did you complete an affidavit?

Karen Baker, RMR, CRR, CCR
United States Court Reporter

1    A     Yes, ma'am.

2    Q     I'm going to show you what has been marked as Defendants'

3    Exhibit 2.  Let me know if you can see this.

4    A     I can see it.

5    Q     All right.  You see it at the bottom?  I'm going to flip

6    over to page 7 of Defendants' Exhibit 2.  Is that your

7    signature?

8    A     Yes, ma'am.

9    Q     All right.  And that was signed on April 4th, 2017?

10   A     Yes, ma'am.

11   Q     Is the information that you provided in your affidavit

12   true and correct to the best of your knowledge?

13   A     Yes, ma'am, it is.

14         MS. CRYER:  Your Honor, at this time I would move to

15   introduce Defendants' Exhibit 2 into the record.

16         THE COURT:  Any objection?

17         MR. SHORT:  No objection, Your Honor.

18         THE COURT:  Defendants' Exhibit 2 is admitted.

19         MS. CRYER:  Thank you, Your Honor.

20         (Defendants' Exhibit 2 received in evidence.)

21   BY MS. CRYER:

22   Q     Mr. Norris, let's look at I believe it is the last page

23   of this exhibit.  And I'm going to scoot it in just a little

24   bit, and if you have any difficulty reading it, let me know and

25   I can hand you a hard copy.

Norris - Direct                                711

1   A     Better let me have a hard copy.

2   Q     Okay.  I'm going to put my marked-on copy up there.

3            MS. CRYER:  May I approach the witness?

4            THE COURT:  You may.

5            MS. CRYER:  Thank you.

6   BY MS. CRYER:

7   Q     So, Mr. Norris, I have drawn a line on this document

8   which is a list of the executions in Arkansas dating back to

9   1990.  Do you see that on this form?

10  A     Yes, ma'am.

11  Q     All right.  Now, my understanding is -- and please

12  correct me if I'm wrong -- my understanding is that in 1990,

13  you were not yet the ADC director?

14  A     That's correct.

15  Q     Now, there were two executions in 1992.  My understanding

16  is that you were not the ADC director at that time?

17  A     That's correct.

18  Q     All right.  And for the two executions that occurred on

19  May 11th, 1994, my understanding is that you were the director?

20  A     Yes, ma'am.

21  Q     Let me ask you a question or two about the four

22  executions that occurred prior to you becoming director.  Did

23  you have any involvement in any of these executions?

24  A     I was assistant director, and I was back near the holding

25  cell before the inmates were moved, but as far as being in the

1    chamber, I was not.

2    Q     That's fine.  And it's my understanding that, according

3    to this document, Inmate John Swindler in June of 1990 was

4    executed by electrocution?

5    A     That's correct.

6    Q     And then starting with Ronald Gene Simmons, and on down

7    to the present day, lethal injection has been the method of

8    execution.  Am I reading that correctly?

9    A     You are, yes, ma'am.

10   Q     Does that comport -- or is that your recollection as

11   well?

12   A     It is.

13   Q     All right.  Let's talk, if we can -- I'm going to zoom

14   this in a little bit.  And let's talk about the two executions

15   that occurred on May 11th, 1994.

16         First of all, do you, by any chance, remember, have any

17   independent recollection of either of those executions?

18   A     Vaguely I remember.  I knew both of the inmates.  But as

19   far as recall, I really don't have much recall for it.

20   Q     Do you recall whether or not there were any problems that

21   were encountered the night of those executions?

22   A     I don't recall any problems with either of them.

23   Q     Do you know how two executions in one night came to be

24   set?

25   A     I really think that I asked for that to happen.

Norris - Direct                                    713

1    Q     Why would you ask for that to happen?

2    A     Well, I was -- as I said before, I was not director in

3    1990.  But John Swindler was executed on the 18th of June, and

4    Ronald Gene Simmons the 25th, which is just a week later.  It

5    was just a hard week.  I mean, we went from executing one

6    person to having a whole week of dealing with executing another

7    person.  And so it made more sense to me to do both of them one

8    night and be done with it so you can get back to your regular

9    routine in your institution.  You have a lot to do there and

10   the institution has to keep moving and keep operating.  So

11   that's my recall.

12   Q     Okay.  Let's move up to the executions that occurred then

13   on August 3rd, 1994.  I believe, according to this chart, there

14   were three executions that night.

15   A     Yes, ma'am.

16   Q     Do you remember that night?

17   A     I do.

18   Q     All right.  Do you recall there being any problems,

19   issues, or concerns with those three executions as far as were

20   they carried out accordingly, or were they carried out as

21   others had been carried out?

22   A     As I recall, there were no problems with the execution

23   process whatsoever.

24   Q     Do you recall how three executions came to be set in that

25   one night?

Karen Baker, RMR, CRR, CCR
United States Court Reporter

Norris - Direct

1    A     These guys were committed -- were involved in the same

2    crime.  And we knew that we had three to carry out.  And it's

3    my belief that I asked, for the same reason, to get ramped up,

4    get in a high state of readiness and prepare for executions and

5    get them done and move on.

6    Q     I know you just mentioned the word "prepare."  Did you

7    prepare for the executions that occurred in 1994?

8    A     We prepared for every one.

9    Q     How do you prepare for an execution?  How did you prepare

10   for an execution?

11   A     There's just a series of things that happen.  You start

12   with the date that's set.  And then, of course, all of the

13   court proceedings and appeals and all that stuff, I mean, you

14   know, it's an ongoing deal.  But when you get down close to

15   time, and then you start with preparation at the facility,

16   dealing with the escort team, getting your IV team together,

17   making yourself comfortable with the people that are doing

18   certain aspects of the job, and compartmentalizing the duties

19   that are carried out so that you have a comfort zone that the

20   people who are charged with doing the job know what they're

21   doing and are efficient at it, and then carrying it out with

22   dignity and respect for human life is -- and doing our duty.

23   Q     Do you recall -- as director back in 1994, do you recall

24   who would have chosen or who was responsible for choosing or

25   selecting the execution team?

Norris - Direct                                    715

1    A     Well, the institutional warden -- and I can't remember

2    who it was at that point -- we had those people responsible

3    because they worked day-to-day with the correctional staff.

4    They are able to observe them in stressful situations, and

5    corrections is stressful every day.  I don't care what's

6    happening.  I mean, it's just not an easy business, but -- so

7    they're able to observe them, judge their actions under stress,

8    and then they select people and then ask them and interview

9    them to see if they're willing to participate in this process.

10   And if they are, then the training really starts.

11   Q     Let's move on to there was an execution, single

12   execution, on I believe that's April 19, 1995.  Do you recall

13   anything about the execution of Richard Snell?

14   A     Yes, ma'am.

15   Q     What do you recall about that execution?

16   A     Well, that was the day of the Oklahoma City bombing.  And

17   we had people in federal court in Pine Bluff when that

18   happened, as I recall that.  And so it was really a strange and

19   tense time.  And we had some security concerns with Snell.  And

20   so we were, of course, always on a high state of readiness, but

21   in this execution, it seemed to be more so.

22   Q     Let me ask about the preparation for the Snell execution

23   versus the execution for the two executions on May 11th, '94,

24   and the three executions on August 3rd, '94.  Between those

25   three sets of executions, was there any difference to your

Norris - Direct

1    planning and preparation for those nights -- execution nights?

2    A     The only difference was the number.  I mean, we prepared

3    for one, we prepared for three, and that's basically it;

4    getting the right folks in the right places and having enough

5    people doing different tasks to deal with the condemned.

6    Q     Was an officer's or an employee's role on the execution

7    team mandatory?

8    A     No.

9    Q     What options were available to the officer if he or she

10   did not wish to participate?

11   A     Well, at first, the warden was charged with selecting,

12   and he did that.  And then when we had our practice runs, I

13   made it a point to, after each of those, to ask if anyone had

14   any qualms or any problems, you know, please let it be known

15   and they could be replaced and there would be nothing ever said

16   about it.  And that didn't happen but once.

17   Q     Why would you ask if the warden had already asked?

18   A     For me, because I wanted -- I just wanted to know and be

19   sure.

20   Q     And I believe you testified just a second ago that you

21   remember on one occasion that there was someone who had a

22   problem and did not wish to serve?

23   A     That's correct.

24   Q     Any type of employment action taken against that

25   employee?

1   A    No, ma'am.

2   Q    All right.  On January 8th, 1997, it looks like you had

3   three executions?

4   A    We did.

5   Q    Do you recall anything, any hiccups or any problems

6   associated with the three executions that night?

7   A    No hiccups, no, ma'am.  They were all carried out as

8   planned.

9   Q    Okay.  Then it looks like you had additional -- and over

10  the years, it appears you had -- am I correct that over the

11  years that you have had some single person or individual

12  executions?

13  A    Oh, yes, ma'am.  Most of them actually.

14  Q    And, again, in 1999, it looks like you had another

15  occasion where you had two executions on one night.  Am I

16  reading that correct?

17  A    Yes, ma'am, on 9/8/99.

18  Q    Do you recall those executions?

19  A    I recall Mark Gardner.  I knew him.  But outside of that,

20  I don't recall anything specific or that stands out.

21  Q    Do you recall any hiccups or problems or issues that took

22  place with regard to those two double executions?

23  A    No, ma'am.

24  Q    And it appears that the remainder of the executions were

25  carried out one at a time, am I reading that correct, or on one

1    night at a time?

2    A     I believe you're correct, yes, ma'am.

3    Q     All right.  Is there any reason that the execution

4    starting in 2000 going through 2005, which was when the last

5    execution occurred -- any reason that those were single-man

6    executions as opposed to two-man executions?

7    A     That's just the way it worked.  I mean, when the governor

8    set the date and the appeals worked themselves through the

9    courts, that's just kind of the way it happened.

10   Q     Other than the executions that we've looked at on this

11   document, do you recall whether or not other multiple

12   executions were scheduled in one night but were just, in fact,

13   not carried out?

14   A     I don't recall anything like that happening.

15   Q     I know that in your affidavit, you discussed -- first of

16   all, you discussed the different executions that had occurred.

17   How did you know -- or what process did you follow, if any, on

18   carrying out these executions?

19   A     I'm not sure I understand your question.

20   Q     And that is a fair response.  Was there a policy in place

21   that told you how to carry out the executions?

22   A     Yes, ma'am.  We developed an administrative directive

23   that dealt with carrying out the process.

24   Q     Okay.  I'm going to show you what was attached to the

25   complaint in this case.  It is not confidential.  And this was

Norris - Direct

1    filed Docket Entry No. 2, this case, on March 27, 2017.

2    Mr. Norris, let me ask, do you recognize what this document is?

3    A    This appears to be a copy of the administrative directive

4    dealing with the execution process, procedure for execution.

5    Q    Okay.  Are you able to read it on the screen, or would

6    you like me to --

7    A    Yes, ma'am, I can read this.

8    Q    Okay.  And on the first kind of full line and through the

9    middle of the page, it indicates -- there's a signature there

10   of an approval name.  Do you recognize that signature?

11   A    Yes, ma'am.  That appears to be my signature.

12   Q    All right.  And are you familiar with this policy?

13   A    I am.

14   Q    Okay.  Were you -- did you remember the policy or all of

15   the intricacies before I showed it to you today?

16   A    No, ma'am.  I just reviewed it today.

17   Q    During the time that you were director for the Department

18   of Correction, starting with the date of its effectiveness

19   going forward to your retirement, were you familiar with this

20   procedure?

21   A    Yes, ma'am.

22   Q    All right.  And I believe this procedure was also used --

23   were you a party in a lawsuit that was filed by Inmate Terrick

24   Nooner back in 2008?

25   A    I don't remember.

Norris - Direct

1   Q      You don't remember.  Okay.  Fair enough.

2          Mr. Norris, let me ask you, in your experience, given

3   what you know and what you remember about being the director of

4   the Arkansas Department of Correction, do you believe that the

5   executions schedule presents extra or additional stress that

6   would lead to error during the executions?

7   A      The schedule as set forth now?

8   Q      Yes, sir.

9   A      I really -- I've not done four sets in 10 or 12 days, but

10  I have done triples and multiple executions really.  I don't

11  see where -- it worked well for us.  I said in my affidavit if

12  I were asked, I would have -- if I had to do them, I would have

13  preferred to do four and four, or three, three, and two, or

14  some set of numbers to get the people ramped up, get everyone

15  trained and in their specific job responsibilities and their

16  compartments of responsibility and then get them done.

17  Q      After the execution had occurred, did you provide or were

18  there any type of debriefing services available to your

19  employees?

20  A      Yes, ma'am, the next day.  As a matter of fact, every

21  time, there was a debriefing session, and it wasn't elective,

22  it was mandatory that you attend, and it was well received and

23  I thought well done and helpful.

24  Q      Why was it mandatory?

25  A      Well, I just thought it was necessary.  You know, you

Norris - Direct

```
 1   have the John Wayne guys that really think nothing would bother
 2   them and they don't need it, but I just didn't agree with that.
 3   So we made it mandatory.  And I really think even the John
 4   Waynes appreciated it in the end.
 5             MS. CRYER:  Your Honor, may I have just one moment?
 6             THE COURT:  You may.
 7             MS. CRYER:  Thank you.
 8   BY MS. CRYER:
 9   Q     Mr. Norris, let me follow up on something that you have
10   said once or twice during your testimony.  You mentioned
11   compartmentalized?
12   A     Yes, ma'am.
13   Q     What do you mean by that?
14   A     Well, so if I had one correctional officer that had to be
15   at the cell front and document everything that happened in the
16   cell endlessly for the whole day, and then he had to escort the
17   inmate to the chamber, and then he had to be part of the IV
18   team, and then he had to be part of the staff that removed the
19   remains, that would be a terrible thing.  But what we had --
20   and, incidentally, we critiqued after every one of these to try
21   to improve our process and make it better.  But if you have one
22   person doing the cell front for a period of time, and I don't
23   remember exactly what it was, but it wouldn't have been all day
24   or it wouldn't have been eight hours.  It probably was more
25   like two hours at a time, but I can't swear to that, but that
```

1    was their job.

2        And then we had a group of people who went to the cell

3    front and escorted the inmate to the chamber and secured him to

4    the gurney.  And they were through.

5        And then the IV team presented themselves and they did

6    their work.

7        And then the medical person who observed and the

8    executioner did his work, and the warden did his work, and I

9    did my work.

10       So when you're able to separate your job responsibilities

11   and get good at it and it's -- then it makes it -- it made my

12   comfort level better and I think that it did the same for the

13   team.  I'm very proud of the work that they did and proud of

14   the team for doing their duty in such a professional manner,

15   and that's what it amounted to.

16   Q    So during the practices that you and your staff would

17   have, would each person -- let's say the person who was

18   responsible for documenting all of the activities going on in

19   the cell, is that the information or is that what they would

20   practice?

21   A    Yes.

22   Q    All right.  And then the person or persons who were going

23   to escort the inmate from the holding cell to the death

24   chamber, is that what they would practice?

25   A    Yes, ma'am.

Norris - Direct

1   Q     Okay.  And then so on with each person or each group of

2   people, they were responsible and they would go through the

3   practices to make sure that they understood what their role

4   was?

5   A     That's correct.  I mean, back to the documentation at the

6   cell front, there wasn't a lot of practicing to do there, but

7   they were, you know, trained on what to look for, what to

8   document, and it was everything.  If you changed channels on

9   the television, it was documented.  If he ate or didn't eat

10  much, he or she, then it was documented.  So training there was

11  just more or less a schooling or an education process.  But the

12  nuts and bolts of the process from going from the cell front to

13  the -- through the execution itself was trained and trained and

14  trained.  Prepare, prepare, prepare, was my motto more or less.

15  Q     Mr. Norris, when you were the director, was the IV team

16  qualified to place the IVs?

17  A     Yes, ma'am.

18  Q     Were the IV team members qualified to place the IVs on

19  the nights that you had two executions?

20  A     Yes, ma'am.

21  Q     Were the IV teams qualified to place the IVs -- the three

22  IVs or the three sets of IVs on the nights that you had triple

23  executions?

24  A     They absolutely were, yes, ma'am.

25  Q     In your opinion, will the current execution schedule make

Norris - Cross

1    it difficult for the IV team members to perform their jobs?

2    A     I think they can do it without a problem.

3            MS. CRYER:  All right.  Your Honor, I believe that's

4    all the questions that I have at this time.

5            THE COURT:  All right.  Cross-examination?

6        And I will tell you, Mr. Short, we're going to take a

7    break at 2:00, so you can structure your cross how you wish,

8    but I'm going to tell you that in advance so I don't interrupt.

9            MR. SHORT:  Fantastic.  Thank you very much, Your

10   Honor.

11                   CROSS-EXAMINATION

12   BY MR. SHORT:

13   Q     All right.  Mr. Norris, first, I just want to be clear.

14   Are you going to be playing a role in the upcoming executions?

15   A     No, sir, I will not.

16   Q     Okay.  Not setting any IVs in this case?

17   A     No, sir.

18   Q     Just checking.  Now, I just want to be clear.  You talked

19   about your work as both a phlebotomist and with respect to, I

20   guess you could say, the medical needs at Cummins.  Is that

21   correct?

22   A     Yes, sir, it is.

23   Q     And you admit -- I mean, there's quite a bit of

24   controversy about the prison blood program back at Cummins from

25   that time period, correct?

Norris - Cross

1    A    Not necessarily from the time I was in it, but later

2    there was some controversy, yes.

3    Q    Okay.  After you were in it?

4    A    I was out of it in '76.

5    Q    Okay.  So after you were out is when they basically

6    stopped testing blood and were selling inmate blood that had

7    HIV and hepatitis and things like that?

8    A    I don't remember when all that came about.  But when I

9    left in '76, it was operating and well accepted as far as I

10   recall.  Could have been a lot of things said about it.

11   Q    There's been a lot of -- there's been investigations

12   since then, right?

13   A    I'm sure.

14        MS. CRYER:  Your Honor, may I have a continuing

15   objection on relevance to this line of questioning?

16        THE COURT:  You may.  I'll overrule it.

17   You may proceed.

18        MR. SHORT:  Thank you, Your Honor.

19   BY MR. SHORT:

20   Q    There's been investigations since then, correct, since

21   you left?

22   A    I don't recall to what degree there's been investigation.

23   I know there's been a lot of media about it.

24   Q    And it got shut down ultimately?

25   A    It was discontinued, yes.

Norris - Cross

1   Q    And you had testified back in the 1970s when you left it

2   that everything was operating according to protocol, correct?

3   A    As far as I knew, yes, sir.

4   Q    No HIV or hepatitis was going out to anyone, it would

5   have been your testimony back then, correct?

6   A    I don't remember when the HIV factor became relevant.  I

7   don't believe it was in '71, and I don't know that it was in

8   '74 or '5 or '6.  I just can't remember.  I know at some point

9   when I was concerned about it as director of corrections in the

10  medical area.

11  Q    All right.  We'll move on.  That's all I've got about

12  that.

13       As far as when you were director, did you have employees

14  that knew how to use firearms?

15  A    Yes, sir.

16  Q    Okay.  Did you have quite a few of them?

17  A    Yes, sir.

18  Q    And did you have guard towers with employees with

19  firearms?

20  A    Sure.

21  Q    They could shoot for some distance, I would imagine?

22  A    Yes, sir.

23  Q    And why was it your belief that those employees were

24  capable of using those firearms and using them accurately?

25  A    Well, because they qualified with them.

Karen Baker, RMR, CRR, CCR
United States Court Reporter

1    Q    Okay.  And did they -- do they have to qualify, do they

2    have to go through any training?

3    A    Yes, sir.

4    Q    And is it your understanding that there's still

5    qualifications and training involved in the employees for ADC?

6    A    I'm sure more so now than ever.

7    Q    Okay.  And it's important for the Arkansas Department of

8    Corrections to make sure that it has officers that can use

9    firearms, correct?

10   A    Yes, sir.

11   Q    And security is very important?

12   A    Absolutely.

13   Q    Okay.  And I'm guessing you had more than one kind of

14   firearm?

15   A    Yes, sir.

16   Q    Okay.  Different handguns, rifles?

17   A    Yes, sir.

18   Q    Okay.  More than 20 guns total?

19   A    For the agency?

20   Q    Yes, sir.

21   A    Yes, sir, more than 20.

22   Q    Okay.  More than a hundred?

23   A    More than a hundred.

24   Q    All right.  Now, let's go back to your affidavit.  I'm

25   going to ask you some questions about that.  I think you do a

Norris - Cross

1    good job making sure it's clear, and I want to make sure I read

2    it right.  Your conclusions and opinions are largely based on

3    your experience?

4    A    Absolutely.

5    Q    Okay.  You understand and you admit that other people

6    could have different experiences?

7    A    No doubt.

8    Q    And I know that you wrote that you reviewed

9    Ms. Lancaster's affidavit.  Is that correct?

10   A    I did.

11   Q    And it's a different opinion than your opinion, correct?

12   A    It is, some parts of it.

13   Q    Right.  And I apologize, I should have clarified.  And

14   you also recognized that there have been other correctional --

15   high-ranking correctional officers that have spoken out with

16   opinions similar to Ms. Lancaster, correct?

17   A    I don't know about that, but I know that there's some

18   corrections people that are -- opinions are different than

19   mine.  I really wouldn't compare two others against one

20   another, but --

21   Q    Okay.

22   A    Yes, sir.  You can hear about what you want to hear about

23   this.

24   Q    Okay.  I mean, because, again, opinions are based on our

25   own experiences on some level?

Norris - Cross

1    A    Correct.  At least mine is based on my experience.

2    Q    Well, and that's what I want to talk to you about, your

3    experience.  First of all, do you have any experience with

4    lethal injection using midazolam?

5    A    None.

6    Q    And while you were at the -- the ADC director, did you

7    ever experience eight executions in 11 days?

8    A    No.

9    Q    Did you ever experience two sets -- two different

10   execution dates within one week?

11   A    Well, the first two were within one week, Swindler and

12   Simmons.

13   Q    Okay.  Within one week?

14   A    Yes, sir.  One was the 18th and one was the 25th --

15   Q    All right.  Fair enough.

16   A    -- or 24th, I believe.  25th.  I'm sorry.

17   Q    Okay.  And what was the most -- how about in two weeks --

18   A    I don't --

19   Q    -- what was the most you've ever had in two weeks?

20   A    Probably three, but I'd have to check.

21   Q    You think you've had three execution dates within two

22   weeks?

23   A    I had three in one day.

24   Q    Three dates.  I'm sorry.  And that's what I'm trying to

25   clarify, different dates.

1    A    I don't believe so.

2    Q    Okay.  And we'll go through that in a second.

3         What's the most you believe you've had in one month,

4    executions in a month, in a calendar month, let's say?

5    A    I would think three, without going through the list, I

6    mean.

7    Q    And those were all on one day, correct?

8    A    That's right.

9    Q    Okay.  And just to be clear, Swindler and Simmons -- you

10   weren't ADC director at that point, were you?

11   A    No, sir, I was not.

12   Q    In fact, you weren't director until Pickens in '94,

13   correct?

14   A    That's right.

15   Q    Okay.  So since you've been ADC director, can you

16   identify where there's been two dates -- different dates of

17   executions within one week?

18   A    No, sir.

19   Q    Can you identify two different dates of executions within

20   two weeks during your time as ADC director?

21   A    I don't think so.

22   Q    Okay.  And would you agree with me that the most

23   executions you oversaw in a calendar year was five?

24   A    I don't know.  The record is here.  If you want me to

25   count that, I will, but if that's correct, then I agree with

Norris - Cross

1   you if it's correct.

2   Q      It probably doesn't take long to count.  I don't want to

3   mislead you.  Do you have it in front of you?

4   A      I'll count.  I do.  So the question again was?

5   Q      I apologize.  It's, in a calendar year, how many

6   executions was the most you ever oversaw?

7   A      So in '92, I did two.  In '94, I did five.  In '95,

8   three.  No, two.  I'm sorry.  '96, one.  '97, four.  '98, one.

9   '99, four.  2000, two.  2001, one.  2003, one.  2004, one.

10  And 2005, one.

11  Q      So you agree with me the most you ever did in one

12  calendar year or oversaw was five executions, correct?

13  A      Yes.

14  Q      Okay.  And, again, I think you testified that the most in

15  a month was three, correct?

16  A      Yes.  I'm sorry.

17  Q      And if you'll look at the amount of time between

18  executions, which I know is important to you and we'll get into

19  that in a second, the least amount of time between execution

20  dates, you'd agree with me, was 55 days?

21  A      Which days are you looking at?

22  Q      And my recollection, and correct me if I'm wrong, is that

23  between 2/16 of '99 and 4/12 of '99 would be the closest dates

24  together, Johnny Cox and Marion Pruitt.

25  A      It appears to be correct.

1    Q     Okay.  And you don't see anywhere on there that -- and

2    you don't recall ever executing on two different dates sooner

3    than 55 days apart?

4    A     I don't recall that.

5    Q     Okay.  So when we're talking about your experience, you

6    don't have experience with eight executions in 11 days?

7    A     No.

8    Q     Okay.  You don't have experience with over one execution

9    date in two weeks?

