1            IN THE UNITED STATES DISTRICT COURT
                EASTERN DISTRICT OF ARKANSAS
2                      WESTERN DIVISION

3    JASON MCGEHEE, STACEY
     JOHNSON, MARCEL WILLIAMS,        No. 4:17CV00179-KGB
4    KENNETH WILLIAMS, BRUCE WARD,
     LEDELL LEE, JACK JONES, DON
5    DAVIS and TERRICK NOONER,

6                   Plaintiffs,        Thursday, April 13, 2017
                                       Little Rock, Arkansas
7    v.                                8:32 a.m.

8    ASA HUTCHINSON, Governor of
     the State of Arkansas, in his
9    official capacity; and WENDY
     KELLEY, Director, Arkansas
10   Department of Correction, in
     her official capacity,
11
12                   Defendants.

       **TRANSCRIPT OF HEARING ON MOTION FOR PRELIMINARY INJUNCTION**
13                         **VOLUME 4**
             BEFORE THE HONORABLE KRISTINE G. BAKER,
14               UNITED STATES DISTRICT JUDGE

15   APPEARANCES:

16   On Behalf of Plaintiffs McGehee, M. Williams, Ward, Davis and
     Nooner:
17
         MR. JOHN CHARLES WILLIAMS, Assistant Federal Defender
18       MR. SCOTT W. BRADEN, Assistant Federal Defender
         MS. JAMIE GIANI, Assistant Federal Defender
19       MS. JULIE VANDIVER, Assistant Federal Defender
           Federal Public Defenders Office
20         1401 West Capitol Avenue, Suite 490
           Little Rock, Arkansas  72201
21

22   On Behalf of Plaintiff Davis:

23       MS. DEBORAH RUTH SALLINGS, Attorney at Law
           35715 Sample Road
24         Roland, Arkansas  72135

25   [APPEARANCES CONTINUED ON NEXT PAGE]

1    [APPEARANCES CONTINUED]

2

On Behalf of Plaintiffs Johnson, K. Williams and Jones:

3
        MR. JEFFREY M. ROSENZWEIG, Attorney at Law
4          300 Spring Building, Suite 310
           Little Rock, Arkansas  72201-2421
5

6    On Behalf of Plaintiff Lee:

7        MR. LEE DEKEN SHORT, Attorney at Law
           Short Law Firm
8          425 West Broadway, Suite A
           North Little Rock, Arkansas  72114
9

10

11   On Behalf of Defendants:

12       MR. LEE RUDOFSKY, Solicitor General
         MS. CHRISTINE A. CRYER, Assistant Attorney General
13       MS. KATINA RENE HODGE, Assistant Attorney General
         MS. JENNIFER L. MERRITT, Assistant Attorney General
14       MR. COLIN R. JORGENSEN, Assistant Attorney General
           Arkansas Attorney General's Office
15         323 Center Street, Suite 200
           Little Rock, Arkansas  72201-2610
16

17

18

19

20

21

22

23

24

25       Proceedings reported by machine stenography; transcript
     prepared utilizing computer-aided transcription.

```
 1              I N D E X (Volume 4 - April 13, 2017)

 2
     WITNESSES
 3   FOR THE PLAINTIFFS:      DIRECT    CROSS    REDIRECT   RECROSS
     Joel Zivot (Recalled)     891      895       954        960
 4

 5   FOR THE DEFENDANTS:
     Joseph F. Antognini       968     1013      1050       1061
 6

 7   FOR THE PLAINTIFFS:
     Craig Stevens (Rebuttal) 1063     1085
 8
     Joel Zivot (Rebuttal)    1102     1106
 9

10   FOR THE DEFENDANTS:
     Wendy Kelley             1112     1140      1266
11

12   EXHIBITS RECEIVED:
     Defendants' Exhibit 3....................................... 971
13
     Defendants' Exhibits 37, 38, 39, 40, and 41................. 981
14
     Defendants' Exhibits 42, 44, 47, 48, and 49................. 983
15
     Defendants' Exhibits 51 and 52............................. 984
16
     Defendants' Exhibits 55, 56, 58, 59, 60, 61, 62, 64, 65,
17       67, 68, and 71........................................ 988

18   Defendants' Exhibit 73....................................1013

19   Plaintiffs' Exhibit 38....................................1084

20   Defendants' Exhibit 1.....................................1118

21   Plaintiffs' Exhibit 34....................................1249

22   Plaintiffs' Exhibit 22....................................1258

23   Defendants' Exhibits 17, 19, 20, 21, 22, 23, 24, and 28.....1282

24   Plaintiffs' Confidential Exhibits A through F..............1283

25   Plaintiffs' Exhibits 3 and 18.............................1284
```

1          (Continuing at 8:32 a.m.)

2          THE COURT:  Good morning.  We are on the record with

3    counsel and the parties.  Counsel only.  Parties, I don't even

4    know.  Director Kelley is not here.  Perhaps she's here.  I'm

5    not certain who is behind the podium.  It is Case No. 4:17CV179.

6          I know the parties, the lawyers last night inquired about

7    time, and an inquiry was made with Mr. Keller this morning about

8    time.  We will endeavor to take short breaks today.  I need to

9    be more sensitive, I'm not doing a good job of being sensitive

10   to my court reporters to let them change out.  As we approach

11   the 8:15 hour, we'll see how much is left.  If folks haven't

12   exhausted it by then, we'll assess what proof there is still

13   that folks wish to put into the record and we'll make a

14   determination.

15         We won't go tomorrow.  I have made that representation to

16   counsel and I think everybody has obligations and commitments

17   for tomorrow.  So if we need to go past 8:15, we'll talk about

18   that and look at that as that hour approaches.  But, I mean, for

19   now, plan your proof as if we're going to keep going and go

20   quickly on breaks today.  With that, let's pick up where we left

21   off last night.

22         MS. CRYER:  Your Honor, my understanding is that the

23   plaintiffs are going to call Dr. Zivot as the first witness,

24   that that's not -- that Director Kelley will take the stand

25   later today.

| 1 | MS. VANDIVER:  That's what we were planning, too. |

1       MS. VANDIVER:  That's what we were planning, too.

2       THE COURT:  That's the plan?  All right.  That's fine.

3  Dr. Zivot, you're welcome to come up here to the witness stand.

4  There's a glass wall that you walk around.

5       You remain under oath from your video testimony on Monday.

6       **JOEL ZIVOT**, **PLAINTIFFS' WITNESS**, **DULY SWORN**

7                  DIRECT EXAMINATION [Continuing]

8  BY MS. VANDIVER:

9  Q.   Good morning, Dr. Zivot.

10 A.   Good morning.

11 Q.   I don't have too much more for you.

12      When you testified on Monday, we talked about the protocol.

13 In your opinion, do you think that this protocol is going to

14 work in the way that the ADC expects that it will?

15 A.   No.

16 Q.   In your expert opinion, what do you think is most likely to

17 happen?

18 A.   This protocol includes many components.  The protocol

19 includes the placing of intravenouses.  It includes the mixing

20 of drugs.  It includes the injecting of drugs.  It includes the

21 evaluation of the states of unresponsiveness.  And with respect

22 to all of those things, I am very concerned that there will be

23 failures in those interventions and that if death should occur,

24 it will not be in the form that is intended by this protocol.

25 It may most likely be as a consequence of death by hypoxia, low

1   oxygen, as a consequence of an individual being paralyzed and

2   unable to indicate that they are very much, in fact, still aware

3   of what is taking place as they die.

4   Q.    If things start going badly, would there -- is there

5   scientifically, does it exist, a way for the ADC to reverse

6   what -- the damage that they've done?  So, for example, say one

7   of my clients is gasping on the table and it doesn't seem like

8   it's going as they expected.  Is there something that the ADC at

9   that point could do to reverse the effects of the drugs?

10  A.    Each of these drugs individually do have antidotes,

11  reversing capacities.  I would say that the reversing capacity

12  for potassium chloride is probably the most difficult.  But

13  midazolam has a reversing agent that is available and vecuronium

14  has a reversing agent that is available.  So these could be

15  given if it was understood what was actually occurring.  And it

16  would have to be recognized and then these drugs, yes, could

17  very well be given.

18  Q.    Did you see any provision in the protocol for antidotes?

19  A.    No.

20  Q.    And could you tell us what the antidotes are for these

21  drugs and what's the antidote for midazolam?

22  A.    So the antidote for midazolam is a drug called flumazenil

23  and it's a drug I have used on occasion.  And the reversing drug

24  for vecuronium, there are a couple that are available.  One is

25  called neostigmine, which generally is mixed with another drug

1    called glycopyrrolate, and the newer reversing drug that's

2    available and is more widely used now is called sugammadex.

3    Q.    In the materials that you've reviewed, have you seen any

4    evidence that the ADC is going to take into consideration the

5    particular medical considerations of each of these inmates?

6    A.    No.

7    Q.    Does that matter?

8    A.    I think it matters, yes.  Let me be clear that lethal

9    injection is not a medical act, but the co-existing medical

10   condition of each inmate I think is germane with respect to how

11   the lethal injection protocol might interact with their medical

12   conditions and cause consequences I don't think intended by the

13   lethal injection protocol.

14           MS. VANDIVER:  I'd like to show Dr. Zivot one of the

15   exhibits that's been marked confidential, but I think if I show

16   it to the other side, they'll agree that it doesn't need to be

17   confidential because it's an e-mail from the ADC to a journalist

18   in response to a FOIA request.

19           THE COURT:  All right.

20           MS. VANDIVER:  Can we turn the ELMO on.

21   BY MS. VANDIVER:

22   Q.    This is Confidential Exhibit A of the ADC, page No. 455.

23   This is an e-mail to a journalist from an ADC official, and the

24   question posed by the journalist was:  "There have been botched

25   executions in the past, several using midazolam.  How are you

1    seeking to minimize the risk of such an event?"

2          I'm reading 5 here.

3          The answer from the ADC is, "Answer:  Arkansas's protocol

4    is based on a protocol that has been reviewed and approved by

5    the U. S. Supreme Court.  The department is confident that this

6    protocol, if followed as designed, is sufficient to minimize the

7    risk of any untoward occurrences.  And the ADC is confident that

8    the assigned personnel have the adequate training to follow the

9    protocol as designed."

10         Do you agree with that assessment, Dr. Zivot?

11   A.   Confidence is a rather personal claim, isn't it?  I suppose

12   people can be confident of many things, but confidence is not

13   proof.  Certainly when I look at this answer, it doesn't really

14   seem like an answer at all.  It just says, don't worry, we've

15   got this handled.  So it doesn't really specify exactly in

16   detail what the nature of their confidence should arise from.

17         If anything, there has been a number of executions that

18   have gone poorly and there have not been many midazolam,

19   vecuronium, potassium executions done in the United States.  So

20   I'm not sure what this basis for confidence is drawing from.

21   Q.   And in your expert opinion, do you believe that the

22   plaintiffs here will be subjected to a substantial risk of

23   experiencing pain and suffering in their execution if they are

24   executed with the current protocol?

25   A.   Yes.

1          MS. VANDIVER:  I have no further questions on direct.

2          THE COURT:  Cross-examination?

3                          CROSS-EXAMINATION

4    BY MS. MERRITT:

5    Q.    Good morning, Dr. Zivot.

6    A.    Good morning.

7    Q.    My name is Jennifer Merritt.  I represent the State of

8    Arkansas in this matter.  We've never met before today, have we?

9    A.    No.

10   Q.    Nor have we ever talked?

11   A.    No.

12   Q.    You are absolutely opposed to the death penalty, aren't

13   you?

14   A.    That is not my claim.

15   Q.    You've been a vocal opponent of the death penalty publicly

16   in the press and on TV, haven't you?

17   A.    No.  I've been a vocal opponent of lethal injection.

18   Q.    Okay.  So you're here today to talk about lethal injection?

19   A.    Correct.

20   Q.    And you are on the record many times opposing lethal

21   injection.

22   A.    Correct.

23   Q.    Let's talk about your CV.

24         I am showing you what has been introduced into evidence as

25   the Plaintiffs' Exhibit 1.  Does this appear to be your current

1   CV?

2   A.    Looks to be so, yes.

3   Q.    And what I want to talk about is quite a long section of

4   your CV that talks about your -- let me see.  Community outreach

5   activities.  All right?

6   A.    Yes.

7   Q.    Here we show a couple of op-ed pieces.  Were these written

8   articles that you authored?

9   A.    Yes.

10  Q.    Okay.  So you wrote an article about, "Why I am for a

11  Moratorium on Lethal Injections"; correct?

12  A.    Yes.

13  Q.    And that was published in the *USA Today* newspaper in 2013?

14  A.    Yes.

15  Q.    Can you summarize what you said in that opinion or in that

16  article?

17  A.    I said that I had concerns that medicine in medical

18  practice was being drawn into the question of capital punishment

19  in the way that medicine and medical practice should reject.

20  Q.    Sure.  So because in medical practice, your whole goal,

21  your purpose, your career, is based on saving lives.  And I

22  understand that.  Right?

23  A.    I would agree.

24  Q.    And so I can understand and I think the Court would

25  understand that based on your experience, you don't like to see

1   drugs and medicines used to kill people.  Is that fair?

2   A.   Well, not only my experience, but the experience of the

3   profession, yes.

4   Q.   And do you think it casts a bad light on the profession to

5   use medicines and drugs that are supposed to save lives to

6   actually end life?

7   A.   I think that -- this is not a question of medicine being

8   poorly branded.  This just really, I think, touches the ethical

9   fundamentals of medical practice.  This is not merely that we

10  don't like the way that we're being represented in this issue.

11  This is really a clear violation of the ethics, the fundamental

12  ethics of the medical profession.  That's my concern.

13  Q.   And those ethics require that you do no harm; right?

14  A.   They require many things.  Doing no harm is one component

15  of an ethical -- a set of ethical rules and guidelines.

16  Q.   So your testimony has to be considered in light of what

17  your own ethical obligations are that you feel to yourself, to

18  your patients, and to your profession.  Is that fair?

19  A.   Yes.

20  Q.   You also wrote an op-ed piece in *Time* magazine that was

21  published in 2014 titled, "The Slippery Slope from Medicine to

22  Lethal Injection."  Did that also talk about some of the things

23  that we just discussed?

24  A.   Yes.

25  Q.   Was there anything else in that article?

1    A.    You'd have to show it to me again.

2    Q.    Okay.

3    A.    I can't recall it specifically.

4    Q.    Okay.  On page 7 of your CV, it looks like you gave an NPR

5    interview in Atlanta, Georgia, in the year 2011 about physicians

6    and the death penalty.  Right?

7    A.    Yes.

8    Q.    And during that NPR interview, did you express concerns

9    about the death penalty generally?

10   A.    No.  I can't recall.

11   Q.    Okay.

12   A.    My comments are generally -- are confined to my concern

13   about lethal injection.

14   Q.    So in 2014, you published an article in Medpage Today.

15   What is Medpage Today?

16   A.    It's a periodical that's intended primarily as a periodical

17   for physicians, although the public, you know, can have access

18   to it as well.

19   Q.    Is it a magazine or a newspaper?

20   A.    I think it's online.  There may be a print form of it, but

21   it's generally online, is where I've seen it.

22   Q.    And so you wrote a piece called, "Cruel and Unusual

23   Punishment"; right?

24   A.    Yes.

25   Q.    So you believe that the death penalty or lethal injection

Zivot - Cross

1   specifically constitutes cruel and unusual punishment?

2   A.   I have no opinion about methods beyond lethal injection.

3   Q.   Okay.  I'll confine my questions to lethal injection then.

4   Thank you.  So you believe that lethal injection is cruel and

5   unusual?

6   A.   Well, I guess it's not as unusual as it used to be, but I

7   believe that it causes suffering and pain, yes.

8   Q.   Do you hold that opinion with regard to all possible drug

9   protocols?

10  A.   When you say all possible drug protocols, you're going to

11  have to be more specific.

12  Q.   Well, for example, using a massive overdose of an opioid.

13  Would that be cruel in your mind?  Single-drug protocol?

14  A.   I don't know what you -- you're going to have to ask me

15  something more specific, what you mean there.  When you say

16  "cruel," we're going to have to have a discussion as to how we

17  define cruelty so that we know we're on the same page.

18  Q.   How do you define cruelty?

19  A.   Well, cruelty is an evolving standard.  Cruelty, what we

20  believe to be cruel I think evolves naturally with the evolution

21  and maturation of civil society.  There are methods of

22  execution, for example, that have been used that have been set

23  aside because the public considers them cruel, where initially

24  they were not considered cruel.  For example, drawing and

25  quartering, which was a method of execution, is no longer done

1    because the public subsequently felt that that was cruel.

2        I think when you talk about cruelty, you have to separate

3    probably cruel acts versus, you know, cruel intention.  It's a

4    complicated kind of subject.

5    Q.   Certainly.  At least in 2014 in the Medpage publication,

6    though, you wrote an article titled, "Lethal Injection:  A

7    Cruel, Painful, Terrifying Execution."  Right?

8    A.   Yes.

9    Q.   So at that point you expressed your opinion that lethal

10   injection is cruel, painful, terrifying; right?

11   A.   Yes.

12   Q.   Okay.  *Miami Herald*, 2014.  There was a piece:  "Doctor

13   speaks out on use of untested drugs in capital punishment."

14       Again, an anti-lethal injection news piece that you

15   participated in.  Did you write that article or give an

16   interview?

17   A.   I don't recall.  I think it was an interview, or maybe it

18   was even quoted from something else that I didn't -- I don't

19   recall being contacted by the *Miami Herald*.

20   Q.   Fair enough.  What about *New York Times* in 2014:  Timeline

21   describes frantic scene at Oklahoma execution.

22       Were you interviewed in connection with the Lockett

23   execution?

24   A.   I believe that I was.

25   Q.   Did you give any opinions about why you thought that

1    execution went wrong?

2    A.    Yes.

3    Q.    What were those?

4    A.    I mean, if you want to refer specifically to the article,

5    we could do that.  But I cannot recall specifically what I said

6    at the time.

7    Q.    As you sit here today, what's your understanding about what

8    went wrong in Oklahoma with regard to the Lockett execution?

9    A.    Well, the difficulty of the Lockett execution had to do, I

10   think, primarily with the establishment and maintenance of

11   adequate intravenous access, which was difficult from the

12   beginning, and ultimately the intravenous failed to be

13   maintained within a vessel.  And when the chemicals were

14   injected, instead of directly entering the circulation as the

15   protocol intended, they instead went into the surrounding tissue

16   around the vein.  In this case it was an attempt at placing the

17   catheter in the femoral vein that ultimately failed.

18   Q.    Okay.  So the pharmacologic effect of the drug was not the

19   cause of this failure; it was the failure to secure adequate IV

20   access.  We don't know what could have been done with the drug

21   because it all did not circulate within the inmate's system;

22   right?

23   A.    We don't know.  Some appears to have gotten in.  Some did

24   not.

25   Q.    Some, but not the full dose.

1    A.    Not the full dose.

2    Q.    And we don't know how much; right?

3    A.    We don't know how much.

4    Q.    What about *Washington Post*, 2014?  You cite in your CV,

5    "Florida's Gruesome Execution Theater."  What's the basis for

6    that article?

7    A.    I think it was around an execution, but I really can't

8    recall, you know, the specifics.  And if you -- I'm sure if you

9    could show me the article, I would -- it would bring it to mind.

10   Q.    As you sit here today, what is your opinion about Florida's

11   gruesome execution theater?

12   A.    I really can't recall the incident right now, so it's

13   possible that -- well, I just can't recall it now.

14   Q.    Are you aware that Florida has conducted approximately 12

15   lethal injection executions using the same three-drug protocol

16   that the Arkansas Department of Correction is using in its

17   current procedure and that those executions, as recognized by

18   the United States Supreme Court in the *Glossip* opinion, were

19   successful?

20   A.    When you say successful, perhaps you need to define that.

21   Q.    Okay.  Let me rephrase it.  What the Supreme Court said in

22   *Glossip* was that the only evidence that the Court had before it

23   at that time were the 12-plus executions that had happened in

24   Florida that appeared to be uneventful.  They proceeded

25   according to protocol and the drugs worked as intended.  Are you

1    aware of that?

2    A.    I would say that to produce a corpse in lethal injection

3    would not be the entirety of an evaluation as to whether that

4    was successful or not.

5    Q.    Okay.  But the drugs worked as intended in that state?

6    A.    If you're saying that the intention was to kill them, then

7    those individuals died, so that was -- if that's your yardstick

8    for successful, then I would agree.

9         I would say that there's much more at play here, and I

10   don't believe that, when those executions were evaluated, that

11   there was any consideration to the autopsy findings that have

12   subsequently become available for some of those executions.

13   Q.    Well, unfortunately, the State under law has the duty to

14   carry out lawfully imposed sentences.  You understand that;

15   right?

16   A.    I'm not sure what you mean when you say unfortunately.

17   Q.    Well, the death penalty -- regardless of your opinion, my

18   opinion, the Court's opinion about the death penalty, the

19   legislature has made a public policy choice to authorize the use

20   of lethal injection executions as a punishment for capital

21   crimes.  Do you understand that?

22   A.    I understand what you've said, yes.

23   Q.    Okay.  So it's a policy -- the issue of capital punishment

24   is a policy question for our legislature.  Right?

25   A.    The issue of -- I'm sorry.  I'm not following what you're

1    asking me here.

2    Q.    Well, we were talking about whether an execution was

3    successful, and I understand and appreciate where you're coming

4    from about how we define success.  But the purpose of the lethal

5    injection procedure is to cause the inmate's death.  Agreed?

6    A.    Broadly, yes.

7    Q.    And the executions at the time of *Glossip*, there were

8    approximately 12 executions that had successfully employed the

9    three-drug midazolam protocol that Arkansas subsequently

10   adopted.  Right?

11   A.    Execution is a bounded concept.

12   Q.    What do you mean by that?

13   A.    It means that execution is a killing in a certain fashion.

14   It can't be any killing.  So if a person ends up dead at the end

15   of an execution, it does not mean that the execution was carried

16   out correctly.

17   Q.    Well, do you have any evidence that there was any so-called

18   botched execution in Florida using the midazolam protocol?

19   A.    Well, there are two things to consider.  The first thing --

20   Q.    Yes or no.  Do you have evidence?

21   A.    When you say evidence, I don't know what you mean exactly.

22   I've looked at autopsies and I've read reports, so if that's

23   evidence, then I have that, yes.

24   Q.    Okay.  Which inmates, in your mind, suffered a botched

25   execution in Florida?

1   A.   I would -- I cannot recall the names because I don't have

2   the autopsies in front of me, but if you gave me --

3   Q.   Why would --

4   A.   I'm sorry.  If you gave me the names and the autopsies, we

5   could go over them one at a time and I could show you where I

6   have serious concerns.

7   Q.   I'm sorry, Doctor, but I'm trying to understand where your

8   concerns are and why you wrote an article about Florida's

9   gruesome execution theater and, as you sit here today, you can't

10  tell me one single botched execution in Florida, can you?

11  A.   I would disagree with that.  I think that I can.

12  Q.   Okay.

13  A.   I'm telling you what I need in order to do that.  I need to

14  see the autopsies again because I cannot recall the names.  But

15  having reviewed autopsies in Florida, I have serious concerns

16  over what those autopsies found.

17        MS. VANDIVER:  Your Honor, I'd like to object.  I

18  believe Ms. Merritt is mischaracterizing this exhibit.  This

19  says interviews, and all these that follow are interviews that

20  Dr. Zivot gave.  These are not articles that he wrote.  So she

21  is asking him whether or not he titled these things, and that

22  is -- she's mischaracterizing this document.

23        THE COURT:  All right.  Ms. Merritt?

24        MS. MERRITT:  I'm simply asking him, as he sits here

25  today, does he know about any botched executions in Florida.

1          THE COURT:  I think we're going back to the questions

2    you've been asking about titles of things you've characterized

3    as articles, and I think opposing counsel's point is, they're

4    not articles, they're interviews.

5          MS. MERRITT:  And that wasn't entirely clear to me

6    from reading the CV and so the doctor can please clarify.

7    BY MS. MERRITT:

8    Q.   I want to know what these are.  You can correct me if I'm

9    wrong, Doctor, but we're visiting the first time about these

10   things.  Is that fair?

11   A.   I appreciate that.  Yes.

12   Q.   And I'm not trying to mischaracterize.  It looks like you

13   put in your CV that part of your public outreach in this area

14   was some kind of participation in articles about Florida.  So,

15   again, my question for you is whether, as you sit here today,

16   you can tell me about any botched executions that you're aware

17   of in Florida.

18   A.   If I can review the autopsies again --

19   Q.   The answer is no then, as you sit here right now?

20   A.   No.  The answer is yes, but I would need to look at the

21   autopsies.  That's the basis of my concern.

22          And I'll add, too, that the problem of an execution has to

23   do with the narrative that is recorded, and the narrative

24   frequently is light on details.  So to say -- to ask people who

25   are not trained or observers or anyone who sits there and

1   observes an execution and then says it all went fine is really a

2   false claim.

3   Q.   Okay.  You would agree with me, however, that laypeople who

4   don't understand perhaps medically what's happening to the

5   inmate at the time, they know what they see; correct?

6   A.   I don't know what you mean when you say that they know what

7   they see.

8   Q.   Well --

9   A.   They see things.

10   Q.   Sure.

11   A.   What the meaning of those things are, how it seems to them,

12   I cannot know.

13   Q.   Here's my question:  So in Oklahoma with regard to the

14   Lockett execution, the witnesses to the execution all recognized

15   and realized that something was going wrong.  Right?

16   A.   I would believe that that would be a fair thing to claim.

17   Q.   Right.  And there have been many published news reports as

18   well as an investigation that was conducted in Oklahoma about

19   what went wrong, and they interviewed every witness to that

20   execution and talked to them about what they observed during the

21   execution.  And everyone that was in that room recognized that

22   the inmate -- the drugs weren't working as intended.  Is that

23   fair?

24   A.   I don't know what people thought.  I think that they saw

25   something that was very distressing as it was reported.  So what

1   their understanding as to why it was going that way, I cannot

2   know.

3   Q.   And I agree with you with regard to the why it was

4   happening.   But in terms of what they could visually observe of

5   what was happening to the inmate, they can all see what's going

6   on.   They're watching.   Correct?

7   A.   People are watching the execution and they see things.

8   Q.   And when they see something that they think is going wrong,

9   such as gasping for breath or struggling to sit up and some

10  other things that we've heard about in court throughout the

11  week, they report those things; right?

12  A.   Yes.

13  Q.   And so I'm unaware of anyone reporting those kinds of

14  events for the 20 or so executions that have happened in

15  Florida, so I'm trying to understand if you have some

16  information that I don't have and the Court doesn't have.

17  A.   Well, I'm going to tell you again that if I can refer to

18  the autopsies, that is something that cannot be seen by a

19  witness but that I think is material.

20  Q.   Sure.   The autopsies happen after the inmate has already

21  died; right?

22  A.   Autopsies are generally done on dead people.   Yes.

23  Q.   Well, we're not doctors, so I want to make sure the record

24  is clear.

25  A.   Fair point.

Zivot - Cross

1   Q.   Again, the question is, are you aware of any eyewitness

2   accounts of botched executions in Florida using the midazolam

3   protocol?

4   A.   I'll have to answer that with an anecdote, if I may.

5   Q.   Well, I just -- yes or no was really all that's needed.

6   A.   To me, the fact that I am not aware doesn't mean that it

7   has not taken place.

8   Q.   Fair point.  But are you aware of any?

9   A.   I am not aware of anyone writing anything, but that doesn't

10  mean that it didn't take place.

11  Q.   Thank you.  Now, let's talk about a couple of other things.

12  So it looks like in 2014, you list here CNN with Sanjay Gupta,

13  "Dr. Zivot:  Lethal injection not humane."  Tell us about that.

14  A.   That was an interview on CNN with Sanjay Gupta discussing

15  lethal injection.

16  Q.   Okay.

17  A.   But that's not my title.  I think it's a fair point to make

18  that these are journalists who title these.  These are not my

19  titles.

20  Q.   Okay.  During that interview did you express an opinion

21  that you think that lethal injection was not humane?

22  A.   I never said the word "humane."

23  Q.   What about, "Amicus on Slate with Dahlia Lithwick,"

24  "Botched protocols"?  Did you give an interview to Dahlia

25  Lithwick in connection with that piece?

1    A.    I did.

2    Q.    Okay.  And so you were offering opinions about what you

3    believed to be botched protocols?

4    A.    That's true.

5    Q.    You did not talk to her about -- or him.  I'm not certain.

6    A.    Her.

7    Q.    -- her about any so-called botched executions in Florida?

8    A.    I'm sorry.  In Florida?  I don't recall.

9    Q.    Okay.  *Huffington Post*, 2015:  "Oklahoma wants to reinstate

10   the gas chamber and experts say it's a bad idea."

11        So I'm going to speculate you didn't write that article;

12   right?

13   A.    True.

14   Q.    You were interviewed?

15   A.    Yes.

16   Q.    And were you one of the experts who said it's a bad idea?

17   A.    I was asked a question from someone to comment on nitrogen

18   hypoxia.

19   Q.    Okay.  What is your thoughts on that?

20   A.    I said I'm not an -- the nitrogen has no medical purpose as

21   a therapeutic agent, and so -- and doctors have no experience on

22   rendering people hypoxic with nitrogen.  However, hypoxia can be

23   very uncomfortable and can be -- and the claim was made that

24   this would not be uncomfortable.

25   Q.    Right.

1   A.   And to the extent that I could opine on that, that was the

2   limit of my comment.

3   Q.   So in your view execution by nitrogen hypoxia is just as

4   bad or at least no better than lethal injection or --

5   A.   I have really no comment on that.

6   Q.   Okay.  But you would not suggest that a state -- or you

7   wouldn't support an adoption of a nitrogen hypoxia lethal

8   injection or death protocol?

9   A.   We'd have to go through that in more detail.  That's not

10  really a protocol.  That's just someone coming up with an idea.

11  Q.   Okay.  But hypoxia can cause severe pain?

12  A.   Hypoxia can be uncomfortable, yes.

13  Q.   *Time*, 2015:  "The Harsh Reality of Execution by Firing

14  Squad."  Did you give an interview in connection with that *Time*

15  piece?

16  A.   I'm really no expert in firing squads, so I really -- it

17  may have been that I was commenting on something else within

18  that piece, but I would not have said anything about the firing

19  squad per se.

20  Q.   Okay.  So you don't hold any opinions about whether a

21  firing squad would be -- significantly reduce a risk of severe

22  pain in a lethal injection or a death method?

23  A.   I have no opinion on that.

24  Q.   Okay.  Would you agree that being shot in the chest

25  multiple times by a high-caliber rifle would be painful?

Zivot - Cross

1  A.   It certainly would seem to be painful, but I have no

2  opinion on that.  I don't know.

3  Q.   Okay.

4  A.   Having never been shot.

5  Q.   Okay.  CNN, 2017:  "Executions put Physicians in Unfair

6  Dilemma."  That's an opinion piece.  Did you write that piece?

7  A.   I did.

8  Q.   Again, is this basically what we've already talked about

9  before in terms of what your opinions are on that issue?  If you

10 have more to add, please do.

11 A.   No.

12 Q.   Okay.  And there was also a 2017 opinion piece for CNN,

13 "Gorsuch Grapples with Death:  A Physician's Viewpoint."  Right?

14 A.   Yes.

15 Q.   So, again, you're speaking out publicly against lethal

16 injection?

17 A.   That piece was actually about Gorsuch's view on physician-

18 assisted suicide.

19 Q.   Nothing to do with lethal injection then.

20 A.   Correct.

21 Q.   Are you in favor of physician-assisted suicide?

22 A.   No.

23 Q.   Why not?

24 A.   It's not a doctor's job.

25 Q.   Just like carrying out a death sentence?

Zivot - Cross

1    A.    Killing is not healing.

2    Q.    Now, you've submitted a declaration about Arkansas's lethal

3    injection protocol; correct?

4    A.    Correct.

5    Q.    I know it was Exhibit 17 to the complaint.  I'm not sure if

6    it's been admitted.  I noticed that your declaration does not

7    cite any support for any of your opinions.  You don't cite one

8    scientific article, book, reference, anything.  Right?

9    A.    Correct.

10   Q.    In testifying I haven't heard you mention, you know, any

11   studies or anything to support your opinions, have you?

12   A.    If you're asking me are there studies that specifically

13   address --

14   Q.    No, I'm not asking if there are studies.  I'm just asking

15   if you've cited any.  I can only prepare for trial or for this

16   hearing based on what you put in your declaration because --

17   this was a very accelerated proceeding.  Fair?

18   A.    Yes.  Fair.

19   Q.    So I'm just curious why you didn't cite any references or

20   any support for any of the opinions that you offered in your

21   declaration.

22   A.    I don't think I understand your question.  It's not a

23   requirement to cite papers in this document.

24   Q.    Okay.  So your opinions are based on your experience, your

25   training, your education then?

1    A.   Which would include my personal review of papers.

2    Q.   Okay.

3    A.   So all of that would be there, yes.

4    Q.   Okay.  I'd like to talk about paragraph 9 of your

5    declaration.  Okay.  I'm showing you a document titled,

6    "Declaration of" -- oh, I'm sorry.  Wrong one.

7         I've got a lot of witnesses today.  I apologize.

8    A.   No problem.

9              MS. MERRITT:  Is his declaration in evidence?

10        No.

11   BY MS. MERRITT:

12   Q.   Okay.  This copy is my working copy, but does this appear

13   to be -- it's marked Exhibit 17, page 1.  Declaration of Joel

14   Zivot, M. D.  And it was filed in this case on March 27, 2017.

15   Did I read that correctly?

16   A.   Yes.

17   Q.   Is that your signature, Dr. Zivot?

18   A.   Yes.

19   Q.   Does this appear to be the declaration you submitted in

20   connection with this case?

21   A.   It does.

22   Q.   Paragraph 9 of your declaration on page 2.  Well, it's got

23   all my notes, so I'm going to read it.  It says:  "The use of

24   midazolam is an inappropriate drug for lethal injection.  In a

25   surgical setting it is used as a sedative and in combination

Zivot - Cross

1   with other drugs.  It is not used on its own to induce general

2   anesthesia and is not capable of rendering a patient unaware or

3   insensate to pain."

4       Did I read that correctly?  Does that sound like what you

5   wrote?

6   A.   Sounds like it.

7   Q.   I'll try to put -- paragraph 9.

8   A.   Yes.

9   Q.   Okay.

10  A.   You left out the last sentence there.

11  Q.   Well, I'm not going to ask about that right now.  I don't

12  have to -- I get to ask the questions.

13  A.   Okay.

14  Q.   They can come back and cover with you what they want to.

15  Okay?

16  A.   Sure.

17  Q.   All right.  And what that says is, the company that created

18  midazolam never contemplated that it would be used in the

19  execution of prisoners.  Fair enough; right?

20  A.   Yes.

21  Q.   Drug companies don't like their drugs to be used in the

22  execution of prisoners, do they?

23  A.   It would be stronger than don't like.

24  Q.   They do everything that they can to prevent that; correct?

25  A.   Yes.

Zivot - Cross

1   Q.   Okay.  Now, it appears to me that the basis for paragraph

2   9, you're talking about the use of midazolam in a clinical

3   setting.  Is that fair?

4   A.   Yes.

5   Q.   And so the Arkansas Department of Correction is not using

6   midazolam in a clinical setting, is it?

7   A.   No.

8   Q.   And so the purpose of the lethal injection procedure is to

9   cause the inmate's death.  You understand that?

10  A.   Yes.

11  Q.   Whereas in a clinical setting, you're doing all that you

12  can to sustain the patient's life; right?

13  A.   Yes.

14  Q.   You say in paragraph 9 that midazolam is not used on its

15  own to induce general anesthesia.  Is that right?

16  A.   Yes.

17  Q.   And that is your opinion?  I just want to make sure that

18  you believe that midazolam cannot be used to induce general

19  anesthesia.  Is that your opinion?

20  A.   It is not used.  That's different than cannot.

21  Q.   Okay.  And that's an important point.  It is not used

22  clinically?

23  A.   As an induction agent.

24  Q.   But it could be?

25  A.   Lots of things could be.

Zivot - Cross

1  Q.   Okay.  Let's look at the FDA-approved package insert for

2  midazolam.

3  A.   Sure.

4  Q.   For the record, I'm showing you Defendants' Exhibit 6,

5  which is in the record.

6  A.   That's pretty small print.

7  Q.   Sir?

8  A.   That's pretty small print.

9  Q.   I will zoom in.

10  A.   Okay.

11  Q.   I'm not going to ask you to get your readers out.  Let's

12  see here.  I don't think we could see it with readers, could we?

13  A.   That's readable now.

14  Q.   Is that better?

15  A.   Yeah.

16  Q.   Okay.  Do you generally recognize what this is?

17  A.   I do.

18  Q.   Can you tell the Court what we're looking at?

19  A.   That is the black box warning.

20  Q.   For what drug?

21  A.   For midazolam.

22  Q.   And is this something that's generally familiar to you as

23  an anesthesiologist?

24  A.   Yes.

25  Q.   Are these documents included with drug shipments?

1    A.    They're part of the package insert.

2    Q.    So they're inside of a box of a vial of drugs?

3    A.    I believe so, yes.

4    Q.    And so, you're right, we're looking here at what's the

5    black box warning.  Why is it important when you're using

6    midazolam clinically to continuously monitor your patients for

7    their respiratory and cardiac function?

8    A.    We're going to talk now about midazolam as medicine?  Just

9    so I'm clear.  That's what we're talking about?

10   Q.    Yes.

11   A.    So the standards of medical practice are distinct, to your

12   point, as to what Arkansas is contemplating.  And what we are

13   trying to do here basically is not kill our patients.

14   Q.    Sure.  That's your top goal as a clinician.

15   A.    And --

16   Q.    Right?

17   A.    -- we're also extremely safety concerned.  So, for example,

18   as an anesthesiologist, I might not do something if it has a one

19   in a hundred thousand chance of taking place.  That's the kind

20   of level of scrutiny and safety that my profession demands and,

21   in fact, is famous for.

22         So warnings like this must be taken in context.  What they

23   are saying is that there is a chance, and if that chance is

24   extremely small, nonetheless, there is a chance of harm,

25   unanticipated harm, that would occur as a consequence of the use

1   of midazolam.  I don't think that's in dispute.

2   Q.    No.  Midazolam is a central nervous system depressant;

3   right?

4   A.    Yes.

5   Q.    And CNS depressants can cause respiratory failure if not

6   monitored; right?

7   A.    It depends.  I think that that's a pretty broad statement.

8   I'd have to unpack that a little bit.

9   Q.    Let's step it back a little bit then.  Your brain, your

10  central nervous system is in the brain; right?  Part of it.

11  A.    Keep going.

12  Q.    Your CNS controls respiratory function.  Yes?

13  A.    Partly, yeah.

14  Q.    And so if you are administering in the clinical setting a

15  respiratory depressant, then you need to closely, continuously

16  monitor your patient for their respiratory and cardiac function

17  to make sure that they can keep breathing during the procedure.

18  Is that fair?

19  A.    Patients who get midazolam may have some alterations in

20  their respiratory function.

21  Q.    What do you mean by alterations in respiratory function?

22  A.    It may change.

23  Q.    Meaning what?

24  A.    Meaning that it may be different than what would normally

25  take place under a normal physiologic state.

1  Q.   Okay.  So as I stand here in front of you, I'm breathing,

2  no problems.  A patient under midazolam, would they -- perhaps

3  their tongue could go back into the back of their throat and

4  obstruct the airway?  Is that one thing that could happen?

5  A.   It's possible.  It's possible.

6  Q.   What are some other things that might happen to a patient

7  under midazolam sedation?

8  A.   Well, midazolam is used frequently in two -- or maybe in

9  two different sorts of situations.  It's used as an adjunct, as

10 the beginning part of an anesthetic that would involve many

11 medications.

12 Q.   Can I stop you there?  Many medications?  And you're

13 speaking in terms of a general anesthetic for a surgical

14 procedure?

15 A.   Or something of that nature, yes.  An anesthetic that may

16 or may not be a, quote, general anesthetic.

17 Q.   Okay.  And then --

18 A.   And sometimes there are procedures where the intention is

19 that a person not undergo a general anesthetic, that's not

20 contemplated, and midazolam is used as a sedative because we

21 recognize midazolam has some beneficial effects on reducing

22 anxiety and impairing memory.

23      So, for example, midazolam will be used during a heart

24 catheterization.  In that setting, a person is awake, having a

25 heart catheterization procedure, say, to determine whether

1    they've got blockages in the arteries of their heart.  And

2    they're lying out in what's called the cath lab.  That's kind of

3    the jargon for where it's done.  And the cardiologist here will

4    direct a nurse to inject some midazolam.

5    Q.    How much?

6    A.    You know, it could be maybe 1 or 2 milligrams at a time.

7    Q.    Okay.

8    A.    But it could go on for hours and hours, and so the

9    midazolam would be continuously redosed.

10   Q.    Okay.  To keep them at that kind of 1-, 2-milligram level?

11   A.    To keep them at a level of comfort.  So it's not so much

12   based upon how much they give; it's just based upon how a person

13   is managing.

14   Q.    Got you.  And otherwise -- what would happen if you did not

15   give the patient that 1- to 2-milligram dose of midazolam prior

16   to a heart catheterization?

17   A.    It could be uncomfortable for them.  It could be

18   uncomfortable, anxiety producing, say.  But I don't think --

19   honestly, it's not -- sometimes there's not a lot of time spent

20   on helping people feel calm.  We just do it with chemicals.

21   Q.    Right.  Okay.  We were talking about the use of midazolam

22   before the induction of general anesthesia.  And as I understood

23   your testimony, you said, no, that doesn't happen.  You don't

24   use it that way clinically?  Is that what you said?

25   A.    Correct.

1    Q.   Now here I'm looking further down on page 1 of Defendants'

2    Exhibit 6 under the clinical pharmacology section.  And I'm

3    going to read here.  It says, "When midazolam is given IV as an

4    anesthetic induction agent, induction of anesthesia occurs in

5    approximately 1.5 minutes when narcotic premedication has been

6    administered and in 2 to 2.5 minutes without narcotic

7    premedication or other sedative premedication."

8         Did I read that right?

9    A.   Yes.

10   Q.   So the manufacturer of midazolam is telling physicians and

11   anesthesiologists that you can give midazolam to induce

12   anesthesia and that the medicine will take effect in two to two

13   and a half minutes.  Is that what that says?

14   A.   That's what that says.

15   Q.   Okay.  And just so we're clear, there was some testimony

16   about whether midazolam might precipitate when mixed with

17   saline.  I think you had some statement in your declaration

18   about that.

19   A.   Yes.

20   Q.   And according to the FDA-approved package insert, it talks

21   about the fact that midazolam may be diluted with .9 percent

22   sodium chloride in water.  Is that what that says?

23   A.   Well, it's also specifying a much smaller quantity than

24   you're talking about here --

25   Q.   Okay.

1   A.   -- in Arkansas.  So it says that -- and we know that

2   midazolam -- all benzodiazepines are generally not water

3   soluble, so they have to be made water soluble.  They actually

4   have to be made soluble -- actually, let me just rephrase that.

5        Midazolam is unusual because it was the first

6   benzodiazepine that actually could be formulated as a water

7   soluble, in a water soluble form.  That's what was new about

8   midazolam.

9        In earlier kinds of benzodiazepines, like diazepam, it has

10  to be mixed in a special emulsion that made it injectable.

11  Q.   Okay.  If I could stop you there.

12  A.   Yeah.

13  Q.   When you give midazolam, it is an intravenous drug;

14  correct?

15  A.   It can be given orally as well.

16  Q.   Or intramuscularly?

17  A.   Intramuscular, too.

18  Q.   When you're giving it intravenously --

19  A.   Yes.

20  Q.   -- isn't the first step always to -- first you have to

21  place the IV line and start a saline drip every single time that

22  you anesthetize a patient?

23  A.   Saline or not necessarily saline, but other things.

24  Q.   Other things.  But you've got some kind of fluid flowing

25  through the tubing into the patient.  Right?

1  A.   There are certain kinds of --

2  Q.   Can you answer my question?

3  A.   Flowing?  Yes.

4  Q.   If I go in to induce labor, if I'm a pregnant mother and I

5  go in to induce labor, the first thing they do, they set IV

6  lines; right?

7  A.   Well, I don't know if it's the first thing that they do.

8  Q.   Well, I'm just saying in terms of administering medication,

9  for example, for the induction of labor in a pregnant mother.

10 When you set an IV line, they always do a saline drip, and then

11 when the doctor orders whatever the medication might be, you

12 always have to first start a saline drip.  Is that right?

13 A.   No.  That's not right.  Sometimes medicine can be directly

14 injected directly into a catheter that doesn't have an IV hooked

15 up into it.

16 Q.   In clinical practice, is it unusual that you would sedate a

17 patient with midazolam who has previously been hooked up to an

18 IV saline drip?  Is it unusual for that to happen?  Is that your

19 testimony?

20 A.   Ask me your question again.  I'm not clear what you're

21 asking me.

22 Q.   Let me rephrase.  Would it be uncommon for a patient of

23 yours to have an IV saline drip going at the time that you go in

24 to give them that 1- or 2-milligram dose of midazolam to sedate

25 them for the heart catheterization procedure?  Would that be

Zivot - Cross

1    uncommon?

2    A.    No, that would not be uncommon.

3    Q.    Okay.  Thank you.

4    A.    But it's a much smaller quantity.

5    Q.    Okay.

6    A.    1 to 2 milligrams is not 500 milligrams.  And I think that

7    that's critical here.

8    Q.    And just to be clear in terms of induction of anesthesia,

9    this is another later page of the Defendants' Exhibit 6, it

10   says:  "Induction of Anesthesia.  For induction of general

11   anesthesia, before administration of other anesthetic agents."

12        Did I read that correctly?

13   A.    No one --

14   Q.    Did I read it correctly, Doctor?

15   A.    Well, not exactly, but -- anesthetic is the way that word

16   is pronounced.

17   Q.    I mispronounced the word?

18   A.    A little bit.

19   Q.    Correct me.  Tell me.

20   A.    I just told you.  Anesthetic.

21   Q.    Anesthetic?

22   A.    Yes.  But I agree that those are the words in English, and

23   I can read them, too.

24   Q.    You understand, I have to make a record for the Court.  So

25   we have to read words into the record so that the written record

1   reflects --

2   A.   I got it.  But if you're asking me can I read those words

3   in English, I can.  If you're asking me a question about

4   meaning, then that's a different question.

5   Q.   Okay.  Why don't you read this in English for me then.

6   A.   "When midazolam is used before other intravenous agents for

7   induction of anesthesia."

8        More?

9        "The initial dose of each agent may be significantly

10  reduced, at times to as low as 25% of the usual initial dose of

11  the individual agents."

12  Q.   Okay.  So, again, the manufacturer of midazolam is giving

13  physicians like yourself instructions about what to do when

14  you're going to use midazolam to induce general anesthesia

15  before other intravenous agents; correct?

16  A.   I'm not disputing what it says.  I'm disputing that it's

17  commonly done.

18  Q.   Okay.

19  A.   That's all.

20  Q.   So the fact that it's not commonly done in your current

21  clinical practice does not mean that it can't be done, does it,

22  Doctor, for the purpose --

23  A.   Well, if you're talking about medicine, okay, we're talking

24  in a conversation about treatment, what you want from me if I'm

25  your doctor, you want me to be giving you the best things that I

1    know how to do using the best information based upon my practice

2    and so on.  You don't want me to just say, "I know, I'll just

3    try this on you today."  So, you're right, I can do a lot of

4    things.  And a label indication does not confine me to go off

5    that label.  Once a drug is used, I can use it in a number of

6    ways.  But you don't want me fiddling with you like that.  You

7    want me to do what's best for you.  And what's best for you is

8    based upon my collective experience, the experience of my

9    colleagues, what people say and do.

10        The FDA, when they write these labels, they're a broad

11   document.  They're not meant to be -- to say to

12   anesthesiologists you should use midazolam as an induction

13   agent.  It in no way says that.  It can.  Again, a lot of things

14   can be done.  But the common practice is, midazolam is not used

15   as an induction agent.  It's just not commonly used.

16   Q.   It's not commonly used as an induction agent today in your

17   clinical practice.  Is that fair?

18   A.   Correct.

19   Q.   The fact that -- so in your opinion midazolam is not the

20   best medicine to induce general anesthesia?

21   A.   Correct.

22   Q.   And that's why you don't use it in your current clinical

23   practice to induce general anesthesia?

24   A.   I and many others.

25   Q.   But if you had no other drug available, you could use

1   midazolam to induce general anesthesia, according to the

2   manufacturer and the FDA; right?

3   A.   Well, we can create an imaginary scenario.

4   Q.   Imagine with me that you have midazolam and nothing else to

5   induce general anesthesia in a patient.  You could use it for

6   that purpose; correct?

7   A.   As an induction agent.

8   Q.   To induce general anesthesia, you could use midazolam, as

9   we just went over in the package insert.  You could; right?

10  A.   It can be used.

11  Q.   Thank you.  It can be used.  Now --

12  A.   But that's not lethal injection.  That's just induction of

13  general anesthesia.

14  Q.   I'm not asking you that.  I'm just asking, in your clinical

15  practice, could you do it.

16  A.   Okay.

17  Q.   And do you have any medical literature that shows that a

18  person given a 500-milligram dose intravenously of midazolam

19  would remain conscious and able to feel pain?

20  A.   I also don't have the opposite of that.

21  Q.   So the answer is no?

22  A.   There is no medical literature that addresses the question

23  in any regard as to what you've said.

24  Q.   And why is that?  Why can't we study the effect of a 500-

25  milligram dose of midazolam?

1  A.   Why can't we?  In what circumstance?  In the circumstance

2  of lethal injection or just generally?

3  Q.   As a general matter, is it possible for a researcher to

4  conduct a study about how a 500-milligram dose of midazolam

5  would affect a person?

6  A.   I can't think of a reason why anyone would want to do that

7  study.

8  Q.   Why not?

9  A.   Because it would be excessive to the amount of midazolam

10 that would be required to achieve the way midazolam is commonly

11 used.

12 Q.   Would it be unethical to conduct that study on a human

13 being?

14 A.   Well, I would have to know the protocol and what was being

15 asked.  So, again, once a drug has a, you know, an indication,

16 sometimes it's clear that another indication may have emerged,

17 may emerge as a consequence of serendipity.

18      So, for example, Viagra, which is a drug that turns out to

19 have some effect on erectile dysfunction, was not actually the

20 intended use of that drug.  It actually was intended to be used

21 for the treatment of pulmonary hypertension.  So the side

22 effect, the other effect of Viagra, occurred without intent.

23 Q.   Okay.  Let me ask you this:  A 500-milligram dose of

24 midazolam is well beyond the known lethal dose of the drug as

25 reported in the literature, isn't it?

1   A.    That would be incorrect.

2   Q.    Okay.  But doesn't the FDA-approved package insert give a

3   black box warning about the risk of death from regular clinical

4   doses of midazolam?

5   A.    You said 500 milligrams is a known lethal dose, and that's

6   distracting me.

7   Q.    What I said is, isn't it well beyond the known lethal dose

8   as reported in the literature?

9   A.    I don't know what the lethal dose is.  That's what I'm not

10  clear on because people -- what that's saying, midazolam maybe

11  in any dose can occasionally cause trouble.  I think that's what

12  that's saying.  It doesn't say in very, very large dosages, you

13  should be careful.

14  Q.    So when the manufacturers of midazolam prepared this

15  package insert, they're giving instructions for clinicians to

16  use it for the treatment of patients; correct?

17  A.    I think that these documents are also advised by -- with a

18  legal ramification in mind, to be frank.

19  Q.    Okay.  It looks like my zoom is not very clear.

20        So if you could, Doctor, read the first two sentences that

21  I'm pointing out under adult and pediatric --

22  A.    "Intravenous midazolam has been associated with respiratory

23  depression and respiratory arrest, especially when used for

24  sedation in noncritical care settings.  In some cases, where

25  this was not recognized promptly and treated effectively, death

1   or hypoxic encephalopathy has resulted."

2   Q.   So the manufacturer is warning everyone, be careful with

3   this drug.  It can be lethal.  Is that fair?

4   A.   That is correct.

5   Q.   Okay.  And the manufacturer would never recommend,

6   according to the dosing instructions, giving a patient anywhere

7   near 500 milligrams, would it?

8   A.   It doesn't say that in this package insert, if that's what

9   you're asking me.  There's no mention of a dose of that size.

10  Q.   Well, okay.  Let's talk about what's the clinical dose of

11  midazolam.  If you were going to use midazolam to induce general

12  anesthesia, how much would you give a 200-pound man?

13  A.   I'd never do it.

14  Q.   If you would, if you had to, how much would you give him?

15  20, 30 milligrams?

16  A.   I never do it, so I don't know what you're asking me.

17  Like, I don't know why I would do this.

18  Q.   Okay.  Let me rephrase then.  Would giving a grown man, a

19  200-pound man, a 20- to 30-milligram dose of midazolam generally

20  be considered for an induction dose of midazolam?

21  A.   Well, I can tell you that I have given a 100-pound man 10

22  milligrams of midazolam and nothing happened.

23  Q.   And have you also given an elderly patient 3 or 4

24  milligrams of midazolam and they almost died or could have died

25  without respiratory support?

Zivot - Cross

1    A.    I'm not that careless.

2    Q.    Are you aware of deaths having occurred with midazolam in

3    doses under 10 milligrams?

4    A.    Honestly not.  Maybe reported, but have I seen it?

5    Q.    In the literature.  You said you've done research on this

6    issue?

7    A.    There may be anecdotes, yes.

8    Q.    So there have been reports in the literature of people

9    dying from midazolam from doses 10, 20, 30 milligrams.  Fair?

10   A.    But you'd have to look at the whole story.  If you're

11   talking about someone who is critically ill and what other

12   medications they have, I'm not --

13   Q.    And I understand that.

14   A.    So I don't know where you're going with this here.  Like,

15   midazolam --

16   Q.    You said in your report that midazolam is not a toxic,

17   lethal drug, and that's just not true, is it?

18   A.    Not a toxic, lethal drug.  It's designed specifically to be

19   not those things.  But can it cause harm under extraordinary,

20   unusual circumstances or idiosyncratic -- can there be

21   idiosyncratic circumstances?  Yes.

22   Q.    Let me ask it this way:  Would you be okay with giving a

23   patient 2 milligrams of midazolam and then walking away without

24   monitoring that patient to make sure that they were breathing

25   okay?

1    A.    I think you're asking me about bad medical practice, so I'm

2    not really clear what --

3    Q.    So the answer is no, you wouldn't be okay with that?

4    A.    Would I walk away and leave them alone after giving them a

5    medication like that?

6    Q.    That's what I'm asking you.  Yes.

7    A.    Someone would be there to monitor them.  There would be

8    some monitoring that would be left in place, either --

9    Q.    Because there's a risk that they might stop breathing with

10   even a small, 4-milligram, 2-milligram dose; right?

11   A.    That risk is pretty small.  It's quite -- vanishingly

12   small, and I would not give that to someone where I thought that

13   that was a likely risk.

14   Q.    But because it is a known risk, you constantly monitor a

15   patient if you give them even 4 milligrams of midazolam;

16   correct?

17   A.    Well, as I said to you that we're -- my profession is the

18   one in a hundred thousand, so we're a bit obsessive.

19   Q.    Okay.  How about the 10-milligram dosage?  Would you be

20   comfortable treating a patient giving them 10 milligrams of

21   midazolam and then leaving them alone in their bed in the

22   hospital room?

23   A.    Once a patient is under my care, I don't leave them alone.

24   Q.    Okay.  What's the largest single dose of midazolam that

25   you've ever given a patient clinically?

1    A.    I've given 10 milligrams at a time.

2    Q.    Okay.  And what happens after you give a patient 10

3    milligrams of midazolam?

4    A.    Well, in this case, not much.

5    Q.    Okay.  What about another patient?  Have you ever given a

6    patient, another patient, 10 milligrams and they needed to be

7    intubated and mechanical ventilation provided?

8    A.    No.  Never done that.

9    Q.    Okay.  You watched them to make sure that they're breathing

10   okay, though?

11   A.    I wouldn't give a quantity of midazolam like that

12   without -- and, again, once a patient gets any quantity of

13   medication from me, they're not left alone.

14   Q.    Okay.  Paragraph 11 of your report talks about the risk of

15   paradoxical hyperreactivity reactions that could possibly occur.

16   What is the risk of a paradoxical hyperreactivity reaction if

17   given a 500-milligram intravenous dose of midazolam?

18   A.    500 milligrams, I don't know.  But large dosages of

19   midazolam have been reported as paradoxical more often than

20   midazolam death, I would say.

21   Q.    And is it a very small risk, but a known risk?

22   A.    In the same way that the package insert has that kind of

23   provision just to let you know, this is the same sort of thing.

24   But, you know, I think that this is something that's described,

25   these paradoxical reactions.  Actually, paradoxical reaction to

1    sedation is actually not that uncommon.  I've seen it with other

2    medications, too.

3    Q.    Going back to Defendants' 6 then, I'm going to see what the

4    manufacturer of midazolam says about paradoxical reactions.

5          Here it says, "Adverse reactions."  Right?

6    A.    Yes.

7    Q.    And it's giving some warnings.  Here it's talking about

8    intramuscular administration, which is not relevant to why we're

9    here today.

10   A.    Uh-huh.

11   Q.    And here it says:  "The following additional adverse

12   reactions were reported subsequent to intravenous administration

13   as a single sedative/anxiolytic" --

14   A.    Amnestic.

15   Q.    -- "amnestic agent" --

16   A.    Which is a small dose.  They mean a small dose there.

17   Q.    Okay.  -- "agent in adult patients."

18   A.    Yes.

19   Q.    So do you see hyperreactivity listed here at all as a --

20   A.    This is a small dose.  I said in large dosages, it can

21   cause that.  So this doesn't say -- when they talk about a

22   single dose here for sedation, anxiolysis, or amnesia, they're

23   talking about a small dose.

24   Q.    Okay.  It goes on to talk about pediatric patients.  The

25   risk of paradoxical reactions is much higher in pediatric

1    patients than it is in adults.  Right?

2    A.    I don't think it says paradoxical reactions in adults.  I'd

3    have to look through this.  But I see what it says there for

4    pediatric patients, anyway.

5    Q.    Would you agree with me that the risk of paradoxical

6    reaction is small?

7    A.    Two percent is a small number, probably.  It depends on

8    what the reaction is.

9    Q.    Okay.  And in terms of a paradoxical hyperreactivity

10   reaction, what that would mean is that the midazolam would not

11   work; is that right?  It would not sedate or anesthetize the

12   patient.

13   A.    It would not sedate them in the way that I think you

14   intend.

15   Q.    Right.  And so would an inmate suffering from a paradoxical

16   hyperreactivity reaction to the 500-milligram dose of midazolam,

17   would he appear to be unconscious on the table?

18   A.    I think if someone has a paradoxical reaction, it means

19   that they're manifestly agitated.

20   Q.    Okay.  So --

21   A.    So I would say, no, it would not appear to be -- what's the

22   word?  I'm sorry.

23   Q.    Unconscious.  So they wouldn't pass a consciousness check,

24   would they?

25   A.    I don't know what you mean when you say consciousness.  I

Zivot - Cross

1   know it's defined here, but that is not a term of art in

2   medicine, just to be clear.

3   Q.   You disagree with me that they would not appear to be

4   unconscious; they would appear to be awake.  Correct?

5   A.   I didn't say that.  I don't know what you think -- would

6   they be reactive?  I mean, they might be reactive.  They may be

7   moving.  They may be vocalizing.

8   Q.   A paradoxical hyperreactivity reaction would be obvious to

9   the people dispensing the drug, wouldn't it?

10  A.   It depends on --

11  Q.   If they're medically trained people?

12  A.   -- if they were able to note that.

13  Q.   Okay.

14  A.   These people are quite restrained.  They're restrained

15  quite completely, and so --

16  Q.   Would you expect a patient or an inmate who is experiencing

17  a paradoxical hyperreactivity reaction to be able to speak?

18  A.   Don't know.

19  Q.   Would they be able to open their eyes?

20  A.   Maybe.

21  Q.   Okay.  Let me ask you this:  When a patient is unconscious,

22  he cannot experience pain, could he?

23  A.   I don't know what you mean when you say unconscious.  And I

24  don't mean to be coy here, but I think it's important that we --

25  I don't know what you mean when you say unconscious.

Zivot - Cross                                938

1   Q.   If you were to give a patient an induction agent to induce

2   anesthesia -- I understand you would not use midazolam -- what

3   would you use?

4   A.   I would use -- most commonly I would use a drug called

5   propofol.

6   Q.   Okay.  Propofol is what's used clinically.  Have you ever

7   used midazolam to induce anesthesia?

8   A.   Maybe once.

9   Q.   So when you use it to induce anesthesia, the reason that

10  it's a good drug or it could be used as a drug to induce

11  anesthesia, you're trying to quickly get a patient to a deep

12  level of sedation.  Is that fair?

13  A.   Are we talking about midazolam or just broadly --

14  Q.   Broadly, an induction agent to induce anesthesia.  What's

15  the purpose?  You don't want it to take an hour.  You're trying

16  to get them there quickly; right?

17  A.   It's intended to create kind of a state of unresponsiveness

18  that would allow subsequent procedures to occur.

19  Q.   And so when you give them that induction drug, what happens

20  then?  Don't you immediately place an endotracheal tube?

21  A.   It depends.  The entirety of an induction involves more

22  than a single drug.

23  Q.   Absolutely.  I'm just asking you, step one is the induction

24  drug; step two, would that be the placement of an endotracheal

25  tube?

1   A.   There is not a single drug here.  It would be incorrect to

2   characterize this as a single drug.  It's a combination of

3   things.

4   Q.   What's the first drug that you would give to a patient to

5   induce anesthesia?

6   A.   Oxygen.

7   Q.   And then after that?

8   A.   I would give maybe 10 milligrams of intravenous lidocaine,

9   followed by 10 milligrams of ketamine, followed by 50 mics of

10  fentanyl, followed by another 10 milligrams of lidocaine while

11  encouraging them to take deep respirations, followed by -- with

12  an ongoing evaluation of their vital signs.  And then I would

13  start some propofol.  I wouldn't rush it.  I would do it slowly.

14  I would watch their vital signs, watch their breathing, watch

15  their oxygen saturation.

16       At some point after some combination of these drugs, I

17  would then -- when I was fairly confident that they were in an

18  unresponsive state, I would proceed to give them a muscle

19  relaxant.

20  Q.   And if I could stop you there, what would you do to reach a

21  level of confidence in the patient's unresponsive state?

22  A.   Well, I'll tell you that unresponsiveness is impossible to

23  verify with certainty.  It is only based upon, you know,

24  clinical experience, for which there is a lot, but still it's an

25  assumption.  I'm making an assumption that their level of

1  unresponsiveness is sufficient for me now to paralyze them and

2  then secure the area, which I think is what you're asking me.

3  Q.    Well, I'm asking you, what do you do to give yourself a

4  level of confidence that they've reached that level?  Do you do

5  the eyelash rub?  Do you do the sternum rub?  Do you do the

6  pinch?  What do you do?

7  A.    It depends.  I might do an eyelash check.  I think that

8  that's very imperfect.  You know, I might I call their name.  I

9  look at their pattern of respiration.  And I can tell you that

10 having done all of those things and being satisfied, I have

11 subsequently intubated people and they have reacted.  So I will

12 tell you that that test is imperfect.  Even though I have been

13 doing it for 20 -- almost 25 years, it's an imperfect test.

14 Q.    Sure.  So it happens to you that you believe that they're

15 sufficiently unconscious, but, in fact, they're aware?

16 A.    Unresponsive.

17 Q.    Unresponsive?

18 A.    Unresponsive.  Yeah.

19 Q.    Okay.

20 A.    And it turns out that when I go ahead to intubate them,

21 they react.

22 Q.    That's not a common occurrence, though, is it?

23 A.    It happens.  It happens.  You know, we have to talk about

24 what common means, but it happens on a regular basis that people

25 still react.

Zivot - Cross                                          941

1   Q.    And so when we are undergoing medical procedures,

2   surgeries, diagnostic testing out in the real world, there's

3   always some risk that we're going to experience some pain;

4   right?

5   A.    There is that risk.  And, in fact, I never guarantee

6   patients that they will not have that experience.

7   Q.    Right.  You do all you can to prevent that, but --

8   A.    Correct.

9   Q.    But you can't always do that, can you?

10  A.    I cannot guarantee that they will not have some experience

11  that they will recall.

12  Q.    Okay.  And is that part of the reason, another good reason

13  to use midazolam?  It helps patients not remember?  Should they

14  feel pain, they don't remember it later?

15  A.    Well, we try that, yes.  I mean, that's really what

16  midazolam I think is -- that's the niche that it occupies.

17  Q.    Is the amnestic effect?

18  A.    It creates amnesia.  But I will tell you, what's

19  interesting about midazolam is, when I have given midazolam, I

20  have had conversations with people after midazolam that seem

21  quite cogent and on point.

22  Q.    After you've given them the drug, you mean?

23  A.    Yes.

24  Q.    But then later, did they remember that conversation?

25  A.    They usually don't, yeah.

1    Q.    Okay.  That's my --

2    A.    But they experience it in the moment.  That's the point is

3    that it's not a -- what we're trying to block there is the

4    recollection of something because midazolam does not necessarily

5    ablate the experience in the moment.

6    Q.    Isn't it true that midazolam could be used for the

7    induction of anesthesia and used as the sole anesthetic for very

8    painful medical procedures?  Not that you would, but could it be

9    used for that purpose?

10   A.    Give me an example of what you mean.  What procedure are

11   you talking about?

12   Q.    An endotracheal intubation.

13   A.    I don't know why I would ever do that.

14   Q.    I'm not asking you why, but could you do it?

15   A.    Again, I could practice poor medicine in a number of ways,

16   and that would be one of them.

17   Q.    The midazolam could be used to induce anesthesia and used

18   as the sole anesthetic for painful medical procedures.  You

19   agree with that; right?

20   A.    I mean, could and should is different.

21   Q.    I understand.

22   A.    People can do a lot of things.

23   Q.    Not that you would, but it could be used; fair?

24   A.    People who practice badly could do all sorts of things.

25   Q.    So the answer is yes.  It could be used for painful --

Zivot - Cross

1    A.    It could be used.

2    Q.    -- medical procedures?

3    A.    Well, it's not an analgesic.

4    Q.    It could be used to induce general anesthesia and used as

5    the only anesthetic agent for painful medical procedures?

6    A.    Again, we could also just give them saline.  I don't know

7    what you're asking me.  Could we?  I mean, you can do a lot of

8    things.  So you could give it, but it would be insufficient.

9    That's all.

10   Q.    So you're unaware of studies reported in the medical

11   literature that used midazolam as the sole agent to induce

12   general anesthesia and then -- for painful medical procedures,

13   such as a C-section?

14   A.    I've read this report.  I can tell you that you're talking

15   about a very specific kind of situation.

16   Q.    Okay.  And I'm trying to move through because we are on

17   limited time.

18   A.    Sure.

19   Q.    So you're aware that there is reported medical literature

20   that you can use midazolam to induce general anesthesia prior to

21   very painful medical procedures.  Right, Doctor?

22   A.    I'm aware that people do that, if that's what you're asking

23   me.

24   Q.    All right.  Thank you.  Thank you.

25   A.    Yeah.

1    Q.    Let's talk about drugs losing their efficacy or becoming

2    poison.  You have an opinion in your declaration that when drugs

3    expire, they either, one, lose their efficacy, or, two, become

4    poison.  Is that a fair characterization of what you had in your

5    report?

6    A.    Broadly.

7    Q.    Okay.  Is there any evidence in the scientific literature

8    that midazolam becomes poison after it expires?

9    A.    I'm not aware of any.

10   Q.    And the FDA has to approve the expiration dates shown on

11   drug vials, doesn't it?

12   A.    I believe so, yes.

13   Q.    Now, in your opinion, because you want to be as careful as

14   you can in medicine for your patients, do you think that the FDA

15   would approve the designation of an expiration date for a drug

16   that is anywhere close to the date at which it would become

17   ineffective for its intended and approved use?

18   A.    I can't speak to the mind of the FDA here.

19   Q.    Okay.

20   A.    I can tell you practically that, you know, I don't like to

21   use -- we don't use medications that are close to their

22   expiration date.

23   Q.    Is it common practice in a clinical setting to draw up

24   anesthetic drugs in a syringe and then use them 15, 20 minutes

25   later or hours later?

1  A.    It depends.  I mean, if a drug is drawn up in a -- it

2  depends.  Like, if I draw up a drug --

3  Q.    I'm not asking you.  Let's say in your -- in an emergency

4  department, is it common to have emergency drugs on hand that

5  you could use throughout the day should an emergency come in and

6  they need a quick administration of anesthetic agent?

7  A.    This is actually quite a controversial point.

8  Q.    Okay.

9  A.    Because when drugs are drawn up, you know, once the sterile

10 container is entered, then the sterility of the drug, of course,

11 can no longer be guaranteed.

12       So drawing up is one thing.  Handling is another.  Storage

13 is another.  So if a drug is drawn up into a syringe, then it

14 may be placed in a refrigerator, you know, for a period of time

15 before it's used.  Something like that may take place.

16       But, generally speaking, the ideal situation is that a drug

17 is drawn up from a sterile container and then used, you know,

18 promptly.  That's the ideal.

19 Q.    Okay.  That's the ideal.  But you wouldn't say it would be

20 uncommon, for example, for a central pharmacy in a hospital to

21 draw up syringes, and then they get distributed to their

22 departments and they are used later that day?  That would not be

23 uncommon, would it, Doctor?

24 A.    And they would be putting them, storing them, having them

25 in a very specific way.

Zivot - Cross

1    Q.    But would it be uncommon for that to happen?

2    A.    It happens.

3    Q.    Okay.  You don't have any evidence that midazolam will

4    become contaminated if drawn into a syringe on the morning date

5    of an execution and then it's used that night?  You don't know

6    that it would become contaminated.  You're just speculating on

7    that; right?

8    A.    I don't know how they're doing it.  I don't know what

9    technique they're using to employ the drugs.  Right.

10   Q.    Why is the risk of contamination important in your clinical

11   practice?

12   A.    Because contamination can result in then a subsequent

13   injection of an infectious moiety into a patient.

14   Q.    Does contamination affect the potency of the drug?

15   A.    When we say contamination, it's a broad -- if it's mixing

16   with something it's not supposed to be mixed with, if it's a

17   concentration -- I mean, contamination is a broad term.  So if

18   we can talk about contamination, say, with bacteria, that's one

19   kind of contamination.  Contamination with maybe other kinds of

20   drugs, where they're mixed together inadvertently.

21   Q.    Right.

22   A.    Or where the concentration is not correct or something of

23   that nature.

24   Q.    Will bacteria grow at a pH of two and a half to three?

25   A.    Some bacteria do.

Zivot - Cross

1    Q.   But in this case, for the Arkansas Department of

2    Corrections purposes, contamination with bacteria, for example,

3    wouldn't really be an issue in the lethal injection context,

4    would it?

5    A.   I don't think the Arkansas protocol intends to kill people

6    with bacteria.

7    Q.   Okay.  And if there were some bacteria in the syringe, that

8    wouldn't impact the efficacy or the pharmacological effects of

9    the midazolam, would it?

10   A.   Are you telling me that Arkansas is permitting the

11   possibility that they will be injecting infected materials?

12   Q.   No, not at all.  You stated in your report that there is a

13   risk of contamination if drugs are drawn into syringes and then

14   used later; right?

15   A.   You asked me if I think it's important if bacteria are in

16   the syringes that are injected.  That was what you asked me.

17   And so my answer is, I didn't think that Arkansas was

18   contemplating injecting bacteria directly into the inmates as

19   part of the lethal injection protocol.  That doesn't seem to be

20   right.

21   Q.   You're correct.  Arkansas does not contemplate that.

22   A.   And so, therefore, it wouldn't be important to exclude

23   that.

24   Q.   It's entirely speculative for you to say that there will be

25   contamination of these drugs; correct?  You don't know what's

1    going to happen.

2    A.    I don't know what's going to happen in the future.

3    Q.    Okay.  And you may not know this, but the law is going to

4    assume that Arkansas is going to follow the protocol as written.

5    Do you understand that?

6    A.    I assume the law assumes that, yes.

7    Q.    Okay.  In a clinical setting, do nurses administer drugs

8    through IVs?

9    A.    Yes, some nurses.  Sometimes.

10   Q.    Sure.  So you might write an order for a drug and a nurse

11   might push it; right?

12   A.    Yes.

13   Q.    And then they would watch the patient for signs of problems

14   with the IV?  Infiltration, for example?

15   A.    Yes.

16   Q.    Are you aware that the ADC's lethal injection procedures

17   provide that two people who are experienced in placing and

18   pushing IV drugs will be constantly monitoring the inmate's IV

19   infusion site for evidence of infiltrate, vein collapse, or

20   other problems?

21   A.    Are these the people that are looking through glass?

22   Q.    I'm not asking you about qualifications.  Do you know that

23   the policy provides that?

24   A.    I don't know what qualifications.  I know qualification is

25   a word.  I don't know what it means here specifically.  To be

Zivot - Cross

 1  qualified is --

 2  Q.    And I'm not asking about qualifications.  I'm just asking

 3  if you're aware that the policy provides that two people who are

 4  experienced in placing and pushing IV drugs will be constantly

 5  monitoring the inmate's IV infusion site for evidence of

 6  infiltrate, vein collapse, or other problems?  Are you aware of

 7  that?

 8  A.    I think you're reading that, so if that's what it says,

 9  yes, I'm aware of that.

10  Q.    Are you also aware that the ADC will have the ability to

11  switch the drug flow to an alternate IV site if necessary?

12  A.    I'm aware that that's what they claim.

13  Q.    Okay.  Isn't it true that healthcare providers like EMTs

14  and nurses routinely assess consciousness of patients using a

15  variety of medically appropriate methods?

16  A.    Are we talking about -- what are we talking about here?

17  Like, in a clinical setting?

18  Q.    Sure.

19  A.    Sure.  Clinical setting, that a variety of people may make

20  claims, may do evaluations of this nature.

21  Q.    Are you aware of the data on BIS levels that demonstrates

22  that you can achieve a BIS in the range of 60 or lower with

23  midazolam, which is the target for general anesthesia?

24  A.    I'm not aware that the Arkansas protocol uses a BIS

25  monitor.

Zivot - Cross                              950

1   Q.   They don't.  I'm asking you if you're aware of scientific
2   literature that shows that midazolam can achieve a BIS of under
3   60?
4   A.   As a sole agent?  Is that what you're asking me?  Or in
5   combination with other agents?
6   Q.   As a sole agent.  Are you aware of that?
7   A.   I'm not aware of that, but that may be.
8   Q.   You're not familiar then with the --
9   A.   I think that BIS -- you know, BIS monitors are -- have a --
10  their utility is very specific.  BIS monitors were really
11  designed for the use of volatile anesthetics, and it's also that
12  BIS is also -- the algorithm that turns the
13  electroencephalograph in a number of 0 to 100 is proprietary.
14  Q.   Right.
15  A.   So it's another black box technology that I cannot know.
16  Q.   So when Dr. Stevens, who is another expert for the
17  plaintiffs, testified that a BIS level under 60 is the desired
18  target for general anesthesia, do you disagree with him on that?
19  A.   That's the company's claim.  I understand that.
20  Q.   Okay.  And are you familiar with this study that was
21  published in the *Anesthesiology* journal?  Is that, like, the
22  premier journal for your field?
23  A.   They would say that they are, yes.
24  Q.   Okay.  You don't agree?
25  A.   It depends on the subject.

1   Q.    It's a respected journal; correct?

2   A.    Yes.

3   Q.    And are you familiar with this article?

4   A.    I would have to look at it again.  Maybe I've seen it.

5   Q.    It's Defendants' Exhibit 12.

6   A.    Okay.

7   Q.    It's written by Lui, L-i-u, and it's called -- can you read

8   the title?

9   A.    Sure.  "Electroencephalogram Bispectral Analysis Predicts

10  the Depth of Midazolam-Induced Sedation."

11        Remember that these things -- articles are claims, and so

12  the power of the evidence is very much, I think, important here.

13  So people say all sorts of things in articles.  Sometimes

14  articles make a claim that subsequently has been shown to be

15  incorrect.  So, you know, I understand this is the best we have,

16  but no one thinks that these are necessarily unrefutable claims.

17  Q.    Okay.  Can you -- this is a peer-reviewed journal; right?

18  A.    I understand.  Peer-reviewed journals sometimes withdraw

19  entire papers because subsequent information has been shown to

20  be -- and peer-reviewed journals also are inclined to publish

21  positive results and not publish negative results.  There's all

22  sorts of issues with the literature, per se.

23  Q.    As a general matter, can you just briefly describe what the

24  peer-review process entails?

25  A.    Sure.  I've reviewed articles for peer review and I've

1    peer reviewed journals.

2    Q.    Okay.  How does it work?

3    A.    I'm given an article.  I read it over.  I look at the, you

4    know, the methodology.  I look at the claims, I look at the

5    statistics, and I decide whether this is, you know, sound

6    science and if the claim can be verified or not.  Sometimes the

7    paper is poor and it's rejected out of hand.  Sometimes the

8    paper is sent back to the authors with the direction that these

9    things need to be clarified.

10        And if after that process the article is deemed to be

11   acceptable, then it's added to the queue of publication.

12   Sometimes it takes months, many months, for it to actually

13   appear in the journal.  And that's the nature of it.

14   Q.    How many peers would typically review an article like this,

15   a study?

16   A.    Well, you know, three maybe.

17   Q.    And they would all be board-certified anesthesiologists?

18   A.    It depends on the subject matter.  Generally a journal

19   would try to find somebody who would be expert in the field, so

20   whatever the question is.

21   Q.    So you would not expect the journal *Anesthesiology* to use

22   any other medical specialty to review an article in its journal?

23   A.    It depends on what the issue is.  Expert.  They would look

24   for experts.  You know, so generally if this is an

25   anesthesiology journal, the experts would be other

1    anesthesiologists.

2    Q.   Who would be expert on the function of the level of

3    midazolam-induced sedation during the onset of anesthesia?  It

4    would be an anesthesiologist; right?

5    A.   Or pharmacology, too.  Pharmacologists.

6    Q.   And at least according to this article, they did measure

7    BIS levels under 60 after induction of anesthesia with

8    midazolam; right?

9    A.   Yes.  I mean, I see those little four data points there.

10   Q.   There's four data points there.

11   A.   And there's quite a spread, too, actually.

12   Q.   Sure.  But there were data points under the 60 level.  And

13   this study involved 26 consenting adult patients who were

14   administered between 4.5 and 20 milligrams intravenous

15   midazolam.  Right?

16   A.   That's what it says.

17   Q.   Okay.

18            THE COURT:  Let's take our break.  It's ten o'clock.

19   We'll go ahead and take a ten-minute break.  We'll come back in

20   here at 10:10.

21       We're in recess.

22       (Recess at 10:02 a.m.)

23                    REPORTER'S CERTIFICATE
         I certify that the foregoing is a correct transcript from
24   the record of proceedings in the above-entitled matter.
                                       Date:  April 13, 2017
25   /s/ Christa R. Jacimore, RDR, CRR, CCR
        United States Court Reporter

1    (Proceedings continuing in open court at 10:13 AM.)

2         THE COURT:  You may proceed.

3         MS. MERRITT:  Thank you, Your Honor.  The State has

4    no further questions for Dr. Zivot at this time.

5         THE COURT:  Redirect?

6              REDIRECT EXAMINATION

7    BY MS. VANDIVER:

8    Q    Dr. Zivot, I want to give you a chance to look at your CV

9    which has been admitted in this proceeding as Plaintiffs'

10   Exhibit 1, and you were asked several questions about on cross.

11   This section that the State was asking you about is titled

12   Interviews.  Correct?

13   A    Yes.

14   Q    So all these things that she was asking you about, you

15   didn't -- you were just talking to reporters, right, with the

16   exception of these opinion pieces?

17   A    Correct.

18   Q    So you didn't come up with the titles of those?

19   A    That's correct.  The opinion pieces are also not my

20   titles.

21   Q    Okay.  Ms. Merritt asked you about this Med Page article,

22   which, again, was not -- is not your title, but do you recall

23   whether that was following the Dennis McGuire execution or that

24   was about the Dennis McGuire execution?

25   A    I believe that that was.

Zivot - Redirect

1    Q     I'd like to give you a chance to look at the autopsies

2    from Florida which Ms. Merritt asked you about but you weren't

3    able to fully answer.  And is there a book there in front of

4    you, the larger book?

5    A     Yes.

6    Q     So these have been admitted into evidence as -- let me

7    just check the list.  I believe they're 11 through 15.  If you

8    want to just take a moment and look at those.

9    A     This is the one that begins with Juan Chavez?

10   Q     Yes.

11   A     Okay.  Do you want me to look at all of them right now?

12   Q     Would that be helpful to you?  On cross she was asking

13   you about whether or not you had evidence of whether or not the

14   Florida executions with midazolam -- I mean, she used the word

15   "botched", and you weren't able to answer without looking at

16   these.  Let me just ask you this.  You were provided with these

17   autopsy reports from Florida prisoners that were executed with

18   midazolam, vecuronium bromide, and potassium chloride.  Is that

19   right?

20   A     Yes.

21   Q     And there are five of them and you talked about them in

22   your direct?

23   A     Yes.

24   Q     And can you reiterate what your impressions were from

25   reading these autopsy reports?

A     So I think that the claim of what lethal injection does
is it creates maybe something akin to sleeping or something
like that and then a person dies, and that if one were to look
at the postmortem of someone who had a lethal injection
execution, the body would be otherwise pristine, there would be
no organ damage as a consequence of the procedure.  It would be
pristine because the death would have been immediate in some
fashion and so there could be no time for organ degradation.
And what strikes me, what alarms me is, we can just start with
Juan Chavez, the comments on what -- the term is used "heavy
lungs" with acute congestion and edema.  This is on page 9.
And that was a striking finding because clearly this is not a
person that entered the execution chamber in this state.

     If they had, they would not be able to lie flat, they
would have been short of breath or coughing, and it's clearly
not something that they began with, so it was acquired as a
consequence of the execution.  So how is it that these lungs
should become so congested?  And I think that that's not
entirely clear.  It's possible that there was some slow decline
in circulation or something like that that caused this backup
of fluid into the lungs.  It's possible that there was a kind
of a mediated response from the brain that causes this what we
would call here pulmonary edema, which just means fluid in the
lungs.  And in any event, fluid in the lungs is exceedingly
uncomfortable.  It would be very uncomfortable for someone.

Zivot - Redirect

1    Now, because of the design of the lethal injection, that
2  discomfort will never be seen because now an individual is
3  paralyzed.  And I'm really at a loss to explain why the
4  paralysis is there to begin with except to create this outward
5  illusion of a calm and peaceful execution.  The people who look
6  at this can only see some of it, and the way that the
7  information is recorded, we understand, has a lot of
8  difficulty, but clearly anyone that is given a paralytic will
9  always after that appear outwardly to be calm.  So I don't take
10  anything of the claim that these executions went on without any
11  negative consequence.
12  Q    That's your impression with all of these autopsy reports
13  that you looked at from Florida?
14  A    Yes.  I believe that they all have these issues with
15  their lungs.
16  Q    Doctor, can you -- I think we need your help clarifying
17  something because as many of us have said, we are lawyers, not
18  doctors, and so the term "anesthetic" I feel like maybe we've
19  been using it to mean one drug.  Is that accurate?  Are we
20  using that correctly when we say that?
21  A    No.  Anesthesia involves a combination of many different
22  drugs.  The state of anesthesia is perhaps the way to think of
23  that term, but that doesn't mean that that is a result of a
24  single drug being administered.  It's a combination of drugs
25  that achieve the anesthetic state.

```
1    Q    So it's not synonymous.  So if I say "an anesthetic," I'm
2    not talking about one drug like propofol, you wouldn't say
3    that's an anesthetic?
4    A    That would be one drug that can -- you know, that in
5    combination with other drugs can produce an anesthetic state.
6    It's not specific to a single agent.
7    Q    Okay.  You were asked a lot of questions regarding the
8    package insert of the -- on the midazolam during
9    cross-examination.
10   A    Yes.
11   Q    And you testified that midazolam is not used as an
12   induction agent?
13   A    That's correct.
14   Q    And why not?
15   A    Other induction agents work better than midazolam does.
16   So it's just -- I think that the market has spoken, frankly,
17   that if midazolam was the best induction agent, everyone would
18   use it.  There's no restriction, no one is barred from using
19   midazolam.  I could use it.  But my experience with midazolam,
20   and in conversation with my colleagues and others, is that it's
21   not done, it's not used because it's not the best drug that --
22   to create that kind of discreet anesthetic state that is
23   required.  And also it really is not an analgesic.  And whether
24   or not propofol is an analgesic, there's some suggestion that
25   it might be, but no one thinks that midazolam is an analgesic.
```

1    Q      And "analgesic" means a pain reliever, right?

2    A      It can relieve pain.

3    Q      So if midazolam was used alone at the start of a

4    procedure, the person could still feel pain?

5    A      They could potentially feel pain, yes.

6    Q      And is there a known lethal dose of midazolam?

7    A      I don't know what that dose is, no.

8    Q      Have you ever killed a patient with midazolam?

9    A      No.

10   Q      One moment.  The other question that you were asked about

11   that label is regard to risk on midazolam, the black box risk.

12   And do you -- is that a significant -- is there a significant

13   risk of death from midazolam alone?

14   A      In the way the midazolam is commonly used, I think it's a

15   very safe drug because anesthesiology is safe, too, safe in

16   that it doesn't usually kill people or harm people.  So I think

17   that the black box warning here is meant as an offer of

18   prudence and that it is warning people that there is this

19   concern.  But, again, it's a really vanishingly uncommon effect

20   because of the way that anesthesia is generally done.  So I

21   think that -- I recognize that there's an obligation, I

22   suppose, to warn for exceedingly rare events if they're

23   serious.  You know, I think that that's fair.

24          And I think that's what underpins the warning here is

25   just in the broadest, most inclusive -- you know, in

1   consideration of everything possible, it's the same way that

2   when you look at a ladder, you purchase a ladder, ladders are

3   covered with warnings stuck to them.  You know, you could fall,

4   you could -- all sorts of things could happen like -- we

5   understand that objects carry risks, but the warning against

6   risks is just meant to be, I think, inclusive and not

7   particular.

8   Q    And, Dr. Zivot, is it still your opinion that this lethal

9   injection protocol, if the midazolam is given as set forth in

10  the protocol, that the inmates are going to feel pain from the

11  vecuronium bromide and the potassium chloride?

12  A    I'm very worried that midazolam does not create the kind

13  of blank experience that this protocol contemplates.  And I'm

14  especially worried when I look at the autopsies that show a

15  very different sort of outcome than I think has been widely

16  appreciated.  So for two reasons.  Because midazolam cannot be

17  verified, and because we entirely obliterate the possibility of

18  really knowing by the paralytic, I'm worried that these are

19  really death by suffocation or something akin to that.

20             MS. VANDIVER:  No further questions.

21             THE COURT:  Anything further for Dr. Zivot?

22             MS. MERRITT:  Yes, Your Honor.

23                      RECROSS-EXAMINATION

24  BY MS. MERRITT:

25  Q    Dr. Zivot, is it really your testimony that a person can

Zivot - Recross

1  die and not suffer any organ damage?

2  A     Yes.

3  Q     How is that possible?

4  A     I don't know -- you're going to have to ask me something

5  more specific.

6  Q     Okay.  Ms. Vandiver just asked you about autopsies of

7  Florida inmates who had been executed under this same protocol

8  that the ADC is using here in Arkansas, right?

9  A     Yes.

10 Q     And do you know how long after the inmates were

11 pronounced dead that those autopsies were performed?

12 A     I think the amount of time varies.

13 Q     Ranging from what?

14 A     If you're asking me does pulmonary edema happen as a

15 consequence after death like that, the answer is no.  There's

16 not further degradation of the lungs in the way -- if that's

17 what you're asking me.

18 Q     No.  I was just asking how long after the inmate died the

19 autopsies were performed.  Do you know?

20 A     I'd have to look.  I don't remember exactly.

21 Q     After a person dies then, is it your testimony that their

22 organs don't further degrade, they stay just as they are?

23 A     Not in the way that that -- not in the way as seen there,

24 no, that doesn't happen.

25 Q     So you testified that the presence of fluid in the

Zivot - Recross

1    lungs -- you said that would be very uncomfortable?

2    A      Yes.

3    Q      That assumes that the inmate was not sedated, correct?

4    A      We don't know the sedated state of the inmate, so -- and

5    that's, I think, what is at issue here.  We don't really know.

6    Q      Well, we do know that clinically you might give a patient

7    1 to 2 milligrams of midazolam to sedate them for a heart

8    catheterization, for example, right?

9    A      Yes, but that's not the same thing as this.

10   Q      I understand that.

11   A      They're given some local anesthetic for the puncture

12   site.

13   Q      And also if an inmate was anesthetized, that means that

14   they would be unconscious, right?

15   A      Inmates are not anesthetized.  They're given midazolam

16   and vecuronium and potassium.  That is not the same thing as an

17   anesthetic.

18   Q      Let's step back then.  An inmate administered a

19   500-milligram dose of midazolam, it's your testimony that they

20   won't be sufficiently sedated to be in an anesthetic state?

21   A      I don't think we're talking about an anesthetic state.

22   You're just asking me whether or not they could feel pain.

23   Q      Would they be conscious in your opinion then?

24   A      I don't know -- it's hard to know, you know, how one

25   defines consciousness here.  I think they can clearly have an

Zivot - Recross

1   interior experience that we can't access.

2   Q    Okay.  But they will have to pass, so to speak, a

3   consciousness check before the Arkansas Department of

4   Correction would administer the vecuronium bromide.  You

5   understand that, right?

6   A    I've told you that I do that myself in practice.  And not

7   infrequently I'm incorrect, that patients respond when I didn't

8   think that they would.

9   Q    So even in clinical practice, there is some risk that the

10  anesthetic won't have the intended effect, correct?

11  A    Yes.

12  Q    Can you quantity that risk?

13  A    It happens on a regular basis that --

14  Q    Is it --

15  A    -- to a certain degree, there may be some more reaction

16  than I would anticipate.

17  Q    In your clinical practice, is it sure or very likely that

18  the anesthetic will fail to work?

19  A    Well, we're talking about an anesthetic versus lethal

20  injection, so I can only answer my anesthetic question, but I

21  cannot then transpose that on to a lethal injection scenario.

22  Q    Okay.  And I didn't ask you to, Doctor.  I asked you, in

23  your clinical practice, do you consider it sure or very likely

24  that what you're doing to anesthetize your patients is not

25  going to work?

Zivot - Recross

1   A     No.  I think it's not common.

2   Q     It's uncommon?

3   A     It's uncommon.

4   Q     It's very rare, correct?

5   A     Well, you know, I don't want to quibble over the

6   definition of "very rare" or "rare" or "uncommon."  I think

7   we're saying the same thing.

8   Q     Okay.  It's not a frequent occurrence?

9   A     It occurs enough that I know that it occurs.

10  Q     Okay.  So the presence of fluid in an inmate's lungs

11  would not prove that the inmate suffered any pain, would it?

12  It simply --

13  A     I want to answer your question about organ degradation

14  here.  The organs --

15  Q     I'm sorry, Doctor, that was not my question.  I'm asking

16  you, does the presence of fluid in the lungs prove that someone

17  experienced pain when they died?

18  A     No one who -- anyone who had fluid in their lungs, unless

19  they -- that would be something that would be, I think,

20  uniformly considered to be noxious, to be uncomfortable.

21  Q     So if an elderly patient was in the hospital suffering

22  from congestive heart failure --

23  A     Yes.

24  Q     -- and then they passed away --

25  A     They died.

Zivot - Recross

1    Q      They die.  You would expect to find fluid on their lungs?

2    A      If their condition was congestive heart failure, if

3    that's what you're asking me, would I expect to find fluid on

4    their lungs at autopsy?

5    Q      Absolutely.

6    A      Yes.

7    Q      Okay.  And yet the presence of fluid on that patient's

8    lungs wouldn't necessarily prove that that patient suffered

9    pain as they died, would it?

10   A      I've taken care of many patients with congestive heart

11   failure, and I can tell you that nobody enjoys that.

12   Q      I'm asking you about when they died from congestive heart

13   failure and you later conduct an autopsy and there is fluid

14   found on the lungs, you don't know whether or not the patient

15   suffered pain when they died?  One thing is it doesn't

16   correlate is what I'm trying to get at.

17   A      I think that congestive heart failure is never a

18   comfortable experience.  It's uncomfortable, in the same way

19   that if you take a glass of water and you drink and by mistake

20   some of that water goes into your trachea, nobody likes that.

21   That's incredibly irritating to put water in your trachea.

22   Q      And I'm not asking about that, Doctor.  What I'm saying

23   is, if you were in the room with your grandmother who was

24   passing away from congestive heart failure and she's laying

25   there unconscious and then she slowly stops breathing and dies,

Zivot - Recross

966

1    and later you were to conduct an autopsy on that patient,

2    there's fluid on the lungs, but the presence of fluid on the

3    lungs doesn't have anything to do with whether the patient

4    experienced pain at the time of death, does it?

5    A    I think that congestive heart failure is an uncomfortable

6    experience for everyone unless --

7    Q    I'm not asking you about congestive heart failure.  I'm

8    saying, fluid on the lungs doesn't equate to pain.  You don't

9    have any data to prove that, right?

10   A    Congestive heart failure or pulmonary edema is extremely

11   uncomfortable.  This I know from having cared for, I don't

12   know, thousands of people with this problem.  So it's not an

13   innocuous experience for anybody.

14   Q    When you conduct --

15   A    And --

16   Q    Let me stop you there.  An autopsy that shows fluid on

17   the lungs does not prove that the person experienced any pain

18   when they died.  It is not proof of that, is it?

19   A    There's no way to know that here.

20   Q    Exactly.  That's my point.  There's no way to know.

21        Now, you don't have any evidence similarly that any of

22   those inmates in Florida suffered pain when they died, do you?

23   A    They were paralyzed.  How would we know?

24   Q    They were also anesthetized with 500 milligrams of

25   midazolam, correct?

Zivot - Recross

1   A     No.  They were given 500 milligrams of midazolam.  That

2   doesn't mean that they were, quote, anesthetized.

3   Q     Nor does it mean that they suffered severe pain when they

4   died.  We just don't know, do we?

5   A     Again, I mean, what is the burden of proof here?

6   Q     That's for the Court to decide.  You don't know.  You

7   cannot say with any degree of scientific certainty that an

8   inmate administered a 500-milligram dose of midazolam is sure

9   or very likely to suffer severe pain when they die, can you?

10  A     Well, the only --

11  Q     Yes or no, Doctor.  Can you say with scientific

12  certainty --

13  A     There's no scientific study that looks at 500 milligrams

14  injections.  We're all just speculating based on other things.

15  Q     So the answer is, no, you cannot say within a reasonable

16  degree of medical or scientific certainty that an inmate

17  administered 500 milligrams of midazolam would suffer severe

18  pain?

19  A     It's not a medical or scientific question that you're

20  asking me.

21  Q     Okay.  The answer is, no, isn't it, Doctor?

22  A     It's not a medical or scientific question that you're

23  asking me.

24  Q     Okay.  I've made my point.  Thank you.  I have nothing

25  further.

```
 1              THE COURT:  Anything further?
 2              MS. VANDIVER:  Not at this time.
 3              THE COURT:  You may step down.
 4         Please call your next witness.
 5              MS. MERRITT:  I call Dr. Joseph Antognini.
 6              THE COURT:  Dr. Antognini, please approach.
 7         JOSEPH ANTOGNINI, DEFENDANTS' WITNESS, DULY SWORN
 8                        DIRECT EXAMINATION
 9    BY MS. MERRITT:
10    Q    Good morning, Dr. Antognini.
11    A    Good morning.
12    Q    Would you please state your full name for the record.
13    A    Joseph Francis Antognini, A-n-t-o-g-n-i-n-i.
14    Q    Can you please tell the Court a little bit about your
15    educational and professional background, Doctor?
16    A    I went to UC Berkeley for an undergraduate degree in
17    economics, and I went to the University of Southern California
18    for my medical degree.  I graduated in 1984.
19    Q    Slow down just a little bit for the court reporter.
20    A    Sure.  And then I did my residency at UC Davis in
21    Sacramento from 1984 to 1987.
22    Q    And what is your practice specialty, Doctor?
23    A    I'm an anesthesiologist.
24    Q    And are you a board certified anesthesiologist?
25    A    I am board certified, yes.
```

Antognini - Direct

1  Q    Okay.  And I'll do my best to let you finish before I

2  talk, but we're going to try to not talk over one another so

3  that the court reporter can take everything down.

4  A    That's good.

5  Q    Okay.  So how long have you worked as an

6  anesthesiologist?

7  A    My residency began in 1985 after my internship, and then

8  I continued my clinical practice up till the end of 2016.

9  Q    Okay.  So that --

10 A    So that is about 30 -- over 30 years.

11 Q    Over 30 years you've worked in clinical practice --

12 A    Correct.

13 Q    -- as an anesthesiologist?

14 A    As an anesthesiologist.

15 Q    Pardon?

16 A    As an anesthesiologist, correct.

17 Q    If you could speak up and speak into the mic, too, for

18 me, that would help me out.

19 A    Sure.

20 Q    How many patients have you anesthetized in your practice?

21 Is there any way for you to even guesstimate?

22 A    My guess is over 10,000.

23 Q    Okay.  And are you active in any professional societies

24 with regard to anesthesia?

25 A    I'm a member of the American Society of Anesthesiologists

1    and the California Society of Anesthesiologists.

2    Q    Tell the Court a little bit about your research interests

3    and your research work with regard to midazolam.

4    A    I've only published one study in the use of midazolam,

5    but I have a lot of other studies and other anesthetic drugs

6    that I've studied.

7    Q    Do you have a particular interest in the mechanisms of

8    anesthesia and the factors that influence anesthetic

9    requirements?

10   A    Yes.  That was the focus of my research, primarily

11   looking at the site where anesthetics act to provide immobility

12   or to prevent movement in response to a noxious stimulus.

13   Q    Okay.  So you've devoted your entire professional career

14   to looking at the ability of anesthetic agents to anesthetize a

15   patient so that they would not feel a noxious stimulus; is that

16   right?

17   A    Generally speaking, yes, to focus on the response to

18   noxious stimulation, so that not only -- and these were animal

19   studies -- not only the movement response, but also the what we

20   call hemodynamic response, that is, the blood pressure response

21   and the heart rate response to noxious stimulus.

22   Q    Okay.  And we'll talk a little bit about how that relates

23   to your opinions in a moment.

24        So we have marked your declaration as an exhibit.  I

25   don't have that number right in front of me.  Hold on a moment.

1      Your declaration has been identified as Defendants'
2 Exhibit 3.  Does this appear to be the declaration that you've
3 submitted to the Court in this matter?
4 A     Yes.
5 Q     It says here at the top it was prepared for this
6 particular case?
7 A     Yes, that's correct.
8 Q     And on page 25, is that your signature, Doctor?
9 A     Yes, it is.
10 Q     And then attached to your report is your CV, correct?
11 A     Correct.
12         MS. MERRITT:  At this time I move to admit
13 Defendants' Exhibit 3.
14         MS. VANDIVER:  No objection.
15         THE COURT:  Defendants' 3 is admitted.
16      (Defendants' Exhibit 3 received in evidence.)
17 BY MS. MERRITT:
18 Q     Do you have a copy of your report with you, Doctor?
19 A     I do.
20 Q     Okay.  I'd just like to go through it and explain to the
21 Court the basis for your opinions.  First of all, what have you
22 reviewed in preparation for your testimony today?
23 A     I reviewed the various legal -- the legal material that
24 was sent to me, which was over 1,000 pages, I did not review
25 all of that; the declarations by Dr. Stevens and Dr. Zivot; and

Antognini - Direct

1    then the lethal injection protocol, the Arkansas Lethal

2    Injection Protocol; and then a number of references that I

3    cited in my report.

4    Q     You conducted a great amount of research on this issue

5    before writing your report?

6    A     That is correct.

7    Q     And I asked you to render expert opinions in the fields

8    of general medicine and anesthesiology, physiology, and

9    pharmacology, correct?

10   A     Yes.

11   Q     Can you explain to the Court what qualifies you to

12   testify as an expert in all of those areas?

13   A     Well, of course, as an anesthesiologist that's board

14   certified and has practiced for many years, and then being a

15   physician, a medical doctor, we certainly have a lot of

16   information or knowledge regarding general medicine.  And then

17   anesthesiology, two of the most important foundations of that

18   specialty is pharmacology and physiology.  So we use those

19   disciplines quite a bit in our specialty.  So I feel as though

20   I can address those areas, especially related to the issues at

21   hand in this case.

22   Q     Why is pharmacology and physiology important to your

23   practice?

24   A     Of course, we use many drugs and we inject many drugs

25   into patients, and they have pharmacological effects and they

Karen Baker, RMR, CRR, CCR
United States Court Reporter

1  have physiological effects.  Anything to do with, aside from

2  the drugs that are injected, have physiological effects.

3  Things we do to patients, surgeons do to patients in terms of

4  fluid management, blood management, placing patients on

5  ventilators, that kind of thing, have physiological effects.

6  So you have to understand the physiology quite a bit to

7  understand what you're doing.

8  Q    For non-laymen, the physiologic effects is literally how

9  the drug is going to affect the body, correct?  Or if you can

10  explain it better, please do.

11  A    Sure.  So, yes, drugs can certainly have physiological

12  effects, but I'm thinking more broadly about things that may

13  not be related to drugs.  But that's, again, just one of the

14  foundations of our specialty.

15  Q    Okay.  Paragraph 5 of your declaration talks about your

16  work.  You are not a seasoned expert witness.  You would admit

17  that, right, Dr. Antognini?

18  A    That's correct.  Maybe my performance here will

19  demonstrate that.  But, no, I do not do a lot of legal

20  testimony.

21  Q    All right.  And I appreciate you, by the way, being here

22  on Holy Thursday.  I know I promised you I'd get you home when

23  I asked you to stay, and I apologize, but I appreciate that so

24  much.

25       Why are you willing to testify here today?  I'm curious.

Antognnini - Direct

1   If you could explain to the Court why it is that you are

2   willing to put yourself out here and talk about these very

3   difficult issues for anesthesiologists.

4   A    Well, I think the primary reason is that I want to make

5   sure that the Court and the parties have the information that

6   they need and the data that they need to come to an informed

7   decision.  So I just -- we all have our own view of the truth

8   or perspective of the truth, I suppose, and I'm going to give

9   you mine.  But mine, I believe, is based on sound science.  And

10  you can do with it whatever you want, but that's the main

11  reason I'm here is to provide you what I think is the sound

12  science behind the use of these drugs and the protocol.

13  Q    Thank you.  So tell the Court about your previous

14  testimony as an expert.  For example, let's talk about the

15  Garden Grove Hospital matter.  What happened there?

16  A    So that was a case that I was contacted on where an

17  elderly woman was given midazolam for a procedure, and she had

18  a respiratory arrest and required basically what we call a

19  code, and she needed to be resuscitated, and then she

20  eventually died.  And the hospital was being -- there was a

21  fine basically levied against the hospital by the state of

22  California.  So it became -- I guess it's called an

23  administrative court.  So I testified on behalf of the

24  hospital -- on behalf of the hospital.

25  Q    You weren't the treating anesthesiologist?

Antognini - Direct

1    A     No, I was not.

2    Q     Do you know the dose of midazolam that elderly patient

3    was given?

4    A     I think it was 4 mill- -- my recollection, 4 milligrams.

5    Q     Okay.  And so in that patient 4 milligrams induced

6    respiratory arrest?  Heart attack?

7    A     Respiratory arrest.  I don't think -- I'm not sure.  I

8    can't remember if her heart stopped or not, but she had a

9    respiratory arrest and then had damage basically as a result of

10   that.

11   Q     Okay.

12   A     She didn't die immediately.  I think she languished for

13   about seven days before she died.

14   Q     Is that an example of how dangerous this drug can be even

15   in very small doses?

16   A     Yes.

17   Q     So tell us about your other expert experience.

18   A     So I was contacted by someone from the state of

19   Mississippi, I think, the Attorney General's Office, to provide

20   an expert report for *Jordan v. Marshall Fisher*.  That was back

21   in January of 2016, I think.

22         And then subsequent to that, I was contacted by somebody

23   from Missouri to render an opinion in *Buckley v. Lombardi*.  And

24   that was a case related to the use of pentobarbital.

25         And then I also had a case with Ohio recently in January

1  of 2017 related to the use of midazolam for lethal injection.

2      And then this is -- obviously here for this case.

3  Q    Okay.  So you've previously given testimony in two court

4  proceedings regarding the efficacy of midazolam for use in a

5  lethal injection procedure, right?

6  A    Yes.  I guess that would be Mississippi and Ohio.

7  Q    Okay.  Now, have you formed an opinion about whether

8  midazolam in the dose contemplated in the Arkansas Department

9  of Correction's lethal injection procedure would be sufficient

10 to render the inmate unconscious and insensate to any pain that

11 they might otherwise experience upon the administration of the

12 second and third drugs in the protocol?

13 A    Yes, I have formed an opinion.

14 Q    And what is your opinion, Doctor?

15 A    My opinion is that the dose of midazolam that's

16 contemplated or is proposed to be used in Arkansas would be

17 sufficient to render the inmate unconscious and unable to sense

18 noxious stimulation or the other things that would occur with

19 the other drugs and, therefore, would render them unconscious

20 and would not be able to sense them in the way that we think of

21 that in the awake state.

22 Q    And so in that regard, what is -- what are we trying to

23 do when we administer general anesthesia?  You talk about the

24 three essential end-points.  Can you describe that for the

25 Court?

1    A     So I just want to clarify, make sure the issue around

2    anesthesia and anesthetic.  So anesthesia is a general

3    anesthesia.  That's the term that we often use.  It is a state

4    that we talk about.  So sort of three essential -- three

5    essential end-points, which is amnesia, unconsciousness, and

6    lack of movement to a noxious stimulus or immobility.  There

7    are some other end-points that people will argue about in terms

8    of hemodynamic stability and so forth.  But those are the three

9    main ones that I discussed.  And an anesthetic, particularly a

10   general anesthetic, in order to be -- in my mind, to be defined

11   as an anesthetic has to achieve all of those three end-points

12   by itself.

13        So I wanted to just clarify what was said earlier, if I

14   may, that regardless of what combinations we may use in a

15   clinical setting, an anesthetic has to be able to achieve those

16   end-points by itself.  It doesn't mean that you have to -- a

17   drug has to achieve all those end-points to be useful, but

18   that's just sort of a definition.

19        So, for example, the first clinical -- or I should say

20   the first public demonstration used ether.  Ether could be used

21   as an anesthetic, but, of course, we wouldn't use it in 2017.

22   So there are a lot of drugs that can achieve anesthesia, but

23   they may not be clinically useful today because we have better

24   drugs.  Again --

25   Q     And so do you have an opinion about the difference

Antognini - Direct

1   between what's clinically appropriate versus what might be

2   appropriate for use in a lethal injection procedure?

3   A      Well, yes, I do.  That is that I don't think that you

4   can -- you necessarily have to use a drug that would be

5   clinically used in 2017, or the standard of care, so to speak.

6   You just want to make sure that you achieve the level of

7   unconsciousness that you need for the -- contemplated, in this

8   case, second and third drugs.

9   Q      And, in your opinion, is midazolam a general anesthetic?

10  A      In my opinion, the data out there in terms of that is, I

11  have to admit, pretty sparse, because you have to say to

12  yourself, well, are you talking about in humans, or in animals?

13  So we haven't done a study in humans to demonstrate or show

14  that midazolam by itself can achieve all three end-points.

15  Q      And why is that?

16  A      Well, that is because, number one, in 2017, there would

17  be no clinical utility of using midazolam as a general

18  anesthetic.  So let me elaborate on that.

19  Q      Okay.

20  A      We know the actions of the drug, we know how long it

21  would last.  In order to give the dose that might be needed to

22  provide general anesthesia with that drug alone would be so

23  large, it wouldn't be useful.  I'm not even sure you could

24  ethically do that kind of study in humans.  Because even if you

25  were to prove that midazolam could be used as a general

Antognini - Direct

```
1   anesthetic in humans, no one would ever use it because we have
2   other drugs that can be used.  But, again, that doesn't mean
3   that it can't -- it couldn't be used in that regard.
4   Q    And can midazolam be used to induce general anesthesia?
5   A    Yes, it can, and we'll get to that point.  I know that's
6   an important thing that we need to talk about.  I just want to
7   say, though, that there is at least one animal study showing
8   that midazolam can be used as a general anesthetic or has
9   achieved general anesthesia.
10  Q    If I show you the defendants' exhibit list, can you
11  identify that?
12  A    Sure.
13  Q    Do you have that handy?
14        MS. MERRITT:  May I approach the witness, Your
15  Honor?
16        THE COURT:  You may.
17  BY MS. MERRITT:
18  Q    Can you answer the question?
19  A    I'm sorry.  Yes.  The article is number 62, it looks
20  like.  Nishikawa is the first author.  And that was -- shall I
21  go ahead and describe that to you?
22  Q    Yes, please.
23  A    That was a study in mice.  The study involved some mice
24  that had -- at least part of the groups had genetic
25  alterations, but like any of these scientific studies, they
```

1    were normal wild type mice and they were able to achieve

2    general anesthesia with midazolam by itself.

3            MS. MERRITT:  And, Your Honor, defendants move to

4    introduce Exhibit 62.

5            MS. VANDIVER:  No objection.

6            THE COURT:  62 --

7            MS. MERRITT:  At this time, Your Honor, for

8    efficiency purposes, I'd like to move to admit the articles

9    that Dr. Antognini relied on to form the basis of his opinions.

10   BY MS. MERRITT:

11   Q    And, Doctor, I asked you to identify for me the most

12   crucial articles for your opinions, right?

13   A    Yes.

14   Q    And what you pulled for me certainly is not everything

15   that you've cited in your declaration, is it?

16   A    No, it is not.

17   Q    But these are what you considered to be the most

18   important for the Court to consider?

19   A    In my opinion, yes.

20   Q    Okay.  And so Defendants' Exhibit 37 is the Barr article,

21   correct?

22   A    Yes.

23   Q    38 is the Blackmon article?

24   A    Correct.

25   Q    39 is Brown?

Antognini - Direct

```
1    A    Yes.

2    Q    40 is Crawford?

3    A    Yes.

4    Q    41 is Dehaba?

5    A    Yep.  Yes.

6    Q    And you relied on each of these articles in forming your

7    opinions in this case?

8    A    That is correct.

9         MS. MERRITT:  Defendants move to admit Exhibits 37,

10   38, 39, 40, and 41.

11        MS. VANDIVER:  I have no objection insofar as

12   they're admitted as material that he relied upon in making his

13   opinion.

14        THE COURT:  All right.  I will admit -- and, again,

15   it's numbers 37, 38, 39, 40, and 41 off of defendants' list.

16   Are those numbers right?

17        (Defendants' Exhibits 37, 38, 39, 40, and 41 received in

18   evidence.)

19        MS. MERRITT:  Yes, Your Honor.  There are a number

20   of others, Your Honor.

21   BY MS. MERRITT:

22   Q    42 is the Dodawad article.  44 is Dundee.  45, Jolivette.

23   Did you rely on all of those?

24   A    The Jolivette does not look familiar to me.

25   Q    Okay.  That might be Dr. Buffington.
```

1        And the FDA Guidance, that's not yours, is it?

2   A    If that's the FDA package insert, I did rely on that.

3   Q    That's not there.  Okay.  So 42, Dodawad, you relied on

4   that one?

5   A    42, yes.

6   Q    And 44, Dundee?

7   A    Yes.

8   Q    What about 47, the Fragen article?

9   A    Yes.

10  Q    48, Gale Abstract?

11  A    I don't remember that one off the top of my head.  I'd

12  have to look and see.

13  Q    I'm showing you, Doctor, what we've identified as

14  Defendants' Exhibit 48.  It is an article called "Titration of

15  intravenous anesthetics for cardioversion: a comparison of

16  propofol, methohexital, and midazolam."  Does that refresh your

17  memory?

18  A    Yes, I do recognize that now, yes.

19  Q    Okay.  Exhibit -- Defendants' Exhibit 49 is Gehrke.

20  Let's just go through it quickly so you can look at the titles.

21  Exhibit 49?

22  A    Yes.

23  Q    That's titled "Diazepam or midazolam for orotracheal

24  intubation in the ICU"?

25  A    Yes.

1        MS. MERRITT:  Okay.  So at this point, I move to

2   introduce Defendants' Exhibits 42, 44, 47, 48, and 49.

3        MS. VANDIVER:  I have no objection to these exhibits

4   as material that was relied upon by Dr. Antognini.

5        THE COURT:  All right.  The exhibits are admitted.

6        (Defendants' Exhibits 42, 44, 47, 48, and 49 received in

7   evidence.)

8   BY MS. MERRITT:

9   Q    Defendants' Exhibit 51 is the same -- I'm sorry.  We've

10  looked at this.  We've introduced this already, I believe, the

11  Glass article --

12  A    Yes.

13  Q    -- about bispectral analysis.  To the extent I want to

14  make sure my record's clear, I'll add it again, but 51 is the

15  BIS article, correct, that we've talked about previously?

16  A    Yes.

17  Q    52 is an article about "The effects of intra-" -- can you

18  say that, Doctor?

19  A    Intrathecal.

20  Q    -- "midazolam on sympathetic nervous system reflexes in

21  man - a pilot study."  Did you rely on that one?

22  A    Yes.

23        MS. MERRITT:  I would move to introduce Defendants'

24  Exhibits 51, 52 into evidence.

25        MS. VANDIVER:  Again, I have no objection to these

 1  documents as information that was relied upon by Dr. Antognini

 2  in making his opinion.

 3              THE COURT:  All right.  51 and 52 are admitted.

 4          (Defendants' Exhibits 51 and 52 received in evidence.)

 5  BY MS. MERRITT:

 6  Q      Is 53 one of yours, or is that Dr. Buffington's?

 7  A      I think that was Dr. Buffington's.

 8  Q      Okay.  Exhibit 54, the "Pharmacokinetics and

 9  Bioavailability of Midazolam in Man."  Did you rely on this

10  one?

11  A      I don't recall that one, but I might have.  It's not

12  listed in my references here, so it might have been --

13  Q      What about 55?

14  A      Yes.

15  Q      "Ketamine has no effect" --

16  A      Yes.

17  Q      Okay.  I'm reading that for the record, Dr. Antognini.

18  A      Oh, I'm sorry.

19  Q      "Ketamine has no effect on bispectral index during stable

20  propofol - remifentanil anaesthesia," correct?

21  A      Yes.

22  Q      And then 56, is this one of your reference articles?

23  A      Yes.

24  Q      Can you read the title, please?

25  A      "Biphasic EEG changes in relation to loss of

Antognini - Direct

1    consciousness during induction with thiopental, propofol,

2    etomidate, midazolam, or sevoflurane."

3    Q    You relied on this article in part as a basis for your

4    opinions in this case?

5    A    Yes.

6    Q    Thank you.  There it is again.  We like this article.

7    Sorry.  We'll skip this one.

8         58, Lobo, do you recognize this article?

9    A    Yes.

10   Q    Can you read the title into the record, please?

11   A    "The use of conscious sedation in elective external

12   direct current cardioversion: a single centre experience."

13   Q    Thank you.  59, "Sedation during colonoscopy."

14   A    Yes, I did rely on that, yes, "Sedation during

15   colonoscopy."

16   Q    60, the Crawford article on "Direct spinal effect of

17   intrathecal and extradural midazolam on visceral noxious

18   stimulation in rabbits."  That was a mouthful.  Did I sort of

19   butcher it?

20   A    You got it right.

21   Q    Okay.  You relied on this article?

22   A    Yes.

23   Q    Defendants' Exhibit 61 is the Messner article regarding

24   "The Bispectral Index Declines During Neuromuscular Block in

25   Fully Awake Persons."  Is this one of your references?

Antognini - Direct                          986

```
 1   A      Yes.
 2   Q      62, a neuropharmacology article about GABA, is this one
 3   of yours?
 4   A      Yes.
 5   Q      63?
 6   A      Not mine.
 7   Q      Okay.  64, "Comparison of Two Benzodiazepines for
 8   Anaesthesia Induction: Midazolam and Diazepam"?
 9   A      Yes, that's one of mine.
10   Q      Again, making sure, 63 was not yours, right?
11   A      Not mine.
12   Q      Okay. Defendants' Exhibit 65 about benzodiazepines and
13   receptors, is this one of your reference articles?
14   A      Yes, I did rely on that.
15   Q      Defendants' Exhibit 66, is that one of yours?
16   A      No.
17   Q      Okay.  Defendants' Exhibit 67, "Midazolam
18   pharmacokinetics following intravenous and buccal
19   administration"?
20   A      Buccal.
21   Q      Thank you.  Buccal administration?
22   A      Yeah, that's one that I relied on.
23   Q      Okay.  Defendants' Exhibit 68, can you read that one into
24   the record, please?
25   A      "Intrathecal midazolam reduces isoflurane MAC and
```

1    increases the apnoeic threshold in rats."

2    Q      Is this one of your references, Doctor?

3    A      Yes.

4    Q      Defendants' Exhibit 69, Shanks' "Are animal models

5    predictive for humans"?  That's not you?

6    A      No.

7    Q      70 is already in the record.  Did you rely on this one,

8    "The Comparative Amnestic Effects" --

9    A      No, I did not.

10   Q      That was Dr. Buffington.

11          What about 71, Zbinden?

12   A      Yes, I did rely on that.

13   Q      Can you read that title?

14   A      "Anesthetic Depth Defined Using Multiple Noxious Stimuli

15   During Isoflurane/Oxygen Anesthesia."

16   Q      Is this one of your references?

17   A      Yes.

18   Q      Thank you, Doctor.

19          MS. MERRITT:  So, Your Honor, I'm going to go over a

20   long list of what we just reviewed.  Defendants move to

21   introduce Exhibits 55, 56, 58, 59, 60, 61, 62, 64, 65, 67, 68,

22   and 71 into evidence.

23          MS. VANDIVER:  I have no objection to these being

24   admitted as materials that Dr. Antognini relied upon.

25          THE COURT:  All right.  They will be admitted.

1          (Defendants' Exhibits 55, 56, 58, 59, 60, 61, 62, 64, 65,

2     67, 68, and 71 received in evidence.)

3               MS. MERRITT:  Thank you, Your Honor.

4               THE COURT:  Before -- I'm sorry to do this to you,

5     but before you launch in with Dr. Antognini, let's take a short

6     five-minute break for our court reporter.  We'll be in recess

7     for five minutes.

8          (Recess at 11:08 AM, until 11:14 AM.)

9               THE COURT:  You may proceed when you're ready.

10              MS. MERRITT:  Thank you, Your Honor.

11    BY MS. MERRITT:

12    Q    Just to make sure I'm clear, what we just introduced into

13    evidence are some, but certainly not all of your references

14    that you looked into, you read, and you researched in order to

15    form your opinions in this case, correct?

16    A    Yes.

17    Q    I'd like to just ask you to walk us through what you've

18    got in here now.  The summary of opinions that you have

19    starting on page 4 of your report, each of these subparagraphs

20    are discussed in more detail later in the report, correct?

21    A    That is correct.

22    Q    Okay.  Tell us about the relationship between the level

23    of anesthesia and noxious stimuli.  And I'm sorry.  Let me take

24    a step back.

25              I'm sorry.  The question stands.  What is the

1    relationship between the level of anesthesia and noxious

2    stimuli?

3    A       So as I mentioned earlier, there are three essential

4    end-points: amnesia, unconsciousness, and immobility.  And the

5    sensitivity to anesthetic drugs are different.  So amnesia

6    comes on first, it's the most sensitive.  And then

7    unconsciousness very closely follows.  And then immobility is

8    actually shifted quite a bit to the right on the dose response

9    curve which I have shown there in sort of a figure or

10   demonstration on page 7.  And it just shows the -- as you

11   increase the anesthetic dose, the ability to form memory, the

12   ability to be conscious decreases to zero basically.  And yet

13   people would move or animals would move, depending on what

14   you're studying.  So the important point there is that movement

15   occurs or can occur even though somebody's unconscious.

16          And there's a lot of animal data and human data --

17   there's some human data to indicate that that would happen.

18   So, for example, some of the data or the work that I did

19   demonstrated that anesthetics act in the spinal cord to prevent

20   movement.  And, again, other animal data indicating that the

21   spinal cord is very capable of generating complex movements.

22          So the important point I was trying to get across here is

23   that just because somebody moves does not mean that -- I should

24   say that somebody who's anesthetized or has been given an

25   anesthetic, just because they move doesn't mean that they're

1   conscious.

2   Q    Okay.  We'll get into that in a little bit more detail,

3   but that reminds me of the frog study I talked about with

4   another one of the expert witnesses.  Is that one of the

5   examples of where the brain was completely disconnected from

6   the spinal cord, and yet the frog moved in response to noxious

7   stimuli?

8   A    That is correct.  So in that study, if I can just take a

9   minute to explain, basically what they did is they -- again, as

10  you described, the frog has a wide reflex so if you put a

11  noxious stimulus on its forelimb, the hind limb will come up to

12  wipe it away.  The frogs were pithed, and then they placed a

13  noxious stimulus on the forelimb, the hind limb comes up and

14  washes it away.  And then when the forelimb was moved, the hind

15  limb and the noxious stimulus is applied again, the hind limb

16  came up and wiped it away in that new space or point in space.

17  So the hind limb knew where the forelimb was that it changed

18  position, yet the brain was disconnected.  So the spinal cord

19  is very capable of complex movements.

20  Q    Pithing of the brain is?

21  A    Separation basically of the brain from the spinal cord.

22  Q    Okay.  So are anesthetics dose-dependent?

23  A    Yes, they are dose-dependent.  So the higher doses, you

24  get more of an action.  So in this case, you would get more --

25  consciousness would fall off and you get unconsciousness,

1   memory would fall off.  And so the demonstration I have here is

2   for inhaled anesthetics, but I think this holds true for

3   intravenous drugs as well.  So people looked at this with

4   propofol and shown very similar relationship that you become

5   unconscious well before you would prevent movement.

6        And I did look at midazolam.  Midazolam has never been

7   studied in humans at doses that could produce movement, so we

8   don't know exactly where that curve is for movement.  But we do

9   know that, based on some other work, that the curve was pretty

10  far to the right so that the relationship for midazolam, I

11  think, would hold true as well.

12  Q    So let me make sure I understand what you just said,

13  Doctor.  No studies have been able to prove that midazolam

14  would suppress movement in 100 percent of patients, right?

15  A    That is correct.  There's no human data out there.

16  Q    Is there human data that shows that midazolam induces

17  unconsciousness?

18  A    Yes.  That is correct.  Yes.

19  Q    We'll talk a little bit more about that.

20       So can you talk a little bit about or explain for the

21  Court how it is that anesthetics can produce immobility

22  independent of the brain's conscious awareness of pain?

23  A    Well, the -- again, the spinal cord is very capable of

24  generating these complex movements.  And the work that I did

25  and the work of others including Ira Rampil that I quoted there

1    demonstrated that you needed to have the action in the spinal

2    cord to prevent the movement that occurs from noxious

3    stimulation.

4         So when you try to extrapolate this to humans, you have

5    to ask yourself, what evidence is there?  So there are case

6    reports of braindead humans who have demonstrated complex

7    movements including crossing of the arms over the chest,

8    sitting up in bed, and so forth, turning of the head.  This is

9    called the Lazarus sign.  So there's evidence in humans that

10   the spinal cord is capable of generating complex movements.

11        So all these studies together, I think, fit very nicely

12   to indicate that the anesthetics seem to be working in the

13   spinal cord to prevent movement.

14   Q    Okay.  So is there scientific data that demonstrates that

15   a patient could be unconscious and yet still move?

16   A    Yes.

17   Q    During surgery?

18   A    And that is pretty common in the operating room.

19   Patients move all the time.  We place belts around patients and

20   arm straps to keep them on the table because they can move, so

21   we have to strap them down.  And we don't want that to happen,

22   but it can happen.  You find that balance sometimes.  And

23   unfortunately sometimes that balance is not right and patients

24   can move.

25   Q    And so for every surgical procedure or most, how often

1    would you actually strap a patient down because you know that

2    they might move and fall or hurt themselves in another way or

3    interfere with the procedure?

4    A      Every patient undergoing a general anesthesia would have

5    to have their arms strapped down and a belt on.  And it's not

6    just because they might move.  They could fall off the table

7    for other reasons.  But, yes, every patient -- it would be

8    below the standard of care not to do that, in my opinion.  So

9    every patient getting a general anesthetic -- and a lot of

10   patients getting regional anesthetics, as well, depending on

11   the level of sedation, they would be strapped down, their arms

12   would be strapped down and a belt on.

13   Q      What is pain?

14   A      So pain is the conscious awareness of a noxious stimulus.

15   And it's -- almost always has an emotional component to it.

16   The International Association for Study of Pain defines that

17   and I put that in my report.  It's both an unpleasant sensory

18   and emotional experience associated with actual or potential

19   tissue damage or described in terms of such damage.  So it's --

20   pain is the usual thing that we think about in our everyday

21   life.  It's -- you know, we're awake, we stub our toe, it

22   hurts.  You have to be conscious to be able to feel pain.  That

23   doesn't mean that your body doesn't react to that noxious

24   stimulus.

25          But, for example, braindead humans can react to noxious

```
1   stimulation.  As I said, they can move, their blood pressures

2   can go up.  I've taken care of braindead humans that were organ

3   donors, and they need an anesthetic because if you do surgery

4   on them to remove their organs, their blood pressure can go up

5   pretty high.  So they can have a hemodynamic response.  So even

6   braindead humans can respond to noxious stimulation,

7   physiologically that is.

8   Q    Like an autonomic response, almost like breathing, our

9   body wants to breathe?

10  A    Correct, kind of like an autonomic response.  That is

11  correct.

12  Q    So the fact that a patient moves during surgery, does

13  that mean they're consciously aware of and experiencing pain?

14  A    Not in my opinion, no.

15  Q    Does the fact that a patient's blood pressure goes up or

16  otherwise the body reacts to a noxious stimulus -- does that

17  necessarily mean that the patient is experiencing pain?

18  A    No.  Blood pressure -- in fact, if you were to go back to

19  the curve that I drew, and I didn't do this for this report.

20  I'm not even sure -- I can't remember, I'm not sure where I got

21  it in my literature.  But if you were to draw the same curve

22  for the hemodynamic response, it'll be even farther to the

23  right of movement.

24  Q    And what is that response, Doctor?

25  A    That is called the hemodynamic response.  That is the
```

1    blood pressure increase and the heart rate increase.  So if you

2    wanted to draw that, it'd be even farther --

3    Q     Over here?

4    A     Yes, over there.

5    Q     Can you draw it for me, Doctor?

6    A     Sure.

7                MS. MERRITT:  Your Honor, may I approach?

8                THE COURT:  You may.

9    BY MS. MERRITT:

10   Q     Doctor, you've drawn a line here far to the right of the

11   figure on page 7 of your report.  Again, what does this line

12   represent?

13   A     So maybe I shouldn't have written that.  That would be

14   the blunting of the hemodynamic response.  We call that M-A-C

15   B-A-R, M-A-C-B-A-R, which basically means blocking the

16   autonomic response.  And some anesthetics, you can't even do

17   that.  You cannot blunt it.  In fact, with isoflurane, which is

18   one of your anesthetics, the only way that you can really blunt

19   that response is that you have to give so much -- that you

20   lower the blood pressure so that the individual's blood

21   pressure is so low that they can't really mount much of a

22   hemodynamic response.  So that autonomic response is very

23   difficult to blunt with most anesthetics.

24   Q     Okay.  And so if I'm understanding what you're saying,

25   the fact that a patient who's undergoing a surgical procedure,

1    the fact that their heart rate were to increase, that doesn't

2    mean they're consciously aware of and experiencing pain, right?

3    A     No.

4    Q     Is there any way to say with any certainty whether they

5    are consciously experiencing pain?

6    A     Well, I know that there's some disagreement, as you've

7    heard, about various monitors that we can use including the BIS

8    monitor.  I think the best we have to go on is that we know the

9    dose response curves are the effects of these drugs.  So if you

10   look at the data on some of the anesthetics, if you just

11   achieve a certain anesthetic level beyond that, the chance that

12   the patient would be conscious and be able to form memories is

13   very, very low.  So I think looking at the actual anesthetic

14   dose is probably more important, based on our experience, than

15   any particular monitor.  And that's, I think, been borne out by

16   some of the data that's been published.

17   Q     Is there a way for you to demonstrate on our paper here

18   what the normal induction of anesthesia dose would be for

19   midazolam as opposed to 500 milligram and how long that dose

20   would last?

21   A     Sure.

22         MS. MERRITT:  Your Honor, could the doctor step down

23   and draw on the board?

24         THE COURT:  You may.

25         And I am fine if opposing counsel wants to move.  If you

```
 1   want to move to be able to see it better, you can pull up a
 2   chair anywhere you want.
 3              MS. MERRITT:  Can you see that, Your Honor?
 4              THE COURT:  I can.
 5   BY MS. MERRITT:
 6   Q    Can you describe for the Court what you've drawn here?
 7   A    Yes.  I don't have to be right in front of it.  I can do
 8   it from here.
 9   Q    Okay.
10              THE COURT:  The only requirement I would have is
11   speak into a microphone either at the podium or at your seat so
12   our court reporter can hear.
13              MS. MERRITT:  Yes, Your Honor.  Thank you.
14   BY MS. MERRITT:
15   Q    Doctor --
16   A    Yes.  So what -- sorry.
17   Q    If you could, I don't know if it was picked up for the
18   record, so you've drawn on a piece of paper a chart.  Can you
19   please describe what you've done here?
20   A    Yes.  So this is basically a concentration versus time
21   curve or two curves, and the concentration of midazolam in the
22   blood or plasma, and then time after a dose that has been
23   given.  And I've drawn two curves.  One of them is red.  One of
24   them is a black line.
25   Q    Okay.  Just so I can make it clear, what's the red line?
```

1    A      So the red line would represent the concentration that

2    would be expected after maybe an induction dose of midazolam,

3    which would be between 0.2 and 0.3 milligrams of midazolam.   So

4    that would be typically 20 to 30 milligrams of midazolam.

5    Q      Okay.   So the typical induction dose for a 200-pound man

6    would be between 20 and 30 milligrams of midazolam.   Is that

7    correct, Doctor?

8    A      That is correct.

9    Q      Okay.   And so you said earlier that midazolam is

10   dose-dependent, correct?

11   A      Yes.

12   Q      So what would you expect to be the typical induction dose

13   for, say, a 400-pound man?

14   A      So as weight goes up, if you look at the literature, the

15   dose has to go up with the weight.   So basically for a

16   400-pound man, which is going to be around 180 to 190

17   kilograms, so I'm just going to round it up to 200 kilograms to

18   make the math easier.   So that would be between 40 and

19   60 milligrams of midazolam.

20   Q      And so what I've written on the bottom of your drawing is

21   20 to 30 milligrams would be the typical induction dose for a

22   200-pound man, correct?

23   A      Yes.

24   Q      And then 40 to 60 milligrams of midazolam would be the

25   typical induction dose for a 400-pound man?

1    A    Correct.

2    Q    And there's been a lot of talk about what exactly it

3    means to induce general anesthesia with midazolam.  Can you

4    explain for the Court what these kind of dosages would do and

5    how it would affect consciousness in a person?

6    A    So the induction process, or to induce general

7    anesthesia -- and I think Dr. Zivot went over that pretty

8    nicely.  So basically -- and I'm not going to talk about the

9    monitoring part because that's not too germane to this issue,

10   but -- so basically you would use your induction drug,

11   anesthetic induction drug, and that will produce the state of

12   unconsciousness that you want, followed by a muscle relaxant.

13   And then you're going to -- many times you're going to use an

14   endotracheal tube.  You're going to place a small -- I say

15   small, but it's about the size of maybe your finger -- plastic

16   tube into the windpipe to breathe for the patient.  And you're

17   going to use a metal tongue blade to do that.

18        And so I think it's important to understand in relation

19   to noxious stimulation that the induction process, again, with

20   endotracheal intubation, involves laryngoscopy and placement of

21   an endotracheal tube that is very stimulating.  In fact, it is

22   more stimulating based on data that I -- or studies that I

23   reviewed, it is more stimulating than a skin incision.  By that

24   I mean that you need these four -- the drug that was studied in

25   the one study for isoflurane, you need more isoflurane to blunt

1   the response to laryngoscopy and intubation than you need to

2   blunt the response to a skin incision.  So if you put that

3   information together, what it says is that midazolam, which is

4   approved by the FDA for induction of general anesthesia, and

5   has been demonstrated in the literature to be used and useful

6   as an induction of general anesthesia drug, sufficiently blunt

7   consciousness, to make someone unconscious.  So you can place

8   an endotracheal tube in a patient and that temporal period when

9   you are doing that we're talking about around 30 to 60 seconds,

10  that's just the placement of the tube.  That stimulation

11  continues once that tube is in place, so that is a very

12  stimulating procedure that is done.

13  Q     So is one of the benefits of midazolam that it is, in

14  terms of induction of anesthesia, it's very short-acting which

15  means it onsets quickly, I guess, for lay people?

16  A     That is one benefit of it that it's not as good and

17  fast-acting as some of the other medications that we use.  And

18  it actually, one of the reasons why it's not particularly

19  useful in 2017 from a clinical perspective is that when you

20  give this induction dose, it's going to actually last longer so

21  people may not wake up as fast because of it, so comparing, for

22  example, midazolam to propofol, someone might not wake up as

23  fast.  If it's a short procedure, they may not wake up as fast

24  if they've been given midazolam as compared to propofol.

25  Q     Doctor, at the top of this red curve here which is a

Antognini - Direct                                    1001

1    demonstration of the typical induction dose, is this a level of
2    unconsciousness, then, like if we drew a little line across?
3    A    Well, I think the level that you would need is actually
4    below that red line.
5    Q    Can you come draw where you think it needs to be and
6    let's use green?
7    A    Sure.
8    Q    Can you write there, Consciousness?  Thank you, Doctor.
9    Can you describe what you've just drawn in green on this
10   demonstrative?
11   A    Yes.  That's a level of drug that you need to produce
12   unconsciousness and that level is based on some of the
13   literature that I reviewed.  But I must say that it'd be easier
14   to actually, instead of having this sort of approximation to
15   show you this on an actual curve, and Dr. Stevens, very kindly
16   in his report, has shown us the concentration time curve for
17   midazolam for a 500-milligram dose and you can probably get a
18   better feel for what I'm talking about.
19   Q    Is that the chart from his textbook?
20   A    No, that was in his report.
21   Q    Okay.  Let me find that for you.
22        MS. MERRITT:  Somehow, Your Honor, I think I've
23   messed up my monitor here.  Can I get some assistance?
24        THE COURT:  Is there a red -- the monitor for the --
25        MS. MERRITT:  The monitor for the ELMO is not

1    working properly.

2                THE COURT:  See if Ms. Washington can help out.

3    There's a master button.  It's resetting.

4                MS. MERRITT:  While we wait for that, Your Honor,

5    may I approach the witness so that he can find the chart that

6    he would like to refer to?

7                THE COURT:  You may.

8    BY MS. MERRITT:

9    Q    For the record, I'm showing you Plaintiffs' Exhibit 16.

10   Does this appear to be the report that you were referring to?

11   A    Yes.

12   Q    And I've asked you to identify the chart that you would

13   like to talk about.  Is this it?

14   A    That is correct, yes.

15   Q    Okay.  How does this support your opinion with regard to

16   the induction dose and the effects of it, of midazolam?

17   A    Well, I was -- so the chart that he has here is based on

18   some data that he extrapolated from a 5-milligram IV dose of

19   midazolam.  So now he's extrapolated 500 milligrams of IV

20   midazolam.  And I just want to demonstrate where the -- this

21   green line would be on this chart that he's drawn here.

22               MS. MERRITT:  May I approach, Your Honor?

23               THE COURT:  You may.

24   BY MS. MERRITT:

25   Q    Okay, Doctor.  Please describe what you've just drawn on

1  this Plaintiffs' Exhibit 16.

2  A     So what I did is I looked at some of the data that I

3  reviewed in the report, the data of Glass, et al., that looked

4  at consciousness and unconsciousness related to midazolam.  And

5  my recollection is that they determined that the level of

6  consciousness, or the amount that you needed to produce

7  unconsciousness in 50 percent of people was around 279, so

8  that's that line.  Now, of course, you can say, well, what's

9  the amount that you need to do 100 percent of people?  It's

10 probably going to be maybe double of that.  So that green line

11 is just the -- what I would say is the ED 50, effective dose

12 50.

13      But, nevertheless, that green line, if you were to get it

14 to 100 percent of people, would be below a thousand.  So the

15 500-milligram dose of midazolam clearly exceeds the amount of

16 drug that you would need.  And not only that, if you look at

17 the time frame there, that time scale that he has there is six

18 hours of time.  So the predicted plasma concentration exceeds

19 that for six hours.  Of course, given the nature of the lethal

20 injection protocol, the time after ten or 15 minutes is not

21 important.

22 Q     Okay.  Just to go back to the demonstrative that you

23 drew, the black line there demonstrates the effect of a

24 500-milligram dose of midazolam.  Is that correct, Doctor?

25 A     That is correct.

Antognini - Direct

```
1   Q    And so this is a concentration in the blood?

2   A    That is correct, yes.

3   Q    And so whether it's under Dr. Stevens' own data, as I'm

4   understanding it, even a typical induction dose of midazolam,

5   20 to 30 milligrams, would be sufficient to render a person

6   unconscious and insensate to pain for at least an hour?  How

7   long?

8   A    Well, for a typical induction dose, it probably wouldn't

9   be an hour.  I'm guessing it would probably be maybe around

10  ten, 15 minutes, is my guess, maybe a little bit longer, 20

11  minutes, depending on the individual.

12  Q    And to a reasonable degree of medical and scientific

13  certainty, how long would a 500-milligram dose render a person

14  unconscious assuming that they had breathing support and

15  otherwise were supported in that way?

16  A    Well, I would have to say it looks like it's going to be

17  beyond six hours because this figure that he drew goes out to

18  six hours, 360 minutes, and it's still -- the line is still

19  well above the green line.  Now, we don't really know for sure

20  that some of the kinetics are going to work out that far in

21  terms of being accurate, but I would say, given that dose, it

22  could be definitely several hours, if not more.

23  Q    So can you state within a reasonable degree of medical

24  and scientific certainty that an inmate administered

25  500 milligrams of midazolam would be unconscious and insensate
```

1    to any pain that they might otherwise experience upon the

2    administration of the vecuronium bromide and the potassium

3    chloride pursuant to the Arkansas lethal injection protocol?

4    A     It's my opinion to a certainty -- medical and scientific

5    certainty that they would be unconscious and unable to sense

6    the other drugs and their effects after 500 milligrams of

7    midazolam.

8    Q     Thank you, Doctor.  And that's based on not only your own

9    research, but even on Dr. Stevens' data?

10   A     Based on my own review of the information, but also what

11   Dr. Stevens put up there, yes.

12   Q     Thank you.  So based on that testimony, the whole

13   discussion about the ceiling effect dose, do you consider that

14   to be relevant in any way to your opinions?

15   A     I do not, because the ceiling effect, to me, is a

16   distraction.  So you can think about the ceiling effect in a

17   number of ways.  First off, in terms of the legal issues that

18   have arisen out of the use of this drug over the last several

19   years, the ceiling effect was introduced as a confounder,

20   perhaps, and it grew legs.  And then, of course, as we all

21   know, when it was -- the case was decided by the Supreme Court,

22   they discussed the issue around the ceiling effect.  So I think

23   the legal system -- and I'm paraphrasing here, so I apologize.

24   But the legal system, I think, latched on to that and just sort

25   of thought, if we only knew the dose that caused the ceiling

 1   effect, if we could only determine that, then we would have a

 2   scientific answer to this.

 3        And Dr. Stevens has provided us some calculations which I

 4   think have some errors or in the past have had errors.  I think

 5   there are still some errors, especially in terms of

 6   interpretation, but I don't think that matters.  The issue here

 7   is, can this drug, can midazolam, induce a state of anesthesia

 8   that would be sufficient to keep -- to make someone unconscious

 9   and unaware and insensate to noxious stimulation?  And I just a

10   moment ago provided you an example of that where you can use

11   this drug and I have used this drug for induction of general

12   anesthesia and intubated patients with it.

13        And intubation, as I say, is a very stimulating

14   procedure.  Just a moment ago, Dr. Zivot talked about

15   aspiration of water and how stimulating that is.  Well, this is

16   just as stimulating, if not more.  So it's not the only

17   stimulating thing that we do during the induction period.  So

18   if midazolam couldn't be used in that way, then the FDA would

19   have never approved it.  Why did the FDA approve it for that

20   use?  Because there was clinical data, human data out there

21   indicating that midazolam could be used for anesthesia

22   induction including endotracheal intubation.

23   Q    Is there any human data that indicates that vecuronium

24   bromide or potassium chloride would somehow cause breakthrough

25   pain or would cause the inmate to suddenly -- even though they

1   were rendered unconscious by the 500-milligram dose, they would

2   suddenly become conscious because of that type of stimuli?

3   A       No.  No.  Once you have administered a large dose, in

4   this case, is contemplated a large dose of midazolam,

5   somebody's unconscious, even a small dose, they're not going to

6   be aware of that.  They're not going to be -- so the effect of

7   the vecuronium, of course, is that you would paralyze the

8   muscles.  That's been already adequately described in the

9   previous testimony.  And somebody will not be able to breathe.

10  Of course, we recognize that that would be uncomfortable or

11  distressing to somebody who is awake, but it wouldn't be to

12  somebody who's anesthetized with midazolam.  They're just --

13  they're unconscious.

14          So you see this all the time in the operating room where

15  somebody's anesthetized and you're trying to get them to

16  breathe at the end of the case and their carbon dioxide level

17  builds up, they won't breathe because these drugs we give them

18  depress breathing.  So they tolerate that, patients tolerate

19  that when they're anesthetized when they're not breathing.  So

20  I don't see how vecuronium in and of itself in somebody who's

21  been administered this midazolam dose is going to be able to

22  sense that in any way.

23  Q       And what about the potassium chloride?

24  A       So potassium chloride, of course, is an irritant to the

25  vein.  And we know that it causes pain in an awake individual,

1    somebody who's not anesthetized.  But I do not believe that
2    potassium chloride is sufficiently noxious in the vein that it
3    would cause somebody to awaken basically from midazolam or any
4    other anesthetic, for that matter.  I just don't think that a
5    lot of the drugs that we administer to patients for anesthesia
6    hurt.  So in the past, we used to give intravenous diazepam,
7    which is very painful.  We give propofol.  By itself, propofol
8    can be very painful to patients.  Etomidate, another drug that
9    can be very painful.  So we routinely administer drugs to
10   patients that can be painful.  Of course, we try to do things
11   to minimize that pain, but they're very painful.
12        And when you give the propofol to an anesthetized
13   patient -- let's say you've anesthetized somebody and you give
14   them propofol as an additional dose -- in my recollection, I
15   don't recall somebody -- that their blood pressure goes up or
16   heart rate goes up, which would be indicative that their --
17   they sense that their body is reacting to it.  I don't think
18   they're sensing it because they're unconscious, but I just
19   don't think that an anesthetized individual, somebody who is
20   given potassium chloride, that it is irritating enough that it
21   would cause them to wake up.
22   Q    Is a reflex response indicative that a patient is
23   experiencing pain while under general anesthesia or any
24   anesthesia?
25   A    No.  So, again, let's be careful about our words.  In my

1    opinion, anesthetized patients don't feel pain.  So you may

2    apply a noxious stimulus and that stimulus -- that noxious

3    stimulus, if I were to apply it to you while you were awake,

4    you would experience pain.  But if I apply that noxious

5    stimulus to you when you are anesthetized, you do not have pain

6    in the common way that we think about pain in this world.

7    Q      So what is the reflex response then?  I might be

8    butchering that term, but you know what I'm getting at?

9    A      Yes.  So the reflex response, for example, and it could

10   be just a simple withdrawal reflex.  So basically you pinch --

11   might pinch somebody or you might apply -- you know, if it's

12   potassium chloride in this case, you apply -- you infuse the

13   potassium chloride, you may get a reflex withdrawal.  And that,

14   again, can happen in anesthetized patients when you give drugs

15   through an IV and they can have a reflex withdrawal.

16   Q      So, for example, if you were to give an anesthetized

17   patient a hard pinch, if they withdrew like this, that would

18   not indicate that they actually felt that pain?  That would be

19   more of an autonomic response?  Is that --

20   A      That is correct, yes.  And, in fact, if you, again,

21   review the chart that Dr. Stevens provided on the ASA

22   guidelines, they explicitly state purposeful movement does not

23   include a reflex withdrawal.

24   Q      Is this the chart that you were referencing, Doctor?

25   A      That is correct, yes.

Karen Baker, RMR, CRR, CCR
United States Court Reporter

1   Q      Is this page 10 of Dr. Stevens' report which is

2   Plaintiffs' Exhibit 16?

3          And so what we are -- is the goal for anesthesia so that

4   a patient does not exhibit a purposeful response to a noxious

5   stimulus?

6   A      Well, we -- generally, surgeons -- and you can imagine

7   why -- surgeons do not want patients to move.  It's hard to hit

8   a moving target.  So even a simple reflex withdrawal could be a

9   problem depending on the type of surgery that you're doing.

10  So, again, we have to be careful about what we might want to do

11  in a clinical situation to what we're thinking about here,

12  which is, are we -- how much of a drug do we need to give to

13  make sure somebody's unconscious?  So just because someone has

14  a reflex withdrawal does not mean that they're awake and

15  feeling it and aware of it.

16  Q      Could you give the Court some examples of what might

17  indicate purposeful movement while a patient is under

18  anesthesia?

19  A      So purposeful movement usually is going to be turning of

20  the head towards the stimulus or maybe the -- so if I were to

21  pinch you on your right hand, and you brought your left hand --

22  left arm over and tried to wipe -- or tried to move the

23  stimulus away, that would be purposeful, that would be

24  considered a purposeful movement.

25  Q      So a purposeful movement, might that suggest that the

1  patient might be experiencing some pain from the procedure?

2  A     It could.  It doesn't necessarily mean that the -- it's

3  an absolute, yes or no.  But when you're anesthetizing

4  somebody, you wouldn't want to be at a level where they're

5  demonstrating purposeful movement like that because you're

6  getting too close, I think, to the possibility that they could

7  begin to have consciousness.  So you want to get below that.

8  Q     Okay.  So you might be approaching the green line.  And

9  under clinical situations, at that point, you might administer

10 a little bit more medicine?

11 A     Correct.

12 Q     But a reflex withdrawal from a painful stimulus is not

13 considered to be a purposeful response, is it?

14 A     Correct.  So just to make sure -- I want to make sure

15 we're clear about that in terms of these ASA guidelines.  So it

16 says as Dr. Stevens has -- in box there, "unarousable even with

17 painful stimulus."  And then to the left of that, "purposeful

18 response following repeated or painful stimulation."  So the

19 designation there between the two is that you demonstrate

20 purposeful movement.  But, again, reflex withdrawal is not

21 purposeful movement.  So what that means, the interpretation is

22 that if you had a reflex withdrawal, then you could still be

23 under general anesthesia.  That's the interpretation.

24 Q     Okay.  Thank you.  Briefly, you said you've

25 anesthetized --

Antognini - Direct

1    A       Over 10,000 is my guess.

2    Q       And what type of consciousness check do you do, Doctor?

3    A       So for a typical anesthetic induction after you've placed

4    the monitors and you give the anesthetic induction drug --

5    typically we do two things.  We call out the patient's name and

6    we might say, "Open your eyes.  Open your eyes."  And

7    eventually they don't open their eyes.  And then we give just

8    an eyelash reflex.  We just touch their eyelash to make sure

9    that they're not blinking.  And then we would proceed with the

10   other medications.  For example, if we were to use a muscle

11   relaxant, we would proceed with that.

12          Sometimes in a situation, what is called a rapid sequence

13   induction, we actually give the induction drug and then we

14   follow immediately with the muscle relaxant, and we don't even

15   do a consciousness check.  And that is done because someone

16   might -- let's say somebody's had their lunch and they go out

17   and they get hit by a car, and they come into the operating

18   room because they have to get their bones fixed or whatever, we

19   know that they have a full stomach and we're worried about

20   aspiration, so we do what's called a rapid sequence induction.

21   So we would give our induction drug followed immediately by the

22   muscle relaxant, and then we'd intubate.  We don't even do a

23   consciousness check.

24   Q       And is that because these drugs are so reliable at

25   inducing consciousness, that you don't really need to?

1    A     That is correct, inducing unconsciousness.  That is

2    correct.

3    Q     Thank you, Doctor.  I have nothing further for you.

4    Thank you, Doctor.

5              MS. MERRITT:  Oh, one more thing though.  Your

6    Honor, may I move to introduce Defendants' Exhibit 73, which is

7    the -- it's page 29 of Plaintiffs' Exhibit 16 and the doctor

8    indicated the unconsciousness line there?

9              MS. VANDIVER:  No objection.

10             THE COURT:  And tell me the number again of this

11   one.

12             MS. MERRITT:  I believe I'm on 73, Your Honor.

13             THE COURT:  All right.  73 will be admitted.

14        (Defendants' Exhibit 73 received in evidence.)

15             MS. MERRITT:  I have nothing further at this time,

16   Your Honor.

17             THE COURT:  All right.  Cross-examination.

18        Let's go ahead and get started.  We'll go until 12:15.

19                       CROSS-EXAMINATION

20   BY MS. VANDIVER:

21   Q     Hello there, Doctor.

22   A     Hello.

23   Q     How are you?

24   A     Fine.  How are you?

25   Q     I've been better.

Antognini - Cross

1    A    So have I.

2    Q    I believe that you testified on direct that you're not

3    currently involved in the treatment of patients.  Is that

4    right?

5    A    Yes, that is correct.

6    Q    Okay.  And you also testified that you belong to the

7    American Society of Anesthesiologists?

8    A    Yes.

9    Q    Did I get that right?

10   A    Yes.

11   Q    And are you aware of their position on -- their

12   guidelines on giving expert testimony?

13   A    I am.

14   Q    Okay.  And so you're aware that because you're not

15   currently involved in the treatment of -- in clinical practice,

16   that you should not be testifying as an expert witness?

17   A    I'm aware of those guidelines.  I don't think that they

18   necessarily apply in this particular situation.  Those

19   guidelines were promulgated primarily to adjudicate standard of

20   care issues.  So, for example, if a patient suffered an injury

21   and they wanted to sue -- say it happened four years ago.  I

22   had to have been in practice at that point in time to be able

23   to qualify as an expert witness.  So it's really the time of

24   the event, and it really refers to medical-legal issues,

25   malpractice issues.

Antognini - Cross

1    Q    But you agree that the text of this is that the

2    qualifications of an eyewitness, according to this society that

3    you belong to, says that you should be actively involved in the

4    clinical practice of anesthesiology at the time of the event,

5    and you are not clinically practicing right now, correct?

6    A    Would you define for me what you mean by the time of the

7    event?  What event are we talking about?

8    Q    I assume these lethal injections that are planned.

9    A    Okay.

10   Q    The lethal injection.

11   A    I don't know who's going to be in practice in the future.

12   That's a future event.

13   Q    You're not currently in practice.  And right now you're

14   giving an opinion about the ADC lethal injection protocol?

15   A    That is correct.  I am currently not practicing clinical

16   anesthesiology.  And those are guidelines.

17   Q    And they're guidelines of an organization which you

18   belong?

19   A    Yes.

20   Q    Thank you.  And you also testified on direct that you're

21   not a seasoned expert witness.  Is that right?

22   A    That is correct.

23   Q    And -- but it's also true that you're getting paid $4,000

24   a day for being in court?

25   A    I -- that is the charge, although I'm not charging

Karen Baker, RMR, CRR, CCR
United States Court Reporter

1  them -- it was only for today.  The other days I'm not going to

2  be charging that amount.

3  Q     So you didn't charge for the Monday, Tuesday, or

4  Wednesday?

5  A     I'm not going to charge them that amount, no.

6  Q     Okay.  So how much are you planning on charging them for

7  those days?

8  A     I'm thinking probably around four hours per day at

9  about -- I think it was $400 an hour.  So maybe 1,600 per day,

10  I think, was my thought.

11  Q     Okay.  So you --

12  A     Although, quite frankly, I put more time into it, but

13  that's probably what I'll do.

14  Q     So you are getting compensated quite nicely to be here?

15  A     Yes.

16  Q     You said in your direct that you performed one study that

17  dealt with midazolam.  Is that right?

18  A     Yes.

19  Q     And isn't it true that that study involved computer

20  models?

21  A     Yes.

22  Q     And you also testified regarding some other studies that

23  you've done regarding anesthesia and immobility.  Is that

24  right?

25  A     Correct.

Antognini - Cross                                                    1017

1    Q      Isn't it also true that your study has been devoted to

2    inhalant anesthetics?

3    A      Well, some of the drugs -- I should say, many of the

4    studies that I perform use inhaled anesthetics, but I certainly

5    did studies using injectable drugs such as thiopental and

6    propofol.

7    Q      None of those studies involved midazolam?

8    A      No.

9    Q      And these studies that you did were research primarily on

10   animals, correct?

11   A      Yes.

12   Q      And when you studied these animals, there was no way for

13   you to study their subjective experience of how they were

14   experiencing the experiment?

15   A      No.

16   Q      And most of those animals ended up dead, I would imagine,

17   after your experiments?

18   A      Yes.

19   Q      So there was no way for you to study the consciousness of

20   those animals?

21   A      No.  Let me -- there was -- I guess there were ways to do

22   it.  I didn't do it, but there could have been ways.

23   Q      Okay.  You did not study the effects of intravenous

24   aesthetics in humans -- anesthetics?

25   A      I'd have to look at my CV because I'm trying to think.

1  There might be one or two studies out there.  I did some human

2  studies.  I can't recall off the top of my head.

3  Q    And you also didn't -- you didn't study the effects of

4  intravenous anesthetics on consciousness in humans?

5  A    No, I don't think I did.  Again, I don't think so.

6  Q    And you did not study the effects of benzodiazepines in

7  animals?

8  A    No.

9  Q    And you did not study the effects of benzodiazepines in

10  humans?

11  A    No.

12  Q    And you did not study the effects of benzodiazepines,

13  period?

14  A    Except for that one computer model study.

15  Q    Okay.  And I think we already covered this.  You didn't

16  study the effect of midazolam in animals?

17  A    No, I did not.

18  Q    And you didn't study the effect of midazolam in humans?

19  A    No.

20  Q    And you have not studied the effects of midazolam on

21  consciousness in humans?

22  A    I have not done a formal study, no.

23  Q    So with regard to this computer study that you did that

24  involved midazolam, because that was a computer study, it did

25  not involve injecting midazolam into a human body.  Is that

Antognini - Cross

1    right?

2    A      Did not, no.

3    Q      And there was some discussion of this spinal -- I'm going

4    to call it spinal because I do not know how to pronounce that

5    word -- injections of --

6    A      Intrathecal?

7    Q      Yes.  You did not study spinal injections of midazolam

8    personally?

9    A      No.

10   Q      And the studies that you cite that involve spinal

11   injections of midazolam, those are your review of studies that

12   other people wrote?

13   A      Correct.

14   Q      And these studies are outside the focus of your own

15   personal research?

16   A      Correct.

17   Q      And as we discussed earlier, the focus of your research

18   was inhaled anesthetics, correct?

19   A      That was the vast majority, yes.

20   Q      Okay.  I want to talk about your report.  Your report has

21   been -- this is the wrong binder.  Your report has been

22   introduced, I believe, as Defendants' Exhibit 3.  And this is

23   this chart that Ms. Merritt was talking to you about on direct.

24   That's part of your report?

25   A      Correct.

Antognini - Cross

1   Q      Okay.  And this is adopted from a study that you

2   authored, right?

3   A      Yes.

4   Q      And that study was on inhaled anesthetics, right?

5   A      Yes.  It was a review article, but it was primarily

6   focused on inhaled anesthetics, yes.

7   Q      Okay.  And this graph here, it has -- this axis says

8   "anesthetic concentration," right?

9   A      Yes.

10  Q      And that concentration refers to the concentration of

11  inhaled anesthetic in the lungs, correct?

12  A      Yes.

13  Q      And there's something called a MAC, MAC fraction, which

14  there was a little bit of discussion about this.  Can you tell

15  me what MAC means?

16  A      MAC is an acronym that stands for minimum alveolar

17  concentration.

18  Q      And that relates to the concentration in your lungs?

19  A      Lungs, right.  And it's a way of measuring basically what

20  we would call the effective dose, 50, which means that, at that

21  dose, you achieve the particular end-point in 50 percent of

22  people.  So many drugs are described in terms of an effective

23  dose 50.

24  Q      And actually the study was based on the study of mice,

25  right?

```
 1    A     For which --

 2    Q     The MAC.

 3    A     MAC is used -- it's been used in thousands of studies in

 4    different animals and humans.  So are you talking about the

 5    mouse study that I cited in Chicago, I believe it was?

 6    Q     No, I'm not.  Hold on one second.  I want to go back and

 7    talk about this graph.  So are you familiar with this book,

 8    Miller's Anesthesia?

 9    A     I am, yes.

10    Q     And you would agree that this is an authoritative text in

11    anesthesia?

12    A     Yes.

13              MS. MERRITT:  I have not been provided a copy of

14    this demonstrative, Your Honor.

15              THE COURT:  If you would share it with Ms. Merritt.

16              MS. VANDIVER:  Do you want me to share this whole

17    book with you?

18              THE COURT:  Just let her take a look real quick what

19    you're showing --

20              MS. VANDIVER:  I need to find my page number.

21              MS. MERRITT:  Thank you.

22              MS. VANDIVER:  Your Honor, I'm showing the witness

23    page 618 of Miller's Anesthesia.

24    BY MS. VANDIVER:

25    Q     Do you see this graph here?
```

Antognini - Cross                                        1022

1    A      Yes.

2    Q      It's essentially the same as the one that's in your

3    report.  Would you agree?

4    A      Yes.

5    Q      But here -- and this is credited to you, right?

6    A      Correct.

7    Q      But here, this X axis says "MAC fraction," right?

8    A      Yes.

9    Q      Which again relates to the lungs?

10   A      Correct.

11   Q      And the one in your report just says "anesthetic

12   concentration"?

13   A      Correct.

14   Q      So you agree that there's no data on which -- on where

15   these curves would be for intravenous drugs?

16   A      I disagree with that, and it's in my report.

17   Q      There's no graph like this for midazolam, is there?

18   A      There is not because, as I explained in my report, we

19   haven't done those studies, at least in humans, to see how far

20   out you'd have to get to abolish movement.

21   Q      And you haven't studied the application of midazolam and

22   its effect on immobility or consciousness; is that right?

23   A      I have not, no.

24   Q      So any opinions in your report on the effects of

25   midazolam on immobility or consciousness you're deriving from

Antognini - Cross

1  reviewing other studies?

2  A     Yes.

3  Q     And those studies are outside the area of your research?

4  A     I wouldn't say they're outside the area of my research.

5  When you're doing research, believe me, you end up learning and

6  knowing a lot of stuff that seems very peripheral at first.  So

7  understanding the action of midazolam and benzodiazepines and

8  their actions are absolutely critical to understanding some of

9  the things that I looked at.  So I wouldn't say they're outside

10  of my research.  Maybe not things -- I didn't study midazolam,

11  but I know a lot about the drug and its pharmacological

12  effects.

13  Q     I want to talk a little bit about movement in surgery.

14  You testified that it happens, that patients move during

15  surgery.  So I understand that you're not treating patients

16  anymore, but if you were and you saw movement in surgery, you

17  would administer more anesthetic?

18  A     Usually I would.  It depends on -- sometimes if the

19  patient is hypotensive, you may not be able to do that.

20  Q     But you can't be sure, during a surgery, whether or not

21  that movement is purposeful or reflexive, can you?

22  A     Not with certainty, no.

23  Q     And you would never do a surgery relying on a reflex

24  check alone, would you?

25  A     Well, I don't want to be evasive.  I do want to answer

1    your question, but what do you mean by a "reflex check"?  What

2    would be an example of a reflex check?

3    Q    Would you just rub somebody's eyelashes and then tell the

4    surgeon to go ahead and cut?

5    A    Quite frankly, I might not do anything in terms of

6    stimulating the patient.  So I --

7    Q    You would be monitoring that patient in other ways,

8    though, correct?

9    A    Yes, I would, but the --

10            MS. VANDIVER:  That's fine.

11       I'm about to get into another topic, so I don't know if

12   this would be a good place to stop.

13            THE COURT:  Why don't we go ahead and break for

14   lunch.  We will be in recess until 1:15.

15       Dr. Antognini, you'll be back on the stand at 1:15.

16       (Recess at 12:15 PM.)

17                  C E R T I F I C A T E

18     I, Karen Baker, Official Court Reporter, do hereby certify

19   that the foregoing is a true and correct transcript of

20   proceedings in the above-entitled case.

21

22   /s/ Karen Baker, RMR, CRR, CCR
     -------------------------------          Date: April 13, 2017
23   United States Court Reporter

24

25

Antognini - Cross                                          1024

1          (Continuing at 1:18 p.m.)

2               THE COURT:  You may proceed with cross-examination

3    when you're ready.

4               MS. VANDIVER:  Thanks.

5                    CONTINUED CROSS-EXAMINATION

6    BY MS. VANDIVER:

7    Q.    Okay.  Let's talk a little bit about midazolam's

8    pharmacology.  Do you agree that benzodiazepines act selectively

9    on GABA receptors?

10   A.    Yes.  I don't know the complete literature.  I'm not sure

11   -- most drugs, many drugs can have actions on other receptors.

12   But traditionally and pharmacologically, the vast majority of

13   the action of drugs like benzodiazepines like midazolam would be

14   at the GABA receptor.  There might be some studies out there

15   that say there's actions in other receptors, but the primary

16   effect, without question, is on the GABA receptor.

17   Q.    So would you agree that you need to have GABA present with

18   the GABA receptor for benzodiazepines to work?

19   A.    Yes.

20   Q.    Would you also agree that once all the receptor sites are

21   occupied, you would not get any further action from the

22   benzodiazepines even if you added more of the drug?

23   A.    Could you repeat the question?

24   Q.    Certainly.  Would you agree that once all receptor sites

25   are occupied, you would not get any further action from the

1   benzodiazepines even if you added more benzodiazepine?

2   A.   You would not get further action, I guess, at the GABA

3   receptor.  I'm not sure if that means -- you might get other

4   actions from a clinical perspective, but certainly at the GABA

5   receptor, I would not expect to see more actions.

6   Q.   You agree at the point when all the receptor sites are

7   occupied and you're adding more midazolam, you will see leveling

8   off in an EEG level?

9   A.   I don't know that we have that -- and this is going to be

10  the EEG in humans?

11  Q.   Yes.

12  A.   In humans, yes.  I don't know that we have a complete data

13  set on that.  I think it would be in the -- so it would be in

14  the stage where there may be some leveling off of the EEG

15  effect, but --

16  Q.   And that leveling off is going to be at about 20 milligrams

17  to 25 milligrams that you'll begin to see a ceiling effect on an

18  EEG?

19  A.   I don't know at what dose you would begin to see that,

20  because you're talking about what sounds like would be a bolus

21  dose, and usually when you're looking at these type of studies

22  or doing these type of studies, you would be looking at an

23  infusion.  So I'm hesitant to answer the question just saying 20

24  to 30 or 20 to 25 milligrams.  Maybe you can clarify your

25  question.

1  Q.    You mentioned on direct that you gave some testimony in

2  Ohio.

3  A.    Correct.

4  Q.    Right?  And let me get a copy of it for you.  One second.

5  I'm showing you a transcript from this Ohio case, which I think

6  is called, "In Re:  The Midazolam Protocol," or "In Re:  Ohio

7  Lethal Injection," or something like that.  And at the top it

8  says, "Antognini - Cross."  That's you, right?

9  A.    Uh-huh, yes.

10  Q.    And here you testified -- the question was:  "What do you

11  think happens once a person runs out of GABA?"  And you

12  testified -- you had some problems with the way that she was

13  asking the question, but you said:  "You would not get further

14  action from the benzodiazepines, basically, if you added more of

15  the benzodiazepine."  Is that correct, that was your testimony

16  there?

17  A.    Yes.

18  Q.    And then on page 620 of this transcript, you said:  "You

19  can begin to see some of that ceiling effect occurring probably

20  within the range."  And then you mentioned this issue with the

21  infusion.  You said, "Basically, I would say that there appears

22  to be a ceiling effect in terms of the EEG.  Based on the

23  current understanding in the data out there" -- I'm sorry.  Let

24  me back up here.  "So as an example, I would not expect a large

25  dose of midazolam -- based on the current information that we

1    have now, I would not expect a large dose of midazolam, and by

2    that I mean something beyond the usual clinical dose, for

3    example, something beyond 20 to 25 milligrams.  Based on the

4    current understanding in the data out there, I would not expect

5    midazolam to have much further effect on an EEG."

6         So you testified in Ohio that you would expect at a

7    clinical dose you would start to see a ceiling effect of

8    midazolam?

9    A.    I would start to see what I consider the -- what we call

10   the knee in the curve, so the bend of the curve, as you see the

11   ceiling effect occur.  But we haven't studied midazolam out

12   further, so when we talk about a ceiling effect, we obviously

13   think about a flat line, and some of these may be slightly

14   curved and you may not be --

15   Q.    But at 20 to 25 milligrams, you would expect for it to

16   start leveling off?

17   A.    Yes, my understanding of the literature.

18   Q.    I'm showing you your report, which is Defendants'

19   Exhibit 3, at page 5.  And here at point C, you said, "Midazolam

20   can be used, and has been used, as the sole medication in a

21   variety of other painful medical procedures."  Is that correct?

22   A.    "In a variety of otherwise painful medical procedures."

23   Q.    Right.  Sorry.  And used several studies to support that

24   statement.  Is that right?

25   A.    Yes.

1    Q.   And some of those studies that you used related to spinal
2    injections of midazolam.
3    A.   I don't think that statement that I made there I am
4    referring specifically to those studies.  I'm thinking more
5    about the studies I referenced related to endotracheal
6    intubation and then the C-section study that I cited.
7    Q.   Okay.  Let's talk about the intubation.  That's the Gehrke
8    study.  Am I saying that right?
9    A.   That's one of them, yes.
10   Q.   Okay.  And that's talking about intubations, right?
11   A.   Correct.
12   Q.   And you said, and you testified on direct, that this is a
13   stimulating procedure where midazolam can be used alone, right?
14   A.   According to what they published, yes.
15   Q.   And in this study, 17 people were intubated using midazolam
16   as a sedative, right?
17   A.   It was used -- that was a drug that they used, yes.
18   Q.   And of those people, five received additional opioids or
19   other drugs after the intubation began.
20   A.   Correct, that's my recollection.
21   Q.   But the study did not exclude people who received opioids
22   before the intubation, right?
23   A.   I'd have to look at the methods.  I'm not sure.
24   Q.   And in fact, explaining somewhat unexpected results of the
25   study, the authors commented that benzodiazepines have

1  synergistic interactions with other drugs, like opioids, that

2  were simultaneously used in most patients, correct?

3  A.   I'd have to look at the paper.  I'm not going to comment on

4  that unless I can review the paper.

5  Q.   This is the -- this is Defendants' Exhibit 49.  Is this

6  that article?

7  A.   Yes.

8  Q.   And it says here, "The use of an opioid like morphine or

9  fentanyl or neuromuscular blockers was allowed at the discretion

10 of the attending doctor," right?

11 A.   It does state that, yes.

12 Q.   And it says here:  "Benzodiazepines have synergistic

13 interactions with other drugs like opioids that were

14 simultaneously used in most patients.  Pharmacokinetics of

15 almost all drugs, including sedatives, are not well known in

16 critically ill patients."  Is that right?

17 A.   Correct.  And I believe that's part of the discussion

18 section.

19 Q.   That's right.

20 A.   Okay.  I can clarify that issue, but perhaps I'll have to

21 do it on, you know, someone else's -- the results clearly show

22 there are patients that received only midazolam in that study.

23 Q.   And there's no evidence that the ADC is planning on using

24 an opioid in this lethal injection procedure, right?

25 A.   I'm not aware, no.  No evidence that I know of.

1    Q.    And this is one of the studies that you rely on to show
2    that midazolam can be used alone in painful procedures, right?
3    A.    Yes.
4    Q.    And the other thing about this study is that it lists
5    reasons for intubation.
6    A.    Yes.
7    Q.    Okay.  This is that same exhibit at page -- I don't know.
8    The article is page number 32.  The reasons for intubation
9    include hypoxemia, hypercapnia, mixed respiratory failure, and
10   coma, correct?
11   A.    Yes.
12   Q.    Hypoxemia is an abnormally low concentration of oxygen in
13   the blood.  Is that right?
14   A.    Yes.
15   Q.    Does that mean oxygen is not getting into the brain?
16   A.    That would be one consequence, yes.
17   Q.    That seems like a pretty bad thing to be happening to a
18   person.
19   A.    Yes.
20   Q.    And if it's not corrected immediately, it could cause death
21   or brain damage?
22   A.    It could.
23   Q.    Okay.  Hypercapnia -- am I saying that right?
24   A.    Yes.
25   Q.    That means an excess of CO-2, right?

1    A.    Yes.

2    Q.    Also a dangerous condition?

3    A.    Can be, yes.

4    Q.    And if it's not corrected, it could lead to death?

5    A.    Yes.

6    Q.    Okay.  What about mixed respiratory failure, that's also a

7    dangerous condition that may lead to death?

8    A.    Yes.

9    Q.    Okay.  What about coma?  Patients in a coma may struggle to

10   maintain breathing on their own.  Is that right?

11   A.    Yes.

12   Q.    Okay.  So in these cases, intubation is a matter of life or

13   death?

14   A.    Yes.

15   Q.    So under these life or death conditions, maintaining an

16   airway is the priority, right?

17   A.    Correct.

18   Q.    And that might take priority over other considerations,

19   such as the patient's comfort?

20   A.    It might, yes.

21   Q.    Okay.  And we also just talked about this statement here,

22   that "pharmacokinetics of almost all drugs, including sedatives,

23   are not well known in critically ill patients," right?

24   A.    It does state that, yes.

25   Q.    And would you agree that a drug may work differently in a

1  healthy patient than the way it would in a very ill patient?

2  A.    It absolutely would, yes, or it could.

3  Q.    And this study was used in 17 critically ill patients,

4  right?

5  A.    I don't know if they define them as critically ill, but

6  they were certainly ill.

7  Q.    And they were in the ICU?

8  A.    In the ICU -- well, if they required intubation, I'm

9  willing to say that, yeah, they were critically ill.

10  Q.    And most of them had opioids on board already, right?

11  A.    I don't remember the article stating that.  I'd have to

12  look at the methods and the patient population.

13  Q.    And under life or death circumstances where a patient's

14  comfort may take a back seat to maintaining an airway, these

15  patients were intubated with midazolam?

16  A.    Yes.

17  Q.    And so this is the study that you're relying on to support

18  your statement that midazolam can be used alone for painful

19  procedures?

20  A.    It's not the only study that I relied upon.

21  Q.    Okay.  Let's talk about another one.  This is Defendants'

22  Exhibit 40.  This is the Crawford study.  This is a study about

23  C-sections, right?

24  A.    Yes.

25  Q.    And you'd agree that the focus of this study was on the

1  drug's effect on blood pressure, heart rate, et cetera, not on

2  the anesthetic effect of either drug?

3  A.    That was the focus, that is correct.

4  Q.    Okay.  And when I say "either drug," this is a comparison

5  study.  Is that right?

6  A.    Yes, it is.

7  Q.    And the study did not consider any analgesic or

8  anesthetizing effects of midazolam or thiopental?

9  A.    No, not directly.

10  Q.    And in this study, nitrous oxide was also given, right?

11  A.    It was given after endotracheal intubation.

12  Q.    And nitrous oxide is an excellent analgesic, right?

13  A.    If it is given, it acts quickly, yes, it is.

14  Q.    And you would agree there's some pain that is generally

15  expected with childbirth?

16  A.    There is certainly pain expected with a vaginal childbirth,

17  but it shouldn't be --

18  Q.    Part of the reason that there may be pain in childbirth is

19  because a doctor is treating two patients, right?

20  A.    Yes.

21  Q.    One being the baby that's being born and one is the mother

22  that's giving birth, right?

23  A.    That is correct.

24  Q.    Okay.  And a lot of times in C-sections, time is of the

25  essence, right?

Antognini - Cross

1    A.    Yes.

2    Q.    And doctors don't want to give heavy narcotics immediately

3    prior to surgery because they may hurt the newborn baby, right?

4    A.    Yes.

5    Q.    So the surgeon's priority during a C-section would be the

6    safety of the baby and minimally affecting the baby with drugs

7    rather than the mother's discomfort that she might not be able

8    to remember?

9    A.    That's a question or a statement?

10   Q.    Well, do you agree with my statement?

11   A.    You'll have to say it again.

12   Q.    Earlier you agreed with me that there's two patients when a

13   baby is being delivered, right?

14   A.    Correct, yes, there are.

15   Q.    And so one of the priorities in treating these two patients

16   is not heavily medicating this baby with narcotics.

17   A.    Yes.

18   Q.    Okay.  And so there may be some trade-off that is

19   acceptable for pain in the mother in order to protect the

20   newborn baby.

21   A.    I don't think that the trade-off that you're talking about

22   would be one where I would give a dose of a drug that's so low

23   that I have a significant chance that the mother would have

24   awareness and pain during the surgical incision.

25   Q.    Isn't it true that what we know about midazolam is that it

1    causes amnesia?

2    A.    That's one of its effects, yes.

3    Q.    So rather than preventing the experiencing of pain, you're

4    preventing, or the study says the mothers are being prevented

5    from remembering the pain during the C-section?

6    A.    Well, we don't know for certain whether any anesthetic

7    produces unconsciousness.  I mean, if you want to have a

8    scientific philosophical question out there beyond -- and this

9    obviously extends beyond the scope of what we're doing here.

10   You know, it's difficult to prove consciousness or

11   unconsciousness with any anesthetic.

12   Q.    And this study is from 1989, correct?

13   A.    '89, yes.

14   Q.    So that's almost 30 years ago then.

15   A.    Yes.

16   Q.    One moment.  This is what's been marked as Defendants'

17   Exhibit 68.  This is the Schweiger -- a study by Schweiger.

18   This is one of the studies that you cited in your report,

19   correct?

20   A.    Yes.

21   Q.    And this is -- again, I'm not going to try to say that

22   word.  But it's about spinal injections of midazolam -- is that

23   right?

24   A.    Yes.

25   Q.    -- into rats?

Antognini - Cross                                              1036

1   A.   Yes.

2   Q.   Okay.  And so this study involves a spinal injection of

3   midazolam.

4   A.   Yes.

5   Q.   And Arkansas protocol doesn't allow for a spinal injection

6   of midazolam.  Is that right?

7   A.   Does not, no.

8   Q.   And in addition to the spinal injection of midazolam, the

9   study also used an inhaled anesthetic.  Is that correct?

10  A.   Yes, that was the nature of that study.

11  Q.   And Arkansas is not planning on using an inhaled anesthetic

12  in executions, right?

13  A.   No.

14  Q.   So in this study, midazolam was not used alone?

15  A.   No.

16  Q.   And it was injected into the spine?

17  A.   Correct.

18  Q.   And it was used with another drug?

19  A.   Correct.

20  Q.   And none of this is relevant to the execution protocol,

21  none of this is true in the execution protocol?

22  A.   None of the methods that were used in that animal study are

23  going to be applied to an inmate in the Arkansas protocol, as

24  far as I am aware.

25  Q.   Thank you.  I want to talk little bit about analgesia.  Am

1    I saying that right?

2    A.    Analgesia.

3    Q.    Analgesia, thank you.  And that means pain relief.  Is that

4    right, or --

5    A.    Yeah, pretty much I'd agree with that.  Yeah.

6    Q.    Earlier you said that *Miller's Anesthesia*, you think that's

7    an accepted textbook in the field?

8    A.    I do believe it's accepted, although I don't believe

9    everything that's in it.  But, anyway --

10   Q.    So you're aware that *Miller's Anesthesia* says that

11   benzodiazepines lack analgesic properties?

12   A.    I'm aware it states that and has stated that in the past

13   six or seven editions.

14   Q.    But you disagree with this textbook?

15   A.    I have cited the studies in my report, and there are others

16   that I didn't cite, that show that there are spinal actions on

17   GABA from benzodiazepines that indicate that it has an analgesic

18   effect on the spinal cord.

19   Q.    And you believe that midazolam creates analgesia?

20   A.    Analgesia.  When a benzodiazepine, in this case midazolam,

21   enters into the spinal cord, there is that possibility.  And I

22   think it's worth considering that the large dose that's used

23   here, that's sufficient to enter the spinal cord and produce

24   analgesia.

25   Q.    So that would be based on the studies where the midazolam

1    is injected directly into the spinal cord.  Is that correct?

2    A.    That is part of the support of that statement, yes.

3    Q.    And again, we already talked about this, that's not going

4    to be happening in these executions?

5    A.    No.

6    Q.    And would you agree that your colleagues disagree with your

7    characterization of midazolam as having analgesic properties?

8    A.    I understand that they disagree with that, and I don't

9    think that they're seeing it the same way that I am, but that's

10   the way science is.

11   Q.    Okay.  I want to talk about this term that has been coming

12   up a lot in this hearing, and that's "consciousness."  *Miller's*

13   *Anesthesia*, this book that you said is a respected text, notes

14   that the term "consciousness" is used indiscriminately.  Do you

15   agree with that?

16   A.    Yes.

17   Q.    Okay.  And it also distinguishes between consciousness and

18   responsiveness.  Do you agree?

19   A.    Yes.

20   Q.    Okay.  One moment.  I've lost my place here.  This is your

21   report, which has been admitted as Defendants' Exhibit 3.  In

22   paragraph 48 there, which is on page 23, you said, "Assessment

23   of consciousness by nonphysicians is a common practice."

24   A.    I did state that, yes.

25   Q.    And your citation for this is the Glasgow Coma Scale and --

1    and how do you pronounce this?

2    A.    Just RASS.

3    Q.    RASS score?

4    A.    Yeah.

5    Q.    And "RASS" stands for Richmond Agitation/Sedation Scale.

6    Is that correct?

7    A.    Yes.

8    Q.    It's used to measure the agitation or sedation level of a

9    patient, correct?

10   A.    Correct.

11   Q.    And when the staff that's using this scale is making this

12   assessment, they're looking for responsiveness.  Is that right?

13   A.    Yes.  I'd have to think about some of the parts of the RASS

14   score.  There may be objective, without -- a response is usually

15   in response to something, and I forget the RASS score -- but,

16   generally speaking, it is a response, yeah.

17   Q.    This is not very classy, but we'll do it this way.  Does

18   that look like the RASS scale to you?

19   A.    It does.  It's a little bit blurry, but I think it is, yes.

20   Q.    I don't know if I can do anything about that.

21   A.    That's all right.  That's enough.  I can read it, I think.

22   Q.    So the first thing here is that they're looking for a

23   response to a voice?

24   A.    Or physical stimulation.  That's what it states there.

25   Q.    And so this scale isn't actually measuring brain activity;

1    it is measuring whether or not you're responding?

2    A.    Correct.

3    Q.    And even someone who is unarousable, according to this, may

4    still be able to experience physical stimulation.

5    A.    I disagree with that.

6    Q.    But this doesn't measure someone's subjective experience;

7    it only measures whether or not they're responding to stimulus,

8    right?

9    A.    That is correct.

10   Q.    Let's talk about the Glasgow -- how do I say that?

11   A.    Glasgow Coma Scale.

12   Q.    And this is *Miller's* again, Volume 2.  Do you see that

13   there at the bottom?

14   A.    Yes.

15   Q.    And is that the Glasgow Coma Scale, reproduced?

16   A.    Yes.

17   Q.    And this is used in neurologic examinations.  Isn't that

18   right?

19   A.    That is correct, among other types of examinations.

20   Q.    And it's an assessment tool for patients with acute brain

21   injury?

22   A.    That's where it is used primarily, yes.

23   Q.    And it relies on independent assessment of eye opening,

24   speech, motor movement, and response to progressive trials of

25   command, voice, and noxious stimuli.

1    A.    Correct.

2    Q.    And this also measures responsiveness.

3    A.    Yes.  Although there's, as I recall -- I'd have to look at

4    this.  But there's going to be -- some of those scores were

5    spontaneous, like for eyes, opens eyes spontaneously, which is

6    not -- I suppose you would call it a response to something, but

7    it's not a response to something that the healthcare worker

8    would -- you know, some type of stimulation of the healthcare

9    worker.  I hope I made that clear.  Spontaneous as opposed to

10   evoked.

11   Q.    I think I understand.  What's the lowest possible score on

12   this?

13   A.    Three, which, by the way, the Glasgow Coma Scale is

14   forgiving.  If you're dead, you get a score of three.

15   Q.    Somebody with a scale of three could still be aware of what

16   they're experiencing?

17   A.    I absolutely disagree.  I just said you could be dead and

18   have a score of three.

19   Q.    But you could also be aware?

20   A.    If somebody -- you know, there's not a pharmacological --

21   there could be a pharmacological reason why you have a score of

22   three.

23   Q.    Would you ever operate on somebody using just this scale?

24   A.    I actually have never used the Glasgow Coma Scale to

25   operate on anyone.  And I've used it to evaluate a patient in

1  terms of their coma level, but I've never used it to operate on

2  anyone.

3  Q.   To assess whether or not they were okay to be operated on?

4  A.   No, I have never used it --

5  Q.   What about that RASS check?  Would you use that solely to

6  determine whether or not you should operate on someone?

7  A.   I would not, although I think you're misconstruing what

8  I've written there.  But that's fine.

9  Q.   What about a trapezius pinch?  If that was the only measure

10  available to you to determine whether or not someone was

11  conscious, would you still operate?

12  A.   Repeat the question.

13  Q.   If all you can do to determine whether or not somebody had

14  been, I guess, properly anesthetized or conscious, or whatever

15  word we want to use, the only tool available to you would be a

16  trapezius pinch, which I understand is a pinch on your shoulder?

17  A.   Yes.

18  Q.   If that's all you could do, would you still operate on that

19  person?

20  A.   I have never really, to my knowledge, used the trapezius

21  pinch as a method to --

22  Q.   Okay.  What about just calling out their name?

23  A.   I have done that, yes.

24  Q.   To go ahead and say, "This person didn't respond to their

25  name, go ahead and cut them open"?

1   A.   No, I haven't used that as my sole criteria.

2   Q.   Right.  You wouldn't use it as your sole criteria?

3   A.   Right.  I mean, during the induction, I think as I

4   mentioned to you earlier, or the Court, we often will give the

5   drug and then ask someone to open their eyes or call out their

6   name.

7   Q.   I'm looking at your report again, which is Defendants'

8   Exhibit 3, and I'm looking at page 6.  Here you say that there

9   are three essential endpoints of general anesthesia:  Amnesia,

10  unconsciousness, and immobility in response to noxious stimulus.

11  Is that right?

12  A.   Correct.

13  Q.   So if a drug achieves only one of these three points, it

14  would not be a general anesthetic, or a general anesthesia would

15  not be achieved?

16  A.   That is correct.

17  Q.   And if a drug only achieved two out of three of those, it

18  would not achieve a general anesthesia?

19  A.   That is correct.

20  Q.   So all three points need to be reached?

21  A.   That is correct.

22  Q.   Okay.  Now, I'm looking at paragraph 25 of your report,

23  which is on page 14.  Here you cite this Nishikawa study.

24  A.   Yes.

25  Q.   And you state that in mice, however, midazolam can produce

1  complete anesthesia.

2  A.   Yes.

3  Q.   And in that study, the control group of nine mice failed to

4  move their tails or right themselves for a certain period of

5  time after administration of midazolam.  Is that right?

6  A.   I don't have the paper in front of me, so I'd have to go on

7  your word on what it says.  And I'm not sure where you are on

8  the paper.  But if that's what it says, that's what it says.

9  Q.   Okay.  And this study didn't measure whether or not the

10 mice remembered that experience.

11 A.   No.

12 Q.   And this study didn't measure what the subjective

13 experience of the mice was.

14 A.   No.

15 Q.   Okay.  And no one measured the brain waves of the nine

16 wild-type mice involved in that experiment.

17 A.   No.

18 Q.   So it's impossible to tell whether the mice were conscious

19 in that study, only that they were unresponsive?

20 A.   That is correct.  If you know of a way of communicating

21 with mice in their unconscious level, I'd love to hear about it.

22 Q.   So it's impossible to show whether or not the mice

23 remembered the experience also, right?

24 A.   In this particular study, they didn't study that, but you

25 certainly can do memory studies in mice.

Antognini - Cross                                                    1045

1    Q.    So from this mouse study it cannot be said that midazolam

2    achieved all three essential endpoints of general anesthesia,

3    correct?

4    A.    They did not measure the other two endpoints.

5    Q.    Only immobility?

6    A.    Only immobility.

7    Q.    I want to talk about immobility a little bit.  What is the

8    purpose -- if your opinion is that the midazolam can create

9    immobility, what is the purpose of the vecuronium bromide in the

10   ADC's lethal injection protocol?

11   A.    So I don't know exactly the reason why, obviously, because

12   I wasn't involved in that protocol, why they used vecuronium.

13   But I think the analogy that I can think of in my mind is, why

14   do they use four or five bullets in a firing squad?  Why not one

15   bullet?  Because maybe one bullet won't be reliably fatal as two

16   bullets --

17   Q.    So you're testifying that they may be relying on the

18   vecuronium bromide to kill the inmate?

19   A.    Well, that's certainly one -- one way in which they could

20   do that.

21   Q.    And you agree the method of death would be suffocation,

22   inability to breathe?

23   A.    It would be inability to breathe.

24   Q.    And do you agree with Daniel Buffington that administration

25   of vecuronium bromide on an awake person would be a peaceful

Antognini - Cross                                    1046

1    experience?

2    A.    I disagree with that.

3    Q.    And do you also agree that immobility is not necessary in

4    an execution?

5    A.    I'm sorry.  I'm not sure if you said do I agree or

6    disagree.  Say that again.

7    Q.    Do you agree immobility, like a paralyzing drug, is not

8    necessary in an execution?

9    A.    No, it's not necessary.

10   Q.    And I don't know if you were here for the testimony the

11   other day when we looked at the picture of the gurney.

12   A.    I did see some pictures of gurneys, yes.

13   Q.    Are you aware that the inmate is strapped down in several

14   locations, right?

15   A.    Yes.

16   Q.    So the vecuronium bromide, as far as immobility goes, if

17   that was something that they wanted to achieve, it's probably

18   unnecessary?

19   A.    Well, except that we're really talking about immobility of

20   the diaphragm, not immobility of other skeletal -- --

21   Q.    And, again, that would just go to making them suffocate?

22   A.    It is one way in which you can perform a legal execution.

23   Q.    A legal execution?

24   A.    Or whatever term you want to use for a lethal injection.  A

25   judicial execution, or whatever term is the legal term.

1   Q.   Do you think that the vecuronium bromide is unnecessary in

2   the protocol?

3   A.   I don't have an opinion really about whether it's necessary

4   or unnecessary.  Again, I go to my analogy about how many

5   bullets do you need for a firing squad?  They may end up

6   thinking they need the fourth drug, or maybe they only need two

7   of those drugs.  I don't know.

8   Q.   And the mechanism of death would be from inability to

9   breathe?

10  A.   From vecuronium?

11  Q.   Yes.

12  A.   Yes.  I don't want to, again, mischaracterize.  In the

13  protocol as it's provided, I'm not saying that that is the way

14  in which the inmate dies.  It is one potential way in which the

15  inmate would die.

16  Q.   You said you think midazolam is a dangerous drug?

17  A.   Yes.

18  Q.   So if that's true, then there should be no reason to have

19  this vecuronium bromide paralytic in the protocol.

20  A.   I do not agree with that.

21  Q.   So you think the vecuronium bromide belongs in the

22  protocol?

23  A.   I don't have a -- I don't -- I don't want to say one way or

24  the other.  Your question was about -- I can't remember exactly

25  what your question was, but I did disagree with it, or your

1    statement.  I didn't -- if you want to repeat it.

2    Q.    It's okay.

3    A.    Okay.

4    Q.    Let's look at your report, which is Defendants' Exhibit 3

5    again, and I'm looking at page 49 -- I'm sorry -- paragraph 49.

6    You're expressing an opinion that the scheduled executions do

7    not pose a burden on the team members.

8    A.    Yes.  At the last sentence I state that, yes.

9    Q.    Okay.  You've never participated in an execution, have you?

10   A.    No.

11   Q.    Have you observed one?

12   A.    No.

13   Q.    Have you interviewed team members who have carried them

14   out?

15   A.    No.

16   Q.    And you're not a psychologist, are you?

17   A.    No.

18   Q.    And have you ever supervised people who have carried out

19   executions?

20   A.    No.

21   Q.    Okay.  So your opinion is based largely on the opinion that

22   trained professionals can place IVs into multiple patients in a

23   single shift?

24   A.    That is correct.

25   Q.    In a hospital setting, right?

1   A.   In a hospital setting.

2   Q.   And you're aware that these executions don't take place in

3   the hospital?

4   A.   Yes, I'm aware of that.

5   Q.   In your direct exam you said that there are case reports of

6   brain-dead humans moving.

7   A.   Yes.

8   Q.   And you mentioned in your report this thing called the

9   Lazarus sign.

10  A.   Yes.

11  Q.   Have you ever seen that?

12  A.   I don't recall the times I've taken care of brain-dead

13  humans if I've seen the Lazarus sign.

14  Q.   And you said you'd been practicing for 30 years and that

15  you're no longer treating patients, but at least you did for

16  about 30 years --

17  A.   That's correct.

18  Q.   -- and you never saw that?

19  A.   No.

20  Q.   Just checking.  I have notes in a lot of different places

21  here.

22           THE COURT:  Doctor, if you need some more water, here

23  you go.

24           THE WITNESS:  Thank you.

25  BY MS. VANDIVER:

1    Q.    Doctor, you would never use midazolam as a sole medication

2    in an elective surgery, would you?  I'm asking what you would

3    do.

4    A.    Yeah.  I'm thinking about -- it's a very broad question --

5    in terms of elective surgery as a sole anesthetic.  If it was a

6    very short procedure, I might.  And I'm talking about --

7    Q.    Would that be your sole choice for pain relief?

8    A.    No.

9          MS. VANDIVER:  No further questions.

10         THE COURT:  Redirect.

11                        REDIRECT EXAMINATION

12   BY MS. MERRITT:

13   Q.    Dr. Antognini, I bet you're wishing you hadn't cited so

14   many references in your report.  It makes it a lot easier to be

15   cross-examined, doesn't it?

16   A.    Maybe I should be less of a scientist when I do these

17   things.

18   Q.    Right.  So you testified on direct that there are no human

19   studies that would show the effect of a 500-milligram dose of

20   midazolam, for a variety of reasons, right?

21   A.    Yes, I did.

22   Q.    But you did look at a number of human studies about the

23   effects of midazolam at normal clinical doses, correct?

24   A.    I did.

25   Q.    And you based your opinions on that, correct?

1    A.    Yes.

2    Q.    As well as your 30 years of experience as a practicing

3    anesthesiologist who cared for patients every single day in the

4    hospital setting, right?

5    A.    Yes, that's correct.

6    Q.    Okay.  Now, Ms. Vandiver asked you a number of questions

7    about your testimony in Ohio, correct?

8    A.    Yes, she did.

9    Q.    She didn't ask you about the part where you said, "You

10   don't run out of GABA," did she?

11   A.    No, I don't remember her saying that.

12   Q.    Can you tell the Court why that's important?

13   A.    So GABA, it's essentially a -- it doesn't get used up.  I

14   mean, it gets -- goes across the synapse and then it's what's

15   called the reuptake and taken into the neuron.  Of course, there

16   is going to be metabolism of GABA, but often a lot of GABA is

17   just sort of recirculating in the synapse.  Again, some of it

18   you're going to have manufacture of it, basically.

19        In sort of a short term, you don't really run out of it.

20   And I don't understand the GABA metabolism very much or know

21   much about it beyond that.

22   Q.    But you were asked, "What happens when a person runs out of

23   GABA and there is no more?"

24   A.    You don't run out of GABA, yeah.

25   Q.    Now, they then tried to get you to admit or concede

Antognini - Redirect                                    1052

1   something about the EEG and the ceiling or the top leveling out

2   effect on an EEG.

3   A.    Correct.

4   Q.    In your mind, does that have any relevance as to whether a

5   500-milligram dose of midazolam would render an inmate

6   unconscious and insensate to severe pain?

7   A.    I don't think so.  So the analogy that I would use -- and,

8   again, it gets back to this issue around the ceiling effect, and

9   when you talk about a ceiling effect, you have to talk about

10  what endpoint are you looking at?  So imagine if you had a very

11  tall bookcase, and you had at the very bottom sedation, and the

12  next might be deep sedation, and then you have EEG, and then you

13  have anesthesia and so forth.  And if you had only a ladder that

14  only went up to sedation, and that might be some drug that you

15  can sedate somebody with, you're not going to get to the other

16  levels.  But if you have a ladder that's tall enough to get to

17  anesthesia, which I believe that midazolam can do, then you're

18  able to do that.  Now, the midazolam ladder won't get you all

19  the way up to, you know, coma, like maybe the pentobarbital

20  ladder would, but, nevertheless, it's good enough to get you to

21  where you need to go.

22       So just because you have a ceiling effect in the EEG

23  doesn't mean that you have a ceiling effect or that you can

24  achieve the anesthesia that you need to do a painful procedure.

25  Q.    Thank you.  Let's go back to the two studies that Ms.

1    Vandiver asked you about.

2         First let's talk about Defendants' Exhibit 49, the Gehrke

3    study about midazolam using endotracheal intubation.  Again, can

4    you explain why you relied on this article, Doctor?

5    A.   Well, they had two groups, and, of course, I was focused on

6    the midazolam group.  And there was a small group, or 12, as I

7    recall 12 of the 17 patients in that midazolam group did not

8    receive opiates, and I believe none of the patients received a

9    muscle relaxant, even though it states the method is at the

10   discretion of the physician, but I guess the physicians decided

11   they didn't need to use those.  And their conclusion was that

12   intubation with IV midazolam is effective and well tolerated.

13   Q.   And so this supports your opinion based on your own

14   clinical experience that midazolam alone is sufficient -- a

15   sufficient anesthetic for use in a painful intubation procedure,

16   correct?

17   A.   Yes.  And that's -- in this study, the other thing I

18   noticed is that they didn't look at the Glasgow Coma Scale.  And

19   15 is the highest.  So these people were not completely aware

20   and responsive in the way that we are all now, but they were

21   pretty darn close.

22   Q.   Certainly weren't comatose?

23   A.   The average, as I recall, and you can look at it, it was

24   around 13, is my recollection.

25   Q.   And they weren't at a level where the anesthetic would

1   ablate to consciousness?  They were not at a level where the
2   anesthetic would ablate consciousness?
3   A.    I don't think I understand your question.
4   Q.    Well, the deepest level of sedation, I've heard other
5   doctors say that it ablates consciousness.  Have you heard that
6   term?
7   A.    You mean with midazolam?
8   Q.    For any anesthetic.  I mean, some anesthetics can ablate
9   consciousness?
10   A.    Yes, that's correct.
11   Q.    And what does that mean?
12   A.    Well, it means -- again, I understand there's going to be
13   disagreement about consciousness.  But as we understand
14   consciousness from an everyday clinical perspective and everyday
15   life, or everyday life perspective, anesthetics suppress that.
16   We can't know -- when somebody is not moving to a stimulus and
17   they have no memory of it, you know, I guess we can't know for
18   sure that they're conscious or not, but that's something you can
19   say about all the patients that are having surgery.  That's the
20   way we practice.
21   Q.    You do the best you can?
22   A.    We don't know.  Let's say it's almost a philosophical
23   question, not a clinical question.
24   Q.    Right.  And so we don't need an anesthetic for use in a
25   lethal injection procedure that would render the patient -- the

1  inmate comatose, do we?

2  A.    No, not in my opinion, because we wouldn't require coma for

3  a surgical procedure.  We wouldn't want coma for a surgical

4  procedure.  In fact, we would want to avoid it.  There would be

5  problems if we tried to do that.

6  Q.    Okay.  Let's talk about Defendants' Exhibit 40.  And this

7  is the C-section study, right?

8  A.    Correct.

9  Q.    And you were asked on cross about the nitrous oxide, right?

10 A.    Yes.

11 Q.    Now, you and I visited about this study before.  Can you

12 explain to the Court all the things that the mother experienced

13 prior to the administration of the nitrous oxide?

14 A.    Yes.  So in a typical C-section where you're going to be

15 doing be a general anesthetic, a different setup than a regular

16 operation.  In a regular operation where you're going to have

17 something done to your knee, let's say, you'll get anesthetized

18 and you'll get prepped and draped.  But because of the concern

19 about the drugs getting into the baby, what happens is that the

20 mother is actually prepped and draped while she's awake, and

21 then the surgeon is ready to go, they're scrubbed, and they have

22 a knife in their hand, the scalpel in their hand, and then the

23 anesthesiologist will administer the drug and then the relaxant

24 and then intubate the patient.  And then once the tube position

25 is confirmed, then the surgeon will make the incision and then

1    start to dissect the tissues.

2         Now, in this study, they used nitrous oxide after the

3    confirmation of the tube placement.  And I went into some

4    calculations to determine about how much time there would be

5    where basically only midazolam, or midazolam was the only

6    anesthetic on board.  And it is about a 30- to 60-second period,

7    by my calculation, where there's minimal nitrous oxide.

8         So, to me, the value of this study in the context here is

9    that if the first 30 to 60 seconds these mothers only had

10   midazolam on board as part of their anesthetic during which they

11   were intubated and they had their initial skin incision -- and,

12   again, this drug is still approved, although I agree not used

13   clinically, but still approved for the use of induction of

14   general anesthesia for procedures where noxious stimulation can

15   occur, and this is just one example of that.

16   Q.   Okay.  And you showed me a video of C-section.  And

17   everyone in the courtroom can thank me because I decided we

18   wouldn't use that today, right?  But the C-section is not simply

19   the cutting of an incision.  Can you explain to the Court all

20   the things that are kind of going into that before the nitrous

21   oxide would have kicked in?

22   A.   So there's incision below the umbilicus, and it is probably

23   going to be about maybe 6 to 7 inches long, and then the surgeon

24   will spread the tissues and cut the muscles and the fascia to

25   get to the uterus.  So it's pretty, pretty significant.

1   Q.   Pretty intense?  That would hurt?

2   A.   Absolutely.

3   Q.   Very painful otherwise without the midazolam, right?

4   A.   Correct.

5   Q.   And also two different -- four hands inside of that mother,

6   spreading all the tissues, right?

7   A.   Correct.  So you have hands in there trying to spread the

8   tissue to get the baby out.

9   Q.   Okay.  Doctor, would coughing or gasping for air or

10  snorting after the administration of the 500 milligrams of

11  midazolam, would that in any way indicate that the inmate would

12  be experiencing pain or would be conscious?

13  A.   I think it would be very unlikely, I mean, that that would

14  be happening based on the actions of the drug.  There could be

15  some airway irritation.  Again, the amount of drug you need to

16  block the response to airway stimulation is really high.  You

17  know, as I mentioned earlier, the isoflurane study, you need a

18  lot of that to block the response to endotracheal patients.  So

19  just because someone is coughing and so forth doesn't indicate

20  to me that they're conscious.

21  Q.   Well, I might not have asked the right question or maybe I

22  didn't understand your response, but you testified on direct

23  that for a normal 200-pound man, a 20- to 30-milligram dose of

24  midazolam would be sufficient to induce general anesthesia and

25  get them into a deep anesthetic state so they could endure an

1    otherwise very painful procedure, right?

2    A.    Yes.   The procedure -- when I say "procedure," I want to

3    make sure, that's the endotracheal intubation as an example that

4    I gave, yes.

5    Q.    As an example?

6    A.    Yeah.

7    Q.    For a 400-pound man, a 40- to 60-milligram dose would be

8    sufficient to get them into that state?

9    A.    Yes.   In obesity, in general, in looking at the studies

10   that are out there, the midazolam dose, you basically have to

11   increase it for body weight, based on their body weight.

12   Q.    And so based on the known -- your own experience, as well

13   as the known clinical and scientific data, a dose far beyond ten

14   times more than the typical clinical dose is more than enough to

15   anesthetize an inmate for the lethal injection procedure.

16   That's your opinion, right, Doctor?

17   A.    That is my opinion, yes.

18   Q.    And you were asked about the IV team.  You're aware that

19   the IV team qualifications are set forth fully in the Arkansas

20   Department of Corrections --

21   A.    I have read that protocol, yes.  I am aware of that.

22   Q.    You may not have been in the room, you weren't here all

23   week long, but they are healthcare-trained and their employment

24   has been verified.  Do you have any concerns about the IV team

25   qualifications that are set forth in the procedure?

1    A.    No.

2    Q.    And do people such as nurses and the other folks that are

3    identified in the IV team qualification section, are they well

4    experienced with studying IV lines and pushing drugs?  Although,

5    they won't be pushing the drugs.  Let's just say setting IV

6    lines?

7    A.    The lists of people that were in that protocol you said,

8    yes, I have no concerns about that.  They've identified -- so

9    the types of individuals that are identified there would have --

10   would have qualifications to do IVs.  I don't want to say a

11   blanket statement, so I'll give you an example.

12         The protocol states that there will be a physician there.

13   If the physician was a psychiatrist, I'd have some concerns that

14   they know how to start an IV.  But, you know, given those types

15   of exceptions, I don't have any issues with the types of

16   individuals there.

17   Q.    So the protocol says the person is experienced with doing

18   that -- performing that task.  So you're going to assume --

19   A.    Yes, I'm going to assume, right.

20   Q.    You're going to assume that the ADC will follow its

21   protocol as written, right?

22   A.    Yes.

23   Q.    And nurses that work in a hospital setting, they can place

24   more than four IVs in a work shift, right?

25   A.    More, yeah.  Four or more, yeah, absolutely.

1  Q.    Far more than four?

2  A.    They can -- I bet you there are some that do eight, ten, 12

3  a day.

4  Q.    I want to make sure I understand your opinion on whether

5  midazolam can reliably be used as the sole anesthetic for short,

6  painful procedures.  What's your opinion?

7  A.    I believe that it can.  And, again, it gets to the issue

8  of -- I know we were wrestling with this issue around is

9  midazolam used, can it be used, and whether it's -- again, I

10  don't want to -- I can't, obviously, render an opinion about the

11  constitutional challenge or threshold.  But I will say that if

12  one of these inmates had appendicitis and had to come to the

13  hospital to have surgery and maybe you had a concern that they

14  had a full stomach, midazolam would be one drug that you could

15  use to induce general anesthesia in that inmate and then

16  intubate that inmate.

17      So what I struggle with, well, if it's okay for us to use

18  that, if there's a clinical -- FDA says it can be used for that

19  purpose, even though we may not want to, that's not our first

20  drug choice, but it can be used for that purpose, if they had

21  appendicitis, I don't understand the concern about, well, why

22  are we concerned about the risk of consciousness in this setting

23  for lethal injection when we're not concerned about it when we

24  would use it in the hospital, or we could use it in the

25  hospital?  And it has been used, as I said in my report.

1   Q.   And you, in fact, have personally done so, correct?

2   A.   I have used midazolam for induction of general anesthesia

3   in my career, yes.

4   Q.   As the sole agent?

5   A.   I cannot remember the other -- I think as the sole agent.

6   I just can't remember.  It was a long time ago, so I don't want

7   to state for sure.

8   Q.   But prior to the endotracheal intubation, you have used

9   midazolam?

10  A.   Correct.

11          MS. MERRITT:  I have nothing further.

12          THE COURT:  Anything further?

13          MS. VANDIVER:  I just have one question.  Can we get a

14  time update?

15          THE COURT:  If you want to ask your question and then

16  we'll take a short break.

17          MS. VANDIVER:  Okay.

18                          RECROSS-EXAMINATION

19  BY MS. VANDIVER:

20  Q.   Doctor, I have one additional question regarding this

21  Crawford study.  I think it's 49, but I don't have it written

22  down here.  Ms. Merritt was talking to you about cutting into

23  the abdomen.  And it's true that by the time that there's

24  cutting happening here, that the patients in this study were on

25  nitrous oxide?

Antognini - Recross                                    1062

1   A.   They were on nitrous oxide, but that doesn't mean that the

2   nitrous oxide had been in sufficient concentration in the brain,

3   which is what I showed in my report.

4   Q.   But they were not only on midazolam?  They were being

5   treated with another -- an analgesic?  They were being treated

6   with an analgesic like nitrous oxide?

7   A.   They had started the nitrous oxide, and in that 30- to

8   60-second period, it's not going to achieve much level in the

9   brain.

10  Q.   Thanks.

11          THE COURT:  Why don't we go ahead and take a recess.

12  Let's take a ten-minute recess.

13          THE WITNESS:  Am I finished?

14          MS. MERRITT:  Nothing further.

15          THE COURT:  You may step down.  Thank you.

16      We'll be back in -- we'll take a 10-minute recess, and

17  we'll come back in at 2:30.

18      (Recess at 2:21 p.m.)

19                  C E R T I F I C A T E

20      I, Eugenie M. Power, Official Court Reporter, do hereby
    certify that the foregoing is a true and correct transcript of
21  proceedings in the above-entitled case.

22

    /s/ Eugenie M. Power, RMR, CRR, CCR        Date:  April 13, 2017
23  United States Court Reporter

24

25

1          (Proceedings continuing at 2:32 p.m.)

2               THE COURT:  You may call your next witness.

3               MR. WILLIAMS:  I would call Dr. Stevens in rebuttal.

4               THE COURT:  Please approach, Dr. Stevens.  And you

5    remain under oath from when the oath was administered earlier

6    this week.

7          **CRAIG STEVENS, PLAINTIFFS' WITNESS, PREVIOUSLY SWORN**

8                         DIRECT EXAMINATION

9    BY MR. WILLIAMS:

10   Q.   Dr. Stevens, welcome back.

11   A.   Good afternoon.

12   Q.   So we heard testimony from Daniel Buffington yesterday, I

13   guess it was, now.  And we heard Mr. Buffington describe the

14   coursework and training of a Ph.D. in pharmacology and sort of

15   what it equips you to do.  What is your opinion of his

16   description, and was that accurate?

17   A.   Well, unfortunately, it wasn't accurate at all.  First of

18   all, he described a Ph.D. in pharmacology as a basic science

19   degree.  That's not correct.  Basic science would be like

20   biology or chemistry, typical undergraduate professer-type

21   degrees.  A Ph.D. in pharmacology is actually a medical

22   discipline degree.  Pharmacologists are situated and housed in

23   medical schools.  He talked about the training, and he was off

24   by a factor of four.  He said we have one year of coursework and

25   then go right into research.  In fact, it can be up to five or

1  six years of coursework.  In my case, it was four years of

2  coursework interspersed with research, because I entered the

3  Ph.D. program already having a master's.  So he said one year.

4  In my case it was four years.  In most cases it's five or six

5  years.

6  Q.    And so what does that equip you to do?

7  A.    Well, it gives you a very broad understanding of

8  pharmacology and all of its aspects.  So everything from human

9  pharmacology, metabolism and toxicology is part of the

10 coursework, just a number of different areas, which I feel gives

11 you a very broad training as a pharmacologist.

12 Q.    And Mr. Buffington opined that there is no ceiling effect

13 with midazolam and other benzodiazepines.  Is that correct?

14 A.    I don't believe that's correct at all.  We heard the

15 State's anesthesiologist admit to a ceiling effect with regard

16 to the EEG.  In my report I talk about a ceiling effect that can

17 occur with regards to some studies of the BIS.  But I think we

18 need to go back to the actual mechanism of actions of the drugs.

19 I find it quite surprising that I seem to be the only one

20 actually talking about how the drug works.  To me, that would be

21 kind of step one.  We know that the drug midazolam only works

22 when GABA is also present.

23 Q.    So I'll talk about that in just a second.  But on the

24 question of mechanism, I think Mr. Buffington characterized

25 benzodiazepines as an alternative product to barbiturates.  Is

1   that an accurate description?

2   A.    Not really.  You can think of it as a very much improved

3   product, much safer, for example, and why they have largely

4   replaced the use of barbiturates in many clinical indications.

5   So an alternative kind of to me implies you could use either

6   one, where indeed the benzodiazepines have, like I mentioned,

7   pretty much replaced it.  If you have problems sleeping, you

8   don't take a barbiturate anymore.  You take a benzodiazepine.

9   Anxiety disorder, you take a benzodiazepine, not a barbiturate.

10  They are much, much safer.

11  Q.    So we talked a little bit about your graph and whether

12  that's right, whether it's wrong.  And that graph was, you know,

13  a depiction of the ceiling effect, which Mr. Buffington referred

14  to as a cartoon, I think.  Is that -- we produced in other

15  books.  Are you the first person to ever create a depiction like

16  that?

17  A.    No.  I thought his description of that was fairly eccentric

18  and idiosyncratic.  Indeed, that is in every pharmacology

19  textbook.  It's a basic tenet of benzodiazepines and

20  barbiturates as much as anything else in the book.  So it's not

21  something I originated.  It's something that I saw and adapted

22  from another textbook, and I actually searched at one time

23  different textbooks.  And I think I found five of them that had

24  similar graphs like that.

25  Q.    All showing a ceiling effect before anesthesia, general

1    anesthesia?

2    A.    Correct.  They all show a ceiling effect.

3    Q.    So going back to the topic of GABA, which you just

4    mentioned, Mr. Buffington talked a little bit about that.  And

5    he said there are multiple GABA subtypes, I think is a fair

6    characterization of his testimony.  To quote him, he said:

7    "It's a bit misleading to say we can understand or opine that

8    you have the capacity to fully bind GABA receptors or that we

9    would ever mechanically deplete GABA, the neurotransmitter, from

10   the body."  I'm wondering if you would share your opinion about

11   that statement.

12   A.    Yeah.  I think there's actually two things in there.  One

13   thing I think he was trying to refer to, that there's different

14   GABA receptor subtypes.  And the State's anesthesiologist also

15   mentioned that.  The main one we think of is the GABA A subtype.

16   That's usually a subscript capital A, capital G-A-B-A and a

17   subscript capital A receptor.  That's the main one.  And I'm in

18   total agreement with the State's anesthesiologist that that's

19   the primary one we think of when we talk about GABA action, when

20   we talk about benzodiazepine action.  There are other

21   lesser-researched subtypes.  There's a GABA B.  It looks like

22   there's a GABA C quite recently discovered.  Those are not

23   considered the main subtypes.  So I think Dr. Buffington was

24   producing little bit of a red herring by saying, well, there's

25   other GABA receptor subtypes.  But they have never been shown to

1    be important for the matters at hand here, which is sedation and

2    the effects of benzodiazepines.

3    Q.    And I think we heard sort of on a similar topic Dr.

4    Antognini say that, at least at a previous proceeding, that you

5    don't run out of GABA.  And is that sort of a -- how do you take

6    that statement?

7    A.    Well, I think he's true in the sense that you don't run out

8    of it, but that doesn't mean there's not a limited supply of it.

9    So, yes, you may have, for example, a hundred units of it,

10   whatever those units may be.  Think of it just like a hundred

11   molecules.  And, yes, they bind to the receptor, and they do get

12   recycled.  They actually get broken down in glial cells, a

13   special cell.  And then they get remanufactured again.  So, yes,

14   there's probably a fairly constant level of GABA in the brain.

15   But the important point is there's a finite level of it.  So as

16   you add more and more drugs that have to work with GABA,

17   eventually you create the ceiling effect because there's not

18   enough GABA for, in this example, 500 milligrams of midazolam.

19   Q.    Mr. Buffington stated that midazolam produces respiratory

20   depression to the same degree as barbiturates and opioids.  Do

21   you agree with that statement?

22   A.    No.  In fact, that one, I had an internal gasp when he said

23   that.  I think most people in the room realized that -- even if

24   they are not scientists, that that can't possibly be true,

25   because we hear all about the opioid epidemic which occurs due

1    to respiratory depression, you know.  We don't hear about all

2    this problem with people taking Xanax and dying from overdose.

3    So that's just one kind of simple public example that I think we

4    all know that he was mistaken when he said that.  So in that

5    case, he couldn't be more wrong than to equate the respiratory

6    depressive effect of midazolam with opioids and even with

7    barbiturates.  Both those two are much stronger in that regard.

8    Q.   So he noted there are many deaths, something like he knows

9    of at least 10,000 deaths from midazolam alone and other

10   benzodiazepines perhaps.  But is that a true statement of what

11   benzodiazepines and midazolam do?

12   A.   No.  In fact, any kind of deaths are very rare and probably

13   only in either debilitated patients, or I think there's been

14   deaths in infants.  It's quite, quite rare to have a death from

15   a benzodiazepine.  I think what he was referring to, and maybe

16   not being totally straightforward, was that, yes, there are a

17   lot of opioid/benzodiazepine deaths.  That's a deadly mixture

18   when you mix them.  Of course, opioids are very strong

19   respiratory depressants.  If you add a benzodiazepine, it

20   doesn't help any.  It tends to potentiate and make it worse.

21   So, yes, benzodiazepines are a problem in that regard.  But by

22   themselves, they are very safe drugs and used by millions of

23   people every day.

24   Q.   So Mr. Buffington's testimony started out by citing, you

25   know, several reports and things that have been entered as

1   exhibits that he said he thought were the most important and

2   that he relied on.  Those were Defendants' Exhibits 12, 35, 36,

3   43, 50 and 70.  Have you had an opportunity to look at those

4   exhibits since yesterday?

5   A.   Yes, I did.

6   Q.   And I think we might just take a look at some of them and

7   talk about them.  Let's bring up Defendants' Exhibit 12 if we

8   can.  That should be Liu.  We've discussed this a couple of

9   times.  What is this study?

10  A.   Yes.  This is the study by Liu et al.  I believe it was

11  1996.  Thank you for making it bigger.  "Electroencephalogram

12  Bispectral Analysis Predicts the Depth of Midazolam-induced

13  Sedation."

14  Q.   And let's go down a couple of pages.  We'll take a look at

15  the graph.

16  A.   I might also add that the title here I think is indicative.

17  Most of these papers cited by either the defendants' expert or

18  my own report, they talk about midazolam's effects as sedation.

19  So I think that's important that all the titles say that.  They

20  don't talk about midazolam's effect on producing general

21  anesthesia, for example.

22  Q.   Right.

23  A.   So that's kind of an important overriding aspect of this.

24  Q.   So taking a look at this, we discussed this a little bit.

25  But, I mean, how would a scientist such as yourself look at this

1    graph?  How would you interpret that?

2    A.    Well, first of all --

3    Q.    That's Figure 1 on page 66 of the study, just for the

4    record.

5    A.    Right.  And that's the one that we've seen quite a bit and

6    where the State has drawn a line at the 60 level and showed

7    these four outlier points there.  And that's basically what they

8    are.  On the graph, that's a total of 208 points.  We have four

9    outlying points.  Whether that's due to the equipment or whether

10   that's due to maybe some kind of artifact that can happen with

11   EEGs, we don't know.  But the fact is those are four out of 208

12   points that, yes, ended up being, by these investigators, below

13   60.  However, four out of 208 is 1.9 percent.  So that's pretty

14   much less than 5 percent, so insignificant in a scientist's

15   mind.  And, indeed, if you look at the table -- I think it's

16   right below there, there's a table.  It may be even the next

17   page.

18   Q.    Which table?

19   A.    The BIS.  Yes, this table right here on Table 2 on the

20   right.  And what you notice there is for each of the sedation

21   scores -- thank you.  For the deepest level of sedation,

22   according to the OAA/S score, is 1.  And that means they don't

23   -- and it's in the paper.  They don't respond to a mild

24   prodding.  So it's not unconsciousness.  In any event, if you

25   look and you go across at the deepest level, 1, you see the BIS

1    score.  They just call it BI here.  You see that it's 69.2 plus

2    or minus 13.9.  So this is how data is looked at.  Obviously,

3    you don't focus on the insignificant outliers.  You focus on the

4    average values.  And from there, you build your data, and you

5    build your theories and your hypothesis.  So a scientist or even

6    an intelligent layperson that reads this paper would not go tell

7    another colleague, oh, yeah, we get a BIS of under 60 in

8    midazolam.  They would say, we saw an average of 69.2 with that

9    lowest sedation score and that sedation at 4, we saw an average

10   of 90, period.  That's how the data is interpreted.

11   Q.   So let's take a look at -- this is one that was I think not

12   cited in the Buffington testimony, as 26, Defendants' 26.  But

13   it was discussed yesterday.  Do you recall being asked about

14   this?

15   A.   Yes.  I believe the State asked me about this during

16   cross-examination.

17   Q.   Did you have a chance to look at this paper?

18   A.   I did.

19   Q.   And did you note anything about it -- we can go down to a

20   couple of -- is this what we focused on yesterday?

21   A.   Right.  Well, you might as well go back one page.  We can

22   look at the table, because this is all that the State showed me

23   yesterday or whenever it was, two days ago.  And if you look

24   there, they focused on the BIS, which is the last two rows here.

25   And you can see they had some averages of 51, 54, 53, 55.9.  In

1    this case, they didn't look at the outliers.  They looked at the

2    average, which is good.  That's the way you want to do it.

3    However, at that time I had not had a chance to read the study,

4    so I couldn't say much about it.  But in reading the study, this

5    actual study was done to simulate apnea or obstruction during

6    the airways that might occur with use of anesthetic drugs,

7    sedative drugs.  So what's not noted here, but now if you want

8    to go to the next page, we can look at that top left figure.

9    And what you see right here is they do this procedure where they

10   do what's called loaded breathing, and they actually block the

11   airways.  They induce hypoxia, which we've learned from the

12   State's anesthesiologist means dangerous lowering of the oxygen

13   in the blood, hypercapnia as well, increase in carbon dioxide.

14   And they had more than a 50 percent decrease in inhalation, so

15   basically they are partially suffocating the patients or the

16   subjects in this study, and from a 3 to 5 percent O2 saturation

17   in the blood, a measure of the blood oxygen.  And then they go

18   even lower, farther on here, in the study.

19        So what this means is that the BIS that we talked about

20   yesterday that was in the mid 50s, for example, is not just

21   midazolam.  It's midazolam plus hypoxia.  So we don't know the

22   effects of starving the brain of oxygen, what that would do to

23   the EEG and the BIS.  But it's not clean data in the sense that

24   their model here was actually trying to get hypoxia.  They

25   wanted to model apnea.  So it's not a good data point for the

1    BIS.  In fact, they weren't really looking at the BIS.  They

2    just used that as part of the demographics of their patient

3    population or the subject population.  So a lot of these studies

4    where they say, oh, yeah, unconsciousness was there, if you

5    really look at the study, as in this, there's some major what we

6    call confounds.  You can't just take it at face value by looking

7    at a table like the State did in this case.  There was severe

8    hypoxia, for example.

9    Q.   Let's take a look at 35 -- yeah, 35, which is another one

10   that Mr. Buffington cited as crucial to his opinion.  Let's go

11   to 303 on the study page.  Zoom in on the second table there.

12   So if you could just tell us what this study is, then what this

13   is telling us.

14   A.   Right.  This study, it was all patients that were going to

15   have surgery, elective surgery, I believe.  So they decided

16   while they have the patient population, they are going to try to

17   do a study of midazolam, BIS, as well as a visual analog scale

18   of sedation.  So in this case they didn't use, like in the

19   previous Liu et al. study, they didn't use the observer's rating

20   scale.  They just asked the patients how sedated you feel, four

21   minutes and eight minutes.  Both the researchers and the

22   patients gave ratings on that just by like drawing a line from

23   zero to 10.  They would just draw a line.  So we don't have a

24   good measure of how sedated, definitely were not unconscious,

25   though, because they were actually drawing lines and stuff.  But

1  what you see here is that there's a control group.  And if you

2  look at the BIS, this is all the BIS scores.  They hover around

3  96.5, 97, very normal, alert type of scores.  Then if we look at

4  the midazolam groups, they went from 2, 5 and 10, so fairly

5  significant dose, 10 milligrams.  This is IV, of course.  And

6  what you notice is that the very lowest they get it is four

7  minutes after the BIS.  It's the last line before the break

8  there in the table.  And they get 71.0 as their lowest BIS.  So,

9  again, it shows that there is human data out there showing that

10 midazolam does not produce the same depth of anesthesia that we

11 see with other known general anesthetic agents.

12 Q.    Let's take a look at 36.  What is this?  And is that

13 supportive of Mr. Buffington's opinion?

14 A.    This is a general paper that just correlated how fast

15 midazolam pharmacokinetically, in other words, the movement of

16 midazolam in the body -- this is no disagreement.  It's just

17 kind of a standard paper looking at the physical properties of

18 benzodiazepines and uptake.  So I have no disagreement.  And

19 it's a foundation paper.  It's just for the drugs themselves.

20 Q.    So it doesn't speak to the ability of midazolam to induce

21 general anesthesia on its own?

22 A.    Not at all.

23 Q.    How about the next one, 43?  What is that?

24 A.    Well, this is a drugs.com printout, which Dr. Buffington

25 actually used as his FDA label, not a recommended practice.  I

1    believe in one of the early Oklahoma cases the State's expert

2    was violently criticized for doing all his research on

3    drugs.com.  It would be preferable to actually have the FDA

4    label instead of a third-party website reenactment of the label,

5    if you will.  But it is just another way to get the label, which

6    can be gotten directly from the FDA, which I can do, or from the

7    drug companies.  Often, if you just type in "midazolam.com," for

8    example, it will switch you to a drug company site, and you can

9    get the FDA label from there.  Anyway, that's what that is, a

10   simple kind of rehashing of the FDA label.

11   Q.    What about 50?  Are you familiar with this book?

12   A.    Yes, I am familiar with it.  It's one that's used a lot by

13   forensic toxicologists.  It's basically an encyclopedic-type

14   compendium of different drugs.  This is the Ninth Edition, which

15   is I think from 2010.  It has very short entries on drugs that

16   you can show if you want.  Again, this might be a starting

17   point, but this isn't a primary reference or a scientific study.

18   So in my opinion, this doesn't serve the same function as a

19   peer-reviewed paper or research paper.  It's more of

20   informational and kind of a getting started point.

21   Q.    So what about 70?  This is the last one that he said was

22   crucial to his opinion.  What is that paper?

23   A.    Yes.  This paper is called "The Comparative Amnestic

24   Effects of Midazolam, Propofol, Thiopental and Fentanyl at

25   Equisedative Concentrations."  Again, they weren't -- they never

1    showed that either one of those, either of those agents produces

2    unconsciousness, because they were just going for sedation.  So

3    when they did that, what they found was, in kind of a surprise

4    -- I can see why it got published -- that propofol actually had

5    the same amount of amnestic or amnesia-producing effects as

6    midazolam, thiopental less so.  And then fentanyl, the opioid,

7    did not have any of the same amnesic effects.  Probably that was

8    good because it let people know that it's not just the benzos

9    that are famous for the amnesic effect, but even propofol also

10   has some of that same property.

11   Q.   So having reviewed all these essential papers, in your

12   opinion do they support Mr. Buffington's opinion that there is

13   no ceiling effect of midazolam?

14   A.   No.  They don't at all.  And my report actually reviews

15   other ones that he had not included in his report that we can

16   talk about if you would like that I did include.

17   Q.   And do these papers in your opinion support Mr.

18   Buffington's opinion that 500 milligrams of midazolam will

19   render an inmate unconscious such that they -- or whether

20   general anesthetic will make them not feel pain from the second

21   and third drugs?

22   A.   No.  There's no support for that premise at all in any of

23   these papers.

24   Q.   Let's take a look at a paper that I believe Dr. Antognini

25   discussed a little bit.  It's Exhibit 51, Defendants'

1    Exhibit 51.  This is the Glass paper, if we can look at page 838

2    within the document, two down.  What is this?  Did you have a

3    chance to review this paper?

4    A.    Yes, I did.

5    Q.    Just generally, can you describe it for us?

6    A.    Sure.  This paper also was a study looking at BIS, which is

7    the EEG signal that we all kind of know about with the skull

8    electrodes.  Then it puts it into a proprietary algorithm, and

9    you come up with a single number from zero to 100.  That's the

10   BIS, which we've already heard explained.  So this, they wanted

11   to, again, look at the different drugs, the four drugs, and see

12   what BIS corresponded to various levels in this Modified

13   Observer's Assessment of Alertness/Sedation Scale, which is

14   being highlighted right now.

15   Q.    So what is the zero on there?

16   A.    So the zero on here does not respond to noxious stimulus.

17   So that pretty much correlates with the ASA Table of General

18   Anesthesia.

19   Q.    Okay.

20   A.    We saw that earlier, and the State's anesthesiologist also

21   brought up the table, so we just saw it today as well.

22   Q.    Let's go two pages down, 840 in the document.

23   A.    Okay.

24   Q.    Can we zoom out a little bit so we can see the whole page.

25   We need to go down two more.  What are these charts showing us?

Stevens - Direct                                    1078

1   A.    Okay.  Each of these plots, we see on the left axis, the

2   vertical axis, the Bispectral Index.

3   Q.    And let's take a -- yeah.  Let's take a look at this one.

4   A.    So, for example, this is isoflurane, gaseous inhalational

5   anesthetic.  I believe the State's anesthesiologist mentioned

6   this drug produces general anesthesia.  And if we look at the

7   left, we can see the Bispectral Index going from zero, the very

8   lowest score you can get, to 100, basically awake.  And we see

9   on the right a little legend.  So the big open circle is 5,

10  basically alert and awake; then the smaller open circle, 4;

11  smaller open circle, 3.  Then 2 is the first closed circle,

12  smaller one, then 1 and then zero.  And what you see here -- and

13  it makes sense -- as you increase the isoflurane concentration

14  along the horizontal or X axis, you see that you tend to go from

15  5 to 4 to 3 to 2 to 1 and then zero.  All those large dark

16  circles are zero, which we know is no response to noxious

17  stimuli, according to the scale they are using.

18  Q.    What does this tell you about isoflurane?

19  A.    Well, it tells me it lives up to its name as being a good

20  general anesthetic.  Once you get to about .8 to 1 percent

21  concentration in the inspired air, you end up with a very sound

22  and robust general anesthesia.

23  Q.    Let's zoom out again and take a look at a couple more of

24  these.  Let's look at the one at the bottom left, please.  And

25  is that telling us something a little bit similar about

1  propofol?  What is that telling us about propofol?  What is

2  propofol again?

3  A.    Propofol is an anesthetic agent used very much now in the

4  ER as well as in the hospital.  And the anesthesiologists -- a

5  good friend of anesthesiologists, I'm sure.

6  Q.    Is it a barb?

7  A.    No, it's not.  It's kind of a unique drug.  It's kind of in

8  a class by itself.  It's a little bit different.  It has some

9  characteristics.  It's kind of unique that way.  Anyway, the

10  Bispectral Index is on the left again.  And what we see, as we

11  increase the amount, again, of the propofol, we go from the

12  large open circle to small open circles to eventually getting a

13  number of the large dark circles, which means no response to

14  noxious stimuli in their sedation score.

15  Q.    So you think that could render general anesthesia based on

16  what you see here?

17  A.    Yes, it could.

18  Q.    Let's take a look at the chart on the top right.  What is

19  that telling us?

20  A.    Now we're looking at midazolam concentrations.  And what we

21  can see here is that, again, on the left -- and these are blood

22  concentrations.  And this is actually the diagram that the

23  State's anesthesiologist used later when he drew something on my

24  report, which we can get to hopefully.  But what this shows is,

25  okay, at the very left we have zero, midazolam.  Of course,

1   we're totally big open circles with sedation scores of 5.  And

2   then, as we move to 200, 400 and 600, we do see more smaller

3   open circles, 3s.  We start to see some closed circles, 2 and 1.

4   But, very importantly, we don't see one large black circle that

5   stands for zero.  In other words, none of the patients had no

6   response to noxious stimuli.

7   Q.   So let's talk about your report a little bit more and how

8   this was used in connection with that.  If we can look at

9   Plaintiffs' 16.  That's Dr. Stevens' report.  And on page 29 of

10  the report is the page we would like to look at, please.  Is

11  this the graph that Dr. Antognini talked about during his

12  testimony?

13  A.   Yes.  This is the one he used.

14  Q.   And just tell us a little bit about how he was using it.

15  Help us understand, you know, how he was using that graph and

16  what your opinion of that is.

17  A.   Right.  I basically did a scaled-up model of what was known

18  after giving a dose of I believe it was 5 milligrams of IV

19  midazolam.  And I just scaled it up basically mathematically to

20  what it would be if you gave 500.  So on the left we have the

21  actual blood or plasma concentration amount of midazolam.  And

22  on the bottom we have the time after you would inject that.  So

23  this is a computer model, if you will, a simulation showing that

24  right at injection it might be up to 12,000 nanograms per mL.

25  And then it has a very fast elimination curve first, so it drops

1    quickly.  Then it has a slower curve that tails off.  So this is

2    a model, of course, because we don't have any real data about

3    this in humans, obviously.  So he used this model to then say,

4    well, if that Glass study we just saw produces unconsciousness

5    at a certain level, then we can draw a line here, which he did,

6    below the 1,000 mark, because the Glass study said about -- I

7    think he said 239 was their limit at least for half the people.

8        So the problem with him doing that is he took the Glass

9    study as if that showed midazolam produced unconsciousness.  But

10   we just looked at the Glass study.  We did not see any scores of

11   zero like we did for the other drugs.  So he started off on the

12   premise that midazolam produces unconsciousness from a paper

13   where it showed it did not produce unconsciousness.  You still

14   have response to noxious stimuli.  So that I found very

15   troubling, because when he drew the line here, then he said, so

16   if someone was given 500 milligrams IV midazolam, they would be

17   unconscious for more than six hours.  Well, it just wasn't true,

18   because the data he used from the Glass paper was not showing

19   unconsciousness.

20   Q.   So last thing, I'm going to take a look at your report on

21   page 32 to 33, specifically heading ii.  What is this part of

22   your report about?

23   A.   This part of the report is where I've looked at the

24   clinical studies that do look at BIS and midazolam.  So as you

25   can see, I include the Liu study in here and include some of the

1    studies that the State's experts have used as well.  First I

2    talk a little about the use of midazolam.  It's not used much

3    for anesthesia induction but for conscious sedation nowadays.

4    And I also talk about the first full paragraph on page 33

5    starting with clinical studies.  I note that a study by Sandler

6    saw a BIS in the range of 77 to 92 reported in a surgical

7    outpatient study and talk about where other studies showed a BIS

8    of 80.  Other studies show that they did not respond to verbal

9    commands when the BIS was 77.  And the Liu study as well, which,

10   again, actually showed that the mean value was 69.

11        So then, I thought, well, are there any studies that

12   actually show a ceiling effect.  And very surprisingly, none of

13   these studies in this next paragraph were cited by the

14   defendants' experts, even though I found them very significant,

15   because they actually do show a ceiling effect of midazolam with

16   regard to the BIS values in humans.

17   Q.   So let's talk about one of those, the Miyake study.  You

18   relied on that, obviously, in producing your report, did you

19   not?

20   A.   I did.  I cited it right there in the middle of the

21   paragraph.

22   Q.   And this is the Miyake study I'll put on the ELMO, if we

23   can use the ELMO.  Can you just give us a general summary of the

24   Miyake study and what it is?

25   A.   Yes.  They were attempting to correlate the midazolam

1    effects, which they do call general anesthesia here, which is

2    interesting.  I have noticed that the Japanese laboratories tend

3    to use that, so it might be just different terminology in many

4    papers.  And they were trying to correlate the relationship with

5    the midazolam and then using a computer model to calculate what

6    they call effect site concentrations.  But the key graph that

7    shows the BIS is actually on page 390, at the top.  Yeah, you've

8    got it already.

9        So if we look at the very top there, that is the BIS

10   scores.  So there's our familiar zero-to-100 scale, which we all

11   know zero is no activity, and 100 is basically like most of us

12   in the courtroom.  And what we can see there at the zero time

13   point, before any drug was given, everyone is up around 96, 97,

14   right up there.  Then what's showing here is that the black

15   circles -- and this is various times after administration.  This

16   is a dose of about 12 milligrams given IV in the black filled

17   circles.  And you can see that it's pretty constant.  It starts

18   to go up a little bit by 60 minutes, so it's a pretty hefty

19   dose.  And it hovers a little bit above 60 and goes up to maybe

20   about 65 after 60 minutes.  But I think what's most telling is

21   embedded in each one of those black circles, there's actually an

22   open circle as well.  That open circle is a third more dose of

23   midazolam IV, 18 milligrams.  And, yet, you see no difference in

24   the actual depression of the BIS.  So this shows what I consider

25   one of the rare data points that actually shows human studies,

1    increasing the dose of IV midazolam does not increase the

2    depression of the EEG, much like the State's anesthesiologist

3    mentioned he saw a ceiling effect with the EEG.  But this shows

4    it with the BIS.  And then, if we look at the first paragraph in

5    the discussion, I think that nicely summarizes the actual

6    findings.

7               MR. WILLIAMS:  Okay.  At this point we move to admit

8    this study, Miyake study, as Exhibit 38 for the plaintiffs.

9               THE COURT:  Any objection?

10              MS. MERRITT:  No objection.

11              THE COURT:  Exhibit 38 for the plaintiffs is admitted.

12         (Plaintiffs' Exhibit 38 received in evidence.)

13   BY MR. WILLIAMS:

14   Q.   So, in general, do you agree or disagree with the State's

15   experts that 500 milligrams of midazolam is sufficient by itself

16   to render general anesthesia sufficient to render someone

17   insensate to pain from the vecuronium bromide or the potassium

18   chloride?

19   A.   I do not agree with that statement.

20   Q.   And what is your opinion of the use of midazolam in the

21   ADC's protocol?

22   A.   My opinion is that midazolam is not a good substitute from

23   using pentobarbital, very different drugs, and that you really

24   need to look at how the drug works and that giving more of a

25   drug does not change the nature of a drug.  You can keep giving

1    more and more, but the nature of the drug is going to act the

2    same way.

3    Q.    Thank you.

4                         CROSS-EXAMINATION

5    BY MS. MERRITT:

6    Q.    Hi again, Dr. Stevens.

7    A.    Good afternoon, Jennifer.

8    Q.    So I just want to revisit a few of these studies.  Again,

9    you haven't attempted to distinguish all 50 or so of the studies

10   that our experts have -- that we've admitted into evidence in

11   this case.  Right?

12   A.    I have not looked at everything.  That's correct.

13   Q.    Okay.  So you picked out a few of these for the Court and

14   are offering some other explanation.  Correct?

15   A.    Those were picked out by your expert witness.  He said

16   those were the most crucial ones that he relied on.

17   Q.    That's true.  We'll go back, and we'll revisit about why

18   they said that.  Mr. Williams ended by talking about the Miyake

19   study.  You mentioned during your direct how important the title

20   of articles are sometimes.  And this one is not one -- I'll show

21   you one in a minute.  This one says:  "Miyake study, 24 patients

22   with American Society of Anesthesiologists Status I or II were

23   randomly allocated to receive either an intravenous IV bolus of

24   midazolam, .2 milligrams per kilogram -- that was the small dose

25   group -- or .3 milligrams per kilogram -- and that was the large

Stevens - Cross                                        1086

1    dose group -- for induction of general anesthesia in a
2    double-blind experimental design."  Did I read that correct?
3    A.    You did.
4    Q.    So if you could translate for me what that means.  A .2
5    milligram per kilogram dose, what would that be in a 200-pound
6    man?  Do you know?
7    A.    Well, I think the best way is actually to look what the
8    actual patients weighed in here.
9    Q.    Okay.
10   A.    Being Japanese, they averaged about 60 kg.
11   Q.    Okay.  Well, that doesn't help me too much either.  In
12   pounds?
13   A.    So if you go 60 times .2, you get 12 milligrams.
14   Q.    So it's about 12 milligrams in the .2?
15   A.    Correct.
16   Q.    Okay.
17   A.    Average.
18   Q.    Then the .3 milligram per kilogram, so the large dose
19   group?
20   A.    That's the 18.
21   Q.    About 18 milligrams?
22   A.    18 milligrams, 16 times .3.
23   Q.    Okay.  Thank you.  So that's an 18 milligram.  You heard
24   Dr. Antognini testify that a 20- to 30-milligram dose would be
25   the average dose that he would use in his clinical practice to

Stevens - Cross                                                    1087

1    induce general anesthesia in a 200-pound man.  So does that seem
2    about right?  Do they seem to agree on the induction dose?
3    A.    That part I don't know about.  Obviously, I know what they
4    did in this study.  But as far as what he uses or would use in a
5    patient is beyond my expertise.
6    Q.    At least in the Miyake study, they were using either 12 or
7    18 milligrams of midazolam for induction of general anesthesia.
8    Right?
9    A.    Correct.
10   Q.    Okay.  Then the conclusion of the study says:  "Following
11   the induction of general anesthesia with IV midazolam .2 or
12   .3 milligrams per kilogram, the BIS was positively correlated
13   with the relative Beta ratio.  Despite a rapid decrease in the
14   plasma and effect site concentrations of midazolam, the average
15   BIS remained less than 60."
16   A.    Greater than 60.
17   Q.    I'm sorry.  Remained greater than 60?
18   A.    You said "less than."  That sign says greater than 60.
19   Q.    I'm sorry.  You are right.  So 60 minutes after induction.
20   Right?  So that was the average based on this dose.  Correct?
21   The 12 or the 18.
22         Now, I think you testified previously -- and admittedly,
23   it's all running together a little bit for me at this point.
24   But I think the experts all agree that midazolam is dose
25   dependent.  Right?

1  A.    Correct.

2  Q.    So a doctor or anesthesiologist might administer a

3  1-milligram dose of midazolam to a patient to make them calm

4  prior to a colonoscopy or something.  Right?

5  A.    That may be, yes.

6  Q.    But they might use 20 to 30 milligrams to induce general

7  anesthesia.  Right?

8  A.    Beyond my knowledge.  I'll go with the general thought of

9  that, yes.

10  Q.    And here the Miyake study supports that statement.  It says

11  midazolam is used for sedation and general anesthesia.  Right?

12  A.    I would assert that that's almost a unique Japanese

13  terminology.

14  Q.    "General anesthesia" is unique Japanese terminology?

15  A.    The way that they use it with midazolam, only because I've

16  noticed it in other papers.  So that might be a cultural thing

17  or just the way that they translate something.  I don't know.

18  In the original Japanese, it might be different.  But both

19  Japanese papers that we looked at talk about using midazolam and

20  producing general anesthesia, for example.  So they tend to use

21  it in a way that I don't think I've seen in the consensus of

22  papers.  Most papers will say sedation, which we know to be true

23  with midazolam.  It's a benzo.

24  Q.    Now, here under the study protocol part of the report

25  here -- and this was published in the *Journal of Anesthesiology*

1    in 2010.  Right?

2    A.    Correct.

3    Q.    It says -- again, talking about that dose between 12 and

4    18 milligrams of midazolam for the induction of anesthesia, "the

5    dose of midazolam was chosen based on previous reports and the

6    fact that a dose less than .2 milligrams per kilogram is

7    insufficient to produce total loss of consciousness for the

8    induction of general anesthesia."  Did I read that right?

9    A.    Right.

10   Q.    Okay.  "Midazolam was dissolved in saline in a syringe for

11   a total volume."  So, again, this goes to a point about the

12   precipitation.  So they dissolved the midazolam in saline.

13   Right?

14   A.    Correct.

15   Q.    Then premedication was not used.  Right?

16   A.    Correct.

17   Q.    Then for the purposes of this study, it says:  "After the

18   administration of IV midazolam, the name of the patient was

19   repeatedly called out and the shoulders shaken.  Following

20   confirmation of the loss of consciousness, vecuronium bromide,

21   .1 milligrams per kilogram, was administered.  The trachea was

22   intubated five minutes after induction, and the lungs were

23   mechanically ventilated."  Did I read that correctly, Doctor?

24   A.    Yes, you did.

25   Q.    Okay.  So these anesthesiologists confirmed the loss of

1    consciousness by repeatedly calling the patient's name and

2    shaking the shoulders.  That appears to be the consciousness

3    check used in this particular study protocol.

4    A.    That's the criteria they use.

5    Q.    Okay.  Then after the consciousness check was performed,

6    some vecuronium bromide was administered.  And why would they do

7    that here?

8    A.    Why did they do what?

9    Q.    Why would they administer vecuronium bromide?  Do you know?

10   A.    I can only assume, again, not being an anesthesiologist,

11   that it may help with the intubation.  But I don't know that.

12   Q.    Okay.

13   A.    I'm a pharmacologist.

14   Q.    Okay.  Right.  Then they waited five minutes.  So that was

15   the amount of time that these anesthesiologists determined would

16   be sufficient for the midazolam to take effect.  Correct?

17   A.    I'm not sure if they are waiting for after the vecuronium.

18   I don't know exactly, you know, the timing-wise or why they did

19   that.

20   Q.    Okay.  It was not an hour later.

21   A.    Correct.

22   Q.    It seems to be within five or ten minutes of the

23   administration of the dose of midazolam.  Right?

24   A.    That appears to be so.

25   Q.    Okay.  Now, under the results section, it says:  "After the

1    induction of anesthesia, all patients lost consciousness and

2    were nonresponsive to their name being called and their

3    shoulders shaken with an Observer's Assessment of

4    Alertness/Sedation, the OAA/S score, of within one to two

5    minutes."  So I understand it took one to two minutes for the

6    12- to 18-milligram dose of midazolam to produce that level of

7    unconsciousness.  Is that a correct interpretation of what I

8    just read?

9    A.   I probably wouldn't say it like that.  We have to remember

10   that the ASA defines "unconsciousness" loss of response to

11   noxious stimulus, among other things.  So this OAA/S score of 1

12   is a slight prodding.  So we have to be very careful.  That's a

13   point I tried to make earlier is that, when we look at the

14   literature, we have to see what criteria they used to say

15   unconsciousness.  And it varies across papers, makes it very

16   difficult actually to come up to valid conclusions.  But my take

17   on it is in alignment with the ASA.  If there's no evidence that

18   they were truly unconscious, we shouldn't use the term

19   "unconscious."  And to have evidence of unconsciousness, we need

20   a noxious stimulus.

21   Q.   Now, you looked at this chart.  I'm trying not to eat up

22   all my cocounsel's time.  I'll get in trouble.  So the BIS.  You

23   would admit that this particular graph -- or how would you

24   describe what this is?

25   A.   Yeah.  So it's a plot.  So it's time versus BIS scores for

1  two groups of patients.

2  Q.    So you will admit, Doctor, that this does show BIS levels

3  under 60 for some of these patients.  Is that true?

4  A.    Actually, in this case that's an SEM.  So that's a

5  different -- that's not showing the range of actual values.

6  That's showing the variants of the mean.  So it's a little bit

7  different when you plot it like that.  We saw the other ones

8  where they had all the dots in those older papers.  That was the

9  actual values.

10 Q.    Okay.

11 A.    When they do that, these are called error bars.  These

12 error bars are usually standard error of the mean, where they

13 take the variants, which is a measure of how wide the

14 bell-shaped curve is.  I don't know if you remember from

15 statistics or if you ever had it.  But all the values -- a mean

16 comes from a distribution of values, and we get a certain shape

17 of the curve.  If there's a lot of variants in the data set,

18 those error bars are bigger.

19 Q.    Okay.  Does this support a conclusion that at least some of

20 those patients achieved a BIS level of under 60?

21 A.    Not necessarily.  We don't know.  I mean, it could be.  I

22 have to admit, on this one we don't know because we don't have

23 the individual values.  And just because the error bar goes a

24 little bit under 60 doesn't necessarily mean -- there could be

25 variants factors.  A standard error of the mean -- again, I'm

1    stretching my own undergraduate statistical knowledge here -- I

2    believe is the variants divided by the square root of N.  So

3    that means how many patients were in the group.  So, yes, it

4    gets very complicated.  But it's not the patient values

5    themselves is what I'm trying to say.  It's a measure of how

6    variable the data is.

7    Q.   How variable it is.  This could reasonably support a

8    conclusion that some of these patients in this study achieved a

9    BIS under 60.  Is that fair?

10   A.   It could be a few points there.  I agree.

11   Q.   Okay, okay.  This is Defendants' Exhibit 26.  Could you

12   read the title of this article, please?

13   A.   Yes.  Surprisingly, it's another Japanese paper.  And it

14   does say "Midazolam General Anesthesia."

15   Q.   Okay.  Go ahead.

16   A.   "The Effect of Gender on Compensatory Neuromuscular

17   Response to Upper Airway Obstruction in Normal Subjects Under

18   Midazolam General Anesthesia."

19   Q.   Okay.  So is this the apnea study that you were talking

20   about earlier?

21   A.   Correct.  That came originally from you showing me the

22   study on day one.

23   Q.   Yes.  Of course.  So I'm curious about one thing.  So if a

24   patient has apnea, they are more susceptible to the effects of

25   midazolam?  Is that right?  Is that what this is saying?

Stevens - Cross                                            1094

1    A.    That relationship between apnea and that, that's not my

2    bailiwick as far as pharmacology goes, so I don't really know

3    the answer to that.

4    Q.    In terms of the use of terminology, general anesthesia, the

5    FDA -- we went over it in detail.  I don't need to show it to

6    you again.  But the FDA-approved label for midazolam clearly

7    does show that it can be used for the induction of general

8    anesthesia.  Right?

9    A.    Correct.

10   Q.    So it's not purely a Japanese use.  It's supported in the

11   FDA-approved label, isn't it, Doctor?

12   A.    Induction is.  But the way the Japanese use, it acts like

13   midazolam can produce general anesthesia.  And I disagree with

14   that use.  So it's a difference between induction and producing

15   general anesthesia.

16   Q.    Okay.  And, again, the Ayuse study, Defendants' 26, it does

17   show BIS levels under 60 throughout.

18   A.    It sure does.  It shows the averages.  Again, right there,

19   you see the plus or minus 4.6.  That would be like the error

20   bars if it was plotted we were talking about before.

21   Q.    Okay.

22   A.    So it doesn't show the actual, you know, numbers of

23   patients and data points.  But it gives you that plus or minus.

24   That's a good example.

25   Q.    So even if we assume though, for example, the highest rate

1   of error, it's still under 60.  Right?

2   A.   Well, the plus or minus is an SEM, so we don't know -- SEM

3   doesn't correlate.  You can't just add that, in other words, to

4   get the actual patient range.  It could be doubled that.  So the

5   SEM is not -- we don't know.  Until we see the actual patient

6   data, we don't know.  But they do show averages.

7   Q.   They show the average BIS from the men was 53.4; women,

8   51.5, the passive BIS.  And the active BIS is a little bit more

9   but still under 60.  Fair?

10  A.   Correct.

11  Q.   Okay.  A couple more things.  We spent some time talking

12  about this Glass article.  And I will admit, I was trying to

13  read it while you were testifying, and I was listening.  So do

14  you know the dose of midazolam that was given to the volunteers

15  who were studied in this one?  Do you know?

16  A.   Well, I believe it was a range.

17  Q.   If you looked at that, would that help you find it?  I'm

18  happy to bring you the study.  I'm not trying to make you guess.

19  A.   No.  I don't want to guess either.  I believe it was a

20  range.  We could look at that if you think that's important to

21  know the actual dose.  I'm not sure we'll get the actual doses

22  given.  But, yeah, at this moment in time I don't know the

23  actual doses.

24  Q.   I guess it's safe to assume it's not a 500-milligram dose

25  in the study.

1    A.    I think we can assume that, yes.

2    Q.    It's likely not 400 or 300.

3    A.    Correct.

4    Q.    Or 200 or 100 or 50 even probably.

5    A.    I agree.

6    Q.    Okay.  So the results of the Glass study show that --the

7    conclusion here:  "The BIS both correlated well with the level

8    of responsiveness and provided an excellent prediction of the

9    loss of consciousness.  These results imply that BIS may be a

10   valuable monitor of the level of sedation and loss of

11   consciousness for propofol, midazolam and isoflurane."  Did I

12   read that right?

13   A.    Correct.

14   Q.    It seems to me like this study is really to see -- I mean,

15   they did some updates on the algorithm of the BIS, and they were

16   trying to see how well it worked.  Is that fair?

17   A.    The BIS 2.0 or whatever?

18   Q.    Right.

19   A.    That may be correct.

20   Q.    So at this point, this was published in 1997.  These

21   anesthesiologists concluded it did correlate well and

22   excellently predicted the loss of consciousness.  Right?

23   A.    In every one of the drugs except midazolam.  There was no

24   loss of consciousness in midazolam.  We did show that when Mr.

25   Williams was up here.

1    Q.    Well, maybe I'm --

2    A.    Right there.

3    Q.    Right here?

4    A.    Yeah.  There was no zeroes.  There's no big black circles.

5    Q.    Well, and, again, I think this goes back to our

6    disagreement between whether midazolam in and of itself is

7    sufficient for maintenance of general anesthesia versus the

8    fourth level, which is a -- I wish I had it in front of me.  Can

9    you explain the level right before that?

10   A.    The level before the zero?  I'm sorry.

11   Q.    Yes.  So on the chart that you have in your report, the 5

12   being general anesthesia, do you recall?

13   A.    Are you talking about the ASA table?

14   Q.    Yeah, the ASA table.

15   A.    Okay.  Yeah.  There's three levels of sedation and one

16   level of general anesthesia.

17   Q.    Okay.  So the one right before general anesthesia, which

18   shows --

19   A.    Deep sedation.

20   Q.    Deep sedation.  So we can disagree about some of that.  But

21   what this does show, that midazolam concentration, whatever the

22   dose is, these authors did measure BIS levels under 60.  Right?

23   A.    There are some dots there.  That's correct.

24   Q.    Okay.  And you put in your report that 60 or under is the

25   target that anesthesiologists typically look for when they are

1    looking for loss of consciousness.  Right?

2    A.    I cited some papers that gave a range, I think, of 40 to

3    60.  Again, that was purely literature review for me, not being

4    an anesthesiologist.

5    Q.    Then the next page -- this was published in the *Journal of*

6    *Anesthesiology*, so it's a respected journal.  Right?  And,

7    again, I want to make sure I'm reading this right.  But this,

8    is, again, showing the probability of consciousness here.

9    Right?  And then the Bispectral Index.  This is actually 3.0.

10   And it looks like the little Xs are plotting the midazolam

11   points.  Is that fair?

12   A.    That's correct.

13   Q.    And then, again, the probability of consciousness gets

14   lower and lower and lower with midazolam, just like the other

15   drugs studied.  And we're seeing BIS levels here in the 60 -- I

16   see some Xs here.  Do you?  I see some Xs here by 50.  Do you

17   see that too?

18   A.    Yeah.  I'm not sure.  However, while you are there, if you

19   look at the legend, it says:  "Relation between BIS and

20   probability of a positive response to a verbal command."  So

21   that's what I mean about loss of consciousness.  If you don't

22   respond -- I don't respond to verbal commands half the time when

23   I'm sitting at the dinner table with my wife.  You know, so, I

24   mean, I'm not unconscious when I don't respond.  So that's what

25   I mean.  Sometimes they use terms that you have to look at the

1    actual criteria.

2    Q.    Right.  But that study did show BIS levels under 60, didn't

3    it, Doctor?

4    A.    It did.  Which is interesting, because it means those

5    patients that were under 60 weren't showing unconsciousness.  So

6    there might be a mix with midazolam.

7    Q.    It's not that they weren't showing unconsciousness.  They

8    weren't in the general anesthetic state according to those

9    authors.

10   A.    Right.

11   Q.    Okay.

12   A.    They were still responding to the verbal command.

13   Q.    And none of this has any relevance really to what Dr.

14   Antognini testified about, which is the induction dose and then

15   the duration of time that the induction dose would last for the

16   inmate.  So if we're talking about a 500-milligram induction

17   dose, the anesthesiologist testified that would take that inmate

18   down into general anesthesia and that that would last well

19   beyond the time that would be required for a lethal injection

20   procedure.  Right?

21   A.    I disagree.  I don't think it can produce general

22   anesthesia.

23   Q.    It can induce general anesthesia according to the FDA.

24   A.    I thought you said it would take them into general

25   anesthesia.

1   Q.   Right.  Which induction of general anesthesia is one of the

2   approved uses according to the FDA.  Right?  Yes or no.

3   A.   It says that.  But I don't think it means produce general

4   anesthesia.  To induce it could mean to get it started, and then

5   you add another drug.  Again, an anesthesiologist is better

6   qualified than me.

7   Q.   You would defer to an anesthesiologist?

8   A.   I would defer to the anesthesiologist.

9   Q.   Thank you, Doctor.  That's all I have.

10              THE COURT:  Anything further?

11              MR. WILLIAMS:  I think we can relieve Dr. Stevens.

12              THE COURT:  Thank you, Dr. Stevens.  You may step

13   down.

14              THE WITNESS:  Thank you, Your Honor.

15              THE COURT:  Why don't we take a ten-minute break.  We

16   will come back in at 20 till four.  We'll take a ten-minute

17   break.

18        (Recess at 3:31 p.m.)

19                     REPORTER'S CERTIFICATE

20      I certify that the foregoing is a correct transcript from
     the record of proceedings in the above-entitled matter.

21

22   /s/Elaine Hinson, RMR, CRR, CCR      Date:  April 13, 2017.
     United States Court Reporter

23

24

25

1    (Continuing at 3:45 p.m.)

2    THE COURT:  During the break, I was handed a Freedom

3  of Information Act request by the Court Security Officer.  I

4  have made a copy of the request and I've handed it to counsel.

5  I will read it into the record.

6    "Honorable Judge Baker, I, Winnie Wright, acting in my

7  professional capacity as a reporter for THV11, would like to

8  request unrestricted access to any and all testimony in your

9  court as it relates to the civil litigation brought forth by the

10  seven men currently scheduled for execution by the State of

11  Arkansas per *Publicker Industries, Inc. v. Cohen*, 733 F.2d 1059,

12  1070 (3d Cir. 1984)."

13    I have received it.  I've not studied the case yet.  I

14  don't know where we're at in the testimony.  If you anticipate

15  that we're going to have sealed testimony, I'll go back and pull

16  that case, but a Third Circuit case doesn't bind me.  I'm not

17  sure what the Eighth Circuit law is in regard to this.  At this

18  point I have a protective order compounded by a state statute

19  that requires some things to remain confidential that are

20  involved in this litigation.  So sorting through all of that, I

21  will happily do that if we need to.

22    My sense of this is, I likely have the right to close that

23  testimony at least at this point based upon both the protective

24  order and the Arkansas state statute that's at issue.

25    I'll let counsel speak to it if you want.

1          MS. MERRITT:  I agree, your Honor.  I mean, I think

2    this Court has the inherent authority to seal proceedings.  This

3    is not a criminal case.  The openness of the courtroom is not as

4    much of a constitutional concern.  Although we haven't briefed

5    it in this case, I have researched the issue in another case,

6    and we prevailed on that issue in state court that there is no

7    First Amendment right to know this kind of information.  And

8    that coupled with the protective order, coupled with the

9    Arkansas confidentiality statute, I believe there's more than

10   ample authority for the Court to close the proceedings in this

11   case.

12        Thank you.

13          THE COURT:  All right.  Anything from plaintiffs'

14   counsel?

15          MR. WILLIAMS:  We have no position.

16          THE COURT:  All right.  Let's call the next witness.

17          MS. VANDIVER:  We call Dr. Joel Zivot in rebuttal.

18          THE COURT:  Dr. Zivot, please approach.

19        You also remain under oath from earlier this week.

20          **JOEL ZIVOT, PLAINTIFFS' WITNESS, DULY SWORN**

21                        DIRECT EXAMINATION

22   BY MS. VANDIVER:

23   Q.   Hello again.

24   A.   Hello.

25   Q.   Dr. Zivot, can someone be unresponsive and still feel pain?

1    A.    Yes.

2    Q.    Does midazolam take away pain at any dose?

3    A.    No.

4    Q.    You were present for the testimony of Dr. Antognini?

5    A.    Yes.

6    Q.    And you were present for the rebuttal testimony and cross-

7    examination of Dr. Stevens?

8    A.    Yes.

9    Q.    And then also, I believe, you looked at some of the

10   testimony of Dr. Buffington, the transcript?

11   A.    Yes.

12   Q.    Did the papers cited by Dr. Antognini or Mr. Buffington or

13   referenced in their testimony change your opinion regarding

14   Arkansas's three-drug protocol?

15   A.    No.

16   Q.    And none of these studies dealt with the administration of

17   500 milligrams of midazolam; is that right?

18   A.    That's correct.

19   Q.    Do you know of any instances where 500 milligrams of

20   midazolam have been given to a human?

21   A.    Well, not in a study, of course, but we do know that there

22   are cases where that amount of midazolam has been given,

23   specifically in executions.

24   Q.    Right.  And did you read the affidavit or testimony of

25   Spencer Hahn?  He's the attorney for Ronald Bert Smith?

1    A.    Yes, I did.

2    Q.    You're aware that Alabama uses the same drug protocol as

3    Arkansas?

4    A.    Yes.

5    Q.    Did you think that Mr. Smith was suffering in his

6    execution?

7    A.    I did, yes.

8    Q.    Are you also aware of the Joseph Wood execution?

9    A.    I am.

10   Q.    Do you know how much midazolam Mr. Wood was given?

11   A.    Mr. Wood was given 750 milligrams of midazolam.

12   Q.    And did you think that Mr. Wood was suffering?

13   A.    I did, yes.

14   Q.    And how long did it take Mr. Wood to die?

15   A.    I believe that Mr. Wood took around two hours to die, and

16   in that instance, midazolam was also combined with

17   hydromorphone, which is a narcotic, and although we've had some

18   discussion about how there's some synergy with midazolam and

19   hydromorphone, even with this extremely large dose of midazolam,

20   it was still difficult to kill Mr. Wood with midazolam of 750

21   milligrams and hydromorphone.

22   Q.    And did you read the testimony of Daniel Buffington that he

23   thought that if vecuronium bromide was given alone to a person,

24   that that would be a peaceful experience?

25   A.    Yes, and I must say I'm rather astounded by that.  I really

1    don't know on what basis he could make that claim.  A curious

2    claim.

3    Q.    So you disagree?

4    A.    Strongly.

5    Q.    What would that experience be like, giving vecuronium

6    bromide to a person that hadn't had any other drugs administered

7    to them?

8    A.    Well, there is a phenomena in anesthesia referred to as

9    awareness, and awareness is something that occasionally

10   happens -- we actually probably don't know how often it actually

11   happens because it might be underreported.  And what awareness

12   is is basically when a patient during an anesthetic has some

13   awareness recollection of the procedure.  And this can be

14   anything from reporting afterwards of maybe hearing sounds or

15   conversations or even a feeling of having heard the entirety of

16   the conversation and also feeling pain.  This occurs -- and

17   unable to indicate such during the procedure.

18         This is likely the consequence of an individual that has

19   received muscle relaxants, like Mr. Buffington describes,

20   without being otherwise anesthetized, unresponsive.  And

21   afterwards people report that experience to be incredibly

22   traumatic, understandably, I think.  In fact, there are self-

23   help groups that have been gathered up where individuals who

24   have shared their experience of awareness under anesthesia have

25   reported symptoms of PTSD and so on.  And I can imagine that

1    that would be a terrifying experience of being stuck there

2    unable to communicate.

3         Now, in those circumstances, those individuals, of course,

4    don't die, and they are attached to a mechanical ventilator.

5    And so although they are not able to, again, indicate that

6    something is up, they're breathing and so they may not

7    experience the feeling of slowly suffocating.  But if even the

8    experience of being held in that place and having awareness

9    while not also choking is terrifying, then if one adds choking

10   or something like that to the experience of being paralyzed and

11   otherwise awake, well, that would be a truly terrifying

12   experience for anyone.

13              MS. VANDIVER:  No further questions at this time.

14              THE COURT:  Cross.

15                        CROSS-EXAMINATION

16   BY MS. MERRITT:

17   Q.   Hello again, Dr. Zivot.

18   A.   Hello.

19   Q.   You were asked about the Smith case, and you said that you

20   believe he was suffering.

21   A.   Yes.

22   Q.   What basis do you possibly have for that?

23   A.   Drawn from my capacity for empathy.

24   Q.   Okay.  What about Wood?  In Arizona, correct?

25   A.   Same way.

1  Q.    750 milligrams.  That was over a very extended period of

2  time, wasn't it, Doctor?

3  A.    It was.

4  Q.    So the doses of midazolam were what?  Do you know?

5  A.    I don't recall how much each dose was when it was

6  administered, but the total was about 750 milligrams as

7  reported.

8  Q.    It was a small, like, 10-milligram or 20-milligram dose

9  mixed with the hydromorphone; right?  Which is an opioid?

10 A.    Yes.  It's an opioid.

11 Q.    So that protocol is nothing like the Arkansas protocol.

12 Would you admit that?

13 A.    I'd say it's similar.  I wouldn't say it's nothing like.

14 Q.    Well, we don't mix our midazolam with any other drugs;

15 right?

16 A.    That combination should only make it more effective, not

17 less effective.

18 Q.    But the addition of the midazolam was nowhere near 500;

19 right?

20 A.    Not in the single dose.

21 Q.    Right.  But the initial dose wasn't second, third.  It took

22 hours for him to get that full dose; right?

23 A.    I think that we've conceded in that court, or there's an

24 opinion that even smaller dosages should do the job, and which I

25 would, of course, object.  And clearly here in the case of

1   Mr. Wood, it certainly didn't do the job.

2   Q.   Well, are you aware that in the Arkansas protocol, if after

3   the administration of the 500-milligram dose of midazolam alone,

4   if the inmate still appears to be conscious, that he will

5   receive a second 500-milligram dose?

6   A.   I am aware of that.

7   Q.   Okay.  How many patients have you anesthetized in your

8   career, Dr. Zivot?

9   A.   Many thousands.

10  Q.   20,000?  10,000?

11  A.   You know, I thought the number was more -- I mean, I've

12  cared for probably upwards of around 40,000 patients in my

13  career, I would say.

14  Q.   Okay.

15  A.   It's a combination of intensive care and the operating

16  room.

17  Q.   How many have reported to you that, after you anesthetized

18  them, that they experienced awareness and pain during a surgical

19  procedure?

20  A.   You know, I only started asking about this in the last few

21  years.  So for the first year, several years of my career, I

22  never even inquired.  Nobody did.  It wasn't really understood

23  to be a question of inquiry.

24       But since I started to ask about it, I have on occasion

25  individuals who have reported to me these sorts of things.  I

1   routinely ask my patients if they've had dreams or if they have

2   recollections.

3   Q.   Okay.

4   A.   And people have reported it to me.

5   Q.   So out of 40,000 patients, you've had several that have

6   mentioned this to you?

7   A.   But I haven't asked all 40,000.  And some of them don't

8   apply.

9   Q.   Would you think that if some of them had experienced a

10  horrifying feeling of being trapped and experiencing pain and

11  awareness during surgery, that they might have mentioned that to

12  you later?

13  A.   Not necessarily.  That's what's peculiar about this

14  problem, is that sometimes people don't know whether they should

15  or shouldn't have it and they don't know who to talk about it

16  with.  That's, I think, part of the problem here.

17  Q.   Okay.  But you would agree that awareness under general

18  anesthesia is not the norm.  It's a rare thing to happen?

19  A.   I don't know how common it is.  I don't think it's common,

20  but I don't honestly know how uncommon it is.

21  Q.   Okay.

22  A.   Because it's not always reported.

23  Q.   Okay.  And you don't have any way to predict whether any

24  one of these seven inmates who are currently scheduled for

25  execution would experience awareness.  You don't know.  You

1    can't predict that, can you?

2    A.    I have concerns that the midazolam that they get will be

3    insufficient to create the kind of state that the State

4    contemplates.   That's my concern.

5    Q.    But in a clinical setting, you would use 20 to 30

6    milligrams of midazolam if you had to -- I understand you don't

7    use midazolam to induce anesthesia.   But you agreed with me, I

8    believe, that a 20- to 30-milligram dose would be sufficient for

9    approximately a 200-pound man to induce general anesthesia,

10   according to the FDA-approved labeling information for the drug;

11   right?

12   A.    The label is just a recommendation.   Those of us at the

13   bedside might see this differently.

14   Q.    So in court, I'm sure while we all appreciate empathy and

15   your feelings, I think what the Court has to decide is whether

16   there's objective evidence of unconstitutional suffering.   And

17   so --

18   A.    Could you define that for me?

19   Q.    What unconstitutional suffering is?

20   A.    Yes, what objective evidence of unconstitutional suffering

21   is.

22   Q.    I'm happy to do that.   The Supreme Court has said that the

23   Constitution does not prohibit pain.   Lethal injection, death

24   penalty does not have to be painless, it does not have to be

25   quick.   What the Constitution prohibits is needless suffering,

1   essentially torture.  So that there has to be objectively

2   intolerable risks of pain so that unless, like, the Court can

3   assume that the Arkansas Department of Correction acted for the

4   purpose of hurting this inmate when they knew something that was

5   better was available.  That's -- and that's a general sense, but

6   the question for you is whether you can state with any degree of

7   medical and scientific certainty that these seven inmates

8   will -- either they're sure or that they are very likely to

9   suffer severe pain and suffering under this protocol.  Can you

10  say that, Doctor?

11  A.   The problem is that we don't have the information at hand.

12  Q.   Okay.  So --

13  A.   The protocol doesn't allow for it.

14  Q.   But the answer is no.  You can't say within a reasonable

15  degree of medical and scientific certainty that these inmates

16  will or very likely would suffer severe pain.  They might, but

17  they might not.

18  A.   I can say that when I read the reports of the executions

19  that I mentioned, that the common experience, not only by me,

20  but by people in attendance, found it to be an extremely

21  distressing and disturbing thing to observe.  And I suspect that

22  they felt that way because they perceived the suffering that was

23  taking place while the execution was occurring.  And I share

24  that feeling.

25  Q.   There's no way to know whether that inmate was suffering

 1  pain.

 2  A.   Well, we can't ask them because they're dead.

 3  Q.   Well, fair enough.

 4          MS. MERRITT:  I don't have anything further.  Thank

 5  you.

 6          THE COURT:  Anything further for Dr. Zivot?

 7          MS. VANDIVER:  No, your Honor.

 8          THE COURT:  Thank you, Doctor.  You may step down.

 9      You may call your next witness.

10          MS. CRYER:  Is that it?

11      We call Director Wendy Kelley.

12          THE COURT:  If you would, Director Kelley, take the

13  stand.  You remain under oath from last night.

14          **WENDY KELLEY, DEFENDANTS' WITNESS, DULY SWORN**

15              DIRECT EXAMINATION [Continuing]

16  BY MS. CRYER:

17  Q.   Good afternoon, Ms. Kelley.

18          MS. CRYER:  I'm sorry.  May I proceed?

19          THE COURT:  You may.

20  BY MS. CRYER:

21  Q.   I'm going to pick up from, I think, where we left off last

22  night.

23      Let me ask, were you involved in the scheduling of the

24  executions set to begin next Monday?

25  A.   Yes.

1    Q.    Okay.  Can you tell me a little bit or tell the judge a

2    little bit about how the scheduling of the executions occurred?

3    A.    I was asked by a member of the Governor's staff if we could

4    get these done before the drug expired.  And I consulted with

5    the warden at the Cummins Unit.  I actually got him on the phone

6    and we had a conversation.

7    Q.    Do you recall how it was decided or who decided to schedule

8    two a night versus one a night for seven or eight days?

9    A.    The Governor made the decision on the scheduling.  We were

10   just consulted about whether it could be done and whether we

11   wanted to do three a night, two a night, or how we wanted to do

12   it.

13   Q.    Ms. Kelley, are you familiar with the study that came out a

14   couple of days ago?  I think there was a survey conducted by

15   *Talk Business* and Hendrix College.  I believe it was a survey

16   conducted on April 4 of this year regarding the death penalty?

17   A.    Yes.

18   Q.    Okay.  And do you recall reading in that survey that 61

19   percent of those surveyed supported the death penalty in

20   Arkansas?

21   A.    Yes.

22   Q.    Do you recall that in that survey, it stated that 49

23   percent of those surveyed supported the continued use of lethal

24   injection as a method of executions?

25   A.    I don't remember the exact number, but it was -- that

1    sounds correct.

2    Q.    And then when asked which alternative to lethal injection

3    would they support the most, 38 percent, which was the largest

4    amount, said they favored public hangings.  Do you recall

5    reading that in the study?

6    A.    Yes.

7    Q.    Does the ADC have a facility set up or designated to carry

8    out --

9          MS. GIANI:  Your Honor, I'm sorry to interrupt.  I

10   missed the citation for that poll.

11         MS. CRYER:  I've got a copy back there.  It was -- let

12   me make sure I haven't marked on it.

13      There you go.  I'm not going to seek to introduce it.

14         MS. GIANI:  I just wanted to look at it.  Thank you.

15         MS. CRYER:  And I believe it was printed in Talk -- in

16   fact, I have Talkbusiness.net.  I believe it was published on

17   April 13, 2017, and it said the poll was conducted on April 4 of

18   this year.

19   BY MS. CRYER:

20   Q.    Okay.  And I'm sorry, Ms. Kelley.  I did not hear the

21   answer to my last question.  Does the ADC have a facility set up

22   or designated to carry out public hangings?

23   A.    No.

24   Q.    Are ADC officers and staff members trained to perform

25   hangings?

1    A.    No.

2    Q.    Would hanging comply with the current Arkansas law?

3    A.    No.

4    Q.    And you're aware also in that report or that survey that it

5    stated that 51 percent of those surveyed supported the current

6    schedule of carrying out eight executions over an 11-day period?

7    A.    Yes.

8    Q.    Let me ask you, if we can, let's go ahead and go back just

9    briefly and talk about the prior litigation that has taken place

10   with regard to the death penalty or lethal injection in specific

11   since the 2000s.

12         Do you recall being a party to a lawsuit that was filed in

13   2008?  Or, excuse me, 2006.  I believe it was *Terrick Nooner v.*

14   *Larry Norris, Wendy Kelley, et al.*?

15   A.    If that was the one challenging lethal injection, yes.

16   Q.    And as you -- do you recall whether or not Administrative

17   Directive 08-28 was at issue in that litigation?

18   A.    It became at issue later.  It wasn't -- it didn't exist

19   when the lawsuit was initially filed.

20   Q.    Was it -- did the policy come into effect while the Nooner

21   litigation was ongoing?

22   A.    Yes.

23   Q.    Do you recall in 2015 state court proceedings filed *Stacey*

24   *Johnson, et al., v. Wendy Kelley, et al.*?

25   A.    Yes.

1   Q.   I believe that was in the Fifth Division, Pulaski County

2   Circuit Court.  Is that your recollection?

3   A.   I just remember it was Judge Griffen.  I don't know what

4   his division number is.

5   Q.   Okay.  And do you recall in that litigation whether

6   Arkansas Act 1096 of 2015 was at issue?

7   A.   If that's the method of execution number, yes, it was.

8   Q.   Do you recall there being an issue in that lawsuit with

9   regard to compounded drugs?

10  A.   Yes, because the law allowed for compounding drugs.  That

11  was part of what was being challenged.

12  Q.   All right.  And I'm going to show you -- I believe this has

13  previously been marked as Defendants' Exhibit 18.  If we look at

14  page 19 of the complaint -- I'm sorry, page 19 of the amended

15  complaint that was filed in this case, in the state court case

16  on September 28, 2015 -- and, again, do you recall that it

17  related to Arkansas Act 1096 of 2015?

18  A.   Yes.

19  Q.   Yes.  Do you recall that in that complaint the plaintiffs

20  alleged there to be problems with the use of compounded drugs?

21  A.   Yes.

22  Q.   And, in fact, would you read the first sentence of

23  paragraph 52 of their amended complaint.

24  A.   "The use of compounded drugs in executions would create

25  grave risks as compared to FDA-approved bulk-manufactured

1  drugs."

2  Q.    And it's my understanding that some of the questions that

3  have been asked of various witnesses throughout this litigation

4  has been to suggest that compounded drugs could be used.  Has

5  that been your understanding?

6  A.    Yes.

7  Q.    And, in fact, if we look at paragraph 55 of their amended

8  complaint, it appears that their expert even offered an opinion

9  discussing the substantial risk of causing unnecessary and

10 lingering pain and suffering if compounded drugs were to be

11 utilized.

12 A.    I remember that.

13 Q.    You do?  Okay.  And, again, top of page 56, I believe they

14 again reference for the third time the fact that using

15 compounded drugs would carry a substantial risk of causing

16 unnecessary and lingering pain.  Is that your recollection of

17 that claim?

18 A.    Yes.

19 Q.    Again in the amended complaint filed in 2015, were the

20 plaintiffs challenging the ADC's three-drug protocol with claims

21 that it was fundamentally flawed?

22 A.    Yes.

23 Q.    Is this the three-drug protocol that we are here today on?

24 A.    Yes, the same one that went up to the Supreme Court.

25        MS. CRYER:  Your Honor, I do not recall whether I had

```
 1   previously moved to admit Defendants' Exhibit 18 into the
 2   record.  If I have not, I would ask to do so at this time.
 3            THE COURT:  Ms. Washington and I both indicate that
 4   it's in.
 5            MS. CRYER:  All right.
 6            THE COURT:  If it's not, is there any objection to it?
 7            MS. GIANI:  No.  No objection.
 8            MS. CRYER:  Thank you, your Honor.  And also, last
 9   night I believe I discussed and went over briefly Ms. Kelley's
10   affidavit which has been marked as Defendants' Exhibit 1.  I
11   believe that I failed at that time to move to introduce it into
12   evidence.  So if I did not move, I would like to move at this
13   time.
14            THE COURT:  All right.  Any objection?
15            MS. GIANI:  No objection.
16            THE COURT:  All right.  I'll admit Defendants' Exhibit
17   1.
18            MS. CRYER:  Thank you.
19       (Defendants' Exhibit 1 received in evidence.)
20   BY MS. CRYER:
21   Q.   Ms. Kelley, did the 2015 lawsuit that was filed in state
22   court allege a lack of qualifications and training as they
23   relate to the IV team?
24   A.   Yes.
25   Q.   Let's look at -- I'd like to look at the two Attachment Cs.
```

1   I have the one for the -- that was attached and made part of the

2   2008 administrative directive, and then I also have the one that

3   has -- that is attached to Administrative Directive 15-28, which

4   it's my understanding is the current policy.  Am I correct?

5   A.    Yes.

6   Q.    All right.  What I'd like to do today is a little bit like

7   I did last night.  I'd like for us to try and find a way to look

8   at both of the Attachment Cs and to look and see if in these

9   subsections if there are any -- if there were any material

10  changes made between 2008 and 2015.  Okay?

11  A.    Okay.

12  Q.    All right.  So in looking at -- first of all, let me just

13  ask, to your knowledge or recollection, were there any

14  substantive changes made between 2008 and 2015 to Attachment C?

15  A.    I know the drugs that we use changed.

16  Q.    Any other changes as far as the procedures that were going

17  to be used with regard to the drugs that you can think of?

18  A.    No.

19  Q.    We're going to go through it, but just as you sit here, I

20  didn't know if there was a certain place that we needed to start

21  with.

22        All right.  If we look at the first paragraph, I have

23  highlighted a couple of sections.  Again, we're looking at the

24  2008 Attachment C, makes reference to, and I have highlighted,

25  "for health and correctional programs."

1    A.    That was not a change.  It was just a clarification.

2    Q.    Okay.  And the 2015 policy, it looks like instead of

3    designating which deputy director we're talking to or

4    referencing, it just simply states "deputy director."

5    A.    Correct.

6    Q.    All right.  And, again, looking back at Attachment C, we

7    have a couple of words, "having" on the second line, third line,

8    beginning of the new sentence, "Unless otherwise stated."

9    A.    Yeah.  I can tell you the next substantive change, looking

10   at that --

11   Q.    Yes, yes.

12   A.    -- is in No. 3.

13   Q.    Okay.

14   A.    We don't carry the drugs down and place them in a vault.

15   Q.    Okay.  What do you do with the drugs now?

16   A.    They stay with the deputy director or designee until they

17   go to the execution chamber.

18   Q.    Okay.  In looking at the 2008 Attachment C under Section

19   No. 1 -- I'll zoom out for a moment.  I see that on the first

20   page you have seven subsections, and that's all of the

21   subsections for the 2008 policy.  And yet in the 2015 policy,

22   you have six.

23   A.    Right.  If you go back to the '08, the one that's

24   highlighted there, No. 6.

25   Q.    Yes.

1    A.    We don't use the cardiac monitor anymore.

2    Q.    Okay.  Are there any type -- I know that testimony was

3    provided last night by Mr. Griffin, and he indicated that an

4    ultrasound would be available during the executions if needed.

5    Are there any other type of equipment other than what has

6    already been discussed that will be present or available?

7    A.    The designee is using a pulse ox -- I don't know if you

8    call it an indicator.  It's something you place on the person's

9    finger, and it measures heart rate, pulse, and oxygen level, I

10   believe.

11   Q.    Is that the little thing like when I go to the doctor and

12   they're wanting to check everything, they clamp it on my finger

13   to check and see what my oxygen level is?

14   A.    Yes.

15   Q.    And I remember they can get several readings from that.  So

16   it's your testimony that that is something that's going to be

17   used in the death chamber?

18   A.    Yes, and it's been being used during the practices.

19   Mr. Griffin is just not in that room, so he may not have been

20   aware.

21   Q.    Okay.  Any other changes that you can see that were made to

22   Attachment C, Section I?

23   A.    Not that were substantive, no.

24   Q.    All right.  Let's go to Section II, which are the set-up

25   procedures.

Kelley - Direct                                    1122

1          In the first paragraph -- I'm going see if I can do this.
2     No, I cannot.
3     A.    None of those are substantive that we haven't already
4     talked about.
5     Q.    All right.  Looks like there's a change.  The new policy
6     references normal saline.  And I am not a medical person or
7     professional, nor am I Ms. Merritt, who I think knows everything
8     medicine.  D5NS.  Do you know what that is?
9     A.    I did when the change was made.  I don't remember now.
10    Q.    Okay.  Do you have any medical training?
11    A.    No.
12    Q.    Again, paragraph No. 2, looks like the only difference was
13    to reference the specific type of solution.
14    A.    And it was explained to me at the time.  I just don't
15    remember now.
16    Q.    Okay.  Looking at paragraph No. 3.  It looks like there was
17    a change.  2008 policy says "both set-ups."
18    A.    Instead of "each set-up."
19    Q.    Okay.
20    A.    That's not material.
21    Q.    All right.  Paragraph No. 4 looks like there was a word,
22    the word "the" was added in the 2015 policy.  It appears that
23    there are -- and please correct me if I'm wrong as I'm going
24    through this.  It looks like there were no changes made at all
25    to paragraph No. 5.

1    A.    Correct.

2    Q.    Paragraph No. 6, it looks like you changed from using

3    Cathlon-like devices, and we just went with the word

4    "catheters."

5    A.    Yes.

6    Q.    All right.  Any other changes that you see in paragraph No.

7    6?

8    A.    No.  No.

9    Q.    Okay.  Paragraph No. 7 looks like the word "lethal" was

10   left out or omitted in front of the word "chemicals."

11         And in paragraph 7 of the 2008 policy, the phrase, "shall

12   ensure that the cardiac monitor is on and functioning properly,"

13   does the ADC during its executions, will it be using or will you

14   be using a cardiac monitor?

15   A.    No.

16   Q.    Do you know why?

17   A.    It was in one of the U. S. Supreme Court cases, talked

18   about the fact that it wasn't needed.  And when it was used

19   historically, I am told that it would -- if somebody bumped the

20   gurney or table, it would make it go off and it would make it

21   look like the inmate had a heart rate even after he had been

22   pronounced, and it just was not used.  It was an antiquated

23   machine.  And instead of spending the money to get a new one

24   that was not doing anything, we just elected after that court

25   case not to get another one.

1  Q.   All right.  Let's look in paragraph No. 8, which is the

2  bottom full paragraph here.  Looks like in the new policy that

3  there was one phrase added:  "To establish a second site and

4  proceed with one site."

5       Do you know why that change was made or if that is a

6  significant change or substantive change?

7  A.   I don't remember what the old one said.  Is that just not

8  in the old one?

9  Q.   It is just not in the old one.  It looks like an addition

10 in the new one.

11 A.   I'm sorry.  I can't see the whole paragraph.  I'd have to

12 read the whole thing to know if that's a substantive change or

13 not.

14 Q.   Okay.  We may at some point come back to that one.

15 A.   Well, because if you look back at -- I'm sorry.  Can you

16 put it back up there?

17 Q.   You're fine.

18 A.   It says, "All efforts will be made to establish two

19 unrelated intravenous sites" -- "infusion sites."  I'm sorry.

20 Says that if one patent infusion site is established and a

21 second site proves to be futile, then the deputy director or

22 designee may direct the IV team to suspend further action.

23      I don't think it's substantive.  I think it's clearer that

24 you can go with one, but I think the other one still allowed for

25 it as well.

1    Q.    Okay.  This big bold section that we talked about, I
2    believe, last night that was read that begins with, "Every
3    effort will be extended to the condemned," it looks like there
4    was an addition or an inclusion to explain what the anesthetic
5    was going to be?
6    A.    Yes.
7    Q.    Any other -- is this a substantive change?
8    A.    No.
9    Q.    All right.  We're going to come back to Section No. III,
10   which is preparation of chemicals.  We're going to go to the
11   injection procedures section.  It looks like there may have been
12   a little bit of moving around or a little bit additional, more
13   explanations included.
14         All right.  In looking at the old policy, we were looking
15   at Section III.  I'm calling the old policy 2008, the new policy
16   the 2015 policy.
17         The first paragraph in both appear to be the same.  In
18   paragraph No. 2, the old section used the word "lethal" in front
19   of "chemicals."  The new one does not.
20         The new one also looks like it references "in the order
21   they appear in Chart A."  Did I read that correctly?
22   A.    Yes.
23   Q.    Do you know why the "in order they appear in Chart A" was
24   included?
25   A.    Because they're in a chart now instead of just listed.

1   Q.   Okay.  And we will go back to that.  But looking on page 19

2   of this policy, is that where we're referring to Chart A?

3   A.   Yes.

4   Q.   All right.  And it identifies which drugs will be used

5   pursuant to the 2015 policy?  Is that your understanding, or am

6   I reading that correctly?

7   A.   Yes.

8   Q.   All right.  Going back, in reviewing paragraphs A,

9   paragraph B, paragraph C, it appears to me that the new

10  paragraphs are a little bit more -- offer a little bit more of

11  an explanation.  Am I correct in reading that, or were changes

12  made for a different reason?

13  A.   No.  It's just more explanation, and, of course, the drug

14  has changed.

15  Q.   Okay.  Again, section D, same thing.  In the old policy,

16  "infusion of lethal chemical," and in the new policy, simply the

17  word "chemical."

18  A.   Right.

19  Q.   Looks like that was the change.  All right.

20  A.   It's just a clarification.  Those drugs by themselves are

21  not lethal.

22  Q.   Okay.  It appears paragraph E remained the same.  There is

23  paragraph E in the old policy, paragraph E in the new policy.

24       Paragraphs -- paragraph F in the old policy, which was

25  lengthy, made reference to three-minute elapsed time between

1    starting the syringe 1 and the remaining chemicals.  If we flip

2    over to page 2, it was contained in one large paragraph.

3         It appears in the new policy that this information was

4    broken into separate paragraphs.

5    A.   That's correct.

6    Q.   And it looks like instead of the three minutes' elapsed

7    time, you've now moved to five minutes.

8    A.   Yes.

9    Q.   All right.  Was there a reason --

10   A.   It's a different chemical, and we were adopting the

11   protocol that had been approved by the Court.

12   Q.   Okay.  If we go to page 21 of the 2015 policy, look like

13   the first paragraph, one, appears that there were no changes

14   between the 2008 policy and the 2015 policy.  Paragraph 1 in the

15   2008 policy or old policy had the word "lethal" in front of the

16   word "chemical."  Looks like that word has been omitted in

17   paragraph 2.

18        It appears the change in 2008 in paragraph 2, subsection A

19   listed administration, and am I correct that in A for the 2015

20   policy it states "the injection procedure" instead of

21   "administration"?

22   A.   The same thing.

23   Q.   Okay.  It looks like there was an -- the word or the letter

24   "a" appeared and reference to "(s)" for "person(s)" in paragraph

25   3.  Looks like those letters were omitted in the new policy.  Is

1   that a substantive change?

2   A.    No.

3   Q.    Okay.  Paragraph 4 in the 2008 policy appears to be the

4   same as 2004 [sic] in the 2015 policy.

5   A.    Yes.

6   Q.    Okay.  When we look at the old policy, 2008, there's a

7   section that references the lethal chemicals.  My understanding

8   is that is now what is found in --

9   A.    Chart A.

10  Q.    -- Chart A.  Okay.  I believe it begins more inclusive, a

11  little more detail, in Section III, preparation of chemicals.

12  This is in the new policy.  And am I correct that in this

13  section, more information has been provided with regard to how

14  the medications will be dispensed?

15  A.    Yes.

16  Q.    Okay.  And the last section I want to look at is, in the

17  old policy, I want to look at IV team qualifications.  What were

18  the IV team qualifications in 2008?

19  A.    I don't believe those changed.

20  Q.    Okay.

21  A.    I'm not looking at it, but I don't think there was any

22  change.

23  Q.    And then if we look at 2015 policy, and the first

24  paragraph, or in the main sentence, it states -- this is in the

25  2008 policy.  "The following certified or licensed individuals

1    with at least two years of professional experience may be on the

2    IV team."

3         And then the new policy, it gives that information and then

4    goes on to expand to "and certification or licensure in at least

5    one of the following fields."

6         Did I read that correctly?

7    A.   Yes.

8    Q.   All right.  If you look at the five team qualifications,

9    are they the same?

10   A.   Yes.

11   Q.   Okay.  And the two documents that we just discussed, are

12   those the only -- is that inclusive of Attachment C to the

13   administrative directives?

14   A.   Yes.

15   Q.   Okay.  Do you recall in the 2015 state court case if the

16   plaintiffs challenged or attacked the consciousness checks that

17   we've been discussing in this lawsuit?

18   A.   It seemed like they challenged everything.  I don't

19   specifically remember.

20   Q.   Okay.  Are the consciousness checks that were being

21   practiced and what have been used in 2015 had an execution been

22   carried out the same that will be used as those that will be

23   used next week?

24   A.   Yes.

25   Q.   So those have not changed?

1    A.    No.  Just the designee has changed.

2    Q.    Why are you no longer using the drug protocol that was in

3    place in 2008?

4    A.    The law changed.

5    Q.    Were you involved in making the changes to Arkansas Code

6    Annotated 5-4-617?

7    A.    Involved as in involved in discussions that led up to

8    changes?

9    Q.    Yes.

10   A.    Yes.

11   Q.    Okay.  Did you ever reach out or have you ever reached out

12   to other Departments of Correction to find out what their

13   experiences were with the use of midazolam?

14   A.    Yes.

15   Q.    Do you recall who you reached out to?

16   A.    I spoke with people in Florida, Virginia, Oklahoma,

17   Alabama, and Arizona.

18   Q.    Is this also information that was contained in Defendants'

19   Exhibit 1, which was your affidavit in this case?

20   A.    Yes.

21   Q.    Earlier in this hearing, Investigator Cummings testified

22   that the ADC could purchase -- and I'm going to batch the names

23   of these drugs, sevoflurane and isoflurane.  Were you here for

24   his testimony?

25   A.    I think so.

1   Q.   To your knowledge, can the ADC purchase those drugs for use

2   in lethal injections?

3   A.   No.  They're not authorized by Arkansas state law.

4   Q.   So even if you could buy them, could you use them in a

5   lethal injection execution?

6   A.   No.

7   Q.   If the Arkansas Department of Correction wanted to -- and I

8   don't have a better phrase, but wanted to go off the grid and

9   come up with their own protocol using drugs not currently

10  allowed by the statute, could you do it?

11  A.   No.

12  Q.   If you wanted to come up with and follow the survey that

13  was taken last week and go with public hangings, could you do

14  that, according to the Arkansas law?

15  A.   No.

16  Q.   Are you aware of any approved manufacturer who is willing

17  to sell a barbiturate to the Arkansas Department of Correction

18  for use in lethal injections?

19  A.   No.

20  Q.   And were you, in fact, present in the courtroom earlier

21  when Dr. Zivot testified that drug manufacturers to his

22  knowledge do not want to sell drugs to Departments of Correction

23  that are going to be used for lethal injection?

24  A.   Yes.  And that was not news to me.

25  Q.   And have you found that to be the case?

Kelley - Direct                                                      1132

1   A.    Yes.

2   Q.    Have you researched compounding pharmacies?

3   A.    I have spoken with compounding pharmacies.

4   Q.    Do you -- and I may see how much you can educate me.  What

5   is a compounding pharmacy?

6   A.    Well, in my layman's understanding, they're licensed,

7   they're approved, they have the standards that are set forth in

8   the statute, what standards they would have to meet.  But they

9   have to be able to get the raw ingredients in order to make the

10  drugs.

11  Q.    The pharmacy would have to be able to get those

12  ingredients?

13  A.    Yes.

14  Q.    Are you aware of any compounding pharmacies that would be

15  willing to compound drugs for the Arkansas Department of

16  Correction to use to carry out lethal injections?

17  A.    I am not.

18  Q.    I know there was a reference or an allegation in the

19  complaint that you have never carried out an execution yourself;

20  is that correct?

21  A.    That is correct.

22  Q.    Have you ever -- during your employment with the Arkansas

23  Department of Correction, has there ever been -- and I'm not

24  talking about the ones that are scheduled for next week, but in

25  years past, have there ever been executions that were scheduled?

1   A.    Yes.

2   Q.    Okay.  How close did you get to actually having an

3   execution carried out?

4   A.    During one of them, it was the night of the execution and

5   we were at the Cummins Unit prepared to start the execution

6   within a relatively short period of time when there was a stay

7   issued.

8   Q.    Before the night of that execution, what preparations, if

9   any, had the Department of Corrections taken to get ready for

10  that execution?

11  A.    Basically the same preparations that we've taken to get

12  ready for the ones that are supposed to start on Monday.

13        We have a big meeting.  We have other agencies there.  We

14  go through the policy.  We make sure that we have the drugs.  We

15  have the practices after people are selected to participate.

16  There's training and instruction, and everybody goes through it

17  until they can do it.

18  Q.    Did you participate in those practices?

19  A.    Yes.

20  Q.    Did your staff participate in those practices?  And by

21  staff, I mean those that were going to be involved in the

22  executions.

23  A.    Yes.

24  Q.    Do any of your staff members, employees, or volunteers or

25  participants in the executions next week, have any of them ever

1   been involved in prior executions?

2   A.    Yes.

3   Q.    One of the claims also that the plaintiffs are asserting in

4   this case has -- is the ineffective assistance of counsel claim.

5   And one of the issues that they address has to do with access to

6   telephones.  Are you aware that that's a claim in this case?

7   A.    Yes.

8   Q.    When you were preparing for the previous executions,

9   whenever they were, before 2017 but since your employment in

10  2006, were the people, any individuals inside the witness room

11  allowed to have telephones?

12  A.    No.

13  Q.    Was the ADC corrections staff, if there were any of those

14  members in the witness room, were they allowed to have phones?

15  A.    ADC corrections staff?

16  Q.    Yes.  Were there any ADC -- maybe I should back it up.

17  Were there any ADC corrections staff employees in the witness

18  room?

19  A.    The major is in the witness room.

20  Q.    Okay.

21  A.    For -- he has a role to play in there.  And then there is

22  at least one other staff member that is in there that has some

23  medical training in case one of the witnesses has a problem.

24  Q.    Okay.  Did the practices that took place prior to 2017 that

25  you were involved with, at that time were victim family members

1  allowed in the witness room?

2  A.   When you talk about practices, that law was changed in 2013

3  or 2015.  I can't remember now.

4  Q.   Have you had any practices since that law was changed?

5  A.   Yes.

6  Q.   Okay.  Do you recall if the night that you all were getting

7  ready for the execution but a stay was issued at the last

8  minute, do you remember if there were any family members of the

9  victim that were in the witness room?

10 A.   No, they weren't.  That was before the law was changed.

11 Q.   That was before the law was changed.  Okay.

12      To your knowledge have attorneys in the witness room ever

13 been allowed to carry cell phones in with them?

14 A.   No.  And it never came up until recently.

15 Q.   Okay.  Do you have an opinion on whether or not cell phones

16 should be allowed in the witness room?

17 A.   We don't allow cell phones.  There's no recording by law,

18 and I don't know anybody that still has a phone that doesn't

19 record, although I suppose somebody might have one.  But there's

20 not -- the witness room is very crowded because we've had to put

21 24 chairs in there in order to accommodate everybody that the

22 law says is going to be there.  The victim's family members can

23 be there, up to six of them.  The inmate's attorney.  The

24 inmate's spiritual advisor, and then 12 citizen witnesses.

25      Then, as I said, we have our chief of security that is in

1    there.  We have one person that is in there for a response if

2    one is needed for any of the witnesses.  And then we have always

3    had a mental health person with the victim's family members.  So

4    we will have one assigned to the victim's family members that go

5    in the chamber and we'll have one that will be with the family

6    if they choose to watch it by closed-circuit video.

7    Q.    You brought up something that I want to go back to.  You

8    mentioned that there will be 12 citizen witnesses that will be

9    in the witness room.

10   A.    Yes.

11   Q.    I remember there was an article a couple of weeks ago that

12   said that the ADC is desperately in need of witnesses.  Do you

13   have witnesses that are going to be present for each of the

14   executions?

15   A.    Yes.

16   Q.    Let me show you what I believe has been marked previously

17   as Defendants' Exhibit 16 and I believe has already been

18   admitted.

19         Do you recognize -- and this just has my handwritten note

20   on it.  Do you recognize this document?

21   A.    I've seen it, yes.

22   Q.    Can you tell the Court what this is?

23   A.    It was a letter -- I believe it's from Mr. DePriest to the

24   attorneys for the condemned inmates telling them what the

25   procedure is going to be and where they can -- where they'll

1   have access to phones and faxes.

2   Q.    And if I'm not mistaken, in previous executions, how many

3   attorneys for the plaintiff have been allowed on the property?

4   A.    On the property, I don't know.  In the witness room, one.

5   Q.    Okay.  Do you know about inside the Cummins Unit itself in

6   the past how many attorneys have actually been allowed inside

7   the unit?

8   A.    No.  I couldn't say for sure.  The only question I was ever

9   asked about was the witness room because we were counting chairs

10  and trying to figure out what we were going to do.

11  Q.    Okay.  And I know that we've talked about -- I'm going to

12  show you one more thing.  Talked about, going back to the prior

13  litigation, do you recall in the state court case that on

14  February 24, 2017, there was a second amended complaint that was

15  filed?

16  A.    Yes.  I think it was dismissed pretty promptly, but, yes, I

17  remember.

18  Q.    You remember that it was filed?  Okay.  And do you recall

19  even in -- as of -- let me get back to the signature page.  As

20  of the filing date of this second amended complaint, which was

21  February 24, 2017, the plaintiffs were still asserting that

22  there were problems with compounded drugs and that compounded

23  drugs should not be used?  Do you recall those allegations as

24  of --

25  A.    I see them now.

1   Q.    -- two months ago?  Okay.

2   A.    I did not remember that being in the amended complaint.

3   Q.    All right.  Did you ask Dan Buffington whether or not he

4   was aware of any compounding pharmacies that would sell drugs to

5   the Arkansas Department of Correction for use in executions?

6   A.    I heard him testify that he didn't know of any.

7              MS. CRYER:  Your Honor, I believe that's all the

8   questions that I have at this time.

9              THE COURT:  All right.  Why don't we take a short,

10  five-minute break.  We'll come back in at a quarter till five.

11  Quarter till five.  We'll give our court reporter a break.

12      We're in recess.

13      (Recess from 4:40 p.m.)

14                    REPORTER'S CERTIFICATE

15      I certify that the foregoing is a correct transcript from
    the record of proceedings in the above-entitled matter.

16

17                                   Date:  April 13, 2017

    /s/ Christa R. Jacimore, RDR, CRR, CCR
18      United States Court Reporter

19

20

21

22

23

24

25

1    (Continuing 4:46 p.m.)

2         THE COURT:  We are back on the record.  A few things

3    before we begin the cross of Director Kelley.

4         We've had a motion filed, a request to file an amicus brief

5    in this case.  I will enter an order.  This is not the first

6    time we've had a request like this in a case that's pending

7    before me.  There is some authority out there in regard to this

8    issue.  I'll enter an order, a short order today permitting it

9    to be filed.  I've not decided whether I'll consider it or not.

10   I want you all to have the privilege of reading it, too, to see

11   if you want to weigh in on that issue.  And I was going to ask

12   if they can file it today, by five o'clock, or shortly after

13   five.  If it is filed, we'll make certain that printed copies

14   are available for you to review.

15        And then it brings up sort of a second issue about

16   correspondence or other things.  I've also made this

17   announcement before in other cases.  When cases like this are

18   pending before me, Ms. Washington gets all of my email.  I don't

19   get my mail; she does.  She scans my mail.  I don't read

20   anything from anyone else about this case.  So she keeps it.

21   She reviews it.  It goes into a file.  But I don't read letters,

22   I don't read emails.  I don't do anything like that.  She

23   screens all of that and pulls it out.  So understand and

24   appreciate that.

25        With that, I think we're ready for cross.  You may proceed.

1                        CROSS-EXAMINATION

2     BY MS. GIANI:

3     Q.    Good afternoon, Director Kelley.  First of all, I want you

4     to know that I do not relish being here, and I'm sure we're

5     probably in a similar boat on that, but, unfortunately, I do

6     have a lot of questions for you, so I'm going to try to get

7     through this as painlessly as possible.

8     A.    Thank you.

9     Q.    As I'm sure you're aware, I'm here, and we're all here on

10    behalf of Don Davis, Bruce Ward, Ledell Lee, Stacey Johnson,

11    Marcel Williams, Jack Jones, Jason McGehee, Kenneth Williams,

12    and Terrick Nooner.  Are you familiar with those men?

13    A.    Yes.

14    Q.    How so?

15    A.    They're inmates on death row in the department.

16    Q.    And do you occasionally visit death row?

17    A.    I do.

18    Q.    And as director, are you ultimately responsible for the

19    safekeeping of those men and women in the department's custody?

20    A.    Yes.

21    Q.    So would you agree with me that you and I have a shared

22    interest in making sure the constitutional rights of these men

23    are protected?

24    A.    Yes.

25    Q.    Okay.  And I tried to take some notes from your testimony.

1    So you started with the department as deputy director of -- was

2    it health services?

3    A.    Health and correctional programs.

4    Q.    Health and correctional programs.  And that was in 2006?

5    A.    Yes.

6    Q.    And that position also, according to the protocols, has a

7    role in executions, correct?

8    A.    Yes.

9    Q.    But there were no executions that actually went through

10   during your time as deputy director?

11   A.    That's correct.

12   Q.    And as director, as part of your duties, do they involve

13   carrying out executions?

14   A.    Yes.

15   Q.    And they may have covered this on direct, but I'm not sure

16   that I heard the answer.  Have you ever witnessed or

17   participated in an execution?

18   A.    No.

19   Q.    Okay.  I want to talk about the statute.  Let's start

20   there.  So under Arkansas law, it says:  "The director shall

21   develop logistical procedures necessary to carry out the

22   sentence of death."  Is the director that's referring to you?

23   A.    Yes.

24   Q.    And I want to walk through this a little bit.  And if you

25   could at this point just tell me if there's anything besides

1   AD 15-28 -- is that the right number?

2   A.   Yes.

3   Q.   -- or the attachments that would include relevant

4   information to this, because we'll walk through those documents

5   separately.  But I just want to know if there's anything else

6   out there that we might need to look at.

7   A.   There was a manual provided to you all during discovery.

8   Q.   The Cummins Execution Manual?

9   A.   Yes, ma'am.

10  Q.   And, also -- okay.  That may answer -- so as to all of

11  these things in (g), and I guess (g)(1), (g)(2), the documents

12  that would cover all of those things would be AD 15-28 and the

13  attachments and the Cummins Execution Manual?

14  A.   Yes.

15  Q.   Okay.  That may be able to shorten my questioning just a

16  little bit.  Okay.  As a part of your responsibilities, are you

17  involved in setting up the execution team?

18  A.   I'm involved with some aspects of it, but I don't select

19  the members of the escort team.

20  Q.   Okay.  And I may need you to break it down for me because

21  I'm in the dark a little bit, aside from the protocols, about

22  what's involved.

23       So there's different teams that are involved.  Is that

24  right?

25  A.   Yes.

1    Q.   So we have the escort team.  And what other teams are
2    involved?
3    A.   I don't remember what it's called, but there's -- for
4    purposes of today's testimony, I'm going to call it a watch
5    team.  It's the people that have to log down everything with the
6    inmate once he's transferred to the Cummins Unit.  And I don't
7    select who is on that team until the afternoon of the execution,
8    in which case it's -- people from Central Office I know were
9    involved in selecting who it was going to be, from Central
10   Office.
11   Q.   You said you were involved?
12   A.   Yes.  Not the ones that -- from the time the inmate is
13   transferred to Cummins, there's someone assign to keep those
14   logs.  I wasn't involved in picking who those people were going
15   to be.  But once the afternoon of the execution arrives and we
16   switch out to people that work in Central Office, I was involved
17   in deciding who those people were going to be.
18   Q.   Okay.  And that's already been decided?
19   A.   Yes.
20   Q.   The escort team's already been chosen?
21   A.   Yes.
22   Q.   What other -- is there a tie-down team?
23   A.   No.  The escort team used to be called a tie-down team.
24   They just changed the name.  Yes.
25   Q.   And, of course, there's the IV team?

1    A.    Yes.

2    Q.    Executioner or executioners?

3    A.    Yes.

4    Q.    And are there any other teams that you can think of that

5    are involved?

6    A.    We don't call them teams, but the people that will be with

7    the victims, I was involved in selecting who those people were

8    going to be.  And then who will be talking with the citizen

9    witnesses ahead of time and be with them throughout the process.

10   Then there are teams assigned to the roadblock.  I was not

11   involved in selecting who was going to be at the roadblocks and

12   other outside security that is set.  I was not involved in

13   picking who those people were going to be.

14   Q.    Okay.  Who is ultimately in charge on the day of an

15   execution?

16   A.    The warden.

17   Q.    The warden of Cummins?

18   A.    Yes.

19   Q.    Is that Warden Straughn?  Is that how you say his name?

20   A.    Yes.

21   Q.    Who has the authority to call off an execution?

22   A.    The governor, the Court, or me.

23          MS. GIANI:  Sorry.  I'm trying to weed through some of

24   my questions to not repeat.  I want to go back to the IV team.

25   And I'm going to try very hard to not ask questions that would

1    implicate confidential material, but if at any time anybody

2    thinks that I'm going into that, just let me know.

3              THE COURT:  All right.

4    BY MS. GIANI:

5    Q.    Are the members of the IV team currently licensed in any

6    medical field?

7    A.    Yes.

8    Q.    And how many members are there?

9    A.    There are two members and backups.

10   Q.    Okay.  Are they all licensed in the same field or different

11   fields?

12   A.    The same field.

13   Q.    So are there four total; two members and two backups?

14   A.    Not officially.  Officially, there's three.  There's two

15   and a backup.

16   Q.    Okay.  What do you mean by "officially"?

17   A.    There are other people that would be able to step in if

18   needed.

19   Q.    Have those people been made aware that they may be called

20   upon?

21   A.    Yes, and they've attended the practices.

22   Q.    And all of these people are licensed in the same field?

23   A.    Yes.

24   Q.    What field is that?

25   A.    It's -- it meets the criteria set out in Attachment C.

1   Q.   Okay.  I've got a lot of papers up here.

2   A.   I think Attachment C says it can be an EMT of a couple of

3   different levels, a nurse, or a physician assistant, maybe.

4            MS. GIANI:  Do we have Attachment C?

5            MS. VANDIVER:  Yes.  It's Exhibit 32.

6   BY MS. GIANI:

7   Q.   So that's what Attachment C says, and I think you were

8   right, if I heard correctly, EMT-intermediate or EMT-paramedic,

9   nurse, physician assistant, or physician.

10  A.   Correct.

11  Q.   And is it your position you can't tell me which one of

12  those it is?  I can reserve it for confidential if you think it

13  is confidential information.

14            THE COURT:  I'll let counsel for the defendants and

15  Director Kelley make that decision.  I think the question was --

16  I think Director Kelley testified they were all of the same

17  category, if I understood the testimony correctly.  Director

18  Kelley, I don't want to misconstrue it.  The question was, which

19  category?  Is that fair?

20            MS. GIANI:  Yes, Your Honor.

21            MS. CRYER:  I think I would prefer that if we could do

22  that outside of the presence of others.  If we can do that in a

23  confidential setting, that would be best.

24            THE COURT:  All right.  Why don't you make a note of

25  that, if you can, and if you have other materials like that,

 1    we'll take it up at the end.  I'll also make a note of your

 2    question.

 3            MS. GIANI:  Thank you, Your Honor.  I may need some

 4    assistance remembering.

 5            THE WITNESS:  Not if you don't have too many

 6    questions.

 7            MS. GIANI:  I wish.

 8    BY MS. GIANI:

 9    Q.   Do these members of the IV team have any medical training

10    specifically in starting IV lines?

11    A.   Yes, all of them.

12    Q.   Okay.  And I may go into that more.  I assume if I ask what

13    that training is -- well, let me ask you, what is that training?

14    A.   It's all within the scope of their license, and they all

15    have done it.

16    Q.   Okay.  Do you know if they have any recent practical

17    experience?

18    A.   Yes, they do.

19    Q.   All of them?

20    A.   Yes, ma'am.

21    Q.   How recent?

22    A.   Well, I haven't talked to them today, but within the last

23    week.

24    Q.   So they've all set an IV line within the last week?

25    A.   Yes, ma'am.

1    Q.   Do they have any recent practical experience in the medical
2    field assessing consciousness?
3    A.   I don't know, but they're not the person that will be
4    assessing consciousness.  I mean, I assume they do, but they're
5    not the designee for that purpose.
6    Q.   Okay.  Let me back up then, because I understood from
7    Mr. Griffin's testimony that the designee, his designee was a
8    member of the IV team as well.
9    A.   I heard him referring to who he designates on the IV team,
10   but his designee for the purpose of monitoring the inmate and
11   assessing consciousness is not the same person as those persons
12   that are on the IV team.  And I remember him saying I have more
13   than one designee, but --
14   Q.   Okay.  Then I was confused.  Okay.  So there is a designee
15   that monitors the inmate and assesses consciousness?
16   A.   Yes.
17   Q.   And there's a separate designee that's on the IV team?
18   A.   Yes.
19   Q.   Okay.  Does the designee that monitors the inmate and
20   assesses consciousness have any recent practical experience
21   assessing consciousness in the medical context?
22   A.   I don't know.
23   Q.   Have you checked the licensures of all of these people, the
24   designee and the IV team and backups?
25   A.   The members of the IV team, yes, I know for a fact that

1  they are currently licensed.  The designee that is monitoring

2  for consciousness, I have reviewed his qualifications in the

3  past.  I did not review them again this time when the executions

4  were set.  And I don't know whether he has any current license,

5  but I do know that he is well qualified to do this.

6  Q.   So he may not be currently licensed?

7  A.   Correct.  The policy just requires that he be medically

8  trained, experienced -- and I forget the other word.

9  Q.   It does not require recent experience?

10 A.   It doesn't say anything about that.  And you may not want

11 me to elaborate further, but as you and I discussed, it is as

12 much my obligation, if not more so, than yours to protect their

13 constitutional rights, and I can assure you we would not have

14 anybody there to monitor that that wasn't competent to do it and

15 didn't feel fully competent to do it.

16 Q.   Okay.  I'm just hesitating here.  As to the IV team, I

17 think we heard some testimony from Mr. Griffin about the two

18 members of the IV team yesterday.  I just want to be extra safe

19 about the question I'm going to ask and make sure --

20        THE COURT:  Certainly, I don't have any problem if you

21 want to talk to opposing counsel in regard to that.

22      (Counsel confer.)

23 BY MS. GIANI:

24 Q.   I believe Mr. Griffin testified that these -- the two IV

25 members were volunteers.  Did you hear that testimony?

1    A.   I don't -- I may have heard it.  If I did, it didn't --

2    they are volunteers in the sense that we asked and they agreed

3    to do it.  They didn't call me up and say, "Hey, I want to do

4    this."

5    Q.   Okay.  That's one of the questions, my follow-up question.

6    I wanted to understand the meaning of "volunteers."  So you

7    reached out to them -- was it you who reached out to them?

8    A.   I did.

9    Q.   Okay.  And does "volunteers" mean they're not being

10   reimbursed for their time or services in any way?

11   A.   That's correct.

12   Q.   So are they currently employed --

13   A.   Not by me, but yes.

14   Q.   -- elsewhere?  So they're not employed -- they're not

15   employees of the ADC?

16   A.   Can I answer that later?

17   Q.   Okay.

18   A.   It's a mixture.

19   Q.   Okay.

20   A.   Okay.

21   Q.   I'll get into that -- just to be safe, I'll get into that

22   later.  Let me make another note here.

23            MS. VANDIVER:  We're writing those down too.

24            MS. GIANI:  Okay.

25   BY MS. GIANI:

1   Q.    And I think I'll get into this one later.  I'll star that.

2         I think Mr. Griffin also testified that there will be no

3   supervision of them in starting an IV line, no supervision of

4   the designee assessing consciousness or other designated duties.

5   Is that your understanding?

6   A.    I heard him say that there was no supervision of them

7   starting the IV line, and I disagree with the way he phrased

8   that.  I mean, I understand his -- I think what he was trying to

9   stress is, there doesn't need to be any supervision, that they

10  know how and they're -- it's within their practice, licensure,

11  scope, whatever the wording he used.  But the designee who is

12  monitoring the inmate observing for consciousness, doing those

13  things, will be there and will be monitoring what they're doing.

14  I will also be in the room.

15  Q.    Okay.  So is it your understanding that you will be

16  supervising the designee and the designee will be supervising

17  the IV team?

18  A.    Yes.

19  Q.    Okay.

20  A.    I couldn't tell you if somebody was -- I mean, I've given

21  blood lots of times, but I couldn't tell you if somebody is --

22  other than, you know, having been stuck, I wouldn't know.  But

23  the designee does know.

24  Q.    Okay.  You're anticipating my questions, which is great.

25  A.    Okay.

1   Q.   So that was -- so you are supervising in the sense that

2   you're just watching and you're available if there's an issue.

3   Is that kind of --

4   A.   Right, if there has to be a decision about whether this is

5   -- whether they're going to be able to get access to a vein or

6   not, I'm there.  But I'm not telling anybody where to stick, and

7   I'm certainly not sticking anybody.

8   Q.   Okay.  And the designee will be supervising, to the extent

9   supervision is required, that they're inserting the IV

10  correctly, is there a problem with the IV infiltration, that

11  sort of thing?

12  A.   Yes, and if there comes a point during the protocol if a

13  decision has to be made whether we're going to call somebody

14  else in, then I will be relying on the designee in terms of, you

15  know, helping me make a decision on what we need to do.

16  Q.   Okay.  I think I have some confidential questions related

17  to that too, but I need to make a note to myself.  Okay.

18       We're not -- I'm going to try to ask this in a way that we

19  don't have to get into confidential information.  But these are

20  not strictly ADC employees, correct?

21  A.   That is correct.

22  Q.   Okay.  And it's the ADC -- it's your department who is

23  charged with carrying out these executions, correct?

24  A.   Except for members of the IV team and the executioner,

25  everybody is an ADC employee.

1    Q.    Okay.  And you, as director, are ultimately responsible for

2    conducting the lethal injection procedure?

3    A.    Carrying out the executions, yes, ma'am.

4    Q.    Have these people, the members of the IV team, the

5    designee, the -- let me ask, is it -- is it one executioner, two

6    executioners, three?

7    A.    It's one.

8    Q.    Okay.  So has the executioner, IV team members, designee,

9    have they all received and reviewed AD 15-28 and Attachment C?

10   A.    I know they've all reviewed Attachment C many times.

11   Q.    Okay.

12   A.    I couldn't tell you sitting here right now whether the

13   executioner has seen that AD.

14   Q.    Okay.  Do they have prior experience in executions?

15   A.    The executioner does, yes.

16   Q.    What about the IV team and the designee?

17   A.    With executions, no.

18   Q.    Okay.  As to the executioner, does he or she have prior

19   experience in Arkansas?

20   A.    Yes.

21   Q.    Any other states?

22   A.    Not that I know of.

23   Q.    I think you may have already answered this.  Is it the same

24   executioner for all seven or eight executions?

25   A.    Yes.

1   Q.    Does he or she have a backup?

2   A.    There are people that could -- could step in.

3   Q.    Are those people aware that they may be on call to step in

4   and fulfill that role?

5   A.    One of them is, yes.

6   Q.    Okay.  Is that person trained -- well, let me take a step

7   back.  Has the executioner been through any training?

8   A.    Yes.

9   Q.    When was that training?

10  A.    With regard to the execution, it's scheduled for this time,

11  and it occurred in 2015, and he has done it before.

12  Q.    Okay.  You said it's scheduled.  So you anticipate that

13  there will be training prior to the first execution?

14  A.    Yes, ma'am.  It just had to be put off.

15  Q.    I understand.  So will it just be one training for the

16  executioner?

17  A.    Yes.

18  Q.    Aside from experience in executions, does the executioner

19  have experience administering intravenous drugs?

20  A.    Yes.

21  Q.    In live humans?

22  A.    Yes.

23  Q.    Okay.  Let me move on to the IV team.  I think we've

24  covered some of these questions.  Have they been through

25  training?

1    A.    Yes.

2    Q.    When was that?

3    A.    Are we talking about training for the execution?

4    Q.    Yes.  I'm sorry.  I should be more clear.  Have they been

5    through execution training?

6    A.    Except for the volunteer, the others have been at all the

7    practices.

8    Q.    Okay.  So there is --

9    A.    When I say "volunteer," I mean non-ADC employees in this

10   particular instance.

11   Q.    Okay.  I'm still trying to keep everything straight, and

12   it's been a very long week.  So there's a designee, two IV team

13   members, and a backup.  Have the two IV team members and the

14   designee participated in execution training, or is one of those

15   the volunteer?

16   A.    One of those is the volunteer.

17   Q.    Okay.  And the volunteer has not participated in execution

18   training?

19   A.    The volunteer has reviewed the protocol, has had lots of

20   discussions, has had meetings, but has not been present at the

21   trainings.

22   Q.    During the trainings, has the other IV team member

23   practiced setting a line?

24   A.    Everything except for inserting.

25   Q.    Okay.  Are there back ups for all the members of the escort

1    team and these other teams that we've talked about?

2    A.   Yes.

3    Q.   And have all of them been through training as well?

4    A.   I would have to check with the warden on that, but the

5    roles are such that if one person had to step off and someone

6    had to step in, it would not create a problem.

7    Q.   Okay.  So you believe the backups then have been trained to

8    be able to step in?

9    A.   Yes.

10   Q.   What about for somebody like Warden Straughn; he has a

11   pretty big role in the process, right?

12   A.   He does.

13   Q.   Is there a backup for him?

14   A.   Yes.

15   Q.   Who would that be?

16   A.   Dale Reed.

17   Q.   Okay.  Is Dale Reed aware of that?

18   A.   He's been at every practice, yes, ma'am.

19   Q.   Is he aware he may have to step in for Warden Straughn?

20   A.   I'm sure he is.

21   Q.   Is there a backup for you?

22   A.   If -- if it was necessary, Mr. Reed would have to stand in

23   for me.  And he is aware of that.

24   Q.   Has he been trained to perform all the functions on your

25   checklist?

1   A.   He doesn't have the same knowledge set that I have, but he

2   knows what's on the checklist, yes.

3   Q.   And Dale Reed testified he has been present at the practice

4   sessions.  Has Warden Straughn also been present at all the

5   practices?

6   A.   Yes, ma'am.

7   Q.   Will there be more trainings or practices after the first

8   set of double executions to prepare for the next set?

9   A.   If necessary.

10  Q.   And how will you know -- how will that determination be

11  made?

12  A.   If everything goes as planned and practiced, then there

13  will not be a need to do that.

14  Q.   Okay.  So at this point there's no individualized training,

15  as far as training for an individual execution; it's training

16  for all eight.  Is that right?

17  A.   There are discussions about what differences might need to

18  take place, but the training in terms of what's happening in the

19  room is the same.

20  Q.   Okay.  And as to all the other execution team members,

21  participants, and backups, has everyone who will be involved

22  received copies of AD 15-28, including Attachment C?

23  A.   No.

24  Q.   Why not?

25  A.   There's not a reason.  The AD is kept confidential -- well,

1 except for litigation, of course, and it is shared with people

2 that need -- that need it. There are checklists that are given

3 to people. I think that everybody that gets a checklist is at

4 the meeting where that AD is pass out and reviewed and is taken

5 back up, unless it's somebody that has a critical role, like

6 Mr. Reed or Mr. Griffin, in which case they'd maintain their

7 copy. But there would -- there's no reason for someone,

8 necessarily, that's got a role of sitting outside the quiet cell

9 and logging knowing everything that's in that AD.

10 Q. Are all the members, all the backups present and on-site

11 for each execution?

12 A. All the ones that have a critical role, yes.

13 Q. And what do you define as a critical role?

14 A. All of them that we've talked about, except I don't know

15 that there is -- I don't know how many people that could step in

16 on the escort team will be present.

17 Q. Okay.

18 A. I can't tell you that.

19 Q. And I think you said apart from the executioner, the

20 designee, the IV team, these participants are ADC staff or

21 employees?

22 A. Except for the executioner and the IV team, yes.

23 Q. How is the executioner paid?

24 A. And the backup for the executioner is not an ADC employee.

25 Q. Oh, okay. How are the executioner and his backup paid?

1    A.    I'm sorry.  One more we didn't talk about.  If someone had

2    to come in and do a central line, that person is not an ADC

3    employee.

4    Q.    Would it be an employee of the ADC contractor?

5    A.    No.

6    Q.    Okay.  How are the executioner and the backup and this

7    central line person paid, or are they paid?

8    A.    They're not paid.

9    Q.    These are all volunteers as well?

10   A.    Yes.

11   Q.    In the sense that they receive no reimbursement for their

12   time and services?

13   A.    Correct.

14   Q.    They're coming in to execute eight men in over four nights

15   dedicating quite a bit of time, without being reimbursed in any

16   way?

17   A.    They're coming in to make sure that this goes according to

18   the law.  And I realize we have a different view of this, but

19   everybody --

20   Q.    I think we have the same view.

21   A.    -- everybody that has a role has a very discrete role, and

22   it is to make sure that it goes smoothly for everyone that's

23   present.

24   Q.    Okay.  Is there any sort of arrangement or agreement with

25   these people?

1   A.   Other than that they remain confidential and that they

2   don't disclose their participation, no.

3   Q.   So no sort of contract or anything like that?

4   A.   No.

5   Q.   Okay.  I want to talk about AD 15-28, but I know that

6   that's confidential, so I'm going to start -- before we have to

7   send people out, I want to start with -- well, I just want to

8   ask a few questions about the 2008 version.  I think we went

9   through both of those at length on direct.  As we went through,

10  this 2008 policy was disclosed in a prior litigation.  Is that

11  right?

12  A.   A redacted copy of it.

13  Q.   Thank you.  A redacted copy.  And it's therefore a public

14  record, publicly available, right?

15  A.   The redacted copy, yes.  Well, they could get it from the

16  court.  They wouldn't get it from us, but yes.

17  Q.   Right.  Is the updated 2015 version publicly available?

18  A.   No, not to my knowledge.

19  Q.   Okay.  To us or anyone else?

20  A.   It has only been released in litigation, except for

21  Attachment C.  That's what the law provides.

22  Q.   Okay.  Do you know when we received the updated version?

23  A.   No, I don't.  I'm assuming you got it during prior

24  litigation.  I mean, it hasn't changed since the other lawsuits

25  that were recently --

Kelley - Cross                                              1161

1  Q.   Do you know if we received it just in response to discovery

2  in this case, approximately six days ago?

3  A.   I can't tell you what date this case was filed, ma'am.  I'm

4  sorry.  I don't know.

5  Q.   Do you have any personal knowledge of whether it was

6  previously released to us, prior to six days ago?

7  A.   No.

8  Q.   Okay.  And we did a long comparison of the two.  But one

9  substantive difference that I want to clarify is, both of these

10 have Attachment C, right, and we went through Attachment C as

11 well?

12 A.   Yes.

13 Q.   There is a difference between the drug protocols used in

14 the 2008 version and the 2015 version.  Is that right?

15 A.   Yes.

16 Q.   Okay.

17       MS. GIANI:  Your Honor, I do want to get into AD

18 15-28.  I'm trying to kind of parse confidential and

19 nonconfidential, but I think it would be easier to just go

20 through the AD right now, if we could.

21       THE COURT:  All right.  I'm going to ask everyone who

22 is not affiliated with the case to please leave the courtroom.

23 We have a protective order involved in this case that the

24 parties have agreed to and the Court has entered.  The parties

25 have agreed that some of the material in this case is

1    confidential, and so for witness testimony in regard to those

2    documents I'm going to clear the courtroom.  So if you would,

3    step outside, please.  You're welcome to stay out there.  As

4    soon as the line of questioning on the confidential material is

5    over, we'll call you back in.

6           (Spectators exited courtroom.)

7           MS. GIANI:  I may have actually been premature on

8    that.  Okay.

9           THE COURT:  One second, before you proceed.  We're

10   going to call those folks back in and talk to our court security

11   officer.  I'm going to make an announcement to them and to you

12   at the same time.

13          MS. GIANI:  And that's okay, because I just realized I

14   do have some nonconfidential questions left.  So if they want to

15   stay in here, they can.

16          THE COURT:  That's fine.  If you can gather them back

17   up, we'll just hold off for a minute.

18          (Spectators re-entered courtroom.)

19          THE COURT:  There's some nonconfidential material that

20   I think that we will cover now, so I've invited you back in.

21   And also, in talking to our court security officer, I know some

22   folks were talking about coming back into the building later

23   tonight, if they left, to get back in.  I am not going to rule

24   from the bench tonight.  When we conclude testimony, and I don't

25   know what time we'll conclude testimony tonight, I'm not sure

1    what our count is in terms of hours, but anybody who is waiting

2    for that, that will not happen tonight.  I will not rule from

3    the bench tonight.

4         You may proceed.

5              MS. GIANI:  Thank you, Your Honor.

6    BY MS. GIANI:

7    Q.   I'm actually going to talk about Attachment C first, which

8    is public.  Okay.  And I first want to look at Section I-2.

9    A.   Is this the 2008 version?  The date's at the end of it.

10   Q.   No.  Thank you for checking.  But this is the 2015 version.

11   It has midazolam.  This is marked on, but -- okay.

12        So looking at Section I-2.  "When the chemicals have been

13   received, the deputy director, or the designee, shall verify as

14   to type and concentration, and thereafter supervise any

15   necessary mixing or reconstituting of the chemicals in such a

16   manner as will meet the injection requirements and in accordance

17   with manufacturer's instructions.  The mixed or reconstituted

18   chemicals shall be transferred to an appropriate syringe or

19   syringes and thereafter placed in a designated injection drug

20   box.  The box will be secured and conveyed to the Cummins Unit."

21        And I believe Mr. Griffin testified yesterday that you

22   would tell him when to go and do this.

23   A.   I heard him say that.

24   Q.   Is that your understanding?

25   A.   He hasn't been involved in this part of it before, and I

1   had discussed with him the fact that we would likely wait until

2   noon, because we've had to do that in the past because of stays.

3   We didn't have to, but we did because of stays, and it worked

4   out well that way.  And so I had not said we're going to do it

5   at noon, but I had told him that we would likely do it at noon,

6   or he would likely do it at noon with his designees.  I'm not

7   doing that.

8   Q.   Okay.  And these are not stored, these drugs are not stored

9   at the Cummins Unit.  Is that right?

10  A.   That is correct.

11  Q.   Where are they stored?  Is that confidential?

12  A.   We have not ever released that information.

13          MS. CRYER:  I was going to say, I'm going to object.

14          MS. GIANI:  Feel free.

15          MS. CRYER:  Thank you.

16          MS. GIANI:  I was not sure that was confidential.

17  Okay.

18  BY MS. GIANI:

19  Q.   And I think -- I believe Mr. Griffin also testified that he

20  had also designated someone in this regard.  Is that right?

21  A.   Yes, he did.

22  Q.   Is that the same designee as the designee in the execution

23  room or is it a different designee?

24  A.   I believe it's someone that will be on the IV team.  Well,

25  I know it is someone that will be on the IV team.

1    Q.    Okay.  I'm trying to keep all the designees straight.

2    A.    Names would make it a lot easier, wouldn't it?

3    Q.    I wish we could have that, but I understand we cannot.  So

4    not the same designee that's in the execution room, but one of

5    the IV team members --

6    A.    Yes, ma'am.

7    Q.    -- is this designee.  Okay.  And do you know if that

8    designee has any experience mixing chemicals?

9    A.    Yes.

10   Q.    Okay.  Recent experience?

11   A.    Drawing up drugs, yes.

12   Q.    Okay.  And I don't know if this is the wording, but you

13   said that they're no longer put in a vault once they get to

14   Cummins.  Is that right?

15   A.    Right.

16   Q.    So how are they stored once -- let's assume they're drawn

17   up at noon.  Are they transported directly to Cummins?

18   A.    They're in the box and they'll stay with Mr. Griffin.

19   They'll go to Cummins when Mr. Griffin goes to Cummins.

20   Q.    And he's just in charge of the box?

21   A.    Uh-huh, he is.

22   Q.    I mean, this may sound like a silly question, but I assume

23   he may have to go to the bathroom during that time, so what

24   happens to the box?

25   A.    He'll lock it up before he goes to the bathroom.

1    Q.    So there is a place --

2    A.    Yes, ma'am.

3    Q.    -- to lock them away?

4    A.    Yes, ma'am.

5    Q.    But the protocol now is just that they're not directly put

6    in a vault and left there until --

7    A.    Historically, I'm told -- I wasn't there -- they mixed them

8    early in the morning and they took them to Cummins and they put

9    them in the vault, and then later in the afternoon, the designee

10   would retrieve them from the vault and take them to the

11   execution chamber.

12   Q.    Okay.  But now Mr. Griffin will essentially carry the box

13   around with him?

14   A.    He will be responsible for keeping it in his possession or

15   locked from the time that he takes the drugs and puts them in

16   syringe until he's at the execution chamber.

17   Q.    Okay.  I want to look at Section I-4.  "Orientation of the

18   executioners to the department's lethal injection procedure, if

19   needed, will be conducted prior to the day of the execution and

20   provided by the director and/or designee."

21        Have you made that determination whether orientation will

22   be needed for the executioner and the backup?

23   A.    I'm not sure if I understand the question correctly, but

24   Mr. Griffin and I are going to be meeting with the executioner.

25   Q.    Okay.  And that will be orientation?

1    A.    Yes.  But he's had a copy of Attachment C since it was

2    published.

3    Q.    Okay.

4    A.    As has the backup.

5    Q.    And will you be -- so it sounds like it's really more of a

6    conversation.  It's not going to be you directing a formal

7    orientation of some kind?

8    A.    This person has experience and has performed that role

9    before.  I have had several discussions with him and meetings

10   with him and he certainly knows more about it than I do, about

11   pushing drugs, and has explained to me what he's watching for

12   and all those sorts of things.  But I'm not -- I don't have that

13   kind of training to spout it all back out to you.

14   Q.    And that's fine.  I probably don't need to hear all of it.

15   Let's see.  Let's look at the next paragraph.  "On the evening

16   of the execution, the executioner shall, under the supervision

17   of the director, or designee, enter the injection room prior to

18   the scheduled time of the execution and shall immediately

19   inventory the injection drug box to ensure that all chemicals

20   are accounted for and that the infusion devices are in

21   readiness."

22        Do you know how the executioners are going to determine all

23   the chemicals are accounted for?  Let me ask it this way.  Will

24   they rely on the labels?

25   A.    When we go back into the other part, I'll give you more

1    detail.

2    Q.    Okay.

3            MS. GIANI:  Can you mark that?

4    BY MS. GIANI:

5    Q.    And will this process that's in paragraph 5, inventorying

6    the injection drug box, making sure the infusion devices are in

7    readiness, is that going to happen one time for both executions

8    or will there be, for instance, two drug boxes?

9    A.    Yes, there will.

10   Q.    Okay.  So when they draw up all the drugs, they'll be put

11   in two separate boxes -- I mean, will they be labeled, for

12   instance, Don Davis, Bruce Ward?

13   A.    They were in the past.

14   Q.    Okay.  So Section V, will the executioner look at both

15   boxes at the same time?

16   A.    He will certainly have time to do that.

17   Q.    Okay.  What about the infusion devices, will he assess

18   those for both at the same time?

19   A.    No, those will be changed out.

20   Q.    Okay.  What are the infusion devices referred to in this

21   paragraph?

22   A.    It's talking about the catheters and the extension tubes

23   and the whatever you call that little switch that you turn over

24   to make it go from saline to the syringe.  I can't remember what

25   all that is called, but --

1    Q.   And do you know how the executioners will determine whether

2    they are in readiness?

3    A.   In the same way as if he went into a patient's room

4    somewhere and was checking them.

5    Q.   And will you be overseeing this process or is that a

6    designee?

7    A.   That's a designee.

8    Q.   And without saying a name, unless it's a name we already

9    know, who is that designee going to be?

10   A.   I believe it was discussed during the closed session

11   yesterday.

12   Q.   Okay.

13             MS. GIANI:  Can you mark that one too?

14   BY MS. GIANI:

15   Q.   Okay.  So what happens if the drugs get to the

16   executioner's room and the drugs or chemicals are determined to

17   be not correct or infusion devices are not ready?

18   A.   It will have been checked ahead of time and triple-checked

19   ahead of time, but there will be extra on-hand, if necessary.

20   Q.   Extra devices?

21   A.   Extra of everything.

22   Q.   So extra -- an extra box of drugs?

23   A.   Extra of everything.  Yes, ma'am.

24   Q.   Okay.  Will you at any time use drugs or equipment that has

25   been set aside for another execution?  For instance, let me ask

1    -- let me ask it this way.  If you have two boxes, let's just

2    take the first set, Don Davis and Bruce Ward, and something goes

3    awry with the first set of drugs, will you be able to pull from

4    the drugs set aside for the second inmate?

5    A.    Yes.

6    Q.    Okay.  And if that happens --

7    A.    We have extra drugs there.

8    Q.    So that's what I'm trying to understand.  So how many boxes

9    of drugs are prepared?

10   A.    Two boxes are prepared, what's called for in the protocol

11   is prepared, and there will be additional drugs that will remain

12   in their current packaging but will be available if needed.

13   Q.    Okay.  So will the drugs then just be stored at Cummins for

14   the entirety --

15   A.    No, they will go back.

16   Q.    So they'll go back and forth?

17   A.    Yes.

18   Q.    Okay.  Looking at the last paragraph.  "The execution

19   gurney will be positioned in the death chamber so that the

20   deputy director, or designee" -- and I think that's also the

21   designee?

22   A.    That's the designee.

23   Q.    And that's the designee that we've talked about that's in

24   the execution room?

25   A.    That is monitoring the inmate.

1    Q.    Okay.   "And the executioner can directly observe the

2    condemned inmate's face and IV infusion sites."

3    A.    Correct.

4    Q.    Will the IV site be visible at all times?

5    A.    Yes.

6    Q.    Not covered by a sheet at any time?

7    A.    It will not be covered by a sheet at any time.

8    Q.    No matter where the placement, if it's placed in the groin,

9    it will not be covered?

10   A.    It will not be covered.

11   Q.    Let's move on to Section II.  And I did not make these

12   markings, so I apologize for whatever is on here.  Do you intend

13   to be present during the IV setup procedure?

14   A.    I do.

15   Q.    Okay.  And where will you be during that time?  Does that

16   occur -- when I say "execution room," I don't know if that's the

17   correct term for it.  Is there a correct term for it?

18   A.    That's fine.

19   Q.    Okay.  Will the IV setup occur in the execution room?

20   A.    Yes.

21   Q.    And where will you be during that time?

22   A.    In the corner --

23   Q.    In the corner?

24   A.    -- watching.

25   Q.    Who else is going to be present?

1    A.   The members of the IV team will be present, the designee

2    will be present, and Mr. Griffin will be present.

3    Q.   You will be present in the room --

4    A.   For that -- while it's being set up, yes, ma'am.

5    Q.   -- for that portion?  What about Dale Reed or Warden

6    Straughn?

7    A.   I imagine they probably will be someplace else.

8    Q.   Okay.  And what are your responsibilities during this time?

9    A.   When that stuff is being set up, I don't have a

10   responsibility.  I just will feel more comfortable if I'm

11   observing.

12   Q.   Okay.  How many attempts to place a line will be allowed?

13   A.   I think the policy says a reasonable amount.

14   Q.   Okay.  In your understanding, what is a reasonable amount?

15   A.   It's really hard to say today.  You know, I wouldn't think

16   that it should take -- I wouldn't think it should take five

17   attempts to insert each line.  I would hope that they would be

18   able to insert the line on the first attempt, both times.  But

19   if they didn't insert it the first time, that wouldn't be -- it

20   would not be reasonable to say you can't try again.

21   Q.   So at least two?

22   A.   Yes.

23   Q.   But beyond that --

24   A.   Uh-huh.

25   Q.   How long will you allow the IV team to attempt to place a

1    line?

2    A.    Well, I'm not going to be rushing them.  I don't want

3    anybody to feel like they have to, you know, stick quickly and

4    maybe make a mistake.  We do have the ultrasound machine, so

5    there should not be a problem.  They should not have to stick

6    more than once because they will be able to watch with the

7    machine where the needle -- if that's the right term.  I think

8    it's actually called a catheter, but I'm not a medical person.

9    They'll be able to see it go in and know that it's properly

10   placed.

11   Q.    Okay.  So no time limit, just --

12   A.    No.  Even during the practices, the discussion with the

13   escort team and everybody is take the time that you need.

14   Q.    Okay.  Will witnesses be able to witness this part of the

15   execution process?

16   A.    No.

17   Q.    And why not?

18   A.    Because the volunteer that is primarily responsible for

19   setting the IVs is a volunteer.  It is not an ADC employee.

20   Q.    And if that volunteer doesn't want to be seen, is that --

21   A.    Correct.

22   Q.    Okay.  So he or she will not be present for the rest of the

23   execution procedure?

24   A.    After the IVs are set and the saline is flowing and we know

25   it's a good line, then they are escorted out of the room before

1   the curtain is opened.  If something were to happen and they

2   have to be brought back in, the curtain will be closed while

3   they're in the room and the curtain will be opened again after

4   they leave the room.

5   Q.   So both members of the IV team will leave, but the designee

6   that's monitoring the IV site will remain?

7   A.   Yes, and will be visible to the witnesses.

8   Q.   Okay.  So the main reason for not being able to witness the

9   IV setup is to protect the confidentiality of this participant?

10  A.   Yes.

11  Q.   I want to jump to paragraph 8.  And this talks about:  "In

12  the event that a patent intravenous infusion site cannot be

13  established, the IV team shall be directed by the deputy

14  director, or designee, to evaluate other possible infusion

15  sites."  And I believe Mr. Griffin testified that --

16           MS. GIANI:  I'm sorry.

17           THE COURT:  Check with opposing counsel.

18       (Counsel confer.)

19  BY MS. GIANI:

20  Q.   Okay.  So I believe Mr. Griffin testified that you would be

21  his designee in that paragraph.  Is that right?

22  A.   He did.

23  Q.   Is that your understanding?

24  A.   That's what I heard him say yesterday.

25  Q.   Were you aware of that before yesterday?

1    A.   I assumed that the designee was the designee that's

2    monitoring the inmate.  But we will both be in the room, and so

3    it's not -- the designee that's monitoring the inmate is

4    medically trained and I am not.  So that's the reason I assumed

5    it would be that person.  But I definitely will defer, with

6    regard to infusion sites, to people who know what they're doing.

7    Q.   Okay.  Well, that clarifies one issue.  Thank you.

8    A.   But Mr. Griffin does not know the person that would come

9    in, if we had to bring somebody in to run a line, and that may

10   be why he said it was me because that is somebody that I have

11   arranged to have on standby.  And so I assumed when I was

12   sitting there yesterday that's what he was thinking about.

13   Q.   Okay.  Well, let's go through this.  "If one patent

14   infusion site is established, and a second site proves to be a

15   futile effort, the deputy director, or designee, may direct the

16   IV team to suspend further action to establish a second site and

17   proceed with one site."

18        Who has the authority to do that, you, or will you defer to

19   the designee?

20   A.   Well, I definitely have the authority to do that.

21   Q.   Uh-huh.

22   A.   But I would consult with the designee about that, and there

23   is an extremely unlikely chance that we would proceed with one

24   line.  I mean, that is not the intention.  The intention is to

25   have two lines.

1    Q.    That's what I wanted to follow up with you, the division of

2    responsibilities between you and the designee.  So you have the

3    authority to say, "No, we're not going to proceed with one

4    line."  Is that right?

5    A.    Uh-huh.

6    Q.    Does the designee have that authority?

7    A.    To say we're not going to proceed with one line?

8    Q.    Right.

9    A.    I'm fairly certain he would defer to me.

10   Q.    So he would defer to you as far as authority is concerned?

11   A.    Yes.

12   Q.    But you might defer to him as far as medical knowledge?

13   A.    Absolutely.

14   Q.    Okay.  But if you were to -- you're going to be in there

15   witnessing it.  If you were, in your judgment, to think, just as

16   a layperson, or in your role as director, that this was not

17   going well, you could stop the execution proceeding, correct?

18   A.    If I felt like that this was not going to happen, we

19   couldn't -- we were not able to get it done for some reason,

20   which I do not foresee happening, but if that happened, then I

21   would close the curtains and make a phone call.

22   Q.    Okay.  Then it says:  "In the case that no patent infusion

23   site is established after reasonable attempts as determined by

24   the IV team, the deputy director, or designee, will direct the

25   IV team to suspend further action and thereafter summon trained,

1   educated, and experienced persons necessary to establish a

2   primary IV line as a peripheral line or as a central venous

3   line."  That's what I believe you were referring to earlier,

4   that you would have that authority to summon --

5   A.   And I have somebody on standby who is trained, educated,

6   and experienced.

7   Q.   And they are there -- they will be there at the Cummins

8   facility?

9   A.   They'll be on the grounds.

10  Q.   Okay.  Can you tell me which category of qualification they

11  fall under?

12  A.   I would rather not tell you, but can I tell you that when

13  we go to the closed session?

14  Q.   Yes.

15           MS. GIANI:  Can we mark that one too?

16           MS. VANDIVER:  Got it.

17           MS. CRYER:  Thank you.

18           MS. GIANI:  Let me see where I'm at.

19  BY MS. GIANI:

20  Q.   So I have some other questions on this paragraph, but it

21  sounds like the person that will really be making the medical

22  decisions is the designee.

23  A.   Uh-huh.

24  Q.   Okay.  Let me star this.  Is this person, the trained,

25  educated, and experienced person, have they been involved in

1   execution training?

2   A.   No.

3   Q.   Will they be?

4   A.   No, I don't see that need.

5   Q.   Okay.  Have they -- has this person been involved in

6   executions before?

7   A.   No.

8   Q.   Okay.  And how will they be summoned, if needed?

9   A.   I'll contact them.

10  Q.   By phone in the room or will you leave the room and go get

11  them?

12  A.   I'll do one of those two things.  Probably both.  I'll

13  probably say, "I'm coming to get you."

14  Q.   About how quickly do you think they would be able to get to

15  the execution room?

16  A.   They're on the grounds, so it shouldn't take long.

17  Q.   Okay.

18  A.   And I don't -- you know, when this was written, we did not

19  have an ultrasound machine.  I do not foresee -- I mean, we have

20  these in here, but I just can't imagine it will come to that

21  since we have a machine and we can see where the veins are.  I

22  don't think it will happen.

23  Q.   And are these people trained in utilizing an ultrasound

24  machine?

25  A.   Yes, and they'll be doing further training.

Kelley - Cross                                    1179

1    Q.    Okay.  So the IV team will be?

2    A.    Yes.

3    Q.    And the designee?

4    A.    Yes.

5    Q.    And when will that training take place?

6    A.    It most likely already has, but they will be doing it in

7    front of me tomorrow.

8    Q.    Okay.  And medical training as far as using the ultrasound

9    equipment?

10   A.    Just showing me that they know how to do it.

11   Q.    Okay.

12   A.    On a live body, not an inmate.

13   Q.    And are you familiar with the use of an ultrasound machine?

14   A.    I've seen it.  I've seen how it works.

15   Q.    Okay.  And do you know how it should properly function to

16   place an IV line?

17   A.    I have seen how it works as in what you can see.  I haven't

18   seen anybody stick anybody while looking at that.

19   Q.    Okay.

20   A.    But I will before Monday.

21   Q.    Okay.  And one -- I think this is the last question on this

22   page.  You mentioned this change:  "Standard practice of using a

23   local anesthetic will be accommodated as necessary."

24        So this local anesthetic, is that for where they're going

25   to place the IV?

1    A.   Yes.  And for putting an IV in a standard spot, like

2    somebody's arm, I don't know that they will use Lidocaine.  But

3    if we had to put in a central line, then they would definitely

4    use Lidocaine.

5    Q.   But as far as you understand, that's a local anesthetic

6    just for the point of insertion of the catheter?

7    A.    Yes.  But -- well, if they were doing it in the arms.  But

8    I think for the central line, I think it's actually -- the kit

9    comes with a -- it would be placed in before the line is put in.

10   So it's injected is my understanding.  But I haven't looked at

11   the kit.  I've only been told about it, and I'm not a medical

12   person.

13   Q.   Okay.  Let's see.  Let's look at Section III.  I think

14   you've already testified, but I'm trying to remember.  Are you

15   going to be present during the preparation of chemicals?

16   A.   No.

17   Q.   I think we've covered some of this.  Okay.  Paragraph 2:

18   "The quantities of chemicals prepared and administered shall not

19   be changed in any manner without prior documented approval of

20   the director."  And the director, is that you?

21   A.   Yes.

22   Q.   Under what circumstances would you change the quantities of

23   chemicals prepared and administered?

24   A.   Under the hypothetical you talked about earlier, if

25   something went completely awry and we had to take -- we had to

1   use chemicals that weren't prepared for that particular

2   execution, that would be the only time.

3   Q.   Okay.  So you haven't documented any approval for any

4   changes for the ones that are scheduled?

5   A.   No.

6   Q.   Okay.  If there is some sort of issue that requires

7   documented approval, will that documented approval -- will

8   notice of that be given to the inmate and to us?

9   A.   There won't be any change between now and the next two

10  weeks.

11  Q.   Okay.

12  A.   And if there was a change to Attachment C, then yes.

13       I'm sorry.  My phone is over there, and it might be --

14  Q.   Okay.

15  A.   You can hit that button or set it on the floor.  Sorry.

16  Q.   Okay.  Looking at paragraph 3:  "All prepared chemicals

17  shall be utilized or properly disposed of in a timely manner

18  after the time designated for the execution to occur."

19       If the drugs -- okay.  First of all, in my hypothetical,

20  Don Davis -- I guess it is not truly a hypothetical.  Don Davis

21  and Bruce Ward, for each of their executions, for instance, will

22  four syringes be prepared of midazolam for Don Davis?

23  A.   You're talking about the midazolam and then the

24  500 milligrams of backup midazolam?

25  Q.   Right.

1    A.    At least one set of backup will be prepared for that night.

2    Q.    Okay.  So it may be that there's in Don Davis's drug box

3    two syringes of midazolam, two syringes of vecuronium bromide,

4    two syringes of potassium chloride, same with Bruce Ward, and

5    maybe a third box of backups for each one?

6    A.    Yes.

7    Q.    Will there be a fourth box of backups in case backups are

8    needed for both inmates?

9    A.    If the backups were used during the first execution, then

10   another set would be prepared before the second one started.

11   Q.    Okay.  So if the drugs for an execution are prepared but

12   not used, so let's say this third box of backups, will those

13   drugs be discarded?

14   A.    I don't know what it says on -- whatever it says on those

15   inserts and stuff.  I don't know.

16   Q.    Well, it just says the quantities of chemicals -- "All

17   prepared chemicals shall be utilized or properly disposed of in

18   a timely manner after the time designated for the execution to

19   occur."  So will the backups that have been prepared be disposed

20   of if they're not used?

21   A.    Yes.

22   Q.    Okay.  So they will not be set aside for possible use in a

23   subsequent execution?

24   A.    There would be no reason for them to.

25   Q.    Okay.  And I think you've said, or either in response to

1    discovery or we've heard testimony, that this is essentially

2    going to be the same team through and through for every

3    execution?

4    A.   For all seven of them that are currently scheduled, yes.

5    Q.   For all seven, okay.  And the majority of them, besides the

6    ones that we mentioned, are ADC employees?

7    A.   Yes.

8    Q.   What is their work schedule going to be like during this

9    time?  Or let's start with Easter.  Are they working on Easter?

10   A.   The security staff that's involved, I don't know if they're

11   working on Easter or not.  The ones that are going to be

12   involved in the execution chamber during the process itself,

13   there's no plans for them to work on Easter, and they shouldn't

14   -- they've been told they don't need to come in until noon on

15   Monday, and they don't need to come in until noon on Tuesday.

16   Q.   So they'll be working Monday, probably late into the night.

17   A.   Uh-huh.

18   Q.   Come back on Tuesday, Wednesday --

19   A.   Is the debriefing.

20   Q.   Okay.  Thursday, another double execution.

21   A.   Uh-huh.

22   Q.   Friday, debriefing?

23   A.   Uh-huh.  So Thursday, they should be coming in before noon.

24   Friday, they just need to report for the debriefing.

25   Q.   So they are not doing their regular work at this time?

1    A.    None of us have been able to do our regular work at this

2    time.

3    Q.    So they're not expected to show up for their normal shift?

4    A.    No.

5    Q.    Okay.  What about Saturday and Sunday?

6    A.    Depends on what their schedule is.  I mean, for instance, I

7    did some work while I was sitting at the table the last couple

8    of days.  You know, I do work at home at night sometimes and on

9    Saturdays and Sundays.  So I'm not telling them they can't work,

10   but I'm not expecting them to get everything done that they

11   would normally be expected to do.

12   Q.    I'm trying to skip things.

13         THE COURT:  Why don't we go ahead and take our

14   ten-minute break.  We'll take our ten-minute break.  We'll come

15   back in -- let's say we'll take a 15-minute break to let our

16   court reporter switch out, and we'll come back in at 6:15.

17         (Recess at 6:04 p.m.)

18                  C E R T I F I C A T E

19         I, Eugenie M. Power, Official Court Reporter, do hereby

20   certify that the foregoing is a true and correct transcript of.

21   proceedings in the above-entitled case.

22

23   /s/ Eugenie M. Power, RMR, CRR, CCR        Date:  April 13, 2017
     United States Court Reporter

24

25

1    (Proceedings continuing at 6:20 PM.)

2    BY MS. GIANI:

3    Q    I've managed to X through like half of my questions.

4    A    Yay.

5    Q    Okay.  I want to look at the drugs now.  Do you know who

6    calculated the drug dosages that should be used in this

7    protocol?

8    A    I got the information from Mr. Griffin, as best I recall,

9    but I believe that we got it from the Oklahoma protocol that

10   had been upheld.

11   Q    Okay.  So you looked to other protocols to kind of --

12   A    Yes.

13   Q    And have you consulted with anyone about the potential

14   that midazolam cannot or is highly unlikely to render a person

15   unconscious as contemplated by the protocol?

16   A    I've consulted with a lot of people, but they have not

17   told me that it's highly unlikely to render them unconscious.

18   Q    You've consulted with a lot of people?

19   A    Yes.

20   Q    And who are those people?

21   A    I've consulted with various people in the medical

22   profession, I've consulted with various pharmacists, and I have

23   consulted with people at other departments of corrections that

24   have this protocol.

25   Q    Have you read our experts' opinions or reports in this

Kelley - Cross

1    case or heard their testimony?

2    A    I heard some of the testimony over the last few days.  I

3    did not read the report of Dr. Zivot or Dr. Stevens.

4    Q    You are going to be in the room during the execution

5    somewhat supervising the consciousness check, is that --

6    A    I will be there and see what's being done, yes.

7    Q    Okay.  What sort of response would you be looking for

8    when the consciousness check is performed?

9    A    I'll be looking to see that the designee is doing all the

10   things that we talked about.  I won't be close enough to the

11   condemned inmate's face to see whether there's any kind of

12   reflex.  You know, he'll be able to see, obviously, very well

13   and the executioner will be able to see very well, but I'm on

14   the other side of the room.

15   Q    Do you know what they will be looking for, either the

16   executioner or the designee?

17   A    I know that they are trained on what to look for and

18   they've done these consciousness checks, not -- the designee

19   hasn't done it in the course of an execution before, but I know

20   that the executioner has experience and the designee has the

21   experience with doing consciousness checks, just not for this

22   purpose.

23   Q    Okay.  So if there's movement, for instance, can anyone

24   in the room speak out if they believe the inmate is still

25   conscious?

1    A      I'm sorry?

2    Q      During the consciousness check or any point thereafter,

3    if there is movement that somebody might interpret as

4    consciousness, are other people in the room free to speak out

5    if they believe the inmate is conscious?

6    A      If I saw some movement or the warden did or the recorder

7    did or Mr. Reed did that we weren't sure the designee saw for

8    some unknown reason, then we would be able to speak to him and

9    ask him to do that again.

10   Q      So as long as you believe the designee saw the movement,

11   you would defer to him to determine whether it was voluntary or

12   not?

13   A      If he saw movement, then he will do whatever checks he

14   wants, but I am 99 percent sure if he saw movement, that we're

15   going to give the next 500 doses of midazolam.

16   Q      After the next 500 doses, if there's still movement?

17   A      I've been -- I have seen nothing to make me believe that

18   is even a remote possibility.

19   Q      Not even the testimony of our experts?

20   A      Not even the testimony of your experts, the parts that I

21   heard, no.

22   Q      That doesn't make you think that it's even a remote

23   possibility?

24   A      They had -- what I heard them say is they have no

25   experience with the 500-milligram dose of midazolam.  I heard

1   one of them talk about there being fluid on the lungs in the

2   autopsies from Florida.  That doesn't in any way to me say that

3   the person was not unconscious.  I don't know if that was what

4   he was intending to say by that or not.  But I didn't hear

5   anything that changed my impression and belief based on the

6   people that I've talked to before and the results that I've

7   read before that makes me believe, as long as we have an

8   appropriate IV, the inmate will be unconscious.

9   Q      Do the executioner or the designee have any experience

10  administering 500 milligrams of midazolam?

11  A      No.

12  Q      And checking for consciousness?

13  A      Checking for consciousness, yes.

14  Q      After administering midazolam?

15  A      No.

16  Q      After administering any dose of midazolam?

17  A      I don't know.  They've never been involved in an

18  execution where midazolam was used.

19  Q      Okay.  So in my hypothetical, if there is movement after

20  -- well, if there's movement after the first two syringes are

21  administered and the designee nevertheless says the inmate is

22  unconscious, will you defer to his determination?

23  A      That's not going to happen.

24  Q      If there's movement after the second backup set of

25  midazolam is administered, if necessary, are you going to defer

Kelley - Cross

```
 1   to the designee's determination of whether the inmate is
 2   conscious or unconscious?
 3   A     I don't believe that there is any possibility that that's
 4   going to happen.  But if for some out-of-this-world experience,
 5   we gave that midazolam and the inmate is not unconscious, then
 6   I'm going to close the curtains and I am going to call the
 7   governor and say, it didn't work, it's not working.
 8   Q     My question is, who gets to make that ultimate
 9   determination, if there's --
10   A     If the inmate is unconscious, it's the designee.
11   Q     So -- well, I think I'm going to get into this in a
12   second.
13         Well, let me go back to my original question.  Is anyone
14   else authorized to speak out and say, I believe this person is
15   conscious?
16   A     The protocol doesn't contemplate that anyone else would
17   have a reason to do that, but there is nothing that would
18   prohibit anyone in the room from doing that.
19   Q     So we had some discovery requests in this case, and in
20   response to the requests, I believe it was there will be no
21   monitoring of vital signs to assess consciousness.  Is that
22   your understanding?
23   A     That was the response.  I don't remember the date that we
24   answered that discovery, but I have since pointed out to my
25   attorney that that is no longer accurate given the fact that we
```

1   are going to use the pulse ox, I think that's what it's called,

2   to monitor vital signs.

3   Q      And when was that decided?

4   A      This week during one of the practices.

5   Q      Who made that decision, you or the designee?

6   A      The designee asked me if it was okay, and I said yes.

7   Actually he asked me last week at a practice and then he

8   brought it this week and has been using it in the practices.

9   Q      Okay.  I've got to find a document real quick.

10          I want to show you the response to our interrogatory

11   about assessing for consciousness.  First of all, who came up

12   with this method?  And it goes on to the next page more in

13   detail.

14   A      I had a discussion with the designee about this, and we

15   were looking at the 2014 testimony of Dr. Dershwitz.

16   Q      So you relied on Dr. Dershwitz's testimony.  Was that in

17   Florida?

18   A      I don't remember.  I just know it was from 2014.

19   Q      Okay.  Are you aware of subsequent litigation regarding

20   midazolam, the use of midazolam in Ohio, for instance?

21   A      Yes, I'm aware of it.

22   Q      Are you aware that there was an injunction issued in that

23   case?

24   A      I'm aware.

25   Q      Upheld by the Sixth Circuit?

Kelley - Cross

```
 1    A      Yes.

 2    Q      And you still believe there's no remote possibility

 3    that --

 4    A      I believe that the Ohio protocol is the Arkansas

 5    protocol, and the Arizona protocol is not the Arkansas

 6    protocol.  And the problem in Oklahoma had to do with IV

 7    placement.

 8    Q      Okay.  We'll get into that.  But you looked at

 9    Dr. Dershwitz's testimony in Florida?

10    A      I don't remember where it was.  I just remember it was

11    from 2014.

12    Q      Okay.  So you picked one expert's testimony out of

13    numerous experts that have testified in this type of litigation

14    around the country?

15    A      The state of Arkansas has worked with Dr. Dershwitz for

16    years.  I'm familiar with him.  I've had conversations with him

17    when we had different protocols.

18    Q      And his view supports the state's view?

19    A      He has not been consulted to my knowledge on this one

20    because he doesn't do consulting anymore.  But I did read what

21    his testimony was with regard to the use of midazolam.

22    Q      So he no longer consults.  Is that right?

23    A      That's my understanding.

24    Q      So you were not able to contact him to ensure that he

25    stands by his opinion from 2014?
```

Kelley - Cross

1    A    I did not.

2    Q    And you decided to credit his 2014 testimony from another

3    state over testimony of other experts in other states and in

4    this case?

5    A    I don't think that's a fair characterization.

6    Q    Okay.

7    A    I have talked with other experts.  I haven't read every

8    expert opinion that's been filed in all of this litigation.  It

9    would be impossible for me to have done that, frankly, and to

10   do anything else.

11   Q    I understand.

12   A    I don't know how y'all got it all done.

13   Q    I don't know either.

14        So this essentially comes from Dr. Dershwitz's testimony.

15   Is that right?

16   A    No.

17   Q    Okay.

18   A    But we discussed his testimony when we were discussing

19   what needed to be done with regard to the consciousness check.

20   Q    Okay.  And you may have already answered this.  When did

21   this -- when was this developed?

22   A    I don't remember if it was the last time these -- there

23   were eight executions set in Arkansas.  I know that we

24   discussed -- well, I know that it was discussed then because

25   the testimony that I'm talking about is not something I got

Karen Baker, RMR, CRR, CCR
United States Court Reporter

Kelley - Cross                                    1193

1    recently.  It was something that we had before.  I don't

2    remember when we got it, but it was in my stuff.  The

3    underlying -- the discussion about how to check when we've been

4    doing the practices, the designee has been doing this and other

5    things including a sternum rub as part of what he's doing to

6    check.

7    Q    Okay.  But this is not found in any sort of written

8    policy or anything like that.  Is that right?

9    A    There's a document that was done very recently that

10   includes this.  It's part of what was drafted out to be shared

11   with witnesses in terms of, when the curtain opens, this is

12   what you're going to see.  There's going to be a five-minute

13   delay, then they'll, you know, wait, and then there will be a

14   check for consciousness, so that they know what it is they're

15   seeing.  That has not been shared with them, but it's just so

16   that they know what to expect.

17   Q    Okay.  So but as far as an internal policy document,

18   there's nothing that sets this out?

19   A    This part of that was shared and discussed with the

20   designee.

21   Q    Okay.  So it's just an understanding between you and

22   Mr. Griffin and the designee that this is what's going to

23   happen?

24   A    Right.  What the policy says is medically appropriate, I

25   think.

Karen Baker, RMR, CRR, CCR
United States Court Reporter

Kelley - Cross                                    1194

1    Q      So did you say the designee has practiced this in

2    trainings?

3    A      Yes.

4    Q      Obviously on someone who's conscious, right?

5    A      Yes.

6    Q      And what is the absence of response in your mind?

7    A      I don't know how to say that other than no response.

8    Q      For instance, is movement a response?

9    A      I think it is.

10   Q      Any sort of movement?

11   A      It's been explained to me by various people that a reflex

12   is not a movement.  But what we're looking -- what we are

13   expecting is no response, including movement, no response.

14   Q      Okay.  Is that going to be the policy that any movement

15   is considered a response?

16   A      If there's movement, then he's going to repeat the

17   consciousness check to determine whether it was purposeful

18   movement or not.

19   Q      Okay.  And let's say if there's an audible reaction, a

20   grunt, a moan, some sort of vocalization, is that a response?

21   A      It is a response, but I don't -- depending on what it

22   sounds like, I don't think that's necessarily a sign of

23   consciousness.  I was there when my grandmother and when my

24   great-grandmother passed away, and there were sounds when they

25   were taking their last breath, and they were not conscious when

Kelley - Cross

1   those sounds were -- I don't believe they were conscious when

2   those sounds were coming.

3   Q    And the person being executed is strapped down, correct?

4   A    There are restraints, yes.

5   Q    Arms are strapped down?

6   A    At the hand, wrists and hand.

7   Q    Okay.  Legs?

8   A    There are restraints that go across approximately the

9   thigh area and the ankles.

10  Q    Chest?

11  A    Yes.

12  Q    Head?

13  A    Their head is placed -- and you saw the pictures -- it's

14  between two devices, basically so that they look up.  The

15  microphone, when they make their last words, is up above them

16  so what they say can be heard in the microphone and so that

17  they would not be able to look over at the witnesses if there

18  was a desire to do so.

19  Q    Is it strapped down as well?

20  A    The strap goes across the top of those, but it doesn't --

21  it might on some people, but normally it's not touching their

22  head, no.  It's just holding those things in place.

23  Q    So do you know what kind of purposeful movement the

24  designee will be looking for if a second -- say -- so my

25  understanding is if a first consciousness check is performed

Kelley - Cross

1   and there's movement, it will go on to a second consciousness

2   check?

3   A    He will wait five minutes from the first syringe of

4   midazolam going in.  He will do a consciousness check.  If he

5   believes that the inmate is unconscious at that point, then the

6   next drugs will start.  If he doesn't, then the next drugs

7   won't start.

8        I'm not expecting movement at any point after that

9   midazolam -- that first dosage of midazolam has been done.  But

10  if at some point during the execution before it is over, there

11  is movement, then he will do another consciousness check when

12  that happens, if and when that happens.

13  Q    Okay.  So at any point if there's any kind of movement,

14  there will be a pause in what's happening -- say, the other

15  drugs or the next set of drugs, the vecuronium bromide, is

16  being administered and there's movement, will you stop the

17  drugs from being pushed?

18  A    We specifically discussed that he will say, "Halt."

19  Q    So any kind of movement, whether it's purposeful or

20  not --

21  A    He will halt it and he will do another check.  I don't

22  believe that will happen, but, yes, we have discussed that.

23  Q    I understand that you don't believe it will happen.  If

24  -- so there's movement, there's a consciousness check, a

25  secondary consciousness check, it's at that point that the

Kelley - Cross                                                    1197

1   determination is made whether the movement is purposeful or
2   not?
3   A    Yes.
4   Q    Okay.  So what kind of purposeful movement would he or
5   she, the designee, be looking for?
6   A    He's not looking for purposeful movement.  If there is
7   movement, depending on what stage we're in here, but, you know,
8   we already thought he was unconscious -- is that what we're
9   talking about?
10   Q    Well, I don't know.  I mean, if the first dosage of
11   midazolam is injected, let's say, and there's a consciousness
12   check, right?
13   A    Yes.
14   Q    And that first consciousness check there's movement, in
15   that scenario would the designee say, "This person is not -- is
16   still conscious"?
17   A    I believe that he would and he would give the dose of
18   midazolam.
19   Q    Okay.  So we give the next dose of midazolam.  And he
20   checks for consciousness and there's movement, is that another
21   automatic, he's still conscious?
22   A    No.  He's going to do the consciousness check.
23   Q    Okay.  So then he will check for purposeful movement?
24   A    Yes.
25   Q    Okay.  So, again, what -- let's say we're at that stage.

1 | What kind of purposeful movement would he be looking for?

2 | A    He's not looking for the purposeful movement.  He's

3 | looking for the absence of any purposeful movement.

4 | Q    Okay.  Well, how will he determine what's purposeful and

5 | what's not?

6 | A    Well, I sat through some of the same testimony you did

7 | today.  If somebody is trying to swat at something or they turn

8 | their head toward where there's some stimuli, that's

9 | considered, what I heard the expert say today, to be purposeful

10 | as opposed to a reflex.

11 | Q    So how is an inmate who has his wrists strapped down

12 | going to swat at something?

13 | A    Unless he can pull his hand out of that restraint, he

14 | can't.

15 | Q    How is an inmate who has his head trapped between two

16 | straps going to move his head to the side?

17 | A    He can move his head.  He may not be able to turn it all

18 | the way, but he can move his head.

19 | Q    Okay.  So, again, let's just take this swat --

20 | A    I know that we could do this all night long, but the

21 | policy says, and the part that I can tell you for sure is that

22 | until that designee determines he's unconscious, we are not

23 | going to give the second and third drug.

24 | Q    And this designee, we can't know his or her identity,

25 | correct?

Kelley - Cross                                    1199

1    A       That's the agreement, yes.

2    Q       Or maybe we can under the highly confidential, I don't

3    know, we might get to that later, but we can't bring him or her

4    in here and question him about these methods, right?

5    A       Right.

6    Q       So essentially I have to rely on you to protect the

7    interest of my clients, right?

8    A       Once they're in that room, yes, ma'am, you do.  I'm

9    sorry.

10   Q       So I hope you can understand the predicament that I'm in.

11   A       I do.

12   Q       And I know that your understanding is the midazolam's

13   going to work great.  My understanding or our understanding is

14   that it won't.  So this to me is a critical juncture as to what

15   is purposeful movement.  When an inmate has both of his

16   extremities strapped to a gurney and his head between

17   restraints, what is purposeful movement?  What can my clients

18   do strapped to that gurney that will get this execution to stop

19   if they're still conscious?

20   A       If they're still conscious, they won't be executed.  If

21   the drugs don't work, it won't happen.

22   Q       How will they be able to alert the designee and everyone

23   else in that room that they're still conscious?  What will be

24   sufficient to make that alert?

25   A       If I've said this before, I apologize, but any movement

Karen Baker, RMR, CRR, CCR
United States Court Reporter

Kelley - Cross                                                1200

1    from the inmate is going to result in another consciousness

2    check by someone who knows how to determine if they're

3    conscious or not.

4    Q    Okay.  I'm asking about that second, because it's my

5    understanding that that subsequent consciousness check is where

6    you check for purposeful movement in particular.  And my

7    concern is that second consciousness check, let's say there's

8    movement, then my client's life is in the hands of a designee

9    who I know nothing or next to nothing about, correct?  That

10   designee is the one that gets to determine whether that

11   movement is sufficient to stop the execution or not; is that

12   right?

13   A    If your client is able to open his eyes or your client is

14   able to turn his head to the side or your client is able to

15   somehow let us know that he's not unconscious, then we will not

16   proceed.  If your client is not able to do anything, then there

17   is -- other than the consciousness check, I don't know what

18   else to say.

19   Q    I'm just concerned about purposeful movement.  So is it

20   my understanding then that opening eyes, turning head, any

21   movement essentially during that second consciousness check

22   will be considered to be purposeful?

23   A    I think opening your eyes is a purposeful movement.  I

24   don't think that's a reflex.  When they talk about that they're

25   going to brush the eyelashes and see if there's any response to

1   that, I have to believe and I would believe if their eyes open,

2   then they're not unconscious.

3   Q     If their eyes are open, they're not?

4   A     If their eyes open, they are not unconscious.

5   Q     Okay.  If there's movement after that second

6   consciousness check, will you stop the execution?

7   A     If there's movement after the second consciousness check

8   and there is any reason to believe that the drug just has not

9   worked on your client, then yes.

10  Q     I don't like the qualifier, but I guess I'll have to be

11  satisfied with that.

12        This says when the warden is notified that the inmate no

13  longer exhibits any sign of life, the coroner will be summoned.

14  Who determines when there's no longer signs of life?

15  A     The designee.  Where that says the executioner will

16  check, it should say the designee will check.

17  Q     Okay.

18  A     It's a typo.

19  Q     So the coroner will be summoned?

20  A     The designee will tell the warden when to summon the

21  coroner.

22  Q     Is it the coroner or the executioner or the designee will

23  check for signs of life?

24  A     The designee will check for signs of life and will notify

25  the warden when to call the coroner.  Then the coroner will

```
 1   come in and make his independent decision.
 2   Q    If all of the midazolam has been administered, let's say
 3   the first 500 milligrams, the backup 500 milligrams, and let's
 4   just say the inmate is still conscious, what will you do?
 5            MS. CRYER:  Your Honor, I'm going to object just
 6   simply because it's been asked and answered and asked and
 7   answered.
 8            THE COURT:  I'll give you a little bit of leeway.
 9   BY MS. GIANI:
10   Q    If they're still conscious after all the midazolam has
11   been administered, what will you do?  Will you wait five
12   minutes, ten minutes?
13   A    The five-minute wait is from the beginning of the first
14   syringe of midazolam.  If 1,000 milligrams has been
15   administered to the inmate and he is still conscious then we
16   will close the curtain and I'll call the governor and tell him
17   it didn't work and summon medical personnel to the room.
18   Q    How long will you wait to determine if that last dose of
19   midazolam has worked?
20   A    I don't think there will be a reason to wait.
21   Q    So one consciousness check, if they're still conscious
22   after that last dose, you're going to call it?
23   A    Yes.
24   Q    Okay.
25   A    And, again, I don't believe that's possible, but yes.
```

1   Q      I think you've at least implicitly answered this, but

2   will consciousness continue to be monitored after the inmate is

3   declared to be unconscious?

4   A      Yes.  Any movement will result in another consciousness

5   check.

6   Q      Okay.  What is your understanding of the purpose of the

7   vecuronium bromide?

8   A      Stops the inmate's breathing.

9   Q      Stops their breathing?

10  A      Yes, ma'am.

11  Q      Okay.  So the potassium chloride wouldn't be sufficient

12  to do that?

13  A      The potassium chloride stops the heart.

14  Q      Which would also stop the breathing?

15  A      Well, I'm not a medical person, but my understanding is

16  the midazolam will make them unconscious, the vecuronium

17  bromide, I can't say that correctly, will stop the diaphragm

18  from working which stops their breathing, and the potassium

19  chloride will stop their heart.

20  Q      Okay.  So do you know why you don't just stop with

21  vecuronium bromide?

22  A      Do I know what?

23  Q      Do you know why the protocol doesn't just stop then with

24  vecuronium bromide?

25  A      Because the potassium chloride stops their heart.  I

1  think the heart could continue to beat if you didn't give them

2  the potassium chloride.  Maybe not very long, but could

3  continue.

4  Q    Is it your understanding that vecuronium bromide also

5  paralyzes the person?

6  A    I understand that's how it works on the diaphragm which

7  is what stops the breathing, yes, ma'am.

8  Q    So would it also block voluntary movement?

9  A    I assume that it would.

10  Q    How quickly do you expect death will result after

11  injection of the potassium chloride?

12  A    I expect that it will occur quickly.

13  Q    Is there --

14  A    But I don't know how long it takes the medicine to travel

15  to the heart.

16  Q    Is there any length of time that you would consider too

17  long such that you would stop the execution and provide

18  life-saving measures?

19  A    After all three of those drugs have been administered?

20  Q    Yes.

21  A    No.

22  Q    So you will wait after all three drugs are administered

23  until the person dies?

24  A    Yes.

25  Q    No matter how long it takes?

1    A     I don't think that it will take very long.

2    Q     Okay.  If a vein is cut down or placement of a central

3    line or other measures are necessary, will these procedures be

4    performed while the inmate is conscious?

5    A     The way the protocol is written, it calls for the lines

6    to be placed before you ever give the midazolam, so yes, the

7    inmate would be conscious.

8    Q     And how long will you attempt -- will you allow those

9    attempts to take place?

10   A     There's not a time for which those attempts would take

11   place as we discussed earlier.

12   Q     How many attempts?

13   A     I can't tell you a number.

14   Q     In your mind, is an execution that results in the death

15   of an inmate, by whatever mechanism, a successful execution?

16   A     I think it's a completion of the execution.  I wouldn't

17   use the word "successful".

18   Q     Are you aware of issues in the execution of Clayton

19   Lockett?

20   A     Yes.

21   Q     If something similar happens with one of these

22   executions, what will you do?

23   A     What happened to Clayton Lockett can't happen here.

24   We're not going to have the IV site covered up where it can't

25   be monitored.

1    Q     So your understanding is there can't be infiltration?

2    A     Not without someone seeing it.

3    Q     There can't --

4    A     Where it can be corrected.

5    Q     There can't be human error that occurs?

6          MS. CRYER:  Objection.  I believe that

7    mischaracterizes her testimony.

8          MS. GIANI:  I was trying to ask a different

9    question.

10         THE COURT:  Do you want to rephrase your question?

11   BY MS. GIANI:

12   Q     Do you believe that it's possible for human error to

13   occur in one of these executions?

14   A     I believe it's possible for human error to occur, yes,

15   but the mistake that happened to Clayton Lockett will not

16   happen.  There was nobody, my understanding is, from what I've

17   read, nobody was monitoring the IV site.  They had it covered

18   with a sheet because of the placement.

19   Q     Are you aware of the issues in the Ronald Bert Smith

20   execution?

21   A     You'll have to remind me which one that is, I'm sorry.

22   Q     Sure.  I'm going to look at your affidavit.  Did you

23   prepare your affidavit?

24   A     I worked with the attorney general's office to prepare

25   and edit the affidavit.

Kelley - Cross                                    1207

1    Q      Paragraph 31 says, "The execution of Ronald Bert Smith in
2    Alabama was not a botched execution as the prisoners allege.
3    Alabama uses essentially the same three-drug protocol as
4    Arkansas.  Although the inmate reportedly coughed and moved
5    after the administration of midazolam, that is to be expected
6    because midazolam is not a paralytic.  In addition, according
7    to medical experts, such involuntary movements while under
8    anesthesia do not show that the inmate suffered any pain during
9    the procedure.  To my knowledge, Alabama does not consider the
10   Smith execution to have been botched and Alabama has no plans
11   to change its protocol."
12          So if one of these eight men coughs and moves after
13   midazolam is administered?
14   A      We're going to do another consciousness check.
15   Q      If after that consciousness check, the inmate coughs and
16   moves, what will you do?
17   A      Give another dose of the midazolam.
18   Q      And if there's more movement?
19   A      I think the answers I gave you don't change because you
20   read me that paragraph.
21   Q      I'm asking you if this happens.  You say this was not a
22   botched execution, that the coughing and the movement were
23   involuntary?
24   A      That's what the expert, Dr. Antognini, testified to as I
25   heard.


                    Karen Baker, RMR, CRR, CCR
                    United States Court Reporter

Kelley - Cross                                        1208

1    Q      What did our expert testify to?

2    A      I didn't hear your expert on Monday morning.  I wasn't

3    here.

4    Q      Okay.  Are you aware that he thinks differently than

5    Dr. Antognini?

6    A      Am I aware what?

7    Q      That he has a different opinion than Dr. Antognini?

8    A      I heard a little bit of it today, but I don't think I

9    heard -- I didn't hear his original direct examination on

10   Monday.

11   Q      You're going to be the person in that room with the

12   authority to stop the execution, right?

13   A      Yes.

14   Q      You're the only person in there that can stop it; is that

15   right?

16   A      I'm the only person that will physically be in the room

17   that can stop it, yes.

18   Q      So your understanding of all the people really in the

19   world as to what is voluntary, what is sufficient to stop an

20   execution, is the most important; is that right?

21   A      I will be talking with the people in the room that have

22   medical training about what's going on.  There is no desire by

23   anybody that's in that room to inflict pain or torture upon

24   your client.

25   Q      I understand that and I appreciate that.  I think that

1   the problem comes between fundamental differences in opinion of

2   what these drugs can do.  And I want to know if one of our

3   clients is coughing and moving, let's say after all the

4   midazolam has been administered, if there's coughing and

5   movement, will you allow the execution to proceed?

6                MS. CRYER:  Objection, asked and answered.

7                MS. GIANI:  I think she said there will be another

8   consciousness check.  I want to know in this particular

9   scenario.

10               MS. CRYER:  I believe the witness's testimony was

11  that nothing has changed with her previous opinion even though

12  you gave her the example that was in the Ronald Bert Smith

13  execution.

14               THE COURT:  Why don't you rephrase your question?

15  BY MS. GIANI:

16  Q     Let me just -- were you present for the testimony of

17  Spencer Hahn?

18  A     I'm sorry?

19  Q     Were you present for the testimony of Spencer Hahn?

20  A     I don't know who that is.

21  Q     He witnessed the Ronald Bert Smith execution.

22  A     No.

23  Q     Are you personally familiar with the execution of Ronald

24  Smith?

25  A     I've spoken to officials in Alabama, but no, I have no

1   personal knowledge.

2   Q      Are you aware that some -- there are at least some

3   witnesses and people who were there who do believe that that

4   was a botch?

5   A      I've read that in the paper.

6   Q      If this scenario, if the Ronald Bert Smith execution had

7   happened in Arkansas, would you have held another execution

8   that same night?

9   A      I know what was reported and I know what the people that

10  I talked to said.  I wasn't there.  I don't know what kind of

11  movement, what kind of cough, I don't know any of that.  I have

12  been present when people died.  If what I hear is what I heard

13  before, I am not concerned that the person is conscious.  But

14  my other answers don't change.  If there's some movement that

15  takes place, we will check for consciousness again.

16  Q      I'm sorry, I'm trying to weed down my questions.

17  A      Thank you.

18  Q      I want to turn to another topic.  Is it correct that

19  there will not be a debriefing after each execution?

20  A      In between the executions on that night, there's no

21  planned debriefing.  If something happens or there's an issue,

22  then we will discuss it before we proceed with the next

23  execution, whatever it takes to resolve whatever's going on.

24  But the current plan is that after the Monday executions on

25  Tuesday, staff do not need to report that morning and we will

1    have a debriefing on Wednesday morning.  And then after the

2    Thursday evening executions, there will be a debriefing on

3    Friday morning.

4    Q    So no debriefing after the first execution that's

5    occurred in this state in 12 years; is that right?

6    A    I just answered you.

7    Q    Do these debriefing sessions cover both mental health

8    debriefing and quality assessment?

9    A    They can, yes.

10   Q    Is there just the one group debriefing or will there be

11   individual debriefing?

12   A    There are conversations constantly about this and there

13   will be conversations constantly between these, and any issues

14   that arise will be dealt with.

15   Q    But no formal process?

16   A    Other than what I've told you.

17   Q    At these mandatory debriefings, the group debriefings,

18   will all the participants be there?

19   A    Except for the executioner.

20   Q    The IV team members?

21   A    The voluntary, the one non-ADC employee, will be invited

22   but I don't know whether that person will want to attend.

23   Q    I believe you said executioner and the voluntary IV team

24   member will not be at the debriefing?

25   A    It's not mandatory for them to attend.  I am fairly

1    confident the executioner will not be interested in attending.

2    If the voluntary member of the IV team wants to attend, that

3    person will be welcome.

4    Q    Will there be a separate debriefing process for those

5    people?

6    A    I'm sure we will be talking about it, yes.

7    Q    If there are any issues or changes suggested at a group

8    debriefing session or to you or a warden individually, will you

9    ask to delay the subsequent executions to make the necessary

10   changes?

11   A    If it's something that can't be fixed before the next

12   execution, yes.

13   Q    When will each double execution begin?

14   A    The executions are scheduled to begin at 7:00.

15   Q    Do you anticipate that the IV lines will have been set at

16   that time?  Is that when the actual injection process is

17   supposed to begin?

18   A    That's when the curtains should open.

19   Q    So at what time is the IV team going to begin to attempt

20   to set a line?

21   A    Approximately 15 minutes before.

22   Q    So around 6:45.  Okay.  When is the second execution set

23   to begin on each night?

24   A    If the first one takes place, then the second one,

25   assuming there's not a delay because of something we need to

```
1    address, will begin at 8:15.
2    Q    Again, that's when you anticipate the curtain would open?
3    A    Yes.
4    Q    So at what time will the IV team begin to attempt to set
5    the lines for the second execution?  Is it also 15 minutes
6    prior?
7    A    Yes.
8    Q    And --
9    A    But those times are set by me and if we need to change
10   them, we will.
11   Q    This may be sort of an elementary question, but who will
12   be executed first on April 17th?
13   A    It goes by their SK number.
14   Q    Do you know who the first inmate would be?
15   A    I don't remember off the top of my head.  I think Bruce
16   Ward has a SK number that comes before Don Davis, but I'd have
17   to double check that.
18   Q    What about on April 20th, do you recall who will be first
19   on that night?
20   A    I do not.
21   Q    Or on April 24th?
22   A    I do not recall off the top of my head.
23   Q    Is it your understanding that there are still executions
24   scheduled for April 27th?
25   A    No.  Jason McGehee got a stay.
```

1    Q      So it's your understanding there will just be one

2    execution that night?

3    A      Yes, ma'am.

4    Q      Will it be the same citizen witnesses for both executions

5    on each night?

6    A      That's the plan.

7    Q      Will there be carry-over to the other nights using the

8    same witnesses?

9    A      On some occasions there are.

10   Q      So there are certain citizen witnesses who will witness

11   maybe three or four, six, eight executions?

12   A      The final determination on the witnesses has not been

13   made.  I'm not trying to avoid answering your question.  I

14   think there's one witness that will be present for all of them

15   and I think there's one person that was involved in -- that's

16   in law enforcement that was involved on more than like one

17   that's set for one night and one that's set for another night,

18   so I think that person will be there for four.

19   Q      Have you performed background checks on all of these

20   individuals?

21   A      The ones that are for sure on there, yes.

22   Q      You anticipate there will be how many citizen witnesses

23   each night?

24   A      12.

25   Q      Okay.  And are these all volunteers?

1   A     Except for the ones I asked to be present, yes.

2   Q     Nobody's being paid to witness?

3   A     No.

4   Q     So once an execution occurs, will a full autopsy be

5   performed?

6   A     That's up to the medical examiner.

7   Q     So if, according to the protocol, that's up to the deputy

8   director or yourself, you haven't made that determination?

9   A     It's my understanding previous medical examiners left

10  that up to us to request.  The current medical examiner, it's

11  my understanding, intends to do a full autopsy on all of them.

12  Q     Okay.  After the first execution, will that body be

13  immediately transported away from the facility?

14  A     That's up to the coroner.

15  Q     Okay.  Will blood be drawn pretty soon after the

16  execution?

17  A     I've been told that that's not -- that the medical

18  examiner doesn't need that.

19  Q     Okay.  Have all -- so there's various portions in these

20  protocols and such that allow for a designee.  Have all those

21  designation decisions been finalized?

22  A     Yes.

23  Q     For all executions?

24  A     Yes.

25  Q     Will the designations for all executions be the same?

Karen Baker, RMR, CRR, CCR
United States Court Reporter

Kelley - Cross

```
1    A      That's the plan.

2    Q      There was some testimony by Mr. Griffin on this last

3    night, but I just want to get your understanding of some of the

4    stuff.  Will attorneys from the attorney general's office be

5    allowed to bring their cell phones to Cummins on the night of

6    the execution?

7    A      There are two locations where there are people from the

8    governor's office and the attorney general's office and the

9    board of corrections.  They're not in the east building which

10   is where this is going to take place, nor are they where

11   inmates are located.  And the answer to that is yes.  There

12   will be hard lines and they will have their cell phones because

13   if somebody issues a stay, I want to know about it.  I don't

14   want there to be any reason why that call does not come.

15   Q      Thank you for clarifying.  We will not be allowed to

16   bring our cell phones; is that correct?

17   A      Your cell phones are not allowed.  You are allowed to go

18   back to the quiet cell and to witness the execution.

19   Q      I believe your testimony on direct was that there was a

20   concern about recording the execution.  Is that correct?

21   A      With regard to cell phones, yes.

22   Q      Have we asked to record anything to your knowledge?

23   A      Not to my knowledge.

24   Q      And does the protocol in any event require all witnesses

25   to sign a form acknowledging there's a no recording policy?
```

Kelley - Cross

1    A      Yes, it does.

2    Q      Or you would risk being kicked out, right?

3    A      Yes, and their device confiscated.

4    Q      Would you allow us to bring a phone without recording

5    capability?

6    A      The policy is no phones.  If you want to be in the

7    witness room, then the answer is no.

8    Q      Okay.

9    A      I can't be in more than one place, and the law says no

10   recordings, and the discussion that I've had even with the

11   attorney general's office is that if they feel like they have

12   to have a witness present from their office, their witness will

13   arrive where the rest of the witnesses arrive, not counting

14   y'all, and they will leave their cell phones and they will be

15   searched like the rest of the witnesses and put on arm band and

16   transported down and transported back.

17   Q      Okay.  I appreciate that, but if the concern is about

18   recording, is there a reason why we cannot bring a phone that

19   doesn't have recording capabilities?

20   A      It would be inappropriate to have a phone in there.  The

21   family's victims are in there, the citizen witnesses are in

22   there.  I wouldn't let you use it even if you had it.

23   Q      Even to call the Court if an issue did come up?

24   A      If you want to leave the witness room and go someplace

25   else and call the Court, you can do that, but you're not going

1   to make a call from that room.

2   Q     Are witnesses locked in the witness room?

3   A     Yes.

4   Q     But we would be able to leave?

5   A     If the one attorney for the inmate asked the major to

6   leave, then we will allow them to leave out the back door.

7   Q     But we would no longer be able to see what was happening

8   in the execution room?

9   A     That's correct.

10  Q     So if we were to call the Court, we couldn't advise them

11  as to what was happening?

12  A     That's your decision to make, but if you leave, you'll be

13  taken somewhere where you can use a phone.  You will not be

14  present.

15  Q     So we would have to choose between calling the Court and

16  advising them of something happening with our client or

17  actually witnessing the execution?

18  A     Yes.

19  Q     Have you considered other accommodations like a landline

20  in the room or leaving a phone with a guard or would it be the

21  same objections?

22  A     They're called officers.

23  Q     I'm sorry, corrections officer.

24  A     And they will take you someplace where you can use a

25  phone, but you cannot use a phone in there where we have

1   citizen and family witnesses.

2   Q    So it's my understanding the executions are not recorded

3   in any way, there's no internal recording, audio or video?

4   A    That's correct.

5   Q    I'm just going to ask you, are you responsible under the

6   law for the dispensation, ordering the dispensation and

7   administration of lethal injection drugs?

8   A    I'm sorry, I don't understand the question.

9   Q    Under the statute, which I don't know what I did with it,

10  are you responsible for ordering the dispensation and

11  administration of lethal injection drugs?

12  A    I don't know what that first word is.  But I am

13  responsible for obtaining them, yes.

14  Q    Did you order the drugs that the Department currently has

15  on hand for use in the scheduled executions?

16  A    The midazolam and the potassium chloride, I did.

17  Q    What about the vecuronium bromide?

18  A    Mr. Griffin obtained that.

19  Q    So under the law, a prescription is not required; is that

20  right?

21  A    That's right.

22  Q    Under Arkansas's law?

23  A    Right.

24  Q    Did you nonetheless obtain a prescription for any of

25  these drugs?

1  A      I did not.  I provided a copy of the statute.

2  Q      I'm sorry?

3  A      I provided a copy of the law.

4  Q      Okay.  So how are the drugs ordered?

5  A      I made a phone call to a source that I felt like from

6  years before might be willing to sell the drugs to us.

7  Q      Was that for the midazolam or the potassium chloride or

8  both?

9  A      It was all three originally.

10 Q      So as far as the drugs that are on hand right now, was it

11 the same source for all three drugs?

12 A      No, it was a different source for all three drugs.  The

13 sources for the first two drugs are no longer willing to

14 assist.

15 Q      By first two, is that midazolam and vecuronium bromide?

16 A      That's correct.

17 Q      Does the Department have any barbiturates on hand?

18 A      Have any what?

19 Q      Barbiturates.  And I don't know if I'm saying that right.

20 A      No.

21 Q      When was the last time that you or anyone on behalf of

22 the Department attempted to obtain barbiturates?

23 A      Attempted to obtain them after the 2015 legislation was

24 passed.  The last time I had some was before that, I think the

25 ones that the DEA came and got.

Kelley - Cross                                    1221

```
 1   Q      The DEA came and got it?
 2   A      I think that's what they were.  It's been a while ago.
 3   Q      Do you recall why that was?
 4   A      Do I recall what?
 5   Q      Why that was.
 6   A      Because I obtained them from outside of the United
 7   States.
 8   Q      If you did have the barbiturates on hand, which drug
 9   option would you choose under the law, the three-drug protocol
10   or a barbiturate?
11   A      If I had been able to obtain the barbiturate, I would
12   have.
13   Q      Would that be your preferred method?
14   A      Yes.
15   Q      I think we've answered this, but just to make sure, are
16   all three of these drugs approved by the FDA?
17   A      Yes.
18   Q      Or made by a manufacturer approved by the FDA?
19   A      Yes, ma'am.
20   Q      Have they been obtained from facilities registered with
21   the FDA?
22   A      Yes.
23   Q      Did you get any of these drugs directly from the
24   manufacturer?
25   A      No.
```

Kelley - Cross

1   Q    Is it your understanding manufacturers don't want their
2   drugs used for this purpose?
3   A    That would be an understatement.
4   Q    In fact, are you aware that manufacturers have contracts
5   with distributors to prevent the distributors from selling to
6   departments of correction?
7   A    I am.
8   Q    In fact, have any manufacturers approached you directly
9   and asked you to discontinue the use of their drugs?
10  A    Yes.
11  Q    Do you have any personal knowledge of why manufacturers
12  don't want their drugs to be used in executions?
13  A    Other than what they've said, no.
14  Q    So what's in their public statement?
15  A    Yes.
16  Q    Have you read the concurring opinion in the recent Sixth
17  Circuit opinion regarding the Ohio execution protocol?
18  A    No, I haven't had time.  I printed it, I just haven't had
19  time to read it.
20  Q    Okay.
21          THE COURT:  Is this going to be a long line of
22  questioning?  I'm asking because we're due for a ten-minute
23  break, and if this is a good spot before you launch into
24  something else.
25          MS. GIANI:  Sure.

Karen Baker, RMR, CRR, CCR
United States Court Reporter

Kelley - Cross

1       THE COURT:  Let's take a ten-minute break.  Let's

2  just come back in here at 7:35.

3       (Recess at 7:24 PM.)

4                  C E R T I F I C A T E

5     I, Karen Baker, Official Court Reporter, do hereby certify

6  that the foregoing is a true and correct transcript of

7  proceedings in the above-entitled case.

8

9

10  /s/ Karen Baker, RMR, CRR, CCR
    --------------------------------       Date: April 13, 2017
11  United States Court Reporter

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (Proceedings continuing at 7:37 p.m.)

2              THE COURT:  You may proceed when you are ready.

3   BY MS. GIANI:

4   Q.    I've been able to gather my thoughts a little bit, so I'm

5   going to --

6   A.    I'm sorry.  I couldn't hear that.

7   Q.    I said I've been able to gather my thoughts a little, so

8   I'm going to move forward.  So I think we were talking about

9   drug manufacturers and restrictions.  But despite these

10  restrictions that manufacturers have placed on selling to

11  departments of correction, your department has been able to

12  obtain drugs, obviously, for use in executions.  Correct?

13  A.    The ones we have, yes.

14  Q.    And has it been your position that the secrecy provision

15  under Arkansas law is necessary to allow these distributors to

16  illegally breach their contracts with the manufacturers?

17  A.    I don't know what their contracts are.  I know that the

18  manufacturers have said they have contracts to prevent them from

19  selling to us.  But I've never seen those, nor would I, if I was

20  getting a prescription for myself, ask you do you have a

21  contract that says you can't sell to Wendy Kelley.  But I do not

22  believe that anybody that has sold to us would have sold to us

23  without that provision in the law.  And, in fact, I had to

24  provide a copy of it to the first supplier when I got the

25  midazolam and the other two originally in 2015.

1  Q.   Are you aware that it's been argued on your behalf that the

2  reason they need that secrecy law and that assurance is so they

3  can breach their contract with the manufacturers?

4  A.   That part doesn't even make sense to me.  No.

5       MS. CRYER:  And I object for the reasons that Ms.

6  Kelley just stated.

7  BY MS. GIANI:

8  Q.   This is a transcript from a state court proceeding.

9       "Ms. Merritt:  Under the Court's hypothetical, there's a

10 contract between the ADC and its possible immediate supplier to

11 withhold disclosure.  And if this Court were to order

12 disclosure, then the ADC, who is a party to this case, would be

13 compelled to comply with the Court's order after taking any

14 interlocutory appeal of that order.  But this is not the

15 scenario that the defendants are talking about in our motion for

16 protective order.  We are not saying there's a contract between

17 the ADC and its supplier that prohibits the ADC from disclosing.

18 What we're saying is that the supplier has a contract with the

19 manufacturer of the FDA-approved drug that is currently in the

20 ADC's possession, whereby the supplier is contractually not

21 supposed to be selling drugs to state departments of correction

22 for use at execution.  This supplier did anyway in an effort to

23 aid the State in carrying out and fulfilling its legal duty to

24 carry out lawfully imposed death sentences.  Requiring the

25 disclosure and outing the identity of that supplier, you are

1    subjecting that supplier, Your Honor, without them being

2    represented, having any due process, even being a party to this

3    case, the Court would be subjecting that supplier to an undue

4    burden."

5        Did I read that correctly?

6    A.   Yes.

7    Q.   And was Ms. Merritt representing you and your department in

8    that lawsuit?

9    A.   I'm sure she was.

10   Q.   And was that secrecy law ultimately upheld?

11   A.   I'm sorry?

12   Q.   Was that secrecy provision in the law ultimately upheld?

13   A.   Yes.

14   Q.   And have you been able to obtain potassium chloride just

15   within the past month or so?

16   A.   Yes.

17   Q.   Did you get that drug from another distributor or another

18   supplier?

19   A.   I got that drug from someone I have not ever gotten drugs

20   from before.  Everyone that has ever been willing to sell us

21   drugs before are no longer willing to sell us drugs, as well as

22   a lot of people who weren't willing to sell us drugs to begin

23   with.

24   Q.   As to the potassium chloride, did you -- was it you --

25   refresh my memory.  Was it you that obtained the potassium

1    chloride?

2    A.    Yes.

3    Q.    Did you make the supplier aware that the drug was for the

4    Department of Corrections for use in an execution?

5    A.    I have never lied.  I have always told everybody I was

6    getting it from what the purpose was.

7    Q.    And they agreed to sell on condition of anonymity?

8    A.    Yes.  And then decided not to get paid to make sure that

9    they remained anonymous.

10   Q.    Okay.  So the State -- your department got potassium

11   chloride for free?

12   A.    After I had it, when I asked about an invoice, they didn't

13   want to give me one because they were afraid that they would be

14   discovered, who they were, so they just donated it.

15   Q.    Okay.  So when did this communication take place?  I guess,

16   let's go to the original communication about seeing if you could

17   get potassium chloride.  When did that take place?

18   A.    I don't remember when it took place, but approximately a

19   week before I got it.

20   Q.    So less than two months ago?

21   A.    I think there's an exhibit that's got the date that we

22   logged it in, so approximately a week before that date.  But I

23   don't remember what it is.  I'm sorry.

24   Q.    Were you pretty confident before you obtained it that you

25   were going to be able to obtain it?

1    A.    I believed that if I could obtain any of those three drugs,

2    it would be the potassium chloride because it is so commonly

3    used, and it's not a registered drug or whatever the correct

4    term is.  So if any of them could be replaced, I felt like that

5    one could be replaced.

6    Q.    Okay.  And was this communication a phone call?

7    A.    Yes.

8    Q.    Was that phone call disclosed in discovery in this case?

9    A.    I don't remember a request for phone call information.  But

10   I guess the answer to your question is not to my knowledge.

11   Q.    Did you read through the discovery requests in this case?

12   A.    I didn't read the initial discovery request.  The first

13   thing I saw was the draft, where it had been pared down based

14   upon the Judge's order.  So I was just reading what was in an

15   initial draft of a response.  But I am aware that everybody knew

16   we had obtained the drug.

17   Q.    Right.  So you read this interrogatory:  "Disclose all

18   communications by the ADC or any of its agents with potential

19   drug suppliers from January 1st, 2015, to the present."

20   A.    I don't have an independent memory of that.  But if that's

21   part of the -- if that's the response you got from us -- there

22   wasn't a lot of time.  We were searching all of our emails.

23   There were thousands of emails that I had to go through that DIS

24   pulled off.  And if I missed something, I missed something.  But

25   when it says "disclose all communications," I presumed, when I

1    read that, that you were looking for any document.

2    Q.   So you didn't read this definition in our discovery

3    requests?

4    A.   I did not read the definitions in your discovery requests.

5    Q.   "Refers to any exchange of information of any kind between

6    two persons or entities in any form, including, but not limited

7    to, letters, memoranda, administrative directives, telephone

8    calls, face-to-face conversations, emails, SMS messages or other

9    forms of text messages, order forms, invoices, receipts and

10   packing slips."

11   A.   No, ma'am.  I did not.

12            MS. CRYER:  I object to the request.  I believe the

13   witness already stated she didn't read it.

14            THE COURT:  I overrule the objection.

15   BY MS. GIANI:

16   Q.   So let's move on to the second -- I guess there was another

17   communication with the supplier of the potassium chloride

18   wherein he told you he or she or it did not want to be paid.  I

19   guess there were two more communications.  You had to actually

20   obtain the drug.  Correct?

21   A.   And that other communication all happened at the time that

22   I picked up the drugs.

23   Q.   Okay.  So you personally picked up the drugs?

24   A.   I did.

25   Q.   Okay.  At that time the supplier told you he did not want

1    to be paid?

2    A.   Correct.

3    Q.   I thought you had testified earlier that it was at a later

4    date.

5    A.   No.  They were in my vehicle.  I had them in my possession.

6    Q.   Okay.  So essentially you asked him:  "How much do I owe

7    you?"

8    A.   Essentially.

9    Q.   And he said "Nothing"?

10   A.   No.  He didn't say "Nothing."  I can't remember his exact

11   words.  It was more of a question about if I get you an invoice.

12   And I said, "Yes.  If you get me an invoice, then I'll have it

13   processed for payment, but that goes through more than my

14   agency."  And he said, "Nevermind.  I'll just donate it."

15   Q.   So he was concerned about it even going through another

16   agency?

17   A.   Yes.

18   Q.   Like, what other agencies are we talking about?  Because

19   this would have been a payment that the State was making?

20   A.   Yes.

21   Q.   Okay.  So there's essentially no record of this

22   transaction.

23   A.   Other than the drug label, which you have, and the package

24   insert, which you have.

25   Q.   I want to look at this affidavit from -- I believe -- was

1    it from 2008?  2015.  Sorry.  Paragraph 9.

2            MS. CRYER:  I apologize.  Which affidavit are we

3    looking at?

4            MS. GIANI:  2015.  I think it's one of your exhibits,

5    but I don't remember the number.

6            MS. CRYER:  Whose affidavit?

7            MS. GIANI:  I think it's your Exhibit 1.

8            MS. CRYER:  Can you turn to the front page?  Okay.

9            THE WITNESS:  I don't think it's from this case.

10           MS. CRYER:  It's not from this case.  Can we look at

11   that for just a second to see what that is?

12        (Attorneys confer.)

13           MS. MERRITT:  Your Honor, at this time could I have an

14   opportunity to review the transcript that I was quoted in?  It's

15   an incomplete version of the conversation and argument to the

16   Court.  I didn't know they were going to be using this, and I

17   want to find the rest of that conversation.

18           THE COURT:  Sure.  I'm not going to take a recess, if

19   that's all right.  If you need a recess before you redirect, you

20   can let me know.

21           MS. CRYER:  We don't.  Thank you.

22   BY MS. GIANI:

23   Q.   This is labeled "Affidavit of Wendy Kelley."  Is that your

24   signature there?

25   A.   Yes.

1    Q.    Dated October 14th, 2015?

2    A.    Yes.

3    Q.    I'm going to look at paragraph 9.  "After Act 1096 of 2015

4    took effect on April 6, 2015, but before the current lethal

5    injection protocol was adopted, I attempted to obtain a

6    barbiturate for the ADC to use to carry out capital punishment

7    by lethal injection.  My efforts were unsuccessful."  Is that

8    right?

9    A.    Yes.

10   Q.    What efforts did you make?

11   A.    I contacted the supplier who actually did provide the other

12   three drugs, but I asked for a barbiturate from that person.

13   And I had also contacted a previous supplier, who refused.  And

14   I contacted a compounding pharmacy, who said they couldn't get

15   the raw ingredients needed and didn't want to provide them

16   anyway for executions.

17   Q.    So three communications?

18   A.    I'm sorry?

19   Q.    Three communications?  Is that right?

20   A.    Yes.  That's what I recall.  That's been a while ago.

21   Q.    I believe I've seen the first communication you were

22   referring to.  Did you disclose the other two in discovery?

23   A.    No.  There's no written anything.  Again, I didn't read

24   your definitions.  I'm sorry.

25          MS. GIANI:  Okay.  I have a confidential question to

1   ask -- can y'all mark for me -- about the first email

2   communication.

3           THE WITNESS:  The only formal request was the one that

4   you have a copy of.

5   BY MS. GIANI:

6   Q.   Okay.  But there, you said, phone conversations.  How

7   were the other requests made?

8   A.   They weren't phone conversations.  They were in-person

9   conversations.

10  Q.   Okay.  "Potential suppliers of lethal drugs declined to

11  supply to the ADC and explained that they would suffer adverse

12  publicity and lose business if they were identified as

13  suppliers."  Was that concern expressed to you?

14  A.   Yes.

15  Q.   Was it expressed in the email?

16  A.   No.  The email that you have is the person that I did get

17  drugs from.

18  Q.   Okay.

19  A.   When I talked to that person, they said, "Send me an email

20  of what you need."

21  Q.   Okay.  But the other two suppliers you talked to expressed

22  this concern?

23  A.   Yes.

24  Q.   Did they mention the contracts with manufacturers?

25  A.   No.  I don't think I even knew about that at the time.

1   Q.    Okay.  Paragraph 11:  "The supplier who sold to the ADC the

2   FDA-approved drugs currently in the department's possession" --

3   and this is 2015 -- "for use in executions only agreed to sell

4   those drugs to the ADC for use in executions after receiving a

5   copy of Act 1096 and confirming that the ADC is required by law

6   to keep its identity confidential unless ordered to disclose the

7   information in litigation."  Is that right?

8   A.    It is.

9   Q.    And the secrecy law was upheld?

10  A.    Yes.

11  Q.    Okay.  Then it says:  "The supplier of ADC's current supply

12  of execution drugs" -- which, again, is 2015 -- "has made clear

13  to me that it will not supply any additional drugs for the ADC

14  to use in executions."  What was that communication?

15  A.    There were phone calls where they asked for their drugs

16  back.  There was a meeting where they asked for their drugs

17  back.

18  Q.    And this was all three?

19  A.    What?

20  Q.    This was all three:  The midazolam, potassium chloride and

21  vecuronium bromide at the time?

22  A.    Yes.

23  Q.    That's the same midazolam that is still -- that the

24  department still has?

25  A.    Yes.

1   Q.   Did they say why they wanted the drugs back?

2   A.   Because they thought they would lose business if somebody

3   found out that they had sold to me.

4   Q.   Did they mention a contract with the manufacturer?

5   A.   Maybe.  I don't clearly remember that.

6   Q.   Okay.

7   A.   But I may have remembered at the time.  Just sitting here

8   right this second, I don't remember.

9   Q.   Okay.  And when were those conversations?

10  A.   Well, I picked up those drugs too.  And that very same day,

11  I got the call saying:  "We made a mistake, and we want them

12  back."  And I said," I'm so sorry."  And then that person's boss

13  called me.  And there were several phone calls of people from

14  that company.  I believe they made calls to others in state

15  government, and I think I met with them the next day.  But I did

16  not return the drugs.

17  Q.   Okay.

18  A.   I simply assured them I wouldn't tell anybody where I got

19  them.

20  Q.   Okay.  Paragraph 13:  "I am currently" -- again, in 2015 --

21  "currently unaware of the identity of any supplier or

22  manufacturer of drugs that will sell them to the ADC for use in

23  executions."  Were you unaware because you hadn't checked with

24  any other suppliers?

25  A.   I was unaware because I really didn't know of any.  And, in

1  fact, when the vecuronium, or however you say that, bromide

2  expired, I talked to Mr. Griffin.  And I said, "I don't know

3  anybody else to try."  And he said, "Well, I have a source.  Let

4  me try."  And he was able to procure it.

5  Q.    Okay.  So, again, at the time you did this affidavit -- and

6  did you prepare this affidavit in 2015?

7  A.    I can't tell you today whether it was typed in my office or

8  at the AG's office.  I don't remember.  But I would have been

9  working with them in the preparation of it.

10  Q.    And at the time that you signed it, were you unaware of any

11  other suppliers or manufacturers that would sell them because

12  you hadn't checked?

13  A.    I can't tell you that.  I don't remember the day that I

14  signed that.  I don't remember what was going on.  I know that

15  whatever is in there is true.  But you are asking me to remember

16  two years ago.  And I have to say I did not know because I know

17  after the vecuronium bromide expired that I did not know.

18  Q.    But Mr. Griffin did?

19  A.    He was able to locate someone.  I did not know that until I

20  was saying to him, "I don't know where else to check."

21  Q.    Has it previously been argued on your behalf the department

22  would be unable to procure new dosages of vecuronium bromide and

23  potassium chloride after their respective expiration dates?

24  A.    I don't know.

25  Q.    How quickly after the expiration date were you able to

1   obtain vecuronium bromide?

2   A.   I don't remember.

3   Q.   A matter of weeks?

4   A.   I don't remember.

5   Q.   How quickly were you able to obtain potassium chloride?

6   A.   I don't remember.  I know it was within a couple of months,

7   but I don't remember.

8   Q.   Okay.  Could you have obtained the drugs even prior to

9   their expiration dates had you attempted to do so?

10  A.   I don't know why I would have even -- I don't know.

11  Q.   Well, you didn't try?

12  A.   No, I did not.

13  Q.   Have all three of the drugs that you intend to use in the

14  currently scheduled executions been independently tested?

15  A.   No.

16  Q.   Have any of them?

17  A.   The midazolam.

18  Q.   What about the vecuronium bromide?

19  A.   No.

20  Q.   Potassium chloride?

21  A.   No.

22  Q.   Why not?

23  A.   There's no need to have them tested.  They came from an FDA

24  bulk manufacturer.  And they are tested at the plant or wherever

25  they make them, it's my understanding.

1  Q.   Did you get those testing results?

2  A.   No, I did not.

3  Q.   Are you aware under the statute that reports obtained from

4  an independent testing laboratory as to the drugs shall be made

5  available to the public?

6  A.   I'm sorry.  Can you blow that up a little bit?  My eyes are

7  older than yours.

8  Q.   If I know how to work this.

9  A.   Or just read it to me.  I see that.

10 Q.   But you just simply do not have them for the vecuronium

11 bromide and the potassium chloride.  Is that right?

12 A.   I didn't have them independently tested.

13 Q.   Okay.

14 A.   There are no reports from an independent testing laboratory

15 for those two drugs.

16 Q.   Okay.  That's what I'm confirming.  So we don't know their

17 current purity, efficacy or if there's any contamination issue?

18 A.   They came from an FDA-approved manufacturer.

19 Q.   Do you know how they were stored?  Well, they didn't come

20 from a manufacturer.  Correct?

21 A.   According to the box.

22 Q.   They came directly from the manufacturer?

23 A.   No.

24 Q.   They came from a supplier?

25 A.   Yes.

1   Q.   Do you know how they were stored after they left the

2   manufacturer?

3   A.   I know they were stored by someone that is licensed and

4   authorized to sell drugs, so I assume they were appropriately

5   stored.   I know when I picked them up, I specifically asked what

6   the temperature was that they needed to be stored at, and I

7   drove directly to the place where they are currently stored.   I

8   didn't stop to go in the gas station and let them get hot or

9   anything.

10  Q.   You asked what they needed to be stored at, but you didn't

11  ask how they had been stored by the supplier.

12  A.   No, I did not.

13  Q.   So the eight men scheduled to be executed are not the only

14  men on death row in Arkansas.   Is that right?

15  A.   There are seven men currently to be executed.   There are 33

16  men on death row.

17  Q.   Has the Governor changed the date on Jason McGehee that you

18  are aware of?

19  A.   Not that I'm aware of.   There's no new date I'm aware of.

20  All I know, there's a stay in place.

21  Q.   Is it your position that after April 30th, your department

22  will be unable to execute any of the remaining men on death row?

23  A.   It is a fact that I don't have any drugs that can be used

24  to execute anybody after April the 30th, because the only

25  midazolam I have expires on April the 30th.   And I do not have a

1    barbiturate.

2    Q.    What attempts have you made to procure additional

3    midazolam?

4    A.    I have not made any at this point in time because I don't

5    know where I would get it from, and I have some that's valid

6    right now.

7    Q.    What attempts have you made to get additional midazolam?

8    A.    I think I said I haven't made any.

9    Q.    But you also said you don't know where you would get it

10   from.

11   A.    That's correct.

12   Q.    Have you made any attempts to try to figure out where you

13   could get it?

14   A.    When I got the potassium chloride, I had a discussion about

15   it, and I was told it would be extremely difficult, didn't know

16   if that person would be able to provide it or not, because --

17   and I don't remember the term, if it's registered or whatever it

18   is.  But it's a different level of drug than potassium chloride.

19   Q.    So not sure if he could get it, or she.

20   A.    I'm sorry?

21   Q.    So the conversation with that supplier was might could get

22   it, but might be difficult?

23   A.    Didn't know if they would be able to.

24   Q.    Weren't sure.  Okay.  You didn't talk to any other

25   suppliers about possibly getting some more midazolam.

1    A.    No.  I have been in a position to try to acquire drugs for

2    execution for over ten years.  I don't know anybody that I

3    haven't already asked.  But I haven't been to every pharmacy in

4    the state of Arkansas yet, and I hope I don't have to go.

5    Q.    And you said you don't know anybody that you haven't

6    already asked.  You also said you haven't asked anybody for

7    additional midazolam.

8    A.    I've been turned down by more than one person.  But since I

9    have had this midazolam, other than discussions that didn't

10   result in any midazolam, no, I haven't.  I'm not trying to be

11   difficult.  I've told you I haven't asked for any more past this

12   expiration date.  I have had discussions about whether it would

13   be possible.  And I don't have anybody that has said, "Yes, I

14   will sell it to you."

15   Q.    I guess that's what I'm asking.  When were those

16   discussions?  We know the one with the potassium chloride

17   supplier.

18   A.    I don't take notes, for obvious reasons.  And the last

19   conversation is the one I can tell you about, which was the one

20   when I got the potassium chloride.

21   Q.    But you don't recall any others within the past few months?

22   A.    I don't recall any others in 2017, other than that one.

23   Q.    When you spoke to the person from the Governor's office

24   about this schedule, was it your impression that you just needed

25   to get this done before the end of the month, before the end of

1   April?

2   A.   The discussion that was held was whether I believed -- I

3   don't think I had the potassium chloride at the time.  I can't

4   remember.

5   Q.   Can I ask you about that, real quick?

6   A.   Okay.

7   Q.   Did you indicate that you were confident that you could get

8   it?

9   A.   What I said was if I can get any of the three, it would be

10  the potassium chloride.

11  Q.   And continue with your explanation of the conversation.  My

12  question was, was it your impression that you needed to get

13  these eight executions done before the end of April?

14  A.   It wasn't that I needed to.  It was could I.

15  Q.   Okay.

16  A.   Could the department carry out the court orders on these

17  people before the end of April.  That was the question.

18  Q.   And the end of April was discussed because of the

19  expiration date of the midazolam?

20  A.   Yes.

21  Q.   Did they ask you if you had tried to obtain additional

22  midazolam?

23  A.   It was discussed that I had no idea where I could

24  potentially get any more.

25  Q.   Were they aware that you had only talked to one supplier in

1   2017?

2   A.   They are aware of when I talked to suppliers.

3   Q.   Okay.  Did you or anyone from your department speak with

4   the Governor about setting the execution dates back in 2015?

5   A.   I'm sure we did.

6   Q.   And in that, in 2015, the executions were spaced apart.  Is

7   that right?

8   A.   I don't remember.  I know they weren't set within two

9   weeks, but I don't remember when they were spaced, how they were

10  spaced.

11  Q.   Okay.  So was the different schedule -- with one exception,

12  the same -- it's eight men, correct, on both occasions, in 2015

13  and now?

14  A.   Yes.  Terrick Nooner was scheduled before and is not this

15  time, and Ledell Lee was not scheduled before and is this time.

16  Q.   In 2015, as you've said, it wasn't scheduled in less than

17  two weeks.  Correct?

18  A.   Correct.

19  Q.   Okay.  So was the difference in scheduling solely due to

20  the expiration date of the midazolam?

21  A.   To my knowledge.

22  Q.   Are you aware of the Clayton Lockett investigation report?

23  A.   I believe I saw it at some point, yes.

24  Q.   And that there was originally a double execution set for

25  that night?

1    A.    Yes.

2    Q.    Are you aware that the report made findings and

3    recommendations stating that the botch was attributed to stress,

4    or partially attributable to stress caused by the setting of a

5    double execution?

6    A.    I don't remember that specifically.  I remember there was

7    somebody that was either quoted or referenced in the report.  I

8    can't remember -- it's been a while -- that said something about

9    they felt the stress in the air because of the second execution,

10   or something like that.  I don't remember exactly.

11   Q.    Okay.  Are you aware of how thorough that investigation

12   was, more than 100 interviews of all the participants?

13   A.    I don't remember that part of it.

14   Q.    Okay.  And that the ultimate recommendation -- one of the

15   recommendations was that no double executions and no more than

16   one execution every seven days?

17   A.    I can't say independently that I recall that.  I think

18   somebody has reminded me that that's what it said.

19   Q.    And are you aware of a letter sent to the Governor by 23

20   corrections officers saying the schedule is ill-advised?

21   A.    I read in the paper that there was such a letter.  I've not

22   seen it, unless that's the letter from Ms. Lancaster.  I did see

23   the letter from Ms. Lancaster.

24   Q.    No.  I want to ask you about that too.  Are you aware of

25   Ms. Lancaster's testimony and affidavit?

Kelley - Cross                                     1245

1    A.    Yes.

2    Q.    Saying that this schedule is also ill-advised and increases

3    risk of psychological problems to the staff?

4    A.    I don't remember exactly her wording, but that was the gist

5    of it.

6    Q.    Were you here for Dr. Hilkey's testimony?

7    A.    Yes.

8    Q.    Saying that pursuant to his experience and debriefing after

9    executions, that there was an increased risk of psychological

10   harm to the staff based on the schedule?

11   A.    I don't remember that part of his testimony.  What I

12   remember them talking about was they were talking about -- the

13   part that I recall is that Ms. Lancaster was talking about

14   someone in particular that had a difficult time.  She wasn't

15   present for the executions, I don't believe.  And the impression

16   I got was she was talking about that there was a member of their

17   staff that had actually been the executioner, which is not the

18   case in Arkansas.

19   Q.    So you didn't hear any of the rest of the testimony about

20   the other members of the staff and generally the stress level?

21   A.    I remember her saying there was one person in particular

22   she was concerned about, and she didn't want to tell us what

23   that person's role was.

24   Q.    That one anecdotal example.  Okay.  Do you just simply

25   disagree with the 23 corrections officers:  Jennie Lancaster,

1    Dr. Hilkey and the Lockett investigation report?

2    A.   I disagree that it would be easier to know that we were

3    going to do this once a month for the next eight months.

4              MS. GIANI:  Your Honor, I know it's nearing 8:15.

5    What is --

6              THE COURT:  Let's take a second and talk about that.

7    I just asked Ms. Washington to give me the count.  It's roughly

8    47 minutes, and maybe 45 minutes.  That's where you are at.  The

9    State has 47.  Plaintiffs have 45.  We are at 8:12 at this

10   point.  I'm happy to take a break.  You all can talk about how

11   you want to proceed.  I don't know how much you have left with

12   Director Kelley.  I know you've indicated you have some

13   confidential matters that you would like to go into with her.

14   We haven't done that yet.  Why don't we take a short recess.

15   We'll come back in here at 8:20.

16             MS. GIANI:  Your Honor, I just wanted to clarify, you

17   were willing to go past 8:15 if we had time left.  I wasn't sure

18   of what the status of that was.

19             THE COURT:  I won't cut you off right now given that

20   we -- I didn't talk to you all about it beforehand.  Everybody

21   is about at the same time.  You know, if you all can talk about

22   it and agree on what you have left, I'm not going to cut off a

23   redirect because you've had her on cross for a long time.  If

24   you don't mind staying, we can stay and plow through it and get

25   it done.  That's about another hour and a half.  I'll let you

1    guys talk about it.  I'll come back out at 8:20.  We're in

2    recess until 8:20.

3         (Recess at 8:15 p.m.)

4                        REPORTER'S CERTIFICATE

5         I certify that the foregoing is a correct transcript from
     the record of proceedings in the above-entitled matter.

6

7    /s/Elaine Hinson, RMR, CRR, CCR      Date:  April 13, 2017
     United States Court Reporter

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1     (Continuing at 8:26 p.m.)

2          THE COURT:  Are we ready to proceed and have counsel

3     reached at least an agreement as of right now in regard to what

4     we're doing?  Are we going to proceed forward?

5          MS. CRYER:  My understanding is plaintiffs' counsel

6     wants to take their full 45 minutes.

7          THE COURT:  All right.

8          MS. GIANI:  I will try to hurry, but I do have a few

9     more things that I want to go through.

10          THE COURT:  I might be listening carefully for

11     repetitive questions.

12          MS. CRYER:  Thank you.

13          MS. GIANI:  Please tell me if I'm repeating --

14          THE COURT:  I don't want to cut off a line of

15     questioning, so let me know if you've got a different line of

16     questioning --

17          MS. GIANI:  At this point, I'm not sure.  If I repeat

18     myself, please tell me.

19          THE COURT:  I understand.

20     BY MS. GIANI:

21     Q.   Okay.  I have -- and this is tiny print, but this is

22     Plaintiffs' Exhibit 34.  I don't think it's been introduced yet,

23     but it's from the Death Penalty Information Center, which I

24     believe was quoted or talked about, and I don't know if it was

25     this particular article, but -- in Ms. Kelley's affidavit.

1      I would move to admit it.

2              THE COURT:  Any objection?

3              MS. CRYER:  No objection.

4              THE COURT:  It's Exhibit 34.  Right?

5              MS. GIANI:  Yes.

6              THE COURT:  It's admitted.

7          (Plaintiffs' Exhibit 34 received in evidence.)

8   BY MS. GIANI:

9   Q.   This is a study done by the Death Penalty Information

10  Center.  It says right here that since states resumed executions

11  in the 1970s, no state has ever executed eight prisoners in 11

12  days.  Only one state, Texas, has ever executed eight prisoners

13  in a calendar month.  This has occurred only twice, in both May

14  and June of 1997.

15          Then the next paragraph goes on to say that scheduling two

16  or more executions on the same day has only happened ten times

17  in the past 40 years.  The last time was in 2000.  Only four

18  states have carried out multiple executions on the same day.

19  Arkansas takes the lead at four times.  Texas, three times.

20  Illinois twice.  South Carolina once.  And then, of course,

21  Arkansas is the only state to have conducted triple executions,

22  which it has done twice, in 1994 and 1997.

23          No state has carried out more than one double execution in

24  the same week.  The shortest time span between multiple

25  executions in any state is 84 days.  And that, again, was

1   Arkansas.

2       Were you aware of those facts?

3   A.   No.

4   Q.   And in determining that you could get these executions done

5   before the end of April, did you speak with anyone about the

6   feasibility of that?

7   A.   Yes.

8   Q.   And who was that?

9   A.   Warden Straughn.

10  Q.   Okay.  Did you talk to -- was Warden Straughn, has he

11  participated in executions before?

12  A.   Yes.  Just not as the warden.

13  Q.   Did you also talk to Larry Norris?

14  A.   I had talked to Larry Norris before.  I didn't talk to him

15  when the -- previously there had been, I think in 2015 when they

16  were set, they were set as doubles.

17  Q.   So you didn't talk to him specifically about this situation

18  before talking to the person from the Governor's Office?

19  A.   No, I did not.  I had talked to him in a prior year about

20  it.  I hadn't talked to him --

21  Q.   Okay.  And in 2015, they were spaced farther apart?

22  A.   I'm sure they were.  I know they weren't scheduled like

23  this.  I just don't remember the spacing.

24       MS. GIANI:  I'm sorry, your Honor.

25       I think I found it.

1  BY MS. GIANI:

2  Q.    Okay.  Did you review this -- let me zoom out.

3  A.    Yes.

4  Q.    This was attached to your affidavit.

5  A.    I didn't remember if it was attached to my affidavit, but I

6  was asked for it.

7  Q.    Okay.  Did you talk about this in the affidavit you

8  prepared for this case?

9  A.    Yes.

10  Q.    And are these your notations on here?

11  A.    No.

12  Q.    Do you know whose notations those are?

13  A.    I think it was somebody in our research department because

14  they were on there when I was given it.

15  Q.    Okay.  And so this is executions, Arkansas Department of

16  Corrections, 1913 to the present.  So 9/9/13, would that be

17  1913?

18  A.    Yes.

19  Q.    Okay.  And would you agree that society has evolved since

20  the 1910s, 1920s?

21          MS. CRYER:  Objection.

22  A.    Yes.

23  Q.    I mean, for instance, we have -- one of the larger things I

24  want to look at here is the ratio of black men to white men on

25  here.  I've counted five white males, 24 black males.  Two black

1    males with death penalty for rape.  We don't do death penalty

2    for rape anymore; is that right?

3    A.   To my knowledge, there's not anybody on death row for that.

4    I don't practice -- I never practiced criminal law.  I don't

5    really know.  Sorry.

6    Q.   That's fine.

7    A.   I'll take your word for it.

8    Q.   Just going into the 1920s, again -- well, I think I did

9    that wrong.  This is five out of 24, I think, were white.

10             MS. CRYER:  Your Honor, may I just have a standing

11   objection or continuing objection to questions with regard to

12   the race of the individuals.  I don't believe there's been an

13   allegation in this complaint that more African-Americans are

14   being executed than Caucasians or vice versa, so I don't

15   understand what the relevance of this line of questioning is.

16             MS. GIANI:  This was something that was attached to

17   her affidavit as representing why this schedule is not -- and

18   one of the claims that we made is this is against the evolving

19   standards of decency as in the Eighth Amendment, and she is

20   relying on this to support the schedule, so I think this is fair

21   game.

22             THE COURT:  I'll let you ask a couple questions, but

23   there is no -- I don't know of any claim that I would say is

24   race-based at all in this case.

25             MS. GIANI:  And I'm not just talking about race.  I'm

1   talking about evolving societal standards.

2   BY MS. GIANI:

3   Q.   I think we pointed to several multiple executions in here,

4   four there, and then a couple in the 19 -- some doubles in the

5   1950s.  And we get to the 1990s.  So between '64 and '90, there

6   were no executions.  And then on four occasions in the '90s,

7   there were multiple executions; is that right?

8   A.   That's what it looks like.  Yes.

9   Q.   In any of these, did you see where there were three

10  execution dates in the span of 11 days?  Did you --

11  A.   Other than the ones that were on the same day, not that I

12  recall, no.

13  Q.   Right.  So three execution dates, I should clarify.

14  A.   Three execution dates in the span of 11 days.  No, I didn't

15  see that.

16  Q.   So definitely not four; is that right?

17  A.   Correct.

18  Q.   Are you aware that other states have been turning away from

19  the use of midazolam in executions?

20  A.   The only state I'm aware of that has done that is Arizona.

21  Q.   And Florida?

22  A.   Florida couldn't get it anymore.

23  Q.   Okay.  Nevertheless, they're no longer using it?

24  A.   Yes, but they told me the only reason they were no longer

25  using it was because they couldn't get it.

1   Q.   And Arizona agreed not to use it anymore; is that right?

2   A.   They told me they weren't using it anymore.  I did read

3   that they had agreed not to use it anymore.

4             MS. GIANI:  I can't find my affidavit.  Does anybody

5   have it?  I just had it.

6        Thank you.

7   BY MS. GIANI:

8   Q.   I want to talk a little bit about your affidavit.

9   A.   Okay.

10  Q.   The current affidavit.  I should clarify.  I think you've

11  already answered some of my questions, so I'm trying to read

12  through.

13            MS. GIANI:  I'm sorry.  I'm sorry for the delay, but

14  I'm trying to speed things up by not asking some questions.

15       I skipped most of them.

16  BY MS. GIANI:

17  Q.   I'm going to skip to paragraph 21, I think.  It says, "I am

18  familiar with the prisoners' claims that the ADC's midazolam

19  protocol and the execution schedule set by the Governor violate

20  their right to be free from cruel and unusual punishment.  I am

21  also familiar with the prisoners' claims that there have been

22  multiple botched executions using midazolam.  I disagree with

23  their contentions based on my personal investigation, knowledge,

24  and experience."

25       Can you tell me what that investigation, knowledge, and

Kelley - Cross                                        1255

1    experience is?  I think we've covered some of it.  But I just
2    want to give you -- if there's anything that's left out about
3    either the schedule or the midazolam protocol.  What is your
4    understanding in that paragraph based on?
5    A.    Regarding -- okay.  Which one do you want me to take first?
6    Q.    Let's go with the midazolam protocol.
7    A.    Okay.  The midazolam, based upon my information, there have
8    not been any issues with it in Florida or Virginia.  It's been
9    used in both places.  The only reason Florida stopped was
10   because they couldn't get it anymore, and it's my understanding
11   that Virginia is getting it from a compounding pharmacy and that
12   neither state has had any issues with it in carrying out
13   executions.
14         Ohio and Arizona had a completely different protocol, a
15   small amount of midazolam, and I don't remember the amount, and
16   then hydromorphone.  I think Arizona copied Ohio's protocol, and
17   they have had problems, but I don't think it's comparable
18   because it's not anywhere close to -- it was less than a
19   hundred.  I don't remember what it was.  But it's nothing like
20   what we're using.
21         Oklahoma, the problem was the IV access because they had
22   started the IV in the groin, they kept a sheet over it, and from
23   my original training with ADC when we were practicing years ago,
24   that is something you absolutely cannot do.  You have to be able
25   to watch for infiltration.

1      I spoke with Alabama, and my understanding, there was --

2  that it took longer than they expected and that it may have

3  taken longer because of the prisoner's condition, but that it

4  wasn't that anyone from the State that was present believed that

5  the inmate was suffering.  It just took longer than anybody

6  wanted it to take or had thought it would take.

7  Q.    Okay.  With respect to some of these other states, is it

8  your understanding, like, Florida and Virginia, that their

9  protocol was the same as Arkansas's?  And not just the drugs,

10  but the actual procedure.

11  A.    I know that I've looked up Florida's.  I don't -- but it's

12  been a couple years ago, at least.  I don't remember the

13  specifics.  I don't know that I've ever looked at Virginia's.

14  If I have, it's been a while ago.  The only ones that I know

15  were when the *Baze* decision came out, which I think was from

16  Kentucky, I know that we worked with the Attorney General's

17  Office at that time because they wanted our protocol to

18  virtually mirror *Baze* because it had been upheld.  And then I

19  know when *Glossip* came out -- I think it was *Glossip*.  Anyway,

20  the Oklahoma case, that that's when the drugs were changed.

21      But I've looked at others over the years, and I just -- I

22  couldn't sit here now and tell you.

23  Q.    Are you aware that, for instance, in the Florida protocol,

24  they didn't wait five minutes after the midazolam to inject the

25  vecuronium bromide, the paralytic?

1   A.    No, I was not aware of that.

2   Q.    Which would make it virtually impossible for there to be

3   any -- for anyone to witness movement?

4   A.    I wasn't aware of that.

5   Q.    And you mentioned something just now about *Baze*, and you

6   said you worked with the Attorney General's Office to try to

7   mirror that protocol.

8   A.    My recollection is that Dustin McDaniel was the Attorney

9   General and that he wanted the Arkansas protocol to be changed

10  to be virtually identical to Kentucky.  And there were some

11  things that -- I think Mr. Norris was still the director at the

12  time.  There were things that had worked well in Arkansas, and I

13  don't think we changed everything the way they wanted us to.

14  But there were changes made.

15  Q.    Okay.  So with this investigation, was it in conjunction

16  with the AG's Office on these --

17  A.    About the midazolam?  No.

18  Q.    Okay.  So that was just your personal investigation?

19  A.    That was me calling to make sure I knew how it had worked

20  in other places.

21  Q.    Okay.  I'm going to look at paragraph 24.  "As discussed by

22  the U. S. Supreme Court in *Glossip v. Gross*, executions carried

23  out using the same three-drug protocol as Arkansas have been

24  successful.  There has been no evidence to show that any of

25  those inmates experienced severe pain or suffering during the

1  procedures due to the use of midazolam."

2  A.    And I would emphasize "due to the use of midazolam."

3  Q.    So that's still your understanding?

4  A.    Yes.

5  Q.    So I guess as to the Ronald Bert Smith execution, you would

6  simply side with the State witnesses who did not believe that he

7  suffered.

8  A.    That's -- yes.

9  Q.    And you talked about Florida and Virginia.  It says,

10  "Florida began using midazolam in executions in 2013 and did so

11  successfully for several years."

12         MS. GIANI:  I guess I would move to admit Exhibit 22.

13  Plaintiffs' Exhibit 22, I believe; is that right?  Which is the

14  Florida protocol.  I don't need to go into it if we can just

15  admit it for the purpose, your Honor can look to see what the

16  protocol is about waiting five minutes.

17         MS. CRYER:  I would object just based on relevance,

18  but that's my only objection.

19         THE COURT:  Because Director Kelley has addressed

20  Florida as one of the states that she's looked at, I'm going to

21  admit it.

22         MS. GIANI:  Okay.

23      (Plaintiffs' Exhibit 22 received in evidence.)

24         MS. GIANI:  I'll move on from there.

25  BY MS. GIANI:

1   Q.   Then you also mentioned Virginia, and paragraph 27:

2   "Virginia successfully used midazolam in one execution in

3   January 2017."  Is that right?

4   A.   Yes.  And they have one planned for later this month.

5          THE COURT:  I want you to make sure you use your time

6   accordingly.  You have about 30 minutes left.

7          MS. GIANI:  Okay.  Thank you.  I'm trying to go

8   through this a little faster.  I had a lot of questions and I'm

9   trying to pare it down.

10          THE COURT:  You're fine.  I just don't want you to be

11   surprised when I say time's up.

12          MS. GIANI:  Thank you for the warning.

13   BY MS. GIANI:

14   Q.   I'm going to skip to paragraph 35.  "Preparing to execute

15   more than one inmate a night does not increase the level of

16   stress on correctional officers, the executioner, members of the

17   IV team, and others who participate in the execution process.

18   In fact, it is my understanding based on my own investigation

19   and discussion with a former ADC director, that stacking

20   executions is actually better than having eight separate dates.

21   This is because the stress is more associated with an execution

22   night than with a specific number of executions.  So having

23   eight separate dates to prepare for would be more stressful than

24   having four dates."

25          Is your understanding that's set forth in this paragraph

1   essentially based on the opinion of Larry Norris?

2   A.   And others at the department.

3   Q.   Okay.

4   A.   And to a limited degree, the fact that I've been involved

5   in preparing for executions for the last ten or so years.  And

6   having a date set itself is stressful and preparing and

7   preparing and practicing and meeting with inmates and all of

8   that is stressful.  I don't know that it's more stressful

9   because there's more than one.  It's just stressful because it's

10  not something that anybody is wanting to do.  I don't know how

11  else to say that.

12  Q.   I think that's a good way to say it.  So is this -- so this

13  understanding is based on Larry Norris and some other people

14  from the department and your own experience preparing for

15  executions.  Did Larry Norris or anybody else in the department

16  that you talked to, have they ever performed an execution using

17  midazolam?

18  A.   No.

19  Q.   Have they ever performed or participated in an execution,

20  more than one multiple execution in a month?

21  A.   Yes, because there have been multiples on one night.

22  Q.   Well, I'm talking about more than one multiple execution in

23  a month.

24  A.   I'd have to go back and look at the list again.  I don't

25  remember, to answer you, but I'm sure it's in that affidavit, or

1    the attachment to the affidavit.

2    Q.   Do you know if Larry Norris or anyone else at the

3    department has ever been involved in executing eight people in

4    an entire year?

5    A.   I think you had him count that the other day and he had

6    not.

7    Q.   So what you're being asked to do now is not something that

8    Larry Norris or anybody else at the department has ever been

9    asked to do?

10   A.   To my knowledge, nobody in the department has ever been

11   involved in an execution in another state, so except for

12   experience here in Arkansas, that's all I would know about it.

13   Q.   And is it your understanding that it would be no easier if

14   the dates were spread out over a year, allowed for debriefing,

15   quality assessment, rest in between, that that would not be

16   easier?

17   A.   I don't have any personal experience to go by other than

18   what we've talked about in the preparing, but it would be

19   extremely difficult to think that every month we were going to

20   carry out an execution for the next eight months.  It requires

21   so much concentration and preparation.

22   Q.   Each one does?

23   A.   Yes.

24   Q.   Okay.  And you have no concerns about you or the other

25   people participating, their ability to sustain that level of

1    concentration over the course of eight executions or seven,

2    however it may be, in 11 days?

3    A.    I don't have any more concern than I would have if I

4    thought they were going to have to face this every month for the

5    next seven or eight months.  And, you know, I'm sure the Court

6    is aware, and maybe this is not my place to say, but part of the

7    reason we're here is because we didn't do executions since 2005.

8    And so all these people have exhausted all of their stuff and

9    just waiting on there to be something upheld in the court where

10   it could move forward.  And part of the discussion on setting

11   the dates had to do with, okay, so if we can't get midazolam

12   after April and we can't get a barbiturate, then which victim's

13   family do we say, sorry, we're just not willing to do this?

14   Q.    Well, didn't you testify that usually it's the longest-

15   serving inmate would probably go first?

16   A.    The SK numbers is the order for the ones that are

17   scheduled, but I don't believe they are the longest-serving

18   inmates on death row, necessarily.

19   Q.    Well, of the ones who have dates set?

20   A.    The ones who have dates set, it is in order of their SK

21   numbers, yes.

22   Q.    You were concerned that if you couldn't get more midazolam

23   after the expiration date or before the expiration date or

24   whenever that you might would prioritize differently over who

25   would be executed?

1   A.   No.  I did not make the decision.  I was just in on the

2   conversation.  And part of the conversation, and it didn't come

3   from me, was about how would we decide which families we're

4   going to tell we're not going to get this done?  And so the

5   question posed to me was, "Can you do it?"

6        And I said, "I need to call and talk to the warden about

7   this."

8        We had previously had conversations among Dale Reed and

9   Larry Norris and others about is it better to do two on one

10  night or to have one and then wait two weeks and do another one.

11  And I know -- I knew that their preference was to do them on the

12  same night.  But the conversation at this particular time was,

13  this is where we are.  This drug is going to expire.  Don't know

14  that we can get it again.  I do know that Florida tells me they

15  couldn't get it again.  I don't have a source for it.  I know

16  that Virginia has gone to a compounding pharmacy, which I

17  don't -- which would not be preferred.  Nor do I know one that

18  would be willing to sell to us.

19  Q.   In the interest of using my time wisely, let me see.  I

20  know I want to cover some confidential stuff.  So let me look

21  through my questions really quick.

22       When you were reviewing other states' protocols, did you

23  note whether other states -- and I think in discovery we have

24  that you reviewed, I think, Florida and Oklahoma's protocols

25  specifically?

1    A.    I think Rory did.

2    Q.    Okay.

3    A.    I'm sorry.  Rory Griffin.

4    Q.    Did you note in there that they specifically incorporated

5    debriefing into their protocols?

6    A.    I don't remember that.

7    Q.    And quality assessment review after each execution?

8    A.    It doesn't surprise me.  We do critical incident reviews,

9    is what we call them, after any major anything.  You know, if an

10   officer gets stabbed or if there's something that happens with

11   an inmate, then by policy, it's actually in policy, although I

12   think I have the authority to do it anyway, I appoint a five-

13   person team and they do a critical incident review of everything

14   that happened, make recommendations of any potential changes.

15   That's in a different policy.  It's not connected with

16   executions.  And I haven't been there when one has actually

17   happened, so I don't know whether before that they did them

18   following them or not.

19   Q.    And when you say you don't know if you did that before,

20   following an execution?

21   A.    I don't know if they did them following executions in 2005

22   and earlier because I wasn't working there.

23   Q.    Are you planning on going through that process after each

24   execution?

25   A.    Not after each execution, but when it's over, yes.

1   Q.   After all eight are over?

2   A.   Seven, yes.

3   Q.   You're right.  Or I hope you're right.

4            MS. GIANI:  I think I may want to move to confidential

5   stuff, but I want to check with my table and make sure.

6            THE COURT:  Sure.

7            MS. GIANI:  I think just one other question that's not

8   confidential.

9   BY MS. GIANI:

10  Q.   Did you when you're talking to whoever you talked to in

11  Virginia, did you inquire about their source of supply?

12  A.   No, because I had tried before to get drugs through the

13  Virginia Department of Correction and they -- the attorney that

14  works for them absolutely would not allow them to cooperate with

15  us.

16  Q.   So you tried to get it directly from the Department of

17  Corrections?

18  A.   I did.

19  Q.   Did you ask them about their source of supply for the

20  drugs?

21  A.   I did not ask them.  I have asked others that use

22  compounding pharmacies, and they will not disclose because they

23  have an agreement with that company that they won't disclose.

24           MS. GIANI:  Okay.  And then I think I'm going to turn

25  to confidential questions.

1           THE COURT:  All right.  If you would, if you're not

2    associated with the lawyers or a party to the case that's signed

3    onto the protective order, I'm going to ask you to step out.  As

4    soon as she is done with this line of questioning and we're done

5    with confidential questioning, I'll call you back in.

6           And I think we are at or under a 15-minute warning at this

7    point.

8           MS. GIANI:  Okay.

9           [Proceedings under seal under separate cover.]

10          (Continuing in open court:)

11          MS. CRYER:  I would normally make a joke right about

12   now and say I plan to take my full 45 minutes, but I don't have

13   it in me to even try.

14                        REDIRECT EXAMINATION

15   BY MS. CRYER:

16   Q.   Ms. Kelley, we're going to rapid-fire through these.  We're

17   going to go back to -- and I'm going to hit and miss because I

18   don't remember which ones were asked in which order.

19          You were shown Interrogatory No. 14.  You were asked about

20   communications and whether you had disclosed those.  Let's look

21   at subparagraph A, which was my understanding of the question

22   that you were being asked.

23          Identify any agent of the ADC, including members of the

24   Attorney General's Office, who have engaged in any communication

25   with any manufacturer, facility, compounded pharmacy, other

 1   supplier, blah, blah, blah, to the present, regardless of

 2   whether the ADC has contracted with them, has purchased or will

 3   supply from that.

 4        Then, question:  Identify any agent of the ADC.

 5        Your response was:  Director Wendy Kelley and Deputy

 6   Director Rory Griffin.

 7        So if you read subsection A to the best of your ability and

 8   knowledge, did you try to respond truthfully and correctly to A

 9   of Interrogatory No. 14?

10   A.   Yes.

11   Q.   Thank you.  B is:  Identify the participants in and

12   summarize the contents of any communication.

13        Did you also attempt to the best of your ability -- with

14   the three days that you had to respond to this discovery, in

15   addition to producing over a thousand pages of documents and

16   e-mails and everything, did you do your best to respond to this

17   discovery when you could?

18   A.   Yes.  I just didn't read the definitions.

19   Q.   Okay.  Were you trying to hide anything from the plaintiffs

20   or the plaintiffs' counsel in this case?

21   A.   No.

22   Q.   Is midazolam a controlled substance?

23   A.   I can't remember what the word -- if that's the correct

24   word, but there's a reason why it's more difficult for anyone to

25   obtain.

1    Q.    Okay.  And with the understanding that you have, I believe,

2    according to the Act 5-4-617 -- and hopefully I got that number

3    right -- that you have the confidentiality provision in there,

4    has that made it any easier for you to obtain drugs for the

5    Department of Correction to be used in lethal injection?

6    A.    We wouldn't have any of the ones that we have now without

7    the confidentiality provision.

8    Q.    If you contact a supplier or even a manufacturer and say,

9    "Hey, I have this confidentiality agreement, please sell drugs

10   to me," have you found them to be forthcoming and eager and

11   willing to sell to you?

12   A.    No.

13   Q.    Okay.  I want to clarify something.  You were shown a

14   portion of a transcript from 2015 from the state case, which I

15   believe was, if not completely identical, all but identical to

16   the case that we're here on today.  And I want to read a part of

17   the transcript.

18        I am looking at abstract page 113.  And I would try and put

19   it on the -- oh, look, it does show up there.  All right.  This

20   is Ms. Merritt.  I'm following up on the portion of the

21   transcript that you were shown earlier in which Ms. Merritt

22   states:  "They could call the drug manufacturers just as Rory

23   Griffin did and do the same investigation that Mr. Griffin did,

24   and those manufacturers have made clear not only to Mr. Griffin,

25   but in the public statements on their websites and their press

 1    releases, as well as statements to their distributor -- we have

 2    a statement about a distributor in Mr. Griffin's affidavit --

 3    manufacturers don't want their drugs to be used in lethal

 4    injection executions and they do everything they can to resist

 5    that."

 6         Did I read that paragraph correct?

 7    A.    I believe so.  It's a little blurry.

 8    Q.    I was going to say, I'm sorry, and I can try and even --

 9    this is pretty impressive.  All right.

10         Next paragraph, and this is, again, Ms. Merritt speaking.

11    "Now, I might have said something earlier and I want to make

12    sure I correct my statement for the record.  I have no idea what

13    is in the ADC's supplier's contract with the drug manufacturers.

14    So I didn't want to suggest that they were in breach of contract

15    by providing drugs to ADC.  I don't know, but what we do

16    know --" and then it looks like the court may have cut her off.

17    Not this Court, but another court, may have cut her off.

18         Did I read that, the next paragraph in that, correctly?

19    A.    Yes.

20    Q.    And, again, the affidavit that you were shown that was, I

21    believe, dated October 14, 2015, and I believe you were

22    referenced to paragraph 9 regarding your attempts to obtain a

23    barbiturate for the ADC, was that an affidavit that was used in

24    the 2015 state case?

25    A.    Would have had to have been.

1   Q.    Okay.  Again, claims identical to the ones in this case.

2        Do you believe, based upon your conversations with experts,

3   that midazolam will render a prisoner unconscious and make him

4   unable to feel pain?

5   A.    Yes.

6             MS. CRYER:  Your Honor, that's all the questions I've

7   got.

8             THE COURT:  All right.  I actually have a few

9   questions for Director Kelley, and then I'll let everybody have

10  another round, even if you don't have time.  But not a long

11  round.

12       If you would, Director Kelley, from the viewing room for

13  the execution chamber, how far of a walk is it to the deputy

14  warden's office?  How long would it take a person to walk there?

15            THE WITNESS:  They would put the attorney in a car and

16  drive them there.

17            MS. MERRITT:  Excuse me.  I cannot hear your answers.

18  Director, would you mind speaking into the mike?  Thank you.

19            THE WITNESS:  I'm sorry.  They would put them in a car

20  and they could drive there.  The other phone that's closest is

21  the one by the quiet cell that they can use up until the time of

22  execution, and they could be escorted back around to the quiet

23  cell.  But there might still be an inmate in the cell next to

24  them, but -- so I don't know that that's a good idea either, but

25  that's the --

1    THE COURT:  That's what's offered; right?  Isn't that
2    what's being offered?
3    THE WITNESS:  They can use that phone while they're
4    back there, and the discussion that was held during one of the
5    breaks was, you know, if you want to leave -- well, maybe it was
6    during testimony.  I'm sorry.  I don't remember.
7    THE COURT:  It's a long night.  And I appreciate you
8    indulging my questions, but I want to get this straight to
9    understand what the ADC's position is on this.
10   THE WITNESS:  No phones in the witness room, period.
11   If they want to leave the witness room, we'll take them to a
12   phone.  Ideally, they would go to the front where they have a
13   phone and a fax and everything.  But if they wanted the closest
14   phone available, then we would simply walk them back around to
15   where the quiet cell is, quiet cells are, and they could use one
16   of those phones.
17   THE COURT:  Is a quiet cell the same thing as a
18   holding cell?
19   THE WITNESS:  In this instance, it's in the back
20   hallway, just outside where the execution chamber is.  It's away
21   from the other inmates, but it's not a hold -- it's not a
22   holding cell in the sense that -- it's got a bed, it's got
23   everything in there.  Not just a place to hold somebody for a
24   few hours.
25   THE COURT:  So if they drive to the deputy warden's

1    office, how long of a drive is that?

2              THE WITNESS:  Three minutes.

3              THE COURT:  Where would the car be?  Who would drive

4    them?

5              THE WITNESS:  The car is waiting right outside,

6    because when it's over, they would be driving them back around

7    there anyway.

8              THE COURT:  Would they have to wait for an escort?

9              THE WITNESS:  No.  The person that's going to be

10   driving them back around would already be there.

11             THE COURT:  Would they have to wait for an escort to

12   leave the witness room?

13             THE WITNESS:  No.  The door out to where the car is is

14   right there.  That building, if you come in on the side that I

15   come in on, you come into the execution chamber.  Then there's a

16   door that goes from the execution chamber into the witness room.

17   There's a door that remains open from the witness room to the --

18   it's not any wider than your desk is.  So the outside door is

19   right there.  You come in, there's a hallway to a bathroom, or

20   you go straight into the witness room.  It's just right there.

21   So you're talking three feet, or whatever the width of the

22   hallway is, to get outside, and the car would be there.

23             THE COURT:  Where's the visitation center?  I

24   understand that that may be another option.

25             THE WITNESS:  It's up -- when you come in the main

1  entrance building to Cummins, it's very close to the deputy

2  warden's office.  It wouldn't -- if they were going to call the

3  Court, they would have more privacy going to the deputy warden's

4  office than the visitation center, and it's not any difference,

5  maybe a few feet difference in space from the front door.

6          THE COURT:  The visitation center requires a drive,

7  too?

8          THE WITNESS:  Yes.

9          THE COURT:  How many people can fit in the witness

10  room for the execution chamber?  I heard you talking earlier

11  about 24 chairs.  Is that the number?

12          THE WITNESS:  24 chairs is pretty much all that will

13  fit.  I have a picture on my phone if you want to see it.

14          THE COURT:  How many citizen witnesses will there be?

15          THE WITNESS:  12.

16          THE COURT:  Why?

17          THE WITNESS:  The law says six to 12, and because I'm

18  asking the witnesses to stay for two executions, I think that

19  there's a chance that some of them won't, and I want to make

20  sure I have at least six for the next one.

21          THE COURT:  If you don't have more than six, if you

22  have just the number you need, you have extra chairs in the

23  witness room, would you entertain having lawyers come in if

24  there's more than one lawyer for the inmate?

25          THE WITNESS:  If the lawyers want to --

1    THE COURT:  If they've got execution one, lawyer two

2  is in the deputy warden's office, which I understand is

3  perhaps -- and we'll get to that question -- but perhaps a

4  possibility.  Some of your witnesses don't stick around for

5  execution two, which you have posited is a possibility.  So you

6  have extra seats.  Right?  Would you consider letting that

7  second lawyer come into the witness room?

8    THE WITNESS:  Do you have a copy of that act?  Does it

9  say an attorney?

10    MS. MERRITT:  I don't know that we have a copy.

11    THE COURT:  I don't know what the act is.

12    THE WITNESS:  I mean the law.  Well, y'all have been

13  using it as exhibits.

14    THE COURT:  I have the conduct of execution.  This is

15  the one that talks about --

16    MS. GIANI:  The witness provision is a different

17  statute, but I don't know --

18    THE COURT:  I don't think this one talks about the

19  counsel.

20    MR. RUDOFSKY:  I don't think we have it here, Judge.

21  And I think just part of the reason, I think what Director

22  Kelley is saying, there are certain sort of statutory

23  prohibitions, and I think she probably would need to look at it

24  before she could answer you.

25    THE COURT:  Is it a statute or --

1    MR. ROSENZWEIG:  It is a statute that's been misquoted

2  a lot.

3    THE COURT:  Okay.  And I understand there's ambiguity

4  about the language.  Right?  I know the parties don't agree on

5  the language of the statute.  I think that's been briefed by

6  both sides.

7    THE WITNESS:  Okay.  I didn't know that.

8    THE COURT:  But that's what you'd be relying on to say

9  you only get one?

10    THE WITNESS:  The statute and the -- and, to my

11  knowledge, although Jeff told me during a break that when

12  Mr. Lockhart was the director, he allowed two to be in the

13  witness room, but I have not had conversations with Mr. Lockhart

14  about this ever.  And I did ask Mr. Norris, and he said there

15  had ever only been one in there.

16    If you have 12 citizen witnesses, six family members and

17  one lawyer for the inmate, and one spiritual advisor and one

18  mental health person there with the victim's families, I think

19  that's 24, unless I miscounted something.  We looked at this

20  because the Attorney General's Office asked about having

21  somebody in the room.  There is a spot where you could put a

22  chair, which the door will bump when that door opens.  But

23  there's a possibility that you could put a 25th chair in that

24  room.

25    THE COURT:  All right.  And are there any plans to do

1  that?

2          THE WITNESS:  I don't want to do it.  It's really

3  cramped and crowded.  If the Court tells me that I need to let

4  them have two attorneys in there, and if their plan for having

5  two is so that one can leave, they would need to be on the back

6  row, next to that door, so they don't disturb anybody else when

7  they get up and walk out.

8          THE COURT:  Okay.  I'm going to hand you what's

9  Defendants' Exhibit 16.  It was referenced earlier.  That's the

10 Court's copy of it.  It's a letter, I think it's from

11 Mr. DePriest, and it's to the lawyers, some of the lawyers,

12 maybe all of the lawyers here.  I'm interested in what's

13 attached to it.

14         THE WITNESS:  Okay.

15         THE COURT:  What is that?

16         THE WITNESS:  There had been questions -- this is just

17 something that Mr. DePriest drafted that's based on -- well,

18 some of it is based on the AD, about the family visitation and

19 legal counsel visitation.  None of that is new.  But I think

20 he -- and it may be in his letter -- assumed they would have

21 more frequent contact with the inmate's families, so letting

22 them know about the visitation.  But it's basically just a recap

23 of what is in the other policies.

24         THE COURT:  Is anything about that new?  And by that,

25 I mean the attachment to Defendants' Exhibit 16.

1    THE WITNESS:  The content in it is not new, except for

2  the bringing in a laptop.  I don't think they were allowed to

3  bring in anything before.  And so that -- but it's not new that

4  they had access to phone lines and fax machines.  It wasn't in

5  the deputy warden's office because that's where the video feed

6  for the family used to go.  But it was in one of the offices up

7  there, is my understanding.

8    THE COURT:  What is that?  And I know there's been

9  discussion here about there's statutes, administrative

10  directives.  You've got protocols that are being talked about.

11  What is the attachment to Defendants' Exhibit 16?

12    THE WITNESS:  It was the information out of the

13  administrative directive that the attorneys needed to have to

14  make their plans based upon the questions they were asking Jim.

15    THE COURT:  What's it titled at the top?

16    THE WITNESS:  It says, "Execution Protocol - Legal

17  Counsel for Inmates with Scheduled Executions."

18    THE COURT:  If I have a challenge to this, is this a

19  new protocol?  So what I'm trying to understand is, what is

20  this?  Who has the ability to create it?  When do you send it

21  out?  Who do you send it out to?  There's been a lot of talk in

22  this litigation about what's a protocol, when you can challenge

23  a protocol, when a protocol changes.  And I'm trying to get my

24  head around what that is, why it was created, and who it got

25  sent to, or did anybody -- did the public know?  I mean, I'm

1   just trying to get my arms around what it is.

2        THE WITNESS:  It was just -- no, it's not new.  None

3   of the information in it is new.  It's a summary of information

4   that used to be given out verbally when people called, and it

5   was just simply an attempt to provide it in one document to the

6   attorneys for the inmates.  It's not something that was adopted.

7   The title is a formal title that Mr. DePriest gave it, but it

8   was not something that was created out of anything other than

9   putting on paper what had been verbally shared with attorneys

10  for inmates over the years.

11        THE COURT:  So in your estimation, the attachment to

12  Defendants' Exhibit 16 is not a protocol in the sense that the

13  execution protocol exists -- I've got claims here that they

14  can't challenge certain portions of it because it hasn't

15  changed, and it's -- and I'm going to be candid with you.  I

16  don't know that I understand how those things get promulgated so

17  that individuals know when something is new and should be

18  challenged.  Does that make sense?  No?

19        THE WITNESS:  The administrative regulations are

20  promulgated by the Board of Corrections and those go through the

21  public hearing process, notice stuff.

22        THE COURT:  That's the ADs?

23        THE WITNESS:  No, that's the ARs, administrative

24  regulations.

25        THE COURT:  And that's a higher level than AD?

1    THE WITNESS:  Right.  Administrative directives are

2  issued by my office, and those do not go through public comment.

3  They're for the internal workings of the agency.  The ones that

4  deal with inmate grievance rights and/or disciplinaries we post

5  for the inmate population for 30 days so they can make

6  complaints or suggestions or whatever, anything that affects

7  their -- changes their rights within, we publish for them.  But

8  it's internal workings of the agency, and we don't take

9  public -- we don't publish them for public comment.

10    Under the Method of Execution Act, the protocols, the

11  logistics for things are considered confidential except for

12  what's set out in that statute which is basically Attachment C.

13    During the time that I've been with the department, these

14  issues with regard to the attorneys, more than one wanting to be

15  present or phones, that's never been an issue until this last

16  month.  And it's not any different than what it was before

17  except for the fact that we're saying you can bring a laptop in.

18  I don't know about under Mr. Lockhart, but I know under

19  Mr. Norris, only one attorney was present, and even, to my

20  knowledge, and we can ask Jeff, when Jeff was there under

21  Mr. Lockhart and there were two attorneys, one didn't leave.

22  They sat through the execution and then left with the witnesses

23  when it was over.

24    THE COURT:  And Mr. Norris, I'll just represent to you

25  I asked him the question of what his practice was, and he

1  testified under oath he couldn't remember if he let more than

2  one attorney in.

3          THE WITNESS:  Okay.

4          THE COURT:  So I'll represent that to you, I asked

5  that question and that's what he said under oath.  I'm not

6  quoting him directly but he couldn't remember to answer the

7  question.

8      That's neither here nor there really with respect to your

9  view of this.  So what you have in your hand that's attached to

10  Defendants' Exhibit 16, Mr. DePriest sent out.  What is it?  I

11  mean, do you have the ability to change it?  Is that a practice

12  that -- you've testified under oath today that you don't intend

13  to change, I'm not sure what, what you have in your affidavit?

14  What's in Defendants' Exhibit 16?

15          THE WITNESS:  When I was talking about I don't intend

16  to change, I was talking about Attachment C.

17          THE COURT:  Attachment C is what you were --

18          THE WITNESS:  Attachment C in my mind is the execution

19  protocol, and that's what I was saying I would not be changing.

20          THE COURT:  Okay.

21          THE WITNESS:  But do I have -- I have the authority to

22  make changes except for what the law tells me I can't change.

23  The law says these are the three drugs we're going to use unless

24  we're using a barbiturate.  Couldn't get the barbiturate, so

25  those are the three drugs we're using.  I can't decide I'm going

1   to give them some other drug.

2       But this is something, yes, I could change.  I don't think

3   I was even in state when Mr. DePriest sent it out.  But it was

4   his attempt to provide more information to the lawyers.  That's

5   all.

6       THE COURT:  Okay.  Thank you.  As a result of that, if

7   anybody has questions, you may ask.

8       MS. GIANI:  I have nothing, your Honor.

9       MS. CRYER:  I have no questions of Director Kelley.  I

10  do have, when we finish with all of the questions, I do have one

11  housekeeping matter to take up, very, very short.  But I have no

12  questions for her.

13      THE COURT:  I don't have any more either.  Thank you

14  very much.  I appreciate it.  You may step down.

15      THE WITNESS:  Thank you.

16      THE COURT:  Okay.  You can go ahead, whatever

17  housekeeping we have, and then I have two things to bring up.

18      MS. CRYER:  It was just to -- I forgot to ask to

19  introduce certain exhibits, so I wanted to move to introduce

20  them.  I would like to move to introduce Defendants' Exhibits

21  17, 19 through 24, and 28.

22      THE COURT:  Is there any objection?

23      MR. WILLIAMS:  No objection.

24      THE COURT:  Those will be admitted.

25      MS. CRYER:  Thank you.

1       (Defendants' Exhibits 17, 19, 20, 21, 22, 23, 24, and 28
2  received in evidence.)
3           MR. WILLIAMS:  We have a similar housekeeping matter.
4  Is this our only one?
5           MS. VANDIVER:  Yes.
6           MR. WILLIAMS:  Have we admitted 23?  Plaintiffs' 23?
7           THE COURTROOM DEPUTY:  Yes.
8           THE COURT:  Yes.
9           MR. WILLIAMS:  Have we admitted three and four?  Oh,
10  four is just demonstrative.  Sorry.  Three?
11           THE COURT:  I don't have Plaintiffs' 3, which I have
12  labeled as the execution protocol, legal counsel for inmates
13  with scheduled executions.
14           MR. WILLIAMS:  I think we were just talking about
15  that.  I don't know if we need to admit that.
16      And then 18 is the only one we haven't admitted which is an
17  e-mail that goes to the same topic.
18           THE COURT:  Okay.  Any objection to those?
19           MS. MERRITT:  No, your Honor.
20           THE COURT:  And I think I referred to -- just so I'm
21  clear on what you're looking at, I think that Plaintiffs'
22  Exhibit 3 is what I referred to as the last two pages of
23  Defendants' Exhibit 16.  Is that right?
24           MR. WILLIAMS:  Yes.
25           THE COURT:  Okay.

Christa R. Jacimore, RDR, CRR, CCR
United States Court Reporter

1    MS. VANDIVER:  I'm sorry.  Did we move in all our
2  confidential exhibits?  I don't know that we did that either.
3    MS. CRYER:  I know A was.  I think A, but I don't
4  remember the others.
5    MS. VANDIVER:  We'd like to move them all in and
6  they're all things that we received from the State in discovery.
7    THE COURT:  Is it A, B, and C?
8    MS. VANDIVER:  I think it goes to --
9    THE COURT:  It goes to F.  Any objection to that?
10  Clearly they're confidential.  They'll remain under seal.  I
11  will tell you that with exhibits, we don't retain copies.  I'm
12  going to keep them for a while and then Tracy will call you and
13  you pick up your exhibits.  Ms. Washington.  I'm sorry.
14     Any objection to the confidential exhibits coming in, A
15  through F?
16    MS. MERRITT:  No, your Honor.
17     (Plaintiffs' Confidential Exhibits A through F received in
18  evidence.)
19    THE COURT:  Anything else?
20    MR. RUDOFSKY:  Your Honor, I have one thing on the
21  amicus brief unless that's one of the things you wanted to --
22    THE COURT:  That's one of the things for me, too.
23    MR. RUDOFSKY:  I'll sit and wait then.
24    THE COURT:  Three and 18, there was no objection;
25  right?  They're already in as Defendants' Exhibit 16, so it's

1    just semantics.  Is that right?

2            MS. MERRITT:  No objection.

3            THE COURT:  All right.  Okay.

4        (Plaintiffs' Exhibits 3 and 18 received in evidence.)

5            THE COURT:  Mr. Rudofsky, you beat me to the punch.

6    The amicus brief, I will tell you very candidly, Mr. Keller has

7    likely read it, I have had it up here but I haven't looked at it

8    yet.  I know enough to know it's from either one or two

9    manufacturers.  So I don't know the parties' positions.  We've

10   entered a short order.

11       I think the law based upon my experience with this in

12   another case that I had is, it's not traditionally done, but I

13   could do it.  But I need to give, I think, notice to you all if

14   I did it.  So I'm not sure if the parties have a strong position

15   on it one way or the other.

16       Reading it to me doesn't really mean that I'm going to

17   consider it.  I've heard a whole lot of evidence in the last

18   several days, and I'll give it the weight that I think it

19   deserves.

20           MR. RUDOFSKY:  Your Honor, we certainly -- we're not

21   opposed to it in the sense of, it's an amicus brief.  Read it.

22   Take it for what it's worth.  The one thing we are opposed to,

23   if it's construed in any way to ask for any specific relief to

24   them, when you read it, you'll see one of the things they sort

25   of say is, we request you to not let ADC use our drugs in lethal

1    injection.  Obviously to the extent that's construed as a

2    request for some type of relief, that's totally improper.

3          THE COURT:  They're not a party.  They haven't moved

4    to intervene.  I haven't granted them the right to intervene.

5    So I don't view it, even if that is a request, it's not a proper

6    request in my view, and being allowed to file something as an

7    amicus, it goes back to the same thing of the public right of

8    access.  I don't want to receive an amicus brief that I declined

9    to have made part of the public record in the case.  I just

10   think that they should have the right to file it if they sought

11   the ability to file it and you all should be aware of it.

12          Anything from plaintiffs' counsel on that?

13          MR. WILLIAMS:  We don't take a position on that

14   either.  I tend to agree that it doesn't ask for proper relief

15   on what it's asking for, based on my read.

16          THE COURT:  All right.  What I will say to you is, I

17   will read it.  I don't think I will consider it.  I don't think

18   it's a basis of the decision or the issues that are before me.

19   That's what I will tell you.

20          And then the last thing I will say, I said it earlier in

21   open court, but I'll repeat it.  I'm not ruling tonight.  I'm

22   not ruling from the bench.  So you don't need to come back

23   tomorrow.  I'm not going to call you to come back tomorrow.  I'm

24   not going to call you to come back next week.  I'm not going to

25   rule from the bench.

1      I will end with what Judge Marshall ended with, which is --
2  I'm going to quote Judge Marshall's words because it's that late
3  in the night.  Thank you very much, everyone, for being here.
4  Everybody has done a very good job representing their clients'
5  interests.  Everyone has done yeoman's work in a short amount of
6  time to get these issues presented to the Court in a way that
7  will enable the Court to consider them carefully with the
8  information that you all have presented and made your record and
9  demonstrated the proof on.

10      So I appreciate it and I appreciate everyone working
11  together to get that done in a short amount of time.  So thank
12  you, and thank your witnesses, too.  I appreciate that.  I know
13  making folks stay after business hours is to ask a lot, so I
14  appreciate it.

15      If there's nothing else, we're adjourned.  You don't have
16  to get your stuff tonight.  You can leave it here and walk out
17  and you can pick it up tomorrow.  You can send someone to pick
18  it up tomorrow.

19      We have a court proceeding at 9:30 tomorrow.  So if it's
20  after 9:30, we may have stacked it up and put it on the back
21  bench, but we won't move it or take it anywhere.

22          MS. CRYER:  Your Honor, my only concern would be the
23  confidential exhibits, if they would be removed from the
24  courtroom.  Otherwise, I don't have any care one way or the
25  other.

1    THE COURT:  Okay.  We'll make sure tonight before we

2    leave that we've picked up all of those.

3    MS. CRYER:  Thank you, your Honor.

4    THE COURT:  Thank you.

5    (Proceedings adjourned at 9:40 p.m.)

6    REPORTER'S CERTIFICATE

7    I certify that the foregoing is a correct transcript from
     the record of proceedings in the above-entitled matter.

8

9    Date:  April 13, 2017

     /s/ Christa R. Jacimore, RDR, CRR, CCR
10   United States Court Reporter

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25