**IN THE UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF ARKANSAS**
**LITTLE ROCK DIVISION**

**CAPITAL CASE**

**JASON MCGEHEE,** *et al.*                                        **PLAINTIFFS**

**v.**                          **Case No. 4:17-cv-00179 KGB**

**ASA HUTCHINSON,** *et al.*                                      **DEFENDANTS**

**ORDER**

Plaintiffs Jason McGehee, Stacey Johnson, Marcel Williams, Kenneth Williams, Bruce
Ward, Ledell Lee, Jack Jones, Don Davis, and Terrick Nooner are inmates currently serving on
death row in Arkansas. They bring this 42 U.S.C. § 1983 action against defendants Asa
Hutchinson, who is sued in his official capacity as Governor of Arkansas, and Wendy Kelley, who
is sued in her official capacity as Director of the Arkansas Department of Correction ("ADC"), to
challenge various aspects of their impending executions.₁ This Court has jurisdiction under 28
U.S.C. §§ 1331.

Before the Court is defendants' motion to dismiss (Dkt. No. 26). Plaintiffs have responded
to defendants' motion (Dkt. No. 31). Defendants move to dismiss many of plaintiffs' claims based
on legal arguments that do not go to the actual merits of the claims, such as *res judicata* and
collateral estoppel. The Court denies these arguments for two reasons. First, and most
importantly, the Court finds that this action is not barred by *res judicata* and collateral estoppel
under Arkansas law. Second, the relief plaintiffs seek here is equitable relief. It would be

---

₁ Governor Hutchinson has not set an execution date for Mr. Nooner. Mr. McGehee is
scheduled to be executed on April 27, 2017; however, his execution was stayed in a separate action
before the United States District Court for the Eastern District of Arkansas. *See Lee v. Hutchinson*,
No. 4:17-cv-00194 (E.D. Ark. Apr. 6, 2017) (order granting in part, denying in part, and holding
in abeyance in part plaintiffs' motion for a preliminary injunction).

inequitable under the circumstances for this Court to dismiss this case without hearing evidence on whether the state's intended use of midazolam would violate the Eighth Amendment. The circumstances are that, within the past week, a "circuit split" appears to have developed on this very issue. *See In re Ohio Execution Protocol*, No. 17-3076, 2017 WL 1279282, at *11-15 (6th Cir. Apr. 6, 2017); *Arthur v. Comm'r, Alabama Dep't of Corr.*, 840 F.3d 1268, at 1300 (11th Cir. 2016), *cert. denied sub nom. Arthur v. Dunn*, 137 S. Ct. 725 (2017). At issue is the method the state of Arkansas will use to execute plaintiffs. As the Supreme Court simply put it, because "execution is the most irremediable and unfathomable of penalties . . . death is different." *Ford v. Wainwright*, 477 U.S. 399, 411 (1986). This weighs in favor of hearing plaintiffs' claims. It does not mean that, on the merits, plaintiffs have "a significant possibility of success" on their claims. *Jones v. Hobbs*, 604 F.3d 580, 581 (8th Cir. 2010) (internal quotation marks omitted) (quoting *Hill v. McDonough,* 547 U.S. 573, 584 (2006)). For the claims that survive defendants' motion to dismiss, that legal analysis and determination are in this Court's Preliminary Injunction Order.

For these and the following reasons, the Court grants in part and denies in part defendants' motion to dismiss (Dkt. No. 26).

## I.       Background

The following alleged facts are taken from plaintiffs' complaint and its attachments (Dkt. No. 2-2). The statements made in plaintiffs' complaint are allegations, not proven facts. However, at this stage of the proceedings, the Court must accept all allegations contained in the complaint as true, and the Court must draw all reasonable inferences from the complaint in favor of the plaintiffs, the nonmoving parties. *See Young v. City of St. Charles*, 244 F.3d 623, 627 (8th Cir. 2001) ("When ruling on a motion to dismiss, the district court must accept the allegations contained in the complaint as true and all reasonable inferences from the complaint must be drawn in favor

of the nonmoving party."). Therefore, for the purposes of this Order, the Court will present plaintiffs' allegations as if they are proven facts.

On February 24, 2017, Governor Hutchinson set execution dates for each of the plaintiffs, excluding Mr. Nooner. Mr. Davis and Mr. Ward are currently scheduled to be executed on April 17, 2017; Mr. Johnson and Mr. Lee on April 20, 2017; Mr. Jones and Marcel Williams on April 24, 2017; and Mr. McGehee and Kenneth Williams on April 27, 2017. Since the 1976 Supreme Court decision in *Gregg v. Georgia,* 428 U.S. 153 (1976), no state has carried out eight executions in 11 days.[2] No state has attempted as many as eight executions in a month since 1997. It has been 27 years since a state successfully executed two people on the same day. In 2014, the state of Oklahoma attempted to execute two people on the same day, but state officials canceled the second execution after complications arose in the first.

### A. Execution Protocol

On at least one occasion, Governor Hutchinson stated that he "scheduled the executions so as to exhaust the State's supply of midazolam before it expires" (Dkt. No. 2-2, ¶ 22). Arkansas Code Annotated § 5-4-617 provides that lethal injection is the appropriate method of execution and that the ADC shall select one of two options for a lethal-injection protocol, depending on the availability of the drugs: (1) a barbiturate; or (2) midazolam, followed by vecuronium bromide, followed by potassium chloride. Director Kelley adopted a written and largely undisclosed lethal-injection protocol for executions using midazolam, which the ADC intends to follow for plaintiffs' executions. "The entirety of Plaintiffs' knowledge about the midazolam protocol is encompassed in a public document known as 'Attachment C[,]'" which is attached as an exhibit to the complaint

---

[2] In their complaint, plaintiffs state that the executions are scheduled to take place over 10 days, but they are actually scheduled to be held over 11 days, with the first executions being scheduled for April 17, 2017, and the last being scheduled for April 27, 2017.

(Dkt. No. 2-2, ¶ 10).  On March 10, 2017, counsel for plaintiffs sent a letter with an attached Freedom of Information Act request to Jim DePriest, ADC's General Counsel, requesting additional information and documents pertaining to the ADC's execution protocol (*Id.*, at 72-74). On March 15, 2017, Mr. DePriest responded to plaintiffs' counsel by letter and stated that there were no additional records, beyond Attachment C ("Arkansas Midazolam Protocol"), that were responsive to counsel's request, and that if there were records, they would be exempt from disclosure (*Id.*, at 75-77).

The Arkansas Midazolam Protocol, which was last revised on August 6, 2015, provides that plaintiffs will be executed by receiving successive injections of 500 milligrams ("mg") of midazolam, 100 mg of vecuronium bromide, and 240 milliequivalents ("mEq") of potassium chloride.  The Arkansas Midazolam Protocol provides that, after the midazolam is injected, but before the injection of vecuronium bromide, the ADC's Deputy Director, or his or her designee, must determine whether the inmate is unconscious by using "all necessary and medically-appropriate methods" (Dkt. No. 2-2, Exhibit 1, at 70).  If the Deputy Director, or his or her designee, determines that the prisoner is unconscious, the vecuronium bromide and potassium chloride are administered.  If the inmate is not unconscious, the Arkansas Midazolam Protocol provides that an additional 500 mg of midazolam will be administered.  After the additional midazolam is administered, the Deputy Director, or his or her designee, conducts a second consciousness check.  If the prisoner is unconscious, the second and third drugs are administered.

The Arkansas Midazolam Protocol provides that the drugs will be administered by an intravenous infusion device ("IV").  The IV lines must be set up by members of the "IV team," who must have at least two years of professional experience in at least one of the following fields: emergency medical technician-intermediate; emergency medical technician-paramedic; nurse;

physician assistant; or physician.  If issues with the IV lines arise, "the Deputy Director, or designee, will direct the IV Team to suspend further action and thereafter summon trained, educated, and experienced person(s) necessary to establish a primary IV line as a peripheral line or as a central venous line" (*Id.*, at 67).

### B.     "Botched" Midazolam Executions And State Responses

Plaintiffs identify what they characterize as four "botched" executions that have taken place since 2014.

1.     On January 16, 2014, Dennis McGuire was executed by the state of Ohio using a two-drug combination of 10 mg midazolam and 40 mg hydromorphone.  The execution took 25 minutes to complete, and Mr. McGuire reportedly moved, gasped, and made choking and snorting sounds during the procedure.

2.     On April 29, 2014, Clayton Lockett was executed by the state of Oklahoma using a three-drug combination of 100 mg of midazolam followed by a paralytic and potassium chloride. State officials halted the execution after Mr. Lockett awoke during administration of the second and third drugs, but he died 40 minutes after the procedure commenced.  After Oklahoma attempted to abort Mr. Lockett's execution, it canceled the execution of another man who was scheduled to be executed the same day.  After these events, the Oklahoma Department of Public Safety concluded that executions should be spaced at least seven days apart.

3.     On July 23, 2014, Joseph Wood was executed by the state of Arizona using a two-drug combination of 750 mg midazolam and 750 mg hydromorphone.  Mr. Wood's execution lasted two hours before he died, and Mr. Wood reportedly gasped and snorted during the execution.

4.     On December 8, 2016, Ronald Bert Smith was executed by the state of Alabama using a three-drug combination of 500 mg of midazolam, followed by 600 mg of rocuronium

bromide, followed by 240 mEq of potassium chloride. Mr. Smith's execution lasted approximately 34 minutes, and Mr. Smith reportedly struggled for breath as he heaved and coughed for approximately 13 minutes. Mr. Smith's attorney, Spencer Hahn, who was present at the execution, reported that:

> [T]wo minutes after the midazolam began flowing, Smith began having "regular asthmatic-sounding barking coughs every ten seconds or so." "He also lifted his head and looked around, moved his arms, clenched his left hand, and moved his lips in what appeared to be an attempt to say something. [His] eyes never closed, and he moved and coughed regularly throughout approximately the next fifteen minutes." Smith was awake after the first consciousness check, "as he was still moving his head, hands and arms, coughing, and attempting to speak." After the second consciousness check, Smith's "eyes remained open" (despite a guard's attempt to push his left eye closed), and Smith "moved his right arm." "Shortly thereafter, they must have administered the paralytic, as [Smith's] breathing became very shallow and he stopped moving. His eyes remained open, with the left eye opening further as his breathing became imperceptible."

(Dkt. No. 2-2, ¶ 15).

Some states have abandoned the use of midazolam in executions: Kentucky banned the use of midazolam in lethal injection in 2014; Arizona recently agreed to never use midazolam as an execution drug again; and Florida eliminated midazolam from its most recent execution protocol (*Id.*, ¶ 16).

### C. Arkansas's Supply of Drugs For Lethal Injection

Arkansas law provides that drugs used in lethal injection shall be:

(1) Approved by the United States Food and Drug Administration and made by a manufacturer approved by the United States Food and Drug Administration;

(2) Obtained from a facility registered with the United States Food and Drug Administration; or

(3) Obtained from a compounding pharmacy that has been accredited by a national organization that accredits compounding pharmacies.

Ark. Code Ann. § 5-4-617(d).

Director Kelley obtained the ADC's supply of midazolam sometime in the summer of 2015, and its expiration date is April of 2017. Director Kelley obtained the ADC's supply of vecuronium bromide in July of 2016, and its expiration date is March 1, 2018. Director Kelley obtained the ADC's supply of potassium chloride in March of 2017, and its expiration date is August 2018.

Director Kelley tested the ADC's supply of midazolam in November of 2015 and provided plaintiffs with a redacted report showing the midazolam was sufficiently potent at that time. Director Kelley tested the current supply of vecuronium bromide in July of 2016, but she has not provided plaintiffs with any record of the results. Plaintiffs do not know if Director Kelley has tested the ADC's supply of potassium chloride.

### D. Policies Governing The Execution

Mr. DePriest informed plaintiffs' counsel that, if a plaintiff has more than one attorney, the ADC would allow only one attorney to witness the execution. Plaintiff's attorney will not have access to a phone while witnessing the execution. Should the attorney leave to gain access to a phone, then the attorney will not be permitted to return to the viewing room. Director Kelley refused to provide plaintiffs with a current copy of the ADC's execution policies, but plaintiffs acquired an earlier version of the policy, dated May 22, 2008, which placed no restrictions on attorney viewing or phone access during the execution. Under the current execution policy, witnesses, including counsel, are not permitted to view the execution until the IV lines have been affixed to the prisoner and the drugs are ready to flow. Execution team members have discretion to pull a curtain during drug flow in the event of a problem, and counsel cannot view events in the execution chamber when the curtain is pulled. Counsel cannot hear anything in the execution room during the execution, as audio to the witness room is turned off after the inmate's last words.

## II. Legal Standard

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556). "While a complaint attacked by a [Federal] Rule [of Civil Procedure] 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555 (alteration in original) (citations omitted). "When ruling on a motion to dismiss, the district court must accept the allegations contained in the complaint as true and all reasonable inferences from the complaint must be drawn in favor of the nonmoving party." *Young*, 244 F.3d at 627. In determining the sufficiency of a complaint, courts review the complaint itself and any exhibits attached to the complaint. *Zink v. Lombardi*, 783 F.3d 1089, 1099 (8th Cir.) (en banc), *cert. denied*, 135 S. Ct. 2941 (2015) (citing *Meehan v. United Consumers Club Franchising Corp.*, 312 F.3d 909, 913 (8th Cir. 2002)).

## III. Discussion

Plaintiffs bring seven claims against Governor Hutchinson and Director Kelley and seek declaratory and injunctive relief.[3] Governor Hutchinson and Director Kelley move to dismiss all of plaintiffs' claims under the Eleventh Amendment (Dkt. No. 27, at 21). "The Eleventh

---

[3] Mr. Nooner, who does not have a scheduled execution date at this time, joins in some, but not all of plaintiffs' claims.

