## IN THE UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF ARKANSAS

JASON McGEHEE, STACEY JOHNSON, BRUCE WARD,
TERRICK NOONER, and DON DAVIS,

*Plaintiffs*

JUSTIN ANDERSON, RAY DANSBY, GREGORY DECAY,
KENNETH ISOM, ALVIN JACKSON, LATAVIOUS JOHNSON,
TIMOTHY KEMP, BRANDON LACY, ZACHARIAH MARCYNIUK,
RODERICK RANKIN, ANDREW SASSER, THOMAS SPRINGS,
and MICKEY THOMAS,

*Intervenors*

v.                              No. 4:17-cv-00179-KGB

ASA HUTCHINSON, Governor of the State of Arkansas,
and WENDY KELLEY, Director, Arkansas Department of Correction,

*Defendants*

## AMENDED COMPLAINT

1. Plaintiffs bring this action under 42 U.S.C. § 1983 to challenge Defendants' choice of

   a midazolam protocol for executions and their failure to properly perform

   consciousness checks during executions. Additionally, they challenge violations of

   their right to access the courts and to § 3599 counsel during executions.

### JURISDICTION AND VENUE

2. Jurisdiction over this matter arises under 28 U.S.C. §§ 1331 (federal question) and

   1343(a)(3) (civil rights violations and equitable relief under an act of Congress).

3. Venue is appropriate in the Eastern District of Arkansas under 28 U.S.C. § 1391(b).

## Parties

4.   Plaintiffs are citizens of the United States and of Arkansas. With the exception of

Jason McGehee,[1] they are death-sentenced inmates currently incarcerated at the

Varner facility of the Arkansas Department of Correction ("ADC"), which is in the

Eastern District of Arkansas and under Defendants' supervision and control.

5.   Defendant Wendy Kelley is the Director of the ADC. She or her designee is

statutorily responsible for "order[ing] the dispensation and administration of the

drug or drugs . . . for the purpose of carrying out the lethal-injection procedure."

Ark. Code Ann. § 5-4-617(b). Kelley is statutorily responsible for conducting "an

execution for a sentence of death" or for designating "some assistant or assistants"

to do so. Ark. Code Ann. § 16-90-502(b), (d). Kelley alone is responsible for

"develop[ing] logistical procedures necessary to carry out the sentence of death."

Ark. Code Ann. § 5-4-617(g).

6.   Defendant Asa Hutchinson is the Governor of Arkansas. He is the final executive

authority in the state. As Governor, Hutchinson is statutorily responsible for setting

execution dates by warrant. Ark. Code Ann. § 16-90-507(a). The Governor also has

the power to suspend execution of a judgment of death. Ark Const. art. 6, § 18; Ark.

Code Ann. § 16-90-506(c)(1).

---

[1] The parties previously notified the Court that the Governor commuted McGehee's death
sentence. ECF No. 100.

<u>FACTS</u>

**A.  The midazolam protocol.**

7.  Arkansas statute provides two options for execution by lethal injection: "(1) a barbiturate; or (2) Midazolam, followed by vecuronium bromide, followed by potassium chloride." Ark. Code Ann. § 5-4-617(c). Kelley has adopted a written protocol for executions using midazolam ("midazolam protocol").

8.  The midazolam protocol calls for the drugs to be administered in the following manner. First, the executioner will inject 500 mg of midazolam, which is intended to—but which, as described further below, will not—render the condemned inmate insensate to the pain caused by the subsequent drugs. Second, five minutes after the midazolam has been injected, the executioner will inject 100 mg of vecuronium bromide, which is intended to paralyze the condemned inmate. Third, the executioner will inject 240 mEq of potassium chloride, which is intended to stop the condemned inmate's heart and to cause his death.

9.  Between injection of the midazolam and injection of the vecuronium bromide, the midazolam protocol calls for the ADC's Deputy Director, or his designee, to "confirm the condemned inmate is unconscious by using all necessary and medically-appropriate methods." The protocol provides no further detail about the nature of "necessary and medically appropriate methods." If the Deputy Director or

his designee thinks the condemned is still conscious after this consciousness check, the executioners will inject another 500 mg midazolam.

**B.  Arkansas executions in 2017.**

**10.** Arkansas executed four men in April 2017: Ledell Lee on April 20; Jack Jones and Marcel Williams on April 24; and Kenneth Williams on April 27.

**11.** During none of these executions were witnesses able to determine the time at which the executioners injected each drug into the prisoner.

