## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF ARKANSAS

JASON McGEHEE, STACEY JOHNSON,
BRUCE WARD, TERRICK NOONER,
and DON DAVIS                                                    **PLAINTIFFS**

JUSTIN ANDERSON, RAY DANSBY, GREGORY
DECAY, KENNETH ISOM, ALVIN JACKSON,
LATAVIOUS JOHNSON, TIMOTHY KEMP,
BRANDON LACY, ZACHARIAH MARCYNIUK,
RODERICK RANKIN, ANDREW SASSER,
THOMAS SPRINGS, and MICKEY THOMAS          **INTERVENORS**

v.                    Case No. 4:17-CV-179-KGB-BD

ASA HUTCHINSON, Governor of the
State of Arkansas, and WENDY
KELLEY, Director, Arkansas
Department of Correction                                    **DEFENDANTS**

---

## BRIEF IN SUPPORT OF
## DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

---

Asa Hutchinson, in his official capacity as Governor of the State of Arkansas,

and Wendy Kelley, in her official capacity as Director of the Arkansas Department

of Correction ("ADC") (collectively, "the State") submit this brief in support of their

Motion for Summary Judgment.  As detailed below, the claims brought by Plaintiffs

and Intervenors (collectively, "the Prisoners") are moot, procedurally barred, time

barred, and/or fail as a matter of law under controlling precedent.  And because the

Prisoners have no cognizable claim, the Amended Complaint is barred by the

Eleventh Amendment.  The Court should enter summary judgment in favor of

Defendants and dismiss the Amended Complaint with prejudice.

## INTRODUCTION

The Complaint filed by the Prisoners in late March of 2017 was just the latest in a long series of efforts to escape their lawful executions.[1]  In a kitchen-sink approach, the Prisoners brought a bevy of challenges to their executions.  None had merit then,[2] and they do not have merit now.  There are no genuine issues of material fact in this case, and Defendants are entitled to judgment as a matter of law on the remaining four claims.[3]  *First,* the midazolam and policy claims (Claims I, III, and IV) are barred by *res judicata* and collateral estoppel and also fail because they are speculative.  *Second*, there are no genuine issues of material fact with regard to midazolam's ability to render an inmate unconscious and insensate to pain and, in any event, the Prisoners have not and cannot carry their burden of proving an available alternative.  *Third*, the undisputed evidence shows that ADC

---

[1] Four of the original Plaintiffs—Ledell Lee, Jack Jones, Marcell Williams, and Kenneth Williams—were lawfully executed in April of 2017.  They are not parties to the Amended Complaint filed on June 21, 2018.  Dkt. No. 117.

[2] The Court dismissed several claims in April 2017 pursuant to Fed. R. Civ. P. 12(b).  Dkt. No. 53.  This Court dismissed Claim 1 of the Complaint—Plaintiffs' effective assistance of counsel claim.  *Id.* at 20.  This Court also dismissed Claim 2, which asserted that executions in the "compressed timeframe" scheduled in April 2017 violated the Eighth Amendment.  *Id.* at 29.  Finally, the Court dismissed Claim 4, which challenged ADC's lethal-injection protocol, separate and apart from its intention to use midazolam, as an independent Eighth Amendment violation.  *Id.* at 50.

[3] The Prisoners filed an Amended Complaint in June 2018 raising four claims:  (1) the use of midazolam as the first drug in Arkansas's three-drug protocol violates the Eighth Amendment; (2) the erratic application of consciousness checks violates Equal Protection; (3) ADC's execution policies violate the Prisoners' right of access to the courts; and (4) ADC's execution policies violate the Prisoners' right to counsel under 18 U.S.C. § 3599.  Dkt. No. 117.

consistently applied the consciousness check protocol in April 2017, and any claim that ADC may in the future deviate from its protocol is speculative. *Fourth*, the Prisoners' claims regarding right of access to courts and counsel (Claims III and IV) are time barred, moot, and fail on the merits. And because the Prisoners have no viable constitutional claim, the sovereign immunity doctrine applies. For each and all of these reasons, the Court should enter summary judgment in favor of Defendants.

## FACTUAL BACKGROUND

The Prisoners were convicted of capital murder and sentenced to death for their heinous crimes decades ago. They have each enjoyed multiple opportunities to challenge their lawful convictions and sentences. Their guilt is beyond dispute.

*Prior Litigation.* Since their convictions and sentences, the Prisoners have been involved in numerous lawsuits, in state and federal courts, challenging different aspects of Arkansas's method-of-execution statute and the ADC's lethal-injection protocol. Their state-court method-of-execution claims have generally been unsuccessful. *See Kelley v. Johnson*, 2016 Ark. 268, 496 S.W.3d 346 (dismissing as barred by sovereign immunity the Prisoners' cruel-or-unusual punishment challenges to the current method-of-execution act and the ADC's current lethal-injection protocol), *reh'g denied* (July 21, 2016), *cert. denied*, 137 S. Ct. 1067, *reh'g denied*, 137 S. Ct. 1838 (2017); *see also Hobbs v. McGehee*, 2015 Ark. 116, 458 S.W.3d 707 (rejecting federal and state constitutional challenges to the ADC's drug protocol as well as policies regarding the selection, training, and

3

qualifications of members of the execution team and the method by which the drugs would be injected); *Ark. Dep't of Corr. v. Williams*, 2009 Ark. 523, 357 S.W.3d 867 (dismissing as moot inmates' challenge to 2008 administrative directive governing lethal-injection protocol).  The Prisoners' only success was a single Arkansas Supreme Court ruling that invalidated an earlier method-of-execution statute on the ground that it delegated complete, unfettered discretion to the ADC in selecting the lethal agent in violation of the state constitution's separation-of-powers article. *See Hobbs v. Jones*, 2012 Ark. 293, 412 S.W.3d 844.

The Prisoners' multiple federal-court challenges have likewise failed.  *See Lee v. Hutchinson*, U.S. District Court, E.D. Ark., No. 4:17-cv-00195-DPM, *aff'd*, 854 F.3d 978 (8th Cir. 2017) (denying the Prisoners' request for an emergency stay of executions for all but one plaintiff, Jason McGehee, for whom the Arkansas Parole Board had recently recommended clemency to Governor Hutchinson); *see also Nooner v. Norris*, 594 F.3d 592 (8th Cir. 2010) (holding that ADC's lethal-injection protocol, including requirements that "trained, educated, and experienced persons" serve on the IV team and establish central venous line, was constitutional); *Jones v. Hobbs*, 604 F.3d 580 (8th Cir. 2010) (granting State's motion to vacate stays of execution because the death-row inmates failed to demonstrate a significant possibility of success on the merits of their claim that the Arkansas method-of-execution act was unconstitutional; act was previously held constitutional, and claims that State could adopt a different, unconstitutional protocol or might deviate from the current protocol at the eleventh hour were purely speculative); *Nooner v.*

*Norris*, 491 F.3d 804 (8th Cir. 2007) (holding that state prisoner convicted of capital murder and sentenced to death was not entitled to a preliminary injunction staying his execution in order to litigate the constitutionality of Arkansas's lethal-injection protocol in a § 1983 suit); *Jones v. Hobbs*, 745 F. Supp.2d 886 (E.D. Ark. 2010) (rejecting inmates' challenge to prior method-of-execution act under the Food, Drug and Cosmetic Act and the Controlled Substances Act); *Williams v. Hobbs*, No. 5:09-cv-00394-JLH, 2010 WL 749563 (E.D. Ark. Mar. 2, 2010) (rejecting argument that prior method-of-execution act violated due process by suppressing information regarding how a defendant's death sentence would be carried out).

And the Eighth Circuit has recently made crystal clear—in this very case—that the Prisoners' instant challenge is doomed to failure as well.  *See McGehee v. Hutchinson*, 854 F.3d 488 (8th Cir. 2017) (vacating stays of execution because Prisoners failed to show that the use of midazolam was sure or very likely to cause needless suffering or that there is a known and available alternative that would significantly reduce a substantial risk of severe pain).

***Arkansas Act 1096 of 2015 and the ADC's Current Lethal-Injection Protocol.***   At the time that the Prisoners filed this lawsuit, they—and anti-death penalty activists who prevented Arkansas from obtaining execution drugs—had successfully prevented Arkansas from carrying out an execution for almost 12 years. In 2015, the Arkansas General Assembly amended the method-of-execution act to, among other things, "address the problem of drug shortages" by "adopt[ing] alternative methods of lethal injection to bring about the death of the condemned

prisoner." Ark. Act 1096 of 2015, § 1(b).  Specifically, that legislation (1) codified a three-drug lethal-injection protocol exactly the same as the one that was upheld by the United States Supreme Court in *Glossip v. Gross*, 135 S. Ct. 2726 (2015), as an alternative to the single-drug protocol upheld by the Arkansas Supreme Court in *Hobbs v. McGehee*, 2015 Ark. 116, 458 S.W.3d 707; (2) authorized ADC to obtain lethal-injection drugs from FDA-registered facilities and accredited compounding pharmacies in addition to traditional pharmaceutical manufacturers; and (3) required ADC to "keep confidential all information that may identify or lead to the identification of . . . entities and persons who compound, test, sell, or supply the drug or drugs" used in the execution process.  *See* Act 1096, § 2(c), (d), (g).

After Act 1096 was adopted and supplier confidentiality was codified as law, ADC was able to procure a supply of FDA-approved drugs sufficient to carry out eight then-scheduled executions.  *See Kelley v. Johnson*, 2016 Ark. 268, at 17, 496 S.W.3d at 358.  ADC then adopted its current lethal-injection procedure utilizing the three-drug midazolam protocol.  **(Ex. 1)**  Other than the different drug protocol, the current execution procedure is very similar to the 2008 procedure.  *Compare* 2008 Lethal Injection Procedure, Ex. 35, at pp. 15-19 *with* 2015 Procedure, Exs. 1 & 36.  There are no material differences between the 2008 and 2015 procedures with regard to general execution procedures, IV set-up procedures, lethal-injection procedures (including procedures for assessing the condemned inmate's consciousness and monitoring IV infusion sites), and IV team qualifications.  *Id.*

***Prisoners' First Lawsuit Challenging Act 1096.*** On April 6, 2015, almost immediately after Act 1096 became law, the Prisoners filed suit attacking its constitutionality in a state-court case styled *Marcel Williams, et al. v. Wendy Kelley, et al.*, Circuit Court of Pulaski County, Arkansas, Case No. 60CV-15-1400. The *Williams* complaint challenged Act 1096 under various provisions of the United States Constitution (including the First Amendment, the Eighth Amendment, the Due Process Clause, the *Ex Post Facto* Clause, and the Supremacy Clause) as well as corresponding provisions of the Arkansas Constitution. The State removed that complaint to federal court.[4]  *See* Notice of Removal and Complaint (Apr. 10, 2015) (Docs. 1 & 2) filed in *Williams v. Kelley*, U.S. District Court, E.D. Ark., No. 4:15-CV-00206-JM. After removal, the Prisoners promptly nonsuited the federal case. *See id.*, Notice of Voluntary Dismissal Without Prejudice (Dkt. No. 4).

The same day that they nonsuited the 2015 federal action, the Prisoners filed an "Amended Complaint" in Pulaski County Case No. 60CV-15-1400 raising only state-law challenges to Act 1096. *See Kelley v. Johnson*, 2016 Ark. 268, at 5, 496 S.W.3d at 352. They then filed a "Second Amended Complaint" on May 1, 2015, again raising only state constitutional challenges to Act 1096. The State moved to dismiss for lack of subject-matter jurisdiction, and on July 17, 2015, after full briefing, the Prisoners voluntarily nonsuited their claims without prejudice. **(Ex.**

---

[4] The Plaintiffs in that case were Marcel Williams, Jason McGehee, Bruce Ward, Terrick Nooner, Jack Jones, Stacey Johnson, and Kenneth Williams. Don Davis and Ledell Lee were later granted permission to intervene.

**32)**  That dismissal of the state-court action was the second time the Prisoners'
constitutional claims against Act 1096 were dismissed.

     *Prisoners' Second Lawsuit Challenging Act 1096.*  On June 29, 2015—
while the State's motion to dismiss Pulaski County Case No. 60CV-15-1400 was still
pending—the Prisoners[5] filed a new state-court lawsuit challenging the
constitutionality of Act 1096 under a different style and case number, *Stacey
Johnson et al. v. Wendy Kelley*, Circuit Court of Pulaski County, Arkansas, Case No.
60CV-15-2921.  In their complaint in the *Johnson* case, the Prisoners affirmatively
alleged that they "voluntarily dismissed the federal case without prejudice in order
to return their causes of action to state court (***where they belong***)."  *Id.*, Compl.
(June 29, 2015) (emphasis added).  They asserted only state constitutional
challenges to Act 1096, including challenges under the state ban on cruel-or-
unusual punishment as well as other state constitutional provisions that mirror the
federal claims brought in the first state-court case.

     *The State-Court Stay.*  Because the Prisoners had exhausted their direct
and collateral challenges to their convictions and death sentences, Governor
Hutchinson set execution dates for October 2015.  The Prisoners sought a stay of
the scheduled executions based on their challenge to Act 1096.  The Arkansas
Supreme Court entered an order staying all executions "pending the resolution of

---

[5] All nine of the original Plaintiffs in this case filed the second lawsuit in the
Pulaski County Circuit Court.

the litigation currently pending in the Pulaski County Circuit Court."[6]  *Kelley v. Griffen*, 2015 Ark. 375, at 4, 472 S.W.3d 135, 137.

**The Prisoners' Amended Complaint Challenging the ADC's 2015 Lethal-Injection Procedure.**   On September 28, 2015, the Prisoners filed an Amended Complaint in the state-court case, to include new claims challenging the constitutionality of the ADC's Lethal Injection Procedure.  *See* Am. Compl. (Sept. 28, 2015) in *Johnson v. Kelley*, Pulaski County No. 60CV-15-2921.  Among other claims, the Prisoners alleged that the ADC's procedure violated the state constitutional ban on cruel or unusual punishment because the first drug in the protocol (midazolam) would not sufficiently anesthetize the condemned inmates to render them unconscious and insensate to the effects of the second and third drugs; lacked sufficient qualification and training requirements for members of the IV team; contained insufficient criteria for assessing consciousness; allowed people to perform the consciousness check without adequate training or experience; and purportedly would cause the inmates to experience severe pain from the administration of the second and third drugs.  *Id.*

---

[6] Contrary to Arkansas law, the state trial court had initially entered a stay of the executions. The only state court that can stay an execution after a death warrant has issued is the Arkansas Supreme Court. In *Kelley v. Griffen*, 2015 Ark. 375, 472 S.W.3d 135, the Arkansas Supreme Court granted the State's emergency petition for a writ of certiorari and lifted the stays of execution previously imposed by the Pulaski County Circuit Court. But the Arkansas Supreme Court simultaneously granted the Prisoners' request for a stay pending resolution of the Pulaski County litigation in Case No. 60CV-15-2921.

