IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF ARKANSAS

| | |
|---|---|
| JASON McGEHEE, STACEY JOHNSON, BRUCE WARD, TERRICK NOONER, and DON DAVIS | PLAINTIFFS |
| JUSTIN ANDERSON, *et al.* | INTERVENORS |
| v.     Case No. 4:17-CV-179-KGB-BD | |
| ASA HUTCHINSON, Governor of the State of Arkansas, and WENDY KELLEY, Director, Arkansas Department of Correction | DEFENDANTS |

## DEFENDANTS' RESPONSE IN OPPOSITION TO MOTION TO EXCLUDE TESTIMONY OF DR. DANIEL E. BUFFINGTON

Asa Hutchinson, in his official capacity as Governor of the State of Arkansas, and Wendy Kelley, in her official capacity as Director of the Arkansas Department of Correction, respectfully submit this response in opposition to the Prisoners' motion to exclude the opinions of Dr. Daniel E. Buffington. As a Doctor of Pharmacy and professor of clinical pharmacology, Dr. Buffington is well-qualified to render reliable expert opinions. Arguing to the contrary, the Prisoners badly misunderstand the training and practice roles of Doctors of Pharmacy like Dr. Buffington. Under controlling precedent, the Prisoners' concerns go to the weight and not the admissibility of Dr. Buffington's opinions in this bench trial. The Court should deny the Prisoners' motion in its entirety.

## ARGUMENT

Without citing a single controlling precedent, the Prisoners seek to exclude all opinions and testimony of Dr. Buffington on the ground that he is not qualified to offer opinions on the pharmacological effects of drugs on humans. The Prisoners also maintain that Dr. Buffington's opinions are based on unreliable methodology and should be excluded because they conflict with the opinions of other experts. As detailed below, both of these arguments are without merit and should be rejected. The Prisoners' personal attacks on Dr. Buffington are not only inappropriate, but also demonstrate their utter lack of understanding of the training and practice roles of Doctors of Pharmacy. For all of these reasons, the Court should deny the Prisoners' motion to exclude Dr. Buffington's testimony.

**I.    Dr. Buffington's training and experience as a Doctor of Pharmacy amply qualify him to render reliable expert opinions in this case.**

Federal Rule of Evidence 702 governs admissibility of expert testimony. *See* Fed. R. Evid. 702. Proposed expert testimony, whether based on scientific, technical, or other specialized knowledge, must meet three prerequisites in order to be admitted under Rule 702: (1) the proposed testimony must be useful to the finder of fact in deciding the ultimate issue of fact; (2) the proposed witness must be qualified to assist the finder of fact; and (3) the proposed evidence must be reliable or trustworthy. *Lauzon v. Senco Prods., Inc.*, 270 F.3d 681, 686 (8th Cir. 2001). This standard is, by design, not a restrictive one but is inclined towards admission of expert testimony. *See Weisgram v. Marley Co.*, 169 F.3d 514, 523 (8th Cir. 1999)

("Rule 702 reflects an attempt to liberalize the rules governing the admission of expert testimony."), *aff'd*, 528 U.S. 440 (2000); *see also Beech Aircraft Corp. v. Rainey*, 488 U.S. 153, 169 (1988) (highlighting the "liberal thrust" of the Federal Rules and their "general approach of relaxing the traditional barriers to 'opinion' testimony"). Indeed, even a lay witness can "testify in the form of opinions or inferences drawn from [his] observations when testimony in that form will be helpful to the trier of fact." *Rainey*, 488 U.S. at 169.

In the context of a bench trial, Rule 702, which codified the *Daubert* standard, is even less restrictive and more inclined towards admission of expert testimony. *See In re Zurn Pex Plumbing Prods. Liab. Litig.*, 644 F.3d 604, 613 (8th Cir. 2011) ("The main purpose of *Daubert* exclusion is to protect ***juries*** from being swayed by dubious scientific testimony.") (emphasis added). As the Supreme Court explained in *Daubert*, the jury and the adversary system itself are generally able to adequately guard against "absurd and irrational pseudoscientific assertions" that might otherwise befuddle and confuse at trial. *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 596 (1993). When, as here, the case is being tried to the Court and not a jury, the Eighth Circuit has explained that the "usual concerns" of the *Daubert* rule—keeping unreliable expert testimony from the jury—are not present. *In re Zurn*, 644 F.3d at 613. As a result, courts relax *Daubert*'s application for bench trials. *Id.*; *see also Gibbs v. Gibbs*, 210 F.3d 491, 500 (5th Cir. 2000) (explaining that, in bench trials, "[m]ost of the safeguards provided for in *Daubert* are not as essential").

