**IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS**

JASON McGEHEE et al.,

*Plaintiffs*

-and-

JUSTIN ANDERSON et al.,                                               *Intervenors*

v.                         No. 4:17-cv-00179-KGB

ASA HUTCHINSON, Governor of the State of Arkansas, and
WENDY KELLEY, Director, Arkansas Department of Correction,

*Defendants*

**RESPONSE IN OPPOSITION TO
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

The question at the heart of this lawsuit is whether the Eighth Amendment forbids

the State's execution protocol as an instrument of cruel and unusual suffering. Is the

protocol very likely to cause pain that Defendants can significantly reduce by

implementing an alternative execution method? As discussed further below, there are

plainly disputes of material fact concerning this question. The parties' experts disagree

on the effect of the protocol. Witnesses disagree on what they saw in the April 2017

executions. And the Plaintiffs have proof that other, less painful execution methods are

available. The Court should deny Defendants' summary-judgment motion and permit

the case to proceed to trial on Plaintiffs' Eighth Amendment claim as well as on the

three other claims in the amended complaint.

I.      **Legal standards.**

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed R. Civ. P. 56(a). The moving party must inform the court of the basis for its motion and must identify portions of the record that it believes demonstrate the absence of a genuine issue of material fact. *See Torgerson v. City of Rochester*, 643 F.3d 1031, 1042 (8th Cir. 2011). The non-moving party must respond to such a showing by submitting evidence that illustrates a genuine issue for trial. *Id.* Disputed facts are viewed in the light most favorable to the non-moving party. *Id.* Credibility determinations, weighing of evidence, and drawing inferences from evidence are functions left for trial. *Id.*

Defendants couch their claim to summary judgment in terms of the Eleventh Amendment, arguing that they're immune from suit because, in their estimation, Plaintiffs "have not—and cannot—establish an ongoing violation of [their] federal rights." Br. at 30. Defendants give a nod to *Ex Parte Young*, 209 U.S. 123 (1908), which permits suits against state actors for prospective relief from violations of federal law. However, they suggest that the *Ex Parte Young* exception is inapplicable here because they're entitled to judgment as a matter of law. This argument misunderstands Eleventh Amendment immunity, which requires no analysis of a claim's merit or factual support. The question under *Ex Parte Young* is merely whether the complaint "*alleges* an ongoing violation of federal law and seeks relief properly characterized as prospective." *281 Care*

*Comm. v. Arneson*, 638 F.3d 621, 632 (8th Cir. 2011) (quoting *Verizon Maryland, Inc. v. Pub. Serv. Comm'n of Maryland*, 535 U.S. 635, 645 (2002)) (emphasis supplied). If the complaint alleges an ongoing violation of federal rights and seeks prospective relief, Eleventh Amendment immunity doesn't apply.

The amended complaint alleges that Defendants intend to enforce policies during their executions that would violate their constitutional rights. They seek prospective relief against enforcement of those polices. Because the suit is at the heart of the *Ex Parte Young* exception, Defendants aren't entitled to Eleventh Amendment immunity. Rather, the question before the Court is whether there are genuine disputes of material fact and whether Defendants are entitled to judgment as a matter of law.

## II.     Defendants aren't entitled to summary judgment on Claim I.

Plaintiffs' primary claim is that the State's execution protocol—500 mg midazolam followed by 100 mg vecuronium bromide followed by 240 mEq potassium chloride—violates the Eighth Amendment. The legal standard is stated in *Glossip v. Gross*, 135 S. Ct. 2726 (2015). To succeed on a method-of-execution claim, a plaintiff must first show that the challenged method is "sure or very likely to cause serious illness and needless suffering." *Glossip*, 135 S. Ct. at 2737. The plaintiff must then "identify an alternative

that is feasible, readily implemented, and in fact significantly reduces a substantial risk of severe pain." *Id.* (cleaned up).[1]

In an opinion issued two days ago, the Supreme Court further clarified *Glossip*'s second prong. Prisoners are "not limited to choosing among [methods] presently authorized by a particular State's law." *Bucklew v. Precythe*, No. 17-8151, slip op. at 19 (Apr. 1, 2019). The proposed alternative "must be sufficiently detailed to permit a finding that the State could carry it out 'relatively easily and reasonably quickly.'" *Id.* at 21 (quoting *McGehee v. Hutchinson*, 854 F.3d 488, 493 (8th Cir. 2017)). If the prisoner selects "an entirely new method" rather than "a proven alternative method," then the State might legitimately reject it. *Id.* at 22. However, there is "little likelihood that an inmate facing a serious risk of pain will be unable to identify an available alternative." *Id.* at 20. Justice Kavanaugh's concurring opinion likewise emphasizes that the burden of *Glossip*'s second prong "can be overstated" and that a prisoner facing serious risk of pain will almost certainly be able to show an alternative.

## A.     The Court has already rejected Defendants' res-judicata defense.

The bulk of Defendants' brief is devoted to the argument that res judicata and collateral estoppel bar Plaintiffs' claim. However, Defendants add nothing of substance to the arguments the Court rejected previously in denying the motion to dismiss.

---

[1] "Cleaned up" indicates that extraneous material such as brackets and internal quotation marks have been removed from a quotation for easier readability. *See United States v. Steward*, 880 F.3d 983, 986 n.3 (8th Cir. 2018).

Indeed, the briefing is in most respects a word-for-word replica of what Defendants wrote in their motion to dismiss. *Compare* ECF No. 27 at 44–56 *with* ECF No. 146 at 31–46. The collateral-estoppel section does add a discussion of *Nooner v. Norris*, 594 F.3d 592 (8th Cir. 2010), a lawsuit that that Plaintiffs Terrick Nooner and Don Davis were involved in. But *Nooner* concerned the adequacy of various safeguards under an older lethal-injection protocol, not whether the midazolam protocol—which the State adopted well after the *Nooner* suit—is likely to cause suffering. *Cf. infra* n.3. In short, the State articulates no reason why the Court's earlier ruling on these topics was wrong, or why circumstances have changed such that the Court's ruling should change. The Court should rely on its earlier ruling and reject these defenses.[2]

Insofar as the circumstances have changed, those changes simply add to the reasons for rejecting the defenses. In *Kelley v. Johnson*, upon which Defendants' res-judicata argument primarily relies, the Arkansas Supreme Court rejected the prisoners' attempts to present alternatives that weren't already in state statute. *See* 496 S.W.3d 346, 359–60 (Ark. 2016). *Bucklew* has now held that ruling to be legally incorrect. *See Bucklew*, slip op. at 19. Moreover, in Arkansas, "res judicata and collateral estoppel are only applicable

---

[2] Plaintiffs didn't appeal their separation-of-powers and ex-post-facto claims to the Arkansas Supreme Court, an issue relevant to the Court's analysis of whether there was a final judgment in state court. *See* ECF No. 53, Order at 30–31. Assuming the non-appeal created a final judgment, that doesn't change the Court's primary ground for rejecting the defenses, which is that the Arkansas Supreme Court's dismissal of the state-court suit on sovereign-immunity grounds didn't amount to an adjudication of Plaintiffs' claims on the merits. *See id.* at 31–42.

when the party against whom the earlier decision is being asserted had a fair and full

opportunity to litigate the issue in question." *Cater v. Cater*, 846 S.W.2d 173, 176 (Ark.

