**Rule 26 Report of Dr. James S. Williams:**
**Efficacy and Feasibility of Firing Squad as a Means of Execution**


**July 27, 2018**

## 1. Introduction

### A. Qualifications.

I am in active practice as an emergency physician, primarily at Citizen's Hospital in Victoria, TX, as well as several other hospitals. I have been employed as the Medical Director of several emergency departments in Texas and Wisconsin, including Alice, TX (09/2016-03/2018), Big Lake, TX (10/2011-09/2015), and Waupaca, WI (12/2007-09/2011). I received my MD in 1991 from the University of Calgary in Alberta, Canada. I have been board-certified by the American Board of Family Medicine since 1998. I have been continuously certified in Advanced Trauma Life Support by the American College of Surgeons since 1994. I have more than 40,000 hours of ER and ICU experience, about 25% of which has been spent in direct trauma care. I have provided medical care to thousands of trauma patients during that time.

I have used my medical skills while working closely with police departments. I was a Police Medical Officer with the City of Ripon, WI, Police Department for 10 years. My duties in this position were primarily administrative: writing and supervising policies for first responders, training police officers in the practice and principles of Trauma Critical Casualty Care ("TCCC"), and ensuring standards were maintained in all aspects of those fields. I also served as a SWAT Team Physician with Waupaca, WI, County Sheriff's Department from 2008 to 2011. My duties in that position were more hands-on, in that I operated as an embedded component of the SWAT Team. I participated in both training and actual SWAT operations with the Team. I was fully armed on all SWAT ops, was held to the same standards of firearms proficiency as all other officers on the SWAT team, and was expected to perform to the same combat standards as all other members of the team. My duties included planning and conducting TCCC training for all SWAT operators, providing on-scene medical care to SWAT operators and civilians in the "hot zone" on ops, liaising with pre-hospital and hospital medical personnel in conjunction with SWAT ops, and acting as a fully functional SWAT operator on ops (as needed). I served in these posts while also performing my regular duties as a hospital emergency physician.

I am well-versed in firearms. I draw on a lifetime of experience working with firearms, including the hunting of small and large game for the table, as a firearms instructor, and many years of competitive shooting at the local, state, regional, and national levels. I currently conduct firearms trainings for law enforcement agencies and authorized civilian organizations through my company, Tactical Anatomy Systems

1

LLC. I have conducted approximately 80 trainings over the past 15 years, and about 10 over the past 5 years. My courses are certified by the Peace Officer Standards and Training Council ("POST") of several states, including Minnesota, Tennessee, Nevada, and Colorado. They are also used in Canada, the United Kingdom, Australia, New Zealand, and a number of other countries for the training of police officers and military personnel. I have been recognized in this field by the American Society for Law Enforcement Training, the International Law Enforcement Training and Education Association, and the International Association of Law Enforcement Firearms Instructors, and I have spoken at national and international conferences sponsored by these and other organizations.

I have not testified as an expert by trial or by deposition during the last four years. I have no publications in the last 10 years. In 2006, I published a training manual entitled *Tactical Anatomy Instructor Manual*. My CV is attached to this report as Appendix A.

### B. Compensation.

I'm being compensated at a rate of $300 per hour for consultation, report preparation, and testimony in this case.

### C. Referral questions.

The Federal Defender's Office in Little Rock has engaged me to address two questions: (1) Would execution by firing squad cause death in a quick and painless manner? (2) Is execution by firing squad feasible?

I will address these questions in detail below. But in short, my answers are "yes" and "yes."

### D. Materials considered.

In addition to drawing from my knowledge and experience in the fields of medicine and firearms, in preparing this report I've considered (1) Utah's protocol for executions by firing squad, attached to this report as Appendix B; (2) the U.S. Army's protocol for executions by firing squad, attached to this report as Appendix C; and (3) the sources listed in the footnotes of the report.

## 2. Whether execution by firing squad causes quick and painless death.

Contemporary understanding of how gunshot wounds affect the human body is extensive. Gunshot wounds can be extremely painful in some cases—but unless the bullet strikes bone, pain is relatively minor, if not virtually painless.

Whether execution by firing squad leads to a quick and painless death depends on a number of factors.

The first factor is one of ballistics: what is the projectile's energy when it strikes the body? Energy is multiplied when several missiles strike the body more or less simultaneously, such as the volley fire of a firing squad. Greater energy of impact imparts a greater degree of damage to the target organism, and subsequent more rapid incapacitation and death (assuming the projectile hits an appropriate target, as discussed further below). More missiles striking the body simultaneously will impart a greater sum of energy, and are therefore more likely to achieve the desired effect than a single projectile.

The second factor is one of anatomy: what vital organs are struck and disrupted by the missile(s)? There are two ways to assure a quick and painless death: (1) significant trauma to the brain or central nervous system (CNS); or (2) denying the CNS the blood supply it requires to continue to function.[1] A shot or shots to the brainstem would be assured to cause a rapid death. So, too, would shots to the cardiovascular bundle—the heart, and the great vessels which lead to and from it—in the chest.

A firing squad causes death by cutting off blood to the CNS through shots to the cardiovascular bundle. When the firing squad's bullets all strike the heart and great vessels, the immediate effect is to cause cessation of blood circulation at its source. Whether the heart stops organized beating or is structurally disrupted to the point of being unable to generate pulse pressure, or whether the arteries leading from the heart are disrupted such that blood flow to the brain and body cease, the net effect is a catastrophic drop in blood pressure in the brain. The brain's function depends upon a continuous supply of oxygen from the blood, and if that blood supply is stopped, unconsciousness ensues within a matter of 10 seconds or less, and cortical/brainstem death inevitably follows within a matter of minutes.

By targeting the cardiovascular bundle, the firing squad causes death with minimal pain. I have interviewed personnel who have served as field medics in the U.S. Armed

---

[1] Fackler, M. (1996), "Gunshot Wound Review," Annals of Emergency Medicine 28 (2): 194-203.

Forces with respect the effects of a gunshot wound to the cardiovascular bundle.
They have informed me that the response to being shot with a rifle in the chest is
highly variable, depending on range, ballistic trajectory, and point and angle of impact
Regardless of these factors, however, subjects who are shot in the central chest
(cardiovascular bundle) typically exhibit no life signs when examined, even when the
time between injury and examination is only a matter ten or fifteen seconds. This
body of experience supports the traditional firing-squad aiming point, and
furthermore is in accordance with medical knowledge of the terminal effects of
cardiovascular gunshot wounds.

The short interval between gunshot wound to the chest and death is also
consistent with an examination of the experience of death by firing squad. In 1938, a
physician monitored the heart activity of a man being executed by firing squad and
found that his heart stopped 15 seconds after the shots were fired. *See Graph of
Heartbeat in in Execution*, Chicago Daily Tribune (Nov. 1, 1938) (reproduced below).
Based on my examination of the ECG tracing in the photo, I believe the subject
experienced immediate onset of ventricular fibrillation; this arrhythmia typically causes
loss of consciousness within two or three seconds, which in my professional opinion
would have been the case for this man.



**CHICAGO DAILY TRIBUNE: TUESDAY, NOVEMBER 1, 1938.**

**Graph of Heartbeat in Execution**

(Story in adjoining column.)

[Associated Press Wirephoto.]

Dr. Stephen H. Besley points to cardigraph, the first ever made
of a man's heart as bullets pierced it. The steady line shows the
heartbeat as John Deering awaited the firing squad; the first flutter
marks the impact of the bullets; the wild fluctuations are the death
struggle; the end is death.

**SLAYER'S HEART TRIPLES BEAT AS HE FACES DEATH**

Salt Lake City, Utah, Oct. 31.—[Special.]—The heart of John W. Deering,
holdup murderer, beat three times faster than normal just before he was
put to death today by a firing squad in the state prison here. The unprecedented
recording was termed valuable to heart disease specialists as it
showed clearly the effect of fear.

An electro-cardiograph film, recorded with the condemned man's permission,
showed that Deering's heart beat jumped from normal 72 to 180,
although he appeared outwardly calm. It maintained that rate for the several
minutes required to complete preliminaries for the execution.

When the doomed man was asked for a last statement his heart beat
fluttered wildly, then calmed after he spoke until bullets ended his life.
The heart beat stopped 15.6 seconds after the bullets struck, but he was
not pronounced dead until two and a half minutes after the five shots
rang out. Utah is the only state in the union now using a firing squad.

SAV

4

The question of the relative painfulness of a gunshot wounds to the chest can be answered by the experience of patients who have survived thoracic gunshot wounds. These persons typically describe the sensation as being that of a severe blunt blow to the chest, like a hard punch, or being struck with a club or bat. Most gunshot-wound victims I have treated in an ED or ICU setting have told me their experience was similar if not identical: the sensation of a powerful blow, a prolonged numbness to the region of the gunshot wound (presumably due to the neural structures in the area being stunned by the temporary cavitation of tissues caused by the bullet's passage), and gradual onset of mild to moderate pain a few hours later. The only exceptions to this, in my experience, are persons who have received gunshot wounds to long bones of the extremities that caused fractures, and gunshot wounds to the abdomen, which produce a sensation of abdominal cramping.

I received a gunshot wound to my right chest in April 1972. My experience concurs with these reports. The bullet was a high-velocity .22 caliber projectile; in terms of ballistic energy, this would fall into the same category as a bullet from a police service caliber handgun on the order of a 9mm or .38 Special weapon. The sensation of being struck by the bullet was much like the sensation of receiving a hard tackle in a football game, or being struck by a hard-pitched baseball: a powerful blunt blow, with no sharp, burning, or other painful sensation. Because the bullet passed very close to the brachial plexus (a bundle of nerves under the clavicle), I had the immediate sensation of numbness or tingling in my neck, shoulder, and right arm, very much like the sensation of a "stinger," which I had experienced several times on the football and rugby field; while unpleasant, it did not seem to me to be in any way painful. I was transported to the hospital and received prompt care. I was asked repeatedly if I needed pain medication, and I declined each time because I simply wasn't experiencing anything I could describe as pain. This pain-free period lasted until approximately 3 hours after I received the wound, by which time I had developed severe muscular stiffness and pain in the chest and shoulder area, and I agreed to an injection of narcotic pain medication.

Journalist Holly Riordan published a compendium of reports from several dozen gunshot-wound victims which strongly agrees with my personal experiences of a gunshot wound, and with the perceptions of pain relayed by the patients that I have

interviewed. The majority of Riordan's interviewees described the sensation of being shot as being more like a punch, slap, or push than a painful penetrating injury.[2]

Finally, it should be stated explicitly that execution by firing squad substantially reduces the chance of a "botched" execution due to error on the part of the executioner(s). The means by which death is effected is simple and straightforward, using an implement (rifle) with which a substantial proportion of the population in general, and the law enforcement population in particular, are expertly familiar. Thus the chance of "operator error" being introduced into the execution is substantially less than it is in execution by the current standard, lethal injection. Further, the means of execution—rifles and ammunition, rather than pharmacologic agents—is not subject to unreliability of supply.

### 3.  Whether execution by firing squad is feasible.

#### A.  Historical use of firing squads for executions.

In order to address the feasibility of firing squads, I first sought answers to two questions concerning the historical use of this method.

**i.**  First, has execution by firing squad been successfully implemented in any other jurisdictions in the United States or abroad? The answer is, not surprisingly, "yes." In military tradition, death by firing squad, or by gunshot wound, has been a traditional and common means of execution since at least the early 19th century. In modern times, the state of Utah has offered condemned prisoners a choice between lethal injection or death by gunshot wound, and since Gary Gilmore's execution in 1977, this method has been successfully implemented three times.[3]

These historical uses demonstrate that it's possible to establish a protocol for successful implementation of death by gunshot wound in Arkansas.

**ii.**  The second question asks us to define what the term "firing squad" actually means.

---

[2] Riordan, Holly (2017), *26 Gunshot Survivors Explain Exactly What The Bullet Felt Like*, *available at* http://www.thoughtcatalog.com/holly-riordan/2017/02/26-gunshot-survivors-explain-exactly-what-the-bullet-felt-like.

[3] "Firing Squad Executes Killer," *The New York Times*, Jan. 27, 1996; "The Firing Squad is Making a Comeback in Death Penalty Cases," *US News & World Report*, Mar. 3, 2017.

Death by fusillade, or multiple rifles firing simultaneously, has been a common means of military execution since at least the Napoleonic era. Rifles are typically the firearm selected for this purpose. Historically, this made sense, as armies usually had an abundance of riflemen, so forming a squad of them for a quick execution was possible almost anywhere. Typically, a battle rifle is a weapon capable of inflicting a fatal wound to an enemy combatant with a single well-placed bullet. As firearms go, the rifle meets the minimum requirement of lethality that an execution requires, in my opinion and that of other experts in the use of deadly force whom I have consulted on this question. Current firearms injury data show that persons intentionally shot by rifles die in about 80% of cases, whereas gunshot wounds from handguns are quite survivable, with 4 out of 5 persons surviving their injury.[4] Using any lighter weapon than the rifle risks ineffectiveness of the method, then. And use of any heavier a weapon, such as an artillery piece, was and is a messy business (not that this has prevented such use; note the British Army practice of having prisoners of war "blown from guns" in the aftermath of the Great Mutiny of India in 1857, among other Colonial applications).[5]

A squad of soldiers armed with such weapons could be counted upon to reliably dispatch a condemned man with little chance of his survival, and with a minimum of administrative fuss and bother. Furthermore, using a group of men to execute the condemned underscores the concept that *the Army* is putting him to death; it is not one man who is doing the killing, but the collective entity they all serve. By extension, execution of a civilian by firing squad implies that it is *the State* terminating the individual's life, rather than an individual.

The execution is traditionally accomplished by having the condemned man face a squad of riflemen, who on command fire their rifles simultaneously into the condemned man's chest; specifically, the cardiovascular bundle in the center of his chest. A squad, in American military terms, is a group of about 10 men. Historically, this number varies from four or five riflemen to as many as twenty. The condemned prisoner may stand or kneel or sit facing his executioners, and is fastened to a post, wall, or chair by straps, ropes, or other bindings. This binding serves to minimize movement by the condemned, allowing precise and fatal placement of the rifle shots by the firing squad.

---

[4] American College of Surgeons (2016), *Advanced Trauma Life Support, Student Manual.*

[5] Wagner, K.A. (2016), *Calculated to Strike Terror: The Amritsar Massacre and the Spectacle of Colonial Violence,* Past & Present, Vol. 233 (1): 185-225.

The squad's rifles are aimed at the middle of the condemned man's chest, in the vicinity of the heart. The primary purpose of this aiming point is to yield a quick death, and the secondary purpose is to avoid disfiguring the face and head of the man being shot, in part out of a sense of human dignity, but also presumably so he may be viewed post-mortem for identification purposes.

### B. Protocols for execution by firing squad.

To prepare this report, I reviewed Utah's current protocol for execution by firing squad and an older firing-squad protocol of the U.S. Army. In my opinion, these protocols or a similar protocol would suffice to cause a quick and painless death.

In summary, the Utah form is as follows:

a) The condemned is secured in a seated position, with an aiming point or target affixed to the chest;

b) The firing squad, consisting of 5 riflemen, faces the condemned at a distance of 21 feet, armed with service rifles of .30 caliber;

c) The squad's rifles are loaded with 2 rounds each by the squad commander; one of the rifles is loaded with blank cartridges, but the members of the firing squad are not aware of which rifle is so loaded prior to firing;

d) On the order of the D.O.C. Director or his Designee, the firing squad commander gives the order to fire, and all 5 riflemen discharge their rifles at the target on the condemned man's chest simultaneously;

e) Three minutes after the first volley, the attending physician examines the condemned to determine if life signs are present; if so, he continues to check for life signs every 1 minute to a maximum of 10 minutes; and if life signs are still present, a second volley shall be fired;

f) If, after the first volley, the condemned shows obvious signs of life or consciousness, a second volley shall be immediately fired.

The Army's procedure differs in some minor but practical points:

a) The firing squad consists of 8 riflemen and a sergeant;

b) The condemned is secured in a standing position to a post, with restraints at the waist and ankles;

c) The squad's rifles are loaded such that at least one, but no more than 3, are loaded with blank ammunition;

d) The squad is arrayed 15 paces (approximately 35 feet) from the condemned;

e) On the order of the officer commanding, all 8 riflemen discharge their rifles at the target on the condemned's chest simultaneously;

f) The officer commanding and medical officer will then examine the condemned, and if in the medical officer's opinion the condemned is still alive, the sergeant will be instructed to fire a "coup de grace" handgun bullet into the condemned's head, aiming just above the ear and with the muzzle one foot from the head.

**Comments on Procedure:**

**i.** The condemned needs to be firmly restrained so an accurate aiming point may be established. A circular target roughly 3-4 inches in dimension should be affixed over the lower 1/3 of the subject's sternum, overlapping the left sternal border, but not overlapping the lower or right border of the sternum. This will place the riflemen's bullets in the upper half of the heart, where the pacemaking structures of the heart reside, or in the aorta and other great vessels, where the outflow of blood from the heart is contained.

The number of riflemen in the squad has varied by jurisdiction, as noted previously, but five to ten rifles is a reasonable range. Fewer than 5 rifles will risk the chance of failure to inflict sufficient injury to cause a quick death, and more than 10 increases the likelihood of more damage to the subject's body than is strictly necessary.

**ii.** The distance (21 to 35 feet) from the riflemen to the condemned is appropriate. Any competent and qualified officer/rifleman in any state's Department of Corrections (or any other branch of law enforcement) should be able to meet this marksmanship requirement easily.

The State of Arkansas POST standards for patrol rifle qualification (attached to this report as Appendix D) require that a peace officer be able to reliably hit a target the size of an 8.5" x 11" sheet of paper at 100 yards (slightly more than 8 minutes of angle or MOA, in marksmanship terms). An 8 MOA target at typical firing squad distance—approximately 12 yards in the firing-squad protocols reviewed for this paper—is 1" in diameter. The firing-squad protocols reviewed for this paper utilize a 4-inch target shot, which is 4 times larger in minutes of angle than the minimum marksmanship target used in qualification. This clearly means that the level of marksmanship required for execution is well within the patrol rifle qualification standard met by all qualified Arkansas peace officers.

It should be noted that "service rifles of .30 caliber" could be any military or law enforcement grade rifle type; most commonly these are bolt action rifles, but semiautomatic action rifles are also in common use and may be suitable. In terms of semi-auto rifles, both the AR10 and M1A SOCOM are 7.62x51 mm NATO (equivalent to .308 Winchester caliber in civilian arms) semiautomatic rifles commonly used by specialist law enforcement units, and are also in widespread use in the United States armed forces, and would suitable for this purpose. Less commonly used but equally suitable would be the Ruger Mini-30 rifle, chambered in 7.62X39 mm caliber. Suitable bolt-action rifles in the same chamberings are readily available and in common use by law enforcement and military specialists and would include the Winchester Model 70, Remington Model 700, Savage 110, or Ruger Model 77. In the present day, the most commonly accepted .30 caliber round is the .308 Winchester (also known as 7.62x51 mm NATO), which would be an adequate choice of ammunition for a firing squad.

Many other ammunition options are available and would be appropriate (depending on the rifle chosen). A standard police/patrol grade of ammunition, consisting of an expanding soft-point jacketed bullet of 150-155 grains, would be best suited.  Such ammunition can be expected to expand rapidly on striking the anterior aspect of the subject's chest, and many, if not all, of the bullets' fragments would remain within the chest rather than exiting the posterior body wall. Examples include Hornady Tactical Action Police (TAP) 155 gr, or Federal/Speer Gold Dot 150 gr ammunition, but there are many other ballistically equivalent and equally efficacious brands widely available on the open market. Use of an armor-piercing or target grade of ammunition would be inappropriate. Such bullets are more likely to overpenetrate the subject's body, causing more severe destruction of the body than is necessary to cause death, and creating more mess.

A suitable backstop should be employed immediately behind the body of the condemned. This should consist of a layer of ballistically absorbent material such as sandbags, which would serve to block overpenetration of any bullets that passed entirely through the subject's body, and would absorb body fluids expelled from the exit wound(s). Behind this should be placed an impervious ballistic barrier such as armor steel plate to prevent bullet fragments from escaping the catchment area and causing ricochets that might injure members of the execution team or witnesses.

**iii.** The traditional practice of loading one of the firing squad rifles with blank ammunition may be of some redeeming value from a public relations perspective, but it is of little practical importance. Historically, this was likely expedient when the

enlisted men serving on a firing squad did so under orders, rather than as volunteers, as riflemen may have had grave individual reservations about being required to serve as executioners. The use of a random blank cartridge in one of the squad's rifles gave each rifleman a "plausible deniability" factor to relieve him from the guilt of having taken the life of a fellow soldier. In the context of a state-sanctioned execution in the present day, however, such an expedient seems unnecessary. The riflemen serving on the firing squad will necessarily be volunteers, and thus no individual moral reticence should be at play. Furthermore, any experienced rifleman is immediately aware of the fact when he fires a blank cartridge; there is no perceptible recoil. As such, each member of the execution team is fully aware if he has fired a live round or a blank when he pulls the trigger, and any fiction generated to preserve anonymity is just that: a fiction. Whether this tradition is preserved in the development of a new protocol is up to the protocol's authors, but in this writer's opinion it is a dramatic gesture with little practical value.

