**IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS**

JASON McGEHEE et al.,

*Plaintiffs*

-and-

JUSTIN ANDERSON et al.,                                            *Intervenors*

v.                              No. 4:17-cv-00179-KGB

ASA HUTCHINSON, Governor of the State of Arkansas, and
WENDY KELLEY, Director, Arkansas Department of Correction,

*Defendants*

**PLAINTIFFS' POST-TRIAL BRIEF**

LISA G. PETERS
FEDERAL PUBLIC DEFENDER

By:    JOHN C. WILLIAMS, ABN 2013233
       Federal Public Defender's Office
       1401 W. Capitol, Suite 490
       Little Rock, AR 72201
       Telephone: 501.324.6114
       E-mail: john_c_williams@fd.org

       *Counsel for Plaintiffs*

# TABLE OF CONTENTS

Introduction .................................................................................................................1

I.   Eighth Amendment Claim.............................................................................2

  A.   Scientific evidence...................................................................................3

    1.  The protocol ....................................................................................3

    2.  The second and third drugs............................................................4

    3.  Midazolam ......................................................................................5

      a.  Its role in the protocol............................................................5

        i.  Midazolam's pharmacology and ceiling effect....................7

        ii.  Midazolam's inability to produce and maintain
            unawareness to painful stimulus....................................12

      b.  The State's science................................................................16

        i.    FDA package insert............................................................17

        ii.   Dr. Buffington....................................................................18

        iii.  Dr. Antognini.....................................................................21

    4.  The science shows that the midazolam protocol
       is very likely to cause suffering...............................................25

  B.   Midazolam executions ..........................................................................26

    1.  Kenneth Williams...........................................................................26

    2.  Marcel Williams .............................................................................31

3.   Other midazolam executions ..................................................................34

4.   Experts' interpretations......................................................................37

C.   Alternative execution protocols ...............................................................41

1.   Firing squad ........................................................................................41

2.   Secobarbital........................................................................................46

3.   Pentobarbital.......................................................................................47

D.   Legal conclusions .......................................................................................48

II.   Equal Protection Claim .......................................................................................50

III.   Access Claims .......................................................................................................52

A.   Multiple attorneys and phone access ......................................................54

B.   Viewing and hearing the entirety of the execution..............................55

C.   Access to information about when the drugs are injected...................56

Conclusion ...........................................................................................................................57

This case concerns three questions. First, and primarily, does the State's three-drug midazolam protocol violate the Eighth Amendment? Second, does the State violate the Equal Protection Clause in its administration of consciousness checks during executions? Third, do the State's restrictions on attorneys' ability to see, hear, and communicate during the execution violate the right of access to counsel and the courts?

After consideration of proof presented at trial on these issues, the Court should now conclude that the midazolam protocol causes cruel and unusual punishment and should issue a permanent injunction against its continued use. Midazolam cannot prevent the condemned from feeling the extremely painful effects of the second and third drugs, which produce suffocation and severe burning. The evidence of this at trial was compelling and conclusive. It included expert testimony establishing that midazolam can render a patient sedate, but not unaware or insensate to pain. It included evidence of a consensus scientific opinion that midazolam has a ceiling effect that prevents increasingly higher doses from having any further potency. It included evidence that patients rendered apparently "unconscious" via use of midazolam are still able to hear and respond to verbal commands by moving a forearm. And it consisted of unbiased eyewitness testimony that individuals executed using midazolam-based protocols were seen gasping for breath, lurching forward in their restraints, raising their arms in the air, or leaving an eye open. Equally compelling was the evidence of far less painful alternatives available to Arkansas, including firing

squad—which the Department's Director admitted would be feasible for Arkansas to implement—and secobarbital.

The Court should also find an Equal Protection violation because the evidence shows that at least one of the executions proceeded even when the executioners weren't sure about consciousness. Finally, the Court should rule for Plaintiffs on the access claims because Defendants haven't met their burden to show that the ADC's restrictions on access are reasonable.

## I.   EIGHTH AMENDMENT CLAIM

Plaintiffs' primary claim is that the State's midazolam protocol amounts to cruel and unusual punishment prohibited under the Eighth Amendment. The law governing this claim is well-established. Plaintiffs must show that the midazolam protocol is "sure or very likely to cause serious illness and needless suffering." *Glossip v. Gross*, 135 S. Ct. 2726, 2737 (2015). They must also "identify an alternative that is feasible, readily implemented, and in fact significantly reduces a substantial risk of severe pain." *Id.* (cleaned up). Plaintiffs have proven both elements.

At trial, Plaintiffs presented extensive proof concerning midazolam, executions using midazolam, and alternatives to the midazolam protocol. The scientific evidence showed that midazolam has a limited sedative effect and cannot render the condemned insensate to the second and third drugs in the protocol. Midazolam has no analgesic properties in itself and is not an anesthetic. Indeed, scientific data show a high rate of

awareness after administration of an anesthetic protocol that includes a dose of

midazolam in amounts around or above the drug's known ceiling dose. Evidence of

movement during midazolam executions further supports a finding that the

condemned suffer. This suffering is entirely unnecessary—the proof showed multiple

available alternatives would eliminate the pain inherent in the midazolam protocol.

## A.   Scientific evidence.

### 1.   The protocol.

Arkansas's execution protocol calls for injection of three drugs. First, the condemned

is injected with 500 mg midazolam. Second, five minutes after the midazolam injection

begins and after "medically appropriate" consciousness checks,[1] the condemned is

injected with 100 mg vecuronium bromide. Finally, sometime after the vecuronium is

injected the condemned is administered 240 mEq potassium chloride. *See* Pls.' Ex. 1. The

potassium is the death agent. It stops the heart. The vecuronium paralyzes the

condemned and stops them from breathing (and also stops the condemned from

exhibiting any further signs of suffering). The midazolam is intended to render the

condemned unaware to the effects of the second and third drugs. The evidence proves

that it does not.

---

[1] The protocol calls for an additional 500 mg midazolam if the designee determines that the condemned is still conscious. As discussed in Part II of this brief, each of the April 2017 executions used a single 500 mg dose of midazolam, despite uncertainty about whether the condemned was still conscious in at least some of the executions.

## 2.   The second and third drugs.

There's little dispute that vecuronium bromide, if administered without adequate anesthesia, would cause the inmates to feel as if they're suffocating. The only witness who has denied that in this litigation is Daniel Buffington. At the preliminary-injunction hearing, Dr. Buffington refused to say that solo vecuronium causes even a "low level of discomfort" and characterized its effect as a "peaceful experience." PI Tr. at 672. Dr. Antognini admitted that an injection of vecuronium by itself isn't peaceful. PI Tr. at 1045–46. At trial, Dr. Buffington attempted to walk back his previous comments by saying that vecuronium bromide would be peaceful when a high dose of midazolam is given first. That retraction, while an inaccurate reading of Dr. Buffington's previous comments, begs the question of whether the midazolam actually renders the prisoners unaware to the suffocation the vecuronium causes. If it doesn't, the prisoners will feel as if they're being strangled to death.

Likewise, there's little dispute that an injection of potassium chloride by itself would be excruciating, with Dr. Buffington again the lone dissenter. At the preliminary-injunction hearing, he commented that a person given an 80 mEq dose of potassium by itself "may have some more discomfort; they may not have discomfort." PI Tr. at 673. No other witness agrees with this assessment. *Cf.* PI Tr. at 1007–08 (Antognini's testimony). Dr. Van Norman, who, unlike Dr. Buffington, administers potassium chloride in her practice, has personally seen someone injected with a 40 mEq dose rise

4

up, scream, and declare that he felt like someone had poured gasoline on him and lit him on fire. The protocol calls for six times more potassium than that. What's more, Dr. Van Norman explained that, because of its well-known effect on the veins, in normal practice potassium chloride is always administered in a diluted form over several hours, never in a single bolus dose. By contrast, Arkansas's execution protocol calls for no dilution of the potassium. An undiluted injection of 240 mEq potassium comes to about fifty times more than the amount known to cause pain. An injection of this size would cauterize and destroy the vein while causing unbearable agony.

### 3.  Midazolam.

#### a.        Its role in the protocol.

The question before the Court is whether a 500 mg injection of midazolam blocks the experience of suffocation caused by the vecuronium bromide and the experience of internal immolation caused by the potassium chloride. The overwhelming evidence shows that it does not.

There are two potential mechanisms by which a drug might provide the necessary blockage. First, the drug itself might have analgesic, or pain-relieving, properties. For example, fentanyl and other narcotic drugs are well-known for their effect on pain neurons, as Dr. Stevens testified, and for their ability to block pain, as Dr. Van Norman explained in her discussion of various anesthetic regimens. By contrast, midazolam itself has no analgesic properties, or at least none that are relevant to the way the drug is

given during executions. The only witness who posited that midazolam provides analgesia was Dr. Antognini. Consistent with his focus on animal rather than human research, Dr. Antognini observed that injection of midazolam into the spinal cords of rats produces an analgesic effect, as suggested by the rats' movements. The only known human study, which Dr. Van Norman discussed in rebuttal, found that when patients were spinally injected with a strong narcotic and midazolam, the midazolam didn't add to the narcotic's analgesic effect but might increase its duration. Even were Dr. Antognini's theory actually applicable to humans, it wouldn't matter here. Midazolam isn't going to be injected into the spines of the condemned. Thus, midazolam doesn't provide the first potential avenue available to provide the necessary blockage of pain.

