## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF ARKANSAS

**JASON McGEHEE, STACEY JOHNSON,**
**BRUCE WARD, TERRICK NOONER,**
**and DON DAVIS**                                                    **PLAINTIFFS**

**JUSTIN ANDERSON, *ET AL.***                                        **INTERVENORS**

          **v.**          **Case No. 4:17-CV-179-KGB-BD**

**ASA HUTCHINSON, Governor of the**
**State of Arkansas, and WENDY**
**KELLEY, Director, Arkansas**
**Department of Correction**                                         **DEFENDANTS**

---

## DEFENDANTS' POST-TRIAL BRIEF

---

The Prisoners failed to carry their burden of proof on any of their claims. The Arkansas Department of Correction's (ADC) midazolam protocol does not cruelly superadd pain to the execution process in violation of the Eighth Amendment. ADC's consistent application of consciousness-check procedures during the April 2017 executions satisfies Equal Protection. And ADC's execution viewing policies provide adequate access to the courts and counsel. For all of these reasons and as discussed in more detail below, the Court should enter judgment in favor of Asa Hutchinson, in his official capacity as Governor of the State of Arkansas, and Wendy Kelley, in her official capacity as ADC Director (collectively, "the State") and dismiss the Prisoners' claims with prejudice.

## ARGUMENT

## I.   The Prisoners did not prove that the midazolam protocol violates the Eighth Amendment.

The Court should enter judgment in favor of the State on Claim I because the Prisoners failed to prove that ADC's use of midazolam as the first drug in its lethal-injection protocol constitutes cruel or unusual punishment.  As the United States Supreme Court recently explained, "when it comes to determining whether a punishment is unconstitutionally cruel because of the pain involved, the law has always asked whether the punishment 'superadds' pain well beyond what's needed to effectuate a death sentence." *Bucklew v. Precythe*, 139 S. Ct. 1112, 1126-27 (2019).   The Prisoners failed to adduce any evidence that, in adopting the midazolam protocol, the State cruelly "superadded" "the infliction of pain for pain's sake." *Id.* at 1127.  To the contrary, the undisputed evidence at trial showed that Arkansas chose this method of execution only after the Supreme Court upheld its constitutionality in *Glossip v. Gross*, 135 S. Ct. 2726 (2015), and in an effort to carry out the sentence in the most humane way possible.  The protocol includes numerous procedural safeguards to ensure the Prisoners are unconscious before the State administers the lethal drugs.  Accordingly, the Court should deny the Prisoners' request for declaratory and injunctive relief and dismiss Claim I with prejudice.

### A.   Midazolam is not sure or very likely to cause needless suffering.

The Prisoners' cruelty claim fails because it is not based on any direct evidence of pain or suffering or a "well-established scientific consensus"

demonstrating that the use of midazolam in conjunction with the other two drugs is sure or very likely to cause severe pain. *McGehee v. Hutchinson*, 854 F.3d 488, 492 (8th Cir. 2017) (en banc) (per curiam). Instead, the Prisoners' claim rests on speculative theories that are unsupported by any scientific studies in humans and conflict with the expert witnesses' clinical uses and experiences with midazolam. The Court should reject the Prisoners' baseless claim and rule in favor of the State on the first *Glossip* prong.

ADC's protocol first calls for a massive 500-mg dose of midazolam—a powerful sedative three to four times as potent per mg as diazepam (Defs.' Ex. 6 at 5)—as the first drug before the administration of the lethal agents. According to the FDA-approved package insert, 500 mg is approximately 10 times the maximum therapeutic dose of the drug when used for anesthesia and, on its own, can be toxic. (Defs.' Ex. 6). Midazolam works by suppressing the central nervous system ("CNS"), and its effects are dose-dependent. *Id.* at 1. In addition to producing sedation, midazolam is a potent anti-anxiety drug that produces a state of drowsiness and calm.. Finally, while not technically a pain-relieving anesthetic, scientific studies have shown that midazolam also has some anesthetic effects as discussed by Dr. Joseph Antognini, a board-certified anesthesiologist and fellow of the American Society of Anesthesiologists.

