IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS

JASON McGEHEE et al.,

*Plaintiffs*

-and-

JUSTIN ANDERSON et al., *Intervenors*

v.                  No. 4:17-cv-00179-KGB

ASA HUTCHINSON, Governor of the State of Arkansas, and
WENDY KELLEY, Director, Arkansas Department of Correction,

*Defendants*

**PLAINTIFFS' POST-TRIAL REPLY BRIEF**

The State's response brief does nothing to undermine the compelling proof that midazolam is an ineffective sedative and that less painful alternative execution methods are readily available. For the reasons stated below—as well as for those already stated in Plaintiffs' post-trial brief—the Court should enter judgment for Plaintiffs on their claims and enjoin future executions with the midazolam protocol.

**I. Eighth Amendment**

As it already argued in its pre-trial brief, the State says it's entitled to judgment on the Eighth Amendment claim because the midazolam protocol doesn't "superadd" the infliction of pain for pain's sake. The argument is based on a faulty premise—that the Supreme Court's recent decision in *Bucklew v. Precythe*, 139 S. Ct. 1112 (2019), added a subjective element to the Eighth Amendment test. But *Bucklew* rejects that interpretation by its own terms, as Plaintiffs explained in response to the State's pre-trial brief (ECF

1

No. 166). Indeed, the State itself implicitly accepts this reality by analyzing the claim under the objective two-prong test stated in *Glossip v. Gross*, 135 S. Ct. 2726 (2015). *Glossip*, of course, did not "uphold [the midazolam protocol's] constitutionality," as the State asserts—it simply found no clear error in a different district court's finding that the protocol wouldn't cause unconstitutional suffering based on the evidence presented in that case. The proof here is different; the proof here is strong; the proof here shows that the midazolam protocol causes cruel and unusual suffering.

**A.   The midazolam protocol is very likely to cause suffering.**

The State's post-trial brief fails to engage Plaintiffs' trial proof. Most fundamentally, the brief miscomprehends the relationship between awareness and pain *as is relevant to the protocol*. It's hardly "bold" to say that awareness means pain *in this protocol*, which includes no analgesic agent but does include one drug known to cause suffocation and another known to cause extreme burning. Medical operations, on the other hand, involve powerful narcotic painkillers, significantly reducing the chance that a patient feels pain if aware. In any case, the State's confused, broad-stroke critique doesn't address what actually matters here: the data. And the data show that at least seventy-two percent of patients given a dose of midazolam at or around the ceiling dosage (plus a narcotic) were aware during their surgery. An awareness rate of that level during the executions means that the condemned is very likely to be cognizant of the excruciating pain from the second and third drugs.

Insofar as the State addresses the actual trial proof, it focuses its energies on midazolam's ceiling effect. Its arguments misfire. While Dr. Stevens would surely be flattered by the credit the State gives him for discovering midazolam's ceiling effect, the phenomenon has already been widely accepted by other scientists and doctors. It emerges inexorably from the drug's mechanism of action, finds real-world application in benzodiazepines' inability to kill healthy people even at high doses, and is accepted by even Dr. Antognini. As for Dr. Buffington, the State makes no attempt to defend his unsupported theory that extra-synaptic GABA receptors eliminate the ceiling effect (or any of the other errors in his testimony, for that matter). Regarding the level at which the ceiling effect occurs, the State demeans the Inagaki and Miyake studies as "small." This adjectival attack doesn't undercut the fact that these human studies, using two very different methods, each discovered that midazolam began to hit its ceiling at around 0.3 mg/kg (Miyake) or 0.4 mg/kg (Inagaki). Even Dr. Antognini has admitted that he would expect to see the ceiling effect kick in at 20–25 mg.