10   A     I don't understand that question.  Sorry.

11   Q     Separate execution dates as opposed to number of

12   individuals being executed.  So the day that you were going to

13   execute someone, let's say April 5th, and then April 7th would

14   be a different date.  Okay.  Have you ever had more than one

15   execution dates within two weeks?  And I think we just

16   established 55 days was the --

17   A     I think you're right.

18   Q     Okay.  And so -- and you'd agree with me your experience

19   is a little different than what's scheduled to occur in this

20   case?

21   A     Of course it is.  Yes, sir.

22   Q     All right.  Just making sure.  I was hopeful it was that

23   easy for you.

24         Okay.  All right.  I just want to say, in your affidavit,

25   you say you were involved in planning and developing of

Norris - Cross

1    execution policy, correct?

2    A    That's correct.

3    Q    And did you oversee, I guess, changes to the protocol,

4    both written protocol and I guess you could say slight

5    adjustments to protocol when you're doing it -- did you make

6    amendments to the protocol as time went on?

7              MS. CRYER:  I'm sorry, Your Honor.  May I -- I don't

8    know if I need to object.  I'm trying to -- never mind.

9              THE COURT:  Do you have confidentiality concerns?

10   Is that --

11             MS. CRYER:  I don't understand his question.  The

12   question is not posed to me, so I'll sit down.

13             MR. SHORT:  I'll rephrase.  That's fine.

14   BY MR. SHORT:

15   Q    Did the policy from the first execution that you ever

16   did, whether formally or informally, did it ever change

17   throughout your time overseeing executions?

18   A    As I testified to, we critiqued after every execution to

19   see if there was something that we could or needed to do to

20   make the process better.

21   Q    Okay.  And some of those critiques were small, some were

22   a little larger, I mean, all range of critiques, right, and

23   changes?

24   A    Well, we had more or less a formal critique in the

25   central office with the people who were involved.  We always

1    critiqued after the fact to see if there was something -- I
2    mean, when you're dealing with lawyers and just -- you know,
3    you're always going to have some kind of different issue or
4    problem.  So, you know, we had to deal with that aspect along
5    with operational aspects and religious aspects.  And so all of
6    those things were considered after every execution so that if
7    it surfaced again, the next person would know how to deal with
8    it, if it were me or not.  And, you know, it's pretty volatile,
9    the corrections business, so it's a good chance I wouldn't be
10   there the next one, so someone else had to do it.
11   Q    And those changes are important to make sure the process
12   gets better and you solve any hiccups you might not have
13   foreseen, correct?
14   A    Yes, sir.
15   Q    And then when you practiced the next time, you would
16   practice knowing those criticisms that you had from last time,
17   correct?  I guess, implementing the changes that you had talked
18   about?
19   A    Yes.
20   Q    Okay.  And you always had at least 55 days to rehearse
21   for the next one to implement those changes, correct?
22   A    Yes.
23   Q    All right.  You didn't have two days?
24   A    No.
25   Q    Now, it looks like your biggest problem with the

Norris - Cross                                          735

1   execution schedule, if I can call it a problem, and you correct

2   me, is not the number per day; it's the number of dates of

3   execution within the 11 days?

4   A     I mean, it's not problematic to me.  The governor has set

5   the dates, and the staff is expected to respond and carry out

6   the process.

7   Q     And I know you don't want to criticize the governor, but

8   if you were choosing it, I think you've already said, you

9   wouldn't have chosen that many separate dates, correct?

10  A     Had I been asked, I would have recommended four dates,

11  and I'll have to tell you that I'm not sure about four per day.

12  I'm pretty sure about three per day because I've done it.  But

13  if it were me making the decision, I would have opted for

14  setting four a day.

15  Q     Because you've done -- you've definitely done three, so

16  you feel comfortable doing what you've already done?

17  A     Yes.

18  Q     Okay.  And what's going on here, I think we've

19  established, is outside of anything you've ever done as far as

20  time -- how many executions in this time frame?

21  A     It's different, the time frame is different, but that's

22  the only difference.

23          MR. SHORT:  Judge, did you say --

24          THE COURT:  2:00.  Let's go ahead and take our

25  recess right now.  We need to switch our court reporters, so

Norris - Cross                                                736

1  let's take -- let's go ahead and take just a five-minute break,

2  if we can, a five-minute break.  We're in recess.

3         (Recess at 2:03 PM.)

4                    C E R T I F I C A T E

5      I, Karen Baker, Official Court Reporter, do hereby certify

6  that the foregoing is a true and correct transcript of

7  proceedings in the above-entitled case.

8

9  /s/ Karen Baker, RMR, CRR, CCR
   -------------------------------          Date: April 12, 2017
10 United States Court Reporter

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (Continuing at 2:11 p.m.)

2               THE COURT:  Mr. Short, you may resume your cross-

3     examination.

4               MR. SHORT:  Thank you, your Honor.

5     BY MR. SHORT:

6     Q.   Mr. Norris, I think we left off and I was talking

7     about it's more stressful when you have fewer amount of time

8     before having another execution.  And you would agree with me on

9     that; correct?

10    A.   Would you repeat that, please?  I'm not sure I understand.

11    Q.   Does it create additional stress if you don't have many

12    days between execution dates?

13    A.   I don't know.

14    Q.   Okay.  Well, I don't know if you remember, on direct

15    examination when you first started, I believe you stated the

16    reason that you liked so many executions in one day is because

17    you were talking about the Swindler and Simmons executions and

18    you said that it was hard executing two people with a week apart

19    and that's why I prefer that we do multiple in one night.

20    A.   We never got a break.  That's right.

21    Q.   Right.

22    A.   We never got a break in that week and it was that business

23    for the whole week.  But this is a different scenario, I guess,

24    in a way.  In a way not.

25    Q.   So you would agree with me -- you testified it creates

1  additional stress by not getting a break for very many days

2  between execution nights.

3  A.   I guess what I'm saying is, you're -- and maybe it is

4  stress.  But you're staying in the ramped-up mode for a week.

5  But now you're going to be staying in the ramped-up mode for 11

6  days.  It just is what it is.

7  Q.   Right.  And 11 days of a ramped-up mode is probably more

8  difficult than a ramped-up mode for seven days.

9  A.   I would think it is.

10 Q.   Okay.  And I think you're right.  I think I may have added

11 the word "stress," and I think you said hard on them.  So there

12 may have been a difference.  It's hard to say what word that

13 would be, other than ramped up, and that's kind of the --

14 A.   I mean, you know, a little stress is good, so -- and I'm

15 not trying to be argumentative with you.  But the process is

16 stressful.

17 Q.   Okay.

18 A.   No question.  The business is stressful, so --

19 Q.   Right.  Absolutely.  And so one of the things, as director,

20 you are coordinating numerous agencies and quite a lot of folks;

21 correct?

22 A.   Yes, sir.

23 Q.   And for those coordinations, it's easier, obviously, the

24 fewer times, separate times you have to make all of those

25 coordinating events; correct?

1    A.    Logistically it's a lot easier.  You have one meeting and

2    you get it, you know, done.  Get it set up and then get it done.

3    Q.    Right.  Because, you know, it doesn't create a lot more

4    coordination for some of those agencies, even if you have more

5    executions in one night; correct?

6    A.    There is less coordination from the outside agencies.  The

7    state police, they have to come from Hot Springs, Little Rock,

8    wherever they come from, one time.

9    Q.    Right.  And if they have three executions in a night or one

10   execution in a night, it really doesn't create that much

11   additional work to coordinate them.

12   A.    No.

13   Q.    Correct?  Or it doesn't create that much more additional

14   stress for some of the behind-the-scenes actors when you have

15   more in one night; correct?  Versus different days.

16   A.    I hope that I'm understanding your question.  It's less --

17   I mean, the difference in one and three for those folks is two

18   hours.

19   Q.    I think you answered my question.  So let me move over to a

20   hypothetical.  I don't have much more with you, I promise.  And

21   if I mislead you, let me know.  Do you watch football?

22   A.    Yes, sir.

23   Q.    Played football at some point?

24   A.    Way back.  Way back.

25   Q.    Been to Razorback games?

Norris - Cross

1    A.    Oh, yeah.

2    Q.    All right.  Now, I guess you can say like these events,

3    whenever you're coordinating things, let's take a Razorback

4    football game.  You've got to coordinate the state -- you've got

5    to coordinate state police for games at Razorback stadium;

6    right?

7    A.    Yes, sir.

8    Q.    You've got to coordinate security checks for people coming

9    in; correct?

10   A.    Yes, sir.

11   Q.    You've got a number of administration that have duties for

12   football games; correct?  You would assume?

13   A.    I haven't seen that part of it, but I assume so.

14   Q.    Okay.  And answer any calls for things going wrong or

15   things like that, possibly?

16   A.    The police agencies, yes.

17   Q.    Or administrators.

18   A.    Possibly.

19   Q.    Okay.  Vendors.  You certainly see vendors; right?

20   A.    Absolutely.

21   Q.    And for coordinating maybe security or coordinating the

22   police, just like you said, the difference to them may be one

23   hour versus three hours; right?

24   A.    Yes, sir.

25   Q.    Okay.  So if you had -- let's say you had two football

Norris - Cross

1  games.  Okay?  So you've got double the amount of time.  For the

2  police and the security, again, it's just a matter of time.  It

3  may take a little more time for them; right?

4  A.   But this is not a football game.

5  Q.   I understand.  But you act like in your -- would you agree

6  with me, in your affidavit you act like fatigue is not a real

7  thing.

8  A.   I don't think I said that.

9  Q.   Okay.  Will you admit that fatigue is a real thing?

10 A.   Of course fatigue is a real thing.

11 Q.   And just like any event, people get tired; right?

12 A.   Fatigue is a real thing.

13 Q.   Okay.

14 A.   But if you prepare, you know what you're preparing for, and

15 you get set up and you do the job, then you go home and rest,

16 hopefully, unless something goes on at the institution.  I mean,

17 but fatigue factor to me is not -- it doesn't change the scope

18 of what's happening.  I mean, one or three.  The difference is

19 time and being on top of your game, being sharp, and doing the

20 job.

21 Q.   And in any -- and let's take it out.  I'm asking the

22 questions here.  In a sporting event, if you play three

23 basketball games, football games, whatever it is, are you as

24 sharp in the third game as you were in the first game?

25 A.   Are you talking about a police officer or an athlete?

1   Q.   I'm sorry.  I'm talking about an athlete.

2   A.   Well, no, sir.

3   Q.   So the players get tired; right?

4   A.   Yes, sir.

5   Q.   And it affects both their mental abilities and their

6   physical abilities when they get tired.

7   A.   I can't answer that.  I would guess that they're tireder.

8   I know they're physically tireder.  But emotionally, I don't

9   know.

10  Q.   I mean, you don't acknowledge that fatigue and physical

11  fatigue clogs your ability to focus?

12  A.   I don't know.  It never stopped me from focusing.

13  Q.   Okay.  So if I kept you up for four days and gave you a

14  test, do you think you would perform the same as you would if I

15  gave it to you on a good night's rest?

16  A.   No, sir, but I think you're way out there on that question.

17  Q.   Okay.

18  A.   The difference in four days and three hours.

19  Q.   Okay.

20  A.   Big difference.

21  Q.   I asked a specific question there, okay?

22  A.   So four days, you'd be tireder.  Yes, sir.

23  Q.   So there may be -- there may be a decreasing amount of

24  concentration based on increasing fatigue.  Would you agree with

25  me on that?

1    A.    There may be.  But in my experience, it didn't matter.  We

2    were successful in carrying out the executions.

3    Q.    Okay.  You were successful in carrying out the executions

4    under that schedule that you were given; correct?

5    A.    Yes.  That's right.

6    Q.    Let me ask you this:  How well do you think the execution

7    team sleeps the night before?

8    A.    I couldn't answer that.

9    Q.    I mean, you didn't talk to them about it?

10   A.    I slept fine.  I was part of the team.

11   Q.    I don't think there's any doubt that you don't have much

12   concern for killing three people in one day.

13   A.    I think you're being a little judgmental there.  I mean --

14           MS. CRYER:  Objection, your Honor.

15           MR. SHORT:  I apologize.  I'll rephrase.

16   BY MR. SHORT:

17   Q.    Did you ever speak to any of your correctional officers and

18   ask them how they slept the night before they executed someone?

19   A.    Not that I recall.

20   Q.    Okay.  It's not important to you whether people sleep or

21   have fatigue, is it?

22   A.    The well-being of my staff is very important.

23   Q.    Okay.  I said -- if you listen to the question.  Is it

24   important to you whether someone is fatigued when they are

25   performing a task?

1   A.   Yes.

2   Q.   So if they don't sleep the night before, that is important;

3   correct?

4   A.   It would be, could be.

5   Q.   And that could limit their ability to correctly perform the

6   task at hand?

7   A.   But I never saw that.

8   Q.   I didn't ask that.

9   A.   I'm just telling you, I never saw it.

10  Q.   I didn't ask that.

11  A.   Ask the question then.

12  Q.   Okay.  I did.

13  A.   Ask it again, please.

14  Q.   Okay.  Fatigue from not sleeping can impact someone's

15  ability to perform a task?

16  A.   Yes.  I would say so.

17  Q.   But you've never -- and you never asked any of your

18  execution team members whether they slept well the night before?

19  A.   Not that I recall.

20  Q.   Okay.  And how did you address with your team members the

21  fact that they've been ramped up for so long or the ramping-up

22  period?  Because you say that that's important.

23  A.   How did I address it with them?

24  Q.   How did you address it with them?  How did you address, how

25  long have you been ramped up?  How long are you going to --

1    A.    I know they were ramped up.  I was there with them.

2    Q.    So what were your conversations with them about it?

3    A.    Is everybody okay?  Did that go okay?  When I'd enter the

4    chamber, while they were leaving.  Their part of the job, did

5    everything go okay?  Yes.

6    Q.    Okay.  So that's the extent of the conversations you had

7    about dealing with their ramped-up --

8    A.    As far as I recall, yes.

9    Q.    Okay.  Would you agree with me that these -- the

10   correctional officers that are assigned to be on the execution

11   and IV teams, do you think they have additional stress and

12   anxiety?

13   A.    Yes.

14   Q.    Do you think that they all -- do you think that stress and

15   anxiety can lead to fatigue?

16   A.    I don't know that I'm qualified to answer that, but, I

17   mean, probably.

18   Q.    Okay.  Ever driven in a pouring-down rainstorm?

19   A.    I have.

20   Q.    Where you're tensed up for a long period of time?

21   A.    Sure.

22   Q.    And it can fatigue you pretty fast.

23   A.    Is that a question?

24   Q.    Correct?

25   A.    I suppose so, counselor.  I never noticed fatigue after

 1   driving in a rainstorm.  I mean, it never occurred to me that I

 2   was fatigued from driving in a rainstorm.

 3   Q.   Have you ever sent an officer home ever because he was

 4   tired?

 5   A.   I don't recall doing that.

 6              MR. SHORT:  I have no further questions.

 7              THE COURT:  Redirect?

 8              MS. CRYER:  Thank you, your Honor.

 9                        REDIRECT EXAMINATION

10   BY MS. CRYER:

11   Q.   Mr. Norris, I may jump around for just a second, but I'm

12   going to try to get all my questions focused.  I want to make

13   sure, I believe Mr. Short was asking you to compare the Arkansas

14   Razorback basketball team, who practice hours a day, running up

15   and down the court, dribbling the ball, tossing it in the hoop,

16   jumping around, doing all their exercising, they play a game, I

17   believe, once a week, maybe every ten days -- I don't watch them

18   that close.  He wants to compare that to the correctional

19   officer who has gone through multiple practices, just like the

20   basketball players, taking the inmate from the holding cell,

21   escorting him to the death chamber.  Equal comparisons in your

22   mind?

23   A.   Not to me.

24   Q.   Okay.  Do you care about your employees?

25   A.   Of course.  Yes, ma'am.

1   Q.   Do you check on your -- did you check on your employees to

2   see how they were doing?

3   A.   Well, yes, ma'am.  We had the session the next morning.  I

4   mean, for the employees, for us.  For me included, and the whole

5   team.

6   Q.   During your tenure as the director of the ADC inside the

7   death chamber, were correctional officers the persons who would

8   insert the IVs into the condemned inmate?

9   A.   No, ma'am.

10  Q.   You were asked a few moments ago about the different

11  executions and the fact that there were -- I believe there was

12  one in 1999, and I believe Mr. Short stated that there were 55

13  days in between the February 16 execution and the April 12

14  execution.  Do you recall that line of questions?

15  A.   Yes, ma'am.

16  Q.   If the Governor had scheduled the execution of Johnny Cox

17  and Marion Pruett for the same day, would you have carried those

18  two out on the same night?

19  A.   Yes, ma'am.

20  Q.   If you had had a preference, would those two executions

21  have been carried out on the same night or on separate nights?

22  A.   I mean I'd have done whatever the Governor ordered.

23  Q.   If the Governor gave you the option and said, Mr. Norris --

24  A.   I'd do them both at one time.

25  Q.   You were asked some questions about gun firing and gun

1    training.  Are your officers trained to shoot at inmates?

2    A.    Only when absolutely necessary.

3    Q.    Do you have a firing range or any location set up on the

4    Department of Correction premises that --

5    A.    Several.

6    Q.    Several?

7    A.    Several of them, yes, ma'am.

8    Q.    Can they be used to execute inmates?

9    A.    No, ma'am.

10   Q.    Now, the part -- and I apologize to Mr. Short when I

11   started to jump up earlier.  I want to show you, we're going

12   back to administrative -- Department of Correction

13   Administrative Directive 08-28.  Again, this was attached to the

14   complaint as Plaintiffs' Exhibit -- I think that says

15   Plaintiffs' Exhibit 1, and there's maybe an Exhibit 11.  I'm not

16   quite sure.  There are a lot of markers on here.  As well as

17   filed in the Terrick Nooner case back in 2008.  My confusion

18   came with Mr. Short's questions when he was asking you about

19   policy and he was asking you about procedure and protocol.  In

20   my mind, those are different things.  So let me just ask, in

21   looking at Administrative Directive 08-28, the administrative

22   directive for the procedure for executions, did the

23   administrative directive change after each and every execution?

24   A.    I don't remember.  I mean, I know it changed sometimes, but

25   I don't know that it changed every time.

1    Q.    Okay.  Do you recall what changes would be made to AD -- or

2    to the different administrative directives?

3    A.    I honestly do not.

4    Q.    Okay.  You were asked about -- talking about being ramped

5    up and that you had -- we were talking about the timing of the

6    executions during I believe it's a 10- or 11-day period, and I

7    believe we have seven executions that are currently scheduled.

8    You testified earlier, I believe, that you would prefer if you

9    could to have four on one night.

10   A.    If I were given the choice and I had to do them, that's

11   what I would prefer to do.

12   Q.    Was the concern that you were talking about that you have

13   with having executions scheduled over so many days, was that a

14   concern more towards the administration and the disruption to

15   the regular normal flow of the penitentiary, or were you talking

16   about your concern was for the stress to the employees?

17   A.    The prison is 24/7/365.  It never slows down, never stops.

18   When you set something like an execution at Cummins, it

19   reverberates through the whole system, the 20 facilities or

20   however many there are now.  Especially, though, at the Cummins

21   Unit, and you can have people brought in from all over the state

22   to help with the security and those kind of things.

23         I guess for the -- my point, for the good of the system and

24   the orderly operation to continue, have a continuum of orderly

25   operation throughout the system would be a huge part of the

1   problem, or the concern.

2   Q.   All right.  And I guess I feel that I need to follow up on

3   a line of questioning that Mr. Short asked which made you --

4   with regard to sleeping the night before an execution, and his

5   comment on whether or not you sleep and whether or not your

6   employees sleep.  Do you care about inmate executions?

7   A.   Well, of course I care.

8   Q.   Is it your job to carry out the order of execution that is

9   issued by the Governor?

10  A.   It's my duty.  It was my duty, and it's now Director

11  Kelley's duty.

12  Q.   Could you allow your personal feelings or preferences to

13  come into play?

14  A.   Should not.

15  Q.   If you were going to -- going back to the firing squad for

16  just a minute, if officers or if staff or if someone was going

17  to be allowed to execute inmates by a firing squad, would

18  that -- would your employees have needed additional training in

19  order to be able to carry out that process?  Or was the process

20  they learned on how to shoot a gun out on the field enough?

21  A.   I need to think about that.  I mean, that's -- that's a

22  huge difference, a big question.  I don't know how to answer

23  that, really.

24  Q.   That is absolutely fair.

25            MS. CRYER:  Okay.  Your Honor, I believe that's all I

Norris - Recross

1    have.  Thank you.

2              THE COURT:  Anything further, Mr. Short?

3                    RECROSS-EXAMINATION

4    BY MR. SHORT:

5    Q.   Mr. Norris, if when you were ADC director, the Governor had

6    told you that he wanted them executed by a firing squad, would

7    you find a way to get that done?

8    A.   I'd have to think about it.  I mean, I'm sure that I would,

9    but -- if I wanted to work, I guess I would.  But, you know, I

10   never have considered it because I know that it's been talked

11   about in the legislature, and that's where the change happens.

12   It doesn't happen with me, nor the Governor, without the

13   legislature.  So that's a big question.  I would -- I'd just

14   have to think about it.

15   Q.   I guess you would or you would not fulfill his request to

16   have them executed by firing squad?

17   A.   Well, I'd certainly want to have some input on his

18   decision.  If he made the decision, then someone would do it,

19   and it may well have been me.  But that's -- it's a strange

20   question to me.  I'm just not really kind of prepared for it.

21   Q.   So you may would defy the Governor?

22   A.   Oh, I didn't say that.  I didn't say that.  I mean, I'm not

23   doing time.  I don't have to work.  I don't have to do that job.

24   But, I mean, that's a huge question that you offer and I would

25   just have to think about that some.

1          MR. SHORT:  Okay.  No further questions.

2                FURTHER REDIRECT EXAMINATION

3    BY MS. CRYER:

4    Q.   Mr. Norris, if the law did not allow for execution by

5    firing squad, could you then execute inmates by firing squad?

6    A.   No, ma'am.

7          MS. CRYER:  Thank you.  That's all I have.

8          THE COURT:  Mr. Norris, I have a question for you.

9        When you were the director and an execution occurred, did

10   you limit the number of attorneys who could witness the

11   execution?

12         THE WITNESS:  Your Honor, I believe the policy said

13   one attorney.

14         THE COURT:  And what did you do?  I don't want to know

15   what the policy said.  I want to know what you did.

16         THE WITNESS:  I honestly can't remember varying from

17   that.  We may have, but I just don't remember.

18         THE COURT:  Do you know if this execution, these

19   executions, are going to be conducted in the same room?  Is the

20   death chamber the same?

21         THE WITNESS:  My understanding, they will be.  Yes,

22   ma'am.

23         THE COURT:  All right.  Thank you.

24         THE WITNESS:  Yes, ma'am.

25         THE COURT:  Anything further?

1            MR. SHORT:  No, your Honor.

2            MS. CRYER:  No, your Honor.

3            THE COURT:  All right.  You may step down.

4            THE WITNESS:  Thank you.

5            THE COURT:  You may call your next witness.

6            MS. CRYER:  Your Honor, why don't we go ahead and put

7    Dale Reed -- yes, he is here.  Why don't we go ahead and put him

8    back on.

9            THE COURT:  You may have a seat, Mr. Reed.  You remain

10   under oath from last night.

11           THE WITNESS:  Yes, ma'am.

12       **DALE REED, DEFENDANTS' WITNESS, PREVIOUSLY DULY SWORN**

13                CROSS-EXAMINATION [Continuing]

14   BY MS. VANDIVER:

15   Q.   Hello again, Mr. Reed.

16   A.   Hello.

17   Q.   You mentioned yesterday, we talked about practices for the

18   execution.

19   A.   Yes, ma'am.

20   Q.   And have you been involved in practices for the upcoming

21   executions?

22   A.   I have.

23   Q.   Can you speak to how the inmates are strapped to the

24   gurney?  And I don't know, would it be helpful if I put the

25   picture of the gurney on the screen for you?

1    A.   Well, for a specific question, it might be helpful.

2         MS. VANDIVER:  Okay.  Sharon, could you put that

3    YouTube video back up and pause it when you see the gurney.

4         Let's wait a minute.  I think there's one where it gets a

5    little bit closer.

6         Stop right there.

7    BY MS. VANDIVER:

8    Q.   Okay.  So this is the gurney; right?  In the death chamber.

9    It's still pretty much -- is this the same gurney that's in

10   there now?

11   A.   It is.

12   Q.   So can you, referring to this picture, explain to me and

13   the Court how the straps work when there is -- when my client is

14   going to be on there.

15   A.   Well, the inmate is brought in under escort of two

16   correctional officers, and then there's a stool that's set down

17   in the -- about where the pipe is there so the inmate can step

18   up on the gurney.

19   Q.   Yeah, I think you can -- see, you can touch.  If you want

20   to touch, you can show us.