Amendment confirms the sovereign status of the States by shielding them from suits by individuals absent their consent." *Frew ex rel. Frew v. Hawkins*, 540 U.S. 431, 437 (2004) (citing *Seminole Tribe of Fla. v. Florida,* 517 U.S. 44, 54 (1996)). However, "[t]o ensure the enforcement of federal law . . . the Eleventh Amendment permits suits for *prospective* injunctive relief against state officials acting in violation of federal law." *Id.* (emphasis added) (citing *Ex parte Young*, 209 U.S. 123 (1908)). "A state official is amenable to suit to enjoin the enforcement of an unconstitutional state statute only if the officer has 'some connection with the enforcement of the act.'" *Digital Recognition Network, Inc. v. Hutchinson*, 803 F.3d 952, 960 (8th Cir. 2015) (citing *Ex Parte Young,* 209 U.S. at 157).

To determine whether an action against state officials in their official capacities avoids an Eleventh Amendment bar to suit, "a court need only conduct a 'straightforward inquiry into whether [the] complaint alleges an ongoing violation of federal law and seeks relief properly characterized as prospective.'" *Verizon Maryland, Inc. v. Pub. Serv. Comm'n of Maryland*, 535 U.S. 635, 645 (2002) (quoting *Idaho v. Coeur d'Alene Tribe of Idaho,* 521 U.S. 261, 296 (1997) (O'Connor, J., concurring). In this case, plaintiffs seek declaratory relief that the state's execution schedule, execution protocol, and other execution policies violate federal law (Dkt. No. 2-2, at 61-63). They also seek preliminary and permanent injunctive relief that would enjoin the state from proceeding with their impending executions (*Id.*). Plaintiffs' prayer for relief "clearly satisfies [the Court's] 'straightforward inquiry.'" *Verizon Maryland, Inc.*, 535 U.S. at 645.

Furthermore, Governor Hutchinson and Director Kelley, who are sued in their official capacities, are amenable to suit in this action. Plaintiffs allege, and defendants do not dispute, that Director Kelley is statutorily responsible for: (1) ordering the dispensation and administration of the drug or drugs for the purpose of carrying out the lethal-injection procedure; (2) conducting an

execution for a sentence of death or designating some assistant or assistants to do so; and (3) developing logistical procedures necessary to carry out the sentence of death (Dkt. No. 2-2, ¶ 6). Plaintiffs allege, and defendants do not dispute, that Governor Hutchinson is statutorily responsible for setting execution dates, and that he has the power to suspend the execution of a judgment of death (*Id.*, ¶ 7). Therefore, Director Kelley and Governor Hutchinson can be sued for prospective injunctive and declaratory relief in this action, as they have "'some connection with the enforcement of the act.'" *Digital Recognition Network, Inc.*, 803 F.3d at 960 (citing *Ex Parte Young,* 209 U.S. at 157).

Governor Hutchinson and Director Kelley also move to dismiss each of plaintiffs' individual claims for specific reasons. The Court will separately address each claim.

### A. Claim One: Execution Schedule And The Right To Counsel Under 18 U.S.C. § 3599

Counsel for the plaintiffs were appointed pursuant to 18 U.S.C. § 3599,[4] which provides, in relevant part:

> Notwithstanding any other provision of law to the contrary, in every criminal action in which a defendant is charged with a crime which may be punishable by death, a defendant who is or becomes financially unable to obtain adequate representation or investigative, expert, or other reasonably necessary services at any time either
>
> (A) before judgment; or
>
> (B) after the entry of a judgment imposing a sentence of death but before the execution of that judgment;
>
> shall be entitled to the appointment of one or more attorneys and the furnishing of such other services in accordance with subsections (b) through (f).

18 U.S.C. § 3599(a)(1).

---

[4] *See* Dkt. No. 1, ¶¶ 36-44.

Plaintiffs allege that § 3599 guarantees them the right to "effective representation of counsel" and that the state's compressed execution schedule denies plaintiffs this right (Dkt. No. 2, ¶ 32). [5] Plaintiffs argue that the compressed execution schedule creates an intolerably-high risk of undermining the effectiveness of their representation, thereby "drain[ing] all meaning from § 3599 and the orders of appointment entered by the federal courts." (Dkt. No. 4, at 10). Plaintiffs assert that they are likely to succeed on their claim that the schedule "violates their right to end-stage counsel under §3599," thereby justifying this Court's issuance of a preliminary injunction (Dkt. No. 4, at 10).

With respect to the claim arising under § 3599, defendants posit four arguments in support of their motion to dismiss (Dkt. No. 26). First, defendants argue that § 3599 does not authorize actions brought under 42 U.S.C. § 1983. Second, defendants argue that § 3599 does not afford a protected right to effective assistance of counsel. Third, defendants argue, in the alternative, that any claim for such a putative right is not ripe. Fourth, also in the alternative, defendants argue that plaintiffs are not in fact suffering from ineffective assistance of counsel (Dkt. No. 27, at 23-24). The Court will address each contention in turn.

### 1. Whether § 3599 Authorizes Actions Under 42 U.S.C. § 1983

Where the construction of a statute is at issue, "our analysis begins, as always, with the statutory text." *Argus Leader Media v. U.S. Dept. of Agric.*, 740 F.3d 1172, 1175 (8th Cir. 2014) (quoting *United States v. Gonzales*, 520 U.S. 1, 4 (1997)). For purposes of the present action, the most pertinent provision of the statute is subsection (e):

> Unless replaced by similarly qualified counsel upon the attorney's own motion or upon motion of the defendant, each attorney so appointed shall represent the defendant throughout *every subsequent stage of available judicial proceedings*, including pretrial proceedings, trial, sentencing, motions for new trial, appeals,

---

[5] Mr. Nooner does not join this claim (Dkt. No. 2-2, at 12).

applications for writ of certiorari to the Supreme Court of the United States, and all available post-conviction process, *together with applications for stays of executions and other appropriate motions and procedures*, and shall also represent the defendant in such competency proceedings and proceedings for executive or other clemency as may be available to the defendant.

18 U.S.C. § 3599(e) (emphasis added).

In *Harbison v. Bell*, the Supreme Court engaged in a thorough interpretation of § 3599. 556 U.S. 180 (2009). While the holding concerns the availability of counsel for state clemency proceedings, this Court finds much of the statutory construction analysis in *Harbison* to be applicable to resolution of the present action. "Under a straightforward reading of the statute, subsection (a)(2) triggers the appointment of counsel for habeas petitioners, and subsection (e) governs the scope of appointed counsel's duties." *Harbison*, 556 U.S. at 185. "Subsection (a)(2) refers to state litigants, and it in turn provides that subsection (e) applies to such litigants." *Id.* at 187.

"Subsection (e) emphasizes continuity of counsel." *Id.* at 193. "It is entirely plausible that Congress did not want condemned men and women to be abandoned by their counsel at the last moment and left to navigate the sometimes labyrinthine clemency process from their jail cells." *Id.* at 194 (quoting *Hain v. Mullin*, 436 F.3d 1168, 1175 (10th Cir. 2006) (en banc) (internal quotations omitted)). "In authorizing federally funded counsel to represent their state clients in clemency proceedings, Congress ensured that no prisoner would be put to death without meaningful access to the 'fail-safe' of our justice system." *Harbison*, 556 U.S. at 194 (quoting *Herrera v. Collins*, 506 U.S. 390, 415 (1993)).

The first issue to be addressed is defendants' jurisdictional claim. Defendants appear to contend that plaintiffs fail to state a claim because actions arising under § 1983 are not authorized by § 3599. Defendants contend that counsel appointed under § 3599 are "only authorized to

represent prisoners in criminal, habeas, and clemency proceedings in federal court" (Dkt. No. 27, at 24-26). Defendants emphasize the language of subsection (a)(1), which provides that a defendant shall be entitled to appointment of an attorney in "every criminal action in which a defendant is charged with a crime which may be punishable by death." 18 U.S.C. § 3599(a)(1). This Court notes that the statute expressly authorizes civil actions arising under 28 U.S.C. §§ 2254 or 2255. *See* 18 U.S.C. § 3599(a)(2). Also, as *Harbison* makes clear, § 3599 authorizes representation in non-judicial proceedings such as state clemency proceedings. 556 U.S. at 194.

The Supreme Court has ratified the use of 42 U.S.C. § 1983, as compared to petitions for habeas corpus under 28 U.S.C. §§ 2254 or 2255, as an appropriate proceeding to seek a stay of execution based on the allegation that a method of lethal injection employed by a State would violate the Eighth Amendment. *See generally Hill v. McDonough*, 547 U.S. 573 (2006). The unanimous court in *Hill* discussed the scope of § 1983 in the context of a request for a stay of execution:

> Filing an action that can proceed under § 1983 does not entitle the complainant to an order staying an execution as a matter of course. Both the state and the victims of crime have an important interest in the timely enforcement of a sentence. Our conclusions today do not diminish that interest, nor do they deprive federal courts of the means to protect it. We state again as we did in *Nelson*, that a stay of execution is an equitable remedy. It is not available as a matter of right, and equity must be sensitive to the State's strong interest in enforcing its criminal judgments without undue interference from federal courts. Thus, like other stay applicants, inmates seeking time to challenge the manner in which the State plans to execute them must satisfy all of the requirements for a stay, including showing a significant possibility of success on the merits.

*Hill*, 547 U.S. at 583-584 (2006) (citing *Nelson v. Campbell*, 541 U.S. 637, 649-650 (2004) (internal citations omitted)).

Moreover, this action is not forbidden by *Heck v. Humphrey*, which held that § 1983 does not permit a prisoner to bring a cause of action challenging the constitutionality of his conviction

in a suit for damages under § 1983. 512 U.S. 477, 488 (1994). In *Nelson*, the Supreme Court determined that an action arising under § 1983 is an appropriate proceeding to challenge an execution protocol. 541 U.S. 637 (2004). "Here, as in *Nelson*, the action if successful would not necessarily prevent the State from executing him by lethal injection." *Hill*, 547 U.S. at 580 (citing *Nelson*, 541 U.S. at 647). Consequently, "granting relief would not imply the unlawfulness of the lethal injection sentence." *Hill*, 547 U.S. at 580. In *Glossip v. Gross*, the Court reaffirmed that "a method-of-execution claim must be brought under § 1983 because such a claim does not attack the validity of a death sentence." 135 S.Ct. 2726, 2738 (2015) (citing *Hill*, 547 U.S. at 573).

In support of dismissal, defendants rely upon *Stevens v. Redwing* for the general proposition that "a pro se litigant has no statutory or constitutional right to have counsel appointed in a civil case." 146 F.3d 538, 546 (8th Cir. 1998) (citing *Wiggins v. Sargent*, 753 F.2d 663, 668 (8th Cir. 1985)). Such reliance is misplaced. In each case upon which defendants rely, a *pro se* litigant sought the discretionary appointment of counsel in a civil action. Neither case cited by defendants concerned the death penalty context. The Court does not construe these precedents as foreclosing the plaintiffs' ability to claim a right to counsel and to bring a § 1983 action seeking a stay of execution under 18 U.S.C. § 3599.

Defendants ask this Court to confine the holding in *Harbison* to the state clemency context. Defendants cite the rationale employed by the concurrence, which would foreclose § 3599's authorization of "a challenge to prison conditions." *Harbison v. Bell*, 556 U.S. 180, 195 (2009) (Roberts, C.J., concurring). However, this rationale was not adopted by the majority in *Harbison* and does not bind this Court, and the Court does not construe the statute so narrowly. Instead, the Court determines that, in enacting § 3599, Congress intended to provide end-stage counsel to prisoners sentenced to death. *See Harbison*, 556 U.S. at 194.

"It is a settled rule of statutory construction that 'we must, if possible, construe a statute to give every word some operative effect.'" *DeBough v. Shulman*, 799 F.3d 1210, 1214 (8th Cir. 2015) (quoting *Cooper Indus., Inc. v. Aviall Servs., Inc.*, 543 U.S. 157, 167 (2004)). "We decline to render part of a statute entirely superfluous." *Debough*, 799 F.3d at 1214 (citing *Knight v. Commissioner*, 552 U.S. 181, 190 (2008)). In the present action, each plaintiff was appointed counsel to represent individuals sentenced to death "throughout every subsequent stage of available judicial proceedings." 18 U.S.C. § 3599(e). This subsection provides a list of such available judicial proceedings that expressly contains both "executive or other clemency," "applications for stays of execution," and "other appropriate motions and procedures." In the light of the Supreme Court's decisions in *Hill* and *Nelson*, the Court determines that the present action constitutes an "application for stay of execution" within the meaning of § 3599. It is unclear to this Court how defendants' proposed construction of the § 3599 would allow for a petitioner to apply for a stay of execution other than in the habeas context, which is provided for elsewhere in § 3599. *See* 18 U.S.C. § 3599(a)(2). Moreover, defendants' proposed construction would afford no method for a petitioner to apply for a stay of execution during the course of the execution itself, when a petitioner's ability to seek such relief could be exercised only through counsel.

The balance of persuasive authority supports this Court's interpretation. In their response in opposition to the motion to dismiss, plaintiffs cite decisions from other circuits that authorize plaintiffs to bring a § 1983 claim seeking a stay of execution pursuant to § 3599(e) (Dkt. No. 31, at 5-6).[6] In *Hooper v. Jones*, the Tenth Circuit decided that § 3599(e) permitted the compensation of appointed attorneys who pursued a lethal injection challenge under § 1983:

---

[6] The Court notes that while the Fifth Circuit case cited by plaintiffs discusses § 3599 in the context of a stay of execution, it does not make reference to the applicability of 42 U.S.C. § 1983. *See generally Battaglia v. Stephens*, 824 F.3d 470 (5th Cir. 2016).

We see no meaningful distinction, for jurisdictional purposes, between the question of whether counsel's CJA appointment encompassed and hence permitted compensation for the pursuit of a lethal injection challenge under § 1983, and the controversy in *Harbison* as to whether counsel's CJA appointment encompassed the pursuit of relief in a state clemency proceeding.

*Hooper v. Jones*, 536 Fed.Appx. 796, 799 (10th Cir. 2013).