**12.** During none of these executions did the Deputy Director or his designee indicate when or whether they were performing a consciousness check as indicated in the protocol.

**13.** During several of the executions, the condemned moved when they should have been anesthetized or paralyzed, as described further below.

*Execution of Kenneth Williams*

**14.** During Kenneth Williams' execution, Williams began bucking against the restraints so hard that it caused bruising to his head. One witness said Williams "lurche[d] forward 15 times in quick succession, then another five times at a slower rate." Other witnesses described the movement as "lurching, jerking, convulsing, and coughing." One witness described his chest pumping for a long time, about four minutes. Sound could be heard through the glass while this movement was happening. *Timeline of Latest Arkansas Execution from AP Reporter*, Apr. 28, 2017,

4

*available at* https://bit.ly/2xo5i2e. One witness described hearing a sigh through the glass without the microphone on in what sounded like an expression of pain. A media witness described it as "disturbing."

<u>Execution of Marcel Williams</u>

**15.** It took forty-five minutes to establish venous access to Marcel Williams. Williams closed his eyes at 10:17 p.m. and was breathing heavily with his chest rising in hard, almost jerky motions. At 10:19, someone started touching his arm in what may have been a consciousness check; heavy breathing and movement continued. The executioner spoke into Williams's ear at 10:22 and his head turned; he was still breathing heavily. At points his breathing was so heavy that a media witness saw his back arch off the gurney. Jacob Rosenberg, *Arkansas Executions: I Was Watching Him Breathe Heavily and Arch His Back*, The Guardian, Apr. 25, 2017, *available at* https://bit.ly/2pekMhK. He continued to breathe hard until 10:23. He coughed at 10:25. The executioner brushed his eyelids at 10:26. Williams's right eye opened at 10:28. The eye continued to move at 10:29. The eye was still open at 10:31 when the executioner brushed Williams's eyelids again. Death was pronounced at 10:33. At no point did the executioner make an affirmative indication that Williams was not conscious. One witness noted eye movement until at least three minutes before the coroner was called.

*Execution of Jack Jones*

16. During the execution of Jack Jones, Jones's lips moved for about a minute after he completed his final words. Five minutes into the execution, his lips moved an additional three to five times. *See* Andrew DeMillo, *Contrasting Accounts of Arkansas Executions from Witnesses*, AP, Apr. 25, 2017, *available at* https://bit.ly/2J5yCMf.

## C.  Other midazolam executions.

17. On January 16, 2014, Ohio executed Dennis McGuire using a combination of 10 mg midazolam and 40 mg hydromorphone. The execution took twenty-five minutes and "was accompanied by movement and gasping, snorting and choking sounds." Erica Goode, *After a Prolonged Execution in Ohio, Questions over 'Cruel and Unusual'*, N.Y. TIMES, Jan. 17, 2014, *available at* http://nyti.ms/2glQUyI.

18. On April 29, 2014, Oklahoma executed Clayton Lockett using 100 mg midazolam followed by a paralytic and potassium chloride. Lockett awoke during administration of the second and third drugs. Though the execution was halted, Lockett died forty minutes after the execution began. *See Glossip v. Gross*, 135 S. Ct. 2726, 2782 (2015) (Sotomayor, J., dissenting).

19. On July 23, 2014, Arizona subjected Joseph Wood to an execution in which he was injected with 750 mg midazolam and 750 mg hydromorphone. Wood "gasped and snorted for nearly two hours" before he finally died. *Glossip*, 135 S. Ct. at 2791; *see also* Mark Berman, *Arizona Execution Lasts Nearly Two Hours; Lawyer Says Joseph Wood*

*Was 'Gasping and Struggling to Breathe*,' WASH. POST, July 23, 2014,

http://wapo.st/2nsiJrk. Wood's attorneys convened a hearing during the execution.

**20.** On December 8, 2016, Alabama executed Ronald Bert Smith using 500 mg of

midazolam followed by 600 mg of rocuronium bromide followed by 240 mEq

potassium chloride. This protocol is effectively the same as the one Arkansas uses.