In an attempt to satisfy the pleading standards set out in *Baze v. Rees*, 553 U.S. 35 (2008), and *Glossip*, 135 S. Ct. 2726, the Prisoners alleged that five alternative execution methods were available that would significantly reduce the risk of severe pain and suffering:  (1) the firing squad; (2) an FDA-approved, fast-acting injectable barbiturate; (3) an overdose of anesthetic gas; (4) a massive overdose of an injectable opioid drug; and (5) a massive overdose of a transdermal opioid patch. *See* Am. Compl. in *Johnson v. Kelley*, Pulaski County No. 60CV-15-2921, ¶¶ 89-93. The Prisoners sought, among other relief, a declaration that Act 1096 is unconstitutional it its entirety, both as applied and on its face, a declaration that the ADC's lethal-injection procedure is unconstitutional, and an injunction preventing the ADC from carrying out the 2015 executions pursuant to Act 1096 and/or the protocol.  *Id.* at 56-57.  The Prisoners, in their Amended Complaint, again made crystal clear that they had voluntarily dismissed their federal constitutional claims "in order to return their causes of action to state court, ***where they belong*.**"  *Id.* ¶ 4 (emphasis added).

The State moved to dismiss the Amended Complaint for failure to allege sufficient facts to state a cognizable constitutional claim.  The state circuit court denied the State's motion in relevant part after a hearing.  *See* Mem. Order Denying Mot. to Dismiss Am. Compl. (Oct. 9, 2015) in *Johnson v. Kelley*, Pulaski County No. 60CV-15-2921.  The parties then engaged in some discovery and filed cross-motions

for summary judgment.[7]   The State's motion for summary judgment was wholly based on sovereign immunity because the Prisoners had failed to adduce any evidence to raise a triable issue of fact on any cognizable constitutional claim.   The State submitted evidence that *none* of the Prisoners' proposed alternative drugs were available to ADC.   **(Ex. 30)**  The state circuit court denied the parties' cross-motions for summary judgment on the substantive cruel-or-unusual punishment and due-process claims, finding that genuine issues of material fact precluded summary judgment in favor of either party.   *See* Mem. Order Concerning Pls.' Mot. Partial Summ. J., Defs.' Cross Mot. Summ. J., & Defs.' Mot. for Prot. Order (Dec. 3, 2015) in *Johnson v. Kelley*, Pulaski County No. 60CV-15-2921.  The State appealed.

***Arkansas Supreme Court's Dismissal of the Prisoners' Constitutional Claims as Barred by Sovereign Immunity.***  On appellate review, the Arkansas Supreme Court reversed the circuit court's "decision *in toto* and dismiss[ed] the prisoners' amended complaint." *Kelley v. Johnson*, 2016 Ark. 268, at 1, 496 S.W.3d 346, 350 (emphasis added).  The Arkansas Supreme Court adopted the *Baze* and *Glossip* standard and held that, "in challenging a method of execution under the Arkansas Constitution, the burden falls squarely on a prisoner to show that (1) the current method of execution presents a risk that is sure or very likely to cause serious illness and needless suffering and that gives rise to sufficiently imminent dangers; and (2) there are known, feasible, readily implemented, and available

---

[7] ADC responded to the prisoners' requests for admissions and interrogatories and produced a number of documents regarding its lethal drugs and lethal-injection procedure in response to their requests for production.

alternatives that significantly reduce a substantial risk of severe pain." *Id.* at 15, 496 S.W.3d at 357.

In evaluating the Prisoners' substantive cruelty claim, the Arkansas Supreme Court agreed with ADC that the Prisoners failed to meet their burden of pleading and then providing at least some evidence to establish that their proposed alternative methods of execution were feasible and capable of being readily implemented by ADC. *Id.* at 16-20, 496 S.W.3d at 357-60. The court held that the Prisoners' allegations that the proposed alternative drugs were "commercially available" did not establish that "ADC, as a department of correction, is able to obtain the drugs for the purpose of carrying out an execution." *Id.* at 19, 496 S.W.3d at 359. The Arkansas Supreme Court thus reversed the lower court's conclusion that the Prisoners had adequately pled and provided sufficient evidence to create a triable issue that there are known, feasible, readily implemented, and available alternatives to the lethal-drug options in Act 1096. *Id.*

The Arkansas Supreme Court also rejected as "entirely conclusory in nature" the Prisoners' allegations that death by firing squad "would result in instantaneous and painless death" and that "ADC has firearms, bullets, and personnel at its disposal to carry out an execution." *Id.* The court reiterated the well-established rule that "[c]onclusory statements are not sufficient" to state a claim. *Id.* The court "emphasize[d] that merely reciting bare allegations is not sufficient to show that a firing squad is a readily implemented alternative." *Id.* The court explained that this is especially true where the proposed alternative is not and in history has never

been authorized by Arkansas law. *See id*. at 19-20, 496 S.W.3d at 359-60 (noting that the Prisoners' proposal did "not comply with the current statutory scheme" and that "[i]n our history, the General Assembly has never seen fit to authorize this form of execution"). The court held that "the Prisoners failed to substantiate the conclusory allegations contained in their amended complaint." *Id*. at 19, 496 S.W.3d at 359. "For these reasons, it cannot be said that the use of a firing squad is a readily implemented and available option to the present method of execution." *Id*. at 20, 496 S.W.3d at 360.

The Arkansas Supreme Court thus reversed in its entirety the Pulaski County Circuit Court's ruling on the Prisoners' cruelty claim because they neither pled nor provided any evidence at all to show that there is a known, feasible, readily implemented, and available alternative method of execution to the ADC. *Id*. at 1, 20-21, 496 S.W.3d at 350, 360. The court also upheld the confidentiality provisions in Act 1096. *Id*. at 21-32, 496 S.W.3d at 360-66. Because the Arkansas Supreme Court's conclusions meant that the Prisoners could not overcome the State's sovereign immunity, that court dismissed the case. *See id*. at 1, 496 S.W.3d at 350 (reversing and dismissing the Prisoners' amended complaint after agreeing with ADC that they failed to sufficiently plead and prove their asserted constitutional violations in order to overcome the defense of sovereign immunity); *see also Ark. Tech Univ. v. Link*, 341 Ark. 495, 501-02, 17 S.W.3d 809, 812-13 (2000) (explaining that dismissal of the case is the appropriate remedy on summary judgment where sovereign immunity prevails).

The Prisoners sought but did not obtain rehearing from the Arkansas Supreme Court. But the Arkansas Supreme Court did agree to stay the mandate while the Prisoners sought a writ of certiorari from the United States Supreme Court. The United States Supreme Court denied the Prisoners' request for review. *Johnson v. Kelley*, 137 S. Ct. 1067, *reh'g denied*, 137 S. Ct. 1838 (2017). After the United States Supreme Court's denial, the Arkansas Supreme Court issued the mandate in *Kelley v. Johnson* on February 24, 2017. The mandate finalized the Arkansas Supreme Court's dismissal of the second state-court case. *See* Ark. Sup. Ct. R. 5-3(a).

**Post-Johnson *State-Court Proceedings.*** After the mandate issued in *Kelley v. Johnson*, the Prisoners filed a procedurally-improper "Second Amended Complaint" in the Pulaski County Circuit Court. *See* Sec. Am. Compl. (Feb. 24, 2017) in Pulaski County No. 60CV-15-2921. The self-styled Second Amended Complaint brought several of the same causes of action that the Arkansas Supreme Court had just dismissed earlier that day, including the substantive cruelty claims against Act 1096 and the ADC's lethal-injection procedure. The Prisoners relied on this Second Amended Complaint to argue to the Arkansas Supreme Court that its October 20, 2015, stays of execution (discussed above) remained in effect. *See* Prisoners' Resp. to the State's Mot. for Clarification (Mar. 1, 2017) in Ark. Supreme Court No. CV-15-829.[8] Specifically, the Prisoners argued that the stay did not

---

[8] On February 27, 2017, the State filed an emergency motion for clarification of the order staying executions in Ark. Supreme Court Case No. CV-15-829. The State fully believed that the stay dissolved under its own terms when the court

14

dissolve upon issuance of the Arkansas Supreme Court mandate in No. CV-15-992 because that Court's decision did not end the litigation in Pulaski County Case No. 60CV-15-2921.

The State argued that the Arkansas Supreme Court's decision in *Johnson* dismissed (as barred by sovereign immunity) the Prisoners' lawsuit in its entirety, and that the stays of execution automatically lifted when the high court issued its mandate on February 24, 2017.  *See* Emergency Mot. for Clarification in Ark. Supreme Court No. CV-15-829 (Feb. 27, 2017), ¶¶ 1, 4.  The State argued that the *Johnson* court's dismissal of the Prisoners' method-of-execution claims on the merits (*i.e.*, at the summary-judgment stage) "fully and completely resolved the Pulaski County Circuit Court proceedings as contemplated in" the order staying executions. *Id.* ¶ 5.  The State also argued that the Supreme Court's dismissal of the Prisoners' complaint in No. CV-15-992 also operated as a final adjudication on the merits (even if somehow incorrectly treated as a motion-to-dismiss decision) because it was actually the *third* time that their claims challenging Act 1096 of 2015 were dismissed and, therefore, operated as a dismissal *with prejudice* under Ark. R. Civ. P. 41(b).  *Id.* ¶¶ 6-14 (citing *Ballard Group, Inc. v. BP Lubricants USA, Inc.*, 2014

---

issued the mandate in *Kelley v. Johnson*, No. CV-15-992, and took actions consistent with that understanding, including issuing death warrants.  However, out of an abundance of caution and because the Prisoners' counsel had made statements to the press and to Governor Hutchinson advancing a different view that the stay remained in effect, ADC sought to ensure that the Arkansas Supreme Court agreed that the stay that was put into effect while the lethal-injection case reached and was decided by the appellate court had been extinguished.

Ark. 276, 436 S.W.3d 445 and *Brown v. Tucker*, 330 Ark. 435, 441, 954 S.W.2d 262, 266 (1997)).

The Arkansas Supreme Court concluded that the State was correct.  On March 2, 2017, the Supreme Court clarified that the stay had automatically dissolved upon the issuance of the mandate in *Johnson*, CV-15-992.  *See* Formal Order in *Kelley v. Johnson*, Ark. Supreme Court No. CV-15-829 (Mar. 2, 2017).

On March 16, 2017, the State moved to strike or, in the alternative, dismiss the Second Amended Complaint filed in Pulaski County as barred by the mandate doctrine, the law-of-the-case doctrine, *res judicata*, collateral estoppel, and for failure to state a claim.  On March 28, 2017, Pulaski County Circuit Judge Wendell Griffen granted the State's motion to dismiss, holding that the Arkansas Supreme Court's decision in *Kelley v. Johnson* "dismissed the litigation, with prejudice[.]" **(Ex. 34 at 5)** Judge Griffen explained:  "Simply put, when the Arkansas Supreme Court reversed this Court's previous ruling it also dismissed Plaintiffs' amended complaint, with prejudice . . . [which] effectively ended this Court's jurisdiction over all claims and contentions asserted in the lawsuit that led to the dismissal."  *Id.* at 6-7.  "This Court has no power to consider challenges to Act 1096 that were raised in the lawsuit that was dismissed by the Arkansas Supreme Court ruling in *Kelley v. Johnson*."  *Id.* at 7.  The state court made crystal clear that "the Arkansas Supreme Court has decided and declared that Plaintiffs are not entitled to a trial" on their cruel-or-unusual-punishment claim regarding the ADC's midazolam protocol.  *Id.*  Plaintiffs filed a motion for reconsideration of that order as well as a

motion for a ruling on their reconsideration request, both of which were deemed denied.[9]  Plaintiffs did not appeal or seek any other relief from those orders.

***Execution Dates Set for April 2017.***  After the claims asserted in *Johnson v. Kelley* were finally resolved upon the issuance of the Arkansas Supreme Court's mandate on February 24, 2017, and the stays of execution lifted, Governor Hutchinson set execution dates for eight of the Prisoners as follows:  Don Davis and Bruce Ward on April 17, 2017; Stacey Johnson and Ledell Lee on April 20, 2017; Marcel Williams and Jack Jones on April 24, 2017; and Jason McGehee and Kenneth Williams on April 27, 2017.  Thereafter, the Prisoners initiated an avalanche of legal proceedings in multiple forums.

***The Instant Lawsuit.***  On March 27, 2017—more than a month after Governor Hutchinson set execution dates and just three weeks before the first scheduled executions—the Prisoners filed their Complaint in this matter.  Compl. (Dkt. No. 2) (Mar. 27, 2017).  Plaintiffs asserted seven causes of action: (1) that the purportedly "compressed" April 2017 execution schedule denied Plaintiffs their right to counsel under 18 U.S.C. § 3599; (2) executions "in the current compressed time frame" between April 17, 2017, and April 27, 2017, would violate the Eighth Amendment; (3) the midazolam protocol violates the Eighth Amendment's prohibition on cruel and unusual punishment; (4) the ADC's execution protocols

_____

[9] On April 17, 2017—after Judge Griffen participated in an anti-death penalty protest at the Arkansas Governor's Mansion on the same day that he issued an order effectively halting scheduled executions—the Arkansas Supreme Court reassigned all cases in his court that involved the death penalty or the State's execution protocol.  *See In re Pulaski County Circuit Court, Fifth Division, Hon. Wendell Griffen*, Ark. Sup. Ct. No. 17-155 (Apr. 17, 2017) (per curiam).

regarding staff training and expertise, consciousness checks, lack of resuscitation plan/equipment, IV and drug-pushing procedures, and drug storage/preparation violate the Eighth Amendment; (5) the combined effect of the midazolam executions under the ADC's procedures and the "compressed schedule" violated the Eighth Amendment; (6) ADC's viewing policy for the April 2017 executions violated Plaintiffs' right of access to the courts; and (7) ADC's viewing policy during the April 2017 executions violated Plaintiffs' right to counsel.  Plaintiffs sought declaratory and injunctive relief.[10]

***The Motion to Dismiss.***  Defendants moved to dismiss the Complaint in its entirety based on sovereign immunity and for failure to state a claim upon which relief can be granted, which this Court granted in part and denied in part.  Dkt. Nos. 26, 27, & 53.  The Court first found that this action is not barred by *res judicata* and collateral estoppel under Arkansas law.  Dkt. No. 53 at 1-2, 29-42.  The Court held that there is no constitutional or statutory right to effective assistance of counsel under § 3599 and dismissed claim one.  *Id.* at 20.  The Court dismissed Plaintiffs' second claim to the extent Plaintiffs argued that the compressed execution schedule alone presented a risk that was sure or very likely to cause serious illness and needless suffering.  *Id.* at 29.  The Court also dismissed Plaintiffs' fourth claim challenging ADC's lethal-injection procedures as an

---

[10]  Mr. Nooner, who did not have a scheduled execution date at that time, joined in some, but not all of Plaintiffs' claims.

independent Eighth Amendment violation. *Id.* at 50. The Court denied the State's motion to dismiss on all other grounds. *Id.* at 59.