To be qualified to testify under Rule 702, an expert need only possess relevant "knowledge, skill, experience, training, or education[.]" Fed. R. Evid. 702. It is well-established that a generally qualified expert's unfamiliarity with some specific aspects of the subject at hand merely affects the weight and credibility of his testimony, not its admissibility. *Smith v. BMW N. Am., Inc.*, 308 F.3d 913, 919 (8th Cir. 2002); *Surles ex rel. Johnson v. Greyhound Lines, Inc.*, 474 F.3d 288, 294 (6th Cir. 2007); *First Tennessee Bank Nat'l Ass'n v. Barreto*, 268 F.3d 319, 333 (6th Cir. 2001). "[I]t is an abuse of discretion to exclude testimony simply because the trial court does not deem the proposed expert to be the best qualified or because the proposed expert does not have the specialization the court considers most appropriate." *Pineda v. Ford Motor Corp.*, 520 F.3d 237, 244 (3d Cir. 2008) (internal quotation marks omitted); *see also Smith*, 308 F.3d at 919 (finding abuse of discretion where the district court excluded testimony of an expert witness qualified in a general field merely because that witness lacked expertise more specialized and more directly related to the issue at hand).

"The qualification inquiry does not ask which expert would be the ***best***; Rule 702 simply asks whether the expert proposed by the party is qualified 'by knowledge, skill, experience, training, ***or*** education.'" *Burgett v. Troy-Bilt LLC*, 579 Fed. Appx. 372, 380 (6th Cir. 2014) (Stranch, J., concurring) (emphases in original). Expert testimony "should be excluded only if it 'is so fundamentally unsupported that it can offer no assistance to the [fact-finder].'" *In re Zurn*, 644 F.3d at 614 (quoting *Bonner v. ISP Techs., Inc.*, 259 F.3d 924, 929-30 (8th Cir. 2001)).

4

The core issue presented here—the suitability of midazolam and other drugs for the specific purpose of executions—falls squarely within Dr. Buffington's training and experience. Dr. Buffington is a clinical pharmacist. According to the American College of Clinical Pharmacy, clinical pharmacists are health care professionals licensed to engage in patient care and clinical research with duties including dispensing prescription drugs, monitoring drug interactions, administering vaccines, and serving as clinical consultants for physicians and other health care providers, hospitals, and patients regarding the effects and proper use of drugs and dietary supplements. Clinical pharmacists work directly with physicians, other health professionals, and patients to ensure that the medications prescribed for patients are appropriate, effective, and safe, and that the medications contribute to the best possible health outcomes. Clinical pharmacists apply specialized knowledge of the scientific and clinical use of medications, including medication action, dosing, adverse effects, and drug interactions, in performing their patient care activities in collaboration with other members of the health care team. Clinical pharmacists practice in health care settings where they have frequent and regular interactions with physicians and other health professionals, interactions which contribute to a better coordination of care. Clinical pharmacists are educated and trained in many direct care patient environments and are frequently granted patient care privileges by collaborating physicians and/or health

systems that allow them to perform a full range of medication decision-making functions as part of the patient's health care team.[1]

The Prisoners' narrow view of *Daubert* and Rule 702 is based on a handful of mostly unpublished—and inapposite—decisions from outside the Eighth Circuit. The pharmacists in all four cases cited by the Prisoners were precluded from offering opinions to a jury on general causation—*i.e.*, that the drugs at issue were pharmacologically capable of causing the plaintiffs' medical conditions (schizophrenia, pneumonia/pancreatitis, respiratory arrest, and dependency/withdrawal syndrome, respectively)—when they had **no** relevant training or experience in pharmacology or in **any** field of science relevant to the plaintiffs' claims (such as psychiatry, psychology, dermatology, neurology, biology, biochemistry, or epidemiology). *Newton v. Roche Labs., Inc.*, 243 F. Supp. 2d 672, 677-78 (W.D. Tex. 2002); *Dellinger v. Pfizer Inc.*, 2006 WL 2057654, at *8 (W.D.N.C. July 19, 2006); *Wehling v. Sandoz Pharm. Corp.*, 1998 WL 546097, at *4 (4th Cir. Aug. 20, 1998) (unpublished); *Devito v. Smithkline Beecham Corp.*, 2004 WL 3691343, at *6-7 (N.D.N.Y. Nov. 29, 2004).

In addition, the excluded opinions in *Newton* and *Devito* lacked any reliable scientific basis. The causation opinion in *Newton* was not based on any clinical or epidemiological studies, but rather on a handful of case studies (similar to the Prisoners' experts here in relying on a handful of allegedly "botched" executions). In

---

[1] *See generally* American College of Clinical Pharmacy, *About Clinical Pharmacists*, available at https://www.aacp.com/about/clinicalpharmacists.aspx (last visited Apr. 3, 2019).