1993). Not only have new plaintiffs intervened in the lawsuit—plaintiffs who have

never been party to any state-court challenge to a method of execution—but new facts

have emerged in the form of significant problems with the April 2017 executions (as

discussed in more detail below). The U.S. Supreme Court has explained that

"development of new material facts can mean that a new case and an otherwise similar

previous case do not present the same claim." *Whole Woman's Health v. Hellerstedt*, 136 S.

Ct. 2292, 2305 (2016). The Court provided the following hypothetical:

> Imagine a group of prisoners who claim that they are being forced to drink contaminated water. These prisoners file suit against the facility where they are incarcerated. If at first their suit is dismissed because a court does not believe that the harm would be severe enough to be unconstitutional, it would make no sense to prevent the same prisoners from bringing a later suit if time and experience eventually showed that prisoners were dying from contaminated water. Such circumstances would give rise to a new claim that the prisoners' treatment violates the Constitution.

*Id.* Substitute midazolam for contaminated water in this scenario and you have

Plaintiffs' situation exactly. For these additional reasons, the Court should deny the res-

judicata and collateral-estoppel defenses.

## B.   The facts are disputed and Defendants aren't entitled to judgment as a matter of law.

As discussed below, Plaintiffs are prepared to present evidence that the midazolam

protocol causes gratuitous suffering that alternative methods would avoid. Proof is

found not simply in the opinions of experts but in the experience of midazolam executions, which have seen condemned men heaving on the gurney and otherwise moving when the midazolam supposedly should have rendered them completely unconscious. The proof is especially strong in the execution of Kenneth Williams, who lurched so violently that he caused bruising to his scalp. Moreover, since the preliminary-injunction hearing, Plaintiffs have developed more robust proof on alternative executions methods.

### 1.   Whether the midazolam protocol causes suffering is disputed.

In their 77-page brief, Defendants devote about three pages to the crux of the matter: Will a 500 mg injection of midazolam anesthetize a condemned man to the point that he won't feel the drowning sensation caused by a 100 mg injection of vecuronium bromide or the severe burning caused by a 240 mEq injection of potassium chloride? *See* Br. at 52–55.[3] Plaintiffs have copious evidence requiring trial of this question.[4]

---

[3] Defendants' longer argument that Plaintiffs' claim is too "speculative" to support an Eighth Amendment violation has nothing to do with the midazolam-specific claim currently before the Court. *See* Br. at 46–52. This section of Defendants' brief is a light reworking of Defendants' earlier argument that the Court should dismiss Claim IV of the original complaint, which alleged that the protocol contains inadequate safeguards to pass muster under the Eighth Amendment. *Cf.* ECF No. 27 at 71–74. The Court did indeed dismiss Claim IV, but not Claim III (reasserted in the amended complaint as Claim I), which alleges that the midazolam protocol causes unconstitutional suffering. Whether the protocol contains safeguards is no longer an issue in the case and is irrelevant to the question before the Court here: whether the midazolam protocol causes suffering.

[4] Plaintiffs provide a complete list of exhibits at the end of this brief.

a.   **The midazolam protocol has caused condemned men to suffer**.

There's evidence that in at least two of the State's April 2017 executions—that of Marcel Williams and Kenneth Williams—midazolam failed to suppress the condemned man's consciousness. Moreover, when other states have used a protocol the same as or materially indistinguishable from Arkansas's, the condemned have shown signs of consciousness.

Marcel Williams's execution began at 10:16 p.m. on April 24, 2017. Jacob Rosenberg, a reporter who witnessed the execution, described "watching him breathe heavily and arch his back." Rosenberg noted that Williams continued to move until at least 10:24. Pls.' Ex. 15 at 2. Jamie Giani, an attorney for Williams who kept meticulous notes, observed Williams turn his head at 10:22 and cough at 10:25. Williams's eye opened at 10:28 and his eye continued to move at 10:29. Pls.' Ex. 12 at 5–6.

Kenneth Williams's execution was even more disturbing. The execution began at 10:52 p.m. on April 27, 2017. According to Kelly Kissel, a reporter for the Associated Press who witnessed the execution, Williams was breathing heavily and his head was bobbing at 10:54. At 10:55, he "lurche[d] forward 15 times in quick succession, then another five times at a slower rate." The lurching was so violent that sounds could be heard in the witness room through the glass. Williams continued to move for the next few minutes. Pls.' Ex. 16 at 2. Accounts by Williams's attorneys agree with the reporter's. At 10:55 one attorney, Eric Motylinski, observed "his chest rising from the

gurney and violently hitting the restraints." Pls.' Ex 14 ¶6. A second attorney, Cass

Belter, heard a "groan of pain" and saw Williams "rising forcibly from the gurney at a

fast rhythm." Pls.' Ex. 13 ¶6. At 10:58 she observed his head "still bobbing"; at 10:59,

Williams emitted "what sounded like an expression of pain" and his "chest rose and

head bobbed after this noise." *Id.* ¶8. All agree that Williams became still at 10:59. No

one knows when the vecuronium went in because the executioners kept no records. The

ADC's "Internal Affairs Log of Timed Activities" doesn't note when each drug was

injected; instead, it notes generally that the "chemicals [were] administered at" 10:52

p.m. Defs.' Ex. 24 at 9. Remarkably, even the designee overseeing the execution doesn't

know what time each drug was injected. Defs.' Ex. 31 (Dep. 99:7-10).