**iv.** Misadventure with the first volley is unlikely. Nevertheless, having the ability to fire a second volley is reasonable and prudent. The firing squad's rifles should be loaded with 2 rounds each prior to commencement of the execution. This seems more prudent than expecting a single individual to complete the execution, such as the sergeant so charged in the Army Regulation.

## 4. Conclusion

This report comprises my best attempt to answer the questions put to me by the Federal Defender's Office regarding execution by firing squad. In my opinion, it is a feasible means of execution and will result in a quick and painless death. I sincerely hope that my efforts will prove to be of some worth to the Court.

_____
James S. Williams M.D.

_____
7/27/18
Date

# CURRICULUM  VITAE
## James Stuart Williams MD
**609 Louisiana Ave, Corpus Christi, TX, 78404; Phone 432-301-2823**

## Education

- MD (1991) University of Calgary, Alberta, Canada
- MSc (1988) Endocrinology, University of Calgary, Alberta, Canada
- BSc (1976) Zoology, University of Calgary, Alberta, Canada

## Postgraduate Training

- Board Certified in Family Medicine, American Board of Family Practice 1998, recertified 2006, 2013
- Board Certified in Family Medicine, College of Family Physicians of Canada, 1993 (currently certified)
- Family Medicine Residency (completed 1993 at Royal Alexandra Hospital), University of Alberta, Canada
- Neonatal Resuscitation1991, recertified 2002, 2004, 2013, 2015, 2017
- ATLS 1994, recertified 2002, 2007, 2012, 2016
- ACLS 1993, recertified 1995, 1997, 1999, 2001, 2003, 2005, 2007, 2009, 2011, 2013, 2015, 2017
- PALS, certified 1991, recertified 2013, 2015, 2017
- ALSO, certified 2000
- Certified as CIC (Sports Concussion Evaluation and Management) by ImPACT, Inc., 2012
- Certified in Diagnostic and Therapeutic Esophagogastroduodenoscopy (EGD), National Procedures Institute, 1999
- Certified in Diagnostic and Therapeutic Colonoscopy, National Procedures Institute, 1999; received full privileges in Colonoscopy, Polypectomy, and Biopsy, Berlin Memorial Hospital, 2000.
- Repeated completion of American College of Sports Medicine's *Team Physician Course Parts I and II*, February 2005
- Completed the American College of Sports Medicine's *Team Physician Course Parts I and II*, February 2001 (Completed Part I February 1998)
- Completed the American College of Sports Medicine's *Advanced Team Physician Course*, December 2003.

## Medical Licensure

- State of Texas, 2011 to present
- State of Wisconsin, 1997 to 2017 (renewal pending)
- Province of Alberta, Canada, 1991 to 2003

**Employment History**

- Emergency Department Physician, Citizens Hospital, Victoria, TX, 03/2018 to present (Schumacher Clinical Partners)
- Medical Director, Emergency Department, Christus Spohn Alice Hospital, 09/2016 to 03/2018 (EmCare Physicians)
- Emergency Department Physician, Christus Spohn Alice Hospital, September 2016 to present (EmCare Physicians)
- Emergency Department Physician, independent contractor for agencies including Concord Medical, EmCare Physicians, Schumacher Clinical Partners, Medicus, and Southwest Medical; 09/2015 to present
- Medical Director, Shannon Sports Concussion Clinic, San Angelo TX, 03/2012 to 05/2016
- Medical Director, Emergency Department, Reagan Memorial Hospital, Big Lake TX, 10/2011 to 09/2015
- Family physician, Shannon Clinic, San Angelo/Big Lake TX, 09/2011 to 09/2015
- Head Team Physician, Ripon College, Ripon WI, 09/1998-08/2011
- Medical Director, Emergency Department, Riverside Medical Center, Waupaca, Wisconsin, 12/2007 to 09/2011
- Emergency Department Physician, Riverside Medical Center, Waupaca, Wisconsin, 06/2005 to 09/2011
- Emergency Department Physician,  Riverview Hospital, Wisconsin Rapids, WI, 06/2003 to 06/2005 fulltime and on locum tenens basis 2005 to 2006
- Adjunct Lecturer in Pharmacology; Department of Chemistry, Ripon College, Spring Semester 2004
- Emergency Department Physician (Fulltime), Berlin Memorial Hospital, 07/2002 to 06/2003
- Family Practitioner, CHN Family Healthcare Clinic, Ripon, Wisconsin, 04/1997 to 08/2002
- Emergency Department Duty Physician (part-time), Berlin Memorial Hospital, Berlin, WI, 06/1998 to 08/2002
- Emergency Department Duty Physician, Ripon Medical Center, Ripon, WI, 07/1997 to 04/2000
- Organizing partner and chief negotiator of Glenmore Clinic, a proposed multidisciplinary medical clinic comprising 6 family physicians and 2 Internal Medicine specialists, 1996.
- Family Practitioner (private practice), Calgary, Alberta, Canada, 03/1994 to 04/1997
- Trauma ICU/Cardiovascular-Surgical ICU Duty Physician at Rockyview General Hospital, Holy Cross Hospital,  and Foothills Provincial General Hospital, 08/1994 to 03/1997
- Sub-contract Physician for Calgary Remand Center,  Calgary Correctional Institution, and Calgary Young Offenders Centre, 1994-1997
- Graduate Teaching Assistant, Dept. of Anatomy and Physiology, Faculty of Medicine, University of Calgary, 1986-87
- Mathematics and Chemistry teacher, Alternative High School, Calgary Public Board of

Education, Calgary, Canada, 1987-88
- Principal, Westlock Christian School, Westlock, Alberta, Canada, 1983-84
- Vice-Principal, Ft. Saskatchewan Christian School, Ft. Sask., Alberta, Canada, 1980-83
- Chemistry and Biology Teacher, Ft. Assiniboine School, Barrhead, Alberta, Canada, 1977-80

**Board Certification**
- Diplomate, American Board of Family Medicine, 1998 to present
- Fellow (FCFP), College of Family Physicians of Canada, 2004 to present
- Certificant (CCFP), College of Family Physicians of Canada, 1993 to 2004

**Scholarships & Awards**

- Named Fellow of the College of Family of Physicians of Canada, 2004
- Ripon Public Schools *Friend of Education* Award; for my twice yearly lectures to Ripon High School Students on the topics of STDs and Teen Pregnancy, 2003
- Alberta Heritage Trust Fund Studentship in Medical Research, 1986-88; for academic merit
- Calgary Co-op Scholarship, 1985; for academic merit

**Committees, Appointments, and Elected Offices**

- 2016-present: Member, Medical Executive Committee, Christus Spohn Alice Hospital, Alice, TX
- 2014-15: Chief of Medical Staff, Reagan Memorial Hospital, Big Lake, TX
- 2010-11: Chief of Medical Staff, Riverside Medical Center, Waupaca, WI
- 2008 to 2011: Medical Officer and SWAT Team member, Waupaca WI County Sheriff's Department
- Member, Wisconsin Sports Concussion Collaborative, 2005-2011
- 1997 to 2011: Head Team Physician, Ripon College Athletic Department, Ripon, Wisconsin
- 2001 to 2011: Medical Liaison Officer, City of Ripon WI Police Department
- 2000 to 2003: Medical Director, Ripon College
- 1999 – 2002:  Director, Ripon Area Service Center, a non-profit organization dedicated to the provision of safe residential and workplace environments for mentally handicapped persons
- 1999 - 2001: Chief of Medical Staff, Ripon Medical Center, Ripon, Wisconsin
- 1995-97:  Chairman, Fee-for-Comprehensive-Care Working Group, Alberta Medical Association; this committee was the key working group researching and developing strategies for implementation of physician remuneration systems for Canadian Physicians during this time period; our work was under national scrutiny. Two of the papers we generated have been widely read and cited in Canadian and international health policy

and economics.

- 1995-96:  Member, College of Physicians and Surgeons of Alberta Advisory Committee on Communications; jointly responsible for developing a communications strategy for promoting the medical profession to the public.
- 1995:  Delegate,  from Alberta Medical Association, to the regular meetings of a national *ad hoc* committee of the Canadian Medical Association to discuss physician remuneration models; Ottawa, Ontario.
- 1994-95:  Member, Alberta Medical Association Task Force on Alternative Remuneration Methods in Primary Care (ARMPC).  Predecessor committee to the FCC Working Group, described above.
- 1994-95:  Member, Organization Committee of the Calgary Regional Medical Staff Association.
- 1993: Chief Negotiator, Professional Association of Interns and Residents of Alberta (PAIRA); responsible for salary negotiations for all post-graduate medical trainees in the province.
- 1991-93:  Treasurer, PAIRA; responsible for association's annual budget of $250,000.
- 1991-93:  PAIRA representative to College of Physicians and Surgeons of Alberta Committee on Professional Education.
- 1990-91:  Graduating President of the Class of 1991, University of Calgary Medical School.
- 1989-91: Student representative, Alberta Medical Association's Committee on Intraoperative and Anaesthetic Deaths.


**Memberships**

- Christus Spohn Hospital System Medical Staff at Alice, Beeville, and Kleburg campuses, September 2016 to present.
- Reagan County Memorial Hospital Medical Staff, 2011 to 2016
- Shannon Clinic Medical Staff, 2011 to 2016
- Texas Medical Association 2012 to present
- Riverside Medical Center Medical Staff, 2005 to 2011
- Wisconsin Sports Concussion Collaborative, 2005 to 2011
- International Association of Law Enforcement Firearms Instructors, 2006 to present
- International Law Enforcement Educator and Trainers Association, 2007 to present
- Association of Emergency Physicians, 2003 to present
- Riverview Hospital Medical Staff, 2003 to 2006
- American College of Sports Medicine, 2000 to present
- American Society for Law Enforcement Training, 1999 to 2005
- State Medical Society of Wisconsin, 1997 to 2011
- College of Family Physicians of Canada, 1991 to present.
- Berlin Memorial Hospital Medical Staff, 1997 to 2004
- Ripon Medical Center Medical Staff, 1997 to 2011
- Canadian Medical Association, 1988-97

- Alberta Medical Association, 1988-97
- Rockyview General Hospital Medical Staff, 1994-97
- Foothills Provincial General Hospital Medical Staff, 1994-97
- Calgary General Hospital Medical Staff, 1994-97
- Grace Hospital for Women Medical Staff, 1994-96
- Didsbury General Hospital Medical Staff, 1993-1995
- Edmonton English Springer Spaniel Club, 1991-1993
- Calgary English Springer Spaniel Training Club, 1988-1995

**Lectures and Conferences** (selected)

- 01/2017: Speaker, National Forensic Examiners Conference, Nashville TN
- 06/2010: Speaker/instructor at the Annual Training Conference of the International Association of Law Enforcement Firearms Instructors (IALEFI), San Antonio, TX
- 04/2009: Speaker/instructor at the Annual Training Conference of the International Law Enforcement Educators and Trainers Association (ILEETA), Wheeling, IL
- 06/2009: Speaker/instructor at the Annual Training Conference of the International Association of Law Enforcement Firearms Instructors (IALEFI), West Palm Beach, FL
- 04/2008: Speaker/instructor at the Annual Training Conference of the International Law Enforcement Educators and Trainers Association (ILEETA), Wheeling, IL
- 06/2008: Speaker/instructor at the Annual Training Conference of the International Association of Law Enforcement Firearms Instructors (IALEFI), Reno, NV
- 04/2007: Speaker/instructor at the Annual Training Conference of the International Law Enforcement Educators and Trainers Association (ILEETA), Wheeling, IL
- 05/2007: Keynote Speaker to the General Assembly at the Annual Training Conference of the International Association of Law Enforcement Firearms Instructors (IALEFI), San Antonio, TX
- 06/2006: Speaker, "Proven & Practical Techniques for Training Patrol Officers in Three-Dimensional Target Visualization", at IALEFI Annual Training Conference, West Palm Beach, FL
- 01/2006: Speaker, "Proven & Practical Techniques for Training Patrol Officers in Three-Dimensional Target Visualization", and Member, 'Panel of Firearms Experts', at the International Meeting of the American Society of Law Enforcement Trainers (ASLET), Albuquerque, NM
- 01/2005: Speaker, "Three Dimensional Target Visualization as a Technique for Law Enforcement Firearms Training, and Member, 'Panel of Firearms Experts', at the International Meeting of ASLET, Jacksonville, FL
- 01/2004:  Speaker, "Tactical Anatomy:  A Firearms Training Model for Law Enforcement Officers", at the International Annual meeting of ASLET, St. Louis, MO
- 2004:  Member of  Panel of Experts in Firearms at International Annual meeting of ASLET, St. Louis, MO
- 04/2003: Lecturer & Instructor, "Tactical Anatomy: A Medical Overview of Gunshot

Wounds for Police", given at several locations, including Chapman Firearms Academy, Columbia, MO, and Ripon City Police Dept, Ripon WI

- 072002: Guest Lecturer, as above, at LFI's Level One course for civilians, given at Port Washington, WI
- 07/2001: Guest Lecturer; "Tactical Anatomy: A Medical Overview of Gunshot Wounds"; given at Ripon, WI, for LFI Level One course for civilians. (LFI is a training organization recognized by the American Society for Law Enforcement Training, International Law Enforcement Educators and Trainers Association)
- 12/1998, Conference attendee and panel member at Medical College of Wisconsin Conference on Firearms Injury Prevention, December 1998, Milwaukee, WI
- 03/1995, Chairman, "Family Practice Update at Kananaskis"
- 1993 – 2004:  Attendee at Continuing Medical Education conferences totaling at least 50 hours per year, thereby earning status in 2004 as a Fellow of the College of Family Physicians of Canada.

**References**

Available upon request.

UDC GRAMA
Classified
PUBLIC

TMF 01/01.00    GENERAL PROVISIONS

TMF 01/01.01    Purpose of Technical Manual
TMF 01/01.02    Cross Reference
TMF 01/01.03    Policy
TMF 01/01.04    Definitions

REVISED 06/10/10                              TMF 01/01 - pg. 1

UDC GRAMA
Classified
PUBLIC

UDC GRAMA
Classified
PUBLIC

TMF 01/01.00     GENERAL PROVISIONS

TMF 01/01.01     Purpose of Technical Manual

    A.   The purpose of this Technical Manual is to provide the Department's policies, procedures and post orders for planning and carrying out the sentence for the execution of a person convicted of a capital offense.

    B.   This chapter shall include policies and procedures related to:

        1.   planning and preparation;

        2.   execution of the sentence;

        3.   post-execution requirements and process;

        4.   security and control;

        5.   witnesses and official visitors

        6.   news media access limitations and briefing;

        7.   delays, stays, and commutations;

        8.   support services functions;

        9.   briefing and training; and

       10.  documentation, review and audit.

    C.   Post orders are included for the staff and others involved in the execution planning, implementation, documentation and review.

TMF 01/01.02     Cross Reference

    A.   Department Policies and Procedures Manuals

        AGr05   Media Relations
        FDr14   Inmate Property

    B.   Other Authority

        UCA 77-19-6   Judgement of death-Warrant-Delivery of warrant-Determination of execution time.

REVISED 06/10/10

TMF 01/01 - pg. 2

UDC GRAMA
Classified
PUBLIC

| | |
|---|---|
| UCA 77-19-10 | Judgement of death-Location and procedures for execution. |
| UCA 77-19-11 | Who may be present-Photographic and recording equipment. |
| UCA 77-19-12 | Return upon death warrant. |
| UCA 26-4-6 | Investigation of deaths by county attorney-Requests for autopsies. |
| UCA 26-4-7 | Deaths over which medical examiner has jurisdiction. |
| BPPPM 3.12 | Commutation Hearings for Death Penalty Cases |

TMF 01/01.03   Policy

It is the policy of the Department that:

A.   execution of persons sentenced to death under Utah law by a court of competent authority and jurisdiction be carried out in the legally prescribed manner;

B.   the Department shall make every effort in the planning and preparation of the execution event to ensure that the execution process:

   1.   adheres to the intent of the law;

   2.   is handled in a manner which minimizes negative impact on the safety, security and operational integrity of the prison;

   3.   accommodates the need for public access to information concerning the event;

   4.   reasonably addresses the privacy interests of those persons for whom the law, Department policy or commonly-held principles of decency require such privacy;

   5.   provides sufficient staffing to ensure that unplanned problems can be accommodated and overcome;

   6.   prepares for stays of execution, commutations and other delays in the execution count-down;

   7.   provides an opportunity for interested persons to exercise their First

REVISED 06/10/10                              TMF 01/01 - pg. 3

UDC GRAMA
Classified
PUBLIC

Amendment rights to demonstrate for or against capital punishment in a lawful manner;

8.  ensures a firm and adequate response to unlawful civil disobedience, trespass, or other violations of the law by persons attempting to disrupt, prevent or other-wise frustrate the lawful process associated with the execution; and

9.  anticipates and provides for sufficient support needs for the execution and the prison as a whole;

C.  the Department shall arrest and encourage the prosecution of persons, including but not limited to, those who:

1.  violate 77-19-11 UCA prohibitions against filming, taping, sketching, broadcasting or otherwise electronically documenting the death of the condemned;

2.  trespass or otherwise enter upon prison property without proper permission and clearance from the Department;

3.  participate in unlawful demonstrations;

4.  unlawfully attempt to or disrupt, prevent or otherwise interfere with the execution;

5.  being inmates, are involved in disruptive, assaultive or other proscribed behavior; or

6.  unlawfully threaten, intimidate or terrorize persons involved in the execution process;

D.  staff involved in the execution make every effort within the requirements and limits of these polices and procedures and the laws of the State of Utah to:

1.  minimize the anxiety and negative impact of the execution on the victim's and inmate's family and friends witnessing the execution;

UDC GRAMA
Classified
PUBLIC

2.   display appropriate levels of professionalism, restraint, and courtesy in interaction with witnesses, demonstrators, news media, and other non-staff persons during the execution process; and

3.   not permit interactions, emotion or intimidation to prevent their proper handling of missions and duties;

E.   the Department review the adequacy and/or the performance of:

1.   the policies and procedures employed;

2.   the Department staff members involved in the execution;

3.   members of allied agencies assisting with the execution; and

4.   statutes and other authority impacting the execution; and

F.   the evaluation of each execution event be used to improve operational procedures for the future.

TMF 01/01.04   <u>Definitions</u>

| | |
|---|---|
| **allied agency** | refers to another criminal justice agency |
| **Attorney General's Office** | staff at the Attorney General's Office or any designated contract attorney approved to carry out the responsibilities described in this technical manual |
| **attorney of record** | the condemned inmate's attorney and other assisting legal personnel |

UDC GRAMA
Classified
PUBLIC

| | |
|---|---|
| broadcast media | refers to radio and television media |
| civilians | any person not a member of the Department, allied law enforcement agency, nor mutual aid agencies |
| Command Post Director | the member who is assigned to supervise the command post functions and activities |
| commutation | the change from a greater to a lesser punishment after conviction |
| drug injection box | box or boxes each of which shall contain one complete set-up for lethal injection; with or without drugs |
| execution building | refers to the area containing the execution chamber |
| execution chamber | the immediate enclosed areas containing the condemned at the moment of execution |

TMF 01/01 - pg. 6

UDC GRAMA
Classified
PUBLIC

| | |
|---|---|
| **mutual aid** | agencies or personnel that provide medical, fire suppression, and other support services to the Draper site |
| **news magazines** | magazines having a national circulation being sold by news stands to the general public and by mail circulation |
| **news media** | collectively refers to those involved with news gathering for newspapers, news magazines, radio, television or news services |
| **news media members** | persons over the age of eighteen who are primarily employed in the business of gathering or reporting news for newspapers, news magazines, national or international new services or radio or television stations licensed by the Federal Communications Commission |
| **newspaper** | for purposes of this chapter, the publication: |

UDC GRAMA
Classified
PUBLIC

1.  circulates among the general public;

2.  publishes legal notices in the community in which it is located or the area to which it distributes; and

3.  contains items of general interest to the public such as political, commercial, religious or social affairs

| | |
|---|---|
| **pardon** | an act of grace by an appropriate authority exempting a person from punishment for a crime |
| **press** | refers to the print media; also see "news media", generally |
| **reprieve** | the temporary suspension of the execution |
| **respite** | see "reprieve" |
| **security curtains** | the curtains which cover the viewing room windows in the executionchamber |
| **Warden** | warden assigned to the Draper site |
| **witness viewing** | the areas from which the |

REVISED 06/10/10

TMF 01/01 – pg. 8

UDC GRAMA
Classified
PUBLIC

**area**                              execution is viewed by
                                      government witnesses, inmate's
                                      witnesses and news media
                                      witnesses

REVISED 06/10/10                              TMF 01/01 - pg. 9

UDC GRAMA
Classified
PUBLIC

TMF 01/02.00     PRE-EXECUTION CHECKLIST

TMF 01/02.01     General Provisions
TMF 01/02.02     Prior to Receiving Death Warrant
TMF 01/02.03     Receipt of Death Warrant to Thirty Days Prior to
                 Execution
TMF 01/02.04     Twenty-Nine to Fourteen Days Prior to the
                 Execution
TMF 01/02.05     Thirteen to Seven Days Prior to Execution
TMF 01/02.06     Six to Three Days Prior to Execution
TMF 01/02.07

**UDC GRAMA**
**Classified**
**PUBLIC**

TMF 01/02.00     <u>PRE-EXECUTION CHECKLIST</u>

TMF 01/02.01     <u>General Provisions</u>

    A.   <u>Purpose of Chapter</u>

       1.   The purpose of this chapter is to provide a checklist of procedures and events which should occur between the issuing of the death warrant and 24 hours prior to the execution.