Second, a drug might depress the central nervous system to such a degree that the condemned will be insensate to the effects of the second and third drugs. Throughout the litigation it has been suggested that the condemned must reach the level of "general anesthesia," which can be broken down into components such as immobility and amnesia. But for the purpose of the Eighth Amendment analysis, what really matters is whether midazolam causes the condemned to reach a state of unawareness that can withstand the delivery of the vecuronium and potassium. If not, the condemned will experience excruciating pain because none of the drugs in the protocol provides analgesia. As discussed in more detail in the below sections, midazolam does not provide that level of anesthesia.

### i. Midazolam's pharmacology and ceiling effect.

Midazolam is within the benzodiazepine class, which includes other drugs such as diazepam (Valium). These drugs were developed as an alternative to barbiturates. Benzodiazepines are considered to be extremely safe. Unlike barbiturates, benzodiazepines can't kill relatively healthy humans when taken alone, though they are dangerous in combination with other substances. Plaintiffs presented several papers to illustrate this point. These papers showed that persons who took massive overdoses of benzodiazepines (and only benzodiazepines)—sometimes in quantities that exceeded the equivalent of 500 mg midazolam—were responsive and emerged unscathed from the experience. *See* Pls.' Exs. 25–27. Although Defendants' expert, Dr. Buffington, opined that midazolam has been known to kill patients with doses as low as 10 mg, on cross-examination it was shown that the papers he relied on identified only a single case of a patient's death being attributed to an overdose of midazolam alone, and even in that case the physicians stated that midazolam only possibly caused the death.

Dr. Stevens went into great detail about why benzodiazepines such as midazolam cannot cause a patient's death. Benzodiazepines have a limited mechanism of action within the body. Their efficacy depends upon the availability of a neurotransmitter called GABA. GABA produces an inhibitory effect on the central nervous system by binding to GABA receptors (and specifically to $GABA_A$ receptors). As Dr. Stevens explained, this mechanism can be thought of as a lock and key—GABA fits into the

GABA receptor, just as other kinds of neurotransmitters fit into other kinds of receptors. Benzodiazepines enhance GABA's inhibitory effect, but only when GABA is present. If GABA isn't present at the GABA receptor, benzodiazepines do nothing. This property makes the drug much less potent than barbiturates—which not only act on the GABA receptor in the absence of GABA but also block excitatory action at other types of receptors—and other anesthetic drugs, which have other mechanism of action in addition. *See* Pls.' Exs. 21 & 22. Benzodiazepines have a single mechanism of action— attachment to GABA receptors when GABA is present. Unlike opioids, they don't act on pain neurons or respiratory neurons.

Critically, there's only so much GABA available to bind to GABA receptors at any given time. That means midazolam and other benzodiazepines can achieve only a limited depressive effect on the central nervous system, as illustrated in the real world by the drugs' inability to cause death in healthy humans. This phenomenon is known as the "ceiling effect." It's acknowledged in every pharmacological textbook and by every reputable pharmacologist and anesthesiologist.

Though he holds himself out as a pharmacologist, Dr. Buffington presented little testimony on the actual pharmacology of midazolam. Notably, at trial Dr. Buffington refused to say that the ceiling effect doesn't exist. Instead, he attempted to sow doubt about its existence by hypothesizing that midazolam might bind not only to the typical GABA$_A$ receptors but also to something known as extra-synaptic GABA$_A$ receptors. The

problem with this theory is that midazolam *cannot* bind to extra-synaptic GABA$_A$ receptors because those receptors lack the particular subunit that benzodiazepines bind to. As Dr. Stevens discussed, each GABA receptor has subunits; benzodiazepines require a gamma subunit to bind. *See* Pls.' Ex. 20. But, as explained in an article published just last year, "[e]xtra-synaptic GABA-A receptors are composed of mainly [delta]-containing receptors, which have . . . low sensitivity to benzodiazepines." Pls.' Ex. 57 at 2. Even the older article Dr. Buffington chose to support his theory says that "[gamma] but not [delta] subunit-containing extrasynaptic GABA$_A$ receptors are modulated by benzodiazepines." Pls.' Ex. 52 at 6. In short, the only testimony that Dr. Buffington presented on pharmacology finds no support in the literature.

*****

Having established that a ceiling effect exists, the question becomes whether it can be quantified. The answer is yes, within a reasonable range.

Plaintiffs presented two human studies that speak to this issue. The first is the much-discussed Miyake study (Pls.' Ex. 24). In this study, the researchers injected patients with either 0.2 mg/kg midazolam or 0.3 mg/kg midazolam. They then measured brain activity on the EEG. They saw no difference between these two groups of patients on the EEG. The study observed that this was likely due to the drug's mechanism of action: "Saturation at the benzodiazepine receptor site would account for the small differences in EEG between patients receiving midazolam 0.2 and 0.3 mg kg$^{-1}$,

respectively, and the absence of burst suppression." Pls.' Ex. 24 at 7. As Dr. Stevens

quite cogently explained during his cross-examination in rebuttal, the Miyake study

suggests that a 0.3 mg/kg dose of midazolam produces no greater sedation than a 0.2

mg/kg dose.

The second study is Inagaki (Pls.' Ex. 31). As Dr. Van Norman explained on direct

examination, the researchers there attempted to replace a known anesthetic (halothane)

with midazolam. Were midazolam a full anesthetic, the researchers would have been

able to use it to completely replace the halothane. But as they injected more and more

midazolam they were able to remove less and less halothane. As illustrated in Figure 3

of the paper, and as Dr. Van Norman further explained, the midazolam had begun to

reach its ceiling at a dose of 0.4 mg/kg. The researchers noted that this was a result of

the drug's mechanism of action: "Midazolam acts at the specific receptors in the central

nervous system (CNS) (1), and the number of benzodiazepine receptors is limited.

Therefore, benzodiazepine receptors will become saturated at a sufficient level of serum

midazolam concentration. The present results indicate clearly that the midazolam action

to potentiate the anesthetic action of halothane has a saturable nature." Pls.' Ex. 31 at 4.

Dr. Antognini critiqued the Inagaki study because it didn't go further to inject doses

of 0.5 mg/kg, 0.6 mg/kg, or greater. But the study need not have gone that far to provide

useful quantification of the ceiling effect. As Dr. Van Norman explained, there's a

marked flattening of the curve at about 0.4 mg/kg (40 mg in a 220-pound person). By

that point midazolam has ceased to have the sort of dose-dependent effect it shows in lower quantities. Indeed, even Dr. Antognini himself admitted at the preliminary-injunction hearing that he'd expect to see midazolam's effect start to flatten at 20 to 25 mg. PI Tr. at 1027. In short, once a prisoner receives 0.4 mg/kg of midazolam, or perhaps lower per Miyake, the midazolam will cease to produce any sedative effect. And that inefficacy occurs well below the 500 mg the protocol calls for.

Finally, Dr. Buffington told the Court that if midazolam's ceiling effect were 0.4 mg/kg or lower the FDA would have required the manufacturer to change the label to omit guidance suggesting injection of 0.6 mg/kg in resistant cases. Coming from a purported authority on pharmaceuticals, this comment betrays a surprising ignorance of how the labelling process actually works. As the Supreme Court has recently explained, the FDA didn't have the power to require the manufacturer to change the label until 2007. Even today, it's the manufacturer's responsibility, not the FDA's, to ensure the continued adequacy of drug labelling. *See Merck Sharp & Dohme Corp. v. Albrecht*, No. 17-290, slip op. at 11 (U.S. May 20, 2019). At 0.6 mg/kg, the drug has already achieved its full effect and poses no danger to patients that would warrant an additional warning. As Dr. Van Norman explained in her rebuttal testimony, there's no incentive for the manufacturer to change the label in that circumstance and the FDA doesn't require that it do so.

### ii. **Midazolam's inability to produce and maintain unawareness to painful stimulus.**

Dr. Van Norman is a practicing anesthesiologist of over thirty years' experience. She's administered anesthesia to at least 19,000 patients and has seen a number of changes in anesthesiology practice during her career. Some of the basic principles have remained the same, though. One of these principles is to ensure that the patient is unaware while under surgery—not merely unable to remember what happened once she emerges from surgery. Another of these principles is that awareness is relative—unawareness to what? The relevant question for any anesthesiologist is not whether the patient appears to be asleep but rather whether the patient is going to feel whatever painful stimulus is applied during the surgery. While an anesthesiologist might use things like an eyelash brush or trapezius pinch, such measures merely allow an initial assessment of whether the drug has begun to take effect. A person who fails to respond to a trapezius pinch may well respond to an incision or injection of a painful drug. Gauging whether someone is unaware to surgical stimulus requires contemporaneous observation and additional administration of anesthetic if the patient shows signs of awareness.

Awareness is distinct from recall. Often the literature conflates the two concepts because recall is frequently assessed by simply asking the patient what she experienced. If the patient remembers what happened during surgery, she was by definition aware. But the converse isn't true, particularly when the anesthetic regimen includes drugs like

midazolam that are adept at producing amnesia. A patient may have experienced the surgery without being able to remember it afterwards. In the lethal-injection protocol, recall is unimportant. Midazolam might make the condemned forget if they survived the procedure, but that's not going to happen. What matters is awareness before death as the second and third drugs take effect.

Awareness is also distinct from pain. A person may be aware during surgery and yet not feel pain because the anesthetic regimen includes a narcotic that blocks pain. As already discussed, there's no analgesic agent in the midazolam protocol. If the condemned are aware to the second or third drugs they will feel suffocation and burning.