Anesthesiologists use low doses of midazolam, from 1 mg up to 10 mg, to provide sedation and treat anxiety before medical procedures, like colonoscopies. It is also used as a sedative in dental offices and medical clinics for minor surgical

procedures like mole removal.  According to the FDA package insert, sedation is achieved within three to five minutes after IV injection, and the time of onset is affected by the total dose administered.  *Id.*

At higher doses (up to approximately 55 mg in a 200-pound person), midazolam reliably induces a state of general anesthesia sufficient for short surgeries and painful medical procedures.  The FDA has approved the use of midazolam "intravenously for induction of general anesthesia" without any narcotic premedication onboard.  *Id.* at 3.  A 2013 pharmacology textbook co-authored by Plaintiffs' expert, Craig Stevens, likewise recognizes that IV midazolam can produce anesthesia.  Midazolam works quickly.  "When midazolam is given IV as an anesthetic induction agent, induction of anesthesia occurs . . . in 2 to 2.5 minutes without narcotic premedication or other sedative premedication."  *Id.* at 1. Midazolam can cause "deep levels of sedation virtually equivalent to a state of general anesthesia where the patient may require external support of vital functions." *Id.* at 3.

Midazolam has a variety of known side effects, several of which are particularly relevant in this case.  Midazolam is known to cause involuntary movements (including tonic/clonic movements and muscle tremors), especially with large doses.  *Id.* at 3 & 5.  "Serious cardiorespiratory adverse events have [also] occurred after administration of midazolam," including "respiratory depression, airway obstruction, oxygen desaturation, apnea, respiratory arrest and/or cardiac arrest, sometimes resulting in death or permanent neurologic injury."  *Id.* at 3.

Because midazolam can slow down or stop breathing altogether, the manufacturer warns that continuous monitoring is required in patient-care settings by persons trained in general anesthesia and who are capable of maintaining a patent airway and supporting ventilation.  *Id.*  Experts on both sides agreed that a sudden IV administration of 500 mg of midazolam can cause respiratory depression, apnea, and hypotension (low blood pressure).  The experts also agreed that a massive IV infusion of midazolam can cause breathing regulatory centers in the brain to cease normal function and remove the drive to breathe voluntarily, which then leads to breathing disturbances, hypoxia (a shortage or lack of oxygen), deeper levels of unconsciousness, twitching, seizures, and other jerky involuntary movements.

There have been no scientific studies conducted in humans about the effect of a 500-mg dose of midazolam.  And because midazolam reliably renders people unconscious and insensate to pain at even clinical doses, the Prisoners' unproven "ceiling effect" theory—the brainchild of pharmacologist Craig Stevens, who has never personally administered the drug, observed its clinical effects, or subjected his theory to the rigors of the scientific method and peer review—is simply beside the point.  The Prisoners' anesthesiology expert, Dr. Van Norman, agreed that there have been no scientific studies proving what the ceiling-effect dose of midazolam is.  The two small studies the Prisoners rely upon in an attempt to support their theory (Pls.' Exs. 24 & 31) did not quantify the ceiling-effect dose and, as a matter of law, do not demonstrate a "well-established scientific consensus" on the ceiling-effect dose.  *See Baze v. Rees*, 553 U.S. 35, 67 (2008) (rejecting "the testimony of a few

experts or a few studies" to support a method-of-execution claim; instead, "an inmate challenging a method of execution should point to a well-established scientific consensus" to prevail). Because their ceiling-effect theory is not supported by any actual data or well-established scientific consensus, the Court should disregard it.

Moreover, even if the Prisoners had established what the ceiling effect dose of midazolam is (and they did not), it would not matter because the dose Arkansas administers in its lethal-injection procedure is more than enough to induce and maintain a state of general anesthesia for the duration of the lethal-injection procedure. Both of the Prisoners' studies acknowledge that midazolam is effectively used for general anesthesia. (Pls.' Ex. 24 at 1; Pls.' Ex. 31 at 1). And the Prisoners' key study, "the much-discussed Miyake study" (Pls.' Ex. 24), actually proved that midazolam alone, *without any other medication onboard*, reliably induced a state of general anesthesia sufficient to anesthetize a person for the painful placement of an endotracheal tube and for the duration of a short medical procedure. (Pls.' Ex. 31). Thus, far from proving the Prisoners' claims, the Miyake and Inagaki studies actually support the State's position that midazolam is an effective anesthetic at even clinical doses for short procedures like a lethal-injection procedure.