Unable to undermine the data, the State falls back on its usual tactic of repeating that midazolam can cause general anesthesia and pointing to every instance of the phrase it can find in the literature. Of course, the American Society of Anesthesiologists, whose chart the State relies upon, says that midazolam *is not a general anesthetic*, as established in the cross-examination of Dr. Antognini. In any case, stray references to "general anesthesia" in the literature do not home in on the specific question relevant to this case:

3

whether midazolam renders the prisoners insensate to vecuronium bromide and potassium chloride. Plaintiffs have already addressed the State's misconceptions about the FDA label and the difference between induction and maintenance anesthesia in their original post-trial brief. They need not repeat those arguments here. Suffice it to say that ten thousand invocations of the term "general anesthesia" wouldn't answer the scientific proof Plaintiffs presented at trial: when patients are given midazolam at or above the dosage at which the drug is known to have no additional effect, an extraordinarily high percentage of them remain aware under surgery. When prisoners are given a dosage above the ceiling effect, the result is no different. Awareness during the analgesia-free midazolam protocol means awareness to suffocation and burning.

The executions bolster the science. The State can't plausibly deny that condemned men frequently move during midazolam executions, so it seeks to downplay the movements as "minor" or some "involuntary" reaction that resulted as a side effect of midazolam. Regardless of how the State characterizes the movements, the anesthesiologists agreed that Kenneth Williams and Marcel Williams exhibited significant airway obstruction—not one of the many other conditions that the State tried to establish through the less weighty opinions of the pathologists. As Dr. Van Norman explained, airway obstruction has a tendency to rouse the condemned from whatever sedation the midazolam exhibits. And the record of both the Arkansas executions and midazolam executions in other states contradicts the State's assertion that no prisoner

has shown a physical response to a consciousness check. Indeed, even were the State correct that the prisoners didn't respond to a check, that would have little bearing on the relevant question—whether they remained aware. As Dr. Van Norman explained, GABAergic drugs can prevent response even in patients who are aware and able to experience pain. *Cf.* Pls.' Ex. 35 at 7–9.

The State is ultimately left with the testimony of its lay witnesses who perceived no pain. This testimony is entitled to little weight. Besides its subjective nature, it doesn't account for the fact that the prisoners received a paralytic drug *expressly designed to prevent expressions of suffering*. The State claims to find objective indicia of painlessness in pulse oximeter readings that remained normal "until the end"—that is until the second drug began to cut off the prisoner's oxygen. But the State presented no proof that elevated pulse-ox readings mean absence of pain or (more relevant) awareness. To the contrary, the only evidence about the import of the pulse ox came from Dr. Van Norman, who explained in rebuttal that the readings undercut the State's theory that the condemned suffered from hypoxia during administration of midazolam.

The question, ultimately, is awareness: does the evidence show that the condemned are aware when the second and third drugs come onboard, such that they are sensate to pain? The science says that's so, and the experience of the executions independently supports the science. As Dr. Van Norman testified, groaning in response to a

consciousness check, eye movement, and movements of the head and arms all signal that the condemned remained aware when the paralytic and potassium were injected.

**B.     Readily available alternatives would substantially reduce suffering.**

The State's position on alternatives relies heavily on its twice-rejected *res judicata* argument. For reasons Plaintiffs have already argued, and the Court has already found, Plaintiffs aren't barred from presenting alternatives.

As for the drug alternatives, the points in Plaintiffs' post-trial brief stand. The Eighth Circuit's requirement that the State have "access to the alternative" doesn't require prisoners to locate a supplier for the department of corrections. Secobarbital is widely available, as Dr. Blanke testified; pentobarbital is also accessible, as indicated by the fact that numerous other states have accessed it. And there's been a meaningful change since the Eighth Circuit's opinion in *McGehee*: the State has passed a law making it a felony to disclose the identity of the drug supplier. This law will make it easier for the State to get execution drugs. The ADC's four-year suspension of its pentobarbital search doesn't show the drug is unavailable, particularly given the change in the law meant to open up drug supply. Secobarbital—a barbiturate already authorized for use in executions under Ark. Code Ann. § 5-4-617(c)(1)—is available under the same rationale.