21   A.   It would be somewhere right in there.  They step up and he

22   turns around because he's shackled, and he sits there.  Then the

23   team comes around the gurney.  There's members around at each

24   place, right by each arm and leg and two at the head.  So these

25   straps are undone when they come into the room.  And then

1  they're put on by two staff members assigned to each location.

2  They're put in place over the inmate.

3        Of course, the two on the end are where the legs are

4  strapped down.

5  Q.   Yeah.  I just want to make sure I understand.  So these are

6  the --

7  A.   That's where the legs are.

8  Q.   Right.  So that's on sort of like below the knee or --

9  A.   Between the knee and the ankle.

10 Q.   Okay.

11 A.   Right around where their feet --

12 Q.   What is this thing that looks like a seat belt?

13 A.   That's a strap that goes over the midsection of the inmate?

14 Q.   Okay.  So kind of like over the pelvis?

15 A.   Over the midsection.

16 Q.   Over the stomach?

17 A.   Uh-huh.  Well, it's really down below the legs, that one

18 is.

19 Q.   Below the hips?

20 A.   Right.

21 Q.   Okay.  What about this?

22 A.   That one's more the midsection.

23 Q.   So, like, the rib cage or --

24 A.   Yeah.

25 Q.   Okay.  What about this?

Reed - Cross

1    A.   That's actually the piece that sets down over the ribs.  So

2    that other one is just right under it.  That piece there goes

3    over here (indicating).

4    Q.   So sort of like above -- like around the armpits maybe

5    or --

6    A.   Yeah.  It's right in here.

7    Q.   Okay.  And then what is this?  I see there's -- you know,

8    we might need to forward the video a little bit, but it looks

9    like there's something under the head; is that right?

10   A.   Well, there's a -- the head goes between those two pieces,

11   and then there's a piece, a strap that goes on across that over

12   the head to hold the head in place there between those two

13   yellow things there.

14   Q.   So the head is strapped down to the gurney.

15   A.   Right.

16   Q.   So the person is strapped at the head, under the armpits,

17   sort of around the rib cage area, about maybe below the hip

18   level, and then between the knees and the ankles?

19   A.   Yes.

20   Q.   Okay.  And then what are these?

21   A.   Those are to strap the hands down, the arms.  The arms lay

22   on that piece that comes out, and then you strap the hands down.

23   Q.   Is the hand strapped open?

24   A.   It's kind of like this (demonstrating).

25   Q.   Can the hand move freely, is the question.  Your fingers

Christa R. Jacimore, RDR, CRR, CCR
United States Court Reporter

1    can move?

2    A.    Your fingers can move.

3    Q.    So this one right here, is that on your wrist?

4    A.    Hand.  That's on -- right over the hand.

5    Q.    Right in here?

6    A.    Hand and the wrist here.

7    Q.    I'm not sure I understand your -- I didn't quite hear you.

8    A.    It goes over the hand to hold the hand tight and the arms

9    down.

10   Q.    Okay.  So the hand will be kind of like held open.

11   A.    Right.  Right.

12   Q.    And then this one is where?

13   A.    Well, that's just a part of that mechanism that goes over

14   the hand.  You've got a strap here and then a strap here.

15   Q.    So two straps over the hands?

16   A.    Two straps for that piece to hold the hand down.

17   Q.    Okay.  Thank you.  That's helpful.

18         I'm not sure how to clear this.

19             MS. VANDIVER:  Okay.  You can do it?  Okay.  Thanks.

20         Sharon, can we advance this just a little bit?  Or just

21   press play and --

22         (Video playing.)

23         Pause.  Okay.  Pause it right there.

24   BY MS. VANDIVER:

25   Q.    Okay.  Now, I'm looking in the reflection right here.

Reed - Cross

1    A.    Right.

2    Q.    Can you tell me what I'm looking at right there?

3    A.    That's the window to the space where the witnesses observe

4    the execution.  It's a mirrored glass.

5    Q.    And I guess I'm not sure if we can -- but this is a

6    reflection of what's happening over here; right?

7    A.    Right.

8    Q.    Okay.

9    A.    That's just a reflective covering on the windows.

10   Q.    And I don't know if there's a good image of this later in

11   the video, but -- so my question is, back here in this area

12   behind this door, you said, is where the chemicals are?

13   A.    No.  It's at the head.  That's the --

14   Q.    Right.  But this is --

15   A.    Oh, I see.  You're looking in the reflection.

16   Q.    I'm looking in the reflection, and I don't know if there's

17   a better --

18   A.    That's where the --

19   Q.    But you understand what I'm getting at?

20   A.    Right.

21   Q.    Okay.  So that's where the executioners are.

22   A.    Yes.

23   Q.    That's your parlance, the people that push the drugs,

24   you've referred to them as executioners; right?

25   A.    Yes, yes.

Reed - Cross

1    Q.    Okay.  So they're behind a solid steel door; right?

2    A.    Right.

3    Q.    And then there's this narrow panel is a two-way mirror; is

4    that right?

5    A.    Right, right.

6    Q.    What is this little box thing here?

7    A.    The box was something that the monitor used to sit on.

8    That's no longer in the area.

9    Q.    What is this?

10   A.    That's the hole where the lines come out.

11   Q.    So that's where the IV lines come from the chemical room?

12   A.    Through there, yeah.

13   Q.    Into the room.  Thanks.  That's what I was wondering.  All

14   right.

15

16        MS. VANDIVER:  I need to ask about some confidential

17   exhibits, but I think what I'm going to do is try to ask my

18   questions, and then maybe we can go back to the exhibits.  So

19   I'll try to do it that way.

20        THE COURT:  I'm not sure who is going to handle --

21   Ms. Cryer, if at any point you think we need to mark the

22   questions as confidential when we talk about the documents,

23   stand up and alert me to that if you have any concerns about

24   this.

25        MS. CRYER:  Is she going to be reading from the --

 1           MS. VANDIVER:  No.

 2           MS. CRYER:  Okay.  Okay.

 3  BY MS. VANDIVER:

 4  Q.   When is the first time that you saw -- yesterday when you

 5  testified, we talked about the difference between the part of

 6  the lethal injection policy that deals with the drugs and the

 7  part that deals with -- well, I'm just going to call it

 8  everything else.

 9  A.   Logistics.

10  Q.   Yeah, sure.  Logistics.  So when was the first time that

11  you saw that policy that deals with everything else?

12  A.   I don't remember exactly when.  Sometime after these dates

13  were set, I got a copy of the policy.

14  Q.   Okay.  And is part of your role during these executions to

15  provide for security?

16  A.   Everyone has a security role, but always --

17  Q.   It's not particularly your domain since you're the chief

18  deputy?

19  A.   No.

20  Q.   Okay.  And are you aware that during these executions, that

21  there will be staff for the Attorney General's Office at the

22  prison?

23  A.   Yes.

24  Q.   And those staff, they're allowed to bring their cell phones

25  into the prison; is that right?

Reed - Cross

```
1    A.    No, not -- nobody's allowed a cell phone into the death
2    chamber.
3    Q.    No one is?
4    A.    No outside agency.
5    Q.    Even the Attorney General?
6    A.    Not to the viewing area.
7    Q.    Mr. Reed, are there going to be debriefings after these
8    executions?
9    A.    Yes.
10   Q.    And tell me, what does that involve?  What is a debriefing
11   after an execution?  What does that mean?  Just take me through
12   that.  What does that look like?
13   A.    All the staff get together at the prescribed time, usually
14   the next day after, at a location close to the unit, but not
15   inside it.  A mental health professional conducts that
16   debriefing and discusses, you know, what everybody went through.
17   Q.    Okay.  Yesterday I sort of pressed you to tell me, just
18   give me a guess how many people that you think are involved in
19   this execution.  And you said that was hard, but your guess was
20   probably about a hundred.  Am I characterizing that right?
21   A.    Yeah.  But not at the chamber.  That's a bigger group of
22   people.
23   Q.    Okay.  So the debriefing only relates to people that are in
24   that chamber?
25   A.    Those who are in the -- the people that actually do the
```

Reed - Cross

1    logs at the -- when the condemned is there, the team that

2    escorts him, the administrative people that are involved

3    directly, in the tie-down process and that actually witness that

4    process.

5    Q.    And about how many people is that?

6    A.    That's probably, I would say, 30 or 35, maybe.

7    Q.    So this debriefing that you said will happen, that relates

8    to those people that are in the chamber.

9    A.    People directly involved with the execution.

10   Q.    Okay.  So you said that all those 30 to 35 people, they'll

11   get together at a location not the prison, but near the prison,

12   and then what?

13   A.    We'll conduct -- a mental health professional will conduct

14   a debriefing.

15   Q.    What does that look like?  I've never been to a debriefing

16   after an execution, so --

17   A.    I've never actually run a debriefing.  I've been to every

18   one that we ever had.

19   Q.    Is your understanding that they will be pretty much the

20   same as they've always been done?

21   A.    Well, the mental health person does that, and he's

22   experienced in doing those for critical incidents such as deaths

23   and other things throughout the department.  I mean, they're

24   trained to do that, and we just talk through the process.  He is

25   the leader of that process.  Staff have a chance to comment or

1    express feelings or whatever that they need to.

2    Q.    The person that does this is an ADC employee?

3    A.    Yes.

4    Q.    You said that people will have a chance to comment?

5    A.    Right.  Everybody there.  I mean, it's confidential within

6    that group.  The person does let the whole group know that this

7    is being conducted in confidence with this group, and they know

8    that it's -- what happens there stays there, if you will.

9    Q.    I'm not asking you when this is going to take place, but

10   about how long -- you know, say you've got other stuff to do

11   that day.  So how long would you prepare on your schedule?  How

12   long would you give yourself for that debriefing to take place?

13   A.    We would take as long as we need.  Normally, my experience

14   has been a couple hours tops, you know, from the time you show

15   up and get everything --

16   Q.    Two hours?

17   A.    Tops.

18   Q.    Sometimes shorter than that?

19   A.    Could be.  It could be longer than that if there was

20   something that needed to be talked out.  I mean, it's a

21   priority.  Everybody is required to be there.  There's nothing

22   else they're scheduled to run to.  We're there to check up on

23   our staff and make sure everybody is all right.

24   Q.    Are you planning on doing a de -- let me go back for a

25   second.

1      These executions are happening two a day; correct?  Or two
2   a night?
3   A.    Yes.
4   Q.    And the first executions are scheduled to occur on Monday?
5   A.    Uh-huh.
6   Q.    For Bruce Ward and Don Davis.
7   A.    Yes.
8   Q.    So are you going to do a debriefing after -- I don't know
9   who is going to go first.  Let's say after Bruce Ward is
10  executed, is there going to be a debriefing after that?
11  A.    There wouldn't be a debriefing until the next day after the
12  executions, after each night.
13  Q.    So you're treating the two executions as one event?
14  A.    Certainly, yeah.
15             MS. VANDIVER:  Okay.  Now I think I need to ask about
16  some of the confidential exhibits.
17             THE COURT:  All right.  If you're not involved in the
18  litigation, I'm going to ask you to clear the courtroom again.
19  We're talking about documents that have been designated
20  confidential and highly confidential under the Court's --
21             UNIDENTIFIED SPECTATOR:  Your Honor, I have a Freedom
22  of Information Act I'd like to present to the Court.
23             THE COURT:  You may.
24      You may just hand it here.
25             UNIDENTIFIED SPECTATOR:  Thank you, your Honor.

1      Will that be considered now and I'll be called back if it

2  applies?

3            THE COURT:  It will.

4        (Proceedings under seal under separate cover.)

5        (Continuing in open court at 3:16 p.m.)

6            THE COURT:  I received before we took a recess here in

7  court -- and so everyone is aware, we did not proceed with

8  questioning the witness while the request was pending.

9      I received a written request from a reporter for KTHV

10  Channel 11 asking for information under the United States

11  Freedom of Information Act laws and also -- I'm not sure --

12  under the Arkansas Freedom of Information Act law as well, and

13  it was to request unrestricted access to the testimony of any

14  and all Arkansas Department of Correction officials in their

15  official capacity.

16      Federal district courts and federal courts are not subject

17  to the Arkansas Freedom of Information Act.  I will take the

18  position that's consistent with others that have looked at the

19  issue on my court that the state law does not control, the

20  Freedom of Information Act does not control this Court, and the

21  United States Freedom of Information Act does not cover courts.

22  Courts are not an agency covered by that act.

23      Understand and appreciate I'm sympathetic, but we've got to

24  plow through testimony that's confidential and highly

25  confidential as requested by the parties.  We will exclude you

1   and will call you back in as soon as we've left that material.

2   But at this point we've got some of that material to cover, and

3   I need everyone who is not affiliated with the party, if you're

4   with the press or you're a spectator, I need you to leave the

5   courtroom.

6         So we'll call you back in.

7               MS. VANDIVER:  Judge, we did come to an agreement that

8   three of the exhibits that I was going to ask about are not

9   confidential.  So I can do that first if we want to --

10              THE COURT:  Sure.  Sure.  Why don't we do that.

11  BY MS. VANDIVER:

12  Q.   You testified earlier that you weren't sure how long it had

13  been after the dates had been set that you saw the execution

14  protocol?

15  A.   Right.  I said I got a copy of it.

16  Q.   And I'm going to show you Exhibit A, page 480, which had

17  been marked confidential but the State agrees is okay for me to

18  show.

19        Can you see that okay?

20  A.   Yes.

21  Q.   So this is two e-mails; correct?  Looks like.  Or an e-mail

22  that includes quoted information from another e-mail?

23  A.   Yeah, uh-huh.

24  Q.   And this is you, M. D. Reed?

25  A.   Yes, ma'am.

1   Q.   You're not a medical doctor; right?  What's that --

2   A.   No, I'm not.  Marshall Dale Reed is my name.

3   Q.   And this e-mail is dated March 7, 2017?

4   A.   Yes, ma'am.

5   Q.   And it says, if I can just read it.  It says:

6   "Mrs. Kelley" -- I assume that's Wendy Kelley.

7   A.   Yes.

8   Q.   -- "advised yesterday that you were e-mailing the most

9   current execution policy.  I'd like to get that as soon as

10  possible so I can be reviewing it."

11  A.   Yes.

12  Q.   So as of March 7 you had not seen the execution policy, or

13  that was the first day you had been able to see that policy?

14  A.   I had not seen it at that point.  It was given to me.

15  Q.   Okay.  Thank you.  I asked you earlier whether or not you

16  were aware that -- or let me rephrase that.  I asked you earlier

17  whether or not Attorney Generals that were on the unit at the

18  night of the execution were able to bring in their cell phones.

19  Do you remember me asking you that question?

20  A.   Yes.

21  Q.   And you said that they were not able to do that?

22  A.   Not into the death chamber.

23  Q.   Not into the death chamber?

24  A.   Not into the witness room or where the execution is being

25  carried out.

1   Q.   Okay.  But they're allowed to bring it onto the unit?

2   A.   I believe so.

3   Q.   Okay.  And this is what's been marked Confidential Exhibit

4   A, page No. 534, but the State has now agreed that it's not or

5   doesn't need to be confidential.  And this is an e-mail, looks

6   like you are the recipient of this.  Now, I recognize this is in

7   2015.

8   A.   Yeah.

9   Q.   And then this -- there's another e-mail from Dale Reed from

10  2016.  So this is preparation not for this time, but regarding

11  executions, it looks like.  Well, let me give you a minute to

12  look at it.

13  A.   Yeah.

14  Q.   Have you had a chance to look at it?

15  A.   I've looked at it.

16  Q.   This e-mail says:  "Jada will get me the AG's cells that

17  will be on the unit that night if you want those added."

18       This is to you from Karen Bottoms.  Who is Karen Bottoms?

19  A.   She's my administrative assistant.

20  Q.   Okay.  And then what's going on in this e-mail up here?  Is

21  this somebody sending an e-mail --

22  A.   At the time of this, Karen Bottoms was working at Cummins,

23  I believe.  She works for me now.  That person up here, Frances,

24  is the warden at Cummins's administrative assistant, who took

25  her place when she retired.

Reed - Cross

1    Q.    Who took Karen's place?

2    A.    Right.  Karen now works for me.  She was at Cummins

3    originally.

4    Q.    Okay.  So your testimony now is that an Attorney General or

5    Assistant Attorneys General that are on the unit the evening of

6    an execution are allowed to have cell phones; they're just not

7    allowed to have them in the execution chamber?

8    A.    That's correct.

9    Q.    Are you aware that attorneys for inmates that are to be

10   executed are not allowed to bring their cell phones onto the

11   unit?

12   A.    Yes.

13   Q.    Okay.  But attorneys for the State are?

14   A.    Yeah.

15           MS. VANDIVER:  I'm sorry.  This is just kind of

16   messing up my order, so I'm trying to figure out a way to do

17   this.

18   BY MS. VANDIVER:

19   Q.    Was it suggested to you by anyone that you should do

20   debriefings after the first execution because there are so many

21   new people on the execution team?

22   A.    We always do debriefings after executions.  So it's sort of

23   a process.  I mean, we talked about debriefings and we think

24   it's important.

25   Q.    We did.  And I guess maybe what my confusion is, on Monday

1   you're planning to execute two people?

2   A.   Yes.

3   Q.   But your debriefing will be after you've executed the

4   second person; right?

5   A.   The next morning, that's when we hold debriefings.

6   Q.   Okay.  So there's no debriefing after the first execution?

7   A.   No, ma'am, there's not.

8   Q.   Okay.  And this is what has been marked Confidential

9   Exhibit A, ADC page No. 646, but the State has agreed that it

10  doesn't need to be confidential.  And this is from Karen Bottoms

11  again, and you mentioned that she's your secretary now; right?

12  Did I get that right?

13  A.   Right.  Yes.  She's my administrative assistant.

14  Q.   Oh, yes.  That's probably -- secretary is not proper

15  anymore.  This is an e-mail from her.  Now, I don't see you in

16  the "to" field here, but she says -- the subject is Execution

17  Calendars.

18       "I worked some up but want to see how you have yours first.

19  We need to ask about the debriefings.  Do we want them after

20  every execution or maybe one a week?  Or one right after the

21  first one since we have so many new people and then have one

22  after the last one?  I'll ask Dale what he thinks when he gets

23  back but Straughn, you should put your thoughts in."

24       So did Karen ask you about this?

25  A.   Well, Karen was working the schedule.  This person down

1    there at Cummins was new to the process, and Karen had done it

2    before.  So Karen was working with her and is still working with

3    her to make sure everything gets scheduled as it needs to be.

4    We've talked about schedules and we've had to work on our

5    schedules and work around some things that we weren't expecting.

6    Q.    Like what is that?

7    A.    Well, like court proceedings and such.

8    Q.    Right.

9    A.    So we've been having to change our schedules.

10   Q.    Yeah.  Did Karen talk to you about doing a debriefing after

11   the first execution since you have so many new people?

12   A.    I saw this e-mail.  I don't know if we had a conversation,

13   but we did talk about when we wanted to have a debriefing.  We

14   say one after the set, we never were talking about having a

15   debriefing between the one that goes at 7 and the one that goes

16   at 8:15.

17   Q.    So there's no plan to talk about how the first execution

18   went?  You're just going to go straight on -- let's say -- and I

19   don't know, do you know whether or not Bruce Ward or Don Davis

20   is set to go first?  Nobody has ever told me.  I don't know.

21   A.    I think it's on the list in order.

22   Q.    In the list of their ADC number?

23   A.    Yeah.

24   Q.    Or their SK number?

25   A.    Uh-huh.

1    Q.    So that would be Bruce Ward then.

2    A.    Yes.

3    Q.    So let's say Bruce Ward is executed first and you're just

4    going to keep on rolling to Don Davis.  You're not going to stop

5    and regroup and see how you did.  You're just going to keep

6    going?

7    A.    If there's no kind of problem with the process, there

8    wouldn't be any kind of need for anything.  That's what the

9    schedule is set out for.  There's ample time between the first

10   one and the second one to get everything re-set up.  There would

11   not be any meeting or anything.  We'd re-set up everything for

12   the second execution.

13   Q.    And the ample time is from 7 to 8:15?

14   A.    That's what we have on schedule.  If we need more, we can

15   adjust that.

16         MS. VANDIVER:  Okay.  Your Honor, now I've got a

17   couple of confidential exhibits that I want to ask about.

18         THE COURT:  All right.  If you would, our court

19   security officer will escort you out of the courtroom, and we'll

20   bring you in just as soon as we finish covering this area.

21         (Proceedings under seal under separate cover.)

22         (Continuing in open court:)

23                         REDIRECT EXAMINATION

24   BY MS. CRYER:

25   Q.    Mr. Reed, let me go back and ask a question or two about

1   your testimony from last night.  There was a discussion last

2   night about the practices, and just to make clear, will there be

3   a practice to cover each and every inmate that is scheduled to

4   be executed?

5   A.   Each and every inmate we will have practices?

6   Q.   Yes.  Let me ask a different -- maybe I can ask a better

7   question.  My understanding from previous testimony is that

8   practices include utilizing an inmate of the same size, width,

9   as one of the condemned inmates.

10  A.   Yeah.

11  Q.   And so do you take that information and use people that are

12  the same size and weight of each of the seven --

13  A.   Right.  We try to do that as close as we can.

14  Q.   Okay.  All right.  Now, I am easily confused and I will

15  admit that, but there has been testimony and it changes between

16  policy and protocol and procedure.  My understanding is that the

17  policy is the administrative directive that references the

18  execution procedure.

19  A.   Yes.

20  Q.   All right.  Let me ask you, does the administrative

21  directive, the policy, the ADC policy, does that change after

22  each execution?

23  A.   Not to my knowledge.

24  Q.   Okay.  If there is an issue that arises, let's say, with

25  the first night of executions and an issue comes up regarding

1  you found it difficult for two officers to make it through the

2  door or get the inmate into the area in a certain way, and after

3  the execution, you realize that that escort could have gone more

4  smoothly, is that something that would be reviewed and analyzed

5  prior to the next execution?

6  A.   Well, we would look at how everything goes.  And if there's

7  anything that could be done smoother or more efficiently, then

8  we would do it that way.

9  Q.   Okay.  After the first execution, assuming something like

10 that happens --

11 A.   Right.

12 Q.   -- do you just go, whoops, too bad, so sad, we'll deal with

13 it tomorrow?

14 A.   We would make whatever adjustments we needed to make.

15 Q.   Okay.  And would that be true after each execution?

16 A.   Yes.

17 Q.   All right.  Is it necessary for, again, some issue arises

18 like that, for you to go back and change a written policy or

19 protocol or something like that to make those adjustments that

20 we're talking about?

21 A.   No.

22 Q.   Do you recall back in 2015 when executions were scheduled?

23 That was two years ago.

24 A.   I recall that we did have one scheduled.

25 Q.   Would you have reviewed the execution policy?  By policy I

1    mean administrative directive.  Would you have reviewed that in

2    2015 in preparation for those executions?

3    A.    The portion that pertained to me directly, yeah.

4    Q.    Throughout your tenure as warden of the Cummins Unit, were

5    you familiar with the administrative directive that was

6    applicable during those executions?

7    A.    Yes.

8    Q.    Do you feel confident and competent as to knowing what is

9    required of you under the administrative directive in order to

10   assist in carrying out the executions next week?

11   A.    Yes, very confident.

12   Q.    There were some members -- sorry.  Excuse me.  There were

13   some questions talking about the difference of fatigue and

14   stress.  Is it stressful to work at a correctional facility?

15             MS. VANDIVER:  Your Honor, I believe that was

16   questions of Mr. Norris, not of this witness.

17             THE COURT:  I'll go ahead and allow it.

18             MS. CRYER:  Okay.  And I apologize if it was.  I

19   thought there were questions and they were relating to whether

20   employees would be under stress and fatigue.  Maybe it was --

21   I'll focus more on fatigue because I do recall that question.

22   BY MS. CRYER:

23   Q.    The employees who are going to be on the execution team,

24   will they have worked an entire shift before seven o'clock next

25   Monday night?

1   A.   Probably not.  No.

2   Q.   I believe you already testified that employees work shift

3   work; right?

4   A.   They're on different shifts.  Some of them are probably on

5   off days that come in to do that.  Some of them may come in on a

6   different shift.

7   Q.   You were asked some questions about cell phones and whether

8   or not cell phones were being allowed to be brought in.  My

9   understanding, and please correct me if I've misunderstood your

10  testimony, but I believe you testified that Assistant Attorney

11  Generals, Deputy Attorney Generals, people from the Attorney

12  General's Office, would not be allowed to bring a cell phone

13  into the witness room.

14  A.   That's correct.

15  Q.   Are phones made available for the use for the Attorney

16  General's Office in either the warden's office or the deputy

17  warden's office?

18  A.   Yes.

19  Q.   Are phones made available for counsel for the condemned

20  inmates in either the warden's office or the deputy warden's

21  office?

22  A.   Yes.  They have phones set up, fax capability, phone lines.

23  Whatever they need.  Staff assigned to make sure that they can

24  make contact, get their calls made.

25  Q.   Is there also a telephone back near the holding cells that

1    has outside access capabilities that can be utilized by counsel

2    for the inmates while they are back there?

3    A.    There are.  There's actually one phone on each cell so that

4    calls can be made.