In *Hooper*, the Tenth Circuit determined that counsel "pursued an *appropriate procedure* seeking a *stay of execution*—a course that tracks the specific language in § 3599(e) identifying judicial proceedings to which a CJA appointment properly extends." 536 Fed.Appx. at 800 (emphasis in original). The Eleventh Circuit has also determined, albeit in *dicta*, that a right to bring a § 1983 claim seeking a stay of execution is included in the right to counsel under § 3599. *Banks v. Secretary, Florida Dept. of Corrections*, 647 Fed.Appx. 910, 913 n.4 (11th Cir. 2016) ("[W]here a § 1983 is brought with or implicitly seeks a stay of execution, § 3599(e)'s express reference to 'stays of execution' displaces the CJA Guidelines' generic reference to § 1983 actions to the extent that the latter would preclude all §1983 claims.")). This Court adopts the sound rationales of the Tenth and Eleventh Circuit opinions cited above.[7]

During the evidentiary hearing in this matter, and in support of their construction of § 3599, counsel for defendants cited two decisions from the Eastern District of Missouri. The first is *Link v. Luebbers*, where the court held that a § 1983 suit did not constitute "other appropriate motions and procedures" under § 3599. 830 F.Supp.2d 729 (E.D. Mo. 2011). This case addressed whether attorneys for an executed capital defendant were authorized to be paid fees pursuant to their appointment under § 3599. The Court declines to apply *Link* to the present action. The court in

---

[7] Providing additional support for this Court's determination, though not as binding authority, the Eighth Circuit Court of Appeals has previously granted a motion for appointment of counsel in a method-of-execution challenge brought under § 1983. *See Johnson v. Lombardi*, No. 15-3420, Amended Order (8th Cir. June 24, 2016).

*Link* addressed only whether a similar § 1983 action constituted an "other appropriate motion[] or procedure[]" under § 3599. *Link* does not address whether such an action constituted an "application for stay of execution." The Court determines that the present action is an application for stay of execution for purposes of § 3599(e). *See Hill*, 547 U.S. at 583; *see also Nelson*, 541 U.S. at 649-650. Likewise, *Winfield v. Steele*, the other decision cited at the hearing by defendants, does not guide the Court's interpretation of § 3599. 2015 WL 1879545 (E.D. Mo. 2015). In *Winfield*, the court invited the United States to file a brief as *amicus curiae* to determine whether § 3599 permitted compensation to appointed counsel who brought a method-of-execution challenge under § 1983. *Id.* at *3. The court did not reach a conclusion deciding the applicability of § 3599 to a method-of-execution claim arising under § 1983. *Id.*

In sum, the determination of the applicability of § 3599 to the present action turns on whether this action constitutes an "application for stay of execution" as provided by subsection (e). With the holdings of the Supreme Court and Circuit Courts of Appeals in mind, the Court concludes that the present action does. The Court determines that § 3599(e) authorizes appointed counsel to bring a claim arising under § 1983 as an application for stay of execution. Consequently, for purposes of the motion to dismiss, whether the plaintiffs have stated an adequate claim upon which relief may be granted depends on whether there is a substantive right to counsel protected by § 3599.

### 2. Whether § 3599 Affords a Right to Effective Assistance of Counsel

"Our cases establish that the right to appointed counsel extends to the first appeal of right, and no further." *Pennsylvania v. Finley*, 481 U.S. 551, 554 (1987). Where a prisoner in a post-conviction proceeding has no constitutional right to counsel, then that prisoner "could not be deprived of the effective assistance of counsel." *Wainwright v. Torna*, 455 U.S. 586, 588 (1982).

"[I]t is the source of the right to a lawyer's assistance, combined with the nature of the proceeding that controls the constitutional question. In this case, respondent's access to a lawyer is the result of the State's decision, not the command of the United States Constitution." *Finley*, at 555-56. In the present action, the source of this alleged right to the effective assistance of counsel is a statute enacted by Congress, not the United States Constitution. *See* 18 U.S.C. § 3599. Therefore, if there is a right to effective assistance to counsel created by § 3599, such a right must be a statutory—rather than constitutional—right. Section 3599 by its terms does not expressly grant a litigant the right to the effective assistance of appointed counsel. Thus, a plain reading of the statute seems to foreclose plaintiffs' right to the relief they seek. The only alternative basis for a right to the effective assistance of counsel would be an implied right of action contained within the statutory text.

"In limited circumstances, courts may determine that 'a private remedy is implicit in a statute not expressly providing one.'" *Great Lakes Gas Transmission Limited Partnership v. Essar Steel Minnesota LLC*, 843 F.3d 325, 329 (8th Cir. 2016) (quoting *Cort v. Ash*, 422 U.S. 66, 78 (1975)). To determine whether § 3599 creates an implicit cause of action, "the central inquiry [is] whether Congress intended to create, either expressly or by implication, a private cause of action." *Touche Ross & Co. v. Redington*, 442 U.S. 560, 575 (1979). The plaintiffs cite *Martel v. Clair* for the proposition that "in spinning off § 3599, Congress enacted a set of reforms to improve the quality of lawyering in capital litigation." 565 U.S. 648, 659 (2012). In this decision, the Supreme Court noted that § 3599 "guarantees that indigent defendants in federal capital cases will receive the assistance of counsel, from pretrial proceedings through stay applications." *Id.*, at 657. "[A] statute need not draw the same lines as the Constitution." *Id.*, at 661. Rather, the object of the inquiry in *Martel* was whether § 3599 provided a statutory right in the context of substitution of

counsel, provided for in subsection (e).  In contrast with the relief sought in the present action, this right to substitution of counsel is made explicit by the terms of the statute.[8]  Indeed, this case demonstrates the ability of Congress to provide a statutory right of action by the express terms of the text.  This Court determines that the express right to substitute counsel contemplated by § 3599(e) by the Supreme Court in *Martel* disfavors a finding of an implied right of action to the effective assistance of counsel in § 3599(e).

In their response in opposition to the motion to dismiss, plaintiffs contend that the statutory right to counsel embodied in § 3599 means the right to conflict-free counsel (Dkt. No. 31, at 6-8).  In support of this contention, plaintiffs cite *Christenson v. Roper*, where the Supreme Court granted a stay of execution pending disposition of the prisoner's motion for appointment of substitute counsel pursuant to § 3599(e).  135 S. Ct. 891 (2015).  Expounding on the "interests of justice" standard articulated in *Martel*, in *Christenson* the Supreme Court reversed a decision denying the motion for substitution of counsel under § 3599(e), where counsel's arguments "were directly and concededly contrary to their client's interest, and manifestly served their own professional and reputational interests."  135 S. Ct. at 895.  *Christenson* and *Martel* both apply to motions to substitute counsel sought "in the interests of justice."  Here, the plaintiffs have not moved for substitution of counsel, so it is not clear that either holding applies to their claim.  The Court does not interpret either *Christenson* or *Martel* to hold that § 3599 provides a statutory right to the effective assistance of counsel.

---

[8] Section 3599(e) provides for the substitution of counsel "upon the attorney's own motion or upon motion of the defendant."  In *Martel*, the issue before the Court was which standard to apply with respect to resolving the motion for substitution of counsel.  The Court ultimately determined that the district court did not abuse its discretion in denying the *habeas* petitioner's motion to substitute.

In construing § 3599(e) the Court in *Martel* also expressed its "prefer[ence] to copy something familiar than concoct something novel." 565 U.S. at 660. Such a preference "enables courts to rely on experience and precedent, with a standard already known to work effectively." *Id.,* at 661. Faced with a dearth of controlling precedent interpreting whether § 3599 guarantees a right to effective assistance of counsel, this Court opts to look to analogous statutory or procedural rights vested in state law for guidance on how to resolve this inquiry.

"There is no constitutional right to an attorney in state post-conviction proceedings." *Coleman v. Thompson*, 501 U.S. 722, 752 (1991) (citing *Finley*, 481 U.S., at 554)). Applying *Finley* in an analogous context, the Eighth Circuit determined that "a state's decision to grant a right to counsel in post-conviction proceedings does not give rise to a due process claim if counsel performs deficiently." *Simpson v. Norris*, 490 F.3d 1029, 1034 (8th Cir. 2007). At issue before the Eighth Circuit in *Simpson* was Arkansas Rule of Criminal Procedure 37.5, which required the state to appoint an attorney to represent a capital defendant in post-conviction proceedings. *Id.*, at 1032. In briefing on this point, neither party explains why the Court should analyze the statutory rights granted by § 3599 as meaningfully distinguishable from those afforded by analogous state procedures. The Court does not see good cause to do so.

For the reasons stated above, this Court declines to infer such a right of action from the statutory text of § 3599. Consequently, the Court holds that § 3599 does not afford a prisoner, though entitled to appointment of counsel pursuant to its provisions, a statutory right to the effective assistance of that counsel. There being no constitutional or statutory right to the effective assistance of counsel pursuant to § 3599, the Court determines that Claim I does not adequately state a claim upon which relief may be granted. Therefore, the Court grants defendants' motion to dismiss with respect to Claim I. Because the Court dismisses plaintiffs' Claim I for these

reasons, the Court declines to reach the parties' other arguments regarding this claim, including whether the claim is ripe for adjudication and whether plaintiffs suffer from ineffective assistance of counsel.

### B.    Claim Two:  Execution Schedule And The Eighth Amendment

In their second claim for relief, plaintiffs argue that the "compressed schedule" of their executions violates the Eighth Amendment's prohibition of cruel and unusual punishment (Dkt. No. 2-2, at 25). [9]  Plaintiffs contend that the execution schedule set by Governor Hutchinson violates the Eighth Amendment under the Supreme Court's "evolving standards of decency" test (*Id.*, at 33).  They also argue that the compressed scheduling of eight executions in 11 days "poses an unnecessary and objectively intolerable risk of substantial harm that is sure or very likely to occur[,]" and that, "[i]f Defendants proceed with this schedule, they are doing so in deliberate indifference to Plaintiffs' constitutional rights" (*Id.*, at 26; 29).  Governor Hutchinson and Director Kelley move to dismiss this claim for three reasons.  Each will be discussed in turn.

### 1.    Standing

Governor Hutchinson and Director Kelley argue that the Court must dismiss this claim because "[t]he Prisoners each lack standing to pursue their Eighth-Amendment claim that the scheduling of *other executions* near in time to their own violates the Eighth Amendment's evolving standards of decency" (Dkt. No. 27, at 34-35) (emphasis in original).  They contend that "[t]he Eighth Amendment is concerned only with each individual Prisoner's personal right to be free from cruel and unusual punishment, which has nothing to do with any other executions or other facts in the broader world that are not directly relevant to an individual Prisoner's execution" (*Id.*, at 35-36).  According to Governor Hutchinson and Director Kelley, "[a] complaint that the State

---

[9] Mr. Nooner does not join this claim (Dkt. No. 2-2, at 25).

should not be putting multiple people to death within days of each other is exactly the type of generalized grievance that does not give rise to Article III standing" (*Id.*, at 35).

Defendants' challenge to standing appears to be limited to plaintiffs' evolving standards of decency argument; defendants do not appear to argue that plaintiffs lack standing to the extent that plaintiffs contend that the compressed execution schedule presents an objectively intolerable risk of serious harm that is sure or very likely to occur. Therefore, the Court will limit its standing analysis to the plaintiffs' evolving standards of decency claim.

"Article III, § 2, of the Constitution restricts the federal 'judicial [p]ower' to the resolution of 'Cases' and 'Controversies.'" *Sprint Commc'ns Co., L.P. v. APCC Servs., Inc.*, 554 U.S. 269, 273 (2008). Plaintiffs have the burden of establishing that they have standing. *Id.* To demonstrate that they have "Article III" standing, plaintiffs must demonstrate:

> (1) [A]n injury in fact (*i.e.,* a "concrete and particularized" invasion of a "legally protected interest"); (2) causation (*i.e.,* a "'fairly . . . trace[able]'" connection between the alleged injury in fact and the alleged conduct of the defendant); and (3) redressability (*i.e.,* it is "'likely'" and not "merely 'speculative'" that the plaintiff's injury will be remedied by the relief plaintiff seeks in bringing suit).

*Id.* at 273-74 (quoting *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560–61 (1992)).

In addition to the three "irreducible constitutional minimum" requirements of Article III standing, *Lujan,* 504 U.S. at 560, courts weigh other "prudential" considerations in determining whether plaintiffs have standing. *United States v. Windsor*, 133 S. Ct. 2675, 2685 (2013) (explaining the distinction between "the jurisdictional requirements of Article III and the prudential limits on its exercise").

The Court finds that plaintiffs have standing to bring their claim that the compressed execution schedule violates their rights under the Eighth Amendment.[10] The second and third elements of Article III standing are easily satisfied: the cause of the alleged injury is fairly traced to Governor Hutchinson's decision to schedule plaintiffs' executions, and plaintiffs' injury would be remedied by an Order from this Court granting an injunction that prevents their executions from occurring on the defendants' proposed schedule. The Court also finds that plaintiffs can demonstrate a concrete and particularized invasion of a legally-protected interest. This is not a generalized grievance because the alleged harm is particular to the eight plaintiffs scheduled for execution, rather than harm "shared in substantially equal measure by all or a large class of citizens." *Warth v. Seldin*, 422 U.S. 490, 499 (1975). This also is not a case where plaintiffs are resting their "claim[s] to relief on the legal rights or interests of third parties." *Id.* While plaintiffs share the same alleged injury, they bring this action to seek to redress the alleged imminent injury that they each will suffer individually.

Plaintiffs have Article III standing to bring their evolving standards of decency claim based on the compressed execution schedule. Governor Hutchinson and Director Kelley do not raise any prudential standing considerations that would bar consideration of plaintiffs' claims. Therefore, the Court finds that plaintiffs, excluding Mr. Nooner and potentially Mr. McGehee, have standing to bring this claim.