During the execution, which took thirty-four minutes, Smith "was apparently

struggling for breath as he heaved and coughed for about 13 minutes." Mark

Berman & Robert Barnes, *After Divided Supreme Court Allows Alabama Execution,*

*Inmate Heaves and Coughs During Lethal Injection*, WASH. POST, Dec. 9, 2016, *available at*

http://wapo.st/2hnRs7p. Spencer Hahn, who witnessed this execution, further

described it at the preliminary-injunction hearing. Tr. 363–387

**21.** In light of midazolam's obvious impropriety as an execution drug, state corrections

departments have abandoned it. Kentucky abandoned it in 2014. In 2016, Arizona

agreed that it will never again use midazolam in an execution. Florida has

eliminated midazolam from its most recent execution protocol.

**D.  Other Arkansas execution policies.**

**22.** Before the April 2017 executions, ADC policy would have allowed only one attorney

to view each execution and would have prohibited communications with other

attorneys or the Court during the executions. Two days before the first scheduled

execution, the Court enjoined this policy and, with the "interest in swift resolution in

mind," ordered the parties to negotiate an agreement that "assures plaintiffs' right to counsel and access to the courts for the entire duration of all executions." ECF No. 54 at 101.

23. The parties reached an agreement that would allow two attorneys to view each execution and that permits telephone access during the executions. ECF No. 62. To Plaintiffs' knowledge, the ADC hasn't incorporated this policy into its protocol or otherwise ensured that it (or a similar policy) will be applicable to future executions.

24. The ADC prevents any witness, including the attorneys, from viewing and hearing the complete execution process. Its policies do not permit witnesses to view the execution until the IV lines have been affixed to the prisoner and the drugs are ready to flow. Members of the execution team have discretion to pull the curtain during drug flow in the event of a problem. Audio to the witness room is shut down after the inmate's last words. The Deputy Director or his designee does not indicate when the consciousness check is being performed or the results of that check. And the executioners do not indicate when they are injecting each drug into the condemned inmate. If, as provided by the protocol, a backup dose of Midazolam is given, there is no indication to the witnesses that more Midazolam is being given.

**CLAIM I: USE OF MIDAZOLAM AS THE FIRST DRUG IN A THREE-DRUG PROTOCOL VIOLATES THE EIGHTH AMENDMENT'S PROHIBITION AGAINST CRUEL AND UNUSUAL PUNISHMENT.**

25. The previous paragraphs of this complaint are incorporated by reference as if fully stated herein.

**26.** Use of midazolam as the first drug in Arkansas's three-drug protocol poses an objectively intolerable risk of substantial harm that is sure or very likely to occur. Alternative execution methods that would avoid this risk are feasible and readily available to Kelley. Accordingly, the midazolam protocol causes cruel and unusual punishment proscribed by the Eighth Amendment.

### A. Midazolam cannot anesthetize Plaintiffs to the suffering the second and third drugs cause.

**27.** Pharmacological experts and anesthesiologists familiar with midazolam have determined that its inclusion in a three-drug execution protocol is all but certain to cause Plaintiffs excruciating suffering. The reasons for that conclusion are as follows:

**28.** The second drug in the midazolam protocol, vecuronium bromide, paralyzes the recipient's diaphragm and prevents breathing. In a surgical setting, a patient given vecuronium bromide would be placed on a ventilator or otherwise be provided with artificial respiration. To a conscious or semi-conscious person, the drug creates the feeling of air-hunger, because the person has the desire to breathe but no ability to do so. Once the paralysis is total, the recipient is unable to communicate and feels as if he has been buried alive. Researchers have determined that vecuronium bromide should not be used alone because it causes serious psychic trauma.

**29.** The third drug in the midazolam protocol, potassium chloride, stops the heart. Administered by itself, it would cause the recipient to experience an excruciating burning pain.

9

30. Unless the prisoner is placed under general anesthesia, he will feel the physical and psychological suffering caused by the second and third drugs in the midazolam protocol. Anesthesia occurs on a spectrum; a level of sedation lower than general anesthesia in a lethal injection is insufficient.

31. Midazolam is a benzodiazepine, a class of drug that also includes Valium and Xanax. Unlike barbiturates, which are typically used in lethal injections and which can render general anesthesia, midazolam has no independent depressive effect. Rather, it binds with a neurotransmitter called "GABA" to produce sedation. Because GABA is present in limited quantities in the brain, midazolam's sedative properties are also limited. Scientists refer to this as the drug's "ceiling effect."

32. Midazolam's ceiling effect prevents it from producing general anesthesia. Thus, it cannot render Plaintiffs insensate to the pain and suffering caused by the vecuronium bromide and the potassium chloride. 500 mg midazolam will sedate Plaintiffs, but it will not anesthetize them to pain. The executioner could pump Plaintiffs with a limitless amount of midazolam, but they would still be aroused by the harrowing effects of the second and third drugs.