***Preliminary-Injunction Proceedings.*** The Prisoners filed a motion for a preliminary injunction and sought an immediate stay of their executions. Dkt. Nos. 3 & 4. The State responded in opposition (Dkt. No. 28) and, from April 10 through April 13, 2017, the Court held an evidentiary hearing. On April 15, 2017, the Court entered a preliminary-injunction order staying the then-scheduled executions. Dkt. No. 54 at 3.

In granting preliminary-injunctive relief, the Court first rejected the State's argument that the Plaintiffs delayed unnecessarily in bringing their federal claims and in seeking emergency relief. *Id.* at 50. The Court then found that Plaintiffs established a significant possibility that the State's method of execution exposes them to a demonstrated risk of severe pain. *Id.* at 55. The Court also found that the April 2017 execution schedule, with eight executions scheduled over 11 days, exacerbated that risk. *Id.* at 56.

Furthermore, the Court agreed with Plaintiffs' contention that the ADC's execution protocol and policies failed to contain adequate safeguards to "mitigate some of the risk presented by using midazolam and trying to execute that many inmates in such a short period of time." *Id.* The Court thus concluded that Plaintiffs were likely to succeed on the merits of their method of execution claims as well as their viewing policy claims. *Id.* at 74, 100-01.

Regarding Plaintiffs' claim that the State's use of midazolam as the first drug in a three-drug protocol is sure or very likely to cause needless suffering, the Court noted that "there is very little published regarding scientific study in humans of the effects of midazolam on humans at certain doses." *Id.* at 57. The Court observed that "the level at which the ceiling effect is demonstrated in humans, if there is a ceiling effect, is unknown." *Id.* at 60. Likewise, the Court recognized that the parties' experts had testified regarding the possible effects of midazolam based on what they had experienced and observed in clinical settings while treating actual patients using much lower doses than the 500-1000 mg dose contemplated in Arkansas's protocol. *Id.* at 62-63. But the Court ultimately found Plaintiffs' experts more credible, found that the anecdotal evidence from midazolam executions in other states "is more consistent with plaintiffs' theory of this case," and held "that there is a significant possibility that plaintiffs will succeed on the merits under the first prong of *Baze/Glossip*." *Id.* at 63-73.

This Court also held that Plaintiffs met their burden of establishing "a significant possibility that the risk of Arkansas's proposed method of execution is substantial when compared to known and available alternative methods" as required under the second prong of *Baze* and *Glossip*. *Id.* at 74. This Court adopted the Sixth Circuit's then-existing test for "availability" under *Glossip*, which rested on whether there was any "possibility" that the State may be able to obtain the proposed alternative in the future. *Id.* at 78-79 (adopting the reasoning of a three-judge panel of the Sixth Circuit in *In re Ohio Execution Protocol*, 853 F.3d 822 (6th

Cir.), *vacated en banc*, 855 F.3d 702 (6th Cir.), *and rev'd en banc,* 860 F.3d 881, 886

(6th Cir. 2017) (holding that "[t]he district court was seriously mistaken as to what

'available' and 'readily implemented' mean" and that, "for that standard to have

practical meaning, the State should be able to obtain the drugs with ordinary

transactional effort")).

Under the now-repudiated "possibility" standard, this Court found that

"plaintiffs established, at this stage of the proceedings, that there is a significant

possibility that pentobarbital is available for use in executions" because Plaintiffs

offered evidence "tending to show that Missouri obtained FDA-approved,

manufactured pentobarbital in the recent past," "Missouri executed an inmate using

pentobarbital as recently as January 31, 2017," and Texas and Georgia "have

carried out numerous executions in recent years with compounded pentobarbital."

*Id.* at 81.  The Court also found that sevoflurane gas and nitrogen hypoxia are

known and available alternatives even though neither method has ever been used

to carry out an execution.  *Id.* at 82-83.  Finally, the Court held that Plaintiffs

demonstrated a significant possibility that the firing squad is a feasible alternative

to the midazolam protocol.  *Id.* at 83-86.

The Court ultimately held that Plaintiffs were likely to succeed on the merits

of their method-of-execution claims as well as most of their other claims, that

Plaintiffs would suffer irreparable harm if the injunction was not granted, and that

the balance of harms and the public interest weighed in favor of stays of execution.

*Id.* at 86.  The Court granted Plaintiffs' motion for a preliminary injunction,

enjoined the State from carrying out the Plaintiffs' death sentences, and ordered the parties to negotiate the terms of a viewing policy "that assures plaintiffs' right to counsel and access to the courts for the entire duration of all executions." *Id.* at 101.

**Execution Viewing Policy.**  The parties filed a Joint Proposed Execution Policy with the Court on April 17, 2017.  Dkt. No. 62.  The parties agreed that the Joint Viewing Policy "assures plaintiffs' right to counsel and access to the courts for the entire duration of all executions."  *Id.* at 1.  Pursuant to that policy, ADC agreed to permit a maximum of three attorneys who represent a condemned inmate into the Cummins Unit of the ADC on the day of the condemned inmate's scheduled execution.  *Id.*  Attorneys for the condemned inmate are allowed to bring one cellular telephone into the unit for use if needed.  *Id.*  ADC also agreed to provide outbound telephone service in the condemned inmate's holding cell.  *Id.*  Two attorneys are allowed cell-side visits on the day of an execution and may also view the execution.  *Id.* at 2.  The third attorney is provided an office from which to work with access to a laptop computer, telephone, and facsimile machine.  *Id.*  If, during the course of an execution, the inmate's attorneys in the viewing room desire to communicate with the Court or co-counsel, they are permitted to step out of the viewing room and use their cellular telephone.  *Id.*  ADC also agreed to allow access to a nearby landline telephone in the event the cellular phone did not work.  *Id.* The Court approved the Joint Viewing Policy on April 17, 2017, but it held that its order did not in any way disturb the April 15, 2017, preliminary-injunction order. Dkt. No. 63.

***Eighth Circuit Vacates Preliminary-Injunction Order.*** Upon the entry of the preliminary injunction, the State promptly filed a motion to vacate the stay order with the Eighth Circuit, which the appellate court granted. *McGehee v. Hutchinson*, 854 F.3d 488 (8th Cir.), *cert. denied*, 137 S. Ct. 1275 (2017). The Eighth Circuit issued a per curiam *en banc* opinion vacating the stays of execution for three reasons. Only a single judge dissented.

First, the Eighth Circuit observed that the Plaintiffs could have brought their § 1983 method of execution claims "much earlier [but] intentionally declined to do so." *McGehee*, 854 F.3d at 491. The court noted that the Prisoners voluntarily elected to forego their federal claim in April 2015 and chose instead to challenge the method of execution in state court under the Arkansas Constitution. *Id.* "Only after the Arkansas Supreme Court rejected their state-law claim, the Supreme Court denied certiorari, and the Governor scheduled the executions did the prisoners present a federal claim in federal court." *Id.* According to the Eighth Circuit, the Prisoners could have litigated their Eighth Amendment challenge to the midazolam protocol "at the same time as the state constitutional claim beginning in April 2015." *Id.* And, regardless of whether or not the claim technically was barred by *res judicata* or collateral estoppel, the court concluded that "the prisoners' use of 'piecemeal litigation' and dilatory tactics is sufficient reason by itself to deny a stay." *Id.* (quoting *Hill v. McDonough*, 547 U.S. 573, 584-85 (2006)).

Second, the Eighth Circuit held that "the district court's conclusion concerning the use of midazolam in the Arkansas execution protocol did not apply

the governing standard and was not adequately supported by the court's factual

findings." *Id.* at 492. "[T]he court never found that the prisoners had a likelihood of

success under the rigorous 'sure or very likely' standard of *Glossip* and *Baze*." *Id.*

"There is no express finding of fact that the prisoners are likely to prove that a 500-

milligram injection of midazolam will fail to anesthetize the prisoners during the

execution or that use of the lethal-injection protocol is sure or very likely to cause

severe pain." *Id.* The court observed that if, as here, "there is no scientific

consensus and a paucity of reliable scientific evidence concerning the effect of a

lethal-injection protocol on humans, then the challenger might well be unable to

meet [his] burden" of showing that "the method creates an unacceptable risk of

pain." *Id.* at 493 (quoting *Glossip*, 135 S. Ct. at 2741). And the appellate court

concluded that the "equivocal" scientific evidence "recited by the district court falls

short of demonstrating a significant possibility that the prisoners will show that the

Arkansas protocol is 'sure or very likely' to cause severe pain and needless

suffering." *Id.*

Third, the Eighth Circuit disagreed with the legal standard that this Court

applied in determining whether alternative methods of execution are known and

available. *Id.* "We do not say that an alternative method must be authorized by

statute or ready to use immediately, but we concur with the Eleventh Circuit that

the State must have access to the alternative and be able to carry out the

alternative method relatively easily and reasonably quickly." *Id.* (citing *Arthur v.*

*Comm'r, Ala. Dep't of Corr.*, 840 F.3d 1268, 1300 (11th Cir. 2016), *cert. denied*, 137

S. Ct. 725 (2017)).  The court explained that this standard "is necessary to conform to the Eighth Amendment" because "[u]nless an alternative is feasible and readily implemented in the sense described, the State has a legitimate penological justification for adhering to its current method of execution in order to carry out lawful sentences."  *Id.*  "When availability (or effectiveness) of an alternative is more speculative, a State's refusal to discontinue executions under the current method is not blameworthy in a constitutional sense."  *Id.*

Under its view of the correct legal standard, the Eighth Circuit concluded that the Plaintiffs did not demonstrate a significant possibility of establishing a known and available alternative that would significantly reduce a substantial risk of severe pain.  *Id.*  The Eighth Circuit held, as a matter of law, that the availability of the alternatives the Plaintiffs advance in this case "is too uncertain to satisfy the rigorous standard under the Eighth Amendment."  *Id.*  Given Arkansas's three unsuccessful attempts to obtain barbiturates in 2015 and the "well documented" difficulty in obtaining drugs for use in lethal injection, the court rejected as "too speculative" the possibility that Arkansas could acquire pentobarbital for use in executions.  *Id.*  The dismissed proposed alternative methods "[w]ith no track record of successful use" in executions, such as sevoflurane gas and nitrogen hypoxia, concluding that they "are not likely to emerge as more than a 'slightly or marginally safer alternative.'"  *Id.* (quoting *Glossip*, 135 S. Ct. at 2737 and citing *Baze*, 553 U.S. at 41 (discussing "untried and untested alternatives")).  The court also found that Plaintiffs failed to establish "a significant possibility that the use of a firing squad is

readily implemented and would *significantly reduce* a substantial risk of severe pain." *Id.* at 494 (emphasis in original).  For each of these reasons, the Eighth Circuit vacated the stays of execution.  *Id.*

**The United States Supreme Court declines to intervene.**  The Prisoners then applied to the United States Supreme Court for a stay of executions and petitioned the Court for a writ of certiorari to the United States Court of Appeals for the Eighth Circuit.  The Supreme Court denied both the stay application and the writ petition.  *McGehee v. Hutchinson*, 137 S. Ct. 1275 (2017).  The Supreme Court also denied four of the condemned inmates' separate applications for stays of execution and petitions for writs of certiorari.  *See K. Williams v. Arkansas*, 137 S. Ct. 1842 (2017); *Lee v. Hutchinson*, 137 S. Ct. 1623 (2017); *M. Williams v. Kelley*, 137 S. Ct. 1285 (2017); *Jones v. Arkansas*, 137 S. Ct. 1284 (2017).

**April 2017 executions.**  The State carried out four executions in April 2017.  Ledell Lee was executed on April 20, 2017, Jack Jones and Marcel Williams were executed on April 24, 2017, and Kenneth Williams was executed on April 27, 2017.  Each of these executions was conducted pursuant to Arkansas law and ADC policy and with the goal of minimizing any risk of pain inherent in executions.  *See* Affidavits of Wendy Kelley, Dale Reed, and William Straughn, Exs. 12-14.  ADC followed all of the policies and procedures set forth in its Lethal Injection Procedure.  *Id.*  Throughout the process, two medical professionals monitored the inmates for signs of consciousness and monitored the IV infusion sites for any signs of infiltrate or other problems.  *Id.*  ADC did not experience any complications or problems with

any of the executions, and the drugs worked as intended. *Id.*; *see also* Execution

Witness Affidavits, Exs. 15-23. None of the inmates executed by the ADC using the

midazolam protocol exhibited any signs of consciousness five minutes after the

administration of midazolam. *Id.* ADC confirmed that each of the condemned

inmate's was unconscious and insensate to pain prior to administering the second

and third drugs in the protocol. *Id.* None of the inmates exhibited any signs of

severe pain or suffering during the lethal-injection procedure. *Id.*

   ***Amended Complaint.*** The Prisoners filed an Amended Complaint in June

2018 raising four claims: (1) the use of midazolam as the first drug in Arkansas's

three-drug protocol violates the Eighth Amendment; (2) the erratic application of

consciousness checks violates Equal Protection; (3) ADC's execution policies violate

the Prisoners' right of access to the courts; and (4) ADC's execution policies violate

the Prisoners' right to counsel under 18 U.S.C. § 3599. Dkt. No. 117. Defendants

timely filed an answer (Dkt. No. 121) and the parties engaged in discovery. This

motion followed.

## STANDARD OF REVIEW

   "The Court shall grant summary judgment if the movant shows that there is

no genuine dispute as to any material fact and the movant is entitled to judgment

as a matter of law." Fed. R. Civ. P. 56(a). "A party asserting that a fact cannot be

or is genuinely disputed must support the assertion by . . . citing to particular parts

of materials in the record, including depositions, documents, electronically stored

information, affidavits or declarations, stipulations . . ., admissions, interrogatory

answers, or other materials[.]"  Fed. R. Civ. P. 56(c)(1)(A).  The Court must view the facts, and inferences to be drawn from those facts, in the light most favorable to the nonmoving party.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

To survive a defense motion for summary judgment, the plaintiffs must go beyond the pleadings and come forward with affirmative evidence raising "a genuine issue of material fact as to whether" the defendants caused the plaintiffs to suffer a cognizable injury.  *Zenith Radio Corp.*, 475 U.S. at 585-86; *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986); *Settle v. Ross*, 992 F.2d 162, 163-64 (8th Cir. 1993).  "An issue of fact is genuine when 'a reasonable jury could return a verdict for the nonmoving party' on the question."  *Woods v. DaimlerChrysler Corp.*, 409 F.3d 984, 990 (8th Cir. 2005) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).  In other words, "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment."  *Dulany v. Carnahan*, 132 F.3d 1234, 1237 (8th Cir. 1997) (quoting *Anderson,* 477 U.S. at 248).  "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'"  *Zenith Radio Corp.*, 475 U.S. at 586 (citation omitted).