6

fact, the pharmacist in *Newton* ignored hundreds of thousands of peer-reviewed articles demonstrating **no link** between the drug at issue in that case (Accutane) and schizophrenia. *Id.* at 679-80. Similarly, the *Devito* pharmacist's opinion that the plaintiff was experiencing withdrawal toxicity reactions from Paxil were "void of a[ny] scientific basis" in either the pharmacist's report or his deposition testimony. 2004 WL 3691343, at *8. Thus, allowing the pharmacist to testify as to general causation would have violated *Daubert*'s requirement that the expert have a reliable scientific basis for his opinions. *Id.*

      The cases relied upon by the Prisoners are inapposite here for several reasons. First, this is a bench trial, not a jury trial, and the *Daubert* rules are significantly relaxed as a result. They do not even acknowledge this crucial distinction.

      Second, unlike the pharmacists in the cases above, Dr. Buffington has decades of experience practicing and teaching in the field of clinical pharmacology. Dr. Buffington is on the faculty at the University of South Florida Colleges of Medicine and Pharmacy and teaches pharmacology to physicians, pharmacists, and nurses. In addition, Dr. Buffington owns and manages a specialty clinic that focuses on providing patient consultations and clinical pharmacology support services for medical practices, hospitals, health systems, and government health care agencies. He also serves as a principal investigator on pharmacology research trials. (Dkt. No. 142-1 at 2, ¶ 3; Dkt. No. 142-4).

Third, Dr. Buffington studied biology at the University of South Florida, which is a field of science that is relevant to the Prisoners' claims. In addition, he completed a clinical Doctor of Pharmacy (PharmD) degree, which is a degree specializing in the study and application of pharmacology and toxicology in humans as a licensed health care professional. (Dkt. No. 142-4 at 2).

Finally, Dr. Buffington's opinions are based on his education, training, and professional experience as well as numerous peer-reviewed, published, scientific articles and other authoritative sources with general acceptance in the scientific community. (Dkt. No. 142-1 at 2-16; Dkt. No. 142-3 at 1-12). As a result, Dr. Buffington's opinions would be admissible even applying the precedents advanced by the Prisoners.

In *Glossip v. Gross*, 135 S. Ct. 2726 (2015), the Supreme Court of the United States rejected arguments similar to the Prisoners' arguments here when it found that the opinions of Dr. Roswell Evans, also a Doctor of Pharmacy, were a reliable basis upon which to affirm the denial of relief to prisoners on the same midazolam claim asserted here. The Supreme Court observed that Dr. Evans, the Dean of Auburn University's School of Pharmacy, "was well qualified to testify about midazolam's properties and that he offered reliable testimony" in the trial court. *Id.* at 2736. The Supreme Court rejected the prisoners' renewed attacks on Dr. Evans's opinions. It reasoned that, "because a 500-milligram dose is never administered for a therapeutic purpose," the opinions of Dr. Evans as well as those of the prisoners' experts necessarily were based on "extrapolations and assumptions." *Id.* at 2741.

8

In affirming the district court's denial of a preliminary injunction to the prisoners, the *Glossip* Court credited Dr. Evans's testimony that a 500-milligram dose of midazolam can render an inmate "unconscious and 'insensate' during the remainder of the procedure" and, in fact, will induce a coma. *Id.* at 2741-42 (citation omitted).

Dr. Buffington's training and experience are comparable to the training and experience of Dr. Evans.[2] Both are Doctors of Pharmacy and are licensed pharmacists; have completed postgraduate training; have experience teaching pharmacology; and have served as scientific and health care expert consultants. Just as Dr. Evans was qualified to offer opinions about the effects of a 500-milligram dose of midazolam in *Glossip*, Dr. Buffington is qualified to offer opinions about the effects of a 500-milligram dose of midazolam and other proposed execution drugs in this case.

In evaluating the effects and proper usage of drugs, clinical pharmacists necessarily rely on a broad range of knowledge covering many fields. Doctors of Pharmacy have expertise in understanding drug information and interpreting and evaluating scientific publications and processes as they relate to the effect or action of any substance in the human body. Accordingly, a Doctor of Pharmacy is arguably *better* qualified to render a reliable opinion on the suitability of a particular drug for executions than an expert with specialized training that is limited to a single field. In any event, and at a minimum, the Court should conclude that Dr. Buffington's

---

[2] *See* Curriculum Vitae of Dr. Roswell Lee Evans, *available at* https://www.auburn.edu/academic/pharmacy/directory/pdf/lee-evans.pdf (last visited Apr. 3, 2019).

training and experience as a Doctor of Pharmacy amply qualify him to render reliable expert opinions in this case.