Expert opinion from Dr. Joseph Cohen, a pathologist, and Dr. Gail Van Norman, an

anesthesiologist, confirms that these executions were painful. After Kenneth Williams's

death, Dr. Cohen conducted an autopsy at Plaintiffs' requests. The autopsy remarked

several findings that escaped the State Medical Examiner's observation. First, Dr. Cohen

noted hemorrhaging in the palpebral conjunctiva (inside of the eyelids). Pls.' Ex. 3 at 6–

7. Dr. Cohen noted that these "are commonly seen in autopsies of individuals who

succumb to . . . asphyxial mechanisms (drowning, drug intoxication)" and "strongly

suggest[] that a component of hypoxia/asphyxia existed just prior to [Williams's]

death." *Id.* at 10. Second, Dr. Cohen observed a prominent, two-inch bruise to the scalp.

*Id.* at 8–9. This bruise "indicates that [Williams's] head was impacted by a blunt

implement just prior to the time of death" and is "consistent with witness accounts of

Williams flailing and banging his head during the execution procedure." *Id.* at 11.

Ultimately Dr. Cohen concluded:

> Adequate anesthesia was not achieved after the administration of
> midazolam and prior to giving vecuronium. . . . With inadequate anesthesia
> by midazolam, the condemned person, in a conscious or semiconscious
> state, will experience severe conscious emotional and physical pain and
> suffering potentially over many minutes with the development and
> increasing perception of air hunger.

*Id.* at 14.

Dr. Van Norman has reached a similar conclusion from the perspective of

anesthesiology. Plaintiffs asked her to review descriptions of movements observed

during the Arkansas executions and to explain whether they're the sort of involuntary

movements that Defendants' anesthesiologist, Dr. Joseph Antognini, has described in

his reports and previous testimony. Dr. Van Norman concluded that the movements

seen in the two Williams executions were inconsistent with the various types of

involuntary movements known to anesthesiologists. Pls.' Ex. 1 at 18–24. Rather, during

each execution she saw a "clear and consistent picture of upper airway obstruction" and

found it "extremely likely" that the condemned men were conscious to the effects of the

second and third drugs. *Id.* at 26. The eye movements observed in Marcel Williams's

execution "are consistent with a voluntary reaction to pain." *Id.* Observers of Kenneth

Williams's execution described "volitional movements that are well-known and typical

of patients with airway obstruction fighting to breathe." *Id.*

The Arkansas executions are hardly the only executions at which observers noted similar movements after administration of midazolam. Since April 2017, Alabama, Ohio, and Tennessee have each used a midazolam protocol that's the same as or substantially similar to Arkansas's. Witnesses from each state have noted movement after administration of the midazolam. During the October 2017 execution of Torrey McNabb in Alabama, the condemned man's arms moved throughout the consciousness checks; five minutes after a second consciousness check, McNabb's feet and head were moving. Pls.' Ex. 17 (Tr. at 636–46). During the September 2017 execution of Gary Otte in Ohio, Otte's stomach began moving violently up and down, he clenched his fist, and tears came out of his left eye. Pls.' Ex. 18 (Tr. at 695–98). During the August 2018 execution of Billy Irick in Tennessee, Irick made choking sounds, moved his head, and strained against the restraints after a consciousness check. Pls.' Ex. 19 (Tr. at 165–70). At trial, Plaintiffs are prepared to present proof about movement during these and other midazolam executions.

In short, the effect of 500 mg midazolam on the human body has now been observed during numerous executions both within and outside Arkansas. Experience shows that the drug can't fulfill its proposed function of preventing the torturous pain that the other drugs in the protocol cause. Defendants' repeated assertion that Arkansas's midazolam executions were "successful" holds true only if "success" is defined as

producing death. It rings false if success is held to the higher standard of producing

non-excruciating death.

### b. Most doctors and scientists agree that no dose of midazolam can render a person insensate to pain from vecuronium and potassium chloride.

In arguing their entitlement to summary judgment, Defendants cite the "expert

opinions of a board-certified anesthesiologist, a doctor of pharmacy and

pharmacologist,[5] and the Chief Medical Examiner at the Arkansas State Crime Lab

opining that a 500 mg dose of midazolam will render an inmate unconscious and

insensate to any pain that might otherwise be experienced upon the administration of

the second two drugs under Arkansas's lethal-injection protocol."[6] Br. at 53. Plaintiffs

have presented their own expert reports from a board-certified anesthesiologist (Dr.

Gail Van Norman), a scientist with a doctorate in pharmacology (Dr. Craig Stevens),

and a forensic pathologist (Dr. Joseph Cohen). Defendants don't explain why their

expert opinions entitle them to judgment as a matter of law; they mention Plaintiffs'

experts only to refer to them in scare quotes. If Defendants think Plaintiffs' experts are

---

[5] Defendants here refer to Daniel Buffington, who, as Plaintiffs have previously explained, isn't a doctor and doesn't have adequate training in pharmacology to be an expert on that subject. He is a pharmacist who may be qualified to testify about pharmacy. *See* ECF No. 142.

[6] This formulation appears to acknowledge that vecuronium bromide and potassium chloride would cause extreme pain if the condemned aren't adequately anesthetized before these chemicals are injected. However, because Buffington has previously opined that injection with vecuronium bromide is a "peaceful" experience and that a person injected with potassium chloride "may not have discomfort," ECF No. 40, Tr. at 672–73, Plaintiffs treat this as a disputed issue.

unqualified to testify, they should have said so in a *Daubert* motion. In any case, the existence of conflicting expert opinion on the effects of midazolam is a textbook reason to deny summary judgment. A concise review of Plaintiffs' expert proof shows that material fact disputes remain.

Vecuronium bromide is a neuromuscular blocker that paralyzes the respiratory and skeletal muscles when injected intravenously. Administered by itself, vecuronium and similar paralytics cause psychic trauma, air hunger, and a feeling of being buried alive. Because the drug's paralytic effect makes the recipient appear serene, she cannot communicate the agony that the drug actually causes her to feel. Pls.' Ex. 2 at 8–9; Pls.' Ex. 1 at 15–16.

Potassium chloride is a heart-stopping agent that's given only in low quantities and in diluted fashion when administered intravenously for medical purposes. It's never given in a large bolus dose (at least not for benign reasons) because it sears the tissue lining the veins. Unfortunate recipients of solo potassium chloride have recalled the experience as akin to being lit on fire. The dose used in the Arkansas protocol is fifty times greater than the dose known to cause excruciating pain. Pls.' Ex. 2 at 10–11; Pls.' Ex. 1 at 17–18.