       2.   Full detail will not be provided for each procedure or event in this chapter. For detail, reference will be made to Chapter TMF 01/05 and other chapters where such detail may be found.

       3.   This chapter will be divided to cover the following time periods:

          a.   prior to the death warrant being issued;

          b.   issuing of death warrant to 30 days prior to the execution;

          c.   14 to 29 days prior to the execution;

          d.   7 to 13 days prior to the execution;

          e.   3 to 6 days prior to the execution; and

          f.

    B.   <u>Policy</u>

       1.   It is the policy of the Department that the count-down to the execution be completed in a systematic manner to ensure that all procedures and events which are necessary in the preparation of the execution are completed in a timely manner.

**UDC GRAMA**
**Classified**
**PUBLIC**

2.   This count-down, though offering flexible application, should be observed and followed as written unless deviation or adjustment is required for carrying out the execution.

3.   The Executive Director/designee may direct deviation from or adjustment to the policies and procedures in this manual at any time when necessary for the good of the Department's mission in carrying out the execution.  Approval for the changes shall be documented in writing.

TMF 01/02.02   <u>Prior to Receiving Death Warrant</u>

A.   <u>Execution Planning Team</u>

When it appears an execution is imminent, prior to the issuing of the death warrant, the Warden shall select an Execution Planning Team. The Team mayinclude:

1.

2.

3.

4.

5.

6.

7.

8.

9.

10.

11.

B.   <u>Involve Additional Planning Assistance</u>

Other persons who may be invited to attend on a meeting-by-meeting basis, include:

1.   a representative or representatives from the Attorney General's Office;

2.   a representative from the office of the County Attorney which prosecuted the condemned;

3.   a representative from the Board of Pardons and Parole;

4.   representatives from the law enforcement agencies which investigated the case involving the condemned;

5.   representatives from law enforcement and other allied agencies who may be asked to assist with various aspects of the execution; and

6.   any other persons deemed necessary or appropriate by the Executive Director/designee, DIO Director or Warden.

C.   <u>Develop Assignments</u>

When it is reasonable to believe a death warrant will be issued in the near future, the Execution Planning Team and those additional persons deemed appropriate shall meet to:

1.   review the Execution Plan (TMF 01);

2.   make assignments for the pending execution;

3.   develop a schedule of events;

4.   assign responsibilities related to revision of the Execution Plan, if needed; and

5.   take any other steps necessary to prepare for the issuance of the

UDC GRAMA
Classified
PUBLIC

deathwarrant and begin the execution count down.

D.   Identify Possible Execution Dates

1.   The Execution Planning Team shall review the Department's schedule of events and identify favorable and unfavorable dates within the period of time in which the execution may be ordered.

2.   Information concerning the Department's requests/concerns related to scheduling shall be communicated to the Attorney General's Office to be communicated to the sentencing court.

TMF 01/02.03   Receipt of Death Warrant to Thirty Days Prior to Execution

Upon receipt of a death warrant from a competent court, the following procedures shall be initiated and should be completed at least 30 days prior to execution.

A.   Receipt of Death Warrant

1.   Upon receipt of the death warrant and as soon as practical thereafter, a meeting of the Execution Planning Team shall be scheduled by the Warden.

2.   The Execution Planning Team shall then coordinate the implementation of the procedures set forth in this technical manual under the direction of the Warden.

B.   Time and Place of Execution

1.   Date

The date for the execution shall be that day set by the sentencing judge.

REVISED 06/10/10                    TMF 01/02   - pg. 14

UDC GRAMA
Classified
PUBLIC

2.   <u>Time</u>

"The Department of Corrections shall
determine the hour, within the appointed
day, at which the judgment is executed."
77-19-6(3)

3.   <u>Location</u>

C.   <u>Condemned Inmate's Choice of Witnesses</u>

1.   The condemned inmate shall be informed
that he may designate religious
representatives, friends, or relatives
not· exceeding a total of five in number
to witness the execution.  77-19-11 (2)
(d)UCA

2.   Refer to TMF 01/07.

D.   <u>Disposition of Personal Property</u>

1.   The inmate shall be contacted for
instructions concerning the disposition
of his personal property.

2.   Refer to TMF 01/05.06.

E.   <u>Disposition of Funds in Inmate's Account</u>

1.   The condemned shall be contacted for
instructions concerning the disposition
of the funds in any accounts controlled
or administered by the prison or
Department.

2.   Refer to TMF 01/05.06 and TMF 01/05.07.

F.   <u>Organ Donation</u>

Organ donation is not an option for condemned
inmates.

G.   <u>Disposition of Body</u>

REVISED 06/10/10                 TMF 01/02   - pg. 15

UDC GRAMA
Classified
PUBLIC

1. The condemned shall be asked for instructions concerning the disposition of his remains following the execution.

2. Refer to TMF 01/05.08.

H. Designate Persons Required to Assist with Execution

1. Those persons necessary to carry out the execution shall be identified.

   a. The Executive Director/designee, DIO Director or Warden shall be responsible for identifying, selecting and obtaining the services of the executioners. See TMF 01/05.03 and TMF 01/05.04.

   b. The Public Affairs Director shall be responsible for coordinating the notification of the news media and selection of individual news media witnesses. See TMF 01.08.02.

   c. The Warden shall be responsible for designating those persons necessary to carry out and support the execution.

2. Redundancy in assignment may be developed for all vital or important positions. The Warden, DIO Director, and Executive Director/designee shall determine which positions require back-up and shall ensure adequate coverage is provided.

3. "Compensation for members of a firing squad or persons administering intravenous injections shall be in an amount determined by the director of the Division of Finance." 77-19-10 (4)UCA

   a. The Department shall negotiate with the executioners and Division of Finance the fee to be paid to the executioners.

REVISED 06/10/10                              TMF 01/02   - pg. 16

UDC GRAMA
Classified
PUBLIC

b.

c.

I.   Other Approved Witnesses

    The Executive Director/designee shall designate other approved witnesses as outlined in TMF 01/07.03.

J.   Contact with State Medical Examiner

1.   Contact shall be made withthe State Medical Examiner to coordinate the Medical Examiner's role.

2.   The Medical Examiner shall be requested to provide direction concerning:

a.   transfer of custody of the executed inmate from the Warden to the Medical Examiner;

b.

c.

3.   Refer to TMF 01/04.

K.   Support Services

1.   The Support Services Deputy Warden coordinates the functions of Support Services Section Personnel.

2.   Support Services units shall include, but not be limited to:

    a.   the Food Services Unit (See TMF 01/05.19); and

    b.   the Maintenance Unit (See TMF 01/05.18).

L.  The Correctional Medical Administrator coordinates functions of the Medical Unit personnel.  (See TMF 01/05.18)

M.  <u>Brief Prison Administrators</u>

    1.   It is necessary to maintain as nearly as possible a normal prison operation during the execution and the activities preceding and following the execution.

    2.   Prison administrators should be briefed as appropriate on plans for the execution, restrictions on access, crowd control, additional security procedures, etc., on an on-going basis.

    3.   Briefings should begin as soon as plans begin to evolve which will effect the general prison operation, and should continue until the operation returns to normal.

TMF 01/02.04   <u>Twenty-Nine to Fourteen Days Prior to the Execution</u>

A.  <u>Witnesses</u>

    1.   The Executive Director/designee shall develop a final list of witnesses consistent with the requirements of 77-19-11 (2) and (3) UCA.

    2.   Any changes to the Government witness list shall be approved by the Executive Director.

    3.   Each witness shall be required to sign an agreement prior to being cleared and added to the witness list.

    4.    The Executive Director may make additions to the witness list when necessary.

    5.    Refer to TMF 01/05.05.

B.    <u>News Media</u>

    1.    Witness requests shall be received and processed by the Public Affairs Office in accordance with TMF 01/08.02.

    2.    Alternate coverage/accommodations for members of the press selected to be present at alternate site shall be handled consistent with TMF 01/08.03.

C.    <u>Inmate Property and Accounts</u>

    1.    Finalize arrangements for disposition of the condemned inmate's property and accounts 14 days prior to execution.

    2.    Refer to TMF 01/05.06 and TMF 01/05.07.

D.    <u>Disposition of Body</u>

    1.    Finalize, if possible, decision concerning disposition of the body.

    2.    Refer to TMF 01/05.08.

E.    <u>Selection of Executioners</u>

    1.    Finalize the selection of executioners and their back-ups.

    2.    Refer to TMF 01/05.03 and TMF 01/05.04.

F.    <u>Medical/Medical Examiner</u>

    1.    Finalize arrangements for a physician consistent with 77-19-10UCA.

    2.

**UDC GRAMA
Classified
PUBLIC**

      3.    Refer to TMF 01/05.08.

  G.   Practices and Rehearsals

      1.    Initiate practice sessions for persons involved in the various parts of the execution event.

      2.    Not all of the persons involved will practice together.  Individual teams will practice as units, with inter-team practices scheduled, as necessary.

**TMF 01/02.05**   Thirteen to Seven to Days Prior to Execution

  A.   Inmate Property/Accounts

      All paperwork on disposition of property and accounts should be completed at least seven days prior to the execution.

  B.   Disposition of Body
      All paperwork should be completed at least seven days prior to the execution.

  C.   Food Services

      1.    At least seven days prior to execution, contact the condemned inmate to arrange last meal.  TMF 01/05.18.

      2.    Determine with the Warden, Draper Site Security Deputy Warden, and Public Affairs Director what beverage and food service will be needed at the various locations where staff will be working.

  D.   Purchase of Substances to Be Used in Lethal Injection

      1.    Purchase substances to be used in the execution.

      2.    Refer to TMF 01/05.11.

  E.   Support Services

**UDC GRAMA**
**Classified**
**PUBLIC**

Finalize all arrangements involving the Support Services assistance with the Support Services Director.

F.    Finalize all arrangements involving the Medical Section assistance with the Correctional Medical Administrator.

G.    Allied Agencies

Finalize arrangements with allied agencies assisting with the execution.

TMF 01/02.06    Six to Three Days Prior to Execution

A.    Witnesses

1.    All witness agreements should be signed.

a.    Copies shall be provided to the:

(1)    Command Post Director; and

(2)    Auditor-in-Charge.

b.    Persons refusing to sign agreements shall not be permitted to attend.

2.    Exceptions to the time requirements will permit delayed signing of agreements for witnesses coming in from out-of-state.

B.    Brief Allied Agencies

1.    Members of allied agencies who have not participated in practice sessions or have not otherwise been briefed previously, shall be briefed and their post or responsibilities explained.

2.    Briefings will include a detailed review of the individual's post order.

C.    Inmate Property and Accounts

1.    Complete all unfinished paperwork and arrangements.

2.    If the condemned fails to cooperate in these arrangements, he shall be notified

UDC GRAMA
Classified
PUBLIC

that the property and money will be
disposed of according to state law, and
Department policy.

D.   Executioners

The Warden shall:

1.


2.   ensure completion of all arrangements
necessary for security of executioners
and protection of their identities.

E.   Equipment Check/Inventory

1.


2.   Refer to TMF 01/05.10(Firing Squad) and
01/10.09 (Lethal Injection).


TMF 01/02.07

A.   Observation Period

1.


2.


3.   Refer to TMF 01/05.12.

B.   Meeting of Execution Planning Team

The Team shall meet to examine preparation
for the execution.  The checklists shall be
reviewed and immediate assignments made to
bring all items current with the schedule of
events.


REVISED 06/10/10                          TMF 01/02   - pg. 22

UDC GRAMA
Classified
PUBLIC

Refer to TMF 01/02 pre-execution checklist
Refer to TMF 01/03 execution checklist
Refer to TMF 01/04 post execution procedure

C.   Review of Procedures

Conduct final review of procedures.

D.   Arrangements for Pickup of Executioners

1.

2.

E.   Food Services

1.   Verify last meal preparation.

2.   Verify beverage/food preparations for working teams.

F.   Communications

1.   Verify installation of and test communications equipment for:

a.

b.

c.   Information Center.

2.   Refer to TMF 01/05.10.

G.   Contact Support Agencies

1.   Contact:

a.   the Attorney General's Office;

b.   the State Medical Examiner's Office;

UDC GRAMA
Classified
PUBLIC

        c.   allied law enforcement agencies;
           and

        d.   the Governor's Office.

   2.   Verify that each agency fully
       understands its role and is prepared to
       complete tasks.

H.   <u>Equipment Check</u>

   1.   Complete pre-execution inventory and
       equipment check.

   2.   All systems should be tested.

**UDC GRAMA
Classified
PUBLIC**

TMF 01/03.00    EXECUTION CHECKLIST

TMF 01/03.01    General Provisions
TMF 01/03.02
TMF 01/03.03
TMF 01/03.04
TMF 01/03.05
TMF 01/03.06

REVISED 06/10/10                              TMF 01/03   - pg. 25

UDC GRAMA
Classified
PUBLIC

TMF 01/03.00     EXECUTION CHECKLIST

TMF 01/03.01     General Provisions

      A.   Purpose of Chapter

          1.   The purpose of this chapter is to provide a checklist of procedures and events which should occur

          2.   Full detail will not be provided for each procedure or event in this chapter. For detail, reference will be made to Chapter TMF 01/05 and other chapters where such detail may be found.

      B.   Policy

          1.   It is the policy of the Department that the count-down to the execution be completed in a systematic manner to ensure that all procedures and events which are necessary to carry out the execution are completed in a carefully coordinated manner.

          2.   The execution shall be carried out in a manner consistent with state law.

TMF 01/03.02

      A.

          1.

          2.

          3.   Refer to TMF 01/05.12.

      B.

REVISED 06/10/10                    TMF 01/03   – pg. 26

UDC GRAMA
Classified
PUBLIC

1.

2.   Refer to TMF 01/05.12.

C.   <u>Inmate Communication</u>

1.

2.

3.

4.   Refer to TMF 01/05.12.

D.   <u>Food Services</u>

1.   The Warden/designee shall contact the condemned to make arrangements for the final three meals.

2.   The final meal shall be served.

3.   Refer to TMF 01/05.18.

E.

UDC GRAMA
Classified
PUBLIC

    1.

        a.

        b.

        c.

        d.

    2.    Refer to TMF 01/03.03 and TMF 01/05.08.

F.    <u>Equipment Check</u>

    1.

    2.    Refer to TMF 01/05.10 and TMF 01/05.11.

TMF 01/03.03

A.    <u>Final Briefing</u>

    1.

    2.    The final briefing shall be attended by the Executive Director/designee, DIO Director, Warden, special teams and other persons specified by the Executive Director or Warden.  The Warden shall conduct the meeting, with the Executive Director/designee and DIO Director providing policy decisions, as needed.

    3.    During the briefing, participants shall:

        a.    identify problems, develop solutions and specify time lines and approve modified policy changes;

UDC GRAMA
Classified
PUBLIC

    b.   provide status reports;

    c.   coordinate support services
         involvement; and

    d.   conduct final review of count down
         procedures.

B.   Food Services

    1.   The condemned shall be fed at
         specified times.

    2.

    3.   Refer to TMF 01/05.18

C.   Visits

    1.

    2.

D.   Restricting Access to Prison Property

    1.

        a.

        b.

        c.

        d.

        e.

    2.

UDC GRAMA
Classified
PUBLIC

a.

b.

3.

E.

1.

2.

3.

4.

TMF 01/03.04

A.

1.

a.

UDC GRAMA
Classified
PUBLIC

b.

c.

2.

a.

b.

c.

3.

a.

b.

c.

4.

a.

UDC GRAMA
Classified
PUBLIC

          b.

B.

   1.

   2.

TMF 01/03.05

A.   <u>Pre-Execution Procedures</u>

   1.   The Warden shall ensure that all count-down procedures for all required activities and actions are completed.

   2.   Immediate action to complete any unfinished required procedures shall be initiated.

B.   <u>Execution Site Teams Assemble</u>

   1.

   2.   The Tie-Down Teams and their back-ups will be positioned to await escort of the condemned to the execution chamber.

C.   <u>Contact with the Attorney General's Office</u>

REVISED 06/10/10

TMF 01/03  - pg. 32

UDC GRAMA
Classified
PUBLIC

1.

    a.

    b.

      (2)

2.

3.

    a.

    b.

4.

UDC GRAMA
Classified
PUBLIC

TMF 01/03.06

A.  <u>Communications with Attorney General's Office</u>

Refer to TMF 01/03.05,C, above.

B.  <u>Final Sequence of Events: Preparation</u>

1.  <u>Bringing Condemned Inmate to Execution Chamber</u>

The condemned inmate shall be:

a.  removed from the observation cell by the Tie-Down Team;

b.  dressed in a clean jump suit (the color of the jump suit will be at the discretion of the Warden);

c.

d.  escorted to the execution chamber.

2.  <u>Tie-Down Procedures</u>

the condemned shall be tied down as explained in TMF 01/05.13(lethal injection) or TMF 01/05.14(firing squad).

3.  <u>Prepare Condemned Inmate for Execution</u>

The condemned shall be readied for execution:

a.  if lethal injection, by completing the I.V. set-up procedure (See TMF 01/05.15); or

b.  if firing squad, by completing the firing squad set-up procedures (See TMF 01/05.16).

4.  <u>Admit Witnesses</u>

a. Witnesses shall be admitted and escorted to assigned viewing areas.

b. The government witnesses shall enter first and shall be escorted to the government witness area. The escort shall remain with the witnesses.

c. Following the government witnesses, the authorized witnesses invited by the condemned, and the victim's witnesses shall be admitted and escorted to the designated witness area.

   (1) If any of the condemned inmate's invited witnesses, or the victim's witnesses wish to be on-site but not actually witness the execution, accommodations may be made for them.

   (2) The escort officers shall remain with the condemned inmate's witnesses and the victim's witnesses.

d. The last witnesses to be admitted shall be the news media representatives.

   (1) The members of the news media selected to witness the execution shall be escorted to the designated witness room. They shall be separate from the condemned inmate's witnesses and the victim's witnesses. Escort officers shall remain with the news media witnesses and ensure their separation from the other visitors while at the execution site.

   (2) The two pool photographers shall be escorted to a designated site, away from, and out of sight of, the execution chamber. They shall

UDC GRAMA
Classified
PUBLIC

be secured inside the
designated site until after
the execution and until such
time that they are allowed to
film the cleaned up execution
chamber.

C.   Final Sequence of Events: Execution

    1.   Staff Witness

       a.   Staff participating in the
          preparation for the execution shall
          exit the execution site.

       b.   Staff members remaining to
          participate in and observe the
          execution shall include the:

          (1)   Executive Director/designee;

          (2)   Executive Director's back-up;

          (3)   DIO Director;

          (4)   Warden;

          (5)   Executioners;

          (6)   Escort Officers; and

          (7)   other staff as designated by
              the Executive
              Director/designee, DIO
              Director, or Warden.

    2.   Count-Down

       a.   At the designated hour mandated for
          the execution, when everything is
          ready, the phone communication
          shall be terminated and the
          Executive Director/designee shall
          instruct the Warden to proceed with
          the execution.

       b.   The Warden and DIO Director shall
          pull open the curtains covering the
          witness room windows.

UDC GRAMA
Classified
PUBLIC

c.   The Warden shall ask the condemned inmate if he has any last words or wishes to make a statement.

   (1)   The statement should not exceed two minutes.

   (2)   If the inmate uses foul language, the Warden should immediately proceed with the next step in the execution procedure.

   (3)   If the statement exceeds two minutes, the execution shall proceed without waiting for the conclusion of his remarks.

   (4)   Audio recording equipment may be used by the Department for the purpose of recording the defendant's last words.  The Department shall permanently destroy the recording made under this subsection not later than 24 hours after the completion of the execution.

d.

e.   The Executive Director/designee shall instruct the executioners in the case of death by injection, or the firing squad leader in the case of a firing squad execution to proceed with the execution:

   (1)   upon receiving the Warden's signal to proceed;

   (2)   after verifying the earliest legal execution time has passed; and

   (3)   if no instruction to halt has been received from the Attorney General's Office.

f.   Following the instruction from the
     Executive Director/designee to
     execute the condemned inmate, the
     executioners shall immediately
     proceed with the execution as
     required in TMF 01/05.15(if by
     lethal injection) or TMF
     01/05.16(if by firing squad).

q.   If the execution is ordered delayed

     the Executive Director shall
     instruct the executioners to step
     away from the execution equipment
     and shall notify them that the
     execution has been stayed or
     delayed.  The procedures set forth
     under TMF 01/06 shall then be
     initiated.