Intraoperative awareness occurs with some frequency. Dr. Van Norman has had personal experience with this on multiple occasions, including with midazolam. As she testified, for a time in the 1980s it was standard to use diazepam or midazolam alongside potent narcotics during cardiac surgery. On one occasion she gave the equivalent of about 1 mg/kg diazepam. The patient later described the doctors sawing his chest open. On another occasion, Dr. Van Norman gave about 0.7 mg/kg midazolam—more than the ceiling-effect dosage—and that patient also recalled the opening of her chest. (Again, these people weren't in pain because they'd been given high-dose fentanyl.) Nor were these the only patients who have reported awareness during surgery to Dr. Van Norman.

Dr. Van Norman didn't just rely on her own experiences. She performed a comprehensive literature review and presented the most pertinent findings of that review to the Court. Most notably, Dr. Van Norman discussed several studies that used the isolated forearm technique to discern awareness in real time during surgery. Dr. Van Norman illustrated the isolated forearm technique with a video (Pls.' Ex. 33). By applying a tourniquet to one of the patient's arms, doctors are able to block that arm from receiving paralytic (which the doctors have injected to prevent movement that would interfere with the operation). Isolation of the arm allows the patient to respond to commands given during surgery if she's aware.

Dr. Van Norman discussed the Linassi paper, which is a meta-analysis of twenty-two isolated-forearm-technique studies concerning various anesthetic regimens. (Pls.' Ex. 34). This paper concluded that 34.8% of patients were aware during surgery as indicated by response during the isolated forearm technique. One of these twenty-two studies, conducted by Russell, concerned patients who received midazolam specifically, and shows that the percentage of those patients who were aware during surgery was even higher. In this study, patients received a premedication dosage of 5–10 mg midazolam, followed by a 0.2 mg/kg bolus dose at induction, followed by another dose of up to 0.3 mg/kg (depending on surgery length). Pls.' Ex. 36 at 1 & tbl. 1. Ultimately this comes to a dosage range of 0.3 mg/kg to 0.6 mg/kg midazolam—an amount close to or higher than the ceiling-effect dosage. On top of that, the patients received alfentanil,

a narcotic. Application of the isolated forearm technique revealed that 72% of these patients responded during surgery. Indeed, this anesthetic regimen, which included an amount of midazolam approximate to what Dr. Van Norman used during cardiac surgery during the 1980s, produced one of the highest response rates of any of the isolated-forearm-technique studies included in the Linassi paper. *See* Pls.' Ex. 34 tbl. 1.

Dr. Antognini criticized these studies on the ground that the isolated forearm technique isn't commonly used in American operating rooms (though it's commonly used in British operating rooms). This critique doesn't compute. The technique need not be used by practitioners to have utility as a research tool into awareness. Dr. Antognini offered no comment on the reliability of the method itself. Academic journals wouldn't have published these studies if the technique produced false reports of awareness. If any criticism of the isolated-forearm technique is warranted, it's that it's under-inclusive. As explained in the Sanders paper (Pls.' Ex. 35), and as Dr. Van Norman reiterated in her testimony on direct, a person can be aware yet be unable to respond to commands. This would occur if the thalamus is damaged or if a drug interferes with its ability to act. GABAergic drugs—that is, drugs that interact with GABA receptors like midazolam—have been linked to such interference with the thalamus, thus making it more likely that a person who has taken midazolam is aware yet unable to respond.

Even if responsiveness were a perfect measure of awareness, the isolated-forearm-technique studies are conclusive that intraoperative awareness during surgery in

general—and after administration of midazolam specifically—is significantly elevated. The isolated forearm technique confirms what anesthesiologists have known for a long time now—midazolam shouldn't be used as a solo anesthetic for painful surgical procedures, at least not unless an emergency requires it to be. When midazolam is used alone, patients move, scream, and feel pain, as is Dr. Van Norman's personal experience when emergencies have required a drug that will at least allow patients to forget what happened to them. Likewise, prisoners will feel—have felt—the suffocating effects of the vecuronium bromide and the burning pain of the potassium chloride.

### b.  The State's science.

The State presented a defense of labels. Quite literally, it depends heavily on the FDA label, which doesn't even say what the State's been trying to make it say. And it leans on any mention of "general anesthesia" it can find, as if a stray reference to that term in the literature overcomes the data concerning what really matters—whether a 500 mg dose of midazolam renders the condemned unaware to the second and third drugs. The contention that midazolam is effective for this purpose must find some other support, which the State attempted to present through Drs. Antognini and Buffington. But when one digs into the expert's discussion of actual data, there's not much there. None of it undercuts Plaintiffs' proof that the condemned will suffer because the midazolam can't block the effects of the second and third drugs. After review of the

testimony and underlying data, the Court should determine that Plaintiffs' experts are more credible than the State's.

### i. FDA package insert

Though the State repeatedly brought up the FDA label at trial, little need be said about it. The State is convinced that the label instructs doctors that they can use midazolam as the sole anesthetic agent to achieve unawareness to a painful surgical stimulus. It says no such thing. Dr. Antognini was effectively crossed about this point during trial. The label gives four indications for use of midazolam. The first two permit it to be used alone, but only for "sedation/anxiolysis/amnesia." Defs.' Ex. 6 at 3. Everyone agrees that the drug is appropriate for anxiolysis and amnesia, but those conditions are of no concern to this case. The third indication is intravenously "for induction of general anesthesia, *before administration of other anesthetic agents*." *Id.* (emphasis added). The final indication allows for "continuous intravenous infusion for sedation of intubated and mechanically ventilated patients *as a component of anesthesia*." *Id.* (emphasis added). In short, the label doesn't say what the State says it says. When the label discusses midazolam in connection with "general anesthesia," it always does so with the precondition that other anesthetic agents are on board. Consistent with this reality, the American Society of Anesthesiologists informs its members that midazolam isn't to be used for general anesthesia, as established in Dr. Antognini's cross-examination.

## ii.  Dr. Buffington

Dr. Buffington's trial testimony amounted to a series of conclusory statements without presentation of scientific support. His ultimate opinion is that midazolam will achieve a state of general anesthesia for around an hour, which is long enough for the execution protocol to be carried out. As an initial matter, Dr. Buffington is at best a weak authority on this proposition because he claims expertise as a pharmacologist, not as an anesthesiologist. Accepting for the sake of argument that his status as a "clinical" pharmacologist gives him some insight into the actual practice of anesthesiology, he has no real experience with midazolam. His limited knowledge of the drug is betrayed by his incorrect belief that the FDA approved it for use in 1995, rather than in the 1980s, as Dr. Van Norman explained. (This wasn't a slip of the tongue—he said it twice.) At best, Dr. Buffington claims to have observed midazolam used as the sole anesthetic agent for painful procedures such as setting bone fractures. But that doesn't mean that midazolam, when used by itself, makes a person insensate to pain. As Dr. Van Norman testified in rebuttal, it's only used this way in emergencies because it will cause the patient to forget the experience. These unfortunate patients scream in pain.

Dr. Buffington's confusion of induction anesthesia and maintenance anesthesia gives additional ground to doubt his opinion. Assume that Dr. Buffington is correct that midazolam alone can induce a person to a state of general anesthesia—an assumption that would disregard the FDA's indication that when used for induction midazolam

must be followed by "other anesthetic agents." That would not mean that midazolam can maintain unawareness to a powerful stimulus such as 240 mEq of undiluted potassium chloride. As Dr. Van Norman explained in rebuttal, maintenance of unawareness during the painful stimulus is what matters, and midazolam can't achieve the requisite maintenance. The opinion of Dr. Van Norman, an experienced practitioner, is entitled to greater weight than Dr. Buffington's on this issue.

As Dr. Buffington has no meaningful background administering midazolam or in practicing anesthesiology, his conclusions lack authority without data to support them. But the State presented no such data at trial. At the preliminary-injunction hearing, Dr. Buffington referenced six articles without delving into what they actually say. PI Tr. at 625. One of them is the package insert as reproduced on drugs.com. Defs.' Ex. 43. Another is the forensic toxicology textbook by Baselt, on which Dr. Buffington was crossed at trial. Pls.' Ex. 50. A third is the Liu study—which assesses EEG levels after injection of midazolam—that the Court has already discussed in its preliminary-injunction order. Defs.' Ex. 12; ECF No. 54 at 57–58. Dr. Buffington provided no context for the other three studies. Perhaps that's because the studies don't really support his opinion, and in some cases fully contradict them.

One such study is the Bulach article (Defs.' Ex. 35). As shown during Dr. Buffington's cross-examination on this article at trial, Bulach demonstrates that whatever level of sedation midazolam achieves begins to wear of very quickly—in far

less than an hour and, in fact, in less time than the length of a typical execution.

Specifically, Bulach shows that patients who received midazolam reached a depth of

sedation as low as 66 on the bispectral index (BIS), which is a technique used to

measure depth of sedation with an EEG. That study showed that, across all patient

groups in the study, the midazolam's sedative effect had begun to wear off within eight

minutes and the patient was becoming more aware. Notably, under Arkansas's

protocol, by eight minutes the condemned would have been administered the

vecuronium bromide, the paralytic effect of which would have rendered the patient

unable to exhibit any signs of increasing awareness or pain. When Dr. Buffington was

crossed on this key contradiction of his opinion, he stated that he would not answer any

further questions about the article until he had a chance to read it. One would have

expected Dr. Buffington to have read the article *before* he relied on it in forming his

opinion.