Similarly, the Prisoners' theory that the second drug in the protocol, a paralytic, will somehow rouse them from a state of unconsciousness is not only unsupported by any scientific data, but it also conflicts with the FDA-approved package insert for the drug. None of the Prisoners' experts were aware of any

scientific or medical evidence showing that vecuronium would cause severe pain in a person who has received a 500-mg IV dose of midazolam. And, quite to the contrary, studies at clinical doses have shown that midazolam and paralytic drugs like vecuronium bromide "have been used together in patients without noting clinically significant changes in dosage, onset or duration in adults." (Defs.' Ex. 6 at 3). Indeed, the experts on both sides (Dr. Cohen and Dr. Kokes) agreed that the combined effects of the midazolam and the vecuronium rendered the condemned inmates deeply unconscious, and that it is improbable that any discomfort was associated with the administration of potassium chloride. This Court should reject the Prisoners' baseless arguments otherwise.

The inmates did not offer any evidence demonstrating that a condemned inmate receiving a 500 mg IV dose of midazolam would remain conscious and able to feel severe pain. As the Eighth Circuit observed in reversing this Court's previous ruling in favor of the Prisoners on the first *Glossip* prong, "[i]f there is no scientific consensus and a paucity of reliable scientific evidence concerning the effect of a lethal-injection protocol on humans, then the challenger might well be unable to meet [his] burden" under *Glossip*. *McGehee v. Hutchinson*, 854 F.3d 488, 493 (8th Cir. 2017). Just as in April 2017, "[t]he equivocal evidence" on the efficacy of midazolam now "falls short of demonstrating . . . that the Arkansas protocol is 'sure or very likely' to cause severe pain and needless suffering." *Id.*

Without any direct evidence or well-established scientific consensus proving that Arkansas's protocol will cause severe pain and needless suffering, the

Prisoners called a parade of lay witnesses to midazolam executions in Arkansas and in other states who offered no proof of pain or suffering but only recounted some minor movements during a few midazolam executions. Significantly, not one witness observed any physical signs of pain or suffering in any of the four Arkansas inmates who were executed with the midazolam protocol in April 2017 such as fist clenching, grimacing or pained facial expressions, tears, cries of pain, or sweating. According to the medical professional constantly monitoring the condemned inmates throughout the process, the pulse oximeter displayed normal readings until the end, indicating that pulse and heart rates were not elevated due to pain. There was ***no physical response*** to any of the painful stimuli applied during the consciousness checks. Indeed, the designee explained how the designee systematically checked each inmate for signs of awareness or consciousness throughout the entirety of the procedures but saw none. The designee was certain the inmates were unconscious and insensate to pain before allowing the execution to proceed to the second and third drugs. The designee's conclusions were consistent with the American Society of Anesthesiologists' Continuum of Depth of Sedation, which indicates that the inmates were in a state of general anesthesia before the lethal drugs were administered because they were "[u]narousable even with painful stimulus." (Defs.' Ex. 82). Even Plaintiffs' pharmacology expert, Dr. Stevens, agreed that lack of response to noxious stimuli means the Prisoners were "beyond sedat[ed]" and in a state of "general anesthesia."

The Prisoners' eyewitness proof, at best, demonstrated that a few prisoners executed exhibited some type of movement during their executions.  Much of the reported "movements" were associated with the simple act of breathing, which lend no support to the Prisoners' claim.  And there is no evidence that other movements reported were purposeful movements as opposed to reflexive or autonomic ones.  Any observed movements appeared to be totally involuntary and are consistent with the known side-effects of midazolam and death caused by multiple drug intoxication.  The Prisoners' own expert, Dr. Cohen, testified on direct examination that all of the reported movements in Kenneth Williams could "absolutely" have been involuntary.  And on cross, Dr. Cohen could not say with any degree of certainty whether Mr. Williams's movements were caused by a seizure or hypoxia or whether it was some kind of voluntary movement.

Moreover, the purported eye movement observed by Marcel Williams's lawyer, Jamie Giani, from 10:28 to 10:29 pm could not have been purposeful.  ADC's internal affairs log for Mr. Williams's execution (Defs.' Ex. 77) shows, and Ms. Giani agreed, that the midazolam was administered at 10:16 pm.  Under the protocol, he would have received all three drugs, including the paralytic, before 10:28 pm.  In addition, absence of respiration and pulse were assessed at 10:31 pm.   So if Mr. Williams's right eye moved at all during his execution (which is questionable as no other witness observed such movement, including Associated Press reporter Kelly Kissel), it could not have been a purposeful response to pain.  And in any event, experts on both sides agreed that movement does not equate to consciousness. Nor

for that matter does mere movement prove that an inmate was able to feel and experience pain.   Because the Prisoners failed to offer any evidence to prove otherwise, the "movement" evidence lends no support to their Eighth Amendment claim.