Finally, even if availability of the drug alternatives is in question, availability of firing squad is not. Director Kelley admitted that firing squad is feasible. Moreover, the State offered no proof to rebut the evidence that a firing squad will significantly reduce

6

the suffering that the midazolam protocol causes. The State's argument in its brief relies entirely on the possibility that the marksmen miss. That's no different from prisoners arguing that lethal injection is unconstitutional because the IV team might make a mistake—an argument the Eighth Circuit has rejected. *See Nooner v. Norris*, 594 F.3d 592, 601–02 (8th Cir. 2010). If prisoners can't rely on the possibility of maladministration to make Eighth Amendment claims, neither can the State rely on the possibility of maladministration to defeat an alternative execution protocol that will reduce suffering if applied without error.

## II. Equal Protection

Plaintiffs' Equal Protection claim arises not from the failure to apply medical-grade stimuli, but rather from the failure to equally apply a safeguard that is supposed to prevent the condemned from being injected with the second or third drugs while aware (regardless of whether the safeguard actually serves that function). This theory of Equal Protection is valid if "plaintiffs [are] able to show an actual pattern of treating prisoners differently in ways that did affect the *risk* of pain to which they would be subjected, and therefore the *risk* of being subjected to cruel and unusual punishment." *Towery v. Brewer*, 672 F.3d 650, 660 (9th Cir. 2012).

Ultimately this claim comes down to a factual determination: did the ADC follow its consciousness-check protocol for each condemned inmate during the April 2017 executions? Of course, the ADC witnesses say they applied the protocol flawlessly, but

that confidence isn't the whole story. Kelly Kissel credibly testified that the designee said "I don't know" after the consciousness check of Marcel Williams—and the State has offered no reasonable explanation to rebut the logical inference that the designee didn't know whether Williams was unconscious. Likewise, for the purpose of this claim, the State is splitting hairs when it argues that Kenneth Williams emitted a groan around the time of the consciousness check rather than in immediate response to a consciousness check. Though the Court should find Cassandra Belter's testimony credible on this point, Kissel's less detailed version doesn't help the State. Either way, the ADC injected the second and third drugs after Kenneth Williams groaned. And this was after the Director testified at the preliminary-injunction hearing that movements would occasion a second round of midazolam and more consciousness checks.

To reiterate, the consciousness checks provide no real protection because they don't approximate the stimulus of the second and third drugs and because midazolam can't render the prisoners insensate to these drugs. But if the midazolam protocol were facially valid (which it is not), the State would be bound to ensure that it adequately confirmed unconsciousness before proceeding with the execution. The evidence shows that the ADC failed to meet that obligation here.

### III. Access to Courts and Counsel

The State bears the burden of pleading and proving affirmative defenses such as statute of limitations and *res judicata*. *See Walker v. Barrett*, 650 F.3d 1198, 1203 (8th Cir.

2011). But in opposing Plaintiffs' access claims, the State points to little trial proof establishing that these defenses are valid. And it fails to add meaningfully to the summary-judgment arguments, which the Court has already addressed in denying summary judgment on these claims. Plaintiffs briefly summarize these arguments (stated more fully at ECF No. 150), incorporating the trial proof where needed.

**Statute of Limitations.** First, the statute of limitations doesn't require dismissal because, even if the State's analysis is correct, Intervenor Latavious Johnson filed his claims within the three-year limitations period. Second, the State's analysis is incorrect because the ADC added midazolam to the protocol and changed its viewing policies in 2015. *Compare* Defs.' Ex. 79 at 2 (2008 policy permitting "counsel" to witness the execution while excluding victim family members from the witness area) *with* Defs.' Ex. 32B at 3 (2015 policy permitting "an attorney" to witness the execution while including up to six victim family members in the witness area). The addition of midazolam, in particular, meaningfully affected the protocol by heightening the risk that the prisoners' counsel would need to access a court during the executions (as in fact happened in 2017).