5    Q.    And if we could, let's look at what has been marked as

6    Defendants' Exhibit 16.  Can you see that on the Teleprompter in

7    front of you?

8    A.    Yes.

9    Q.    To your knowledge, have you seen this letter prior to

10   today?

11   A.    Yes.

12   Q.    Okay.  And does it authorize and state that in addition to

13   the usual one attorney being allowed onto the premise for the

14   condemned inmate, now two attorneys will be allowed onto the

15   premises?

16   A.    Yes.

17   Q.    Okay.  One can go to the deputy warden's office, where they

18   can have outbound phone calls -- inbound and outbound phone

19   calls, as well as availability to fax machines?

20   A.    Yes, ma'am.

21         MS. CRYER:  Your Honor, I move to admit Defendants'

22   Exhibit 16 into the record.

23         THE COURT:  Any objection?

24         MS. VANDIVER:  No, your Honor.

25         THE COURT:  Defendants' Exhibit 16 is admitted.

1              MS. CRYER:  Thank you.

2         (Defendants' Exhibit 16 received in evidence.)

3    BY MS. CRYER:

4    Q.   Mr. Reed, do you think in your experience, and based upon

5    your experience and your knowledge, that the execution schedule

6    that is currently set starting next Monday presents extra stress

7    or will create extra stress that will lead to error at the

8    executions?

9    A.   No, I don't.

10             MS. CRYER:  Your Honor, I believe that's all that I

11   have.

12             THE COURT:  Anything further?

13             MS. VANDIVER:  I have no further questions, but I do

14   want to move Confidential Exhibits A and C into evidence.

15             THE COURT:  All right.  Any objection to Confidential

16   Exhibits A and C?

17             MS. CRYER:  No, your Honor.  My understanding is that

18   those will be sealed?

19             THE COURT:  They will be.

20             MS. CRYER:  Okay.  Then no objection.  Let me go back

21   for just a second.  Are we talking about the entire Exhibit A or

22   just the pages that were referenced?

23             MS. VANDIVER:  The entire exhibit.

24             MS. CRYER:  Okay.  No objection.

25             THE COURT:  All right.  A and C will be admitted.

1          (Confidential Exhibits A and C received in evidence.)

2              THE COURT:  May Mr. Reed step down?  May Mr. Reed step

3    down?  Yes?

4              MS. VANDIVER:  Yes.

5              THE COURT:  Ms. Cryer, may Mr. Reed step down?  May

6    Mr. Reed step down?

7              MS. CRYER:  I'm so sorry.  Yes, your Honor.  Mr. Reed

8    may step down.  My apologies.

9              THE COURT:  You may step down.

10             THE WITNESS:  Thank you.

11             THE COURT:  You may call your next witness.

12             MS. CRYER:  Thank you.  I'll call Rory Griffin.

13             THE COURT:  Ms. Washington will administer the oath.

14          **RORY GRIFFIN, DEFENDANTS' WITNESS, DULY SWORN**

15                         DIRECT EXAMINATION

16   BY MS. CRYER:

17   Q.   Good afternoon, Mr. Griffin.

18   A.   Good afternoon.

19   Q.   Would you please state your name for the record.

20   A.   Rory Lynn Griffin.

21   Q.   And, Mr. Griffin, where are you employed?

22   A.   Arkansas Department of Correction.

23   Q.   And how long have you been employed with the Arkansas

24   Department of Correction?

25   A.   For the Arkansas Department of Correction since 2009,

Griffin - Direct                                      780

1    somewhere probably around June, end of June.

2    Q.    Okay.  What is your educational background?

3    A.    I am a licensed LPN.  I have a master's in healthcare

4    administration, a bachelor of science in organizational

5    management.

6    Q.    And when did you obtain your LPN license?

7    A.    Sometime during 1991, probably early, or the end of '90.

8    Q.    Okay.  Did you actually bring a copy of your resume with

9    you today?

10   A.    It's not the whole resume, but just if you asked me dates,

11   I brought the dates, like, when I started working in the

12   correctional or the prison system in '92, how long I worked at

13   what, whether it was a nurse, ombudsman for a while, and then

14   infirmary manager.  I did bring that.

15   Q.    Did you bring several copies of that?

16   A.    No, I didn't.  I brought one.

17   Q.    All right.  Let's go over that.

18         MS. CRYER:  Your Honor, if plaintiffs' counsel would

19   like to make that an exhibit, we're happy to do that and we can

20   give them Mr. Griffin's copy on the next break, or let them have

21   access, of course, to it during cross-examination if that's

22   okay.

23         MS. VANDIVER:  I don't mind looking at it, but I don't

24   have a desire to make it an exhibit at this point.  I haven't

25   seen it.

```
 1              MS. CRYER:  Okay.  May I hand it to her?
 2              THE COURT:  You may.
 3              MS. CRYER:  Okay.
 4    BY MS. CRYER:
 5    Q.   Mr. Griffin, let's start out with your employment history.
 6    Let's go back to you graduated from high school?
 7    A.   Yes.
 8    Q.   Did you go to college?
 9    A.   Yes.
10    Q.   Where did you start working after college?
11    A.   Well, and, actually, I kind of did it a little backwards.
12    I graduated high school, decided I wanted to work construction
13    for a while, and it didn't take me a long while to figure out I
14    didn't want to do that.
15              Then I went to nursing school, and then I decided to go
16    back to college to finish my bachelor's, then went straight into
17    and finished my master's.
18    Q.   Okay.  So during the time that you were either working on
19    your degree or once you had graduated and obtained your degree,
20    where was your first place to work post construction?
21    A.   The Arkansas Department of Correction, and I assume you're
22    talking about when I became a licensed nurse.  And it was at the
23    Arkansas Department of Correction at the Varner Unit.
24    Q.   Okay.  Again, were you an ADC employee at that time?
25    A.   No.  I worked for the medical contracted vendor, who back
```

1    then was PHP.

2    Q.    PHP?

3    A.    Yes, PHP Healthcare.

4    Q.    Okay.  And you were an LPN for them?

5    A.    Yes.  That's correct.

6    Q.    What were some of your job duties and responsibilities as

7    an LPN?

8    A.    At the time Varner was probably 1,100 inmates.  That was

9    before they built on, added the Supermax, and we had an

10   eight-bed licensed infirmary.  My duties were to conduct sick

11   call, administer medications, take care of the infirmary

12   patients, start IVs, monitor IVs, give medications IV that were

13   ordered by the provider.  Just basic nursing functions.

14   Q.    I know what a sick call is, but would you give the judge a

15   description of what a sick call is.

16   A.    In the prison system, if an inmate has a medical issue,

17   they would submit a sick call request and say whatever their

18   issue is, that I feel like I have a fever or I think I have a

19   cold or I have the flu.  And it would be triaged and you would

20   schedule them.  If it wasn't an emergency, you would schedule

21   them and you would see them at sick call.

22         Then, of course, any emergencies, which was part of the

23   duties of the job, if we had injuries, work injury from the hoe

24   squad, any type of injury, they would bring them in as an

25   emergency and we would treat them right then.  If they got hot

Griffin - Direct                                             783

1   in the field and thought they might be having heat exhaustion,

2   we'd bring them in, treat them.  Start IVs, fluids.

3   Q.   Where did you learn to start an IV?

4   A.   In nursing school.

5   Q.   What type of training did you go through in order to learn

6   how to do that?

7   A.   You observe and you practice and get certified and checked

8   off by your nursing instructor by demonstrating that you can do

9   it.

10  Q.   Were there a certain number of times in which you had to go

11  through the process in order to be certified?

12  A.   I don't think there's, like, a set number.  Just when your

13  instructor -- whoever was your instructor over clinicals was

14  comfortable that you could do it.

15  Q.   And what is involved in starting an IV?

16  A.   Assessing the patient for a vein, having the necessary

17  medical supplies, the catheter tape ready, the IV tubing already

18  set up so that when you do get a good vein -- what's involved,

19  you're sticking a needle into the arm, finding the vein, getting

20  blood to register.  Then you're taking the little hep-lock off

21  the catheter, hook the IV tube to it, and open it up, let it

22  start flowing into your vein.

23  Q.   Do you have any estimate or guesstimate, even, as to how

24  many times you inserted an IV during your employment at the

25  Varner Unit as an LPN?

Griffin - Direct                                    784

1    A.    I have no idea on the number.  Just many, many times.

2    Q.    How long were you the LPN at the Varner Unit?

3    A.    I stayed at the Varner Unit approximately two years before

4    I moved to that company's original office as the ombudsman.

5    Q.    And by that company, you mean PHP?

6    A.    PHP.

7    Q.    What were some of your responsibilities and job duties as

8    the regional state-wide ombudsman?

9    A.    Basically the role was to function like a patient advocate,

10   if there were issues or problems that you needed to investigate.

11   You may get -- even on the medical side, you maybe have

12   complaints from loved ones or family members, relatives, or

13   somebody called a senator or representative and there were

14   issues that needed to be looked at.  That's what I would

15   investigate and look into.

16   Q.    Were you actually seeing -- during your tenure as the

17   regional state-wide ombudsman, were you actually hands-on

18   treating inmates?

19   A.    No.

20   Q.    Okay.  How long did you stay in the position of regional

21   state-wide ombudsman?

22   A.    It was approximately a year.

23   Q.    Okay.  Then where did you go?

24   A.    Then I -- which I consider a promotion, I actually promoted

25   to the health services administrator at the Tucker Unit, and at

1    the time, the females were at Tucker.

2    Q.    Were you still employed by PHP?

3    A.    Yes.

4    Q.    Okay.  And what were some of your job duties and

5    responsibilities related to being the health services

6    administrator, or HSA?

7    A.    Or infirmary manager.

8    Q.    Infirmary manager.

9    A.    The role of infirmary manager is more like a clinic

10   manager.  You have DONs, a physician, you have several different

11   disciplines in your staff.  So you have maybe x-ray tech,

12   dentist that comes in so many hours, DON, LPNs.  Depends which

13   facility, how large it is.  The physician may be a mid-level.

14   And your responsibility is to manage and run the operations.

15   Other than -- the only thing you don't run is, you don't make

16   clinical decisions.  You know, I could never in that role, nor

17   would I want to, direct what a physician could or could not do.

18   And as long as I can remember in the department, we have ACA

19   standards, that one of their standards is that you do not -- the

20   manager doesn't dictate clinical decisions.  It's that way for a

21   reason.

22   Q.    During your -- or in your role as the HSA or the infirmary

23   manager, were you actively, hands-on providing treatment to

24   inmates?

25   A.    Not really.  No, that wasn't my primary role.  I'm not

Griffin - Direct                                    786

1    going to say that I wouldn't help if something come up or we had

2    an emergency, and probably -- at this unit, it was smaller, and

3    later on some of the larger ones, more so.  If I had an

4    emergency, I would usually always be -- if it was during the day

5    and I was there, I would be present.  I did like to observe and

6    watch my staff and see how they handled the emergency and see

7    who might need a little more training.  Some people are just

8    better at emergencies than others.  Were they calm, did they

9    handle it appropriate, do what they needed to do?  Like that.

10   Q.    During that time, did you have any outside employment?

11   A.    Probably about the year, or most of the year that I was at

12   Tucker, I did, because -- and I'd just been an ombudsman for a

13   year and then went to Tucker and wasn't getting to use nursing

14   skills that much.  So I decided to work part time at JRMC as a

15   nurse.  So I worked most weekends as a nurse at JRMC, on, like,

16   2 Northeast.  And I picked that floor.  A lot of people do not

17   like that floor because it was the urology and orthopaedic

18   floor.  But you had a lot more complicated patients there, and I

19   just happened to like that.

20        If I can back up, I did leave out one thing.  For the two

21   years I was at Varner as a night nurse, I worked several -- a

22   lot of overtime at the diagnostic hospital.  At the time that's

23   where our hospital facility was located, at the old Diagnostic

24   Unit.

25   Q.    What did you do at the Diagnostic Unit?

1    A.    At the hospital, you had more acute-type patients.  The

2    majority of them would have IVs.  You would have an RN and,

3    like, two LPNs and some CNAs.  You did patient care, whatever

4    was required.  If you had new patients in, needed an IV, you

5    started it.  If you had some that had IVs, you monitored them,

6    gave medications as ordered.  Whatever the physician had

7    ordered.

8    Q.    Coming back to where you were talking about your part-time

9    employment at JRMC, am I correct that JRMC stands for Jefferson

10   Regional Medical Center?

11   A.    You are correct.

12   Q.    And was that the hospital or is that the hospital in Pine

13   Bluff?

14   A.    Was the hospital in Pine Bluff.

15   Q.    How long did you work part time for JRMC?

16   A.    Approximately, like, a year, because they really like to

17   keep you booked up.  Right after that year, I was taking on a

18   new role, as we'll probably go to in a second, but --

19   Q.    And I believe I know this, but let me make sure.  During

20   your employment at JRMC, was it part of your job duty to start

21   IVs in patients?

22   A.    Yes.

23   Q.    All right.  After -- putting JRMC aside, we were at the

24   Tucker Unit as the infirmary manager.  At some point did you

25   leave the Tucker infirmary?

Griffin - Direct                                    788

1    A.   Yes, I did.  And I do want to clarify one thing on these

2    dates.  These are, like, approximate, and I didn't break them

3    down to month.  Because, like, it might have been the end of

4    '97 -- you know, these dates are not exact dates when I changed

5    these, but they're real close.

6    Q.   Okay.

7    A.   I left Tucker in '97, and it was actually, like, July of

8    1997.  I can remember that particular day because the medical

9    contract was awarded to a new company in July of 1997.  And at

10   the time it was CMS, who later changed their name to Corizon.

11   They came in as the new medical vendor, assessed, evaluated all

12   the staff, met with all of us.  And they wanted to put me back

13   at Varner, which was a larger unit than where I was at.  And it

14   was also during the time that they were starting to build and

15   going to be opening up the Supermax.  So I moved to Varner, as

16   infirmary manager.

17   Q.   All right.  And how long were you the infirmary manager at

18   the Varner Unit?

19   A.   Like, from '98 to 2003.  Even though I put '98, it's really

20   July of '97.  All the way up to 2003.

21   Q.   Were your job duties and responsibilities as the infirmary

22   manager at Varner similar to those when you were the infirmary

23   manager at Tucker?

24   A.   Yes.

25   Q.   All right.  Any additional outside employment, side

```
 1   employment, or anything while you were the infirmary manager at
 2   Varner?
 3   A.    No.
 4   Q.    All right.  I know you left there and went on up, so what
 5   was your next employment?
 6   A.    When I was at Varner, that particular medical company,
 7   medical vendor, they had had issues and they were having --
 8   Cummins was kind of a problem site for them.  They'd gone
 9   through several infirmary managers or HSAs, and they approached
10   me and asked me would I be willing to move over to Cummins.  I
11   agreed and said I would.  So I moved over to Cummins, which at
12   the time was the largest facility in the state.
13   Q.    And your move to Cummins, was that as the infirmary
14   manager?
15   A.    Yes.
16   Q.    And you were still employed by the outside medical
17   contract?
18   A.    Yes.
19   Q.    And not the ADC?
20   A.    The same company.
21   Q.    Okay.
22   A.    CMS, later Corizon.
23   Q.    And how long did you remain the infirmary manager at
24   Cummins?
25   A.    Until the end of June 2009, somewhere like the 25th.
```

Griffin - Direct

1  Q.   And where did you go?  What happened June 25, 2009?

2  A.   Mr. Byus, or John Byus, was the former administrator for

3  medical and dental services for the department, and he had

4  retired and I had applied for and interviewed for and was

5  selected for the position of administrator of medical and dental

6  services for their department.  I accepted it and that's where I

7  went.

8  Q.   All right.  During your employment at the Cummins Unit as

9  the infirmary manager, I believe that was from approximately

10 2003 or so until 2009 --

11 A.   Yes.  The end of -- yes.

12 Q.   That ballpark.

13 A.   Yes.

14 Q.   Do you recall if there were any executions that were

15 carried out at the Cummins Unit?

16 A.   Yes, there were.

17 Q.   Were you involved in providing any type of treatment or

18 participation on the execution team during those executions?

19 A.   No.  The medical vendor is never involved in the execution.

20 Q.   All right.  Was your role just to provide medical treatment

21 and care to all of the other inmates at the Cummins Unit?

22 A.   Yes.

23 Q.   All right.

24 A.   And on that, on the night of executions, I may -- I would

25 stay around, and I may change my providers' schedule a little

1   bit so that they would be around in case something was to happen

2   in the population, which it never did.  But it was kind of a

3   quieter time.  The halls were locked down.  Didn't mean we

4   couldn't get patients for doctors' call or provider call.  They

5   would just escort them and bring them down to us.

6   Q.   But as far as being, such as, in the death chamber or

7   anywhere around -- am I correct that you were not there?

8   A.   Correct.

9   Q.   Okay.

10  A.   If they were prescribed medications while they were in the

11  holding cell, nursing staff would, of course, go down and

12  administer their medicines, but no involvement in the execution

13  process.

14  Q.   Okay.  Let's talk about your role as the administrator of

15  medical and dental services, starting in 2009.  At that point

16  did you become an employee of the Department of Correction?

17  A.   Yes.

18  Q.   Still same, essentially same location, same people you had

19  been working with, however your employment went from a

20  company -- a contract employer to a state employee?

21  A.   Right.  And then not the same -- I left Cummins and went to

22  Central Office.

23  Q.   Where is Central Office located?

24  A.   Off Princeton Pike in Pine Bluff.

25  Q.   Okay.  In Pine Bluff.  Will you explain to the judge what

Griffin - Direct

1    some of your duties and responsibilities were as the

2    administrator of medical and dental services.

3    A.    Some of your duties were to monitor the contract.  You're

4    monitoring the performance and what all work the contractor is

5    doing, which coming from that side all those years, I had --

6    gave me insight into all their operations.  I knew what I was

7    supposed to be doing.

8         So I'd monitor their contract.  I chaired the hospital

9    board of review committee, which is a committee that's set up

10   for the diagnostic, used to be, or now the Ouachita hospital.  I

11   would be a member of their regional performance improvement

12   committees.  They review their staffing.  They would have to

13   submit very detailed reports each month showing me all their

14   different operations.

15        So you'd be monitoring, are they doing the -- and another

16   aspect was to monitor on how compliant everything was with the

17   accreditation and ACA.  Which that falls back into, when I'm

18   monitoring the contract, are they seeing the inmates within the

19   72 hours for their routine?  Are the doctor referrals getting

20   seen in seven days?  So I would monitor those, and if we had a

21   facility that wasn't doing maybe as well as they should, I would

22   make site visits.

23   Q.    And how long were you in the role of administrator of

24   medical and dental services?

25   A.    From 2009, that June, all the way to the very end of 2013.

1    New role started January 1, 2014.

2    Q.    And what new role was that?

3    A.    The deputy director of healthcare and programs, my current

4    position.

5    Q.    All right.  Between 2009 and the very end of 2013, during

6    the period that you were the administrator of medical and dental

7    services, do you recall whether or not there were any executions

8    that were scheduled?

9    A.    Scheduled?

10   Q.    Yes.

11   A.    I believe so.

12   Q.    Okay.  Did you have any type of involvement in preparing

13   for those executions in your role as administrator of medical

14   and dental services?

15   A.    Yes.

16   Q.    Okay.  What role did you have?

17   A.    One of the roles -- can I get a drink of water up here?

18           THE COURT:  You may.  Here.

19       Why don't we go ahead and take a five-minute break.  We'll

20   come back in at 4:20.

21       (Recess at 4:15 p.m.)

22                      REPORTER'S CERTIFICATE
         I certify that the foregoing is a correct transcript from
23   the record of proceedings in the above-entitled matter.

24                                      Date:   April 12, 2017
     /s/ Christa R. Jacimore, RDR, CRR, CCR
25       United States Court Reporter

Griffin - Direct

1          (Continuing at 4:23 p.m.)

2               MS. CRYER:  Am I good to go?

3               THE COURT:  You are.  Go right ahead.

4                    CONTINUED DIRECT EXAMINATION

5     BY MS. CRYER:

6     Q.    Mr. Griffin, in your role as deputy director, are you going

7     to be involved -- have you been involved in the execution

8     procedure?

9     A.    Yes.

10    Q.    Okay.  I'm going to show you what was attached to the

11    plaintiffs' complaint as I believe their Exhibit 1.  Do you

12    recognize this document?

13    A.    Yes.

14    Q.    All right.  What is this document?

15    A.    That's Attachment C of our lethal injection AD.

16    Q.    And have you reviewed this prior to today?

17    A.    Many times.

18    Q.    Let's start at the -- in Section I, number 1, it makes

19    mention of:  "The deputy director, or designee, is responsible

20    for ensuring that the chemicals for lethal injection, the

21    gurney, straps, and other necessary items are available for use

22    on the scheduled date of execution."  Did I read that right?

23    A.    Yes.

24    Q.    Are you the deputy director that is responsible for that?

25    A.    Yes, I am.

1    Q.    Again, following the second sentence, are you the deputy

2    director that is healthcare trained, educated, and/or

3    experienced in matters related to the establishment and

4    monitoring of IVs?

5    A.    Yes, I am.

6    Q.    And the mixing and administration of the chemicals and

7    assessing the presence or absence of consciousness?

8    A.    Yes.

9    Q.    If we look at paragraph number 2, is it going to be your

10   job or your duty to verify as to type and concentration and

11   thereafter supervise any necessary mixing or reconstituting of

12   the chemicals to be used in the lethal injection?

13   A.    Yes, me and someone -- whoever I designate to assist.

14   There will be more than one person is what I'm trying to say.

15   Go ahead.

16   Q.    No.  Go ahead.

17   A.    I was going to say, yes, whoever I designate will also be

18   trained and it will be within their scope of practice to --

19   Q.    Will it be a correctional officer?

20   A.    No.

21   Q.    Okay.  Paragraph number 3:  "The deputy director, or

22   designee, shall maintain physical custody of the injection drug

23   box and physically convey the box directly to the execution

24   chamber for use."

25         Are you the deputy director that will be responsible for

1   that role or will it be your designee?

2   A.   Yes, and it will be me.

3   Q.   Okay.  Looking down -- let's move down to paragraph 6,

4   which is at the bottom.  Will it be your responsibility to make

5   sure that the execution gurney is positioned in the death

6   chamber and that the executioner can observe the condemned

7   inmate's face and IV infusion site?

8   A.   Yes.

9   Q.   Let's turn to page 2.  And I'm skipping over some of these

10  that I haven't had highlighted.  But let me go back and check,

11  briefly.  Are you the deputy director that's referenced in

12  paragraphs 1 through 6 on this first page?

13  A.   Yes.

14  Q.   Okay.  Let's look at page 2, under Section II, the IV setup

15  procedure.  It reads:  "The deputy director, or designee, shall

16  have an intravenous infusion device placed on each arm, or other

17  standard anatomical venous point of entry, of the condemned

18  inmate."  Is that going to be your job?

19  A.   No.

20  Q.   Okay.  Is that going to be the role of your -- have you

21  designated someone for that position?

22  A.   Yes.

23  Q.   And it says:  "The individuals engaged in this activity

24  will be referred to as the IV team and shall be qualified as set

25  forth in Section V."

Griffin - Direct

1          Let's scoot over to Section V of this policy.  Can you see

2    it in front of you?

3    A.    Yes.

4    Q.    Are these the qualifications that the IV team members must

5    possess?

6    A.    Yes.

7    Q.    Okay.  Going back to Section II, it states that:  "The

8    intravenous catheter shall be initiated through standard

9    procedure for such devices.  Once the infusion of the IV

10   solution has been assured, the IV devices shall be secured as

11   appropriate."  Is it your job to monitor or supervise that this

12   is done correctly?

13   A.    No.

14   Q.    Whose role, or is there a position or a designee of who

15   will be responsible for overseeing that?

16   A.    Designee.

17   Q.    We have under Section III, the preparation of chemicals.

18   Will you be the deputy director involved in this or do you have

19   a designee that will be responsible?

20   A.    It's a combination; it will be the deputy director and

21   designee or designees.

22   Q.    Okay.  And, again, under Section IV, injection procedure,

23   will you be involved and is it -- does it reference you in

24   Section IV of this policy?

25   A.    No.

1   Q.   Okay.  Is it of your designee or designees?

2   A.   Either my designee or the director's designee.

3   Q.   Okay.  Again, looking at page 5, there are references as to

4   job duties as the deputy director or designee.  Will these be

5   your duties or those of your designee?

6   A.   Am I looking at all of them or one particular?

7   Q.   Looking at all of them, unless we need to pull one out and

8   separate them out.

9   A.   Let me just look for a second.  She's messing with me

10  again.

11  Q.   I am.  I'm sorry.

12  A.   And the question was, would that be my responsibility?  Is

13  that your question?

14  Q.   Yes.

15  A.   No.

16  Q.   Would that be someone that you have designated?

17  A.   Yes.

18  Q.   All right.  Again, I believe we've already discussed

19  Section V -- excuse me -- IV, the team qualifications.

20       Mr. Griffin, do you know what a consciousness check is?

21  A.   Yes.

22  Q.   What is a consciousness check?

23  A.   A consciousness check would be if you were assessing a

24  patient, it would be, like, coming up to them, saying their

25  name, maybe gently shaking them, doing the eyelash reflex.