### 2. Evolving Standards Of Decency

Governor Hutchinson and Director Kelley argue that, even if plaintiffs have standing, they "fail[] to state a claim that the execution schedule violates evolving standards of decency under

---

[10] Mr. McGehee's claim may become moot if defendants do not appeal Judge Marshall's Order granting Mr. McGehee a stay of execution or if Judge Marshall's decision is affirmed on appeal.

the Eighth Amendment" (Dkt. No. 27, at 39).  Plaintiffs contend that executing eight men in 11 days violates the Eighth Amendment because it is "contrary to evolving standards of human decency" (Dkt. No. 2-2, ¶ 76).  In support of this claim, plaintiffs allege that "no state (apart from Oklahoma's failed attempt in 2014, which in itself is a cautionary tale) has conducted multiple executions in one day in seventeen years.  And no state in modem history has attempted to execute so many men in such a short time period" (*Id.*, ¶ 92).  They note that the Missouri Supreme Court recently adopted a rule providing that the state's "department of corrections shall not be required to execute more than one warrant of execution per month" (*Id.*, ¶ 91) (citing Mo. S. Ct. R. 30.30(f)).  Plaintiffs conclude that "[o]ur country does not participate in mass executions. Execution schedules such as the one Defendants contemplate do not respect the innate human dignity of the condemned" (*Id.*).

Defendants contend that plaintiffs' evolving standards of decency claim:

[R]uns headlong into an insurmountable obstacle—the "evolving standards of decency that mark the progress of a maturing society" protected by the Eighth Amendment under *Estelle v. Gamble*, 429 U.S. 97, 102 (1976) is *personal* and *unique* to the individual capital defendant to be executed and has nothing to do with surrounding circumstances such as whether other capital defendants are scheduled to be executed or not. . . . [S]urrounding and fully extraneous circumstances such as whether *other* capital defendants are scheduled to be executed are completely irrelevant to the inquiry.

(Dkt. No. 27, at 36-37).  Defendants also offer information from the searchable execution database on the website for the Death Penalty Information Center, which they argue undermines plaintiffs' "bare assertion that states have rarely held multiple executions on the same day or on consecutive days or in the same week" (*Id.*, at 37).  They urge the Court to take judicial notice of this information so that it may be considered at the motion to dismiss stage (*Id.*).

The Court finds that defendants' interpretation of the Supreme Court's evolving standards of decency cases is too narrow.  On multiple occasions, the Court has considered our nation's

evolving standards of decency to hold that the death penalty cannot be imposed upon classes of offenders. *See Roper v. Simmons*, 543 U.S. 551, 568–69 (2005) (holding that the death penalty may not be imposed on juvenile offenders); *Ford*, 477 U.S. at 410 ("The Eighth Amendment prohibits the State from inflicting the penalty of death upon a prisoner who is insane."). Therefore, while the Court has serious doubts about this claim, which the Court will address in its Order on plaintiffs' motion for a preliminary injunction, the Court denies defendants' motion to dismiss this claim.

### 3.    Method Of Execution

Governor Hutchinson and Director Kelley argue that, to the extent that plaintiffs claim that the compressed schedule of their executions is an impermissible method of execution, plaintiffs fail to state a claim (Dkt. No. 27, at 43). Two Supreme Court decisions control the Court's analysis of this claim. In *Baze v. Rees*, 553 U.S. 35 (2008), the controlling opinion states that, to challenge successfully a state's lethal injection protocol under the Eighth Amendment, a condemned prisoner must: (1) "establish[] that the State's lethal injection protocol creates a demonstrated risk of severe pain[;]" and (2) "show that the risk is substantial when compared to the known and available alternatives." *Baze*, 553 U.S. at 61. In *Glossip v. Gross*, 135 S. Ct. 2726, *reh'g denied*, 136 S. Ct. 20 (2015), the Court reaffirmed that "[t]he controlling opinion in *Baze* outlined what a prisoner must establish to succeed on an Eighth Amendment method-of-execution claim." *Glossip*, 135 S. Ct. at 2737.

Defendants argue that plaintiffs' complaint fails to contain sufficient factual allegations to state a method of execution claim based solely on the compressed execution schedule. Specifically, defendants assert that the plaintiffs fail to plead sufficient facts to state the first prong of *Baze*/*Glossip*: that the compressed execution schedule "creates an objectively intolerable risk

of substantial harm that is sure or very likely to occur" (Dkt. No. 27, at 39-40). Citing three cases from the Eighth Circuit Court of Appeals, defendants argue that "[b]inding precedent forecloses the Prisoners' speculative Eighth-Amendment challenge against the execution schedule" (*Id.*, at 40) (citing *Zink v. Lombardi*, 783 F.3d 1089, 1100-03 (8th Cir. 2015); *Clemons v. Crawford*, 585 F.3d 1119, 1125-27 (8th Cir. 2009); *Taylor v. Crawford,* 487 F.3d 1072, 1080 (8th Cir. 2007)).

In *Zink v. Lombardi*, the Eighth Circuit found that plaintiffs' second-amended complaint, which challenged Missouri's use of compounded pentobarbital in its lethal injection protocol, failed to state an Eighth Amendment claim because the prisoners "failed to include factual allegations . . . which permit the reasonable inference that Missouri's lethal-injection protocol is '*sure or very likely*' to create a substantial risk of severe pain." *Zink*, 783 F.3d at 1102 (emphasis in original). In their second amended complaint, the prisoners in *Zink* identified four potential risks that they claimed "could result from the State's use of compounded pentobarbital." *Id.*, at 1099. First, they alleged that the compounded pentobarbital could be sub-potent, which "could fail to cause the death of the prisoner, leaving him unconscious with a lower rate of respiration, causing irreversible brain damage[;]" or super-potent, which "could result in suffocation and difficulty breathing before losing consciousness." *Id.*, at 1099-100. Second, they alleged that compounded pentobarbital "could easily be contaminated with allergens, toxins, bacteria, or fungus" and "that the injection of pentobarbital so contaminated could cause a painful allergic reaction in the blood." *Id.* at 1100. Third, they alleged "that foreign particles could contaminate the compounded pentobarbital, creating the risk that a prisoner could experience serious pain upon injection or could suffer from a pulmonary embolism." *Id.* Fourth, they alleged that "the drug may not maintain the proper pH, potentially resulting in numerous complications, most notably severe burning upon injection or a pulmonary embolism." *Id.* The prisoners also alleged that

"improper storage of the pentobarbital and use beyond its expiration date could exacerbate the potential for these harms." *Id.* The Eighth Circuit found that these allegations failed to state an Eighth Amendment method of execution claim under the first prong of *Baze* because the plaintiffs relied "entirely on hypothetical and speculative harms that, if they were to occur, would only result from isolated mishaps." *Id.*, at 1102.

Defendants maintain that this Court should apply the Eight Circuit's heightened pleading standard in *Zink* to plaintiffs' complaint.[11] As the Court will explain in more detail later in this Order, even if the Eighth Circuit adopted a heightened pleading requirement for a method of execution claim in *Zink*, this Court concludes that such a requirement is inconsistent with *Glossip*, which the Supreme Court issued a few months later. Further, regardless of the pleading standard applied—*Zink* or *Glossip*—the Court finds that plaintiffs' factual allegations pertaining to the risks posed by defendants' compressed execution schedule, standing alone, are too speculative to survive a motion to dismiss.

In their complaint, plaintiffs allege that "[a]ny execution imposes an extraordinary amount of stress on corrections officers and others involved in the elaborate process" and that "[t]he stress is multiplied when multiple executions are scheduled for the same day, or when executions are scheduled without a reasonable period for rest, recovery, and assessment" (Dkt. No. 2-2, ¶¶ 78-79). Relying on a declaration from a former corrections official, which is attached to their complaint, plaintiffs claim that "the stress placed on corrections officers during a ten-day string of

_____

[11] In *Zink*, the majority opinion disputed that it was adopting a heightened pleading standard. 783 F.3d at 1104 ("We disagree with Judge Shepherd and the dissenting judges that requiring a plaintiff to plead the elements of an Eighth Amendment claim as defined in *Baze* is a "heightened pleading requirement" that exceeds the requirements of Rule 8 as explained in *Iqbal* and *Twombly*.").

executions will heighten physical and mental fatigue, will prevent any meaningful post-execution review of death-chamber procedures, and will accordingly increase the risk that the condemned inmate will suffer during the execution" (*Id.*, ¶ 80). Plaintiffs allege that the risk of a mistake is great because "[e]xecution teams are generally made up largely of staff from the department of corrections[,] . . . not hired executioners" and that execution team members "will be called upon to take part in the killing of an otherwise healthy human being, under intense scrutiny and pressure, in a process that they have little to no prior experience with, using a drug that has not been used before for executions in this State" (*Id.*, ¶¶ 81, 83).

Plaintiffs argue that the "[p]hysical, emotional, and mental fatigue of those involved in this execution schedule substantially increases the risk that a critical detail will be overlooked, that a mistake will be made, and that Plaintiffs will unconstitutionally suffer the consequences" (*Id.*, ¶ 85). Plaintiffs also cite to the fact that:

> After the botched execution of Clayton Lockett in Oklahoma, an investigation of Oklahoma's execution practices (which were substantially similar to what Arkansas has planned) found that intravenous lines in Lockett's case had been mishandled in part because of the "extra stress" from the state's scheduling of two executions on the same day. . . . The report resulting from the Lockett investigation recommended that executions not be scheduled within seven calendar days of each other in deference to manpower and facility concerns.

(*Id.*, ¶ 90). Plaintiffs note that the "Missouri Supreme Court recently adopted a rule" providing "that '[t]he department of corrections shall not be required to execute more than one warrant of execution per month'" (*Id.*, ¶ 91) (quoting Mo. S. Ct. R. 30.30(f)).

The Court finds that these alleged facts, taken as true, do not show that plaintiffs are "entitled to relief." Fed. R. Civ. P. 8 (a)(2). Plaintiffs state in their complaint that "[a]ny execution imposes an extraordinary amount of stress on corrections officers and others involved in the elaborate process" (Dkt. No. 2-2, ¶ 78). While it is certainly conceivable that executing eight

inmates in 11 days would increase the stress that corrections officials are under, which would increase the risk that the officials would make a mistake, there is no way to determine what level of stress makes the risk of mistake "objectively intolerable." *Glossip*, 135 S. Ct. at 2737. The Court grants defendants' motion to dismiss plaintiffs' second claim, to the extent plaintiffs argue that the compressed execution schedule alone presents a risk that is sure or very likely to cause serious illness and needless suffering.

## C.     Claim Three:  Midazolam And The Eighth Amendment

In their third claim for relief, plaintiffs argue that the "[u]se of midazolam as the first drug in Arkansas's three-drug protocol" violates the Eighth Amendment's prohibition of cruel and unusual punishment (Dkt. No. 2-2, ¶ 102).  Governor Hutchinson and Director Kelley argue that "[t]his claim is absolutely barred by *res judicata* and collateral estoppel and, in any event, fails to state a cognizable Eighth-Amendment claim" (Dkt. No. 27, at 43).  This Court rejects defendants' arguments for the following reasons.

### 1.     *Res Judicata*

Governor Hutchinson and Director Kelley argue that plaintiffs' midazolam claim is barred by the doctrine of *res judicata*, as plaintiffs had a full and fair opportunity to litigate their claims in their latest action in state court (Dkt. No. 27, at 43-53).  *See Kelley v. Johnson*, 496 S.W.3d 346 (Ark. 2016), *reh'g denied* (July 21, 2016), *cert. denied*, No. 16-6496, 2017 WL 670646 (U.S. Feb. 21, 2017).  In response, plaintiffs contend that *res judicata* does not apply because there has been no final judgment in the state case (Dkt. No. 31, at 15).  Plaintiffs argue that, even if there was a final judgment, *res judicata* does not apply because adjudication was on the basis of subject-matter jurisdiction and not on the merits, so as to trigger application of the doctrine under Arkansas law (*Id.*).  Plaintiffs argue that any purported final judgment was based on the Arkansas Supreme

Court's determination that the Arkansas suit was not based on proper jurisdiction because it was barred by sovereign immunity (*Id.*). Finally, plaintiffs argue that, even if there was a final judgment, "it was not one that provided plaintiffs a full and fair opportunity to litigate their midazolam claim in state court" (*Id.*).

"Under the Full Faith and Credit Act, 28 U.S.C. § 1738, federal courts 'must give to a state-court judgment the same preclusive effect as would be given that judgment under the law of the State in which the judgment was rendered.'" *Finstad v. Beresford Bancorporation, Inc.*, 831 F.3d 1009, 1013 (8th Cir. 2016) (quoting *Migra v. Warren City Sch. Dist. Bd. of Educ.*, 465 U.S. 75, 81 (1984)). As defendants argue that a previous decision from the Arkansas Supreme Court bars this action, the Court will analyze this issue under Arkansas law. *Zutz v. Nelson*, 601 F.3d 842, 847 (8th Cir. 2010).

Under Arkansas law, plaintiffs' claims are barred by *res judicata* if: "(1) the first suit resulted in a final judgment on the merits; (2) the first suit was based on proper jurisdiction; (3) the first suit was fully contested in good faith; (4) both suits involve the same claim or cause of action; and (5) both suits involve the same parties or their privies." *Baptist Health v. Murphy*, 373 S.W.3d 269, 278 (Ark. 2010). "Where a case is based on the same events as the subject matter of a previous lawsuit, *res judicata* will apply even if the subsequent lawsuit raises new legal issues and seeks additional remedies." *Hardy v. Hardy*, 380 S.W.3d 354, 358 (Ark. 2011) (citing *Beebe v. Fountain Lake School Dist.*, 231 S.W.3d 628 (Ark. 2006)).