33. The second drug in the protocol has the additional effect of preventing Plaintiffs from communicating any distress caused by the third drug. Were there no paralytic, the arousal and pain caused by the potassium chloride would be obvious to any observer. The paralytic prevents an observer from seeing something that is

10

scientifically verifiable to pharmacological experts: midazolam is incapable of anesthetizing the prisoners to the agonizing pain caused by the third drug. The paralytic serves no function in the execution other than masking the prisoner's reactions; it simply adds another element of risk to the execution process. It does not anesthetize the condemned and it is unnecessary to cause death (which is the function of the potassium chloride).

34. The consciousness check is necessary to discern awareness but insufficient to determine whether the prisoner is insensate to pain. The term "unconscious" is not a term of art. There is a continuum of sedation, the deepest being general anesthesia. Only general anesthesia is sufficient to prevent the experiencing of painful stimulus. A sleeping person is "unconscious" but is not under general anesthesia. It is possible for a person to exhibit no movement, suppressed reflexes, and no responsiveness to verbal or physical stimuli and still not have reached the surgical plane of anesthesia. A person may be judged "unconscious" but still be able to feel pain from the vecuronium bromide or potassium chloride.

B.  **Multiple alternative execution methods are feasible, readily available, and would significantly reduce Plaintiffs' suffering.**

35. Execution by firing squad would be a more humane and reliable means of death than the torturous chemical procedure Defendants now use. Properly performed—and proper performance is a simple matter for trained marksmen—execution by firing squad will cause a painless and nearly instantaneous death. The State has all

11

the personnel and implements necessary to carry out an execution by firing squad.

And such a method is feasible, as evidenced by Utah's use of a firing squad in 2010.

Utah has a detailed protocol for firing squad executions, which it would be easy for

Arkansas to either adopt or adapt.

36. The State could execute Plaintiffs by a lethal injection of FDA-approved,

manufactured pentobarbital. Pentobarbital is a barbiturate and would adequately

anesthetize Plaintiffs to the pain the second and third drugs otherwise would cause.

At least one other state (Missouri) has obtained FDA-approved, manufactured

pentobarbital in the recent past. Additionally, Arkansas has passed laws to shield

drug suppliers from public view, Ark. Code Ann. § 5-4-617(i)(2), thus facilitating its

ability to acquire drugs, as exhibited by its August 2017 acquisition of midazolam (a

drug Kelley previously indicated she would never be able to acquire after April

2017).

37. An injection of compounded pentobarbital, implemented with appropriate

safeguards, would significantly reduce the risk of Plaintiffs' suffering. Compounded

drugs come with additional risks, but with easily implemented safeguards—for

example, acquisition from a reputable pharmacy and adequate testing of the drug—

this method would significantly reduce the suffering the midazolam protocol is sure

to cause. Compounded drugs are available to the State—indeed, Texas and Georgia

have carried out numerous executions in recent years with compounded

pentobarbital.

**38.** Execution using a massive overdose of sevoflurane as the sole lethal agent would

significantly reduce the pain and suffering inherent in the midazolam protocol.

Sevoflurane is a gas that has the same mechanism of action as barbiturate drugs and,

like barbiturates, is sufficient to cause death on its own. The gas is available to the

ADC for use in executions from Piramal Critical of Bethlehem, PA. The equipment

required for administration is also available from online vendors, and medical

expertise is not required to operate it.

**39.** A three-drug protocol that substitutes etomidate for midazolam would significantly

reduce the substantial risk of pain and suffering inherent in the midazolam protocol.

While not a barbiturate, etomidate has many of the same chemical properties as

barbiturates and is thus more appropriate for executions than a benzodiazepine such

as midazolam. Florida uses a three-drug protocol of this nature. It has been able to

obtain etomidate for use in executions and has carried out an execution using the

drug as recently as February 2018.

**40.** A two-drug protocol of 100 milligrams diazepam followed by 7,500 micrograms

fentanyl would significantly reduce the substantial risk of pain and suffering

inherent in the midazolam protocol. Nevada and Nebraska have each obtained these

drugs for use in executions.