**ARGUMENT**

## I.   The Amended Complaint is Barred by the Eleventh Amendment.

The Court should enter judgment as a matter of law in favor of the State because the Prisoners have not—and as matter of law cannot—overcome the Defendants' sovereign immunity from suit. The Eleventh Amendment to the United States Constitution absolutely bars a suit by an individual brought against a state or its agencies or departments, regardless of the relief sought. *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 100 (1984).  Suits against state officials or employees are also barred when "the state is the real, substantial party in interest." *Id.* at 101.  When a suit is brought against state employees in their official capacities, the suit "is the functional equivalent of a suit against the State" and is also barred by the Eleventh Amendment. *Zajrael v. Harmon*, 677 F.3d 353, 355 (8th Cir. 2012) (*per curiam*).

Method-of-execution challenges are barred by the Eleventh Amendment unless the Prisoners properly plead (at the motion-to-dismiss stage), then provide enough evidence to create a genuine dispute of material fact (at the summary-judgment stage), and then ultimately prove (at trial) that the statute or protocol is unconstitutional under the standards set forth in *Baze* and *Glossip*.  On the record here, the undisputed evidence demonstrates that the Prisoners' method-of-execution claim fails as a matter of law.  The Prisoners' other claims likewise fail as a matter of law.  Thus, sovereign immunity bars this suit.

The Amended Complaint seeks injunctive relief in an apparent attempt to invoke the *Ex Parte Young* fiction, which allows a narrow range of actions for prospective injunctive relief against public officials. *See Ex Parte Young*, 209 U.S. 123 (1908).  While the official-capacity defendants are *potentially* subject to the *Ex Parte Young* rule, it only permits a suit seeking prospective relief against an ongoing violation of a federal right. *281 Care Committee v. Arneson*, 638 F.3d 621, 632 (8th Cir. 2011).  As shown below, the Prisoners have not—and cannot—establish an ongoing violation of the Prisoners' federal rights. Consequently, the Prisoners have no claim for prospective injunctive relief against the official-capacity defendants as an exception to sovereign immunity, and all of the Prisoners' claims should be dismissed for lack of jurisdiction.

Moreover, even putting aside the sovereign immunity doctrine, the Court should enter judgment as a matter of law in favor of the State on the remaining claims because they are moot, time-barred, and/or fail on the merits on the undisputed facts.

**A.     The claims asserted by Jason McGehee are moot and should be dismissed with prejudice.**

"There is [] no case or controversy, and a suit becomes moot, 'when the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome.'" *Chafin v. Chafin*, 133 S. Ct. 1017, 1023 (2013) (quoting *Already, LLC v. Nike, Inc.*, 568 U.S. 85, 91  (2013)).   Plaintiff Jason McGehee's death sentence was commuted by Governor Hutchinson in September 2017.  *See* Notice of Commutation, Dkt. No. 100.  The parties agree that Governor Hutchinson's

30

commutation renders the claims in this action moot as to McGehee.  *Id.*  The Court should therefore enter judgment as a matter of law in favor of the State on all claims asserted by McGehee.

### B.   The midazolam claim is barred by *res judicata* and collateral estoppel.

Federal courts are required to respect the decisions of state courts.  Under 28 U.S.C. § 1738, "[t]he records and judicial proceedings of any court of any . . . State . . . shall have the same full faith and credit in every court within the United States . . . as they have by law or usage in the courts of such State."  The Eighth Circuit has explained that "federal courts are limited to the extent [they] cannot give review to claims that have already been fully adjudicated in state court." *Sparkman Learning Center v. Ark. Dep't of Human Servs.*, 775 F.3d 993, 998 (8th Cir. 2014).  "If a state court would not hear the case because it was precluded by a previous holding in that state's courts, the federal courts must 'give the same preclusive effect to state court judgments that those judgments would be given in the courts of the State from which the judgments emerged.'"  *Id.* (quoting *Kremer v. Chem. Constr. Corp.*, 456 U.S. 461, 466 (1982)).  "Federal courts do not provide a forum to relitigate claims previously decided adversely in state courts."  *Id.*  In *Knutson v. City of Fargo*, 600 F.3d 992 (8th Cir. 2012), the Eighth Circuit held that litigants could not bring claims before a federal court that were actually fully decided by state courts in what would amount to appellate review of the state-court ruling.  *See id.* at 995-96.

Under 28 U.S.C. § 1738, federal courts apply state law to decide whether claims previously decided in that state's courts, which are then brought in federal court, are barred by the prior state-court judgment. *Sparkman Learning Ctr.*, 775 F.3d at 998. Under Arkansas law, the doctrine of *res judicata* ends litigation by preventing a party from relitigating for a second time a matter in which it has already had an opportunity to be heard. *Powell v. Lane*, 375 Ark. 178, 185, 289 S.W.3d 440, 444 (2008). This is because a plaintiff is "required to join all acts which [he] could have brought against the [defendant] in the same lawsuit, if it is possible for [him] to do so in that lawsuit." *Lundquist v. Rice Mem. Hosp.*, 238 F.3d 975, 978 (8th Cir. 2001).

Arkansas law bars relitigation of a subsequent suit under claim preclusion when: (1) the first suit resulted in a final judgment on the merits; (2) the first suit was based on proper jurisdiction; (3) the first suit was fully contested in good faith; (4) both suits involve the same claim or cause of action; and (5) both suits involve the same parties or their privies. *Jayel Corp. v. Cochran*, 366 Ark. 175, 178, 234 S.W.3d 278, 281 (2006). *Res judicata* bars relitigation of claims that were actually litigated in the first suit as well as claims that could have been litigated. *Id.*; *Powell*, 375 Ark. at 185, 289 S.W.3d at 444. When a case is based on the same events as the subject matter of a previous lawsuit, *res judicata* applies even if the subsequent lawsuit raises new legal issues and seeks additional remedies. *Id.* Moreover, strict privity in the application of *res judicata* is not required. *Parker v. Perry*, 355 Ark. 97, 104, 131 S.W.3d 338, 344 (2003). Instead, for privity to exist,

there only needs to be "substantial identity" of the parties.  *Id.*  When two parties are so identified with one another that they represent the same legal right, privity exists for the purposes of *res judicata.*  *Id.*  As discussed below, each of the elements of *res judicata* is satisfied in this case, and it is therefore impossible for the Prisoners to succeed on the merits of their midazolam claim.

> ### 1.    *The Arkansas Supreme Court issued a final judgment on the merits in* Kelley v. Johnson.

The Arkansas Supreme Court issued a final judgment that decided the constitutional issues before it—including the Prisoners' claim that the use of midazolam as the first drug in ADC's lethal-injection protocol **(Ex. 1)** would amount to cruel or unusual punishment—on the merits in *Kelley v. Johnson*, 2016 Ark. 268, 496 S.W.3d 346.  The majority opinion made clear that the court was reversing the lower court's denial of summary judgment to the State based on the Prisoners' failure to meet proof with proof and substantiate their method-of-execution claim. *See Johnson*, 2016 Ark. 268, at 12-13, 496 S.W.3d at 355-56 (discussing summary-judgment standard of review with regard to the Prisoners' midazolam claim); *id.* at 16, 496 S.W.3d at 357-58 (discussing the parties' contentions on the midazolam claim both on the pleadings and on the merits); *id.* at 16-18, 496 S.W.3d at 358-59 (discussing evidence presented by both sides on the midazolam claim); *id.* at 18-19, 496 S.W.3d at 359 (agreeing with the State that the Prisoners "have not met their burden of demonstrating . . . that the proposed alternative drugs are available to ADC for use in an execution").  Thus, as the Pulaski County Circuit Court held in dismissing the Prisoners' "Second Amended Complaint" filed after the appeal **(Ex.**

**34)**, the Supreme Court's decision *Kelley v. Johnson* was a dismissal on the merits that fully and completely resolved the Prisoners' state-court case.

The Supreme Court's dismissal of the Prisoners' claims in *Kelley v. Johnson* also operated as a final adjudication on the merits because it was actually the *third* time that their claims challenging the 2015 midazolam protocol were dismissed and, therefore, operated as a dismissal *with prejudice* under state law. *See, e.g.*, *Ballard Group, Inc. v. BP Lubricants USA, Inc.*, 2014 Ark. 276, 436 S.W.3d 445 (2014). It is well settled in Arkansas that "'there is a limit to the number of times a case can be dismissed,' regardless of whether the dismissals are voluntary or involuntary." *Ballard Group*, 2014 Ark. 276, at 19, 436 S.W.3d at 456 (quoting *Bakker v. Ralston*, 326 Ark. 575, 579, 932 S.W.2d 325, 327 (1996)). In *Ballard Group*, the Arkansas Supreme Court held that a plaintiff's "failure to comply with the requirements of Arkansas Rule of Civil Procedure 8 for pleading facts is [] a 'failure of the plaintiff to comply with these rules' as contemplated in Rule 41(b)," and thus "a dismissal granted for failure to state facts upon which relief can be granted under Rule 12(b)(6) constitutes an involuntary dismissal under Rule 41(b)." 2014 Ark. 276, at 20, 436 S.W.3d at 456-57 (quoting Ark. R. Civ. P. 41(b)). Under Ark. R. Civ. P. 41(b), an involuntary dismissal "is without prejudice to a future action by the plaintiff unless the action has been previously dismissed, whether voluntarily or involuntarily, in which event such dismissal operates as an adjudication on the merits." Ark. R. Civ. P. 41(b). In *Brown v. Tucker*, 330 Ark. 435, 954 S.W.2d 262 (1997), the Arkansas Supreme Court applied Rule 41(b) and modified a Rule

12(b)(6) dismissal to operate as one with prejudice when the plaintiff had filed a prior lawsuit against the same defendant but had voluntarily nonsuited that case.

Under *Ballard Group* and *Brown*, the Arkansas Supreme Court's dismissal of the Prisoners' claims in *Johnson*—whether under Rule 12(b)(6) for failure to state a claim or on the merits on summary judgment—was an adjudication on the merits with prejudice.  As in *Brown*, the Prisoners here filed a prior lawsuit against the State challenging the midazolam protocol in Pulaski County Circuit Court Case No. 60CV-15-1400[11] but voluntarily nonsuited that case after the State removed it to federal court.  *See* Notice of Voluntary Dismissal Without Prejudice (Dkt. No. 4) in *Williams v. Kelley*, U.S. District Court, E.D. Ark., No. 4:15-CV-00206-JM.  The Prisoners' voluntary nonsuit of their federal constitutional claims, including their Eighth-Amendment challenge to the 2015 midazolam protocol, was the first time their midazolam claim was dismissed.  The same day that they nonsuited the federal action, the Prisoners filed an "Amended Complaint" in Pulaski County Circuit Court No. 60CV-15-1400 raising only state-law challenges to the midazolam protocol and other provisions of Act 1096.[12]  After the State moved to dismiss that

---

[11] As discussed *supra*, the plaintiffs in the first state-court case were the same as the plaintiffs in the second state-court case, and those same plaintiffs filed this federal lawsuit, as well.  The Prisoners' first state-court case challenged the 2015 method-of-execution act on the following federal and state constitutional grounds: (1) Contracts Clause; (2) First Amendment; (3) procedural Eighth Amendment; (4) Due Process; (5) separation of powers (judicial and legislative); (6) substantive Eighth Amendment; (7) Ex Post Facto; and (8) Supremacy Clause.

[12] In their amended complaint, the Prisoners asserted the same claims as the original complaint, except that they were brought under the Arkansas Constitution.

Amended Complaint and a subsequent Second Amended Complaint for lack of jurisdiction, the Prisoners stipulated to the dismissal of Pulaski County Circuit Court No. 60CV-15-1400.  **(Ex. 32)**  That was the second dismissal of the Prisoners' midazolam claim.

The Prisoners then re-filed their midazolam claim (and other state-law claims) in Pulaski County Circuit Court Case No. 60CV-15-2921, which the Arkansas Supreme Court dismissed on the merits in *Kelley v. Johnson*, 2016 Ark. 268, 496 S.W.3d 346.  The United States Supreme Court then declined review.  *See Johnson v. Kelley*, 137 S. Ct. 1067, *rehr'g denied*, 137 S. Ct. 1838 (2017).  The Arkansas Supreme Court's order **(Ex. 33)** clarifying that the stay of executions imposed in Ark. Supreme Court No. CV-15-829 dissolved upon the issuance of the mandate in *Kelley v. Johnson*, Ark. Supreme Court No. CV-15-992, unequivocally confirmed that the Prisoners' state-court case was over.  In addition, the Arkansas Supreme Court's dismissal in *Johnson* was the ***third*** time that a court dismissed the Prisoners' constitutional challenges against the 2015 lethal-injection procedure and thus operated as an adjudication on the merits under the plain language of Ark. R. Civ. P. 41(b).  The Pulaski County Circuit Court confirmed in its order dismissing the Prisoners' "Second Amended Complaint" in No. 60CV-15-2921—which was the ***fourth*** time the Prisoners' midazolam claims were dismissed—that the Arkansas Supreme Court's decision in *Kelley v. Johnson* was a final dismissal on the merits with prejudice.  **(Ex. 34)**

For all of these reasons, the Court should conclude that the Prisoners'
constitutional challenges to the 2015 lethal-injection procedure were (or could have
been) adjudicated on the merits in previous state-court litigation, thus satisfying
the first element of the State's *res judicata* defense.

### 2.    *The other elements of* res judicata *are satisfied.*

There can be no dispute that the Pulaski County Circuit Court (and the
federal district court upon removal) had jurisdiction to consider the Prisoners'
challenges to ADC's 2015 lethal-injection protocol **(Ex. 1)** under the federal and
state constitutions in the prior lawsuits.  As the docket sheets reflect, and as
summarized in the Factual Background section *supra*, the prior suits were fully
contested in good faith by all parties.  In prior proceedings before the state court,
the State moved to dismiss multiple iterations of the Prisoners' constitutional
claims filed in two different cases (60CV-15-1400 and 60CV-15-2921), the parties
litigated the propriety of a preliminary injunction or temporary restraining order
enjoining midazolam executions before the trial court and the Arkansas Supreme
Court, and then the parties cross-moved for summary judgment and presented all of
the evidence they had to support their positions on the merits.