II.   **Dr. Buffington's opinions are based on reliable facts and data.**

The Prisoners next argue that Dr. Buffington's opinions are unreliable and should be excluded because other experts disagree with him. Their argument is specious. The law is well-established that criticisms of the bases and sources of an expert's opinion generally affect the weight to be given that opinion rather than its admissibility. *In re Zurn*, 644 F.3d at 614; *see also Viterbo v. Dow Chem. Co.*, 826 F.2d 420, 422-24 (5th Cir. 1987) (affirming exclusion of expert opinion because it was based on nothing "more than credentials and a subjective opinion"). "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert*, 509 U.S. at 596. As the Prisoners concede, Dr. Buffington supports his opinions with citations to peer-reviewed, published, scientific literature. The Prisoners' criticisms therefore go to the weight and not the admissibility of Dr. Buffington's testimony.

III.  **As a matter of law, the Prisoners' other arguments cannot justify exclusion of Dr. Buffington's opinions.**

The Prisoners devote a large part of their motion *in limine* to accusing Dr. Buffington of dishonest acts such as making misleading statements in his CV. Rather than reference Dr. Buffington's testimony in this case—because they chose not to depose him—the Prisoners cite evidence developed in other cases, some of

which is more than 10 years old.  Defendants respectfully submit that the Prisoners' accusations are improper and should not be considered by the Court for any purpose.  In any event, such attacks, based on stale information, cannot as a matter of law justify the wholesale exclusion of his testimony in this case.  The Prisoners' criticisms are more properly reserved for cross-examination.  *See Tussey v. ABB, Inc.*, 746 F.3d 327, 337 (8th Cir. 2014).  Dr. Buffington's opinions are not so fundamentally unsupported that they can offer no assistance to the Court.  *See In re Zurn*, 644 F.3d at 614.

At trial, Dr. Buffington will explain that PharmD programs now require four years of both didactic and experiential clinical training in pharmacology, including the basic sciences, drug action, pharmacokinetics, therapeutics, research methods, and literature evaluation.  Dr. Buffington will explain why and how Doctors of Pharmacy are the leading drug information and clinical pharmacology specialists in the entire health care field.  Dr. Buffington will describe for the Court (and provide evidence to support) his Clinical Pharmacology Fellowship specializing in applied clinical pharmacology at Emory University.  That fellowship included developing the structure of the Pharmacy Department clinical research program, developing clinical trial protocols, and participating in the management of clinical studies.  Dr. Buffington also worked in the Clinical Laboratory, analyzing clinical data and clinical software applications.  Although Dr. Buffington has not done research specifically on midazolam, that is not a requirement for him to testify (and if it was, *none* of the experts in this case would likely qualify).  Dr. Buffington has extensive

11

clinical research experience and training on midazolam in different practice settings including surgical applications. Indeed, Dr. Buffington teaches anesthesiologists how to utilize and manage medications for the surgical suite, and anesthesiologists look to him to provide the technical expertise on pharmacology to perform their roles safely and effectively.

In short, the Prisoners are either confused or attempting to deliberately mislead the Court about Dr. Buffington's credentials and experience. The Court should deny the Prisoners' motion *in limine* and give Dr. Buffington an opportunity to defend against these baseless attacks at trial.

## CONCLUSION

The motion to exclude the testimony of Dr. Buffington is unsupported by authority, does not reflect an accurate understanding of health care training and practice roles, and should be denied. Dr. Buffington is qualified to give opinions on the clinical and toxicologic effects various drugs as a method of execution and how those drugs would produce their expected pharmacologic effects on a condemned inmate. Because this is a bench trial, any *Daubert* concerns are minimized if not entirely absent. This Court can and should allow the parties to fully develop Dr. Buffington's testimony at trial and then give his opinions the weight the Court believes is appropriate in the exercise of its sound and considerable discretion.

        Respectfully submitted,

        LESLIE RUTLEDGE
        Attorney General

        NICHOLAS J. BRONNI
        Solicitor General

By: */s/ Jennifer L. Merritt*
    JENNIFER L. MERRITT (2002148)
    Senior Assistant Attorney General
    323 Center Street, Suite 200
    Little Rock, Arkansas  72201
    Tel.:  (501) 628-1319
    Fax: (501) 682-2591
    Email:  Jennifer.Merritt@ArkansasAG.gov

*Attorneys for Defendants*

## CERTIFICATE OF SERVICE

I, Jennifer L. Merritt, do hereby certify that on this 3rd day of April, 2019, I electronically filed the foregoing with the Clerk of Court using the CM/ECF filing system, which shall send notification of the filing to any participants.

                            */s/ Jennifer L. Merritt*
                            Jennifer L. Merritt