To prevent the certain pain from vecuronium bromide and potassium chloride, it's essential that the condemned receive a drug that anesthetizes them—*i.e.*, that prevents them from feeling or being aroused by the extraordinarily painful stimulus of the

second and third drugs. Arkansas has selected midazolam for this purpose. Midazolam

is a benzodiazepine drug. Unlike barbiturates, a separate class of drug sometime used

for executions, benzodiazepines present no risk of lethal overdose. This feature stems

from benzodiazepines' limited mechanism of action. Midazolam (like other

benzodiazepines) decreases brain activity through its interactions with an inhibitory

neurotransmitter in the brain called "GABA." Specifically, GABA must bind to a GABA

receptor, at which point midazolam acts on the GABA receptor to increase inhibition of

neurons. Unlike barbiturates, which have multiple mechanisms of action, midazolam

has an effect only when GABA is present. Because GABA is limited in the body, so, too,

is midazolam's depressive effect. Pls.' Ex. 2 at 4–8.

Midazolam's limited potency is known as the "ceiling effect." This phrase refers to

the phenomenon whereby greater dosages of the drug produce no additional sedation.

There are both animal and human studies illustrating the drug's ceiling effect. Pls.' Ex. 1

at 14–15. Ceiling effect can't be calculated in universally applicable quantities because

results vary based on the individual, particularly the individual's weight. But studies in

humans have shown the ceiling effect to occur at around 0.4 mg/kg, which translates to

a dose of 40 mg in a 220 pound person. *Id.* at 15. Other human studies using different

methods have produced a lower number. Pls.' Ex. 2 at 12–13. Whatever the precise

dosage—and assuming it's even possible to speak in universally applicable terms about

this—midazolam's ceiling effect kicks in well below the 500 mg the Arkansas protocol

calls for. Indeed, Dr. Antognini admitted at the preliminary-injunction hearing that he'd expect to see midazolam's ceiling effect begin to occur at around 20–25 mg. ECF No. 49, Tr. at 1027.

Turning from theory to practice, midazolam is never used as the sole anesthetic in invasive surgery because it lacks all the properties that render true anesthesia. Most importantly, it has no analgesic (pain-reducing) properties. Though it makes one extremely drowsy, it doesn't block arousal from extreme noxious stimuli. As a leading pharmacology textbook explains, "Although the clinical literature often refers to the 'anesthetic' effects and uses of certain benzodiazepines, these drugs do not cause a true general anesthesia; awareness usually persists, and a failure to respond to a noxious stimulus sufficient to allow surgery cannot be achieved." Pls.' Ex. 1 at 6. Midazolam is adept at causing amnesia—leading patients to forget any painful experience they may have had—but the lack of recall after surgery doesn't equate to the lack of awareness during surgery (or, as is relevant to this case, during an execution). *Id.* at 9.

Researchers have studied intraoperative awareness using a method called the "isolated forearm technique," which allows patients who have been given anesthetic agents to move their arm in response to commands if aware of the commands. Dr. Van Norman cites several studies that find a high percentage of patients remained aware after receiving large doses of benzodiazepines. In one such study, *seventy-two percent of patients* continued to exhibit awareness even after they'd been given approximately 60

mg midazolam—higher than the ceiling-effect dose—*and* about 12.7 mg of the narcotic alfentanil. *Id.* at 10–11 & n.21. Studies such as these refute the notion that a large dose of midazolam renders the condemned insensate to the extreme pain caused by large doses of vecuronium bromide and potassium chloride.

In sum, the parties' experts dispute whether a 500 mg dose of midazolam will render the condemned unaware of the excruciating pain the other drugs will cause if anesthesia is inadequate. Defendants' insistence that the scientific proof is "equivocal" cannot be accepted at face value, and Plaintiffs have presented enough evidence to bring the matter to trial.

### c. Defendants haven't pointed to evidence exhibiting absence of factual dispute.

Defendants have failed to produce evidence that shows no genuine issue of fact for trial. They attempt to do so by pointing to midazolam's FDA label, the post-mortem midazolam concentrations noted at autopsy, and Dr. Stevens's textbook. The evidence shows that these points are disputed, immaterial, or both.

**FDA label.** Defendants argue that they're entitled to judgment as a matter of law because the Food and Drug Administration "has approved the use of midazolam for the induction of anesthesia without the use of any other drugs." Br. at 53. The label does not say that. The label repeatedly says midazolam is appropriate for "sedation/anxiolyxis/amnesia"—conditions that do not include general anesthesia and that do not describe the lack of awareness or analgesia necessary to prevent pain from

vecuronium bromide or potassium chloride. When the label uses the term "general anesthesia," it uniformly does so with reference to other drugs. Midazolam is indicated "intravenously for induction of general anesthesia, *before administration of other anesthetic agents*." Defs.' Ex. 2 at 3 (emphasis supplied). When the label provides instruction for "induction of anesthesia," it does so with qualification: "for induction of general anesthesia, *before administration of other anesthetic agents*." *Id.* at 6 (emphasis supplied). The label simply does not say that midazolam can achieve and maintain general anesthesia by itself. When Defendants deposed Dr. Van Norman, she confirmed that, though the label refers to midazolam as an "induction agent," induction agents "are drugs that can be used when combined with other drugs to introduce the anesthetic but not to maintain it, and the FDA does not say that it can be used as a solo anesthetic agent." Pls.' Ex. 8 (Dep. 102:20-23).

**Autopsies.** Citing the State Medical Examiner's report and post-execution autopsies, Defendants argue that the men executed in April 2017 had "toxic" levels of midazolam in their bloodstreams. This bit of information is meaningless without context. Defendants do not suggests that toxicity, whatever they believe that means, equates to inability to be aroused by and feel the pain from massive injections of paralytic and potassium chloride. Toxicity certainly doesn't mean that the midazolam kills the condemned by itself, before they feel the pain from the remaining injections, because midazolam isn't fatal at any dose. In his deposition, Dr. Stevens "very strongly

disputed" that benzodiazepines can cause fatal overdose. Pls.' Ex. 9 (Dep. 76:10-13). Merely labeling the blood levels "toxic" doesn't exhibit the absence of a material fact dispute for trial.