REVISED 06/10/10                    TMF 01/03  – pg. 38

UDC GRAMA
Classified
PUBLIC

TMF 01/04.00   POST-EXECUTION PROCEDURES

TMF 01/04.01   General Provisions
TMF 01/04.02   Certification of Death
TMF 01/04.03   Removing Witnesses from Execution Chamber
TMF 01/04.04   Removal of Executed Inmate
TMF 01/04.05   Removing Executioners from the Execution Area
TMF 01/04.06   Site Clean-Up
TMF 01/04.07   News Media Re-Entry to Execution Site
TMF 01/04.08   Returning to Standard Operation
TMF 01/04.09   Audit of Execution
TMF 01/04.10   Post-Execution Countdown Schedule

**UDC GRAMA**
**Classified**
**PUBLIC**

TMF 01/04.00   POST-EXECUTION PROCEDURES

TMF 01/04.01   General Provisions

A.   Purpose of Chapter

The purpose of this chapter is:

1.   to provide the procedures to be followed following the death by execution of the condemned inmate;

2.   to identify the responsibilities for tasks to be completed; and

3.   to provide for the transfer of the body of the condemned from the custody of the Department.

B.   Policy

It is the policy of the Department that:

1.   the witnesses to the execution shall be removed from the execution chamber for the news media witnesses who shall be removed to a secondary location until permitted to return for a filming opportunity in the execution chamber;

2.   the condemned inmate shall be examined by a licensed physician following the administering of the fatal drugs or the first volley by the firing squad to ensure that death has occurred;

3.   the physician, when satisfied that death has occurred, shall certify the condemned inmate dead;

4.   following the certification of death, the body of the condemned shall be surrendered to the State Medical Examiner;

5.   after removal of the body, the chamber shall be restored and the news media permitted to return to photograph the chamber;

UDC GRAMA
Classified
PUBLIC

6.    after the chamber has been photographed, the news media shall be returned to the designated area to brief the other assembled members of the news media;

7.

8.    the entire execution process will be reviewed and evaluated by the AuditBureau to permit a post-execution examination of the competence, efficiency and effectiveness of the execution procedures and staff (see TMF 01/20).

TMF 01/04.02    <u>Certification of Death</u>

A.    After the drugs have been administered/or the execution completed by firing squad:

    1.    the Warden shall wait a maximum of three minutes;

    2.    the Warden shall then tell the DIO Director/designee to summon the attending physician to the condemned; and

    3.    the physician shall take the condemned's vital signs.

B.    If there are signs of life, the physician shall wait beside the condemned and check the vital signs every 60 seconds until vital signs cease.

C.    If execution is by firing squad, and if after a maximum of ten minutes from the first volley, there are still signs of life, the physician will inform the Warden.  The Warden will then initiate the steps in TMF 01/05.16.

D.    When no vital signs are detected, the physician shall certify death in keeping with standard medical practices.

TMF 01/04.03    <u>Removing Witnesses from Execution Chamber</u>

      2.    The Medical Examiner, or his designee,
            may issue the death certificate for
            deaths that occur at the prison. (UCA
            26-4-7, 26-4-10)

TMF 01/04.05   <u>Removing Executioners from the Execution Area</u>

     A.

     B.

     C.

TMF 01/04.06   <u>Site Clean-Up</u>

     A.   The injection team shall (if execution was by
         lethal injection):

         1.   use universal precautions and protective
             equipment to protect for blood or other
             potentially infectious materials;

         2.

         3.

         4.

         5.

     B.   The Tie-Down Team shall be responsible for:

         1.   using universal precautions and
             protective equipment to protect against
             blood and other potentially infectious
             material; and

UDC GRAMA
Classified
PUBLIC

A.  After the certification of death by the physician, the curtains shall be closed by the Warden and DIO Director/designee and the witnesses shall be escorted from the witness viewing rooms

    1.

    2.

    3.

    4.

    5.

B.  The news media shall be escorted to an alternate location in the execution building until they can be returned for the filming opportunity after the execution chamber has been cleaned up.

C.  The condemned inmate's witnesses, government witnesses, and the victim's witnesses shall be escorted to waiting transportation vehicles

D.

TMF 01/04.04    Removal of Executed Inmate

A.  After the witnesses have been removed:

    1.  if the execution is by lethal injection, the IV should be cut by the executioners in order for the catheters to remain in the executed inmate's body; and

    2.

B.  The State Medical Examiner/designee shall be escorted into the death chamber

    1.  The State Medical Examiner has jurisdiction over all deaths that occur at the Utah State Prison. (UCA 26-4-7)

**UDC GRAMA**
**Classified**
**PUBLIC**

     2.    cleaning up the execution site, using universal precautions where appropriate.

TMF 01/04.07   <u>News Media Re-Entry to Execution Site</u>

    A.    After the site is restored and cleaned, the news media witnesses and pool photographers shall be escorted to the execution site.

    B.    The photographers shall be permitted to tape/photograph the site and observation cell (if approved by the Warden) as required in TMF 01/08.

    C.

TMF 01/04.08   <u>Returning to Standard Operation</u>

    A.

        1.

        2.

    B.

    C.

TMF 01/04.09   <u>Review of Execution</u>

Refer to TMF 01/20.

TMF 01/04.10   <u>Post-Execution Countdown Schedule</u>

    See Exhibit 04-1 for the proposed schedule for the post-execution period.
        (Sample for Lethal Injection)

                Execution

REVISED 06/10/10                    TMF 01/04   – pg. 44

**UDC GRAMA**
**Classified**
**PUBLIC**

_____
Date

```
0005 DIRECTOR/DESIGNEE GIVES WARDEN OK TO BEGIN EXECUTION
0005 TO 0006  CURTAINS PULLED
0006 TO 0008  LAST STATEMENT BY CONDEMNED
0008 SIGNAL BY WARDEN TO BEGIN EXECUTION
0023 SIGNAL BY EXECUTIONER THAT DRUGS HAVE BEEN ADMINISTERED
0024 DOCTOR BROUGHT INTO EXECUTION CHAMBER
0027 DOCTOR PRONOUNCES DEATH AND DEATH WARRANT SIGNED
0028 CURTAINS CLOSED
0029
0030
0031
0034 TIE DOWN TEAM/MEDICAL EXAMINER INTO DEATH CHAMBER TO REMOVE
     BODY
0036
0037

0038 CLEAN UP CREW INTO DEATH CHAMBER
0039
0040

0040 WARDEN GIVES DIRECTIVE FOR MEDIA TO RETURN TO EXECUTION
     CHAMBER
0100 MEDIA RETURNED TO STAGING AREA
```

UDC GRAMA
Classified
PUBLIC

(Sample for Firing Squad)

Execution Time Line

———————————————
Date

0005 DIRECTOR/DESIGNEE GIVES WARDEN OK TO BEGIN EXECUTION
0005 TO 0006 CURTAINS PULLED
0006 TO 0008 LAST STATEMENT BY CONDEMNED
0008 SIGNAL BY DIRECTOR/DESIGNESS TO BEGIN EXECUTION
0011 DOCTOR BROUGHT INTO EXECUTION CHAMBER
0014 DOCTOR PRONOUNCES DEATH AND DEATH WARRANT SIGNED
0015 CURTAINS CLOSED
0017
0018
0019
0021 TIE DOWN TEAM/MEDICAL EXAMINER INTO DEATH CHAMBER TO REMOVE
     BODY
0023
0025

0026 CLEAN UP CREW INTO DEATH CHAMBER
0031 WARDEN GIVES DIRECTIVE FOR MEDIA TO RETURN TO EXECUTION
     CHAMBER
0050 MEDIA RETURNED TO STAGING AREA

UDC GRAMA
Classified
PUBLIC

| TMF 01/05.00 | EXECUTION PROCEDURES |
|---|---|
| TMF 01/05.01 | General Provisions |
| TMF 01/05.02 | Death Warrant |
| TMF 01/05.03 | Selection of Executioners by Lethal Injection |
| TMF 01/05.04 | Selection of Executioners by Firing Squad |
| TMF 01/05.05 | Designation of Persons Required, Permitted or Prohibited from Witnessing the Execution |
| TMF 01/05.06 | Disposition of Condemned Inmate's Property |
| TMF 01/05.07 | Disposition of Money in Inmate Account |
| TMF 01/05.08 | Disposition of the Body of the Condemned |
| TMF 01/05.09 | Equipment Check/Inventory: Lethal Injection |
| TMF 01/05.10 | Equipment Check/Inventory: Firing Squad |
| TMF 01/05.11 | Acquisition and Storage of Drugs for Lethal Injection |
| TMF 01/05.12 | Observation Period and Related Activities |
| TMF 01/05.13 | Tie-Down Procedures: Lethal Injection |
| TMF 01/05.14 | Tie-Down Procedures: Firing Squad |
| TMF 01/05.15 | Execution by Lethal Injection |
| TMF 01/05.16 | Execution by Firing Squad |
| TMF 01/05.17 | Pre-Execution Rehearsals and Practices |
| TMF 01/05.18 | Support Services Functions |

TMF 01/05.00    EXECUTION PROCEDURES

TMF 01/05.01    General Provisions

    A.  Purpose of Chapter

        1.  This chapter provides the procedures which are used when the Department exercises its statutory responsibility to carry out an execution.

        2.  The topics include those procedures which are employed:

           a.  immediately prior to receiving the death warrant;

           b.  from receiving the death warrant to and during the execution;

           c.  immediately following the execution; and

           d.  during the debriefing and audit phases of the execution.

    B.  Policies

        1.  It is the policy of the Department that the procedures employed in preparing for and carrying out an execution be comprehensive and clearly defined.

        2.  The procedures shall be developed consistent with state and federal law.

TMF 01/05.02    Death Warrant

    A.  Judgement of Death

        1.  When judgment of death is rendered, a warrant signed by the judge and attested by the clerk under the seal of the court, shall be drawn and delivered to the sheriff of the county where the conviction is made.  77-19-6 UCA

        2.  The Sheriff shall deliver the warrant and a certified copy of the judgment to the UDC Executive Director/designee at

UDC GRAMA
Classified
PUBLIC

the time of delivering the defendant to the custody of the Department.  77-19-6 UCA

3. The warrant states the conviction and judgment, the method of execution, and the appointed day the judgement is to be executed.  The Department of Corrections shall determine the hour, within the appointed day, at which the judgement is to be executed.

B. <u>Return Upon Death Warrant</u>

1. After the execution, the UDC Executive Director/designee shall make a return upon the death warrant showing the time, place and manner in which it was executed.  77-19-12 UCA

a. The "Certificate of Execution":

(1) shall be signed by the Warden and the physician; and

(2) shall include the full names and official titles of the official witnesses.

b. The "Certificate of Execution" shall be submitted for review to the Executive Director/designee.

c. Following review by the Executive Director/designee, the "Certificate of Execution" shall be returned to the Warden.

2. The "Certificate of Execution" shall be directed by registered mail to the clerk of the court of the county from which the individual executed was sentenced.

3. A return receipt shall be requested from the recipient.

4. A copy of the certificate shall be placed in the deceased inmate's file.

TMF 01/05.03   <u>Selection of Lethal Injection ExecutionTeam</u>

UDC GRAMA
Classified
PUBLIC

A.   Statutory Requirements

1.   The Executive Director/designee shall ensure that the method of judgment of death specified in the warrant is carried out at a secure correctional facility operated by the department at an hour determined by the department on the date specified in the warrant.  77-19-10 (1) UCA

2.   When the judgment of death is to be carried out by lethal intravenous injection, the executive director of the department or his designee shall select two or more persons trained in accordance with accepted medical practices to administer intravenous injections, who shall each administer a continuous intravenous injection, one of which shall be a lethal quantity of sodium thiopental or other equally or more effective substance sufficient to cause death.  77-19-10 (2) UCA

B.   Selection of Execution Team

1.   If the judgment of death is to be carried out by intravenous lethal injection, a minimum of two persons, each trained to administer intravenous injections shall be selected for the IV team.

2.   Method of Selection

a.   The DIO Director/designee and the Warden of the Utah State Prison, Draper site, shall be members of the execution team by virtue of their official position.

b.   The Executive Director/designee, DIO Director/designee and the

UDC GRAMA
Classified
PUBLIC

Warden shall select a minimum of four (4) additional members, other than the DIO Director/designee and Warden, for the execution team.

1. Of the four (4) additional members, a minimum of two (2) execution team members will be on the IV team.

2. No member of the execution team, other than the DIO Director/designee and Warden, shall be required to serve as a member of the execution team without consent.

3. The Executive Director/designee, DIO Director/designee, and Warden will designate one execution team member as the execution team leader.

   a. The execution team leader shall not be the DIO Director/designee or the Warden; and

   b. The execution team leader shall not be a member of the IV team.

4. The Executive Director/designee, DIO Director/designee, and Warden shall review the qualifications of the IV team members according to requirements outlined in subsection (3)(a through d) and other relevant information as to appropriate training and skills in administering intravenous injections. One IV team member will be designated as the IV team leader.

c. Following the examination and evaluation of candidates, the Executive Director/designee, DIO Director/designee and Warden, shall

**UDC GRAMA**
**Classified**
**PUBLIC**

select the execution team members.

    d.    All execution team members shall read and understand the execution procedures.  The Warden shall conduct a review of the execution procedures annually.

3.    IV Team Qualifications

    a.    At least two (2) members of the execution team shall be designated as the IV team for an execution by lethal injection.

    b.    Each member of the IV team shall be a:

        1.    Phlebotomist;

        2.    Emergency Medical Technician;

        3.    Paramedic; or

        4.    Military Corpsman.

    c.    Each member of the IV team shall:

        1.    Have at least one (1) year of professional experience in his specialty;

        2.    Remain certified in his specialty or profession; and

        3.    Fulfill all continuing education requirements in his specialty or profession.

    d.    Prior to participating in an execution, the members of the IV team shall have participated in at least three (3) complete execution practices.

UDC GRAMA
Classified
PUBLIC

4. Securing Services

    a. The Warden/designee shall contact those chosen for the execution team to notify them of their selection and verify their willingness and availability to perform the duties of execution by lethal injection.

        1. If any person declines participation, the Executive Director/designee, DIO Director/designee and Warden will select a replacement according to the processes outlined in this section.

        2. If all of the execution team members agree to participate, their individual roles as execution team members shall be explained to them.

    b.

TMF 01/05.04   Selection of Executioners by Firing Squad

A.   Statutory Requirements

    1. "The Executive Director of Corrections/ designee shall ensure that the method of judgment of death specified in the warrant is carried out at a secure correctional facility operated by the Department of Corrections." 77-19-10(1) UCA

    2. "If the judgment of death is to be carried out by firing squad, the Executive Director of Corrections or his designee shall select a five-person firing squad of peace officers."77-19-10 (3) UCA

UDC GRAMA
Classified
PUBLIC

B.   Selection of Executioners

    1.   A five-person execution team, plus twoalternates and a team leader shall be chosen for the firing squad.

    2.   The alternate(s) shall be selected to replace any member(s) of the firing squad who are unable to discharge their required functions.

    3.   Persons selected for the firing squad shall be POST certified peace officers.

    4.   Selected peace officers will be required to demonstrate proficiency with weapons designated to carry out the execution.

        a.   Under conditions substantially similar to those of the execution chamber, proficiency shall be exhibited by:

            1.   Firing each weapon.

            2.   At a minimum of 21 feet, accurately hitting the target of the same dimension as that which will be attached to the condemned.

        b.   During the proficiency test, failure to accurately hit the specified target with one round from each weapon fired shall disqualify the officer.

    5.

C.   Method of Selection

    1.   The Executive Director/designee, DIO Director and Warden shall be responsible for the selection process.

REVISED 06/10/10                    TMF 01/05   - pg. 54

UDC GRAMA
Classified
PUBLIC

2.

3.    The final choice of firing squad members shall be the responsibility of the Executive Director/designee, DIO Director and Warden.

4.    The Executive Director/designee, DIO Director/designee and Warden shall review the qualifications of the firing squad, including required proficiency as outlined in section (B4) and other relevant information.

D.   <u>Securing Services</u>

1.    The Executive Director and/orWarden shall contact those chosen for the firing squad, alternates and team leader to notify them of their selection and to verify their willingness and availability to perform the execution duties.

    a.    If any person rescinds his original offer to participate, the selection team shall meet to select a replacement.

    b.    If all of the selectees agree, their individual roles shall be explained to them.

2.

TMF 01/05.05   <u>Designation of Persons Required, Permitted or Prohibited from Witnessing the Execution</u>

A.   The Utah Code limits and identifies those persons who may attend and witness the execution.  (See TMF 01/07.03.)

B.  The Warden shall designate the required
personnel to carry out the statutory
requirements of an execution.  Staff should
include:

    1.        Deputy Warden;

    2.    Observation Officers

    3.       Tie-down Officers,

    4.    one Team Foreman for the escort/Tie-Down
Team;

    5.    executioners (reference TMF 01/05.03 &
.04);

    6.    Clean-up Officers (number to be
determined by the Warden/designee),
assigned to clean up the execution
chamber immediately following the
execution;

    7.    Guide Officers (number to be determined
by the Warden/designee);

    8.

    9.

C.  The Warden/designee shall designate the
appropriate resources necessary to carry out
the requirements of an execution.  The
designated individuals shall be responsible
for:

    1.    advising the Warden concerning any
medical supplies, etc.;

    2.    the preparation and supervision of meals
prepared during the observation period,
and for the condemned inmate's last
meal;

3.   ordering, verifying, picking-up the drugs, equipment, etc., necessary to carry out an execution by lethal injection; and

4.   pronouncing the death of the condemned inmate.

**TMF 01/05.06**   Disposition of Condemned Inmate's Property

A.   Contact with Condemned Inmate

1.   At least 30 days prior to the scheduled execution the condemned inmate should be contacted to discuss arrangements for disposing of his property.

2.   At least 14 days prior to the execution property-disposition arrangements should be finalized.

3.   At least seven days prior to the execution all paperwork required for final disposition should be completed.

4.   If the condemned is uncooperative, doesn't wish to make specific property-disposition arrangements, or for any other reason has not made arrangements for disposition, he shall be notified the property will be disposed of as required under 64-13-15 (1) UCA.

B.   Options for Disposing of Property

1.   Property may be released to an authorized visitor (family, friend or attorney).  The release would follow the normal property release procedures.

2.   Property may be mailed through the U.S. Postal Service.  The prison's Mail Unit shall process the mailing consistent with standard mail procedures.  Indigent status does not cover property-release postage.

3.   Property may be donated to a charitable organization.

4.   If the condemned fails to designate a property-disposition option:

> "if property is not claimed within one year of death...it becomes property of the state and may be used for correctional purposes or donated to a charity within the state."  64-13-15 (1) UCA

C.   Release Procedure

1.   Following a decision to release the condemned's property, the property shall be:

a.   inventoried by        staff; and

b.   transferred to the property room.

2.   The release will then follow according to the appropriate release procedures. Refer to FDr14, "Inmate Property" and FDr03, "Inmate Mail."

TMF 01/05.07   Disposition of Money in Inmate Account

A.   Contact with Condemned Inmate

Follow the time-table for contact with the condemned outlined for property under TMF 01/05.06.

B.   Options for Disposing of Inmate Accounts

1.   The condemned shall be required to complete a money transfer form releasing the money in his account to his next of kin or other person or organization of his choice.

2.   If the condemned refuses or otherwise fails to complete the necessary forms, the funds shall be disposed of consistent with state law.

TMF 01/05.08   Disposition of the Body of the Condemned

A.   Release to Medical Examiner

**UDC GRAMA**
**Classified**
**PUBLIC**

1.    After the executed inmate is pronounced dead, the body shall be released from the restraints and removed from the execution chamber.

2.    The body shall be immediately surrendered to the State Medical Examiner/designee.

UDC GRAMA
Classified
PUBLIC

TMF 01/05.09    Equipment Check/Inventory: Lethal Injection

A.  Responsibility

1.  The IV team shall conduct a check of equipment and materials necessary to conduct the execution.

2.

B.  Inventory

1.

2.

3.    ¦

a.

b.

4.

C.  Bloodborne Pathogen Precaution

1.  As a precaution, all persons who may come in contact with the condemned's body fluids shall be issued rubber

REVISED 06/10/10

**UDC GRAMA
Classified
PUBLIC**

gloves and bloodborne pathogen
protection supplies and equipment.

TMF 01/05.10    <u>Equipment Check/Inventory: Firing Squad</u>

A.   The Warden shall ensure an equipment check of
appliances necessary to carry out an
execution.

B.

1.

2.

3.

4.

5.

6.

7.

C.   The execution team leader shall be
responsible to arrange for:

1.        .30-caliber rifles;

2.         live rounds of ammunition;

3.        blank rounds of ammunition;

4.   practice sessions and dry fire;

5.   ensuring equipment is clean and
operable; and

6.   back-up equipment for items 1, 2, 3,
above.

D.              prior to the execution:

1.   the executioners shall be escorted into
the execution chamber by the DIO
Director/designee; and

UDC GRAMA
Classified
PUBLIC

2.

E.   Bloodborne Pathogens Precaution

As a precaution, all persons who may come in contact with the condemned's body fluids shall be issued rubber gloves and bloodborne pathogen protection supplies and equipment.

TMF 01/05.11   Procurement, Storage and Accountability of Chemicals for Lethal Injection

A.   Purchase

1.

the Warden shall provide to the pharmacist for his official records a memorandum specifying:

a.   The drugs which must be obtained;

b.   A copy of the judgment of death; and

c.   A copy of the state statute.   77-19-10(2) UCA

2.

the pharmacist shall order the drugs from the vendor.  Upon receiving the drugs, the pharmacist shall:

a.

b.   Immediately notify the Warden that the drugs have been received;

c.

d.

**UDC GRAMA**
**Classified**
**PUBLIC**

e.