Quite apart from whether Dr. Buffington read the studies correctly (or at all), the

entire premise of his argument—that BIS data indicates whether a person will be aware

to surgical stimulus—is wrong. It doesn't matter how long midazolam exhibits a

depressive effect if it doesn't render a person insensate to surgical stimulus in the first

place. As the Court probably realizes at this point, the experts have been using the BIS

studies for two distinct purposes. The first purpose is to show changes in brain activity

relative to either the passage of time or the injection of more midazolam. This is a valid

exercise and provides useful evidence for the ceiling effect of midazolam or for the

duration of the drug's effect. The second purpose is to show that midazolam itself

renders a person unaware to painful stimulus. This use is more questionable. As both

Drs. Antognini and Van Norman explained, the BIS monitor can't reliably gauge

whether someone is unaware and ready for surgery. Moreover, Dr. Buffington was

forced to admit on cross-examination at trial that the studies he relies on don't exhibit

general anesthesia even by the manufacturer's stated criterion (a score below 60 on a

100-point scale). Faced with this data, Dr. Buffington contended that the drug generates

"deep sedation" and that there's no requirement to achieve general anesthesia in the

first place. That point undermines his earlier testimony that midazolam will achieve a

state of general anesthesia necessary to prevent the inmates from feeling pain from the

second and third drugs.

### iii.  Dr. Antognini

The gist of Dr. Antognini's opinion is that midazolam can be used to produce

unawareness to pain even if no responsible anesthesiologist would use it this way. In

what was hardly a ringing endorsement for the lethal-injection protocol, Dr. Antognini

said that if he were on an island and needed to administer anesthesia, he would give

midazolam rather than nothing. Indeed, if stuck an island with nothing else available,

one might reasonably administer a stiff drink rather than nothing, but that does not

endorse it as an acceptable approach for achieving unawareness in a civilized

environment. Dr. Antognini presented no experiential basis for endorsing midazolam as a sole anesthetic; instead he relied on a literature review to support his opinion. But an examination shows this review, at least insofar as it was presented in testimony, to be irrelevant or unsupportive of Dr. Antognini's opinion.

Dr. Antognini presented much of the basis for his opinion at the preliminary-injunction hearing. It appears to have three prongs: that midazolam has produced anesthesia in animal studies; that a 500 mg midazolam injection produces a blood-plasma level beyond that associated with unconsciousness; and that midazolam can be used by itself for endotracheal intubation.

Animal studies. At the preliminary-injunction hearing, Dr. Antognini briefly discussed a study by Nishikawa (Defs.' Ex. 62) that, per Dr. Antognini's description, showed that mice were "able to achieve general anesthesia with midazolam by itself." PI Tr. at 979–80. What the study actually showed was that the mice didn't move after injection of midazolam. PI Tr. at 1043–44. The study didn't say anything about whether the mice remained aware. And, of course, these were mice, not humans. Dr. Antognini's reliance on animal research and his focus on movement rather than awareness is characteristic of his background but not particularly relevant to whether midazolam can render a human insensate to surgical stimulus. Insofar as Dr. Antognini opines that immobility necessarily involves unawareness, Dr. Van Norman's testimony and the Sanders study (Pls.' Ex. 35) refutes that point.

Blood-plasma levels. At the preliminary-injunction hearing, Dr. Antognini attempted to show that a 500 mg midazolam injection will produce blood-plasma levels above the amount associated with unconsciousness. *See* PI Tr. at 1001–05; Defs.' Ex. 73. The problem is that the paper that formed the basis for this opinion, Glass (Defs.' Ex. 51), doesn't actually show that midazolam rendered the study subjects "unconscious" in any way that's actually relevant to the lethal-injection protocol. The midazolam subjects in this study never achieved an awareness score showing them unresponsive to noxious stimulus. Dr. Stevens pointed out this issue in his rebuttal at the preliminary-injunction hearing. PI Tr. at 1077–81. Dr. Antognini was cross-examined about it at trial as well. Beyond that, as Dr. Stevens testified at trial, studies by Greenblatt and Divoll (Pls.' Exs. 26 & 27) found awareness despite extraordinarily high blood-plasma levels of diazepam, a closely related benzodiazepine. In short, the data about blood-plasma levels, insofar as it is useful, indicates that a person can reach extreme blood-plasma levels of midazolam and still remain aware.

Endotracheal intubation. The argument that emerges most prominently from Dr. Antognini's testimony is that midazolam is adequate for the execution protocol because it can be used by itself to insert an endotracheal tube. This argument relies on a couple of premises. The first is that an endotracheal tube is more painful than a surgical incision or an injection of potassium chloride. Dr. Antognini provided no support for this opinion, which certainly didn't account for the fact that the protocol calls for

potassium to be injected in a quantity (and at a rate) many times higher than that known to cause pain. The second premise is that some studies have used midazolam for endotracheal intubation. The primary study Dr. Antognini relied on for this proposition at trial was Miyake. The researchers in this study used not only midazolam but also a narcotic, remifentanil, to place the tube. *See* Pls.' Ex. 24 at 2. The remifentanil was later turned off, but, as Dr. Van Norman explained in rebuttal, it is the placement of the tube, not its mere presence, that's stimulating. More importantly, the study didn't say anything about whether the midazolam rendered the subjects unaware, which is the important question for present purposes. Notably, Dr. Antognini appeared very careful not to say that he himself would use midazolam by itself for endotracheal intubation—indeed, at trial he even mentioned using fentanyl (an analgesic) during the procedure.

*****

In sum, Dr. Antognini presented no data to show that midazolam can render the prisoners unware to the second and third drugs. Indeed, he was confronted with recent guidance from the American Society of Anesthesiologists, of which he is one of only 700 fellows, stating that benzodiazepines such as midazolam aren't intended for general anesthesia. Dr. Antognini's opinion should carry little weight in the face Dr. Stevens's testimony about midazolam's pharmacology and Dr. Van Norman's testimony about its inability to produce unawareness to surgical stimulus. [2]

---

[2] At the end of trial, Defendants moved to admit a number of exhibits from the preliminary-injunction hearing. Plaintiffs objected that there had been insufficient discussion of the exhibits

4. **The science shows that the midazolam protocol is very likely to cause suffering.**

Upon consideration of all the science, the Court should conclude that 500 mg midazolam is unable to render the prisoners unaware to the horror of the second and third drugs. Midazolam and other benzodiazepines have a ceiling effect that every pharmacological textbook acknowledges and that few pharmacologists and anesthesiologists (besides Dr. Buffington) dispute. The data indicates that midazolam reaches its peak effect at around 0.3 mg/kg or 0.4 mg/kg, depending on which study one relies upon. That is, of course, well below what the condemned receive under the execution protocol. A separate study shows that at least 72% of patients given an amount of midazolam at or above the ceiling-effect dosage (alongside a powerful narcotic) exhibited awareness as measured by the isolated forearm technique—the best way to gauge awareness after administration of anesthetic agents. This data finds additional support in the personal experience of Dr. Van Norman, who has documented multiple instances of not just awareness but recall in patients who were given midazolam for anesthesia. In short, the scientific proof shows it very likely that the

---

to permit admission under Federal Rule of Evidence 703. Upon review of the preliminary-injunction transcript, Plaintiffs acknowledge adequate discussion at the preliminary-injunction hearing of the following exhibits: Defendants' 12, 26, 36, 40, 43, 49, 50, 51, 62, 68, 70, and 73. They withdraw their objection to these exhibits. Plaintiffs maintain their objection to the remaining exhibits on the ground that Defendants have made no showing that their probative value outweighs their prejudicial effect under Rule 703. Defendants presented no discussion whatsoever of these studies at the preliminary-injunction hearing or at trial.

prisoners will be aware of suffocation caused by the vecuronium and the burning caused by the potassium.

## B.  Midazolam executions.

In addition to the extensive scientific testimony, the Court received evidence about the 2017 Arkansas executions and executions in other states that use midazolam. These accounts show that a number of condemned men moved unexpectedly during their executions. Only in Ledell Lee's execution did the trial witnesses—four ADC employees and an employee of the Attorney General's office—notice nothing remarkable, at least not before the vecuronium bromide came onboard to stop any movement. Jack Jones's execution was marked by irregularities discussed during a hearing immediately after his execution. At trial it emerged that Jones's execution isn't even analogous to the others because he also received a substantial dose of methadone, a strong narcotic, which peaked at the time of his execution, as Dr. Van Norman explained in rebuttal. The other executions, including the out-of-state executions discussed at trial, exhibited significant problems and lend additional support to the scientific evidence that the prisoners remained aware to the second and third drugs.

### 1.  Kenneth Williams.

There can be little doubt that Kenneth Williams's execution went horribly awry. Multiple witnesses described him violently lurching the upper half of his body against the restraints and moaning at the time of the consciousness check. The State minimized

the events of Williams's execution from the moment it ended and its witnesses

continued to do so at trial, resisting even the basic fact that Williams moved his head

during the lurching. These opinions should not be credited in light of the transparently

coordinated nature of the testimony and, even more importantly, the objective proof of

bruising to Williams's scalp—bruising that could only have occurred by Williams

banging his head against the gurney's wooden headboard.

Kelly Kissel is a former AP reporter who has seen ten executions—eight lethal

injections that didn't involve midazolam and two that did (Kenneth Williams and

Marcel Williams). The two midazolam executions involved more movement from the

condemned than he'd ever seen in a non-midazolam execution. In Kenneth Williams's

execution, four to five minutes after the execution began, the top half of Williams's

body lurched violently against the restraints fifteen times in quick succession. Then

Williams lurched five more times at a slower rate. Williams's head was coming up

against the leather strap. Though the microphone to the witness room was off, Kissel

could hear the thrashing. He could also hear a groan or a moan around the time a

consciousness check was administered. Kissel commented that Williams moved

throughout the execution until he was dead.