Likewise, the "awareness" evidence the Prisoners focused on during the trial and in their post-trial brief does nothing to prove their case under the "rigorous" *Glossip* test.   This evidence showed that, despite all the marvels of modern medicine, anesthesiologists cannot prevent or even detect awareness during surgeries.   Dr. Van Norman confirmed that there is no monitor that exists today that can tell an anesthesiologist or surgeon that her patient is awake and aware and experiencing pain during surgery.   Yet surgeons continue to operate on patients in hospitals across the country and the world every single day.   This is because the benefits of surgeries and invasive medical procedures far exceed the risks of awareness.   This is also because medicines like midazolam effectively relieve patients of anxiety before their procedures and anesthetize them during their procedures.

Studies or case reports showing awareness during surgery using different anesthetic agents or much smaller doses of midazolam do not prove that Arkansas inmates will surely or very likely experience severe pain after the injection of 500 mg of midazolam.   Indeed, in the vast majority of the reported data, patients reported that they were comfortable and *not* experiencing pain, despite being able to demonstrate awareness during their surgeries.   If awareness means pain, as the

Prisoners boldly suggest here, then the modern operating room as we know it would cease to exist, and life-saving procedures would no longer be available.  But that is not reality.  It defies commonsense, law, and logic to maintain that ADC, as a corrections department charged with carrying out death sentences, should be held to a higher standard of care than medical practitioners treating patients.  *See Baze*, 553 U.S. at 58-60 (rejecting inmates' challenge to Kentucky's protocol for its lack of a system to monitor the prisoners' anesthetic depth because monitoring procedures, drawn from medical practice, are not constitutionally required); *Glossip*, 135 S. Ct. at 2742 (following *Baze* and making clear that the safeguards implemented during an execution need not match a medical standard of care); *Thorson v. Epps*, 701 F.3d 444, 448 (5th Cir. 2012) (holding that "lay-monitoring" of condemned inmates' consciousness based solely on the warden's visual inspection satisfies the constitution because "*Baze* forecloses a holding that any type of additional monitoring (*i.e.*, EKG, eyelash testing, pinching) is required by the Constitution"); *Connecticut v. Webb*, 750 A.2d 448, 456 (Conn. 2000) (holding that executions need not meet medical standards of care because "the circumstances surrounding an execution, namely the extreme dosage and ultimate objective, are unique to the execution process").

### B. The Prisoners have not established that another execution method is available to ADC that will significantly reduce a risk of severe pain.

Despite litigating the merits of their midazolam claim for the last four years, and pursuing discovery from numerous other states regarding their lethal-drug

suppliers, the Prisoners failed to offer any evidence that their proposed alternative execution drugs are actually available to the ADC for use in executions.  This is why the Arkansas Supreme Court dismissed their midazolam claim on the merits three years ago in *Kelley v. Johnson*, 2016 Ark. 268, 496 S.W.3d 346, and why the Eighth Circuit vacated this Court's stays of execution in *McGehee v. Hutchinson*, 854 F.3d 488 (8th Cir. 2017).  In *Kelley*, the Arkansas Supreme Court expressly rejected the Prisoners' "commercial availability" argument.  Likewise, as the Eighth Circuit confirmed on appeal in this case, it is the Prisoners' burden to prove that the State has "access to the alternative" and can "carry out the alternative method relatively easily and reasonably quickly."  *Id.* at 493 (citing *Arthur v. Comm'r, Ala. Dept. of Corr.*, 840 F.3d 1268, 1300 (11th Cir. 2016, *cert. denied*, 137 S. Ct. 725 (2017)).  "When availability (or effectiveness) of an alternative is more speculative, a State's refusal to discontinue executions under the current method is not blameworthy in a constitutional sense."  *Id.* (citing *Baze*, 553 U.S. at 67).  In reversing this Court's preliminary injunction staying all executions, the Eighth Circuit rejected the "reasonable possibility" standard urged by the Prisoners and found that the proof they adduced "is too uncertain to satisfy the rigorous standard under the Eighth Amendment." *Id.*