*Res judicata*. First, the defense is waived. Second, the access claims weren't actually litigated, as required by Arkansas law. Third, problems with the April 2017 executions created new material facts and a new basis for the claims.

**"Speculative" claims**. The claims aren't speculative because Plaintiffs have pointed to multiple concrete occurrences during the April 2017 executions that occasioned the need for attorney access. As the Court held in denying summary judgment, Plaintiffs have standing to bring these claims.

**Mootness**. The State overstates Director Kelley's commitment to maintaining the Joint Execution Viewing Policy. She made continuation of the Joint Policy contingent, saying she doesn't intend to renege on the agreement while she remains director. Personal assurances to avoid a court order aren't sufficient. This is a classic instance of the voluntariness exception to mootness. Unless it's clear that the allegedly wrongful conduct won't reoccur, the claim isn't moot. *See Young v. Hayes*, 218 F.3d 850, 852 (8th Cir. 2000) (quoting *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167 (2000)). The ADC could abandon the Joint Policy on a whim. Director Kelley couldn't reassure the Court that the ADC won't rescind the policy if she leaves the agency or if some indeterminate cell-phone jamming statute comes to Arkansas. The claim isn't moot. The Court would remedy the harm as it relates to multiple-attorney access and phone access by incorporating the Joint Policy into the judgment.

**Merits**. The parties have already briefed the merits of this claim in the motion to dismiss and the motion for summary judgment. None of the trial proof changes the merits analysis.

For sure, the State asserts that, as a matter of law, the ADC's restrictions don't implicate Plaintiffs' right of access to courts. They say no authority supports the access claims, but in denying the motion to dismiss the Court analyzed multiple opinions accepting such claims. *See* ECF No. 53, Order at 55–59 (discussing *Cooey v. Strickland*, *Hoffman v. Jindal*, and *Coe v. Bell*). In light of these authorities and the Court's earlier analysis, the State's argument is easily rebutted as to each viewing policy at issue here:

- **Multiple attorneys and phone access.** The Court has already found these prohibitions to burden the right of access. *Id*.

- **Viewing the entirety of the execution.** Though the State cites authority saying "more than a single needle insertion" wouldn't create cruel and unusual punishment, Plaintiffs have proven more than that. It took forty-five minutes for the ADC to establish a vein for Marcel Williams. As the court explained in *Coe*, the right "requires that counsel have some access to the prisoner during the last hour before the execution and be permitted to witness his execution." 89 F. Supp. 2d 962, 966 (M.D. Tenn. 2000). Saying that the "execution" excludes insertion of the lines used solely to kill the prisoner does violence to the English language.

- **Access to information about when the drugs are injected.** The State claims that the timing of the second and third drugs is "obvious." The claim is outrageous in light of the evidence. Multiple witnesses said they had no idea when the drugs were injected. Only the ADC witnesses in the chamber had any knowledge of

that, and Director Kelley actually permitted her notes about the timing of the injections to be destroyed. The ADC's unjustified monopoly on this evidence burdens Plaintiffs' right of access to courts.

As the policies burden Plaintiffs' rights, *Turner v. Safley*, 482 U.S. 78 (1987), requires the State to justify its restrictions on access. But its brief fails to assert any such justifications. For the reasons already stated in Plaintiffs' post-trial brief, the Court should enter judgment for Plaintiffs on these claims.

## CONCLUSION

The Court should enjoin future use of the midazolam protocol and should enter judgment for Plaintiffs as stated in Plaintiffs' post-trial brief.

Date: July 9, 2019                                    Respectfully submitted,

                                                      LISA G. PETERS
                                                      FEDERAL PUBLIC DEFENDER


                                                      JOHN C. WILLIAMS, ABN 2013233
                                                      Assistant Federal Public Defender
                                                      Federal Public Defender's Office
                                                      1401 W. Capitol, Suite 490
                                                      Little Rock, AR 72201
                                                      Telephone: 501.324.6114
                                                      E-mail: john_c_williams@fd.org

                                                      *Counsel for Plaintiffs*