1    Could even do a corneal reflex.  And you could move on to more

2    aggressive stimulus, such as a sternum rub or a real good pinch

3    to see if you get any kind of response from them.

4    Q.    And who -- what is the -- strike that.  What are the

5    qualifications necessary in order to perform a consciousness

6    check?

7    A.    Medically -- someone that's medically trained.

8    Q.    What do you mean by "medically trained"?  I mean, I may

9    think I'm medically trained because I watch *Grey's Anatomy* every

10   Thursday.  So tell me, what does it mean actually medically

11   trained?

12   A.    Could be someone that's licensed, a nurse, physician, EMT,

13   medic in one of the military branches, just somebody who has

14   some formal training.  And if you want to be quite honest, I can

15   probably train you how to do a consciousness check.

16   Q.    Will the individual who performs the consciousness check

17   the night of the executions be a correctional officer?

18   A.    No.

19           MS. CRYER:  Your Honor, I believe I'll pass the

20   witness at this time.

21           THE COURT:  All right.  Cross-examination.

22           MS. VANDIVER:  Let me just organize myself and I'll be

23   right there.

24           THE COURT:  All right.

25                      CROSS-EXAMINATION

1    BY MS. VANDIVER:

2    Q.    Good afternoon, Mr. Griffin.

3    A.    Good afternoon.

4    Q.    I'm Julie Vandiver.  I don't believe we've ever met before.

5    A.    I don't recall meeting you.

6    Q.    But we have spoken by email before, I believe, on behalf of

7    some of my clients.  Is that right?

8    A.    Yes.

9    Q.    Yes.  So Ms. Cryer took you through your resumé, and you

10   are an LPN.  Is that right?

11   A.    That's correct.

12   Q.    And that stands for "licensed practical nurse."

13   A.    Yes.

14   Q.    And is it correct that the only education that's required

15   to be an LPN is a high school diploma?

16   A.    That's correct.  Same education that's required to go into

17   RN school.

18   Q.    I guess I don't mean to be admitted to school.  I mean to

19   be an LPN.

20   A.    Yes, it -- it would be the same thing.  I mean -- and the

21   reason I said that, if you have a high school diploma, you can

22   sign up and go into an LPN program or you can sign up and go

23   into an RN program.

24   Q.    Now, correct me if I'm wrong, you can actually become an

25   LPN without graduating from an LPN program.  Is that right?

Griffin - Cross                                                                801

1    A.    I have no idea.

2    Q.    Okay.  I've got this -- this is part of the Nurse Practice

3    Act in Arkansas.  We just handed a copy to the state.  And it

4    says:  "The qualifications for an applicant for a license to

5    practice practical nursing, you need to have good moral

6    character, and you have to have completed an approved high

7    school course of study or the equivalent thereof and have

8    completed a prescribed curriculum in a state-approved program

9    for the preparation of practical nursing and hold a certificate

10   or diploma therefrom.  However, the Arkansas State Board of

11   Nursing may waive this requirement if the board determines the

12   applicant to be otherwise qualified."

13        So are you aware that sometimes you don't actually have to?

14   A.    I can say it like this.  For example, somebody comes out of

15   the military, was a medic, been one for 20 years and wanted to

16   just take the exam.

17   Q.    Okay.

18        MS. CRYER:  And, Your Honor, I'm going to object on

19   the basis of relevance.  I believe he's already testified that

20   he graduated high school, went to college, and got a degree.

21        THE COURT:  I'll overrule the objection.  You can go

22   ahead.  I don't know how much more time you're going to spend on

23   that.

24        MS. VANDIVER:  Not much.

25   BY MS. VANDIVER:

1   Q.   You said you went to college later.  Your degree in nursing

2   was from Great Rivers Vo-tech.  Do I have that name right?

3   A.   Yes.

4   Q.   And that's a one-year program?

5   A.   Yes, it is.

6   Q.   But you're not currently engaged in the practice of

7   nursing.  Is that right?

8   A.   That's correct.

9   Q.   You're kind of more of a desk man now?

10  A.   I don't know about a desk man.  But --

11  Q.   Okay.

12  A.   -- I mean, my licenses are current.  I keep them current

13  and do my continuing education.  But I don't do hands-on.

14  There's many aspects of nursing, not just direct patient care.

15  Q.   So you don't treat patients now?

16  A.   No.

17  Q.   And does your job require you to consult in the treatment

18  of the ADC inmates?

19  A.   No, I don't think so, if I understand your question.  I

20  don't know what you specifically mean by "consult."

21  Q.   Well, do you have any input in how -- so there are a lot of

22  men and women at the ADC -- I don't know how many, but I'm sure

23  you probably do -- that are getting medical treatment which I

24  understand to be under your purview.  Is that right?

25  A.   That's correct.

Griffin - Cross                                                803

1   Q.   But what their particular medical treatment is or isn't,

2   that isn't your concern, that's somebody else's.  Is that right?

3   A.   A physician or nurse practitioner is going to be the one,

4   just like a hospital or anywhere else, that's directly under

5   their care and they would make the medical decisions of what the

6   treatment's going to be.

7   Q.   Thanks.  And the ADC uses a contractor, I think we talked

8   about this, because you previously worked for the ADC medical

9   contractors.

10  A.   Not the current contractor, no.

11  Q.   A contractor, right?

12  A.   Two of them in the past, yes.

13  Q.   So as far as providing the doctors and nurses and the

14  people that work at the ADC, that's something that's handled by

15  the contractor.  Is that right?

16  A.   Correct.

17  Q.   Okay.  So you seek out the contractor and deal with the

18  contractor, as far as -- do you award the contract?

19  A.   We -- what -- and, actually, I was involved with the -- we

20  put out an RFP and they bid on it and we select one, which I

21  chaired the committee back in, probably, 2013.  Two members of

22  our board, I think the director from both agencies, and me, and

23  I can't remember who else, we spent about a year writing the

24  RFP, put it out, and allowed people to bid on it, and we

25  selected and awarded a contract to the medical vendor.

1   Q.    Okay.  And it's correctional -- is it Correctional Medical

2   Services, or --

3   A.    Correct Care Solutions.

4   Q.    Correct Care Solutions.  So if, like, one of the units

5   needs a doctor or someone, the hiring of the doctor is handled

6   by the Correct Care Solutions?

7   A.    Yes.

8   Q.    That's not part of your duties?

9   A.    No.

10  Q.    Were you consulted in the setting of these execution dates?

11  A.    No.

12  Q.    I want to look at Plaintiffs' Exhibit 32, which you were

13  just shown on your direct exam, which is Attachment C.  And I

14  think you know what it looks like, but --

15  A.    And I'm assuming -- I shouldn't.  But when you say

16  consulted about, did somebody ask me when the date should be?

17  Q.    Did they talk to you before they set them?

18  A.    No.

19  Q.    So this is that document that we were just talking about.

20  Are you the author of this document?

21  A.    No.  I probably worked on revising this document with other

22  people.

23  Q.    So can you tell me then about -- tell me about that

24  process.  How did this document get written?

25  A.    Well, in -- I can't remember all the exact revisions, but

Griffin - Cross

1    it was back when -- I can't remember the exact dates, but

2    sometime in 2015, we were looking at -- I guess after the

3    legislators had set the law and said, you know, we're going to

4    use these drugs, and then we started looking at the availability

5    and what was out there.  And just speaking of my own personal

6    thing, I think I probably looked at what was available and what

7    all states were using.  And then the Supreme Court had upheld

8    the Oklahoma's dosage of the drugs, and that's kind of how we

9    went with the direction or what we have in there now.

10       I don't know if I answered your question or not.

11   Q.   Kind of.  That's all information I'm interested to hear.

12   So it sounds like -- and it might be helpful for me to show you

13   -- I think what you're talking about is the method of execution

14   statute.  When you say the legislature decided what the --

15   A.   Yes, I think I am.  I'd have to see it.  Yes, I think this

16   is probably where I probably became involved in it, that this

17   came out and we knew our options were this and this.

18   Q.   Okay.

19   A.   I was looking at, what, you know, we were setting, what

20   would the dosage be for these meds.

21   Q.   Just for the purpose of the record, I'd like to say I'm

22   showing the witness Arkansas Code Annotated 5-4-617, which is

23   the method of execution law.

24       So I think the area that you're talking about is this part

25   here in (c), when it says you need to select one of the

1    following options for a lethal injection protocol depending upon

2    the availability of the drugs.  And there's two options,

3    correct?

4    A.   Yes.

5    Q.   A barbiturate or midazolam followed by vecuronium bromide

6    followed by potassium chloride.  So it sounds like, and correct

7    me if I'm wrong, that you were involved in deciding which way

8    you were going to go?

9    A.   Well, no, I don't think so, because I'm pretty sure -- I

10   wasn't involved in the drugs, these particular drugs.  I think

11   we already had these drugs, so we were looking at what the

12   dosages should be.

13   Q.   Okay.  So when -- let's switch back here.  Where this

14   questioning started was, we were talking about when this was

15   written, and so I think that's a question you were trying to

16   answer, and I appreciate that.

17        So by the time that you wrote this, you already had, or the

18   department already had midazolam.  Is that my understanding of

19   your testimony?

20   A.   When was this written?

21   Q.   Well, on the bottom here, it says, "Revised 8-6-2015."

22   A.   I am pretty sure that we had midazolam at that time.  I

23   would have to check to give you a hundred percent answer, but --

24   Q.   Okay.

25   A.   And let me go ahead and clarify one thing too.  This

1    document, it's not like it was just a total remake.  If you go

2    back and look at our previous versions of our AD, there's

3    probably little changes to it.

4    Q.    And that more deals with drug administration.  Is that

5    right?

6    A.    Say that again.

7    Q.    Drug administration.  So the previous protocol, correct me

8    if I'm wrong -- and I'm not sure when your involvement with this

9    started -- there was a protocol in place that used

10   phenobarbital.  Do you remember that?

11   A.    No.

12   Q.    One of the things that you said in answering my earlier

13   question was you had kind of looked at what other states had

14   done.  Is that correct?

15   A.    Well, as far as -- I was looking at, like, what dosages of

16   these three drugs would you -- were they using or did they use

17   in their protocols.

18   Q.    So tell me a little bit about that research, if you would.

19   A.    I believe by the time I was -- I started looking at this, I

20   had looked at Florida's, I looked at Oklahoma, and I think that

21   at the point I was looking at it, Oklahoma had already revamped

22   and actually increased their level of midazolam and been all the

23   way through the Supreme Court had ruled that it wasn't

24   unconstitutional.  So my recommendation would be let's go with

25   the same dosage they have.  I'm certainly not the one that's

1    making the final decision on what this AD was going to say --

2    Q.    But that was your recommendation, and it seems like it got

3    adopted, as far as you know?

4    A.    As far as I know.

5    Q.    Did you consult with -- I understand your testimony is that

6    you're a nurse.  But did you consult with any medical

7    professionals to design this lethal injection protocol, or this

8    procedure?

9    A.    No.  I would have given my recommendations to the director,

10   and I'm not sure who she would have consulted with, whether it

11   was the AG or who.

12   Q.    Okay.  So you just don't know?

13   A.    I didn't.  So my answer to you is no.

14   Q.    You didn't.  And so you were involved in the authoring of

15   this document, and so was the director, Ms. Kelley?

16   A.    Yeah.  I don't know if you would word it like that, the

17   authoring or not.

18   Q.    Okay.

19   A.    I was involved to make recommendations or what my thoughts

20   would be on the dosage of the medications.

21   Q.    So do you know who actually wrote it?

22   A.    No.

23   Q.    Okay.  Let's see.  I want to put this statute back up here.

24   We discussed a minute ago that this statute allows for two

25   different lethal injection protocols, there's two options, to

Griffin - Cross

1   use the language of the statute.  The first is a barbiturate.

2   And it sounds like that -- well, let me just ask you.  Was that

3   something at the time that you were making your recommendations

4   for this Petitioners' Exhibit 32, or Plaintiffs' Exhibit 32, was

5   that something you considered?

6   A.   No, because we already had midazolam and the Supreme Court

7   had ruled that it wasn't unconstitutional, so I don't see why I

8   would look at a barbiturate.

9   Q.   So you didn't make any efforts at that time to try to get a

10  barbiturate?

11  A.   No.

12  Q.   Okay.  Have you made any efforts since to get a

13  barbiturate?

14  A.   No.

15  Q.   So you've never tried to get a barbiturate?

16  A.   No.  I have the drugs that match our law and our AD, so,

17  no, I've never looked to get barbiturates.

18  Q.   Is that your job?  Are you the one that is in charge of

19  getting the drugs?

20  A.   It falls under one of my duties, to obtain the drugs.  That

21  doesn't necessarily mean that if the director got the drugs from

22  somewhere, then I wouldn't get them.  But it is under my duties

23  to try to obtain the drugs.

24  Q.   I didn't quite understand your last answer.  I sort of had

25  a lapse in paying attention.  What did you say?

Griffin - Cross

1   A.   I said that it is one of my duties to obtain the drugs, but

2   I was going to say, if somebody else obtained them, then, of

3   course, I wouldn't have to.  The only other person that would be

4   would be the director.

5   Q.   If she did it, it would take it off your plate?

6   A.   Yes.

7   Q.   But if she doesn't do it, it falls on you?

8   A.   Yes.

9   Q.   Okay.  Ms. Cryer already went through some of this with you

10  and covered some of my questions, because I was wondering, as

11  well, whether or not you were the deputy director that's

12  referred to in this document.  So I'm going to have some

13  questions for you about that as well.

14       You mentioned, and correct me if I'm wrong, of course, that

15  one of the duties in this that you plan on designating is the

16  ones in paragraph 2, or was it someone's going to help you with

17  this?

18  A.   Let me read it again.

19  Q.   Okay, yeah.  Go ahead.

20       (Witness reviews document.)

21  A.   I will be present, but what I said was either my designee

22  or designees.

23  Q.   Your designee -- your designee or designees will do what?

24  A.   Well, let me add -- you asked me the question a while ago

25  and now I'll answer it.  Are you talking about mixing the

Griffin - Cross

1  chemicals?  I'm not sure.  I've lost your question.  So what is

2  your question?

3  Q.  I thought your testimony was on direct that some of the

4  duties in paragraph 2 you're going to have either a designee do

5  or have them assist you.

6  A.  And I can't remember exactly how I worded it, but I said I

7  would be involved, but there would be designee or designees

8  also.

9  Q.  Well, I'm really not that concerned about how you worded

10  it.  I just want to know what's going to happen.  So why don't

11  you just tell me now what your plan is regarding the things that

12  are described in paragraph 2, which, for the record, I'll go

13  ahead and read.  It says:  "When the chemicals have been

14  received, the deputy director, or the designee, shall verify as

15  to type and concentration, and thereafter supervise any

16  necessary mixing or reconstituting of the chemicals in such a

17  manner as will meet the injection requirements (see Chart A) and

18  in accordance with manufacturer's instructions.  The mixed or

19  reconstituted chemicals shall be transferred to an appropriate

20  syringe or syringes and thereafter placed in a designated

21  injection drug box.  The box will be secured and conveyed to the

22  Cummins Unit."

23      So tell me in that paragraph, what of those things are you

24  going to do and which of those things are you going to

25  designate?

1    A.    Okay.  The actual -- well, let me read them one by one, if

2    you want me to do that.

3    Q.    Sure, that will work.

4    A.    Okay.  Verify as to the type and the concentration, that

5    will be me and designee or designees.  So more than one person

6    will do that.

7          Supervising any necessary mixing or reconstituting of the

8    chemicals in such a manner, that will be me and a designee.

9    Could be also, if I have two designees in at the same time, that

10   would put, like, three people.  But, basically, I'd say the

11   supervisor, so you could say me.  But it's not going to just be

12   me.  I want more than one person.  Kind of like if you're a

13   nurse and you're pulling up insulin, it's always double-checked

14   by another person.  If you're asking me who is going to actually

15   draw the vial, draw it up, put it in here, I haven't made that

16   decision yet.

17   Q.    Okay.

18   A.    It will be one of -- me or the designee or designees.

19   Q.    Now, I'm not asking you to tell me a person's name, but I

20   do want to know if you've selected your designee.

21   A.    Yes.

22   Q.    And is it more than one person?

23   A.    I'd say no.

24   Q.    How did you select that person?

25   A.    That person is a member of the IV team.

Griffin - Cross

1   Q.   Okay.  So they'll have whatever -- and we're going to talk

2   about this later.  So whatever the qualifications or your

3   selection regarding the IV team will be the same as to this

4   designee?

5   A.   Yes.

6   Q.   Okay.  And is that -- and I'm sure that you know this.  But

7   there's multiple executions scheduled, either seven or eight,

8   right?

9   A.   Yes.

10  Q.   And so is that designee that's going to be helping you with

11  this process going to be the same for each execution?

12  A.   Yes.

13  Q.   And these executions are going to happen two a night,

14  correct?

15  A.   Yes.

16  Q.   And so when -- and there was testimony earlier, which I

17  believe you were present for, from Mr. Reed, that the executions

18  are going to happen at 7:00 p.m. and 8:15.  Were you here for

19  that testimony?

20  A.   Yes, I was.

21  Q.   So when did you plan, you and your designee on the day of

22  the executions, plan on doing the things that are described here

23  in paragraph 2 on page 1 of Exhibit 32?

24  A.   When directed by the director.

25  Q.   And so you don't know when that's going to be?

1   A.   No, I can't give you a time.

2   Q.   Is this something that you've practiced?

3   A.   As a nurse for drawing up or reconstituting meds, yes, I've

4   done it many times.  Is it something that I've practiced with

5   all of these?  Not out of the real medicine, no.

6   Q.   Okay.  I guess the reason I've asked is because there's

7   been some testimony that there are execution practices, you

8   know, for the IV -- well, not the IV team.  I'm sorry.  The

9   escort team and the tie-down team.  And so I didn't know which

10  part of these things on this that are your duties you practiced?

11  A.   And I've been involved with all the practices also, in

12  going through all of the different steps.  But have I practiced

13  being able to read a vial that says one milligram per milliliter

14  and I need 50 milligrams or milliliters in each of these two

15  syringes?  No, I don't think I need to practice that.  I think I

16  can do that.

17  Q.   Okay.  And you don't know when that's going to happen?

18  A.   It will be the day of, but I do not know the time.

19  Q.   And you'll just wait to hear from Director Kelley when she

20  says go, then you'll do it?

21  A.   That's it.

22  Q.   I want to jump back to paragraph 1.  It says:  "The deputy

23  director, or the designee, is responsible for assuring that the

24  chemicals for lethal injection, the gurney, straps, and other

25  necessary items, are available for use on the scheduled date of

1    execution."

2         And so you testified on direct that that's you and you're

3    not planning on designating those duties, right?

4    A.   Correct.

5    Q.   So I think we talked about the chemicals, and I want to

6    talk about them again later, but not right now.  The gurney,

7    that's something that's there.

8    A.   Yes.

9    Q.   Okay.  So you don't have any control over that.

10   A.   Correct, yes.  It's stationary.

11   Q.   Right.  What about the straps?

12   A.   The straps are already actually there.  They're in place.

13   Q.   Okay.  So what are the other necessary items?

14   A.   It would be any of the supplies necessary.  Of course, if

15   we put them all down, it will be the chemicals, and it will be

16   any items or supplies that are necessary to start the IVs, run

17   the IV bags, the lines, or the IV tubing.

18   Q.   IV bags, tubes.  What was the last thing you said?

19   A.   I said it would be anything needed to start an IV.

20   Q.   Then you rattled a few things off and I missed the last

21   thing.

22   A.   The catheters, the alcohol --

23   Q.   The catheters and the what?

24   A.   Catheters, an op site, like a clear tape that you can put

25   over it when you start a catheter, you can see it.  You need the

1    IV tubing, the IV bag, or IV fluids, you know, the bag of

2    fluids.  Yeah, I'm trying to -- I can't remember which one I

3    said or didn't say.  Basically, all supplies that would be

4    required to start the IV.  Different size catheters.

5    Q.    Okay.  And is this -- I mean, is this a list somewhere that

6    you have or you just -- I mean, you just kind of know?

7    A.    I've actually spoke with the IV team and had their input on

8    what they wanted to have.  So do I have a list right now of it?

9    No.  I could probably make you a list or we could have a list.

10   But, no, I don't have a current list of it.

11   Q.    So you just kind of have it in your head as far as what you

12   think you'll need?

13   A.    Well, actually, it's not in my head.  I've sat down in the

14   past with the members of the IV team and went through the items

15   needed and put it in, like, a little IV start kit, and I have

16   that --

17   Q.    So you physically have it somewhere?

18   A.    Yeah, it's put together so I don't have to try to remember

19   it at the last minute or come up with did I forget a pair of

20   scissors.

21   Q.    How many of those do you have ready?  How many of those

22   kits do you have ready to go?

23   A.    Two.

24   Q.    Okay.  So you plan on restocking that then?

25   A.    Yes.

Griffin - Cross

1    Q.   I'm not sure if this was asked on direct, and if it was, I
2    just don't remember what your answer was.  And I know you've
3    participated some in, like, the buildup to executions that
4    didn't happen.  But have you been a part of any executions at
5    the ADC before?
6    A.   Not with ADC -- not with ADC.  I was at Cummins when there
7    were some executions in the past, but I was on the medical side
8    and not involved.
9    Q.   So you didn't have anything to do with it?
10   A.   Correct.
11   Q.   And have you been involved with the executions at another
12   correctional institution?
13   A.   I haven't worked at another correctional institution.
14   Q.   So you've never been involved in an execution, other than
15   maybe being at the unit at the same time it was happening?  Is
16   that --
17   A.   Correct.
18   Q.   Okay.  And you said that you've been at the practices.  Is
19   that right?
20   A.   I can't hear you.
21   Q.   Sorry about that.  You said you've been at these practices
22   that they've been doing or you've been doing for the executions?
23   A.   Yes.
24   Q.   So you've been in the execution chamber?
25   A.   Yes.

1   Q.   And were you here yesterday and earlier today when we

2   played that video off of YouTube of the execution chamber?

3   A.   Yes.  Is that the one you drew the little --

4   Q.   Uh-huh.

5   A.   Yes.

6   Q.   So that's an accurate depiction of what the chamber looks

7   like --

8   A.   Yes.

9   Q.   -- today?  I think the video is kind of old.

10  A.   Overall, yes.

11  Q.   Overall?  Are there differences?

12  A.   Well, I don't think that little box you all were talking

13  about is there.  But other than that, yes.  The walls haven't

14  changed.  The dimensions or the design haven't changed.

15  Q.   And the IV tubes still come through that little hole?

16  A.   Still come through that little hole.

17  Q.   And the executioners will still be behind that steel door

18  with that narrow mirror there?

19  A.   Yes.

20  Q.   Two-way mirror?

21  A.   It's probably a six or seven-inch little window slot there,

22  yes.

23  Q.   Okay.  So let's see.  I'm trying to arrange my questions

24  not to ask about the confidential exhibits until later, so it's

25  just causing me to reorganize things a little bit.

1      Let's go back to this, which when I say "this," I mean

2    Exhibit 32.  On paragraph 3 on page 1, it says:  "The deputy

3    director shall maintain physical custody of the injection drug

4    box and physically convey the box directly to the execution

5    chamber for use."  You're not going to designate that.  You're

6    going to be in charge of that?

7    A.   Correct.

8    Q.   And these drugs are kept off-site, right?  They're not kept

9    at the Cummins Unit?

10   A.   Correct.

11   Q.   So I presume they're going to be driven to the Cummins

12   Unit?

13   A.   I would think they'd have to be.

14   Q.   I don't know.  You guys maybe have a helicopter or

15   something.  Let's see.  Now, the executioners are not chosen by

16   you.  Is that correct?

17   A.   That's correct.

18   Q.   And you don't -- I mean, you don't train them or you're not

19   involved with them, or I guess --

20   A.   Correct.

21   Q.   Okay.  So who does that?

22   A.   The director.

23   Q.   Okay.  Have you been in that little chemical room?

24   A.   For every practice.

25   Q.   For every practice?

1    A.    Yes.

2    Q.    So you've been in the little chemical room?

3    A.    Yes, I've been in the little room behind the little

4    mirrored glass.

5    Q.    Why is that?

6    A.    To communicate with the person that's on the outside that's

7    talking through an encrypted radio headset and to see how the

8    view is, what all I can see, and can I see the IV lines, can I

9    see through his legs.  That's why I was in there.

10   Q.    So you've not done any practices where you've been on the

11   outside, in the -- I'm sorry -- in the part where my client is

12   going to be, on the gurney?

13   A.    Correct, I don't have a role there.

14   Q.    Will you have a role there during the execution?

15   A.    I don't -- if -- we may have to go to confidential.

16   Q.    Okay.

17              THE COURT:  What would you like to do?

18              MS. VANDIVER:  If I could just look at my questions

19   for a minute to see if I can kind of circle back to this?