### a.    Final Judgment

The Arkansas Supreme Court's decision in *Kelley v. Johnson* does not preclude this action because there has been no final judgment entered in that case. Defendants point to no final judgment and instead rely on their claim that the mandate operated as a final judgment for *res*

*judicata* purposes.  In *Kelley v. Johnson*, defendants took an interlocutory appeal under Arkansas Rule of Appellate Procedure 2(a)(10), as the Arkansas Supreme Court makes clear.  *Kelley*, 496 S.W.3d at 354.  Prior to that interlocutory appeal, the Pulaski County Circuit Court previously dismissed plaintiffs' claims that the method-of-execution act violated the separation-of-powers and *ex post facto* clauses of the Arkansas Constitution.  Plaintiffs were not permitted to appeal these claims under state procedural rules.  *See Ark. State Claims Comm'n v. Duit Constr. Co.*, 445 S.W.3d 496, 504 (Ark. 2014).

Under Arkansas law, a final judgment is required unless there is some basis for an interlocutory appeal.  *See Convent Corp. v. City of N. Little Rock*, 492 S.W.3d 498 (Ark. 2016).  In the absence of a final judgment, plaintiffs had no basis upon which to ground their right to appeal, and there can be no application of *res judicata* without a final judgment.  *Crockett & Brown, P.A. v. Wilson*, 864 S.W.2d 244, 246 (Ark. 1993) ("Finality for purposes of appeal is closely related to finality for purposes of *res judicata*.").  Because there has been no final judgment entered in the state case, the state court case may continue in an action parallel to this action.  *See Baptist Health*, 373 S.W.3d at 278 ("It is well settled that federal district courts and state courts are separate jurisdictions, and identical cases between the same parties can proceed simultaneously.").

### b.    Jurisdiction

The Arkansas Supreme Court's decision in *Kelley v. Johnson* also does not preclude this action under the doctrine of *res judicata* because *Kelley v. Johnson* was not "based on proper jurisdiction."  Under Arkansas law, the court acquires no jurisdiction when the suit is one against the state, and there is no waiver of sovereign immunity.  *Crossno v. Felts*, 2014 Ark. 262, at 2-3; *McCain v. Crossett Lumber Co.*, 174 S.W.2d 114, 120 (Ark. 1943) ("Neither the trial court *nor*

*this court* acquire jurisdiction in a case where the pleadings show that the suit is in effect one against the State.") (emphasis added); *Pitcock v. State*, 121 S.W. 742 (Ark. 1909). The issue of sovereign immunity is one of subject-matter jurisdiction that the appellate court is required to address on its own. *DFA v. Staton*, 942 S.W.2d 804, 805 (Ark. 1996) ("Subject-matter jurisdiction based on sovereign immunity is an issue that is *always open,* and it is the duty of an appellate court to raise the issue of its own volition."). The Arkansas Supreme Court has determined that *res judicata* does not apply when a prior claim was dismissed for lack of subject-matter jurisdiction because the doctrine "presupposes that the court in which the claim was litigated properly had jurisdiction over those proceedings." *See First Commercial Bank, N.A. v. Walker*, 969 S.W.2d 146, 150 (Ark. 1998) ("For *res judicata* to apply, the claim must have been adjudicated on the merits; this requirement presupposes that the court in which the claim was litigated properly had jurisdiction over those proceedings. Here, the chancery court rendered a judgment for the Bank on the merits, but we reversed that decision for lack of subject-matter jurisdiction. Therefore, the circuit court was not required by the doctrine of *res judicata* to adopt on remand any of the Chancellor's holdings.") (internal citations omitted).

In *Kelley v. Johnson*, the Arkansas Supreme Court found that Director Kelley and the ADC were entitled to sovereign immunity from plaintiffs' claims. 496 S.W.3d at 360.[12] The sovereign immunity "defense arises from article 5, section 20 of the Arkansas Constitution, which provides:

---

[12] The Arkansas Supreme Court, in an opinion issued by a divided court, based the holding in *Kelley v. Johnson* exclusively on sovereign immunity. As the Arkansas Supreme Court explained, the sole basis for their jurisdiction over Director Kelley and the ADC's interlocutory appeal was "Rule 2(a)(10) of the Arkansas Rules of Appellate Procedure[,]" which permits "an appeal from an interlocutory 'order denying a motion to dismiss or for summary judgment based on the defense of sovereign immunity.'" *Kelley*, 496 S.W. 3d at 354. Further, the Arkansas Supreme Court observed, "ADC argues that the appeal is proper because sovereign immunity was the sole basis on which it moved for dismissal and for summary judgment and that the circuit court has ruled on all the issues raised in their motions." *Id.*

'The State of Arkansas shall never be made a defendant in any of her courts.'" *Id.*, at 354. Under Arkansas law, "sovereign immunity is *jurisdictional* immunity from suit, and jurisdiction must be determined entirely from the pleadings." *Id.* (emphasis added). Plaintiffs can surmount a claim of sovereign immunity by establishing that a state agency is acting illegally or unconstitutionally. *Id.* The Arkansas Supreme Court found that Director Kelley and the ADC were entitled to sovereign immunity because plaintiffs' action was against the state, and plaintiffs failed to plead sufficient facts in their complaint to establish that Director Kelley and the ADC's proposed method of execution was unconstitutional. *Id.*, at 360. Accordingly, the Arkansas Supreme Court concluded that the defendants were entitled to sovereign immunity, meaning the trial court—and the Arkansas Supreme Court—lacked jurisdiction to hear plaintiffs' complaint. *Duit Constr. Co., Inc. v. Arkansas State Claims Comm'n*, 476 S.W.3d 791, 795 (Ark. 2015), *reh'g denied* (Jan. 14, 2016), *cert. denied sub nom. Duit Const. Co. v. Arkansas State Claims Comm'n*, 137 S. Ct. 42 (2016) ("When the pleadings show that the action is, in effect, one against the State, the circuit court acquires no jurisdiction."); *see also* Ark. Const. art. V, § 20 ("The State of Arkansas shall never be made defendant in *any* of her courts.") (emphasis added); *McCain*, 174 S.W.2d at 120 (noting that the Arkansas Supreme Court does not "acquire jurisdiction in a case where the pleadings show that the suit is in effect one against the State"). Accordingly, *Kelley v. Johnson* was not based on proper jurisdiction under Arkansas law, meaning it does not have a preclusive effect on this action because it does not satisfy all of the requirements for *res judicata* under Arkansas law. *See Baptist Health*, 373 S.W.3d at 278 (setting forth the requirements).

Defendants are correct that, when confronted with plaintiffs' attempt to file a "second amended complaint" after the appeal, the Pulaski County Circuit Court determined that the Supreme Court's decision in *Kelley v. Johnson* was a dismissal on the merits that fully and

completely resolved the Prisoners' state-court case. *See Johnson, et al. v. Kelley, et al.*, Case No. 60CV-15-2921 (CO6DO5, March 28, 2017). This Court finds that, contrary to the Pulaski County Circuit Court's reading of *Kelley v. Johnson* and defendants' arguments here, the majority in *Kelley v. Johnson* based that decision on pleading standards of Arkansas law, not proof. Although the ADC argued to the Arkansas Supreme Court—and argues now—that plaintiffs failed to "plead and prove" their Eighth Amendment claims, the majority's holdings in *Kelley v. Johnson* make no determinations regarding proof related to the method of execution and Eighth Amendment claims. The holdings are limited to determinations made at the pleading stage. *See Kelley*, 496 S.W.3d at 359 ("In their amended complaint, the Prisoners pled only that the drugs they offered as alternatives were 'commercially available.' . . . Consequently, the Prisoners failed to even allege that the proposed drug protocols are 'feasible' and 'readily implemented' by ADC. Accordingly, the circuit court erred in concluding that the Prisoners pled sufficient facts as to the proposed alternative drugs."); *id.* at 359-60 ("We reach the same result with respect to the Prisoners' alternative method of a firing squad. . . . However, these allegations are entirely conclusory in nature. Conclusory statements are not sufficient under the Arkansas Rules of Civil Procedure, which identify Arkansas as a fact-pleading state. . . . In this case, the Prisoners failed to substantiate their conclusory allegations contained in their amended complaint. . . . As a consequence, ADC was entitled to dismissal on this proposed alternative.") (internal citations omitted); *id.* at 360 (regarding the challenge to the Arkansas Midazolam Protocol under the Arkansas Constitution "[o]n this issue, the circuit court ruled that the Prisoners need to satisfy the requirement of offering a feasible and readily implemented alternative to the Arkansas Midazolam Protocol. We agree with ADC's contention that this claim must be analyzed under the two-part test we have herein adopted for method-of-execution challenges. . . . This claim also fails because, as we have

discussed, the Prisoners failed to establish the second prong of the *Glossip* test."). This is consistent with the Arkansas Supreme Court's observation that "jurisdiction must be determined entirely from the pleadings." *Id*. at 354.

Further, in dismissing the action, the majority in *Kelley v. Johnson* used the language "[r]eversed and dismissed. . . ." *Id*. at 366. The court's order was silent as to whether the complaint was dismissed with or without prejudice. The use of that language is consistent with a determination under Arkansas Rule of Civil Procedure 12 regarding pleadings: when a complaint is dismissed under Rule 12(b)(6) for failure to state facts upon which relief can be granted, the dismissal should be without prejudice. *Ratliff v. Moss,* 678 S.W.2d 369 (Ark. 1984). If the Arkansas Supreme Court had wanted its dismissal to operate with prejudice under Arkansas Rule of Civil Procedure 56, the Arkansas Supreme Court presumably would have included such language.

### c. Arkansas Rule Of Civil Procedure 41(b)

Further, because this Court concludes that the Arkansas Supreme Court's decision in *Kelley v. Johnson* was not "based on proper jurisdiction" as a result of a determination of sovereign immunity, this Court is not convinced the Arkansas Supreme Court would apply Arkansas Rule of Civil Procedure 41(b) to a subsequent suit brought on these claims. Defendants argue this should bar plaintiffs' current suit. This Court acknowledges that the Pulaski County Circuit Court, in what can only be described as *dicta*, expressed the view that, because the Arkansas Supreme Court's decision in *Kelley v. Johnson* was the third time plaintiffs' claims challenging Act 1096 of 2015 were dismissed, the Arkansas Supreme Court's dismissal operated as a dismissal with

prejudice under Arkansas state law.13  The Pulaski County Circuit Court theorized that, given the

ruling in *Ballard Group, Inc. v. BP Lubricants USA, Inc.*, 436 S.W.3d 445 (Ark. 2014), "a

dismissal granted for failure to state facts upon which relief can be granted under Rule 12(b)(6)

constitutes an involuntary dismissal under Rule 41(b))."  *Id.* at 456-57 (quoting Ark. R. Civ. P.

41(b)); *see also Brown v. Tucker*, 954 S.W.2d 262 (Ark. 1997).

The Pulaski County Circuit Court neither discussed nor analyzed the significance of the

dismissal based on sovereign immunity and how that might impact the application of Arkansas

Rule of Civil Procedure 41(b).  This Court can find no reported case that addresses this exact issue

under Arkansas law.  However, it is clear that Rule 41 is subject to broad equitable exceptions.  In

*Jonesboro Healthcare Center, LLC, v. Eaton-Moery Environmental Servs., Inc.*, 385 S.W.3d 797

(Ark. 2011), the Arkansas Supreme Court determined that a dismissal due to lack of subject matter

jurisdiction did not constitute a voluntary nonsuit triggering the two-dismissal rule in Arkansas

Rule of Civil Procedure 41(b).  In that case, the plaintiff initially filed suit in district court.  *Id.* at

801.  Six days after discovering the issue, plaintiff's counsel informed the district court.  *Id.*  The

district court had no option of transferring the case to the appropriate jurisdiction; it was required

to dismiss the suit.  The Arkansas Supreme Court concluded that, despite that, the dismissal at the

plaintiff's request for lack of subject matter jurisdiction was "not the type of voluntary dismissal

---

13  The Pulaski County Circuit Court's pronouncements regarding Arkansas Rule of Civil Procedure 41(b) are *dicta*.  The Arkansas Supreme Court determined that defendants were entitled to sovereign immunity in that original action, which is *jurisdictional* immunity from suit.  As a result, the Circuit Court's pronouncements were not central or necessary to that court's determination that it lacked jurisdiction to hear allegations challenging the method of execution and midazolam under the Eighth Amendment raised in a second amended complaint.  Likewise, the application of Arkansas Rule of Civil Procedure 41(b) would not be a basis on which to appeal or challenge the Arkansas Supreme Court's decision in a direct appeal of *Kelley v. Johnson.*  Any argument that a subsequent action on these same claims is barred under Arkansas Rule of Civil Procedure 41(b) would necessarily be addressed and properly before the court in which the subsequent action is filed, not in the original action.

contemplated by Rule 41(a), nor the type of involuntary dismissal that is contemplated by Rule 41(b)." *Id.* at 804.

In reaching this conclusion, the Arkansas Supreme Court determined that, "[a]t first glance, a literal interpretation of the words 'whether voluntarily or involuntarily' giving them their ordinary and common meaning would lead to the conclusion that a dismissal for want of subject-matter jurisdiction would be an involuntary dismissal. However, such a literal application and interpretation leads to an absurd result that is not only contrary to the purpose and intent of the rule, but also contrary to well-established law." *Id.* As for well-established law, the court reasoned that "[a] court that acts without subject-matter jurisdiction or in excess of its jurisdiction produces a result that is void and cannot be enforced. Certainly then, a dismissal from a court that lacks subject-matter jurisdiction cannot operate under Rule 41(b) as an 'adjudication on the merits.'" *Id.* (internal citations omitted). As for the intent of Rule 41(b), the court determined that the rule "was intended to allow the trial courts to clean up their dockets and get stale cases off the active docket." *Id.* (quoting *Cory v. Mark Twain Life Ins. Corp.*, 688 S.W.2d 934, 935 (1985)).

The court further explained:

> The primary purpose of the two-dismissal rule is to prevent unreasonable use of the plaintiff's unilateral rights to dismiss an action prior to the filing of the defendant's responsive pleading, and it is an exception to the general principle that a voluntary dismissal of an action does not bar a new suit based upon the same claim. The two-dismissal rule was unique at the time it was first adopted, and its intention was to prevent delays and harassment by plaintiffs securing numerous dismissals without prejudice. But where the purpose behind the two-dismissal exception would not appear to be served by its literal application, and where that application's effect would be to close the courthouse doors to an otherwise proper litigant, a court should be most careful not to construe or apply the exception too broadly.