**41.** An oral administration of 10 grams secobarbital, a barbiturate, would cause a

painless death. The drug would be administered via feeding tube, which does not

require the condemned to swallow or take any other physical action. Establishing a

feeding tube is relatively painless, is significantly easier than establishing venous

access, and can be done in less than a minute. Once ingested, a 10g dosage of

secobarbital causes coma within five minutes and death within half an hour. This is

the primary method for physician-assisted suicide in jurisdictions that allow that

practice. Secobarbital is readily available for physician-assisted suicide and would

also be available for use in executions.

**CLAIM II:** ERRATIC APPLICATION OF CONSCIOUSNESS CHECKS VIOLATES PLAINTIFFS' RIGHT
TO EQUAL PROTECTION

**42.** The previous paragraphs of this complaint are incorporated by reference as if fully

stated herein.

**43.** As members of a class of persons subject to execution under Arkansas law, Plaintiffs

have a fundamental right under the Eighth Amendment to be free from cruel and

unusual punishment.

**44.** Defendants have adopted a protocol that requires a consciousness check. This

requirement is intended to guard against injection of painful drugs while the

prisoner is capable of feeling them. The consciousness check is a core protection of

the Plaintiffs' fundamental right to be free from cruel and unusual punishment.

**45.** As shown by the April executions, the ADC does not apply the consciousness check consistently from execution to execution. The executioners either did not carry out an appropriate consciousness check or proceeded with the execution even after the condemned exhibited movements indicating consciousness.

**46.** Defendants have no legitimate interest in carrying out a midazolam execution without consistently adhering to the procedure they have adopted in an attempt to protect against gratuitous pain.

**47.** Defendants' failure to consistently apply a consciousness check to each of them violates Plaintiffs' right to equal protection.

**CLAIM III: KELLEY'S POLICIES DURING THE EXECUTIONS VIOLATE PLAINTIFFS' FIRST AMENDMENT RIGHT OF ACCESS TO THE COURTS.**

**48.** The previous paragraphs of this complaint are incorporated by reference as if fully stated herein.

**49.** Plaintiffs have a right to access the courts under the First Amendment. This right guarantees them the ability, through counsel, to contact a judge during the execution should it appear the execution is being carried out in a way that violates the Eighth Amendment.

**50.** Kelley's policies prevent Plaintiffs' attorneys from seeing any part of the execution until the condemned is strapped to the gurney and intravenous access is established. So, for example, Marcel Williams's attorneys were unable to determine whether he was undergoing any gratuitous pain and suffering during the forty-five minutes it

took to establish venous access to him. Twice in the past year, states have

abandoned executions after repeatedly puncturing the condemned and failing to

access a vein. *See* Tracy Connor, *Doyle Lee Hamm Wished for Death During Botched*

*Execution, Report Says*, NBC News, Mar. 5, 2018, *available at*

https://nbcnews.to/2JOYlti;  Tracy Conner, *Ohio Cancels Execution of Alva Campbell*

*after Failing to Find Vein*, NBC News, Nov. 15, 2017, *available at*

https://nbcnews.to/2ik4hhD. Failure to provide attorney access to the entire

execution violates Plaintiffs' right of access to the courts.

51. Kelley's policies prevent Plaintiffs' attorneys from determining when each drug is

injected. For example, during the April executions, the attorneys could not tell

whether the executioners waited five minutes to conduct the consciousness check,

whether the executioners injected multiple rounds of midazolam, or the time at

which the executioners injected the vecuronium bromide. By preventing Plaintiffs'

attorneys from verifying that the executioners have not materially deviated from

their protocol, Kelley's policy violates Plaintiffs' right of access to the courts.

52. Kelley's policy previously prevented more than one attorney from witnessing an

execution and prevented the witnessing attorney from contacting co-counsel or a

judge during the execution. This policy violates Plaintiff's First Amendment right of

access to the courts. While Kelley agreed to change that policy for the April 2017

executions, she does not appear to have adopted it for executions going forward.

<u>Claim IV</u>: Kelley's policies during the executions violate the right to counsel under 18 U.S.C. § 3599

**53.** The previous paragraphs of this complaint are incorporated by reference as if fully stated herein.

**54.** Under 18 U.S.C. § 3599, indigent persons sentenced to death are entitled to "the appointment of one or more attorneys." Each Plaintiff has been appointed an attorney or attorneys under this provision.

**55.** Attorneys appointed under § 3599 are authorized to represent the death-sentenced person "throughout every subsequent stage of available judicial proceedings, including . . . all available post-conviction process, together with applications for stays of execution and other appropriate motions and procedures."