Under the fourth element, this Court must determine whether this case
involves the same claims that were (or could have been) presented in the state-court
action.  In the Eighth Circuit, in determining whether two causes of action are the
same for *res judicata* purposes, "a claim is barred by res judicata if it arises out of
the same nucleus of operative facts as the prior claim."  *Lane v. Peterson*, 899 F.2d

737, 742 (8th Cir. 1990).  In *Lane*, the court held it "indisputable" that federal-law claims raised in a second lawsuit that were based on the same facts as a prior suit brought under state law presented "the same claim for res judicata purposes." *Id.* at 743.  The cases involved "precisely the same nucleus of operative facts." *Id.*  The gist of all the claims in both cases was that the defendants wronged the plaintiffs and should be required to disgorge the proceeds from an asset sale. *Id.*  The Eighth Circuit found that the federal claims were barred despite the fact that some of those claims "would involve some evidence that perhaps was not relevant in" the first case due to the different elements of the causes of action alleged. *Id.*  The Eighth Circuit concluded that the plaintiffs' reliance in the second suit "on different substantive law and new legal theories does not preclude the operation of res judicata" because the doctrine "prevents parties from suing on a claim that is in essence the same as a previously litigated claim but is dressed up to look different." *Id.* at 744.  "Thus, where a plaintiff fashions a new theory of recovery or cites a new body of law that was arguably violated by a defendant's conduct, res judicata will still bar the second claim if it is based on the same nucleus of operative facts as the prior claim." *Id.* (citing cases).

The same result is required here.  The Prisoners in *Kelley* asserted claims that Act 1096 and the ADC's 2015 lethal-injection procedure (and specifically the use of midazolam) violated the constitutional ban on cruel-or-unusual punishment under the State constitution, and they bring the same claim now, except that it is under the Eighth Amendment.  Just like in *Lane*, the Prisoners' claims are barred

by *res judicata* despite their attempt to dress them up to look different.  It is evident from the face of the pleadings that the Eighth-Amendment claims asserted in this matter arise out of the same nucleus of operative facts as the previous litigation in *Kelley v. Johnson.* The applicable standards of pleading and proof to sustain a viable method-of-execution claim are the same under both the Eighth Amendment and the state-law equivalent.  *Johnson*, 2016 Ark. 268, at 14-15, 496 S.W.3d at 357 (adopting *Baze* and *Glossip* standards).  Under *Lane*, this Court should conclude that the doctrine of *res judicata* bars the Prisoners' midazolam claim under the Eighth Amendment because it is the same claim that was adjudicated by the state court in *Johnson.  See id.*; *see also Sparkman Learning Center*, 775 F.3d at 999 (affirming dismissal of complaint based on *res judicata* when the same due process claims were raised first in state court and then later in federal court).

Finally, the privity element is satisfied here.  Both the state-court suits and this case involve the same parties or their privies representing the same legal rights or interests:  nine death-row inmates on one side seeking to invalidate Arkansas's 2015 lethal-injection procedure and stay their executions, and the State on the other seeking to sustain the procedure and to carry out its lawful duty of carrying out the Prisoners' lawful sentences. This meets the privity requirement under Arkansas law.  *See Sparkman Learning Ctr.*, 775 F.3d at 999 (holding that state officials were in privity with a state agency sued in a prior lawsuit despite the addition of new parties); *see also Collum v. Hervey*, 176 Ark. 714, 3 S.W.2d 993 (1928) (finding privity between a husband and wife); *Francis v. Francis,* 343 Ark.

104, 31 S.W.3d 841 (2000) (finding privity between a brother and sister); *Hardie v. Estate of Davis,* 312 Ark. 189, 848 S.W.2d 417 (1993) (finding privity between a testator and his remote heirs); *Phelps v. Justiss Oil Co.,* 291 Ark. 538, 726 S.W.2d 662 (1987) (finding privity between a landlord and tenant); *S. Farm Bureau Cas. Ins. Co. v. Jackson,* 262 Ark. 152, 555 S.W.2d 4 (1977) (finding privity between an insurer and its insured); *Curry v. Hanna,* 228 Ark. 280, 307 S.W.2d 77 (1957) (finding privity between a bankrupt debtor and his trustee).

As shown, all of the elements of *res judicata* are satisfied here.  The Prisoners' federal lawsuit is based on the same facts as the previous state-court litigation: the ADC's adoption of a lethal-injection procedure that employs midazolam as the first drug in the protocol.  *Res judicata* applies even if the Prisoners plead slightly different facts or rely on some different evidence in support of their federal claim.  All of the material facts alleged that are relevant to the Prisoners' current claim were (or could have been) raised in the state court. Instead, the Prisoners have simply taken yet another bite at the apple and added some new allegations about the protocol or purported alternative methods of execution that they could have pleaded before in the state court but did not.[13]  As discussed above, *res judicata* bars relitigation of claims that could have been litigated in the first suit as well as the claims that were actually litigated when the two lawsuits arise out of the same common nucleus of operative facts.  Because *res*

---

[13] *See* Sec. Am. Compl. ¶¶ 2, 5, 8, 11 in Pulaski County Circuit Court No. 60CV-15-2921 (explaining the five previous complaints and amended complaints the Prisoners have filed challenging the 2015 protocol).

*judicata* clearly bars this action, the Court should enter judgment as a matter of law in favor of the State.

### 3. *The Prisoners' midazolam claim is also barred by collateral estoppel.*

Collateral estoppel is similar to the doctrine of *res judicata* in that it "serves both judicial and private interests in the termination of litigation," but it can apply even if a second suit is brought on a different cause of action than a prior suit. *Oldham v. Pritchett*, 599 F.2d 274, 276, 278 (8th Cir. 1979).  Collateral estoppel is a legal doctrine that "bar[s] the relitigation of factual or legal issues that were determined in a prior . . . court action" and "applies to bar relitigation in federal court of issues previously determined in state court." *In re Scarborough*, 171 F.3d 638 (8th Cir. 1999).  Federal courts look to the substantive law of the forum state in applying the collateral estoppel doctrine and give a state-court judgment preclusive effect if a court in that state would do so.  *See Baker Elec. Coop., Inc. v. Chaske*, 28 F.3d 1466, 1475 (8th Cir. 1994).

In Arkansas, collateral estoppel runs to issues as opposed to the full case and does not require mutual identity of parties. *State Office of Child Support Enforcement v. Willis*, 347 Ark. 6, 15, 59 S.W.3d 438, 444 (2001).  If the following four elements are satisfied, a court's determination on an issue is conclusive in a subsequent proceeding:  (1) the issue sought to be precluded must be the same as that involved in the prior litigation; (2) that issue must have been actually litigated; (3) the issue must have been determined by a valid and final judgment; and (4) the determination must have been essential to the judgment. *Id.*  For an issue to be

"actually litigated," it must be raised in the pleadings or otherwise, the defendant must have had a full and fair opportunity to be heard, and a decision must have been rendered on the issue. *See Powell*, 375 Ark. at 186, 289 S.W.3d at 445.

As discussed in detail above, the Prisoners challenged the constitutionality of the ADC's midazolam protocol in state court. The issues of whether midazolam is "*sure or very likely* to cause serious illness and needless suffering," and whether there are alternative methods of execution that are "feasible, readily implemented, and in fact significantly reduce a substantial risk of severe pain" were actually litigated in *Johnson*. *See Glossip*, 135 S. Ct. at 2737. The midazolam cruelty claim was raised in the pleadings, all parties had a full and fair opportunity to be heard on the issue (both on a motion to dismiss and on cross-motions for summary judgment on that claim), and the Supreme Court rendered a final decision on the merits of the cruelty claim in *Kelley v. Johnson*. The Arkansas Supreme Court held that the Prisoners had not properly pleaded nor sustained their burden of proving a known, feasible, readily implemented, and available alternative method of execution. The Prisoners are collaterally estopped on that issue. Thus, then and now, their midazolam cruelty claim cannot survive.

Similarly, the Prisoners are collaterally estopped under the Eighth Circuit's controlling decision in *Nooner*, 594 F.3d 592, a case in which the appellate court affirmed the grant of summary judgment in favor of the State on an analogous claim under ADC's 2008 protocol **(Ex. 35)**. In that case, several death-row inmates—some of whom are Plaintiffs here—filed a § 1983 lawsuit alleging, among

other things, that the first drug in ADC's three-drug lethal-injection procedure (which at that time was a drug called sodium pentothal) would fail to sufficiently anesthetize them from the excruciating pain that they would otherwise endure upon the injection of the paralytic and heart-stopping drugs in violation of the Eighth Amendment.

On appellate review, the *Nooner* court observed that the Arkansas protocol contained several safeguards to ensure that the first drug was administered properly and that the prisoner had been rendered fully unconscious before the injection of the second and third drugs. *Nooner*, 594 F.3d at 601. The protocol at that time required the Deputy Director to wait three minutes after the first injection before directing the executioner to administer the remaining chemicals. *Id.* During that time, the Deputy Director had to verify that the prisoner was unconscious using "standard procedures for assessing consciousness as required by medical paraprofessionals, such as checking for movement, opened eyes, eyelash reflex, and response to verbal commands and physical stimuli." *Id.* If the prisoner remained conscious after the injection of the sodium pentothal, the protocol required the Deputy Director to direct the executioner to inject the back-up doses of sodium pentothal. *Id.* Finally, the protocol required the Deputy Director to continuously monitor the IV infusion sites throughout the execution and to suspend the flow of lethal chemicals if she suspected a problem. *Id.*

The inmates in *Nooner* argued that evidence about four allegedly "botched" executions in Arkansas in which each of those condemned prisoners exhibited signs

of consciousness within three minutes of the first injection created a genuine issue of material fact regarding whether the protocol created a substantial risk of serious harm.  *Id.*   The Eighth Circuit rejected that argument because "the current protocol contains numerous safeguards designed to prevent ADC from administering pancuronium bromide and potassium chloride to a prisoner who is not fully unconscious."  *Id.* at 602.   The court held that ADC's procedures "sufficiently protect prisoners from remaining conscious during the injection" of the lethal drugs and affirmed the grant of summary judgment in favor of the State on the prisoners' Eighth Amendment claim.  *Id.* at 602-03.   "Under the current protocol, 'any risk that [Arkansas's lethal injection] procedure will not work as designated . . . is merely a risk of accident, which is insignificant in our constitutional analysis."  *Id.* at 603 (quoting *Taylor v. Crawford*, 487 F.3d 1072, 1080 (8th Cir. 2007), *cert. denied*, 553 U.S. 1004 (2008)).

The same result is required here.  The current protocol, like the one at issue in *Nooner*, contains several safeguards to ensure that the midazolam is administered properly and that the prisoner has been rendered fully unconscious before the vecuronium bromide and potassium chloride are injected.  The protocol requires the Deputy Director or designee to wait five minutes after the injection of midazolam and to confirm the prisoner's lack of consciousness by "necessary and medically-appropriate methods" before directing the executioner to administer the remaining chemicals.  **(Ex. 1)**  The ADC's methods for assessing consciousness are the same now (or even more in-depth) as they were in 2008 when *Nooner* was

decided.  (**Ex. 29 ¶ 42; Ex.  31 at 105-06**)  Just like the 2008 protocol at issue in

*Nooner*, the 2015 protocol requires ADC to inject a second dose of the anesthetic

drug in the event the prisoner remains conscious after the first dose.  **(Ex. 1)**

Finally, the protocol continues to require the Deputy Director or designee to

continuously monitor the IV infusion sites throughout the execution and to stop the

execution if she or he suspects a problem.  **(Ex. 1)**   Under *Nooner*, the 2015 protocol

contains sufficient safeguards to prevent ADC from administering the vecuronium

and potassium chloride to a prisoner who is not fully unconscious and thus satisfies

the Eighth Amendment.  *See Nooner*, 594 F.3d at 602.

The Prisoners cannot avoid the preclusive effect of the prior decisions on the

midazolam claim and the sufficiency of ADC's procedures by pointing to the events

of the 2017 executions, the testimony of their new slate of experts, or newly-

identified alternative execution methods.  As the Eighth Circuit Court of Appeals

explained in *Lundquist v. Rice Memorial Hospital*, collateral estoppel bars

relitigation of ultimate issues of fact—such as whether using midazolam in lethal-

injection executions is sure or very likely to cause needless suffering or whether

ADC's protocol sufficiently protects prisoners from the risk of remaining conscious

during the injection of the lethal drugs—when those issues were determined by

final judgments in prior proceedings.  121 Fed. Appx. 664, 668 (8th Cir. 2005).

"Collateral estoppel relates to the sub-elements and facts one must prove up in

order to sustain an overarching cause of action."  *Id*.  On remand after an appeal or

in a second case, a party has the "opportunity to produce truly 'new' evidence" on an

issue, but a party does "not receive a second chance at producing evidence" on the ultimate issue of fact that should have been produced in the first case, "as collateral estoppel bars that result[.]" *Id.* at 668-69. Here, the Prisoners failed to produce evidence in the state court to sustain their midazolam claim, and they failed to produce evidence in the federal court to show that ADC's procedures failed to sufficiently protect them from the risk of being conscious during the injection of the second two drugs. Because collateral estoppel bars relitigation of those issues, the Court should enter summary judgment in favor of the State on Claim I.

### C. As a matter of law, the midazolam protocol satisfies the Eighth Amendment.

As discussed above, in Claim I the Prisoners allege that the use of midazolam as the first drug in a three-drug protocol violates the constitutional ban on cruel and unusual punishment. On the undisputed facts, the Prisoners have no cognizable Eighth Amendment claim. As a result, the Court should enter judgment as a matter of law in favor of the Defendants on Claim I.

### 1. *The Prisoners' midazolam claim is too speculative to support an Eighth-Amendment violation.*

The Prisoners' Eighth Amendment claim rests on their speculative contention that, despite the administration of a massive dose of midazolam (which is a toxic dose per the medical examiner **(Ex. 25)**), a five-minute pause for the drug to take effect, and then a comprehensive consciousness check, that the Prisoners might somehow still remain conscious and aware of the lethal-injection procedure and be

46

able to experience severe pain upon the administration of the second and third drugs, which would then result in unconstitutional suffering. However, merely suggesting a slightly or marginally safer alternative to a State's lethal-injection protocol does not create an actionable Eighth-Amendment claim. *Baze*, 553 U.S. at 50. Permitting Eighth-Amendment violations on this ground would transform courts into "boards of inquiry charged with determining 'best practices' for executions, with each ruling supplanted by another round of litigation touting a new and improved methodology." *Baze*, 553 U.S. at 51. This "best practices" approach is not grounded in any precedent. *See id.* Further, it would necessarily "embroil courts in ongoing scientific controversies beyond their expertise, and would substantially intrude on the role of state legislatures in implementing their execution procedures—a role that by all accounts the States have fulfilled with an earnest desire to provide for a progressively more humane manner of death." *Baze*, 553 U.S. at 51.