**Dr. Stevens's textbook.** Defendants suggest that they're entitled to judgment as a matter of law because Dr. Stevens refers to "anesthesia" in connection with midazolam—a point they have fixated on in the past. But the latest edition of Dr. Stevens's textbook is clear that benzodiazepines in high doses "produce hypnosis (sleep) and moderate sedation, but not reaching the depth of general anesthesia needed for loss of reaction to painful stimulus." Pls.' Ex. 20 at 6–7. While Defendants may wish to question Dr. Stevens about this on cross-examination, a stray reference to "anesthesia" in his textbook doesn't override the vastly more detailed opinion he's given here, which is that midazolam administered by itself cannot render the general anesthesia necessary to prevent the condemned from feeling the torture of vecuronium and potassium chloride.

### d. Plaintiffs are entitled to a trial on the science.

Defendants argue, ultimately, that the Eighth Circuit's opinion in *McGehee* entitles them to judgment without trial. But *McGehee* didn't preclude Plaintiffs from bringing additional evidence to show midazolam's inefficacy, and the proof discussed above creates, at this stage, material questions of fact about whether the midazolam protocol causes pain. Scientific evidence isn't encrusted in amber. As an Ohio district court wrote

recently in a case similar to this one, "it is the essence of the scientific method to

continue to test previously reached conclusions against newly accumulated data." *In re*

*Ohio Execution Protocol Litig.*, No. 11-1016, 2019 U.S. Dist. Lexis 8200, at \*229 (Jan. 14,

2019). Plaintiffs in that case had previously failed to show likely suffering from Ohio's

midazolam protocol, which is materially indistinguishable from Arkansas's. But after

considering additional evidence, the court found "a consensus about the insufficiencies

of midazolam to prevent severe pain and needless suffering." *Id.* at \*229–30. Plaintiffs

here have presented sufficient proof for a trial on this issue.

### 2.  Plaintiffs will present proof on the availability of alternatives.

There likewise remain factual disputes about whether there's an alternative

execution method that will significantly reduce the pain caused by the execution

protocol and that the State can implement "relatively easily." *Bucklew*, slip op. at 21.

Specifically, there remain material questions of fact about, at the very least, execution by

firing squad, secobarbital, and pentobarbital.[7]

---

[7] While Plaintiffs focus here on these three alternatives, at trial they may also prove the availability of fentanyl or sevoflurane.

On March 15, 2019, the United States District Court for the District of Nebraska ordered the Nebraska Department of Correctional Services to produce information about how they identified their fentanyl supplier by April 12. *See McGehee v. Nebraska Dept. of Corr. Servs.*, No. 18-3092, ECF No. 36 (D. Neb.). While the supplier of the fentanyl used in Nebraska's most recent execution has sworn it won't sell any more execution chemicals, *See* Defs.' Ex. 28, the discovery may still illustrate the availability of fentanyl to Arkansas through other sources.

As for sevoflurane, Plaintiffs previously presented proof that there's a company willing to sell the gas to Defendants for executions and that the gas works like a barbiturate. ECF No. 39, Tr. at 269–71 (testimony of Dr. Stevens); ECF No. 35, Tr. at 212–16 (testimony of Joseph

**Firing squad**. The firing squad is a tested method most recently used by Utah in its June 2010 execution of Ronnie Lee Gardner. Dr. James Williams, an emergency physician and expert in firearms, has reviewed protocols used by Utah as well as the U.S. Army and is prepared to offer opinions about the feasibility and relative painlessness of firing-squad executions. The firing-squad is typically performed by having about five trained marksmen fire high-powered rifles at a target covering the cardiovascular bundle. Having treated patients who have been shot in the chest, and having been shot in the chest himself, Dr. Williams can attest that the feeling of such a wound is akin to being administered a powerful tackle followed by numbness—mild compared to the suffocating and searing that the drugs in the midazolam protocol cause. Pls.' Ex. 4 (Rept. at 5). The method also produces quick death: "subjects who are shot in the central chest (cardiovascular bundle) typically exhibit no life signs when examined, even when the time between injury and examination is only a matter [of] ten or fifteen seconds." *Id.* at 4. In a deposition, the Utah warden who oversaw the Gardner execution testified that Gardner was pronounced dead minutes after the first volley. Pls.' Ex. 10 (Dep. 59:17–60:3).

The equipment and personnel requirements for the firing squad are feasible. The firing squad requires high-powered rifles and specific types of ammunition, but this

---

Cummings). Even without previous use in executions, its mechanism of action makes it a significant improvement over midazolam—or at least a factual dispute remains on that issue.

equipment is commonly used by law enforcement and the United States Armed Forces. Pls.' Ex. 4 (Rept. at 10). The cost of the ammunition used in Garner's execution was about forty or fifty dollars. Pls.' Ex. 10 (Dep. 43:7-14). The rifles were already on hand at the department of correction. *Id.* (Dep. 42:18–43:3). As for personnel, Utah uses law-enforcement officers who have been certified through Police Officer Standards and Training ("POST"). *Id.* (Dep. 22:14–23:25). These standards in Arkansas require law-enforcement officers to reliably hit a piece of 8.5x11 paper from a distance of 50 yards. Pls.' Ex. 4, App'x D at 1. Given that the typical firing-squad distance is much shorter than fifty yards, any qualified law-enforcement officer in Arkansas will be able to hit the target so as to cause the condemned a painless death. *See* Pls.' Ex. 4 (Rept. at 9).

Defendants remark that they do not currently have a chamber for firing-squad executions. That does not entitle them to judgment as a matter of law. Utah, too, lacked a chamber when it executed John Taylor by firing squad in 1996. The department erected a temporary plywood structure in a warehouse. Pls.' Ex. 11 at 17. Desiring a more permanent arrangement, Utah built a new chamber after the Taylor execution. The chamber differs from a lethal-injection chamber only in its somewhat larger size, gun ports, chair for the condemned to be strapped to, Kevlar on the wall behind the chair to prevent ricochet, and bulletproof glass to the witness areas. *Id.* at 20–22. The walls are made of the same materials and thickness as that of the cells. *Id.* at 33. The plans weren't complicated; Utah "just used the general specs that was for the other

buildings." *Id.* at 15. Construction of a new chamber, should the State consider it necessary, is not an architectural challenge and would be relatively simple.

Defendants muse that a missed shot could cause pain. That's a strange objection. As Defendants have repeatedly argued, speculation about accidents in administration of an execution protocol can't support an Eighth Amendment claim. *Cf. Nooner*, 594 F.3d at 599. Defendants can't legitimately object to an alternative protocol by engaging in the same sort of conjecture. In any case, such an outcome is unlikely considering the significant marksmanship training that Arkansas law-enforcement officers receive and the practice they would undoubtedly conduct before execution. Speculation on farfetched outcomes can't win summary judgment in the face of evidence that the method is relatively painless and available.