    1.

    2.

    3.

    4.

f.

3.   Storage and Handling of Drugs

    a.

    b.   See the next two pages for the
        Equipment and Materials Checklist.

UTAH STATE DEPARTMENT OF CORRECTIONS
Equipment and Materials Checklist: Execution by Injection

UDC GRAMA
Classified
PUBLIC

| Quantity | Item | Code |
|---|---|---|
| | Sodium Thiopental (Pentathal), 500 mgm., w/diluent | A |
| | Pancuronium Bromide (Paravulon), 50 mgm. Ampules | A |
| | Potassium Chloride, 240 miliequiv. Ampules | A |
| | Valium injection, 10 mgm | A |
| | Syringe, 60 cc Lur Lock | |
| | Syringe, 10 cc Lur Lock | |
| | Syringe, 5 cc Lur Lock | |
| | Needle, 18 Ga., 1 ½ | |
| | Needle, 25 Ga., 1 ¼ | |
| | Angiocath, 14 Ga., 2 ¼" | |
| | Angiocath, 18 Ga., 1 ¼" | |
| | Angiocath, 16 Ga., 1 ¼" | |
| | Normal saline, IV bad, 1000C | |
| | Lidocaine HCL, 2% w/Epinephrine | |
| | Lidocaine HCL, 2% w/o Epinephrine 2 | |
| | Solution injection set, 70" long with | |
| | Y-injection site:  Travenol Code: #2C0005S | |
| | Extension set, 35" long; Travenol Code #2C0066 | |
| | Stethoscopes | |
| | Boxes of alcohol preps | |
| | Rolls of Kling | |
| | Adhesive tape, 1" | |
| | Adhesive tape, 2" | |
| | Scissors, bandage, Pr. | |
| | Tourniquet | |
| | Hemostat, sterile | |
| | Flashlight, w/batteries | A |
| | Batteries, flashlight, (spares) | A |
| | Ace wraps 3" | |
| | Needle holders | |
| | 10 packs sterile gauze | |
| | Sharp containers | |

UDC GRAMA
Classified
PUBLIC

| | BIO-Hazardous trash bags | |
| | Extra large impervious gowns | |
| | IV hangars | |
| | Mayo stand | |
| | Terry cloth towels | |
| | Goose neck light | |
| | Blood spill kits | |
| | Trash containers | |
| | Electronic Heart Monitor (EKG) | |

TMF 01/05.12   <u>Observation Period and Related Activities</u>

      A.   <u>Access</u>

          1.

          2.

          3.

      B.   <u>Preparation of the Observation Cell</u>

          1.

             a.

             b.

             c.

          2.   <u>Stocking the Cell</u>

a.  The observation cell shall be
    outfitted with the following items:

    (1)  mattress (1);

    (2)  pillow (1);

    (3)  pillow case (1);

    (4)  sheets (2);

    (5)  blankets (2);

    (6)  towel (1);

    (7)  soap, small (1);

    (8)  toilet paper, roll (1);

    (9)  jump suit (color to be
         determined by the Warden) (1);

    (10) socks (1 pr.);

    (11) shower thongs (1 pr.); and

    (12) pocket comb, no metal (1).

b.  If requested, the cell will also
    have the following items purchased
    new

    (1)  Bible (1);

    (2)  magazine

    (3)  newspaper
              ; and

    (4)  photographs

c.  The following items may be given on
    request, as needed,

    (1)  toothbrush (1);

UDC GRAMA
Classified
PUBLIC

(2)   toothpaste

(3)

d.   If the condemned inmate receives
mail the officer shall allow the
condemned inmate adequate time to
read the mail

f.

g.   Additional property shall be
approved by the warden.

3.   Test Equipment

a.

b.

c.

1.

2.

3.

**UDC GRAMA
Classified
PUBLIC**

4.

5.

6.

   a

   b.

D.   <u>Securing Condemned Inmate's Property/Cell</u>

1.

2.

3.

UDC GRAMA
Classified
PUBLIC

b.

    (1)

    (2)

    (3)

    (4)

c.

    (1)

    (2)

    (3)

    (4)

4. Personal property shall be separated from prison property, and the personal property put into a suitable container and sealed.  Each search team member shall initial the seal.

5. The designated property officer shall sign for and assume responsibility for the inventoried property.

6.

a.

b.

7.

8.  The personal property shall be taken to
    the DIO property room for storage.

E.  <u>Observation Function</u>

1.

a.

b.

c.

d.

e.

f.

g.

2.

a.

b.

UDC GRAMA
Classified
PUBLIC

    3.

    4.

    5.

F.   <u>Activities During the Observation Period</u>

    1.

    2.   Unless previously served, meal service, including the last meal, shall be served during the observation period.

    3.

UDC GRAMA
Classified
PUBLIC

4.

    a.

    b.

    c.

UDC GRAMA
Classified
PUBLIC

TMF 01/05.13    Tie-Down Procedures: Lethal Injection

    A.   Transfer of Condemned Inmate to Execution Site

        1.   The condemned inmate shall be escorted from the observation cell to the execution chamber by the Tie-Down Team.

        2.

           a.

           b.

           c.

           d.

    B.   Positioning of Tie-down Team

        1.

        2.

        3.

        4.

        5.

    C.   Securing Inmate to Gurney

UDC GRAMA
Classified
PUBLIC

1.

2.

    a.

    b.

    c.

    d.

    e.

    f.

    g.

3.

UDC GRAMA
Classified
PUBLIC

4.

5.    Upon completion of the execution and as
directed by the Warden, the Tie-Down
Team shall enter the execution chamber
and remove the straps in the reverse
order as outlined above.

TMF 01/05.14   Tie-Down Procedures: Firing Squad

A.   Bringing Condemned Inmate to Execution
Chamber

The condemned inmate should be escorted from
the observation cell to the execution chamber
by the Tie-Down Team

B.   Positioning the Tie-Down Team

1.

2.

3.

4.

C.   Securing the Inmate to the Chair

1.

2.

UDC GRAMA
Classified
PUBLIC

a.

b.

3.

4.

5.   Upon completion of the execution and as
     directed by the Warden, the Tie-Down
     Team shall re-enter the execution
     chamber and remove the straps in reverse
     order as outlined above.

TMF 01/05.15   <u>Lethal Injection Protocol</u>

A.

1.

2.

REVISED 06/10/10                           TMF 01/05 – pg. 76

UDC GRAMA
Classified
PUBLIC

B.   Preparation of Syringes

    1.

        a.

        b.

        c.

    2.   The execution team leader shall providethe drug box to the IV team leader.

        a.   The IV team leader shall prepare each chemical in accordance with the manufacturer's instructions and draw them into the two (2) sets of syringes.

        b.   The second member of the IV team and the execution team leader shall observe preparation of the chemicals and verify that the instructions and procedures have been carried out correctly.

        c.

    3.   The syringes containing the chemicals shall be prepared and loaded in the following order:

        a.   Two 60-cc syringes, each containing 240 milliequivalents of Potassium Chloride in 50-cc and label syringes "Syringe #3.

        b.   Two 60-cc syringes, each containing fifty (50) milligrams of Pancuronium Bromide in 50-cc and

REVISED 06/10/10

TMF 01/05 – pg. 77

UDC GRAMA
Classified
PUBLIC

label syringes "Syringe #2".

c.   Two 60-cc syringes, each containing three (3) gm of Sodium Thiopental in 50-cc and label syringes "Syringe #1".

d.   The secondary syringes containing each of the three chemicals are to serve the following purposes.

1.   Secondary syringe of Sodium Thiopental is prepared in the event the condemned has not lost consciousness sixty (60) seconds after the first administration of the chemical.

2.   Secondary syringes containing Potassium Chloride and Pancuronium Bromide are prepared in the event the condemned has not been pronounced dead after the first administration of the chemicals.

4.   Any syringes that are loaded with lethal injection chemicals that are not used during the execution shall:

a.   Be returned to the Warden by the execution team leader;

b.   Be destroyed by the Warden,

5.   Any unused chemicals that were not mixed in preparation of the lethal injection shall:

a.   Be returned to the Warden by the IV team leader;

b.   Be destroyed by the Warden,

UDC GRAMA
Classified
PUBLIC

C.

D.

E.   <u>The IV team leader:</u>

    1.   Shall, along with the second IV team member, verify two (2) labeled sets of each of the three (3) chemicals are present, filled, and clearly labeled;

    2.   Provide the two (2) labeled sets of each of the three (3) chemicals contained in the drug box to the execution team leader who will verify, along with another execution team member, selected by the execution team leader, the appropriate number of syringes have been surrendered and are clearly labeled; and

    3.   Prepare the IV set-up.

F.   <u>IV Set-up Procedure by IV Team</u>

    1.   The connector of Administration Set (McGaw V1417 or equivalent) shall be inserted into the bag of Normal Saline IV solution.

    2.   The Flo Trol clamp located above the "Y" site shall control the flow of solution.

    3.   A 35-inch Extension Set (Travenol 2C0066 or equivalent) shall be connected to the needle adapter of the Administration Set.

UDC GRAMA
Classified
PUBLIC

4.   The set-up for administration into the back-up IV site may require additional Extension Sets due to the potential of additional distance.

5.   All connections should then be taped to ensure they do not come apart during the procedure.

6.   The tubing shall be cleared of air by removing the protector from the needle adapter and opening the Flo Trol clamp letting the tube fill with solution.

7.   The Flo Trol clamp shall then be closed and the protective cap over the needle adapter replaced.

8.   Steps 1 through 7 shall be repeated for the second set-up.

G.   Injection Procedure by IV Team

1.   The Warden shall order the condemned person escorted to the execution chamber and strapped to the gurney.

2.   The IV team shall run the IV lines to the condemned person by the following:

a.   Site and insert one (1) primary IV line; and

b.   Site and insert one (1) back-up IV line.

3.   The IV team members shall determine the location of the IV sites on the body of the condemned person.

4.

a.

b.

c.

d.

REVISED 06/10/10

TMF 01/05 - pg. 80

UDC GRAMA
Classified
PUBLIC

H.   IV Placement Process by IV Team

    1.   The angiocath shall be inserted into the vein of the primary IV site.

    2.   To best ensure that a needle is inserted properly into a vein, the IV team members shall look for the presence of blood in the valve of the sited needle.

    3.   The inner needle is then withdrawn and the needle adapter is placed on the angiocath.

        a.

        b.

    4.   The flow of normal saline shall be started and administered at a slow rate to keep open.

    5.   Step 1 through 3 shall be repeated for the back-up IV site.

    6.   The Administration Sets shall be running at a slow rate of flow, to keep open and ready for the insertion of syringes containing the injection chemicals.

    7.   Both set-ups shall be observed by the IV team members to ensure they are both patent and functioning properly.

    8.   No further action is necessary at this time.

I.   Lethal Injection Procedure

    1.   The execution team shall:

UDC GRAMA
Classified
PUBLIC

a.  Securely connect the electrodes of the cardiac monitor to the condemned person; and

b.  Ensure the equipment is functioning properly.

2.  At the designated hour mandated for the execution, when everything is ready:

a.  The DIO Director/designee and Warden shall pull open the curtains covering the witness room windows.

b.  The Warden shall ask the condemned inmate if he has any last words or wishes to make a statement.

    1.  The statement should not exceed two minutes.

    2.  If the inmate uses foul language, the Warden should immediately proceed with the next step in the execution.

    3.  If the statement exceeds two minutes, the execution shall proceed without waiting for the conclusion of his remarks.

    4.  The Department, for the purpose of recording the condemned inmate's last words, may use audio recording equipment.

        a.  The Department shall permanently destroy the recording made under this subsection not later than 24 hours after the completion of the execution.

        b.  No form of duplication of the audio shall be permitted.

        c.  The Warden, witnessed by the DIO Director/designee, shall

UDC GRAMA
Classified
PUBLIC

destroy any audio
recording.

c. At the conclusion of the remarks,
or when the Warden determines it is
time to proceed, a prearranged
signal shall then be given by the
Warden to the Executive
Director/designee.

d. The Executive Director/designee
shall order the execution team
leader to begin the administration
of the chemicals providing:

  1. The earliest legal execution
  time has been verified and has
  passed; and

  2. No instruction to halt has
  been received from the
  Attorney General's Office.

e. Following the instruction from the
Executive Director/designee to
execute the condemned inmate, the
execution team leader shall
immediately proceed with the
execution.

f.

  1.

  2.

  3.

3. Upon the Executive Director/designee's
order to proceed, the execution team
leader shall begin the following

sequence:

a.   The flow of the normal saline into the arm shall be cut off using the Flo Trol clamp.

b.   The clamp should be moved as close to the "Y" site as possible.

c.   The 18 ga needle of Syringe #1 (three (3) gm of Sodium Thiopental) shall be inserted into the "Y" site and the injection shall commence.

  1.   A steady, even flow of the injection shall be maintained with only a minimum amount of force applied to the syringe plunger.

  2.   When the entire contents of the syringe have been injected, syringe #1 shall be removed from the "Y" site.

d.   The Flo Trol clamp should then be opened fully and allowed to run for 15 seconds.

e.   The Flo Trol clamps shall then be closed.

f.   A period of sixty (60) seconds shall pass after the administration of the Sodium Thiopental and closure of the Flo Trol clamp.

  1.   After the passage of sixty (60) seconds:

    a. If it appears to the Warden based on his visual inspection that the condemned person is not unconscious:

    i.   The Warden shall notify the Executive Director/designee;

    ii.   The Executive Director/designee

UDC GRAMA
Classified
PUBLIC

will order the
execution team to
switch to the back-
up IV site;

    iii.    The Executive
Director/designee
shall order that the
back-up IV site be
used with a new flow
of Sodium Thiopental

(secondary syringe
labeled Syringe #1);
and

    iv.    The Executive
Director/designee
shall order the
remaining sequence
of chemicals to be
injected through the
back-up IV site.

2. If it appears to the Warden
based on his visual inspection
that the condemned person is
unconscious after the first
injection of Sodium
Thiopental, the Warden shall
notify the Executive
Director/designee who will
then order the execution team
to continue to the next step
in the sequence.

g. The 18 ga needle of Syringe #2
(fifty (50) milligrams of
Pancuronium Bromide) shall be
inserted into the "Y" site and the
injection shall commence;

1. A steady, even flow of the
injection shall be maintained
with only the minimum amount
of force applied to the
syringe plunger.

2. When the entire contents of
the syringe have been
injected, Syringe #2 shall be

REVISED 06/10/10

TMF 01/05 - pg. 85

**UDC GRAMA**
**Classified**
**PUBLIC**

removed from the "Y" site.

h.   After syringe #2 has been given, the Flo Trol clamp should be opened fully for 15 seconds.

i.   The Flo Trol clamp shall then be closed.

j.   The 18 ga needle of Syringe #3 (240 milliequivalents of Potassium Chloride) shall be inserted into the "Y" site and the injection shall commence;

   1.   A steady, even flow of the injection shall be maintained with only the minimum amount of force applied to the syringe plunger.

   2.   When the entire contents of the syringe have been injected, Syringe #3 shall be removed from the "Y" site.

k.   The Flo Trol clamp shall then be opened fully and allowed to run for 15 seconds.

l.   The Flo Trol clamp shall then be closed.

m.   An execution team member designated by the execution team leader shall start a stopwatch once the lethal injections are complete.

n.   The execution team leader shall:

   1.   Observe the heart monitor; and

   2.   Advise the attending physician electrical activity of the heart has ceased as indicated by a flat line on the heart monitor.

o.   The Warden shall notify the Executive Director/designee if it appears an additional set of lethal chemicals needs to be administered

REVISED 06/10/10

TMF 01/05 - pg. 86

UDC GRAMA
Classified
PUBLIC

due to the following conditions:

1.   Heart monitor does not indicate a flat line after ten (10) minutes; or

2.   The attending physician is not able to declare the time of death after ten (10) minutes.

p.   In the event death has not occurred;

1. The Executive Director/designee will order the process established in subsection (2)(f) of this section and subsequent sections to continue with the secondary set of syringes until death has occurred.

q.   During the execution by lethal injection, the DIO Director/designee and Warden shall:

1.   Watch the primary IV site for failure, leakage, the catheter coming out of a vein, or any other problem.

2.   In the event that an IV fails, leaks, if the catheter comes out of the vein, or any other problem arises, the execution team shall be ordered to switch to the back-up IV.

3.   In the event the execution team is ordered to switch to the back-up IV, the DIO Director/Warden shall watch the back-up IV site for failure, leakage, the catheter coming out of a vein, or any other problem.

J.   <u>Post Lethal Injection Steps</u>

1.   When the physician declares death, the Executive Director/designee, DIO

REVISED 06/10/10

TMF 01/05 - pg. 87

Director/designee and Warden shall be
informed.

2.   The DIO Director and Warden shall close
the viewing room curtains.

3.   The Executive Director/designee shall
make appropriate contact with the
Governor and Attorney General informing
them of the completion of the execution.

K.   Disposal of BIO-Hazardous Contaminated Items

1.   The execution team leader shall place
items that have been contaminated with
blood or other potentially infectious
materials (OPIM) that have the potential
to puncture into a puncture proof
container (sharps container).

2.   The execution team leader shall place
other types of blood or other
potentially infectious materials in
trash containers lined with a red BIO-
Hazardous waste bag.

3.   The Correctional Medical Administrator
shall ensure that the contaminated waste
is disposed of in the proper Dumpster.

TMF 01/05.16   Execution by Firing Squad

A.

B.

1.   Refer to TMF 01/05.10.

2.   The team leader shall load the weapons
and prepare to issue them to the members
of the firing squad.

3.   Two rounds shall be loaded in each
weapon.

4.   Care shall be taken to preclude any
knowledge by the members of the firing

UDC GRAMA
Classified
PUBLIC

squad of who is issued the weapon with two blank cartridges.

C.    The Warden shall direct that an aiming point or target be placed over the condemned inmate's heart.

D.    Upon completion of "C", above, the Warden shall direct the person who placed the target to exit the execution chamber.

E.    After the target is in place and all witnesses are secured, the Warden shall direct that the viewing room curtains be opened.

F.    After all preliminaries are completed, the Warden, at the conclusion of the condemned inmate's last words (which shall not exceed two minutes and cease at any point should the condemned use foul language), shall place the hood over the condemned's head.

    (1)    Audio recording equipment may be used by the Department for the purpose of recording the defendant's last words.

    (2)    The Department shall permanently destroy the recording made under this subsection not later than 24 hours after the completion of the execution.

    (3)    No form of duplication of the audio shall be permitted.

    (4)    The Warden, witnessed by the DIO Director/designee, shall destroy any audio recording.

G.    The DIO Director/designee, Warden, and any other observers shall exit the execution chamber.

H.    When the Warden enters the executioners' room and secures the door, if no stay or delay in the execution has been ordered, the Executive Director/designee shall immediately order the firing squad team leader to begin the cadence for the executioners to fire.

I.   A designated execution team member shall start a stopwatch once the first volley has been fired.

J.   If the condemned inmate appears to be unconscious, upon the order of the Executive Director, the Warden and DIO Director shall re-enter the execution chamber after the first volley.

  1.   The Warden shall wait a maximum of three minutes after the first volley and then call for the physician to check the vital signs of the condemned.

    a.   If there are signs of life, the physician shall wait beside the condemned and check the vital signs every 60 seconds.

    b.   When no vital signs are detected, the physician shall certify death in keeping with standard medical practices.

    c.   After death is certified, the Warden shall direct that the viewing room curtains be closed.

  2.   If, after a maximum of ten minutes from the first volley, the inmate is unconscious but alive, the Warden shall direct the physician to make a final check of the condemned's vital signs.

    a.   If on final check, vital signs are detected, the Warden shall order the physician to exit the execution chamber.

    b.   The Warden and DIO Director shall re-enter the executioner's room.

    d.   The Executive Director/designee shall order the firing squad team leader to make the weapons ready to fire.

    e.   The Executive Director/designee shall immediately order the firing squad team leader to begin the

UDC GRAMA
Classified
PUBLIC

cadence for the firing squad to
fire a second volley.

    f.    After the firing of the second
volley, the Warden and DIO Director
shall re-enter the execution
chamber and proceed with paragraph
"J,1", above.

K.    If, after the first volley is fired, the
condemned is obviously conscious, the
Executive Director/designee shall instruct
the firing squad team leader to immediately
prepare the weapons to fire again.

    1.    The firing squad team leader shall ready
the weapons in a controlled and safe
manner.

    2.    The firing squad team leader shall
ensure the executioners do not see which
weapon contains the blank cartridges.

    3.    When the weapons are ready, if the
condemned is still obviously conscious,
the Warden shall ensure no staff members
are in the execution chamber.

    4.    Upon notice from the Warden that the
execution chamber is clear, the
Executive Director shall immediately
order the firing squad team leader to
begin the cadence for the executioners
to fire a second volley.

    5.    After the second volley, continue with
"J", above.

L.    The Executive Director shall make
notification of the condemned's death to the
Governor and the Attorney General.

TMF 01/05.17    <u>Pre-Execution Rehearsals and Practices</u>

A.    A minimum of three rehearsals and practices
shall be conducted to carry out an execution
in a timely fashion maintaining the necessary

UDC GRAMA
Classified
PUBLIC

security.  Practice/rehearsal shall be provided for but will not be limited to:

1.  briefing;

2.  removing the condemned inmate from the observation cell;

3.