Eric Motylinski and Cassandra Belter confirmed this account and presented a few

additional details. Motylinski and Belter were part of a legal team appointed to

represent Kenneth Williams sixteen days before he was executed. Motylinski and Belter

saw the same sort of lurching that Kissel observed. They heard noises they described as choking, heaving, or groaning at around the same time as the lurching. After the lurching, Motylinski left the witness room to place a phone call about what was happening to Williams. Belter remained and heard Williams groan audibly in response to the designee pushing on Williams's shoulder at around 10:58. She also saw Williams's mouth open after the designee poked Williams's eye.

The State presented two "citizen witnesses," State Senator Trent Garner and former Pulaski County prosecutor Tammy Harrelson, who worked at the Attorney General's Office during the executions. Neither witness denied seeing Williams move after administration of the midazolam, but neither interpreted the movement as problematic. Garner described the lurching episode as a little more than pronounced heavy breathing. Harrelson said it didn't involve pain. Garner claimed authority to assess pain through his military experience and Harrelson claimed similar authority through her experience as a plaintiffs' attorney representing nursing-home residents. Each produced an affidavit describing the execution in similar terms. Most notably, each affidavit described the lurching episode as "involuntary muscle spasms." Garner admitted that an attorney from the Attorney General's office wrote his affidavit but claimed that he came up with the phrase "involuntary muscle spasms" himself. Harrelson said that she wrote her affidavit herself, including the phrase "involuntary muscle spasms," and sent it to the Attorney General's office.

Four ADC employees witnessed Kenneth Williams's execution and testified about it at trial: Wendy Kelley, Dale Reed, William Straughn, and the designee. None of these witnesses could deny Williams's movement, but they said it only involved the chest. Straughn described Williams's chest and abdomen moving as if he were breathing heavily. The designee described "arching." Reed described Williams's chest coming up like a coughing movement but without noise. Kelley described Williams's torso coming off the table for fifteen to twenty seconds in a rhythmic fashion. Like Reed, she described it as a coughing motion without a coughing sound. She denied seeing Williams's head move.

The Court should not credit these ADC employees' descriptions as complete accounts of what happened during the execution. The descriptions are subject to skepticism because they were manifestly the product of coordination. At trial, Plaintiffs showed that affidavits signed by Kelley, Reed, and Straughn (and authored by the AG's office) were largely verbatim facsimiles of one another. The testimony about the executions was mostly a perfunctory recitation of the affidavits. As was illustrated on cross-examination of Wendy Kelley and the designee, the ADC witnesses had essentially decided beforehand, based on their own expert witnesses, that the executions were going to be free of pain or problems. Their affidavits and testimony are predictable expressions of that predetermination.

Even more damning, the evidence showed that the Governor's office and the ADC coordinated to create talking points to inform the public that nothing was wrong with Kenneth Williams's execution. Pls.' Ex. 56. The talking points, which the ADC's public affairs officer reviewed and edited, told government representatives to publicize that "nothing abnormal occurred throughout the process." They encouraged citation to Dr. Buffington's opinion that a 500 mg dose of midazolam would render the condemned insensate to pain. And they blamed Williams's attorney for making a phone call that caused "dramatized descriptions by media witnesses." *Id.* at 4. The ADC employees' testimony didn't depart from the general line.

Above all, the Court should give little weight to the ADC employees' descriptions because they don't jibe with the objective evidence. The employees' resistance to the notion that Williams was jerking his head—a fact that even State's witness Tammy Harrelson admitted on cross-examination—can't withstand Joseph Cohen's autopsy. The autopsy showed a two-inch bruise on the back of Williams's scalp in the area where his skull began to protrude from his neck. Dr. Cohen testified that the bruise was the product of a blunt force trauma sustained at the time of execution or several hours before. The force could have been produced by Williams's reported thrashing of his head against the wooden headboard on the gurney. Dr. Kokes, whose office missed the bruise in the first place, criticized Dr. Cohen for not microscopically examining the bruise to more precisely determine when it developed. But that criticism is meaningless

without an alternative explanation for the bruise in the hours or days leading up to the execution. There is none. Williams's medical records or the detailed logbook kept at the Cummins holding cell would have noted if Williams had sustained an injury of the magnitude necessary to cause the bruise. As Kelley admitted on cross-examination, she has never seen such a record. Yet she and the other ADC witnesses continued to deny that Williams so much as moved his head during the execution.

In short, testimony that there was no movement or minimal movement during Kenneth Williams's execution, or that no sound could be heard in the witness room, is not convincing. The Court should instead credit the testimony of Plaintiffs' witnesses that Williams violently thrashed against the restraints after administration of the midazolam and made noises audible to the spectators, including a moan in response to a consciousness check.

### 2. Marcel Williams.

Kelly Kissel also witnessed Marcel Williams's execution and again described a scenario in which the condemned was more active than in any non-midazolam execution he'd ever seen. Kissel saw Williams breathing in a distressed manner from the moment the execution began. His breathing then became worse. After the designee performed a consciousness check, Kissel, who testified that he has hearing difficulties and has been trained to read lips, saw the designee turn to someone in the execution

chamber and say, "I don't know." Kissel observed Williams's right eye remain open throughout the process.

Jacob Rosenberg was a second media witness to this execution. He observed Williams breathing heavily and arching his back off the gurney from 10:16 (when the execution began) until 10:21. At 10:21 the designee performed a consciousness check and said something, though Rosenberg didn't recall who he was talking to. Williams continued to breathe heavily. Rosenberg believed a second dose of midazolam went in based on his understanding from the preliminary-injunction hearing that almost any movement could cause the consciousness check to be failed. Williams became still at 10:24. One of his eyes remained open throughout the process.

Jamie Giani represented Williams and witnessed his execution. She took notes during the execution and reduced them to an affidavit shortly afterwards. She noticed hard breathing at 10:17, continuing through 10:23. She noticed Williams's head move three times from 10:18 to 10:22. Williams coughed at 10:25. Giani didn't see Williams's eyes open earlier in the execution, but at 10:28 she saw the right eye open slightly and observed movement of the pupil. The pupil moved again at 10:29. The right eye remained open at 10:31, though now without pupil movement.

The State presented testimony from three "citizen witnesses" to Marcel Williams's execution: Will Jones, an employee of the Attorney General's office; State Senator Kim Hammer; and former White County prosecuting attorney Phyllis Hendrix. None of

these witnesses noted anything remarkable about the execution. Jones said Williams's eyes closed within a minute or two; he observed no movements and heard no sounds. Hammer said that Williams's breathing was loud. Hendrix denied that Williams gasped for air. She said he was snoring and in a state of peace.

Jones's testimony was based partially on an affidavit he signed in March 2018. Jones explained that he actually prepared the affidavit several weeks after the execution but didn't sign it until later. He didn't take notes during the execution yet purported to remember exact times as reflected in his affidavit. Hendrix and Hammer signed affidavits soon after the execution. Each admitted that the AG's office wrote the affidavit, though they said they provided the content themselves. These affidavits nevertheless included numerous instances of identical phrasing. For example, each contained a verbatim misstatement about a staff member visibly turning a valve to administer the drugs. (Under the current arrangement it's impossible to see the administration of the drugs.) Hammer's affidavit erroneously referred to Ledell Lee. When confronted with this, Hammer didn't even know who Lee was.

The State also presented the testimony of the same four ADC employees who observed Kenneth Williams's execution. Most of the witnesses denied any movement at all; Kelley said there was a slight movement of the hand, which she attributed to relaxation, because the hand restraint wasn't tied tightly. Kelley allowed that Williams's breathing became heavier after the midazolam was given.

The Court should credit the more detailed accounts of the Plaintiffs' witnesses, which were based on independent observations recorded contemporaneously with the execution. The accounts of the State's witnesses suffer from the same sort of coordination and bias problems as discussed with the State witnesses to Kenneth Williams's executions. Certainly, Jamie Giani represented Marcel Williams for a significant period of time and participated in the preliminary-injunction hearing. But her testimony withstands scrutiny because it aligns (albeit not perfectly) with the descriptions of neutral observers Kissel and Rosenberg. All three witnesses noted heavy breathing, and all of them noted Williams's open eye. She didn't coordinate with these witnesses, and she recorded her observations as they were happening. The State has presented no evidence to suggest that she observed things that didn't actually occur.

### 3.   Other midazolam executions.

During this proceeding, the Court has heard evidence of four additional midazolam executions: Ron Smith and Torrey McNabb in Alabama, Ron Phillips in Ohio, and Billy Ray Irick in Tennessee. Tennessee uses the same drugs in the same quantities as Arkansas. *See* Pls.' Ex. 6 at 34. Per Lisa Lagos's testimony, Ohio substitutes 1,000 mg rocuronium bromide for 100 mg vecuronium bromide. *See* Pls.' Ex. 3 at 13. Alabama substitutes 600 mg rocuronium bromide. *See Grayson v. Warden*, 672 F. App'x 956, 959 (11th Cir. 2016). As Dr. Stevens explained at trial, the substitution of rocuronium for vecuronium produces no meaningful change to the protocol.

The witnesses to these executions described various movements and reactions in the condemned:

- <u>Ron Smith</u>. The Court heard Spencer Hahn's testimony about this execution, which occurred on December 8, 2016, at the preliminary-injunction hearing. As the Court previously found in its preliminary-injunction order, Smith began having regular barking coughs every ten seconds or so a couple minutes after the midazolam was injected. He lifted his head, attempted to look around, moved his arms, clinched his left hand, and moved his lips. He was still moving after the first consciousness check. After the second consciousness check his eyes remained open and he moved his right arm. ECF No. 54, Order at 17–18.