Under *Kelley* and *McGehee*, this Court is bound to enter judgment in favor of the State on the midazolam claim.  The Prisoners did not produce evidence of even one supplier who is willing and able to sell the proposed alternative execution drugs to Arkansas.  Instead, the Prisoners continue to rely on the same theory of

availability that has already been rejected by both the Arkansas Supreme Court and the Eighth Circuit. This alone is fatal to their cruelty claim. In addition, their secobarbital proposal fails because that drug has never been used as a method of execution. The State established at trial that secobarbital is particularly unsuitable for use as an execution drug because it often takes hours or even days to work and, sometimes, does not work at all. The Constitution does not require Arkansas to be the first state in the nation to adopt secobarbital as a method of execution. *See Bucklew*, *supra*, slip op. at 22 ("The Eighth Amendment prohibits States from dredging up archaic cruel punishments or perhaps inventing new ones, but it does not compel a State to adopt 'untried and untested' (and thus unusual in the constitutional sense) methods of execution."). The Court should find that the Prisoners failed to prove that either secobarbital or pentobarbital are available alternative execution methods. *See McGehee*, 854 F.3d at 493 (holding that "[t]he possibility that Arkansas could acquire pentobarbital for use in executions is too speculative to justify stays of execution").

The Prisoners' firing-squad claim is barred by *res judicata* and collateral estoppel. The Arkansas Supreme Court dismissed that claim on the merits in *Johnson*, 2016 Ark. 268, at 19-20, 496 S.W.3d at 359-60, and the law prevents the Prisoners from having a second round of litigation on that same factual issue in federal court. *See Lane v. Peterson*, 899 F.2d 737, 742-44 (8th Cir. 1990) (explaining that *res judicata* applies when the claims arise out of the same nucleus of operative facts). In addition, and in any event, Arkansas adduced evidence that

13

the use of a firing squad may actually *increase* the risk of pain to which the Prisoners are subjected.  There is no dispute that, if the marksmen miss, a firing squad would cause an excruciatingly painful death.  Accordingly, this Court should hold that the Constitution does not require Arkansas to resurrect this archaic execution method that has been abandoned by 49 states and the United States military.  *See Bucklew*, 139 S. Ct. at 1129-30 (holding that, where a proposed alternative only results in a "minor reduction in risk," "the State ha[s] a 'legitimate' reason for declining to switch from its current method of execution as a matter of law") (citing *Baze*, 553 U.S. at 52).  As the Eighth Circuit held in *McGehee*, "[t]he firing squad has been used by only one state since the 1920s."  493 F.3d at 494.  "It requires trained marksmen who are willing to participate and is allegedly painless only if volleys are targeted precisely."  *Id.*  As it did in 2017, the record after trial "comes short of establishing a significant possibility that the use of a firing squad is readily implemented and would *significantly reduce* a substantial risk of severe pain."  *Id.* (emphasis in original).

 For all of the foregoing reasons, the Prisoners' midazolam claim fails on the merits, and the Court should enter judgment in favor of the State on Claim I.

## II. The Prisoners did not prove that ADC's application of consciousness check procedures violates Equal Protection.

 The scant evidence adduced at trial on Claim II is insufficient to show that ADC has a pattern and practice of deviating from its consciousness-check procedures in ways that increase the risk of pain to which the Prisoners will be

subjected as required to prove an Equal Protection claim.  *See Zink v. Lombardi*, No. 12-04209-CV-C-BP, 2014 WL 11309998, at *10 (W.D. Mo. May 2, 2014) (citing *In re Ohio Execution Protocol Litig.*, 840 F. Supp. 2d 1044, 1054-55 (S.D. Ohio 2012) and *Towery v. Brewer*, 672 F.3d 650, 660 (9th Cir. 2012)).  The evidence at trial demonstrated that ADC applied the consciousness check procedures consistently from execution to execution in April 2017.  In each instance, ADC confirmed that the inmate was unconscious and insensate to pain prior to administering the lethal drugs.  Each and every eyewitness to the April 2017 executions testified that he or she observed the designee performing the consciousness checks and applying various graded stimuli—up to and including painful stimuli like rubbing the inmates' eyeballs, strong pinches, and sternal rubs—to see if the inmates would react.  And all but one of the eyewitnesses testified that they saw and heard ***no reactions at all*** from the Arkansas inmates during the consciousness checks.

The Prisoners offer only rank speculation— based on Mr. Kissel's supposedly reading the designee's lips—to suggest that the execution of Marcel Williams proceeded despite concerns that he was still conscious. But contrary to that speculation, the designee, other ADC participants, and citizen witnesses to Marcel Williams's execution offered credible testimony that Mr. Williams was completely unconscious and nonresponsive to any painful stimuli before ADC completed the execution.  Thus, the events of Marcel Williams's execution do not support the Equal Protection claim.