20              THE COURT:  Sure.

21   BY MS. VANDIVER:

22   Q.    Okay.  Let's look at page 2 of Exhibit 32.  We were talking

23   about the chemical room, right, and it's behind that door?

24   Okay.  In paragraph 4, it says:  "Extension tubing will be of

25   sufficient length to accommodate the distance from the control

1    device to the IV insertion sites."

2    A.    Which one are you on?

3    Q.    I'm sorry.  I'm on paragraph 4 here.

4    A.    All right.  I'm with you now.  I'm with you.

5    Q.    Okay.  So let's start actually -- let's start at the

6    beginning here, in paragraph 4.  "IV extension tubing will be

7    connected to the discharge ports on the right/left three-way

8    control devices and shall be thereafter connected to the

9    applicable right and left IV insertion sites."

10        Did you write this?

11   A.    No, I think that part already existed.  I don't believe I

12   wrote that.  It was in some previous versions.

13   Q.    So what is IV extension tubing?

14   A.    It's -- you have a primary IV tubing, and if you need to

15   cover more distance or if you want an extension set on it that

16   will have ports where you -- and I'm just going to talk about

17   generally, like in a hospital or anywhere else, if you wanted to

18   have access, you could inject medication into it.  But it's

19   various lengths, just like it says.  It's extension tubing.

20   Q.    Okay.  So how much extension tubing are you going to have

21   to accommodate the distance from the control device to the IV

22   insertion sites?

23   A.    I can't remember the exact length.  They're pretty short

24   extension tubings.  And I think, like, two 24- or 30-inch

25   extension tubings to go to the patient.

Griffin - Cross

1  Q.   They're not really a patient, right?

2  A.   Depends on your perspective or point of view.  I mean --

3  Q.   You think you're giving them medical treatment?

4  A.   In this scenario, I don't think they're patients.  Okay.

5  Q.   Thanks.

6  A.   Inmate then.

7  Q.   One second.  I want to go back to this other page, the

8  first page.  We talked about the chemicals, and this was

9  something that you said one of the IV team members is going to

10 be responsible for but that you're going to supervise them.  Is

11 that right?

12 A.   Which paragraph are you referring to?

13 Q.   Paragraph 2, which deals with on the first page -- I'm

14 sorry -- which deals with mixing and reconstituting the

15 chemicals.

16 A.   Okay.

17 Q.   Which of the lethal injection chemicals needs to be

18 reconstituted?

19 A.   Vecuronium bromide is a powder.

20 Q.   Okay.  So how are you going to reconstitute it?

21 A.   With sterile water or bacterial static water.  Most likely

22 sterile water.  If you use sterile water, it's good for, like,

23 one day.

24 Q.   And so how is that -- I mean, how is that done?

25 A.   I don't have the -- I don't know the volume.  I would have

1    to get the insert like I do with any other medicine, read it,

2    and put the amount.  I think that one is -- it's, like, 20 cc's

3    of the sterile water, but I can't remember.

4    Q.    And so how do you get the sterile water into the powder

5    form?

6    A.    To get it into the powder form?

7    Q.    How do you get it into the powder?  You mix it with the

8    powder somehow, right?

9    A.    You would draw it up -- whatever the liquid you're using,

10   you would draw it into a syringe and insert it into the vial,

11   push the plunger, let it get in there and mix it up.

12   Q.    Then what?

13   A.    And then after you mix it up, when it's time to draw it up,

14   you would draw it up into the syringes that we would be using

15   for the execution.

16   Q.    And so that's what you'll do with the vecuronium bromide

17   because that's the powder?

18   A.    I'm pretty sure.

19   Q.    Okay.  So you're not involved -- you're involved, it sounds

20   like, at this remote location with putting the drugs in a box,

21   getting the syringes and putting them in a box?

22   A.    Can you repeat all that?  I missed the very first and I

23   knew I was lost when you --

24   Q.    Sorry.  From our previous conversation, it sounds like

25   you're involved with putting the drugs in the syringes, you put

Griffin - Cross

1    them into a box, you transfer them to the Cummins Unit.

2    A.    Yes.

3    Q.    Okay.  But you're not involved in this paragraph 5, which

4    says that --

5    A.    Let me read it just a second.

6          (Witness reviews document).

7    A.    Okay.  Go ahead.

8    Q.    You're not involved with inventorying the drugs at the

9    Cummins Unit in the chemical room.  Is that right?

10   A.    I think we may be going confidential side again.

11   Q.    Okay.  We talked about the execution chamber.  Is it part

12   of your job to provide any other equipment for the execution

13   chamber on the night of the executions, other than this kit that

14   has the IV stuff in it, and, of course, the chemicals?

15   A.    What's covered in this AD?  I'm not sure if -- I'm missing

16   what you're asking.

17   Q.    Is there -- let me just be more specific.  Are you going to

18   have, for instance, any monitoring equipment in there for the

19   inmates, you know, like vital signs?

20   A.    No.  Something like cardiac monitoring or something like

21   that?

22   Q.    Yes.

23   A.    No.

24   Q.    Will there be any kind of monitors that will be hooked up

25   to the inmate?

1    A.    No.

2    Q.    And are you aware -- and I'm not asking you to tell me

3    anybody's name, okay -- who is going to be in the room with my

4    client while this execution is happening?  I mean --

5    A.    Who is going to be in, like, the main wide-open execution

6    chamber?

7    Q.    Yes, yes, yes.

8    A.    Yes.

9    Q.    Who's going to be in that room -- I'm not asking you to

10   tell me their name.  But I guess -- can you tell me how many

11   people are going to be in that room, other than my client?

12   A.    Then I would probably need to know what given point in time

13   of the execution, because the number of people in the room vary

14   depending on the process and what's going on.

15   Q.    Okay.  Do you just want to kind of walk me through it?

16   A.    No.  I'd rather answer your question.

17   Q.    Okay.  So what's the first part of the execution procedure,

18   what happens?

19   A.    And I'm still trying to picture in my mind, but I guess the

20   first part -- and I can't remember all the steps that I'm not

21   involved with.  But I think the first step would probably be the

22   director would bring in the executioner and take them into the

23   room.

24   Q.    Okay.

25   A.    I don't know the exact points as the other people that come

1    into the room, the recorder, or who they are, you know, when

2    they actually come and take their point.  But then at some point

3    the --

4    Q.   Okay.

5    A.   Go ahead.  Then at some point the tie-down team will escort

6    the inmate in, as I think somebody was testifying when

7    explaining how the gurney worked, and they will strap him down

8    on the gurney at this time.  There's more people in the room

9    because you have the tie-down team that's in there.

10   Q.   But they don't stay in there, right?

11   A.   No, they don't stay.

12   Q.   And so then after that, what happens?  After my client will

13   be tied down and then the tie-down team leaves --

14   A.   Well, they hadn't left yet.

15   Q.   Oh, okay.

16   A.   Because then before they leave, the IV team will be called

17   in.  And I'm not the one that's calling them in.  That's a

18   designee that's going to be doing that.  So the IV team will be

19   called in to establish the IV lines.  Once the IV lines are

20   established, two of them, then the IV team's excused and then

21   the tie-down team's excused.  And --

22   Q.   So the tie-down team stays during the insertion of the IV?

23   A.   I'm not sure if every one of them stay, but definitely some

24   of them stay during --

25   Q.   What's their role?

1  A.   The tie-down team?

2  Q.   I assume that my client will already be tied down at the

3  time that the IV is inserted.  Is that right?

4  A.   Yes.  And I can't remember if it's one or just two or what.

5  But let's say you're tied down and the IV team needed to -- and

6  you didn't have good veins here, or for some reason I couldn't

7  get them and I needed a limb or I needed some assistance to

8  untie a hand, certainly the IV team's not going to do that.

9  Q.   The IV team is not going to do what now?

10  A.   If the IV team is starting an IV on the inmate on the

11  gurney, and I can't find a vein in the arm, or they couldn't

12  find a vein in the arm, well, maybe they need the hand released

13  so they can check for veins in the hand.

14  Q.   Oh, I got you.  I understand.  So you're saying you would

15  undo the strap?

16  A.   Yes.

17  Q.   Okay.  I gotcha.

18  A.   Or if they need to look at his leg or whatever that may be.

19  Q.   So they might be looking at his leg for a different place

20  to get in?

21  A.   Yes.  And I can't answer where they're going to look, but

22  they're there to assess and start an IV.

23  Q.   Uh-huh.  Okay.  One second here.  Okay.  So after that,

24  let's assume that IV access is achieved.  I assume the IV team

25  leaves.  Is that right?

1    A.    Yes.

2    Q.    Okay.  And so at that point who is in the room?  And I'm

3    not asking you their name.  Just what's the personnel in the

4    room then?

5    A.    And I'll try to remember.  If I miss somebody, these are

6    not my part.  So I believe you have the recorder's still in the

7    room, the warden's still in the room.  And I'm not your best

8    person to answer this, but the director probably is, the

9    director will still be in the room.  Let's see.  And a designee

10   that's monitoring the inmate is in the room.  That's all I can

11   think of.  But I could be missing somebody.

12   Q.    Let's see.  And is one of those people going to be a

13   doctor?  Will there be a doctor in the room?

14   A.    No.

15   Q.    Okay.  And forgive me if I've already asked you this, but

16   we talked about mixing the drugs and putting them into syringes.

17   And there's two executions a day.  You're going to do them both

18   at the same time.  You're going to get all the drugs ready for

19   two executions at the same time.  Is that right?

20   A.    Whatever the director directs me to do, as far as that is.

21   Q.    Okay.  You don't know?

22   A.    No.

23   Q.    And this doesn't give you guidance on that because it's not

24   mentioning two executions, right?

25   A.    What is "this"?

1   Q.   I'm sorry.  Exhibit 32, which is Attachment C.

2   A.   Which one are you -- any particular one or just the whole

3   thing?

4   Q.   It's not really talking about having two executions, right?

5   A.   It gives me as much guidance for two as it does for one.

6   Q.   It doesn't tell you when to mix the drugs for the second

7   execution.

8   A.   It doesn't tell me when to mix for the first.

9   Q.   So just whenever, whenever the director says so?

10  A.   (Witness nods head.)

11  Q.   I want to talk a little bit more about the IVs.  And I

12  think that your testimony is clear that you're not the person

13  that's placing the IVs.

14  A.   That's correct.

15  Q.   Okay.  And I think this is the case.  You're in charge of

16  hiring them.  Is that right?

17  A.   There's no hiring -- you don't hire them.

18  Q.   You don't hire them?

19  A.   The people involved in the process are volunteers.

20  Q.   Okay.  So they don't get paid.

21  A.   Selecting the IV team according to the AD is my

22  responsibility.

23  Q.   Okay.  And how many people are on the IV team?

24  A.   Two.

25  Q.   Two.  And will those be the same two people for all of the

1   executions that are scheduled for April?

2   A.   Yes.

3   Q.   Okay.  So you select them, and you said they don't get

4   paid, they're volunteers.  What do you do to vet them?  Do you

5   know what I mean when I say "vet them"?

6   A.   Yes, I know what you mean.  Look at their -- do they meet

7   the criteria that's lined out in this AD Attachment C.

8   Q.   Okay.  Let's talk about that.  Okay.  And this is page 6 of

9   Exhibit 2 -- or, I'm sorry -- 32, Section V.  Is this what

10  you're talking about?

11  A.   Yes.

12  Q.   Okay.  So this says:  "Each member of the IV team shall

13  have at least two years of professional experience."  I know

14  there's more, but I'm just going to stop there.  When does this

15  -- how current does that experience have to be?

16  A.   Current.

17  Q.   Okay.  So the person that's doing this needs to be a

18  practicing person in one of these fields?

19  A.   Yes.  I wouldn't -- I wouldn't want to pick somebody that

20  was retired, but, yeah, they need to be practicing, currently

21  licensed in one of these areas.

22  Q.   And their license has to be current?

23  A.   Yes.

24  Q.   And what have you done to check whether or not, you know,

25  they're actually licensed currently or whether or not they're

1    currently working?

2    A.    Verified their license.

3    Q.    You verified their license?

4    A.    Yes.

5    Q.    And what about their employment and their experience, how

6    do you check that?

7    A.    If I -- if I know the individual, I know where they

8    currently work.  But I can just say that their employment is

9    verified.

10   Q.    Okay.  Let's see.  Okay.  And, you know, tell me if this is

11   something you'd rather me ask you confidentially or answer

12   confidentially.  But are you going to be supervising the IV

13   team?  I mean, is your role limited to selecting them?

14   A.    Yes.

15   Q.    Okay.  So you have no -- after you select them and you work

16   together to constitute the drugs, or reconstitute the drugs, you

17   don't have any further involvement with the IV team?

18   A.    No.  I'm not supervising them, I'm not telling them how to

19   start an IV.  That's -- that's their role.

20   Q.    Okay.  Is someone supervising them?

21   A.    No.  As far as starting the IV?  No.  They're qualified to

22   start the IV.  They don't require supervision.

23   Q.    Okay.

24   A.    Hold up.  You're going to take me into another round of

25   water.

1           THE COURT:  Go ahead.  Please.

2    BY MS. VANDIVER:

3    Q.    Okay.  So I'm talking about Exhibit 32 at page 2.  It says:

4    "The deputy director, or designees, shall have an intravenous

5    infusion device placed in each arm."

6    A.    Which number were you on?

7    Q.    Number 1.  Sorry about that.  And so I believe your

8    testimony is that you will designate the IV team to do that,

9    number 1?

10   A.    Yes.

11   Q.    Okay.  What is a --

12   A.    There is -- go ahead.

13   Q.    You go ahead.

14   A.    I'm sorry.  I'm going to wait on you.

15   Q.    What does "other standard anatomical venous point of entry"

16   mean?

17   A.    That's just another way of saying either in your arm or

18   another location on your body to start an IV.

19   Q.    Anywhere on your body?

20   A.    Anywhere they find a vein that's a good vein that they

21   assess and decide this is a good vein where I can start an IV.

22   Where this -- I have to take my glasses off to read this, but I

23   can't see you without them.  Let's see.  Yeah.  Because a lot of

24   people, you may assume the arm means like in here (indicating),

25   and they decide I have a lot better vein in my hand, top of my

1    hand, then they go there, or if they have to look at your lower

2    extremities, which is not uncommon.

3    Q.    Okay.  So is there any -- I mean, "standard anatomical

4    venous point of entry," is that a term of art?

5    A.    A term of art?

6    Q.    I mean, is that a medical term?  It sounds like you're just

7    kind of saying that means anywhere they can find a vein.

8    A.    I haven't actually looked that phrase up, but I'm saying --

9    well, I'm not saying.  Of course, they're the ones that are

10   going to start the IV and select the vein.  But in nursing, I

11   don't think we just start anywhere you can find a vein.  And you

12   wouldn't want to say that.  There are veins that are -- that run

13   super deep and, obviously, I couldn't see or start an IV there.

14   Q.    So that would be unstandard?

15   A.    Yeah, I guess you could call it that.

16   Q.    And so I feel like you're kind of saying, Well, this is the

17   purview of the IV team, but it says the deputy director or the

18   designee, so, I mean, it's ultimately -- does this fall to you

19   whether or not this is done correctly?

20   A.    I'm not going to be in the room, and if it's done -- I

21   don't know.  Explain your question, what you mean.

22   Q.    Well, it says either you or someone you designate need to

23   make this happen, right?

24   A.    Yes.

25   Q.    And you're not -- did you testify that you've already

Griffin - Cross                                          834

1    selected this IV team?

2    A.    Yes.

3    Q.    Okay.  So have you talked to this IV team about where else

4    they can try to get venous access if they are not able to get it

5    in the arm?

6    A.    No.  This IV team is licensed and it is within their scope

7    to start IVs, and I don't have to tell them -- and I won't be

8    there.  I'm not looking at the actual time this is going on.

9    I'm not in there viewing the vein, palpating the vein, seeing if

10   you have a good vein or do I need to go to the hand.  They're

11   credentialed and are perfectly capable of starting an IV or

12   saying they attempted and couldn't start one.  I don't need to

13   go in the room and tell them how to start an IV.

14   Q.    It sounds like the way that this is written is that the

15   first place they would want to start is the arm.  I mean, is

16   that -- that's kind of how we would expect it to go?

17   A.    That probably would be safe to say, yes.

18   Q.    And then if it doesn't work, then they can explore some

19   other areas.

20   A.    They can go to a place other than the arm, if that's what

21   you're calling "explore."

22   Q.    You're not giving them any guidance as to where the next

23   acceptable places to look for a vein are?

24   A.    No.

25   Q.    Okay.

Griffin - Cross

1    A.    I actually have met with -- the director, I, a member of
2    the IV team, and the warden have met and spoke to each of the
3    inmates and let the IV team assess their veins and do they think
4    there would be a good vein for them to access.  We've already
5    done that.
6    Q.    When was that done?
7    A.    I can't remember which exact day it was.  It was, like,
8    Monday or Friday.  I don't remember which day.
9    Q.    Monday of this week or Friday of last week?
10   A.    Yeah.  I don't remember the day.
11   Q.    Did you do that for all eight guys or seven guys?
12   A.    No, we did it for -- we did it for four, the first four,
13   and we will schedule another meeting to meet with the other
14   four.
15   Q.    Okay.  Do you need to take a phone call or --
16   A.    No, I was looking at the calendar to see if I can give you
17   the date.  Pretty sure it was Monday, but it's not on my
18   calendar.
19   Q.    Okay.  Now, I have a question about paragraph 8.  In this
20   context, can you tell me what "patent" means?
21   A.    Patent?  That means open.
22   Q.    Okay.  "In the event that a patent intravenous infusion
23   site cannot be established, the IV team shall be directed by the
24   deputy director, or designee" -- so is that you or is this the
25   IV team?

1    A.    Well, I think you're missing a step here, because the

2    designee can be a person other than -- not me and a person other

3    than the IV team.

4    Q.    Okay.  So the designee is not always the same person, for

5    this document?

6    A.    No.

7    Q.    Okay.  I think I understand.

8    A.    Okay.  Like, person monitoring the patient for

9    consciousness could be me or a designee.  So say that's the

10   designee.  They call for a regular IV team to come in.  So that

11   designee is separate than the IV team.  Is that making sense?

12   Q.    I think I understand, yeah.

13   A.    Okay.

14   Q.    So then for number 8, are you planning on doing this, or

15   are you planning on designating this?

16   A.    Let me read --

17   Q.    The first sentence there.

18   A.    Let me read it first.

19         (Witness reviews document.)

20   A.    Designating.

21   Q.    Okay.  And I'm not asking you to tell me their name, but

22   who are you going to be designating that to?

23   A.    I'm trying to think how to answer that if I don't answer --

24   give you a name.  What are you asking me?

25   Q.    I mean, it's not a member of the IV team.  Is that right?

1    A.    That's correct.

2    Q.    Okay.  I guess maybe you would be more comfortable

3    answering this toward the end of the questioning when we clear

4    the courtroom?

5    A.    That would be all right with me.

6    Q.    Okay.  There's this big statement here on the bottom that's

7    in caps.  It says:  "Every effort will be extended to the

8    condemned inmate to ensure that no unnecessary pain or suffering

9    is inflicted by the IV procedure."  And tell me if this is not

10   your role.  But at what point is it going to be determined that

11   IV access can't be established?

12   A.    That would be determined by the IV team.

13   Q.    Okay.  So they're allowed to just keep going until they

14   give up?

15   A.    No.  And the director will also be in the room.  But, no, I

16   don't know what -- how you're asking that.  But, no, they're not

17   allowed just to, like, let's say stick ten times.  And the

18   director will be in the room.

19   Q.    How many times are they allowed to stick?

20   A.    It's not a set number of times.

21   Q.    But less than ten?

22   A.    Definitely.

23   Q.    More than five?

24   A.    Possibly, if you were looking at multiple, you know, arms

25   or --

1    Q.    Because you want to get two lines going, right?

2    A.    Yes.

3    Q.    So we kind of talked about whether or not there's a number

4    of sticks that would cause somebody to say, Okay, this is

5    enough.  What about amount of time, like if it's just taking a

6    really long time, is there a point that you or someone else

7    would say, or your designee would say, "This has just gone on

8    too long"?

9    A.    Well, I'm not going to be in the room, so I'm not going to

10   be able to say anything.

11   Q.    But you'll have a designee there?

12   A.    Yes.

13   Q.    Okay.  And you haven't discussed that with the designee?

14   A.    Yeah.  The time is not going to be an issue, and I know

15   that the executions, as they say, are scheduled at this and this

16   time.  But if the IV team needs more time and it runs over, then

17   it just runs over.  And you also will have, like I said before,

18   the director will be in the room also.

19   Q.    So as much time as they need to establish intravenous

20   access, they will be allowed that time?

21   A.    Yes.

22   Q.    So there's not going to be a limit put on it that this has

23   just gone on too long?

24   A.    No, there's not a limit.  They will come in -- the IV team

25   will come in, just like it would be no different than they were

1  seeing a patient in the free-world setting and say, "You need to

2  start a line on this."  You know, nobody would go with him down

3  to the room and watch and see, "Are you starting it?"  Because

4  they are licensed to do this.  And they will come in and attempt

5  to start an IV and take whatever time they need to do it.

6  Q.    So your testimony is that you're not going to be

7  supervising them --

8  A.    Correct.

9  Q.    -- in that effort?  Is someone going to be supervising

10  them?

11  A.    No, not as far as their role to start an IV.  No, they do

12  not require supervision for starting the IV.

13  Q.    And if it's taking too long or -- I'm sorry.  I shouldn't

14  phrase it that way.  If it's taking a long time or they need to

15  do multiple attempts, that is in their discretion?

16  A.    Say that again.

17  Q.    Let me break my question down.  If they need to do -- if

18  it's taking longer than you may have expected under the schedule

19  that you have established --

20  A.    I don't think time is an issue, so you can probably take

21  that out of the equation.  I'm not worried about I've got to

22  stay on this schedule, the next one has to start at this time,

23  no.

24  Q.    So they will have the discretion to take as much time as

25  they need to set the IVs?

1    A.    Yes.

2    Q.    And there's not going to be anyone supervising them as far

3    as how many times they can be trying different points on the

4    body?

5    A.    You will have the director in the room, and, of course, the

6    director, at any point if she saw them sticking them multiple

7    times and wanted to say, "That's enough, I'm going to call in

8    somebody to do another process," then she'll make that call.

9    Q.    Okay.  And what would that other process be?

10   A.    Let's see.  You're not going to turn to that paragraph?

11   Q.    Well, if I can find it.  Is this what you're talking about?

12   A.    Yes.

13   Q.    This is on page 6.

14   A.    Okay.  Number 3.  That would be what the next step would be

15   if you cannot start an IV.

16   Q.    Do you want to go ahead and read that for the record?

17   A.    Sure.  "If all efforts to reestablish patent infusion site

18   fail, the deputy director, or designee, will direct the IV team

19   to suspend further action and trained, educated, and experienced

20   person or persons necessary to establish a primary IV line as a

21   peripheral line or as a central venous line will be summoned to

22   facilitate an IV infusion site."

23       In this particular one, my designee in this is the

24   director.

25   Q.    Okay.  And I think there's probably -- I'm obviously not as

Griffin - Cross

1    familiar with this document as you are.  I think there's another

2    part of this that deals with the central line, because that

3    sounds like if the vein fails.  Oh, here it is.  We were there.

4    Just didn't realize it.  Here, on the bottom of this paragraph

5    8:  "If one patent infusion site is established and a second

6    site proves to be a futile effort, the deputy director, or

7    designee, may direct the IV team to suspend further action to

8    establish a second site and proceed with one site."

9         So I think you said that's not going to be you?

10   A.   Correct.

11   Q.   And is that the director again?

12   A.   That's the director.

13   Q.   Okay.  Let's see.  And in the case that no patent infusion

14   site is established after reasonable attempts as determined by

15   the IV team, "The deputy director, or designee, will direct the

16   IV team to suspend further action and thereafter summon trained,

17   educated, and experienced persons necessary to establish a

18   primary IV line as a peripheral line or as a central venous

19   line."  Is that right?

20   A.   Uh-huh.

21   Q.   I think I had you looking at the wrong part earlier.  That

22   was if something failed after they were able to get venous

23   access, and this looks like on the first -- you know, the first

24   go-round.

25        Are you responsible for having these trained, educated, and

1    experienced persons necessary to establish a primary IV line

2    available?

3    A.    No.

4    Q.    Okay.  And whose responsibility is that?

5    A.    The director.

6    Q.    You don't know anything about that?

7    A.    I don't know who it is.

8    Q.    And what is a central line?

9    A.    Central line, basically if you did like a PICC or a central

10   line, it's -- there's different ways.  They could actually put

11   one in, but it's in your jugular.  They can put a catheter in

12   your arm that would run a line all the way up into one of your

13   main veins.

14   Q.    And how is the process to put in a central line different

15   from putting in a peripheral line?

16   A.    I've never put in a central line, nor am I qualified to put

17   a central line in.

18   Q.    Do you know what kind of experience or education is

19   necessary to do a central line?