*Id.* at 802-03 (quoting *Smith v. Washington*, 10 S.W.3d 877, 880 (Ark. 2000) (internal citations omitted)). Because lack of subject-matter jurisdiction could be raised by either party or the court itself, the court determined it was not within plaintiff's unilateral right to dismiss; that there had

not been delays and harassment by plaintiffs securing numerous dismissals without prejudice; and that the case was not stale, among other reasons cited for not applying Rule 41(b). *Id.* at 803-04.

On the facts presented here, sovereign immunity is not solely within the control of plaintiffs; it must be raised by defendants and can be waived. Further, under Arkansas law, like subject-matter jurisdiction, Arkansas courts are obligated to address sovereign immunity on their own. *Staton*, 942 S.W.2d at 805 ("Subject-matter jurisdiction based on sovereign immunity is an issue that is *always open,* and it is the duty of an appellate court to raise the issue of its own volition."). When confronted with a claim of sovereign immunity, if the court finds it applicable, the court must dismiss the claim, as it is jurisdictional immunity from suit rendering the court with no further authority to take action over that claim. For these reasons, among others, the Arkansas Supreme Court might apply the rationale of *Jonesboro Healthcare* to this dismissal based on sovereign immunity or conclude that *Jonesboro Healthcare* is controlling precedent, concluding that to close the courthouse doors to an otherwise proper litigant through operation of Arkansas Rule of Civil Procedure 41(b) under these circumstances would be improper.

Despite defendants' suggestions to the contrary, this Court attaches no significance to the fact that the Arkansas Supreme Court recently issued an "order clarifying that the stay of executions imposed in Ark. Supreme Court No. CV-15-829 dissolved upon the issuance of the mandate in *Kelley v. Johnson*, Ark. Supreme Court No. CV-15-992. . . ." (Dkt. No. 27, at 49). The Arkansas Supreme Court acknowledged that the stays of execution were implemented "pending the resolution of the underlying litigation." *Kelley v. Johnson*, 496 S.W.3d at 352 (citing *Kelley v. Griffen*, 472 S.W.3d 135)). The dismissal based on sovereign immunity led the Arkansas Supreme Court to lift the stays.

## 2. Collateral Estoppel

In the alternative, defendants argue that collateral estoppel, which is similar to the doctrine of *res judicata*, should apply to certain of plaintiffs' claims, including their midazolam claims. Under these circumstances, Arkansas law governs the question of collateral estoppel. *National Farmers Union Standard Ins. Co. v. Morgan*, 966 F.2d 1250, 1253 (8th Cir. 1992). Under Arkansas law, the four elements of collateral estoppel, or issue preclusion, are that: (1) the issue is the same as that involved in a prior litigation; (2) the issue was actually litigated; (3) the issue was determined by a valid and final judgment; and (4) the determination was essential to the judgment. *East Texas Motor Freight Lines v. Freeman*, 713 S.W.2d 456, 459 (1986).

This Court declines to dismiss plaintiffs' Eighth Amendment challenge to the Arkansas Midazolam Protocol based on collateral estoppel arising from *Kelley v. Johnson*. Collateral estoppel is a legal doctrine that "bar[s] the relitigation of factual or legal issues that were determined in a prior. . . court action" and "applies to bar relitigation in federal court of issues previously determined in state court." *In re Scarborough*, 171 F.3d 638, 641 (8th Cir. 1999). In *Kelley v. Johnson*, the Arkansas Supreme Court found that Director Kelley and the ADC were entitled to sovereign immunity from plaintiffs' claims, as this was the sole basis for the Arkansas Supreme Court's jurisdiction over that interlocutory appeal. 496 S.W.3d at 360. Given the well-settled federal law in this area, sovereign immunity is not an issue to be actually litigated before this Court. Plaintiffs bring their claims under 42 U.S.C. § 1983 against Governor Hutchinson and Director Kelley seeking declaratory and injunctive relief. "To ensure the enforcement of federal law . . . the Eleventh Amendment permits suits for *prospective* injunctive relief against state officials acting in violation of federal law." *Frew ex rel. Frew v. Hawkins*, 540 U.S. 431, 437 (2004) (emphasis added) (citing *Ex parte Young*, 209 U.S. 123 (1908)).

Further, as the Arkansas Supreme Court made clear under Arkansas law, "sovereign immunity is *jurisdictional* immunity from suit, and jurisdiction must be determined entirely from the pleadings." 496 S.W.3d at 360 (emphasis added). That means the Arkansas Supreme Court analyzed Arkansas Rule of Civil Procedure 12(b)(6). Arkansas has adopted a clear standard to require fact pleading, which is deemed to be a higher standard by which the sufficiency of the allegations in a complaint is tested. *See* Arkansas Rules of Civil Procedure 8 and 12; *Malone v. Trans–States Lines, Inc.,* 926 S.W.2d 659, 661 (Ark. 1996); *Hollingsworth v. First Nat'l Bank & Trust Co.,* 846 S.W.2d 176, 178 (Ark. 1993).

In contrast, the Federal Rules of Civil Procedure require only notice pleading, a lower threshold than fact pleading. Federal Rule of Civil Procedure 8(a)(2) requires only "a short and plain statement of the claim showing that the pleader is entitled to relief," in order to "give the defendant fair notice of what the. . . claim is and the grounds upon which it rests." *Bell Atl. Corp.*, 550 U.S. at 545. While a complaint attacked by a Federal Rule of Civil Procedure 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the "grounds" of his "entitle[ment] to relief" requires more than labels and conclusions, and a formulaic recitation of a cause of action's elements will not do. Factual allegations must be enough to raise a right to relief above the speculative level on the assumption that all of the complaint's allegations are true." *Bell Atl. Corp.*, 550 U.S. at 545. To the extent defendants contend the Eighth Circuit adopted a heightened pleading standard in *Zink* akin to fact pleading, for reasons the Court will explain in more detail later in this Order, the Court rejects this suggestion. Even if the Eighth Circuit adopted a heightened pleading standard for a method of execution claim in *Zink*, this Court concludes that such a requirement is inconsistent with *Glossip*, which the Supreme Court issued a few months later.

No court has addressed the merits of plaintiffs' claim that midazolam is likely to cause constitutional suffering. The Pulaski County Circuit Court determined that genuine issues of material fact remained to be tried on this issue. The Arkansas Supreme Court declined to address the issue, instead resolving only that plaintiffs failed to meet Arkansas's heightened fact pleading standard on the second prong of the *Glossip* test. *Kelley*, 496 S.W.2d at 360 (stating in reference to plaintiffs' assertion that using midazolam entails objectively unreasonable risks of substantial and unnecessary pain and suffering, "[t]his claim also fails because, as we have discussed, the Prisoners failed to establish the second prong of the *Glossip* test."). Plaintiffs also contend that collateral estoppel does not apply because new evidence has emerged regarding alternatives that could not have been raised before, citing information regarding Missouri's purchase of compounded pentobarbital (Dkt. No. 2-2, Exhibit 18), and that the Arkansas legislature has since refused to consider another execution method that plaintiffs maintain would reduce the suffering caused by midazolam (Dkt. No. 2-2, Exhibit 24).

For the reasons explained, this Court concludes that the issues to be determined in this litigation are not the same as those involved in the prior litigation. In addition, this Court concludes that the prior litigation did not result in a final judgment that would preclude plaintiffs under the doctrine of collateral estoppel from refiling suit alleging these same claims in Arkansas state court.

Moreover, when evaluating the application of these procedural doctrines, this Court cannot ignore the subject matter of this action or the very recent developments in this area of the law. "Death is different." *Woodson v. North Carolina*, 428 U.S. 280, 305 (1976). Developments in the law in this area within the last week have led to what may be a "circuit split," meaning that the United States Courts of Appeals for different circuits disagree with one another over the meaning and application of standards announced in *Baze* and *Glossip*. The meaning and application of

those standards directly impacts plaintiffs' claims here. *See In re Ohio Execution Protocol*, 2017 WL 1279282, at *11-15; *Arthur*, 840 F.3d at 1300.

### 3.      Failure To State A Claim

Governor Hutchinson and Director Kelley argue that, even if plaintiffs midazolam claim is not barred by *res judicata* or collateral estoppel, it should "be dismissed because the Complaint fails to allege sufficient facts to state a plausible Eighth-Amendment claim as required to overcome the State's Eleventh Amendment immunity" (Dkt. No. 27, at 56). As in their Eighth Amendment claim based solely on the compressed execution schedule, plaintiffs must "establish[] that the State's lethal injection protocol creates a demonstrated risk of severe pain" and "must show that the risk is substantial when compared to the known and available alternatives." *Glossip*, 135 S. Ct. at 2737 (quoting *Baze*, 553 U.S. at 61). Governor Hutchinson and Director Kelley argue that plaintiffs fail to plead sufficient facts to state both prongs of *Baze*/*Glossip*, but focus the majority of their arguments on the second prong.[14]

### a.      Demonstrated Risk Of Severe Pain

In their complaint, plaintiffs allege that the Arkansas Midazolam Protocol creates a demonstrated risk of severe pain because midazolam "cannot render Plaintiffs insensate to the pain and suffering caused by the vecuronium bromide and the potassium chloride" (Dkt. No. 2-2, ¶ 108). The three drugs used under the Arkansas Midazolam Protocol serve different purposes. The second drug, "vecuronium bromide, paralyzes the recipient's diaphragm and prevents breathing"

---

[14]   Defendants also argue that this Court should dismiss plaintiffs' midazolam claim because "Midazolam protocols have been upheld by numerous courts, including the United States Supreme Court and the Arkansas Supreme Court" (Dkt. No. 27, at 65). These earlier decisions are not controlling. *See In re Ohio Execution Protocol Litig.*, 2017 WL 1279282, at *6 (6th Cir. Apr. 6, 2017) ("The Supreme Court did not say that use of midazolam is per se constitutional such that no district court may ever conduct fact-finding and find otherwise.").

(*Id.*, ¶ 104). Relying on materials provided by their expert witnesses, which are attached to their complaint, plaintiffs allege that, if "[a]dministered by itself, it leaves the recipient unable to communicate and feeling as if he has been buried alive" (*Id.*). The third drug, "potassium chloride, stops the heart." (*Id.*, ¶ 105). Plaintiffs further allege that, if potassium chloride were administered by itself, "it would cause the recipient to experience an excruciating burning pain." (*Id.*).

Midazolam, the first drug, is administered to prevent or substantially limit the prisoners' suffering from the effects of the second and third drugs. Plaintiffs allege that there is a demonstrated risk that midazolam will fail to serve that purpose, leaving plaintiffs exposed to "the harrowing effects of the second and third drugs" (*Id.*, ¶ 108). Plaintiffs allege that:

> Unlike barbiturates, which are typically used in lethal injections and which can render general anesthesia, midazolam has no independent depressive effect. Rather, it binds with a neurotransmitter called "GABA" to produce sedation. Because GABA is present in limited quantities in the brain, midazolam's sedative properties are also limited. Scientists refer to this as the drug's "ceiling effect."

(*Id.*, at 107). Plaintiffs contend that "[m]idazolam's ceiling effect prevents it from producing general anesthesia. . . . 500 mg midazolam will sedate Plaintiffs, but it will not anesthetize them to pain" (*Id.*, ¶ 108).

The Court finds that plaintiffs pled sufficient facts to state a plausible claim under the first prong of *Baze*/*Glossip*. Plaintiffs provide specific alleged facts in their complaint and attached exhibits that, taken as true, would establish that it is "sure or very likely" that midazolam will fail to prevent plaintiffs from being exposed to the effects of vecuronium bromide and potassium chloride. *Glossip*, 135 S. Ct. at 2736. These alleged facts are not speculative—they are grounded in specific reasons about the chemical properties of midazolam provided by plaintiffs' experts, which are bolstered by the complications that arose in the four "botched" midazolam executions identified by plaintiffs. Plaintiffs have also stated sufficient facts that, when taken as true, show

that the effects of vecuronium bromide and potassium chloride constitute "severe pain." *Id.*, at 2737.

### b. Substantial Risk Compared To Known And Available Alternatives

Governor Hutchinson and Director Kelley argue that, while plaintiffs identify a number of proposed alternative methods of execution in their complaint, they "failed to allege facts demonstrating that those alternative methods are known, feasible, readily implemented, and available to ADC and that they would significantly reduce a substantial risk of severe pain" (Dkt. No. 27, at 58). Plaintiffs identify six proposed alternatives in their complaint: (1) replacing midazolam with FDA-approved, manufactured pentobarbital; (2) a two drug cocktail of midazolam and potassium chloride; (3) execution by firing squad; (4) replacing midazolam with compounded pentobarbital; (5) sevoflurane as the sole lethal agent; and (6) nitrogen hypoxia (Dkt. No. 2-2, at 36-38). Plaintiffs also argue that the state of Arkansas's unwillingness to even consider more humane execution methods dispenses with the need for plaintiffs to plead and prove alternative execution methods to show an Eighth Amendment violation (*Id.*, at 38).

The Court finds that plaintiffs have pled sufficient facts to state a plausible claim under the second prong of *Baze/Glossip*. As a preliminary matter, the Court is compelled to address the Eighth Circuit's standard for pleading a method of execution claim under the Eighth Amendment.