**56.** "Available judicial proceedings" and "appropriate motions and procedures" include motions that counsel may find necessary to make during the execution to advocate for her client's right to be free from cruel and unusual punishment.

**57.** Kelley's policies prevent Plaintiffs' attorneys from protecting their clients' rights by obstructing them from seeing and hearing the full execution process. Without a complete view of the execution from the time the condemned enters the chamber, an attorney has no way of knowing whether the execution is violating her client's Eighth Amendment rights. For example, during the attempted 2009 execution of Romell Broom in Ohio, the executioners repeatedly pierced Broom with needles for two hours as they unsuccessfully tried to find a vein. Under Kelley's policies,

17

Plaintiffs' attorneys could not raise such a problem with the courts—indeed, they could not even learn of it. Likewise, Kelley's policy of shutting off the chamber audio would prevent Plaintiffs' attorneys from hearing any audible reaction Plaintiffs have to the drugs. And Kelley's policies prevent Plaintiffs' attorneys from discerning when each drug is injected into their client. Plaintiffs' right to counsel requires that their attorneys have complete visual and audio access to the execution from the time Plaintiffs enter the chamber to the time they are pronounced dead.

58.  Kelley's policy previously prevented more than one attorney from witnessing the execution and prevented the witnessing attorney from contacting co-counsel or a judge during the execution. While Kelley agreed to change that policy for the April 2017 executions, she does not appear to have adopted the change for executions going forward. Section 3599 envisions the appointment of multiple counsel for death-sentenced persons, up to and including the execution itself. To adequately protect the Plaintiffs' rights, it is necessary to have at least two attorneys present— one who can respond to any problems that arise, and one who can continue making a record of the execution—and it is also necessary to permit telephone access to the court and co-counsel during the execution. The policy's limitations infringe upon the right to counsel guaranteed by 18 U.S.C. § 3599.

## Conclusion and Prayer for Relief

59.  For all of the above reasons, Plaintiffs respectfully ask this Court to:

18

- Declare that Arkansas's midazolam protocol is unconstitutional;

- Declare that Defendants' failure to apply the consciousness check in a consistent fashion is unconstitutional;

- Permanently enjoin Defendants from executing Plaintiffs using the midazolam protocol;

- Declare that Defendants must allow counsel for Plaintiffs to be able to hear and see the entirety of the execution process until death is confirmed;

- Declare that Defendants must provide visual and audible signals of when each drug is being injected into the condemned;

- Declare that Defendants must provide ready access to a telephone during the execution that will allow Plaintiffs' attorneys to reach persons responsible for overseeing the execution and any appropriate governmental or judicial authority;

- Declare that Defendants must permit multiple defense team members to witness the execution if Plaintiffs have multiple attorneys;

- Permanently enjoin Defendants from executing any Plaintiff unless access to counsel and the courts, as outlined above, is guaranteed throughout the execution process; and

- Grant any further relief the Court deems proper.

Respectfully submitted,

s/ John C. Williams
JOHN C. WILLIAMS, ABN 2013233
SCOTT W. BRADEN, ABN 2013233
Federal Public Defender's Office
1401 W. Capitol, Suite 490
Little Rock, AR 72201
501.324.6114
scott_braden@fd.org
john_c_williams@fd.org

*Counsel for Plaintiffs Jason McGehee, Don Davis, Terrick Nooner, and Bruce Ward; and for Intervenors Justin Anderson, Ray Dansby, Gregory Decay, Kenneth Isom, Latavious Johnson, Timothy Kemp, Brandon Lacy, Zachariah Marcyniuk, Andrew Sasser, Thomas Springs, and Mickey Thomas*

/s/ Jeff Rosenzweig
JEFF ROSENZWEIG, ABN 77115
300 Spring Street, Ste. 310
Little Rock, AR 72201
501.372.5247
jrosenzweig@att.net

*Counsel for Plaintiff Stacey Johnson and Intervenor Alvin Jackson*

/s/ James Moreno
JAMES MORENO (PA Bar 86838)
CRISTI CHARPENTIER (PA Bar 62055)
AREN ADJOIAN (PA Bar 95132)
Fed. Cmty. Def. Off. for E.D. Pa.
601 Walnut St., Ste. 545 West
Philadelphia, PA 19106
215.928.0520
James_Moreno@fd.org
Cristi_Charpentier@fd.org
Aren_Adjoian@fd.org

*Counsel for Intervenor Roderick Rankin*