Since *Baze*, the Eighth Circuit has repeatedly held that "[t]he mere fact 'an execution method may result in pain, either by accident or as an inescapable consequence of death,' does not amount to an Eighth Amendment violation." *Nooner*, 594 F.3d at 599 (citing *Clemons v. Crawford*, 585 F.3d 1119, 1125 (8th Cir. 2009)); *Zink v. Lombardi*, 783 F.3d 1089, 1100 (8th Cir. 2015) (speculation is insufficient to state an Eighth Amendment claim; even accepting as true the hypotheticals presented in prisoners' amended complaint, it would amount to no more than an isolated mishap, which does not give rise to an Eighth Amendment

violation).  Like the *Baze* court, the Eighth Circuit relies on the ADC's written

protocol to determine whether an Eighth Amendment violation exists.  *Nooner*, 594

F.3d at 601.  Because the ADC's written protocol is constitutional on its face, the

Prisoners' allegations of risks of accidents or isolated mishaps are not relevant to

the court's constitutional analysis.  *Nooner*, 594 F.3d at 601-02 (relying on and

quoting *Baze*).

Even where prisoners point to numerous opportunities for error under a

prison's lethal-injection protocol, courts hold that these risks do not establish an

Eighth-Amendment violation.  *See Baze*, 553 U.S. at 53.  In *Baze*, the Supreme

Court rejected the prisoners' claims that the (1) potential for inadequate dosing of

the lethal drug; (2) risk of improper mixing; (3) possibility of IV failure; and (4) lack

of adequate training and means for monitoring anesthetic depth established a

sufficiently substantial risk of harm.  553 U.S. at 53-54.  The Court agreed that

compliance with the manufacturer's instructions for reconstituting and mixing, the

protocol's requirement that the IV Team have at least one year of professional

experience, that a backup line be established prior to the administration of the

drugs, and monitoring of the process by the warden and deputy warden negated the

prisoners' allegations of substantial or imminent risk sufficient to establish an

Eighth Amendment violation.  *Baze*, 553 U.S. at 54-56.

Those same procedural safeguards are included in Arkansas's protocol **(Ex.
1)**, and so the Prisoners have no viable Eighth-Amendment claim based on the

current protocol.  *See Nooner*, 594 F.3d at 602 (holding that ADC's 2008 protocol,

which is substantively similar to the 2015 protocol, contained numerous safeguards that sufficiently protected the Prisoners from remaining conscious during the injection of the paralytic and heart-stopping drugs); *see also Taylor*, 487 F.3d at 1083 (concluding that Missouri's written protocol was constitutional on its face and that requiring the state to engage a physician trained in administration of anesthesia, purchase equipment to monitor anesthetic depth, maintain specific court-ordered record-keeping practices, and hire a supervising physician was not required under the Eighth Amendment).

Indeed, not even allegations and evidence related to past allegedly "botched" executions can establish that Arkansas's lethal-injection protocol creates a substantial risk of serious harm.  In *Nooner*, the plaintiffs alleged that the ADC "botched" four previous executions because the prisoners showed signs of consciousness within three minutes of being injected with the first drug.  594 F.3d at 601.[14]  Relying on *Taylor*, the Eighth Circuit restated the rule that the current protocol *as written* is the focus of any constitutional inquiry.  *Nooner,* 594 F.3d at 601-02.  Focusing next on *Baze*, the court reiterated that an isolated mishap does not give rise to an Eighth-Amendment violation.  *Id.* at 602 (citing *Baze, supra*). "[A]ny risk that [Arkansas's lethal-injection] procedure will not work as designated in the protocol is merely a risk of accident, which is insignificant in our constitutional analysis," the Eighth Circuit held.  *Id.* at 603 (citing *Taylor*, 487 F.3d at 1080).  The *Nooner* court held that ADC's 2008 protocol, which required ADC to

---

[14] The *Nooner* plaintiffs are also plaintiffs here, including Terrick Terrell Nooner, Don William Davis, and Jack Harold Jones, Jr.

verify that the prisoner was unconscious by using "standard procedures for assessing consciousness as required by medical paraprofessionals, such as checking for movement, opened eyes, eyelash reflex, and response to verbal commands and physical stimuli," sufficiently protected the prisoners from the risk of remaining conscious during the injection of the lethal drugs.  *See id.* at 601-08 (holding that the 2008 protocol sufficiently satisfied requirements for training and qualifications members of the IV and execution team, provided adequate safeguards against the unnecessary infliction of pain during IV establishment through the use of a local anesthetic, provided for monitoring of the IV infusion sites, and required consciousness determination and back-up doses of the anesthetic before lethal chemicals were injected).  The Eighth Circuit will not, absent supporting factual allegations, infer that a State will disregard its own lethal-injection protocol.  *See Clemons*, 585 F.3d at 1128.

The State has adduced evidence establishing that ADC's current lethal-injection procedure—like the 2008 procedure at issue in *Nooner*—contains adequate safeguards to minimize any risk of consciousness during the injection of the lethal drugs.  Director Wendy Kelley's affidavit establishes that ADC still employs the same "necessary and medically-appropriate methods" for assessing consciousness as the 2008 policy.  **(Ex. 29 ¶ 42)**  ADC's protocol ensures that the condemned inmate is unconscious through the application of medically-appropriate graded stimuli that will demonstrate, if there is no response, the presence of unconsciousness before the administration of the second and third drugs.  *Id.*  The consciousness check starts

out with simple movements such as stroking an eyelash, saying the person's name, and/or gentle shaking. *Id.* If there is no response, ADC then escalates the degree of stimulus to the application of very noxious stimuli including rubbing the inmate's eyeballs, a very hard pinch or squeeze of the trapezius muscle, and a strong sternal rub. *Id.*; *see also* Designee Dep., Ex. 31, at 106.[15]

Moreover, while the Prisoners complain that midazolam is not the anesthetic of choice in clinical settings, the Constitution does not mandate the "use of execution procedures that may be medically optimal in clinical contexts." *Taylor*, 487 F.3d at 1084. "For exceedingly practical reasons, no State can carry out an execution in the same manner that a hospital monitors an operation." *Id.* Constitutional standards do not require physicians to become executioners, and prisoners have no right to execution by physician. *See id.* Accordingly, the State has broad discretion to determine the procedures for conducting an execution. *Id.* at 1084.

The State successfully carried out four midazolam executions in April 2017. **(Exs. 12-24)** As required by ADC's protocol, an experienced medical practitioner performed consciousness checks on all four inmates five minutes after the midazolam injections. Designee Dep., Ex. 31, at 105-06. The midazolam worked as intended, rendering all four of the condemned inmates unconscious and insensate to painful stimuli. *See id.* at 47, 50, 53, 74, 76, 78-79, 81-82, 89-92, 95, 98-99, 101-03;

---

[15] Exhibit 31 is a redacted excerpt of deposition of the Deputy Director's designee who performed the consciousness checks during the April 2017 executions under ADC's execution policy. For convenience, the pages referred to in this brief refer to the page numbering in the top right corner of the deposition transcript.

*see also* Execution Witness Affidavits, Exs. 12-23.  The Prisoners' contention that—despite the procedural safeguards in the protocol and ADC's successful use of the protocol in the past—they are still sure or very likely to suffer extreme pain is rank speculation that as a matter of law is insufficient to support their claim.  The Court should, therefore, enter summary judgment in favor of Defendants on Claim I.

> ### 2.     *The Prisoners' have not and cannot show that the midazolam protocol is sure or very likely to cause needless suffering.*

The Court should also enter judgment as a matter of law in favor of the Defendants on the midazolam claim because Plaintiffs have failed to adduce sufficient evidence to establish a plausible Eighth-Amendment claim as required to overcome the State's Eleventh Amendment immunity.  "While methods of execution have changed over the years," the United States Supreme Court "has never invalidated a State's chosen procedure for carrying out a sentence of death as the infliction of cruel and unusual punishment." *Glossip*, 135 S. Ct. at 2732.  As the Eighth Circuit recently confirmed, Prisoners cannot successfully challenge a method of execution unless they establish that the method presents a risk that is "*sure or very likely* to cause serious illness and needless suffering" and that gives rise to "sufficiently *imminent* dangers." *McGehee v. Hutchinson*, 854 F.3d at 492 (quoting *Glossip* and *Baze*) (second emphasis added); *see also Williams v. Kelley*, 854 F.3d 998 (8th Cir. 2017) and *Jones v. Kelley*, 854 F.3d 1009 (8th Cir. 2017).

To establish a method-of-execution claim under the Eighth Amendment, the Prisoners must first adduce evidence demonstrating that the execution protocol

entails a "substantial risk of serious harm" or an "objectively intolerable risk of harm" that prevents prison officials from pleading that they were "subjectively blameless for purposes of the Eighth Amendment." *McGehee*, 584 F.3d at 495 (quoting *Glossip*, 135 S. Ct. at 2737). This they have not and cannot do. The Food and Drug Administration has approved the use of midazolam for the induction of anesthesia without the use of any other drugs. **(Ex. 2)** The State has submitted expert opinions of a board-certified anesthesiologist, a doctor of pharmacy and pharmacologist, and the Chief Medical Examiner at the Arkansas State Crime Lab opining that a 500 mg dose of midazolam will render an inmate unconscious and insensate to any pain that might otherwise be experienced upon the administration of the second two drugs under Arkansas's lethal-injection protocol. **(Ex. 3-10)** Indeed, the inmates who were executed in 2017 had postmortem midazolam concentrations still well within the toxic range for that drug alone. **(Exs. 10, 25)** Moreover, even the Prisoners' own expert witness authored a textbook identifying "anesthesia" as the major clinical use of midazolam. **(Ex. 11)** That text also confirms that intravenous administration of midazolam produces greater central nervous system depression than does oral administration and that IV administration can cause respiratory depression, which led the FDA to issue a specific warning of respiratory depression for midazolam. *Id.*

While the Prisoners now offer a new slate of supposed "experts" who disagree, the science is, at best, just as "equivocal" as it was in 2017 when the Eighth Circuit rejected this Court's conclusions on the first *Glossip* prong. *McGehee*, 854 F.3d at

493.  In *McGehee*, the Eighth Circuit noted the lack of any scientific studies concerning the impact of a 500mg dose of midazolam on humans and discussed this Court's conclusion that, if there is a "ceiling effect" for midazolam, under which effectiveness levels off at a certain dosage, the level is unknown.  *Id.* at 492.  The Eighth Circuit explained that "[this] court appeared to acknowledge that there was no 'well-established scientific consensus' that the use of midazolam in conjunction with the other two drugs was very likely to cause severe pain."  *Id.*  The Eighth Circuit recognized that if, as here, "there is no scientific consensus and a paucity of reliable scientific evidence concerning the effect of a lethal-injection protocol on humans, then the challenger might well be unable to meet [his] burden" under *Glossip*.  *Id.* at 493.  And the Eighth Circuit held that "equivocal evidence" on the effect of a 500 mg dose of midazolam on humans "falls short of demonstrating a significant possibility that the prisoners will show that the Arkansas protocol is 'sure or very likely' to cause severe pain and needless suffering."  *Id.*

Nothing has changed since that decision.  There still is no established scientific consensus that the use of midazolam in conjunction with vecuronium bromide and potassium chloride is sure or very likely to cause severe pain.  There is still a paucity of reliable scientific evidence concerning the effect of ADC's lethal-injection protocol on humans.  Four inmates were successfully executed in Arkansas in 2017 using the midazolam protocol, and there is no evidence demonstrating that they consciously experienced severe pain and suffering during the procedure.  Accordingly, the Prisoners have not—and cannot—show that the protocol is "sure or

very likely" to cause severe pain and needless suffering under the Eighth Circuit's controlling decision in *McGehee*.  The Court should enter summary judgment in favor of the State on Claim I.

>      3.      ***The Prisoners have not and cannot show that ADC has access to an alternative execution method that will significantly reduce the risk of severe pain.***

The Court should also enter summary judgment in favor of the State on Claim I because the Prisoners have not—and cannot—show that the State has access to a "known and available" alternative method of execution that will "significantly reduce a substantial risk of severe pain." *McGehee*, 854 F.3d at 493. In proving that an alternative execution method is known and available, the Prisoners must show that the State has "access to the alternative and be able to carry out the alternative method relatively easily and reasonably quickly." *Id.* (adopting availability test in *Arthur v. Comm'r, Ala. Dep't of Corr.*, 840 F.3d 1268, 1300 (11th Cir. 2016), *cert. denied*, 137 S. Ct. 725 (2017)).  "Unless an alternative is feasible and readily implemented in the sense described, the State has a legitimate penological justification for adhering to its current method of execution in order to carry out lawful sentences." *Id.* (citing *Baze*, 553 U.S. at 52).  "When availability (or effectiveness) of an alternative is more speculative, a State's refusal to discontinue executions under the current method is not blameworthy in a constitutional sense." *Id.* (citing *Baze*, 553 U.S. at 67 (Alito, J., concurring)).  Accordingly, the Prisoners' burden is not met "by showing a slightly or marginally safer alternative." *Glossip*,

135 S. Ct. at 2737; *see also Baze*, 553 U.S. at 41 (discussing "untried and untested alternatives").

In *McGehee,* the Eighth Circuit rejected all of the alternative execution methods that the Prisoners included in their original complaint as too speculative to satisfy their burden under the Eighth Amendment.  In their Amended Complaint, the Prisoners continue to assert that the use of manufactured or compounded pentobarbital is a feasible, readily available alternative execution method.  Am. Compl. ¶¶ 36-37.  But the Eighth Circuit held that "[t]he possibility that Arkansas could acquire pentobarbital for use in executions is too speculative to justify stays of execution.  Arkansas made at least three unsuccessful inquiries about obtaining barbiturates in 2015, and the difficulty of obtaining drugs for use in lethal injection is well documented."  *McGehee*, 854 F.3d at 493.  In response to discovery, the Prisoners were unable to identify even *one* potential supplier of pentobarbital.  **(Exs. 26-27)**  Indeed, the information adduced by the Prisoners in discovery demonstrates that suppliers of lethal injection chemicals in other states absolutely will not—under any circumstances—sell lethal drugs to Arkansas to carry out executions.  **(Ex. 28)**  Because the Prisoners have not and cannot carry their burden of proving that pentobarbital is available to ADC for use in executions, as a matter of law, it is not an available alternative.