**Secobarbital**. Secobarbital, a barbiturate drug, is the primary drug used in procedures for medical-aid-in-dying ("MAID"), also known as "death with dignity." Dr. Charles Blanke is an expert practitioner in this area, having participated in over 125 such procedures in states where MAID is permitted by law. According to Dr. Blanke, a ten-gram dose of secobarbital typically causes coma within five minutes and death usually occurs within twenty-five minutes. The drug is often taken orally but it can also be administered via a feeding tube. Intubation takes about fifteen to thirty seconds to complete. A feeding tube can be inserted into an uncooperative patient with relative ease—indeed, with greater ease than IV placements, which can be quite complicated for

some prisoners. "Death caused by secobarbital is painless. The drug does not have a paralytic effect that renders patients incapable of expressing pain. Secobarbital affects higher brain function almost immediately and renders the patient quite insensate to pain." Pls.' Ex. 5.

All of these features make secobarbital a feasible alternative that would significantly reduce the pain inherent in the midazolam protocol. Defendants suggest otherwise by speculating that secobarbital procedures might cause injury or pain through the feeding tube, exceedingly long death, or no death at all. Br. at 58. But these are remote possibilities. Though Dr. Blanke acknowledged that insertion of the tube might be painful without topical anesthetic, in his experience the procedure is painless when topical anesthetic is used. Defs.' Ex. 38 (Dep. 33–34). (The State's current protocol calls for a topical anesthetic, lidocaine, when inserting IVs. *See* Defs.' Ex. 1 at 2.) Similarly, when asked about various possible injuries, Dr. Blanke responded: "Have I ever seen it? No, I have not, and I believe the risk is incredibly numerically small." Defs.' Ex. 38 (Dep. 35–36). Defendants highlight a report that a patient took days to die, but the report didn't even state what drug the patient took. (Not all death-with-dignity procedures use secobarbital.) In Dr. Blanke's experience the longest a patient has taken to die under secobarbital is several hours, though this is "uncommon." *Id.* (Dep. 42–44). And the possibility that secobarbital won't cause death at all is another extreme unlikelihood. It has caused death in about 99.4 percent of reported cases and in all cases

that Dr. Blanke has handled. Pls.' Ex. 5; Defs.' Ex. 38 (Dep. 54). The evidence points towards the painlessness and viability of the secobarbital method.

Finally, as Defendants acknowledge in their brief, Plaintiffs have identified a direct source of secobarbital. *See* Pls.' Ex. 7 (filed under seal). As an out-of-state pharmacy, this supplier would have to comply with state regulations for importing controlled substances, most notably by obtaining a license to do so. *See* Ark. Bd. of Pharm. Reg. 070.00.8-08-00-0001 *et seq.* However, the requirements for importing drugs aren't onerous—according to public records the State Pharmacy Board licenses over 1,500 wholesalers of legend drugs, *see* https://bit.ly/2uxWxOP—and there's little reason to believe the State would deny a license to a pharmacy that seeks to import execution chemicals.

**Pentobarbital.** Defendants state that they made three unsuccessful inquiries about obtaining barbiturates (*i.e.*, pentobarbital) in 2015. Br. at 56; *see also* ECF No. 49, Tr. at 1232. They've produced nothing in discovery to suggest that they've tried to obtain a barbiturate in the intervening four years. Earlier this year, the Arkansas Senate passed a bill providing even stricter confidentiality for drug suppliers—indeed, disclosure of the supplier would be a felony—in an effort to open new channels of supply. *See* SB464, *available at* https://bit.ly/2Fzsonn. Accepting for the sake of argument that Defendants have actually sought pentobarbital in good faith, should this bill become law Defendants will likely gain access to pentobarbital.

Plaintiffs engaged in third-party discovery with Missouri to examine potential sources of pentobarbital. Missouri's pentobarbital supplier, which that state has dubbed "M7," provided an affidavit in litigation over the subpoena. M7 says it provided execution chemicals to Missouri "based on M7's political views on the death penalty, and not based on economic reasons." Pls.' Ex. 21 ¶3. Similarly, the supplier of Arkansas's potassium chloride for the 2017 executions had no economic motivation and just donated the drugs to Director Kelley personally. ECF No. 49, Tr. 1229–30. This is the reality of lethal injection today. Most (if not all) pharmaceutical manufacturers object to the use of their drugs in executions and place commensurate contractual restrictions on their supply chains. Politically motivated middlemen like M7 want to advance the death penalty but require protection from the consequences of contractual breach. Rightly or wrongly, secrecy laws provide economic security for suppliers who would otherwise expose themselves to risk by breaching their contracts with manufacturers. Notably, M7 doesn't say that it would refuse to supply pentobarbital to other states. With stricter secrecy protections in place, it's likely that Defendants can find a more appropriate execution drug than midazolam, either from M7 or from another supplier who wants to support executions.

****

In sum, Plaintiffs' midazolam claim isn't subject to res judicata or collateral estoppel, and there remain genuine issues of material fact concerning both prongs of the *Glossip* test. The Court should deny Defendants' motion for summary judgment on Claim I.

### III.   Defendants aren't entitled to summary judgment on Claim II.

There remains a material dispute of fact on Claim II. To be clear, Plaintiffs aren't alleging that the consciousness checks violate the Eighth Amendment by providing an inadequate safeguard. Because midazolam can never render the condemned insensate to the second and third drugs, no form of consciousness checking can protect the condemned from pain. However, if the State is going to take the position that the consciousness checks are useful in deciding that it's okay to inject the vecuronium, and if the checks form a core provision of the execution protocol, then the Equal Protection Clause requires the executioners to apply the checks to each condemned man equally to ensure he's not moving before he's paralyzed. Though the designee insists that s/he performed the checks properly and in a uniform fashion each time, that was not observers' experience. Of Marcel Williams's execution, Jamie Giani says:

> I kept waiting for the consciousness check to be completed. I never saw the designee make any affirmative indication that Marcel was not conscious, and in fact, there was eye movement at least 3 minutes before the coroner was called. I did not think they had even pushed the second or third drugs yet, so I was shocked when the coroner was called. I saw no sternum rub or pinch. It certainly was not clear how the consciousness decision was made—if, in fact, it ever was.