4.  escort to execution chamber;

5.  tie-down procedures completed;

6.  approximate time for IV injection procedure (execution time approximate);

7.  clearing and escorting witnesses to/from execution site;

8.  security curtains opened and closed;

9.  condemned inmate's body removed from execution table/chair;

10.

11.  clean-up;

12.  debriefing outlined;

13.  firing of weapons; and

14.  ensure sufficient precautions are taken to minimize the risk of bio-hazardous exposure.

B.  Planning backward from the execution shall be used to develop realistic time lines for each function involved in the execution.

C.

1.  Discrepancies, concerns or proposed modifications due to system problems

**UDC GRAMA**
**Classified**
**PUBLIC**

shall be immediately reported to the
Warden.

2.

TMF 01/05.18   Support Services Functions

   A.   Food Services

      1.   Observation Period Meal Service

         a.

         b.   The Food Services Director/designee
shall confirm the condemned's
choice of a last meal.  The
confirmation should be made 48-24
hours prior to the execution.

         c.

         d.

         e.   Alcoholic beverages shall not be
served nor used for cooking.

      2.   Beverage and Food Service for Staff

         a.   Because of the length of time many
persons will be required to remain
on site without being able to
leave, it may be necessary to serve
food and beverages to those
assigned to the execution.

REVISED 06/10/10              TMF 01/05 - pg. 93

b.

c.   Food and beverage services may be
     provided to:

     (1)   the command post;

     (2)   the Information Center;

     (3)   the food preparation area of
           the building in which the
           execution will occur;

     (4)   to the Draper site Security
           Deputy Warden for delivery to
           perimeter posts; and

     (5)   other sites as needed.

d.

B.   <u>Medical Staff</u>

     1.   <u>Receipt of Death Warrant</u>

          Upon receipt of the death warrant the
          Correctional Medical Administrator
          shall:

          a.   review the medical procedures, post
               orders and equipment checklist and
               make recommendations in writing to
               the Warden concerning any back-up
               or duplication of any medical

REVISED 06/10/10                    TMF 01/05 - pg. 94

UDC GRAMA
Classified
PUBLIC

paraphernalia that may be necessary
to carry out an execution; and

b.   shall confer with the Chief
Physician and assign all execution-
related tasks to be completed.

2.   Thirteen to Seven Days

a.   At least thirteen days prior to the
execution the Warden shall provide
to the pharmacist, for his official
record, authorization to purchase
drugs.  Authorization shall be in
the form of a memorandum including:

(1)   the names of the drugs which
shall be obtained;

(2)   a copy of the judgement of
death; and

(3)   a copy of the state statute
(77-19-10 (2) UCA).

b.   At least seven days prior to the
execution the pharmacist shall
order the drugs from the vendor
(refer to chapter TMF 01/05.11).

(1)   If the state's prime vendor
cannot deliver the drugs, the
pharmacists shall make
arrangements with other
vendors or hospitals to obtain
the drugs.

(2)   If the drugs cannot be
delivered to the prison by the
primary vendor or their
delivery service to the
prison, the pharmacist shall
notify the Correctional
Medical Administrator.

(2)   The Correctional Medical
Administrator shall make
arrangements with the Draper
site Security Deputy Warden to
have an officer accompany them

UDC GRAMA
Classified
PUBLIC

to the location where the
other drugs may be obtained.

c.

3.

4.

5.

a.

b.

c.

6.

a.

   (1)  the sodium pentothal syringes
       shall be prepared by the
       pharmacist at the direction of
       the Warden when it appears the
       execution shall be carried
       out;

REVISED 06/10/10

TMF 01/05 - pg. 96

UDC GRAMA
Classified
PUBLIC

(2) a medical-response team shall be on standby to provide any medical attention which may be needed during the time of the scheduled execution;

(3) a USP emergency equipment kit and a back-up kit shall be made available at the execution site; and

(4) the Correctional Medical Administrator (CMA)/designee and a USP Medical staff with skills in intravenous injections, I.V. set-up, cut-down, etc., shall be available at the execution site to provide medical assistance in the execution chamber, if necessary.

b. Equipment and lethal drugs shall be gathered up by the CMA/designee following the execution.

(1) The CMA/designee shall be responsible for the disposal of the medical equipment used for lethal injection in accordance with TMF 01/05.15.

(2)

C. Maintenance Staff

1. Receipt of Death Warrant

a. Upon receipt of the death warrant the Deputy Warden Support Services shall:

(1) review the maintenance procedures and the equipment checklist and make recommendations in writing for changes, additional equipment, etc. as is viewed essential

REVISED 06/10/10

TMF 01/05 - pg. 97

UDC GRAMA
Classified
PUBLIC

and provide such
recommendations to the Warden
            prior to the scheduled
execution date; and

(2)   confer with the Maintenance
      Director and assign all
      execution related tasks to be
      completed.

b.   The Maintenance Director shall then
     prepare a task completion calendar
     which shall be presented to the
     Deputy Warden Support Services for
     approval, including:

(1)   a review of the maintenance
      procedure and the equipment
      checklist;

(2)   recommendations to the Warden
      in writing of changes,
      additional equipment, etc. as
      is viewed essential
      prior to the scheduled
      execution date;

(3)   identification of strategies
      to ensure that all systems,
      equipment, and mechanisms
      associated with the execution
      facility are functional and
      are readily repairable given
      an unexpected malfunction;

(4)   identification of emergency
      equipment, materials, and
      substances necessary to ensure
      that system, equipment, and/or
      mechanism malfunctions are
      expeditiously remedied;

(5)   establishment of inspection
      checklist and time frames for:

      (a)   the facility designated
            for the execution;

      (b)   the observation cell; and

      (c)   emergency backup systems;

UDC GRAMA
Classified
PUBLIC

(6)   ensuring that all maintenance service/repair trucks are in good operational condition and supplied with equipment, tools, and supplies necessary to correct all execution related emergencies; and

(7)   identification of maintenance personnel necessary to address all execution day maintenance emergencies.

2.

The Maintenance Director shall:

a.   complete a pre-inventory check of the necessary equipment; and

b.   complete a written report to the Deputy Warden Support Services of equipment, etc. requiring repair, replacement or duplications, including recommendations to correct problems and time frame necessary to make necessary corrections.

3.

The Deputy Warden Support Services shall direct the Maintenance Director to:

a.

c.   conduct an inspection of the following equipment:

(1)   execution chamber;

(2)   observation cell; and

(3)   emergency back-up systems and equipment.

4.

REVISED 06/10/10                                   TMF 01/05 - pg. 99

**UDC GRAMA**
**Classified**
**PUBLIC**

a.

    (1)

    (2)

    (3)

b.   A pre-inventory check shall be completed to ensure equipment is operational and in proper working order.

5.

a.

    (1)

    (2)

       (a)

       (b)

       (c)

    (3)  emergency back-up systems and equipment.

b.   Emergency equipment shall be checked to ensure readiness for the execution.

6.

a.   Complete the procedures as outlined in 5, above.

b.

c.

UDC GRAMA
Classified
PUBLIC

UDC GRAMA
Classified
PUBLIC

d.

(1)

(2)

(3)

(4)

(5)

(6)

REVISED 06/10/10

TMF 01/05 - pg. 101

UDC GRAMA
Classified
PUBLIC

UDC GRAMA
Classified
PUBLIC

TMF 01/07.00    WITNESSES

TMF 01/07.01    General Provisions
TMF 01/07.02    News Media Witnesses
TMF 01/07.03    Designation of Persons Required, Permitted or
                Prohibited from Witnessing
TMF 01/07.04    Witness Agreement

UDC GRAMA
Classified
PUBLIC

TMF 01/07.00    <u>WITNESSES</u>

TMF 01/07.01    <u>General Provisions</u>

        A.   <u>Purpose of Chapter</u>

           The purpose of this chapter is to:

           1.   identify the types and number of witnesses permitted to attend the execution; and

           2.   to provide legal requirements concerning the witnessing of the execution.

        B.   <u>Policy</u>

           It is the policy of the Department that:

           1.   procedures for selecting witnesses to the execution shall conform with 77-19-11 UCA;

           2.   witnesses shall enter into written agreements before being approved for attendance; and

           3.   witnesses shall be subject to search prior to being admitted.

TMF 01/07.02    <u>News Media Witnesses</u>

        A.   Members of the news media shall be permitted to witness the execution.

        B.   Selection shall be at the discretion of the Executive Director/designee.

        C.   Refer to TMF 01/09 for news media selection procedures.

TMF 01/07.03    <u>Designation of Persons Required, Permitted or Prohibited from Witnessing</u>

        A.   The Utah Code limits and identifies those persons who may attend and witness the execution.

REVISED 06/10/10                              TMF 01/07 - pg. 108

UDC GRAMA
Classified
PUBLIC

1.   The Executive Director of Corrections or his designee shall:

     a.   cause a physician to attend the execution, 77-19-10 (5) UCA; and

     b.   permit the attendance at the execution of members of the press and broadcast news media named by the Executive Director of the Department/or his designee, 77-19-11 (4) UCA.

2.   At the discretion of the Executive Director of the Department of Corrections/designee, the following may attend the execution:

     a.   the prosecuting attorney, or his designated deputy, of the county in which the defendant committed the offense for which he is being executed, 77-19-11 (2)(a) UCA;

     b.   no more than two law enforcement officials from the county in which the defendant committed the offense for which he is being executed, 77-19-11 (2)(b) UCA;

     c.   the Attorney General or his designee, 77-19-11 (2)(c) UCA;

     d.   religious representatives, friends, or relatives designated by the defendant, not exceeding a total of five persons, 77-19-11 (2)(d) UCA; and

     e.   unless approved by the Executive Director, no more than five close relatives of the deceased victim, as selected by the Executive Director, but giving priority in the order listed in TMF 01/01.04.

3.   The persons enumerated in Subsection (2) may not be required to attend, nor may any of them attend as a matter of right, 77-19-11 (3) UCA.

UDC GRAMA
Classified
PUBLIC

4.  The following persons may also attend
    the execution:

    a.  staff as determined necessary for
        the execution by the Executive
        Director of the Department of
        Corrections/designee; and

    b.  no more than three correctional
        officials from other states that
        are preparing for executions, but
        no more than two correctional
        officials may be from any one
        state, as designated by the
        Executive Director of the
        Department of Corrections or his
        designee, 77-19-11 (7)(a) UCA.

5.  Other necessary staff designated by the
    Executive Director of the Department of
    Corrections/designee shall be permitted
    to the execution.

    a.  The "necessary staff" shall include
        those persons identified in the
        post orders and procedures in
        TMF 01.

    b.  "Necessary staff" shall not be
        limited to members of the Utah
        Department of Corrections but may
        include members of allied agencies
        assisting with the execution.

6.  The Department is empowered and directed
    by 77-19-11 (8) UCA to adopt rules
    governing the attendance of persons at
    the execution.

7.  No person under the age of 18 may attend
    the execution.

B.  For those persons who shall carry out the
    execution or serve in support roles in the
    execution area, refer to TMF 01/05.05 B, C.

**UDC GRAMA**
**Classified**
**PUBLIC**

TMF 01/07.04    <u>Witness Agreement</u>

(See following page for Witness Agreement.)

**Rules of Conduct for Witnesses Observing an Execution
at the
Utah State Prison**

1.  That you will not bring onto prison property anything constituting legal or illegal contraband under any applicable statute, rule, or policy including any firearm, dangerous weapon, implement of escape, explosive, spirituous of fermented liquor, medicine, poison, or any other item creating a threat to the safety, security, or management of the prison;

2.  That you agree to submit to a reasonable search for contraband and other searches as considered necessary by the Department for entry to Department prison and staging area property;

3.  That you conduct yourself in a lawful and orderly manner;

4.  That you comply with all lawful directives of correctional personnel while on Department property;

5.  That you will not bring to the execution site any photographic or recording equipment; and

6.  That you understand that the Department of Corrections will not provide mental health services to witnesses.

7.  That you understand the Department of Corrections is required to record/report the names of all witnesses in attendance as well as provide the information to media representatives.


I have read the above rules and agree to abide by them.  I understand that my failure to comply with the rules will result in my immediate removal from Department of Corrections property and that I may be subject to criminal prosecution.


_____          _____
      Signature of Witness                        Date


_____          _____
UDC Representative                                Date

UDC GRAMA
Classified
PUBLIC

TMF 01/08.00   NEWS MEDIA PROCEDURES

TMF 01/08.01   General Provisions
TMF 01/08.02   News Media Selection
TMF 01/08.03   Alternate Coverage/Accommodations
TMF 01/08.04   News Media Attendance at the Execution
TMF 01/08.05   Limitations on Coverage
TMF 01/08.06   News Media Briefing
TMF 01/08.07   News Media Support and Equipment
TMF 01/08.08   Media Representative Agreement

REVISED 06/10/10                     TMF 01/08 - pg. 112

**UDC GRAMA**
**Classified**
**PUBLIC**

TMF 01/08.00   NEWS MEDIA PROCEDURES

TMF 01/08.01   General Provisions

    A.   Purpose of Chapter

       The purpose of this chapter is:

       1.   to provide the policies, procedures and requirements for providing access to the execution and information relating to the execution to the news media;

       2.   to provide the procedure for:

          a.   releasing background information;

          b.   releasing information during the execution;

          c.   coverage of the execution; and

       3.   to provide requirements for safeguarding the institution and protected information.

    B.   Policy

       1.   It shall be the policy of the Department to permit press access to the execution and information concerning the execution consistent with the requirements of the constitutions and laws of the United States and state of Utah.

       2.   The Department is generally required to provide no more access to the news media, to the inmates and facilities it supervises and controls than that available to the general public.

       3.   The Department and the Utah Code recognize the need for the public to be informed concerning executions conducted by the Department of Corrections.

          a.   The Department will participate and cooperate with the news media to inform the public concerning the execution.

          b.   Information should be provided in a timely manner.

UDC GRAMA
Classified
PUBLIC

4.   If the condemned is willing, the Department may allow an opportunity for the condemned to speak with the news media.  If allowed, the interview may:

   a.   include those members of the news media selected to witness the execution;

   b.   include additional members of the news media authorized by the Department, but not including more than one reporter from the same agency; and

   c.   be held at a time and location determined by the Department.

5.   During exigent circumstances, communication may be temporarily suspended until the situation has been stabilized.  Exigent circumstances shall include, but not be limited to:

   a.   riots;

   b.   hostage situations;

   c.   fires or other disasters; or

   d.   other inmate disorders.

6.   Refer to Chapter AGr05, "Media Relations" for general news media access to information, inmates and facilities.

TMF 01/08.02   Underline: News Media Selection

A.   Number in Attendance

   The Department shall permit members of the press and broadcast news media to witness the execution.

B.   Authority to Select

   The Executive Director/designee shall be responsible for selecting the members of the

REVISED 06/10/10                    TMF 01/08  -  pg. 114

App'x B Page 112

UDC GRAMA
Classified
PUBLIC

news media who will be permitted to witness
the execution.   77-19-11(4) UCA

C.   Selection Process

1.   After the court sets a date for the
execution of the death penalty, news
directors or editors may submit a
written list of news media witnesses
(one per organization) and other news
personnel needed at the execution, to
the attention of the Executive Director
at least 30 days prior to the execution.
When administrative convenience or
fairness to the news media dictates, the
Department in its discretion may extend
the request deadline.

2.   Requests for consideration may be
granted by the Executive
Director/designee provided they contain
the following:

a.   a statement setting forth facts
showing that the requesting
individual falls within the
definition of "member of the press
and broadcast news media" set forth
in these regulations;

b.   an agreement to act as a pool
representative as described in
these regulations;

c.   an agreement that the media member
will abide by all of the
conditions, rules and regulations
while in attendance at the
execution; and

d.   agreement that they will conduct
themselves consistent with existing
press standards.

3.   Upon receipt of a news director's or
editor's request for permission for news
media witnesses to attend the execution,
the Executive Director/designee may take
such steps as he deems necessary to
verify the statements made in the
request.  After verifying the
information in the requests, selection

of witnesses shall be made by the
Executive Director/designee.

4. The Executive Director/designee shall
   identify the media members who have been
   selected to witness the execution.
   Media members shall be selected on a
   rotating basis from the following
   organizations:

   a. Salt Lake daily newspapers;

   b. television stations licensed and
      broadcasting daily in the State of
      Utah;

   c. one newspaper of general
      circulation in the county in which
      the crime occurred;

   d. one radio station licensed and
      broadcasting in the State of Utah;
      and

   e. the remainder from a pool of
      broadcast, print and wire services
      news media organizations operating
      in Utah.

5. In the event that the Executive Director
   is unable to name a news media witness
   from each of the above-described
   organizations, he shall name other
   qualifying media members to attend.

6. No news media witnesses other than those
   named to attend the execution as
   described in this chapter shall be
   permitted to witness the execution.

D. Pool Photographers

   1. Two photographers shall be appointed as
      pool photographers to photograph/film
      the execution chamber following clean
      up.

   2. The pool photographers may be selected
      from agencies other than those

UDC GRAMA
Classified
PUBLIC

represented among those witnessing the execution.

**TMF 01/08.03**     Alternate Coverage/Accommodations

A.   Additional Media Selected

1.   The Executive Director may designate additional members of the press and broadcast news media who request and receive permission to be allowed at a location designated by the Executive Director on prison property during the execution.

2.   The additional media selected shall be from both the print and broadcast media.

B.   Alternate Location

1.   The alternate location shall be a press briefing area.

2.   Media members must contact the Department's Public Affairs Director at least 14 days prior to the execution date to make any special arrangements for hook ups or other necessary arrangements.  Any expense incurred shall be borne by the specific news media requiring special equipment or hook ups.

3.   No special access nor briefings will be provided to members of the press who are not selected as witnesses nor selected for the alternate site.

4.   The alternate site shall be made available to the selected members of the news media at 1700 hours the day prior to the scheduled execution date.

C.   Briefing Media at the Alternate Site

1.   The Public Affairs Director shall arrange for:

a.   pre-execution briefings;

b.   distribution of media briefing packages;

UDC GRAMA
Classified
PUBLIC

      c.    briefings throughout the execution
            event; and

      d.    post-execution briefings by the
            news media who witnessed the
            execution.

   2.    The news media witnesses to the
        execution shall be returned to the media
        briefing area to answer questions from
        media members at the alternate site.

**TMF 01/08.04**   <u>News Media Attendance at the Execution</u>

   A.   The Warden/designee shall permit the members
       of the press and broadcast news media,
       selected by the Executive Director/designee
       in accordance with these regulations, to
       witness the execution.

   B.   Each news media witness attending the
       execution shall be carefully searched prior
       to admittance to the execution chamber.

      1.

        a.    Electronic or mechanical recording
            devices include, but are not
            limited to, still, moving picture
            or video cameras, tape recorders or
            similar devices, broadcasting
            devices, or artistic paraphernalia,
            such as notebooks, and drawing
            pencils or pens, etc.

        b.    Violation of this prohibition is a
            class B misdemeanor. 77-19-11(5)

        c.    Only a small notebook (no larger
            than 4" x 6") and a pen or pencil
            issued by the Department shall be
            permitted.

      2.    Only the selected members of the news
          media (witnesses and two pool
          photographers) shall be allowed to

UDC GRAMA
Classified
PUBLIC

attend the pre-execution briefing. The group will be escorted into a briefing room.

a.

b.

c.

3.

a.

b.

4. Persons requesting to witness the execution shall be required to sign a statement or release absolving the institution or any of its staff from any

UDC GRAMA
Classified
PUBLIC

legal recourse resulting from the exercise of search requirements or provisions of the witness agreement.

C. The Warden/designee shall not exclude any news media witness duly selected in accordance with these regulations from attendance at the execution except as described in these regulations, nor may the Warden/designee cause a selected news media witness to be removed from the execution chamber unless the media member:

    1. refuses to submit to a reasonable search as permitted in these regulations;

    2. faints, becomes ill or requests to be allowed to leave during the execution;

    3. causes a disturbance within the execution chamber; or

    4. refuses or fails to abide by the conditions and regulations set forth by the Department.

D. The execution chamber shall be arranged so as to provide space for the attending news media witnesses and the space arranged shall have a view of the execution site, with the exception of:

    1. a view of the members of the firing squad, if employed; or

    2. if lethal injection is chosen, those directly administering the method of execution, who shall be concealed from the view of the media members so that their identities will remain unknown.

E. The selected news media witnesses shall be transported as a group to the execution location prior to the execution and shall be allowed to remain there throughout the proceeding.

F. The Department shall designate a representative or representatives to remain with the media members throughout the execution proceedings for the purpose of supervising and escorting.

REVISED 06/10/10

TMF 01/08 - pg. 120

UDC GRAMA
Classified
PUBLIC

G.   News media witnesses shall be admitted to the execution area on the date set for the execution only after:

1.   proof of identification have been presented to the Public Affairs Director/designee at the staging area;

2.   receiving an orientation by the Public Affairs Director/designee; and

3.   signing an agreement to abide by conditions required of news media witnesses to the execution.

H.   After the execution has been completed and the site has been restored to an orderly condition, news media witnesses may be permitted to return to the execution chamber for purposes of filming, photographing and recording the site.