- <u>Ron Phillips</u>: Lisa Lagos, an attorney at the Federal Defender's Office for the Southern District of Ohio, witnessed Ron Phillips's execution on July 26, 2017. Lagos took notes and observed Phillips make a fish-out-of-water motion with mouth during consciousness checks at 10:33. Phillips's stomach heaved and quivered a bit. The last noticeable mouth movement was 10:36 (or possibly at 10:38, though Lagos was less sure about that). Lagos also observed a slight movement of the head at 10:36. One hand became more clenched during the course of the execution.

Ohio keeps a detailed record of the time at which it injects the drugs[3] and performs the consciousness checks. Pls.' Ex. 5. This record permits orientation of Phillips's movements to injection of the drugs. In Phillips's execution, the midazolam began at 10:31:14 and ended at 10:33:03. Consciousness checks began at 10:33:48 and ended at 10:34:16. The vecuronium bromide began at 10:34:42 and ended at 10:36:16—that is, at around the time Lagos observed Phillips's last noticeable mouth movement and the movement of his head. Potassium followed at 10:38:20 (when Lagos thought she might have seen Phillips' mouth move) and ended at 10:40:17. Lagos's testimony is uniquely compelling because it shows reactions to the other drugs despite the administration of midazolam.

- <u>Torrey McNabb</u>: Santino Coleman, who represented McNabb in habeas and now works at the Federal Defender's Office in Chicago, witnessed McNabb's execution on October 19, 2017. Coleman testified that McNabb's forearms, which weren't strapped down, moved repeatedly during his execution. In response to a bicep pinch, McNabb's arms rotated slightly. After that, his arms made the same motion without stimulus. A guard then did a verbal check and McNabb's left

---

[3] Wendy Kelley testified that she took notes of when the drugs were administered. Astoundingly, she shredded them (or allowed them to be shredded) after the executions. This litigation was ongoing and that information would have been highly probative to the questions before the Court. Destruction of this record was prejudicial to Plaintiffs. Because Kelley allowed the destruction, the Court should infer that the evidence would have been favorable to Plaintiffs' case. *See Dillon v. Nissan Motor Co.*, 986 F.2d 263, 266–69 (8th Cir. 1993).

arm made the same rotating motion. The guard pinched McNabb's left arm and Coleman observed a fourth slight twist of that arm. A few minutes later McNabb's arm suddenly went all the way up in the air and fell back down. His head turned, his feet moved, his brow furrowed, and his lip curled in a grimace. The movement was shocking. To Coleman it looked like McNabb was going to get off the table. McNabb's mouth moved slightly for a minute or two; movement stopped after that.

- <u>Billy Ray Irick</u>: Steven Hale, a reporter for the *Nashville Scene*, witnessed Irick's execution on August 9, 2018. The execution began around 7:26. Irick's eyes closed and he began to snore pretty quickly. There was a consciousness check after about seven minutes. Irick didn't react to his name being shouted or to a pinch. But two minutes after these checks he jolted and made a noise that sounded like a cough or choke. He moved his head slightly and appeared to strain against the restraints. Irick turned bluish-purple at around 7:37.

**4. Experts' interpretations.**

There's strong evidence that Kenneth Williams, Marcel Williams, and other men executed using midazolam moved during their executions in ways that aren't associated with other methods of lethal injection. What do these movements tell us about their experience of the executions? While many of the State's lay witnesses attempted to label the movements as "involuntary" or not indicative of pain, none of

these witnesses are qualified to offer such opinions. The expert testimony, on the other hand, further supports what the science tells us: that the midazolam didn't render the condemned unaware to the second and third drugs.

At trial, much of the expert testimony focused on Kenneth Williams's execution, given the extent of Williams's movement during the execution and Dr. Cohen's performance of an independent autopsy. The bruising found at autopsy has already been discussed above. In addition, Dr. Cohen found petechial hemorrhaging in Williams's eyelids. This sort of hemorrhaging is most often associated with asphyxiation. It can only occur when a person is alive and was sustained at some point during the execution. Dr. Cohen also found fluid in the lungs, which signals respiratory failure.

Strangulation and respiratory failure isn't a surprise: the protocol contains a paralytic drug known to cut off the recipient's breathing. But the State used Dr. Kokes's testimony to link these findings to the midazolam as well. Dr. Kokes provided a mélange of opinions about various concepts such as respiratory depression, agonal breathing, hypoxia, hypotension, seizures, and the like. As a forensic pathologist who focuses on autopsies and who deals with midazolam cases rarely, if ever, his testimony on these topics—not to mention his conclusions that the midazolam prevented the prisoners from feeling pain—is entitled to little weight. His erroneous belief that midazolam can kill a person by itself is indicative of the unreliability of his opinions.

Dr. Kokes also didn't seem to comprehend that, as Dr. Stevens explained, midazolam has no mechanical effect on the respiratory system as opposed to the central nervous system. (Dr. Blanke clearly outlined the distinction when discussing the effects of secobarbital on cross-examination.) Of course, Dr. Kokes is competent to testify about the autopsies and draw conclusions from them, but the Court should take his freewheeling opinions about midazolam and its effects with a grain of salt.

Dr. Kokes ultimately tried to explain Kenneth Williams's lurching as a product of "cerebral hypoxia"—deprivation of oxygen to the brain. He opined that the hypoxia also produced a reduction in consciousness beyond whatever effect the midazolam had. However, the available proof disproves the hypoxia theory. Both Wendy Kelley and the designee testified that they monitored the condemned men's oxygenation with a pulse oximeter. The pulse ox showed normal readings when the midazolam was administered. It only declined when the vecuronium came onboard. As Dr. Van Norman explained in rebuttal, pulse ox readings at a normal level aren't indicative of cerebral hypoxia. So Kenneth Williams's movements weren't the product of hypoxia. Nor did hypoxia cause reduced awareness before injection of the other drugs.

Dr. Van Norman and Dr. Antognini are both more qualified than Dr. Kokes to testify on this subject. And they agreed that Kenneth Williams's lurching wasn't a product of respiratory depression, or of hypoxia, or of agonal breathing, or any of the various other phenomena the State batted around indiscriminately at trial. Rather, they were evidence

of airway obstruction. Dr. Antognini made this point on direct and Dr. Van Norman in rebuttal. Both testified that the lurching witnessed in Kenneth Williams's execution, and the arching witnessed in Marcel Williams's execution as well, was the result of the midazolam relaxing the airway muscles to such a degree that the airway became blocked. When Marcel Williams arched his back off the gurney repeatedly, he was trying to breathe. When Kenneth Williams lurched off the gurney repeatedly, he was trying to breathe. Such strenuous efforts to breathe are the opposite of respiratory depression.

Though the anesthesiologists agree that obstruction occurred, they part ways in their interpretation of what that means about awareness. Dr. Van Norman explained that, while airway obstruction doesn't necessarily indicate awareness, obstruction will begin to rouse a person if she was initially unaware. The obstructing person will begin to awaken in her efforts to breathe. Dr. Antognini, on the other hand, testified that the condemned weren't aware to the obstruction because the drug had already rendered its anesthetic effect. In other words, Dr. Antognini simply relied on his opinion, already discussed above, that 500 mg midazolam produces general anesthesia. He didn't address the rousing effect of airway obstruction.

Regardless of whether the obstruction roused the condemned from their sedated state, the ultimate issue is whether the condemned were unaware during injection of the second and third drugs. Further evidence that they weren't is found in the

40

additional movements that Plaintiffs' witnesses identified. Dr. Van Norman addressed these movements at the end of her testimony on direct. By responding to a consciousness check with a groan, Kenneth Williams indicated that he was aware. By moving his pupil after a consciousness check, Marcel Williams indicated that he was aware. By moving his head as the paralytic was injected, Ron Phillips indicated that he was aware. By raising his arm after a consciousness check, Torrey McNabb indicated that he was aware. By jolting his body and moving his head from side to side after a consciousness check, Billy Ray Irick indicated that he was aware.

One need not see visual proof to believe what the science tells us—that midazolam cannot render the condemned insensate to the suffocation caused by the vecuronium and the searing caused by the potassium. Indeed, with its use of an agent that's guaranteed to paralyze the condemned, the protocol is explicitly geared to mask the midazolam's inefficacy. But it failed at even that. These men moved in a way that showed awareness. While the science is enough to tell us these men suffered, the movements provide persuasive confirmation.

**C.    Alternative execution protocols.**

**1.  Firing squad.**

In *McGehee v. Hutchinson*, 854 F.3d 488, 494 (8th Cir. 2017), the Eighth Circuit concluded that the record at the preliminary-injunction hearing fell short of showing that the firing squad is "readily implemented" and would significantly reduce a

substantial risk of severe pain. Plaintiffs have now made the requisite proof that firing squad is a feasible alternative execution method that will reduce the suffering the midazolam protocol causes.

Dr. James Williams, an emergency-room doctor who has treated numerous patients with gunshot wounds, testified about gunshot wounds and the mechanism of death when one is shot in the heart, as is the case with the firing squad. A shot to the heart stops delivery of oxygen to the brain via the blood. This stoppage would cause the gunshot recipient to lose consciousness within seven to ten seconds. An EEG from a previous firing-squad execution confirms a quick loss of consciousness. Pls.' Ex. 50.

Would the condemned feel pain during those seven to ten seconds before consciousness is lost? Dr. Williams explained he would not, at least not beyond the sensation one might experience when tackled while playing football or rugby. Unlike gunshots to the extremities, where there are a large number of nerve fibers, or to bones, which involve painful fracturing, gunshot wounds to the chest aren't painful upon impact. The sensation is like a strong punch to the chest. Dr. Williams has himself been shot in the chest and that describes his experience. It's also consistent with the descriptions of gunshot-wound victims Dr. Williams has interviewed as part of his medical practice; with additional written accounts that Dr. Williams reviewed; and with the experience of Senator Trent Garner, who on cross-examination discussed his experience of being shot during an armed robbery without realizing it. Ultimately Dr.