Nor is there any Equal Protection claim based on the events of Kenneth Williams's execution.  The "groan" purportedly heard by two witnesses to Kenneth Williams's execution—out of over 35 participants, guards, and citizen witnesses— does not establish that ADC deviated from the protocol in a way that subjects the Plaintiff Prisoners to a higher risk of pain during their executions.  While one of Mr. Williams's attorneys, Cassandra Belter, testified that the groan was in response to a painful pinch to the shoulder, her testimony on that point (as with most of the rest of her testimony, as well) was not corroborated by any other witness.  The other witness to the groan, AP reporter Kelly Kissel, stated repeatedly that he could not recall the timing of it confirmed that neither he nor the other witnesses "linked" the groan to the consciousness check.  In other words, he did not understand the groan to have been in response to a painful pinch.  Mr. Kissel repeatedly testified, moreover, that at no point did Kenneth Williams respond in any way to the consciousness checks or appear to be in pain or struggling.  Indeed, according to Mr. Kissel, the noise did not sound like a cry of pain at all, but rather the body simply giving up or releasing air.  Mr. Kissel also confirmed that the designee was constantly monitoring Mr. Williams's status at all times throughout the entire procedure, checking for problems and signs of consciousness.  Thus, far from showing a substantial deviation from the protocol, Mr. Kissel's testimony confirms that the designee followed the protocol precisely.

As shown, the Prisoners' evidence falls woefully short of proving that ADC has exhibited a pattern and practice of substantially deviating from its execution

protocol in any way that would increase the risk of pain to which the Prisoners will be subjected.  Indeed, even if the Prisoners had proof that Arkansas had materially deviated from its protocol by failing to apply medical-grade stimuli to assess consciousness (and they do not), that would not support an Equal Protection claim since execution safeguards are not required to match a medical standard of care. *Arthur v. Commissoner, Ala. Dept. of Corr.*, 840 F.3d 1268, 1313-14 (11th Cir. 2016) (following *Baze* and *Glossip* and holding that, because a medical-grade pinch is not required under the Constitution, there can be no Equal Protection claim that such a medical-grade pinch is not uniformly performed), *cert. denied sub nom. Arthur v. Dunn*, 137 S. Ct. 725 (2017) (mem.).  Under *Arthur*, the Prisoners have no Equal Protection claim based on medical standards of care such as the consciousness-check procedures.  *See id.*; *see also Thorson*, 701 F.3d at 448 (holding that, under *Baze*, visual "lay-monitoring" of inmates' consciousness during an execution satisfies the Constitution).

For all of these reasons, the Court should enter judgment in favor of the State on Claim II.

## III.  ADC's execution viewing policies do not violate federal law.

In Claims III and IV of the Amended Complaint, the Prisoners maintain that ADC's execution policies violate their First Amendment right of access to the courts and their alleged right to counsel under 18 U.S.C. § 3599.  These claims fail for five reasons.

First, as established by Director Kelley and other ADC witnesses and confirmed by the Prisoners' own witness, AP Reporter Kelly Kissel, the challenged execution policies have been in place for over a decade. ADC policy has never permitted multiple attorneys for the condemned to witness an execution or to bring cell phones into the prison or viewing chamber. ADC has never allowed anyone to witness the placement of IV lines or gurney tie-down procedures. ADC has always turned the microphone off in the execution chamber during executions. ADC has never announced the time at which each separate drug is administered. The Prisoners' policy claims are, therefore, time-barred. *See, e.g.*, *Bucklew v. Lombardi*, 783 F.3d 1120, 1128-29 (8th Cir. 2015).

Second, as detailed in the State's summary-judgement papers, the Prisoners' policy claims are barred by *res judicata* and collateral estoppel because these claims were—or could have been—adjudicated on the merits in prior lawsuits involving challenges to other parts of ADC's execution procedures. *See Allen v. McCurry*, 449 U.S. 90 (1980) (holding that the rules of *res judicata* and collateral estoppel apply in § 1983 actions and encompass both civil and criminal state-court judgments and decisions); *see also Nooner v. Norris*, 594 F.3d 592 (8th Cir. 2010) (rejecting Arkansas inmates' challenges to other provisions of ADC's lethal-injection protocol); *Hobbs v. McGehee*, 2015 Ark. 116, 458 S.W.3d 707 (rejecting the Prisoners' federal and state constitutional challenges to the ADC's procedures regarding the selection, training, and qualifications of members of the execution team and the method by which the drugs would be injected).