20   A.    I've already said I do not know the person nor the --

21   Q.    That wasn't my question.

22   A.    Okay.  What did you say?

23   Q.    What kind of -- you said you don't have the education or

24   experience to put in a central line.

25   A.    Okay.

1  Q.   Do you know what kind of education or experience is

2  required to put in a central line?

3  A.   An RN that's been trained and checked off, I believe, can

4  do a central line.  Of course, a physician, a physician

5  assistant.

6  Q.   I missed what you said.  An RN that's been trained in what

7  now?

8  A.   An RN that's been trained and has been -- I said certified

9  or been checked off, signed off on this procedure.

10  Q.   Checked off, okay.  So is this -- that sounds like a

11  question for the director, I think.  Let's see.

12       Now, you testified earlier that it's part of your job to

13  have all the -- a little kit ready to go for the IV infusion, to

14  get peripheral venous access.  Is that right?

15  A.   Uh-huh.

16  Q.   And is that part of your job, to also have the equipment

17  necessary for a central line?

18  A.   Yes.

19  Q.   And so do you have that ready to go?

20  A.   Yes.

21  Q.   Okay.  And what is that?

22  A.   And it comes in a kit, and I can't tell you a name of every

23  part inside of it.

24  Q.   You'll buy it and it says, like, "central line kit"?

25  A.   Like a single, double, triple.  But, yes, you can buy a kit

1    for a central line.

2    Q.   Okay.  And you have -- you have bought those, one, two,

3    three, four --

4    A.   I don't know.  We might want to wait to ask that one too --

5    Q.   Okay.

6    A.   -- or I could probably answer it.  I've acquired it.

7    Q.   Okay.  You just have one?

8    A.   No.

9    Q.   Okay.

10   A.   Okay.

11   Q.   How many do you have?

12   A.   I don't know.  It's like several.

13   Q.   Okay.  And you said that there's no equipment for

14   monitoring the inmate in the execution chamber.  Is that right?

15   A.   Yes.

16   Q.   So --

17   A.   We may have to define "equipment."  But if you mean, like,

18   electronic equipment, if you're talking about a cardiac -- what

19   are you referring to?

20   Q.   That's what I was talking about.  Is there other kinds of

21   equipment in the room that does monitor an inmate?

22   A.   Not really equipment, unless you consider a stethoscope.

23   But that's not to monitor them during the process.  So I'd just

24   say no.

25   Q.   The stethoscope is to declare them dead, is that what the

1    stethoscope is for?

2    A.    Yes.

3    Q.    In the event that there needs to be a central line placed,

4    will you have an ultrasound machine in that room, in the

5    execution chamber?

6    A.    We actually have a handheld ultrasound, yes.

7    Q.    So that's going to be there?

8    A.    Yes.

9    Q.    That's one of the things that you're bringing with you?

10   A.    Yes, I'll bring it.  Well, I say -- it may be with the

11   person that's going to do the central line, if needed.

12   Q.    Okay.  That's something that belongs to the Cummins Unit

13   infirmary or that's something that's in your possession?

14   A.    It is something that's in my possession.

15   Q.    Okay.  Let's see.  Let's talk a little bit about the

16   midazolam.  And I apologize if we've already talked about this,

17   but it's late in the day.  It sounded like, I think you said

18   before, that you don't have any communication with the

19   executioners, the people that push the drugs.  Is that right?

20   A.    I said that we wouldn't want to answer it in open court.

21   Q.    Okay, okay, okay.  Have you studied or read about

22   midazolam?

23   A.    No.

24   Q.    Okay.  So you've done no research into how it should be

25   administered?

1    A.    No, I haven't studied or researched midazolam.

2    Q.    Okay.  I think you said that you're not going to be the

3    person doing the consciousness check.  Is that right?

4    A.    That's correct.

5    Q.    And so is that a person that you're going to designate?

6    A.    Yes.

7    Q.    Okay.  And have you done that already?

8    A.    Yes.

9    Q.    Okay.  And are you able to tell me who that is?  Do you

10   want me to ask later?

11   A.    Ask later.  I'm not sure.

12              THE COURT:  Why don't we go ahead and take a 15-minute

13   break.  We'll take a longer break.  We'll come back in at five

14   after six.  Come back in at five after six.

15         (Recess at 5:51 p.m.)

16                    C E R T I F I C A T E

17      I, Eugenie M. Power, Official Court Reporter, do hereby

18   certify that the foregoing is a true and correct transcript of

19   proceedings in the above-entitled case.

20

21   /s/ Eugenie M. Power, RMR, CRR, CCR      Date:  April 12, 2017
     United States Court Reporter

22

23

24

25

1          (Proceedings continuing at 6:06 p.m.)

2              THE COURT:  You may proceed whenever you are ready.

3              MS. VANDIVER:  Thanks.

4                      CROSS-EXAMINATION CONTINUING

5   BY MS. VANDIVER:

6   Q.    Your testimony has been -- correct me if I'm wrong -- that

7   you are not planning on being in the room during the execution

8   of the inmate.  Right?

9   A.    No.

10  Q.    Okay.  Save it for later.  Okay.  Did you develop -- on

11  direct you talked about a consciousness check.  Right?  Do you

12  remember talking about that?

13  A.    Yes.

14  Q.    Okay.  And we talked about how this document was written,

15  this Exhibit 32.  You said you had some input into it.  Is that

16  right?

17  A.    Or reviewed it, yeah.  That's a little iffy, but yes.

18  Q.    And on page 5 of this document, (g), it says:  "Once the

19  deputy director, or designee, determines that the condemned

20  inmate is unconscious, the remaining chemicals will be

21  administered in the order they appear in Chart A."  So are you

22  planning on designating that task?

23  A.    Yes.

24  Q.    Okay.

25              MS. CRYER:  Julie, is your microphone on?  I'm having

 1   trouble hearing.

 2            MS. VANDIVER:  It is.  I'm probably not doing a good

 3   job speaking into it.

 4            MS. CRYER:  I'm having trouble hearing.  Sorry about

 5   that.

 6   BY MS. VANDIVER:

 7   Q.   Sorry.  I just want to make sure I remember to ask all this

 8   stuff.  Okay.  Now, so you are designating the actual

 9   consciousness check.

10   A.   Say that again.

11   Q.   You said that you are planning on designating the task of

12   determining whether the inmate is unconscious.

13   A.   I'm designating the person that's going to be in there

14   monitoring throughout this process.  So, yes, that person would

15   have to do it, because I'm not there.

16   Q.   Okay.  So did you develop the method which they are going

17   to use to determine whether or not the inmate is unconscious?

18   A.   We've discussed -- I think both I and the director have

19   discussed with this person different ways that you would check

20   for consciousness, but I wouldn't say I developed the method.

21   Q.   Okay.  Well, I would like to hear about the discussion

22   regarding that.

23   A.   As I probably prior said, the checking the patient, saying

24   their name, doing an eyelash reflex.

25   Q.   What does that mean?

1    A.    It means I'm brushing, like, your eyelash and looking to

2    see if there's a reflex from me doing that.

3    Q.    What would that look like if there was a reflex?

4    A.    It would look like you are squinting or your eyelid

5    movement.

6    Q.    Okay.  Go ahead.

7    A.    And then -- let me think.  I already said you would say

8    their name.  You may shake them a little, say their name a

9    little louder.

10   Q.    Shake them how?

11   A.    Grab you by the shoulder.  If you was laying down, I would

12   say:  "Hey, hey.  Are you awake?"

13   Q.    Uh-huh.

14   A.    Then you would move up to a -- where were we at?

15   Q.    Shaking them by the shoulder.  "Hey, hey.  Are you awake?"

16   A.    Corneal reflex, which would mean that you would pull the --

17   your eye, I would pull your eyelid up and touch your eyeball to

18   see -- usually there's going to be a reaction from a conscious

19   person, and move on up to something painful like a real good,

20   firm pinch.

21   Q.    Okay.  When you are pinching -- or not you.  But the

22   guidance is when you are doing this pinch, where on the body are

23   you pinching?

24   A.    Trapezius pinch, like right here on this muscle that runs

25   right here (indicating).

1    Q.    Okay.  And what are you using to pinch?

2    A.    Your fingers.

3    Q.    Your finger and your thumb?

4    A.    Yes.

5    Q.    You don't use like a --

6    A.    No.  Your finger and thumb.

7    Q.    Okay.  And how -- it sounds like this was a discussion that

8    you and the director and this designee for the consciousness

9    check had, and you discussed this is the method to use.

10   A.    We've talked about it.  We actually do it in practice.

11   Q.    Okay.  So you do it on -- there was some testimony from

12   Dale Reed that you'll have an officer sort of play the part of

13   the inmate.

14   A.    Yes.

15   Q.    Okay.  So you've been practicing the consciousness check?

16   A.    Yes.  Other than we wouldn't pinch that person playing that

17   part.  We don't touch their cornea, of course.  And we wouldn't

18   pinch them as hard as you would pinch somebody if I was really

19   checking to see if you were conscious.

20   Q.    Okay.  Did you use these methods when you were practicing

21   nursing?

22   A.    Yes.

23   Q.    And what would be the context in which you were using them?

24   A.    If you -- it could be many contexts.  If you received a

25   call in, say, out in the population, in the barracks, that an

1    inmate is down, unresponsive, and you go check on them.  You

2    want to know are they conscious.  Are any of these going to get

3    a reaction?  Are they going to talk to me?

4    Q.   Because you want to know, like, how ill they are.

5    A.   I want to know if they are conscious.

6    Q.   For what purpose?

7    A.   To know -- well, I want to know if they are conscious and

8    responsive or unresponsive.

9    Q.   Because there's different things you might need to do if

10   they are, like, lifesaving stuff or --

11   A.   I don't know if I know what you are asking me.

12   Q.   I assume when you went out, onto the tier because someone

13   had passed out or something and you were doing this, you weren't

14   going to start injecting them with chemicals.  Right?

15   A.   Yes.

16   Q.   So what was the purpose of pinching them or brushing their

17   eyelashes?  Why did you need to know?

18   A.   I wanted to know if they was conscious so I could talk with

19   them.  And if I ended up having to call the doctor if they

20   weren't conscious, I would need to relay that they were

21   unconscious and not responsive.  And the doctor would make a

22   decision what to do.

23   Q.   Uh-huh.

24   A.   Or I would call -- in that case scenario, you may call for

25   an ambulance.  It's kind of a broad -- you know, we're kind of

1    in a big "what if" here.

2    Q.    Uh-huh.

3    A.    I would be taking -- nevermind.  I'll wait until you ask a

4    question.

5    Q.    Okay.  Does the word or the term "purposeful movement" mean

6    anything to you?

7    A.    Yes.

8    Q.    What does that mean?

9    A.    It means that you move with a purpose.

10   Q.    And how can you tell whether or not someone is moving with

11   a purpose?

12   A.    Well, if you were -- let's say -- and I'll just give you a

13   scenario.  Let's say that you were a seizure patient, and we've

14   had inmates who have been known to fake seizures sometimes.  If

15   you are a seizure patient and I'm checking on you, and let's say

16   -- I'm just going to say a scenario.  But if I was to try to

17   hold an ammonia capsule up, under your nose, or something like

18   that, or I was doing something and you purposely, you know,

19   grabbed my hand and moved it away, that would be purposeful

20   movement.

21   Q.    Okay.  So I take it that if there are movements that are

22   purposeful, there's also movements that are not purposeful?  Is

23   that right?

24   A.    Yes.

25   Q.    Okay.  So can you give me -- I understand grabbing

1    someone's hand would probably be purposeful.  So can you explain

2    to me what -- should I call it unpurposeful?  Nonpurposeful?  Is

3    there a medical term that's appropriate here?

4    A.    I don't know.  I'm not an expert on unpurposeful or

5    purposeful movement.

6    Q.    You are not?

7    A.    No.

8    Q.    Is there somebody at the department that's an expert on

9    purposeful or nonpurposeful movements?

10   A.    I couldn't answer that.

11   Q.    So you just don't know?

12   A.    Well, I don't know what?

13   Q.    Whether or not there's somebody that is at the department

14   that's an expert in purposeful or nonpurposeful movement.

15   A.    I don't know if there's somebody that's an expert.

16   Q.    Is there somebody that works on the execution team or

17   that's going to be involved in the execution that's an expert in

18   purposeful or nonpurposeful movements?

19   A.    I don't know.

20   Q.    Okay.  So that's not something that you've discussed?

21   A.    No.  I haven't had a discussion on do we have an expert on

22   purposeful or nonpurposeful movement.

23   Q.    Have you discussed with the members of the execution team

24   what a purposeful movement is or a nonpurposeful movement is?

25   A.    I don't think that -- I'm trying to think of my

1  discussions.  I'm not sure if I've had that discussion with --

2  myself with the designee.  I do believe the director has had

3  some discussion with the designee on purposeful and

4  nonpurposeful.  And I do know that some of the things that would

5  be nonpurposeful would be certain, you know, reflexes or tensing

6  of the muscles.  That's not purposeful.  Or if you were to pinch

7  your arm and you just pulled, like, away from the pinch or

8  something like that, that wouldn't be considered purposeful.

9  But if you were to reach with the other hand to push me away,

10  then that would be purposeful.

11  Q.    So if you pinched somebody and they went -- like flinched

12  away from it, that's not purposeful?

13  A.    No.

14  Q.    Okay.  So the examples of a purposeful movement in response

15  to a pinch would be grabbing your hand?

16  A.    Or like looking --

17  Q.    What else?

18  A.    If I pinched you on this side.  And, of course, I know

19  where you are going to go with that.  They can't move their

20  hand.  But if I was to purposely look at the point where the

21  pain was coming from would be purposeful.

22  Q.    But recoiling from the pain is not purposeful?

23  A.    Just flinching would not be.

24  Q.    So a person that's flinching in response to pain is not

25  acting purposefully?

Griffin - Cross

1    A.    Not necessarily.

2    Q.    Not necessarily, but they could be?

3    A.    I would have to be -- I would think you would have more

4    than just a flinch.  Like if you flinched, you looked over at

5    me, then you may be.

6    Q.    Uh-huh.  The inmate's head is strapped down too.  Right?

7    A.    I couldn't hear.

8    Q.    The inmate's head is strapped down too?

9    A.    Yeah.  His head is strapped down.  His eyes are not.

10   Q.    Okay.  You said that you know what a reflex looks like.  So

11   could you explain to me how you can tell when someone -- when

12   something is a reflex?

13   A.    Are you talking about, like, the eyelash or what?  When you

14   just say "reflex," I don't really know what you are talking

15   about.

16   Q.    So I assume a reflex involves a movement, some sort of

17   movement.  Right?

18   A.    Uh-huh.

19   Q.    And you said recoiling from pain in response to a pinch

20   would be a reflex.

21   A.    (Witness nods head.)

22   Q.    Okay.  What other kinds of movement do you think would be a

23   reflex?  I think it would be easier -- and I'm sorry.  I'm not

24   trying to make this hard on you.  Let's talk about in response

25   to the procedures that you've said will be used in a

1    consciousness check in these executions.  Okay?  So you said

2    brushing an eyelash.  What kind of movement could somebody have

3    in response to brushing the eyelash that would just be a reflex

4    and not purposeful?

5    A.    Well, I think what I would be looking for there, if you

6    were unconscious, is lack of --

7    Q.    Nothing?

8    A.    Yeah.  You are looking for in some cases a lack of a

9    reflex, not -- you are kind of mixing up where if I just pull

10   away, it would be different.  So I'm looking for it not.  If I'm

11   touching your eyeball and you do nothing, then you don't have a

12   reflex.

13   Q.    Uh-huh.

14   A.    A normal person, when you touch your eyeball, they are

15   going to shut your eye.  You may bat your eyes.

16   Q.    Okay.  So if I can summarize your testimony a little bit,

17   you are responsible for acquiring the lethal injection chemicals

18   and having them there and ready.  Right?

19   A.    Uh-huh.

20   Q.    And having the --

21   A.    Wait a minute.

22   Q.    When I say "there," I mean at the execution chamber.

23   A.    Yeah.  Okay, yes.  I'll say yes to that.

24   Q.    And you are responsible for getting the IV kit together.

25   A.    Yes.

Griffin - Cross

1    Q.   And you testified that you've gotten some central lines,

2    getting kits together?

3    A.   Yes.

4    Q.   And you testified that you have an ultrasound machine

5    together or ready to go.

6    A.   Yes.

7    Q.   Do you have --

8    A.   Okay.  Go ahead.  No.  I don't have anything.

9    Q.   Do you have any plans or have made any provisions to have

10   resuscitation equipment available in the execution chamber?

11   A.   No.

12   Q.   Okay.  Now, we talked about the lethal injection chemicals

13   that you have, a little bit, when we talked about reconstituting

14   them, and we talked about you drawing them into syringes.  Do

15   you have any drugs in your possession or in the possession of

16   the ADC to reverse the midazolam?

17   A.   No.

18   Q.   Have you sought any?

19   A.   No.

20   Q.   Do you have drugs to reverse the vecuronium bromide?

21   A.   No.

22   Q.   Have you sought any?

23   A.   No.

24   Q.   Do you have drugs to reverse the potassium chloride?

25   A.   No.

1    Q.    Have you sought any?

2    A.    No.

3    Q.    If after the midazolam is injected into my client and it's

4    determined that he is still conscious, are there any plans to

5    reverse the midazolam?

6    A.    Not that I'm aware of.

7    Q.    Okay.  In these rehearsals -- you said you've been present

8    for rehearsals.  Right?

9    A.    Uh-huh.

10   Q.    Have you rehearsed seeking medical treatment for the

11   inmate?

12   A.    No.  One of -- I'll add this, though.  One of the ACA

13   standards, it's required, like, at least a four-minute response

14   time.  And I don't make this call.  But I know anywhere in that

15   prison, if you were to call for medical staff, they would be

16   there.  And it would probably be less than that four minutes

17   from where the infirmary is located.  I'm pretty familiar with

18   Cummins, being the health service administrator there six years.

19   Q.    How far is the infirmary?

20   A.    I'm not real good with distance, so let's go with a minute

21   and a half.

22   Q.    To walk?

23   A.    Yeah.

24   Q.    Okay.  I believe you testified earlier that it's your job

25   to buy chemicals for the purpose of lethal injection, unless

1    Wendy Kelley has taken care of that for you.

2    A.    Wendy Kelley, yes.

3    Q.    Right?  So it's sort of on your list of to-do, unless she

4    takes care of it.

5    A.    It's listed as one of the responsibilities in here under

6    me.

7    Q.    Okay.  And is it part of your job as deputy director to

8    purchase drugs for the ADC for things other than lethal

9    injection, like medicine or Tylenol?

10   A.    No.

11   Q.    Okay.  How is that accomplished?

12   A.    The contracted medical vendor.

13   Q.    Okay.  I want to talk to you about the affidavit that you

14   signed in October 2015.  Do you remember doing that?

15   A.    You will have to show it to me.  I think I know what you

16   are talking about.

17   Q.    I will.

18         MS. VANDIVER:  The copy that I have is out of the

19   confidential exhibits, but I -- this has been in court before.

20   Is it okay?

21         MS. CRYER:  For some reason, I thought we -- didn't we

22   list that as an exhibit?

23         MS. MERRITT:  It's been filed of record.

24         MS. VANDIVER:  The copy that I have and was planning

25   to use is in the confidential exhibits book.  If you would

1    rather me use another copy --

2              MS. CRYER:  I was thinking we had listed it as an

3    exhibit.

4              MS. MERRITT:  We did.

5              MS. VANDIVER:  You may have.

6              MS. MERRITT:  We're fine with you using the affidavit.

7              MS. CRYER:  But thank you for asking.

8    BY MS. VANDIVER:

9    Q.   Okay.  Do you have one of these little books up there, a

10   skinnier binder?

11   A.   There's a big, thick black book up here.  There is no

12   skinny binder.

13   Q.   Let me grab you one.  This just might be easier, because

14   you might want to peruse this a little bit.

15             MS. VANDIVER:  Your Honor, I'm looking at what's been

16   marked as Confidential Exhibit D.  It's ADC page numbers 179

17   through 184.  And it's the affidavit signed October 14th, 2015.

18   BY MS. VANDIVER:

19   Q.   Okay.  Have you had a chance to review that?

20   A.   I looked at it.  I'll probably go to wherever you ask --

21   Q.   Sure.

22   A.   -- questions.

23   Q.   Do you remember signing this?

24   A.   Yes.

25   Q.   How was this prepared?

1  A.    The affidavit?  Is that what you are asking me?

2  Q.    Yeah, yeah.

3  A.    I believe the AG's office probably sent me a rough draft

4  after I contacted these people, provided my information.  And

5  they sent the first rough draft to me.  I revised and edited and

6  sent it back.

7  Q.    Okay.  So just by way of summary, this document summarizes

8  some efforts that you made to talk to pharmaceutical

9  manufacturers about purchasing lethal injection chemicals.  Is

10  that right?

11  A.    Yes.

12  Q.    So I just want to sort of walk through this.  On page ADC

13  179, it says:  "I've conducted an investigation into the

14  availability of drugs manufactured by Akorn."  Actually, I'm

15  sorry.  I want to be here on 3.  "I spoke with Kim Radkey of

16  Akorn."  What is Akorn, with a K, A-k-o-r-n?

17  A.    A pharmaceutical company.

18  Q.    Okay.  So when you say it's a company, can you be more

19  specific?  Are they the maker of drugs?  Do they make drugs,

20  manufacturer?

21  A.    I'm not sure.  I'm not sure if they are a seller or

22  manufacturer.

23  Q.    Okay.

24  A.    Well, I know that they are a distributor or they sell the

25  drugs, but I'm not sure if they are the manufacturer or not.

1   Q.   Okay.  Have you talked to them since you talked to them on

2   October 13th, 2015?

3   A.   No.  I haven't talked to any of these pharmaceutical

4   companies listed in this affidavit since this day.

5   Q.   So this is the last communication that you had with these

6   companies.

7   A.   Yes.

8   Q.   Okay.  It says, in paragraph 6, you spoke by telephone with

9   Martin Wilson, who is the media contact for Par Pharmaceuticals.

10  Now, you were calling about buying drugs.  Right?

11  A.   Uh-huh.

12  Q.   So why did you call the media contact?

13  A.   I called and asked what -- stated the purpose of what I was

14  wanting to do or to buy or check the availability of drugs.  And

15  this is who they referred me to.

16  Q.   So the media contact is, like, a PR person?

17  A.   I don't know what they are.

18  Q.   So you didn't write this, so you don't know.

19  A.   No.  I wrote it.  I just don't know what that definition

20  for that company, what he exactly does.

21  Q.   That was his title?

22  A.   Yes.  I listed their name and their title.  So I don't know

23  what he actually -- what it entails, being the media --

24  Q.   So you just called, like, their 1-800 number or something,

25  and they patched you through to this guy?

1    A.    Actually, the AG's office, actually -- and I believe this

2    was based on litigation.  They actually had given me a list of

3    the manufacturers and the specific drugs they wanted me to check

4    and see if we could get.  And they had phone numbers listed for

5    each of the companies, and that's what I called.

6    Q.    And did they give you the contact name of who you were

7    supposed to talk to?

8    A.    I cannot remember that.

9    Q.    Okay.  So you just called the phone numbers that they gave

10   you.

11   A.    Yes.  And it was -- each one they gave me were for these

12   particular companies.

13   Q.    So in paragraph 9, which is on ADC page 181, it says:  "I

14   contacted Pearson Bownas."  I'm not sure if I'm saying that

15   right.  That's the vice president of litigation and regulatory

16   for AbbVie Pharmaceuticals.  So is that, like, a lawyer?

17   A.    I've got his title.  I don't know if he's a lawyer or not.

18   Q.    Okay.  So this is the person that you called to inquire

19   about buying drugs.

20   A.    Yeah.  When that says that's who I spoke to, that's who I

21   spoke to.

22   Q.    So you didn't talk to, like, a sales rep.  You went

23   straight to the vice president of litigation?

24   A.    Yes.

25   Q.    Okay.  In paragraph 12, it says:  "I spoke with Sarah

1    Padgitt, a litigation attorney for Baxter Health Corporation,

2    via telephone."  Again, the purpose of your call was to see

3    whether or not they would sell drugs to the ADC for executions.

4    Right?

5    A.    Correct.

6    Q.    And you called an attorney to ask that question?

7    A.    Yes.

8    Q.    In paragraph 17, you say:  "I spoke with Paul Dickson, who

9    is the owner of Morris and Dickson Co., LLC, via telephone.

10   Morris and Dickson is a full-line wholesale pharmaceutical

11   distributor in Louisiana.  I informed Mr. Dickson that I had a

12   list of medications and wanted to see if the ADC could purchase

13   the medications through his company.  Mr. Dickson said there was

14   no need to go through the list of medications.  He was very

15   familiar with the medications used for executions.  He then

16   explained his company has individual contracts with the

17   manufacturers.  He would have to get approval from the

18   manufacturers before Morris and Dickson Co. would be able to

19   sell any medications to the ADC for use in executions."