On at least two occasions, the Eighth Circuit Court of Appeals has found that condemned prisoners failed to state a method of execution claim because their complaints did not include "plausible allegation[s] of a feasible and more humane alternative method of execution, or a purposeful design by the State to inflict unnecessary pain." *In re Lombardi*, 741 F.3d 888, 896 (8th Cir. 2014); *see also Zink*, 783 F.3d at 1106. In the first case, *In re Lombardi*, the Eighth Circuit concluded that the plaintiffs failed to state a claim because their complaint included no

allegations pertaining to an alternative method of execution.  *In re Lombardi*, 741 F.3d at 895.  In *Zink*, the Eighth Circuit took its earlier decision a step further, finding that plaintiff's "allegation in the second amended complaint that 'other methods of lethal injection the Department could choose would be constitutional' does not contain sufficient factual matter to state a claim to relief that is plausible on its face."  *Zink*, 783 F. 3d at 1106-07.  The Eighth Circuit stated that "[t]he second amended complaint includes no factual matter that even hints at how the State—drawing on feasible and readily implemented alternatives—could modify its lethal-injection protocol to reduce significantly the alleged substantial risk of severe pain." *Id.*, at 1103.  The court concluded that such a "'naked assertion' that other methods would be constitutional, devoid of further factual enhancement, fails to state a claim under the Eighth Amendment." *Id.*  In reaching its conclusion, the majority rejected a criticism made in the dissent that the court was imposing a "heightened pleading requirement" for method of execution claims. *Id.*, at 1104; *see also Zink*, 783 F.3d at 1119 (Bye, J., dissenting) ("The majority opinion establishes heightened pleading requirements for death-row inmates challenging a state's method of execution under the Eighth Amendment.").

Both *In re Lombardi* and *Zink* were decided after the United States Supreme Court issued its decision in *Baze* but before the Supreme Court's decision in *Glossip*.  The procedural history of *Glossip* and statements made by the Supreme Court in *Glossip* provide the most current lens through which this Court must examine pleading requirements for a method of execution claim.

While at the district court level, the defendants in *Glossip* filed a motion to dismiss plaintiffs' method of execution claims for failure to state a claim.  *See* Defendants' Motion To Dismiss Plaintiffs' Amended Complaint and Brief in Support, *Warner v. Gross*, No. 5:14-cv-665-F (W.D. Okla.  Nov. 14, 2014), ECF No. 97.  In their amended complaint, plaintiffs alleged that:

> Sodium thiopental is an ultrashort-acting barbiturate. The patent for its creation has expired and the patent provides the scientific information to permit its reproduction. It would be feasible to use sodium thiopental in a single-drug formulation to execute Plaintiffs. With sound procedures and properly trained personnel, use of sodium thiopental to execute Plaintiffs would be lawful, and would significantly reduce the substantial risk of severe pain posed by other drugs and drug combinations identified set forth in the September 30, 2014 Field Memorandum.

Amended Complaint, *Warner v. Gross*, No. 5:14-cv-665-F (W.D. Okla. Oct. 31, 2014), ECF No. 75, ¶¶ 30-31. Relying on *In re Lombardi*, the defendants argued that these alleged facts were insufficient to state a claim under the second prong of *Baze*. Defendants' Motion To Dismiss Plaintiffs' Amended Complaint and Brief in Support, *Warner v. Gross*, No. 5:14-cv-665-F (W.D. Okla. Nov. 14, 2014), ECF No. 97, at 15 ("[A]s in *In re Lombardi*, Plaintiffs have not alleged any feasible, humane alternative, nor have they alleged any plausible claim that the State will purposely inflict unnecessary pain.").

The district court denied defendants' motion to dismiss. Regarding defendants' argument that plaintiffs failed to *plead* an alternative method of execution, the district court found that:

> In contrast to the allegations in *Lombardi*, in the instant case plaintiffs allege that there is an alternative method of execution to compounded pentobarbital, specifically, manufactured sodium thiopental. Defendants contend this drug is not a feasible alternative because it is not available. That contention, however, goes beyond the pleadings and presents an evidentiary issue the court cannot reach at this stage.

*Warner v. Gross*, No. 5:14-cv-665-F (W.D. Okla. Dec. 12, 2014) (order denying defendants' motion to dismiss). The district court later denied plaintiffs' motion for a preliminary injunction, finding that plaintiffs failed to *prove* that the proposed alternative methods of execution were readily available. *Glossip*, 135 S. Ct. at 2738.

In *Glossip*, the Supreme Court noted that, "[i]n their amended complaint, petitioners proffered that the State could use sodium thiopental as part of a single-drug protocol." *Id.* The Court made no mention as to the sufficiency of the factual allegations in plaintiffs' amended

complaint. Instead, the Supreme Court affirmed the district court's factual finding that plaintiffs failed to *prove* that sodium thiopental was an available alternative. *Id.* In reaching this conclusion, the Supreme Court used the clear error standard, thereby "defining 'availability' as a factual finding." *In re Ohio Execution Protocol Litig.*, 2017 WL 1279282, at *9. The Supreme Court also reiterated that there is not a "heightened pleading requirement" for method of executions claims. *Glossip*, 135 S. Ct. at 2738-39.

This Court finds that, while "the Eighth Amendment requires a prisoner to plead and prove a known and available alternative[,]" *Id.*, at 2729, plaintiffs challenging a method of execution need not plead facts in the level of detail defendants argue here, purporting to rely on the Eighth Circuit's opinion in *Zink*. The Court reaches this determination as a result of the clarification offered by the United States Supreme Court in *Glossip*, and after tracing the procedural history of that case. The Court notes that its understanding of *Glossip* is shared by at least one other district court. *See Price v. Dunn*, No. CA 14-0472-KD-C, 2015 WL 6962854, at *8 (S.D. Ala. Oct. 20, 2015), *report and recommendation adopted*, No. CV 14-0472-KD-C, 2015 WL 6964660 (S.D. Ala. Nov. 10, 2015) (denying defendants' motion to dismiss plaintiffs' amended complaint for failure to plead sufficient facts of an available alternative method of execution). The Court finds that the defendants' arguments pertaining to the availability of alternative methods of execution should be resolved after considering the evidence presented at the Court's evidentiary hearing. Therefore, the Court denies defendants' motion to dismiss this claim at the pleading stage.

The Court also finds that, even if defendants are correct and the Eighth Circuit in *Zink* instituted a higher pleading standard that controls, plaintiffs pled sufficient facts to state a plausible method of execution claim. To succeed on their method of execution claim, plaintiffs must "identify a known and available alternative method of execution that entails a lesser risk of pain"

than the Arkansas Midazolam Protocol. *Glossip*, 135 S. Ct. at 2731 (quoting *Baze*, 553 U.S. at 61). The Supreme Court "has provided very little guidance as to the definition of 'availability' of execution methods." *In re Ohio Execution Protocol Litig.*, 2017 WL 1279282, at *9. The Eighth Circuit has not elaborated on the meaning of availability, other than by finding that a "threadbare assertion that lethal gas is *legally* available in Missouri is not the same as showing that the method is a feasible or readily implementable alternative method of execution." *Johnson v. Lombardi*, 809 F.3d 388, 391 (8th Cir.), *cert. denied*, 136 S. Ct. 601, 193 L. Ed. 2d 480 (2015). Other Circuit Courts of Appeal are split as to what qualifies as an alternative method. *Compare Arthur*, 840 F.3d at 1300 (concluding that plaintiffs must prove, among other requirements, that "the State actually has access to the alternative"), *with In re Ohio Execution Protocol Litig.*, 2017 WL 1279282, at *9 (affirming the district court's finding that compounded pentobarbital was an available alternative method of execution despite the fact that "Ohio does not currently have pentobarbital on hand and cannot purchase pentobarbital to use in executions directly from drug manufacturers").

Among other alternative methods, plaintiffs here allege that manufactured pentobarbital "would adequately anesthetize Plaintiffs to the pain the second and third drugs otherwise would cause[,]" meaning it would significantly reduce a substantial risk of severe pain (Dkt. No. 2-2, ¶ 110). Plaintiffs argue that it is available to the state because "Arkansas has passed laws to shield drug suppliers from public view, Ark. Code Ann. § 5-4-617(i)(2), thus facilitating its ability to acquire drugs, *as exhibited by its recent purchases of vecuronium bromide and potassium chloride*" (*Id.*) (emphasis added). The Court finds that plaintiffs' allegations concerning the availability of manufactured pentobarbital are sufficiently specific to survive defendants' motion to dismiss.

Plaintiffs also allege that replacing midazolam with compounded pentobarbital "would significantly reduce the risk of Plaintiffs' suffering" (*Id.*, ¶ 37). The Sixth Circuit Court of Appeals recently affirmed a district court's finding that plaintiffs were able to establish that compounded pentobarbital is available for the purposes of the second prong of *Glossip*. *See In re Ohio Execution Protocol Litig.*, 2017 WL 1279282, at *8. The Court finds that hearing evidence on the availability and suitability of compounded pentobarbital is appropriate in this action. For these reasons, the Court denies defendants' motion to dismiss plaintiffs' midazolam claim.

### D. Claim 4: Lethal Injection Protocol And The Eighth Amendment

In their fourth claim for relief, plaintiffs argue that, separate and apart from its intention to use midazolam, the ADC's execution "protocol carries unacceptable risks of severe pain in violation of the Eighth Amendment" (Dkt. No. 2-2, ¶ 120). Governor Hutchinson and Director Kelley move to dismiss this claim as untimely, barred by *res judicata* and collateral estoppel, and for failure to state a claim.

Assuming without deciding that plaintiffs' claims here are timely and not barred by *res judicata* or collateral estoppel, the Court finds that plaintiffs fail to state a claim based on the provisions in the execution protocol that do not involve the use of midazolam. The Eighth Circuit has held that an earlier version of Arkansas's lethal injection protocol does not violate the Eighth Amendment. *Jones v. Hobbs*, 604 F.3d 580, 582 (8th Cir. 2010); *Nooner v. Norris*, 594 F.3d 592 (8th Cir. 2010). Responding to defendants' motion to dismiss, plaintiffs argue that the protocol at issue in *Jones* and *Nooner* has changed: "that protocol used sodium thiopental, not midazolam" (Dkt. No. 31, at 24). Plaintiffs contend that "[a]opting midazolam as the first drug in the protocol is a sea change—one that imbues the entire protocol with new risks of substantial harm to the Prisoners" (*Id.*).

The Court agrees with plaintiffs that the other policies included in the lethal injection protocol are relevant to determine whether the state's use of midazolam violates the Eighth Amendment, which is why the Court denies defendants' motion to dismiss plaintiffs' fifth claim. However, based on the Eighth Circuit's decisions in *Jones* and *Nooner*, the Court grants defendants' motion to dismiss plaintiffs' fourth claim.

**E.    Claim 5:  Execution Schedule, Midazolam, And Protocol And The Eighth Amendment**

In their fifth claim for relief, plaintiffs argue that, "[i]f neither the schedule, nor the use of midazolam, nor the lack of adequate protocol constitutes an independent constitutional violation, they substantiate a constitutional violation in combination" (Dkt. No. 2-2, ¶ 160).  Governor Hutchinson and Director Kelley move to dismiss this claim because it is "is utterly speculative" (Dkt. No. 27, at 75).  They also argue that, if plaintiffs' "midazolam claim is correct . . . then any potential for personnel error adds nothing of constitutional significance because even if everything went exactly as planned, there would still be a constitutional violation" (*Id.*).

This Court has found that plaintiffs stated sufficient factual allegations to state a claim that the Arkansas Midazolam Protocol violates the Eighth Amendment.  The Court rejects defendants' argument that the alleged risks of the use of midazolam, the compressed scheduling, and the ADC's execution protocol are unrelated.  In *Baze* and *Glossip*, the Supreme Court stressed that district courts should consider the safeguards a state employs in determining whether the state's lethal injection protocol violates the Eighth Amendment.  *See Glossip*, 135 S. Ct. at 2742; *Baze*, 553 U.S. at 55.  In *Glossip*, the Supreme Court specifically found that "[t]he District Court did not commit clear error in concluding that [certain] safeguards help to minimize any risk that might occur *in the event that midazolam does not operate as intended*." *Glossip*, 135 S. Ct. at 2742 (emphasis added).  If the state's safeguards are inadequate, as the plaintiffs allege, than that fact is

relevant to plaintiffs' midazolam claim. The Court denies defendants' motion to dismiss this claim.

### F.     Claims 6 And 7:  Viewing Policy Claims

The Court addresses Claims VI and VII together, because they involve common issues of law and fact. These two claims relate to whether Director Kelley's policies deprive plaintiffs of their First Amendment right of access to the courts and their right to counsel under 18 U.S.C. § 3599. At the outset, given the unique circumstances presented by the execution context, the Court determines that any putative right to access the courts necessarily depends on the right of counsel to petition the court on plaintiffs' behalf. Therefore, resolution of Claims VI and VII must be determined simultaneously.

Plaintiffs allege that Director Kelley's viewing policies deprive them of their right to petition courts to allege actual, non-frivolous constitutional deprivations occasioned by the method of their execution (Dkt. No. 2-2, ¶¶ 166-173). Plaintiffs allege that, in the execution context, there is a heightened possibility that counsel for plaintiffs may need to access the courts during the executions themselves (*Id.*, ¶ 168). Plaintiffs allege that Director Kelley's viewing policies would force plaintiffs' counsel either to view the execution or have telephonic access to the courts but would make accomplishing both impossible (*Id.*, ¶ 169).

These conditions, plaintiffs allege, cause an unconstitutional deprivation of their right of access to the courts. Plaintiffs note that, given the potential exigencies inherent to the execution process, other states' departments of correction policies both permit multiple attorneys to witness executions and provide for methods by which counsel may contact the courts during the course of

executions (Dkt. No. 2-2, Ex. 5).[15]  With respect to the claim arising under § 3599, plaintiffs allege that a prospective motion for stay of execution, to be raised during the course of an execution in order to remedy an ongoing Eighth Amendment deprivation, amounts to an "appropriate motion and procedure" and "application for stay of execution" pursuant to the terms of § 3599(e) (Dkt. No. 2-2, at ¶¶ 176-178).  Therefore, if only one attorney is permitted to witness the execution, without the capability of communicating with a court, plaintiffs allege that it would be impossible to satisfy counsel's duties under § 3599 (*Id.*, ¶¶ 179-181).