The Prisoners suggest Arkansas could use a firing squad to carry out executions.  Am. Compl. ¶ 35.  In reviewing the Prisoners' similar suggestion in April 2017, the Eighth Circuit rejected this purported alternative on the grounds

that, "The firing squad has been used by only one State since the 1920s. It requires trained marksmen who are willing to participate and is allegedly painless only if volleys are targeted precisely.  The record comes short of establishing a significant possibility that use of a firing squad is readily implemented and would *significantly reduce* a substantial risk of severe pain." *McGehee*, 854 F.3d at 494 (emphasis in original).  And since that decision, the Prisoners have not developed any additional evidence to the contrary.  Indeed, there is no evidence that ADC has appropriate facilities at which to carry out a firing-squad execution or that ADC has access to trained marksmen willing to participate in a firing-squad execution.  No one could plausibly dispute that a missed shot could result in an extremely painful death.  To the contrary, as before, there is not any evidence that a firing squad will significantly reduce a substantial risk of severe pain or that ADC could implement execution by firing squad "relatively easily and reasonably quickly." *McGehee*, 854 F.3d at 493.  Thus, as a matter of law, the firing squad is not a readily available alternative.

The Prisoners next suggest anesthetic gas as alternative method of execution. Am. Compl. ¶ 38.  As the Eighth Circuit explained in April 2017, sevoflurane gas has "never been used to carry out an execution." *McGehee*, 854 F.3d at 493.  And just as before, "[w]ith no track record of successful use, [sevoflurane is] not likely to emerge as more than a 'slightly or marginally safer alternative.'" *Id.* (citing *Glossip*, 135 S. Ct. at 2737 and *Baze*, 553 U.S. at 41); *see also* Ex. 5 ¶ 37 (explaining that sevoflurane requires special training and equipment and poses a risk of accidental

inhalation to members of the execution team).  Hence, as before, this suggestion fails as a matter of law.

Attempting to bolster their case, the Prisoners' Amended Complaint does purport to offer some new alternative execution methods.  These include: (1) the substitution of a drug called etomidate for midazolam; (2) a two-drug protocol using diazepam and fentanyl; and (3) an oral dose of secobarbital, a drug they allege is the primary method for physician-assisted suicide in jurisdictions that allow that practice.  Am. Compl. ¶¶ 39-41.  But there is no evidence that Arkansas can acquire etomidate, diazepam, or fentanyl "relatively easily and reasonably quickly." *McGehee*, 854 F.3d at 493; *see* Exs. 26-27 (admitting that the Prisoners are unaware of the identity of any supplier of etimodate, diazepam, or fentanyl willing to sell it to Arkansas for use in executions).  And although the Prisoners claim that one out-of-state pharmacy would be willing to sell secobarbital to Arkansas for use in executions, even if that is in fact true, that method is untried and untested as a method of execution, requires administration by nasogastric feeding tube which can be painful and carries risk of accidental injury during placement, is not always successful in causing death, and can take hours or even up to *five days* to work. **(Ex. 6 ¶ 2; Ex. 38 at 33-37, 42-44, 54-57)**  Indeed, when administered to a healthy individual, secobarbital could take even longer to work.  **(Ex. 38 at 48-49)** Therefore, at best, secobarbital is "not likely to emerge as more than a 'slightly or marginally safer alternative.'"  *McGehee*, 854 F.3d at 493.

With the law of the case now established regarding both the merits of the
Prisoners' claim that midazolam will not work as intended and the availability of
the Prisoners' proposed alternative methods of execution, the Prisoners' midazolam
claim fails as a matter of law.  The Court should grant summary judgment on Claim
I to the Defendants and dismiss that claim with prejudice.

### D. The Prisoners' equal-protection claim (Claim II) fails as a matter of law.

In Claim II of the Amended Complaint, the Prisoners assert an as-applied
equal-protection challenge with regard to ADC's consciousness-check procedures.
They maintain that, "[a]s shown by the April executions, the ADC does not apply
the consciousness check consistently from execution to execution" and that "[t]he
executioners either did not carry out an appropriate consciousness check or
proceeded with the execution even after the condemned exhibited movements
indicating consciousness."  Am. Compl. ¶ 45.  The Prisoners maintain that
Defendants' alleged failure to consistently apply a consciousness check to each of
the condemned inmates violates their right to equal protection.  *Id.* ¶ 47.  To
support their claim, the Prisoners rely on lay witnesses to the executions of
Kenneth Williams, Marcel Williams, and Jack Jones who did not understand or
appreciate what was going on in the execution chamber (the Prisoners apparently
concede that ADC conducted an appropriate consciousness check with regard to
Ledell Lee).  *Id.* ¶¶ 14-16.  Yet as discussed below, ADC properly performed
consciousness checks on Kenneth Williams, Marcel Williams, and Jack Jones and
confirmed that they were unconscious and insensate to pain prior to administering

the lethal drugs.  As a result, the Prisoners' equal protection claim fails as a matter of law, and summary judgment should be entered in favor of Defendants on Claim II.

The Equal Protection Clause of the Fourteenth Amendment requires that the government treat similarly situated people alike.  *Klinger v. Dep't of Corr.*, 31 F.3d 727, 731 (8th Cir. 1994) (citing *City of Clerburne v. Clerburne Living Ctr., Inc.*, 473 U.S. 432, 439 (1985)).  In death-penalty cases, an inmate must show that the State will treat him differently than other similarly-situated persons.  *DeYoung v. Owens*, 646 F.3d 1319, 1327 (11th Cir. 2011).  Deviation from a "core provision" of the State's execution procedure may violate a prisoner's equal protection rights.  *See Zink v. Lombardi*, No. 12-04209-CV-C-BP, 2014 WL 11309998, at *10 (W.D. Mo. May 2, 2014) (citing *In re Ohio Execution Protocol Litig.*, 840 F. Supp. 2d 1044, 1054-55 (S.D. Ohio 2012)).  "Core provisions are those pertaining to properly administering and carrying out the executions of inmates[.]"  *Id.*  But the Equal Protection Clause does not require a state to have a comprehensively detailed written protocol that would "ensure that every execution is performed in a precisely identical manner."  *DeYoung*, 646 F.3d at 1328.  "Additionally, a viable Equal Protection claim requires 'an actual pattern of treating prisoners differently in ways that did affect the risk of pain to which they would be subjected, and therefore the risk of being subjected to cruel and unusual punishment.'"  *Zink*, 2014 WL 11309998, at *10 (quoting *Towery v. Brewer*, 672 F.3d 650, 660 (9th Cir. 2012)).

There is no evidence here that ADC has a pattern and practice of deviating from any "core provision" of its execution protocol as required to sustain an equal protection claim.  ADC's protocol requires the Deputy Director or a designee to "confirm the condemned inmate is unconscious by using all necessary and medically-appropriate methods."  **(Ex. 1 at 5)**  Director Kelley in her affidavit explains that the "necessary and medically-appropriate methods" for assessing consciousness involve the application of graded stimuli that will demonstrate, if there is no response, the presence of unconsciousness.  **(Ex. 29 ¶ 42)**

The Deputy Director's designee who was present for all four executions in April 2017 and performed the consciousness checks testified that s/he had sufficient training and experience as a medical practitioner to perform the consciousness checks.  **(Ex. 31 at 28-32)**  The purpose of the consciousness check is to determine if the inmate reacts to any kind of stimuli and can feel pain.  *Id.* at 46.  The designee was checking to ensure that the inmates were completely unconscious and could not feel pain.  *Id.* at 47.  As required by the protocol, the designee waited five minutes after the midazolam injection to perform the consciousness checks in all four executions in April 2017.  *Id.* at 53, 69, 106.  The designee used the same undisputedly medically-appropriate measures to assess consciousness for all four of the condemned inmates.  *Id.* at 106-07.  The designee spoke to the inmate to confirm a lack response to verbal stimuli; checked the inmate's pulse by feeling the carotid artery and looking at the pulse oximeter; and listened for breath sounds and felt the side of the inmate's throat to assess breathing.  The designee then escalated the

stimuli to assess the lack of response to physical stimuli, which included brushing the inmate's eyelashes to confirm the absence of a reflex movement; opening the inmate's eyes, touching the corneas (eyeballs), very tightly pinching the left earlobe with the fingernails, pinching the trapezius muscle on the shoulder, and finally performing a hard sternal rub. *Id.* at 50, 74, 90. According to the undisputed medical testimony, both a trapezius pinch and sternal rub are "extremely painful" and would have evoked a reaction out of anyone that was conscious. *Id.* at 50, 90. And these are the same consciousness-check techniques that the Eighth Circuit held in *Nooner* sufficiently protected prisoners from remaining conscious during the administration of the second and third drugs in Arkansas's lethal-injection protocol. 594 F.3d at 601-02.

The designee confirmed that s/he performed all of the above components of the consciousness check on all four of the inmates who were executed in April 2017 and that each inmate was unconscious and did not respond to any of the stimuli. **(Ex. 31 at 53, 55, 89, 91, 99, 101-02, 106-07)** Only after confirming the absence of consciousness did the designee indicate to the executioner that it was appropriate to proceed with the injection of the second and third drugs. *Id.* at 91-92, 103. All of the executions complied with the written protocol. *Id.* at 104; *see also* Exs. 12-14.

The evidence regarding ADC's compliance with its written consciousness-check protocol is undisputed and warrants judgment as a matter of law in favor of Defendants on the Prisoners' equal protection claim.

### E.    Claims III and IV fail as a matter of law.

In Claims III and IV of the Amended Complaint, the Prisoners argue that ADC's execution policies that prevent their attorneys from viewing "the entire execution" violate their First Amendment right of access to the courts and their alleged right to counsel under 18 U.S.C. § 3599.  Specifically, the Prisoners complain that, under the 2015 policy **(Ex. 1)**, their attorneys are prevented from seeing any part of the execution until the condemned is strapped to the gurney and intravenous access is established.  The Prisoners also complain that, under the 2015 policy, Kelley shuts off the chamber audio during the execution, which purportedly prevents them from ensuring that the execution is being carried out in a way that satisfies the Eighth Amendment.  Am. Compl. (Dkt. No. 117) ¶¶ 49-50, 57.  The Prisoners further allege that ADC's policies prevent their attorneys from determining the precise time that each drug is injected, which purportedly prevents them from verifying that the executioners have not materially deviated from their protocol.  *Id.* ¶¶ 51, 57.  Finally, the Prisoners complain that ADC's execution policy prevents more than one attorney for the condemned inmate from witnessing an execution, which they claim prevents the witnessing attorney from contacting co-counsel or a judge during the execution.  *Id.* ¶¶ 52, 58.  As discussed below, these claims fail as a matter of law for several independently-dispositive reasons, and the Court should enter summary judgment in favor of Defendants on Claims III and IV.

### 1.   *Claims III and IV are time-barred.*

The challenged execution policies have been in place for over a decade and are, therefore, time-barred.  Section 1983 claims are tort actions and are governed by the statute of limitations applicable to personal injury actions in the state where the Section 1983 action is brought.  *Ketchum v. City of West Memphis*, 974 F.2d 81, 82 (8th Cir. 1992); *Miller v. Norris*, 247 F.3d 736 (8th Cir. 2001).  Arkansas has a three-year statute of limitations for personal injury actions. Ark. Code Ann. § 16-56-105(3); *Ketchum*, 974 F.2d at 82.  Thus, 42 U.S.C. § 1983 actions filed in Arkansas are limited to a three-year limitations period.  Similarly, challenges to a state's method of execution are subject to the limitations period applicable to constitutional challenges brought pursuant to 42 U.S.C. § 1983. *McNair v. Allen*, 515 F.3d 1168, 1174 (11th Cir. 2008).  The limitations period begins to run on the date the state review is complete or the date on which the prisoner becomes subject to a new or substantially changed execution protocol, whichever occurs later. *Wellons v. Comm'r, Ga Dept. of Corr.*, 754 F.3d 1260, 1263-65 (11th Cir. 2014); *McNair v. Allen*, 515 F.3d 1168, 1174 (11th Cir. 2008).

"Of course, a claim that accrues by virtue of a substantial change in a state's execution protocol is limited to the particular part of the protocol that changed." *Gissendaner v. Commr., Georgia Dept. of Corrections,* 779 F.3d 1275, 1280–81 (11th Cir. 2015), *cert. denied sub nom. Gissendaner v. Bryson*, 135 S. Ct. 1580 (2015). "In other words, a substantial change to one aspect of a state's execution protocol does not allow a prisoner whose complaint would otherwise be time-barred to make a

'wholesale challenge' to the State's protocol." *Gissendaner*, 779 F.3d at 1281.  Citing decisions from the Eleventh, Fifth, and Sixth Circuits, the Eighth Circuit has explained that claims are time barred where they could have been asserted against any past lethal-injection protocol, not just a recently-modified one.  *Bucklew v. Lombardi*, 783 F.3d 1120, 1128-29 (8th Cir. 2015) (citing *Wellons v. Comm'r, Ga. Dep't of Corr.*, 754 F.3d 1260, 1263–64 (11th Cir.2014); *Walker v. Epps*, 550 F.3d 407 (5th Cir.2008), *cert. denied*, 558 U.S. 829 (2009); *Cooey v. Strickland*, 479 F.3d 412, 416–24 (6th Cir.2007), *cert. denied*, 553 U.S. 1014, 1006 (2008)).

The Eighth Circuit's decision in *Bucklew* controls here.  The undisputed evidence shows that the particular components of ADC's execution policy that the Prisoners challenge in Claims III and IV have been in place since at least 2008.  *See* Affidavit of Wendy Kelley, attached to the Mot. Summ. J. as Ex. 29, ¶ 47; ADC's Administrative Directive 08-28, attached to the Mot. Summ. J. as Ex. 35, at 2, 11; ADC's Administrative Directive 15-28, attached to the Mot. Summ. J. as Exhibit 36, at 2-3 (filed under seal).  The 2008 policy is clear that only one legal counsel for the inmate was allowed to witness the execution, and that rule was included again in the 2015 policy at issue in this case.  Ex. 29, ¶ 47; Ex. 35 at 2; Ex. 36 at 3. Similarly, under the 2008 policy, intravenous access was established outside of the presence of witnesses, and the curtains to the execution chamber were not opened until after the condemned inmate was present in the execution chamber and strapped to the gurney.  Ex. 35 at 10-11.  These policies are the same in the 2015 version.  Ex. 36 at 11.

Likewise, under the 2008 policy, the microphone and audio feed in the execution chamber were only turned on during the following parts of the execution: (1) the condemned inmate's last words or statements, (2) the warden's pronouncement that "the officials are ready to proceed with the execution," (3) the coroner's pronouncement of death, and (4) the Director's announcements to the witnesses concerning the order of the court, the time the lethal injection was administered, and the time of death.  Ex. 35 at 11-12.  The policy required the recorder to turn off the microphone and audio feed for the remainder of the execution procedure.  *Id.*  These policies are exactly the same in the 2015 directive. Ex. 36 at 11-12.  Under controlling precedent, the statute of limitations on the Prisoners' policy claims began to accrue in 2008 with the adoption of AD 08-28 (Ex. 35) and are now time-barred.