Pls.' Ex. 12 at 6. Likewise, while Jacob Rosenberg reported that the designee "checked [Marcel Williams's] pulse and touched his eyes and said something," he didn't report any sternal rub or trapezius pinch. Rather, the official "continually checked Williams by touching his hands and face." Pls.' Ex. 15 at 2–3. In Kenneth Williams's execution, an attorney witness observed the designee touching Williams's eyes and manipulating Williams's left shoulder, after which his "chest rose and head bobbed." Pls.' Ex. 13 ¶8. The execution proceeded anyway. The designee again touched Williams's neck or shoulder just three minutes before he was pronounced dead. Pls.' Exs. 13 ¶12 & 14 ¶10.

Defendants dismiss these accounts by saying that witnesses "did not understand or appreciate what was going on in the execution chamber." Br. at 59. But the witnesses have given factual accounts of the consciousness checks, based on their own observation, that do not jibe with the designee's. There's a material question of fact about what happened in the execution chamber; any inference to be drawn from those observations should be reserved for trial.

## IV.    Defendants aren't entitled to summary judgment on Claims III and IV.

Defendants make a clarifying concession in arguing Claims III and IV are moot: that the Joint Proposed Execution Viewing Policy ("Joint Policy") the parties negotiated in April 2017 (ECF No. 62) is "not limited in time or scope to only the executions that were scheduled to take place in April 2017" and that the policy will apply to "all executions." Br. at 68. Defendants' apparent intention to continue abiding by the Joint Policy

narrows the questions that arise under Claims III and IV, and Plaintiffs request that

Court encompass the terms of the Joint Policy in its eventual judgment. The remaining

issue is whether the State violates Plaintiffs' rights under the First Amendment or § 3599

by obscuring visual and auditory access to the entire execution, including the affixation

of the IV lines and the pushing of the drugs. Plaintiffs raise these issues in paragraphs

50, 51, and 57 of their amended complaint.

## A.       Statute of limitations.

The Court previously analyzed whether these claims are barred by the statute of

limitations in its order denying the motion to dismiss. As the Eighth Circuit hasn't

adopted a definitive holding on this issue, the Court applied the law of other circuits

concluding that the statute of limitations—three years here—accrues on the later of two

dates: (1) the date direct review became complete by denial of certiorari or (2) the date

the plaintiff became subject to a new or substantially changed execution protocol. *See*

ECF No. 53, Order at 54. For two reasons, the claims aren't time-barred under this rule.

First, there were substantial changes to the protocol in 2015, less than three years

before this lawsuit and the motion to intervene were filed. Chief among these was the

change to the injection protocol itself. The switch to a non-anesthetic drug created a

need, exhibited even more clearly in the April 2017 executions, for Plaintiffs' attorneys

to be privy to the precise time at which chemicals are injected. Additionally, a new

viewing protocol became effective on September 3, 2015. The 2015 protocol allowed

significantly more people to view the execution, as required by a 2015 amendment to

Ark. Code Ann. § 16-90-502. Defs.' Ex. 36 at 3–4. These changes reset the accrual date.[8]

Second, even were they correct that Claims III and IV accrued in 2008 with adoption

of the previous execution policy, Defendants are not entitled to judgment on the basis of

statute of limitations because one of the intervenors, Latavious Johnson, filed suit

within three years of the date his case became final by denial of certiorari on direct

review. The U.S. Supreme Court denied certiorari from his direct appeal on October 17,

2016. *See Johnson v. Arkansas*, No. 16-5590 (U.S.). Even if the protocol has remained

substantially unchanged since 2008, Johnson's claim accrued on October 17, 2016. His

motion to intervene, filed on March 21, 2018 (ECF No. 106), was well within the three-

year statute of limitations.

**B.      Res judicata.**

Defendants' res-judicata defense on these claims isn't properly before the Court

because this is the first time in the litigation they have raised it. While Defendants'

motion to dismiss argued that the midazolam claim was subject to res judicata, it didn't

raise the same defense to the viewing claims. And Defendants' answer to the amended

---

[8] Additionally, the 2015 protocol changed the attorney-viewing provisions. While the previous protocol allowed "counsel" to view the execution, the 2015 protocol specified that "an attorney" could view the execution. *Compare* Defs.' Ex. 35 at 2 *with* Defs.' Ex. 36 at 3. The Court has already parsed through the ADC's various policy shifts on this issue. *See* ECF No. 54, Order at 88–91. In any case, the precise date the ADC changed its policies regarding the number of attorneys is irrelevant now that Defendants intend to follow the Joint Policy moving forward.

complaint asserted no res-judicata or collateral-estoppel defense. *See* ECF No. 121 at 14–15. The Court should consider the defense waived.

Even if Defendants properly asserted the defense, it doesn't bar these claims. Defendants cite several prior lawsuits in which they allege the claims "could have been adjudicated." Br. at 67. As Defendants tacitly acknowledge, the suits concerned no viewing policy and these claims weren't actually litigated, which is fatal under Arkansas law. *See Baptist Health v. Murphy*, 373 S.W.3d 269, 278 (Ark. 2010) (res judicata requires both suits to "involve the same claim or cause of action"); *East Texas Motor Freight Lines, Inc. v. Freeman*, 713 S.W.2d 456, 459 (Ark. 1986) (collateral estoppel requires the issue to "have been actually litigated"). Finally, as explained above, res judicata yields when there are new material facts. Even if res judicata would otherwise apply, the problems with the April 2017 executions create a basis for new claims on these issues.

## C.    "Speculative" claims.

Defendants argue that Plaintiffs' claims are speculative because they depend upon the notion that the executioners might commit negligence. To the contrary, the experience of the April 2017 executions illustrates the need for additional attorney access. Take Marcel Williams's execution as an example. The executioners had difficulty establishing an IV line to Williams and took forty-five minutes to do so. Pls.' Ex. 12 at 4. Executions have been cancelled after less prodding than that. *See* Tracy Connor, "Ohio

Cancels Execution of Alva Campbell after Failing to Find Vein," NBC News (Nov. 15, 2017), *available at* https://nbcnews.to/2ik4hhD.  During these forty-five minutes, Williams had no legal counsel to protect his interests because his attorneys were denied visual and auditory access. When Williams was eventually injected, witnesses didn't believe he was unconscious and could only speculate that additional midazolam was given. Pls.' Exs. 12 & 15. Indeed, not even the designee knows what time the midazolam came in or how much of it came in. Defs.' Ex. 31 (Dep. 89:6) ("I don't know what time anything happened, actually."). The time at which the drugs are injected is a fact essential to protection of Plaintiffs' rights. The Court need not speculate on the need for additional transparency—it's apparent from the April 2017 executions themselves.