1.   Re-entry to the site shall be permitted only after the site has been restored to an orderly condition, including:

a.   removal of the body of the condemned;

b.   evacuation of those involved in administering the execution; and

c.   clean up of the execution chamber.

2.   Restoring the site to an "orderly condition" prior to the filming opportunity shall not unnecessarily disturb the physical arrangements for the execution.

3.   Media members permitted to return to the execution chamber for the filming and recording of the site shall include:

a.   the news media witnesses who were selected to witness the execution;

b.   one pool television camera man; and

c.   one pool newsprint photographer.

UDC GRAMA

Classified

PUBLIC

4.   The film/videotape shall not be used in any news or other broadcast until it is available to all agencies participating in the pool.  All agencies receiving the film/videotape will be permitted to usethem in news coverage and to retain the film/videotape for file footage.

I.   News media representatives shall, after being returned from the execution to the staging area, act as pool representatives for other media representatives covering the event.

1.   The pool representatives shall meet at the designated media center and provide an account of the execution and shall freely answer all questions put to them by other media members and shall not be permitted to report their coverage of the execution back to their respective news organizations until after the non-attending media members have had the benefit of the pool representatives' account of the execution.

a.   News media members attending the post-execution briefing shall agree to remain in the briefing room and not leave nor communicate with persons outside the briefing room until the briefing is over.

b.   The briefing shall end when the attending news media members are through asking questions or after 90 minutes, whichever comes first.

2.

TMF 01/08.05   Limitations on Coverage

A.   The Warden, with the concurrence of the Executive Director, may alter these regulations to impose additional conditions, restrictions and limitations on media coverage of the execution when such requirements become necessary for the

REVISED 06/10/10

TMF 01/08 - pg. 122

UDC GRAMA
Classified
PUBLIC

preservation of prison security, personal safety or other legitimate interests which may be in jeopardy.

B.  If extraordinary circumstances develop, the additional conditions and restrictions shallbe no more restrictive than required to meet the exigent circumstances.

TMF 01/08.06   <u>News Media Briefing</u>

A.  <u>Pre-Execution Briefing Packets</u>

1.  The Public Affairs Director shall prepare a press briefing packet for reporters approved to witness the execution, or to cover the execution from the news media staging area.

2.  The briefing press packet should be provided to news media representatives as they arrive at the staging area.

3.  The contents of the press briefing packet shall include, but not be limited to, biographical information on the condemned, the list of official witnesses, pool reporters, family witnesses, execution procedures, sequence of events, and the history of executions in Utah.

4.  Updates will generally be communicated and/or distributed to the press on an hourly basis beginning about 1700 hours the day preceding the execution. Briefing updates should include:

    a.  a summary of activities related to the execution procedures and sequence of events; and

    b.  a summary of the condemned inmate's activities during his final 24 hours.

B.  <u>Death Announcement</u>

1.  The Public Affairs Representative/designee shall read a prepared statement to the press, prior to the post-execution press conference, announcing that the execution has been completed.

UDC GRAMA
Classified
PUBLIC

2. The announcement shall include, but not be limited to:

   a.  the time of the execution;

   b.  the time the condemned was pronounced dead; and

   c.  the condemned's final words.

C.  <u>Post-Execution Conference</u>

   1.  The post-execution conference shall begin immediately following the arrival of the pool reporters from the execution site.

   2.  The Public Affairs Director shall introduce the members of the press who witnessed the execution and facilitate the post-execution conference.

   3.  The Executive Director, Deputy Director, Institutional Operations Division Director and/or Warden may appear and answer questions at the press conference.

   4.  The post-execution conference shall continue for ninety minutes or until the questioning of the reporters who witnessed the execution has been completed; whichever comes first.

D.  <u>Travel Routes</u>

   1.

   2.

E.  <u>Media Center</u>

   1.  The Media Center shall be located in the designated staging area.

REVISED 06/10/10                          TMF 01/08 - pg. 124

App'x B Page 122

**UDC GRAMA
Classified
PUBLIC**

2.   The Public Affairs Director shall assume responsibility for routine press briefings at the Media Center.

3.   Press briefings and the post-execution conference will be held at the Media Center.

4.   News media personnel may not access nor occupy any other part of the staging area.  The media shall have access only to the designated media center.

5.   Members of the news media may not seek, speak to or interview any official visitor while at the staging area.

6.

TMF 01/08.07   Underline{News Media Support and Equipment}

A.   Underline{Telephones}

1.   The Public Affairs Director shall coordinate all telephone needs with the Deputy Warden Support Services at the Utah State Prison.

2.   Each news agency requiring dedicated telephone lines, shall submit in writing its telephone needs to the Public Affairs Director 14 days prior to the scheduled execution.  Agencies requesting dedicated phone lines will be responsible for the cost of those lines.

3.   The Department shall install a reasonable number of telephones, for local use and collect calls only, for news media use at the Media Center.  If the Department is unable to install collect-call only telephones, personal cellular phones may be used.

B.   Underline{Electrical Outlets}

UDC GRAMA
Classified
PUBLIC

Each news agency must communicate its needs for electrical power to the Public Affairs Director 14 days prior to the scheduled execution.

C.   Refreshments

The Public Affairs Director may inquire about having a private caterer at the staging area for the media to purchase items.

D.   News Media Support Vehicles

1.

2.

TMF 01/08.08   Media Representative Agreement

(See following page for Media Representative agreement.)

UDC GRAMA
Classified
PUBLIC

**Rules of Conduct for Media Representatives Observing an Execution
at the
Utah State Prison**

1.  That you will not bring onto prison property anything constituting legal or illegal contraband under any applicable statute, rule, or policy including any firearm, dangerous weapon, implement of escape, explosive, spirituous of fermented liquor, medicine, poison, or any other item creating a threat to the safety, security, or management of the prison;

2.  That you agree to submit to a reasonable search for contraband and other searches as considered necessary by the Department for entry to Department prison and staging area property;

3.  That you conduct yourself in a lawful and orderly manner;

4.  That you comply with all lawful directives of correctional personnel while on Department property;

5.  That you will not bring to the execution site any photographic or recording equipment;

6.  That you understand that the Department of Corrections will not provide mental health services to witnesses; and

7.  That you understand the Department of Corrections is required torecord/report the names of all witnesses in attendance as well as provide the information to media representatives.

I have read the above rules and agree to abide by them.  I understand that my failure to comply with the rules will result in my immediate removal from Department of Corrections property and that I may be subject to criminal prosecution.

News Organization_____

_____          _____
       Signature of News Media Witness                    Date

_____          _____
       News Agency Editor/Producer                        Date

UDC GRAMA
Classified
PUBLIC

UDC GRAMA
Classified
PUBLIC

TMF 01/20.00    REVIEWAND DOCUMENTATION

TMF 01/20.01    General Provisions
TMF 01/20.02    Review Assignment
TMF 01/20.03    Documentation of Execution
TMF 01/20.04    Retention and Safeguarding Documentation
TMF 01/20.05    UDC Employee Questionnaire

REVISED 06/10/10

UDC GRAMA
Classified
PUBLIC

TMF 01/20.00   REVIEW AND DOCUMENTATION

TMF 01/20.01   General Provisions

A.   Purpose of Chapter

The purpose of this chapter is to provide the policies, procedures and requirements for reviewingthe execution process.

B.   Policy

1.   It shall be the policy of the Department that of the execution process shall be performed as ordered by the Executive Director.

2.   Auditors assigned to perform thesereviewsshall beallowed access to designated aspects of the executionpreparation.

3.   Auditors participating in the reviewof the execution are not to be involved in the execution preparationprocess, but shall act as observers only and, at all times, act in such a way that they create the least disruption possible in that process.

5.   Appropriate documentation of the execution shall be created, collected, safeguarded, and retained to provide an adequate review trail and a proper historical record.

6.   Documentation shall be protected in accordance with 64-13-25(2) UCA.

TMF 01/20.02   ReviewAssignment

Authority to Conduct a Review

1.   The Executive Director shall be responsible for determining if a reviewis to take place in each execution.

2.   The Auditor(s) selected for the execution review shall, upon direction

UDC GRAMA
Classified
PUBLIC

from the Executive Director, prepare a
questionnaire to be completed by staff
involved in the execution process.  The
survey shall be approved by the
Executive Director and all responses
shall be confidential.  Only the
Executive Director may grant release of
the survey responses.

TMF 01/20.03    Documentation of Execution

Documentation to be Retained

Documentation which shall be retained shall
include:

1.   the warrant and all other legal papers;

2.   correspondence, both official and
     unofficial, which is received by the
     Department of Corrections;

3.   minutes of meetings held for purposes of
     planning or disseminating information;

4.   inter-agency written communication;

5.   intra-departmental written
     communication;

6.   logs, journals, chronological notes,
     etc., of key locations; and

7.   a newspaper file.

TMF 01/20.04    Retention and Safeguarding Documentation

A.   Execution File

1.   An execution file shall be established
     for each condemned person.  The file
     shall be organized into sections which
     should include:

     a.   legal documents;

     b.   official correspondence;

       c.    unofficial correspondence;

       d.    intra-departmental written communication;

       e.    chronological notes, logs, etc.; and

       f.    meeting minutes.

2.    Each section of the execution file shall have material filed in chronological order.

3.    All working documents which cannot be filed during the execution process or immediately after, shall be copied and a copy shall be placed in the execution file.

4.    All intra-departmental communication shall have a courtesy copy to the execution file.

B.    <u>Execution File Maintenance</u>

1.

2.

C.    <u>Access to Execution File</u>

Only those individuals authorized by the Executive Director of Corrections, DIO Director, or Warden, shall have access to the execution file.

D.    <u>Long-Term Storage</u>

To ensure that all documents concerning an execution shall be retained to provide a reviewtrail and an adequate historical record, the execution file shall be stored in accordance with the archive's plan of the Department.

**UDC GRAMA
Classified
PUBLIC**

TMF 01/20.05    UDC EMPLOYEE QUESTIONNAIRE

_____
Name of the Condemned

INSTRUCTIONS:

Please complete this questionnaire as soon after the execution as possible.  Answer each question completely and accurately.  Add as many pages as necessary if answers need more space.

Complete and return this questionnaire to the AuditBureau at Utah Department of Corrections, 14717 S. Minuteman Drive, Draper, 84020, by _____.

Thank you.

FULL NAME:_____
TITLE:_____
LOCATION: _____
FUNCTION DURING THE
EXECUTION: _____

1.  Were you provided adequate direction for your area of responsibility?

    If you answered "No," please explain what direction would havebeen beneficial to you.

    _____
    _____
    _____

2.  Were you adequately trained or briefed in your area of  responsibility?

    Yes___No____

    If you answered "No," please explain what training or briefing would have been beneficial to you.

    _____
    _____
    _____
    _____

3.  Did you observe anything that you thought was not adequately addressed?

    Yes___No__

    If you answered "Yes," please explain.

    _____
    _____
    _____
    _____
    _____

UDC GRAMA
Classified
PUBLIC

4.   Please make any additional comments or suggestions.

_____

_____

_____

_____

_____

_____

_____

_____


**THANK YOU!**

UDC GRAMA
Classified
PUBLIC

TMF 01/21.00   TRAINING AND BRIEFING

TMF 01/21.01   General Provisions
TMF 01/21.02   Training and Briefing Components

UDC GRAMA
Classified
PUBLIC

TMF 01/21.00   <u>TRAINING AND BRIEFING</u>

TMF 01/21.01   <u>General Provisions</u>

A.   <u>Purpose of Chapter</u>

The purpose of this chapter is to provide the policy and procedure concerning briefing and training of staff, members of allied agencies and others involved in an execution.

B.   <u>Policy</u>

It is the policy of the Department that staff and others involved in carrying out an execution:

1.   receive comprehensive briefings covering:

   a.   their duties and responsibilities;

   b.   the specifics of post orders covering assigned positions;

   c.   communication and chain of command;

   d.   overview of functions and activities during the execution;

2.   are provided copies of post orders outlining the duties and responsibilities of assigned positions;

3.   receive the level of briefing and training necessary based on the requirements of assigned duties;

4.   rehearse and practice functions which involve:

   a.   difficult timing;

   b.   a high degree of skill;

   c.   procedures of a highly critical nature; and/or

   d.   moderately difficult or complex interaction with others; and

UDC GRAMA
Classified
PUBLIC

5.    receive instructions concerning back-up systems to provide:

    a.    problem-resolution assistance;

    b.    policy decisions;

    c.    crisis management assistance; and

    d.    information requests.

**TMF 01/21.02    Training and Briefing Components**

A.    General

Training and briefing shall include, but not be limited to:

1.    issuing all members or other participants a post order for their assigned positions;

2.    providing an orientation or briefing covering assigned duties and general operational information;

3.    if necessary, detailed training covering legal, operational or technical aspects of assigned position;

4.    if necessary, rehearsal of job functions; and

5.    key positions in Manual TMF 01.

B.    Post Orders

1.    Each member or other participant shall be issued the post order or instructions for his assigned position.

2.    The post order shall include, but not be limited to:

    a.    the position title;

    b.    location(s) of assignment;

    c.    title of supervisor;

UDC GRAMA
Classified
PUBLIC

      d.    supervisory role, if any;

      e.    duties and responsibilities--
            general and specific; and

      f.    emergency role.

3.    When appropriate, one or more chapters of TMF 01 may be issued with a post order.

4.    All post orders (and any accompanying manual material) shall be returned at the completion of the execution event.

C.    <u>Briefing/Orientation</u>

1.    Most assignments will be very specialized, involving a narrow range of duties.  For such positions, briefing/orientation sessions will be all the training required in addition to the general training skills and experience of the persons assigned.

2.    Orientation sessions shall include but not be limited to:

      a.    an overview of the execution process and operational components;

      b.    location of assigned post;

      c.    chain of command and organizational information;

      d.    an overview of the countdown of activities and procedures leading to the execution;

      e.    an explanation of support and crisis intervention systems;

      f.    interaction with the news media;

      g.    a review of the specific post order requirements, duties and other elements; and

UDC GRAMA
Classified
PUBLIC

        h.    a question-and-answer period.

D.    <u>Training/Rehearsal</u>

    1.    For assignments requiring more technical or complex functions, critical timing or interaction elements, or duties of a particularly difficult nature, more comprehensive training shall be required.

    2.    Team leaders shall be responsible for training and scheduling rehearsals as needed for team members.

UDC GRAMA
Classified
PUBLIC



*AR 633–15

ARMY REGULATIONS }

No. 633–15 }

HEADQUARTERS,
DEPARTMENT OF THE ARMY
WASHINGTON 25, D. C., *7 April 1959*

# PROCEDURE FOR MILITARY EXECUTIONS

| | | Paragraph | Page |
|---|---|---|---|
| SECTION I. | GENERAL | | |
| | Definitions | 1 | 2 |
| | Manner of execution | 2 | 2 |
| | Witnesses | 3 | 2 |
| | Multiple executions | 4 | 2 |
| | Escort | 5 | 3 |
| | Chaplain | 6 | 3 |
| | Medical officer | 7 | 3 |
| | Interpreter | 8 | 3 |
| | Miscellaneous | 9 | 3 |
| II. | EXECUTION BY MUSKETRY | | |
| | Officer charged with carrying out execution | 10 | 4 |
| | Assembly of escort | 11 | 5 |
| | Execution | 12 | 5 |
| III. | EXECUTION BY HANGING | | |
| | Officer charged with carrying out execution | 13 | 6 |
| | Executioner | 14 | 7 |
| | Assembly | 15 | 7 |
| | Execution | 16 | 8 |
| IV. | EXECUTION BY ELECTROCUTION | | |
| | General | 17 | 8 |
| | Officer charged with carrying out execution | 18 | 8 |
| | Executioner | 19 | 8 |
| | Execution | 20 | 8 |
| V. | PROCEEDINGS AFTER EXECUTION | | |
| | Disposition of remains | 21 | 9 |
| | Disposition of effects | 22 | 9 |
| | Notification and reports | 23 | 9 |
| VI. | MODIFICATION OF PROCEDURES | | |
| | Limited Facilities | 24 | 10 |
| | In time of war | 25 | 10 |
| VII. | STRUCTURES | | |
| | Permanent scaffold | 26 | 10 |
| | Semipermanent scaffold | 27 | 10 |
| | Emergency structures | 28 | 10 |
| VIII. | EQUIPMENT | | |
| | Hood | 29 | 11 |
| | Collapse board and binding strap | 30 | 11 |
| | Rope | 31 | 11 |
| | Post | 32 | 11 |
| | Electrocution | 33 | 11 |

* These regulations supersede DA Pam 27–4, 9 Dec 1947, including C 1,
24 June 1953.

TAGO 5167B—Apr

## Section I

## GENERAL

**1. Definitions.** For the purpose of these regulations only the following definitions apply:

*a. Confirming authority.* The competent authority of the agency through which military jurisdiction is exercised ordering the execution of a sentence of death.

*b. Officer designated to execute the approved sentence.* The officer designated by the confirming authority (*a* above) to execute the approved sentence of death.

*c. Officer charged with carrying out the execution.* The subordinate officer duly and officially named by an order of the officer designated to execute the sentence (*b* above) and directed therein to carry out the execution.

**2. Manner of execution.** Military executions will be in the manner designated by the confirming authority or by shooting, hanging, or electrocution.

**3. Witnesses.** The officer designated by the confirming authority to execute the approved sentence will prescribe whether the execution will be public or private, rules of secrecy as to time, place, and the presence of witnesses, military or civilian, including members of the press if the presence of the latter is deemed proper. In the case of the execution of a foreign national, the officer designatd to execute the sentence will prescribe whether persons of the same nationality as the condemned may be present. Neither photographs nor motion pictures of the actual execution will be permitted except for official purposes. The environs of the place of execution will be closely and securely guarded to prevent the intrusion of unauthorized persons. All persons in attendance will be cautioned that no demonstrations or unseemly conduct will be tolerated.

**4. Multiple executions.** In multiple executions by electrocution in the continental United States the prisoners will be executed in succession and the same electric chair will be used for each execution. In multiple executions by musketry or hanging, the prisoners may be executed either simultaneously or in succession. Where two or more prisoners are to be executed in succession by musketry or hanging, the same execution party or gallows may be used for each execution. Where two or more prisoners are to be executed simultaneously by musketry, a separate execution party will be provided for each of the prisoners. The latter will be placed in line at an interval of ten paces. Where two or more prisoners are to be executed simultaneously by hanging, the officer designated to execute

the sentence will prescribe the number of gallows to be erected, and the prisoners will be hanged from the gallows simultaneously or by groups.

**5. Escort.** The escort for execution by musketry or hanging may be dismounted or motorized, but upon arrival at the scene of execution, motorized escorts will form in the manner prescribed for dismounted escorts. The minimum escort will consist of components as prescribed in paragraphs 11a and 15a. Where the prisoner is to be executed by electrocution, the strength, formation, and duties of the guard escort will be as prescribed by the officer charged with carrying out the execution.

**6. Chaplain.** In all executions, a chaplain of the prisoner's choice will be provided if practicable. If no chaplain of the prisoner's choice or of his particular faith and/or race is available, the officer charged with the execution of the sentence will take all reasonable measures to provide a civilian clergyman of that faith and/or race. The chaplain should be available at all times after the prisoner is notified of the time of execution.

**7. Medical officer.** A medical officer will be officially designated to be in attendance upon the execution. It will be his duty to determine the extinction of life in the prisoner and to make pronouncement thereof. He will furnish a death certificate to accompany the report of execution.

**8. Interpreter.** In the event the prisoner does not speak English, an interpreter will be officially designated to be in attendance at the notification of the prisoner (par. 9a) and the execution. It is his duty to interpret the charge, finding, sentence orders, and any last statement made by the prisoner. Before entering upon his duties, the interpreter will take the oath or affirmation required of an interpreter for a court-martial.

**9. Miscellaneous.** a. The prisoner will be notified of the time of execution no less than 24 hours prior thereto if practicable, at which time the charge, finding, sentence, and order directing the execution will be read to him by the officer charged with carrying out the execution. The chaplain should be present.

b. Unless the exigencies of the situation preclude such action, due notice of the time and place of execution will be given to the next of kin of the prisoner and an opportunity provided for the claiming of the body following the execution.

c. Items of clothing and alterations thereto to be worn by a prisoner to be executed by hanging or electrocution will be as prescribed by the officer charged with carrying out the execution, in

accordance with the technical instructions of the executioner. A prisoner in the Armed Forces of the United States will be dressed in regulation uniform from which all decorations, insignia, or other evidence of membership therein have been removed. Likewise, no such evidences will appear on any clothing used in burial. Similar procedures may be dispensed with, at the discretion of the officer charged with carrying out the execution (or higher authority) in the case of a prisoner in the armed forces of another nation. A prisoner not within the foregoing categories may be dressed in any clothing available.

*d.* After the prisoner is notified of the time of execution (*a* above), the commanding officer of the place of confinement will, where practicable, approve any reasonable special request of the prisoner, including special request for food, and permission to have in his possession a Bible, Rosary, or similar religious articles during the execution. Sufficient writing paper and envelopes should be furnished and no limit placed on the number of letters which may be written. All letters are subject to censorship and may or may not be forwarded.

SECTION II

EXECUTION BY MUSKETRY

**10. Officer charged with carrying out execution.** The officer charged with carrying out the execution will command the escort and make the necessary arrangements for the conduct of the execution. He will—

*a.* Instruct and rehearse the escort and the execution party in their duties, insuring that all members of the execution party are qualified in the weapon to be used.