Williams concluded that the firing squad wouldn't be painful and would reliably cause rapid death—a conclusion that the State only feebly rebutted through Dr. Antognini's review of two old firing-squad videos that aren't representative of how the protocol here would work.

In addition to presenting proof that the firing squad would significantly reduce pain, Plaintiffs presented ample evidence that it's readily implemented. The Supreme Court has explained that "a prisoner may point to a well-established protocol in another State as a potentially viable option." *Bucklew v. Precythe*, 139 S. Ct. 1112, 1128 (2019). The Court has received Utah's firing squad protocol, which Utah used as recently as 2010. Pls.' Ex. 44. The protocol calls for what Dr. Williams, an experienced marksman, considers the essential elements: firearms with adequate power, riflemen of sufficient proficiency, and the ability to fix the condemned in a stationary position so the riflemen aren't presented with a moving target. Plaintiffs presented numerous photos of the Utah execution chamber and execution chair, which provides just one example of how the protocol might be implemented in practice.

Of utmost concern in any firing-squad execution is the provision of riflemen who are able to hit the target so as to cause a painless death. Dr. Williams obtained and reviewed Arkansas's CLEST standards for patrol rifle and select fire weapons. Pls.' Ex. 47. These standards require trainees to repeatedly hit an 8.5" x 11" piece of notebook paper at a distance of 50 yards within thirty seconds. Dr. Williams showed that at the

distance of twelve yards, this same shot, which a firing-squad member need only make once, is equivalent to hitting a target of 1.25 inches—well smaller than the size of the target needed for an accurate shot to the heart. *See* Pls.' Ex 51. This is an easy assignment for any competent marksman. If a potential executioner proved himself incompetent he'd be weeded out in the sort of pre-execution practices that Utah conducts and that Utah corrections official Steven Turley described.

Warden Straughn testified that ADC officers undergo different firearms training that uses different weapons and requires lower accuracy. It doesn't follow that no competent marksmen is available to carry out the execution. The executioners don't even need to come from the ADC. Such is the case in Utah, where, as Gregory Peay explained, corrections officers undergo less firearms training than the law-enforcement officers who actually participate in the execution. Indeed, Wendy Kelley testified that many of the participants in the lethal-injection protocol (the IV team and the executioner) volunteer. The ADC finds volunteers with some medical training even though participation in executions is contrary to the dictates of the medical profession. Competent marksmen have no similar ethical prohibition.

Plaintiffs also presented evidence about the cost and construction of an execution chair and an execution chamber, should the ADC want to build one. As Peay testified, the Utah chamber is modeled on existing plans. Its walls are no thicker than those used in the cells. It requires bulletproof glass for the witness rooms, Kevlar to prevent

possible ricochet, and an additional room from which the executioners can fire, but otherwise its construction elements differ little from a chamber appropriate for lethal injection. And the cost of carrying out the firing squad itself isn't particularly significant. Most is allocated to labor that would have to be paid regardless of the method of execution. A Utah corrections official estimated that a planned 2003 firing-squad execution would require $3,000 for "sundry supplies." Pls.' Ex. 41. A local newspaper reported $25,000 for execution materials, including the chair, used in Ronnie Lee Gardner's 2010 execution. Pls.' Ex. 43. Turley was skeptical that the costs for the Garner execution were even that high. He estimated the cost of ammunition to be about $50.

Director Kelley admitted that the firing squad is feasible. In 2015, she declined to sign an affidavit attesting that the department couldn't carry out an execution by firing squad. And nothing in her trial testimony suggests that the situation has changed. As was discussed in her cross-examination, the ADC has a large budget and labor available for a basic construction project such as a firing-squad chamber. Indeed, the ADC is in the process of building an armory at the Varner Unit. Though Director Kelley obviously doesn't want to perform executions by firing squad, that's not a legitimate reason for rejecting a painless method of execution in favor of the painful midazolam protocol.

2. **Secobarbital.**

Plaintiffs presented the testimony of Dr. Charles Blanke, the country's leading

practitioner of medical-aid-in-dying procedures ("MAID"). Dr. Blanke explained that

the preferred agent for MAID is secobarbital, a barbiturate, in a 10 mg dose (or 15 mg if

the patient is heavier). Secobarbital comes in capsule form and is then dissolved in a

liquid. The liquid can be drunk or, if the patient is unable to swallow, administered via

a nasogastric tube. Placement of a nasogastric tube takes about 30 seconds, can be done

by a number of different medical personnel, and is painless when given with a local

anesthetic such as lidocaine (which the Arkansas execution protocol already calls for).

In Dr. Blanke's experience, injection of 10 mg secobarbital will cause a painless death

within half an hour. On rare occasions a person might take hours or even days to die,

but the median time to death among documented cases is twenty-five minutes. As Dr.

Blanke explained on cross-examination, healthier patients die more quickly than

unhealthy ones because their GI tract works better and allows for better absorption of

the drug.

Dr. Blanke explained that secobarbital is widely available in the United States. It can

be obtained by any pharmacy that requests it. John Kirtley, the executive director of the

Arkansas State Board of Pharmacy, provided additional detail about what a supplier

would have to do to sell secobarbital (or any other drug) to the ADC. The supplier

would need to complete an application (Pls.' Ex. 49). Assuming that the application was

filled out appropriately and that the supplier's answers didn't raise any red flags, the application turnaround is about two weeks.

The State has correctly pointed out that no state has carried out an execution using secobarbital. But unlike the administration of nitrogen gas, which the Supreme Court rejected in *Bucklew*, this method of execution doesn't require reinvention of the wheel. And unlike the plaintiff in *Bucklew*, Plaintiffs here have spelled out the alternative in sufficient detail. The State statute already calls for use of a barbiturate. Administration of the drug via feeding tube rather than intravenous line is a change, of course, but the execution procedures could otherwise remain largely the same. Indeed, as Dr. Blanke testified, insertion of a nasogastric tube is less risky than insertion of intravenous lines. The method has been used numerous times, even if not on prisoners, and has proven itself quick and painless. The State could adapt its current protocol to accommodate secobarbital; the mere fact that no state has used secobarbital in an execution before doesn't justify continued use of midazolam instead.

### 3. **Pentobarbital.**

There's no dispute that a single-drug pentobarbital protocol is preferable to a three-drug midazolam protocol. The State says the drug is unavailable. But as Director Kelley admitted during cross-examination at trial, the ADC hasn't tried to get pentobarbital for over four years (even though other states have conducted numerous pentobarbital executions during that time). Kelley also testified about a new secrecy statute, which

will go into effect later this year and which she believes will help her get execution

drugs by assuring the supplier that it won't be identified. Notably, Kelley didn't assert

that the secrecy law will help her get only the drugs in the midazolam protocol. She

acknowledged that the law applies to pentobarbital as well. The law would also make it

easier to acquire secobarbital if the State's method-of-execution statute allowed its use.

Plaintiffs are required to show that State has "access to the alternative." *McGehee*,

854 F.3d at 493. They aren't required to tell the ADC where they should actually get the

drug. Locating a supplier is Kelley's responsibility as the ADC director. The Court

should view skeptically the ADC's claim to have no access to pentobarbital. Defendants

made the same plea about midazolam in 2017. They used a purported lack of supply to

justify scheduling eight executions over the course of two weeks. Then within months

they obtained more drug and scheduled another execution. The ADC could likewise

obtain pentobarbital (or secobarbital) with reasonable effort.

## D.    Legal conclusions.

Based upon the proof presented at trial and discussed above, Plaintiffs have shown

that the midazolam protocol is "sure or very likely to cause serious illness and needless

suffering." *Glossip*, 135 S. Ct. at 2737. There's a scientific consensus that midazolam

cannot render the condemned insensate to the suffocation caused by the vecuronium

bromide and the burning caused by the potassium chloride. The State has presented no

evidence beyond the flawed opinions of its experts and an erroneous reading of the

FDA label to show that midazolam will render the condemned insensate to pain. By contrast, Plaintiffs have proven that midazolam has a ceiling effect that is well below the amount called for in the midazolam protocol and that is at or below the amount known to be associated with awareness. Studies using the isolated forearm technique have shown that patients are frequently aware after administration of anesthesia and are aware at a rate of at least 72% after administration of midazolam. Patients in these studies aren't necessarily in pain because they have received an analgesic drug. The Arkansas protocol calls for no analgesic drug. In these executions, awareness is pain. Movements during the executions support the scientific consensus that 500 mg midazolam won't maintain unawareness during the procedure—and that the condemned will suffer as a result.

This suffering can be avoided. The Supreme Court has explained that there is "little likelihood that an inmate facing a serious risk of pain will be unable to identify an available alternative." *Bucklew*, 139 S. Ct. at 1128–29; *see also id.* at 1136 (Kavanaugh, J., concurring). Consistent with that directive, Plaintiffs have proven feasible alternatives that will stop the torture the current protocol causes. The State has identified no legitimate reason for maintaining an execution method that causes the condemned to feel as if they're being suffocated and burned alive. The Eighth Amendment requires the State to abandon the midazolam protocol and to conduct its executions in some other way.

## II.  EQUAL PROTECTION CLAIM

The State presents the consciousness checks as an essential element of its midazolam protocol. These checks are said to ensure that the condemned aren't aware of the second and third drugs. They're purported to protect the prisoners' fundamental right to be free from cruel and unusual punishment. As such, the Equal Protection Clause prohibits deviation from this provision of the protocol unless the deviation is narrowly tailored to a compelling government interest. *See In re Ohio Execution Protocol Litig.*, 840 F. Supp. 2d 1044, 1054 (S.D. Ohio 2012).