Third, the protocol claims fail because they rest on the inmates' speculative contention that something could go wrong during future executions and that ***might possibly*** cause a deprivation of their legal rights.  Claims based on hypothetical future events—like Prisoners' claims here—fails as a matter of law.  *See Bucklew*, 139 S. Ct. at 1134 (explaining that "federal courts 'can and should'" dismiss method-of-execution lawsuits that are "based on 'speculative' theories").

Fourth, the policy claims are moot in light of the Joint Proposed Execution Viewing Policy.  While Defendants believe ADC's viewing policy as written is constitutional, Director Kelley confirmed that ADC will continue to comply with the Joint Proposed Execution Viewing Policy negotiated by the parties in this case, until such time as it becomes impossible for her to do so (if, for example, the law should change and require cell phone jamming in prisons).  As a result, the Court should hold that the Prisoners' viewing policy claims are moot.

Fifth, the policy claims also fail on the merits.  There is no basis for the Prisoners' request for a permanent injunction requiring ADC to permit attorneys for inmates to witness IV placement.  As a matter of law, IV placement does not implicate the Eighth Amendment.  *See Thorson v. Epps*, 701 F.3d 444, 447-48 (5th Cir. 2012) (rejecting inmate's argument concerning a lack of contingency plans for problematic IV placement as both "groundless" and "purely hypothetical"); *Raby v. Livingston*, 600 F.3d 552, 558 (5th Cir. 2010) (rejecting claim based on IV insertion procedure because "any minor pain involved in multiple attempts to find an adequate vein" does not present "any potentially constitutionally significant risk of

pain"); *Hill v. Lockhart*, 791 F. Supp. 1388, 1394 (E.D. Ark, 1992) ("On the rare occasion when there is difficulty in locating a vein, more than a single needle insertion may be necessary.  This is hardly the cruel and unusual punishment contemplated by the Eighth Amendment.").

ADC's other policies likewise do not burden Plaintiffs' ability to access the courts or counsel.  ADC follows a detailed written execution protocol and announces when an execution begins.  It is obvious to everyone in the witness room when the first drug is administered and when the consciousness check is performed five minutes later.  It is equally obvious—based on the protocol and the timing of the consciousness check—when the second and third drugs will be administered.  ADC allows a condemned inmate to have an attorney witness his execution, and ADC provides access to both landline telephone and fax lines that can be used to contact the courts as necessary during an execution.  Neither the Constitution nor federal statute requires anything more.

The fact that the Prisoners cannot cite any authority from anywhere in the country in support of their policy claims demonstrates the Prisoners' claims are utterly and completely meritless.  No court in the country has found that the Prisoners' proposals are constitutionally required.  Indeed, it is obvious that the Prisoners seek to have this Court micromanage Arkansas's execution process and impose the Prisoners' purported "best practices." .  But this Court cannot—and should not—do so.  *See Baze*, 553 U.S. 51 (holding that federal courts cannot serve as "boards of inquiry charged with determining 'best practices' for executions" as

doing so would "substantially intrude on the role of state legislatures in implementing their execution procedures").

For each and all of these reasons, the Court should enter judgment in Defendants' favor on Counts III and IV.

## CONCLUSION

For all of the foregoing reasons, the Court should deny the Prisoners' requests for declaratory and injunctive relief, enter judgment in favor of the State, and dismiss the Prisoners' Amended Complaint with prejudice.

Respectfully submitted,

LESLIE RUTLEDGE
Attorney General

NICHOLAS J. BRONNI (2016097)
Solicitor General

JENNIFER L. MERRITT (2002148)
Senior Assistant Attorney General
323 Center Street, Suite 200
Little Rock, Arkansas  72201
Tel.:  (501) 628-1319
Fax: (501) 682-2591
Email:  Jennifer.Merritt@ArkansasAG.gov

*Attorneys for Defendants*

## CERTIFICATE OF SERVICE

I, Jennifer L. Merritt, do hereby certify that on this 28th day of June, 2019, I electronically filed the foregoing with the Clerk of Court using the CM/ECF filing system, which shall send notification of the filing to any participants.

*Jennifer L. Merritt*