20         Did you ever follow up with Mr. Dickson?

21   A.    No.

22   Q.    Okay.  One other question about this.  I'm sorry.  In

23   paragraph 15, it says you talked to somebody at Janssen

24   Pharmaceutical Company, Cheryl F.  And she wasn't able to answer

25   your questions, but she advised you to send a letter with your

1    question to their company.

2    A.    Uh-huh.

3    Q.    And that you would receive a response in six to eight

4    weeks.  And you said that you did that, on that same day you

5    mailed the letter.  And so you did this on October 13th, and you

6    signed this declaration on October 14th.  Right?  So that was

7    just, like, the day before you signed this declaration.

8    A.    Yes.

9    Q.    And, in fact, all these contacts were either the day

10   before -- if we can just look:  October 13th, October 13th,

11   October 13th, October 13th, October 13th, October 14th,

12   October 13th, October 13th, October 13th.  So these were all

13   either the day before or the day of that you signed this

14   affidavit.

15   A.    Yes.

16   Q.    Okay.  So did you ever follow up with Janssen

17   Pharmaceutical Company?

18   A.    No.  And I never received a response back from them either.

19   Q.    But you didn't call them about your letter.

20   A.    No.

21   Q.    Okay.  Now, you have lethal injection chemicals in your

22   possession, in the ADC's possession.

23   A.    Yes.

24   Q.    And are you aware -- a lot of this --

25              MS. VANDIVER:  I need to get a drink of water.

1           THE COURT:  You are fine.

2           MS. VANDIVER:  I'll just be a minute.

3  BY MS. VANDIVER:

4  Q.    Okay.  So it sounds like, from reading your declaration in

5  2015, that you were very upfront with these companies about the

6  purpose for which you wanted to get these drugs.

7  A.    Yes.

8  Q.    Are you aware of a manufacturer of vecuronium bromide

9  that's okay with selling the drugs to prisons for the purpose of

10  executions?

11  A.    No.

12  Q.    Okay.  And are you aware of a manufacturer of potassium

13  chloride that's okay with selling the drugs to prisons for the

14  purpose of executions?

15  A.    No.

16  Q.    And, in fact, don't those manufacturers have, I'm just

17  going to call them "agreements" -- or I'm not really sure what

18  the legal term is -- with distributors that they are not to sell

19  them to prisons for the purpose of lethal injection?

20  A.    Yeah.  That's what several of them had told me, yes.

21  Q.    So when you -- when the ADC got its current supply of

22  vecuronium bromide and potassium chloride, you weren't getting

23  them directly from the manufacturer?

24  A.    I can't answer for both.  I didn't -- I didn't get the

25  potassium chloride.  So ask your question again.

1  Q.   Okay.  When -- but you did get the vecuronium bromide.

2  A.   Yes.

3  Q.   So you didn't get that drug directly from the manufacturer.

4  A.   No.

5  Q.   Okay.  And you got it, I take it, from a distributor that

6  wasn't supposed to sell it to you.

7           MS. CRYER:  Objection, Your Honor.  I believe that is

8  something that needs to be deemed confidential, if not highly

9  confidential, that needs to be taken up pursuant to the

10 protective order, please.

11          THE COURT:  All right.

12          MS. VANDIVER:  I'm not asking him who he got it from.

13          MS. CRYER:  I believe she did.

14          THE COURT:  I think she asked if it was a person that

15 was or an entity that was supposed to sell it.  Did the

16 manufacturer know that the entity was selling it is how I took

17 the question.  Am I fair in what you asked?

18          MS. VANDIVER:  Yes.  I'm sorry.  Yes.

19          MS. CRYER:  Okay.  Okay.

20          THE WITNESS:  So am I answering?  Is it going to the

21 confidential part or what?

22          MS. VANDIVER:  I think the judge has said it's okay

23 for you to answer.

24          THE COURT:  Understanding that nature of the question,

25 it's all right for him to answer that question.  Don't provide

1    the name.  But the question is based upon my understanding of

2    this -- and everyone correct me if I'm wrong -- there's a

3    manufacturer, there's a middle entity, and there's the ADC, who

4    purchased it.  Was the middle entity authorized or supposed to

5    sell it to you is the question.  Is that fair?

6              MS. VANDIVER:  Yes.

7              THE WITNESS:  No.

8    BY MS. VANDIVER:

9    Q.    And the reason that you are able to get a drug from

10   somebody that's not supposed to sell it to you goes back to this

11   statute, which we looked at earlier.  Right?  This 5-4-617?

12   A.    I'm not sure if I understand what you are asking me.

13   Q.    Well, let me be more specific.

14   A.    That would help.

15   Q.    So this law, which we've been calling the "Method of

16   Execution" statute -- and I think that's actually what it's

17   called -- it requires you to keep confidential information that

18   may lead to the identity or lead to the identification of, and

19   in (B) is the persons who supply the drugs to the ADC.

20   A.    Okay.

21   Q.    So is this confidentiality what is allowing you to get this

22   drug that you are not supposed to be able to get?

23   A.    I can't say that this would allow me to get a drug that I'm

24   not supposed to get.  If that manufacturer had a policy that I

25   don't want any of my distributors to sell it no matter what,

1    then this statute wouldn't help me at all.

2    Q.    So how is it that you were able to get the vecuronium

3    bromide when they weren't supposed to sell it to you, the

4    distributor wasn't supposed to sell it to you?

5    A.    He wasn't supposed to sell it to me.  If he hadn't -- if he

6    had done what he was supposed to, he wouldn't have sold it to

7    me.  I wouldn't have got it.

8    Q.    Uh-huh.  Have you talked to any compounding pharmacists

9    about providing drugs to the ADC?

10   A.    No.

11   Q.    Other than this discussion -- I assume when you talked to

12   this person that you got the vecuronium bromide from -- did you

13   talk to him on the phone?

14   A.    Yes.

15   Q.    Okay.  Other than your conversation with him, have you had

16   any communications with drug suppliers since your affidavit that

17   we were looking at in October of 2015?

18   A.    No.

19   Q.    No.  Okay.  Is there someone else that is handling that at

20   the department that's not you?

21   A.    It would be either me or the director.

22   Q.    Okay.  Did you pay for the vecuronium bromide?

23   A.    Yes.

24   Q.    Okay.  You very well may not be, but are you aware that the

25   Court ordered the State to respond to an interrogatory which

1    requested a summary of all communications between agents of the

2    ADC and drug suppliers?

3    A.    Say that again.

4    Q.    Do you know what an interrogatory is?

5    A.    Yes.

6    Q.    So are you aware that there were some interrogatories in

7    this case?

8    A.    Yes.

9    Q.    Did you talk to the attorney general about that?

10    A.    Yes.

11    Q.    Okay.

12    A.    To my knowledge, all the documents and stuff that we were

13    gathering or turning over to you guys.

14    Q.    And were you asked to provide a summary of your

15    communications with drug suppliers?

16    A.    I was asked to -- I think the way they did it was -- any of

17    our emails or correspondence, we did a search of all that.

18    Q.    So they didn't ask you about phone calls.

19    A.    No.

20    Q.    Okay.  So you didn't relate to them about this phone call

21    you had regarding the vecuronium bromide?

22    A.    No.  If you didn't ask --

23    Q.    I'm not saying me.  I'm saying them.

24    A.    Yeah.  No.  I don't think this 2015, or whenever it was,

25    came up.

1   Q.   When you were able to get the vecuronium bromide, was that

2   just one phone call?

3   A.   I think so.

4   Q.   So the first guy that you called was okay with selling it

5   to you.

6   A.   The person I called was okay with selling it to me, yeah.

7   Q.   And that was the first phone call that you made trying to

8   get more vecuronium bromide?

9   A.   It was somebody I was familiar with.

10   Q.   Okay.  Did you pay for the vecuronium bromide in cash?

11   A.   No.

12   Q.   Have you tested the vecuronium bromide?

13   A.   No.

14   Q.   Have you tested the potassium chloride?

15   A.   No.

16   Q.   Have you talked to the supplier that sold you the

17   vecuronium bromide about providing other drugs for lethal

18   injection?

19   A.   Yes.  Well, not about other lethal -- I believe it didn't

20   come to me, and I can't remember.  I'm pretty sure this company

21   requested or wanted the drug back.  So, no, I haven't talked to

22   this same person about getting more drugs.

23   Q.   The person that sold it to you wanted it back?

24   A.   Yes.

25   Q.   So the distributor?

1    A.    Yes.

2    Q.    But you didn't give it back?

3    A.    No.

4    Q.    And are you aware how Texas does its executions, what drugs

5    they use in executions in Texas?

6    A.    I've looked it up before, but I can't tell you what they

7    are using right now --

8    Q.    Okay.

9    A.    -- just off the top of my head, no.

10   Q.    Are you aware that Texas has executed four people this

11   calendar year, in 2017?

12   A.    No.  If you tell me, I'll believe it.  But have I been

13   tracking it?  No.

14   Q.    That's news to you.  You don't pay attention to what Texas

15   does.

16   A.    I don't.  I haven't tracked it.  I couldn't have told you

17   if you asked me how many people Texas executed this year.

18   Q.    Okay.  So if Texas uses pentobarbital, you haven't tried to

19   get pentobarbital.

20   A.    No.  I have the drugs I need to conduct the execution.  So,

21   no, I haven't tried to get another one.

22          MS. VANDIVER:  I'm ready to ask about some

23   confidential exhibits.

24          THE COURT:  All right.  If you are not affiliated with

25   the case, I'm going to have to ask you step out of the

1    courtroom.  I'll ask my lawyers to turn around and let me know

2    if there's anyone in the courtroom you don't recognize.

3         [Proceedings under seal under separate cover.]

4                    REPORTER'S CERTIFICATE

5         I certify that the foregoing is a correct transcript from
     the record of proceedings in the above-entitled matter.

6

7    /s/Elaine Hinson, RMR, CRR, CCR       Date:  April 12, 2017.
     United States Court Reporter

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (Continuing at 7:09 p.m.)

2          [Proceedings under seal under separate cover.]

3          (Continuing in open court:)

4                MS. CRYER:  Your Honor, I have one document that I'm

5     looking for.  Give me two seconds.

6                THE COURT:  That's fine.

7                          REDIRECT EXAMINATION

8     BY MS. CRYER:

9     Q.   All right.  Mr. Griffin, I want to go -- and I think I just

10    have a couple of questions for you.  All right.  With regard to

11    the statute, that became effective April 6, 2015.  Did I read

12    that date correct?

13    A.   Yes.

14    Q.   Okay.  You were asked some questions earlier about your

15    affidavit that you provided, and it was filed with the Court on

16    October 16, 2015.  Do you recall that line of questioning?

17    A.   Yes.

18    Q.   And I'm sorry I've written all over my copy.  The date of

19    your affidavit was October 14, 2015.  Do you recall that?

20    A.   Yes.

21    Q.   All right.  And there is a file mark copy in the upper

22    right-hand corner, and that was filed in the Pulaski County

23    Circuit Court.  Do you remember that lawsuit?

24    A.   Yes.

25    Q.   Okay.  I'm going to refer you to what has been marked as

1    Defendants' Exhibit 18.  This is a copy of the first amended

2    complaint that was filed in the Circuit Court of Pulaski County,

3    Arkansas, Fifth Division.  Again, here is the file mark in the

4    upper right-hand corner.  Do you understand this to be the

5    lawsuit that you filed -- in which your affidavit was filed?

6    A.    Yes.

7    Q.    And, again, the plaintiffs in this case, Stacey Johnson,

8    Jason McGehee, Bruce Ward, Terrick Nooner, Jack Jones, Marcel

9    Williams, Kenneth Williams, Don Davis, and Ledell Lee.  Did I

10   read all of those names correctly?

11   A.    Yes.

12   Q.    And according to the complaint, starting on page 1, going

13   to page 2, it states that the prisoners challenge as an

14   unconstitutional Arkansas Act, 1096 of 2015.  That was the new

15   lethal injection statute.  And it also states that the prisoners

16   also challenge as unconstitutional the particular lethal

17   injection protocol that the ADC has adopted pursuant to the new

18   statute.

19         Did I read that correct?

20   A.    Yes.

21   Q.    And is your understanding of what the lethal injection

22   protocol that the ADC had adopted as of the time this lawsuit or

23   this amended complaint was filed in September of 2015 was a

24   three-drug -- the three-drug cocktail, or three-drug protocol?

25   A.    Yes.

1  Q.    In looking at this complaint, again, on page 19 of the

2  pleading, it shows that they were challenging the Arkansas Act

3  1096 of 2015.  Did I read that correctly?

4  A.    Yes.

5  Q.    All right.  On page 20, there's a section in which they

6  indicate problems with compounded drugs.  Did I read that

7  correctly?

8  A.    Yes.

9  Q.    On page 29 of the first amended complaint, they raise a

10 claim of the lack of qualifications and training requirements,

11 and they mention in reference medical equipment, medical

12 supplies, et cetera.

13     Did I read that correctly?

14 A.    Yes.

15          MS. VANDIVER:  Your Honor?

16          THE COURT:  Yes.

17          MS. VANDIVER:  It's late, and I trust that Ms. Cryer

18 is an excellent reader, and I just think that this testimony is

19 not very helpful and it's just taking up a lot of time just

20 asking if she's reading this pleading correctly.  I'm not really

21 sure why this witness needs to comment on that.

22          THE COURT:  I'll recognize the objection.  You can use

23 your time how you want.  All of this is, I think, already in

24 this record.

25          MS. CRYER:  It is.

```
 1              THE COURT:  You're welcome to go ahead and --

 2              MS. CRYER:  Okay.  Well, I will move on, other than

 3    one more reference.

 4    BY MS. CRYER:

 5    Q.    On page 38, there was reference to the consciousness check

 6    and issues and discussions about that.  Did I read that

 7    correctly?

 8    A.    Yes.

 9    Q.    Now, you were asked --

10              MS. CRYER:  Oh, your Honor, I would move to introduce

11    Defendants' Exhibit 18 into the record.

12              MS. VANDIVER:  No objection.

13              THE COURT:  Defendants' 18 is admitted.

14         (Defendants' Exhibit 18 received in evidence.)

15              MS. CRYER:  I would move to introduce Defendants'

16    Exhibit 13 in the record.  It is the affidavit of Rory Griffin,

17    which I believe plaintiffs' counsel has already referenced and

18    used with Mr. Griffin.

19              MS. VANDIVER:  No objection.

20              THE COURT:  And that was Defendants' 13?

21              MS. CRYER:  Yes, your Honor.

22              THE COURT:  Defendants' 13 is admitted.

23         (Defendants' Exhibit 13 received in evidence.)

24    BY MS. CRYER:

25    Q.    Now, Mr. Griffin, with regard to the different entities in
```

1   which you were asked about making contact with, let me ask, were

2   any of the companies that you made contact with cooperative and

3   willing to discuss the issue of selling drugs to the Arkansas

4   Department of Correction for use in executions?

5   A.   Well, some that said we won't sell them to you.  I guess

6   they were cooperative in providing that answer.

7   Q.   Okay.  Were they willing to sell the ADC the drugs?

8   A.   No.

9   Q.   You have been asked a lot of questions about supervising

10  the IV team and inserting the IV into the arm, and I know that

11  we've heard your answer on that numerous times.  But let me ask

12  you, back when you worked as an LPN and would insert an IV, did

13  you have to have a supervisor there standing next to you making

14  sure that you inserted the IV correctly?

15  A.   No, I didn't.  And I worked a lot of night shifts where a

16  doctor gave me an order to start an IV.  That's what I did.

17  Q.   Okay.

18  A.   No supervision other than me and my license.

19  Q.   I believe you testified that there will be an ultrasound

20  machine available in the death chamber.  Did I hear that

21  correctly?

22  A.   It will be available.  I don't know if I said the exact

23  location.

24  Q.   Okay.  But it will be available for use during the

25  execution?

1    A.    Yes.

2    Q.    Okay.  Maybe I should have said that.  My apologies.

3          Can an ultrasound be used in attempting to locate a vein?

4    A.    Yes.

5    Q.    Such as for someone who is obese or morbidly obese?  Could

6    an ultrasound help locate a vein?

7    A.    Yes.

8          MS. CRYER:  Your Honor, I believe that's all that I

9    have.  Thank you.

10         THE COURT:  All right.  Anything further for Mr.

11   Griffin?

12         MS. VANDIVER:  One moment.

13         No questions, your Honor.

14         THE COURT:  Mr. Griffin, thank you.  You may step

15   down.

16         THE WITNESS:  Thank you.

17         THE COURT:  Do you wish to call your next witness?  We

18   can go forward until 8:15 as we planned.  I will defer to

19   counsel on what you wish to do.

20         MS. CRYER:  Your Honor, if we may, we would prefer to

21   wait and start fresh in the morning.

22         THE COURT:  All right.  My understanding is we have a

23   pretty full day tomorrow; is that right?

24         MS. VANDIVER:  We'd rather keep going.

25         THE COURT:  That's what --

1           MS. CRYER:  Okay.

2           THE COURT:  Let's go ahead.

3           MS. CRYER:  We'll call Director Wendy Kelley.

4        **WENDY KELLEY, DEFENDANTS' WITNESS, DULY SWORN**

5                     DIRECT EXAMINATION

6    BY MS. CRYER:

7    Q.   Good evening, Ms. Kelley.

8    A.   Hi.

9    Q.   Would you please state your full name for the record.

10   A.   Wendy Lynne Kelley.

11   Q.   And, Ms. Kelley, where are you employed?

12   A.   The Arkansas Department of Correction.

13   Q.   And what is your current job title?

14   A.   Director.

15   Q.   How long have you been the director of the Arkansas

16   Department of Correction?

17   A.   Since January 13, 2015.

18   Q.   How long have you been employed with the Arkansas

19   Department of Correction?

20   A.   Since February 2006.

21   Q.   What position were you hired into in February of 2006?

22   A.   Deputy director for health and correctional programs.

23   Q.   What were some of your job duties and responsibilities as

24   deputy director for health and correctional programs?

25   A.   I supervised the mental health and medical administrators,

1    the chaplaincy service administrator, the administrator for sex

2    offender assessment.  I answered a lot of appeals of medical

3    grievances from inmates.  I served on the management team.  I

4    helped draft policies.  I can't remember anything else off the

5    top of my head.

6    Q.    All right.  I'm going to show you what has been attached to

7    the complaint in this case.  Do you -- again, I can't remember

8    if this is Plaintiffs' Exhibit 1 to the complaint or if it is

9    Exhibit 11 to the complaint.  But this was attached to the

10   complaint that was filed in this lawsuit on March 27, 2017.  Do

11   you recognize this document?

12   A.    Yes.

13   Q.    All right.  Does it also indicate on here that it was also

14   filed in a 2008 lawsuit?

15   A.    It was filed July 16, 2008, in something.

16   Q.    Okay.  And is this the type of policy that you would have

17   been involved with in helping to draft, create, or review as

18   part of your duties as the deputy director?

19   A.    Yes.

20   Q.    Do you recall whether or not you were actually involved in

21   the preparation or revisions to this policy?

22   A.    I believe I was.

23   Q.    Was there a policy that predated or preceded this policy?

24   A.    Yes.  07-48.

25   Q.    And we'll get back to this one in just a moment.

1        Did you prepare an affidavit in this case?

2   A.   Yes, ma'am.

3   Q.   I'm going to show you what has been marked, I believe, as

4   Defendants' Exhibit No. 1 and ask if you recognize this

5   document.

6   A.   Yes.

7   Q.   And if I turn to page 15 of the document, is this your

8   signature?

9   A.   Yes.

10  Q.   All right.  And did you also attach certain documents to

11  your affidavit?

12  A.   Yes.

13  Q.   And I believe Exhibit 1 was a copy of -- excuse me.

14  Exhibit A or Attachment A was a copy of the executions by the

15  Arkansas Department of Correction, dated 1913 to present.  Did I

16  read that correct?

17  A.   Yes.

18  Q.   Exhibit B was a printout of the executions from the state

19  of Arkansas -- or that have been held in the state of Arkansas

20  since 1990.  Did I read that correctly?

21  A.   That is really blurry on here.  I'm sorry.  I can't read

22  it.

23  Q.   I'm not sure I can make it much better.

24  A.   It starts in 1990.

25  Q.   Okay.  And then there's the Exhibit B.

1          Exhibit C, photographs.  Do you recognize these
2   photographs?
3   A.    Yes.  They're pictures that I took during one of the
4   practices.
5   Q.    And what are these photographs of?
6   A.    I took them from inside the execution closet, whatever you
7   want to call it, where the executioner is, looking out to
8   show -- I had been asked by Ms. Merritt previously if the
9   executioner could see, could monitor the veins in the inmates'
10  arms.  And so I took the picture instead of trying to describe
11  it to her.
12  Q.    And then Exhibit D to your affidavit, did you attach
13  information from other states with regard to their executions?
14  A.    Yes.
15  Q.    Is this the first lawsuit that you have been named a
16  defendant in with regard to midazolam?
17  A.    I was in court last week in a case, and I don't -- it was
18  mostly against the Parole Board, but I was one of the named
19  defendants.  I don't remember if midazolam was an issue in that.
20  I was in a case in front of Judge Griffen, it seems like
21  several, but it might have just been one, I'm not sure, that
22  involved midazolam.
23  Q.    Was that the lawsuit that I previously showed Mr. Griffin,
24  the 2010 lawsuit?
25  A.    I honestly don't remember the year, but it was one of the

1   things that you showed Mr. Griffin, yes.

2   Q.   As director of the Department of Correction, are you sued a

3   lot?

4   A.   Yes.

5   Q.   For a variety of reasons or just for one?

6   A.   For a variety of reasons.

7   Q.   Has the policy -- I'm putting back up Administrative

8   Directive 08-28.  Has this document -- does this policy remain

9   in effect as of today?

10  A.   No.  It's been superseded.

11  Q.   Do you recall how many times it has been superseded?

12  A.   I believe twice.

13  Q.   And is the current, most recent -- what is the number of

14  the current, most recent one?

15  A.   It's AD 15-something.  I don't remember.

16       MS. CRYER:  Your Honor, I would like to -- I'm going

17  to want to show Ms. Kelley copies of the 2008 policy and compare

18  them to the 2015 policy.  The 2015 policy itself has been marked

19  confidential.

20       THE COURT:  All right.  I'm going to ask our folks

21  again to leave the courtroom.

22       MS. CRYER:  And if we're going until --

23       THE COURT:  We're going to go until 8:15, and I

24  anticipate this line of questioning is going to last until 8:15.

25       MS. CRYER:  I do, too.

1          THE COURT:  We'll be back again tomorrow morning at

2     8:30.

3          [Proceedings under seal under separate cover.]

4          (Continuing in open court:)

5          THE COURT:  All right.  You may proceed.

6          MS. CRYER:  Okay.

7     BY MS. CRYER:

8     Q.   Ms. Kelley, I'm going to show you -- this is -- attached to

9     the AD 15-28, it is page 22 of the policy.  I'm sorry it keeps

10    turning.  And the beginning of this section --

11    A.   I recognize it's Attachment C.

12    Q.   Thank you.  All right.  Were there any changes to the IV

13    team qualifications between the 2008 policy and the 2015 policy?

14    A.   No.  Not that I recall.

15         MS. CRYER:  Okay.  Your Honor, I know that I have, I

16    believe, one minute left.  I'm willing to give that one minute

17    back if I can start on another topic tomorrow.

18         THE COURT:  That's fine.  We'll end for the evening.

19    Thank you all very much.  We'll see you back here at eight-

20    thirty in the morning.  We'll be in recess until then.

21         MR. RUDOFSKY:  Your Honor, I have a selfish question.

22    I know I am planning to, and I'm guessing potentially one of my

23    opposing counsel is possibly planning to prepare for a closing

24    argument.  I think it's probably useful for the Court.  On the

25    other hand, if the Court would indicate it's not really

1   interested in it at all, that probably would change my

2   preparation overnight.

3              THE COURT:  You know, I really don't need a closing

4   argument.  I'll be very honest.  I'm not going to prevent you

5   from giving it if you really want to.  I think I have better

6   ways to spend the time that would benefit both sides, to let me

7   work instead of hearing the argument.  But I won't foreclose you

8   that opportunity if you think it's very important.  Or if your

9   client thinks it's very important, I'm happy to hear it.

10             MR. RUDOFSKY:  I appreciate it.  That's why I asked

11  the question.

12             THE COURT:  All right.

13             MS. MERRITT:  One other housekeeping matter, your

14  Honor.  If we could get an update as to where we stand on the

15  time that's left for tomorrow, that would be appreciated.

16             THE COURT:  She's working on it right now.  Tracy is

17  working on it right now.  She'll prepare some notes.

18             MS. MERRITT:  Thank you, your Honor.

19             THE COURT:  If you're going to have your phones and

20  computers, if you want to leave the courtroom, we'll e-mail it

21  out, if you want the update on time.

22        (Overnight recess at 8:17 p.m.)

23                        REPORTER'S CERTIFICATE
          I certify that the foregoing is a correct transcript from
24  the record of proceedings in the above-entitled matter.
                                        Date:   April 12, 2017
25  /s/ Christa R. Jacimore, RDR, CRR, CCR
         United States Court Reporter