Plaintiffs allege that, in the past, Director Kelley's predecessors have permitted multiple attorneys to witness executions (Dkt. No. 2-2, ¶ 25).  Plaintiffs allege that, Director Kelley's policies permit only one attorney per inmate to witness an execution (*Id.*, 27, Ex. 9).  Plaintiffs allege that, due to Director Kelley's policies, the lone witnessing attorney would have no access to a telephone during the execution (*Id.*, ¶ 28, Ex. 10).  Plaintiffs allege that Director Kelley's predecessor provided procedures in the past that placed no restrictions on attorney viewing or phone access during the execution, and that there is no indication as to when these policies changed (*Id.*, ¶ 29).  Plaintiffs allege that Director Kelley's policies prevent all witnesses, including counsel for plaintiffs, from viewing and hearing the complete execution process (*Id.,* ¶ 30).

Plaintiffs allege that Director Kelley's policies "prevent the one attorney who is allowed to view the execution from effectively representing his clients by depriving him of any access to a phone (and thus to courts or co-counsel)" (Dkt. No. 2-2, ¶ 179).  Plaintiffs allege that Director Kelley's policies "prevent [p]laintiffs' attorneys from raising such a problem with the courts." (*Id.*,

---

15  Plaintiffs cite the case of Joseph Wood in Arizona as an example of the potential necessity of immediate judicial review during the execution process.  During Mr. Wood's nearly two-hour execution, his attorneys were forced to leave the witness room to seek a stay of execution during a telephonic hearing with a federal judge, which eventually was convened.  Mr. Wood died during the course of the 30-minute hearing.

¶ 180).  Plaintiffs further allege that "plaintiffs' right to counsel requires that their attorneys have a complete visual and audio access to the execution from the time [p]laintiffs enter the chamber to the time they are pronounced dead. (*Id.*).  Finally, plaintiffs allege that "arbitrarily limiting [p]laintiffs to one attorney in the witnessing room . . . infringe[s] upon the right to counsel guaranteed by 18 U.S.C. § 3599" (*Id.*, ¶ 181).

### 1.    Whether The Claims Are Time-Barred

As a threshold matter, defendants assert that plaintiffs' Claims VI and VII "are time-barred because the ADC's witness and technology policies have not changed since at least 2008." (Dkt. No. 27, at 76).  Plaintiffs dispute this.

Plaintiffs bring this action pursuant to 42 U.S.C. § 1983.  Section 1983 does not provide a statute of limitations; therefore, courts "borrow the statute of limitations from state law." *Mountain Home Flight Serv., Inc. v. Baxter Cty., Ark.*, 758 F.3d 1038, 1044 (8th Cir. 2014) (citing *Birmingham v. Omaha Sch. Dist.,* 220 F.3d 850, 855 (8th Cir. 2000)).  As this action arises out of the state of Arkansas, "the applicable statute of limitations is three years."  *Id.*; *see also Grand Valley Ridge, LLC v. Metro. Nat. Bank*, 388 S.W.3d 24, 35 (Ark. 2012) ("[P]ursuant to Arkansas Code Annotated section 16–56–105 (Repl. 2005), a three-year statute of limitations applies to tort actions.").

At issue is when the three-year statute of limitations period began to run for plaintiffs' claims.  While federal courts borrow the statute of limitations period from state law, "the accrual date of a § 1983 cause of action is a question of federal law that is *not* resolved by reference to state law." *Wallace v. Kato*, 549 U.S. 384, 388 (2007) (emphasis in original).  The Eighth Circuit has not addressed this issue.  *Bucklew v. Lombardi*, 783 F.3d 1120, 1128 (8th Cir. 2015) ("Now that the claim is being addressed on the merits, past delays bring to the forefront the question of

the applicable statute of limitations governing method-of-execution Eighth Amendment claims, a question this court has not addressed.").

However, the Eighth Circuit has implied that it would be inclined to follow the reasoning of the Fifth, Sixth, and Eleventh Circuits.  *Id.* at 1129 (citing *Wellons v. Comm'r, Ga. Dep't of Corr.,* 754 F.3d 1260, 1263–64 (11th Cir. 2014); *Walker v. Epps,* 550 F.3d 407 (5th Cir. 2008); *Cooey v. Strickland,* 479 F.3d 412, 416–24 (6th Cir. 2007)).  These circuits have found that a "claim challenging the state's method of execution 'accrues on the later of the date on which' direct review is completed by denial of certiorari, 'or the date on which the capital litigant becomes subject to a new or substantially changed execution protocol.'" *Gissendaner v. Comm'r, Georgia Dep't of Corr.*, 779 F.3d 1275, 1280 (11th Cir.), *cert. denied sub nom. Gissendaner v. Bryson*, 135 S. Ct. 1580, 191 L. Ed. 2d 661 (2015) (quoting *McNair v. Allen*, 515 F.3d 1168, 1174 (11th Cir. 2008)); *see also Walker*, 550 F.3d at 414 ("The district court concluded that such causes of action necessarily accrue on the later of two dates: the date direct review of an individual case is complete or the date on which the challenged protocol was adopted. We agree with the district court."); *Wilson v. Rees*, 620 F.3d 699, 700 (6th Cir. 2010) (same).

The Court denies defendants' motion to dismiss with respect to these claims based on the statute of limitations.  There are sufficient facts alleged in plaintiffs' complaint, which if taken as true as the Court must at this stage, overcome defendants' argument that Claims VI and VII are time-barred.

> Bar by a statute of limitation is typically an affirmative defense, which the defendant must plead and prove.  A defendant does not render a complaint defective by pleading an affirmative defense, and therefore the possible existence of a statute of limitations defense is not ordinarily a ground for Rule 12(b)(6) dismissal unless the complaint itself establishes the defense.

*Jessie v. Potter*, 516 F.3d 709, 713 n.2 (8th Cir. 2008) (internal citations omitted). Assuming without deciding that the Eighth Circuit would adopt the Fifth, Sixth, and Eleventh Circuit's understanding of accrual for method of execution claims, the plaintiffs have alleged enough at this stage of the proceeding to survive defendants' motion to dismiss. The Court will not dismiss this claim based on defendants' argument that these claims are untimely. Therefore, the Court will turn to the substantive allegations raised by Claims VI and VII.

### 2. Right Of Access To The Courts

"Prisoners have a constitutional right of access to the courts." *Bounds v. Smith*, 430 U.S. 817, 821 (1977). Courts have imposed on prison administrators "required remedial measures to insure that inmate access to the courts is adequate, effective, and meaningful." *Id.* at 822. "Our decisions have consistently required States to shoulder affirmative obligations to assure all prisoners meaningful access to the courts." *Id.* at 824. "The fundamental constitutional right of access to the courts requires prison authorities to assist inmates in the preparation and filing of meaningful legal papers by providing prisoners with adequate law libraries or adequate assistance from persons trained in the law."[16] *Bounds*, 430 U.S. at 828 (emphasis added).

With its opinion in *Lewis v. Casey*, 518 U.S. 343 (1996), the Supreme Court clarified the ambit of its holding in *Bounds*. "The right that *Bounds* acknowledged was the (already well-established) right of *access to the courts*." *Lewis*, 518 U.S. at 350 (parentheses and emphasis in original). The majority traced the "roots" of the right of access to the courts articulated in *Bounds*, a history worth repeating in full:

---

[16] In a footnote, the Supreme Court defined its main concern as "protecting the ability of an inmate to prepare a petition or complaint." *Bounds*, 430 U.S. at 828, n.17 (quoting *Wolff v. McDonnell*, 418 U.S 539, 576 (1974)).

> We had protected that right by prohibiting state prison officials from actively interfering with inmates' attempts to prepare legal documents, *e.g., Johnson v. Avery*, 393 U.S. 483, 484, 489-490 (1969), or file them, *e.g., Ex parte Hull*, 312 U.S. 546, 547-549 (1941), and by requiring state courts to waive filing fees, *e.g., Burns v. Ohio*, 360 U.S. 252, 258 (1959), or transcript fees, *e.g., Griffin v. Illinois*, 351 U.S. 12, 19 (1959), for indigent inmates.

*Lewis*, 518 U.S. at 350. Having recited this jurisprudential arc, Justice Scalia, writing for the majority, summarized the right of access to the courts: prisoners must be afforded "a reasonably adequate opportunity to present claimed violations of fundamental constitutional rights to the courts." *Id.* at 351 (quoting *Bounds*, 430 U.S., at 825) (internal quotations omitted).

Therefore, the question before this Court is whether the ADC's execution policies afford plaintiffs a reasonably adequate opportunity to present claimed constitutional violations during their executions. While this appears to be an issue of first impression in the Eighth Circuit, other district courts have addressed analogous challenges to similar execution policies. "There is unquestionably a right to access the courts involved in the context of executions that inherently injects the issue of access to counsel into this discussion." *Cooey v. Strickland*, 2011 WL 320166 *7 (S.D. Ohio 2011). "[C]ourts have recognized that the traditional access to the courts analysis requiring actual injury is unworkable in the prisoner execution context." *Hoffman v. Jindal*, 2014 WL 130981 *6 (M.D. La. 2014) (citing *Cooey*, 2011 WL 320166 at *11). In this situation, the traditional actual injury analysis "makes no sense when many of the claims could not even be recognized until during the execution process." *Cooey*, 2011 WL 320166 at *11. Instead, in this "unusual context," the circumstances of an execution "present an inherent risk of actual injury to the timely and meaningful presentation of non-frivolous claims to a court." *Id.* at *11 (explaining that the circumstances surrounding an execution "present an inherent risk of actual injury to the timely and meaningful presentation of non-frivolous claims to a court.")

This Court has considered but declines to adopt the contrary reasoning of the Eleventh Circuit in *Grayson v. Warden*. 2016 WL 7118393 (11th Cir. 2016). In that case the Eleventh Circuit held that the prisoner failed "to establish an actual injury" for purposes of standing. *Grayson*, 2016 WL 7118393 at *8. "The possibility that something might go wrong during his execution . . . does not qualify an actual injury." *Id*. (citing *Lewis v. Casey*, 518 U.S. 343, 351-352 (1996)). This Court concludes that the *Grayson* court misconstrued the alleged constitutional deprivation at issue. Unlike in *Grayson*, this Court does not find that plaintiffs have failed to allege an "actual injury" for standing purposes. Here, plaintiffs do not allege that the imminent injury is the mere prospect of an Eighth Amendment violation occasioned during the execution. Rather, plaintiffs allege that the imminent injury is the lack of meaningful access to a court from which they might seek redress from a prospective Eighth Amendment violation occasioned during the executions.

In a case cited but not followed in *Grayson*, a district court in the Sixth Circuit held that an inmate had a right to have counsel view his execution with access to a telephone. *Grayson*, 2016 WL 7118393 at *8 (citing *Coe v. Bell*, 89 F.Supp.2d 962, 967 (M.D. Tenn. 2000), *vacated by Coe v. Bell*, 230 F.3d 1357 (6th Cir. 2000) (vacated as moot because the prisoner had been executed). Though the district court decision was vacated due to mootness, its admonition regarding the right of access to the courts is worth repeating:

> Plaintiff has an Eighth Amendment right not to be subjected to cruel and unusual punishment, and substantial case law supports the contention that this right attaches until his successful execution. Plaintiff's right to meaningful access to the courts to assert that right requires that counsel have some access to the prisoner during the last hour before the execution and be permitted to witness his execution and have access to a telephone until execution has been successfully carried out.

*Coe*, 89 F.Supp.2d at 966 (internal quotations and citations omitted).

Consequently, the district court held that "the plaintiff has the right under the First, Eighth, and Fourteenth Amendments to have some access to his counsel during the last hour before the execution and to have his counsel witness the execution." *Id.* at 967. "[C]ounsel must have access to a telephone with an unimpeded outside line at the time that he or she witnesses the execution." *Id.*

The Court has also considered the case of *Towery v. Brewer*, 2012 WL 592749 (D. Ariz. 2012), but does not consider its reasoning applicable in this case. *Towery* concerned the right to counsel in the context of communications between prisoners and their counsel. *Id.,* at *18). In that case, the prisoners alleged that the presence of prison authorities near their holding cell would hamper their ability for 'privileged communication' with their counsel. *Id.* at *18. Here, plaintiffs' concern does not arise from alleged deficiencies in the communications between plaintiffs and their counsel; rather, plaintiffs' concern is that their counsel witnessing the executions will be unable to access the courts to seek redress. Therefore, the Court finds the reasoning contained in the other district court opinions to be more instructive.

"It is for the courts to remedy past or imminent official interference with individual inmates' presentation of claims to the courts." *Lewis*, 518 U.S. at 350. "'Meaningful access to the courts is the touchstone,'" *Id.,* at 351 (quoting *Bounds*, 430 U.S. at 823). Plaintiffs have alleged that ADC policies prohibit multiple counsel from witnessing the execution and fail to guarantee counsel's reasonable telephonic access to the courts. Without both, plaintiffs allege that ADC interferes with their right to petition this Court from relief, "should it appear the execution is being carried out in a way that violates the Eighth Amendment" (Dkt. No. 2-2, 167). Assuming the factual allegations contained within plaintiffs' complaint to be true, as the Court must at this stage,

plaintiffs have sufficiently alleged a claim of "imminent official interference" with their right to petition this Court for relief from imminent actual injury. *Lewis*, 518 U.S. at 350.

In sum, adopting the reasoning of the district court opinions in *Cooey*, *Hoffman*, and *Coe*, this Court determines that, as alleged in plaintiffs' complaint, Director Kelley's execution protocol interferes with the plaintiffs' right of access to the courts. For purposes of the motion to dismiss, the Court determines that plaintiffs have stated a claim upon which relief may the granted. Consequently, the Court denies defendants' motion to dismiss with respect to Claims VI and VII (Dkt. No. 26).

## IV. Conclusion

For the reasons stated, the Court grants in part and denies in part defendants' motion to dismiss (Dkt. No. 26).

Dated this 15th day of April, 2017.

Kristine G. Baker
United States District Judge