Not only could the Prisoners have asserted their challenges to the ADC's viewing policies nearly a decade ago (*see* Ex. 35) —they actually did so in *Nooner v. Norris*, 594 F.3d 592.  The Prisoners have been aware of the provisions of the protocol they now challenge since at least 2008, and they actually litigated some of these issues in *Nooner*.  *See Nooner*, 594 F.3d 592.  Plaintiffs' access to courts and counsel claims could have been asserted against the 2008 "lethal injection protocol, not just the modified protocol adopted in [2015]."  *Bucklew*, 783 F.3d at 1129.  They are, therefore, time-barred as a matter of law and should be dismissed with prejudice.

### 2. *The Prisoners' protocol claims are barred by* res judicata *and collateral estoppel.*

The Prisoners' protocol claims are barred for a second reason, as well.  They now bring legal challenges to the ADC's 2015 execution procedures that were or could have been adjudicated on the merits in prior lawsuits involving the same parties or their privies.  *See Nooner v. Norris*, 594 F.3d 592; *see also Hobbs v. McGehee*, 2015 Ark. 116, 458 S.W.3d 707 (rejecting federal and state constitutional challenges to the ADC's procedures regarding the selection, training, and qualifications of members of the execution team and the method by which the drugs would be injected).  As a result, they are barred by *res judicata* and collateral estoppel just like the midazolam claim discussed earlier in this brief.

### 3. *The Prisoners' protocol claims are too speculative to support an Eighth Amendment violation.*

Third, as discussed above with regard to the midazolam claim, the Prisoners' access to courts and counsel claims rest on their speculative contention that that ADC *might* commit negligence in the future and fail to properly follow the protocol as written, which *might* then result in a deprivation of their right of access to the courts and counsel.  As explained above, because the ADC's written protocol is constitutional on its face, the Prisoners' allegations of risks of accidents or isolated mishaps are not relevant to the court's constitutional analysis.  *Nooner*, 594 F.3d at 601-02 (relying on and quoting *Baze*).

### 4.   *The policy claims are moot in the light of the Joint Execution Viewing Policy.*

The Court should also enter judgment as a matter of law in favor of Defendants on Claims III and IV because they are moot.  Inasmuch as the parties negotiated a Joint Proposed Execution Viewing Policy that they agreed "assures plaintiffs' right to counsel and access to the courts for the entire duration of all executions," Claims VI and VII are now moot.  *See* Dkt. Nos. 62 & 63.  The Joint Execution Viewing Policy was not limited in time or scope to only the executions that were scheduled to take place in April 2017.  Dkt. No. 62.  Indeed, the parties mutually agreed that it would apply to "all executions."  *Id.* at 1.  Therefore, the Court should find that there is no longer a justiciable controversy with regard to Claims III and IV and dismiss those counts with prejudice.

### 5.   *The policy claims fail on the merits.*

The Prisoners' right-to-access-the-courts claim (Claim III) fails as a matter of law because the Prisoners' constitutional right to access the courts does not turn on whether the Prisoners are permitted to have counsel witness their executions, or whether counsel is permitted access to a phone during executions, or any other matter complained about in Claims III and IV.  It is, of course, well-established that prisoners have a constitutional right to access the courts.  *Bounds v. Smith,* 430 U.S. 817, 821 (1977).  To meet constitutional muster, a prisoner's access to the courts must be "adequate, effective, and meaningful."  *Id.*  But *Bounds* "guarantees no particular methodology but rather the conferral of a capability—the capability of

bringing contemplated challenges to sentences or conditions of confinement before the courts." *Lewis v. Casey*, 518 U.S. 343, 356 (1996).  Conceptually, this right does not turn on any other event such as an execution—rather, it is simply a right to the "capability" of bringing a claim regarding an inmate's sentence or "conditions of confinement" in court.  The Prisoners here clearly have that capability through their lawyers (who have plainly already contemplated and brought numerous claims on behalf of their clients).  ADC's policies governing executions do not bar access to courts for the Prisoners' attorneys.  Claim III fails at the outset for this reason alone.

Similarly, as a threshold matter, the Prisoners' right to counsel claim (Claim IV) is discrete and limited, not boundless in scope and number as the Prisoners seem to believe.  The Prisoners have counsel (indeed, many if not all of them have multiple attorneys representing them).  Although the right to counsel may include a right to have *some* meaningful attorney-client contact leading up to an execution and may include a right to have *an* attorney witness the execution, ADC's policy permits each Prisoner to have access to counsel on the day of the execution and permits an attorney for each Prisoner to witness each execution (and additional provisions were made to allow a second attorney for each Prisoner in the warden's office during each execution with access to inbound and outbound calls and faxes).  **(Exs. 36-37)**  The Prisoners demand more—that they be permitted to have *multiple* attorneys present to witness each execution, that the witnessing attorneys be permitted near immediate phone access, and so on.  But there is no constitutional

imperative in the conceptual right to counsel that requires satisfaction of these demands. Claims III and IV fail as a matter of law because the Prisoners have failed to establish a violation of their rights to access the courts or to counsel.

If the Court considers Claims III and IV any further, then the claims should be analyzed under *Turner v. Safley*, 482 U.S. 78 (1987), which sets forth the appropriate standard for review of prison policies. The *Turner* factors include: (1) whether there exists a valid, rational connection between the prison regulation and the legitimate governmental interest put forward to justify it; (2) whether there are alternative means of exercising the right that remain open to prisoners; (3) the impact accommodation of the asserted constitutional right will have on guards and other prisoners, and on the allocation of prison resources generally; and (4) the absence of ready alternatives is evidence of the reasonableness of a prison regulation. *Id.* at 89-91. Analyzed under the *Turner* factors, and on the undisputed facts, the Prisoners' have not and cannot succeed on the merits of these claims.

The Court does not need evidence to conceive the legitimate government interests—which are actually codified by statute in Ark. Code Ann. § 16-90-502— served by the ADC's prohibition of phones and other devices with recording technology, as well as the ADC's limitations on the number of witnesses to an execution, including attorneys representing the Prisoner to be executed. Arkansas has made a valid policy choice to limit execution witnesses to one attorney per inmate and to prohibit audio and video recordings of executions, and ADC's lethal-injection policy is consistent with (and actually required by) state law. The

Prisoners have failed to advance any legitimate reason why the Court should second-guess this State policy. *See, e.g.*, *Entertainment Network, Inc. v. Lappin*, 134 F. Supp. 2d 1002, 1017-18 (S.D. Ind. 2001) (noting various legitimate interests furthered by prison policy prohibiting recording or broadcasting of executions and holding that "[w]hatever First Amendment protection exists for viewing executions, it is not violated by the [prison's] explicit regulation against recording or broadcasting them to the public").

First, the ADC's policy is validly and rationally connected to maintaining security in the prison setting. Second, the policy promotes the government's interest in not sensationalizing executions or dehumanizing the condemned prisoners—an interest likely shared by the Prisoners and their families. Third, the policy preserves the solemnity of executions—another interest that is likely shared by the Prisoners and their families. Fourth, the recording prohibition protects the privacy and dignity of the condemned prisoner—an interest that is again likely shared by the Prisoners and their families—and also protects the privacy and dignity of victims and their families who are witnessing executions as well as the persons who carry out the executions. Of course, limitations on the number of witnesses and what portions of executions may be witnessed promote many of the same interests as the prohibition on recording devices.

The other *Turner* factors also militate in favor of the ADC. As explained above, the Prisoners don't have a cognizable right to exercise, so the second *Turner* factor militates in the ADC's favor. Requiring ADC to allow the Prisoners to bring

two or more lawyers to witness executions would violate Ark. Code Ann. § 16-90-502(e)(1)(E) and strain the ADC's limited space in the witness room, and allowing those lawyers to bring recording devices would not only violate the statutory prohibition on recording devices in the witness room under Ark. Code Ann. § 16-90-502(e)(5)(C), but also obliterate the State's legitimate interests in not sensationalizing executions, not dehumanizing condemned prisoners, preserving the solemnity of executions, and protecting the privacy and dignity of the condemned prisoners and their families, the victims and their families, and the persons who carry out the executions.  So the third *Turner* factor militates in the ADC's favor. Only the fourth *Turner* factor—available alternatives—is debatable, and ADC submits that *at most*, the Court should allow the Prisoners' counsel to have access to a landline.  But the evidence shows that the Prisoners' counsel *will* have access to a landline (and fax machine), so this claim is moot.

In *Grayson v. Warden*, 2016 WL 7118393 (11th Cir. Dec. 7, 2016), the Eleventh Circuit upheld Alabama's policy prohibiting witnesses, including counsel for the condemned prisoner, from having cell phone *or landline* access during execution of a condemned prisoner.  The Eleventh Circuit noted that the condemned prisoner who claimed that the policy infringed his right to access the courts was unlikely to succeed on the merits because he did not cite, and the court did not find, "any precedent suggesting that Alabama's policy prohibiting witnesses from having cell phone or landline access infringes on the First, Eighth, or Fourteenth Amendments."  *Id.* at *8.  The court also found that "to state a valid right-of-access

claim, [the prisoner] would have to establish an actual injury"—but the "request for access to a cell phone or landline is based on the possibility that something might go wrong during his execution, which does not qualify as an 'actual injury.'" *Id.* The Court should adopt the reasoning of the Eleventh Circuit and enter judgment as a matter of law in favor of the State on Claim III.

In *Cooey v. Strickland*, 2011 WL 320166 (S.D. Ohio Jan. 28, 2011), the district court considered numerous challenges against Ohio's execution policy and resolved two claims relevant to this case. First, the court concluded that the policy allowing a condemned prisoner to designate three witnesses for his own execution but requiring him to use one of those designations if he wished to have his execution witnessed by his attorney did *not* violate the condemned prisoner's right to counsel. *Id.* at *5-*7. The court held that "the fact that an inmate can have counsel present to witness an execution only if the inmate designates counsel as one of the three permissible witnesses" did *not* run afoul of the Constitution. *Id.* at *5. "A system that requires an inmate to forego one layperson witness in order to have counsel present in no way functions as an infringement on any right to counsel or effectuates any preclusive effect of constitutional import." *Id.* at *6. Notably, the district court's entire discussion of the condemned prisoner's right to counsel in *Cooey v. Strickland* consistently refers to counsel in the singular—there is no suggestion that the condemned prisoner might possibly need or be entitled to have *multiple* attorneys present to witness his execution as the Prisoners seek. The Court should enter judgment as a matter of law in favor of the State on Claim IV.

The *Cooey* district court also addressed a challenge against the prison's policy prohibiting access to cell phones *and* landlines.  2011 WL 320166 at *12.  The policy "provide[d] an inmate's counsel only with access to an office containing a telephone located in a separate building from the execution building."  *Id*.  The court noted that the prison's rationale for the prohibition was "purported security concerns" and that "prophylactic policy judgments, and even remote security concerns can nonetheless pass muster as constitutionally reasonably justifications necessitating alternative reasonable accommodations."  *Id*.  And although it was "less than clear how security concerns might reach counsel's use of an institution phone located in the execution building itself," the condemned inmate failed to direct the court "to any controlling authority supporting the propositions that the Constitution compels that counsel be permitted to bring a cell phone or personal computer into the building in which the execution takes place or that counsel be afforded the use of a telephone located in that specific building."  *Id*.  The court found it unnecessary to rule on the merits of the constitutional claim, however, because the record supported the fact that "the unwritten custom and practices surrounding the protocol" afforded counsel with access to a landline in the execution building.  *Id*.  Again, ADC's custom and practice as reflected in a letter from ADC's Chief Legal Counsel to the Prisoners' attorneys confirms that ADC has made provisions to allow a second legal counsel for an inmate to be present at the Cummins Unit with access to inbound and outbound faxes and telephone calls.  **(Ex. 37).**  ADC also made provisions for outbound phone lines for use of legal counsel at the holding cells and

in the visitation center.  *Id.*  Because the ADC has already clarified its policies to alleviate the Prisoners' concerns in Counts III and IV, the Court should enter judgment as a matter of law in favor of the Defendants on these claims.

ADC Director Kelley's affidavit confirms the fact that the ADC has already clarified its execution-day policy to resolve the Prisoners' concerns about counsel and phone access—and her affidavit goes even farther than the letter from ADC's Chief Counsel.  **(Ex. 29)**  "ADC has informed the Prisoners' counsel that, on the date of execution, one legal counsel for the inmate will be allowed to visit the inmate at the holding cell" and "[t]he time of visitation is not limited except for specified inmate activities such as showering or eating."  **(Ex. 29 ¶ 45)**.  The Prisoner's counsel may remain with the Prisoner at the holding cell until the Prisoner is escorted to the execution chamber, at which time, counsel may choose to be escorted to the witness room, the warden's office, or the visitation center through completion of the execution.  *Id.* ¶ 46.  Director Kelley confirms that, at the request of the inmate, an additional legal counsel will be allowed to enter the unit and remain in the warden's office during the execution.  *Id.* ¶ 48.  Although state law prohibits anyone from making an audio or video recording of an execution, and the ADC has never allowed anyone to bring cell phones or other devices with recording capabilities to witness executions (*id.* ¶¶ 49-50), the ADC will make available *two* outbound phone lines for the use of counsel who visits the Prisoner in the holding cell, and inbound and outbound phone lines and an inbound and outbound fax line for the use of the additional counsel who chooses to be in the warden's office for the

execution.  *Id.* ¶ 51.  In addition, the legal counsel who chooses to be in the warden's office for the execution will be permitted to bring a laptop computer to the warden's office.  *Id.* ¶ 52.

As shown, if anything, ADC has gone far beyond what is constitutionally required in terms of preserving the Prisoners' right of access to courts and counsel. The Court should therefore enter judgment as a matter of law in Defendants' favor on Counts III and IV.

## CONCLUSION

As shown, there are no genuine issues of material fact, and Defendants are entitled to judgment as a matter of law.  The Court should grant the State's motion for summary judgment and dismiss this case with prejudice.

Respectfully submitted,

LESLIE RUTLEDGE
Attorney General

NICHOLAS J. BRONNI
Solicitor General

By: */s/ Jennifer L. Merritt*
   JENNIFER L. MERRITT (2002148)
   Senior Assistant Attorney General
   323 Center Street, Suite 200
   Little Rock, Arkansas  72201
   Tel.:  (501) 628-1319
   Fax: (501) 682-2591
   Email:  Jennifer.Merritt@ArkansasAG.gov

*Attorneys for Defendants*

## **CERTIFICATE OF SERVICE**

I, Jennifer L. Merritt, do hereby certify that on this 20th day of March, 2019,

I electronically filed the foregoing with the Clerk of Court using the CM/ECF filing

system, which shall send notification of the filing to any participants.

*/s/ Jennifer L. Merritt*
Jennifer L. Merritt