D.     **Merits.**

The Court has previously determined that Plaintiffs have a right of access to courts through the duration of their executions and that the protocol interferes with that right. ECF No. 53, Order at 55–59; ECF No. 54, Order at 92. The Court has also determined that the ADC's restrictions on multiple attorneys and phone access are unreasonable. ECF No. 54, Order at 92–100. By the Joint Policy, the parties and the Court resolved this issue as it relates to the number of attorneys and telephone access. The question remaining for resolution is whether Plaintiffs have a right for their attorney(s) to view the entire execution. In other words, should the attorneys be permitted to see and hear what happens in the witness room, including IV insertion, from the time the

condemned enter the chamber, and should they be permitted to see when each drug is injected?[9]

The Court's earlier conclusion that Plaintiffs have a right of access to the courts is equally applicable to these aspects of the executions. Thus, Defendants have the burden to show that the restrictions are reasonable under *Turner v. Safley*, 482 U.S. 78 (1987). But Defendants' briefing, which is mostly duplicative of their earlier briefing on this issue, doesn't assert any new interest that the Court hasn't already rejected in the preliminary-injunction order. As before, Defendants assert a statutory interest in barring recording devices; as before, Plaintiffs don't allege their attorneys should be able to record the executions, only to view and hear them in their entirety so they can protect Plaintiffs' rights. Defendants also cite generalized security concerns without specifying what they really are. If these concerns relate to the executioners' identities, they can be met by the use of surgical garb or through cameras that focus on the condemned or the drug injection rather than the participants. Such accommodations will not excessively burden prison resources or personnel. Indeed, courts have required such accommodations

---

[9] Plaintiffs acknowledge that in the midst of the April 2017 executions they sought modification of the Joint Policy to permit their attorneys to view the insertion of IV lines. ECF No. 73. (They first alleged entitlement to see injection of the execution drugs in the amended complaint, after it became obvious that no one can tell when the drugs are injected and that the ADC keeps no record of that.) The Court denied "renegotiation of material terms of the joint proposed execution viewing policy at this time" because Plaintiffs could have withheld consent to an agreement that didn't allow access to the IV procedures. ECF No. 76, Order at 3. The order denying the motion to modify doesn't appear to pass judgment on the merit of Plaintiffs' claim that their attorneys should be able to see and hear the entirety of the execution.

under the different (but related) right of public access under the First Amendment. *See, e.g.*, *Guardian News & Media LLC v. Ryan*, 225 F. Supp. 3d 859, 870 (D. Ariz. 2016) (enjoining corrections department from "conducting lethal injection executions without providing a means for witnesses to be aware of the administration(s) of lethal drugs, and from . . . clos[ing] the viewing of an execution absent the existence of a legitimate penological objective which would merit such closure"). As for Defendants' appeal to Plaintiffs' dignity, it "strains credulity for the State to assert that these interests will be offended to a meaningfully greater degree when witnesses are permitted to watch the insertion of intravenous lines than when they are simply allowed to watch the inmates die." *Associated Press v. Otter*, 682 F.3d 821, 825 (9th Cir. 2012).

In sum, Plaintiffs' right of access to courts encompasses the ability to see and hear the entire execution, including insertion of the intravenous lines and the actual injection of each chemical. Because Defendants haven't established a legitimate penological justification overcoming this right, their motion for summary judgment on Claims III and IV should be denied.

### V.    Conclusion.

For the reasons stated above, material issues of fact remain to be resolved and Defendants aren't entitled to judgment as a matter of law on any of Plaintiffs' claims. The Court should deny the motion for summary judgment.

Date: April 3, 2019                          Respectfully submitted,

                                             LISA G. PETERS
                                             FEDERAL PUBLIC DEFENDER

                                             /s/ John C. Williams_____
                                             JOHN C. WILLIAMS, ABN 2013233
                                             SCOTT W. BRADEN, ABN 2007123
                                             Federal Public Defender's Office
                                             1401 W. Capitol, Suite 490
                                             Little Rock, AR 72201
                                             501.324.6114
                                             john_c_williams@fd.org
                                             scott_braden@fd.org

**PLAINTIFFS' EXHIBITS**

Exhibit 1: Report of Dr. Gail Van Norman (July 25, 2018)

Exhibit 2: Supplemental Report of Dr. Craig Stevens (July 27, 2018)

Exhibit 3: Report of Dr. Joseph Cohen (July 27, 2018)

Exhibit 4: Report of Dr. James Williams (July 27, 2018)

Exhibit 5: Affidavit of Dr. Charles Blanke (July 30, 2018)

Exhibit 6: Rebuttal Report of Dr. Gail Van Norman (August 30, 2018)

Exhibit 7: Second Affidavit of Dr. Charles Blanke (September 10, 2018) (filed under seal)

Exhibit 8: Excerpts from Deposition of Dr. Gail Van Norman (January 24, 2019)

Exhibit 9: Excerpts from Deposition of Dr. Craig Stevens (January 17, 2019)

Exhibit 10: Excerpts from Deposition of Steven Turley (January 25, 2019)

Exhibit 11: Deposition of Gregory Peay (January 25, 2019)

Exhibit 12: Declaration of Jamie Giani (April 25, 2017)

Exhibit 13: Declaration of Cassandra Belter (April 28, 2017)

Exhibit 14: Declaration of Eric Motylinski (May 1, 2017)

Exhibit 15: Jacob Rosenberg, "Arkansas Executions: I Was Watching Him Breathe Heavily and Arch His Back," THE GUARDIAN (April 25, 2017)

Exhibit 16: "Timeline of Latest Execution from AP Reporter," ASSOCIATED PRESS (April 28, 2017)

Exhibit 17: Testimony of Santino Coleman in *In re Ohio Execution Protocol Litig.*, No. 11-1016 (S.D. Ohio Oct. 25, 2017)

Exhibit 18: Testimony of Carol Wright in *Abdur'Rahman v. Parker*, No. 18-183-II
          (Davidson Cnty. Chancery Ct. July 11, 2018)

Exhibit 19: Testimony of Steven Hale in *In re Ohio Execution Protocol Litig.*, No. 11-
          1016 (S.D. Ohio Dec. 11, 2018)

Exhibit 20: Excerpt of *Pharmacology* Textbook by George M. Brenner and Craig W. Stevens
          (5th ed. 2018)

Exhibit 21: Declaration of M7 (July 23, 2018)