*b.* Arrange for the receipt of the prisoner by the prisoner guard.

*c.* Arrange for an execution party of eight men and one sergeant.

*d.* Arrange for a chaplain to accompany the prisoner.

*e.* Arrange for the presence of a medical officer at the scene of the execution.

*f.* Cause a post with proper rings placed therein for securing the prisoner in an upright position to be erected at the place of execution.

*g.* Cause eight rifles to be loaded in his presence. At least one but no more than three will be loaded with blank ammunition. He will place the rifles at random in the rack provided for that purpose.

*h.* Provide a black hood to cover the head of the prisoner.

*i.* Provide a 4-inch round target, white or black as appropriate; a black target will be used when light colored clothing is worn.

*j.* Cause the prisoner's wrists to be secured either behind his back or in front at the waist (fig. 1), before or immediately after his receipt by the prisoner guard.

*k.* Provide straps to secure the prisoner to the post at waist and ankles.

**11. Assembly of escort.** *a.* The prisoner guard will consist of four men armed with rifles, under the command of a sergeant armed with a pistol. At the proper time, the prisoner guard will proceed to the place of confinement to receive the prisoner.

*b.* The execution party will be formed unarmed and proceed to a previously prepared rack of rifles, secure arms, and move to the scene of the execution, halting 15 paces from and facing the position to be taken by the prisoner. The sergeant of the execution party will be armed with a pistol. At close interval, at order arms, and at parade rest the execution party will await the arrival of the prisoner and escort.

*c.* Witnesses, if any, will take position facing the scene of the execution, 15 paces to the right and 5 paces to the front of the execution party.

*d.* At the designated time, the prisoner, with his wrists bound securely behind his back or in front at the waist (fig. 1), accompanied by the chaplain, will be received by the prisoner guard. The escort will then proceed to the scene of the execution.

*e.* The prisoner guard, prisoner, and chaplain will proceed directly to the prisoner's post, halt, and face the execution party.

**12. Execution.** *a.* The officer charged with carrying out the execution will take position in front of the execution party and face the prisoner. He will notify the prisoner and the chaplain that a brief time will be allowed the prisoner for any last statement. After a reasonable time, he will order the sergeant of the execution party and the sergeant of the prisoner guard to secure the prisoner to the post and to place the hood over his head. The medical officer then will place the target over the prisoner's heart. The prisoner prepared, the officer charged with carrying out the execution will order the prisoner guard to move to a position five paces behind the execution party. The chaplain and medical officer will take positions five paces to the left of and five paces to the front of the execution party. The officer charged with carrying out the execution will take position five paces to the right of and five paces to the front of the execution party.

AGO 5167B

*b.* Commands for the execution will be given orally as prescribed below:

> (1) At the command READY, the execution party will take that position and unlock rifles.
>
> (2) At the command AIM, the execution party will take that position with rifles aimed at target on the prisoner's body.
>
> (3) At the command FIRE, the execution party will fire simultaneously.
>
> (4) The officer charged with carrying out the execution will then bring the execution party to "Order Arms."

*c.* The officer charged with carrying out the execution will join the medical officer who will examine the prisoner and, if necessary, direct that the "coup de grace" be administered. Should the medical officer so decide, the sergeant of the execution party will administer the "coup de grace," with a hand weapon, holding the muzzle just above the ear and one foot from the head.

*d.* Upon pronouncement of the death of the prisoner by the medical officer, the execution party will proceed to the rack from which the rifles were originally obtained, and replace the rifles in the rack at random. The execution party will then be dismissed.

*e.* The prisoner guard will return to the area of their quarters and be dismissed.

## Section III

### EXECUTION BY HANGING

**13. Officer charged with carrying out execution.** The officer charged with carrying out the execution will command the escort and make the necessary arrangements for the conduct of the execution. He will—

*a.* Instruct components of the escort in their duties.

*b.* Arrange for the receipt of the prisoner by the prisoner guard.

*c.* Arrange for a chaplain to accompany the prisoner.

*d.* Arrange for the presence of a medical officer at the scene of the execution.

*e.* Provide a proper gallows.

*f.* Provide a black hood to cover the head of the prisoner.

*g.* Provide a collapse board for use if necessary.

*h.* Cause the prisoner's wrists to be secured before or immediately upon his receipt by the prisoner guard. The wrists may be secured either behind the back or in front, fastened to the belt (fig. 1).

*i.* Determine the proper amount of drop of the prisoner through the trapdoor. A standard drop chart for normal men of given weights is given below. Variation of the drop because of physical condition may be necessary. A medical officer will be consulted to determine whether any factors, such as age, health, or muscular condition will affect the amount of drop necessary for a proper execution.

| | | | |
|---|---|---|---|
| 120 lbs or less | 8′ 1″ | 170 lbs | 6′ 0″ |
| 125 lbs | 7′ 10″ | 175 lbs | 5′ 11″ |
| 130 lbs | 7′ 7″ | 180 lbs | 5′ 9″ |
| 135 lbs | 7′ 4″ | 185 lbs | 5′ 7″ |
| 140 lbs | 7′ 1″ | 190 lbs | 5′ 6″ |
| 145 lbs | 6′ 9″ | 195 lbs | 5′ 5″ |
| 150 lbs | 6′ 7″ | 200 lbs | 5′ 4″ |
| 155 lbs | 6′ 6″ | 205 lbs | 5′ 2″ |
| 160 lbs | 6′ 4″ | 210 lbs | 5′ 1″ |
| 165 lbs | 6′ 2″ | 220 lbs and over | 5′ 0″ |

*j.* Rehearse the execution within 24 hours prior to the scheduled time for the execution. A sandbag or similar object approximating the prisoner's weight may be used to insure proper functioning of the gallows, trapdoor, and hangman's noose.

**14. Executioner.** An official experienced executioner will be appointed by the officer charged with carrying out the execution. If one is not available to the command, a professional civilian executioner may be obtained and appointed. In the event a professional executioner is not available, a suitable emotionally stable member of the command will be selected and appointed executioner.

**15. Assembly.** *a.* The prisoner guard will consist of 10 men armed with rifles, two corporals armed with pistols, under the command of a sergeant armed with a pistol. The prisoner guard will form in double ranks and at the proper time will proceed to the door of the place of confinement to receive the prisoner.

*b.* Witnesses, if any, will assemble at the scene of the execution in positions designated by the officer charged with carrying out the execution.

*c.* At the designated time the prisoner, with his wrists bound securely, accompanied by the chaplain, will be received by the prisoner guard and placed between the ranks. The escort will then proceed to the scene of the execution.

*d.* Upon the arrival of the escort at the scene of the execution, the corporals and the sergeant of the prisoner guard will conduct the prisoner to the platform of the gallows, the officer charged with carrying out the execution and the chaplain preceding the prisoner.

**16. Execution.** *a.* The officer charged with carrying out the execution will notify the chaplain and the prisoner that a brief time will be allowed the prisoner for any last statement. After a reasonable time, he will have the executioner place the hood over the prisoner's head, bind the prisoner's ankles, adjust the noose around the prisoner's neck, and then take position at the trigger. Upon signal from the officer charged with carrying out the execution, the executioner will spring the trap. The medical officer will then examine the body for time of death and report to the officer charged with carrying out the execution.

*b.* Upon the pronouncement of the death of the prisoner, the escort will return to the area of their quarters and be dismissed.

## SECTION IV

## EXECUTION BY ELECTROCUTION

**17. General.** Execution by electrocution may be effected only at the confinement facility designated by Headquarters, Department of the Army. Procedures for execution by electrocution will necessarily vary from those prescribed for execution by musketry or hanging.

**18. Officer charged with carrying out execution.** The officer charged with carrying out the execution will make the necessary arrangements for the conduct of the execution. He will—

*a.* Select and appoint such personnel, including guards, as may be required to carry out the execution.

*b.* Instruct all components of the execution party in their duties.

*c.* Arrange for a chaplain to accompany the prisoner.

*d.* Arrange for the presence of a medical officer at the scene of the execution.

*e.* Provide the mechanical facilities and items of equipment and clothing required to carry out the execution.

**19. Executioner.** The officer charged with carrying out the execution will obtain and appoint a professional civilian executioner to perform the execution. Execution by electrocution may not be performed by other than a professional civilian executioner.

**20. Execution.** *a.* On the day of execution, the prisoner will be clothed and otherwise prepared in accordance with instructions of the executioner.

*b.* At the designated time, the prisoner, accompanied by the chaplain, will proceed under guard from the prisoner's cell into the execution chamber. The officer charged with carrying out the exe-

cution will notify the chaplain and the prisoner that a brief time will be allowed the prisoner for any last statement. After a reasonable time, he will order the guards to place the prisoner in the electric chair according to the instructions of the executioner. Following the placing of the prisoner in the electric chair, the officer charged with carrying out the execution, the guards, the chaplain, and the medical officer will move to designated positions in the execution chamber. The executioner will then perform final preparations. Upon signal from the executioner that all final preparations have been completed and he is ready to proceed, the officer charged with carrying out the execution will signal the executioner to perform the execution.

*c.* Upon notification from the executioner that he may proceed, the medical officer will then examine the body, note the time of death, and report to the officer charged with carrying out the execution.

*d.* Upon pronouncement of the death of the prisoner, the officer charged with carrying out the execution will dismiss the execution party.

SECTION V

PROCEEDINGS AFTER EXECUTION

**21. Disposition of remains.** The officer charged with carrying out the execution will arrange in advance for an ambulance or other conveyance with sufficient personnel to be in attendance upon the execution to receive and care for the body. If the next of kin or other relatives of the deceased desire the body, the officer charged with carrying out the execution will, if practicable, permit its delivery to them for burial. If no such claim is made, he will cause it to be buried in a post or civilian cemetery or at the pace of death, whichever may be deemed proper and is authorized by pertinent regulations. Disposition of remains of such personnel of the Armed Forces of the United States is governed by Army Regulations of the 638-series or comparable regulations of the United States Navy or United States Air Force as appropriate. All burials in post cemeteries are governed by AR 210-190.

**22. Disposition of effects.** See 10 USC 4712 et seq. and AR 643-50 or AR 643-55 as applicable. War criminals and civilan resident criminals convicted by a Military Tribunal and executed by military authorities are considered as subject to military law for the purpose of disposition of effects.

**23. Notification and reports.** The officer designated to execute the approved sentence will notify The Adjutant General immedi-

ately following the execution, by fastest available method of communication, of the carrying out of the sentence of death, the time, place and any unusual circumstances attendant thereon. He will likewise, in addition, furnish other notifications as may be required by AR 600–65 and AR 600–66 or AR 600–67. The quartermaster or other officer in charge of burial will furnish the report of burial as required in the regulations cited in paragraph 21.

SECTION VI

MODIFICATION OF PROCEDURES

**24. Limited facilities.** If the facilities are not available for the carrying out of each of the provisions of this regulation or if the exigencies of the situation require it, the officer designated to execute the approved sentence may make the necessary modification of the provisions herein contained, except that he may not change the mode of execution. Any modification will be reported in writing to the confirming authority.

**25. In time of war.** In time of war, only the minimum number of troops necessary to accomplish the execution need be employed.

SECTION VII

STRUCTURES

**26. Permanent scaffold.** A permanent type, demountable scaffold, with a metal trigger mechanism, will be erected when the need for such a structure is determined by the commanding officer (fig. 2). Where available, troops belonging to the Corps of Engineers will be employed in the constructing of the scaffold, but where not available, or where it is more practicable, other troops or civilans may be employed. Preliminary tests will be made to insure the strength of the rope and the stability of the scaffold's construction. If facilities are limited, a trapdoor on the second floor of the building may be constructed to effect the execution, or a similar improvisation employed.

**27. Semipermanent scaffold.** A semipermanent scaffold which requires no special metal fittings may be used in executions by hanging when deemed expedient by the officer charged with carrying out the execution (fig. 3).

**28. Emergency structures.** When the exigencies of the field so dictate, emergency type gallows may be used (fig. 4).

SECTION VIII

EQUIPMENT

**29. Hood.** The hood will be black, the outer surface of rough materials, split at the open end so that it will come well down on the prisoner's chest and back.

**30. Collapse board and binding strap.** A collapse board will be provided for use in case of the collapse of the prisoner (fig. 5).

**31. Rope.** The rope will be of manila hemp, at least ¾ inch and not more than 1¼ inches in diameter and approximately 30 feet in length. The rope will be boiled and then stretched while drying to eliminate any spring, stiffness, or tendency to coil. The hangman's knot (fig. 7) will be used in the preparation of the noose. That portion of the noose which slides through the knot will be treated with wax, soap, or grease to insure a smooth sliding action through the knot. The noose will be placed snugly around the prisoner's neck in such a manner that the hangman's knot is directly behind his left ear.

**32. Post.** Design for post used in execution by musketry as mentioned in paragraph 12a, is shown in figure 6.

**33. Electrocution.** Facilities and equipment for effecting execution by means of electrocution will be in accordance with Headquarters, Department of the Army instructions.



A= Body Strap
B= Arm Straps 1"x9"

*Figure 1. Binding strap.*



**PLAN OVER BEAM**



**PLATFORM AND STAIR PLAN AT SECTION A-A  SCALE ½″ = 1′**

*Figure 2 ①. Permanent scaffold.*

AGO 5167B



**FRONT ELEVATION SCALE ½″ = 1′**

*Figure 2 ②. Permanent scaffold, front elevation.*



SIDE ELEVATION SCALE ½″–1′

Figure 2 ③. Permanent scaffold, side elevation.

App'x C Page 1414



*Figure 2 ⓒ. Permanent scaffold, bell crank.*

AGO 5167B



Figure 8 ①. Semipermanent scaffold.



Figure 3 ③. Semipermanent scaffold, details.

App'x C Page 1717



Section A - A
$\frac{3}{4}" = 12"$

Elevation of Trigger Post    $\frac{3}{4}" = 12"$



4"x 4"   9' 6" Long   In   Two   Pieces   At   Center

Hinged   To   Stand   with   1-Inch   Bow   At   Center

## MATERIALS

| | | | |
|---|---|---|---|
| 2 pcs | 6"x 8"- | 22' Long | Gallows   Posts |
| 4 | 6"x6"- | 12' | Platform   Posts |
| 2 | 2"x10"- | 16' | Step   Stringers |
| 4 | 2"x10"- | 10' | Cross   Bar - Beam |
| 3 | 2"x8"- | 14' | Joist- Extend for stair landing |
| 1 | 2"x8"- | 12' | Joist- Short |
| 7 | 2"x8'- | 10' | Joists- Regular |
| 8 | 2"x6"- | 14' | X  Braces |
| 4 | 2"x6'- | 10' | Gallows  Braces |
| 1 | 4"x4"- | 10' | Knee Braces (cut to 5' 0") |
| 4 | 4"x4"- | 4' | Newels |
| 2 | 2"x4"- | 16' | Stair  Rail |
| 1 | 2"x4"- | 14' | Stair  Rail |
| 3 | 2"x4"- | 10 | Stair Rail  & Trap Door Rail |

$$\left( \text{Flooring if 2" thick} \begin{cases} 10\text{ pc } 2"x8" & 12' \text{ Long} \\ 6 & 2"x8" & 10' \text{ Long} \\ 3 & 2"x8" & 8' \text{ Long} \end{cases} \right)$$

| | | | |
|---|---|---|---|
| 1 pc | 2"x6"- | 8' Long | Trap Door   Rails |
| 1 | 2"x6 3/4" 8' | | 140 BM 3/4" T&G  Pine Flooring |
| 4 | 2"x10"- 14' | | Cut into 3' 6" lengths  Step Tread |
| 1 | 4"x4"- 10' | | Trigger |

*Figure 3 ③. Semipermanent scaffold, details*—Continued.



3 POLES SECURELY TIED
AT TOP AND SUNK 18" IN
GROUND

Tripod Lashing

*Figure 4. Emergency gallows, post type and tripod type.*



A - Brace Board          B₁ B₂ B₃ = 1 inch straps

*Figure 5. Collapse board.*



*Figure 6. Post used in execution by musketry.*



Length of loops: from A to B should be approximately 18 inches, and from C to Running End should be approximately 35 inches to 108 inches depending upon diameter of the rope. Wrap Running End around for six turns. No extra rope should remain.

*Figure 7* ① *and* ②. *Hangman's knot.*



Tighten loops by pulling at Running End. Lock loops and form knot by pulling down at point D. Slide knot up or down on Standing Part to adjust size of loop.

*Figure 7* ③ *and* ④.

AGO 5167B

App'x C Page 2121

[AG 250 (16 Mar 59) PMGK]

By Order of *Wilber M. Brucker*, Secretary of the Army:

MAXWELL D. TAYLOR,
*General, United States Army,*
*Chief of Staff.*

Official:

R. V. LEE,
*Major General, United States Army,*
*The Adjutant General.*

Distribution:

*Active Army:* D.

To be distributed as needed to Headquarters of Department of the Army Staff Agencies, Headquarters Army Audit Agency and field offices, Headquarters of Major Commands.

*NG:* State AG (3).

*USAR:* None.

CLEST Minimum Standards For Patrol Rifle and Select Fire Weapons
For Law Enforcement Agencies

Paragraph I.  Law Enforcement personnel assigned to utilize a Patrol Rifle are required to qualify with the Rifle a minimum of one time annually.  A Patrol Rifle is defined as any center fire rifle primarily designed for Military/Law Enforcement use and has a detachable box magazine (i.e. M-16, AR15, M4, HK MP5, UMP, Ruger Mini 14, Remington 7600P, and or variants.)  Sporting rifles, converted sporting rifles, or bolt-action rifles are not considered patrol rifles.  "Select Fire Weapon" is defined as any firearm that is capable of shooting more than one round with a single depression of the trigger.  Law Enforcement Agencies may choose to shoot the "Model Course of Fire" as outlined in paragraph III or construct their own course of fire ensuring all required minimum tasks/standards are met as outlined in paragraph II.  Agencies that elect to construct their own qualification course must submit their course of fire to CLEST for approval 30 days prior to course instruction.

Paragraph II.  Required minimum tasks/standards for the Arkansas Patrol Rifle Qualification Course:
1. Qualification courses must be taught by a CLEST certified firearms instructor.
2. All agencies must shoot a minimum of 20 rounds during their course of fire.
3. All Agencies must incorporate a minimum of one (1) mandatory reload drill during the course of fire. Five seconds may be added to particular battery of fire when such battery includes a reload drill.
4. All agencies must incorporate firing from standing, kneeling, and prone positions.
5. All shooters must score a minimum of 80% to pass their course of fire or meet higher standard established by their agency.
6. All agencies must utilize targets that do not exceed 93.5 square inches of scoring area which is equal to a 8.5" x 11" piece of notebook paper (the B-27 target contains 86.5 square inches of scoring area within the circumference of the 9 ring and therefore meets this requirement as limited to the 9 and 10 ring area.) Instructors may utilize multiple targeting areas (such as incorporating head shots) as long as no single scoring area exceeds 93.5 square inches and each target area is scored separately.
7. Agencies must construct a course of fire that includes the following:
   a. 3-7 yard line          Minimum of 5 rounds     7 seconds
   b. 10-15 yard line        Minimum of 5 rounds    10 seconds
   c. 25 yard line           Minimum of 5 rounds    25 seconds
   d. 50 yard line           Minimum of 5 rounds    30 seconds
8. Agencies that utilize select fire weapons are required to shoot an additional 20 rounds in a select fire mode, by firing 2-3 rounds per single depression of the trigger.  All rounds will be fired between the 7 and 10 yard lines at the Agencies discretion.  Select fire rounds will be scored separately.  Minimum passing score is 80%.
9. Form F-18 will be completed and submitted to CLEST upon completion of a certified course of instruction. Agencies will maintain firearms qualification records for employees that may be audited by CLEST at any time.  Records

will be maintained for the duration of an employee's employment plus 5
years.


Paragraph III.  Arkansas Model Patrol Rifle Qualification Course
(Meets all minimum requirements for non-select fire weapons.  Officers utilizing
weapons capable of select fire must shoot additional rounds as described in Paragraph II.)

Target:      B-27 Standard Silhouette
Rounds:    20

Scoring:     Shots inside the 9 ring = 10 points
             Shots outside the 9 ring = 0 points
             Center head shots (if applicable) = 10 points


       200 points are possible.
       160 points, (80%) needed to Qualify.


Stage 1.                                50-yard line
       1. Starting from the ready position, fire 2 rounds standing, then 3 rounds prone.
                             5 rounds total
                             30 seconds.

Stage 2.                                25-yard line
       1.   Starting from the ready position, fire 2 rounds standing, combat reload, then fire 3
            more rounds kneeling
                             5 rounds total
                             30 seconds.

Stage 3.                                15-yard line
       1.    Starting from the ready position, fire 5 rounds  standing.
                             5 rounds total
                             10 seconds.

Stage 4.                                 3-yard line
       1.  Starting from the ready position, fire 5 rounds standing.
                             5-rounds total
                             7 seconds

Shots to the center of the head are recommended at this stage so that the shooter may
demonstrate that he is aware of the impact change created by the sight over bore
phenomenon that occurs with AR15/M16/M4 style rifles at close distances.