As should be clear from Plaintiffs' discussion of the Eighth Amendment claim, the consciousness checks don't actually serve their stated purpose in the current protocol. They don't approximate the stimulus of the second and third drugs. Even if a prisoner doesn't respond to a consciousness check, midazolam's inefficacy will lead them to suffer. Even if the executioners thought a prisoner failed a consciousness check, injection of the second 500 mg dose of midazolam would have no additional effect on the condemned man's awareness. That said, if the State is going to proceed as if the checks are necessary to protect the prisoners from cruel and unusual punishment, its executioners must apply those checks in the manner the protocol requires. At a minimum, this means that they may not inject the second and third drugs if it doesn't appear that the midazolam has rendered the prisoner unaware.

The proof showed that, on two occasions, the executioners departed from the protocol by proceeding with the execution despite negative feedback from the consciousness check. At the preliminary-injunction hearing, Wendy Kelley made much of the idea that movements or coughing from the condemned would trigger additional consciousness checks or additional midazolam. But when the executions actually happened, the executioners omitted these measures and injected the vecuronium bromide despite evidence that both Marcel Williams and Kenneth Williams remained aware.

Kelly Kissel testified that, during Marcel Williams's execution, the designee turned to someone in the execution chamber after the consciousness check and said, "I don't know." The logical inference is that the designee didn't know whether Williams was unconscious. Yet rather than performing another consciousness check or injecting another 500 mg dose of midazolam, the executioner proceeded to inject the vecuronium bromide. Likewise, per Cassandra Belter's testimony, Kenneth Williams responded to a consciousness check by emitting an audible groan. Belter's testimony finds additional support from Kissel, who also heard a groan. Though he couldn't place its exact timing, he said it occurred around the application of the consciousness check. Rather that performing another consciousness check or injecting another 500 mg dose of midazolam, the executioner proceeded to inject the vecuronium bromide.

Paralyzing these men before adequate assurances of unconsciousness violated the protocol's most basic insurance against the suffocation and pain that the other drugs cause. The State has no compelling interest in injecting the paralytic despite the designee's inability to determine whether the condemned is unconscious. It has no compelling interest in injecting the paralytic after the condemned responds to a consciousness check with a groan. These departures from the protocol violate the Equal Protection Clause. If the Court doesn't strike down the entirety of the midazolam protocol as a violation of the Eighth Amendment, this Equal Protection violation should preclude the State from carrying out any more midazolam executions without remedial measures to prevent similar departures in the future.

### III. ACCESS CLAIMS

Plaintiffs allege that Defendants' viewing policies violate their right to access the courts under the First Amendment and their right to counsel under 18 U.S.C. § 3599. Specifically, they've challenged three particular viewing restrictions: (1) the prohibition on multiple attorneys and telephone access during executions; (2) the prohibition on viewing and hearing the entirety of what goes on in the execution chamber, including the insertion of the intravenous lines; and (3) the prohibition on information about when each drug in the protocol is pushed.

In analyzing this claim, the first question is whether each restriction burdens Plaintiffs' right of access to the courts and counsel. The Court has already determined

that to be true for the restrictions on multiple attorneys and phone access. ECF No. 53, Order at 55–59; ECF No. 54, Order at 92. The other two restrictions likewise burden Plaintiffs' rights. Without being able to see insertion of the IV lines, or to hear their clients' reactions to the execution drugs (assuming those reactions aren't so loud as to be heard even with the microphone off), Plaintiffs' attorneys can't ensure that the executioners aren't inflicting Plaintiffs with excessive pain. Likewise, without access to information about when the drugs are injected, Plaintiffs' attorneys can't verify the time and manner of drug administration, which is essential to ensuring that the protocol is properly followed and that their clients aren't subject to cruel and unusual punishment.

Having established that these restrictions interfere with Plaintiffs' rights, the burden then shifts to Defendants to show that they're reasonable. This part of the analysis is guided by the four-part inquiry articulated in *Turner v. Safley*, 482 U.S. 78 (1987): (1) whether there's a rational connection between the restrictions and a legitimate government interest; (2) whether prisoners have other avenues for exercising the right without changing the policy; (3) the impact that accommodation will have on guards, inmates, and allocation of prison resources; and (4) whether there are reasonable alternatives that would accommodate the right at *de minimis* cost. At trial, Defendants didn't present proof sufficient to show that the restrictions are reasonable under the *Turner* test.

1.  **Multiple attorneys and phone access.**

In its preliminary-injunction order, the Court found that the ADC's restrictions on multiple attorneys and telephone access are unreasonable under *Turner*. ECF No. 54, Order at 92–100. The parties then entered into a Joint Execution Viewing Policy (ECF No. 62) that remedied this violation. Defendants sent mixed signals about the continued validity of this policy in pretrial briefing. They argued that they intended to stick to the policy—an attempt to moot the claim, notwithstanding the doctrine of voluntary cessation—but also argued, contrary to the Court's earlier order, that the restriction on multiple attorneys and phone access created no violation. Director Kelley likewise offered an ambiguous response when questioned about the Joint Policy on cross-examination at trial, saying she doesn't plan to go back on it but that she doesn't intend to incorporate it into ADC policy either.

The Court should end the ambiguity by simply incorporating the Joint Policy into its judgment. The State presented no additional proof at trial to alter the Court's earlier analysis. Director Kelley said she'd rather not be subject to such a court order and cited the possibility of cellphone jamming coming to Arkansas. She provided no specifics on the content or timing of this proposal. This vague expression of concern doesn't create a rational basis for burdening Plaintiffs' right to access the court during executions if necessary. And it has nothing to do with allowing multiple attorneys to view the execution. At best, it might counsel a modification of the Joint Policy to permit the

alternative option of installing a landline accessible to counsel just outside the witness room. It doesn't justify restricting attorney and phone access altogether.

## 2.  Viewing and hearing the entirety of the execution.

Director Kelley asserted that the reason for preventing the attorneys from viewing the entirety of what goes on in the execution chamber is to protect the anonymity of the IV team, which includes volunteers. (She didn't assert a specific justification for restricting audio access.) According to Director Kelley's testimony on direct examination, even the use of surgical garb is insufficient to protect this interest because the area around the prison is small and the garb wouldn't prevent witnesses from identifying their relative or neighbor.

It's questionable that the need to protect the IV team members' identity is a legitimate government interest because the ADC allows the designee to appear to the witnesses in plain sight during the execution. The designee's identity has remained undisclosed to the public since the executions. But even accepting that an IV team member's volunteer status recommends greater discretion, the restriction isn't rationally connected to the stated interest. The execution witnesses come from all over the state, with heavier representation from the jurisdiction of the offense. It's highly unlikely that the witnesses will actually recognize this person, who apparently comes from the environs of Cummins. And if they do, the State's recent felonization of

disclosing an executioner's identity will probably deter publicization. *See* Ark. Act 810 of 2019.

Moreover, there are reasonable alternatives that would protect the right at *de minimis* cost. Most obviously, the ADC could simply allow the attorneys (but not the other witnesses) to enter the chamber during the preliminary portions of the execution. As Steven Hale testified, this is how Tennessee handles it. Alternatively, the State could use video cameras to show the affixation of the IV lines. As Lisa Lagos testified, this is how Ohio handles it. The cameras could focus on the placement of the lines without showing the IV team members' faces. And Director Kelley admitted that the installation of cameras is a routine matter at the ADC. In short, the experience of other states exhibits that the ADC has multiple ways to accommodate Plaintiffs' rights at minimum cost.

### 3. Access to information about when the drugs are injected.

Director Kelley didn't offer a basis for denying Plaintiffs access to information about the time at which each drug is injected. To the contrary, she recorded some of this information herself, but then neglected to put it in the official log and destroyed her raw notes. The destruction of these notes is concerning (if not sanctionable). Litigation was ongoing. The timing of each injection is plainly relevant to a determination of how the drugs actually worked in practice. The Court should prevent the Director's future monopoly on this information by ordering that it be made public. The ADC could contemporaneously convey the time at which the drugs are injected at little to no cost. It

could focus a camera on the drug control valve without revealing the executioner's identity. Someone in the execution chamber could make a verbal announcement. The drug could be announced with prearranged signals. At the very least, the ADC could include the precise timing of each injection in its log, as Ohio does. It already has a person in the room dedicated to creating a log; as Kelley testified, it was evident (at least to her) what time the drugs were injected. Whatever the accommodation, the ADC shouldn't be permitted to maintain secrecy and exclusive control over information that goes directly to the question of whether the condemned are being subject to cruel and unusual punishment.

## CONCLUSION

Based on the proof presented at trial and discussed above, the Court should enjoin Defendants from conducting executions with the midazolam protocol. Though this injunction would render an additional injunction on the Equal Protection claim unnecessary, the Court should declare an Equal Protection violation for the reasons discussed above. Finally, the Court should incorporate the Joint Execution Viewing Policy into its judgment and should enjoin any future execution unless the ADC allows attorneys to view and hear the execution in its entirety and to access information about when each drug is injected.

Date: May 31, 2019                          Respectfully submitted,

                                            LISA G. PETERS
                                            FEDERAL PUBLIC DEFENDER


                                            JOHN C. WILLIAMS, ABN 2013233
                                            Federal Public Defender's Office
                                            1401 W. Capitol, Suite 490
                                            Little Rock, AR 72201
                                            Telephone: 501.324.6114
                                            E-mail: john_c_williams@fd.org

                                            *Counsel for Plaintiffs*